NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone: 949.833.7800
Facsimile: 949.833.7878

Attorneys for Defendant and Counter-claimant
RTZ ASSOCIATES, INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC., | Case No: 4:24-cv-01132-JST |
| Plaintiff, | Assigned to: Hon. Jon S. Tigar |
| vs. | **DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT** |
| RTZ ASSOCIATES, INC.; and DOES 1 through 10, | |
| Defendants, | *[Concurrently filed with Declaration of David C. Lee; and [Proposed] Order]* |
| | Date: July 2, 2026 |
| | Time: 2:00 p.m. |
| | Courtroom: 6 |
| RTZ ASSOCIATES, INC., | |
| Counter-claimant, | |
| vs. | |
| INTUS CARE, INC., | |
| Counter-defendant. | |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 2, 2026, at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Jon S. Tigar in Courtroom 6, located at 1301 Clay Street, Oakland, California 94612, Defendant RTZ Associates, Inc. ("RTZ") will and hereby does move to exclude the opinions and testimony of Plaintiff IntusCare, Inc.'s ("Intus") proffered damages expert, Dr. Kristopher Hult ("Hult"), pursuant to Federal Rule of Evidence 702. In the alternative, RTZ moves the Court for an order excluding each discrete category of Hults damages opinions that rests upon the methodological deficiencies identified in the accompanying Memorandum of Points and Authorities.

This motion is made on the grounds that Hult's expert report and opinions fail to satisfy the requirements of Federal Rule of Evidence 702 because they are not based on sufficient facts or data, are not the product of reliable principles and methods, and do not reflect a reliable application of those principles and methods to the facts of this case.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of David C. Lee and exhibits attached thereto, [Proposed] Order, all the files and pleadings in this action, and such further oral argument and evidence as may be presented at the hearing on this Motion.

Dated:  May 28, 2026

NOSSAMAN LLP
DAVID C. LEE
KASIA PENN

By:_____
       David C. Lee

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

**TABLE OF CONTENTS**

I.      INTRODUCTION                                                                                          1

II.     LEGAL STANDARD                                                                                  2

III.    ARGUMENT                                                                                            4

        A.      Hult's Assumption that Intus Lost Data Access in September 2022 Is
                Contradicted by the Record.                                                          4

        B.      The Pre-Existing Contracts Category ($182,512) Is Contradicted by
                the Evidence as to Each Account.                                                  5

                1.      BoldAge ($106,340).                                                              5

                2.      Community PACE at Home ($7,380).                                       6

                3.      Senior Care Partners PACE ($51,542).                                   7

                4.      Neighborhood Healthcare PACE ($17,250).                            7

        C.      The "Unobservable" Lost-Revenue Category ($4,048,059) Is Built
                Entirely on Speculation.                                                               7

                1.      The Core Assumption Is Untestable.                                        9

                2.      The Data Are Insufficient.                                                        11

                3.      The Forward Extrapolation Has No Evidentiary Basis.             12

                4.      The Conduct-Period Cutoff Undermines the Pre-Period Test.  12

                5.      Hult's RTZ-Client Classification Error Invalidates the
                        Difference-in-Differences Model.                                            13

        D.      The CRM-Based Damages ($8,942,498) Rest on Unverified, Self-
                Serving Plaintiff Designations                                                        13

        E.      The Underlying CRM Data Is Riddled with Anomalies Suggesting
                Litigation-Driven Fabrication.                                                        15

        F.      Intus' Own Sales Records Show Intus Received Revenue from
                Products Hult Claims Were "Lost."                                                  17

        G.      Hult's Renewal Revenue Projection ($3,696,519) Impermissibly Rests
                on a Pyramid of Speculative Inferences.                                         18

        H.      The $164,658 in "Labor Costs" Were Never Verified or Validated, But
                Instead Generated with AI-Assistance.                                            19

        I.      Hult Ignores Alternative Causes and Mitigation.                           21

        J.      Hult's Profit-Margin Conversion Uses an Arbitrarily Narrow Seven-
                Month Window.                                                                             22

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

K.    Hult Applies the Risk-Free Treasury Rate to Discount Inherently Uncertain Cash Flows. 22

IV.    CONCLUSION 22

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azco Biotech, Inc. v. Qiagen, N.V.*,
   No. 12CV2599 BEN (DHB), 2015 WL 12516014 (S.D. Cal. Nov. 12, 2015)...............3, 4, 18

*Clausen v. M/V New Carissa*,
   339 F.3d 1049 (9th Cir. 2003) ........................................................................................3, 14

*Columbia First Bank, FSB v. United States*,
   60 Fed. Cl. 97 (2004) ...........................................................................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...........................................................................................................1, 2

*De Coster v. Amazon.com, Inc.*,
   No. 2:21-CV-00693-JHC, 2025 WL 1970287 (W.D. Wash. July 1, 2025).............................9

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..................................................................................................3, 12, 14

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ........................................................................................3, 14

*IceMOS Tech. Corp. v. Omron Corp.*,
   No. CV-17-02575-PHX-JAT, 2019 WL 5960069 (D. Ariz. Nov. 13, 2019) ..........................3

*Jacked Up, LLC v. Sara Lee Corp.*,
   291 F. Supp. 3d 795 (N.D. Tex. 2018), aff'd, No. 3:11-CV-3296-L, 2018 WL
   2064126 (N.D. Tex. May 2, 2018)........................................................................................20

*Jian-Ming Zhao v. RelayRides, Inc.*,
   No. 17-CV-04099-JCS, 2018 WL 2096854 (N.D. Cal. May 7, 2018) ....................................3

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................................................2

*Lyman v. St. Jude Med. S.C., Inc.*,
   580 F. Supp. 2d 719 (E.D. Wis. 2008)...................................................................................20

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ...........................................................................10, 11, 14, 15

*Mukhtar v. Cal. State Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002) ............................................................................................21

-iv-

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008) ...........................................................................................3, 9

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
  360 F. Supp. 3d 994 (N.D. Cal. 2018), aff'd, 815 F. App'x 117 (9th Cir. 2020) .................3, 18

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
  55 Cal. 4th 747 (2012) ..............................................................................................................3

**Other Authorities**

Fed. R. Evid. 702 ...................................................................................................... *passim*

Fed. R. Evid. 702(b)................................................................................................... *passim*

Fed. R. Evid. 702(c)...................................................................................................................7, 19

Fed. R. Evid. 702(d)...............................................................................................................9, 13, 21

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

## I.    INTRODUCTION

To support its damages case, Plaintiff IntusCare, Inc. ("Intus") retained Dr. Kristopher Hult ("Hult"), who opines that ███████████. *See* Declaration of David C. Lee ("Lee Decl."), Ex. 1 [Expert Report of Dr. Kristopher Hult ("Hult Rep.")] ¶ 22. ███████████. *Id.* ¶ 67. ███████████ *Id.* ¶ 31. Simply put, the analysis in Hult's report cannot survive Rule 702 or *Daubert* as it is derived from unsupportable assumptions that ignore or contradict the evidence to reach Intus' damages goals. ███████████ *Id.* ¶ 42. ███████████ *Id.* ¶ 43. ███████████ *Id.* ¶¶ 43–44, 67, Ex. 10.

Nearly every dollar of Hult's headline number is built on layers of improper assumptions rather than verified fact. His regression analysis ███████████ depends on premises that he never attempts to verify, and which are contradicted by the actual evidence. ███████████



—without any effort to account for the many other reasons that a competitor might have been selected over Intus, even though Intus was a new company without any track record in this business.

RTZ respectfully requests that the Court exclude Hult's opinions in their entirety. At a minimum, the Court should exclude each discrete category of damages that is based upon the methodological defects identified below.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 assigns to the trial court a "gatekeeping" obligation to ensure that expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The gatekeeping duty extends to all expert testimony, including economic damages analyses. *Kumho Tire*, 526 U.S. at 147.

As amended effective December 1, 2023, Rule 702 provides that a witness may offer expert testimony only if the proponent demonstrates to the court, by a preponderance of the evidence, that: (a) the expert's specialized knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. The amendment rejected prior decisions treating reliability as a weight-rather-than-admissibility question; the Advisory Committee made clear that "each of these admissibility requirements" must be "established by a preponderance of the evidence" before expert testimony reaches the jury. Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

It is not enough for an expert to possess credentials and offer a conclusion. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); see also *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). Expert testimony must rest on "more than subjective belief or unsupported speculation." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059–60 (9th Cir. 2008). And an expert who simply assumes critical inputs rather than independently analyzing them is not applying a reliable method. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

These principles apply with special force to lost-profits opinions. Courts have repeatedly excluded damages projections that are speculative or that do not account for alternative causes. *See Jian-Ming Zhao v. RelayRides, Inc.*, No. 17-CV-04099-JCS, 2018 WL 2096854, at *5 (N.D. Cal. May 7, 2018) (rejecting expert opinion on damages because there was no "evidentiary basis for the assumptions they used or demonstrat[ions] that the methodology was reliable"); *IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 5960069, at *13 (D. Ariz. Nov. 13, 2019) ("As a new business, Plaintiff may not rely solely on projections but instead must offer proof of profitability to establish lost profits with reasonable certainty."). California law, which supplies the substantive rule of decision for Intus's state-law claims, likewise imposes a rigorous gatekeeping standard on lost-profits testimony. See *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 770, 774 (2012).

Courts have applied these principles to exclude damages opinions that, like Hult's, assume causation, rest on a pyramid of speculative inferences, or rely on inputs the expert did not independently verify. *See, e.g.*, *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1021 (N.D. Cal. 2018), aff'd, 815 F. App'x 117 (9th Cir. 2020) (rejecting lost profits analysis of expert who "relied on 'no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises.'"); *Azco Biotech, Inc. v. Qiagen, N.V.*, No. 12CV2599 BEN (DHB), 2015 WL 12516014, at *2 (S.D. Cal. Nov. 12, 2015) (granting exclusion of expert opinion on lost profits because expert report failed

-3-

to base claims upon historical data or a similarly situated company). The likelihood that a lost profits opinion will be impermissibly speculative is especially high in cases like this one, in which the party alleging lost profits is a new and unestablished business: "Unestablished businesses generally cannot recover lost profits because such damages are 'uncertain, contingent and speculative.'" *Id.*

## III.   ARGUMENT

### A. Hult's Assumption that Intus Lost Data Access in September 2022 Is Contradicted by the Record.

Initially, Hult's entire analysis rests on his assumption ██████████████ ████████████ when RTZ allegedly ██████████████ ████████████████ Lee Decl., Ex. 1 [Hult Rep.] ¶¶ 14, 40. Hult concedes that ████████████████████ ████████ *Id.*, Ex. 11 [Rough Draft of Transcript of Deposition of Kristopher Hult ("Hult Tr.")] at 43:10-21. But this foundational premise is contradicted by Intus's own admissions. In its interrogatory responses, Intus admitted under oath that it had ongoing user access to the PACECare system licensed to RTZ-Intus common customers as recently as December 2024. *See id.* ¶ 3, Ex. 2 [Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories]. RTZ's internal audit of access logs further confirms that ██████████████ ████████████████████████ *Id.*, Ex. 3 [Expert Rebuttal Report of Peter Schwechheimer ("Schwechheimer Rep.")] ¶ 10 n.6; *see also id.*, Ex. 4 [Deposition of Michael Zawadski ("Zawadski Dep.")] 64:3–24 (confirming Intus could obtain all relevant electronic health record ("EHR") data through PACECare's expanded report functionality without RTZ support). In other words, Hult wrongly assumes that Intus was entirely "blocked" from accessing patient data as of September 2022, when the evidence shows that Intus continued to access that data for years afterwards.

Hult's September 2022 assumption appears to derive from ██████████████ ████████████████████████████████████ ████████████████████████████████████

*Id.*, Ex. 5 [Intus 002039-40]. But ███ does not show that access was terminated. To the contrary as demonstrated above, Intus's own interrogatory responses, deposition testimony, and RTZ's audit logs demonstrate that Intus's access to customer PACECare systems continued uninterrupted at multiple sites. An expert opinion premised on a factual assumption that is contradicted by Intus' own sworn admissions cannot satisfy Rule 702's requirement that testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b).

**B. The Pre-Existing Contracts Category ($182,512) Is Contradicted by the Evidence as to Each Account.**



However, as shown below, the evidence contradicts Hult's causation narrative for each of these accounts. ███ Lee Decl., Ex. 11 [Hult Tr.] at 33:23-25. ███ *Id.*, Ex. 1 [Hult Rep.] ¶¶ 49-50. ███ (*Id.*, Ex. 11 at 54:15-24) because ███ *Id.* at 55:15-17. But ███ *See id.*, Ex. 6 [Intus 019841].

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

*Id.* Moreover, Intus possessed the ongoing ability to access all relevant EHR data it needed from BoldAge through PACECare's "expanded report" functionality. *Id.*, Ex. 4 [Zawadski Dep.] at 64:3-24. Hult admitted in deposition that *Id.*, Ex. 11 [Hult Tr.] at 66:9-14. Thus, Hult's damages assumption that , and even though it continued to have access to BoldAge data.

*See id.*, Ex. 1 [Hult Rep.] ¶¶ 51-52; *id.*, Ex. 6 [Intus 019841-42].

*Id.*, Ex. 11 [Hult Tr.] at 67:13-68:6.

*Id.* at 71:2-12.

*Id.* at 68:19-69:24.

*Id.*, Ex. 3 [Schwechheimer Rep.] ¶ 16. Thus, Hult's analysis here is built upon just one irrelevant data point dated nearly one year after the alleged harm, and Hult's analysis fails to support any connection between the March 13, 2024 email and the claimed lost revenue.

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5



Lee Decl., Ex. 1 [Hult Rep.], Ex. 3.

*See id.*, Ex. 7 [Intus 002062]. Moreover, Intus has admitted it maintained system user access to Senior Care Partners' PACECare system throughout nearly the entire timeframe of Hult's claimed losses. *See id.* ¶ 3, Ex. 2 [Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One]. Again, Hult's analysis is founded upon no facts, and he is unable to identify any factual support because the evidence instead undermines his claims and conclusions.

Lee Decl., Ex. 1 [Hult Rep.], Ex. 3.

Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 19. Thus, to reach his conclusion that Intus's lack of data access caused lost revenues, Hult ignores the evidence of Intus' uninterrupted access to such data during the entire period. An expert opinion that attributes revenue losses to "data blocking" when RTZ's access-log audit confirm uninterrupted data access is not the product of "reliable principles and methods." Fed. R. Evid. 702(c).

**C. The "Unobservable" Lost-Revenue Category ($4,048,059) Is Built Entirely on Speculation.**

As a threshold matter, Hult's "unobservable" category rests on an assumption that these business opportunities actually existed in the first place. But there is no evidence that they did.

Lee Decl., Ex. 1 [Hult Rep.] ¶ 67.

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5



" *Id.*

*Id.*, Ex. 11 [Hult Tr.] at 146:25-148:10.

(*id.*, Ex. 1 [Hult Rep.] ¶ 70, Ex. 7).

*Id.*, Ex. 11 [Hult Tr.] at 149:9-22. That is not evidence of a lost business opportunity. It is rank speculation that Intus—a new and unproven start-up company—would have developed new business relationships with entities who were complete strangers to Intus.

*Id.*, Ex. 1 [Hult Rep.] ¶¶ 67–69.

*Id.* ¶ 67.

(*id.* ¶ 68)

(*id.* ¶ 69).

(*Id.* ¶¶ 68-69.)

(*Id.*)

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

*Id.*, Ex. 11 [Hult Tr.] at 152:9-153:13.

Further, because these wholly-theoretical opportunities have no transactional footprint, Hult cannot tie his opinion to any identifiable transaction. Instead, he resorts to a difference-in-differences regression, which is a method that employs foundational assumptions that are incapable of verification. The result is an opinion that rests on "subjective belief or unsupported speculation" rather than the "sufficient facts or data" Rule 702 demands. *Nationwide Transp. Fin.*, 523 F.3d at 1059–60; Fed. R. Evid. 702(b).

1. The Core Assumption Is Untestable.

Hult's difference-in-differences regression is admissible only if its foundational assumption—that treated and control groups would have followed parallel trajectories absent the alleged wrongdoing—can be tested against the facts of the case. Fed. R. Evid. 702(d) (requiring "a reliable application of the principles and methods to the facts of the case"); *De Coster v. Amazon.com, Inc.*, No. 2:21-CV-00693-JHC, 2025 WL 1970287, at *12 (W.D. Wash. July 1, 2025) (citing *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (a difference-in-differences regression requires that "a sample is representative—that is, it was not selected in a biased manner—sample size will not skew the results of the analysis.").



Lee Decl., Ex. 1 [Hult Rep.] ¶ 71.

*Id.*, Ex. 11 [Hult Tr.] at 166:1-24.

*Id.*, Ex. 1 [Hult Rep.] ¶ 73.

*Id.*, Ex. 1 [Hult Rep.] ¶ 71.

-9-

*Id.*

*Id.* There is thus no reliable basis for his resulting opinion. *See, e.g., McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (upholding exclusion of expert report where expert's speculation on lost profits had no basis in the record, did not consider market conditions, and simply attributed all lost profits to the acts of opposing party).

*See* Lee Decl., Ex. 1 [Hult Rep.] ¶ 81 *id.* ¶ 59 *id.* ¶ 96 .

If the treated group and the control group diverged for reasons unrelated to RTZ, then Hult's regression analysis reflects those differences and not any purported effect of RTZ's conduct. But Hult made no effort to account for any factors other than RTZ's purported information-blocking. For example,

*Id.*, Ex. 11 [Hult Tr.] at 156:14-157:3. Thus, Hult's core assumption that the revenue growth for the two client groups would be similar is unreliable and results in baseless conclusions. Because Hult's methodology "rests on unsupported assumptions and ignores distinctions crucial to arriving at a valid conclusion," his faulty opinions must be excluded.

-10-



*McGlinchy*, 845 F.2d at 807 (9th Cir. 1988) (upholding exclusion of expert report where expert's speculation on lost profits had no basis in the record, did not consider market conditions, and simply attributed all lost profits to the acts of opposing party).

### 2. The Data Are Insufficient.

The opinion is not based on the "sufficient facts or data" Rule 702(b) requires. ██████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Lee Decl., Ex. 1 [Hult Rep.] ¶ 82, Ex. 9. In statistical modeling, R-squared measures the proportion of variance in the dependent variable that the model actually explains. ████████████████████████████ ████████████████████████████ Crucially, the remaining 35.2%, *more than one-third of the total variation*, is left unexplained.

Further, Hult made no effort to control for client size, geography, contract vintage, or any other factors that could explain differential growth rates between RTZ-using and non-RTZ-using clients. ████████████████████████████████████ ████████████████████████ (*id.* ¶ 79), ████████████ ██████████ (*id.* ¶ 80), ████████████████████████████████ (*id. ¶ 81*), ████████████████████ (*id.* ¶ 82).

Each restriction further shrinks an already-small dataset, and distorts the reality of Intus' business. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Lee Decl., Ex. 1 [Hult Rep.] ¶ 80. ████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ *See* Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶¶ 55, 62–63. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

-11-

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5

Lee Decl., Ex. 1 [Hult Rep.] ¶¶ 81–82. A regression with so few observations and so many unexplained variables does not provide a reliable foundation for a $4 million damages opinion. *See Joiner*, 522 U.S. at 146 ("analytical gap between the data and the opinion proffered").

### 3. The Forward Extrapolation Has No Evidentiary Basis.

The extrapolation beyond the data likewise lacks any evidentiary foundation. Even accepting Hult's regression at face value, it captures data only from September 2023 through July 2025 (a period of less than two years).

Lee Decl., Ex. 1 [Hult Rep.] ¶¶ 85–86.

*Id.* ¶ 86. That thus assumes "unobservable" lost contracts would mirror the duration, implementation timing, and revenue profile of contracts Intus actually pursued. But the entire premise of this damages category is that these theoretical "opportunities" left no data footprint, making the extrapolation inherently untethered from any factual record. This is the type of speculative leap that Rule 702 is designed to prevent and that the Ninth Circuit has repeatedly held warrants exclusion. *See Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 121 (2004) (rejecting expert's multiplier for estimating lost profits in a but-for world because the multiplier was "insufficiently rooted in the evidence in the real world to support damages in any reasonably certain amount").

### 4. The Conduct-Period Cutoff Undermines the Pre-Period Test.

Hult's arbitrary conduct-period cutoff further undermines the reliability of his regression analysis.

Lee Decl., Ex. 1 [Hult Rep.] ¶ 78.

*Id.*

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5



Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 58. This inconsistency alone renders the regression unreliable under Rule 702(d).

     5.   <u>Hult's RTZ-Client Classification Error Invalidates the Difference-in-Differences Model.</u>

Hult utilizes the difference-in-differences approach for his regression analysis to measure the purported difference in growth rates between RTZ-using and non-RTZ-using customers. However, Hult makes a critical error in how he classifies his treatment group, and this error invalidates his analysis.

Lee Decl., Ex. 1 [Hult Rep.], Ex. 7; Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 52.

*Id.*

Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 52, Table 4.

**D.  The CRM-Based Damages ($8,942,498) Rest on Unverified, Self-Serving Plaintiff Designations**

For the second category of damages, Hult does not investigate causation. Rather, he assumes it.

Lee Decl., Ex. 1 [Hult Rep.] ¶ 31 (emphasis added).

*Id.*

-13-

*Id.* ¶ 57 (emphasis added).

*Id.*, Ex. 11 [Hult Tr.] at 86:1-19. He did not interview any of the 11 PACE entities. He did not review communications between those entities and RTZ. He did not analyze whether those entities chose a competitor for product, pricing, service, competition, customer budget or strategic reasons unrelated to the disputed data access. He did not even look at any of Intus's CRM data outside the narrow slice that Intus cherry-picked for his review. *Id.* at 81:9-13

*Id.* at 93:3-15. Hult simply accepted the characterization of Intus' own sales team—a group with every incentive to attribute lost deals to RTZ's alleged misconduct rather than to competitive shortcomings of their employer.

This is precisely the type of opinion the 2023 amendment to Rule 702 was designed to screen. An expert who "assumes" a dispositive input— (Lee Decl., Ex. 1 [Hult Rep.] ¶ 57)—has not satisfied the proponent's burden to demonstrate reliability by a preponderance of the evidence. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he proponent must demonstrate to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."). Hult's express deferral of causation proof to trial is an admission that his own opinion does not rest on the "sufficient facts or data" that Rule 702(b) requires.

An expert who "simply assumed" the key causal premise "without independent analysis" is not applying a reliable methodology. *See Hangarter*, 373 F.3d at 1017; *Joiner*, 522 U.S. at 146. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Clausen*, 339 F.3d at 1056. Courts routinely exclude damages opinions that depend on a plaintiff's unverified characterization of causation. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988). In *McGlinchy*, the Ninth Circuit ruled that the District Court did

not abuse its discretion in excluding an expert witness' studies and testimony where the "study rests on unsupported assumptions." *Id.* There, in forecasting lost profits after a change in relations between plaintiff and defendant, the expert "attributed all of the future lost profits to the acts of [opposing party]…[and conceded] that the cause of the decline in sales theoretically could have been anything." *Id.* at 806. Here, Hult makes the same assumption that the Ninth Circuit held was invalid: that the opposing party, here RTZ, was the sole cause of all lost profits without any consideration of other causes. The Ninth Circuit has explained that such a "report and testimony would pose a great danger of confusing the fact and cause of damages with the amount of damages." *Id.*

 Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 44, Table 3. *Id.* *Id.* ¶ 45. *Id.*, Ex. 1 [Hult Rep.], Ex. 10. The fact that the claimed losses exceed the company's entire historical revenue is itself a red flag indicating that his methodology is untethered from reality.

**E. The Underlying CRM Data Is Riddled with Anomalies Suggesting Litigation-Driven Fabrication.**

Even setting aside Hult's assumption of causation, the underlying CRM data itself is unreliable. *Id.*, Ex. 11 [Hult Tr.] at 75:8-10.

*Id.*, Ex. 3 [Schwechheimer Rep.] ¶¶ 23–25, Table 1.

*Id.*, Ex. 11 [Hult Tr.] at 113:15-4.

. *Id.* at 114:6-115:12.

*Id.*

¶ 24. F

. *Id.* Given the real-time purpose of CRM systems, populating a database with information on years-old lost opportunities implies these entries were manufactured for purposes of litigation, not reliable records maintained in the ordinary course of business.

The anomalies do not end there.

*Id.* ¶ 26, Table 2. In other words, Hult's analysis attributes losses to RTZ's alleged conduct at PACE entities that had no relationship with RTZ at the time of the supposed "loss."

Additionally,

*Id.* ¶ 27. An opportunity lost before the alleged conduct began cannot, by definition, have been caused by that conduct.

*Id.*, Ex. 11 [Hult Tr.] at 124:25-127:15. Hult has offered no explanation as to why he excluded only 8 of these 9 entries.

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5



*Id.* Both the uniformity and the timing of these labels suggest that the loss reasons were applied retrospectively in connection with this litigation, not recorded contemporaneously in the ordinary course of business.

### F. Intus' Own Sales Records Show Intus Received Revenue from Products Hult Claims Were "Lost."

Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶¶ 33–34.

. *Id.* ¶¶ 37–38.

. *Id.* ¶ 42.

. *Id.* ¶ 41.

Put simply, Hult made no attempt to reconcile his "lost" revenue figures with Intus's actual sales data. That this expert would claim millions in lost sales for accounts where the plaintiff was simultaneously earning revenue on the same products is a fundamental reliability failure under Rule 702.

**G.  Hult's Renewal Revenue Projection ($3,696,519) Impermissibly Rests on a Pyramid of Speculative Inferences.**

Lee Decl., Ex. 1 [Hult Rep.] ¶ 65.

*Id.* ¶ 59.

*Id.*, Ex. 11 [Hult Tr.] at 131:23-133:16.

*Id.* at 136:5-139:14.

*Id.*, Ex. 1 [Hult Rep.] ¶ 63.

This compounding of speculation regarding contracts that never existed is exactly the "pyramiding of inferences" that courts have long rejected as too speculative to support a damages award. *See, e.g.*, *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1021 (N.D. Cal. 2018), aff'd, 815 F. App'x 117 (9th Cir. 2020) (rejecting lost profits analysis of expert who "relied on 'no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises.'"); *Azco Biotech, Inc. v. Qiagen, N.V.*, No. 12CV2599 BEN (DHB), 2015 WL 12516014, at *2 (S.D. Cal. Nov. 12, 2015) (granting exclusion of expert opinion on lost profits because expert report failed to base claims upon historical data or a similarly situated company; "Unestablished businesses generally cannot recover lost profits because such damages are 'uncertain, contingent and speculative.'").

Lee Decl., Ex. 1 [Hult Rep.] ¶ 64. He identifies no executed contract actually containing the provision, nor any other supporting data. A plaintiff's desire for price escalators is unsurprising—but the courts are not in the business of endorsing wish-fulfilment in the guise of expert opinion. An expert's "understanding" of what a party "sought" plainly is not "sufficient facts or data" within the meaning of Rule 702(b). Fed. R. Evid. 702(b).

The heterogeneity problem is equally fatal. The notion that Intus would win a multi-million-dollar enterprise software deal at the same rate as a small compliance add-on defies economic common sense. Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 30, n.35. An expert methodology that ignores these distinctions and applies a one-size-fits-all probability as the foundation for $8.9 million in claimed damages is not the product of "reliable principles and methods." Fed. R. Evid. 702(c).

**H. The $164,658 in "Labor Costs" Were Never Verified or Validated, But Instead Generated with AI-Assistance.**

Lee Decl., Ex. 1 [Hult Rep.] ¶ 94, Ex. 11. Hult did not independently verify any of these labor cost inputs.



t████████████████████████████████████████ *Id.*, Ex. 11 [Hult Tr.] at 188:11-23. ████████████████████████████

████████████████████████████████ *Id.*, Ex. 1 [Hult Rep.] ¶ 94 (emphasis added).

████████████████████████

*Id.* ("Intus estimates labor costs using a custom GPT model when human review is not available."). Hult does not describe the prompts used, the model version, the training or validation protocols, the accuracy of the AI outputs against any known baseline, or any other information from which the reliability of these AI-generated figures could be evaluated. Hult simply incorporates them into his damages model without question.

But the deficiency is not limited to the AI-generated subset. ████████████ ████████████████ *Id.* Whether the labor cost inputs were generated by AI or reported by Intus personnel, Hult blindly accepted all of them without any independent verification. The 2023 amendment to Rule 702 was enacted precisely to prevent such blindness and deferrals: under the amended rule, "the proponent must demonstrate to the court that it is more likely than not that the proffered testimony meets the admissibility requirements." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

An expert like Hult who expressly declines to opine on whether an input is reliable, and instead leaves that determination to the factfinder at trial, has conceded that the opinion fails Rule 702's threshold gatekeeping requirement. *See Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 803 (N.D. Tex. 2018), aff'd, No. 3:11-CV-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018) ("the Federal Rules of Evidence require an expert to do more than blindly accept numbers provided by any party in calculating lost profits"); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (finding data used by expert to be unreliable because expert blindly accepted the data and did not "independently verif[y] the reliability of the data before opining on plaintiffs' future sales").

Hult's methodology fails the Rule 702 requirements. An expert cannot satisfy the "sufficient facts or data" and "reliable application" prongs by incorporating black-box AI output

-20-

and reserving verification for cross-examination. Fed. R. Evid. 702(b), (d); *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1065–66 (9th Cir. 2002) (gatekeeping must occur before jury hears opinion). The $164,658 in unverified labor costs, including $67,618 generated by AI, should be excluded.

### I.   Hult Ignores Alternative Causes and Mitigation.

A damages expert must "actively" consider, and where possible rule out, alternative explanations for the observed harm. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Hult makes no effort to do so. He does not analyze whether Intus lost opportunities because of the quality or pricing of its own services, product limitations, customer-service complaints, or broader competitive dynamics in the PACE analytics market. His model mechanically attributes every single dollar of perceived revenue shortfall to RTZ, based on RTZ's mere say-so. He makes no attempt to test and verify his own assumptions or hypotheses.

The record, however, contains ample evidence of alternative causes that Hult completely ignores. Intus's own CEO testified that RTZ "launched a competitive analytics product" during the relevant period—an independent market dynamic that could explain lost business entirely apart from any data-access dispute. Lee Decl., Ex. 8 [Deposition of John Robert Felton] at 207:7–8. Intus' VP of Data and Infrastructure likewise confirmed that clients had the ability to manually download CSV files and transmit them to Intus as a workaround, but that "Manually downloading the data is too difficult" and that "the automation is part of the value." Lee Decl., Ex. 9 [Deposition of Evan Walters] at 181:7–15. And Intus' Chief Revenue Officer and co-founder testified that shortly after Intus's access was restricted, "we started hearing whispers and rumors of RTZ wanted [sic] to build a competitive product to Intus or building out," which is a separate competitive threat that Hult never accounts for. Lee Decl., Ex. 10 [Deposition of Evan Jackson] at 48:4–6. In other words, the record reveals multiple independent explanations for Intus' claimed revenue shortfall: a competing analytics product, the availability of manual data-access alternatives that Intus deemed commercially unacceptable, and evolving competitive dynamics in the PACE market. Hult's report failed to investigate, test, and rule out any of these.

-21-

### J.   Hult's Profit-Margin Conversion Uses an Arbitrarily Narrow Seven-Month Window.



Lee Decl., Ex. 1 [Hult Rep.] ¶ 98.

*Id.* ¶ 96.

*Id.* ¶¶ 96, 98. There is no methodological justification for selecting the seven-month slice with the highest gross profit margins out of a nearly seven-year period to use as the purported "average" for purposes of calculating lost profits, particularly when the excluded periods include negative margins that would materially reduce damages. This is precisely the kind of results-oriented input-selection that Rule 702 forbids. *See Apple Inc. v. Samsung Electronics Co.*, No. 11-CV-01846-LHK, 2014 WL 252045, at *4-5 (N.D. Cal. Jan. 22, 2014).

### K.   Hult Applies the Risk-Free Treasury Rate to Discount Inherently Uncertain Cash Flows.

Lee Decl., Ex. 1 [Hult Rep.] ¶ 100. By using the risk-free rate, Hult implicitly treats Intus' projected future cash flows as carrying the same level of risk as obligations of the United States government. That assumption is indefensible for a venture-capital-backed startup that was founded in 2019 and launched its first product in 2020, but has never achieved consistent profitability, and whose gross margins have fluctuated . By applying the Treasury rate instead of a risk-adjusted discount rate, Hult systematically inflates the present value of every damages category. This fundamental mismatch between the risk-free Treasury rate and the risk profile of venture-capital-backed startup Intus renders Hult's present-value calculations unreliable under Rule 702.

## IV.   CONCLUSION

For the foregoing reasons, RTZ respectfully requests that the Court enter an order:

-22-

1. Excluding the expert opinions and testimony of Hult in their entirety; or in the alternative, excluding:

    a. Hult's foundational assumption that Intus lost data access in September 2022, which is contradicted by Intus' own sworn admissions and access logs confirming ongoing access to PACECare systems;

    b. The pre-existing contracts category of $182,512, which is contradicted by the documentary evidence as to each of the four accounts;

    c. The "Third Source of Lost Revenue" ("unobservable") category of $4,048,059;

    d. The CRM-based damages category of $8,942,498 premised on unverified Intus self-designations of causation;

    e. The $3,696,519 in projected renewal revenue derived from contracts never awarded;

    f. The $164,658 in labor costs based upon causal assumptions and AI-estimations;

    g. Hult's profit-margin conversion, which applies a seven-month 2025 margin to a nearly seven-year damages window;

    h. Hult's present-value calculations, which apply the risk-free Treasury rate to the inherently uncertain cash flows of a venture-capital-backed startup; and

    i. All damages opinions that fail to account for alternative causes or mitigation.

2. Granting such other and further relief as the Court deems just and proper.

Dated:  May 28, 2026

NOSSAMAN LLP
DAVID C. LEE
KASIA PENN

By: _____
        David C. Lee

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

RTZ ASSOCIATES, INC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. KRISTOPHER HULT
70435444.v5