NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:   415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>   Plaintiff,<br><br>  vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>   Defendants, | Case No: 4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**DECLARATION OF DAVID C. LEE IN SUPPORT OF DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S OPPOSITION TO PLAINTFF INTUSCARE INC.'S MOTION TO EXCLUDE EXPERT PETER SCHWECHHEIMER**<br><br>*[Concurrently filed with Opposition]*<br><br>Date:  July 2, 2026<br>Time:  2:00 p.m.<br>Courtroom: 6 |
| RTZ ASSOCIATES, INC.,<br><br>   Counter-claimant,<br><br>  vs.<br><br>INTUS CARE, INC.,<br><br>   Counter-defendant. | |

DECLARATION OF DAVID C. LEE IN SUPPORT OF RTZ ASSOCIATES, INC.'S OPPOSITION TO PLAINTFF INTUSCARE INC.'S MOTION TO EXCLUDE EXPERT PETER SCHWECHHEIMER
70506344.v1

**DECLARATION OF DAVID C. LEE**

I, David C. Lee, declare as follows:

1.      I am an attorney at law admitted to practice in this Court, and a partner of Nossaman LLP, counsel of record in this action for Defendant and Counter-Claimant RTZ Associates, Inc. ("RTZ").  I make this declaration in support of RTZ's Opposition to Plaintiff IntusCare Inc.'s ("Intus") Motion to Exclude Expert Opinions of Peter Schwechheimer. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts.

2.      Attached as **Exhibit A** is a true and correct copy of the relevant portions from John Robert Felton's deposition transcript, taken on April 8, 2026.

3.      Attached as **Exhibit B** is a true and correct copy of the relevant portions from Alexander Rothberg's deposition transcript, taken on February 27, 2026.

4.      Attached as **Exhibit C** is a true and correct copy of a document marked by Intus' counsel as "Exhibit 57" during the deposition of Michael Zawadski, taken on February 23, 2026.

5.      Attached as **Exhibit D** is a true and correct copy of the relevant portions from the deposition of Michael Zawadski, taken on February 23, 2026.

6.      Attached as **Exhibit E** is a true and correct copy of the relevant portions from the deposition of Peter Schwechheimer, taken on May 20, 2026.

7.      Attached as **Exhibit F** is a true and correct copy of a document produced by RTZ, Bates numbered RTZ0000814-0000818, and designated as Highly Confidential by RTZ pursuant to the protective order in this action.

8.      Attached as **Exhibit G** is a true and correct copy of the relevant portions from Evan Jackson's deposition transcript, taken on November 25, 2025.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Dated this 11th day of June 2026 in San Francisco, California.

DAVID C. LEE

DECLARATION OF DAVID C. LEE IN SUPPORT OF RTZ ASSOCIATES, INC.'S OPPOSITION TO PLAINTFF INTUSCARE INC.'S MOTION TO EXCLUDE EXPERT PETER SCHWECHHEIMER
70506344.v1

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,                )
                                 )   Case No. 4:24-cv-01132-JST
            Plaintiff,           )
                                 )
       vs.                       )
                                 )
RTZ ASSOCIATES, INC.,            )
and DOES 1 through 10,           )
                                 )
            Defendants.          )


THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

DEPOSITION OF JOHN ROBERT FELTON

Chicago, Illinois

Wednesday, April 8, 2026

Reported by:

JENNIFER L. BERNIER, CSR, RMR, CRR

the exhibit, that's your signature on this agreement, correct?

A.   Yeah.

Q.   Okay.  I just want clarification.  This is the agreement that you had referenced in the business case that we discussed previously, right?

A.   Yes.

Q.   All right.  And I presume that this EHR Data Use and Access Agreement that Intus signed with Tabula Rasa is an agreement that you had reviewed prior to signing this?

A.   Yes.

Q.   Okay.  And at some level, Intus, in approaching RTZ with its business case, was looking to have a similar type -- albeit different, but a similar type of arrangement, correct?

A.   Yes.

Q.   Okay.

A.   To match or exceed.

Q.   Do you recall whether or not, in any discussions that you had with RTZ -- either during the business case discussions or later -- discussing Intus's potential acquisition of RTZ?

A.   Yes.

Q.   Okay.  When did those discussions, to the

extent that you recall, first start happening?

A.   I don't recall exactly when.

Q.   All right.  Well, let's see if we can use a couple of benchmarks.

The business case was submitted to RTZ on February 3rd, 2023.

A.   It must have been after.

Q.   Okay.

A.   Yeah.

Q.   Do you remember the circumstances under which those talks kind of commenced?

A.   My recollection is that we weren't making progress on the business case and we said, "Okay, well, what if we just acquired the business," and that together businesses are more attractive to programs than separately.

Q.   Okay.  And do you recall having specific discussions with Mr. Zawadski or anybody else at RTZ that helped kind of facilitate movement in the acquisition direction?

A.   Only Michael, yes.

Q.   Okay.  Is it fair to say that, at least insofar as acquisitions were concerned, he was the only person you were talking to?

A.   Yes.

Q.   Okay.  Who else on Intus's side was involved in those discussions?

A.   At some point, we had a meeting in person with Michael, me, David Feinberg, our board member.  I think we had dinner with Michael.

Q.   And was that in California?

A.   It was in California.  And at that time, we had an employee named Mace Wolf --

Q.   Okay.

A.   -- I think at that time.

Q.   And what about RTZ kind of attracted Intus to the prospect of an acquisition?

A.   We wanted data access, and together I think we could have provided more value to the PACE market than separately.

Q.   Was RTZ an attractive acquisition target because it also had an EHR that had traction in the marketplace -- or an EMR that had traction in the marketplace?

A.   Yes.

Q.   Are you aware as of 2023 whether or not the concept of CareHub had already been kind of floated internally at Intus?

A.   We had not begun any designs or development around CareHub at that point in time.

Q.   At some point in Intus's progression, presumably the development or acquisition of an EMR was something that Intus felt was valuable for its business?

A.   Yeah.  It was -- I mean, we were pulled in that direction because we were locked out of the electronic medical records system.

Q.   What do you mean?

A.   As in to provide our analytic solution, we need access to the EMR.

Q.   Right.

A.   We did not have access to the EMR data.

Q.   Yeah.  But that was only for four clients, right?

A.   CareHub came about much later than this --

Q.   Right.  My --

A.   -- business case.

Q.   My question was:  At some point in Intus's development and progression, a decision was made:  Hey, you know what?  We ought to either acquire an EMR or develop an EMR.  Right?

A.   Yeah.  The development conversation came far after the acquisition talks with RTZ that you're referencing.

Q.   Right.

A.   Yeah.

Q.    Okay.  So I'm just -- I'm trying to understand whether Intus just organically came to the conclusion that a natural expansion of its business interests would include having an EMR under its corporate umbrella.

A.    The business case for the EMR came about due to the existential threat of us not having access to EMR data.  We had --

Q.    Through -- through PACECare?

A.    Through PACECare, correct.

Q.    Even though your business case represents that you have 30 clients, only four of which are RTZ?

A.    At that time of the business case.

Q.    Yes.

A.    We developed CareHub after the business case.

Q.    Okay.

A.    Like far after the business case.

Q.    Well, my understanding of your testimony -- maybe I'm wrong -- is that you felt that it was important to move in the direction of the acquisition of PACECare through an acquisition of RTZ because your inability to access PACECare represented an existential threat.

A.    Yes.  They were a meaningful portion of the market that we would not be able to integrate with, which caps the growth capacity of our business.

Q.   At the time that a decision has been made to approach RTZ about a potential acquisition, what internal communications were you having outside of the presence of counsel about that acquisition?

A.   I don't recall.  There may have been a board conversation, but that would be in the presence of counsel.

Q.   So you didn't have -- or you don't recall having any discussions with your other two cofounders, Alex or Evan, about the prospect of acquiring RTZ?

A.   None that I recall.

Q.   So the only conversations that you can recall internally about the acquisition of RTZ would have been protected by privilege -- or would be protected by privilege?

A.   Yeah.  We most definitely spoke about it with our board of directors at board meetings, which would have counsel present, and then one of our board members was present at the meeting with Mike in California.

Q.   Do you recall any specifics about the meeting that you had with Mike in California with Mr. -- was it Kleinberg {sic}?

A.   Yes.

Q.   Okay.  What -- what did you guys talk about?

A.   Just a shared vision for PACE and PACE

C E R T I F I C A T E

I, JENNIFER L. BERNIER, CSR, RMR, CRR, a Certified Shorthand Reporter for the State of Illinois, do hereby certify:

That JOHN ROBERT FELTON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this April 20, 2026.

_____

JENNIFER L. BERNIER, CSR, RMR, CRR

Certified Shorthand Reporter

Registered Merit Reporter

Certified Realtime Reporter

Illinois CSR No. 084.004190

# EXHIBIT B

Volume I   Pages 1-226

Exhibits 62-71

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

INTUS CARE, INC.

    Plaintiff                          Case No.

V.                                   4:24-cv-01132-JST

RTZ ASSOCIATES, INC.; and DOES 1

through 10                           Assigned to:

    Defendants                       Hon. Jon S. Tigar

_____

RTZ ASSOCIATES, INC.

    Counter-claimant

V.

INTUS CARE, INC.

    Counter-defendant

_____

DEPOSITION OF ALEXANDER ROTHBERG

Friday, February 27, 2026, 9:55 a.m.

MANATT, PHELPS & PHILLIPS LLP

One Beacon Street

Boston, Massachusetts  02108

-----REPORTER:  Sonya Lopes, RPR, CSR-----

had a couple of shared partners.

Do you have an understanding as to whether or not Intus has any sort of NDA with Epic one way or the other?

A.  Epic, the EMR company?

Q.  Yes.

A.  I don't know if we have an NDA with them or not.

Q.  Okay.  Does Intus maintain any sort of NDA vault?

A.  Yeah.

Q.  And who maintains that?

A.  I'm not sure.

Q.  Do you know if Evan Walters is involved in that?

A.  I would very much doubt it.

MR. LEE:  Mr. Rothberg, I think that's all I have.

MR. BESHAI:  Wow.  Okay.  I don't have any questions.

(The court reporter requested that copy orders be stated on the record)

MR. BESHAI:  Yes.  And the normal delivery time is fine.

(Deposition concluded at 3:50 p.m.)

able to tell or link compromised data to different scripts?

A.  I guess if it happened, yes.  I mean, the attack vector is not typically, like, at a script level.  It's at an infrastructural level.  But, certainly, the script that corresponds to the infrastructure, if it were to be breached, yes.

Q.  At a high level, do you have an understanding of Intus's kind of mitigation, remediation processes that it would follow in the event there was a security incident?

A.  Yes.

Q.  Again, at a very high level, can you describe it?

A.  Yeah.  Well, so we have a variety of policies primarily following the SOC 2 Type 2 framework -- well, SOC 2 framework.  We've been Type 2 for a while.  We have the attestation on Pop Health -- may be pending coming out on Pop Health.

So we have an incident response plan.  We have vulnerability policies.  We have information security policies.  We have, I mean, lots of policies pertaining to standards of encryption, like AES-256 or comparable, SSL-1 point -- I think we're on 2 and 3 at this point but used to be 1.1, 1.2.

That's in our data encryption policy, various other things like that.

Q.   Okay.  We've talked a bit about the data extraction processes relating to PaceCare and at some level relating to TruChart and PACELogic, I suppose.

Aside from those methods that we've talked about, can you tell me what other methods Intus has used to extract data from other EHRs?

A.   Sure.  Other than the automated script, as we've described it, and the manual, the hard way, as we've described it --

Q.   As you've described it.

A.   -- right -- APIs -- I mean, that's the gold standard -- I wouldn't have a comprehensive list of all of the ways we've gotten in this type of data.

SFTP is sort of a late-stage protocol, if you will.  So it's secure file transfer protocol. That could be either that the system of record is dumping into our SFTP -- think of it kind of like a mailbox -- or it could be the customer has done an easy way or hard way or some other way that's opaque to us.  They've put it into our mailbox.  So in a sense, that's certainly a data transfer protocol, but it doesn't prevent the others from being true.

I'm not sure that we've done any FHIR integrations. I know that I, in the past, had explored FHIR Sandbox to try to educate myself on modern methods and in service of opportunities that we thought we would have. But I don't know with confidence if we've done any FHIR integrations.

Q. Okay. Who have you set up an API with for data extraction?

A. Well, not for data extraction. But we have an API connection with Alation in connection to CareHub.

Q. Right. I mean, CareHub, essentially, is, for lack of a better word, a layer on Alation; correct?

A. We partner with Alation.

Q. Anybody besides Alation?

A. That we've used APIs?

Q. Yes.

A. I couldn't say with confidence.

Q. Okay. What about SFPTs (verbatim)?

A. Same answer. I couldn't say with confidence. I know that -- again, that's one of those ones where I know we have customers who use our SFTP like a mailbox. But what they do to get the data into there? I'm not sure.

Q.   Okay.

A.   Oh, and, I mean, for -- in service of on-boarding customers to CareHub, we've certainly received data extracts.  Those are often through SFTP.

Q.   That's a customer who's migrating from EHR to CareHub.

A.   Right.

Q.   Okay.  Can you tell me when the development of CareHub commenced?

A.   Roughly I can.  It was, I believe, in 2024.

Q.   And what prompted Intus to start developing CareHub?

A.   I mean, there's, I wouldn't say, like, one singular cause.  Would you like me to enumerate some of the motivations?

Q.   Yes.

A.   Well, honestly, we thought we could do a lot more good.  I think that, you know, it's tough with just a data analytics product to really drive change in a way that's as effective as controlling and influencing the sort of place where people do their day-to-day work.

If we say "Hey, we really recommend that, you know, you do this, that, or the other" -- things

that a data analyst would do -- you know, you're like McKinsey.  And McKinsey can tell you what to do.  Then they just fly on out of there.

Being the electronic health, medical record, EHR allows us to evangelize, I guess, some of the ways that we think PACE programs could be really effective and then to sort of build that into their systems.

Q.  Are you aware at some point that Intus approached Tabula Rasa about buying its EHR division?

A.  I am aware of that.

Q.  Okay.  And what drove Intus's interest in acquiring Tabula Rasa's EHR division?

THE WITNESS:  Just to check.  I think all of those conversations -- like, all of them were under NDA.  Am I allowed to talk about --

MR. BESHAI:  Under --

Q.  I'm not looking for the specific deal points.  What I'm looking for is what drove Intus to explore purchasing Tabula Rasa's EHR division.

A.  Oh, yeah.  I mean, it's -- I think it's similar to the motivations that I just described to you to build CareHub.  The ability to do better, do more, effect greater change.  You know, we thought

we could -- we still think -- I mean, and we are proving it.  We think we can do more.

Q.  You're also aware that Intus at some point approached RTZ about buying the company.

A.  Vaguely aware.

Q.  Okay.  How did you become aware of that?

A.  Some internal conversation, I'm sure.  I mean, it was not in the course of this deposition thing, if that's what you're asking.

Q.  I'm not sure I'm following you.

A.  I became aware through some conversation maybe with Robbie.

Q.  Okay.  I see.  In other words, today isn't the first time you heard --

A.  Yes.

Q.  -- about approaching RTZ for an acquisition.

A.  Yes.  That's what I'm saying.  Today is not the first time I'm hearing of it.

Q.  You believe you may have had a conversation with Robbie Felton about that.  Do I understand that?

A.  That's right.  That's what I'm saying.

Q.  Do you recall, even generally, the discussion points that you may have had with Robbie

about that acquisition?

A.   It would have been technical in nature, I mean, "Hey, Alex.  From what you know, do you think, you know, this would be a good system to buy" or, you know, "Hey, you've talked to PACE programs.  Do they like RTZ?  Are they happy," things that I would have, I guess, had any real knowledge of.

Q.   Okay.  And I presume that Intus made its offer to buy RTZ after you had those conversations; correct?

A.   I guess I don't really know.  Yeah.  I'm not sure, actually.

Q.   In your view, that would be a reasonable sequence, though; right?  Robbie coming to you, asking your impressions about RTZ's system, you providing feedback, and then Intus making a decision to actually make an offer to RTZ.  Right?

A.   Yeah.  That seems reasonable.  I guess what I'm saying is maybe I only got involved once it was details time or -- I don't know what the sequence of this kind of thing is.

Q.   Do you have an understanding as to whether or not Intus's decision to pursue CareHub came only after it failed in its efforts to acquire either Tabula Rasa's division or RTZ?

A.   I think that -- I mean, clearly, we wanted an EMR or EHR for the reasons that I've described. If we were going to spend all the money to buy one, we wouldn't have probably a lot of money left to build one.

So I guess I view those decisions as linked, but the strategy certainly could have been preset before any of the activities commenced.

Q.   Okay.  My understanding is that Intus hired EHR or EMR developers specifically in the development of CareHub; is that correct?

A.   We've hired software engineers.

Q.   And were those software engineers hired specifically to build CareHub?

A.   They were hired specifically to be the software engineers who will build CareHub.

Q.   Okay.  Were those engineers hired in 2024 once the decision to develop CareHub was made?

A.   Yes, I believe hired in 2024 at some point after the decision was made.  The decision -- I guess you're not asking when the decision was made. Certainly, the developers were hired in 2024.

Q.   I guess you prompted the question.  When was the decision made?

A.   Right.  This is, like, also hard to answer

because, you know, I mean, I guess the aspiration to build an EMR is very hard to trace when that started.  I guess the decision to build the EMR -- I don't know.  I mean, when you decide something, you can decide, un-decide.  Once you start hiring people, then you're really sort of in it.

So I don't know -- not to, like, get philosophical.  But I guess you could say we really went for it once we hired the developers and that, you know -- but when did we first contemplate it?  When did we decide we were going to do it?  Earlier.

Q.  Do you know how much earlier?

A.  I think the -- I mean, when did we first contemplate it?  You know, probably in the classroom before we even built Pop Health is "Hey, what are we going to build?"  But the EMR is always expensive to build, as I'm sure you know.  So it's been, you know.

Q.  CareHub was announced, I guess, to the world at least as a 2025 deliverable, I believe, in October of 2024.  Is that about right?

A.  I don't know about the October, but it was certainly announced as a 2025 deliverable.

Q.  How many clients has Intus signed to CareHub to date?

THE WITNESS:  Can I answer that?

MR. BESHAI:  You can answer -- like, if you know, you can answer.  But if the questions start getting into details about who the clients are, et cetera, that's a different conversation.  If you have a rough sense of how many, you can share that.

A.  Do you mean, like, active or signed to go active?

Q.  Both.

A.  Active, certainly under 60, well under 60. Signed to go active?  I don't know.  It's -- I mean, it's more Evan Jackson's side of the house than mine but -- well, certainly, under a hundred.  That's an easy sort of estimate.  Somewhere between 30 and a hundred I guess would be a safe thing for me to say. I'm not the business person.

Q.  I'm sorry.  I just want to make sure I have the numbers right.

So it's under 60 for those who have signed to be contracted for CareHub; is that correct?

A.  I was saying under 60 who are active.

Q.  Who are active.

A.  And, you know -- just because it's not my area of expertise but to, you know, try to be

helpful, somewhere between 30 and a hundred are signed to be active.

Q.   How many systems -- maybe I'm not hearing you correctly.   When you say "under 60 who are active," those are systems that have achieved go live?

A.   Right.   That's what I'm saying.

Q.   Okay.   Under 60 is a big number.

A.   Yeah.

Q.   So do you have any better ballpark?   Are we talking zero to ten?   Are we talking ten to 20, 20 to 30?   I mean, "under 60" is a lot.

A.   Say 20 to 60.

Q.   Okay.   Who was the first account that Intus signed?

MR. BESHAI:   So this came up in Evan Jackson's deposition, if you recall.   And at the time -- which was November -- this was still an open subject between us about the extent to which we were going to give any discovery about CareHub, the specific technical details, the clientele.

Then in December, we had a conversation about it.   You haven't pursued it.   And so we stand on our objection that we put into the RFPs.   We're reiterating them again.   Happy to take it up with a

ALEXANDER ROTHBERG                                       JOB NO. 2407964
FEBRUARY 27, 2026

CERTIFICATE OF REPORTER

I, SONYA LOPES, Registered Professional Reporter and Notary Public, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

That the witness requested to review the transcript and make any changes to the transcript. As a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure, the changes made by the witness are appended to the transcript.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 12th day of March, 2026.

_____

Sonya Lopes                    My Commission Expires:

Notary Public                  October 28, 2027

# EXHIBIT C

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

## ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT
### Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.

This **ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT** ("Agreement"), effective as August 26, 2022 ("Effective Date"), is by and between Tabula Rasa HealthCare Group, Inc., a Delaware Corporation ("TRHC") and Intus Care, Inc., a Delaware Corporation ("Intus"). TRHC and Intus may be referred to herein collectively as the "Parties" or individually as a "Party."

**WHEREAS,** patient, health, and/or clinical information and data arises from and/or relates to a patient and/or patients' medical history or treatment including without limitation at PACE facilities ("Patient and Health Data");

**WHEREAS,** TRHC has compiled such Patient and Health Data, as well as other operational, financial, and additional information and data, in electronic health record form or similar ("EHR" Data);

**WHEREAS,** TRHC stores such EHR Data in its PrimeSuite, PaceLogic, and/or Truchart systems or programs and/or a similar system or program ("TRHC Programs") ; and

**WHEREAS,** TRHC desires to allow Intus to use and access the EHR Data, and Intus desires to use and access the EHR Data from TRHC, subject to the terms and conditions of this Agreement, for the benefit and/or potential benefit of each of TRHC and Intus.

**NOW, THEREFORE** in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Use and Access</u>. TRHC hereby grants Intus a non-exclusive license and the right to use and access the EHR Data for Intus' business, operations, and services including but not limited to access and use related to data analysis, data display, metric generation, data delivery, data deidentification or anonymization, providing advice and insight, and/or internally by Intus to enhance or modify Intus' product or services ("License"). TRHC relatedly hereby grants Intus license and the right to grant sublicenses under the License provided that (i) no sublicense may exceed the scope of rights granted to Intus under this Agreement; (ii) all sublicense rights will terminate automatically effective as of the expiration or termination of this Agreement unless provided otherwise in this Agreement; (iii) Intus shall require all sublicensees to agree in writing to the applicable terms and conditions of this Agreement; and (iv) no sublicense shall be to a direct business competitor of TRHC known by Intus ("Sublicense"). Each of the License and Sublicense are subject to the terms and conditions of this Agreement. Furthermore, TRHC shall in a mutually agreeable location put a "Launch Intus Care" button or similar technology in TRHC's Platforms linking to the applicable Intus product(s) or service(s to encourage and improve navigation to the applicable Intus care product(s) or service(s).

2. <u>Fee</u>. So long as the Extract (defined below) is being used by Intus and is being deployed to Intus clients, Intus shall pay TRHC $2.00 per member per month for all active members included in the Extract with a minimum of $10,000 per month ("Fee").

1

**Exhibit**

**57**

**Zawadski**

02/23/2026    C.A.N.

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

## ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT
### Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.

3. <u>Data</u>. For TRHC and Intus' mutual customers, TRHC shall make the EHR Data readily available for access and use by Intus electronically, or by other means as mutually agreed upon by the Parties in writing, on a no less frequent than daily basis, or another frequency as mutually agreed upon by the Parties in writing. For TRHC's and Intus' mutual customers, TRHC shall (i) generate a nightly EHR Data extract using a mutually agreed upon format ("Extract"), and (ii) make such Extract available after a mutually agreeable time each day to Intus via a secure FTP site hosted by TRHC. TRHC shall (iii) continuously provide Intus with a preview environment for the Extract for Intus to use for purposes of Intus testing and developing and (iv) make commercially reasonable efforts to timely add to and/or modify the Extract to meet the business and technical needs of Intus.

TRHC warrants that: (i) the EHR Data shall not include any virus or other malicious code; (ii) TRHC has obtained and shall maintain all governmental and regulatory licenses, registrations, permits, certifications, and approvals required for the EHR Data; (iii) TRHC has obtained and shall maintain at all times during the term of this Agreement all third-party permissions, rights, and consents required to license the EHR Data as contemplated by this Agreement; (iv) TRHC has undertaken reasonable efforts to ensure that the EHR Data is timely and accurate; and (v) TRHC will use reasonable efforts to notify the Intus of errors in the EHR Data. TRHC shall, to the extent necessary, make corrections to the EHR Data that TRHC generally makes available free of charge to all licensees of the EHR Data, each of which constitutes EHR Data and is subject to the terms and conditions of this Agreement. The EHR Data may be subject to US export control laws, including the Export Control Reform Act and its associated regulations. The EHR Data is subject to the Business Associate Agreement attached hereto as <u>Exhibit A</u> ("BAA") to the extent the BAA is applicable and necessary.

Intus and TRHC acknowledge and agree that this Agreement pertains to the use, access, and/or licensing of the EHR Data such that no other rights of either Party are created or abridged unless expressly set forth in this Agreement, and that this Agreement does not in any manner supersede, waive, or limit any right of either Party concerning the EHR Data or the underlying patient or medical information, data, or records, whether established by law, statute, regulation, and/or rule. Intus and TRHC acknowledge and agree that, as between TRHC and Intus, no intellectual property is being exchanged pursuant to this Agreement. Intus and TRHC acknowledge and agree that Intus owns and will own any insights, analysis, advice, metrics, de-identified or anonymized data and/or information, and other output arising from Intus services or the EHR Data ("Intus Data").

4. <u>TRHC Materials and Tools</u>. TRHC owns all right, title, and interest in and to TRHC Materials and Tools. TRHC and its licensors reserve all rights in and to the TRHC Materials and Tools not expressly licensed and/or granted to Intus in this Agreement. Except as otherwise specified in this Agreement, any access or use of TRHC Materials and Tools by third parties shall be subject to TRHC's prior written consent. Except for the MedWise Risk Score™, TRHC grants to Intus a non-exclusive license and the right to use and access the TRHC Materials and Tools consistent with this Agreement and the License and Sublicense rights granted therein to the extent TRHC Materials and Tools may be contained in the Extract and/or EHR Data.

2

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

"TRHC Materials and Tools" shall mean any and all proprietary data and/or databases, data models, documentation, software, source code, object code, tools, algorithms, user interface designs, methodologies, and other identifiable materials owned by or licensed to TRHC prior to this Agreement or independently of Intus, including, without limitation, the MedWise Risk Score™ ("TRHC Materials and Tools"). "TRHC Materials and Tools" do not include and are distinct from EHR Data or Intus Data.

5. Security. Each Party shall use all reasonable industry standard legal, organizational, physical, administrative, and technical measures and security procedures to safeguard and ensure the security of the EHR Data and to protect the EHR Data from unauthorized access, disclosure, duplication, use, modification, or loss. Intus shall be responsible for deleting each Extract from the secure FTP site once the Extract is transferred to the Intus environment.

6. Confidential Information. Either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media/in written or electronic form or media ("Confidential Information"). Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Party at the time of disclosure; (c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; (d) independently developed by the receiving Party without the use of the disclosing Party's Confidential Information; or (e) is the EHR Data.

Except as provided in this Agreement, during the term of this Agreement and three (3) years thereafter, the receiving Party shall not disclose the Confidential Information to any person or entity, except to the receiving Party's or its affiliate's employees, directors, partners, clients, vendors, officers, consultants, and agents who have a need to know the Confidential Information for the receiving Party to exercise its rights hereunder or perform its obligations hereunder.

Notwithstanding the foregoing, each Party may disclose Confidential Information to the limited extent required (i) in order to comply with the order of a court or other governmental body, or as otherwise necessary to comply with applicable law, provided that the Party making the disclosure pursuant to the order shall first have given written notice to the other Party; or (ii) to establish a Party's rights under this Agreement, including to make required court filings. Notwithstanding the foregoing, a Party may without approval, make such press releases or other public statements that are required under applicable securities laws and regulations and the rules of any stock exchange or market on which its, or its affiliates', securities are traded.

Upon the expiration or termination of this Agreement and request of the disclosing Party, the receiving Party, at its option, shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and confirm in writing to the disclosing Party that such Confidential Information has been destroyed. Each Party's obligations of nondisclosure concerning Confidential Information are effective as of the Effective Date and will expire three (3) years from the date first disclosed to the receiving Party except where the Confidential Information is a trade secret, in which case the obligations for such Confidential Information will survive until the Confidential

3

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

Information is no longer a trade secret through no fault of or breach of this Agreement by the receiving Party.

7. Independent Contractors. TRHC and Intus are independent contractors, and nothing contained in this Agreement shall be construed to constitute the TRHC and Intus as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking.

8. Indemnification. TRHC shall indemnify, defend, and hold harmless Intus from and against any and all losses, damages, liabilities, or costs including attorneys' fees ("Losses") incurred by Intus resulting from any third-party claim, suit, action, or proceeding that Intus' access and/or use of the EHR Data infringes, violates, or misappropriates such third party's intellectual property rights and/or privacy and/or data security rights, provided that Intus promptly notifies TRHC in writing of the claim, cooperates with TRHC, and allows TRHC sole authority to control the defense and settlement of such claim.

9. Limitations of Liability. EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS LIMITATIONS OF LIABLITY SECTION OR THE INDEMNIFICATION SECTION OF THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES REGARDLESS OF WHETHER EITHER PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE.

10. Equitable Relief. Each Party agrees that a breach or threatened breach by such Party of any of its obligations under the License, Data, Security, Confidential Information, Term, or Non-Compete sections of this Agreement may cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

11. Term. The initial term of this Agreement begins on the Effective Date and will continue in effect until three (3) years from such date ("Initial Term"). This Agreement will automatically renew for continuous successive one (1) year terms unless earlier terminated by a Party by providing notice to the other Party pursuant to this Agreement's express provisions no less than one hundred and eight (180) days prior to the end of the current term (each a "Renewal Term" and together with the Initial Term, the "Term"). Either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party materially breaches this Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured forty-five (45) days after the non-breaching Party provides the breaching Party with written notice of such breach. Upon expiration and/or termination of this Agreement, the License will terminate except

4

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

### ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT
### Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.

that Intus will have and retain the right and license to use and access the EHR Data as required to meet Intus' contractual obligations as related to or dependent upon the EHR Data or License.

12. Notice. All notices and writings permitted or required hereunder shall be in writing and shall be deemed properly given upon: (i) email exchanged between the known and recognized email addresses of the Parties and (ii) delivery in hand to the receiving Party, (iii) delivery by a nationally recognized courier service with a signed written receipt by the receiving Party, or (iv) five (5) days after deposit in the United States mail, first-class postage prepaid and addressed to the Party designated to receive such notice at the mailing address specified herein or, if such address has changed, then at such other address that the Party has designated in writing as the successor address, and delivered in accordance herewith.

13. Entire Agreement and Amendment. This Agreement is the complete agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior oral and written agreements with respect to the subject matter of this Agreement. This Agreement may not be amended unless such amendment is in writing and signed by the authorized representatives of both Parties.

14. Severability and Waiver. The invalidity or unenforceability, in whole or in part, of any provision, term, or condition hereof shall not affect the validity or enforceability of the remainder of such provision, term or condition or of any other provision, term, or condition, which shall be construed so as to give effect, as nearly as possible, to the intent of this Agreement as evidenced by all the provisions hereof. Neither Party shall be deemed to have waived any provision hereof unless such waiver is in writing and executed by a duly authorized officer of the waiving Party. No waiver by either Party of any provision hereof shall constitute a waiver of such provision on any other occasion. All obligations and rights of the Parties expressed in this Agreement shall be in addition to, and no in limitation of, those provided by the applicable law.

15. Survival. The Confidentiality, Indemnification, Limitation of Liability, Equitable Relief, Term, Non-Compete, and Choice of Law terms of this Agreement shall remain in full force and effect beyond the Agreement's expiration and/or termination.

16. Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

17. Choice of Law. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without regard to its rules concerning conflicts of laws. Exclusive venue for any action brought in connection with the Agreement shall be in the State of Delaware.

18. Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

5

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

## ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT
### Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.

19. Noncompete.    During the Term of this Agreement and for a period of three (3) years thereafter, Intus shall not compete or interfere, directly or indirectly, or induce or assist any person to compete or interfere, directly or indirectly, with TRHC in the "adverse drug event" business or space worldwide. During the Term of this Agreement and for a period of three (3) years thereafter, THRC shall not compete or interfere, directly or indirectly, or induce or assist any person to compete or interfere, directly or indirectly, with Intus in the "population health" business or space worldwide. Both Parties acknowledge and agree that the covenants and restrictions contained in this section are reasonable and necessary to protect the legitimate interests of the other Party and constitute a material inducement to the other Party entering into this Agreement.

*(Signatures Follow)*

6

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**TRHC:**

**Tabula Rasa HealthCare Group, Inc.**

By: *Calvin H. Knowlton, PhD*
Name: Calvin H. Knowlton, PhD
Title: Chairman and CEO, TRHC
Address: 228 Strawbridge Drive, Moorestown, NJ 08057
Email: legal@trhc.com
Date: 08/26/2022

**INTUS:**

**Intus Care, Inc.**

By: *John Robert Felton*
Name: John Robert Felton
Title: CEO
Address: 225 Dyer Avenue, Providence, RI 02903
Email: robbie@intus.care
Date: 09/08/2022

7

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

## EXHIBIT A
## BUSINESS ASSOCIATE AGREEMENT

This <u>BUSINESS ASSOCIATE AGREEMENT</u> ("BA **Agreement**") is effective as of the Effective Date of the EHR Data Use and Access Agreement between the Parties to it (the "**Effective Date**") and is entered into by and between Tabula Rasa HealthCare Group, Inc., located at 228 Strawbridge Drive, Moorestown, NJ 08057 ("**Covered Entity**"), and Intus Care, Inc. ("**Business Associate**").

### RECITALS

**WHEREAS**, Covered Entity and Business Associate have entered into an EHR Data Use and Access Agreement pursuant to which the Covered Entity provided EHR data to the Business Associate (the "**Covered Entity Agreement**"). In furtherance of such agreement Business Associate may from time to time perform on behalf of Covered Entity a function or activity supporting the Covered Entity that involves the Use or Disclosure of Protected Health Information ("**PHI**").

**WHEREAS**, Business Associate and Covered Entity desire to enter into this BA Agreement regarding the Use and/or Disclosure of PHI as required by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), the Standards for Privacy of Individually Identifiable Health Information ("**Privacy Rule**") and the Standards for Security of Electronic Protected Health Information ("**Security Rule**") promulgated thereunder, and the Health Information Technology for Economic and Clinical Health Act (Division A, Title XIII and Division B, Title IV, of the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5) ("**HITECH Act**"), and the regulations implementing the HITECH Act.

**NOW, THEREFORE**, in consideration of the mutual promises below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### AGREEMENT

A.    <u>General Compliance with HIPAA Privacy Rule and Security Rule</u>.
The parties shall conduct their respective businesses in accordance with all applicable laws and regulations regarding the privacy and security of PHI, including, without limitation, HIPAA and the HITECH Act, as amended from time to time, and the regulations promulgated thereunder.

B.    <u>Definitions</u>.
Terms used but not otherwise defined in this BA Agreement shall have the same meaning given to such terms in HIPAA, the HITECH Act, or any implementing regulations promulgated thereunder, including, but not limited to, the Privacy Rule and the Security Rule. In the event of a conflict regarding any definition in this BA Agreement and the definitions in HIPAA, the HITECH Act, or any implementing regulations promulgated thereunder, including but not limited to the Privacy Rule and the Security Rule, the definitions in HIPAA, the HITECH ACT and any implementing regulations shall govern.

8

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

## ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT
### Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.

1.    **"Breach"** means the acquisition, access, Use, or Disclosure of PHI in a manner not permitted under the Privacy Rule which compromises the security or privacy of PHI (within the meaning of 45 C.F.R. § 164.402).

2.    **"Data Aggregation"** means, with respect to PHI created or received by Covered Entity, the combining of such PHI by Business Associate with the PHI received by Business Associate in its capacity as a business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective covered entities.

3.    **"Designated Record Set"** means a group of records maintained by or for a covered entity that is: (i) the medical records and billing records about Individuals maintained by or for a covered health care provider; (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for the covered entity to make decisions about Individuals. For the purposes of this paragraph, the term "record" means any item, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for a covered entity.

4.    **"Disclose"** or **"Disclosure"** means the release, transfer, provision of access to, or divulging in any other manner of PHI outside the entity holding the information.

5.    **"Electronic Protected Health Information"** or **"ePHI"** shall have the same meaning as the term "electronic protected health information" in 45 C.F.R. § 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

6.    **"Individual"** means the person who is the subject of PHI and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

7.    **"Individually Identifiable Health Information"** is information that is a subset of health information, including demographic information collected from an Individual, and (1) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) relates to the past, present, or future physical or mental health or condition of an Individual; the provision of health care to an Individual; or the past, present, or future payment for the provision of health care to an Individual; and (i) that identifies the Individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the Individual.

8.    **"Privacy Rule"** means the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E.

9.    **"Protected Health Information"** or **"PHI"** means Individually Identifiable Health Information that is: (i) transmitted by "electronic media," as defined in 45 C.F.R. § 160.103; (ii) maintained in any medium described in the definition of electronic media; or (iii) transmitted or maintained in any other form or medium.

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

10.     **"Required by Law"** means a mandate contained in law that compels an entity to make a Use or Disclosure of PHI and that is enforceable in a court of law.

11.     **"Secretary"** means the Secretary of Health and Human Services or any other officer or employee of the U.S. Department of Health and Human Services to whom the authority involved has been delegated.

12.     **"Security Incident"** means the attempted or successful unauthorized access, Use, Disclosure, modification, or destruction of information or interference with system operations in an information system.

13.     **"Security Rule"** means the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Part 164 Subpart C.

14.     **"Unsecured Protected Health Information"** means PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the Secretary in the guidance issued under section 13402(h)(2) of Public Law 111-5.

15.     **"Use"** means the sharing, employment, application, utilization, examination, or analysis of PHI within an entity that maintains such information.

C.     Obligations and Activities of Business Associate.

1.     Nondisclosure.  Business Associate shall not Use or Disclose PHI other than as permitted or required by the Covered Entity Agreement, this BA Agreement or as Required by Law.

2.     Minimum Necessary.  Business Associate shall limit any PHI Used, Disclosed or requested to the minimum necessary to accomplish the intended purpose of the Use, Disclosure or request.

3.     Safeguards.  Business Associate shall use appropriate safeguards to prevent the Use or Disclosure of PHI other than as provided for by the Covered Entity Agreement or this BA Agreement.

4.     Security Rule.  Business Associate shall comply with the Security Rule provisions set forth in 45 C.F.R. Part 164, Subpart C, including the provisions relating to Security Standards General Rules (45 C.F.R. § 164.306), Administrative Safeguards (45 C.F.R. § 164.308), Physical Safeguards (45 C.F.R. § 164.310), Technical Safeguards (45 C.F.R. § 164.312), Organizational Requirements (45 C.F.R. § 164.314) and Policies and Documentation (45 C.F.R. § 164.316), and implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic Protected Health Information Business Associate creates, receives, maintains, or transmits on behalf of Covered Entity.

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

### ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT
### Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.

5.    Reporting of Disclosures.  Business Associate shall report, in writing, to Covered Entity any Use or Disclosure of PHI not provided for by the Covered Entity Agreement or BA Agreement of which Business Associate becomes aware.

6.    Mitigation.  Business Associate shall mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a Use or Disclosure of PHI by Business Associate in violation of the requirements of this BA Agreement.

7.    Business Associate's Agents.  Business Associate shall ensure that any agents, including subcontractors, which create, receive, maintain or transmit PHI on behalf of Business Associate agree in writing to restrictions and conditions that are no less restrictive than those that apply to Business Associate through this BA Agreement with respect to PHI.

8.    Access to PHI.  At the written request of Covered Entity (and in the reasonable time and manner designated by Covered Entity), Business Associate shall provide access to PHI in a Designated Record Set to Covered Entity or, as directed by Covered Entity in writing, to an Individual in order to meet the requirements under 45 C.F.R. § 164.524.  This provision shall only apply if Business Associate has PHI in a Designated Record Set.  Business Associate further shall notify Covered Entity of any requests for access it receives from an Individual within five (5) business days of receipt.

9.    Documentation of Disclosures.  Business Associate shall document such Disclosures of PHI and information related to such Disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of Disclosures of PHI in accordance with 45 C.F.R. § 164.528.

10.    Accounting of Disclosures.  At the written request of Covered Entity (and in the reasonable time and manner designated by Covered Entity), Business Associate shall provide to Covered Entity information collected in accordance with Section C.9 of this BA Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of Disclosures of PHI in accordance with 45 C.F.R. § 164.528 (and HITECH Act § 13405(c). Business Associate further shall notify Covered Entity of any requests for accounting of Disclosures it receives from an Individual within ten (10) business days of receipt.

11.    Amendment of PHI. At the written request of Covered Entity (and in the reasonable time and manner designated by Covered Entity) Business Associate shall make any amendment(s) to PHI in a Designated Record Set that Covered Entity directs pursuant to 45 C.F.R. § 164.526. This provision shall only apply if Business Associate has PHI in a Designated Record Set. Business Associate further shall notify Covered of any requests for amendment it receives from an Individual within fifteen (15) business days of receipt.

12.    Internal Practices.  Business Associate shall make its internal practices, books and records, including policies and procedures, relating to the Use and Disclosure of PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, available to Covered Entity, or to the Secretary, for purposes of determining Covered Entity's and/or Business Associate's compliance with the Privacy Rule and/or Security Rule.

11

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

13.     Reporting of Potential Breaches and Security Incidents. Business Associate shall report in writing to Covered Entity any Security Incident or potential Breach of Unsecured Protected Health Information as follows:

a)     Business Associate shall report any actual, successful Security Incident within two (2) days of Business Associate's discovery of such actual, successful Security Incident.

b)     Business Associate shall report any attempted, unsuccessful Security Incident of which Business Associate becomes aware at the written request of Covered Entity but in no event more frequently than on a quarterly basis.

c)     Business Associate shall report any potential Breach of Unsecured Protected Health Information within two (2) days of discovery.

In each instance (a) through (c) above, the written report shall include the following: (i) the identification of each Individual whose Unsecured Protected Health Information has been, or is reasonably believed by Business Associate to have been accessed, acquired, Used or Disclosed during any such Security Incident or potential Breach, to the extent known by Business Associate; (ii) such other information regarding the Security Incident or potential Breach as is known to Business Associate at the time the report is made (such as the type of PHI involved, the nature of the information accessed, acquired, Used or Disclosed, etc.); and (iii) an acknowledgement by Business Associate that the information provided pursuant to (i) and (ii) shall be supplemented if and when further information becomes available to Business Associate.

14.     Additional Responsibility. To the extent Business Associate is to carry out an obligation of Covered Entity under the Privacy Rule provisions set forth at 45 C.F.R. Part 164, Subpart E, Business Associate shall comply with the requirements of the Privacy Rule that apply to Covered Entity in the performance of such obligation.

D.     Permitted Uses and Disclosures by Business Associate.

1.     Permitted Uses and Disclosures. Except as otherwise limited in this BA Agreement, Business Associate may Use or Disclose PHI to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Covered Entity Agreement, provided such Use or Disclosure would not violate the Privacy Rule if done by Covered Entity.

2.     Use for Management and Administration. Except as otherwise limited in this BA Agreement, Business Associate may Use PHI for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

3.     Disclosure for Management and Administration. Except as otherwise limited in the Covered Entity Agreement and this BA Agreement, Business Associate may Disclose PHI for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that: (a) the Disclosures are Required by Law, or (b) Business Associate obtains reasonable assurances from the person to whom the information is

12

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

Disclosed that it will remain confidential and Used or further Disclosed only as Required by Law or for the purpose for which it was Disclosed to the person, and (c) the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

      4.     Data Aggregation. Except as otherwise limited in this BA Agreement, Business Associate may Use PHI to provide Data Aggregation services to Covered Entity as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

      5.     Obligations of Covered Entity.

      6.     Notice of Privacy Practices. Covered Entity shall provide Business Associate with the notice of privacy practices from Covered Entity, as well as any limitations and/or changes to such notice, of which Covered Entity is notified, to the extent that such limitations and/or changes may affect Business Associate's Use or Disclosure of PHI.

      7.     Changes in Permission. Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by an Individual to Use or Disclose PHI, of which Covered Entity is notified, to the extent that such changes may affect Business Associate's Use or Disclosure of PHI.

      8.     Notification of Restrictions. Covered Entity shall notify Business Associate of any restriction to the Use or Disclosure of PHI that Covered Entity has agreed to in accordance with 45 C.F.R. § 164.522 and of which Covered Entity is notified, to the extent that such restriction may affect Business Associate's Use or Disclosure of PHI.

      9.     Permissible Requests by Covered Entity. Covered Entity shall not request Business Associate Use or Disclose PHI in any manner that would not be permissible under HIPAA, as amended by the HITECH Act, or any implementing regulations.

E.     Term and Termination.

      1.     Term. The term of this BA Agreement shall be effective as of the date of the Covered Entity Agreement and shall terminate upon the earlier of the date of termination or expiration of the Covered Entity Agreement.

      2.     Termination for Cause. Notwithstanding any other provision of this BA Agreement to the contrary, (i) either party may terminate the Covered Entity Agreement and/or this BA Agreement in the event of a material breach of any term of this BA Agreement by the other party which is not corrected within thirty (30) days of receipt of written notice describing the nature of the alleged breach, and (ii) Covered Entity may immediately terminate the Covered Entity Agreement and/or this Agreement in the event of a material breach of this Agreement that involves a Breach of Unsecured PHI.

      3.     Effect of Termination. Except as provided in this Section E.3, and except as provided in the Covered Entity Agreement, upon termination of this BA Agreement for any reason,

13

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

Business Associate shall return or destroy all PHI received from Covered Entity or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of Business Associate or subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI. In the event that Business Associate believes that returning or destroying PHI is not feasible, Business Associate shall notify Covered Entity in writing of the conditions that make return or destruction infeasible. Upon mutual agreement of Covered Entity and Business Associate that return or destruction of the PHI is infeasible, Business Associate shall extend the protections of this BA Agreement to such PHI and limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

4.    Indemnification.  Business Associate agrees to indemnify and hold harmless Covered Entity and its affiliates and their respective current and former officers, directors, members, employees and agents (collectively, "Indemnitees"), from and against any liability, claim, action, loss, cost, damage or expense (including reasonable fees of attorneys and experts) incurred or suffered by Indemnitees, to the extent that such liability, claim, action, loss, cost, damage, expense or fees are attributable to or incurred as a result of an unauthorized Use or Disclosure of PHI by Business Associate or its subcontractor or agent; an acquisition, access, Use, or Disclosure, by Business Associate or its subcontractor or agent, that constitutes a Breach or Security Incident; any material breach of this BA Agreement by Business Associate; or any material breach of the agreement described in Section C.7 of this BA Agreement by Business Associate's subcontractor or agent.

F.    Miscellaneous.

1.    Regulatory References. A reference in this BA Agreement to a section in the Privacy Rule or Security Rule means the section as in effect or as amended, and for which compliance is required.

2.    Amendment. The parties agree to take such action as is necessary to amend this BA Agreement from time to time for Covered Entity and Business Associate to comply with the requirements of the Privacy Rule and Security Rule, HIPAA, the HITECH Act and its implementing regulations that are binding on such party.

3.    Survival. The respective rights and obligations of Business Associate under Sections E.3 and E.4 of this BA Agreement shall survive the termination of this BA Agreement.

4.    Interpretation. The parties agree that any ambiguity in this BA Agreement or conflict with the terms of the Covered Entity Agreement shall be resolved to permit the parties to comply with HIPAA and the HITECH Act and any implementing regulations promulgated thereunder, including but not limited to the Privacy Rule and Security Rule and applicable state laws.

5.    No Third-Party Beneficiary. Notwithstanding any other provision of this BA Agreement to the contrary, if any, nothing in this BA Agreement, or in the parties' course of

14

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

dealings, shall be construed as conferring any third-party beneficiary status with respect to this BA Agreement on any person not a party to this BA Agreement.

6.    Assignment. This BA Agreement may not be transferred or assigned by either party without the prior written consent of the other party.

7.    Governing Law. All questions with respect to the construction of this BA Agreement and the rights and liabilities of the parties except as otherwise provided, shall be determined in accordance with the laws of Delaware. All disputes hereunder shall be resolved in the applicable state or federal courts in the State of Delaware. The parties' consent to the jurisdiction of such courts and waive any jurisdictional or venue defenses otherwise available.

8.    Counterparts. This BA Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

9.    Effect of BA Agreement. This BA Agreement sets forth the entire agreement and understanding between the parties regarding the subject matter hereof and supersedes all other discussions, representations, agreements and understandings of every kind, whether oral or written, with respect to the subject matter hereof. In the event of a conflict between the terms of this BA Agreement and the terms of the Covered Entity Agreement or any agreement for services between the parties, the terms of this BA Agreement shall control.

*(Signatures Follow)*

DocuSign Envelope ID: 7A02FF1C-3B3B-4FA0-ACD7-EDA7A0D9C5EC

**ELECTRONIC HEALTH RECORD DATA USE AND ACCESS AGREEMENT**
**Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc.**

**IN WITNESS WHEREOF**, each of the undersigned parties have caused this BA Agreement to be duly executed in their respective names and on their behalf effective as of the date first set forth above.

**TABULA RASA HEALTHCARE GROUP, INC.**

By: _Calvin H. Knowlton, PhD_
4EBE431FB5FD410

Name: Calvin H. Knowlton, PhD
Title: Chairman and CEO, TRHC
Date: August 26, 2022

**INTUS CARE, INC.:**

By: _John Robert Felton_
8E158814C4054C1

Name: John Robert Felton
Title: CEO
Address: 225 Dyer Avenue, Providence, RI 02903
Email: robbie@intus.care
Date: 09/08/2022

16

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____
                                )
INTUSCARE INC.,                 )
                                )
          Plaintiff,            )
                                )
vs.                             ) No. 4:24-cv-1132-JST
                                )
RTZ ASSOCIATES, INC.; and       )
DOES 1 through 10,              )
                                )
          Defendants.           )
_____)

VIDEOTAPED DEPOSITION OF MICHAEL ZAWADSKI

San Francisco, California

Monday, February 23, 2026

Volume I

Reported by:
CATHERINE A. NOLASCO, RMR, CRR, BS
CSR No. 8239
Job No. CA 7889273

PAGES 1 - 205

Page 1

Q    So the -- what was the name of the

09:53:11

company -- the software company when you were
building the systems --

A    It was RTZ Associates and then RTZ
Systems, just because it was originally more

09:53:18

consulting, when my father worked there.  And then
when I took over and started doing it, we really
pivoted hard into information systems.

Q    Okay.  So the --

A    So that was a naming change and really

09:53:34

just an evolution of what we did.

Q    All right.

A    But that was, like, 2015-ish.  I mean, it
was quite a while ago.

Q    Okay.  One thing that I --

09:53:44

A    I'm not positive on the year, but ...

Q    Yeah.  Let's break that down a little bit,
and I want to make sure I understand --

A    Sure.

Q    -- what RTZ Associates is and which entity

09:53:50

is which and what happened to it.

But just one thing for the court reporter.
If we're both talking at the same time, it makes it
very difficult for her.  So I will try to wait for
you before I jump in with a new question.  If you

09:54:04

Page 13

could try to wait for me to finish my question

09:54:06

before you answer, it will just make it much easier
on her and we'll get a cleaner record.

Is that fair?

A     Sounds.

09:54:14

Q     Okay.  So we're in the late '90s, and you
go to work for RTZ Associates.

Is that the -- just from a corporate-form
standpoint, is that the same entity that ultimately
was rolled up into Collabrios, or was there an

09:54:30

entity change?

A     There were -- I'm not remembering the
specific moments, but it was, like, two people in a
sole proprietorship, and that then became an S corp.
That S corp is what became Collabrios.  The

09:54:48

S corp -- I don't know the exact year it happened,
but it was around that period of time, around 2000
or so, but I don't know the exact date.

Q     Okay.  So --

A     It's been a few years.

09:55:01

Q     Fair enough.

So the -- and whether it was '99 or 2000
or 2001, for, I think, our purposes, it doesn't
matter.  I just want to make sure I'm tracing the
corporate entity.

09:55:10

Page 14

So -- and that corporate entity, when it
09:55:12
became an S corp, it was RTZ Associates; is that
what it was called?

A    Correct.

Q    And it remained that same S corp until the
09:55:18
Collabrios transaction; is that correct?

A    Correct.

Q    All right.  Can you describe for me
what -- what Collabrios is?

And, you know, I know there was a
09:55:29
transaction.  It brought a number of different
companies, maybe parts of companies together.

Can you walk me through what happened
there?

MR. LEE:   I'm going to interpose an
09:55:42
objection.  Vague and ambiguous.  Calls for
speculation.

And also, to the extent your response
requires you to reveal attorney-client
communications, I'd ask that you not do so.  To the
09:55:50
extent that you can answer the question without
doing so, then go ahead and respond.

THE WITNESS:  To clarify the question, are
you talking about business purpose or formation
or --
09:56:04

Page 15

BY MR. WEIR:

09:56:05

Q    I want -- I want to kind of know all those things, and I -- maybe we break them down into -- so why don't we just start with why it happened.

So what was the business purpose of

09:56:14

creating Collabrios, from your perspective?

A    Candidly, the entity had gotten large.  We were growing at a good clip.  I had done it for about 20 years, give or take -- I mean, a little more, but I like to call it 20.  And we were at a

09:56:32

point where we were growing fast and it was time to really look at how we could grow infrastructure better.

Q    So the -- when you say "we" were growing fast, I assume you mean RTZ was growing fast?

09:56:49

A    Correct.

Q    And then the Collabrios transaction, just so I have the timeline, when did that close?

A    The Collabrios transaction closed in October of 2024.  I don't remember the exact date.

09:57:05

Q    Another thing that will come up throughout the course of the deposition:  I don't want you to just randomly guess about stuff.

A    Okay.

Q    But if you have a general basis -- and you

09:57:20

Page 16

did a good job there for, "yeah, I" -- "it was in
09:57:22
this general time frame" or, you know, "I would
estimate this."  I'm entitled to those things, but
just rank speculation, I don't want that.

A    Fair enough.
09:57:34

Q    But -- so you did -- you did a good job
there.  And that will come up from time to time
throughout the deposition.

All right.  So immediately prior to the
Collabrios transaction -- so let's call it the 2023
09:57:45
time period -- can you describe for me RTZ's lines
of business?

A    Sure.

We did -- and these are -- RTZ had a very
dense book of business.  We had services for PACE,
09:58:06
which included everything from operational tools, a
TPA, we had adult day services.  We had systems for
state governments that looked at bringing together
case management tools, so we had a lot of state
contracts going through.  We did 1915(c) waiver
09:58:29
programs.

The genesis of RTZ, back -- going to the
associates days, was the idea that information
should drive decision-making.  And there was always
the phrase, going back to when I started, that --
09:58:42

Page 17

program-based, policy-oriented.  So we always looked
09:58:44
at informing these organizations, not just how to do
their job, but how to do it in the context of policy
and continuous quality improvement, which seems to
change the acronym every so often, but making
09:58:55
information really make an impact difference.  And
that goes back to the beginning of PACE, that
started in San Francisco at On Lok, which is a
program my father worked at as the information
director back in the '80s.
09:59:07

Q    You said "On Block"?

A    On Lok.

Q    Oh, On Lok.

A    Yeah.  And apologies to the Lunar New
Year.  I don't know exactly what it means, like
09:59:17
happy home or something to that extent.

Q    So was the -- you mentioned a number of
different services.  Were they all PACE-related?

A    No.

Q    What -- what portion of the business would
09:59:38
you say in the -- let's call it the '23 time
period -- related to PACE products --

A    I --

Q    -- or services?

A    PACE was, overall in the country, going --
09:59:48

Page 18

a lot of growth, and it was growing for us in the
09:59:53
same way.  So it was probably half or more than
half, but historically it had probably been closer
to a third.

But I don't -- that's a recollection.  I
10:00:03
would have to go back and look.

Q    Okay.  What is -- if you could describe
for me what PACECare is.

A    PACECare is a information system that
organizes the workflows of a PACE organization from
10:00:27
the first call -- a participant inquires in the
program -- all the way through the management of
that participant.  The management of the participant
includes ambulatory EMR functions, includes
authorizations, includes day center, includes
10:00:45
financial transactions, includes over- -- overview
information about how to manage those clients and do
reporting at the federal level and many states.

That's a synopsis, but we'd be here all
day if I gave you every detail.
10:01:02

Q    Fair enough.

So who -- who is -- I mean, PACE programs
are using it, obviously.  I mean, that's the --

A    Yeah.

Q    -- that's the target customer.
10:01:11

Page 19

that Intus was accessing the system or having these

14:28:08

automated scripts pull data, did you notice any sort of, like, system strain or delay issues or --

A    We did have some sort of bursts and speed issues, but even to this day, I don't know if that

14:28:29

was Intus running the reports or the clients running them for their own -- creating their own data warehouse to go through and do stuff.

But, I mean, you would see people during reporting periods, "All of a sudden, it's very slow

14:28:43

this morning."

And we're like, "Yeah.  Well, you ran this report that grabs every data table at once."

Q    So I suppose, based on your answer, the slowness could have absolutely nothing to do with

14:29:05

Intus or running reports or running the --

A    It's probably the expanded export that is to blame, but it doesn't mean Intus was running the expanded export, in fairness to them, because they weren't the only ones using that report.

14:29:16

But we do know that that report specifically, when we did reviews, came up as a big pig in the pipeline going through.

Q    So how long would it take the system to generate the report?

14:29:35

Page 149

A    Generally about two to three minutes.

14:29:36

What could be a challenge for any section of the system or any system is, when people don't get it back in a minute and click on it five times. Although anybody who ran it regularly wouldn't do

14:29:46

that.  So you really generally saw it in two to three minutes go through, so --

Q    All right.  So the --

A    I mean, you can screw up anything if you try hard enough, but really -- so the -- yeah, like,

14:29:57

you click it -- and you even -- and the way we set it up, too, so the user wouldn't be inconvenienced, is you eventually ended up with the ability to set it up and just have it run in background, so you could come back and click it later, because we

14:30:10

didn't want them to have to wait around for it. So -- and we wrote special instructions how to do it.  So we tried to make it easier and easier to do over time.

Q    Okay.  Do you know who Community PACE is?

14:30:23

A    I believe Community PACE is a program in the State of Michigan.  I don't know where in the State of Michigan, but there's a lot of PACE programs that contain the word "community," so I could be mistaken.

14:30:52

Page 150

Q    Were you aware that they received a
14:30:59
cease-and-desist letter about providing access to
Intus?

A    I am aware that they got a letter.

Q    Was that something that you directed?
14:31:11

A    That was something in consultation with
counsel that was decided to be sent.

Q    The -- any particular -- any particular
reason why it was sent to them?

A    I think there was a whole narrative around
14:31:35
access that was very strange with Community PACE,
specifically where Intus purported to be part of
Tabula Rasa and covered by their NDA, and,
therefore, they should be given access without an
NDA.  And it just sounded really strange, and we
14:31:55
wanted to sort of get more information on that.

Q    Was that the -- is that the only reason
you recollect?

A    I mean, that's odd, in terms of going
through, so it just raised questions about what they
14:32:13
were trying to do.

Q    When you -- let's shift gears a little bit
here.

In the acquisition of Tabula Rasa, the
PACELogic product, were you aware, in the course of
14:32:40

Page 151

acquiring those assets, that there was a access

14:32:46

agreement between Intus and Tabula Rasa?

       A       Complicated answer.

               I've asked for a copy of this agreement.
People have referenced things.  I've never seen a

14:32:59

document specifically to that effect, but I remember
having several conversations trying to clarify the
fact that there was some understanding that there
was access.

               MR. WEIR:  Well, today is your day.

14:33:18

               THE WITNESS:  That's good.

               MR. WEIR:  At least I can be helpful on
one thing.

               THE WITNESS:  I told you this was a
Valentine's box that people were going to drop

14:33:28

things in.

               (Exhibit 57 was marked for
               identification by the court reporter.)
               THE WITNESS:  Lots of reading.
BY MR. WEIR:

14:33:51

       Q       So this is 57, right?
       A       Yeah.
               David, are you familiar with this
document?
               MR. LEE:  Has this been produced?

14:33:58

Page 152

THE WITNESS:  I feel like we've asked for it a whole bunch of times.

MR. WEIR:  I believe it has, although I don't see Bates numbers on it.  So I'm not sure why we don't have a Bates one.  I did ask my team to make sure it was produced, so -- and I'm -- there may be actually more than one agreement on this, but ...

Q    So I take it that you've never seen this before?

A    I have not, although I've heard rumors of it.  No, I mean, it is a document that I've asked to see several times during the acquisition and subsequently from David during this process.

Q    Now, just so I understand the dynamics --

A    Sure.

Q    So in -- this was signed in -- this was signed in '22 -- it looks like August-September of '22.

A    Okay.

Q    So the -- it's about the same time as the discussions -- that Intus is in discussions or at least starting discussions with RTZ on an access arrangement.

A    Yeah.

Page 153

Q    And the -- I'm sure there's different

14:35:33

functionality, but at its core, does the PACECare product and the PACELogic product -- at least as in 2022, do they have overlapping -- largely overlapping functionality?

14:35:55

A    I'm going to give you another complicated answer.  You're going to love me for this, but again --

PACELogic is set up as a coordinator of other systems, specifically Greenway for medical

14:36:06

information.  And PACELogic, which was doing some of the PACE-specific functions and it contained no financial section -- PACECare did all of those within one architecture.  So collectively, it did the functions -- if you bought Peak as a third-party

14:36:26

administrator, you used PACELogic to do your PACE stuff and then you used Greenway to do the EMR, and they were sort of daisy-chained together, which was one of the big challenges with it.

But that's -- so with that ground, they

14:36:41

covered similar stuff, but finance was outsourced rather than part of the underlying model.

Q    Okay.  And so the -- I guess when Collabrios acquired the Tabula Rasa assets related to PACELogic, I guess, if I'm -- this -- this did

14:37:06

Page 154

not come up in the due diligence?

14:37:11

A    It was discussed, requested, and never provided.

Q    Okay.

A    I don't know why it's such a complicated

14:37:29

document to get ahold of, but if you look at it, it talks about Intus is being deployed and will pay TRHC $10,000 per month.  I know specifically when I asked about where those payments were or were they happening, I was told they never happened, it never

14:37:46

happened.

And so I said, "I thought there was a data agreement and you were paying for it."

And they said, "Don't worry about it. That doesn't really -- that's something that didn't

14:37:55

really come to fruition."

So it was Schrödinger's cat.  I mean, it existed and it didn't exist, and then it didn't come over as part of that packet.

Q    So your understanding is the -- this was

14:38:07

not a contract that was acquired by Collabrios?

A    My understanding was that this was essentially a stillborn contract, where the $10,000 was never actually paid, and it never really got effectuated.

14:38:19

Page 155

And again, my understanding was based on the fact that no one wanted to produce this document for me, so it was kind of like talking around in circles on things.  So understanding the structure, I was brought in by AHP to be part of the conversation around PACELogic, but AHP technically acquired the Tabula Rasa assets, not me as the Collabrios lead, but they brought them in and then merged them in.  So I was present but not the person directing those pieces.

So I don't know if they received documents other than I did.  I know that I never, you know, sort of got chapter and verse on this, because I wanted to understand were we still getting this revenue and what was the obligation under it.

I know, perhaps complicating it -- I think Cal Knowlton left shortly after this was signed. Cal Norton was the founder of Tabula Rasa, but Tabula Rasa was part of a take-private that deposed Cal, for lack of a better term.  So I don't know if this was, like, the last thing he did or something they all ignored or what, but it was very confusing.

Q    So if you look at Confidential Information --

A    Uh-huh.

Page 156

Q    Now, I would assume that you would agree
14:39:39
with me that the folks -- the makers of PACELogic
would have the similar IP concerns that you
expressed earlier, with respect to interface and
whatnot.
14:39:54

Would that be a fair statement?  Would you
agree with me on that?

A    I think we saw --

MR. LEE:  Objection.

THE WITNESS:  -- the world --
14:39:59

MR. LEE:  Hold on.

THE WITNESS:  -- very differently.

MR. LEE:  Hold on.  Objection.  Calls for
speculation.

BY MR. WEIR:
14:40:05

Q    You said --

MR. LEE:  If you know, you can answer.

BY MR. WEIR:

Q    Yeah, you said you saw the world very
differently.
14:40:09

Describe for me what you mean.

A    I think Tabula Rasa was a medication
company that ended up with some IT assets that they
never knew what to do with.  And so they didn't know
either what they had or what they wanted to do with
14:40:25

Page 157

them.

14:40:27

And that's my personal opinion on it, not -- I can't give you chapter and verse of why I felt this, but that's why their assets were in play.

Q   Okay.  All right.  So since you have not

14:40:39

seen this before, and you do -- and it sounds like you don't believe it was an asset that was acquired by Collabrios --

A   I'm not sure that any payments were -- I mean, I think -- I'm not sure any payments ever

14:41:01

existed under this arrangement, is the other thing that's -- Robbie signed it.

I don't know if you asked Evan about this in his deposition or not.

But I don't know, in terms of going

14:41:16

through -- the way it was explained to me by so many different people was, like, yeah, technically it existed and everyone ignored that it existed.  And so it was rumored, but it seems like did this ever actually get put into place or not was unclear too.

14:41:32

Q   Okay.

A   That was one of the reasons, allegedly, why it wasn't provided to me, too.  Like, oh, it doesn't really matter.  It didn't really happen.

So I'm certainly not the person most

14:41:46

Page 158

knowledgeable on it.  I was the person most

14:41:48

interested in it, however.

MR. LEE:  You've answered.

MR. WEIR:  Yeah.  The --

THE WITNESS:  Sorry.

14:41:54

MR. WEIR:  Fair enough.

Q    You know, there's a -- I won't -- I won't ask you that.  That's not -- since you didn't write it and you didn't sign it, let's -- at least now you have a copy of it.

14:42:08

A    That's good.

Q    Was Community PACE, if you know, the only PACE -- the only PACE entity that received a -- some sort of cease-and-desist letter from RTZ regarding Intus's access?

14:43:20

A    I don't know the answer to that question.

Q    How often would you say you were directly interacting with PACE clients via email?

MR. LEE:  Over what period of time?

MR. WEIR:  Let's call it from '22 to '24.

14:44:17

THE WITNESS:  How do I -- I mean, what do you mean by the question?  Like, how often would I talk to any individual client --

MR. WEIR:  (Nods head.)

THE WITNESS:  -- or all clients?

14:44:38

Page 159

I really only talked to clients who either

14:44:39

approached me directly on a question, 'cause they had historical background with me, or was having an acute issue that got raised to me.

So from '22 to '24, it went from a period

14:44:51

where we staffed up and we had a lot of people who were now taking over items, and I would get sort of the outside issue.  It's why Senior Care Partners, that was working on a new version -- I'd talk to them more than I'd talk to, like, average clients.

14:45:04

So it was sort of, when things got elevated to me, they went through, but, generally, if it wasn't elevated, I wasn't the person doing it.

BY MR. WEIR:

Q    And so who would have been your folks on

14:45:15

the front lines dealing with the PACE program directly?

A    It -- '22 was a big transition people year, just because we came out of the pandemic and people had to go back to the office as we went into

14:45:27

'22, so -- but Melanie was there.  Laura was there. Dylan was there.

Q    Just for the record, I know some of these, like Melanie Martinez.

A    Laura Emery, Melanie Martinez, Dylan

14:45:43

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A     They're not documented in a specific way.

14:47:59

Q     Did you limit the time period of the search?

A     I did.  I think I ran it from 2021 forward.

14:48:10

Q     Did you do any searches for specific people, like "all of my communications with Robbie"?

A     I did do that.

Q     You said that Collabrios has moved to a Outlook-based system?

14:48:38

A     Yes.

Q     Was -- were the communications that existed on the Gmail-based system ported over into the Outlook system?

A     Not all of them.  There's a time cut-off.

14:48:54

I'm not sure where they ultimately did that time cut-off.

Q     Do you know if the Gmail system is still available for searching?

A     I do not know if it's still available.

14:49:07

Q     Who would know that?

A     Kevin Lathrop would know that 'cause he supervises the CTO.

Q     When did Kevin come aboard?

A     Call it January of '25, maybe.

14:49:24

Page 163

Q    So shortly after the Collabrios

14:49:27

acquisition --

A    Yeah.

Q    -- or deal?

A    Yeah.

14:49:32

Q    And did you know Kevin before the

transaction?

A    No.

Q    Was -- was he introduced by the investors?

A    He was through a search firm.

14:49:51

Q    Oh, okay.

A    I won't elaborate on it because it will

just get me in trouble for giving too long an

answer, but it's also not germane, so you're not

missing anything.

14:50:06

Q    Okay.  And I assume same thing with

respect to -- well, do you know, one way or the

other, whether there was any sort of, like, email

capture or in-box capture for your documents?

MR. LEE:  Objection.  Vague and ambiguous.

14:50:28

MR. WEIR:  Sorry.  That wasn't a very good

question.

Q    So sometimes -- sometimes what we'll do in

these cases is we'll take a snapshot of your

in-box --

14:50:38

Page 164

A    Okay.

14:50:39

Q    -- and sent items, and then that gets exported or saved in some way.

Do you know if that happened in this case?

A    I do not.

14:50:45

Q    And I assume that same answer with respect to all of the potential people that might have sent relevant emails?

A    Yeah.

Q    Okay.  Are you aware that you have filed

14:50:57

counterclaims in this case?

A    I am.

Q    Do you know what they are?

A    I believe, as we go through, we filed some for wrongful access and for interference with some

14:51:48

of the things we've done.

We've debated different counterclaims.  I don't know which ones have ultimately survived to be part of the record.

Q    With respect to the access counterclaims,

14:52:02

what is your understanding of how RTZ has been or its systems have been harmed by the Intus access?

A    I think strain on the systems, as we've talked about.

Q    Anything else?

14:52:33

Page 165

A    You know, it's been a long time since I've 14:52:37 thought about the counterclaim side of this. Nothing immediately comes to mind, but ...

Q    There was an allegation that RTZ made in the case about Intus mining valuable data from 14:53:20 PACECare functionality, operability, layout, interfaces, et cetera.

Can you tell me everything you know about that allegation?

A    I think that stems from a suspicion that 14:53:36 the speed with which they built their system and the basis of their running start was an understanding and ability to explore our system.

Q    What's your understanding of how long it took -- I assume you're referring to CareHub; is 14:53:52 that correct?

A    I am.

Q    What's your understanding as to how long it took Intus to create CareHub?

A    I don't know how long it took them to 14:54:04 create CareHub in personnel hours, which is probably the relevant math.  I don't know how big their staff is.

I do think that their methodology appeared to be look at all the systems that are there and 14:54:17

Page 166

then iterate upon them, which is always our concern

14:54:19

on access to our systems.

Q    So you keep saying it's a concern.

Do you have any -- as you sit here today, any evidence that you can point to that that

14:54:32

actually happened?

A    I haven't seen their system, nor am I aware of exactly where they went in our system.

Q    Has anybody at Collabrios or RTZ -- do you know -- have they seen CareHub?

14:54:58

A    No one I've spoken to has seen CareHub.

Q    And then I think we talked about it earlier in the audit trails.

Is that the universe of people that would have been associated with or trying to review what

14:55:14

areas of PACECare Intus accessed?

A    Can you take another shot at that one?

MR. LEE:  Vague and ambiguous.

MR. WEIR:  Yeah.  Fair enough.

Q    We talked about audit trails a little bit

14:55:29

before.

I don't think I asked you the ultimate question about who are the people that did the audit -- audit trail work that you referred to.

A    Who looked at -- they would have been

14:55:38

Page 167

someone on the DBA team.

14:55:40

Q    On the DBA?

A    Database administration team, looking at logs.

The way that would have come to me would

14:55:45

have likely been, "Can someone check where they've been?"

And then someone would have asked a technical person to produce it, and then they would have relayed the information to me.

14:55:55

Q    And what do you recall being relayed to you about that?

A    That -- I believe -- and I'm going back a number of years -- that Robbie had been given an account by Beacon, and he had gone through the

14:56:18

system.

Q    Okay.  Has RTZ lost any -- lost any clients or any business as a result of anything that Intus has done?

A    I -- I would -- I mean, this calls for

14:56:55

some speculatization [sic] -- I can't talk and the air conditioning kicked in, too, so -- I think the way the conversations have gone have been prejudicial in terms of how RTZ has been viewed by clients.  And I think it's evidenced by notes that

14:57:16

Page 168

we saw from Intus earlier today and many, many more

14:57:20

like them that Intus has presented itself as this very virtuous party who only -- only wants what's fair, and then when we get to the one-on-one dialogue, they keep changing and moving the ball and

14:57:32

making it hard to do, and then come back and complain to clients.

And I think, for us, we've tried to be sort of slow and steady, and they've been -- move around fast and break stuff, because they were in a

14:57:42

different direction in a different timeline.

And I think that has made it really difficult for us to go through and do things.

Q    But as --

A    As a tortious interference question, I --

14:57:56

you know, I think they've gone in with clients we've had and spent a lot of time.  I think if you look at Beacon, which has become a client, and one where Robbie had access, it looks like, yeah, they spent time going through the system and then talking to

14:58:10

that client and then taking that client on.

So it seems like if he did indeed go into Beacon and Beacon did become their client, I think he used that access to really talk to them and understand where they're coming from and then to

14:58:22

Page 169

iterate for them.

14:58:24

Q    Well, I mean, I assume you're not saying that Beacon can't talk to Robbie about things they like and dislike about the RTZ system.

A    I'm saying Beacon shouldn't have provided

14:58:41

Robbie access to the system to go in and facilitate that conversation.

Q    And your basis for saying that that conversation took place or it was facilitated by access is what?

14:58:56

A    Based on the questioning of my team, "Can someone check if he went into that system?" and them saying they did.

Q    Anything else?

A    That would be the primary.

14:59:16

Q    So are you -- and let me just make sure I understand what you're saying.

A    Sure.

Q    Are you saying that you believe that -- that you lost the -- does RTZ no longer service

14:59:27

Beacon?

A    We do -- we no longer -- I think we service a subset of them.

Q    And I guess I should say Collabrios now, not RTZ.

14:59:40

Page 170

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:    03/09/2026

*Catherine A. Nolasco*

Catherine A. Nolasco, RMR, CRR, BS
CSR No. 8239

Page 202

Veritext Legal Solutions
866-299-5127               calendar-ca@veritext.com               www.veritext.com

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,                      )   Case No.
                                       )   4:42-cv-01132-JST
          Plaintiff,                   )
                                       )
     vs.                               )
                                       )
RTZ ASSOCIATES, INC. And DOES 1        )
through 10,                            )
                                       )
          Defendants.                  )
_____)

REMOTE PROCEEDINGS OF THE

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

PETER SCHWECHHEIMER

San Francisco, California

Wednesday, May 20, 2026

Volume I

Reported by:
ROCHELLE HOLMES
CSR No. 9482
Job No. 8227878
PAGES 1 - 193

Page 1

That's -- that's Paragraph 38.

Q    Okay.

A    And -- so yeah, that's Paragraph 38.

Q    Okay.  So she comes back.  So that was your request and she responds for -- well, I guess the --  11:11AM was there a -- you gave her the list of stuff that Intus folks accessed.  She goes through and ranks them high, medium and low.

Is there a -- and maybe you produced this, I don't have it in front of me, which is why I'm asking,  11:12AM but did you produce that chart as to what she ranked high, medium and low?

A    I don't know that I did, but if I didn't, that's my oversight, because I would have wanted to produce that.  And so that would be on me if I didn't.  11:12AM

MR. LEE:  It has been produced.

MR. WEIR:  Do you know if we have that?

MR. LEE:  Yes.  It's been produced amongst the materials that were provided today.

MR. WEIR:  All right.                         11:12AM

Q    BY MR. WEIR:  Was there any effort to quantify what "high" means, for example?

A    No.  That's -- I looked at that as false precision; right?  So many -- you know, you've got a simultaneous effect here.  It's hard to know -- you  11:12AM

Page 39

get this in patents, you know, there's 100,000 patents in an iPhone, how would you rank them one to, you know, 100,000?  It's almost a meaningless exercise because some functions and features are more important to some people than others.                                      11:13AM

And so I want to just keep it basic and get some idea of like what did they see, was it operational, did it help them in any way and was it -- was it something in PACECare that you typically find in another EHR system, like was there something unique   11:13AM in PACECare that -- was it something unique that they saw in PACECare that they wouldn't have seen in another EHR system.

And so without trying to impose some, you know, some ranking, numerical ranking system on that,   11:13AM I thought high, medium, low value was probably the best that we could do.

Q    All right.  So you get this ranking.  What are you doing with it to convert that into a damage figure, if anything?                                      11:14AM

A    Well, I haven't done anything yet, but I can imagine a world in which information comes back on PACECare and the development of PACECare.

THE REPORTER:  I can't hear you, Mr. Lee.  I know you're not talking officially, but...                11:14AM

Page 40

THE WITNESS:  He's not.  He just reminded me.

THE REPORTER:  I know.  But Mr. Weir can hear him, so -- and just for a clear record.

THE WITNESS:  But I can imagine giving information on -- on CareHub where -- where you could match the development or -- about certain -- the inclusion or exclusion of certain functions and features based on -- because Ms. Emery did identify at least some of these ones that were ranked high that were available in PACECare but wouldn't have necessarily be available in a competitor product.

And so the development of CareHub, if it includes some or all of those particular features or functions, could be very relevant to my damages calculation.

Q   BY MR. WEIR:  Sure.  So you would -- so I was kind of asking you about this earlier.

You'd have to compare -- you have to compare what CareHub actually became to what PACECare was at the time of access to see if there's a match.  And if there's not a match, then there's not going to be any damages associated with CareHub development; correct?

A   So could you repeat that?  Because I get the CareHub, PACECare thing mixed up.

11:14AM

11:15AM

11:15AM

11:15AM

11:16AM

Page 41

866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q    So based on your answer, I take it that it does -- this is going to hinge upon whether or not there are certain features and functionality that were "copied" by Intus when they built CareHub; right?

A    Well, I wouldn't necessarily copied                11:16AM
verbatim.  But -- and again, I'd be just speculating here.  I don't know.

And -- and the -- the false comparison would be to say, well, what would -- what would CareHub look like without it if they didn't have this development     11:16AM
and what would it look like with it.  You don't know what it would look like without it.  There's no alternative world in which CareHub would have been developed without having -- without Intus employees having access to -- to PACECare.                      11:17AM

So we really don't know what in the "but for" world what CareHub would look like if it didn't have access, because they did.  And so you can't unring the bell on that one.

Q    Do you know what -- do you know what        11:17AM
Ms. Emery did to come up with her high, medium and low rankings?

A    I mean, I instructed her and we discussed this.  Give me one second here.

Just that, you know, as I say here (As        11:18AM

read):

"Modules that provided insight into

PACECare's organizational structure and/or

included features or functions uncommon to

the standard EHR software were ranked as    11:18AM

high."

So things that had to do with

organizational structure or functions that were

uncommon to other EHR software, she ranked them high.

But modules that had more of a standard answer or    11:18AM

design were marked as medium or low.

Q   You used the term "organizational structure"

a few times.  Is that -- is that how you described it

to Ms. Emery?

A   I think that's how she described it to me.    11:19AM

Q   What does that -- what does that mean to

you, what -- organizational structure?

A   As a layperson I would say it's how things,

modules interact with one another, how data is, you

know, what variables are called, just the basic    11:19AM

structure of how this operates and feels to the

consumer, a customer, how it operates internally, what

makes some things intuitive, how modules interact, how

the information is stored.

I would say that anything in how things are    11:19AM

Page 43

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, Rochelle Holmes, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me via videoconference; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated this 1st day of June, 2026

*Rochelle Holmes*

Rochelle Holmes

CSR No. 9482, CCRR No. 0123

Page 190

# EXHIBIT "F"

# FILED UNDER SEAL

# EXHIBIT G

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

----------------------------------x

INTUS CARE, INC.,                          :

                    Plaintiff,             :   Case No.

        vs.                                :   4:24-cv-01132-JST

RTZ ASSOCIATES, INC., and DOES 1 :

through 10,                                :

                    Defendants.            :

----------------------------------x

AND RELATED CROSS-ACTION              :

----------------------------------x


            VIDEOTAPED DEPOSITION OF EVAN JACKSON

                San Francisco, California

              Tuesday, November 25, 2025


Stenographically Reported by:
LORI STOKES
RPR, CSR No. 12732

Job No. 2173676

Pages 1-296

one -- so, I guess to walk through my general recollection of the timeline, as I noted, our access got cut off.

And then shortly thereafter, we started hearing whispers and rumors of RTZ wanted to build a competitive product to Intus or building out.

So that's kind of -- you know, we started hearing those whispers and rumors.  I'd say after that is when we started seeing RTZ as more of a competitor.  So yeah.

Q    Okay.

As you sit here today, do you have an understanding as to whether or not RTZ actually did roll out a data analytics product?

A    I don't know at that time.  I've heard rumors more recently that they're rolling out some data-related products.  And -- I don't know.  I don't know the inner workings of their business.

Q    So I want to see if I can put a finer bead on this.

Generally speaking, do you have an understanding as to when it was Intus considered, by time time, RTZ to be a competitor?

A    Again, I would say from -- and this is, you know, again from my personal perspective, not

speaking on behalf of the business -- started seeing them as a competitor after our access got cut off.

We started hearing they were building a competitive solution to us.  That's when.

Q    Okay.

With the realization, or at least in your mind, the conclusion that RTZ had become a competitor, in your view, do competitors interact with each other differently than noncompetitors?

ATTORNEY BESHAI:  Objection.  Vague as to "differently."

BY ATTORNEY LEE:

Q    Do you understand the question?

A    Can you rephrase?

Q    Sure.

Does Intus treat competitors differently than it treats noncompetitors?

ATTORNEY BESHAI:  Objection.  Vague as to "treat."

THE WITNESS:  The reason I think about it is -- it's hard to answer.  Each relationship is different.

I mean, even with times, with competitors, you have to work with each other, partner together, so it's just -- it's a spectrum.

BY ATTORNEY LEE:

Q    Okay.  Well, let's narrow the spectrum and just focus on RTZ.

Does Intus react or view RTZ differently as a competitor now than it did at the time RTZ was a noncompetitor?

ATTORNEY BESHAI:  Objection.  Vague as to "view" and "react."

BY ATTORNEY LEE:

Q    You're a Brown-educated guy.  You're smart.

You understand these words, right?

A    I want to make sure I really understand the questions so I can answer them.

Q    So the question is:  How does Intus treat RTZ differently as a competitor versus a noncompetitor?

A    I would say that where our relationship changed -- again, and I lay out that timeline as such because it's not necessarily because of whether we see them as a competitor or not.  I think our relationship changed because of the way they started interacting and treating us.

Again, throughout this time, we're working well together.  We're not -- and all of a sudden

that relationship as partners changed drastically.

So I think that's really, you know, what shifted.

Q    So a drastic change in behavior --

A    Yes.

Q    -- in a relationship is what drives, in your mind, the difference between a competitor and a noncompetitor?

A    Well, no.  Again, you asked me to narrow it down to a specific instance, and that's what changed the relationship.

Q    Okay.

Okay.

Intus has deployed CareHub, correct?

A    Yes.

Q    And that's a rollout that started happening in 2025?

A    Yes.

Q    Okay.

Do you view CareHub as being a competitive product to PACEcare?

A    Yes.

Q    And so would the deployment of CareHub, in your view, alone make RTZ a competitor?

A    Yes.

EVAN JACKSON                                                          JOB NO. 2173676
NOVEMBER 25, 2025

                                        )
STATE OF CALIFORNIA          )
                                        )

                  CERTIFICATE OF REPORTER

     I, LORI STOKES, do hereby certify that the witness in the foregoing deposition was by me duly affirmed to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed under my direction and supervision; that the foregoing is a full, complete and true record of said testimony; that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

     I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of the cause named in said caption.

     IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of December, 2025.

_____

          LORI STOKES, CSR No. 12732