NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:  415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:  949.833.7878

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>             Plaintiff,<br><br>        vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>             Defendants,<br><br>RTZ ASSOCIATES, INC.,<br><br>             Counter-claimant,<br><br>        vs.<br><br>INTUS CARE, INC.,<br><br>             Counter-defendant. | Case No:     4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**DECLARATION OF DAVID C. LEE IN SUPPORT OF DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S OPPOSITION TO PLAINTFF INTUSCARE INC.'S MOTION TO EXCLUDE EXPERT TRACI CREEGAN**<br><br>*[Concurrently filed with Opposition, and Declaration of Traci Creegan]*<br><br>Date:          July 2, 2026<br>Time:         2:00 p.m.<br>Courtroom: 6 |

DECLARATION OF DAVID C. LEE IN SUPPORT OF RTZ ASSOCIATES, INC.'S OPPOSITION TO PLAINTFF INTUSCARE INC.'S MOTION TO EXCLUDE EXPERT TRACI CREEGAN
70512534.v1

## DECLARATION OF DAVID C. LEE

I, David C. Lee, declare as follows:

1.      I am an attorney at law admitted to practice in this Court, and a partner of Nossaman LLP, counsel of record in this action for Defendant and Counter-Claimant RTZ Associates, Inc. ("RTZ").  I make this declaration in support of RTZ's Opposition to Plaintiff IntusCare Inc.'s Motion to Exclude Expert Opinions of Traci Creegan. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts.

2.      Attached as **Exhibit A** is a true and correct copy of the relevant portions from Traci Creegan's deposition transcript, taken on May 26, 2026.

3.      Attached as **Exhibit B** is a true and correct copy of the relevant portions from Alexander Rothberg's deposition transcript, taken on February 27, 2026.

4.      Attached as **Exhibit C** is a true and correct copy of the relevant portions from Evan Walter's deposition transcript, taken on March 16, 2026.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Dated this 11th day of June 2026 in San Francisco, California.

_____
DAVID C. LEE

DECLARATION OF DAVID C. LEE IN SUPPORT OF RTZ ASSOCIATES, INC.'S OPPOSITION TO PLAINTFF INTUSCARE INC.'S MOTION TO EXCLUDE EXPERT TRACI CREEGAN

70512534.v1

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,                    )
                                     )
          Plaintiff,                 )
                                     ) Case No.
     v.                              ) 4:24-cv-01132-JST
                                     )
RTZ ASSOCIATES, INC., and            )
DOES 1 through 10,                   )
                                     )
          Defendants.                )
                                     )

REMOTE VIDEO-RECORDED DEPOSITION

OF

TRACI CREEGAN

TUESDAY, MAY 26, 2026

Stenographically Reported By:
JENNIFER L. SMITH, CA CSR NO. 10358, RMR, CRR, CRC
Job Number: 8228028

Page 1

electronic health record.                           10:14:32

So that would mean that I am often analyzing audit logs, activity logs, user activity within electronic health record to identify where potential fraud may have occurred or where potential activities were taking place within the record.                           10:14:34 10:14:37 10:14:42 10:14:44 10:14:48

So that's primarily what I do in that arena from a litigation perspective.                           10:14:50 10:14:53

Q.   It sounds like -- I don't want to put words in your mouth, but it sounds like you kind of have -- there's multiple buckets, one kind of a compliance role, where you're providing consulting services to assist either IT vendors or healthcare organizations with compliance with various IT-related regulations, and then this litigation support bucket.                           10:14:59 10:15:01 10:15:02 10:15:06 10:15:10 10:15:14 10:15:18

Is that -- is that a fair characterization of your practice?                           10:15:21 10:15:23

A.   I would.  I would say that's a fair characterization.  I would also say there are two other buckets that go along with that, one being that I work with attorneys who are representing private equity firms or venture capital firms that are in the process of a potential merger acquisition, and they want to review their health information technology to identify if there are any potential compliance risks.                           10:15:24 10:15:26 10:15:29 10:15:32 10:15:35 10:15:39 10:15:43 10:15:45

Page 13

secure the data they need; correct?    10:36:34

A.    Typically I -- I don't know that I've seen    10:36:36
an analytics vendor access an electronic health    10:36:38
record to obtain the electronic health information    10:36:43
they need.    10:36:46

In my experience, they are -- the analytics    10:36:46
vendor is requesting an export or an extract of    10:36:50
electronic health information that they are going to    10:36:57
use and analyze.    10:36:59

I -- in my experience, I have not had an    10:37:00
analytics vendor who has requested or received access    10:37:03
to the electronic health record for the purpose of    10:37:06
data analytics.    10:37:10

Q.    Let's assume that -- let's assume that    10:37:15
that -- there was an analytics vendor that did    10:37:17
receive direct user interface access to pull the    10:37:22
data, and maybe it was because the way the system    10:37:26
works, it's the most efficient way, or there's a    10:37:29
number -- potentially a number of reasons why that    10:37:32
was the elected method.    10:37:35

Would you view that as a security risk?    10:37:36

A.    I would view it as a potential security risk    10:37:39
because that's not the normal or industry standard    10:37:42
practice for requesting electronic health information    10:37:46
or data from an EHR system.    10:37:50

Page 29

BY MR. WEIR:                                          10:42:09

Q.  Do you -- do you think if an EHR vendor           10:42:23

refused to provide access to a coding vendor that a   10:42:27

particular provider wanted to use, that it would      10:42:31

create any legal issues for that EHR system?          10:42:34

MR. LEE:  Objection.  Vague and ambiguous as          10:42:37

to "legal issues."  Calls for a legal conclusion.     10:42:40

Lacks foundation.  Calls for speculation.             10:42:43

You can answer, if you understand.                    10:42:45

THE WITNESS:  Yeah, I can't provide any               10:42:47

legal opinions.  I'm not here today to provide any    10:42:48

legal opinions.                                       10:42:51

BY MR. WEIR:                                          10:42:51

Q.  Do you think it's appropriate for -- so I         10:42:55

take from your answer you wouldn't think it's         10:42:57

appropriate for an expert to provide opinions about   10:42:59

what regulations mean or a regulatory framework.      10:43:01

Is that fair?                                         10:43:09

A.  I would say I think it's appropriate to           10:43:09

apply -- or provide factual determinations, based on  10:43:11

the regulations.                                      10:43:15

But to be able to determine if something is           10:43:18

legal or not legal or a violation of a regulation is  10:43:20

something that's not up to me to determine.  I can,   10:43:24

you know, provide an opinion on whether there is a    10:43:28

Page 33

factual determination, based on the facts of the    10:43:31

case.    10:43:34

Q.   I'm not sure I understand -- I'm not sure I    10:43:36

understand what you're saying, but when you say -- so    10:43:38

you're giving opinions on what exactly?    10:43:40

When you say "factual determination," what    10:43:45

are you -- what are you opining on?    10:43:47

MR. LEE:   Okay.   Vague -- vague and    10:43:51

ambiguous.   Is there something specific within her    10:43:52

report?    10:43:54

MR. WEIR:   Yeah, I think we'll get into it,    10:43:55

and it may be better to get to more specifics.    10:43:56

BY MR. WEIR:    10:43:56

Q.   But just in general, I -- since we kind of    10:43:59

started down this path, I'm just curious kind of how    10:44:03

you viewed your assignment.    10:44:07

You're -- you're giving -- you're making    10:44:08

factual determinations about what?    10:44:10

A.   Right.    10:44:13

So, for example, factual determinations    10:44:13

based on the definition of an actor in the    10:44:15

information blocking regulations.   So there are    10:44:20

definitions there, based on the facts of the case,    10:44:22

and the facts that have been provided to me.    10:44:25

I am providing my opinion that, based on    10:44:27

Page 34

those facts, a -- you know, for example, RTZ does not    10:44:30

meet the definition of an actor in alignment with    10:44:34

those regulatory requirements.    10:44:38

Q.   Okay.  And the facts you're assuming to    10:44:40
reach that conclusion are what you cite in your    10:44:43
report?    10:44:47

A.   That is correct.    10:44:47

Q.   And then so how are you -- and that -- let's    10:44:50
talk about the actor one.    10:44:56

In your view, you're not giving a legal    10:44:59
opinion or making a legal conclusion about whether or    10:45:03
not RTZ is an actor?  That's not part of your    10:45:07
opinion?    10:45:09

A.   Correct.  I am not a lawyer.  So I do not    10:45:10
have any legal training.  So I cannot opine on the    10:45:12
legality of those regulations.    10:45:16

Q.   But -- but you're -- you are opining on    10:45:26
whether or not, under the language of the    10:45:29
regulations, you think RTZ is or is not an actor?    10:45:32

A.   Based on the facts that I have been    10:45:37
provided, I am offering an opinion that, in my    10:45:39
opinion, RTZ does not constitute an actor under those    10:45:45
regulations.    10:45:49

Q.   And as part of that, are you giving an    10:45:50
opinion about what the regulations are?    10:45:53

Page 35

A.   I'm offering an opinion on what the regulations say.

Q.   And you are offering an opinion about -- or trying to offer an opinion about what the regulations mean; correct?

A.   Based on -- I am -- basic -- using the knowledge that I have and the experience that I have to identify the facts that align or don't align with the definitions in the regulations.

Q.   I'm not sure I follow that.

So are you or are you not giving an opinion about what the regulations mean?

A.   I am giving an opinion of whether the definitions in the opinion -- the facts in this matter align with the definitions in the regulation.

So, for example, there is a definition of a healthcare provider as an actor.  Based on the facts in this matter, RTZ is not a healthcare provider.  They don't provide healthcare services.  So, therefore, they are not an actor.

Q.   Based on your understanding of what the various and relevant regulations mean?

A.   Correct.

Q.   So what do you envision -- so we have a jury trial in this case.  I mean, are you envisioning your

Page 36

A.  Yeah.  Great question.   11:33:08

So I reviewed the definitions for "actor,"   11:33:09
both in the regulations and the additional ONC,   11:33:14
again, Office of the National Coordinator, guidance   11:33:18
that supports the definitions.  I also reviewed the   11:33:23
subsequent regulations, because ONC -- so the 21st   11:33:25
Century Cures Act was the law that then set forth the   11:33:32
ONC Cures Act final rule which then also has the   11:33:34
HTI-1 final rule.  So there's kind of some   11:33:39
iterations.   11:33:43

So I reviewed all of them to ensure that I   11:33:43
was not missing any changes in interpretation,   11:33:45
changes in language that would be relevant in this   11:33:49
matter.   11:33:52

So that was my first course of action.   11:33:53

Second is I reviewed the documents that were   11:33:55
produced to me that illustrated the type of services   11:33:57
and the type of entity that RTZ is or was, and   11:34:02
together I reviewed those to determine if they   11:34:09
actually met the definition of an actor in any of   11:34:12
those circumstances.   11:34:16

And I will also add on to that and I did   11:34:24
also have a conversation with Kevin Lathrop.   11:34:27

Q.  And when was that conversation with Kevin?   11:34:34

A.  It was before my report.  So I would say it   11:34:36

Page 60

was probably end of March, beginning of April.    11:34:40

Q.    When were you first engaged for this matter?    11:34:49

A.    I was first engaged in May of 2025.  It    11:34:52
might have been April.  April, May.  Sorry.    11:34:59

Q.    And so why were you talking to Kevin Lathrop    11:35:14
or Lathrop?    11:35:17

A.    Sure.    11:35:18

I had some questions about how they enter --    11:35:19
how RTZ interacted with the companies that they    11:35:21
interfaced with.  So specifically Surescripts, Quest    11:35:25
as those were identified as qualifying RTZ to be a    11:35:31
health information network or a health information    11:35:34
exchange.    11:35:37

Q.    And what did he tell you?    11:35:42

A.    He told me that those were direct contracts.    11:35:44
So those were direct contracts between the PACE    11:35:46
facility and those entities.  So, for example, like a    11:35:51
Quest, which is a laboratory vendor, there was either    11:35:56
a direct contract with them or there was a contract    11:35:58
between the three organizations together, which makes    11:36:01
them all affiliated entities.    11:36:08

Q.    Okay.  We'll get to that in a moment.    11:36:11

Direct contracts between PACE facility and    11:36:16
the --    11:36:19

A.    I would say the third party, like either the    11:36:22

Page 61

other, and it's probably because my question isn't    11:37:53

clear.    11:37:55

But so I -- I took your statement a moment    11:37:55

ago that a lab, for example, that has a contract with    11:37:59

a PACE program to provide certain services to put    11:38:03

data into the EMR, to extract data from the EMR, that    11:38:08

that -- in that scenario, the lab would still be    11:38:13

affiliated with the PACE program because of the    11:38:15

contractual relationship; is that correct?    11:38:18

A.   Correct.   The PACE facility and the lab have    11:38:19

an affiliation with each other.    11:38:22

Q.   Okay.   And the -- and that -- that view is    11:38:24

coming from what?    11:38:29

A.   I would say based on the word "affiliated,"    11:38:31

and also on my experience in the industry is we would    11:38:35

call that a point-to-point interface, and a    11:38:37

point-to-point interface means that there is two    11:38:51

entities that are exchanging information from one to    11:38:43

other, and that there is no other parties involved in    11:38:48

that.    11:38:51

Q.   Well, I want you to assume in this situation    11:38:53

that they're both using the same -- they're both    11:38:56

using PACECare for purposes of having that    11:38:59

information exchange.   That's the vehicle that's    11:39:03

leading to the information exchange.   I want you to    11:39:05

Page 63

information exchange between a lab and the PACE
program?

A.   Because those organizations are all
affiliated via contracts.

Q.   And where are you getting this notion that,
because you have a contractual -- a contract between
the PACE program and the lab, that it creates an
affiliation such that there -- should be treated one
in the same for purposes of applying the information
blocking regulations to them?

A.   Right.

Well, in and of itself, "affiliation" means
that they're related to each other.  So having a
contractual obligation to each other would support
that.

Secondarily, a health information exchange
or health information network is when different
entities that have no affiliation or relationship
with each other are potentially exchanging
information with each other, but they are not
necessarily -- do not have any type of relationship
with each other.

Q.   And -- and why do you say that?  Where are
you getting at that?

A.   Based on the definition of HIE or an HIN in

Page 65

the regulatory requirements.    11:41:36

Q.  And is it -- can you point me in your report    11:41:40
what page you're --    11:41:41

A.  Yeah.  Absolutely.    11:41:42

So we'll -- we can start on Page 6,    11:41:49
Paragraph B provides the definition of an HIN or an    11:41:54
HIE.    11:42:05

Q.  I'm sorry.  You're referring to -- to one --    11:42:23
to B, Subpart I, or both little i and ii?    11:42:27

A.  They're both applicable to the definition,    11:42:36
but i is primarily, among more than two unaffiliated    11:42:39
individuals or entity, other than the individual or    11:42:44
entity to which this definition may apply --    11:42:46

Q.  All right.    11:42:51

A.  -- that are unable to exchange with each    11:42:53
other.    11:42:56

Q.  Okay.  And where is it in the regulations    11:42:58
that says unaffiliated means that they don't have    11:43:01
a -- that the -- that they don't have a contract    11:43:07
between them?    11:43:09

A.  I think "unaffiliated," as a word, means    11:43:11
that there is no relationship between the parties.    11:43:14
And in this instance, there is an established formal    11:43:18
relationship via contract.    11:43:21

Q.  Okay.  So that -- that's your -- so    11:43:26

Page 66

So if we go to Page 10.                          11:44:41

Q.  Okay.                                         11:44:45

A.  We can kind of step through some of the       11:44:46
aspects regarding that starting at 35 --          11:44:50

Q.  Uh-huh.                                        11:44:54

A.  -- if you would like to.                       11:44:55

Q.  Yep.  That's the order.  I'm trying to         11:44:57
understand --                                      11:45:01

A.  Okay.  Perfect.                                11:45:02

Q.  -- what opinions you're going to give and      11:45:03
what they're based on.                             11:45:05

So, yeah, why don't you walk me through what       11:45:06
your analysis is as to why you think a lab and the 11:45:08
PACE programs are affiliated such that PACECare is  11:45:15
not operating as an exchange of information between 11:45:18
those parties.                                      11:45:21

A.  Sure.                                           11:45:22

So, as I said, affiliation is a relationship        11:45:23
between two parties.  Those two parties have a      11:45:26
relationship via a contractual obligation.          11:45:29

In the industry, a lab interface or an              11:45:33
e-prescribing interface is a one-to-one interface.  11:45:39
It is only functioning in organizations that have an 11:45:42
established relationship.                            11:45:47

Those interfaces do not communicate with            11:45:49

Page 68

other unaffiliated entities.  So if there are three different PACE facilities, they will have three different individual interfaces to either the lab vendor or the e-prescribing vendor.

None of those interfaces are going to exchange information outside of those two entities. So it's isolated to two entities.

If you look at what an actual HIE or an HIN is, they're examples in 36 that talk about CommonWell Alliance, Carequality, e-Health Exchange.

Those are all entities that actually broker the communication of information between two unaffiliated entities.

So in that type of environment, I could be a PACE facility -- let's just say -- or let's just use a hospital to be more simple.  I could be a hospital in Wisconsin, and there could be a patient of mine who is being seen in Massachusetts.  The way that I get their information is via health exchange or health network, like e-Health Exchange or Carequality.

They are going to broker that -- that transaction, even though I have no knowledge or relationship with the hospital in Massachusetts.

So these are typically -- they have a

Page 69

A.    They can be sharing information with different parties via interfaces, which in and of itself doesn't make them an HIE or a HIN.

Within health IT, there are a -- probably dozens of different ways that information can be exchanged or accessed between different organizations, including the fax machine.

So I don't really think it's relevant as to how any of those organizations were accessing or exchanging information.

Q.    Well, but do you -- I mean, what do you know about how those organizations were exchanging information or interacting with PACECare?

A.    As long as that information was point to point, there's -- they're -- they're affiliated in some way, shape, or form.  There is an affiliation or relationship with them.

Q.    You've used "point to point" a couple times.

What -- what do you mean by that, "point to point"?

A.    Yeah.

So that means that I in -- the PACE facility is communicating directly with another entity.  That entity could be the ambulance vendor.  That could be a skilled nursing facility.  It could be any type of

Page 72

A.   And I can say that --    11:58:32

Q.   So do that.    11:58:33

A.   An HIE or an HIN doesn't store electronic    11:58:34
health information.  They broker the exchange of it.    11:58:38
So that's, again, an inaccurate -- an impossible    11:58:40
hypothetical.    11:58:43

Q.   Okay.  So you're just -- you're interpreting    11:58:46
the regulations in a way that the -- that it's    11:58:48
impossible for an HIE or an HIN to actually have or    11:58:50
store health information on their systems?    11:58:55

A.   Right.  Because that's not what they do.    11:59:01
That's not how they function.  They don't function    11:59:04
like an EHR.  So they're a totally different entity,    11:59:06
and so they're not storing patient information.    11:59:10
They're brokering the exchange of it.    11:59:15

So they wouldn't have a report to give you.    11:59:17
So if RTZ is a health information exchange, they    11:59:23
don't have a report.  So it just -- it's not a --    11:59:27

Q.   But they do have a report.  I mean, we know    11:59:33
that PACECare has a report.    11:59:35

A.   Well, if they're an EHR they do; right?    11:59:36
Like, I think there is a distinction there between    11:59:39
the different types of entities, and if you're not    11:59:42
considering that, it's just implausible that that's    11:59:43
how -- what would you want the report to produce if    11:59:47

Page 79

more information from Intus about who is going to be    14:14:50
running this?  How often are they going to be running    14:14:53
it?  Is it going to be in the middle of the day that    14:14:55
it could potentially impact the speed of the PACE    14:14:58
system?  I would have a lot of questions.    14:15:02

    So I would want to have more in-depth    14:15:04
dialogue with them to understand if or if not it is    14:15:07
technically feasible, and if it introduces any    14:15:10
potential risks or threats into PACECare at that    14:15:14
time, and that is standard industry practice.    14:15:18

    Based on my experience over the last 25    14:15:22
years, that would be exact response an EHR would    14:15:25
give.    14:15:30

    Q.  So I see the regulations you've quoted in --    14:15:33
in your report, and it refers to technical    14:15:35
feasibility.    14:15:38

    Are you just interpreting technical    14:15:41
feasibility to encompass all those other things you    14:15:44
just mentioned?    14:15:47

    A.  Well, I think technically -- so if I'm going    14:15:48
to look at something technically from an EHR    14:15:51
perspective, I am going to look at it from a security    14:15:53
perspective.  I am going to look at it from a speed,    14:15:57
a performance perspective.  I am going to look at it    14:16:00
from a privacy perspective.  Those are all part of my    14:16:03

Page 137

technical evaluation.  So, yes, I would consider those all part of my technical evaluation.

Q.  Okay.  And so you've looked at the script; right?

A.  I have.

Q.  What's your view on security privacy?

A.  I reviewed the script from the perspective of reviewing what data elements they were -- Intus was requesting within it.  There were some things that I noticed, such as user names and passwords were defaulting into it, which would be a concern for me.

I would want to understand exactly how those user names and passwords are being populated into the script because I -- we need to be able to have audit logs that accurately track the specific user, who is logging into PACECare at any time.

And if those are shared credentials that being used in that script, that is -- goes against they HIPAA privacy -- HIPAA Security Rule.

Q.  But that would be -- that would be -- that would be an issue for PACE program, not necessarily RTZ; correct?

A.  No.  As RTZ is a business associate, and so as part of their business associate agreement, they do agree to apply to -- to the technical safeguards

Page 138

in.  I -- I've never seen it.                              14:21:33

Q.  Well, set aside whether the system can do it          14:21:43
or not, I mean, wouldn't anybody looking at it be          14:21:45
able to determine, okay, this one is going to be the       14:21:48
script because, okay, it's the exact same thing over       14:21:51
and over again at 2:00 in the morning?                     14:21:54

A.  If they undertook a thorough analysis, they           14:21:58
may.  It also depends on the detailed level that is        14:22:00
in the audit logs and that are maintained.  They may       14:22:04
not.  Because Evan Walters can sign in and follow the      14:22:08
same exact steps as a script, but I would not know if      14:22:13
it was Evan Walters or if it was the script.              14:22:18

Q.  Okay.  So I guess just did -- it sounds like          14:22:21
you didn't do any of this analysis?                        14:22:25

A.  So I reviewed the audit logs that were                14:22:27
provided.  Within the audit logs, I am able to see         14:22:29
the user that logged into the system, into PACECare.       14:22:36
I can see the module that was accessed.  I can see         14:22:41
when they accessed a patient versus when they did an       14:22:44
export of data.  So I can see all of that information      14:22:50
in there.                                                  14:22:54

I don't see the metadata behind it, which is             14:22:56
what would be potentially used to analyze the actual,      14:22:59
you know, navigation or key strokes that were used to      14:23:04
get to that point if RT -- if RTZ tracks to that          14:23:08

Page 142

providing services to.                                    14:30:01

A.   That's mischaracterizes --                      14:30:02

MR. LEE:  Objection.  Mischaracterizes --   14:30:03

BY MR. WEIR:                                              14:30:03

Q.   Okay.  So what is your opinion --          14:30:05

MR. LEE:  Hold on.  Hold on.                 14:30:06

Mischaracterizes the witness's prior testimony.           14:30:07

MR. WEIR:  Okay.                             14:30:10

THE WITNESS:  Okay.  It's --                 14:30:11

BY MR. WEIR:                                              14:30:11

Q.   What is your opinion --                     14:30:12

A.   Yes.  So -- I will read it.                 14:30:14

Q.   What is your opinion with respect to -- with   14:30:17
respect to -- so I see in -- I see on, you know, I        14:30:20
guess it starts on Page 31 or so there --                 14:30:24

A.   Correct.                                    14:30:26

Q.   -- that -- what opinion are you giving?     14:30:26

You're saying that Intus exceeded the scope          14:30:32
of its stated data needs.                                 14:30:33

A.   Correct.  So that is my opinion is that the     14:30:40
audit logs evidence that Intus, the access that they      14:30:45
had and were using, exceeded the scope of what they       14:30:51
said their data needs were.  That is my opinion.          14:30:55

Q.   And you're basing the scope of the data     14:31:02
needs on their EHR data map and the -- the scripts        14:31:03

Page 148

misinformed or -- I mean, what -- that's what I'm    14:58:16

trying to figure out where --    14:58:19

A.   Yeah.  So my opinion is that Intus    14:58:20

misunderstood some of the regulatory requirements at    14:58:22

that time, and that's based on their own deposition    14:58:27

and on emails, because if they had understood them,    14:58:31

there would have been -- there would have been    14:58:36

different information in the email.  You wouldn't be    14:58:40

asking for a FHIR API and saying people are required    14:58:42

to give it to you if you know that that's not    14:58:44

actually a regulation in the requirements.    14:58:47

Q.   Okay.  So, like, at 99, is it the same    14:58:53

answer, "These excerpts from Mr. Rothberg's    14:59:06

deposition demonstrate that Intus fundamentally    14:59:10

misunderstood the regulatory framework governing EHR    14:59:14

data exchange obligations"?    14:59:16

A.   Yes, that is my opinion that, based on his    14:59:18

testimony, that he did not understand the regulatory    14:59:20

framework.    14:59:25

Q.   Or his testimony is inconsistent with your    14:59:27

understanding of the regulatory framework?    14:59:30

A.   Based on the fact that -- regarding FHIR    14:59:34

APIs, those are factual basis.  So I don't know that    14:59:39

I agree with that.    14:59:44

Q.   Is your opinion about Mr. Rothberg having    14:59:51

Page 159

misunderstood regulatory obligations with respect to 14:59:56
FHIR APIs, is it limited to FHIR APIs, or are you 14:59:59
giving a larger opinion that just none of these guys 15:00:03
at Intus knew what they were talking about? 15:00:07

A.    I think in this area -- I have to look here 15:00:09
to just double-check exactly -- oh. 15:00:12

Q.    Huh-oh. 15:00:19

A.    No, I -- hold on one second.  Okay.  I 15:00:19
apparently don't have lights, but can you still hear 15:00:31
me and see me? 15:00:33

Q.    I can hear you and see you.  Are you good -- 15:00:34
I guess we do have video. 15:00:36

Are you good with the video, David, I 15:00:37
mean -- 15:00:40

MR. LEE:  Yeah. 15:00:40

THE WITNESS:  I don't know if we're on power 15:00:41
backup or what, but I'm okay. 15:00:43

MR. WEIR:  Okay.  We still gotcha. 15:00:46

THE WITNESS:  And I apologize.  Can you 15:00:50
repeat the question, because I don't remember it at 15:00:52
the moment. 15:00:55

BY MR. WEIR: 15:00:55

Q.    So your opinion that Mr. Rothberg was 15:00:56
mistaken about FHIR APIs and obligations that RTZ had 15:01:01
with respect to offering a FHIR API, is -- is your 15:01:07

Page 160

opinion limited to FHIR APIs, or are you giving an    15:01:13

opinion that Mr. Rothberg or anybody at Intus just    15:01:17

didn't understand the regulatory framework in a    15:01:20

broader sense?    15:01:23

A.    So I -- based on the quote that I have in A    15:01:24

of that opinion, I would say it's broader than that,    15:01:28

as Mr. Rothberg basically says, "We didn't fully    15:01:31

understand the mechanism that they had to give that    15:01:35

information."    15:01:38

And so, to me, that is saying that they did    15:01:40

not understand the regulatory framework and the    15:01:42

obligations in any manner -- in this manner.    15:01:47

Q.    Okay.    So you're taking his testimony that    15:01:54

says, "We didn't fully understood the mechanism," and    15:01:56

then using that to make -- reach the factual    15:02:00

conclusion that they didn't understand the regulatory    15:02:03

framework at large?    15:02:05

A.    Well, I think he states that he did not    15:02:07

understand the mechanism, which, to me, is the    15:02:09

regulatory framework.    15:02:15

Q.    What, from your background or expertise,    15:02:22

is -- are you basing this opinion that you -- the    15:02:25

statement that you just made to me?    15:02:30

A.    Yeah.    15:02:32

So based on my experience over the last 25    15:02:32

Page 161

years and being involved with the -- all of the

regulatory requirements and frameworks that have come

to fruition since the American Recovery &

Reinvestment Act in 2009 is it is my experience that

health IT vendors who do not understand mechanisms or

request processes do not have an understanding of the

regulatory frameworks.

That is common knowledge that I would expect

any health IT vendor to be familiar with of what is

and is not required under regulatory frameworks.

If I was an analytics vendor, I would have

an extensive experience with -- or understand and

seek out the regulatory requirements surrounding data

exchange.  I think that's a very fair assessment.

Q.  All right.  Let's -- so let's talk about --
let's go to Page 23 of your report, the section
titled, "Agreeable Terms."

A.  Sure.  I'm there.

Q.  So I -- before we get to what you write, I
want to make sure I understand what your view is of
this negotiation that took place and how it impacts
the applicability of the Manner Exception.

So can you kind of walk me through your
views on that?

A.  Sure.

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

A.   Is -- is that -- it says that "or cannot   15:07:41
reach agreeable terms" is part of A1 of the Manner   15:07:48
Exception.   So -- and that's at Paragraph 70.   15:07:53

Q.   All right.   So how does -- how does that   15:08:14
work?   Let's -- let's say that the -- you have an EMR   15:08:23
provider, who just doesn't really want to give the   15:08:28
data or -- or access to the party that's requesting   15:08:32
it.   15:08:37

Is the Manner Exception triggered if the EMR   15:08:39
provider just says, no, I'm not agreeing to those   15:08:42
terms?   It's my NDA.   Take it or leave it.   You've   15:08:45
got to sign it.   15:08:48

A.   So based on my experience, working with the   15:08:48
ONC, who is the one who governs this requirement, is   15:08:51
it's all a fact-pattern-based assessment.   15:08:55

So based on the facts that occurred leading   15:09:02
up to saying they're not able to reach agreeable   15:09:04
terms all have to be considered.   15:09:07

Q.   And what -- what is considered?   What types   15:09:15
of issues are considered and -- about whether or not   15:09:16
the failure to reach terms is the product of a good   15:09:21
faith negotiation or whether it's just the product of   15:09:23
the EMR provider not wanting to share the data?   15:09:25

A.   Right.   15:09:29

So that's actually a great question because   15:09:29

Page 165

the ONC has not ruled on anything regarding this and 15:09:30 has not provided any legal guidance on my 15:09:33 conversations with representatives at the ONC. They 15:09:37 look specifically at the facts to see if they meet, 15:09:43 in their eyes, this exception. 15:09:49

So they will evaluate -- from my 15:09:51 understanding from speaking with them is they will 15:09:54 evaluate to see if the parties did attempt to 15:09:56 negotiate, if the EHR vendor just said flat out no. 15:09:59 They'll look to see the length of that, what were 15:10:05 some of the criteria, but they will do their own 15:10:07 evaluation to determine if that should be invoked or 15:10:09 not. 15:10:14

Q. And you -- do you have any sense of what 15:10:15 that criteria is? 15:10:17

A. Well, as I said, since the ONC has not 15:10:20 actually ruled on any information blocking to date, 15:10:22 there is no -- no information on that. I personally 15:10:27 had conversations with people at the ONC, and their 15:10:32 response to me is it is all fact pattern based. We 15:10:37 will assess the facts on an individual case-by-case 15:10:41 basis to make the determination. 15:10:44

Q. Did you talk to -- in the course of 15:10:46 preparing your report and working on this project, 15:10:49 did you talk to Michael Zawadski? 15:10:51

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

REPORTER'S CERTIFICATE

I, JENNIFER L. SMITH, California CSR No. 10358, Washington CCR No. 3101, RMR, CRR, CRC, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

*Jennifer L. Smith*

JENNIFER L. SMITH

CA CSR NO. 10358

WA CCR NO. 3101

RMR, CRR, CRC

Page 180

# Exhibit B

Volume I  Pages 1-226

Exhibits 62-71

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

INTUS CARE, INC.

    Plaintiff                        Case No.

V.                             4:24-cv-01132-JST

RTZ ASSOCIATES, INC.; and DOES 1

through 10                      Assigned to:

    Defendants              Hon. Jon S. Tigar

_____

RTZ ASSOCIATES, INC.

    Counter-claimant

V.

INTUS CARE, INC.

    Counter-defendant

_____

DEPOSITION OF ALEXANDER ROTHBERG

Friday, February 27, 2026, 9:55 a.m.

MANATT, PHELPS & PHILLIPS LLP

One Beacon Street

Boston, Massachusetts  02108

-----REPORTER:  Sonya Lopes, RPR, CSR-----

first few, because we were optimistic, we would say "Hey, do you have any way of getting us your health data in an easy way?"

And they would say -- I mean, well, I'm not characterizing exact conversations.  This is generally speaking.  But they would say "Well, not" -- you know, "Not really.  Like, how would you get health data?"

Then we would say something maybe, again, generally, like, "Well, we think that you're entitled to be able to get your data."  They would say, like, "How do you do that?"

So that's sort of the nature of how a question might come up, like, "Hey, how would" -- you know, "You're under the impression we're entitled to get the data nicely.  How do we do that?"  That would be the nature of the question where they might ask us.

Q.  Right.  My question is, which clients were asking that or which clients were you having this discussion with.

A.  As I mentioned previously, Senior Care Partners we spoke with about how to get their data. But, I mean, prior to them, as I mentioned, LifeCircles PACE was a program.  I don't recall

exactly who this referral was, but LifeCircles PACE
was on the Mediture on EHR.  And they were an early
customer of ours where I think I remember some
people, but I don't remember exactly which program
they were at.

Q.  Okay.  So the two that you can recall as of
March 2021 that were clients of your Population
Health application were SCP and LifeCircles.

A.  I recall other customers of the Population
Health as well.

Q.  Right.  Sure.  Those are the two you can
recall by name at this point.

A.  No.  Well, I can recall those, but I can
also recall other customers of the Population Health
application.

Q.  Which other customers?

A.  PACE Organization of Rhode Island; Huron
Valley PACE, which I think is just what we call
them -- they might have had a sort of stranger name
-- and Thome PACE, T-h-o-m-e, which I think also
might have had a stranger name; but that's what
everyone calls them.

So Thome PACE, PACE Rhode Island, Huron
Valley PACE, LifeCircles PACE, Senior Care Partners
PACE, and perhaps what we call Community PACE; but

it's the PACE organization in Newaygo, Michigan, N-e-w-a-y-g-o.

They may or may not have been a client in March of 2021, but it was around that time I think. That's why I had to give a range because the dates are very difficult to reconstruct.

Q.  So your reference to -- going back to this exhibit.  Your reference to EHRs that do not allow FHIR connections to go out is a reference to EHRs that don't have a mechanism through which data in its entirety can move out of the system; correct?

A.  No.  I mean, there are many methods where you might allow data in its entirety to go out. FHIR is just one of those.

Q.  Okay.  So you were identifying a very specific limitation to the EHRs that you were pointing out to Vorro; correct?

A.  So, like I said, our impression -- it was many years ago; we were younger in healthcare.  But our impression is that everyone just had to do it. We thought FHIR was, like, the rule.

So going from that mindset where "Hey, everyone's got to have FHIR connections," we were kind of surprised that people didn't.  And so we were talking to Vorro.  Like, we sort of wanted to

tell them what we thought was a strange situation because we thought everyone had do FHIR and that's, like, the easy way.

We were saying, like, "Hey, Vorro, just FYI in advance, the easy way is, like, not on the table as far as we can tell."  So that's the nature of why I mentioned it in this opening e-mail.

Q.  As you sit here today, do you believe that EHRs are required to have FHIR connections?

A.  I don't know.  I'm not a lawyer.  I think that EHRs are required to provide -- well, I don't know about "required."  I think EHRs ought to provide access to the customers' data to the customer in an easy, comprehensive way.

Q.  Mindful that that's your belief that they should.  As you sit here today, do you have any understanding as to whether they are required to?

MR. BESHAI:  Objection.  Asked and answered.

Q.  You can answer.

A.  My legal expertise is, like, much weaker than yours or anyone else's.

Q.  So is your answer "no," you don't?

A.  My answer is that I don't feel qualified to make an opinion on what's required.

saying "We have reviewed the initial information provided by Alex.  But we did not see the detailed specification, API information, sample file, transmission information, et cetera."  I presume they didn't see that because you didn't send it.

A.  Well, so what I sent them was the contents of the e-mail we were just referring to.

Q.  Right.  It was just a high-level delineation of the types of information that you would like to receive?

A.  Right.  It's -- right.  It's information that we would like to receive.  I mean, not so high level.  Gets into the fields, like, "Medicare ID," "Medicaid ID," you know.  It is what it is, I guess.

Q.  Yeah.  The full spectrum of information that you send is essentially the type of data that you would need to populate your Population Health dashboard?

A.  Right.  Right.

Q.  You respond -- if you go to the first page of the exhibit --

A.  Yeah.

Q.  -- you respond to Laura.  You say "I'm not sure that we have effectively communicated the nature of the relationship.  As a starting-off

point, we would like read-only access to your system."  Do you see that?

A.  I do see that.

Q.  By "read-only," that's the same type of access that we talked about before when you --

A.  Right.  Just receiving information.

Q.  Right.

A.  Yes.

Q.  You write "The business relationship is one where we would consume your information via API or otherwise to populate our system.  For this reason, I'm not sure what that sample file from us would look like."

In other words, you're saying "We only need to catch the information.  We don't need to throw it."

A.  Yes.  Exactly.  Yes.  Exactly.

Q.  Okay.  You go on to write "For this reason, all we need to know is how to get access and, ideally, what the structures and promises of your data output are, again, depending on protocol."

When you said "All we need to know is how to get access," what you're referring to is how to get access to PaceCare's interface; correct?

A.  No.  Access to the data.

Q.   Okay.  At this point in time, had you --
again, we're in May of 2021.  Do you know whether or
not Intus had any PaceCare -- strike that.

Do you know whether Intus had any PACE
organization customers that were using PaceCare?

A.   The only one would have been Senior Care
Partners.  I don't believe at this point they were
using PaceCare, so no.

Q.   Based on what you're telling me, is it fair
to assume that Senior Care was Intus's first PACE
organization customer using PaceCare?

A.   They weren't using it at this time.  But,
yes, when they were using it, they were the first.

Q.   Okay.  Thank you.

A.   Yes.

Q.   Your e-mail obviously invites a discussion.
And at the top of this exhibit, Mike Zawadski
responds saying, you know, "Here's a date I'm
available."  Do you see that?

A.   I do see that.

Q.   Based on what you've already testified, it
sounds like you had a conversation.

A.   Yes, we did.

Q.   Okay.  And do you recall what the fruits
or, at least, what the outcome of those

conversations were?

A.    Yeah.   I mean, not, you know, word for word or letter for letter.   But my impression leaving that conversation -- well, first of all, I remember feeling very positive about it.

My impression leaving the conversation is that we had sort of said, like, "Hey, you know, we can" -- I mean, it's sort of like we outlined, "We can" -- "We're really flexible."

I think my impression was like "Hey, if you have FHIR, if you have API, if you have SFTP, like, whatever you've got, we want it.   But if you" -- "if you've got nothing, then we can do what we had been doing, which is, you know, we just need access to a log-in account, and that's it.   Like, if you" -- "if you don't want to build anything, you don't have anything or what have you, if you just give us, like, this read-only log-in account, then we're good."

Q.    Okay.   And the read-only log-in account would allow you to implement the automated script that you had already developed.

A.    That's right.   Well, it would -- the automated script of the nature that we developed. But it would have to be modified.

ALEXANDER ROTHBERG                                          JOB NO. 2407964
FEBRUARY 27, 2026

CERTIFICATE OF REPORTER

I, SONYA LOPES, Registered Professional Reporter and Notary Public, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

That the witness requested to review the transcript and make any changes to the transcript. As a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure, the changes made by the witness are appended to the transcript.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 12th day of March, 2026.

_____

Sonya Lopes                    My Commission Expires:

Notary Public                  October 28, 2027

# Exhibit C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


CASE NO:  4:24-CV-01132-JST


INTUS CARE, INC.,

    Plaintiff,

Vs.

RTZ ASSOCIATES, INC.; and DOES 1 Through 10,

    Defendants.


REMOTE DEPOSITION OF:

EVAN WALTERS

March 16, 2026

9:33 A.M.


REPORTED BY:

    CINDY C. JENKINS, CCR

A.      Kakarla.

Q.      And what is his title?

A.      He's Senior VP of Engineering.

Q.      Is he dedicated to all things Intus in terms of products, or just PopHealth or IRIS or CareHub?

A.      He leads the entire engineering organization.

Q.      Okay.  And am I correct that you stopped reporting to Bharath once you migrated to the staff software engineer position?

A.      Sorry.  Can you -- you said I started -- yeah, sorry, can you repeat that?

Q.      Sure.  And are you just having a hard time hearing me?  Am I not coming through loudly enough, or is it my connection isn't good?

A.      No.  Sorry.  You were -- the timeline inspired a momentary reverie. Let's -- yeah.  Back to it.  Sorry about that.

Q.      So my -- I think my question was -- no, I can't remember what my question was.

MR. LEE:  Cindy, can you read my

question, please?  I don't remember it.

(Record read.)

THE WITNESS:  Well, there's some nuance there, just with how the titles transitioned, when we actually hired Chris.

Q.    (By Mr. Lee) Understood.  Okay.

A.    Yeah.  So really -- I started reporting to Chris even when my title was still VP of data and infrastructure.  It took a period -- there was a period of time before we were able to switch the title.

Q.    Understood.  Alex testified in deposition that -- and I'll use his words, that you had the most direct knowledge about the development of the automated scripts to access PACECare; is that accurate?

A.    Yes.  Yeah.  Aside from the, you know, other engineers that were working on it.

Q.    Sure.  But those were engineers that were working on it under your leadership; correct?

A.    That's right.

Q.    And so ultimately, you were the one that was accountable for developing those

automated scripts with team effort?

A.    Yeah.  Yes.

Q.    At a high level -- and you may have addressed some of this, so my apologies if it's a little overlapping.  At a high level, can you generally describe what your involvement was in creating an automated script that would be used to extract data from PACECare?

A.    So at the time, you know, I led the team, but I also, you know, had hands-on keyboard fairly frequently.  And the process for developing one of these automations is to direct the -- the -- our web driver to click in certain places in the browser, the same -- the same actions a human would take in order to use the website and extract the report.

So you codify those same actions that a human would take and put them into your script.

Q.    And the script then automates that process?

A.    Right.

Q.    And it allows that process to run at whatever interval the client or Intus

dictate; correct?

A.    That's right.

Q.    And so were you involved for purposes of development of this automated script in accessing PACECare in order to discern what those human steps would be?

A.    Yes, we needed to access PACECare to do that.

Q.    When is the first time that you recall accessing PACECare?

A.    It must have been 2022.  Yeah, I don't have a specific date for you.  That sounds about --

Q.    Why do you say 2022 as opposed to 2021 after you started in May?

A.    I don't -- so I don't remember developing integration in 2021.  I might be misremembering.

Q.    Okay.  Let me see if I can add a little context here.  Robbie Felton has declared that Intus had access to PACECare from June 2021 through September of 2022.

A.    Okay.

Q.    Are you aware of whether or not Intus had access to PACECare for reasons other

than developing an automated script?

A.     No.  No, definitely not.

Q.     Why do you say "definitely not"?

A.     Our access was for the sole purpose of accessing our customers' data.

Q.     Well, sure.  But --

A.     Really, what else would we do?

Q.     Well, okay.  Let me untwine that -- or unwind that a little bit.

You mentioned that access to PACECare was needed in order to develop the automated script; correct?

A.     Right.

Q.     Okay.  Are you telling me that Intus had no other reason to enter PACECare but for the development of the automated script?

A.     Right, which is to access our customers' data.

Q.     Well, the access to the customers' data is facilitated through the deployment of the automate script; right?

A.     Right.  You don't need the automated script in order to access the data.

Q.    Correct.  In other words, PACECare has a reporting functionality; right?

A.    (Witness nods head.)

Q.    Is that a "yes"?

A.    That's a yes.

Q.    Okay.  And what Intus's team -- development team for the automated script did was pull down the operations menu, click into reporting, and understand the steps to generate very specific reports that would extract very specific data that would be used to power the PopHealth analytics dashboard; correct?

A.    That's right.  That's what the scripts did.

Q.    Right.  And going back to your prior description, the human steps of processing those same reports would yield exactly the same type of data that Intus would then use to power its PopHealth data analytics dashboard; correct?

A.    That's right.  It mimics exactly what a human would do in order to pull those same reports.

Q.    Right.  And so, if I understood

to was -- yeah, I don't remember the specifics.  But the way that we access it was no longer available to us.

Q.    What way are you describing or referencing?

A.    Using customer credentials.

Q.    And when you say "using customer credentials," are you referring to using the credentials of a PACE organization's employees' credentials?  Or are you talking about a PACE organization issuing PACECare credentials to Intus?

A.    Using a customer's -- a customer's employee's credentials.  Since RTZ was no longer allowing us to access via an account provision specifically for us, we got access to the data that our customers were authorizing us to access using one of their credentials.

Q.    Have you heard of the term within Intus, "reintegration"?

A.    Yes.

Q.    What does reintegration mean to you?

A.    In the case where we, you know,

there are a couple scenarios.  Either an

organization is with a different -- they're

using a different EHR, and they transition to

a new one, that might require a

reintegration.  Or we swap the source of data

from one EHR to another.  Or it might be that

the customer churned or no longer was our

customer.  And then at some point, they

bought our product again.  So we had to

reintegrate them.

Q.    And when you say "reintegrate,"
you're talking about the establishment of the
automated data pipeline from the EHR to the
PopHealth system; correct?

A.    That's right.

Q.    So just to make this crystal
clear, so, as you sit here today, is it your
testimony that Intus has stopped all access to
PACECare --

A.    Yes.

Q.    -- since 2025?

A.    Yes.

Q.    And your understanding is
because -- or your understanding is that that
occurred because RTZ no longer authorized

account credentials for access to PACECare?

A.    I don't know the specifics.  But the reason we no longer had access to the credentials was because our customer didn't give them to us.

Q.    But you still had access to data; right?

A.    Without access to the credentials, no.

Q.    Well, let me ask it differently. A PACE organization could still undertake the human steps of extracting the data and transmitting that to Intus in order to power its PopHealth program; right?

A.    That's right.

MR. LEE:  Okay.  We're in a good place to take a break.  Five minutes?

MR. WEIR:  Why don't you give me ten if that's okay?  Let's go off the record.

MR. LEE:  Yeah.

(A short break was taken.)

Q.    (By Mr. Lee) Mr. Walters, prior to the break, we were talking about kind of the automated scripts.  And if I recall your testimony correctly, you weren't sure whether

"Good morning, Evan.  RTZ's rep sent this over yesterday requesting to have it completed and sent back.  She said as soon as she receives, they'll start working on building an Intus account for you.  I'll send login information as soon as I receive it."  And then if you go up to the attachment line above the e-mail body, you'll see that --

A.    I see that.

Q.    -- You'll see that there's an attachment for an NDA to access PACECare, 8/16/22.  Do you see that?

A.    I see it.

Q.    Okay.  When you received this e-mail, what did you do with that NDA?

A.    I don't recall.

Q.    Okay.  Do you recall reviewing the NDA?

A.    No.

Q.    Do you recall having any discussions within Intus about that NDA?

A.    Not in particular.

Q.    Okay.  What about generally?

A.    Generally, yes.  You know, what I understood was that RTZ was blocking our

authorized access to PACECare.  And this was, you know, a method that they were trying to use to do that.  But, you know, I don't know the specifics of the NDA, its relevance, what it means.  But that's what I knew generally about it.

Q.    Okay.  I want to see if I understand your answer.  When you were saying this is an instance of RTZ blocking access, are you referring to RTZ's request that Intus execute an NDA to get access?

A.    Yes.  Right.  That's what I'm saying is that our customers had authorized us to use their data for -- you know, so that they could make use of the PopHealth tool. And this was something that RTZ was trying to do to prevent us from doing that.

Q.    You mean requesting that Intus execute an NDA to access PACECare?

A.    Right, whatever this is.  Again, I don't -- I only understood it generally.

Q.    Okay.  Are you aware of instances in which Intus has required third parties to enter into an NDA?

A.    No, I'm not aware.

Q.    Are you aware of instances in which Intus has required its consent to allow somebody to access Intus's systems?

A.    Not that I'm aware of.

Q.    So those things may have happened, you just don't know if they did?

A.    That's right.  I'm not aware.

Q.    Now, the last couple of exhibits that we looked at relating to Beacons and NeighborhoodPACE in which accounts were created for you, do you know whether or not you continued to access those accounts despite having received the NDA from RTZ in August of 2022?

A.    So our integrations continued operating as expected.  We have been authorized to access the data by our customers.  You know, I don't know anything beyond that.

Again, what I understood this to be was an attempt by RTZ to block our legitimate access to the data.

Q.    Well, I want to be clear about this.  What Intus was blocked from was access to PACECare; correct?

A.      We were blocked from accessing our customers' data.

Q.      Well, you've already described that the customer could download a CSV file and transmit that CSV file to Intus for upload into the PopHealth dashboard; correct?

A.      That's true.  But, again, it's a barrier that makes the value of the Population Health analytics tool inaccessible.  Manually downloading the data is too difficult.  And then the real value of the product, in addition to the analytics functionality, is that the data can be made available at a daily frequency.  The automation is part of the value.

Q.      That's a value to the client, as you testified?

A.      Yeah, exactly.

Q.      It's not a value to Intus, because data is data.  Whether you get it via an e-mailed upload, or you get it via FTP, or you get it via automated script, the data is the same; right?

MR. WEIR:  Objection.  It's argumentative.  It misstates the evidence.

Q.      (By Mr. Lee) Okay.  You can answer.

A.      The data is not static.  We need to get the data every day for it to be valuable.

Q.      Valuable to whom?

A.      To the customer.

Q.      But you would agree that some customers would only have their dashboards refreshed once a week; right?

A.      There are some customers who only have their dashboard refreshed once per week, yes.

Q.      And so it's really up to the customer to decide what frequency they want their Intus dashboard to refresh; correct?

A.      So we understand the value of our products, and the value is largely in it being real-time, as real-time as possible.

Q.      Mr. Walters, I want you to listen to my question, okay, and answer that question.

MR. LEE:  Cindy, could you please read it back?

(Record read.)

just do it this way.

MR. LEE:  Charles, this might be a little odd.  I'm going to introduce what has previously been marked as Exhibit 15.

MR. WEIR:  Yeah.  Yeah.

MR. LEE:  But it wouldn't allow me to mark it --

MR. WEIR:  Oh, it's 15.

MR. LEE:  -- not mark it. So I just marked it again as 15.

MR. WEIR:  Oh, okay, perfect. No, that's perfect.

MR. LEE:  So sorry for that.

MR. WEIR:  Not odd all.  That's -- I thought you were going to tell me they wouldn't let you mark it as 15.

MR. LEE:  Yeah.  So it looks like it might have -- I don't know.

MR. WEIR:  Perfect.

(Whereupon, Defendant's Exhibit 15 was marked for identification.)

Q.     (By Mr. Lee) Mr. Walters, I'm showing what has been previously marked as Exhibit 15.  I know that you're not on this

e-mail.  So I just, you know, will concede that up front.  So what I want to do is actually ask you about an e-mail written from Laura -- Laura Ferrara, which is on page 2208 at the bottom.

A.    Okay.  Are we just concerned with the -- this particular e-mail?  Should I just read this?

Q.    Yeah.  We'll start there.  I don't -- I don't think I have --

MR. WEIR:  Evan, if you want to scan it to get the context, certainly take your time to do that.

Q.    (By Mr. Lee) Yeah, I think -- I mean, just for -- for context, I think my questions are largely going to be confined to Laura Ferrara's e-mail starting on 2208.

A.    Okay.

Q.    But you're free to look at as much of this as you want.

A.    Okay.  Ready to proceed.

Q.    Great.  If we look at page 2208 and Ms. Ferrara's e-mail at the bottom of the page dated September 26th, 2022, you'll see that she's writing to Mary Austin at

BoldAgePACE.  Do you see that?

A.    Yes.

Q.    And she said -- she says, "Thank you, Mary.  I appreciate the conversation with you this morning.  I'm confident that we will be able to continue setting BoldAge up for success in using IntusCare despite the current RTZ access issues."  Do you see that?

A.    Yes.

Q.    Okay.  Now, this is dated September 26th, 2022, which is roughly a month-ish from that last e-mail, which we just looked at in which you were provided a copy of the NDA.  Do you see that?  Or do you --

A.    I see the date, yes.

Q.    Okay.  Do you recall having discussions internally with anybody at Intus about the effect of RTZ's request on Intus's ability to automatically extract data from PACECare?

A.    Not in particular.

Q.    Okay.  Do you recall hearing that on September 14th, 2022, Intus received a cease and desist letter from RTZ demanding that it cease access to PACECare without

consent?

A.    So I'm -- I'm generally -- I don't know the timeline.  I am generally aware of this further attempt of RTZ to block our legitimate access to our customers' data.

Q.    Okay.  You -- you keep saying "legitimate access."  What makes access, in your view, to PACECare legitimate?

A.    I don't know when it was -- there's a piece of legislation that sort of guarantees or mandates that health information systems provide reasonable methods of accessing data.  And I guess that's -- that's where I'm basing my description of this access as -- as legitimate, meaning our customers authorized it, and they needed us to have this access so that they could make good use of their data and that -- and, yeah, that's why -- that's why it was legitimate.

Q.    Okay.  You're referring to the 21st Century Cures Act?

A.    That's right.

Q.    Have you ever read that?

A.    No.  No, I have not.

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of Alabama, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.      DATED:      3/16/2026

*Cindy C. Jenkins*

_____

Cynthia C. Jenkins, 470