Charles E. Weir        (SBN 211091)
Andrew M. Beshai      (SBN 308030)
EPSTEIN BECKER & GREEN, P.C.
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone:     310.556.8861
Facsimile:     310.553.2165
cweir@ebglaw.com
abeshai@ebglaw.com

Attorneys for Plaintiff
INTUSCARE INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUSCARE INC., | Case No. 4:24-cv-01132-JST |
| Plaintiff, | *Assigned to Hon. Jon S. Tigar* |
| v. | **PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT** |
| RTZ ASSOCIATES, INC.; and DOES 1 through 10, | |
| Defendant. | |

Date:   July 2, 2026
Time:   2:00 p.m.
Crtrm:  6

Complaint Filed: February 23, 2024
Amended Complaint Filed: April 2, 2024
Counterclaims Filed: June 20, 2024

1

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ....................................................................................................... 5

II.   LEGAL STANDARD................................................................................................. 6

III.  RTZ'S MOTION TO EXCLUDE HULT SHOULD BE DENIED........................................ 7

    A. Hult's Opinion Based on Lost Data Access in September 2022 Is Based on Sound Methodology. ...................................................................................................... 7

    B. Hult's Pre-Existing Contracts Category Is Not Contradicted by the Evidence .................. 9

    C. The Lost Opportunities Category Rests on Sound Methodology. ................................... 10

        1. Hult's  Difference-in-Differences Regression Analysis Is Sound............................. 11

        2. RTZ's Arguments About Hult's Use of Data Are Meritless ..................................... 13

    D. Hult's CRM-Based Damages Are Reliable......................................................................... 16

    E. The CRM Data Hult Relies on Is Reliable and Not a Basis for Exclusion. ...................... 19

    F. RTZ's Argument About Revenue from Allegedly Lost Products Is Meritless................. 21

    G. Hult's Renewal Revenue Projection Rests on Sound Methodology................................ 22

    H. Hult's Labor-Cost Figures Are Reliable. .......................................................................... 24

    I.  RTZ's Argument Regarding Alternative Causes and Mitigation Is Baseless................... 24

    J.  Hult's Profit Margin Conversion Is Reliable. ................................................................... 26

    K. Hult's Application of the Risk-Free Treasury Rate Is Not a Basis for Exclusion. ........... 27

IV.   CONCLUSION.............................................................................................................. 27

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) .......................................................................................... 7, 19

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ........................................................................................ 7, 19

*Daubert v. Merrell Dow Phar, Inc.*,
509 U.S. 579 (1993) ............................................................................................................. 6

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .................................................................................. 7, 10, 19

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................................................................................... 19

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ............................................................................................ 19

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998) ................................................................................ 7, 12, 13

*Lauderdale v. NFP Ret., Inc.*,
No. 821CV00301JVSKES, 2022 WL 17324416 (C.D. Cal. Nov. 17, 2022) ........................ 14

*Mighty Enters., Inc. v. She Hong Indus. Co.*,
745 F. App'x 706 (9th Cir. 2018) ................................................................................ 12, 17

*United States ex rel. Miller v. ManPow, LLC*,
No. 221CV05418VAPADSX, 2023 WL 9005796 (C.D. Cal. Nov. 22, 2023)...................... 14

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010)........................................... 6, 7, 19

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
No. 16-CV-3059-BAS-AGS, 2019 WL 4727939 (S.D. Cal. Sept. 27, 2019) ................... 7, 13

*Usanovic v. Exp Realty LLC*,
No. C23-0687JLR, 2026 WL 539136 (W.D. Wash. Feb. 26, 2026)..................................... 14

**Other Authorities**

Federal Rule of Evidence 702 .................................................................................................. 6, 7

Hult Report Ex. 2 ....................................................................................................................... 12

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

Hult Report Ex. 8 ............................................................................................................ 18

Intus' "CRM" ................................................................................................................ 16

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant RTZ Associates, Inc. ("RTZ") has moved to exclude portions of the Report (the "Report") of IntusCare Inc.'s ("Intus") expert Kristopher Hult ("Hult"). RTZ's motion amounts to a misguided critique of Hult's reliance on certain evidence in calculating damages. But quibbling with why Hult relied on certain data for his model can be raised on cross-examination, it is not a basis to exclude his testimony. Indeed, RTZ does not once attack the methodology Hult employs. Nor can it, as Hult applied sound, widely accepted economic principles and methodology to determine Intus' damages. Unable to challenge Hult's methodology, RTZ, instead, advances meritless arguments.

First, RTZ contends that Hult's lost profits calculation does not rest on sufficient evidence of causation. This argument rests on misstating both Hult's role and his opinions. RTZ asserts that Hult assumes all lost revenue after a certain date is because of RTZ's information blocking conduct. RTZ argues there could have been other reasons for lost contracts, such as price. This is a misstatement of Hult's opinion. Hult's analysis isolates the impact of RTZ's conduct by looking at Intus' historical "win rate," i.e. the rate at which Intus historically won contracts. By analyzing the "win rate," lost contracts that are the result of things like price, are in fact filtered out. Thus, RTZ is just mischaracterizing the opinions. In addition, he was retained as an expert to opine on damages assuming that Intus is able to prove liability at trial. Hult is not reviewing emails and opining on what they mean with respect to any specific customers. For example, for Community PACE there is email correspondence that shows that Community PACE terminated its relationship because RTZ blocked Intus' access. Hult mentions that email in his report as evidence of a causal connection, but at the end of the day, the jury can interpret that email, it is not Hult's role to do that. Hult considered financial records from Intus and calculated the difference between the revenue Intus was contractually entitled to receive in the but-for world and the revenue it actually received after RTZ's conduct began. His model also isolates the impact of RTZ's conduct. The fact that for certain buckets of damages the evidence of causation comes from other evidence that will be presented to the jury is not a basis for excluding his opinions.

5

Second, Hult's opinion as to the millions in lost revenue Intus suffered is based on sound economic methodology and supported by reasoned analysis and citations to academic literature. RTZ does not dispute that a regression analysis or a difference-in-differences framework—both of which Hult utilized—are sound economic methodologies for calculating damages. Instead, RTZ casts vague aspersions as to the underlying data Hult used, calling into question the accuracy of Intus' financial records and customer data. Ironically, while claiming Hult should have done more to verify these written records, RTZ does not identify what should have been done or provide evidence to support its assertions. RTZ also contends that Hult failed to consider certain data points like client size, geography, contract vintage, competition, pricing, product launches, and other potential explanations. Not so. Hult considered all of these points as set forth fully in his report. But even assuming RTZ's quibbles with the accuracy of the underlying data had any legitimacy, it would still not be a reason to exclude Hult. Disagreements over how a methodology was applied or whether certain data inputs were used go to weight not admissibility. And RTZ can raise its points on cross-examination. The Court should, therefore, deny RTZ's motion to exclude the expert testimony of Hult.

## II.    <u>LEGAL STANDARD</u>

Hult's opinions easily meet the Daubert standard. Federal Rule of Evidence 702 provides that an expert witness's testimony will be admitted if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. *See also Daubert v. Merrell Dow Phar, Inc*., 509 U.S. 579, 589-95 (1993) (the trial court acts as a "gatekeeper" to ensure through a preliminary determination that proffered expert evidence is both relevant and reliable). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and *is relevant to the task at hand*.'" *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (emphasis added).

As explained further below, RTZ does not dispute that Hult's expertise and specialized knowledge will help the jury; nor does RTZ attack Hult's methodologies. Instead, RTZ misstates

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

his opinions and quibbles with the underlying evidence. These are not a proper basis to exclude expert testimony. "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998). "A criticism that [an expert] did not consider enough material in forming his opinion is not a proper objection." *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 16-CV-3059-BAS-AGS, 2019 WL 4727939, at *4 (S.D. Cal. Sept. 27, 2019). "Facts casting doubt on the credibility of an expert witness and contested facts regarding the strength of a particular scientific method are questions reserved for the fact finder." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1053 (9th Cir. 2014). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). Federal Rule of Evidence 702 "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). All of RTZ's attacks fall into the above categories and fail.

## III.    RTZ'S MOTION TO EXCLUDE HULT SHOULD BE DENIED

### A.    Hult's Opinion Based on Lost Data Access in September 2022 Is Based on Sound Methodology.

In September 2022, RTZ sent Intus a cease-and-desist letter threatening suit if Intus continued to access PACECare. There is not a dispute that this date is significant and reflected a change in posture between RTZ and Intus. In its motion, RTZ also does not dispute that this is the date that RTZ insisted that Intus stop accessing Intus client data via PACECare. It is also not disputed that Intus in fact lost access to its clients' data on PACECare. The fact that Intus tried failed workarounds like having its clients manually pull and export the data doesn't change the

analysis. RTZ's position as of September 2022 materially impaired Intus' ability to provide its services and deterred clients from contracting with Intus. RTZ's factually and legally misplaced liability defense that Intus could have accessed data by having its clients manually pull thousands of health records, does not impact the damage model. For damages purposes, the relevant economic question is not whether Intus could still obtain some data through occasional access or alternative means; instead, the question is whether RTZ's conduct materially impaired Intus' ability to provide its products, support its clients, and compete for business.

RTZ contends that Hult's analysis rests on a faulty premise because he "wrongly assumes that Intus was entirely 'blocked' from accessing patient data as of September 2022." (Mot. at 4:23-24.) Not so. RTZ's argument misconstrues Hult's opinion and the relevant starting point. Hult expressly stated that his analysis did not assume Intus lost all access to data. Rather, he explained that Intus "didn't necessarily have to have no access to data, it had to have a loss of access that affected their ability to perform their services." (Hult Depo. 50:5-7.) And when asked about circumstances where Intus might still receive some data, he explained that the relevant inquiry was whether the access was "sufficient for Intus to provide its services." (Hult Depo. 63:5-8.) September 2022 is the point at which RTZ's conduct impaired Intus' ability to obtain the direct, repeatable, and sufficiently reliable access to client data that Intus needed to provide its services. (Hult Report ¶¶ 7–8, 13–20; Hult Depo. 45:17–19; 50:5–7; 63:5–8).[1]

RTZ's argument also fails because it fundamentally misunderstands the economic relevance of the September 2022 date. As explained in Hult's report, Intus' business model depended on access to clients' EMR data, and RTZ's conduct allegedly "prevented or increased the cost, complexity, and delay in Intus's ability to receive Intus's clients' data and, in turn, provide analytics work." (Hult Report ¶ 40.) Hult's analysis is also supported by observed market outcomes, including revenue interruptions from pre-existing contracts and reduced revenue growth among RTZ-using clients after September 2022 that are consistent with Intus experiencing diminished ability to access and use the data necessary to provide its services. (Hult Report ¶¶ 44–46, 55, 67–86.) As Hult explains, economists commonly assess the marketplace effects of challenged conduct

---

[1] The Hult Report and deposition transcript were filed under seal as part of RTZ's Motion to Exclude Hult's Expert Opinions. (Dkt. 152.)

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

by examining whether the observed outcomes are consistent with the alleged mechanism of harm. (Hult Report ¶¶ 42, 71–74.)

In sum, RTZ does not attack the economic principles or methodology on which Hult's analysis relies; instead, it misrepresents Hult's opinion and asserts that he should have adopted what amounts to RTZ's liability defense in his opinions. Not only is RTZ wrong, but these issues are not a reason to exclude an expert.

**B.    Hult's Pre-Existing Contracts Category Is Not Contradicted by the Evidence**

Hult attributed ▮▮▮▮ in lost revenue to four Intus clients whose payments were interrupted or reduced as a result of RTZ's conduct. (Hult Report ¶¶ 44, 55.) RTZ's criticism of the pre-existing contract damages mischaracterizes both Hult's methodology and the nature of the underlying evidence. Hult's analysis of pre-existing contract damages is straightforward and based on observed revenue interruptions. He identified clients that were generating revenue for Intus before the onset of RTZ's alleged conduct and then examined whether those revenue streams were interrupted after the conduct began. As Hult explains, the invoicing data show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Hult Report ¶¶ 44–46, 54–55.) Based on those records, Hult calculated the difference between the revenue Intus was contractually entitled to receive in the but-for world and the revenue it actually received after RTZ's conduct began. (*Id*.)

RTZ's issue with the pre-existing contracts damages is not about Hult's methodology; rather, RTZ faults Hult for not doing more to tie the revenue decline to RTZ's conduct. As above, emails and testimony regarding these specific programs will be presented to the jury. The jury can evaluate whether emails that state contracts are being terminated because of RTZ is sufficient evidence to establish causation. (*See, e.g.,* Hult Report ¶ 51.) Obviously, Intus believes it does. Hult's observation that the revenue declines coincide with RTZ's conduct is also part of the causation analysis and certainly something he can testify about. RTZ's contention that the lost revenue from BoldAge was not caused by RTZ's conduct but was instead "Intus' own voluntary decision to suspend billing" is merely RTZ's take on the evidence. (Mot. at 5:18-6:9.) Contrary to

9

RTZ's take, the reason Intus stopped billing its customers is because it could no longer provide the service. (Hult Report ¶ 39.) Calling that a "voluntary" decision is quite the stretch. But, either way, RTZ's effort to spin an email is not a basis to exclude Hult's damages opinions. Similarly, RTZ also maintains that for Community PACE, Hult fails to "show [any] connection between [RTZ's conduct] and the claimed losses." (Mot. at 6:11-26.) As for Senior Care Partners PACE, RTZ again contends that Hult fails to "link[] these alleged losses to RTZ's conduct," and "the evidence suggests Intus voluntarily paused Senior Care Partners' billing." (Mot. at 7:1-11; *see also* 7:12-22 [same argument as to Neighborhood Healthcare PACE].) Each of these arguments is merely RTZ criticizing Hult for not adopting RTZ's view of the world.

In sum, RTZ's argument fails because "[t]he court's role is to determine 'the scientific validity' of an expert's 'principles and methodology,' not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record. That is for the litigants to argue, and for the jury to decide." *Elosu*, 26 F.4th at 1026. As stated above, RTZ does not challenge the methodology or principles Hult relies on. Nor could it, as Hult applied sound economic methodologies. RTZ's position that there is insufficient evidence of causation can be asserted at trial, but it is not a valid basis to exclude Hult's testimony.

### C.      The Lost Opportunities Category Rests on Sound Methodology.

Hult opines that Intus missed out on ▇▇▇▇▇▇ in potential business opportunities. RTZ's primary criticism—that these "unobservable opportunities" are allegedly speculative—fundamentally misunderstands the nature of the opinion and analysis. The fact that some lost opportunities are not directly observable in a firm's internal records does not make them improper or speculative. Hult's report specifically cites the economic literature on vertical foreclosure, which recognizes that restricting access to a critical input can harm downstream competition even where the foregone transactions themselves are not directly observable in company records. (Hult Report n.23 (citing Ordover, Saloner & Salop (1990) and Hart & Tirole (1990).) In these cases, economists compare observed market outcomes to a but-for benchmark and use accepted econometric techniques to estimate the injury. (Hult Report ¶¶ 42, 71–74.) The same principle applies here. As Hult explained in his report, these opportunities are "unobservable" because Intus was foreclosed

from ever competing for them in the first place and therefore "generated no bids, proposals, or contracts and therefore do not appear in Intus' CRM, invoicing systems, or other internal data." (Hult Report ¶ 20; *see also* Hult Report ¶ 67.) The absence of a CRM entry is therefore not evidence that the opportunity did not exist; it is the very reason an econometric approach is necessary. (Hult Report ¶¶ 20, 67–74.) Indeed, while RTZ feigns ignorance of the market dynamics to assert that the lost opportunities damage bucket is speculative, the bucket is a logical and reasonable outflow of RTZ's conduct. All programs in the PACE space are potential Intus clients. This includes all programs on the PACECare platform. Intus is going to secure some of those contracts and lose others. But, when RTZ includes in its contracts that reports and information cannot be shared with Intus, the programs on the RTZ platform are improperly removed from the group of potential clients and Intus loses all of them.

RTZ's argument that these opportunities are speculative because they do not appear in CRM data is flawed. The relevant question is not whether Intus can identify every foregone opportunity individually. The relevant question is whether reliable economic methods can estimate the difference between actual outcomes and what would have happened had RTZ not foreclosed the PACE programs using PACECare. Hult's analysis does exactly that. According to his report, the objective of the damages analysis is to compare Intus' actual economic position with "the economic position they would have attained absent the information blocking conduct." (Hult Report ¶ 41.) The difference-in-differences model provides a systematic and accepted means of making that comparison. (Hult Report ¶¶ 71–86.) Hult also adopted multiple conservative limitations designed to avoid overstating these damages. He excluded certain clients to avoid double counting of lost revenue, excluded CareHub revenues, and used assumptions that tend to reduce rather than increase the estimate. (Hult Report ¶¶ 80, 81 n.63, ¶ 100 n.76.) For those reasons, the opportunity damages are not speculative. They are the product of a standard econometric framework applied conservatively to observed market data.

RTZ's remaining challenges to the lost revenue damages are meritless.

### 1.     Hult's Difference-in-Differences Regression Analysis Is Sound

Consistent with standard economic practice, Hult estimated lost revenue damages using a

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

difference-in-differences framework that compares the revenue growth of Intus clients affected by RTZ's conduct with the revenue growth of comparable Intus clients not affected by RTZ's conduct. (Hult Report ¶¶ 71–86.) This methodology is a "common econometric analysis" that measures whether and by how much revenue from RTZ-using clients grew more slowly than revenue from comparable non-RTZ clients after the conduct period began. (Hult Report ¶¶ 71–73.) As the report further explains, this type of benchmarking and difference-in-differences analysis is a standard economic tool used to estimate damages where direct observation of the lost opportunity is not possible. (Hult Report ¶¶ 67–74 & nn.49, 51–52; Hult Report Ex. 2 (citing McCrary & Rubinfeld, Measuring Benchmark Damages in Antitrust Litigation; Baker & Rubinfeld, Empirical Methods in Antitrust Litigation; Cameron & Trivedi, Microeconometrics; Kennedy, A Guide to Econometrics); see also Hult Report ¶ 71 n.49 (describing the analysis as a common "yardstick approach").) RTZ does not dispute that a difference-in-differences regression analysis is a proper economic methodology. Instead, RTZ quibbles with some of the data on which Hult relied. But "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231. For instance, RTZ contends that "Hult blindly relied on the revenue data Intus provided him, and did nothing to validate the accuracy of the data." (Mot. at 9:23-24.) But RTZ does not point to a single issue with the accuracy of Intus' revenue data, nor does it explain how Hult's reliance on the revenue data justifies exclusion.[2] "Experts can rely on data provided to them without independent verification because the 'factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir. 2018) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004)). And RTZ also conveniently omits that Hult reviewed and compared multiple sources of information, including revenue data, invoicing data, CRM data, and other business records, to assess whether those sources were internally

---

[2] Indeed, RTZ's own damages expert cites to a phone conversation with Collabrios' president, Kevin Lathrop, as his only evidence of foregone revenue, and he does not explain any steps he took to validate the accuracy of the data.

consistent and reflected the same underlying business activity. (Hult Depo. 89:15–20.) Based on that review, he found the revenue data to be consistent with the other financial and operational records. RTZ identifies no evidence that the revenue data are inaccurate or that any alleged inaccuracy materially affects the conclusions of Hult's analysis.

RTZ also trots out the same losing causation argument again, contending that Hult "attributes any divergence in growth rates to RTZ's actions," (Mot. at 9:25-26), and that Hult failed to consider that "client-level revenue trajectories [may] diverge for reasons having nothing to do with RTZ." (Mot. at 10:9-12; *see also* 10:19-20 [faulting Hult for making "no effort to account for any factors other than RTZ's purported information-blocking"].) As explained, this is a misstatement of the analysis. Hult is controlling for other factors with his use of Intus' "win rate." Moreover, Hult's role is not to opine on the existence of legal causation. Instead, he was tasked with isolating the impact of RTZ's conduct on Intus' profits. His analysis does exactly that. (Hult Depo. 141:18–24; 147:9–11; 150:5–22.) Economists frequently "look at outcomes to try to understand if there would have been additional sources of lost revenue" even when the underlying opportunities do not appear in internal records. (Hult Depo. 141:20–23.) Hult's analysis is based on market outcomes, not specific contracts, because economic damages often must be inferred from observed market behavior rather than identified by transaction. (Hult Depo. 150:5–22; 156:11–20.)

### 2. RTZ's Arguments About Hult's Use of Data Are Meritless

RTZ's criticisms of the difference-in-differences analysis largely fall into four categories: (1) omitted-variable arguments; (2) sample size and statistical fit; (3) sample-selection and weighting choices; and (4) robustness. (Mot. at 11:4-13:19.) At the outset, none of these challenges are a basis on which to exclude an expert. "A criticism that [an expert] did not consider enough material in forming his opinion is not a proper objection" in a Daubert motion to exclude. Quidel, 2019 WL 4727939 at *4. Arguments about "faults in [an expert's] use of [a particular] methodology . . . go to the weight, not the admissibility, of his testimony." Kennedy, 161 F.3d at 1231; see also Mitcheson v. El Antro LLC, No. CV-19-01598-PHX-GMS, 2020 WL 7075239, at *3 (D. Ariz. Dec. 3, 2020) (rejecting a motion to exclude an expert based on disagreement about variables and rates used in a damages calculation and explaining, "whether these rates most accurately reflect the

facts at hand will be an issue of fact which can be addressed at trial through cross examination"); *United States ex rel. Miller v. ManPow, LLC*, No. 221CV05418VAPADSX, 2023 WL 9005796, at *5 (C.D. Cal. Nov. 22, 2023) (rejecting an argument that an expert's "purported failure to consider the economic uncertainty of the global pandemic" necessitates exclusion and explaining that faults in application of a methodology go to weight not credibility). "To the extent that defendants disagree with [Hult's] conclusion that there was a fatally flawed process due to a lack of documents, steps, or analysis, they can subject him to vigorous cross-examination." *Lauderdale v. NFP Ret., Inc.*, No. 821CV00301JVSKES, 2022 WL 17324416, at *9 (C.D. Cal. Nov. 17, 2022); *Usanovic v. Exp Realty LLC*, No. C23-0687JLR, 2026 WL 539136, at *2 (W.D. Wash. Feb. 26, 2026) ("[A]t this stage of the litigation, [Defendant's] focus on the purported unreliability of [an expert's] data is misplaced. Defendant will have an opportunity to 'vigorously cross-examine' [the expert] at trial.").

Putting aside that RTZ's arguments challenging the data Hult used are not a basis to exclude his testimony, the more fundamental problem is that RTZ is wrong.

First, RTZ argues that the regression fails to control for client size, geography, contract vintage, competition, pricing, product launches, and other potential explanations. (Mot. at 11:12-13.) This criticism misunderstands both the controls included in the model and the nature of difference-in-differences analysis. The regression explicitly controls for product type and revenue type, (Hult Report ¶¶ 74–76; Ex. 9), and Hult examined whether pricing differed between opportunities affected by RTZ's conduct and Intus' broader set of opportunities and found no meaningful differences. (Hult Report ¶ 19 n.4.) Hult also ran an alternative regression specification that included customer fixed effects. (Hult Report ¶ 75 n.54; ¶¶ 87–91). A customer fixed-effects model compares changes within a given customer over time and therefore controls for time-invariant customer characteristics, including geography, competitive conditions, customer size, customer-specific preferences, and other fixed differences across customers. In all circumstances, there was a substantial and observable divergence in revenue behavior for non-RTZ clients and RTZ-using clients. (Hult Report ¶ 75 n.54.) RTZ is simply wrong, therefore, to contend that Hult failed to consider other variables.

[REDACTED]

Third, RTZ criticizes the decision to weight the regression by revenue and the decision to exclude certain observations, including clients with affirmatively recorded losses, CareHub products, and 2020 startup-period observations. (Mot. at 11:26-12:4.) These choices were expressly disclosed, economically justified, and tested. The weighting approach gives greater influence to observations representing larger amounts of revenue, which is a standard and reasonable approach when estimating the economic impact of conduct on revenues. (Hult Report ¶ 79.) Clients with affirmatively recorded losses were excluded from the regression to avoid double counting. The purpose was to estimate the revenue growth that would have occurred for clients that were not included in the other damage buckets. (Hult Report ¶ 80.) Including clients with affirmatively recorded losses would no longer isolate the effect of the conduct on that population. (Hult Depo. 172:7–25; 173:15–174:17.) Additionally, CareHub was excluded because it is an EMR product that may be affected differently than Intus' analytics products. (Hult Report ¶ 81.) The partial 2020 startup period was excluded because it contained only a small amount of revenue and was not representative of Intus' broader growth trajectory and because excluding it was conservative. (Hult Report ¶ 81 & n.63.) These restrictions were not hidden, arbitrary, or outcome-driven; they were disclosed and economically justified. Hult also ran robustness checks to show that, among other changes, including 2020 and removing weighting do not change the conclusions of the regression analysis. (Hult Report ¶ 87–90.)[3]

---

[3] RTZ argues that its own expert, Schwechheimer, provides an alternative specification that causes the coefficient to lose statistical significance and therefore renders Hult's analysis unreliable. (Mot. at 11:18-26.) This argument fails. Schwechheimer's specification is economically and econometrically mis-specified because it assumes that all three categories of

15

Fourth, RTZ is wrong to argue that Hult's extrapolation about the value of future profits is unsupported. (Mot. at 12:5-21.) RTZ's first mistake is that it misunderstands how future profits were calculated. Economists use a firm's actual historical experience to project the economic consequences of opportunities that were impaired or lost as a result of the challenged conduct. And that is exactly what Hult did here: His analysis is grounded in Intus' own business records and historical experience, including observed opportunity values, implementation timing, contract duration, win rates, renewal rates, and revenue realization patterns. (Hult Report ¶¶ 57–66, 84–86.) For instance, Intus opportunities often involve substantial implementation periods between contract execution and revenue realization, and Hult relied on Intus' actual opportunity and invoicing data to assess those timing patterns. (Hult Report ¶ 78 n.62.) Thus, the use of future periods reflects the actual implementation and revenue cycle observed in Intus' business rather than an assumption created for litigation. Likewise, any renewal revenues are based on Intus' observed renewal experience and actual contract terms, not an assumption that every opportunity would continue indefinitely. (Hult Report ¶¶ 63–66.) The same principle applies to the projection of unobservable lost revenue. (Hult Report ¶¶ 84–86.) In sum, Hult's approach relies on Intus' actual business experience and observed revenue patterns—not speculation—to estimate the timing and magnitude of future lost revenues. The fact that RTZ has a different spin on those underlying facts does not make Hult's methodology unsound or support exclusion of his testimony.

### D.    Hult's CRM-Based Damages Are Reliable.

Hult analyzed data in Intus' "CRM" database. The CRM database includes Intus' contacts with potential customers and the result of Intus' various business pitches. RTZ's primary argument about Hult's CRM-based damages is that "Hult did nothing to verify whether the spreadsheet of CRM data Intus provided to him was validated by any source data." (Mot. 14:3-4.) This is not a basis for exclusion because, as explained, "[e]xperts can rely on data provided to them without

alleged lost revenue can be analyzed using the same regression framework and are affected by RTZ's conduct in the same manner. Hult expressly rejects that assumption. As explained in the report, the three categories of damages arise through different mechanisms, occur at different points in time, and require different methodologies to estimate their economic effects (Hult Report ¶¶ 43–44, 67–69, 79–80.) This argument, therefore, amounts to nothing more than dueling opinions from opposing experts. It is not a basis to exclude Hult.

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

independent verification because the 'factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Mighty Enters., Inc.*, 745 F. App'x at 709.

RTZ also conveniently omits Hult's explanation of how he validated the data. Hult relied on three separate CRM data extracts maintained by Intus in the ordinary course of business: (1) opportunities Intus identified as lost due to RTZ's conduct, (2) opportunities used to calculate Intus' historical renewal rate, and (3) opportunities used to calculate Intus' historical win rate. (Hult Report ¶¶ 29-33.) The CRM data track business opportunities, contract values, covered lives, contract outcomes, and the reasons opportunities were won or lost. (Hult Report ¶ 29.) Hult also explained that CRM data are a common type of business record used to track opportunities, expected revenues, contract outcomes, and the reasons opportunities were won or lost, and that firms routinely use such data to make business decisions in the ordinary course of business. (Hult Depo. 102:15–103:10.) He understood from discussions with Intus personnel that the CRM system was maintained and used in the ordinary course of business, which is consistent with the type of business records economists routinely rely upon in damages analyses. (Hult Depo. 87:24–88:13, 89:15–20.)

Hult also did not use the CRM data in isolation. He compared the CRM opportunities to Intus' revenue data and other materials in the record to confirm that the CRM data were consistent with other evidence. (Hult Depo. 89:15–20.) Nothing in RTZ's motion demonstrates that the CRM system ceased functioning as an ordinary-course business record or that the opportunities reflected in the CRM data do not represent genuine business opportunities tracked by Intus.

RTZ also argues that a portion of CRM-related damages arises from opportunities involving products such as IRIS and CareHub that became commercially available after the alleged conduct began. That criticism misunderstands the theory of harm. The relevant question is not whether every product was commercially available on the first day of the conduct period. The relevant question is whether the opportunities themselves would have arisen during the damages period and whether RTZ's conduct affected Intus' ability to compete for those opportunities. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

17

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████ (Hult Report Ex. 8.) ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ (Hult Report ¶ 78 n.62; ¶¶ 84–86.) █████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████ (Hult Report ¶¶ 63–66, 84–86.)

Finally, RTZ argues that the ██████████████████████████████████████████████████████████████ That criticism misunderstands the nature of a growing business and the purpose of a but-for analysis. As explained in Hult's report, ███████████████████████████████████████████████████████████████████████████████████████████████████

(Hult Report ¶¶ 71–86.) RTZ identifies no mathematical error, no flaw in the calculations, and no alternative economic model demonstrating that the estimated damages are unreasonable. At most, RTZ disagrees with the factual assumptions underlying particular opportunities. Those disputes go to weight, not the reliability of the methodology.

None of RTZ's cited authority supports excluding Hult's opinion. The primary case on which RTZ relies, *McGlinchy v. Shell Chem. Co.*, involved a drastically different set of facts. 845 F.2d 802 (9th Cir. 1988). There, the court granted summary judgment to the defendants because plaintiffs "made no showing at all about causation or fact of damages." *Id*. at 808. The court also excluded a damages expert who "acknowledged that he did not relate the loss to specific acts and,

indeed, could not recall any specific acts by [] defendants. He added that the cause of the decline in sales theoretically could have been anything." *Id*. at 806. Put differently, the damages expert in that case simply attributed all lost profits to defendants without applying any methodology or analyzing which profits were associated with the allegedly wrongful conduct. *McGlinchy*, therefore, stands for the unremarkable proposition that a damages expert cannot simply parrot the plaintiff's own projections and call it an expert opinion.

Hult's analysis is nothing like in *McGlinchy* because he engaged in an analysis to isolate the impact of RTZ's conduct on Intus' profits that: (1) employed recognized, independent methodologies (e.g., regression analysis, difference-in-differences methodology); (2) based the analysis on ordinary course-of-business records and historical revenue data; and (3) calculated damages in a manner that is replicable and subject to cross-examination. Where, as here, an expert's methodology is sound, challenges to the expert's assumptions and data go to weight, not admissibility. *See City of Pomona*, 750 F.3d at 1053; *Primiano*, 598 F.3d at 564; *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70; *Elosu*, 26 F.4th at 1017.

Nor do *Hangarter* or *Joiner* support RTZ's arguments. (Mot. at 14:23-24.) *Hangarter* does not discuss causation or even contain the word "causation" a single time. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004). Indeed the *Hangarter* court affirmed the district court's denial of motions to exclude two expert witnesses. *Id*. at 1017. *Joiner* is likewise inapposite. There, the challenged experts had relied on faulty animal studies to opine "that [plaintiff's] exposure to [certain substances] had contributed to his cancer." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997).

### E.    The CRM Data Hult Relies on Is Reliable and Not a Basis for Exclusion.

RTZ's argument that the CRM data was created for litigation is baseless. (Mot. at 15:23-17:5.) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This approach is incorrect. As Hult explained, opportunities may be revisited, updated, or otherwise modified as part

19

of ordinary sales and account-management activities, and ██████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ Accordingly, Hult properly relied upon the documented existence of the various opportunities. (Hult Report ¶¶ 56–66.) Thus, even accepting RTZ's characterization of certain date discrepancies, those discrepancies do not undermine the economic information on which Hult's damages calculations are based.

Indeed, after applying Hult's own exclusions, ██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████ RTZ offers no empirical basis for concluding that somewhat larger differences reflect fabrication rather than ordinary business processes, later revisions, data migrations, clerical issues, or the revisiting of existing opportunities. Nor does RTZ identify any witness testimony, metadata, document, or other evidence showing that any opportunity was fabricated, materially altered, or inaccurately recorded. Instead, RTZ asks the Court to infer fabrication solely from date-field discrepancies. The entire criticism rests on speculation about what might have occurred, not evidence of what actually occurred. And, as stated repeatedly, this type of quibbling about data inputs is the proper subject of cross-examination, not expert exclusion.

████████████████████████████████████████████████████████████

██████████████████████ But that is precisely the purpose of the CRM system: to record Intus' understanding of why opportunities were won or lost. The existence of a common loss reason does not demonstrate fabrication. To the contrary, it is consistent with Intus using its CRM system to track opportunities it believed were affected by RTZ's conduct. (Hult Depo. 80:16–20.) More importantly, Hult did not simply accept every CRM opportunity at face value. He used the CRM opportunities only as a starting point and then applied additional adjustments to isolate the effect of RTZ's conduct because an opportunity identified by Intus as lost due to EMR data blocking is not necessarily the same thing as an opportunity that should be fully attributed to RTZ's conduct for damages purposes. (Hult Depo. 81:19–24; 82:4–16; 83:8–13.) Hult did not "take it as given from the spreadsheet" that each opportunity should be attributed to RTZ. (Hult Depo. 82:23–25.)

20

Consistent with that approach, Hult's analysis incorporates observed win rates, renewal rates, exclusion of certain opportunities, and other conservative assumptions. (Hult Report ¶¶ 56–66.)

Finally, the CRM data are not viewed in isolation. The CRM opportunities are consistent with Intus' invoicing data, revenue data, contemporaneous communications, and the broader pattern of reduced growth among RTZ-using clients identified elsewhere in Hult's analysis. (Hult Report ¶¶ 44–55, 57–66.) Hult compared the CRM data to Intus' revenue data and other information in the record to confirm that the CRM opportunities were consistent with the broader evidence. (Hult Depo. 89:15–20.) At most, RTZ identifies factual disputes regarding individual records. Those disputes go to the weight of the evidence, not the reliability of the underlying business records or the economic methodology that relies upon them.

**F.      RTZ's Argument About Revenue from Allegedly Lost Products Is Meritless**

RTZ argues that Hult's CRM damages analysis improperly treats certain opportunities as lost even though Intus continued to receive revenue from the same customers, products, or customer-product combinations. (Mot. at 17:8-25.) According to RTZ, the existence of continued revenue demonstrates that the allegedly lost opportunities were not actually lost and that Intus ultimately received the revenues associated with those opportunities. That criticism misunderstands the distinction between a specific business opportunity recorded in the CRM data and aggregate revenues received from a customer relationship. The fact that a customer continued to generate some revenue does not establish that the particular opportunity identified as lost was ultimately won or that Intus received the revenues associated with that opportunity. As a result, a customer may continue generating revenue for Intus while simultaneously declining a separate expansion opportunity, renewal opportunity, or new product opportunity that appears in the CRM data.

21

RTZ's argument is also fundamentally flawed because it does not identify any CRM opportunity that Hult treated as lost and demonstrate that the revenues associated with that opportunity were actually received by Intus. Instead, RTZ points to the existence of some revenue from the same customer or product and assumes that such revenue must correspond to the allegedly lost opportunity. That assumption is unsupported. Indeed,

Accordingly, RTZ's criticism does not identify a flaw in the methodology.

RTZ's criticism also rests on unsupported assumptions regarding covered lives.

That assumption is unsupported and does not undermine the CRM opportunity.

**G.     Hult's Renewal Revenue Projection Rests on Sound Methodology.**

RTZ's criticism mischaracterizes the basis for the renewal damages analysis. (Mot. at 18:1-19:20.) The renewal component is not based on an assumption that contracts would continue indefinitely or that every lost opportunity would automatically renew. Rather, it is based on Intus' observed renewal experience and actual business records.

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

[REDACTED]

Equally unavailing is RTZ's criticism of Hult's use of Intus' observed 2025 win rate. The purpose of the win-rate adjustment was not to reconstruct every historical sales cycle since Intus' founding, but to estimate the likelihood that opportunities identified in the CRM data would have been realized during the damages period. [REDACTED]

[REDACTED] A recent win rate is therefore more likely to reflect the sales environment, product offerings, customer base, and competitive conditions relevant to the future opportunities and revenues included in the damages calculation than win rates from Intus' earlier stages of development. The relevant question is whether the selected rate is grounded in observed company experience. Here it is.

[REDACTED]

The renewal analysis is therefore grounded in company-specific evidence rather than speculation. As explained in Hult's report, the CRM data contain information regarding actual contract opportunities, contract outcomes, and renewal behavior. (Hult Report ¶¶ 29–31, 63–64.) The renewal assumptions are drawn directly from those observed data and reflect how Intus'

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

business actually operated during the relevant period. (Hult Report ¶¶ 63–66.)

In sum, RTZ's "pyramid of inferences" argument mischaracterizes the renewal calculation. The renewal component is not based on an assumption that Intus would automatically win and then automatically renew contracts it never obtained. Rather, it is an expected-value calculation based on observed probabilities from Intus's business records.

**H.     Hult's Labor-Cost Figures Are Reliable.**

RTZ's criticism of the labor-cost component does not identify a flaw in the damages methodology. (Mot. at 19:23-21:4.) The labor-cost damages are based on Intus' business records and information compiled by Intus personnel regarding time spent responding to RTZ's conduct, including work related to data integrations, data flows, and RTZ-related operational disruptions (Hult Report ¶ 94.) Economists routinely rely on company records and employee-provided information when quantifying damages, and Hult's role was to use those inputs to calculate the resulting economic harm, not to independently audit Intus' internal timekeeping records. Once again, RTZ criticizes the accuracy of the underlying records rather than the reliability of the economic methodology used to incorporate those costs into the damages calculation. █████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

**I.     RTZ's Argument Regarding Alternative Causes and Mitigation Is Baseless.**

RTZ's criticism that Hult's analysis fails to account for alternative causes or mitigation misunderstands both the purpose of the difference-in-differences methodology and the analyses he actually performed. (Mot. at 21:5-27.) Hult does not simply attribute all changes in Intus' revenue to RTZ's conduct. Rather, the regression compares revenue growth among RTZ-using clients to revenue growth among otherwise comparable non-RTZ clients over the same period, which is specifically designed to isolate the effect of the challenged conduct from broader market forces affecting Intus' business generally. (Hult Report ¶¶ 71–76, ¶ 75 n.54.) The purpose of the econometric analysis is to compare two groups and isolate the effect of the conduct while controlling for other factors that could affect revenue. (Hult Depo. 30:18–31:1; 31:18–32:9.) And

the regression was designed to address alternative explanations for changes in revenue by comparing outcomes across groups and isolating the effect of the conduct from other influences. (Hult Depo. 31:18–32:9.)

Hult's report also includes multiple features specifically designed to address alternative explanations. The regression controls for product type and revenue type, tests for preexisting differences in revenue trends, and includes alternative specifications and robustness checks. (Hult Report ¶¶ 74–76, 87–91.) In addition, Hult ran a customer fixed-effects specification that compares changes within the same customer over time and therefore controls for time-invariant customer characteristics, including geographic location, competitive conditions, customer-specific preferences, and other fixed differences across customers. (Hult Report ¶ 75 n.54.) Even under that specification, Hult continued to find that revenue growth among non-RTZ clients exceeded revenue growth among RTZ-using clients after the conduct period began. (*Id.*)

Hult also made adjustments to CRM-based damages calculations to account for the possibility that opportunities may have been lost for reasons unrelated to RTZ's conduct rather than simply attributing all identified opportunities to RTZ. (Hult Depo. 30:23–31:4; 32:20–33:9; 82:4–16; 83:8–13.) For example, he applied observed win rates and renewal rates precisely because an opportunity identified by Intus as affected by RTZ's conduct is not necessarily the same as an opportunity that should be fully attributed to RTZ's conduct for damages purposes. (Hult Report ¶¶ 59–66; Hult Depo. 82:4–16; 82:23–25.) These adjustments make the damages analysis more conservative and reduce the risk that unrelated factors are attributed to RTZ.

RTZ's alternative-cause criticisms are also largely hypothetical. The relevant question is not whether one can identify potential alternative explanations in the abstract, but whether those factors actually generated different revenue trends between the RTZ and non-RTZ groups that would explain the observed divergence in outcomes. (Hult Depo. 163:21–164:25.)

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT

█████████████████████████████████████

RTZ's mitigation criticism is similarly misplaced. The damages analyses are based on Intus' actual observed revenues, opportunities, and business outcomes and therefore already reflect whatever mitigation efforts Intus undertook in the real world. To the extent RTZ contends that Intus could have taken additional mitigation measures or achieved different outcomes through different business decisions, that is a factual dispute concerning the but-for assumptions and underlying liability issues, not a flaw in the economic methodology.

### J.   Hult's Profit Margin Conversion Is Reliable.

RTZ's criticism of the profit-margin calculation applies the wrong economic standard.

(Mot. at 22:1-14.) Damages should reflect the profits Intus would have earned on the lost revenues after accounting for the incremental costs of providing those services, not historical costs that would have been incurred regardless of whether the lost sales occurred. (Hult Report ¶ 95-99.) For that reason, Hult applied gross profit margins to the lost revenues, which provides a reasonable measure of the incremental profitability associated with additional sales. (*Id*.)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████ Because the lost profits occur primarily in future periods, more recent operating results provide a more reliable measure of the profitability Intus would have expected to earn on incremental future sales than margins observed during its earliest startup years.

Moreover, RTZ's criticism ignores the economic distinction between average historical margins and incremental margins. For a software and analytics business such as Intus, many costs associated with developing the platform, building the technology, and maintaining the underlying infrastructure are fixed or largely fixed over the relevant range of output. As a result, the incremental cost of serving an additional customer is generally lower than the average cost reflected in historical financial statements. The relevant question is therefore not what Intus' average profitability was during its startup period, but what profits it would have earned on the additional

26

revenues lost as a result of RTZ's conduct. ███████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████

### K.        Hult's Application of the Risk-Free Treasury Rate Is Not a Basis for Exclusion.

RTZ's criticism misunderstands the role of the discount rate in Hult's analysis. (Mot. at 22:15-26.) The use of a Treasury rate does not reflect an assumption that Intus itself is as risk-free as the United States government. Rather, after estimating the but-for damages and incorporating risk adjustments elsewhere in the analysis, the remaining task is to convert future damages into present-value terms. ██████████████████

███████████████████████████

███████████████████████████

███████████████████████████

██████████████████ Applying an additional risk-adjusted discount rate on top of those adjustments would risk double-counting the same uncertainty.

As with all of RTZ's other arguments, this position boils down to nothing more than a dispute about how Hult applied an otherwise sound methodology. It is not the basis for exclusion.

### IV.    CONCLUSION

For the foregoing reasons, the Court should deny RTZ's Motion to Exclude Expert Opinions of Kristopher Hult.

///

///

---

[4] The Schewechheimer Report was filed under seal as part of Intus' Motion to Exclude Peter Schwechheimer. (Dkt. 149.)

Dated:  June 11, 2026

EPSTEIN BECKER & GREEN, P.C.

By:  */s/ Charles E. Weir*

Charles E. Weir
Andrew M. Beshai

Attorneys for Plaintiff
INTUS CARE, INC.

PLAINTIFF'S OPPOSITION TO DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S
NOTICE OF MOTION AND MOTION TO EXPERT OPINIONS OF KRISTOPHER HULT