NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:   415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>             Plaintiff,<br><br>    vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>             Defendants, | Case No:     4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**SUPPLEMENTAL DECLARATION OF DAVID C. LEE IN SUPPORT OF DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF SHAWN FLEURY**<br><br>*[Concurrently filed with Reply In Support of Motion to Exclude Expert Opinions of Shawn Fleury]*<br><br>Date:         July 2, 2026<br>Time:         2:00 p.m.<br>Courtroom: 6 |
| RTZ ASSOCIATES, INC.,<br><br>             Counter-claimant,<br><br>    vs.<br><br>INTUS CARE, INC.,<br><br>             Counter-defendant. | |

Case No. 4:24-cv-01132-JST

SUPP DECL OF DAVID LEE ISO RTZ'S REPLY ISO MOTION TO EXCLUDE EXPERT OPINIONS OF SHAWN FLEURY

70536255.v1

## <u>SUPPLEMENTAL DECLARATION OF DAVID C. LEE</u>

I, David C. Lee, declare as follows:

1. I am an attorney at law admitted to practice in this Court, and a partner of Nossaman LLP, counsel of record in this action for Defendant and Counter-Claimant RTZ Associates, Inc. ("RTZ"). I make this supplemental declaration in support of RTZ's Reply in Support of Motion to Exclude Expert Opinions of Shawn Fleury. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts.

2. Attached as **Exhibit 1** is a true and correct copy of the relevant portions from Shawn Fleury's deposition transcript, taken on May 25, 2026.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Dated this 18th day of June 2026 in San Francisco, California.

_____
DAVID C. LEE

SUPP DECL OF DAVID LEE ISO RTZ'S REPLY ISO MOTION TO EXCLUDE EXPERT OPINIONS OF SHAWN FLEURY

70536255.v1

# EXHIBIT 1

# Deposition Transcript

Case Number: 4:24-cv-01132-JST

Date: May 25, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# SHAWN FLEURY



CERTIFIED COPY

Reported by:
MIKEN M. COBBS

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

report, and I'm not going to be able to pronounce his last name, I looked very briefly at Peter's report, just a couple of sections, and then I did have a short meeting with Andrew last week where, again, we just talked about the three sections of my report.

Q    Okay.  You're referring to Peter Schwechheimer?

A    Yes, sir.

MR. LEE:  For the record, I believe it's S-c-h-w-e-c-h-h-e-i-m-e-r.

THE WITNESS:  That's impressive.

BY MR. LEE:

Q    All right.  Aside from talking with Mr. Beshai, Andrew Beshai, have you talked with anybody else about this deposition?

A    Just his co-counsel.

Q    Okay.  I'm sorry, just his co-counsel?

A    Just Andrew's co-counsel on the matter.

Q    Okay.  And is that Charles Weir?

A    It is.

Q    Okay.  Did you talk with anybody at Intus?

A    I did not.

Q    Okay.  Have you ever talked with anybody at Intus?

A    I have not.

Q    If we go to the next section of your CV, "Education," you note that you hold a BS in Management/ Computer Systems Information" from Park University; is that correct?

A    Yes.

Q    And then you have -- at least I think I'm reading this correctly.  You have two associate degrees in Applied Science Criminal Justice and Applied Science Electronic Systems Technology; is that correct?

A    Yes.

Q    Okay.  Aside from these degrees, do you hold any other degrees?

A    No.

Q    Do you hold any certifications?

A    I have hold -- held many certifications throughout my career.  I do not hold any certifications right now that are currently active, which is why they're not listed in the CV.

Q    Okay.  Have you ever held any certifications that are healthcare related?

A    No.

Q    I want to go to the next section of your CV, which is "Testimony."  And you've alluded to some of this, but on my count, it looks like your testimony has been provided in five different matters; is that

an expert report could -- I don't think it was official declaration.  It would be very similar to what we provide in a declaration, just didn't have that declaration statement.

Q    Okay.  What is the difference between deposition testimony and oral testimony?

A    So, when I say "oral testimony," I mean I was on the stand providing testimony before the court.

Q    Okay.  And when you say "providing testimony before the court;" in other words, you were called as an expert witness at trial and you were providing testimony at trial?

A    Yes, sir.

Q    Okay.  And you've done that, it looks like, twice, or three times?  I'm sorry.

A    And that one case for the U.S. Air Force, yes.

Q    Okay.  Do any of the matters listed under your "Testimony" section involve health IT regulatory compliance issues?

A    No.

Q    Do any of them involve health IT industry standards or electronic health record data exchange?

A    No.

Q    Do any of them involve healthcare at all?

A    No.

Q    I'm assuming if you were testifying in three of the matters, perhaps four, including the one in the early 2000's, you were qualified as an expert in courts?

A    I was.

Q    Okay.  And have you ever qualified as an expert in California?

A    No.

Q    Have you ever qualified as an expert in matters beyond those that are listed here in your "Testimony" section?

A    No.

Q    I want to go to the last section of your CV, "Presentations."  And you have a series of listed presentations between March 2017 and April 2025.

Do you see that?

A    I do.

Q    Okay.  Do any of those presentations concern health IT regulatory compliance?

A    No.  These ones don't.

One thing I will note for these presentations, these are all public presentations. They would not include presentations that we provided directly internal to an organization.  So, like the

be in scope.  So, I -- you may have a specific -- what you asked may have a specific answer where that's an actual role there, and that answer may be no to that. I just don't know if that's a specific title or role at one of these entities.  But we have worked with regulators to help them understand cybersecurity gaps, and that have included gaps within the language within the contract themselves that could present a risk that the regulator needs to be aware of.

Q    Okay.  Which health IT regulators are you referring to?

A    Yes.  So, two good examples would be the Department of Insurance for Indiana, and the Department of Insurance for Connecticut.  We also worked with the Attorney General for Massachusetts on a healthcare matter.  So, those would be the three that I'm specifically lumping into that category.

Q    Lumping into the health IT regulatory --

A    Yes.

Q    -- focus?  Okay.

Have you ever advised a client on the 21st Century Cures Act?

A    I have not.

Q    Are you aware of the 21st Century Cures Act?

A    I am, but mostly because of this matter.  I

did research it for this particular matter.

Q   Okay.  Do you have familiarity with its implementing regulations?

A   To the extent that it was applicable for this matter, yes, but nothing beyond that.

Q   So, I assume, then, you've never advised a client on information blocking regulations under that act?

A   I have not.

Q   Are you familiar with the ONC Health IT certification program?

A   No.

Q   Do you know what "ONC" stands for?

A   Not as I sit here.

Q   Have you ever been retained as an expert to opine specifically on health IT industry standards for VHR data exchange?

A   I have been retained to help organizations, healthcare specific organizations, understand the risks associated with transferring data -- healthcare data, and how they can manage those risks to an acceptable risk level.  So, that's the extent to which I would say yes.

Q   Okay.  And how many matters for which you've been engaged on that subject have you had?

A    I was asked to provide a rebuttal report to Ms. Creegan's opinion.  I will say it's part of what was provided over to me.  I was also provided the opinion of -- again, I'm not going to be able to pronounce his last name.  Peter S.  And I did review certain portions of his report as part of my understanding of this matter.

Q    Okay.  But we can agree that you were specifically engaged for purposes of rebutting Ms. Creegan's report, correct?

A    Primarily, yes.

Q    Okay.  You've had an opportunity to review Ms. Creegan's report, and in it, I think you would have observed that she has 25 years' worth of health IT experience, both certifications in Health Information Management Systems, Professional Compliance, and Risk Adjustment Coding.

If I recall your testimony before, but just for purposes of clarity, am I correct that you don't hold any health IT specific certifications?

A    That is correct.

Q    And you never have?

A    Please ask the question again.  I didn't hear you.

Q    Yeah.  And you never have, correct?

A    That is correct.

Q    Okay.  You have a copy of your report, obviously, in front of you, and what I would like to do is have you turn to the "Executive Summary" portion, which is on Page 4 of your report.

A    I'm there.

Q    Okay.  Am I correct that the Executive Summary portion just generally summarizes the opinions that you reached in this matter?

A    In general, yes.

Q    Okay.  And Paragraph 17 through 20 set forth the summary of your opinions, and, as I understand it, your opinions consist of rebutting Ms. Creegan's conclusions in three respects; one, the industry practices in SaaS arrangements; two, whether read-only access poses security concerns, and, three, whether the audit logs prove that Intus's access exceeded the scope of its stated data needs.

Is that, at a high level, generally correct?

A    Yes.

Q    And then the rest of your report, essentially, just sets forth the bases for your generalized opinions; is that correct?

A    Yes.

Q    Are there any opinions that you have formed

Q    Okay.  Are you familiar with any materials published by ONC regarding EHR contracts and terms?

A    No.

Q    And I think I know the answer to this, and I may have missed it, but your report fails to make any reference to ONC at all, correct?

A    I don't believe ONC is referenced.  I'm not going to look through the whole thing, but I don't think ONC is referenced.

Q    Okay.  I would like to direct your attention to Paragraph 21 of your report.  And in that paragraph, you seem to criticize Ms. Creegan's statement that the PACECare agreement reflects, quote, common industry practice, closed quote, for SaaS contracts.

What do you base your criticism on?

A    So, my criticism within this section as a whole is that it just goes too far in that there is no real common industry practice as it relates to Software as a Service Arrangement.  I mean, later in the section I specifically talk about the types of -- types of ways I've seen organizations like SaaS providers provide data transfer to other concerned parties or other mutual -- other entities that have a mutual relationship with a client.  I was about to say joint client.  It's not really joint client.  They have the

So, no, there was not other requests that we made as it related to requests for documentation beyond what was provided.

Q    Okay.  Are you aware of whether counsel provided you with copies of Intus's data maps and extraction guidelines?

A    I can't recall.

Q    Is that material that you would have identified in your materials relied upon portion of your expert report?

A    Yes.

Q    But as you sit here today, you don't recall, one way or the other, whether you reviewed data maps or extraction guidelines?

A    I can't recall.

Q    Do you recall whether or not you reviewed the NativeScripts?

A    I did review the NativeScripts.

Q    Are you aware of the fact that Intus dedicated staff to assisting PACE customers on how to generate expanded exports?

A    I know they worked with their clients on it, yes.

Q    Are you aware that Intus instructed PACE customers on how to transmit the expanded exports to

system -- let me start by saying, I have no understanding of the specific PACECare database infrastructure layout.  I don't know what systems make that up.  I don't know all of the components that go into the backend layer that helps support that specific database.  Typically it's multiple systems, multiple components that would allow that to occur.

So, when you ask for access to a system, typically the way I would parse that, just based on how I've seen it work, is not asking for access to the backend components, not asking for the entire structure, and read-only access to everything.

What I would be -- the way I parse this specific statement is, "we need access to the system to be able to get the data we need."  That's very different than an interpretation that says, "we need access to all of the components that make up the system in order for us to get the data that we need."

Q   Okay.  Are you aware of any instance in which Intus has asked for backend access to anything with PACECare?

A   I'm only opining on this particular email and the way I parse the language within this email.

Q   Okay.  Did you talk to Mr. Rothberg about what he meant?

SHAWN FLEURY
MAY 25, 2026

JOB NO. 2743510

A    I did not.

Q    So, you don't have an understanding, one way or the other, what he means by "read-only access to your system," correct?

A    Well, I can read the email, and the context of the email itself, to gain an understanding of what was being talked about in this email.  So, to that extent, yes, but I have not had any independent conversations with him specifically on -- let me rephrase that.

I haven't had any independent conversations with him.

Q    And you're not aware of any access by Intus to the PACECare system beyond user interface access; fair?

A    Correct.  Fair.

Q    So, as you sit here today, the only access that you're aware of Intus having in PACECare is user interface system access, right?

A    That's correct.

Q    And using or having system user access, correct?

A    Correct.

Q    So, you understand that there is a distinction between system user access to a system and

health data needs is, in your words, incorrect, and
conflicts with the facts, closed quote, correct?

A    That's correct.

Q    And your audit log analysis focuses on
interpreting system activity; is that fair?

A    We reviewed all of the logs that were
available to us as part of the export of data that was
provided.

Q    Okay.  In Paragraph 34, you opine that each
of the modules that Ms. Creegan identifies, quote,
could reasonably be characterized into the types of
data that Intus was requesting, closed quote.

Do you see that?

A    I do.

Q    Did you talk to anybody at Intus about that?

A    I did not talk to anybody at Intus about
that.

Q    Okay.  And so, this is based entirely on,
quote, your review of the modules; is that right?

A    My review of Exhibit 63.  My review of other
data that's listed in appendix.  I know in my report I
mention the May 27th email between Rothberg and
Zowatsky.  So, that was considered.  But yes, that's
what my opinion is being based off of here.

Q    And that's -- what you have just described is

the basis of your review; is that fair?

A    The basis of my review are the documents listed in the appendix, yes.  Appendix B.

Q    Are you able to explain how the redirect dot main dot psychiatric notes management module relates to anything that Intus states it needs for its demographics and utilization data?

A    I think, as said in my report, I think "etc" provides a lot of room for things such as notes to be included within the data that is necessary for Intus to perform services for patient care -- or excuse me, for the patient care facilities.

So, my real opinion here is that Ms. Creegan is providing an opinion that just isn't based on anything other than a very limited email list that was provided, that's her reference within her report as to what she relied on, and that there's a lot of additional items that could be necessary for Intus to provide the level of support it needs to its clients.

Q    So, this particular module, in your mind, relates to Intus's expressed data needs because it fits within the et cetera reference?

MR. BESHAI:  Objection.  Misstates the testimony.

A    I don't think there is a direct stated data

et cetera has a defined use within the English language, so I would disagree with the premise.

Q    No.  I didn't ask my question clearly enough, obviously.

As you sit here today, you don't know what Mr. Rothberg's use of "etc" actually references, correct?

A    Other than it references that there could be other items necessary -- let me make that a statement instead of a question.

To the extent that "etc" would indicate that additional data may be necessary to meet the need, I think "etc" does stand on its own.

Now, as to what that "etc" could have meant, then no, I'm not trying to interpret what other data elements Mr. Rothberg could have meant by having et cetera in there.

Q    In other words, you don't know one way or the other what the et cetera could be referencing or specifically is referencing, right?

MR. BESHAI:  Objection.

A    Just that it --

MR. BESHAI:  Asked and answered.

A    Just that it references that there could be other categories that are needed.  Or other items may

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time set forth; that the witness in the foregoing proceedings, prior to testifying, was administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, a review of the transcript (  ) was (  ) was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  06/10/2026

_____

MIKEN M. COBBS

CSR NO. 10702