# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,

*Plaintiff*,

v.

RTZ ASSOCIATES, INC.; and DOES 1
through 10,

*Defendants*.

Case No. 4:24-cv-1132-JST

**EXPERT REPORT OF TRACI CREEGAN**

**April 22, 2026**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**TABLE OF CONTENTS**

I.   Executive Summary ............................................................................................ 1

    A.   Qualifications ............................................................................................ 1

    B.   Parties & Allegations ............................................................................... 2

    C.   Assignment & Summary of Opinions ...................................................... 3

II.   Background ..................................................................................................... 4

    A.   The 21st Century Cures Act and Information Blocking ....................... 4

    B.   Exceptions to Information Blocking ....................................................... 7

    C.   The PACECare Software System ............................................................ 8

    D.   The Arrangement between RTZ and Intus............................................. 9

III.   RTZ did not meet the regulatory definition of "Actor" and therefore was not subject to the information blocking regulations ................................................................ 10

IV.   Even if RTZ was considered an Actor, its conduct did not meet the regulatory definition of information blocking ................................................................................ 14

    A.   The information blocking regulations govern access, use, or exchange of EHI.. 14

    B.   RTZ did not possess ownership rights to EHI ...................................... 16

    C.   RTZ did not interfere with Intus's ability to obtain EHI directly from PACE facilities.............................................................................................. 18

V.   Even if RTZ's conduct could be construed as information blocking, which it was not, the circumstances would nonetheless satisfy all conditions of the manner exception. ......... 19

    A.   The request for EHI and manner........................................................... 20

    B.   Agreeable terms ..................................................................................... 23

    C.   Alternative manner................................................................................. 24

VI.   Intus deviated from established health IT industry standards and from the accepted processes for data exchange and user access requests. ................................................... 26

    A.   Intus's misunderstanding of applicable regulatory obligations and industry standards ....................................................................................... 27

    B.   Intus's credential sharing practices deviated from industry-standard user access protocols................................................................................. 29

    C.   Audit log evidence confirms Intus's access exceeded the scope of its stated data needs ....................................................................................... 31

VII.   Conclusion ..................................................................................................... 34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Attachment 1: Creegan CV**

**Attachment 2: Materials Relied Upon**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.   EXECUTIVE SUMMARY

1. I, Traci Creegan, Associate Director of Berkeley Research Group, LLC ("BRG"), 1800 M Street NW, Washington, DC 20036, hereby submit this expert report, which sets forth my opinions in the above-captioned matter.

2. The opinions in this report are my own and are based upon my education, professional experience, the references cited in this report, and examination of the documents and other information submitted by the parties in this matter. My opinions are subject to change should I receive additional documents and/or information, and I reserve the right to supplement and/or amend this report should additional information become available to me.

3. In preparing this report, I have been assisted by staff at BRG, working under my supervision and control. BRG bills for professional services rendered based on actual hours incurred at contractually agreed-upon rates per hour. My billing rate is $665 per hour. BRG's compensation in this matter is not dependent on, or in any way contingent upon, my findings or opinions or the outcome of the matter.

### A.   Qualifications

4. I am an Associate Director in BRG's Healthcare Practice, which provides consulting, advisory, and expert services to the healthcare industry. I lead BRG's health information technology (health IT) disputes and investigations team. I have over 25 years of healthcare experience focused on health IT and regulatory compliance.

5. I am a Certified Professional in Health Information and Management Systems (CPHIMS), a Certified Professional Compliance Officer (CPCO), and a Certified Risk Adjustment Coder (CRC). I am also a member of several health IT and compliance professional organizations, including the American College of Healthcare Executives (ACHE), the Health Information Management System Society (HIMSS), Bluebird Leaders, and the Health Care Compliance Association (HCCA).

6. I have been actively engaged with the programs and federal regulations mandated by the American Recovery and Reinvestment Act of 2009 (ARRA), Medicare Access and CHIP Reauthorization Act of 2015 (MACRA), and 21st Century Cures Act of 2016 (Cures Act). For more than a decade,  I have provided expert guidance on federal health IT regulations to software developers, health systems, hospitals, and physician practices, providing them guidance and advice regarding compliance with the Office of the National Coordinator (ONC) Health IT Certification Program and Centers for Medicare & Medicaid Services (CMS) Promoting Interoperability (PI) Program (previously Meaningful Use and the Electronic Health Record (EHR)[1] Incentive Program).

7. My engagement with these programs has continued as they have evolved. I have advised clients on the Health Data, Technology, and Interoperability (HTI-1) Final Rule (effective March 2024), which eliminated edition-based certification, introduced algorithm transparency and AI-related decision-support requirements, adopted USCDI Version 3 as the new baseline standard, and revised information-

---

[1] The terms "Electronic Health Records (EHR)" and "Electronic Medical Records (EMR)" are used interchangeably to describe digital patient records.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

blocking definitions and exceptions under the Cures Act. I have similarly advised clients on the CMS PI Program's evolving requirements, including updated scoring thresholds, expanded public health and clinical data exchange obligations, and the program's continued role in driving meaningful use of certified EHR technology. With respect to information blocking specifically, I have provided guidance to clients on the Cures Act's prohibition on information blocking, the regulatory exceptions codified at 45 C.F.R. Part 171, and the enforcement framework that has matured significantly in recent years, including OIG's civil monetary penalty authority (up to $1 million per violation, effective September 2023), the provider disincentives framework (effective July 2024), and the joint ASTP/OIG Enforcement Alert issued in September 2025 signaling a significant escalation in federal enforcement activity.

8. Since the inception of the ONC Health IT Certification Program, I have collaborated with and advised health IT software developers on achieving certification, interpreting the certification criteria, performing gap analyses, developing software and workflow requirements, implementing standard nomenclature, utilizing industry-standard testing tools, leveraging industry forums, certification demonstration strategies, and staff education.

9. In 2021, in conjunction with Reed Smith, LLP, I co-presented a six-part webinar series entitled "Information Blocking, Interoperability, and Patient Access – How to Prepare for the New Rules Now." During this series, I discussed business considerations, the implications of the rules, and practical guidance on compliance and enforcement related to implementation.

10. My Curriculum Vitae describing in detail my professional experience and educational credentials, is attached as **Attachment 1** to this report.

### B.  Parties & Allegations

11. IntusCare Inc. (Intus) is a Delaware corporation with its principal place of business in Providence, Rhode Island.[2] It provides healthcare analytics services to its clients, which include healthcare providers that operate Medicare's Program of All-Inclusive Care for the Elderly, referred to as "PACE."[3] To address PACE programs' data needs, Intus built a product that ingests data from clients' clinical, administrative, and financial sources to provide analytics that help clients predict negative medical events, better coordinate care, and provide clinical, health quality, and compliance staffing support.[4]

12. RTZ Associates, Inc. (RTZ) is a California corporation with its principal place of business in Lafayette, California. RTZ is a provider of PACE software, which is a cloud-based EHR software specifically developed to support the needs of PACE programs.[5] RTZ is a pioneer in PACE-specific EHRs and care coordination platforms, and its PACECare product is designed to streamline clinical, operational, fiscal, and regulatory workflows for PACE programs.[6]

---

[2] Plaintiff's Amended Complaint (Apr. 4, 2024), ¶ 3.

[3] Plaintiff IntusCare Inc.'s Motion for Partial Summary Judgment (June 26, 2025) (hereinafter referred to as "Plaintiff's Motion for Partial Summary Judgment"), p.1.

[4] *Id.*

[5] *Id.* at ¶ 5.

[6] *RTZ Systems*, LinkedIn (last accessed Sep. 2, 2025), *available at* https://www.linkedin.com/company/rtz-associates/.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

13. Between June 2021 and September 2022, Intus obtained electronic health records data by extracting the data from RTZ's PACECare software.[7] Intus has alleged that, starting in September 2022, RTZ refused to grant Intus access to PACECare data and later prohibited Intus's clients from providing RTZ with access.[8] Intus claims RTZ engaged in information blocking in violation of federal laws and regulations.[9]

### C. Assignment & Summary of Opinions

14. Counsel has asked that I provide my expert opinion regarding the information blocking allegations raised by Intus against RTZ, as well as the applicable standards and practices within health IT. My opinions are presented in greater detail throughout the remainder of this report.

15. In summary, based on my review of the relevant facts, the applicable regulations under the Cures Act,[10] established health IT industry standards, and based on my professional experience in health IT, my opinions are as follows:

   a. At the time of the alleged information blocking claims, RTZ was not a health information exchange or health information network, nor did it operate as a developer of certified health IT during the relevant period. Therefore, as a factual matter, RTZ is not "an actor" subject to the information blocking regulations.

   b. Even if RTZ could be considered an actor under the information blocking regulations, which it is not, RTZ's actions were consistent with reasonable and accepted industry practices and did not interfere with Intus's access, use, or exchange of electronic health information (EHI). Accordingly, RTZ's conduct did not constitute information blocking as defined by federal regulation.

      i. The information blocking regulations pertain to the access, use, or exchange of EHI, not the provision of system-level or user access to proprietary software systems.

      ii. The PACECare Agreement explicitly affirms that RTZ does not possess ownership rights to, nor does it exercise control over, the EHI entered into PACECare by the PACE facilities. Authority over EHI access rests exclusively with the PACE facility clients as data owners.

      iii. At all relevant times, the PACE facilities maintained the ability to access and share EHI stored in PACECare with Intus through reasonable means in alignment with their PACECare Agreement. RTZ did not impede, restrict, or interfere with Intus's ability to obtain EHI directly from the PACE facilities.

   c. Even if RTZ's conduct could be construed as information blocking, which it was not, the circumstances satisfy the factual conditions of the Manner Exception.

---

[7] Plaintiff's Amended Complaint at ¶ 14.

[8] *Id.* at ¶ 2.

[9] *Id.*

[10] Established under the 21st Century Cures Act, the information blocking regulations are codified at 45 C.F.R. Subpart 171. Throughout my report, I will refer to such regulations as the "information blocking regulations."

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

     i.  Intus did not submit a clear, consistent, or sufficiently detailed request for EHI that would have enabled RTZ to evaluate technical feasibility or assess confidentiality, security, or operational risks.

     ii.  Despite multiple rounds of negotiation, the parties were unable to reach mutually agreeable terms governing the access, exchange, or use of EHI, and RTZ offered a reasonable, industry-standard alternative manner of access through the standard expanded exports.

     iii.  RTZ offered EHI in a machine-readable format via the expanded exports in CSV format,[11] an industry standard machine-readable format, thereby satisfying the Manner Exception's alternative manner condition.

  d.  Intus's conduct deviated from established health IT industry standards and from the accepted processes for data exchange and user access requests in several material respects:

     i.  Intus operated under a fundamental misunderstanding of applicable regulatory obligations, including the mistaken belief that all EHR vendors were required to provide FHIR API[12] access regardless of certification status.

     ii.  Rather than engaging RTZ's established user provisioning process, Intus obtained shared login credentials directly from PACE facilities, in violation of industry-standard user access protocols and the HIPAA Security Rule's unique user identification requirement.[13]

     iii.  PACECare audit logs confirm that Intus accessed system modules well beyond the scope of its stated data needs, reflecting a pattern of unauthorized access that continued through January 5, 2026.

## II. BACKGROUND

### A. The 21st Century Cures Act and Information Blocking

16. The Cures Act,[14] enacted in 2016, is a comprehensive law intended to accelerate medical innovation, enhance research, and improve patient access to care.[15] The Cures Act directs the Department of Health

---

[11] CSV (Comma-Separated Values) are plain text files that store data in a comma separated format, making them highly compatible with various software applications.

[12] HL7 Fast Healthcare Interoperability Resources (FHIR) is an API-focused data-exchange standard developed by Health Level Seven (HL7) that enables health information to be represented and exchanged in a structured, modular, and interoperable format across different health IT systems. *Health Level 7 (HL7) Fast Healthcare Interoperability Resources (FHIR)*, ONC (last accessed Mar. 17, 2026) *available at* https://www.healthit.gov/interoperability/investments/fhir/.

[13] 45 C.F.R. § 164.312(a)(2)(i).

[14] Pub. L. 114-225.

[15] *21st Century Cures Act—A Summary*, Betty Lengyel-Gomez (last accessed Aug. 30, 2025), *available at* https://legacy.himss.org/resources/21st-century-cures-act-summary#:~:text=The%2021st%20Century%20Cures%20Act%2C%20signed%20December%2013%2C%202016%2C,improve%20mental%20health%20service%20delivery.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

and Human Services (HHS) and ONC[16] to strengthen electronic health access and prohibit the practice of information blocking.[17] Under the Act, the ONC Cures Act Final Rule[18] and the HTI-1 Rule[19] (collectively "ONC Rules"), information blocking is unlawful conduct by specific "actors" that is likely to interfere with access, exchange, or use of EHI.[20]

17. The purpose of the information blocking rule is to promote access and the exchange of EHI; however, the rule does not mandate access to entire systems or require actors to make EHI available absent a specific request proactively.[21] Specifically, in the Cures Act Final Rule, ONC clarified that the information blocking provision does not require that actors provide access to their proprietary systems or platforms.[22] Rather, the provision is focused on ensuring that actors do not engage in practices that interfere with access, exchange, or use of EHI.[23] ONC further emphasized that the goal of the rule is to promote access to the data itself, not necessarily to the systems in which the data resides.[24] This is a critical distinction because it allows health IT software developers and providers to maintain control over their proprietary systems while still complying with the law by making the data accessible through standardized, interoperable methods.

18. The information blocking provisions of the ONC Rules apply to three categories of actors:[25,26]

   a. **Health Care Provider**: A health care provider is a hospital, skilled nursing facility,  home health entity or other long term care facility; health care clinic; community mental health center; renal dialysis facility; blood center; ambulatory surgical center; emergency medical services provider; federally qualified health center; group practice; pharmacist; pharmacy; laboratory; physician; practitioner; provider operated by or under contract with the Indian Health Service or by an Indian tribe, tribal organization, or urban Indian organization; rural health clinic; covered entity under 42 U.S.C. 256b; ambulatory surgical center; therapist; and

---

[16] ONC was temporarily dually titled as the Office of the Assistant Secretary for Technology Policy/ONC (ASTP/ONC) following a July 2024 HHS reorganization that expanded the office's enterprise technology, data, and AI oversight responsibilities. On March 31, 2026, HHS reversed that reorganization, restored the office's singular ONC title, and re-aligned enterprise technology functions under the HHS Office of the Chief Information Officer, refocusing ONC on its core statutory mission related to health IT policy, standards, certification, interoperability, and information blocking enforcement. *See HHS Aligns Health Technology Leadership to Deliver Data Liquidity, Affordability, and an AI-Enabled Health System for Americans*, ONC (Mar. 31, 2026), *available at* https://healthit.gov/news/hhs-aligns-health-technology-leadership-to-deliver-data-liquidity-affordability-and-an-ai-enabled-health-care-system-for-americans/.

[17] *See id.*

[18] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

[19] *Health Data, Technology, and Interoperability: Certification Program Updates, Algorithm Transparency, and Information Sharing*, 89 Fed. Reg. 1,192 (Jan. 9, 2024), *available at* https://www.govinfo.gov/content/pkg/FR-2024-01-09/pdf/2023-28857.pdf.

[20] *Information Blocking*, ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/information-blocking/.

[21] *See Information Blocking: Answers to Frequently Asked Questions*, Mike Lipinski et al. (Feb. 2021), *available at* https://www.healthit.gov/sites/default/files/page2/2021-02/IB%20FAQs%20Webinar_02-02-2021_FINAL.pdf; *HTI-1 Final Rule: Information Blocking*, Janice Ziegler and Ramy Fayed (Feb. 26, 2024), *available at* https://www.dentonshealthlaw.com/hti-1-final-rule-information-blocking/; *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

[22] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

[23] *Id.*

[24] *Id.*

[25] *Information Blocking Actors*, ASTP (Apr. 2024), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Actors_Fact_Sheet_508_0.pdf.

[26] 45 C.F.R. 171.102.

Page 5

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

any other category of health care facility, entity, practitioner, or clinician determined appropriate by the HHS Secretary.

b. **Health Information Network (HIN) or Health Information Exchange (HIE)**: These are entities that determine, control, or have the discretion to administer any requirement, policy, or agreement that permits, enables, or requires the use of any technology or services for access, exchange, or use of electronic health information:

   i. Among more than two unaffiliated individuals or entities (other than the individual or entity to which this definition might apply) that are enabled to exchange with each other; and

   ii. That is for a treatment, payment, or health care operations purpose, as such terms are defined in 45 CFR 164.501 regardless of whether such individuals or entities are subject to the requirements of 45 CFR parts 160 and 164.

c. **Health IT Developer of Certified Health IT**: A health IT developer of certified health IT is an individual or entity, other than a health care provider that self-develops health IT that is not offered to others, that develops or offers health information technology (as that term is defined in 42 U.S.C. 300jj(5)) and which has, at the time it engages in a practice that is the subject of an information blocking claim, one or more Health IT Modules certified under a program for the voluntary certification of health information technology that is kept or recognized by the National Coordinator pursuant to 42 U.S.C. 300jj-11(c)(5) (ONC Health IT Certification Program).

19. The information blocking regulations also apply to an individual or entity that does not develop any products certified under the ONC Health IT Certification Program if that individual or entity resells or re-licenses select certified health IT developed by others.[27] The definition of a health IT developer of certified health IT, defined above, is met by any individual or entity that develops or offers health IT certified under the ONC Health Certification Program.[28] If an individual or entity offers certified health IT for any period of time on or after the applicability date of 42 CFR 171, then they would be considered a health IT developer of certified health IT for purposes of their conduct during that time. The information blocking provision would not apply to conduct the individual or entity engaged in after they no longer have or no longer offer any certified health IT.[29] However, claims of information blocking with respect to conduct occurring while the individual or entity had certified health IT could be acted upon by HHS after the individual or entity no longer had or offered certified health IT.[30]

---

[27] *Information Blocking*, ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/information-blocking/.

[28] *Information Blocking*, ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/information-blocking/.

[29] *FAQs,* ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/faq/do-information-blocking-regulations-apply-individual-or-entity-does-not-develop-any-products/.

[30] *FAQs,* ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/faq/do-information-blocking-regulations-apply-individual-or-entity-does-not-develop-any-products/.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

20. Notably, there is no private right of action under the Cures Act or the ONC Rules.[31] Instead, enforcement authority lies with HHS and ONC.[32] ONC receives and reviews claims of potential information blocking, particularly those involving health IT developers of certified health IT.[33] ONC then refers claims to the HHS Office of Inspector General (OIG), which is responsible for investigating all types of actors, including health care providers, health information networks, and health IT developers.[34] Only OIG has the authority to impose penalties or disincentives for violations, and private actors have no standing to enforce the rule themselves.[35]

### B. Exceptions to Information Blocking

21. Section 4004 of the Cures Act authorizes the Secretary of HHS to identify reasonable and necessary activities that do not constitute information blocking, referred to as exceptions.[36] On behalf of HHS, ONC has defined ten exceptions to the information blocking prohibition (see Figure 1).[37] When an actor's practices with respect to accessing, exchanging, or using EHI meet the conditions of one or more exceptions, such practices will not be considered information blocking.[38] Conversely, a practice that does not meet the conditions of an exception is not automatically considered information blocking; rather, it will be evaluated on a case-by-case basis to determine whether information blocking has occurred.[39]

---

[31] *Fourth Circuit Publishes Landmark Ruling on 21st Century Cures Act "Information Blocking,"* Cameron Cantrell and Kate Black (Mar. 24, 2025), *available at* https://hintzelaw.com/blog/2025/3/24/fourth-circuit-publishes-landmark-ruling-on-21st-century-cures-act-information-blocking#:~:text=On%20March%2012%2C%202025%2C%20the,state%20privacy%20right%20of%20action.

[32] *See Frequently Asked Questions: What Happens After I Report Information Blocking through the Information Blocking Portal on ONC's Website, HealthIT.gov?*, ONC (last accessed Apr. 2, 2026), *available at* https://www.healthit.gov/faq/what-happens-after-i-report-information-blocking-through-information-blocking-portal-oncs.

[33] *Id.*

[34] *Id.*

[35] *See id.*

[36] *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

[37] When ONC first proposed implementing the information-blocking provisions of the Cures Act, it identified seven categories of reasonable and necessary practices that would not constitute information blocking, as reflected in the 2020 proposed and final rules codified at 45 C.F.R. Part 171. Since that time, ONC has refined, expanded, and clarified the scope and conditions of these exceptions through subsequent rulemaking, including amendments and the addition of new, narrowly tailored exceptions in later HTI final rules. The current exceptions framework is set forth in 45 C.F.R. §§ 171.200–171.403 and reflects the agency's evolving policy judgments regarding permissible limitations on access, exchange, or use of electronic health information.

[38] *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

[39] *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1. 10 Exceptions to the Information Blocking Provision**



22. The exceptions to the information blocking provision are organized into three categories.[40] These are: 1) exceptions that involve not fulfilling requests to access, exchange, or use EHI; 2) exceptions that involve procedures for fulfilling requests to access, exchange, or use EHI; and 3) exceptions that involve practices related to actors' participation in the Trusted Exchange Framework and Common Agreement (TEFCA).[41] The applicable exception to this matter is the Manner Exception.

23. The Manner Exception recognizes that actors may face legitimate technical or contractual constraints in fulfilling requests for EHI in a specific format or method. It is not information blocking for an actor to limit the manner in which it fulfills a request to access, exchange, or use EHI. The actor must first attempt to fulfill the request in the manner requested, and if the actor is technically unable to do so or cannot reach an agreement on the terms of the request, the actor must offer at least two alternative ways to provide EHI, one of which must use certified technology or recognized standards.[42] Critically, an actor need not fulfill a request in the precise manner demanded; so long as it makes a good-faith attempt and offers compliant alternatives, its conduct falls within the exception and does not constitute information blocking.

### C. The PACECare Software System

24. PACECare is a cloud-based administrative software solution that is licensed to PACE facilities throughout the United States.[43] Licensees of PACECare use the system as an administrative tool to

---

[40] *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

[41] *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

[42] *New ONC Final Rule Expands Information Blocking Regulatory Exceptions*, Kristen O'Brien and Rachel Stauffer (Jan. 3, 2024), *available at* https://www.mcdermottplus.com/insights/new-onc-final-rule-expands-information-blocking-regulatory-exceptions/.

[43] Defendant RTZ Associates, Inc.'s Answer to First Amended Complaint and Counterclaims (Jun. 6, 2024), p. 9, ¶ 1 (hereinafter "Defendant's Answer to First Amended Complaint").

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

maintain and organize operations, manage finances, and track key PACE participant data entered into and managed by the software solution.[44]

25. The PACECare system is confidential and proprietary to RTZ.[45] Access to PACECare is restricted to specific users who have been approved by RTZ.[46] Each authorized user is issued unique login credentials, and only users with such authorized credentials are permitted to access PACECare.[47]

26. RTZ organizes and maintains the data input into and stored within the PACECare system through its cloud-based storage, which consists of numerous services.[48] Licensees, via their authorized users, access the PACECare system via an internet connection using a web browser.[49]

27. According to the Certified Health IT Product List (CHPL), PACECare was certified as a Complete EHR under the ONC Health IT Certification Program under the umbrella of RTZ ChartCare from September 2011 through April 2016, when it was retired.[50,51] In addition, RTZ's ChartCare2 was certified as a Complete EHR from October 2015 through June 2020, when it was retired as well.[52]

### D. The Arrangement between RTZ and Intus

28. RTZ licenses its software system to PACE facilities via a PACECare Agreement (the Agreement) that allows the contracting facility to access and use the PACECare product.[53] The Agreement specifically provides that RTZ is the exclusive owner of all aspects of the PACECare system, including but not limited to the source code, system logic and functionality, screen layout and design, and associated reports, forms, and documents.[54]

29. The Agreement acknowledges that licensed PACE facilities own the ***data and information*** they enter into the PACECare system.[55] The Agreement, however, expressly prohibits PACE facilities from providing PACECare system access to any third party without RTZ's consent, particularly competitors.[56] Therefore, while PACE facilities can access, use, and exchange their data with other parties as needed, they cannot grant a third-party access to PACECare to retrieve such data without RTZ's express consent and an executed non-disclosure agreement (NDA).[57]

---

[44] *Id.* at ¶ 2.
[45] *Id.* at ¶ 3.
[46] *Id.*
[47] *Id.*
[48] *Id.* at ¶ 4.
[49] *Id.*
[50] *Product List*, Certified HealthIT (last accessed Apr. 2, 2026), *available at* https://chpl.healthit.gov/#/search.
[51] In this context, "retired" refers to the vendor's voluntary decision to withdraw the product from active certification under the ONC Health IT Certification Program. Retirement does not indicate decertification, noncompliance, or any adverse action by ONC. Vendors commonly retire certifications when a product is sunset, replaced by a newer version, or no longer marketed or maintained for purposes that require ongoing ONC certification.
[52] *Product List*, Certified HealthIT (last accessed Apr. 2, 2026), *available at* https://chpl.healthit.gov/#/search..
[53] Defendant's Answer to First Amended Complaint, p. 9, ¶ 5.
[54] *Id.*
[55] *Id.* at ¶ 6.
[56] *Id.*
[57] *Id.* at p. 9-10, ¶¶ 6-7.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

30. In August 2022, RTZ provided Intus, a third-party seeking access to the PACE facility's instance of PACECare, with its standard NDA.[58] Intus did not execute RTZ's proposed NDA and instead, on September 13, 2022, presented an entirely different "Access Agreement" to RTZ for consideration.[59] RTZ rejected Intus's proposed agreement.

31. On October 13, 2022, Intus's counsel presented RTZ's counsel with a "Data Integration and/or Data Extract Agreement."[60] In November 2022, Intus, via counsel, sent a redline NDA to RTZ.[61] The parties continued to negotiate an agreeable NDA that would have permitted Intus to access PACECare.[62] In February 2023, Intus presented RTZ with a Business Case[63] to develop a partnership between the two companies and ultimately attempted to acquire RTZ.[64] However, despite these efforts, RTZ and Intus failed to reach an agreement, and the parties were unable to come to agreeable terms.

## III.  RTZ DID NOT MEET THE REGULATORY DEFINITION OF "ACTOR" AND THEREFORE WAS NOT SUBJECT TO THE INFORMATION BLOCKING REGULATIONS

32. As discussed in Section II.A of this report, three categories of actors are regulated by the information blocking section of the ONC Cures Act Final Rule: Health Care Providers, Health Information Networks or Health Information Exchanges, and Health IT Developers of Certified Health IT.

33. The ONC Cures Act Final Rule defines a Health Care Provider in accordance with the definition in the Public Health Service Act.[65] RTZ does not constitute a Health Care Provider based on this definition. RTZ is neither a place of service where healthcare services are provided nor a clinician of any type.

34. The regulatory definition of HIN or HIE (HIN/HIE) in the ONC Cures Act Final Rule is broad, which lends itself to potential misinterpretation.[66] Importantly, the fact that an EHR offers interfaces or connectivity to other systems/vendors does not in itself constitute the EHR as an HIN/HIE. To be classified as a HIN/HIE, the entity must have a functional role in enabling the exchange between multiple unaffiliated entities.

35. Two critical elements in the regulatory definition confirm that RTZ does not meet the factual criteria necessary to be defined as HIN/HIE.

    a. First, by regulatory definition, an HIN/HIE enables exchange "among more than ***two unaffiliated*** individuals or entities [emphasis added]."[67] In the Amended Complaint, Intus

---

[58] Defendant's Answer to First Amended Complaint, p. 11, ¶ 17.

[59] RTZ0007671.

[60] RTZ0000660 at 660-673.

[61] RTZ0000020 at 33.

[62] *Id.*

[63] RTZ0000807 at 807-808.

[64] RTZ0008384.

[65] 42 U.S.C. 300jj. For the full definition, please cross-reference Section II.A, which provides the full definition for each category of actors.

[66] As defined in Section II.A., an HIE/HIN is an entity that enables secure, electronic access to a patient's medical history, which enables information sharing and care coordination.

[67] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

claims that RTZ is an "actor" under the information blocking regulations because "RTZ externally markets that PACECare provides '[certified lab interfaces (e.g. Quest, Sunquest)' and '[c]ertified e-prescribe interfaces (e.g. CareKinesis, Surescripts.)'" [68] However, this argument fails to account for the fact that these are "affiliated" entities, not "unaffiliated," as required by the definition. The fact that PACECare facilitates the exchange of information through industry-standard interfaces with another entity does not, in itself, render the software developer an HIN/HIE. It is my understanding that the interfaces described above are direct point-to-point connections between PACECare and the contracted e-prescribing and lab vendors, each established under separate agreements with the PACE facility. Because these interfaces exist solely to support the PACE facilities' operations, and because data exchanges occur through a dedicated connection rather than a network that enables exchanges among more than one, neither RTZ nor PACECare meets the regulatory definition of a HIN/HIE.

b. Second, the definition also includes the requirement that the entity "determines, controls, or has the discretion to administer any requirement, policy, or agreement that permits, enables, or requires the use of any technology or services for access, exchange, or use of electronic health information." It is my understanding that RTZ does not administer any policies or exercise any control over an exchange framework.

36. This distinction is further complicated by the fact that most EHR vendors participate in a recognized HIN, HIE, or both, and some of the larger EHR software developers operate or offer HIE/HIN solutions alongside their core EHR products.

a. CommonWell Alliance, Carequality, or eHealth Exchange are the most well-known and highly utilized HINs.[69] These entities operate under well-defined governance frameworks that require participants to adhere to standardized policies and technical specifications to facilitate the exchange of information among unaffiliated entities. Within these frameworks, participants exchange EHI using industry-standard protocols such as HL7 Clinical Document Architecture (CDA) or HL-7 FHIR.[70] Importantly, none of these organizations or exchange methods require or involve system-level access to individual EHRs to retrieve the EHI.

b. HIEs are often established and governed at either the local/regional or state level. The majority of these HIEs are operated as nonprofits or government entities. HIEs are typically categorized by geographic location or organizational structure. Some states, like Maryland (CRISP)[71] and Indiana (IHIE),[72] operate a single statewide HIE, while others, like

---

[68] Plaintiff's Amended Complaint, ¶ 25.

[69] *Homepage*, CommonWell Alliance (last accessed Sep. 22, 2025), *available at* https://www.commonwellalliance.org/; *Homepage*, Carequality (last accessed Sep. 22, 2025), *available at* https://carequality.org/; *Homepage*, eHealth Exchange (last accessed Sep. 22, 2025), *available at* https://ehealthexchange.org/.

[70] *Clinical Document Architecture Overview*, HL7 International (last accessed Sep. 22, 2025), *available at* https://build.fhir.org/ig/HL7/CDA-core-sd/overview.html; *What Is HL7® FHIR®?*, ONC (last accessed Sep. 22, 2025), *available at* https://www.healthit.gov/sites/default/files/page/2021-04/What%20Is%20FHIR%20Fact%20Sheet.pdf.

[71] *Welcome to CRISP*, CRISP (last accessed Mar. 4, 2026), *available at* https://www.crisphealth.org/about/.

[72] *Homepage*, Indiana Health Information Exchange (last accessed Mar. 4, 2026), *available at* https://www.ihie.org/.

Page 11

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

California and Texas, operate HIEs under various models, including regional, local, and semi-specialized HIEs.[73]

    c. Similarly, some large EHR software developers operate or offer HIE/HIN solutions in addition to their core EHR platforms, such as Epic's Care Everywhere platform, or Oracle Health HIE.[74] Both of these solutions facilitate the exchange of EHI by unaffiliated entities under an established governance framework.[75]

37. By contrast, it is my understanding that neither PACECare nor other RTZ solutions facilitate EHI exchange under a defined framework between **_unaffiliated entities_**. As such, RTZ does not meet the functional criteria of the regulatory definition of an HIE/HIN.

38. In my opinion, RTZ does not meet the factual criteria defined in the ONC Rules to be considered an HIN/HIE. RTZ does not exchange EHI among **_unaffiliated entities, nor do they control or administer a framework for such exchange._**

39. Notably, this characterization of RTZ as an EHR, rather than a HIN/HIE, is reflected in the pleadings themselves. Throughout the Amended Complaint and the Motion for Partial Summary Judgment, RTZ and PACECare are repeatedly referenced as an EHR from a functionality standpoint; they are only characterized as an HIN/HIE in the context of the information blocking regulations.[76] The Motion for Partial Summary Judgment claims that RTZ is also an actor because it had been certified under the ONC Health IT Certification Program.[77] However, in my experience, EHR certification under the ONC program does not constitute, or otherwise transform an EHR into an HIN/HIE.

40. The definition of a "Health IT developer of certified health IT" in the ONC Cures Act Final Rule clearly states that the developer has "**_at the time it engages in a practice that is the subject of an information blocking claim,_** one or more Health IT Modules certified under a program for the voluntary certification of health information technology that is kept or recognized by the National Coordinator pursuant to 42 U.S.C. 300jj-11(c)(5) (ONC Health IT Certification Program) [emphasis added]."[78]

41. In Intus's Motion for Partial Summary of Judgement, it accurately states that RTZ **_was_** an "ONC-ACTB certified Electronic Health Record."[79] However, it fails to note that RTZ's certification (for all software versions) was fully retired by June 30, 2020.[80] (See Figures 2 & 3 below.)

---

[73] *See Homepage*, C3HIE (last accessed Mar. 4, 2026), *available at* https://c3hie.org/; *Welcome to Providence Health Information Exchange*, Providence (last accessed Mar. 4, 2026), *available at* https://www.provshare.org/; *Homepage*, LANES (last accessed Mar. 4, 2026), *available at* https://lanesla.org/.

[74] *Homepage*, Epic – Care Everywhere (last accessed Sep. 22, 2025), *available at* https://www.epic.com/careeverywhere/?search=&country=&usstate=; *Healthcare Interoperability*, Oracle Health (last accessed Sep. 22, 2025), *available at* https://www.oracle.com/health/interoperability/#rc30p2.

[75] *Id.*

[76] Plaintiff's Amended Complaint ¶ 25, f. 1; *see* Plaintiff's Partial Motion for Summary Judgment.

[77] Plaintiff's Partial Motion for Summary Judgment, p. 3.

[78] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

[79] Plaintiff's Motion for Partial Summary Judgment, p. 3.

[80] *Id.*

Page 12

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

42. The Amended Complaint identifies September 2022 as the beginning of the relevant time period for Intus's information blocking claims. By that time, RTZ's ONC Health IT certification had been retired for over two years. Because RTZ was no longer certified during the relevant period, it does not meet the definition of an actor under the ONC Cures Act Final Rule and is therefore not subject to the information blocking provisions.

**Figure 2: Certified HealthIT Product List, RTZChartCare[81]**



**Figure 3: Certified HealthIT Product List, ChartCare2[82]**



---

[81] *RTZChartCare; Product List*, Certified HealthIT (last accessed Sep. 15, 2025), *available at* https://chpl.healthit.gov/#/listing/186.
[82] *ChartCare2; Product List*, Certified HealthIT (last accessed Sep. 15, 2025), *available at* https://chpl.healthit.gov/#/listing/355.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

43. In summary, RTZ is not an actor under the Information Blocking provision of the Act and corresponding information blocking regulations. At the time of the alleged claims, RTZ was not a health care provider, a HIN/HIE, or a health IT developer of certified health IT.

## IV.    EVEN IF RTZ WAS CONSIDERED AN ACTOR, ITS CONDUCT DID NOT MEET THE REGULATORY DEFINITION OF INFORMATION BLOCKING

44. Even if RTZ could be considered an actor under the information blocking regulations, which it is not, RTZ's actions were consistent with reasonable and accepted industry practices and did not interfere with Intus's access, use, or exchange of EHI. Accordingly, RTZ's conduct did not constitute information blocking as defined by federal regulation.

### A.  The information blocking regulations govern access, use, or exchange of EHI

45. The information blocking regulations pertain to the ***access, use, or exchange of EHI***, not the provision of system-level or access to the user interface (UI) of proprietary software systems, like PACECare.

46. As described in Section II.A, the information blocking regulations define information blocking as any practice that is likely to interfere with the access, exchange, or use of EHI, unless the conduct is required by law or fits within one of the limited regulatory exceptions.[83] The regulations apply to healthcare providers, certified health IT developers, and HIE/HINs.[84] By design, the information blocking rules focus on the availability of EHI and the promotion of interoperability.

47. Consistent with this regulatory design, the primary policy focus of the information blocking rule is patient access to information and minimizing actions that block patients, providers, and other authorized parties from obtaining and using EHI.[85] HHS and ONC have repeatedly framed the policy aim as enabling "friction free" information flow for patients and clinicians.[86] Read in that context, the regulations are directed at EHI availability, not at compelling access to, or disclosure of, proprietary software systems or source code.[87] The regulations define actors' duties by reference to EHI and enumerate narrow exceptions (e.g., privacy, security, infeasibility) that center on when EHI may be withheld.[88] This text and guidance confirm that the system regulates EHI availability, not vendor software system access.

48. The threshold question, therefore, is not how RTZ responded to Intus's request, but whether the request falls within the scope of the information blocking regulations at all. Because Intus was not requesting EHI, it was requesting access to PACECare's proprietary software system, RTZ's response to that request is not subject to the information blocking framework.

---

[83] *See* 45 C.F.R. Part 171.

[84] *See* 45 C.F.R. Part 171.

[85] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

[86] *Enforcement Alert: Information Blocking*, ASTP (Sep. 4, 2025), *available at* https://oig.hhs.gov/documents/special-advisory-bulletins/10930/information-blocking-enforcement-alert-2025.pdf.

[87] 85 Fed. Reg. 25642, 25633; 45 C.F.R. 171.303(b)(4)(iv).

[88] 45 C.F.R. Part 171; *Information Blocking*, American College of Cardiology (last accessed Feb. 17, 2026), *available at* https://www.acc.org/InformationBlocking.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

49. This distinction is not a matter of interpretation. In October of 2022, Intus, through counsel, explicitly acknowledged the regulatory distinction between "system access" and "access to EHI."  When RTZ proposed an interface to facilitate EHI exchange, Intus responded, "Intus is not proposing an interface between the parties' respective software, nor is one necessary. System/PACECare access is entirely distinct from EHI access."[89] This admission demonstrates that Inus was requesting user-level system access to PACECare's software rather than requesting EHI itself.

50. Under the information blocking regulations, actors' obligations are defined by reference to the access, exchange, or use of EHI.  The regulations do not require actors to provide proprietary, administrative, or end-user UI access to their software systems, nor do they compel the granting of login credentials or system-level privileges. Because Intus's request pertained to software system access, a category that falls outside of the scope of information blocking regulations, RTZ had no obligation to comply with that request.

51. The record further confirms that RTZ's conduct was not directed at withholding EHI. RTZ made multiple attempts to facilitate the exchange of EHI through industry standard tools, including Application Programming Interfaces (APIs) and interfaces, each of which Intus declined or did not pursue.

    a.  In April 2021, RTZ requested API specifications from Intus to establish the requested integration.[90]

    b.  In July 2021, Mr. Mike Zawadski, Chief Executive Officer at RTZ, informed Intus that "the standard expanded exports can be used for this purpose after go live until this is reviewed fully, spec'd and priced."[91]

    c.  In October 2022, RTZ suggested an interface as an industry-standard EHI exchange mechanism, but Intus declined in favor of continuing to pursue system-level access.[92]

52. The pattern of these exchanges demonstrates that the dispute between the parties was never about the availability of EHI. RTZ consistently offered pathways for EHI exchange; Intus sought access to the PACECare system itself. That request, by Intus's own characterization, is distinct from a request for EHI, and it is therefore outside the scope of the information blocking rules. Any question of system-level access is a contractual and operational matter, one that RTZ was prepared to address through appropriate channels, not a regulatory obligation imposed by the information blocking framework.

53. As the foregoing analysis demonstrates, RTZ's conduct was directed at facilitating compliant EHI exchange, not withholding it. RTZ consistently offered appropriate, secure, and industry-standard methods for exchanging EHI. The regulations are designed to ensure access to EHI, not to require vendors to open their proprietary systems or provide user-level credentials. RTZ acted in good faith to support compliant information exchange—not to block it.

---

[89] RTZ0000189 at 208.
[90] Deposition of Evan Jackson (Nov. 25, 2025) (hereinafter "Jackson Dep.") – Ex. 28.
[91] Jackson Dep. – Ex. 30.
[92] RTZ0000189 at 208, 210.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### B. RTZ did not possess ownership rights to EHI

54. The PACECare Agreement explicitly affirms that RTZ does not possess ownership rights to, nor does it exercise control over, the EHI entered into PACECare by the PACE facility clients.

55. PACE facilities enter into a "Software as a Service" agreement with RTZ when licensing the use of PACECare.[93] This agreement specifies the rights, obligations, and requirements governing the use of PACECare, including the respective ownership rights of each party. [94]

56. The Ownership section of the Agreement between RTZ and the PACE facility clients expressly delineates ownership rights of each party. RTZ retains ownership of the PACECare product, while PACE facility clients retain exclusive ownership of all data and information entered into PACECare, including EHI. Ownership of EHI carries with it the attendant right to determine the conditions under which that data may be accessed, exchanged, or used by third parties. Under the Agreement, RTZ has no ownership interest in, and retains no contractual rights over, the EHI entered into PACECare by its clients

### Figure 4. RTZ PACECare Agreement[95]

> 7.2    CLIENT owns all data and information that it enters into PACECare. RTZ shall not acquire any rights to any such CLIENT data or information.

57. In my experience, the ownership structure outlined in the Agreement reflects common industry practice in "Software-as-a-Service" (SaaS) arrangements. Under this type of model, the client licenses the right to use the software system but does not acquire any ownership of the system itself.[96] The client retains full ownership of its data. The software vendor's role is to provide, maintain, and support the system, not to own, manage, or exercise control over the access to, exchange of, or use of the client's data.

58. SaaS licensing agreements and pricing models are also frequently structured around user-based access. A site license typically includes a set number of authorized user accounts, with pricing scaled accordingly. In these arrangements, the software vendor typically retains control of user account provisioning to ensure accurate tracking and application of licensing and pricing requirements, a function of license management, not data control.

59. Attachment C of the PACECare Agreement confirms that RTZ ███████████████████████ ███████████████████████████████████████████████████. This is consistent with standard SaaS licensing practice and further reflects that RTZ's management of user accounts is a function of its licensing structure, rather than an exercise of control over the access to, exchange of, or use of the underlying EHI.

---

[93] PACECare Agreement, "Software as a Service," RTZ0006181 at 184.

[94] PACECare Agreement, "Software as a Service," RTZ0006181 at 184.

[95] PACECare Agreement, "Software as a Service," RTZ0006181 at 184.

[96] *Software As A Service vs. Software Licensing*, Kelly Logan (Nov. 3, 2023), *available at* https://www.loganpartners.com/e-commerce-laws-in-the-eu-a-guide-for-us-companies-2/#:~:text=SaaS%20Agreement:%20Users%20pay%20a,licenses%20or%20resources%20as%20needed.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 5. PACECare Agreement, Attachment C[97]**



60. Taken together, the Agreement's ownership provisions and licensing structure confirm that RTZ has no independent authority over the access to, exchange of, or use of EHI within PACECare, as that authority rests exclusively with the PACE facility clients as data owners. As a practical matter, an entity that neither owns EHI nor holds independent authority over it is not in a position to restrict third-party access to that data. RTZ's role as system provider simply does not extend to determining how, or to whom, client-owned EHI is made available. For these reasons, it is my opinion that RTZ's conduct with respect to EHI in PACECare does not satisfy the factual conditions necessary to constitute information blocking.

61. RTZ's ownership of the PACECare system architecture further informs this analysis. The PACECare Agreement expressly states that RTZ "owns all aspects of the PACECare product, including but not limited to source code, system logic/functionality, screen layout/design and documents/forms/reports," and prohibits clients from attempting to reverse engineer the system or provide access to third parties for that purpose.[98] These restrictions govern how PACECare may be accessed and used as a software system; they have no bearing on whether PACE facilities can access,

---

[97] PACECare Agreement, "Software as a Service," RTZ0006181 at 196.
[98] PACECare Agreement, "Software as a Service," RTZ0006181 at 184.

Page 17

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

exchange, or use their own EHI. Intus was aware of these contractual limitations, based on the September 2022 cease and desist letter[99] and as acknowledged by Mr. Evan Jackson, Co-Founder and Chief Revenue Officer at Intus, in an April 2023 internal email.[100,101] Any restrictions related to system architecture or proprietary functionality therefore stemmed from RTZ's legitimate ownership and intellectual property protections, and are separate from any question concerning PACE facilities' ability to access, exchange, or use their EHI.

### C. RTZ did not interfere with Intus's ability to obtain EHI directly from PACE facilities

62. At all relevant times, the PACE facilities maintained complete control over their EHI and retained the ability to access, exchange, and use it as they saw fit, including sharing it with any third party of their choice, including Intus. RTZ did not impede, restrict, or interfere with Intus's ability to obtain EHI directly from the PACE facilities through reasonable and contractually permissible means.

63. The email communications below confirm that the PACE facilities never lost the ability to exchange EHI with Intus, and that multiple reasonable methods of data exchange were available and acknowledged by Intus itself.

   a. An email from Ms. Laura Ferrara, Chief Strategy Officer at Intus, dated September 26, 2022 confirms that Intus can "walk through the reports that are needed from RTZ and where to find them within RTZ[,]" and "[a]s a process, when you send the reports, our data team will upload the information into Intus Care so you can see the data displayed."[102] PACE facilities can extract the reports and email them to Intus every week.[103]

   b. In the same email chain, Ms. Lauri Wertz, Implementation Manager at Intus, further clarifies in communication with a PACE facility that data integration is possible "for the purpose of extracting and receiving the RTZ reports to continue data integration."[104]

   c. In communication with another PACE facility on November 7, 2022, Ms. Ferrara reiterates that PACE facilities have access to the requested EHI and can send the data to Intus.[105] Specifically, she stated that "we were hoping that we could receive manual data reports from your EHR on possibly a weekly basis[,]" and "[t]his would require someone on your team to extract and send the reports to Intus Care."[106]

64. These emails demonstrate that Intus was not blocked from accessing or using the EHI maintained in PACECare. That Intus itself proposed and accepted manual report transmission as a workable method of data exchange further supports that this approach constituted a reasonable means of accessing EHI

---

[99] RTZ0000809 at 812.

[100] Intus 004131; Jackson Dep. at 193:13-194:11.

[101] *See* RTZ000809 at 812. Intus was expressly on notice that sharing login credentials was prohibited via the September 14, 2022 cease-and-desist letter demanding that Intus stop attempting to access RTZ's systems through third-party credentials.

[102] Intus 002205.

[103] *Id.*

[104] *Id.*

[105] Intus 002384.

[106] *Id.*

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

under the circumstances. At all relevant times, the PACE facilities had the ability to export and transmit EHI to Intus, thereby enabling continued access to the EHI.

65. In my professional opinion, the evidence does not support the conclusion that RTZ impeded or restricted the PACE facilities' ability to access, exchange, or use their EHI, which is the conduct the information blocking framework is designed to address. The limitations RTZ enforced were tied to protecting its proprietary software and system architecture, not to restricting access to EHI. Accordingly, the documented facts establish that RTZ did not engage in information blocking.

## V.    EVEN IF RTZ'S CONDUCT COULD BE CONSTRUED AS INFORMATION BLOCKING, WHICH IT WAS NOT, THE CIRCUMSTANCES WOULD NONETHELESS SATISFY ALL CONDITIONS OF THE MANNER EXCEPTION.

66. As covered in Section II, information blocking exceptions are designed to identify, for actors, reasonable and necessary activities that do not constitute information blocking.[107] The primary objectives of exceptions include ensuring patient safety and data integrity, protecting the security of EHI and valid interests, supporting innovation and competition, and acknowledging legal, operational, and technical barriers to requests for EHI.[108] The Manner Exception is particularly relevant here because the central dispute concerns not whether EHI could be accessed, but how RTZ was expected to facilitate that access.

67. It is important to note that the information blocking exceptions only apply when there is a clear, actionable request to access, exchange, or use EHI. The regulatory framework is structured around how an actor responds to a request. Without a request, the information blocking provisions are not implicated, and the topic of exceptions is not relevant.

68. Moreover, a request must be sufficiently detailed to allow the actor to determine whether it can technically fulfill the request and to assess whether fulfilling the request would raise any privacy or security concerns.[109] A vague, shifting, or technically ambiguous request does not impose on the actor an obligation to fulfill it in any particular manner, as the actor cannot meaningfully evaluate what fulfillment would require.

69. The Manner Exception's primary objective is to provide "clarity and flexibility to actors concerning the required manner in which the actor may fulfill the request. This exception supports innovation and competition by allowing actors to first attempt to reach and maintain market negotiated terms for the access, exchange, and, use of EHI."[110]

---

[107] *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), available at https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

[108] *Id.*

[109] *See* 45 C.F.R. 171.301. The Manner Exception requires that actors must respond to requests for EHI, including determining the "content and manner" requested and whether they can technically fulfill it. This inherently requires that the request be specific enough to identify both the content (the EHI at issue) and the manner (format/means of access).

[110] 85 Fed. Reg. 25,642, 25,676–25,679 (May 1, 2020).

Page 19

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

70. The first condition of the Manner Exception is:[111]

> (a) *Manner requested.*
>
> (1) An actor must fulfill a request for electronic health information in any manner requested, unless the actor is technically unable to fulfill the request or cannot reach agreeable terms with the requestor to fulfill the request in the manner requested.
>
> (2) If an actor fulfills a request for electronic health information in any manner requested:
>
> (i) Any fees charged by the actor in relation to fulfilling the request are not required to satisfy the exception in § 171.302; and
>
> (ii) Any license of interoperability elements granted by the actor in relation to fulfilling the request is not required to satisfy the exception in § 171.303.

71. Applying this condition to the documented interactions between RTZ and Intus, it is my professional opinion that the factual requirements of this condition were met based on several key factors: (1) what constitutes the request for EHI, (2) the manner in which the EHI was requested, and (3) the inability to reach agreeable terms.

### A.    The request for EHI and manner

72. As evidenced by the communications between RTZ and Intus, Intus did not request access to EHI in a consistent or sufficiently detailed manner. The first integration request was initiated by a mutual client (Senior Care Partners (SCP)), on April 23, 2021, when SCP introduced RTZ and Intus by email, for the purpose of setting up integration with PACECare as SCP was migrating from a different EHR to PACECare. In response, RTZ requested API specifications from Intus and engaged its interface team to review the Intus interface specifications. As part of these communications, Intus provided a list of data fields and requested the ability to "pull the following information ranging from once weekly to once daily in an automated way, at a time that can be configured so as not to load your system (such as 2am when client traffic is low.)"[112]  This communication did not specify the manner or technical requirements necessary for RTZ to evaluate the feasibility or risk of the proposed exchange.

73. In a follow-up email dated May 13, 2021, Mr. Alex  Rothberg, Co-Founder and Chief Technology Officer at Intus, further clarified Intus's position, stating that "we [Intus] would like read-only access to your system," that "[t]he business relationship is one where we would consume your information, via API or otherwise to populate our system," and that "[f]or this reason, all we need to know is how to get access, and ideally what the structures and promises of your data output are, again depending on protocol."[113]  In my opinion, these communications do not constitute adequate requests for EHI. They lack the specificity necessary for RTZ to perform a meaningful technical and security assessment, specifically, the particular EHI categories being requested, any proposed exchange

---

[111] 45 C.F.R. 171.301(a).
[112] Deposition of Alexander Rothberg (Feb. 27, 2026) (hereinafter "Rothberg Dep.") – Ex. 63 (Intus 001464 at 470).
[113] Rothberg Dep. – Ex. 63 (Intus 001464).

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

mechanism, and relevant technical parameters. A request of this nature, asking broadly for system access without defining the scope, format, or technical requirements of the data exchange, is not a sufficiently actionable request under standard industry practice or the regulatory framework.

74. EHR vendors routinely receive custom and third-party requests from other vendors seeking access to or exchange of EHI. Consistent with the Cures Act and its implementing regulations, EHR vendors typically maintain standardized intake and review processes designed to enable the secure, reliable, and technically feasible exchange of EHI while minimizing avoidable risk to system integrity and data security. This review typically includes an assessment of the specific EHI categories requested, the proposed exchange mechanisms, and any relevant technical parameters. This information is required to determine whether the requested exchange can be supported within the EHR's existing infrastructure; whether it can be implemented in a manner that preserves the confidentiality, integrity, and availability of EHI, and whether the request could introduce unintended vulnerabilities, operational instability, or downstream system impacts. Absent this level of detail, an EHR vendor cannot reasonably evaluate the feasibility or risks associated with fulfilling the request.

75. Mr. Rothberg's request for "*read-only* access to your system" further illustrates the problem. A request of this nature, seeking access to the EHR UI rather than to specific EHI, would immediately raise security concerns for any EHR vendor and require further discussion before any action could be taken. As stated in paragraph 50, it is not standard practice for an EHR developer to provide system-level UI access in response to a request for EHI.   These are materially different types of access, and conflating them reflects a fundamental misunderstanding of how EHI data exchange is conducted under standard industry protocols. This misunderstanding is further evidenced by Mr. Rothberg's deposition testimony, in which he admits that Intus had a fundamental misunderstanding regarding the use of FHIR APIs, stating "…we thought that everyone had to give us FHIR – at this time, we thought everyone had to give us FHIR. And so we sort of found ourselves disappointed by that."[114]

76. Mr. Rothberg's expectation that RTZ was obligated to provide FHIR API access was not grounded in applicable regulatory requirements or standard industry practice. EHRs that are not certified under the ONC Health IT Certification Program have no obligation to provide FHIR APIs, or any API functionality at all. Furthermore, even among certified EHRs, the requirement to implement FHIR-based standardized APIs did not take effect until December 2022.[115] PACECare was not a certified EHR during the relevant period and has not obtained certification since. It is worth noting that this distinction extends beyond FHIR APIs. The information blocking regulations do not require a certified health IT software developer to grant access to their proprietary software, user credentials, or system-level UI access, nor would this be consistent with standard practices in the industry. The regulations are strictly focused on the access, exchange, and use of EHI, not on providing user credentials or third-party access to a system. Accordingly, RTZ has no regulatory obligation to provide FHIR API access or system-level access to PACECare, and Intus's expectation to the

---

[114] Rothberg Dep. 48:10-15.
[115] *An Upcoming Milestone in Our Interoperability Journey*, ONC (Mar. 2022), *available at* https://healthit.gov/blog/healthit-certification/an-upcoming-milestone-in-our-interoperability-journey/.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

contrary reflects a misunderstanding of the applicable regulatory framework and industry standard practices.

77. It is crucial to note that at the time of Intus's initial request, SCP had not yet gone live with PACECare and was therefore not using the software for patient care or operational activities. As a result, no EHI existed within PACECare at the time, and RTZ could not have engaged in any conduct that would constitute information blocking with respect to SCP's EHI during this period.

78. From May 2021 through July 2021, while SCP was implementing PACECare, RTZ informed Intus that although the integration discussions would continue the "standard expanded reports can be used for [data exchange] after go live until this is reviewed fully, spec'd and priced."[116] The record reflects that Intus did not object to this alternative at the time it was offered. Nevertheless, from October 2021 through August 2022, Intus requested PACECare user credentials from multiple PACE facilities and used them to access the system,[117] despite having no agreement with RTZ authorizing such access, and outside of RTZ's established user-provisioning and licensing processes.

79. When RTZ became aware in September 2022 that Intus was accessing the PACECare system for mutual clients without proper credentials or without a proper agreement in place, it was clear that Intus was not requesting EHI from PACECare but was requesting access to the PACECare UI. As discussed in Section IV.B, RTZ's restrictions on system-level UI access are analytically separate from any question of whether PACE facilities could access, exchange, or use their own EHI. When Intus subsequently requested "a single account, as well as the domain of your RTZ EHR" in August 2022, this request was similarly directed at system access rather than EHI and similarly lacked the specificity necessary to constitute a clear and actionable request for EHI.[118]

80. When Intus requested user credentials and system-level access to PACECare, RTZ appropriately requested an NDA to protect its proprietary technology and other confidential information. It is important to distinguish between this requirement and any question of access to EHI. RTZ did not require an NDA for the exchange of EHI but required one for system-level access to the user interface that implicated its intellectual property and security controls. This is consistent with RTZ's internal standards. Mr. Zawadski testified that other health IT vendors had requested access to the PACECare UI and that such access was routinely permitted pursuant to an executed NDA.[119] Despite RTZ's attempt to establish reasonable protective terms, the parties were ultimately unable to reach a mutually acceptable agreement.

81. Throughout this period, Intus's requests remained inconsistent and shifting. Mr. Zawadski emphasized this in his deposition testimony, stating that during the Seattle PACE conference, he questioned whether Intus's latest position was "the final-final and we dig in, or do we wait for more evolution of the ask" and noting that "indeed, they eventually then switched to try to buy us, in terms of going through. So the ask did change again."[120] This testimony corroborates the documentary

---

[116] RTZ0005665.
[117] Jackson Dep. – Ex. 12, 13, 14, and 31.
[118] Deposition of Lori Wertz (Jan. 30, 2026) (hereinafter "Wertz Dep.") – Ex. 23.
[119] Deposition of Michael Zawadski (Feb. 23, 2026) (hereinafter "Zawadski Dep.") at 140: 18-20.
[120] Zawadski Dep. at 53:13-57:4; 95:22-96:2.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

record, which reflects that Intus alternated between requesting a single EHI extract, asserting that it required direct system access, and ultimately pursuing acquisition.[121] None of which constitutes a clear, consistent, and sufficiently detailed request for EHI that would have enabled RTZ to evaluate and fulfill the request in a technically and legally appropriate manner.

82. In my opinion, the communications between RTZ and Intus during this period do not reflect a clear, consistent, or sufficiently detailed request for EHI that RTZ failed to fulfill. Intus's shifting and contradictory positions, alternating between a single EHI extract, direct system access,[122] and ultimately an acquisition attempt,[123] reflect a fundamental inability to articulate a technically actionable request. That deficiency cannot be attributed to any conduct by RTZ.

### B.     Agreeable terms

83. A review of the communications between RTZ and Intus, including exchanges with counsel for both parties, demonstrates that the parties were unable to reach an agreement on terms governing data access and exchange. The impasse arose from three compounding factors: Intus's lack of clarity regarding the scope and operational requirements of its request, inaccurate assumptions regarding RTZ's legal and contractual obligations, and RTZ's efforts to implement reasonable and necessary safeguards to protect the confidentiality, security, and integrity of its proprietary EHR.

84. By late 2022, communications between counsel for both parties reflected the full extent of the divide between the parties' respective positions. On October 27, 2022, Intus described its needs as limited to a single file that RTZ could provide.[124] However, by December 9, 2022, Intus sought user access to the PACECare UI and proposed terms that involved ongoing data transfer processes.[125] These shifting positions made it impossible for RTZ to evaluate and commit to a stable set of terms. Intus also proposed a formal Data Integration and/or Data Extraction Agreement,[126] the terms of which illustrate the breadth and nature of what Intus was seeking. Among other things, the proposed agreement would have required RTZ to grants Intus a non-exclusive license "to use and access the EHR Data for Intus' business, operations, and services including but not limited to access and use related to data analysis, data display, metric generation, data delivery, data deidentification or anonymization, providing advice and insight, and/or internally by Intus to enhance or modify Intus' product or services."[127] The proposed agreement further required RTZ to embed a "Launch Intus Care" button or similar technology within the PACECare platform, and to generate a nightly EHR data extract, make it available via a secure FTP site hosted by RTZ, continuously provide Intus with a preview environment for testing, and make commercially reasonable efforts to modify the extract to meet Intus's evolving business and technical needs. These terms went well beyond a

---

[121] RTZ0000807 at 807-808.
[122] *See generally* RTZ0000189.
[123] *See* Deposition of John "Robbie" Felton (Apr. 11, 2026) (hereinafter "Felton Dep.") at 164:20-22; 176:10-25.
[124] RTZ0000189 at 207-208.
[125] RTZ0000189 at 195.
[126] RTZ0000660 at 660-673.
[127] RTZ0000668 at 668.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

straightforward request for EHI access and imposed significant ongoing technical, operational, and commercial obligations on RTZ that were not required under the applicable regulatory framework.[128]

85. In a communication dated October 27, 2022,[129] counsel for Intus sought to reframe Intus's position, stating that "Intus is not proposing an interface between the parties' respective software, nor is one necessary" that "Intus is seeking access to a single file, data extract of its clients' (as shared with RTZ) EHI" and that "Intus does not need to access PACECare under the data extract approach." Counsel further acknowledged that PACECare's "standard expanded exports" have previously sufficed for EHI access" and suggested that SFTP "may be the easiest transfer mechanism."  While this communication was more focused than prior requests, it did not resolve the parties' impasse. It arrived in the context of ongoing negotiations in which Intus had simultaneously proposed the expansive Data Integration Agreement terms described above, and the parties remained unable to reach mutually agreeable terms on the scope, security, and commercial conditions governing any data exchange arrangement.

86. Although RTZ and Intus engaged in multiple rounds of negotiations, they were unable to reach a mutual agreement on terms that appropriately balanced access to EHI with reasonable and necessary technical, legal, and confidentiality protections. Numerous draft agreements were exchanged, including NDAs with redlines and a proposed "Access Agreement,"[130] Data Integration and/or Data Extraction Agreement[131] and a business case;[132] however, the parties were unable to reconcile positions on the allocation of risk, protective measures, and commercial obligations, resulting in a failure to reach agreeable terms.[133]

87. In my opinion, the factual requirements of the first condition of the manner exception are satisfied. Intus failed to provide a clear, consistent, and sufficiently detailed request for EHI that would have enabled RTZ to evaluate whether the request presented confidentiality, security, or technical risks. When Intus did articulate more specific requests, those requests sought UI access to PACECare, rather than EHI, in a permissible manner, as discussed in Section V.A. In addition, the parties were unable to meet mutually agreeable terms governing access to EHI despite extensive negotiations, further reinforcing that RTZ's conduct was consistent with the application of reasonable and necessary conditions permitted under the Manner Exception.

### C.    Alternative manner

88. The second condition of the Manner exception addresses the alternative manner in which an actor must fulfill a request when it is technically unable to fulfill the request in the manner requested or cannot reach agreeable terms with the requestor. The regulation establishes a strict priority order,

---

[128] RTZ0000668 at 668.
[129] RTZ0000189 at 207.
[130] RTZ007671.
[131] RTZ0000660 at 660-673.
[132] RTZ0000807 at 807-808.
[133] *See* RTZ0000668; RTZ0000243; RTZ0000524; Zawadski Dep. – Ex. 49, 50.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

requiring the actor to proceed through each tier in sequence and only advance to the next if it is technically unable to fulfill the request at the prior tier.[134]

> **(b)** *Alternative manner.* If an actor does not fulfill a request for electronic health information in any manner requested because it is technically unable to fulfill the request or cannot reach agreeable terms with the requestor to fulfill the request in the manner requested, the actor must fulfill the request in an alternative manner, as follows:
>
> **(1)** The actor must fulfill the request without unnecessary delay in the following order of priority, starting with paragraph (b)(1)(i) of this section and only proceeding to the next consecutive paragraph if the actor is technically unable to fulfill the request in the manner identified in a paragraph.
>
>> **(i)** Using technology certified to standard(s) adopted in part 170 that is specified by the requestor.
>>
>> **(ii)** Using content and transport standards specified by the requestor and published by:
>>
>>> **(A)** The Federal Government; or
>>>
>>> **(B)** A standards developing organization accredited by the American National Standards Institute.
>>
>> **(iii)** Using an alternative machine-readable format, including the means to interpret the electronic health information, agreed upon with the requestor.

89. Applying this priority framework to RTZ's circumstances, the first tier, fulfilling the request using technology certified to the standards adopted in part 170 as specified by the requestor, is not applicable. PACECare was not a certified EHR during the relevant period and has not obtained such certification since. Accordingly, RTZ was technically unable to fulfill any request in accordance with certified technology standards, and the analysis proceeded to the second tier.

90. The second tier requires fulfillment using content and transport standards specified by the requestor and published by the Federal Government or a standards developing organization accredited by the American National Standards Institute. Intus did not specify any such content and transport standards at any point during its communications with RTZ. In the absence of a specified standard, RTZ was technically unable to fulfill the request at this tier, and the analysis proceeded to the third tier.

91. The third tier requires fulfillment in an alternative machine-readable format, including the means to interpret the EHI, agreed upon with the requestor. RTZ offered the standard expanded exports, which are exported as a flat file, in a CSV format, an alternative machine-readable method of accessing EHI as early as July 2021.[135] On multiple occasions, Intus confirmed that these standard expanded exports contained the requested EHI in a manner that was acceptable for integration.

    a. On September 26, 2022, Laura Ferrara, Chief Strategy Officer at Intus, confirms that these reports are sufficient for integration in communications with BoldAge PACE.[136]

---

[134] 45 C.F.R. 171.301(a)(1).
[135] *See* 45 C.F.R. 171.301.
[136] Intus 002208.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b. Counsel for Intus acknowledged in an October 2022 communication that these exports had "previously sufficed for EHI access," indicating that this alternative was not only offered but also functioned as a workable method of data exchange for a period of time.[137] To the extent that agreement on this alternative was ultimately not reached, that outcome is attributable to Intus's shifting and inconsistent requests and its insistence on terms that went well beyond what the regulatory framework requires, rather than any failure by RTZ to offer a compliant alternative.

c. Mr. Rothberg, further confirms during his deposition that "Those flat files are the files that we needed to do our services, yes."[138]

92. In my professional opinion, based on the documented facts and standard health IT practices, RTZ satisfied the factual requirements of the Manner Exception. Intus failed to submit a clear, consistent, and technically actionable request for EHI, and the parties were unable to reach mutually agreeable terms despite extensive negotiations. Applying the alternative manner priority framework, PACECare was not certified technology; Intus did not specify any applicable content or transport standards; and RTZ offered EHI in an alternative, machine-readable manner through the standard expanded exports in CSV format. Each of the conditions of the Manner Exception is therefore met. To the extent RTZ's conduct could be evaluated under the information blocking framework at all, that conduct falls squarely within the Manner Exception and did not constitute information blocking.

## VI.  INTUS DEVIATED FROM ESTABLISHED HEALTH IT INDUSTRY STANDARDS AND FROM THE ACCEPTED PROCESSES FOR DATA EXCHANGE AND USER ACCESS REQUESTS.

93. EHR vendors operating in the health IT industry are expected to adhere to established standards governing data exchange, user access, and system integration. Under standard industry practice, EHR vendors do not initiate or implement interfaces or data exchange connections to third-party vendors unless a mutual client, the healthcare organization that owns and controls the EHI, requests such an integration. Because the EHI belongs to the client, not the EHR vendor, the client is responsible for determining which external systems or vendors should receive, access, or exchange that information. Accordingly, EHR vendors generally rely on their customers to specify the third-party systems they wish to integrate with, and any proposed integration typically requires technical, security, and contractual assessments before it can be enabled. It is against this backdrop of established industry practice that Intus's conduct must be evaluated.

94. Consistent with this industry model, EHR vendors are not obligated to build or maintain interfaces for every third party that requests connectivity. Only EHRs certified under the ONC Health IT Certification Program are required to provide standards-based APIs to facilitate data exchange. PACECare was not a certified EHR during the relevant period and has not obtained such certification since. Even though RTZ was under no obligation to develop third-party integration, it made multiple

---

[137] RTZ0000479 at 477.
[138] Rothberg Dep. at 56:23-24.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

attempts between 2021 and 2022 to formalize a data-sharing and system access arrangement with Intus to facilitate the exchange of EHI on behalf of its mutual clients, engaging its interface team, requesting API specifications from Intus, and offering alternative methods of EHI exchange while a formal integration was being evaluated. RTZ's good-faith efforts to collaborate with Intus are inconsistent with any characterization of its conduct as obstructive or intended to impede access to EHI.

95. As defined in the Cures Act and ONC Rules, interoperability is the ability of different health IT systems to access, exchange, integrate, and cooperatively use data received through standardized methods, including APIs, HL7 interface messages, and FHIR-based protocols.[139] This framework focuses on enabling structured, secure, and repeatable data exchange between systems, yet it does not include granting UI or administrative access to proprietary software as a means of interoperability.[140] ONC's interoperability standards and certification reinforce that API-based exchange, standardized data elements, and recognized transport protocols are the intended mechanisms for facilitating access, exchange, and use of EHI at scale.[141] These standards are designed to streamline information flow across the healthcare ecosystem and emphasize the use of certified, documented exchange methods rather than system-level access to a vendor's UI or internal workflow design.[142] Read together, the interoperability rules establish that ONC's recognized modalities for data exchange are API-based access, FHIR-based protocols, and certified transport standards—none of which encompasses granting UI or administrative access to a vendor's proprietary software. [143]

96. The use of industry-standard tools and exchange methods not only protects the privacy and security of EHI but also protects the intellectual property of the software developer. These considerations together inform the standard against which the conduct of both parties must be measured.

### A.    Intus's misunderstanding of applicable regulatory obligations and industry standards

97. Based on the deposition testimony of multiple Intus executives and staff, Intus was relatively new to the health IT industry at the time of the relevant events and had not yet developed a full understanding of applicable industry standards, regulatory frameworks, and operational requirements. In my opinion, this lack of institutional familiarity led to several material departures from established health

---

[139] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

[140] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf; *see* 45 C.F.R. § 170.315(g)(10); 45 C.F.R. § 170.404.

[141] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf; *see* 45 C.F.R. § 171.301(b)(1)(i).

[142] *New ONC Final Rule Expands Information Blocking Regulatory Exceptions*, Kristen O'Brien and Rachel Stauffer (Jan. 3, 2024), *available at* https://www.mcdermottplus.com/insights/new-onc-final-rule-expands-information-blocking-regulatory-exceptions/; *see* 45 C.F.R. § 170.404.

[143] *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf; 45 C.F.R. § 171.301(b)(1); 45 C.F.R. § 170.315(g)(10).

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

IT practices and accepted processes, resulting in repeated miscommunications and, ultimately, a breakdown in the parties' data-sharing relationship.

98. In particular, Intus operated under the mistaken belief that EHR vendors were obligated to provide EHI and on-demand access, regardless of certification status or adherence to standard data exchange and user access protocols. As reflected in deposition testimony, email correspondence, and PACECare access logs, this misunderstanding materially informed Intus's request and expectations throughout the relevant period. The following excerpts from Mr. Rothberg's deposition testimony illustrate the nature and extent of this misunderstanding:

   a. "So it was our impression then – it's our impression now – that electronic health records have to give access to information in certain ways and that at the time – I suppose maybe now – we didn't fully understand the mechanism that they had to give that information. And so we wanted to talk to someone who's a data integration company because we thought they would have some way of, like, asking nicely or asking, you know, in some special way that would – like, 'Oh, it's a light bulb moment. Of course I have to give you access to the data' and Vorro would, like, know how to do that."[144]

   b. "So, like I said, our impression – it was many years ago; we were younger in healthcare. But our impression is that everyone just had to do it. We thought FHIR was, like, the rule. So going from that mindset where, "Hey, everyone's got to have FHIR connections,' we were kind of surprised that people didn't. And so we were talking to Vorro. Like, we sort of wanted to tell them what we thought was a strange situation because we thought everyone had do FHIR and that's, like, the easy way."[145]

   c. "I think that EHRs are required to provide – well, I don't know about 'required.' I think EHRs ought to provide access to the customers' data to the customer in an easy, comprehensive way."[146]

   d. "But that's what I'm – again, you know, we thought everyone had to give us FHIR – at this time, we thought everyone had to give us FHIR. And so we sort of found ourselves disappointed by that."[147]

   e. "But I mean, especially at this time, we thought that – we thought that every electronic health record company had to have FHIR. And basically, we thought that there was, like, some kind of magic word that we had to use and if we asked it in, like, the right way, they would say, 'Oh, yeah. We've got that FHIR endpoint. Here you go.'"[148]

99. These excerpts from Mr. Rothberg's deposition demonstrate that Intus fundamentally misunderstood the regulatory framework governing EHR data exchange obligations. Mr. Rothberg assumed that all EHRs had to provide FHIR APIs. This assumption was incorrect on two independent grounds. First,

---

[144] Rothberg Dep. at 36:10-22.
[145] Rothberg Dep. at 42:18-43:3.
[146] Rothberg Dep. at 43:10-14.
[147] Rothberg Dep. at 48:11-15.
[148] Rothberg Dep. at 71:11-18.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the obligation to implement FHIR-based standardized APIs applies only to certified EHRs, which PACECare was not. Second, even among certified EHRs, the requirement to implement FHIR-based standardized APIs did not take effect until December 2022, after the period during which Intus was making its initial requests of RTZ.[149] Intus's expectations of RTZ were therefore not grounded in applicable regulatory requirements at any point during the relevant period, and its repeated expressions of surprise and disappointment that RTZ did not provide FHIR access reflect a misunderstanding of the law rather than any deficiency in RTZ's conduct.

### B.    Intus's credential sharing practices deviated from industry-standard user access protocols

100. A separate and equally significant departure from industry standard practice concerns Intus's approach to user access and credential management. In SaaS-based health IT arrangements, such as the PACECare licensing model, it is standard practice to provision system access through a controlled, vendor-managed process that ensures each user is assigned unique credentials tied to their individual identity. This practice is not merely a matter of operational preference; it is a baseline security requirement mandated by the HIPAA Security Rule, which applies to both covered entities and business associates, and expressly requires: "Unique user identification (Required). Assign a unique name and/or number for identifying and tracking user identity."[150] As discussed in Section IV.B, RTZ maintains control over user account provisioning as part of its licensing structure. This control serves a dual purpose, ensuring accurate application of licensing terms and preserving the integrity of system access controls required under applicable law.

101. Prior to granting system-level access to the PACECare UI, RTZ appropriately required the execution of an NDA to protect its proprietary technology and other confidential information. This requirement is consistent with standard practice in SaaS and health IT agreements where NDAs serve multiple essential functions, including safeguarding trade secrets, protecting pricing structures and business strategies, and ensuring confidentiality of other sensitive operational information. Consistent with industry practice, NDAs are generally required to be executed before confidential information is disclosed or system access is granted. Mr. Zawadski confirmed that this was RTZ's established internal practice, testifying in his deposition that other health IT vendors had requested access to the PACECare UI and that such access was routinely permitted pursuant to an executed NDA.[151] Intus was aware of this requirement in September 2022, as part of the cease-and-desist letter[152] and as acknowledged by Mr. Jackson in an April 2023 internal email, yet the parties were ultimately unable to reach a mutually acceptable agreement on its terms.[153]

102. Rather than engaging with RTZ's established access protocols, Intus pursued an alternative approach that bypassed RTZ's user provisioning process entirely. As reflected in deposition testimony and email communications from Intus executives, counsel, and staff, Intus requested and obtained login

---

[149] *An Upcoming Milestone in Our Interoperability Journey*, ONC (Mar. 2022), *available at* https://healthit.gov/blog/healthit-certification/an-upcoming-milestone-in-our-interoperability-journey/.

[150] 45 C.F.R. § 164.312(a)(2)(i).

[151] *See* Zawadski Dep. at 53:23-55:4; 56:13-57:1; 74:11-75:22; 140:13-20.

[152] RTZ0000809 at 812.

[153] Intus 004131; Jackson Dep. at 193:13-194:11.

Page 29

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

credentials directly from PACE facilities and used those credentials to access PACECare, without RTZ's knowledge or authorization and without executing the required NDA:

    a. "I think at least in some cases, log-in credentials were directly given to him. And in some cases, probably, he used the log-in credentials that were created – I mean, created for IntusCare in my name."[154]

    b. "We tried to work with the clients to leverage their credentials to get the data and information, again in service of those contracts. That approach didn't really end up working out well, so that's kind of how things landed for us."[155]

    c. "Using a custom's – a customer's employee credentials. Since RTZ was no longer allowing us to access via an account provision specifically for us, we got access to the data that our customers were authorizing us to access using one of their credentials."[156]

    d. "So it was – it was common practice for all of our customers, really, to provision access to someone, whoever the – maybe first contact or, you know, whoever it made sense for them to provision an account for. And then that account became our access point. And then access – you know, access to that – those credentials was authorized based on who needed access and who was authorized to have access."[157]

    e. "No. I wouldn't have accessed PACECare. I would have given the credentials to the team."[158]

103. These statements confirm that credential sharing was not an isolated incident but rather an accepted and recurring practice within Intus's operations. In addition, Mr. Walters testified that Intus did not maintain a log of who was using these shared credentials to log into PACECare. [159] Intus's characterization of this practice as customer-authorized does not mitigate its non-compliance with applicable security requirements. The HIPAA Security Rule's unique user identification requirement exists precisely to ensure that system access can be attributed to, monitored for, and revoked from a specific individual.[160] Shared credentials fundamentally undermine these controls. In the absence of unique user credentials, user identity and activity cannot be reliably authenticated, logged, or audited, rendering access controls, audit controls, and incident response capabilities ineffective and exposing EHI to unauthorized access, misuse, and undetectable security incidents.

104. The risks associated with Intus's credential sharing practices were not hypothetical. At least one PACE facility, SCP's Director of Risk Management, recognized and raised these concerns directly with Intus stating: "We are not comfortable using a current staff's credentials to login for other purposes. This can create compliance issues and put Tim (or another staff member) at risk."[161] That

---

[154] Rothberg Dep. at 113:5-9.
[155] Jackson Dep. at 80:19-23.
[156] Deposition of Evan Walters (Mar. 18, 2026) (hereinafter "Walters Dep.") at 58:13-19.
[157] Walters Dep. at 93:22-94:6.
[158] Felton Dep. at 237:1-2.
[159] Walters Dep. at 89:21-90:2.
[160] 45 C.F.R. § 164.312(a)(2)(i).
[161] Intus 002989 at 989.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

a PACE facility's own risk management personnel independently identified the compliance and security implications of Intus's approach underscores that Intus's practices fell outside the bounds of accepted industry standards and reasonable security practice.

105. These concerns were not isolated to a single facility. My review of email communications between Intus and certain PACE facilities has shown that multiple facilities were uncomfortable with Intus's proposed data extraction methods.[162] Several PACE facilities raised compliance and security concerns, expressed an unwillingness to use provider credentials for automated extraction, or requested additional evaluation by their internal IT and compliance teams before approving Intus's proposed approach.[163] Other facilities insisted on maintaining operational control over data exchanges, or preferred alternative models in lieu of Intus-managed access methods.[164] PACE facilities exercised independent discretion over whether, and how, Intus could extract their data, and Intus's proposed methods were neither universally accepted nor automatically implemented across PACECare users.[165]

106. The reluctance expressed by multiple PACE facilities further reflects that Intus's proposed access methods were inconsistent with standard health IT practice. It is not standard practice for health IT software developers to provide system-level UI access in response to a request for EHI. Common practice is to exchange EHI using industry-standard tools such as exported reports (e.g., Excel, CSV, TXT) exchanged via SFTP, APIs, or interfaces (HL-7, FHIR) to facilitate information exchange.

107. Rather than engaging with these established methods and protocols, Intus pursued an approach that bypassed RTZ's user provisioning process entirely. After RTZ offered the standard expanded exports as an alternative manner of accessing EHI, as discussed in Section V.A, Intus did not inform RTZ that this manner was unacceptable. Instead, Intus independently requested and obtained user credentials from SCP and other PACE facilities[166] granting itself direct, unauthorized access to the PACECare UI and enabling it to extract EHI outside of RTZ's established access controls and oversight. This approach was inconsistent with RTZ's responsibilities as a business associate under the PACECare Agreement and with the security safeguards RTZ was obligated to maintain over system access and EHI. Rather than reflecting a good-faith effort to obtain EHI through reasonable and permissible means, Intus's conduct circumvented the very controls that exist to protect the confidentiality, integrity, and availability of EHI.

### C.    Audit log evidence confirms Intus's access exceeded the scope of its stated data needs

108. The extent and nature of Intus's unauthorized access to PACECare are documented in the system's audit logs and audit logs produced by Intus. PACECare audit logs record user activity at the module level, providing a detailed record of which areas of the system were accessed, by whom, and when. This granular activity data is significant because it allows a direct comparison between the modules Intus accessed and the modules that would have been necessary to fulfill its stated purpose of

---

[162] Intus 002989 at 989.
[163] Intus 002989 at 989.
[164] Intus 003704 at 705.
[165] *See* Intus 002989; Intus 003704.
[166] *See* Jackson Dep. – Ex. 12, 13, 14, and 31.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

obtaining the specific EHI categories identified in its requests and the standard expanded exports it acknowledged as a workable method of data exchange.

109. This comparison reveals a material discrepancy. Intus's stated requests were limited to specific EHI categories accessible through PACECare's reporting module and the standard expanded exports. However, the audit logs demonstrate that Intus did not confine its access to the reporting module. User credentials associated with Mr. Robbie Felton (Co-Founder and Chief Executive Officer at Intus), who testified that he does not recall a specific instance where his name was utilized for credentials, and that he never accessed PACECare, actually accessed several PACECare modules unrelated to the standard expanded exports defined in the "EHR Data Map"[167] or in the Intus Native Scripts.[168] Modules that Mr. Felton accessed outside of this scope include:[169]

    a.   redirect.main.advancedirective

    b.   redirect.main.assessmentManager.specific

    c.   redirect.main.claims

    d.   redirect.main.efilecabinet

    e.   redirect.main.meds.new

    f.   redirect.main.notegrievance

    g.   redirect.main.notesManagement

    h.   redirect.main.pacequalitydata2018

    i.   redirect.main.physicianOrder

    j.   redirect.main.prospectmanager

    k.   redirect.main.psychiatricNotesManagement

    l.   redirect.main.recording

    m.   redirect.main.service.v2

    n.   redirect.main.vitalSignsList

    o.   redirect.to.outreach.inquiry.

110. These modules contain highly sensitive clinical, financial, and operational data well beyond the scope of any EHI Intus claimed to need. To illustrate the sensitivity of the data implicated, these modules include areas of PACECare associated with advanced directives, clinical assessments, physician orders, medication management, psychiatric notes, claims processing, quality data, and prospective patient outreach. These categories of information carry significant privacy, clinical, and

---

[167] Rothberg Dep. – Ex. 66.
[168] Felton Dep. at 237:11-13; Intus 001350-Intus 001364.
[169] RTZ0008378.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

regulatory implications and bear no relationship to the reporting functions Intus represented as the basis for its access requests.

111. The audit logs reflect user credentials associated with Mr. Rothberg, similarly accessed PACECare modules unrelated to the scope of Intus's stated data needs, including:[170]

     a.  redirect.issue.manager

     b.  redirect.main.careplan

     c.  redirect.main.claims

     d.  redirect.main.efilecabinet

     e.  redirect.main.meds.new

     f.  redirect.main.membership

     g.  redirect.main.pacequalitydata2018

     h.  redirect.main.recording

     i.  redirect.main.servicePlan.

112. The access reflected in the audit logs for both Mr. Felton and Mr. Rothberg is inconsistent with Intus's stated purpose and raises significant privacy and security concerns. It is unclear why Intus needed, or chose to, access these modules outside the PACECare reporting module, as such access does not align with their stated requests for EHI. By obtaining shared credentials outside of RTZ's established provisioning process and navigating beyond PACECare's reporting module, Intus introduced material risks to the confidentiality, integrity, and availability of EHI maintained in PACECare. This conduct directly threatened the security controls RTZ was obligated to maintain as a business associate and exposed PACE facility clients and their patients to risks of unauthorized access, data misuse, and undetectable security incidents that RTZ had no ability to monitor, prevent, or remediate given that the access occurred outside its provisioned user management framework.

113. The PACECare audit logs show that Intus continued to obtain unauthorized access to PACECare as recently as January 5, 2026.[171] This ongoing pattern of unauthorized access underscores that Intus's conduct was not a product of confusion during an early stage of the parties' relationship but rather a persistent practice that continued despite RTZ's efforts to enforce appropriate access controls. In my opinion, RTZ's enforcement of those access controls was reasonable and necessary to protect the confidentiality, integrity, and availability of EHI maintained in PACECare, and was consistent with the safeguards an EHR vendor in RTZ's position would be expected to implement under standard health IT practice.

---

[170] RTZ0008378.
[171] RTZ0008378.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

114. In addition to the PACECare audit logs, Intus produced a spreadsheet labeled Appendix A, which details the dates on which Intus's login credentials were used to access PACECare.[172] This log demonstrates that Intus accessed PACECare a total of 9,895 times between January 2022 through December 2024. These access records directly contradict Mr. Felton's declaration, which asserted that Intus has been completely locked out of PACECare since March 15, 2024. Contemporaneous system access data confirms that Intus continued to access PACECare well beyond that date. Taken together, the evidence examined across this section demonstrates that Intus's conduct, including its misunderstanding of applicable regulatory obligations, its circumvention of RTZ's established user provisioning and access control processes, its use of shared credentials in violation of HIPAA Security Rule requirements, and its access to PACECare modules well beyond the scope of its stated data needs, reflects a pattern of departures from established health IT industry standards. In my professional opinion, it was Intus's conduct, not RTZ's, that deviated from accepted industry practice throughout the relevant period. RTZ's responses to Intus's requests, including its requirements for an NDA prior to granting system access, its enforcement of user provisioning controls, and its offer of alternative methods of EHI exchange, were each consistent with reasonable, industry-standard practices for an EHR vendor in RTZ's position.

## VII.  CONCLUSION

115. As detailed above, based on the materials I reviewed, the applicable regulatory framework, and my professional experience in health information technology, it is my opinion that RTZ did not engage in information blocking under the 21st Century Cures Act or its implementing regulations. At the time of the alleged conduct, RTZ's factual circumstances did not meet the definition of an actor subject to the information blocking provisions. Even assuming RTZ could be considered an actor, the record does not support the finding that RTZ engaged in any practice that interfered with the access, exchange, or use of electronic health information. The PACE facilities retained the ability to access and transmit their EHI, and RTZ consistently offered reasonable, industry-standard methods for doing so. RTZ's actions, including its efforts to formalize a data-sharing arrangement, its implementation of appropriate security and confidentiality safeguards, and its maintenance of controls over proprietary system access, were consistent with customary health IT practices. The record further reflects that it was Intus's conduct, not RTZ's, that departed from established industry standards, as evidenced by Intus's misunderstanding of applicable regulatory obligations, its circumvention of RTZ's access controls, and its use of shared credentials in violation of standard security practice. Further, to the extent the challenged conduct could be evaluated under the information blocking framework, the circumstances align with the conditions of the Manner Exception. For these reasons, and for the bases described throughout this report, the evidence does not support the conclusion that RTZ engaged in information blocking.

116. The opinions and analyses expressed in this report are based on my review of the documents and information made available to me as of the date of this report, my independent research, and my professional experience. I reserve the right to modify, supplement, or amend my opinions should

---

[172] Plaintiff's Objections and Responses to Defendant's Interrogatories, Set One – Appendix A.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

additional information or materials become available to me, or should I be asked to address additional issues within the scope of my expertise.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 22, 2026, at Woodstock, GA.

Traci Creegan

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Attachment 1

## Creegan CV

**Curriculum Vitae**



**TRACI CREEGAN, CPCO, CPHIMS, CRC**

BERKELEY RESEARCH GROUP, LLC

Direct: 443.450.1040

Mobile: 508.410.3119

tcreegan@thinkbrg.com

### SUMMARY

Traci Creegan is an Associate Director at Berkeley Research Group. She has over twenty-five years of healthcare and management experience focused on health information technology (IT) and regulatory compliance. She utilizes her understanding of the complex health IT landscape to provide litigation support and advisory services to health IT developers, healthcare organizations (HCOs), payers, and counsel in alleged healthcare fraud disputes and investigations, enforcement matters, and mergers and acquisitions.

Ms. Creegan has extensive experience developing, testing, implementing, and marketing health IT software solutions that span all facets of healthcare, from individual specialized modules to integrated electronic health records (EHRs), in alignment with regulatory requirements. She has actively engaged with the programs and federal regulations mandated by the American Recovery and Reinvestment Act of 2009, the Medicare Access and CHIP Reauthorization Act of 2015, and the 21st Century Cures Act of 2016. She has spent over a decade studying, interpreting, and translating federal regulations for clients to provide contextually appropriate advisory services. Ms. Creegan's expertise focuses on the federal rules published by the Centers for Medicare & Medicaid Services (CMS) Promoting Interoperability (PI) Program (previously Meaningful Use and the EHR Incentive Program), the Assistant Secretary for Technology Policy (ASTP)/Office of the National Coordinator (ONC) Health IT Certification Program, and the Merit-based Incentive Payment System (MIPS).

Ms. Creegan has advised HCOs on developing and implementing strategic plans for achieving and maintaining compliance with annual PI, MIPS, and Clinical Quality Measure (CQM) requirements and educates the organizations on the risk of non-compliance.

Since the inception of the ONC Health IT Certification Program, Ms. Creegan has collaborated with and advised health IT developers on achieving certification, interpreting the certification criteria, performing gap analyses, developing software and workflow requirements, implementing standard nomenclature, utilizing industry-standard testing tools, leveraging industry forums, certification demonstration strategies, documentation best practices, and staff education.

Ms. Creegan utilizes her experience collaborating with EHR developers and healthcare organizations to provide industry context, assess compliance, and translate evidence and



disclosures. She is uniquely positioned to advise on litigations involving health IT as she understands the complexities, regulatory requirements, and time commitments it takes to successfully implement and integrate EHRs into an extensive healthcare delivery network.

Ms. Creegan regularly advises HCOs and payers regarding the effectiveness of their Compliance and Ethics Program. She utilizes her experience as a Certified Professional Compliance Officer (CPCO) and her first-hand industry experience with complex and continually changing regulatory requirements to provide strategic advice to her clients.

### INDUSTRIES

- Health Information Technology
- Electronic Health Records
- Healthcare Providers
- Healthcare Payers
- Healthcare Compliance & Ethics
- Private Equity

### EXPERTISE

- Certified Health IT Compliance & Remediation
- Interoperability and Information Blocking
- Health IT Compliance and Coding Audits
- Health IT Software Development Life Cycle (SDLC)
- Health IT Implementation Management & Support
- Healthcare Compliance & Ethics Program Effectiveness
- Dispute & Investigation Litigation Support
- Health IT Merger & Acquisition Advisory and Due Diligence

### PROFESSIONAL EXPERIENCE

Ms. Creegan's health IT and consulting experience includes:

*Certified Health IT Regulatory Compliance & Remediation*

- Audited regulatory compliance for health IT developers, identifying potential non-conformities with the ONC Certification Criteria; facilitated ONC-ACB disclosure and corrective action plans, including customer communication, software remediation strategy, documentation standardization, and ONC-ACB re-testing.

- Developed and delivered ONC Health IT Certification and CMS PI education for health IT developers and counsel; led multi-departmental interactive workshops focused on Automated Measure Calculations and CQMs.

- Advised HCOs and health IT developers on the complexities of complying with

2



Information Blocking Regulations and participation in health information exchange networks.

*Health IT SDLC, Implementation, Management, & Support*

- Led a team of consultants in designing, building, testing, and integrating a bespoke, rules-driven professional fee capture module into an EHR's existing provider documentation templates for a multi-entity health system.

- Facilitated the development and implementation of clinical, administrative, and billing workflows for behavioral health, long-term care, and oncology specialties.

*Dispute & Investigation Litigation Support*

- Provided litigation support and expert advisory services regarding federal health IT programs' complexities, timelines, and variability.

- Developed financial models for damages exposure to counter the U.S. Department of Justice's (DOJ) settlement calculation of incentive payments at risk; DOJ accepted the countered calculation.

- Advised counsel on the applicability and relevance of the ONC Health IT Certification Program, CMS PI Program, and MIPS Federal regulations on litigation cases.

- Developed defense strategies for counsel to refute class-action status due to a health IT developer's inability to deliver compliant software for PI and MIPS attestation.

- Performed effective and efficient complex evidence analysis to identify potential fraud and non-compliance related to federal grant funding; summarized findings presented to the executive board by counsel.

- Served as contextual and industry expert for counsel, formulated defense strategies, mediation position arguments, interrogatory responses, and deposition questions in multiple health IT matters in the U.S. and internationally.

*Healthcare Compliance & Ethics Program Effectiveness*

- Assessed and developed recommendations on the design, implementation, and operational effectiveness of Compliance and Ethics Programs.

- Developed effectiveness scorecards informed by evolving best practices and guidance issued by regulatory and enforcement agencies, including the Office of the Inspector General of the U.S. Department of Health and Human Services, CMS, and the DOJ.

- Formulated Compliance and Ethics work plans aligned with the organization's strategic imperatives, identified risks, and relevant regulatory, administrative, and contractual requirements and guidance.



*Health IT Merger & Acquisition Advisory, Due Diligence*

- Evaluated health IT solutions' competitive landscape and market viability.
- Assessed SDLC to ensure compliance with best practices and to identify potential risks.
- Assessed health IT targets for regulatory and Certified Health IT compliance risks.
- Calculated EHR Incentive Program exposure via bespoke modeling.

## EDUCATION

Bachelor of Science, Rehabilitation Services, East Carolina University

## PRESENT POSITION

Associate Director, Berkeley Research Group, LLC, 2018 – Present

## PREVIOUS POSITIONS

Managing Consultant, Berkeley Research Group, 2015 – 2018
Senior Product Manager, Corporate Strategy, MEDITECH, 2002 – 2015

## PROFESSIONAL AFFILIATIONS

American College of Healthcare Executives (ACHE)
BlueBird Leaders
Health Information Management System Society (HIMSS)
Health Care Compliance Association (HCCA)
American Association of Professional Coders (AAPC)
Women's White Collar Defense Association (WWCDA)

## PROFESSIONAL CERTIFICATIONS

Certified Professional in Health Information and Management Systems (CPHIMS)
Certified Professional Compliance Officer (CPCO)
Certified Risk Adjustment Coder (CRC)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Attachment 2

## Materials Relied Upon

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Case Filings**

1. Defendant RTZ Associates, Inc.'s Answer to First Amended Complaint and Counterclaims (Jun. 6, 2024).

2. Plaintiff IntusCare Inc.'s Motion for Partial Summary Judgment (June 26, 2025).

3. Plaintiff's Amended Complaint (Apr. 4, 2024).

4. Plaintiff's Objections and Responses to Defendant's Interrogatories, Set One – Appendix A.

**Deposition Testimony**

1. Deposition of Evan Jackson (Nov. 25, 2025).

2. Deposition of Lori Wertz (Jan. 30, 2026).

3. Deposition of Michael Zawadski (Feb. 23, 2026).

4. Deposition of Alexander Rothberg (Feb. 27, 2026).

5. Deposition of Evan Walters (Mar. 18, 2026).

6. Deposition of John "Robbie" Felton (Apr. 11, 2026).

**Produced Documents**

1. Intus 001350-Intus 001364.

2. Intus 002205.

3. Intus 002208.

4. Intus 002384.

5. Intus 002989.

6. Intus 003704.

7. Intus 004131.

8. RTZ0000020.

9. RTZ0000189.

10. RTZ0000243.

11. RTZ0000524.

12. RTZ0005665.

13. RTZ0000660.

14. RTZ0000668.

15. RTZ0006181.

16. RTZ0007671.

17. RTZ0008378.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Statutes and Regulations**

1. 42 U.S.C. 300jj.

2. Pub. L. 114-225.

3. 45 C.F.R. 171.102.

4. 45 C.F.R. 171.301(a).

5. 45 C.F.R. § 171.301(b)(1).

6. 45 C.F.R. 171.303(b)(4)(iv).

7. 45 C.F.R. § 170.315(g)(10).

8. 45 C.F.R. § 170.404.

9. 45 C.F.R. Part 171.

10. 45 C.F.R. § 164.312(a)(2)(i).

**Publicly Available Materials**

1. *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

2. *21st Century Cures Act—A Summary*, Betty Lengyel-Gomez (last accessed Aug. 30, 2025), *available at* https://legacy.himss.org/resources/21st-century-cures-act-summary#:~:text=The%2021st%20Century%20Cures%20Act%2C%20signed%20December%2013%2C%202016%2C,improve%20mental%20health%20service%20delivery.

3. *An Upcoming Milestone in Our Interoperability Journey*, ONC (Mar. 2022), *available at* https://healthit.gov/blog/healthit-certification/an-upcoming-milestone-in-our-interoperability-journey/.

4. *ChartCare2; Product List*, Certified HealthIT (last accessed Sep. 15, 2025), *available at* https://chpl.healthit.gov/#/listing/355.

5. *Clinical Document Architecture Overview*, HL7 International (last accessed Sep. 22, 2025), *available at* https://build.fhir.org/ig/HL7/CDA-core-sd/overview.html.

6. *Enforcement Alert: Information Blocking*, ASTP (Sep. 4, 2025), *available at* https://oig.hhs.gov/documents/special-advisory-bulletins/10930/information-blocking-enforcement-alert-2025.pdf.

7. *FAQs,* ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/faq/do-information-blocking-regulations-apply-individual-or-entity-does-not-develop-any-products/.

8. *Fourth Circuit Publishes Landmark Ruling on 21st Century Cures Act "Information Blocking,"* Cameron Cantrell and Kate Black (Mar. 24, 2025), *available at* https://hintzelaw.com/blog/2025/3/24/fourth-circuit-publishes-landmark-ruling-on-21st-century-cures-act-information-blocking#:~:text=On%20March%2012%2C%202025%2C%20the,state%20privacy%20right%20of%20action.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

9. *Frequently Asked Questions: What Happens After I Report Information Blocking through the Information Blocking Portal on ONC's Website, HealthIT.gov?*, ONC (last accessed Apr. 2, 2026), *available at* https://www.healthit.gov/faq/what-happens-after-i-report-information-blocking-through-information-blocking-portal-oncs.

10. *Health Data, Technology, and Interoperability: Certification Program Updates, Algorithm Transparency, and Information Sharing*, 89 Fed. Reg. 1,192 (Jan. 9, 2024), *available at* https://www.govinfo.gov/content/pkg/FR-2024-01-09/pdf/2023-28857.pdf.

11. *Health Level 7 (HL7) Fast Healthcare Interoperability Resources (FHIR)*, ONC (last accessed Mar. 17, 2026) *available at* https://www.healthit.gov/interoperability/investments/fhir/.

12. *Healthcare Interoperability*, Oracle Health (last accessed Sep. 22, 2025), *available at* https://www.oracle.com/health/interoperability/#rc30p2.

13. *HHS Aligns Health Technology Leadership to Deliver Data Liquidity, Affordability, and an AI-Enabled Health System for Americans*, ONC (Mar. 31, 2026), *available at* https://healthit.gov/news/hhs-aligns-health-technology-leadership-to-deliver-data-liquidity-affordability-and-an-ai-enabled-health-care-system-for-americans/.

14. *Homepage*, C3HIE (last accessed Mar. 4, 2026), *available at* https://c3hie.org/.

15. *Homepage*, Carequality (last accessed Sep. 22, 2025), *available at* https://carequality.org/.

16. *Homepage*, CommonWell Alliance (last accessed Sep. 22, 2025), *available at* https://www.commonwellalliance.org/.

17. *Homepage*, eHealth Exchange (last accessed Sep. 22, 2025), *available at* https://ehealthexchange.org/.

18. *Homepage*, Epic – Care Everywhere (last accessed Sep. 22, 2025), *available at* https://www.epic.com/careeverywhere/?search=&country=&usstate=

19. *Homepage*, Indiana Health Information Exchange (last accessed Mar. 4, 2026), *available at* https://www.ihie.org/.

20. *Homepage*, LANES (last accessed Mar. 4, 2026), *available at* https://lanesla.org/.

21. *HTI-1 Final Rule: Information Blocking*, Janice Ziegler and Ramy Fayed (Feb. 26, 2024), *available at* https://www.dentonshealthlaw.com/hti-1-final-rule-information-blocking/.

22. *Information Blocking Actors*, ASTP (Apr. 2024), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Actors_Fact_Sheet_508_0.pdf.

23. *Information Blocking Exceptions*, ASTP (last accessed Sep. 2, 2025), *available at* https://www.healthit.gov/sites/default/files/2024-04/IB_Exceptions_Fact_Sheet_508_0.pdf.

24. *Information Blocking*, American College of Cardiology (last accessed Feb. 17, 2026), *available at* https://www.acc.org/InformationBlocking.

25. *Information Blocking*, ONC (last accessed Apr. 2, 2026), *available at* https://healthit.gov/information-blocking/.

*Intus Care, Inc. v. RTZ Associates, Inc.*
**Case No. 4:24-cv-1132-JST**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

26. *Information Blocking: Answers to Frequently Asked Questions*, Mike Lipinski et al. (Feb. 2021), *available at* https://www.healthit.gov/sites/default/files/page2/2021-02/IB%20FAQs%20Webinar_02-02-2021_FINAL.pdf.

27. *New ONC Final Rule Expands Information Blocking Regulatory Exceptions*, Kristen O'Brien and Rachel Stauffer (Jan. 3, 2024), *available at* https://www.mcdermottplus.com/insights/new-onc-final-rule-expands-information-blocking-regulatory-exceptions/.

28. *Product List*, Certified HealthIT (last accessed Apr. 2, 2026), *available at* https://chpl.healthit.gov/#/search.

29. *RTZ Systems,* LinkedIn (last accessed Sep. 2, 2025), *available at* https://www.linkedin.com/company/rtz-associates/.

30. *RTZChartCare; Product List*, Certified HealthIT (last accessed Sep. 15, 2025), *available at* https://chpl.healthit.gov/#/listing/186.

31. *Software As A Service vs. Software Licensing*, Kelly Logan (Nov. 3, 2023), *available at* https://www.loganpartners.com/e-commerce-laws-in-the-eu-a-guide-for-us-companies-2/#:~:text=SaaS%20Agreement:%20Users%20pay%20a,licenses%20or%20resources%20as%20needed.

32. *Welcome to CRISP*, CRISP (last accessed Mar. 4, 2026), *available at* https://www.crisphealth.org/about/.

33. *Welcome to Providence Health Information Exchange*, Providence (last accessed Mar. 4, 2026), *available at* https://www.provshare.org/.

34. *What Is HL7® FHIR®?*, ONC (last accessed Sep. 22, 2025), *available at* https://www.healthit.gov/sites/default/files/page/2021-04/What%20Is%20FHIR%20Fact%20Sheet.pdf.