# EXHIBIT C

*Confidential – Subject to Protective Order*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

| | |
|---|---|
| INTUS CARE, INC., <br><br>          Plaintiff, <br>    vs. <br><br> RTZ ASSOCIATES, INC.; and DOES 1 through 10, <br><br>          Defendants. | Case No.  4:24-cv-01132-JST |

### EXPERT REPORT OF PETER SCHWECHHEIMER
### PROFFERED ON BEHALF OF DEFENDANT AND COUNTERCLAIMANT
### RTZ ASSOCIATES, INC.

_____      4/23/2026

Peter Schwechheimer                               Date

*Confidential – Subject to Protective Order*

**TABLE OF CONTENTS**

I.    QUALIFICATIONS..................................................................................................................1

II.    SCOPE OF ASSIGNMENT .................................................................................................1

III.    SUMMARY OF OPINIONS..................................................................................................2

IV.    CASE BACKGROUND ........................................................................................................2

    A.    The Parties ................................................................................................................2

        1.    RTZ Associates, Inc............................................................................................2

        2.    Intus Care, Inc. ...................................................................................................3

    B.    Program of All-Inclusive Care for the Elderly (PACE)........................................3

    C.    The Instant Litigation...............................................................................................5

V.    TIMELINE OF RELEVANT EVENTS ..............................................................................6

    A.    Negotiations Over EHR Data Access ......................................................................6

    B.    Intus' Unauthorized System Access to PACECare .................................................9

    C.    Intus' Venture Capital Financing............................................................................12

VI.    ASSESSMENT OF ECONOMIC DAMAGES.................................................................16

    A.    RTZ's Damages ......................................................................................................17

        1.    Unauthorized Access Damages..........................................................................17

        2.    Lost Profit Damages ..........................................................................................22

    B.    Intus' Unjust Enrichment........................................................................................23

        3.    Calculating Intus' Unjust Enrichment ...............................................................26

*Confidential – Subject to Protective Order*

## I.    QUALIFICATIONS

1.    I am an economic consultant and testifying expert with nearly three decades of professional experience in the economics of intellectual property, antitrust, commercial damages, transfer pricing, and technology licensing including the licensing of standard essential patents (SEPs). My experience includes a broad range of projects and assignments including the calculation of economic damages in the form of lost profits, price erosion, unjust enrichment, lost enterprise value, and royalties on patent, copyright, and trademark infringement, trade secret misappropriation, monopolization, group boycott, price fixing, and Hatch-Waxman matters in both the U.S. and Canada. From 2020 - 2022, I was an adjunct professor at Bentley University where I taught courses in microeconomics and applied economics. A copy of my curriculum vita, which lists my professional experience as well as representative selection of cases I've testified or consulted on is attached as Exhibit 1 to this report.

2.    I am being compensated at a rate of $750 per hour for work on this matter.  The opinions I express in this report are independent of my compensation and as such, I have no financial interest in the outcome of this litigation.

## II.    SCOPE OF ASSIGNMENT

3.    I have been retained by counsel for Defendant and Counterclaimant RTZ Associates, Inc. ("RTZ") to assess and calculate the amount of economic damages owed to RTZ in the event the trier-of-fact finds Plaintiff and Counter Defendant Intus Care, Inc. ("Intus") liable for one or more of the counterclaims alleged by RTZ.

4.    During my work on this matter, I have considered documents and information produced in discovery, discussions with technical experts, conversations with RTZ corporate representatives, relevant deposition testimony, court filings on record in this case, as well as other publicly available documents and information. In addition to documents cited throughout this report, Exhibit 2 lists documents and other information that I received and/or considered in forming the opinions set forth in this report. Given the parties' outstanding discovery issues, I may supplement and/or amend my opinions in the event new information, evidence, or testimony becomes available after the disclosure of this report.

1

*Confidential – Subject to Protective Order*

### III.    SUMMARY OF OPINIONS

5.    Based on the information available to me as of the date of this report, economic damages resulting from Intus' unauthorized access to and use of RTZ's PACECare software over the June 2021 – December 2024 timeframe totals ▮▮▮▮▮ Should the trier-of-fact determine that Intus' unauthorized access to PACECare continued through at least December 2025, RTZ's damages would total ▮▮▮▮▮ The calculable amount of economic damages to date represents a lower bound on the total amount of damages likely suffered by RTZ over the relevant timeframe.

6.    From an economic perspective, the nature, scope, and duration of Intus' unauthorized access to a (now) competitor EHR software system suggests Intus' was unjustly enriched by its ongoing system access to RTZ's PACECare software. While such unjust benefit would likely manifest in a shorter development cycle, accelerated market entry, and additional venture capital funding, I have been advised that the information and data necessary to undertake a complete and thorough of Intus' unjust enrichment (e.g., documents regarding Intus' development and commercial launch of its CareHub EHR software) would benefit from a full production from Intus.

7.    Whether and the extent to which Intus' unauthorized access to PACECare resulted in lost profits (on lost EHR software sales) and/or price erosion damages to RTZ also cannot be assessed as of the date of this report due to the paucity of information from Intus regarding the commercial launch and subsequent customer-level sales records for its CareHub EHR software.

### IV.    CASE BACKGROUND

#### A.  The Parties

##### 1.   RTZ Associates, Inc.

8.    RTZ Associates, Inc. ("RTZ") is a California-based technology company that specializes in providing comprehensive, cloud-based electronic health record (EHR) and care management software for aging and long-term care programs for over three decades.  In the early 1990s, RTZ began introducing case management programs to PC-based software, enabling long-term

2

*Confidential – Subject to Protective Order*

care facilities to collect data and track patient outcomes more effectively.[1] In 1999 RTZ released their first web-based client management/service coordination software product – a full decade before the term "cloud computing" became commonplace.[2]

9.  In October 2024, Assured Healthcare Partners ("AHP"), a healthcare investment management firm, announced the formation of Collabrios Health and the acquisition of assets from RTZ and the EHR technology platform of AnewHealth (formerly Tabula Rasa HealthCare and CareVision HealthCare).[3]

### 2.  Intus Care, Inc.

10. Founded in 2019, Intus Care, Inc. ("Intus") identifies itself as a health analytics company that synthesizes and uses electronic health records from various PACE programs to identify risks, visualize trends, and optimize patient care.[4] On October 3, 2024, Intus announced the 2025 commercial launch of CareHub, the company's EMR and practice management system for PACE.[5] I have been advised that Intus' CareHub EHR software is a direct competitor of RTZ's PACECare software.

### B.  Program of All-Inclusive Care for the Elderly (PACE)

11. Developed in the Chinatown-North Beach region of San Francisco in the 1970s to address the long-term healthcare needs of seniors of immigrant families, the Program for All-Inclusive Care for the Elderly ("PACE") is a government funded healthcare model for individuals aged 55 or older requiring nursing home-level care due to chronic illness.[6]

12. The PACE model of care utilizes interdisciplinary teams that includes primary care providers, registered nurses, home care coordinators, personal care attendants, dietitians, social workers, transportation staff, PACE center managers, and physical, occupational and recreational therapists providing a full range of care and quality of life services to help older adults live

---

[1] https://frameworkltc.com/partner-hub/rtz-systems.
[2] https://frameworkltc.com/partner-hub/rtz-systems.
[3] https://www.prnewswire.com/news-releases/ahp-announces-the-formation-of-collabrios-health-a-leading-provider-of-integrated-technology-infrastructure-solutions-for-pace-programs-302273477.html?mkt_tok=NjI3LUNQSy0xNjIAAAGWGxF_YdQWA0BQBsdthPNDqPhtEUETlwraw25lG2PfqspJNIhK5KpZh3dplCHacJ95SULgB4idGqwNkzf3HzQVm5nHPwTulEWidUuXhTeU7Nw4.
[4] Amended Complaint dated April 2, 2024.
[5] https://intuscare.com/news/intus-care-announces-launch-of-carehub/.  I note that as of October 2, 2024, Intus claimed "several customers" had "already signed on" to implement the CareHub EMR system.
[6] https://www.ncbi.nlm.nih.gov/books/NBK597375/#article-156321.s1.

*Confidential – Subject to Protective Order*

safely in their communities for as long as possible.[7] PACE participants have demonstrated lower hospitalization rates, fewer readmissions, and fewer potentially avoidable hospitalizations than comparable populations, with shorter hospital stays (less than six days) within 12 months compared to other programs.[8] Participants enrolled in PACE not only experienced a reduction in hospitalizations but also showed improvements in both mental and physical health, enabling them to reside in their communities with greater independence an average of four years longer and maintain a significantly higher quality of life.[9]

13.    To update and modernize the nationwide PACE program, the Centers for Medicare and Medicaid Services ("CMS") issued a final rule in May 2019 revising and updating the regulatory requirement for the PACE program under Medicare and Medicaid including a) reducing administrative burden for PACE organizations, b) allowing PACE members to keep their primary physician, c) clarifying and simplifying enrollment policies, and d) setting requirements for quality improvement."[10]

14.    As of February 2026, 200 PACE organizations operating across 33 states provide comprehensive medical and social services to more than 91,000 older adults, with 94% of participants continuing to live in their communities.[11]

15.    PACE facilities typically utilize specialized EHR software to manage the complex needs of dual-eligible participants through an interdisciplinary team (IDT) model. Unlike traditional clinical EHRs, these PACE-specific platforms are designed to integrate clinical, social, and long-term care data, while facilitating the "provider-led, payer-funded" nature of these programs. Key functionalities of PACE EHR software include tracking integrated care plans, managing adult day center attendance, and handling Medicare Part D and Medicaid capitation billing.

---

[7] https://www.ncbi.nlm.nih.gov/books/NBK597375/#article-156321.s1; https://www.npaonline.org/about-npa/news/news/2026/02/26/pace-reaches-major-milestone-with-200-programs-nationwide.
[8] https://www.ncbi.nlm.nih.gov/books/NBK597375/.
[9] https://www.ncbi.nlm.nih.gov/books/NBK597375/.
[10] https://www.cms.gov/newsroom/fact-sheets/programs-all-inclusive-care-elderly-pace-final-rule-cms-4168-f#:~:text=On%20May%2028%2C%202019%2C%20the,over%20120%20percent%20since%202011. *See also*: https://www.jefferies.com/wp-content/uploads/files/Tabula%20Rasa%20Healthcare%20Inc.pdf.
[11] https://www.npaonline.org/about-npa/news/news/2026/02/26/pace-reaches-major-milestone-with-200-programs-nationwide.

4

*Confidential – Subject to Protective Order*

16.    As of 2025, the overall U.S. EHR market was estimated to be a $14.5 billion industry with the hospital segment accounting for more than one-half of total software sales. The U.S. EHR software market is highly concentrated as evidenced by the fact that the combined market share of the top three EHR vendors (e.g., Epic Systems, Oracle Cerner, and MEDITECH) is approximately ~75%.[12]  For reference, PACE-specific EHR software is categorized within the "Post-Acute and Specialized" segment of the overall U.S. EHR market.[13] In a LeadingAge CAST survey of PACE providers, 89% of respondents indicated they use an electronic health records system while 71% reported their current EHR system was "still missing PACE-specific functionalities."[14]

17.    As of 2026, leading competitors in the PACE EHR software market include Collabrios (including RTZ, Tabula Rasa HealthCare, and CareVention HealthCare), PacePlus, Intus Care, and StoriiCare.[15]

### C.  The Instant Litigation

18.    I understand the various claims and counterclaims alleged here by both Intus and RTZ in this litigation branch out from a common root: namely, access to the electronic health records of mutual Intus and RTZ clients. Specifically, Plaintiff Intus claims RTZ engaged in "information blocking", i.e., allegedly denying Intus access to customer electronic health data maintained in RTZ's proprietary PACECare EHR software system.[16]

19.    In response, Counterclaimant RTZ alleges Intus nonetheless obtained broad, unauthorized access to the PACECare system without RTZ's direct knowledge or consent.[17] I understand RTZ also alleges Intus exploited its "wrongful access" to the PACECare system to investigate and learn about the "functionality, operability, layout, interfaces, data presentation, and report

---

[12] https://www.definitivehc.com/blog/most-common-inpatient-ehr-systems.
[13] Post-Acute & Specialized EHR segments represents approximately 15% of the U.S. EHR market.
[14] https://leadingage.org/interoperability-is-a-major-concern-for-pace-providers-cast-survey-finds/#:~:text=Most%20PACE%20providers%2C%2089%25%2C,still%20missing%20PACE%2Dspecific%20functionalities.
[15] https://collabrios.com/, https://intuscare.com/, https://www.paceplus.com/, https://www.storiicare.com/who-we-serve/pace-software.
[16] Amended Complaint.
[17] Defendant RTZ Associates, Inc.'s Answer to First Amended Complaint and Counterclaims, June 20, 2024 ("RTZ's Answer and Counterclaims.")

*Confidential – Subject to Protective Order*

generating capabilities" to expedite and refine its own development of a competing EHR system.[18]

## V.   TIMELINE OF RELEVANT EVENTS

### A.  Negotiations Over EHR Data Access

20.   I have reviewed certain email correspondences and communications between Intus, RTZ, and their respective counsel produced in discovery on this matter. Given the extent to which the parties' relevant communications have been discussed and summarized elsewhere, my reference to select documents for the purposes of providing a timeline of these events is necessarily summary and intended for background purposes only.

21.   Intus claims that it initially contacted RTZ requesting access to its PACECare EHR software in approximately April 2021 and claims that it extracted electronic health records data from PACECare over the June 2021 – September 2022 timeframe "[w]ith [RTZ's] knowledge and consent."[19]  I understand RTZ denies it ever gave Intus' permission to access its PACECare system and would not have done so without having first executed a non-disclosure agreement (NDA) between the parties.

22.   According to RTZ, Intus introduced itself to RTZ by way of a March 15, 2022 email from Intus' CEO Robbie Felton ("Mr. Felton") to RTZ's CEO Michael Zawadski ("Mr. Zawadski").[20] RTZ contends it only learned that Intus had wrongfully accessed its PACECare system in or around August 2022.[21]

23.   Over the July 26, 2022 - August 20, 2022 timeframe, I understand Intus and Community Pace exchanged several emails regarding "migration to RTZ" efforts that included the "need to establish access to RTZ."[22]  From these correspondences, I understand that Evan Walters of Intus ("Mr. Walters") requested Community Pace to "[p]lease provide us with a single account, as well as the domain of your RTZ EHR" and a bit later asked "could you please send us credentials for your new EHR so there's as little downtime as possible" given that the "go-live

---

[18] RTZ's Answer and Counterclaims.
[19] Amended Complaint at 14.
[20] RTZ's Answer and Counterclaims at 8.
[21] RTZ's Answer and Counterclaims at 12.
[22] Intus 004143 – Intus 004146.

6

*Confidential – Subject to Protective Order*

for RTZ is today."[23]    On August 18, 2022, Malorie Marquardt at Community Pace ("Marquardt") emailed Mr. Walters indicating stating their RTZ rep sent Community Pace an NDA "requesting it be completed and sent back" and that they (RTZ) will "start working on building an Intus account for you" as soon as RTZ receives confirmation.[24]  Separately, RTZ informed its customer Neighborhood Healthcare on July 26, 2022 that "anyone from an outside entity" that "is going to be accessing PCO" (PACECare) needs to "sign an NDA before they are granted access."[25]

24.    I understand that on September 7, 2022, Mr. Felton emailed Mr. Zawadski indicating that "[o]ne of our team members" received an NDA from RTZ regarding Intus' Beacon PACE integration.[26] In this email, Mr. Felton suggested he had "a few redlines that we would need to make before moving forward."[27] I understand Mr. Felton forwarded Mr. Zawadski a proposed alternative to RTZ's NDA less than a week later.[28]

25.    In a reply email to Mr. Felton on September 14, 2022, Mr. Zawadski took issue with Mr. Felton's prior characterization of a "a few redlines" to RTZ's NDA.[29] Mr. Zawadski claimed the redlined version of RTZ's NDA he received was "and entirely different "access agreement" that omits or decapitates all material terms of our offered agreement", stating that the document he received from Mr. Felton was "neither as implied from previous emails" nor "in any way useable."[30] I understand Mr. Felton responded to Mr. Zawadski's concerned email without reference to RTZ's NDA, instead inquiring if Mr. Zawadski would be "open to discussing a business arrangement for us to access PACE Programs' data", stating that it would be "awesome to have a cooperative arrangement going into the NPA Conference!"[31]

26.    I understand that on September 14, 2022, counsel for RTZ ("Nossaman") informed Intus that it learned Intus "has gained access to RTZ's PACECare product on multiple occasions without RTZ's written approval or consent" and instructed Intus to cease and desist from "accessing or

---

[23] Intus 004143 – Intus 004146.
[24] Intus 004143 – Intus 004146.
[25] Intus 004150 – Intus 004158.
[26] Intus 002019 – Intus 002020.
[27] Intus 002019 – Intus 002020.
[28] Intus 002035 – Intus 002038.
[29] Intus 002035 – Intus 002038.
[30] Intus 002035 – Intus 002038.
[31] Intus 002041 – Intus 002044.

*Confidential – Subject to Protective Order*

attempting to access RTZ's PACECare solution through RTZ's customer base unless and until RTZ provides its written consent to such access."[32]

27.     On September 16, 2022, Mr. Zawadski responded to Mr. Felton's prior day email that RTZ receives "a large volume of interface requests" and that while he would have been "open to collaboration", such an arrangement would need to meet two "tests" including 1) protecting RTZ's IP (intellectual property) and 2) benefiting our clients, RTZ, and Intus.[33] Mr. Zawadski indicated that if the collaboration met both tests, it would then have been "prioritized based on the expected benefits vs opportunity costs."[34] In closing, Mr. Zawadski reiterated that "Intus rejected our NDA (one accepted by other entities)" and instead "drafted its own agreement that would afford us less IP protection than having no agreement at all" and that he "considered the process paused" because both agreements (RTZ's NDA and Intus' proposed access agreement) had been rejected."[35]

28.     While various emails and correspondences between RTZ, Intus, and their respective counsel over the October 2022 – August 2023 timeframe reveal varied efforts to provide Intus the EHR data of RTZ's customers as either a "single file" expanded extract, through "front-end" access to PACECare, as part of an expanded business arrangement between the parties, and even through Intus' proposed acquisition of RTZ, I understand RTZ and Intus ultimately did not reach an agreement that RTZ believed was necessary to protect its "most valuable work product" from unauthorized use (i.e., including the "work flows, variables, things that relate to an industry and resonate[s] with them") despite a "merry-go-round of NDA conversations."[36]

29.     On February 2, 2024, counsel for RTZ was notified that Intus had filed an information blocking complaint with the Office of the National Coordinator for Health Information Technology claiming RTZ's "continued violations of The 21st Century Cures Act and the federal information blocking regulations at 45 CFR Part 171."[37]

---

[32] Intus 002039 – Intus 002040.
[33] Intus 002063 – Intus 002067.
[34] Intus 002063 – Intus 002067.
[35] Intus 002063 – Intus 002067.
[36] RTZ0000160 – RTZ0000183, Intus 002026 – Intus 002028, Intus 0000280 – Intus 0000311, RTZ0000807 – RTZ0000808, RTZ's Answer and Counterclaims at 25, Deposition of Michael Zawadski, Vol. 1, dated February 23, 2026 ("Zawadski Deposition") at 59:3 – 59:14 and 138:15 – 139:1.
[37] RTZ0000674.

*Confidential – Subject to Protective Order*

**B. Intus' Unauthorized System Access to PACECare**

30. RTZ alleges beginning in June 2021, Intus began obtaining unfettered access PACECare to obtain both the customer EHR data at certain PACE facility customers as well as to the proprietary "functionality, operability, layout, interfaces, data presentation, and report generating capabilities" of the PACECare software itself through its unauthorized receipt and use of the registered log-in credentials of certain RTZ licensed customers.[38]

31. I have been advised by counsel that the timeline of events regarding Intus' alleged unauthorized access to PACECare can be delineated in the following three phases: 1) the Automated Script Phase (June 2021 through September 14, 2022), the Ferrara Process Phase (September 15, 2022 – January 2023), and the Updated Automated Script Phase (January 2023 – present.)

32. Despite an impasse regarding the NDA that would have permitted Intus' preferred means of obtaining customer EHR data from RTZ (i.e., directly from the PACECare system via an automated script), I understand Intus could have obtained all of the relevant customer EHR data it needed to provide its data analytics services in the form of an "expanded report" (e.g., a data file export) directly from each PACE facility itself through the reporting functionality of PACECare.[39]  I also understand this expanded report functionality was designed into the PACECare system to allow "[PACE] organizations to be able to do their own analysis . . . across the vast majority of data within the PACE application."[40] In fact, following RTZ's cease and desist letter of September 14, 2022, Intus began instructing clients how to manually export EHR data as a daily file based on Intus' RTZ data map "as an interim solution until we can resume the automated integration." (i.e., the so-called Ferrara Process)[41]

33. However, despite the available alternatives for obtaining the requested EHR data, Intus has acknowledged obtaining "user interface" access to the PACECare system itself by using log-in credentials created for Intus by certain PACE facilities as well directing customers to enter their unique PACECare log-in credentials into Intus' data analytics software to create at direct

---

[38] RTZ's Answer and Counterclaims.

[39] Zawadski Deposition, Vol. at 64:3 – 64:11.  Mr. Zawadski testified that while he wasn't aware of Intus' specific data needs as of July 2023, "the data file that St. Paul's (a PACE customer) got every night, which was a hundred percent of their data, could certainly accomplish it." Zawadski Deposition, Vol. 1 at 190:2 – 190:12.

[40] Zawadski Deposition, Vol. 1 at 63:17 – 64:2.

[41] Deposition of Evan Walters dated March 16, 2026 ("Walters Deposition"). Exhibit 95

9

*Confidential – Subject to Protective Order*

connection of automatically extracted data.[42]  RTZ contends that the use of customer log-in credentials by either method allowed Intus to gain unauthorized access to PACECare software without RTZ's knowledge or consent.[43]  Intus admits it has extracted EHR data through the PACECare software at six separate PACE facilities since at least January 2022 including Neighborhood Health, Beacon of Life PACE, Senior Care Partners PACE, Community PACE, St. Paul's PACE, and New Horizons.[44]

34.    I understand that RTZ has since conducted an internal audit and review of the PACECare access logs of RTZ–Intus common customers in an attempt to determine the exact nature, scope, and timing of Intus' apparent unfettered access to its PACECare software. I have been provided with a spreadsheet ("Intus audit log") that purportedly depicts certain log-in and access information recorded by the PACECare software including, *inter alia*, the log-in date and time ("log_date"), a session identifier ("session_id"), the unique internet protocol address of the accessing computer ("ip_address"), and the specific area or functionality of the software that was accessed ("module_name").[45]

35.    Based on the information from its audit of PACECare access, RTZ identified 13 unique agent identification numbers ("agent_id") that it subsequently traced back to Intus through either an account name or by the unique IP address associated with an Intus employee's access point.[46] I understand RTZ's internal audit logs determined Intus accessed PACECare through its own account or through client credentials at six separate PACE facilities.[47]

36.    I have reviewed the relevant portions of the Expert Report of Traci Creegan ("Creegan Report") and have conversed with Ms. Creegan regarding the nature and scope of Intus' access in and around the PACECare software as depicted by the records contained in the Intus Audit

---

[42] Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One ("Intus' Rog Responses, Set One." I understand that in certain instances unbeknownst to RTZ, some PACECare customers also set up separate log-in credentials for Intus' specific use.

[43] RTZ's Answer and Counterclaims at 86 – 87.

[44] Amended Intus' Rog Responses, Set One, Appendix A, Amended Complaint at 14.  While Intus concedes it "obtained the electronic health records data by extracting the necessary data from approximately June 2021 to September 2022", data produced by Intus regarding "the dates that the login credential was used to access PACECare" at these six Pace facilities extends from January 2022 through December 2024 (*See:* Appendix A.)

[45] RTZ0008378.

[46] RTZ0008378.

[47] RTZ0008378. These PACE facilities include Community Pace, Neighborhood Healthcare, Senior Care Partners, Pace CNY – Loretto, Upham's ESP/PACE, and Beacon

10

*Confidential – Subject to Protective Order*

Log.[48] As a threshold matter, I have been advised that the standard expanded reports extraction from the PACECare system is performed by the procedures depicted in the "EHR Data Map".[49] I understand that upon her review and comparison of the Intus audit logs (a record of user activity at the module level) and the EHR Data Map, Ms. Felton identified a "material discrepancy" between the modules needed to extract EHR data from PACECare and the modules Intus actual accessed in the PACECare system.[50]

37.   Based on user credentials assigned to Mr. Felton and Alex Rothberg, Co-Founder and Chief Technology Officer at Intus, ("Mr. Rothberg"), the Creegan Report found that both Mr. Felton and Mr. Rothberg "accessed PACECare modules unrelated to the scope of Intus' stated data needs", that these modules contained "highly sensitive clinical, financial, and operational data well beyond the scope of any EHI Intus claimed to need", and that such unauthorized access "raises significant privacy and security concerns."[51]

38.   In an effort to determine the relative value or importance of the PACECare modules accessed by Messrs. Felton and Rothberg, I provided a list of the PACECare modules identified in the Intus Audit Log to Laura Emery, Senior Product Manager at Collabrios Health ("Ms. Emery") and asked her to evaluate and provide a relative ranking of these modules as either High, Medium, or Low value based on two factors including their ability to provide insight into the PACECare system's organizational structure as well as features and functions that would not typically be included in an EHR.[52] Modules that provided insight into PACECare's organizational structure and/or included features or functions uncommon to standard EHR software were ranked as "High" while modules that have more of a standard answer or design were ranked as "Medium" or "Low".[53]

39.   Of the 40 PACECare modules analyzed and ranked by Ms. Emery, a total of 16 unique modules are identified in the Creegan Report as having been accessed by either Mr. Felton or Mr.

---

[48] Expert Report of Traci Creegan dated April 22, 2026 ("Creegan Report"). Conversation with Traci Creegan on March 18, 2026 and March 27, 2026.
[49] Creegan Report at 109.
[50] Creegan Report at 108 – 109.
[51] Creegan Report at 109 – 112.
[52] Conversation with Laura Emery dated April 15, 2026.
[53] Conversation with Laura Emery dated April 15, 2026.

*Confidential – Subject to Protective Order*

Rothberg.[54] Among this subset of PACECare modules, more than one-half (9 of 16) were assessed as having "High" value while fully 38% (6 of 16) were evaluated as having "Medium" value.[55]

40.    When asked, in his view, "is there something special about the layout, that if Intus, for example, saw the layout, that it would just give them this massive leg up in product development?", Mr. Zawadski answered "yes" and expounded on this answer by explaining that the type of unauthorized access to PACECare that Mr. Felton and Mr. Rothberg enjoyed revealed "the entire organizational principle of the system" that "took years to develop."[56] Mr. Zawadski further explained that the type of system access Intus gained conveys the "cumulative set of knowledge, in terms of how it's set up, that shows progression from the last 20 years of all the updates based on accumulated user feedback, understandings about what people understood and what they didn't."[57]

41.    That is, product development is non-linear, iterative, and path dependent. From an economic perspective, the value of what's being observed (e.g., this module is implemented by doing "X") includes the certainty of knowing and the economic value of knowing, often by trial and error and through great expense, that this module is definitely not implemented by doing "Y" or "Z". As such, Intus would have been unjustly enriched by this "massive" developmental short cut by using such knowledge to achieve the same or similar result at a much lower cost, in a shorter amount of time, and with must less risk. The value of this likely unjust benefit both in terms of lower development costs and, consequently, accelerated competitive entry with market-approved functionality is both knowable and measurable given access to documents relevant to Intus' development and commercial launch of its CareHub software.

### C. Intus' Venture Capital Financing

42.    As of the date of this report, there is a paucity of information produced in discovery in this matter concerning Intus' business operations, market strategy, and financial results. As such, one is therefore left searching the public domain for any information on the company that is

---

[54] Conversation with Laura Emery dated April 15, 2026. The list of 40 PACECare modules provided to Ms. Emery were identified as having been accessed by Intus in the Intus Audit Log (*See* RTZ0008378.)
[55] Conversation with Laura Emery dated April 15, 2026.
[56] Zawadski Deposition at 61:23 – 62:7.
[57] Zawadski Deposition at 62:4 – 62:14.

12

*Confidential – Subject to Protective Order*

both available and published by reputable sources, a challenging effort made even more so by the fact that Intus remains a small, privately held concern.

43.    Fortunately, one such category of information that is both publicly available and robust includes the type, source, and amount of venture capital funding secured by Intus over the 2020 – 2025 timeframe. **Table 1** below provides a summary list of Intus' venture capital financing by round.[58]

**Table 1**

| Date | Funding Type | Lead Investors | Amount ($M) |
|---|---|---|---|
| 10/24/2019 | Grant | Mass Challenge | $0.05 |
| 04/23/2020 | Pre-Seed Round | EO Ventures | $0.50 |
| 04/27/2021 | Seed Round | 3CC/Third Culture Capital, EO Ventures | $1.65 |
| 04/20/2022 | Seed Round | Preface Ventures, Jumpstart Nova, Collab Capital, Concrete Rose Capital, Brown Angel Group, Green Egg Ventures | $3.10 |
| 11/02/2022 | Series A | Deerfield Management | $14.10 |
| 01/16/2025 | Venture Round | Deerfield Management, Citi Impact Fund, Jumpstart Nova | $11.50 |
| 04/15/2026 | Majority investment | Blue Star Innovation Partners | N/A |
| | | **Total Funds Raised** | **$30.90** |

44.    I note that in April 2021 and again in April 2022, Intus raised a total of $4.75 million in two rounds of "seed" funding from a group of angel and small institutional investors.[59] (**Table 1**) In industry parlance, "seed" funding is defined as the first official equity-based financing round for start-ups, typically in the range of $0.5 million to $5.0 million, made by a venture capital firm or angel investor that a promising start-up uses to fund further product development and/or additional proof-of-concept business plan activities including the development of a minimum viable product (MVP) or prototype, assembling a founding team and hiring first employees,

---

[58] Venture capital (VC) is a form of private equity used to support startups and early-stage companies with the potential for substantial and rapid growth, typically in exchange for an ownership stake (equity) in the company. *See:* https://www.svb.com/startup-insights/vc-relations/what-is-venture-capital/.
[59] https://www.forbes.com/sites/frederickdaso/2021/04/27/intus-care-raises-165m-to-create-the-data-platform-long-term-healthcare-facilities/; https://www.nasdaq.com/press-release/intus-care-announces-$3.1m-in-funding-to-support-scale-up-of-predictive-analytics.

13

*Confidential – Subject to Protective Order*

setting up operational infrastructure, and launching initial marketing initiatives and sales motions.[60]

45.    From this initial operational and financing stage, a start-up's ability to secure subsequent rounds of more significant venture capital funding (Series A) is predicated on achieving specific, next-level business activity milestones including demonstrating a product-market fit, proof of scalability and unit economics, and the ability to generate annual recurring revenue ("ARR") typically in the range of $1 million to $3 million+.[61] That is, crossing Series A isn't just raising capital; it's proving you can turn money into sustained, scalable growth."[62] As shown in **Table 1**, Intus secured $14.1 million in next-stage, Series A financing from Deerfield Management in November 2022, a mere six months after having secured a second round of seed funding in the amount of $3.1 million in April 2022.

46.    Finally, in January 2025 Intus announced it had raised an additional $11.5 million in a "strategic follow-on financing round" bringing its total "funding to over $27 million", a fact which Intus claims underscores its "strong market positioning" based on the company's "significant step forward in [its] mission to create the [CareHub] platform that organizations use to deliver the right care, at the right time, every day for older adults with complex needs."[63]

47.    Over the April 2021 – November 2022 timeframe, Intus' efforts to scale up its healthcare analytics business depended substantially on the company's ability to secure increasing sums of institutional equity financing. Such financing was itself dependent on Intus' ability to meet or exceed certain stage-specific performance metrics identified previously, most notably the ability to generate recurring revenues at an exponential rate of growth (e.g., ARR and ARR growth) and doing so with increasing profitability (e.g., LTV:CAC ratio).[64]

---

[60] https://carta.com/uk/en/learn/startups/fundraising/seed-funding/.

[61] https://www.thesaascfo.com/essential-saas-metrics-for-a-series-a-fundraise/.  Intus previously acknowledged the company expected more than $2.1 million in revenue in 2023. *See:* https://www.forbes.com/profile/intus-care/.

[62] Hor, T., Dimov, D., Romme, G., Skinner, J. (2026). Seed to Series A—Scaling Up, *Startup Fundraising Decoded*. Palgrave Macmillan, Singapore. https://doi.org/10.1007/978-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-0_13.

[63] https://intuscare.com/news/intuscare-increases-total-funding-to-over-27m/.

[64] https://burklandassociates.com/2022/05/17/critical-series-a-finance-metrics-for-saas-startups/#:~:text=3%20Critical%20SaaS%20Metrics%20for,of%20your%20SaaS%20startup's%20profitability. The LTV:CAC is a measure of profitability calculated as average total revenue of a customer (LTV) divided by the average expense to gain one new customer (CAC).

*Confidential – Subject to Protective Order*

48. In furtherance of its performance objectives and equity financing goals, in February 2023, Intus offered RTZ a business collaboration proposal based on its desire for a "seamless" integration of common RTZ-Intus customer EHR data into Intus' data analytics platform.[65] Tellingly, Intus' conceded in its proposal that (then) "[m]utual customers (i.e., PACE programs) of Intus Care and RTZ are required to have program employees manually download EHR data" and that this would result in "frustration and regular inquiry from the program's administrators."[66] In consideration for allowing "streamlined data integration", Intus offered to pay RTZ data access fee of $2 PMPM (i.e., Per Member, Per Month) in addition to some additional (and indeterminate) amount of economic benefit that RTZ would realize as "a "preferred" EHR vendor and/or partner" of Intus."[67]

49. From an economic perspective, the value Intus is attempting to capture here isn't derived from the mere access to common customer EHR data per se but from a preferred form and manner of EHR data access that shifts the associated costs and risks (data production, administration, and maintenance costs) from Intus to its third-party EHR software "partner" (e.g., RTZ), effectively lowering its own costs while allowing Intus to offer a "customer experience" without any "additional or manual effort" (i.e., cost) borne by a PACE program or its administrators.[68]

50. During the relevant timeframe, the successful execution of its business plan (e.g., acquiring new customers, providing seamless experience to existing customers, maximizing operational efficiency, and increasing profitability) would have been a critical signal to investors as to the viability and scalability of a start-up like Intus. As such, the economic incentive to capture the full "value-add" conferred by the automatic extraction of EHR data, by whatever means, would have been significant and strategically motivating to Intus both from an operational perspective as well as an equity funding perspective.

---

[65] RTZ0000807 – RTZ0000808. "Intus Care can integrate with most EHR systems and companies (e.g., TRHC, EPIC Systems, EClinicalWorks, and AthenaHealth" to fluidly access EHR data, *but not RTZ*." (emphasis added)
[66] RTZ0000807 – RTZ0000808.
[67] RTZ0000807 – RTZ0000808.
[68] RTZ0000807 – RTZ0000808.

*Confidential – Subject to Protective Order*

## VI.    ASSESSMENT OF ECONOMIC DAMAGES

51.    RTZ alleges Intus' intentional, unauthorized access to and navigation through its proprietary PACECare system violates various federal and California state statutes with respect to computer fraud and abuse, trespass, unfair competition, and breach of contract.[69] As a threshold matter, I understand anyone found to have "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct . . . obtains anything of value" or who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss" is liable for the economic damages resulting from this unauthorized access.[70] In the event the trier-of-fact finds Intus liable under one or more applicable statutes, RTZ would be entitled to various pecuniary remedies including compensatory damages, exemplary damages, and restitution as well as injunctive, declaratory, and/or other equitable relief.[71]

52.    I understand that under the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), a claimant "may allege damage or loss from the misappropriation of their data, so long as they articulate that theory of loss in a concrete way."[72]  I have also been advised both that the disgorgement of defendant's profits "is a remedy contemplated by the statute" and that to show "damage or loss" under the CDAFA, a "plaintiff need not have suffered a corresponding loss, as 'California law recognizes a right to disgorgement of profits resulting from unjust enrichment.'"[73]

53.    Based on the relevant facts and the information available to me as of the date of this report, I have identified the following categories of economic damages suffered by RTZ and/or that unjustly enriched Intus that can be attributed to or are likely derivative of Intus' alleged unauthorized access to RTZ's proprietary PACECare system including a) unauthorized access

---

[69] RTZ's Answer and Counterclaims at 48 – 89.
[70] https://www.law.cornell.edu/uscode/text/18/1030.
[71] RTZ's Answer and Counterclaims, at 48 – 89. *See also*:
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=502.&lawCode=PEN;
https://www.law.cornell.edu/uscode/text/18/1030;
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=CIV&sectionNum=3294; and,
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=BPC&sectionNum=17200.
[72] *Lineberry v. AddShopper, Inc.*, 3:23-cv-01996, at 3 (N.D. Cal. Feb. 19, 2025).
[73] *Smith v. Rack Room Shoes, Inc.*, 24-cv-06709, at 4 (N.D. Cal. Aug. 4, 2025) and *Rodriguez v. Google LLC*, 20-cv-04688 at 6 (N.D. Cal. Jan. 3, 2024) (quoting *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (9th Cir. 2020)).

16

*Confidential – Subject to Protective Order*

damages, b) competitive effect damages, and c) restitution. I provide both the basis for and my assessment of these damages in the sections below.

54.     While the framework for calculating economic damages in this matter is straightforward, the dearth of information produced in this case regarding the development and launch of Intus' CareHub EHR software and the extent to which its unauthorized access to PACECare benefitted Intus (and harmed RTZ) in some material way therefore cannot be analyzed completely as of the date of this report. Consequently, the economic damages both calculated and contemplated in the following sections would necessarily represent a lower bound on Intus' actual unjust enrichment and RTZ's actual damages.

### A.  RTZ's Damages

#### 1.  Unauthorized Access Damages

55.     Through its alleged unfettered, ongoing access to PACECare, Intus ensured itself the ability to a) "seamlessly" extract EHR data at certain PACE facility customers, b) automatically populate and update its healthcare analytics dashboard at its preference, and c) acquire valuable insights into and knowledge from the "most valuable work product" of a leading (and potential competing) EHR software product including "work flows, variables, things that relate to an industry and resonate[s] with them."[74]

56.     From first principles, economic damages attributable <u>only</u> to Intus' unauthorized access to and use of PACECare to extract EHR data can be assessed from the perspective of the parties' reservation price; i.e., the maximum amount one party (here, Intus) would be willing to pay and/or the minimum amount the other party (here, RTZ) would be willing to accept to have permitted the defendant's alleged bad acts. As such, the relevant exercise here involves determining the "price" Intus would have been willing to pay and/or that RTZ would have been willing to accept to have knowingly permitted Intus the type and scope of access to PACECare set forth in a) and b) (but excluding c)) above.[75]

---

[74] Zawadski Deposition, Vol. 1 at 58:24 – 59:14.
[75] Economic damages attributable to the insights and knowledge Intus allegedly gained from its unauthorized access to a competitor's EHR software simply cannot be valued at this time without additional discovery from Intus regarding the development and commercial launch of its CareHub EHR software platform.

*Confidential – Subject to Protective Order*

57.    From an economic perspective, the use of comparable third-party, arm's-length transactions or licenses for benchmarking the calculation of economic damages is a standard, straightforward, and widely accepted methodology. As discussed below, one such third-party agreement involving EHR data access has been produced in this litigation.

58.    On August 26, 2022, Tabula Rasa HealthCare Group, Inc. ("Tabula Rasa") and Intus executed an Electronic Heath Record Data Use and Access Agreement ("DUAA") under which Intus was granted a "non-exclusive license and right to use and access the EHR Data for Intus' business, operations, and services" including but not limited to access and use related to "data analysis, data display, metric generation, data delivery, data deidentification or anonymization, providing advice and insight, and/or internally by Intus to enhance or modify Intus' product or services."[76] Additionally, the parties also acknowledged that "no intellectual property is being exchanged [between TRHC and Intus] pursuant to this Agreement" and that "TRHC Materials and Tools" are distinct from EHR data.[77] Under the DUAA's fee terms, Intus agreed to pay Tabula Rasa a $2.00 per member, per month (PMPM) extract fee with a guaranteed minimum payment of $10,000 per month.[78]

59.    In **Table 2**, I summarize the key terms from the Tabula Rasa-Intus DUAA and the comparable scope of use Intus got through its unauthorized access to PACECare.

---

[76] Zawadski Deposition, Vol.1, Exhibit 57. Mr. Zawadski testified that when he stated "I thought there was a data agreement and you were paying for it" (in reference to Tabula Rasa-Intus DUAA) he was subsequently told "that's something that really didn't come to fruition." Zawadski Deposition, Vol. 1, at 154:23 – 155:25. From an economic perspective, whether the Tabula Rasa-Intus DUAA was eventually "effectuated" is of little to no consequence with respect to the veracity of the license terms and conditions of this arm's length, fully-executed agreement.

[77] Zawadski Deposition, Vol.1, Exhibit 57.

[78] Zawadski Deposition, Vol.1, Exhibit 57.

*Confidential – Subject to Protective Order*

**Table 2**

| Terms | Tabula Rasa-Intus DUAA | Intus' Unauthorized Access |
|---|---|---|
| Effective date: | August 2022 | June 2021[79] |
| Term: | 3 years | 3.6 years+[80] |
| Data extract: | EHR data | EHR data |
| Data access: | FTP | via PACECare |
| Data frequency: | Nightly | On demand |
| Data formatting / modification: | Commercially reasonable efforts to timely add / modify | On demand |
| Fee: | $10,000 minimum/month $2.00 PMPM | – |
| Access to EHR software functionality: (Software functionality, operability, layout, interfaces, data presentation, and report generating capabilities) | No | Yes |

60.    As shown in **Table 2**, the license rights conveyed to Intus under the DUAA and Intus' alleged unauthorized access to and use of PACECare to extract EHR data are seemingly comparable across several key elements: both involve Intus, a start-up company in the (then) seed round of equity financing; both include a comparable term of access; and both include the automatic, "seamless" extraction of comparable EHR data, at a comparable access frequency, and the opportunity to update or modify the relevant data as needed.

61.    Despite the relative comparability among several key terms, a fundamental difference in the method of EHR data extraction exists between the two approaches taken by Intus. Under the DUAA approach, Tabula Rasa agreed to make EHR data extracts readily available through a file transfer protocol (FTP), a standard communication protocol that uses separate control and data connections between the client and the server.  As such, this file transfer method provides an effective safeguard against the unauthorized disclosure of various Tabula Rasa "Materials and Tools" (e.g., its proprietary data and/or databases, data models, documentation, software, source code, object code, tools, algorithms, user interface designs, methodologies, and other

---

[79] Amended Complaint at 14. When questioned, Mr. Zawadski acknowledged that the date of the Tabula Rasa-Intus agreement was "about the same time as the discussions . . . that Intus is in discussions or at least starting discussions with RTZ on an access arrangement." *See*: Zawadski Deposition, at 153:21 – 153:25.

[80] June 2021 – December 2024 is equivalent to 43 months or 3.6 years (43 / 12 = 3.5833 years)

19

*Confidential – Subject to Protective Order*

identifiable materials) in that it neither requires nor permits system access to TRHC software programs themselves.[81]

62.     By contrast, the alleged approach taken by Intus through its unauthorized access to PACECare effectively circumvented the very prohibition against accessing certain confidential functionality, operability, and layouts of the EHR software that Intus contractually agreed to under the terms of the DUAA. While its unauthorized use of certain PACE facility log-in credentials certainly provided Intus an efficient, automatic ability to access EHR data extracts free from customer effort and oversight from RTZ, the evidence also indicates Intus exploited its access to PACECare to view various proprietary aspects of the software unrelated to the narrow reporting functionality required to obtain EHR data. Unfortunately, the extent of Intus' commercial use (and the economic value of its use) of the RTZ confidential information it accessed and inspected, while generally identifiable, remains unknown at this time. Whether and to what extent knowledge of PACECare's workflows, processes, and other confidential information accelerated the development and commercial launch of Intus' competing CareHub EHR software and/or caused RTZ to lose sales and profits would aide in a more complete and thorough analysis as to the total amount of economic damages owed to RTZ.

63.     Throughout the relevant timeframe, Intus was a small start-up healthcare analytics company focused on customer acquisition, revenue generation, and profitability working to attract additional rounds of venture capital financing. As such, the unimpeded, automatic, real-time access to the EHR data of actual and potential PACE facility customers would have been critically important in fostering Intus' value-added approach. Conversely, Intus' inability to provide a "seamless" customer experience due to purported time-consuming data acquisition inefficiencies (e.g., data availability, frequency, and format consistency) would likely have had a significant detrimental effect on its commercial prospects at a critical juncture in the company's lifecycle.

64.     The relevant question here is whether the information available to me as of the date of this report is sufficient to calculate <u>some</u> measure of RTZ's damages attributable to Intus' unauthorized access to PACECare. I find that it is. The comparability of what Intus contracted

---

[81] Zawadski Deposition, Vol.1, Exhibit 57.

*Confidential – Subject to Protective Order*

for and received under the terms of the DUAA (automatic, nightly EHR data extracts) and what Intus simply took through its unauthorized access to PACECare (automatic, on-demand EHR data extracts) are effectively equivalent, save for the propriety of the acquisition method itself.

65.    Under the fee terms of the DUAA, Intus agreed to compensate Tabula Rasa $2.00 per member, per month (PMPM) for providing a nightly extract of EHR data via an FTP. However, because Intus accessed and extracted the relevant EHR data from PACECare itself without effort or support from RTZ, this $2.00 monthly per member fee is not applicable. However, I do find the "$10,000 per month" contractual minimum payment compelling (and applicable) here from an economic perspective. In contrast to the per active member fee (whose monthly total depends on the number of active members), the $10,000 payment agreed to by Intus represents the minimum fixed monthly fee for access to nightly EHR data extracts independent of the number of active users.[82]

66.    Based on its own admissions, Intus "obtained the electronic health records by extracting the necessary data from approximately June 2021 to September 2022."[83] However, in Appendix A to its interrogatories responses, Intus admits that it used certain log-in credentials to access PACECare over the January 2022 – December 2024 timeframe.[84] Taking Intus' admissions on their face, I've assumed the relevant timeframe over which Intus' used log-in credentials to access PACECare without authorization is inclusive of the 42 month period from June 2021 through December 2024. As such, I calculate the amount of economic damages owed to RTZ resulting from Intus' unauthorized access to PACECare to be ▮▮▮▮▮ based on the information currently available to me as of the date of this report. I note that this estimate necessarily represents the minimum quantum of economic damages suffered by RTZ in that it does not (and as of this date, cannot) account for any realized economic benefit resulting from Intus' gained knowledge of RTZ confidential information and methods.

---

[82] I note that Intus informed RTZ it was "willing [sic] pay RTZ a $2 PMPM" for all mutual Intus and RTZ customers, governed by a "data access" agreement between the companies. *See*: RTZ0000807 – RTZ0000808. I understand no such data access agreement was ever agreed to and executed between the parties.
[83] Amended Complaint at 14.
[84] Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One, Appendix A.

*Confidential – Subject to Protective Order*

### 2. Lost Profit Damages

67.    RTZ contends Intus exploited its excessive, unauthorized access to PACECare as a means to accelerate the development and commercial launch its own competing EHR software CareHub. I understand Intus commenced development of CareHub in early 2024, announced its launch in October 2024, and went live with the software in May 2025, a timeline RTZ categorizes as a rapid period from development to market.[85]

68.    Based on information provided by RTZ, I understand RTZ has identified, to date, three PACE facility customers that have subsequently migrated from PACECare to Intus' CareHub EMR platform including ███████████████████████████████████████████████[86]

**Table 3**

| Customer | Annual Revenue[87] | x | Profit %[88] | = | Annual Profit | x | License Term[89] | = | Total Profit |
|---|---|---|---|---|---|---|---|---|---|
| ██████████████ ███ | ███ | x | ██ | = | ██ | x | 3 years | = | ██ |
| ██████████ | ███ | x | ██ | = | ██ | x | 1 year | = | ██ |
| ██████ | ███ | x | ██ | = | ██ | x | 1 year | = | ██ |
| **Total PACECare Incremental Profit** | | | | | | | | = | ██ |

69.    In **Table 3**, I calculate the total incremental profit RTZ would have earned under the standard agreement terms with each of its three former PACECare customers. For example, under the terms of its agreement with ████████ RTZ earned annual revenues of ██████.[90] Therefore, at the company's ████ profit margin, RTZ would earn ██████ in annual incremental profits and total incremental profits of ██████ under a three year PACECare agreement with ██████████ (*See* **Table 3**.) As shown in **Table 3**, the cumulative incremental profit RTZ would have earned under renewed PACECare agreements with

---

[85] https://intuscare.com/news/intus-care-announces-launch-of-carehub/, https://intuscare.com/news/intus-care-announces-paceri-carehub-deployment/.
[86] RTZ0002801, RTZ0007280 , RTZ0000847.
[87] Conversation with Kevin Lathrop, April 22, 2026.
[88] 2024 Gross Profit % from RTZ's Pro Forma Adjusted Income Statement FY2022 – FY2024
[89] RTZ0002801, RTZ0007280 , RTZ0000847. With respect to Community Pace at Home and High Desert PACE, the 1 year license term reflects the automatic annual renewal term under these agreements.
[90] Conversation with Kevin Lathrop, April 22, 2026.

*Confidential – Subject to Protective Order*

███████████████████████████████████████████ totals approximately
██████████

70.    Admittedly, the mere fact that RTZ has identified specific PACECare customers whom it subsequently lost to Intus' CareHub EHR platform does not, by itself, establish the required causal nexus between the alleged bad acts and the claimed economic harm.[91] Rather, RTZ must establish that but-for Intus' alleged unauthorized access to PACECare, it would otherwise have made at least one (and up to three) of the lost sales identified in **Table 3**.

71.    I have been advised that RTZ continues to seek certain discovery from Intus in this matter including, *inter alia*, CareHub-related presentations and Board packages, competitive intelligence, planning documents, development timelines, and internal communications from Intus that are essential to establishing the causal link between Intus' unauthorized access to PACECare and the accelerated development of CareHub. Given the vital nature that such information would have on the assessment of economic damages in this case, I may supplement and/or amend my opinions in the event new information, evidence, or testimony becomes available after the disclosure of this report to reflect new information, documents, or facts produced by Intus.

### B. Intus' Unjust Enrichment

72.    Based on my review of the available information, Intus' was likely unjustly enriched in two meaningful ways:

   i.    *Supporting and growing its healthcare analytics customers*

73.    Over the June 2021 to June 2023 timeframe, Intus was a small start-up primarily focused on growing its healthcare analytics business and attracting additional rounds of venture capital funding. Therefore, a critical factor in Intus' likely success was predicated on the company's ability to provide a "customer experience in which each PACE program's EHRs are seamlessly integrated into Intus Care's services and software without any additional or manual effort by a PACE program."[92] Just how critical this "seamless integration" of customer EHR data was to

---

[91] 18 U.S.C. § 1030(g) establishes the causal nexus requirement between the alleged violation and the claimed loss. "Any person who suffers damage or loss <u>by reason of a violation</u> of this section may maintain a civil action against the violator to obtain compensatory damages." (emphasis added)
[92] RTZ0000807 – RTZ0000808.

23

*Confidential – Subject to Protective Order*

Intus' ability to provide a positive "customer experience" was stressed by Mr. Walters in deposition in which he testified that it (i.e., manual generation of EHR data via an expanded report) was both "time consuming" and "error-prone" to "click through the PACECare tool and select the necessary parameters and wait for the reports to download." [93] Simply stated, Mr. Walters acknowledged that the frequency at which Intus had the ability to automatically populate EHR data directly into its healthcare analytics dashboard (i.e., have "live" data) was "the value-add of the application itself", reiterating that "[a]gain, the value-add is the automation."[94] (emphasis added)

74.   From Intus own documents and testimony, the criticality as to Intus' ability to access PACECare and automatically extract EHR data from common PACE facility customers cannot be overstated. Whether Intus extracted EHR data from PACECare "[w]ith RTZ's knowledge and consent" as Intus claims or was unauthorized and done without RTZ's knowledge is effectively a distinction without a difference with respect to the economic value of such access to Intus over the relevant timeframe.[95] The ability to promise and deliver a seamless user experience to both existing and potential PACE facility customers would have been a critical component of Intus' ability to grow its customer base, increase its revenues and profitability, and attract new sources of outside financing.  Conversely, offering a customer experience and delivering a "time-consuming", "error prone" service dependent on a manual data extraction and ongoing customer involvement would have rendered Intus' data analytics service less desirable and resulted in the company having fewer customers and lower revenue.

ii.   *Accelerated development cycle and competitive market entry*

75.   Electronic health record (EHR) software is typically characterized as having high switching costs resulting from both direct and indirect costs including increased financial (out-of-pocket costs), training and implementation costs, and workflow disruption/productivity loss.[96]  Given the degree of vendor "lock-in" associated with EHR software, lowering a potential customer's cost to switch with respect to one or more of these dimensions is competitively important,

---

[93] Walters Deposition at 183:25 – 184:8
[94] Walters Deposition at 51:25 – 52:18.
[95] Amended Complaint at 14.
[96] Edsall, Robert L., and Kenneth G. Adler. "EHR switch survey: responses from 305 family physicians." *Family practice management* 22.1 (2015): 13-18, Holmgren, A. J., Apathy, N. C., & Kanter, G. P. (2025). Electronic health record market consolidation and implications for cybersecurity. *Health affairs scholar*, 3(8)

24

*Confidential – Subject to Protective Order*

especially for a newer market entrant. One common approach of lowering the cost of switching EHR software platforms, especially with respect to training, implementation, and lost productivity costs, is by offering a similar functional user experience and "look and feel" as leading competitor systems.[97] According to Mr. Zawadski, the "user interface and the selection of variables" is the "most valuable work product you'll create."[98] As such, Intus' unauthorized user access to PACECare, seeing "how someone builds and creates something", would allow someone to "now hyper-speed forward their development of anything else."[99]

76.   From an economic perspective, accelerating the product development cycle, all else equal, would unjustly enrich Intus by lowering the total development cost of its competing CareHub software. According to RTZ, Intus was able to access 20 years of RTZ's effort "trying figuring out how to make an organization really function" including creating accurate, efficient work flows, different reporting standards, and coming up with new variables.[100] According to Mr. Zawadski, "once you see it [e.g., PACECare's work flows] . . . you're not going to unsee it."[101]

77.   Another expected benefit of an accelerated development cycle is that it also typically accelerates a product's subsequent market entry. Accelerated market entry is often a success indicator, a signal to actual and potential investors of exceptional management, superior plan execution, high product-market traction, and lower investment risk.

78.   If Intus was able to accelerate the development and commercial launch of CareHub as a result of its unauthorized access to PACECare, Intus would be unjustly enriched by the resulting benefits it was able to capture including lower development costs and the incremental revenues from PACE facility customers it was able to compete for an acquire when, but-for its alleged unauthorized access to PACECare, it would otherwise have not yet entered the market.

---

[97] Comparison of the core functionality of Microsoft Excel and Google Sheets is illustrative. Excel and Sheets share the same "look and feel" and core functionality including their fundamental grid layouts, basic formulas, graphics, and pivot tables.  As such, users experience a low cost of switching between these products.

[98] Zawadski Deposition, Vol. 1 at 59:3 – 59:14.

[99] Zawadski Deposition, Vol. 1 at 60:23 – 61:8.

[100] Zawadski Deposition, Vol. 1 at 60:2 – 60:10.

[101] Zawadski Deposition, Vol. 1 at 61:6 – 61:8.

25

*Confidential – Subject to Protective Order*

### 3. Calculating Intus' Unjust Enrichment

79. I am aware that when questioned, Intus' Chief Revenue Office Evan Jackson ("Mr. Jackson") admitted Intus' 2025 CareHub revenue was "in the ballpark of a few million"[102] but otherwise could not provide the number of clients Intus had signed up CareHub to date ("I don't know specifically."[103]), or Intus' aggregate monthly revenue from CareHub contracts ("I don't know exactly.[104]), or the CareHub revenue projection for Q1:2026 ("I don't know specifically."[105])

80. It goes without saying that the ability to calculate the alleged unjust benefit Intus is alleged to have gained its unauthorized access to PACECare is significantly hampered by the inaccessibility of relevant Intus ordinary-course-of-business documents and data memorializing the development, customer acquisition, and sales revenues of its CareHub EHR software. I may supplement and/or amend my opinions in the event new information, evidence, or testimony becomes available after the disclosure of this report to reflect new information, documents, or facts produced by Intus.

---

[102] Deposition of Evan Jackson, Vol. II (rough) ("Jackson Deposition, Vol. II (rough)") dated April 9, 2026 at 41:15 – 41:18.

[103] Jackson Deposition, Vol. II (rough) at 27:2 – 27:8.

[104] Jackson Deposition, Vol. II (rough) at 40:16 -40:18.

[105] Jackson Deposition, Vol. II (rough) at 46:14 – 46:16.