# EXHIBIT F

NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone: 949.833.7800
Facsimile: 949.833.7878

Attorneys for Defendant RTZ ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC., | Case No: 4:24-cv-01132-JST |
| Plaintiff, | Assigned to: Hon. Jon S. Tigar |
| vs. | **DEFENDANT'S DISCLOSURE OF REBUTTAL EXPERTS** |
| RTZ ASSOCIATES, INC.; and DOES 1 through 10, | |
| Defendants, | Complaint Filed: February 23, 2024<br>Amended Complaint Filed: April 2, 2024<br>Counterclaims Filed: June 20, 2024 |

Case No. 4:24-cv-01132-JST

DEFENDANT'S DISCLOSURE OF REBUTTAL EXPERTS

70438095.v1

Defendant RTZ Associates, Inc. ("Defendant"), pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, hereby provide their Rebuttal Expert Disclosures as follows:

1.    Defendants may present the rebuttal expert testimony of Peter Schwechheimer. Mr. Schwechheimer has been specifically retained to provide testimony in this matter.  A copy of Mr. Schwechheimer's rebuttal expert report is enclosed herewith as Attachment A.

RTZ reserves the right to supplement these disclosures, to disclose additional expert testimony, and to rebut any expert testimony that Plaintiff Intus Care, Inc. discloses.

Dated:  May 12, 2026                    NOSSAMAN LLP
                                        DAVID C. LEE
                                        KASIA PENN


                                        By:  /s/ *David C. Lee*
                                              David C. Lee

                                        Attorneys for Defendant RTZ ASSOCIATES, INC.

DEFENDANT'S DISCLOSURE OF REBUTTAL EXPERTS
70438095.v1

# ATTACHMENT A

*Confidential – Subject to Protective Order*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND**

| | |
|---|---|
| INTUS CARE, INC., | |
| Plaintiff, | |
| vs. | Case No.   4:24-cv-01132-JST |
| RTZ ASSOCIATES, INC.; and DOES 1 through 10, | |
| Defendants. | |

**EXPERT REBUTTAL REPORT OF PETER SCHWECHHEIMER
PROFFERED ON BEHALF OF DEFENDANT AND COUNTERCLAIMANT
RTZ ASSOCIATES, INC.**

_____    May 12, 2026

Peter Schwechheimer                                    Date

*Confidential – Subject to Protective Order*

**TABLE OF CONTENTS**

I.    QUALIFICATIONS..................................................................................................1

II.   SCOPE OF ASSIGNMENT .....................................................................................1

III.  SUMMARY OF OPINIONS .....................................................................................2

IV.   REBUTTAL TO THE HULT REPORT....................................................................2

    A.    Background...................................................................................................2

    B.    Analyzing Dr. Hult's Lost Revenue Calculations.........................................3

        1.    Intus' Alleged Lost Revenue from Pre-Existing Contracts ................................4

        2.    Intus' Alleged Lost Revenue from Affirmatively Recorded Business Opportunities ......7

        3.    Intus' Alleged Lost Revenue from Unobservable Business Opportunities ....................18

    C.    Analyzing Intus' Alleged Lost Profit Calculations........................................25

*Confidential – Subject to Protective Order*

## I.    QUALIFICATIONS

1. I am an economic consultant and testifying expert with nearly three decades of professional experience in the economics of intellectual property, antitrust, commercial damages, transfer pricing, and technology licensing including the licensing of standard essential patents (SEPs). My experience includes a broad range of projects and assignments including the calculation of economic damages in the form of lost profits, price erosion, unjust enrichment, lost enterprise value, and royalties on patent, copyright, and trademark infringement, trade secret misappropriation, monopolization, group boycott, price fixing, and Hatch-Waxman matters in both the U.S. and Canada. From 2020 - 2022, I was an adjunct professor at Bentley University where I taught courses in microeconomics and applied economics. A copy of my curriculum vita, which lists my professional experience as well as representative selection of cases I've testified or consulted on was attached as Exhibit 1 to opening report in this matter.

2. I am being compensated at a rate of $750 per hour for work on this matter.  The opinions I express in this report are independent of my compensation and as such, I have no financial interest in the outcome of this litigation.

## II.    SCOPE OF ASSIGNMENT

3. I previously submitted an expert damages report in this matter on behalf of Defendant and Counterclaimant RTZ Associates, Inc. ("RTZ").[1] Here, I have been asked by counsel for Defendant and Counterclaimant RTZ Associates, Inc. to respond to the opinions set forth in the Expert Report of Dr. Kristopher Hult ("Hult Report") proffered on behalf of Plaintiff and Counterclaim Defendant Intus Care, Inc. ("Intus").

4. During my work on this matter, I have considered documents and information produced in discovery, discussions with technical experts, conversations with corporate representatives, relevant deposition testimony, court filings on record in this case, as well as other publicly available documents and information. In addition to documents cited throughout this report, Exhibit 2 lists documents and other information that I received and/or considered in forming

---

[1] Expert Report of Peter Schwechheimer Proffered on Behalf of Defendant and Counterclaimant RTZ Associates, Inc. dated April 23, 2026.

1

*Confidential – Subject to Protective Order*

the opinions set forth in this report. Given the parties' outstanding discovery issues, I may supplement and/or amend my opinions in the event new information, evidence, or testimony becomes available after the disclosure of this report.

## III.    SUMMARY OF OPINIONS

5.    The opinions and damages calculations proffered by Dr. Hult in his expert report are the product of inference, assumption, and supposition whose mathematically teased results collapse under the slightest scrutiny.

6.    Dr. Hult's assumption of causality is fatal, as is his simple acceptance and use of objectively inaccurate data and information to calculate his baseless, unsupported damages estimates.

## IV.    REBUTTAL TO THE HULT REPORT

7.    In the opening pages of his expert report, Dr. Hult states he has "calculated the damages to Intus that are caused by RTZ's information blocking conduct under the assumption that RTZ's conduct has already been found to be tortious." He has not done so.  What Dr. Hult has in fact done is conflate causality with the assumption of liability, the result of which imbues his analysis with a *post hoc ergo propter hoc* fatality that undermines his damages opinion in its entirety.

### A.  Background

8.    As a threshold matter, Dr. Hult "assumes that RTZ's information-blocking conduct began in September 2022" at which time RTZ allegedly "stopped giving Intus direct access to patient data stored in RTZ's PACECare system."[2] Dr. Hult goes on to state that because "Intus's business model requires access to its clients' clinical and administrative data stored in an EMR system such as RTZ's PACECare", Intus "suffered economic harm" because it was "unable to compete" as a result of RTZ's alleged conduct.[3]

9.    Presumably, Dr. Hult's assumption to "evaluate and quantify damages to Intus" as of September 2022 is based on a September 14, 2022 letter from RTZ's counsel to Intus revealing

---

[2] Hult Report at 14, 40.
[3] Hult Report at 13, 20.

*Confidential – Subject to Protective Order*

their discovery that Intus had "gained access to RTZ's PACECare product on multiple occasions without RTZ's written approval or consent" and thereby instructing Intus to cease and desist from "accessing or attempting to access RTZ's PACECare solution through RTZ's customer base unless and until RTZ provides its written consent to such access."[4]

10.    Dr. Hult's suggestion that RTZ had "stopped giving" PACECare access it had previously granted to Intus is disputed by RTZ and refuted by evidence on record in this case.[5] In addition, Dr. Hult's assumption that Intus no longer had "access to patient data stored in RTZ's PACECare system" as of September 2022 is also contradicted by Intus' own sworn admissions that they, in fact, had ongoing user access to the PACECare system licensed to RTZ-Intus common customers as early as January 2022 and as recently a December 2024.  In addition, RTZ contends Intus could have obtained all of the relevant customer EHR data it needed to provide its data analytics services in the form of an "expanded report" (e.g., a data file export) obtainable through the reporting functionality of PACECare without Intus needing to access the user interface.[6]

## B.  Analyzing Dr. Hult's Lost Revenue Calculations

11.    The Hult Report quantifies three sources of alleged lost revenues to Intus by purportedly comparing Intus' revenues in a but-for world imagined by Dr. Hult absent RTZ's alleged information blocking conduct and the "actual" world in which RTZ allegedly did. Dr. Hult's three sources of lost revenues include 1) revenue from contracts that were in place and generated revenue for Intus prior to September 2022 but whose payments were interrupted or reduced, 2) revenue from new opportunities that Intus competed for after September 2022 but did not win as a result of RTZ's alleged conduct, and 3) revenue from opportunities that Intus

---

[4] Intus 002039 – Intus 002040. In its cease and desist letter, counsel for RTZ informed Intus that it learned Intus "has gained access to RTZ's PACECare product on multiple occasions without RTZ's written approval or consent."

[5] Intus 019841 – Intus 019845.  In an email to Selina Lindley and Maria Greene at Intus on March 13, 2024, Kelsey Bruno of Community PACE indicated "we [Community PACE] . . . are unable to grant any new licenses to Intus employees" and that "any Intus employees who were previously granted access have had their accounts deactivated."  I understand RTZ contends it did not and would not authorize customer licensees to grant or otherwise provided user access to its PACECare system to unauthorized third-parties.

[6] Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One, Appendix A. As discussed in my opening expert report, RTZ's internal audit of access logs indicate Intus had broad access to the PACECare system at certain RTZ-Intus common as early as January 2021 and as recent as January 2026 (*See* RTZ0008378) and Zawadski Deposition, Vol. I at 64:3 – 64:11.

*Confidential – Subject to Protective Order*

was allegedly foreclosed from bidding on as a result of RTZ's alleged conduct. I address each of Dr. Hult's claims in the sections below.

### 1. Intus' Alleged Lost Revenue from Pre-Existing Contracts

12.  The first category of economic harm estimated by Dr. Hult results from the alleged "reduction in Intus's revenue . . . from contracts that existed prior to the alleged conduct" from several Intus clients that "did not pay Intus revenue that was already contractually agreed as a result of the conduct."[7] According to Dr. Hult, Intus "Invoicing data" shows four clients were "generating revenue for and being invoiced by Intus prior to September 2022, but Intus stopped collecting after RTZ's conduct."[8]

13.  In responding to Dr. Hult's contentions here, I note the following:

### BoldAge

14.  From a single line item entry in Intus' so-called "Invoicing data", Dr. Hult calculates ▮▮▮▮▮ in Intus foregone revenues from pre-existing contracts with BoldAge over the November 2022 to October 2024 timeframe.[9] To support his contention that "Intus lost revenue because it was unable to collect subscription revenue from BoldAge", Dr. Hult cites a January 3, 2023 email from Evan Jackson of Intus to Bobbi Runyon at Beacon Pace (the predecessor name of BoldAge) indicating that "we [Intus] have decided to pause subscription billing for our RTZ customers at this time in an effort to show our commitment to our partners while we work to negotiate with RTZ to resume automatic access to the data."[10] (emphasis added) Importantly, Intus' email indicated that in the meantime "your team will have access to the Intus Care platform."[11]

15.  By Intus' own contemporaneous admission, its decision to "pause subscription billing" at that time was unilateral and motivated by an "effort to show or commitment to our partners" while working to "resume automated access to the data."[12] Importantly, Intus did not then claim it

---

[7] Hult Report at 43.
[8] Hult Report at 47.  These four clients identified by Dr. Hult include Community PACE at Home, Senior Care Partners PACE, BoldAge PACE, and Neighborhood PACE.
[9] Hult Report at 50. I note that the monthly estimates of lost revenue in the Invoicing data spreadsheet (Intus 018874) indicate missing data. *See* Hult Report, Exhibit 3.
[10] Intus 019841.
[11] Intus 019841.
[12] Intus 019841.

*Confidential – Subject to Protective Order*

had no access to the BoldAge data or that it had been somehow "blocked" by RTZ from accessing BoldAge's information, just that it was working to resume "automated access" to the data, access it would later concede it had acquired and maintained through the use of PACECare login credentials from at least December 2022 through May 2023.[13] That Intus continued to provide BoldAge access to its data analytics platform (e.g., "In the meantime, your team will have access to the Intus Care platform") is telling.[14] The evidence that: 1) as of its January 2023 email, Intus could provide BoldAge ongoing access to its platform, 2) that Intus admittedly had and would maintain system user access to BoldAge's PACECare EHR data until May 2023, and 3) that Intus possessed the ongoing, uninterrupted ability to access all of the relevant EHR data it needed from BoldAge in the form of an "expanded report" undermines the predicate assumption in Dr. Hult's damages analysis that Intus was blocked from data over the November 2022 to October 2024 timeframe, particularly given Intus' decision to voluntarily "pause subscription billing" as a "commitment to our partners."[15] Consequently, Dr. Hult's damages analysis is factually unsupported for damages resulting from these alleged lost Intus revenues.

### Community PACE at Home

16. According to Dr. Hult's analysis, Intus' foregone revenues from pre-existing contracts with Community PACE at Home totaled ███ over the October 2022 to June 2023 timeframe.[16] To support his contention that these claimed lost revenues result from RTZ's alleged conduct, Dr. Hult cites a March 13, 2024 email from Community PACE informing Intus of its decision to cancel a planned "mock audit".[17] My review of Intus' monthly sales records indicates the lost revenue claimed here by Dr Hult is unrelated to and unsupported by the March 13, 2024 email from Community PACE regarding status of the planned mock audit, an email, it should be noted, that post-dates Intus' alleged lost revenues by more than eight months.[18]

---

[13] Intus 019841. *See also* Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One, Appendix A.

[14] Intus 019841.

[15] Discussion of expanded report from Deposition of Michael Zawadski, Vol. I dated February 23, 2026 ("Zawadski Deposition, Vol. 1") at 64:3 – 64:11.

[16] Hult Report at 51.

[17] Intus 019841 – Intus 019842.

[18] Intus 018874, Intus 018877, Hult Report, Exhibit 3.

*Confidential – Subject to Protective Order*

Consequently, Dr. Hult's analysis is again factually unsupported for these damages and relies on a factual data point that post-dates the period of alleged harm.

## Senior Care Partners PACE

17.    As set forth in Exhibit 3 of his report, Dr. Hult represents that Intus had ▆▆▆▆ in foregone revenue from Senior Care Partners PACE over a 10 month span from October 2022 through June 2023.[19] I note that Dr. Hult provides no explanation and cites no "evidentiary examples" for including these alleged lost revenues from Senior Care Partners PACE in his damages calculations beyond the fact that the timing of these alleged lost revenues as set forth in Intus' Invoicing data comports with his damages narrative.[20]

18.    This absence of supporting evidence from Dr. Hult's analysis undermines the conclusion that damages for that period of time are substantiated. As with BoldAge, evidence suggests that Intus also voluntarily paused Senior Care Partner's billing .[21]   Moreover, Intus has admitted that it had and maintained system user access to Senior Care Partners PACECare system to extract data over nearly the entire timeframe for which Dr. Hult assumes Intus lost revenues.[22] Intus' admitted access to Senior Care Partner's data undermines the predicate assumption by Dr. Hult that Intus was blocked from accessing Senior Care Partners PACE's data over the relevant timeframe. Consequently, Dr. Hult's analysis again is factually unsupported and otherwise inconsistent with other reliable evidence and wholly undermines his conclusions on the period of alleged lost revenue.

## Neighborhood Healthcare PACE

19.    Finally, Dr. Hult concludes without "evidentiary examples" that Intus also lost a total of ▆▆▆▆ over the eight-month period from November 2022 through June 2023 due to RTZ's alleged conduct.[23] In response, I again note that Intus has admitted it maintained system user access to Neighborhood Healthcare PACECare system to extract data through the reporting

---

[19] Hult Report, Exhibit 3.
[20] Intus 018874.
[21] Intus 002062 (Deposition Exh. 110 (R. Felton)).
[22] Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One, Appendix A.
[23] Hult Report, Exhibit 3.

6

*Confidential – Subject to Protective Order*

functionality of PACECare.[24]  In addition, I understand RTZ's data log audit indicates Intus had access to Neighborhood Healthcare PACE's data through PACECare from November 2022 through November 2025, a timeframe covering the entire period over which Intus allegedly lost revenues due to RTZ's alleged conduct.[25] Accordingly, Dr. Hult's conclusion that Intus' lack of data resulted in lost revenues from November 2022 through June 2023 seemingly ignores direct evidence to the contrary and therefore undermines the predicate factual assumption supporting his damage conclusion.

### 2. Intus' Alleged Lost Revenue from Affirmatively Recorded Business Opportunities

20.    As one of the bases for his damages calculation, Dr. Hult endorses and extensively relies upon a dataset of "business opportunities that Intus competed for but *lost as a result of RTZ's conduct*" (emphasis added) that were "affirmatively recorded in Intus's customer relationship management, or CRM, system" and supposedly maintained and used by Intus in the "ordinary course of business" ("CRM data").[26] Dr. Hult generally describes Intus' CRM data as including information that "classifies potential business opportunities, the total contract value, the reason the business opportunity was lost (if the business opportunity was lost), the number of covered lives, along with other information."[27] For each of these designated "lost" business opportunities, the CRM data purportedly provides "the contract's expected revenue based on the per member monthly fee, the number of participants, the expected contract length, and one-time fees."[28]

21.    I have reviewed the CRM data provided by Intus and analyzed its use by Dr. Hult in his damages calculations.[29] In **Exhibit 3** of this report, I reproduce the CRM data records for the ▮ business opportunities Intus purportedly lost with RTZ customers due to "EMR Data Blocking" over the October 2020 – April 2026 timeframe.[30]  In addition to the threshold

---

[24] Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One, Appendix A.

[25] RTZ0008378.

[26] Hult Report at 18, 27. Customer relationship management ("CRM") is a software system that "gathers, links, and analyzes all collected customer data, including contact information, interactions with company representatives, purchases, service requests, assets, and quotes/proposals." *See* https://www.oracle.com/cx/what-is-crm/.

[27] Hult Report at 29.

[28] Hult Report at 19.

[29] Intus 018880.

[30] The October 2020 – April 2026 date range reflects the Close Date for these alleged lost business opportunities.

*Confidential – Subject to Protective Order*

problems of causality (i.e., the complete lack thereof here) that I will also address, I note that the underlying CRM data itself includes several anomalies and inconsistencies that challenge the veracity of these affirmed "ordinary course of business" records and any analyses or calculations resulting from their use.

### i. *Intus' anachronistic and flawed CRM data*

22. Data is considered "the most critical part of any CRM software solution" with successful customer engagement and relationship strategies hinging on "accurate, complete, and accessible" customer information.[31] CRM data is a record of potential business opportunities generated and stored in a company's CRM software system in real time and updated periodically if and when additional information regarding a particular opportunity becomes available. Given the goal of CRM systems, the actionable nature of the information involved, and the serial manner in which information becomes available over time, one would expect to observe a standard chronological structure to CRM records in which a new opportunity, bid, or project is created in the system and updated with additional information (e.g., win/loss information, start date, updated pricing information, change in scope, etc.) as it becomes available over time.

23. For each of the ▇ separate records contained in the CRM data, I calculate the number of days each "lost" Intus contract was an active or prospective business opportunity as the difference in their Close Date and Created Date ("Diff days").[32] While the realities of real-world record keeping practices are likely to produce minor inconsistencies from time to time in the observed data (e.g., mock audit opportunity at Community PACE at Home that was created on 2/16/2024 but "closed" one day earlier on 2/15/2024), I observed that a substantial number of these purported lost business opportunities were only created in Intus' CRM system a significant amount of time, often years, *after* being identified as "closed" (i.e., lost) which suggests they were included ex post in Intus' CRM system (i.e., are not contemporaneous entries) and therefore not kept in the "ordinary course" of Intus' business as promoted by Dr. Hult.

24. As shown in **Exhibit 3**, fully ▇ of the ▇ lost business opportunities attributed to "ERM data blocking" in the CRM data were recorded with a "Close Date" (i.e., acknowledgement the

---

[31] https://www.oracle.com/cx/what-is-crm/.
[32] **Exhibit 3.**

8

*Confidential – Subject to Protective Order*

opportunity was no longer available) that predates the date the specific record was created ("Created Date").   Accounting for the four or five observations whose Diff days could reasonably be categorized as "minor record keeping inconsistencies", the average number of days the remaining business opportunities were recorded in Intus' CRM system <u>after</u> they were determined to be lost is 641 days or 1.75 years. Give the real-time value of this (and similar) customer/opportunity-based information, the recording of such information often (multiple) years after the fact would have essentially zero actionable business use.   For example, three lost "Pop Health" opportunities at Senior Care Partners PACE were "created" in the CRM system on August 26, 2024 for opportunities that were identified as closed (lost) as of November 18, 2020, January 1, 2022, and January 1, 2023. Given the role of CRM software plays in real-time relationship management, populating a CRM system with information on a nearly four year old lost business opportunity implies a non-standard intent, and indicating that such an opportunity was lost as a result of "EMR data blocking" nearly <u>two years before</u> the very conduct is alleged to have begun raises data validation concerns about the soundness of the information Dr. Hult's analysis depends upon.

25.   In **Table 1** (below), I reproduce the ▉ anomalous business opportunities from the Intus CRM data identified as having been lost due to "EMR data blocking". Sorting these lost opportunities in ascending order by Created Date reveals the following observations: 1) all but one of these multiple lost opportunities is attributable to one of four common RTZ-Intus customers, 2) these retroactively created observations are clustered around only a few dates, and 3) the error in date differences is insignificant for observations around or before the date of RTZ's alleged conduct (September 2022) but significant for observations beginning in July 2023.

*Confidential – Subject to Protective Order*

**Table 1**

| # | Organization | Created Date | Close Date | Diff (days) |
|---|---|---|---|---|
| 1 | | 6/28/22 | 5/19/22 | (40) |
| 2 | | 11/17/22 | 11/15/22 | (2) |
| 3 | | 11/17/22 | 11/15/22 | (2) |
| 4 | | 5/20/23 | 5/12/23 | (8) |
| 5 | | 7/5/23 | 10/31/20 | (977) |
| 6 | | 7/5/23 | 10/31/21 | (612) |
| 7 | | 7/5/23 | 10/31/22 | (247) |
| 8 | | 7/6/23 | 11/6/20 | (972) |
| 9 | | 7/6/23 | 11/6/21 | (607) |
| 10 | | 7/6/23 | 11/6/22 | (242) |
| 11 | | 2/16/24 | 2/15/24 | (1) |
| 12 | | 2/29/24 | 7/30/23 | (214) |
| 13 | | 8/26/24 | 11/18/20 | (1,377) |
| 14 | | 8/26/24 | 1/1/22 | (968) |
| 15 | | 8/26/24 | 1/1/23 | (603) |
| 16 | | 3/14/25 | 7/5/23 | (618) |
| 17 | | 3/14/25 | 7/5/24 | (252) |

26. **Table 2** (below) includes an additional cut of the CRM dataset, a list of 16 business opportunities that Intus alleges were lost as a result of RTZ's "EMR data blocking."[33] However, comparison of the Close Date and the RTZ Go-Live Date (i.e., the date a new system moves from testing/development into the production environment, becoming fully operational for end-users) highlights significant flaws with the CRM data: each of these opportunities is notably labeled as lost (closed) due to "EMR data blocking" even before that particular PACE organization became an actual RTZ customer (by an average of more than one year.)

---

[33] *See* **Exhibit 3** for the complete CMR dataset. I note that 10 of these observations are also included in the results in **Table 1**.

*Confidential – Subject to Protective Order*

**Table 2**

| # | Organization | RTZ Go-Live Date | Close Date | Diff (days) |
|---|---|---|---|---|
| 1 | | 9/19/22 | 10/31/20 | (688) |
| 2 | | 10/23/23 | 11/6/20 | (1,081) |
| 3 | | 10/21/21 | 11/18/20 | (337) |
| 4 | | 9/19/22 | 10/31/21 | (323) |
| 5 | | 10/23/23 | 11/6/21 | (716) |
| 6 | | 4/16/24 | 5/19/22 | (698) |
| 7 | | 10/23/23 | 11/6/22 | (351) |
| 8 | | 4/16/24 | 11/15/22 | (518) |
| 9 | | 4/16/24 | 11/15/22 | (518) |
| 10 | | 7/1/24 | 5/12/23 | (416) |
| 11 | | 4/16/24 | 8/19/23 | (241) |
| 12 | | 4/16/24 | 2/15/24 | (61) |
| 13 | | 4/16/24 | 2/15/24 | (61) |
| 14 | | 11/1/24 | 5/6/24 | (179) |
| 15 | | 11/1/24 | 5/20/24 | (165) |
| 16 | | 11/1/24 | 6/25/24 | (129) |

27.    Additionally, I observe that each of the ▉ business opportunities identified in the CRM data and reproduced in **Exhibit 3** includes, regardless of the date, the notation "EMR data blocking" as an entry in the data's "Loss Reason" category. Nine of these business opportunities labeled as lost due to "EMR data blocking" opportunities were closed <u>prior</u> to the beginning of RTZ's alleged information blocking conduct (i.e., September 14, 2022) while fully one-half ▉ ▉ ) were marked as closed prior to the date Intus filed an information blocking complaint with the Office of the National Coordinator for Health Information Technology (February 2, 2024.)[34] Both the timing and the legalese nature of this identifier suggest that this information was not recorded by Intus in the ordinary course of business. Again, this raises concerns about the reliability of the data underpinning Dr. Hult's damage analysis.

28.    That Dr. Hult fully accepts the CRM data provided by his client and assumes "this list is true and correct for the purposes of my analysis" despite the host of errors and inconsistencies that are obvious and problematic upon closer inspection generates doubts as to whether Dr. Hult's analysis derives from objective analytical scrutiny of the underlying datasets on which his conclusions are predicated.

---

[34] RTZ0000674.

11

*Confidential – Subject to Protective Order*

ii.  *Analyzing Dr. Hult's Use of Intus' CRM Data*

29.   Despite the validation issues regarding the source and reliability of the available CRM data, Dr. Hult's analysis of Intus' alleged lost revenues from "affirmatively recorded business opportunities," once stripped of the presumption of information blocking, exhibits methodological deficiencies.

30.   Dr. Hult arrives at his estimate of Intus' Lost Revenue from Affirmatively Recorded Business Opportunities by summing up the Full Duration TVC ("Total Value of the Contract") across all opportunities ( ▮▮▮▮ with an Implementation Commencement Date beginning in September 2022 and after "adjusting" this total for Dr. Hult's estimate of Intus' win rate ▮▮▮.[35]

31.   To "account for the possibility that some of these contracts are often renewed", Dr. Hult estimates additional lost revenues from the "potential renewal of these contracts" by taking the "lost revenue" from the "contracts" depicted in the CRM data and multiplying these revenues by the product of his "win rate" ▮▮▮ and his estimate of Intus' "renewal rate" ▮▮▮. Not to be outdone, Dr. Hult apparently also applies a "▮ percent annual price escalator" to the "contracts in the CRM data with an implementation date of 2025 or later" to "reflect price increases that would occur when contracts are renewed in the but-for world."[36] Dr. Hult thus estimates total lost contract renewal revenues of ▮▮▮▮ after discounting and price escalators.[37] Taken together, Dr. Hult estimates  a total of ▮▮▮▮ in alleged Intus lost revenues from "Affirmatively Recorded Business Opportunities" purportedly identified in the CRM data.

---

[35] Hult Report at 58-59. I note that Dr. Hult's proclamation that his estimate of Intus' win rate is "conservative" does not make it so. Dr. Hult's backup calculations reveal that his win rate calculation is based opportunities in 2025 only, whereas the alleged lost business opportunities include observations from 2022 ▮▮, 2023 ▮▮, 2024 ▮▮ 2025 ▮▮ and 2026 ▮▮.  In addition, ▮▮▮▮▮▮▮) of the observations used by Dr. Hult to calculate his 2025 win rate included products that were not commercially available until late-2024 (IRIS) and early-2025 (CareHub). As such, applying this 2025 win rate to opportunities allegedly lost in 2022 – 2024 overstates the probability-adjusted but-for sale.

[36] Hult Report at 63 – 64.

[37] Hult Report at 65.

*Confidential – Subject to Protective Order*

### iii. *Rebutting Dr. Hult's CRM Data Analysis*

32.    In **Exhibit 4**, I analyze the alleged lost business opportunities due to "EMR data blocking" reproduced in the CRM data produced in this matter to determine the truthfulness, accuracy, and completeness of the information that forms the basis of Dr. Hult's damages analysis. Where possible, I compare the amount and time period of the alleged lost Intus revenues set forth in the CRM data to Intus' actual monthly product-level revenues on a customer-by-customer basis.

**Capital Health LIFE**

33.    As depicted in Exhibit 5 of his report, Dr. Hult identifies three opportunities he claims Intus lost as a result of RTZ's "EMR data blocking" conduct.[38]  In **Exhibit 4**, I compare Intus' actual monthly product revenues (available through July 2025) with the monthly alignment of Intus' alleged lost revenues from the CRM data.[39] According to Dr. Hult, Intus lost three product opportunities at Capital Health LIFE identified as PopH and Consulting services that would have totaled ▉▉▉▉ in monthly revenues over the May 2024 – June 2025 timeframe.[40]

34.    However, the company's own monthly sales records over this same timeframe indicate Intus, in fact, earned revenues on the sale of PopH and Consulting to Capital Health LIFE at levels represented in Intus' CRM data through July 2025.[41]  That Intus' only product revenues from Capital Health LIFE coincide with RTZ's November 1, 2024 "Go-Live" date indicates the Dr. Hult has included revenues lost due to RTZ's alleged conduct that were simply not lost.

**Brio Living Services/Thome**

35.    In Exhibit 5 of his report, Dr. Hult includes an entry for a lost sale of "UM Consulting" services to Brio Living Services/Thome in his estimate of lost Intus revenue due to RTZ's alleged "EMR data blocking" conduct.  I note that Intus identified two lost business opportunities at Thome attributed to "EMR data blocking" but that Dr. Hult includes only the latter opportunity

---

[38] Hult Report, Exhibit 5.
[39] Intus 018877 and Intus 018880.
[40] Hult Report, Exhibit 5.
[41] Intus 018877 and Intus 018880. I note that with respect to monthly Population Health revenues, the difference between the actual revenues recorded by Intus and the revenue estimates depicted in the CRM data differ by the actual and projected number of covered patients at each facility.

*Confidential – Subject to Protective Order*

in his damages analysis.[42] According to Dr. Hult, Intus lost ▮▮▮▮ in revenues on UM Consulting as of August 2023 due to RTZ's alleged blocking conduct despite the fact that Thome would not become an RTZ customer until the following April.[43]

36.    It is important to acknowledge that although Dr. Hult dropped Intus' May 2022 lost opportunity at Thome from his damages analysis because the implementation data preceded September 2022, the CRM data produced by Intus in this case nonetheless identified this opportunity as being lost due to "EMR data blocking" despite the fact that this particular record was both "created" and "closed" months before Intus claims RTZ's blocking conduct first began in September 2022.  This fact should heighten one's suspicion with respect to the accuracy and provenance of Intus' CRM data.

## Brio Living Services

37.    The CRM data produced by Intus in this matter includes seven separate records depicting alleged lost opportunities at Brio Living Services over the January 2021 – May 2026 timeframe.[44]   While each of these alleged lost opportunities is attributed to "EMR data blocking" by RTZ, Dr. Hult logically drops both entries whose implementation date precedes the September 2022 allegations against RTZ.  As I show in **Exhibit 4**, Intus has a recurring, uninterrupted stream of monthly PopH revenues over the November 2020 – July 2025 timeframe. I note that while these monthly revenues predate RTZ's October 23, 2023 "Go-Live" date with Brio Life Services, they also continue for the subsequent two years until the final month of revenue provided in the Intus revenue spreadsheet.[45]  Over the January 2023 – July 2025 timeframe, the difference between the "lost" monthly PopH revenues claimed by Dr. Hult (▮▮▮▮ per month) versus the actual monthly PopH revenue recorded by Intus over this timeframe (an average of ▮▮▮▮ per month) can be explained by the number of actual versus expected patients.[46] Adjusting Intus' total "lost" (projected) PopH sales claimed by Dr.

---

[42] Intus 018880. Dr. Hult dropped lost business opportunities with implementation dates before September 2022. See Hult Report at fn. 36.

[43] RTZ's Go-Live data at Thome was April 16, 2024. *See* Hult Report, Exhibit 5.

[44] Intus 018880.

[45] Intus 018877.

[46] Because both Intus' actual revenue and the projected "lost" revenue from the CRM data are based on a $7 PMPM (per member, per month) rate, the expected "lost" revenues calculated in the CRM data assume more than 1,000 covered patients at Brio Living Services while the actual number of covered patients at this PACE facility is

14

*Confidential – Subject to Protective Order*

Hult over the January 2023 – July 2025 time period for the (average) actual monthly covered member at this facility reduces Dr. Hult's lost PopH revenue due to RTZ's "EHR data blocking" conduct from ▮▮▮▮ down to $▮▮▮▮ (a difference of more than ▮▮▮▮). At least with respect to PopH sales to Brio Living Services, it appears that Dr. Hult's damages calculation claiming lost PopH sales from January 2023 through July 2025 ignores actual Intus sales records to the contrary.[47]

38.    Finally, I return to an observation I made in an earlier paragraph of my report (and depicted in **Table 1**) with respect to the "batch" recording of lost business opportunities in the CRM data. As shown in **Exhibit 3**, despite implementation dates that range from January 2021 to November 2024, five of the seven lost business opportunities claimed by Intus at Brio Living Services were recorded ("created") in its CRM system on the very same day (July 6, 2023).[48] As sixth observation, an alleged lost "upsell" of Intus' IRIS product was added into its CRM system in the months leading up to Intus filing its information blocking complaint against RTZ.[49]  I note that this particular lost IRIS opportunity was added to Intus' CRM database on October 13, 2023, more than nine months prior to Intus' announced launch of the product, approximately one year before the product's first commercial sale, and more than 2.5 years before its recorded implementation commencement date. This purported lost opportunity represents the second largest lost business opportunity by revenue ($▮▮▮▮ in Dr. Hult's analysis.[50]  Dr. Hult's analysis conspicuously fails to account for any of this incongruous timeline in his calculation of this $▮▮ damage component.

### Neighborhood Healthcare PACE

39.    In **Exhibit 4**, I compare Intus' actual recorded sales over the July 2022 – July 2025 timeframe with the various alleged lost business opportunities at Neighborhood Healthcare PACE. In total, Dr. Hult includes revenues from eight of the nine business opportunities identified as

---

approximately 400 per month over the January 2003 – August 2024 timeframe. See Intus 018877, Intus 018880, and Intus 019846.

[47] The alleged lost PopH revenues calculated or assumed by Dr. Hult over the 12 month period ending in December 2023 were acknowledged as lost ("closed") by Intus in the CRM data as of November 2022, nearly a full year before Brio Living Services became and RTZ customer. *See* Intus 018880.

[48] Intus 018880.

[49] RTZ0000674.

[50] Intus 018877. https://intuscare.com/news/integrated-emr-system-for-pace/.

*Confidential – Subject to Protective Order*

"lost" due to RTZ's alleged "EMR data blocking" in the CRM data.[51]   With respect to the 2023 and 2024 ICS Consulting opportunities, Intus' monthly sales records confirm Intus did, in fact, post revenues for these products over the same time period as the alleged opportunities assumed lost due to "EMR data blocking" by Dr. Hult. Importantly, when lining up and comparing Intus' actual and alleged lost PopH sales over the relevant timeframe, it appears that Dr. Hult's calculation improperly doubles certain lost PopH revenues contained in Exhibit 5 calculations which are already included in his Exhibit 3 estimates.[52]

40.     While I note an eight month period over which Dr. Hult asserts that Intus received no PopH revenue (November 2022 – June 2023), Intus' sworn interrogatory responses state and RTZ's audit logs show Intus continually accessed Neighborhood Healthcare's PACECare system interface to extract EHR over the November 2022 – July 2025 timeframe.  As such, Dr. Hult fails to account for whether Intus' voluntary "pause" in subscription billing factors into his calculation of purported PopH revenue.[53]

### New Horizons

41.     As shown in Exhibit 4, Dr. Hult damages analysis includes ▇▇▇▇ in alleged lost Intus' revenues to New Horizons with respect to Compliance Services ▇▇▇ and IRIS (▇▇▇▇ with an implementation date of April 5, 2024 and October 18, 2024, respectively.  However, Intus' Invoicing data indicates that Intus began recording recurring revenues attributable to its IRIS product in January 2025. Again, despite Intus sales records indicating actual Intus revenues on the same product (IRIS) being sold to the same client, at/around the same time period, Dr. Hult makes no attempt to verify this alleged lost business opportunity with New Horizons.

### Brio/Huron Valley

42.     As shown in **Exhibit 3**, Dr. Hult claims a total of ▇▇▇ in alleged lost Compliance Service and UM Consulting revenues over the November 2022 through April 2025 timeframe at Huron Valley PACE due to RTZ's alleged information blocking conduct.  However, in as shown in

---

[51] Hult Report, Exhibit 5.
[52] Hult Report, Exhibit 3 and Exhibit 5.
[53] Plaintiff Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One, Appendix A. RTZ0008378.

16

*Confidential – Subject to Protective Order*

**Exhibit 4** comparison, Intus also began recording revenues for Compliance Service and UM Consulting sales to Huron Valley beginning exactly in November 2022 and continuing through July 2025. Despite the appearance that Intus sold the same products to the same customer of the same time period, Dr. Hult inexpiably includes these four "lost" opportunities due to RTZ's information blocking in his damages calculations.

43. **Exhibit 4** includes a side-by-side comparison of Intus' actual product revenues and the alleged lost opportunities at nine PACE facilities (including the PACE facilities I've expanded upon here.)

44. **Table 3** (below) includes product-level summary of Intus' purported lost revenues from CRM-recorded business opportunities that forms the basis of Dr. Hult's damages analysis.[54] Of note, fully ▮▮▮▮▮▮ of the total ▮▮▮▮▮▮ in alleged lost revenues in the CRM data are derived from products that only became commercially available 2+ years after RTZ's alleged information blocking began (IRIS and CareHub). In addition, I have been advised that CareHub is Intus' competitor EMR product and thus does not, by definition, require access to customer EMR data through PACECare or other competing EMR platform (and thus should be excluded from any damages calculation based on this fact alone.)

45. Of additional note, revenues from Intus' alleged lost business opportunities over the 2025 – 2026 timeframe amount to nearly three-quarters (73.6%) of all lost revenues assumed by Dr, Hult in his analysis.

**Table 3**

| Product | 2022 | 2023 | 2024 | 2025 | 2026 | Total |
|---|---|---|---|---|---|---|

---

[54] See Hult Report, Exhibit 5.

*Confidential – Subject to Protective Order*

46.    Finally, Dr. Hult's calculation of Intus' "lost revenue from contract renewals" is essentially a less supported carbon copy of his calculation of the alleged lost revenues from his so-called "affirmatively" recorded business opportunities with the addition of minor adjustments for a "renewal rate", a "price escalator", and discounting.

47.    The sum total of Dr. Hult's damages approach here is thus: 1) he assumes causality (that is, assumes alleged losses directly result from RTZ's alleged information blocking conduct), 2) he assumes (despite provable flaws, mistakes, apparent opportunism, and double counting) that the CRM data is true and correct, 3) he assumes the most recent calculable "win rate" is representative, 4) he assumes (with only a passing reference as support) that the lost customer opportunities in the flawed CRM data would "renew", and 5) he assumes his calculated "renewal rate" is representative.  In the end, Dr. Hult's estimates here are not principled, they're not supportable, they're not accurate, they're the product of conjecture and multiplication, and they do not and cannot reflect the underlying facts of this case.

### 3.    Intus' Alleged Lost Revenue from Unobservable Business Opportunities

48.    Remarkably, Dr. Hult estimates a third source of lost revenue from opportunities that are "unobservable" to Intus.  Dr. Hult defines these <u>unobservable</u> <u>potential</u> business opportunities as ones that "Intus was foreclosed from competing on because RTZ was denying Intus access to the clients' electronic health data" and that because Intus did not actually compete for these unknown opportunities, they "don't appear in Intus's CRM or Invoicing data."[55]  In summary, Dr. Hult attempts to estimate some amount of unobservable, potential business opportunities that were unknown to Intus, that Intus didn't compete for, and that cannot be documented.

49.    As set for in Exhibit 7 of his report, Dr. Hult identifies two categories of RTZ customers relevant to his "unobservable business opportunities" analysis: PACE programs that previously produced revenue for Intus but for which Intus has no affirmatively recorded lost opportunities (▮ programs) and PACE programs that would be potential new clients to Intus (▮ programs.)[56]

50.    In an attempt to quantify his unobservable revenue from some number of unknown potential business opportunities for some customers Intus' didn't have, Dr. Hult "compare(s) how Intus'

---

[55] Hult Report at 67.
[56] Hult Report at 70.

*Confidential – Subject to Protective Order*

revenue growth grew for clients that were impacted by RTZ's conduct (i.e., Intus clients that used RTZ as their EMR supplier) comparted to clients that were not impacted by RTZ's conduct (i.e., Intus clients that did not use RTZ as their EMR supplier)" under the assumption that Intus would have comparable levels of revenue growth for these two sets of customers.[57] However, according to Dr. Hult, the apparent difference in growth rates between RTZ-using and non-RTZ using customers represented in Exhibit 8 of his report provides graphical evidence "consistent with RTZ's conduct suppressing Intus' growth among RTZ-using clients."[58]

### i.  *Analyzing Dr. Hult's Difference-in-Differences Approach*

51. To measure whether this apparent difference in growth rates among RTZ-using and non-RTZ using customers is the result of RTZ's alleged conduct beginning in September 2022, Dr. Hult uses regression analysis to implement an approach known as difference-in-differences.[59] A difference-in-differences model rests on the assumption that the two groups being compared (here, RTZ-using and non-RTZ clients) were on similar trajectories before the alleged conduct began.

52. To begin, I reproduce the chart depicted in Exhibit 8 of Dr. Hult's report but with one important correction.  Dr. Hult erred when identifying and plotting Intus' revenues attributable to "Clients Using RTZ". Once flagged as an RTZ client, Dr. Hult attributed all revenues over the July 2020 – July 2025 time period to these customers with no consideration for the fact that a number of these clients first became RTZ customers much later on (*see* Dr. Hult's Exhibit 7). As shown in Table 4, this one correction to Dr. Hult's graphical presentation of Intus' revenue data indicates a violation of the pre-period parallel trends assumption, a critical requirement for a valid difference-in-differences analysis.

---

[57] Hult Report at 71.
[58] Hult Report at 72.
[59] Hult Report at 74.

*Confidential – Subject to Protective Order*



53.   Next, Dr. Hult runs a regression to test whether the two groups of interest, i.e., Intus customers who use RTZ as their EMR supplier and Intus customers who do not, have statistically different revenue trends in the period prior to September 2023.[60] Based on his regression, Dr. Hult claims there is no statistically significant difference in the revenue trends between RTZ and Non-RTZ customers "prior to September 2023 that would be driving differential growth rates between these two groups."[61]

54.   Dr. Hult's regression is flawed and his results are incorrect. In **Table 5** (below), I first replicate and then correct Dr. Hult's regression. The necessary corrections made to Dr. Hult's regression show that there is, in fact, a statistically significant difference in the revenue trends of RTZ and Non-RTZ customers in the (correct) pre-conduct period, a result that violates the parallel trends assumption required under a difference-in-differences analysis.

---

[60] Hult Report at 91.
[61] Hult Report at 91.

*Confidential – Subject to Protective Order*

**Table 5**

| VARIABLES | Dr. Hult | Corrected |
|---|---|---|
| Revenue Type | | |
| Implementation | -1.668*** | -1.299*** |
| | (0.256) | (0.387) |
| Recurring | 0.563*** | 0.494 |
| | (0.207) | (0.303) |
| Product | | |
| PopH | 0.769*** | |
| | (0.177) | |
| UM | -0.838*** | |
| | (0.217) | |
| Trend | 0.113* | 0.0168*** |
| | (0.0623) | (0.00569) |
| Non-RTZ Client | 26.24 | -116.7*** |
| | (47.48) | (17.70) |
| Non-RTZ Client*Trend | -0.0332 | 0.157*** |
| | (0.0623) | (0.0237) |
| Intercept | -77.50 | -3.632 |
| | (47.43) | (4.218) |
| | | |
| Observations | 117 | 65 |
| R-squared | 0.759 | 0.738 |
| Blocking Date | September 2023 | September 2022 |
| All Customers Included | NO | YES |

Robust standard errors in parentheses
*** $p<0.01$, ** $p<0.05$, * $p<0.1$

55.    The first column of **Table 5** reproduces the parallel trends regression results included in the Hult Report.[62]   To correct Dr. Hult's regression, I made two adjustments: first, I reversed Dr. Hult's sample restriction by including RTZ customers with revenues in the CRM and Invoicing data and second, I used the September 2022 alleged conduct date that Dr. Hult has assumed and relied upon throughout his report.[63]  As set forth in the second column of **Table 5** ("Corrected"), the necessary corrections to Dr. Hult's methodology indicate that there is a

---

[62] Hult Report at 91.
[63] Dr. Hult's provides a dubious explanation (i.e., "to avoid potential double counting") for restricting his sample set of RTZ customers in his parallel trends regression.

21

*Confidential – Subject to Protective Order*

statistically significant difference in the revenue trends between RTZ and Non-RTZ customers in the pre-conduct period.

ii. *Analyzing Dr. Hult's Main Regression Specification*

56. Dr. Hult's main regression specification is fairly straightforward, he regresses the natural log of revenue (to measure proportional changes in revenue) on a set of explanatory variables including product (Consulting, IRIS, PopH, UMasS), revenue type (fixed, recurring, implementation revenue), an indicator for whether revenue was from clients that used RTZ, and a conduct period indicator defined as any month including or after the date the alleged conduct began.[64]

57. The coefficient of interest for estimating lost profits from Dr. Hult's regression is the coefficient on the interaction term. This term measures whether, and by how much, revenues during the conduct period for non-impacted clients (Intus clients that did not use RTZ as their EMR provider) differed compared with alleged impacted clients (Intus clients that did use RTZ) after controlling for other factors that could impact revenue.[65] Among the "several additional considerations" in his analysis, Dr. Hult includes: 1) a difference-in-difference cutoff date of September 2023, 2) weighting his regression by total revenue, 3) restricting the analysis to customers who do not have lost revenue in either the CRM or Invoicing data, 4) dropping all observations from 2000, and 5) dropping CareHub revenues from the analysis.[66]

58. Dr. Hult begins his damages analysis acknowledging "[m]y analysis assumes the RTZ's information-blocking conduct began in September 2022."[67] Despite this assumption, Dr. Hult's regression model does not use September 2022 as the dividing line between the "before" and "after" conduct periods. Instead, Dr. Hult arbitrarily shifts that line forward by a full calendar year to September 2023.[68] The practical effect of this arbitrary shift is that there are now twelve months of data following the alleged conduct that are now treated in the model as if the conduct had not yet occurred. Dr. Hult offers two reasons for this shift: a delay between the conduct and its revenue impact, and the fact that the affected clients had limited revenue

---

[64] Hult Report at 76.
[65] Hult Report at 77.
[66] Hult Report at 78 – 81.
[67] Hult Report at 14.
[68] Hult Report at 78.

*Confidential – Subject to Protective Order*

with Intus before September 2023.[69] Neither reason is justified or can be factually supported. As a matter of basic research design, a difference-in-differences model requires that the pre- and post-periods be defined around the actual event under study.[70] If the conduct began in September 2022, the model should measure its effect from that point forward. Redefining the start date to produce a better-fitting model raises the question of why the model cannot produce reliable results using the date that the Plaintiff itself identifies as the start of the harmful conduct.

59.    Dr. Hult reports that his DiD regression produced a positive and statistically significant coefficient on his Non-RTZ * Post-RTZ Conduct interaction term.[71] However, based on my review and replication of his analysis, I find his approach here to be both flawed but easily corrected.

60.    In **Table 6** (below) I reproduce the results from Dr. Hult's main regression specification ("Dr. Hult") and my regression results after making the necessary corrections to his analysis ("Corrected").

---

[69] Hult Report at 78.

[70] Wooldridge, J. M. (2002). *Econometric analysis of cross section and panel data* (2nd ed.). MIT Press., pp 129-130.

[71] Hult Report at 83 and Exhibit 9.

*Confidential – Subject to Protective Order*

**Table 6**

| VARIABLES | Dr. Hult | Corrected |
|---|---|---|
| Revenue Type | | |
| Implementation | -0.954*** | -0.420 |
| | (0.310) | (0.313) |
| Recurring | 0.478*** | 1.043*** |
| | (0.149) | (0.156) |
| Product | | |
| IRIS | 1.179*** | 0.712*** |
| | (0.136) | (0.157) |
| PopH | 1.035*** | 0.446*** |
| | (0.0968) | (0.116) |
| UM | 0.354*** | -0.221 |
| | (0.129) | (0.157) |
| Non-RTZ Client | 0.639*** | 0.709*** |
| | (0.169) | (0.165) |
| Post-RTZ Conduct | 0.107 | 1.117*** |
| | (0.165) | (0.0786) |
| Non-RTZ Client * Post-RTZ Conduct | 0.790*** | 0.188 |
| | (0.190) | (0.191) |
| Intercept | 8.443*** | 7.820*** |
| | (0.206) | (0.150) |
| | | |
| Observations | 310 | 381 |
| R-squared | 0.648 | 0.532 |
| Blocking Date | September 2023 | September 2022 |
| All Customers Included | NO | YES |

Robust standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

61. As shown in Table 6, I re-ran Dr. Hult's main regression specification with the very same corrections I made to Dr. Hult's parallel trends analysis: that is, I used the monthly Intus revenue data for all RTZ customers and September 2022 as the alleged blocking date.

62. As shown in the "Corrected" column (above), the effect of using the claimed September 2022 conduct date and including the RTZ CRM and Invoicing data observations results in the coefficient on the relevant interaction term (Non-RTZ Client * Post-RTZ Conduct) becoming insignificant (i.e., the model no longer shows a statistically meaningful difference in revenue growth between the two groups after the conduct.)

63. It should be noted that this not the result of an alternative model or a different analytical approach. They are the results of Dr. Hult's own model applied to the available data and with the conduct date alleged by Intus. This, if the model only produces a meaningful result when

24

*Confidential – Subject to Protective Order*

certain affected customers are removed, the result is an artifact of that sample restriction, not a reliable measure of the economic impact of RTZ's conduct.[72]

64.    I note that in analyzing the robustness of his approach, Dr. Hult tested both January 2024 and January 2025 as alternative conduct-period cutoff dates. Because both date choices are later than September 2023, they only indicate the divergence in Dr. Hult's (flawed) approach persists once it appears, not that September 2023 is the correct date.[73]

65.    The results here are conclusive: contrary to Dr. Hult's opinion, a proper parallel trends analysis and difference-in-differences regression clearly shows both a violation of the parallel trends assumption (i.e., statistically significant differences in revenue trends in the pre-conduct period) as well as statistically insignificant effect of RTZ's alleged conduct on the revenue trends between Clients Using RTZ and those who are not.  As a result, the alleged lost Intus revenues from "unobservable business opportunities" cannot be proven (are not statistically different from $0.)

## C.  Analyzing Intus' Alleged Lost Profit Calculations

66.    In Exhibit 10 of his report, Dr. Hult summarizes the three categories of alleged Intus lost revenue "due to EMR data blocking" including lost revenues from Pre-Existing Contracts, Lost Opportunities in Intus's CRM data, and his Regression Analysis of RTZ and Non-RTZ Customers.[74]  Dr. Hult's calculations result in alleged lost Intus revenue due to RTZ's alleged information blocking conduct totaling ▮▮▮▮▮▮▮  For perspective, Dr. Hult's analysis concludes RTZ's alleged information blocking conduct beginning in September 2022 caused Intus to lose <u>more</u> revenue ▮▮▮▮▮▮ than the Intus itself earned in total over the 2021 – July 2025 timeframe ▮▮▮▮▮▮[75]

67.    To estimate Intus' lost profits on his alleged lost Intus revenues, Dr. Hult calculates Intus' product-level gross profit from Intus' consolidated profit and loss statement, the results of

---

[72] The flaw Dr. Hult's analysis is not limited to the September 2022 conduct date. Using the September 2023 date, Dr. Hult's model similarly fails to show a reliable treatment effect when all customers are included.

[73] Testing later cutoffs is mechanically expected to produce significant results: as the post-period shrinks and captures only the peak of the divergence, the interaction coefficient will remain large. This is not evidence that the model is robust, but evidence that the divergence is concentrated in the later months of the sample.

[74] Hult Report at 83 and Exhibit 10.

[75] Intus 018878.

*Confidential – Subject to Protective Order*

which are depicted in Exhibit 12 of his report.[76]  Dr. Hult "uses the gross profit margin that corresponds to the product of interest when possible" and the "average gross profit when I do not know which product was responsible for the lost profit.[77] While Dr. Hult's methodology appears to be fairly standard, his selection of Intus' margin data is not.  In Exhibit 12, Dr. Hult uses Intus' gross margins for the January – July 2025 period, despite his estimate of Intus' lost sales occurring in 2022, 2023, and 2024 as well.  Applying a higher 2025 gross margin to less profitable product sales made in 2022 overstates its profitability and inflates Dr. Hult's damages calculations. For reference, Intus' average gross profit percentage over the 2022 – July 2025 timeframe was 33.1 percent, or 40.2 % <u>lower</u> than effective gross profit margin used in Dr. Hult's calculation of lost profits.  I note that the $⬛ in lost profits constructed by Dr. Hult is more than <u>double</u> Intus' cumulative gross profits over the 2021 – July 2025 timeframe.[78]

68.  In his calculation of lost profits, Dr. Hult discounts "any future lost profits to present value using the U.S. 1-year Treasury rate of 3.65 percent" and by doing so Dr. Hult implies Intus' future cash flows have the same level of risk (i.e., essentially none) as the U.S. government.[79] A vastly better approximation of the riskiness of Intus' future cash flows would be its Weighted Average Cost of Capital (WACC), the average (borrowing) rate a company expects to pay to finance its assets with debt and equity. I understand Intus has received various rounds of venture capital funding over the past five years.[80] While I have not been provided with Intus' valuation documents with respect to these funding rounds, it's certain that its venture capital investors did not discount Intus' future cash flows at the risk free rate.[81]

---

[76] Intus 018878.

[77] Hult Report at 99.

[78] Intus 018878.

[79] Hult Report at 100.

[80] Expert Report of Peter Schwechheimer Proffered on Behalf of Defendant and Counterclaimant RTZ Associates, Inc. dated April 23, 2026.

[81] https://leeds-faculty.colorado.edu/bhagat/Bhagat-JRF-2014.pdf.  Use of the risk-free Treasure bill rate and not a discount rate the represents Intus' real-world risk profile is yet another windfall (to Intus) contained in Dr. Hult's calculations.

26

*Confidential – Subject to Protective Order*

69.     Finally, Dr. Hult reproduces a summary of additional labor costs allegedly expended by Intus, including purported technical and operational work, undertaken to "respond to RTZ related items" "related to RTZ conduct."[82] Without additional context, I simply note Dr. Hult reports these alleged additional costs in an amount equal to ▮▮▮▮▮▮.[83]

---

[82] Hult Report at 94.
[83] Hult Report, Exhibit 11.

27

Confidential – Subject to Protective Order

# EXHIBIT 2

Confidential – Subject to Protective Order

## MATERIALS RELIED UPON

**Case Filings**

1. Plaintiff's Objections and Responses to Defendant's Interrogatories, Set One – Appendix A.

**Deposition Testimony**

1. Deposition of Michael Zawadski (Feb. 23, 2026).

**Expert Reports**

1. Expert Report of Peter Schwechheimer Proffered on Behalf of Defendant and Counterclaimant RTZ Associates, Inc. dated April 23, 2026.

2. Expert Report of Dr. Kristopher Hult ("Hult Report").


**Produced Documents**

3. Intus 002026 – Intus 002028

5. Intus 002039 – Intus 002040

9. Intus 018880

9. Intus 018874

9. Intus 018877

9. Intus 018878

9. Intus 019841 – Intus 019845

9. Intus 019846

11. RTZ0000674

13. RTZ0008378

**Publicly Available Materials**

1. https://www.oracle.com/cx/what-is-crm/

2. https://intuscare.com/news/integrated-emr-system-for-pace/

3. Wooldridge, J. M. (2002). *Econometric analysis of cross section and panel data* (2nd ed.). MIT Press., pp 129-130.

4. https://leeds-faculty.colorado.edu/bhagat/Bhagat-JRF-2014.pdf.

# EXHIBIT 3

Confidential - Subject to Protective Order

**Exhibit 3**

Analysis of Alleged Lost Opportunities Recorded in Intus' CRM System

| Opportunity Name | Organization | Product | Created Date | Close Date | Diff days | Implementation Commencement Date | Sales Type | Full duration TCV | Contract Duration | Loss Reason | RTZ Go-Live Date | Included in Damages | Close Date - RTZ Go-Live (days) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 7/5/23 | 10/31/20 | (977) | 12/30/20 | Net new | | 12 | EMR data blocking | 9/19/22 | | (688) |
| | | | 7/6/23 | 11/6/20 | (972) | 1/5/21 | Net new | | 12 | EMR data blocking | 10/23/23 | | (1,081) |
| | | | 8/26/24 | 11/18/20 | (1,377) | 1/17/21 | Net new | | 12 | EMR data blocking | 10/21/21 | | (337) |
| | | | 7/5/23 | 10/31/21 | (612) | 12/30/21 | Renewal | | 12 | EMR data blocking | 9/19/22 | | (323) |
| | | | 7/6/23 | 11/6/21 | (607) | 1/5/22 | Renewal | | 12 | EMR data blocking | 10/23/23 | | (716) |
| | | | 8/26/24 | 1/1/22 | (968) | 3/2/22 | Renewal | | 12 | EMR data blocking | 10/21/21 | | 72 |
| | | | 6/28/22 | 5/19/22 | (40) | 5/19/22 | Upsell | | 15 | EMR data blocking | 4/16/24 | | (698) |
| | | | 5/13/22 | 7/5/22 | 53 | 7/5/22 | Expansion | | 12 | EMR data blocking | 8/1/21 | | 338 |
| | | | 6/16/22 | 7/5/22 | 19 | 9/3/22 | Net new | | 12 | EMR data blocking | 8/1/21 | 1 | 338 |
| | | | 11/17/22 | 11/15/22 | (2) | 11/15/22 | Upsell | | 15 | EMR data blocking | 4/16/24 | 1 | (518) |
| | | | 11/17/22 | 11/15/22 | (2) | 11/15/22 | Upsell | | 15 | EMR data blocking | 4/16/24 | 1 | (518) |
| | | | 7/5/23 | 10/31/22 | (247) | 12/30/22 | Renewal | | 12 | EMR data blocking | 9/19/22 | 1 | 42 |
| | | | 7/6/23 | 11/6/22 | (242) | 1/5/23 | Renewal | | 12 | EMR data blocking | 10/23/23 | 1 | (351) |
| | | | 11/22/22 | 1/26/23 | 65 | 1/26/23 | Expansion | | 12 | EMR data blocking | 8/1/21 | 1 | 543 |
| | | | 8/26/24 | 1/1/23 | (603) | 3/2/23 | Renewal | | 36 | EMR data blocking | 10/21/21 | 1 | 437 |
| | | | 5/20/23 | 5/12/23 | (8) | 5/12/23 | Net new | | 15 | EMR data blocking | 7/1/24 | 1 | (416) |
| | | | 2/29/24 | 7/30/23 | (214) | 7/30/23 | Upsell | | 3 | EMR data blocking | 8/1/21 | 1 | 728 |
| | | | 6/28/22 | 8/19/23 | 417 | 8/19/23 | Renewal | | 15 | EMR data blocking | 4/16/24 | 1 | (241) |
| | | | 3/14/25 | 7/5/23 | (618) | 9/3/23 | Renewal | | 12 | EMR data blocking | 8/1/21 | 1 | 703 |
| | | | 7/6/23 | 8/25/23 | 50 | 10/24/23 | Net new | | 36 | EMR data blocking | | 1 | |
| | | | 7/5/23 | 10/31/23 | 118 | 12/30/23 | Renewal | | 12 | EMR data blocking | 9/19/22 | 1 | 407 |
| | | | 8/14/23 | 12/31/23 | 139 | 12/31/23 | Net new | | 12 | EMR data blocking | 11/1/21 | 1 | 790 |
| | | | 7/6/23 | 11/6/23 | 123 | 1/5/24 | Renewal | | 12 | EMR data blocking | 10/23/23 | 1 | 14 |
| | | | 11/22/22 | 1/26/24 | 430 | 1/26/24 | Renewal | | 12 | EMR data blocking | 8/1/21 | 1 | 908 |
| | | | 11/17/22 | 2/15/24 | 455 | 2/15/24 | Renewal | | 15 | EMR data blocking | 4/16/24 | 1 | (61) |
| | | | 11/17/22 | 2/15/24 | 455 | 2/15/24 | Renewal | | 15 | EMR data blocking | 4/16/24 | 1 | (61) |
| | | | 2/16/24 | 2/15/24 | (1) | 2/15/24 | Upsell | | 3 | EMR data blocking | 9/19/22 | 1 | 514 |
| | | | 3/18/24 | 4/5/24 | 18 | 4/5/24 | Net new | | 12 | EMR data blocking | 5/1/22 | 1 | 705 |
| | | | 5/20/23 | 5/1/24 | 347 | 5/1/24 | Upsell | | 3 | EMR data blocking | 9/19/22 | 1 | 590 |
| | | | 12/14/23 | 5/20/24 | 158 | 5/20/24 | Upsell | | 12 | EMR data blocking | 11/1/24 | 1 | (165) |
| | | | 1/1/24 | 3/21/24 | 80 | 5/20/24 | Net new | | 36 | EMR data blocking | 11/1/21 | 1 | 871 |
| | | | 1/30/24 | 5/31/24 | 122 | 5/31/24 | Upsell | | 12 | EMR data blocking | 8/1/21 | 1 | 1,034 |
| | | | 5/16/24 | 6/25/24 | 40 | 6/25/24 | Net new | | 6 | EMR data blocking | 11/1/24 | 1 | (129) |
| | | | 7/19/23 | 5/6/24 | 292 | 7/5/24 | Net new | | 12 | EMR data blocking | 11/1/24 | 1 | (179) |
| | | | 6/27/24 | 8/30/24 | 64 | 8/30/24 | Upsell | | 12 | EMR data blocking | 10/23/23 | 1 | 312 |
| | | | 3/14/25 | 7/5/24 | (252) | 9/3/24 | Renewal | | 36 | EMR data blocking | 8/1/21 | 1 | 1,069 |
| | | | 1/6/24 | 8/19/24 | 226 | 10/18/24 | Net new | | 36 | EMR data blocking | 5/1/22 | 1 | 841 |
| | | | 8/8/24 | 10/31/24 | 84 | 10/31/24 | Upsell | | 12 | EMR data blocking | 7/1/24 | 1 | 122 |
| | | | 3/14/24 | 12/1/24 | 262 | 12/1/24 | Net new | | 3 | EMR data blocking | | 1 | |
| | | | 11/21/24 | 12/31/24 | 40 | 12/31/24 | Upsell | | 3 | EMR data blocking | 7/1/24 | 1 | 183 |
| | | | 7/6/23 | 11/6/24 | 489 | 1/5/25 | Renewal | | 12 | EMR data blocking | 10/23/23 | 1 | 380 |
| | | | 6/12/24 | 3/21/25 | 282 | 5/20/25 | Upsell | | 36 | EMR data blocking | 7/1/24 | 1 | 263 |
| | | | 4/5/24 | 3/31/25 | 360 | 5/30/25 | Upsell | | 36 | EMR data blocking | 8/1/21 | 1 | 1,338 |
| | | | 5/22/23 | 4/1/25 | 680 | 5/31/25 | Net new | | 36 | EMR data blocking | 2/1/24 | 1 | 425 |
| | | | 1/23/25 | 4/1/25 | 68 | 5/31/25 | Net new | $ | 36 | EMR data blocking | 2/1/24 | 1 | 425 |
| | | | 4/1/25 | 6/30/25 | 90 | 8/29/25 | Net new | | 36 | EMR data blocking | 9/19/22 | 1 | 1,015 |
| | | | 10/11/23 | 4/1/26 | 903 | 5/31/26 | Upsell | $ | 36 | EMR data blocking | 10/23/23 | 1 | 891 |

# EXHIBIT 4

Confidential - Subject to Protective Order

**Exhibit 4**
Analysis of Intus Acutal Revenues and Alleged Lost Business Opportunities

| | Revenue/Sales | Implementation Commencement | Contract | Implementation |
|---|---|---|---|---|

Confidential - Subject to Protective Order



Confidential - Subject to Protective Order

**Exhibit 4**
Analysis of Intus Acutal Revenues and Alleged Lost Business Opportunities

| Source | Customer Organization | Item Account / Opportunity | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Confidential - Subject to Protective Order



Confidential - Subject to Protective Order

**Exhibit 4**
Analysis of Intus Acutal Revenues and Alleged Lost Business Opportunities



Confidential - Subject to Protective Order



**PROOF OF SERVICE**

The undersigned declares:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and am not a party to the within action; my business address is c/o Nossaman LLP, 777 S. Figueroa Street, 34th Floor, Los Angeles, CA 90027.

On May 12, 2026, I served the foregoing **DEFENDANT'S DISCLOSURE OF REBUTTAL EXPERTS** on parties to the within action as follows:

☐ (By U.S. Mail)  On the same date, at my said place of business, Copy enclosed in a sealed envelope, addressed as shown on the attached service list  was placed for collection and mailing following the usual business practice of my said employer.  I am readily familiar with my said employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service, and, pursuant to that practice, the correspondence would be deposited with the United States Postal Service, with postage thereon fully prepaid, on the same date at Los Angeles, California.

☐ (By Overnight Service)  I served a true and correct copy by overnight delivery service for delivery on the next business day.  Each copy was enclosed in an envelope or package designated by the express service carrier; deposited in a facility regularly maintained by the express service carrier or delivered to a courier or driver authorized to receive documents on its behalf; with delivery fees paid or provided for; addressed as shown on the accompanying service list.

☑ (By Electronic Service)  Pursuant to California Rules of Court, rules 2.251, from service email address:  mwiman@nossaman.com, by emailing true and correct copies to the persons at the electronic notification address(es) shown on the accompanying service list.

☐ (By Electronic Service) Pursuant to California Rules of Court, rules 2.251, by submitting an electronic version of the document(s) to a court-approved third-party e-filing vendor, I caused the document(s) to be e-served to the person(s) listed on the attached service list.

Executed on May 12, 2026.

☑ (FEDERAL)  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Marlene Wiman
Marlene Wiman

- 1 -
PROOF OF SERVICE

70438095.v1

**SERVICE LIST**
*Intus Care, Inc. v. RTZ Associates, Inc.*
*USDC Northern District Case No. 4:24-cv-01132-JST*

| | |
|---|---|
| Epstein Becker Green<br>Charles E. Weir<br>1925 Century Park East<br>Suite 500<br>Los Angeles, CA  90067<br>Telephone: (310) 556-8861<br>Facsimile: (310) 553-2165<br>cweir@ebglaw.com). | *Attorneys for Plaintiff INTUS CARE, INC.* |
| MANATT, PHELPS & PHILLIPS, LLP<br>Charles E. Weir<br>Andrew Beshai<br>2049 Century Park East, Suite 1700<br>Los Angeles, CA 90067<br>Telephone: (310) 312-4000<br>Facsimile: (310) 312-4224<br>cweir@manatt.com<br>abeshai@manatt.com | *Attorneys for Plaintiff INTUS CARE, INC.* |
| SAVAGE LAW PARTNERS, LLP<br>C. Alexander Chiulli<br>564 South Water Street<br>Providence, RI 02903<br>Telephone: (401) 238-8500<br>Facsimile: (401) 648-6748<br>achiulli@savagelawpartners.com | *Attorneys for Plaintiff INTUS CARE, INC.* |

PROOF OF SERVICE

70438095.v1