# EXHIBIT 1

MANATT, PHELPS & PHILLIPS, LLP
Charles E. Weir (Bar No. 211091)
CWeir@manatt.com
Andrew Beshai (Bar No. 308030)
ABeshai@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Plaintiff*
INTUSCARE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUSCARE INC. <br><br> Plaintiff, <br><br> v. <br><br> RTZ ASSOCIATES, INC.; and DOES 1 through 10, <br><br> Defendants. | Case No. 4:24-cv-1132-JST <br><br> Assigned to: Hon. Jon S. Tigar <br><br> **PLAINTIFF INTUSCARE INC.'S DISCLOSURE OF EXPERT TESTIMONY UNDER FED. R. CIV. P. 26** <br><br> Complaint Filed: February 23, 2024 <br> Amended Complaint Filed: April 2, 2024 <br> Counterclaims Filed: June 20, 2024 |

Pursuant to Federal Rule of Civil Procedure 26, Plaintiff IntusCare Inc. ("Intus") discloses the identities and written report of the following expert witness:

**Shawn R. Fleury**

Under Federal Rule of Civil Procedure 26(a)(2)(B), the rebuttal report of Shawn R. Fleury is served as an enclosure to this disclosure. The report contains:

1. A complete statement of all opinions Mr. Fleury will express and the basis and reasons for

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S EXPERT DISCLOSURE

them.

2. A list of the documents and materials that Mr. Fleury considered in forming his opinions. (Fleury Report, Appendix B). The documents, facts, and data that Mr. Fleury considered are also identified throughout the report.

3. Mr. Fleury's qualifications and professional curriculum vitae. (*Id*. at Appendix A).

4. A list of all other cases in which, during the previous 4 years, Mr. Fleury testified as an expert at trial or by deposition. (*Id.*).

5. Mr. Fleury's hourly rate is $550.

Intus reserves the right to supplement these disclosures, to disclose additional expert testimony, and to rebut any expert testimony that Defendant discloses.

Dated: May 12, 2026                          MANATT, PHELPS & PHILLIPS, LLP


By: */s/ Charles E. Weir*
      Charles E. Weir
      Andrew Beshai

      *Attorneys for Plaintiff*
      INTUSCARE INC.

PLAINTIFF'S EXPERT DISCLOSURE

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE INC.<br><br>        Plaintiff,<br><br>  v.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>        Defendants. | Case No. 4:24-cv-1132-JST |

**REBUTTAL REPORT OF SHAWN FLEURY**

May 12, 2026

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.    INTRODUCTION

1.   I have been retained to serve as an expert witness by Epstein Becker & Green, P.C. ("Counsel" or "EBG"), on behalf of its client, Intus Care, Inc. ("Client" or "Intus"). I have been asked to provide my rebuttal opinion regarding the litigation between Client and RTZ Associates, Inc. and their successors ("RTZ").

2.   The opinions set forth in this report are based on my education, training, and experience, in addition to my review of the materials provided, and consultation with my team. I reserve the right to modify, amend, or add to these opinions if additional information is provided or becomes known to me.

3.   The documents I reviewed regarding this matter include, but are not limited to, the expert report of Traci Creegan, and documentation, security artifacts, and relevant materials that were obtained in the discovery process.

4.   My Curriculum Vitae is appended to this report as Appendix A, and the list of documents I have reviewed is in Appendix B.

## II.    QUALIFICATIONS

5.   My name is Shawn Fleury. I am a cybersecurity expert with approximately twenty-nine (29) years of risk management, incident response, and consulting experience. Over the course of my professional career, I have had the opportunity to assist in the assessment, development and/or strengthening of hundreds of cybersecurity programs across the private and public sectors. I am intimately familiar with the industry standards and best practices that should be included in a cybersecurity program, and I hold first-hand experience designing and implementing these practices. Additionally, I have been retained by hundreds of clients to evaluate their cybersecurity posture (including protective measures, tools and technologies, operational practices, etc.) and identify direct recommendations to enhance their cybersecurity program. I have provided cybersecurity services to organizations across a wide range of industries, including healthcare, health technology, financial, insurance, hospitality, manufacturing, energy, transportation, and government.

6.   In addition to conducting risk assessments and cybersecurity program reviews for corporations and government agencies, I have also been engaged by regulators to assist them in their examinations assessing cybersecurity programs for effectiveness. My role in these engagements has been to conduct security evaluations of corporations, assist regulators in understanding the security posture of these organizations, and provide observations on the completeness of the security programs.

7.   I am currently a Managing Director at Aletheian Labs ("Aletheian Labs"), a digital forensics and cybersecurity consulting firm. In my role at Aletheian Labs I provide expert witness and investigation services, including on engagements opining on whether an organization had a reasonable security program.

8.   Prior to my current role, I was a Vice President at Kivu Consulting ("Kivu"). In my role at Kivu, I led the Advisory Services organization, the Incident Response organizations, and the Managed Security Services organization. Through leading these organizations, I have an in-depth visibility into the tactics and techniques that threat actors are using to target and attack organizations; as well as the security controls that organizations can implement to address the risk of attack.

9.   Before joining Kivu, I was a Senior Director at Palo Alto Networks ("PANW"). In this role, I provided advisory services to corporate executives and boards regarding cybersecurity risk management, information security management, and risk management oversight. Additionally, I was frequently

engaged as a trusted advisor to assess the posture of organizational cybersecurity programs and identify opportunities for enhancement.

10. Prior to my role at PANW, I was a Director at The Crypsis Group ("Crypsis"). During my time at Crypsis, I was responsible for building the company's cybersecurity risk management service offering. While my roles and responsibilities at Crypsis were like those at PANW, I also spent a significant amount of time crafting the techniques that Crypsis consultants leveraged to deliver proactive cybersecurity services to clients.

11. Prior to The Crypsis Group, I served as a Director on the Global Cyber Risk Services practice at the global consultancy of Alvarez & Marsal ("A&M"). During my time at A&M, I conducted hundreds of cybersecurity risk assessments, in which I evaluated the organizational risk posture of both domestic and international organizations. While I worked with many different frameworks and standards at A&M, many risk assessments were conducted by leveraging the National Institute of Standards and Technology ("NIST") Cybersecurity Framework ("CSF") for control evaluation. My goal while delivering cyber risk assessments was to evaluate each organization's cybersecurity program and information security practices to identify opportunities for the enhancement of their cybersecurity posture.

12. Before joining A&M, I was a Senior Forensics Consultant at Forward Discovery Inc., a cybersecurity company that specialized in cyber risk management services. While at Forward Discovery Inc., my primary responsibility was assisting organizations with understanding their potential risk exposures. I accomplished this by analyzing each individual organization across people, process, and technology to gain a full understanding of their cybersecurity ecosystem. After fully comprehending a client's unique risk posture, I would identify security controls that could be implemented to mitigate the aforementioned risks.

13. Prior to joining Forward Discovery, I held Security Analyst roles at Dell, Inc and United Services Automobile Association ("USAA"), a financial institution headquartered in San Antonio, Texas. During my time at USAA, I was involved with third-party risk assessments for key vendors to ensure that each vendor implemented security in accordance with USAA contractual requirements.

14. I spent several years as a Computer Crime Investigator for the United States Air Force Office of Special Investigations ("OSI"). During my time with OSI, I investigated computer crimes impacting Air Force systems and/or people.

15. I have been a lecturer for the United States Department of State, Diplomatic Security Service, Cyber Training Program. As a lecturer, I have developed and delivered cyber strategy, cybersecurity, and cyber-terrorism seminars for foreign government officials, law enforcement management, and senior corporate executives in overseas countries. I deliver these seminars to assist the US government in achieving their goal of providing awareness and training to nation-states in combating cyber-related crime/terrorism. The content of my seminars include instruction on cybersecurity standards and best practices that other countries may use to protect their critical assets from cyber threat actors.

16. Neither Aletheian Labs, nor I, are involved in any aspect of the litigation matter at issue. Neither Aletheian Labs, nor I, have any financial interest in the pending litigation matter or its outcome. I am independent of the parties involved and their legal representatives. My bill rate is $550 an hour.

## III.    EXECUTIVE SUMMARY

17.  I have conducted a detailed review of information pertaining to this matter, including the Expert Report of Traci Creegan and documentation made available by counsel during the discovery process. I have developed the opinions reflected in this report.

18.  During my career, I have assessed the controls that companies implement around third-party access and have responded to incidents that included SaaS platforms.

19.  Based on my experience conducting risk assessments, responding to incidents (including of SaaS platforms), testifying on reasonable security matters, and helping organizations implement cybersecurity controls to mitigate third party access risk, I am providing rebuttal opinions related to Ms. Creegan's opinions regarding: 1) SaaS Agreements and arrangements; 2) System Access;  and 3) the Audit Log produced in this case. It is my opinion that Ms. Creegan overstates the uniformity of certain purported industry standards, and misstates or misinterprets the facts presented in this matter, which leads her to improperly opine that "it was Intus's conduct, not RTZ's, that departed from established industry standards".[1]

20.  Specifically, I rebut and respond to the following points raised by Ms. Creegan:
     i.    There is a common industry practice in Software as a Service ("SaaS") arrangements;
     ii.   Read-only access would have raised security concerns; and
     iii.  Audit logs prove Intus' access exceeded the scope of its stated data need.


## IV.    REBUTTAL OF TRACI CREEGAN OPINIONS

### A.  SOFTWARE AS A SERVICE ("SaaS") AGREEMENTS

21.  Ms. Creegan opined that "in [her] experience, the ownership structure outlined in the [PACECare] Agreement reflects common industry practice in 'Software-as-a-Service' (SaaS) arrangements. Under this type of model, the client licenses the right to use the software system but does not acquire any ownership of the system itself. The client retains full ownership of its data."[2] While the level of uniformity of software service arrangements is debatable, I agree that in this instance the PACECare Agreement Ms. Creegan cites provides that RTZ does not own any of "the data and information that [the PACE program] enters into PACECare."[3]

22.  Ms. Creegan further opines that because the software vendor (here, RTZ) does not own any of the data in PACECare, its "role is to provide, maintain, and support the system, not to own, manage, or exercise control over the access to, exchange of, or use of the client's data."[4] Again, while this is certainly a model that can apply to SaaS arrangements, it is not categorically true and it depends on the industry, applicable laws and the contract terms. Moreover, this statement is inconsistent with the facts of this case where RTZ has not taken a hands-off approach to access to and use of the client's data. Instead, RTZ has restricted access regarding how the client can and cannot share its data with parties such as Intus. RTZ included provisions in its SaaS agreements that its PACE clients could not "provide (and will expressly inform staff not to provide): . . . forms/documents/reports produced by PACECare to any internal software development team or third-party—specifically but not limited to

---

[1] *Creegan Report* ⸿ 115
[2] *Creegan Report* ⸿ 57
[3] RTZ0006181 at §7.2.
[4] *Creegan Report* ⸿ 57

Rebuttal Report of Shawn Fleury                                                        Page | 4

other software vendors competing with or seeking to compete with RTZ, including but not limited to Tabula Rasa Healthcare, Intus Care, Epic Systems, and Salesforce as well as their affiliates and agents."[5] Ms. Creegan did not consider or analyze this contract provision in reaching her conclusion. A contract provision in a SaaS agreement prohibiting the client (here, the PACE program) from sharing reports of its data with an independent contractor (here, Intus) is highly relevant to the analysis of whether the SaaS vendor is exercising control over "the access to, exchange of, or use of the client's data." Ms. Creegan's failure to address this provision undermines her opinion that it was Intus, as opposed to RTZ, that was operating outside of certain industry norms.

23. Further discussing SaaS agreements, Ms. Creegan opines that "the software vendor typically retains control of user account provisioning to ensure accurate tracking and application of licensing and pricing requirements, a function of license management, not data control."[6] Ms. Creegan relies on this observation to ultimately conclude that RTZ did not exercise control over the access to, exchange of, or use of the client's data. Ms. Creegan's opinion rests only on account provisioning and licensing/pricing requirements to reach this conclusion, and overlooks other important considerations. As explained above, Ms. Creegan did not consider or analyze the provisions in the SaaS agreement restricting PACE clients' ability to share reports of their data with independent contractors, such as Intus. Additionally, there are plenty of SaaS providers that allow for Single Sign On ("SSO"), self-service portals, or other mechanisms for allowing customers to manage their own user accounts. Ms. Creegan is factually wrong in her opinion that software vendors typically retain control over user provisioning. It is common for software vendors to sell a certain number of seats and the contracting party can apportion those seats to whomever they want. It is more uncommon for software vendors such as RTZ to dictate to clients who can and cannot receive access, and how data stored on its software system can flow among the client's organization and vendors. In this case, Intus did have authorized user accounts at certain points in time and those accounts were either provisioned by RTZ, on behalf of their mutual clients, or by the clients directly.

24. Ms. Creegan notes that: "[the PACECare agreement] prohibits clients from attempting to reverse engineer the system or provide access to third parties for that purpose. These restrictions govern how PACECare may be accessed and used as a software system; they have no bearing on whether PACE facilities can access, exchange, or use their own EHI."[7] However, the PACECare SaaS agreement does not limit the sharing of reports to only those entities seeking to reverse engineer the PACECare system. Rather, the language of the agreement is broad and prohibits sharing "forms/documents/reports produced by PACECare"[8] with any third party, regardless of the purpose of the third party's use of the data. Ms. Creegan, therefore, appears to have added her own narrow interpretation to the agreement that is not found in the plain language of the contract. For that reason, Ms. Creegan's conclusion that the restrictions in the SaaS agreement "have no bearing on whether PACE facilities can access, exchange, or use their own EHI" rests on an incomplete reading of the PACECare SaaS agreement including, but not limited to, the contract terms.

---

[5] RTZ0000814; RTZ0000819; RTZ0000824; RTZ0000827; RTZ0000847

[6] *Creegan Report.* ¶ 58

[7] *Creegan Report* ¶ 61

[8] RTZ0000814; RTZ0000819; RTZ0000824; RTZ0000827; RTZ0000847

## B. SYSTEM ACCESS

25. Ms. Creegan opines that Intus' "request for 'read-only access to [RTZ's] system' further illustrates the problem. A request of this nature, seeking access to the EHR UI rather than to specific EHI, would immediately raise security concerns for any EHR vendor and require further discussion before any action could be taken. As stated in paragraph 50, it is not standard practice for an EHR developer to provide system-level UI access in response to a request for EHI."[9] For this proposition, Ms. Creegan relies on a single quote extracted from a larger email thread.[10]

26. Before responding to Ms. Creegan's points, it is important to place the quote she relies on in the context of the larger email exchange. The thread begins with a client, Senior Care Partners, asking its independent contractor, Intus, to send API specifications to RTZ so that Intus could access Senior Care Partners' data and provide its analytics service. A representative from RTZ responds to the thread and invites Intus to provide its API specifications for review. There is no indication in the email thread that RTZ was unable or unwilling to provide API access at this point. Intus' Alex Rothberg responds with the data that Intus needs to service its client and states, "I hope that this will provide a sufficient backdrop for a more in-depth technical conversation about how you are most comfortable with providing regular access to the information." Nowhere in the initial response does Mr. Rothberg ask for User Interface ("UI") access; quite the opposite, he invites a conversation with RTZ to see how it is "most comfortable with providing regular access to the information". RTZ does not respond. Roughly one week later, Intus' Evan Jackson follows up and asks RTZ for a status update. RTZ does not respond. Another week passes and Senior Care Partners follows up. RTZ then responds, stating that it "does not have any questions on what was shared" by Intus, and asks Intus to re-send its API specifications. The next day, Mr. Rothberg responds that Intus would like "read-only access to [PACECare]" but only "as a starting point." Mr. Rothberg goes on to explain that the goal would be to consume the clients' data from PACECare "via API or otherwise," and he requests "read-only access" in order to assess "what the structures and promises of [RTZ's] data output are" to inform further discussion.

27. Ms. Creegan's opinion that Intus, through Mr. Rothberg, sought read-only access to PACECare is missing the context of the larger email. From this single quote, Ms. Creegan concludes that Intus sought "access to the EHR UI rather than to specific EHI," which according to Ms. Creegan would "immediately raise security concerns for any EHR vendor and require further discussion before any action could be taken."[11] This conclusion is misplaced for several reasons.

28. First, the context of the email indicates that Intus was seeking read-only access "as a starting point" and that its goal was to consume the clients' data from PACECare "via API or otherwise." Put differently, the context of the larger email casts doubt on the notion that system-level access was Intus' goal at the time. Additionally, the read-only access being requested is via API not via UI. In fact, at no point in the email that Ms. Creegan is relying on did Intus request UI access to the system. In her response to the email thread, Ms. Emery proposes to "set up a call to discuss the details of the transmission." This phrasing does not indicate UI access, as UI access would not typically be phrased as the transmission of data; there is nothing in this email to indicate that either party was discussing

---

[9] *Creegan Report* ¶ 75
[10] INTUS 001464 - INTUS 001473
[11] *Creegan Report* ¶ 75

Rebuttal Report of Shawn Fleury                                                              Page | 6

the use of UI access at this point in time. As such, Ms. Creegan misinterprets the facts or was not provided with all of the facts, and the opinion omits crucial context.

29. Second, the notion that Mr. Rothberg's request would "immediately raise security concerns" is unfounded. As I noted, the reference to "read-only access" was in reference to read-only API access. Ms. Creegan's interpretation of the request is inaccurate in the API use case. If we consider Ms. Creegan's incorrect interpretation of UI access being requested, I still find her opinion inaccurate. Ms. Creegan failed to explain what security concerns were implicated, as the UI access is the same access that RTZ provides to all of its PACE clients. There is no indication anywhere in Ms. Creegan's report that Intus sought or obtained access to any source code or other proprietary, programmatic components of PACECare beyond the UI. In my experience, a mere request for access to a UI does not immediately raise security concerns; rather, the context in which the request is made must be considered. A request from a client's vendor, at the client's behest, with a full explanation of the purpose for the request, does not raise security concerns. Furthermore, I have seen many examples of platform vendors choosing to provide access to a third party via a UI. It is not an uncommon practice as Ms. Creegan attempts to construe it. It is relatively common for parties to agree to share information via a mechanism that works for both parties, whether we are discussing APIs, Secure File Transfer Protocol ("SFTP"), or direct UI. Each method has its own strengths and weaknesses, and a request for any of them would not raise a security concern.

30. Third, Ms. Creegan notes that Mr. Rothberg's request would "require further discussion before any action could be taken," but she ignores the portions of the email thread where Mr. Rothberg invites further discussion by stating: "I hope that this will provide for a more in depth technical conversation about how you are most comfortable with providing regular access to the information."[12] Not only does Ms. Creegan fail to analyze this part of the email thread, but she also does not reference ensuing emails after May 2021 in which Intus acknowledges RTZ's right to secure its program and proposes, "using a data extract approach, [to] only access the programs' EHI."[13] Again, Ms. Creegan failed to consider the full context of negotiations before concluding that Intus' request posed a security concern.

31. Ms. Creegan also opines that "Under standard industry practice, EHR vendors do not initiate or implement interfaces or data exchange connections to third-party vendors unless a mutual client, the healthcare organization that owns and controls the EHI, requests such an integration. Because the EHI belongs to the client, not the EHR vendor, the client is responsible for determining which external systems or vendors should receive, access, or exchange that information. Accordingly, EHR vendors generally rely on their customers to specify the third-party systems they wish to integrate with, and any proposed integration typically requires technical, security, and contractual assessments before it can be enabled. It is against this backdrop of established industry practice that Intus' conduct must be evaluated."[14] Under standard industry practice, the client can specify the external system, independent contractor, or vendor that should receive access to and integrate with its EHI on an EHR. It is not a deviation from standard practice for the client to allow the independent contractor or vendor to specify and negotiate the technical, security, and contractual issues with the EHR provider, with the client's consent and knowledge. That is exactly what was occurring in this matter. Rothberg Deposition Exhibit 63 is a 3-party conversation between RTZ (platform provider), Intus (third-party

---

[12] Rothberg Deposition Exhibit 63
[13] RTZ0000208
[14] *Creegan Report* ⁋ 93

vendor) and Senior Care Partners P.A.C.E. (customer). A close reading of the email highlights the fact that the customer was making the request for integration services. RTZ deviated from common industry practices in that it did not follow its client's (and the owner of the data) request to permit Intus' access.

### C.  AUDIT LOGS

32. Ms. Creegan opines that "Audit log evidence confirms Intus's access exceeded the scope of its stated data need".[15] However, this opinion is incorrect and conflicts with the facts.[16]

33. First, Ms. Creegan bases her opinion on one email chain[17] where Mr. Rothberg, in an email dated April 26, 2021, listed the following requirements[18]:

> "Patient:
> > Name, Medicare ID, Medicaid ID, Race, Address, Living Situation, Birthday,
> Enrollment Status, Diagnosis Codes (ICD-10), Care Team, Care
> > Facility, Careplan, Gender, Medications, Disenrollment Reason, MemberId
>
> Utilization:
> > All incident data including Falls, Burns, Infections, General
> > > -time occurred, time discovered, reported by, patient, location, severity,
> etc
> > All admissions including Inpatient, SNF, ALF, ER, etc.
> > > -start date, end date, principalDX, admittingDX, facility name, admission
> type, discharge status, etc."

34. The email notes that Medications are included under the Patient data that is being requested, which likely corresponds to the "redirect.main.meds.new" module. As such, Ms. Creegan's opinion that this module falls outside of the request is unsupported and factually incorrect. Also significant is the inclusion of the abbreviation "etc." in the requirements, which indicates that additional data elements may be necessary to complete Intus' responsibilities to its customer. My review of the modules that Ms. Creegan characterizes as "beyond the scope" determined that each of them could reasonably be categorized into the types of data that Intus was requesting. Additionally, there is at least one follow-up email[19] from Mr. Rothberg to Mr. Zawadski on May 27, 2021, which contained a spreadsheet[20] where additional data elements were outlined.

35. Second, RTZ was not the owner of the EHI in the system. This is made clear in the contracts between RTZ and its customers and, as such, RTZ should have had no role in determining which data a

---

[15] *Creegan Report* VI.C.

[16] The fact that this opinion is faulty impacts the accuracy of any opinions relying on this opinion, including opinions by Peter Schwechheimer.

[17] INTUS 001464 – INTUS 001473

[18] See INTUS 001467 – INTUS 001468 for the complete email content.

[19] INTUS 001519

[20] INTUS 001520

customer's authorized third party should or should not access. If RTZ had concerns, it was free to raise them with its customers, but as Ms. Creegan concedes it was ultimately the customers' responsibilities, as the data owner, to make such a determination.

36. Third, there is no evidence in the logs[21] that Intus exceeded the permissions of the accounts which had been provisioned by RTZ. If Intus' access should have been limited, that could have been accomplished during the account provisioning process, of which my understanding is that RTZ was provisioning Intus accounts in the 2021 – 2022 timeframe. Additionally, if certain modules were so sensitive as to raise confidentiality concerns surrounding what RTZ claims is proprietary information, RTZ itself could have structured its access in such a way as to render those modules off limits to users. After all, my understanding is that Intus could access only the areas of PACECare that were also available to the PACE clients. Put differently, RTZ's concern that access to certain modules posed security or confidentiality concerns is belied by the fact that RTZ made those modules available to its PACE clients and to Intus. Ms. Creegan does not address or account for these facts in any way.

37. Fourth, Ms. Creegan had access to PACECare, but makes no mention of doing anything to evaluate its functionality or the various fields in the audit log. For example, the audit logs[22] all contain the word "redirect." That may be part of the reporting function and not a direct user interface. There is no way to determine what the mode of access was without reviewing the database schema, which Ms. Creegan does not indicate she did while forming her opinion, even though it was available to her.

38. Finally, the number of times that certain modules were accessed by Intus' assigned accounts is noteworthy. Table 1 details the total number of audit log entries for each module name identified by Ms. Creegan as being accessed "outside of [the] scope"[23] or "unrelated to the scope"[24] of Intus' stated data needs.[25] As evident in Table 1, 13 of the 19 modules were accessed fewer than 100 times. I would expect a higher volume of audit log entries if there was systematic data mapping occurring by Intus.

| Module Name | Count of Audit Log Entries |
|---|---|
| redirect.issue.manager | 78 |
| redirect.main.advancedirective | 35 |
| redirect.main.assessmentManager.specific | 8 |
| redirect.main.careplan | 5 |
| redirect.main.claims | 16 |
| redirect.main.efilecabinet | 123 |
| redirect.main.meds.new | 723 |
| redirect.main.membership | 2 |
| redirect.main.notegrievance | 17 |
| redirect.main.notesManagement | 12,886 |
| redirect.main.pacequalitydata2018 | 206 |

---

[21] RTZ0008378

[22] RTZ0008378

[23] *Creegan Report* ¶ 109

[24] *Creegan Report* ¶ 111

[25] As aforementioned, this opinion is incorrect and conflicts with the facts. As such the number of Audit Log Entries for a module is ultimately immaterial.

| Module Name | Count of Audit Log Entries |
|---|---|
| redirect.main.physicianOrder | 4 |
| redirect.main.prospectmanager | 169 |
| redirect.main.psychiatricNotesManagement | 39 |
| redirect.main.recording | 13 |
| redirect.main.service.v2 | 7 |
| redirect.main.servicePlan | 2 |
| redirect.main.vitalSignsList | 349 |
| redirect.to.outreach.inquiry | 51 |
| **Grand Total** | **14,733** |

*Table 1: Count of Audit Log Entries for Modules*

## V.    CONCLUSION

39. For the reasons stated above, it is my opinion that Ms. Creegan overstates the uniformity of certain purported industry standards and misstates or misinterprets certain facts presented in this matter. Specifically, Ms. Creegan's opinion that Intus' requests and conduct was outside of industry norms is incorrect. Based on the facts of the case, it is my opinion that it was RTZ who deviated from industry norms related to SaaS contracting arrangements and claimed security concerns. I also find that Ms. Creegan's opinion that the audit log evidence confirms Intus' access exceeded the scope of its stated data needs is incorrect and conflicts with the facts.

/s/ Shawn R. Fleury
May 12, 2026

# APPENDIX A

# Shawn R. Fleury

**ALETHEIAN LABS**
**Managing Director, January 2026 to Present**
Gulf Breeze, FL
Mobile: (234) 244-7236
shawn@althlabs.com

Provide digital forensic and cybersecurity consulting services in litigation matters, regulatory inquiries, and internal investigations.

**KIVU CONSULTING**
**Vice President, Advisory Services,** November 2023 – January 2026
Gulf Breeze, FL
Mobile: (234) 244-7236

Led incident response, proactive, and managed security advisory teams, with responsibility for team utilization, quality assurance, and business development. Directed and executed complex incident response, post-breach remediation, and cybersecurity transformation engagements. Designed and delivered advisory services to help clients identify, assess, and mitigate cybersecurity risk.

Significant cases included:

- Testifying expert in a business email compromise matter involving a seven-figure fraudulent wire transfer, providing opinions on security controls, business practices, and industry standards.
- Testifying expert in a business email compromise matter involving multiple wire transfers, providing opinions on security controls, business practices, industry standards, and the normal course of business between the parties.

**UNIT 42 SECURITY CONSULTING - PALO ALTO NETWORKS (Formerly Crypsis; Acquired in 2020)**
**Senior Director,** September 2020 – November 2023
**Director,** May 2019 – September 2020
Gulf Breeze, FL

Provided proactive risk management services based on information security best practices. Led digital forensics and incident response teams supporting internal investigations, data breach incidents, litigation matters, and regulatory inquiries.

Significant cases included:

- Consulting expert for a large global financial services company in data breach litigation, leading a team that evaluated the reasonableness of cybersecurity controls and supported expert report development and deposition strategy.
- Engaged as a testifying expert for a regional healthcare organization involved in data breach litigation alleging a lack of reasonable security in place at the time a data breach occurred.
- Provided strategic cybersecurity services to a large municipality that had suffered a ransomware attack, enabling operational recovery, development of an improved security posture, and facilitating long-term risk mitigation.
- Advised the Security Steering Committee for a large health care organization and audited the progress of the effectiveness and efficiency for the cybersecurity program that was being developed and implemented.
- Provided investigative support to a state Attorney General's office, including defining data request scope, document review, and advising on industry best practices and regulatory requirements.

**ALVAREZ & MARSAL (Formerly Forward Discovery; Acquired in 2012)**
**Director,** September 2012 – May 2019
**Senior Forensics Consultant,** November 2010 – September 2012
New York, NY

Managed network intrusion response efforts, including investigation and remediation activities. Conducted acquisition and forensic analysis of digital media to support investigations and legal matters. Led e-discovery investigations and provided consulting services involving personal computers, file servers, email systems, mobile devices, and removable media. Provided investigative consulting related to intellectual property theft, intrusion detection, and analysis of end-user computer activity. Delivered instruction and training in digital forensics, including mobile device analysis, incident response, and Macintosh forensics.
Significant cases included:

# ALETHEIAN LABS
## DIGITAL FORENSICS

- Testifying expert for a case involving a Payment Card Industry (PCI) data breach. Provided an expert report, deposition, and testimony on the facts related to the case.
- Consulting and testifying expert for a case involving the ownership of a system that had been acquired during the acquisition of a regional primary educational institution. Conducted a forensic analysis of the system and reviewed documents related to the acquisition process. Provided multiple expert reports during the engagement.
- Conducted hundreds of security assessments while employed at A&M. The assessments included work with organizations in the following industry verticals: Insurance, Financial, Health Care, Retail, Government, and Manufacturing. Additionally, led the efforts to develop a pre-bind insurance assessment methodology while at A&M.
- Conducted an 8-week NIST risk and gap evaluation of a major healthcare insurer who served more than 50M insured. The assessment included reviewing audits, policies, HIPAA compliance, HITrust Certification, and 800-53 self-attestations. During the assessment over sixty-five leadership and SME interviews were conducted. A report was provided to the State insurance regulator to assist the regulator with a better understanding of how they could better utilize NIST to conduct future NAIC examinations.
- Provided Cellebrite Certification Course training to law enforcement agencies on the collection of digital evidence from cellular devices.

## U.S. DEPARTMENT OF STATE ANTI-TERRORISM ASSISTANCE PROGRAM
**Instructor,** January 2011 – November 2019
Washington DC

Provided advisement, training, briefings, and presentations to foreign law enforcement officers on areas including cyberterrorism and cybercrime. Provided technical computer investigation training to law enforcement and governmental agencies worldwide. Created course content on digital forensics, network forensics, and mobile device forensics.

These courses included:

- Basic Incident Response Course, Colombian National Police Bogota, Medellin
- Cellular Communications Forensics Course, Multiple Locations: India, Mexico
- Encase I, Jordanian National Police, Amman Jordan
- Encase II, Multiple Locations: New York, Texas, Jordan
- Introduction to Digital Forensics Investigations, Jamaica
- Identification and Seizure of Digital Evidence, Multiple Locations: Trinidad and Tobago, Mexico
- Principles of Internet Investigations Course, Bosnia
- Mastering Macintosh Forensics, Mexico City, Mexico
- XRY and Cellebrite Training Course, Jordan
- Social Media Investigations Course, Kosovo

## DELL TECHNOLOGIES
**Security Analyst,** August 2007 – November 2010
Round Rock, TX

## USAA
**Security Analyst,** August 2005 – November 2007
San Antonio, TX

## U.S. AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS
**Computer Crime Investigator,** January 2003 – May 2005
San Antonio, TX

Investigative support for crimes alleged to have been committed by Air Force personnel. Types of cases included murder investigations and child exploitation investigations. Provided information security briefs to bases supported by Detachment 401.

## U.S. AIR FORCE
**Communication and Electronic Specialist,** October 1997 – December 2002
Multiple Duty Stations

## EDUCATION
**PARK UNIVERSITY**
B.S., Management/Computer Systems Information, 2006

**ALETHEIAN LABS**
DIGITAL FORENSICS

**COMMUNITY COLLEGE OF THE AIR FORCE**
Associate in Applied Science, Criminal Justice, 2004
Associate in Applied Science, Electronic Systems Technology, 2002

## TESTIMONY

September 2025: Provided deposition testimony for Gideons International v Monex, Inc f/k/a Tempus, Inc, State Court of Tennessee.

July 2025: Provided oral testimony for American Deposit Management v. Iron Bend in Wisconsin Arbitration.

May 2025: Provided a declaration for Gideons International v Monex, Inc f/k/a Tempus, Inc, State Court of Tennessee.

April 2025: Provided deposition testimony for American Deposit Management v. Iron Bend in Wisconsin Arbitration

January 2025: Provided a declaration for American Deposit Management v. Iron Bend in Wisconsin Arbitration.

September 2019: Provided oral testimony on the findings identified in a PFI Report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A. State Court of Illinois, Case No. 2016-L-006874.

April 2019: Provided deposition on the findings identified in a PFI Report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A., State Court of Illinois, Case No. 2016-L-006874.

March 2019: Provided a declaration on the findings identified in a PFI Report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A., State Court of Illinois, Case No. 2016-L-006874.

August 2018: Provided a declaration related to the sale of certain assets and the ownership of data thereafter for Cadence Education, LLC, v. James L. Vore, et al., State Court of Kansas.

March 2017: Provided a declaration related to proposed redactions of a PFI report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A., State Court of Illinois, Case No. 2016-L-006874.

March 2014: Provided expert report and oral testimony related to the alleged theft of intellectual property in CMA v. Lakshminarayanan Thiagarajan, State Court of Virginia.

## PRESENTATIONS

April 2025: Evolution of Crisis Communication Panel - NetDiligence Conference
November 2024: Tackling the AI Threat Landscape - KivuCast
October 2024: Ransomware Advisory Board – NetDiligence Conference
October 2023: Unit 42 Current Threat Assessment & Predictions – CyberCon 2023
May 2022: Cyber Security in the Ransomware Age – Professional Liability Defense Federation
February 2022: Unit 42 Breach Readiness Cybersecurity Leaders Exchange – Palo Alto Networks
August 2020: Insider Threats and Hunting with the Enemy – Blackhat USA 2020
October 2019: GDPR Update – NetDiligence Conference
September 2019: Fines of Fury (CCPA) - Dorsey
March 2017: M&A Transactions: Negotiating the Deal with Due Diligence – The Knowledge Group

# APPENDIX B

# APPENDIX B: Documents Reviewed

**<u>Case Materials:</u>**
All documents cited in my report that are not cited herein.
Complaint filed on February 23, 2024
Amended Complaint filed on April 02, 2024
Defendant RTZ Associates, Inc.'s Answer to First Amended Complaint and Counterclaims filed on June 20, 2024
Plaintiff's Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One and Appendix A dated December 16, 2024
Plaintiff's Intus Care, Inc.'s Motion for Partial Summary Judgment filed on April 18, 2025 (REDACTED)
Amended Scheduling Order filed on September 30, 2025
Defendant's Disclosure of Experts dated April 23, 2026
Intus Database Log.xlsx

**<u>Deposition Materials</u>**
Deposition Transcript of Lauri Wertz dated August 19, 2025
Deposition Transcript of Evan Jackson dated November 25, 2025
Deposition Transcript of Michael Zawadski dated February 23, 2026
Deposition Transcript of Alexander Rothberg dated February 27, 2026
Deposition Transcript of Evan Walters dated March 16, 2026
Deposition Transcript of John Robert Felton dated April 8, 2026
Exhibit 23 - Deposition of Lauri Wertz dated August 19, 2025
Exhibit 28 – Deposition of Evan Jackson dated November 25, 2025
Exhibit 49 - Deposition of Michael Zawadski dated February 23, 2026
Exhibit 50 - Deposition of Michael Zawadski dated February 23, 2026
Exhibit 63 - Deposition of Alexander Rothberg dated February 27, 2026
Exhibit 66 - Deposition of Alexander Rothberg dated February 27, 2026

**<u>Production Data</u>**
Intus 001350.yaml
Intus 001351.yaml
Intus 001352.yaml
Intus 001353.yaml
Intus 001354.yaml
Intus 001355.yaml
Intus 001356.yaml
Intus 001357.yaml
Intus 001358.yaml
Intus 001359.yaml
Intus 001360.yaml
Intus 001361.yaml
Intus 001362.yaml
Intus 001363.yaml
Intus 001364.yaml
Intus 001519.pdf
Intus 001520.xlsx
Intus 002105.pdf

# APPENDIX B: Documents Reviewed

Intus 002205.pdf
Intus 002384.pdf
Intus 002989.pdf
Intus 003704.pdf
Intus 003831.yaml
Intus 003832.yaml
Intus 003833.yaml
Intus 003834.yaml
Intus 003835.yaml
Intus 003836.yaml
Intus 003837.yaml
Intus 003838.yaml
Intus 003839.yaml
Intus 003840.yaml
Intus 003841.yaml
Intus 003842.yaml
Intus 003843.yaml
Intus 003844.yaml
Intus 003845.yaml
Intus 004131.pdf
RTZ0000020.pdf
RTZ0000189.pdf
RTZ0000243.pdf
RTZ0000477.pdf
RTZ0000512.pdf
RTZ0000660.pdf
RTZ0000668.pdf
RTZ0000807.pdf
RTZ0000809.pdf
RTZ0000814.pdf
RTZ0000819.pdf
RTZ0000824.pdf
RTZ0000827.pdf
RTZ0000847.pdf
RTZ0002801.pdf
RTZ0005665.pdf
RTZ0006181.pdf
RTZ0007280.pdf
RTZ0007671.pdf
RTZ0008378.XLSX
RTZ0008384.pdf

## PROOF OF SERVICE

*IntusCare Inc. v. RTZ Associates, Inc.*
U.S.D.C. – Northern District of California Case No. 4:24-cv-1132-JST

I, Rebecca Blake, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is MANATT, PHELPS & PHILLIPS, LLP, 2049 Century Park East, Suite 1700, Los Angeles, California 90067. On **May 12, 2026**, I served the within:

### PLAINTIFF INTUSCARE INC.'S DISCLOSURE OF EXPERT TESTIMONY UNDER FED. R. CIV. P. 26

on the interested parties in this action addressed as follows:

| | |
|---|---|
| David C. Lee, Esq.<br>NOSSAMAN LLP<br>50 California Street, 34th Floor<br>San Francisco, California 94111<br>Phone: 415.398.3600<br>Fax:   415.398.2438<br>Email: dlee@nossaman.com<br><br>Assistant: Marlene Wiman<br>Email: mwiman@nossaman.com | *Attorneys for Defendant*<br>RTZ ASSOCIATES, INC |
| Kasia Penn, Esq.<br>NOSSAMAN LLP<br>18101 Von Karman Avenue, Suite 1800<br>Irvine, California 92612<br>Phone: 949.833.7800<br>Fax:   949.833.7878<br>Email: kpenn@nossaman.com | *Attorneys for Defendant*<br>RTZ ASSOCIATES, INC. |

☒ **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically from my e-mail address, rblake@manatt.com at Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the person(s) at the electronic mail addresses listed above. The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on **May 12, 2026**, at Los Angeles, California.

_____
Rebecca Blake

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

PROOF OF SERVICE

404785217