NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:   415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878

Attorneys for Defendant and Counter-claimant
RTZ ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>            Plaintiff,<br><br>       vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>            Defendants, | Case No:      4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)** |
| RTZ ASSOCIATES, INC.,<br><br>            Counter-claimant,<br><br>       vs.<br><br>INTUS CARE, INC.,<br><br>            Counter-defendant. | Date:          July 2, 2026<br>Time:          2:00 p.m.<br>Courtroom: 6 |

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

# TABLE OF CONTENTS

**Page**

I.    ARGUMENT ........................................................................................................................1

    A.    Hult's Assumption of Lost Data Access in September 2022 Is Contradicted by the Evidence and Renders His Opinions Irrelevant and Unreliable ........................................................................................................1

    B.    Hult's Assumptions for His Pre-Existing Contracts Category ($182,512) Are Contradicted by the Evidence, and His Opinions Are Irrelevant and Unreliable ........................................................................................................2

    C.    Hult's "Unobservable" Lost-Revenue Category ($4,048,059) Is Built on a Pyramid of Speculation, Misapplies the Methodology, and Is Unreliable ..............3

        1.    Hult's Core Assumption Is Unsupported and Untestable ............................4

        2.    The Data Are Insufficient ...........................................................................6

        3.    The Forward Extrapolation Has No Evidentiary Basis................................7

        4.    Hult's Faulty Benchmark for the Pre-Conduct Period Invalidates His Analysis ...............................................................................................7

        5.    Hult's RTZ-Client Classification Error Invalidates His Model...................8

    D.    Hult's Opinions of CRM-Based Losses ($8,942,498) Are Unreliable ...................9

        1.    These Opinions Rest on Unverified, Self-Serving Plaintiff Designations................................................................................................9

        2.    The CRM Data Is Riddled with Anomalies That Hult Simply Ignores.......................................................................................................10

        3.    Intus' Own Sales Records Contradict Hult's Claimed Losses...................11

        4.    Hult's Renewal Revenue Projection ($3,696,519) Is Unreliable...............12

    E.    Hult's $164,658 in Unreliable "Labor Costs" Includes AI-Generated Nonsense ...............................................................................................................13

    F.    Hult Ignored Alternative Causes, Rendering His Opinions Unreliable................14

    G.    Hult's Profit-Margin Conversion Opinion Is Unreliable .....................................15

    H.    Hult's Application of a Risk-Free Treasury Rate Is Unreliable ...........................16

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT
(REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT
NO. 189)

70568244.v2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azco Biotech, Inc. v. Qiagen, N.V.*,
No. 12CV2599 BEN (DHB), 2015 WL 12516014 (S.D. Cal. Nov. 12, 2015)........................11

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ........................................................................................14

*Columbia First Bank, FSB v. United States*,
60 Fed. Cl. 97 (2004) ..............................................................................................5, 7, 14

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ........................................................................................1

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..........................................................................................................4, 5

*Jacked Up, LLC v. Sara Lee Corp.*,
291 F. Supp. 3d 795 (N.D. Tex. 2018), *aff'd*, No. 3:11-CV-3296-L, 2018 WL
2064126 (N.D. Tex. May 2, 2018)........................................................................................13

*Kincaid & King Const. Co. v. U. S. for Use of Olday*,
333 F.2d 561 (9th Cir. 1964) ........................................................................................10

*Lyman v. St. Jude Med. S.C., Inc.*,
580 F. Supp. 2d 719 (E.D. Wis. 2008)..................................................................................13

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988) ........................................................................................5, 9

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
632 F. Supp. 3d 1108 (S.D. Cal. 2022)..................................................................................7, 8

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) ....................11

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016)....................6, 8, 9

*Seattle-First Nat. Bank v. Randall*,
532 F.2d 1291 (9th Cir. 1976) ........................................................................................10

**Other Authorities**

Fed. R. Evid. 702 ........................................................................................................ *passim*

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

Fed. R. Evid. 702(b) .................................................................................................................................1, 2

Case No. 4:24-cv-01132-JST
RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT
(REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT
NO. 189)

70568244.v2

## I.    ARGUMENT

Opinions regarding lost profits for new businesses are fertile ground for *Daubert* exclusions, as they are inherently speculative. Here, a major red flag is that Hult's estimated lost revenue (before deductions) of ▮▮▮▮▮ *exceeds Intus's entire earned revenue in the roughly five-year period for which he had actual historical data* (▮▮▮▮▮). (Lee Decl., Ex. 1 [Hult Rep.] at Ex. 10.) Hult achieves this eye-popping figure via a series of unsupported assumptions that are contradicted by the actual evidence and misapplication of the relevant methodologies.

Although Intus argues for a liberal *Daubert* review and repeatedly attempts to shift the burden onto RTZ to prove that Hult's opinions are *not* reliable, that is not the standard. Indeed, the Ninth Circuit recently "confirm[ed] that a proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and that there is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). As detailed below, Hult's opinions fail under this standard and must be excluded.

**A.  Hult's Assumption of Lost Data Access in September 2022 Is Contradicted by the Evidence and Renders His Opinions Irrelevant and Unreliable**

It is undisputed that the starting point for Hult's opinions is his assumption that Intus lost access to data stored in RTZ's PACECare system in September 2022. But Intus cannot evade its own admissions that it had ongoing user access to the PACECare system licensed to RTZ-Intus common customers as recently as December 2024. (Lee Decl., ¶ 3, Ex. 2 [Intus's Objections and Responses to Interrogatories] at 5:10-7:13.) (*See also id.*, Ex. 3 [Expert Rebuttal Report of Peter Schwechheimer ("Schwechheimer Rep.")] at ¶ 10 n.6 (RTZ's access logs confirm Intus maintained broad access to PACECare at certain customer sites through January 2026), & Ex. 4 [Deposition of Michael Zawadski ("Zawadski Dep.")] at 64:3–24 (confirming Intus could obtain all relevant electronic health record ("EHR") data through PACECare's expanded report functionality without RTZ support).) An expert opinion that is not "based on sufficient facts or data" is neither relevant not reliable. Fed. R. Evid. 702(b).

Intus now argues that its ongoing data access after September 2022 was not sufficiently

70568244.v2

direct and repeatable to provide its services to clients. But this is mere attorney argument, unsupported by Hult's methodology. Hult admitted that his analysis failed to consider any distinction between access to RTZ's PACECare software and access to the patient data itself, nor had he ever considered how his opinions would be affected if Intus in fact had data access. (Lee Decl., Ex. 11 [Hult Tr.] at 46:8-48:11.) Hult also did nothing to verify his assumption that Intus could no longer perform its services after September 2022. (*Id.* at 50:8-51:12.) Accordingly, his opinions are not relevant or reliable under Rule 702, as Hult failed to account for the evidence of Intus's ongoing access and/or whether it was still able to provide services after September 2022.

### B. Hult's Assumptions for His Pre-Existing Contracts Category ($182,512) Are Contradicted by the Evidence, and His Opinions Are Irrelevant and Unreliable

Intus dismisses the specific evidence contradicting Hult's pre-existing contracts damages opinions as to all four Intus clients at issue, arguing essentially that the jury should examine all the evidence and decide whether to credit Hult's testimony. But the very purpose of the Court's gatekeeping function under *Daubert* is to *prevent* unreliable expert testimony from being presented to the jury—and that is precisely why Hult's opinions should be excluded. Indeed, Hult admitted that his damages calculations for all four clients are questionable because there is "a general factual question as well as to which – whether each of those were lost as a result of RTZ's conduct." (Lee Decl., Ex. 11 [Hult Tr.] at 33:23-25.) The specifics as to each customer confirm that Hult's opinions do not rest on "sufficient facts or data." Fed. R. Evid. 702(b).

BoldAge. Hult assumed that for BoldAge and every client in this category, Intus lost revenue because RTZ caused Intus to be "unable to serve these clients" (*id.*, Ex. 11 [Hult Tr.] at 54:15-24) and thus unable to collect payment. (*Id.* at 55:15-17.) But Hult testified that he did not know "what type of data access Intus had with BoldAge." (*Id.*, Ex. 11 [Hult Tr.] at 66:9-14.). In fact, the evidence shows that Intus was not "unable" to collect revenue but instead unilaterally decided to "pause" its billing, while BoldAge would continue to "have access to the Intus Care platform,"—thus clarifying that Intus was still providing its services to BoldAge. (*See id.*, Ex. 6 [Intus 019841].) Further, Intus could still access all relevant EHR data it needed from BoldAge

70568244.v2

through PACECare's "expanded report" functionality. (*Id.*, Ex. 4 [Zawadski Dep.] at 64:3-24.)

Community PACE ("CP"). Hult relies on a single March 13, 2024 email from CP to opine on alleged lost revenue from October 2022 through June 2023. (*See id.*, Ex. 1 [Hult Rep.] ¶¶ 51-52; *id.*, Ex. 6 [Intus 019841-42].) Obviously, an email sent more than eight months after the alleged period of lost revenue does not support Hult's opinion, and Intus does not argue otherwise. Indeed, Hult forthrightly admitted this email "is not showing that the[y] lost revenue from [CP] at the October 2022 period" and that he "didn't have a specific piece [of evidence] from the record to tie to that [CP] contract in September 2022." (*Id.*, Ex. 11 [Hult Tr.] at 67:13-68:6.) In fact, Intus's monthly sales records show no connection between the email and the claimed losses. (*Id.*, Ex. 3 [Schwechheimer Rep.] ¶ 16.) Hult conceded that other than this irrelevant email, "I don't have any other factual items" to support the alleged cessation of revenue between October 2022 and June 2023. (*Id.*, Ex. 11 [Hult Tr.] at 71:2-12.) Hult also did not know what contract (if any) was in place for CP in this period, what services CP received from Intus, or whether Intus still had access to CP data during this period. (*Id.* at 68:19-69:24.)

Senior Care Partners PACE ("SCP"). Hult's opinion as to lost revenue from SCP lacks even more supporting facts or data. Intus does not dispute Hult's inability to cite any "evidentiary examples" linking these alleged losses to RTZ. (Lee Decl., Ex. 1 [Hult Rep.] at Ex. 3.) In fact, Intus voluntarily paused SCP's billing, as it did with BoldAge. (*See id.*, Ex. 7 [Intus 002062].) Further, Intus admits it maintained system user access to SCP's PACECare system throughout nearly the entire timeframe of Hult's claimed losses. (*See id.* ¶ 3, Ex. 2 [Objections & Responses to Interrogatories] at 5:10-7:17.) Hult simply ignored the contradictory evidence.

Neighborhood Healthcare PACE ("NH"). Intus does not dispute that Hult's opinion regarding lost NH revenue lacks any "evidentiary samples" tying claimed losses to RTZ. (*Id.*, Ex. 1 [Hult Rep.] at Ex. 3.) Nor does it dispute that Intus had continuous access to NH's data during the entire period of the claimed losses. (Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 19.)

**C. Hult's "Unobservable" Lost-Revenue Category ($4,048,059) Is Built on a**

Case No. 4:24-cv-01132-JST

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

**Pyramid of Speculation, Misapplies the Methodology, and Is Unreliable**

It is undisputed that there is no evidence that the purported "unobservable" business opportunities that Hult opines on ever actually existed. Hult admits he had no Intus data to support these "opportunities." (Lee Decl., Ex. 1 [Hult Rep.] ¶ 67.) There were no bids, proposals, communications, preliminary discussions, or expressions of interest to support Hult's speculation that such "opportunities" existed. (*Id.*, Ex. 11 [Hult Tr.] at 146:14-148:10.) He also concedes his opinion attributes "lost" revenue to entities that "have never produced revenue for Intus and would, therefore, be potential new clients" (*id.*, Ex. 1 [Hult Rep.] ¶ 70). Yet he concludes that these entities would have become Intus clients only because they are on ***RTZ's*** client list. (*Id.*, Ex. 11 [Hult Tr.] at 149:9-22.) He identifies no methodology for this intellectual leap, because there is none. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Nor does Hult identify any supporting facts or data for three assumptions that serve as the foundation for his "unobservable" damages calculations: (1) that potential clients were "aware of RTZ's [alleged] information blocking conduct," (2) that this "awareness" is the sole reason the potential clients never approached Intus for business, and (3) that these potential clients actually had existing business opportunities available to offer to Intus (though Intus was never aware of any such opportunities). (Lee Decl., Ex. 1 [Hult Rep.] ¶¶ 68-69.) Without any supporting data, this is no more than rank speculation. Indeed, it is undisputed that Hult did nothing to verify whether any such potential clients were aware of RTZ's alleged conduct, or whether these potential clients had ever even heard of Intus. (*Id.*, Ex. 11 [Hult Tr.] at 152:9-153:13.)

Moreover, Hult's opinions calculating "unobservable" lost revenue should be excluded in light of his failure to properly apply the difference-in-differences regression methodology.

### 1. Hult's Core Assumption Is Unsupported and Untestable

Hult's difference-in-differences regression analysis rests on his core assumption that absent RTZ's alleged conduct, two groups would have shown parallel revenue growth: (1) clients who used RTZ's PACECare and therefore were affected by RTZ's alleged conduct, and (2)

70568244.v2

clients who did not use RTZ and were therefore unaffected. (Lee Decl., Ex. 1 [Hult Rep.] ¶ 71.)

Hult claims these two groups would have comparable revenue growth but for RTZ's conduct based on his unsupported assumption that "outside of the firm that hosts their electronic health records, these clients face similar market forces, pricing, and sales practices." (*Id.*) But he identified no facts or data to justify those critical baseline assumptions. He cites no market survey, pricing data, or sales data, and plainly did not actually verify whether both groups had "similar market forces, pricing, or sales practices." (*Id.*) Expert opinion should be excluded where it is "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146; *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (expert properly excluded as expert's speculation on lost profits had no basis in the record, did not consider market conditions, and simply attributed all lost profits to the acts of opposing party). Intus failed to respond to this argument in its Opposition, and has thus conceded the point.

It is self-evident that if factors other than RTZ's conduct caused the two groups to diverge, then their divergence is irrelevant to this case. Hult nonetheless failed to account for any other factors potentially responsible for the divergence he finds. For example, it is uncontested that Intus was an unproven startup business in a rapidly expanding market where client revenue levels diverge for many reasons (e.g., product launches, geographic expansion, entry of other competitors, etc.) (Mot. at 10:9-16). Yet Hult did not consider those or other relevant factors, i.e., whether any potential customers were a good fit for products Intus offered, or whether there were any budget, timing, procurement, or implementation factors at play—instead, he just "assum[ed] they would [work] with Intus" regardless. (Lee Decl., Ex. 11 [Hult Tr.] at 156:14-157:3.)

Intus claims (without any supporting citation) that Hult's difference-in-differences analysis "is controlling for other factors with his use of Intus' 'win rate.'" (Opp. at 13:10.) There are at least two problems with this. <u>First</u>, nothing in Hult's opinions supports that assertion— indeed, Hult did not even *mention* the purported ███ "win rate" when explaining how he calculated the "unobservable" losses. (Lee Decl., Ex. 1 [Hult Rep.] at ¶¶ 66-91.) In fact, Hult applied the "win rate" only to the CRM-based damages. (*Id.* at ¶19.) <u>Second</u>, the "win rate" itself

70568244.v2

is unreliable, because Hult did nothing to validate it. Instead, he blindly accepted Intus's self-reported wins and losses for a 10-month period. (Lee Decl., Ex. 11 [Hult Tr.] at 131:23-133:16.) Hult never looked at Intus's win/loss rate at any other time, and assumed the narrow slice of win/loss data Intus chose to send him was accurate and "representative" without any factual basis. (*Id.* at 136:5-139:14.) Thus, there is no support for Intus's specious assertion that the "win rate" accounts for all other market factors in Hult's opinions regarding "unobservable" losses.

### 2.   The Data Are Insufficient

As detailed in the Motion (at 11:5-12:4), Hult's regression analysis is faulty due to his arbitrary choices regarding important data points (i.e., his exclusion of unfavorable data points), resulting in insufficient facts or data to support his opinions. In response, Intus argues that faults in Hult's underlying data and his use of it go to the weight of his testimony rather than its admissibility. (Opp. at 13:19-12.) While that might be true if there were only a few such faults, here the foundation of Hult's analysis is so riddled with holes that the entire structure falls. *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 401-407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) (analyzing the collective problems with an expert's regression analysis and holding that taken together the many issues required exclusion).

While Intus argues that Hult considered some variables (specifically product and revenue type) (Opp. at 14:18-19), that does not remedy his failure to account for other major data points, including differences between the clients in Hult's two groups (size, geography, contract vintage) or his weighting the regression by revenue, and completely excluding from his analysis certain customers and products and all data from 2020. (Mot. at 11:12-12:4.) His use of a customer fixed-effects model (Opp. at 14:21-25) is not a cure because such a model "looks at how revenues change within a client" over time—it does not control for differences between *different* client groups (e.g., those who used RTZ and those who did not). (Lee Decl., Ex. 1 [Hult Rep.] at ¶ 75 & fn. 54.) Thus, when RTZ's expert ran a regression analysis removing Hult's arbitrary data restrictions, the model no longer shows a statistically meaningful difference in revenue trends between the groups. (Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶¶ 55, 62–63.) *See Reed Const.*

- 6 -                                              Case No. 4:24-cv-01132-JST

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

*Data Inc.*, 49 F. Supp. 3d at 407 (expert model fails under Rule 702 when "very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions").

### 3. The Forward Extrapolation Has No Evidentiary Basis

Next, Hult's extrapolation to the future based on the speculative lost revenue figure he calculated from September 2023 through July 2025 is not supported by sufficient facts and data. Intus argues that the projection of future lost revenue is supported because Hult used Intus's existing data and then extrapolated to the future. (Opp. at 16:1-17.) But that misses the point, which is that the 78.2% multiplier Hult used for this calculation derives from "unobservable" opportunities which—by definition—left no footprint in Intus's historical data, making Hult's extrapolation inherently untethered from any factual record. *See Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 121 (2004) (lost profits multiplier was "insufficiently rooted in the evidence in the real world to support damages in any reasonably certain amount").

### 4. Hult's Faulty Benchmark for the Pre-Conduct Period Invalidates His Analysis

Finally, Hult egregiously erred by using a pre-conduct period that ends in September 2023. Because Intus alleges the wrongful conduct began in September 2022, Hult's pre-conduct period overlaps with the alleged conduct period *by an entire year*. Because selection of a proper benchmark period is critical to this methodology, Hult's failure to use the correct benchmark alone requires exclusion of Hult's regression analysis. The Opposition simply ignores this issue.

A regression methodology "requires an expert to first identify a benchmark period free of [wrongful] conduct and a damages period when the allegedly [wrongful] conduct occurred." *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1165 (S.D. Cal. 2022). Only by understanding how other factors impacted the plaintiff during the "clean" pre-conduct period can an expert reasonably identify what (if any) effect can be attributed to the defendant's actions in the conduct period. "Thus, a sound econometric approach to selecting these periods is essential to the validity of the entire analysis." *Id.* at 1166. In *Persian Gulf*, an expert's regression analysis was excluded where he selected a benchmark pre-conduct period of 10 years that actually contained more than four years of wrongful conduct. *Id.* at 1167. This

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

"methodological flaw in framing his benchmark period render[ed] his analysis irrelevant to Plaintiffs' case" because plaintiffs' theory of liability was that defendant engaged in wrongful conduct during the benchmark pre-conduct period. *Id.*

Where (as here) the pre-conduct period overlaps substantially with the alleged conduct period, the regression analysis "falls apart"—and "[w]hen the fundamental principles that a methodology is based on are disregarded in this way, it is not 'shaky but admissible evidence' with conclusions that should be tested by cross-examination. ***Rather, the underlying methodology is so flawed that the analysis is rendered unreliable and cannot be cured by the adversarial process at trial.***" *Id.* at 1168 (emphasis supplied). *See also Reed Const. Data Inc.*, 49 F. Supp. 3d at 400 ("[T]o be admissible, a regression analysis must examine an appropriate selection of data. When constructing a benchmark statistic, the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger.").

Here, Hult states that his "calculations assume RTZ's conduct had an effect starting in September 2022" (Lee Decl., Ex. 1 [Hult Rep.], ¶11), consistent with Intus's allegations that RTZ's wrongful conduct began in September 2022. (Dkt. 25 [Amended Complaint], ¶¶37, 54.) But by using a purported "clean" pre-conduct period that includes an entire year of the purportedly wrongful conduct up through September 2023, Hult disregards the fundamental principles of the regression methodology and his "analysis is rendered unreliable and cannot be cured by the adversarial process at trial." *Persian Gulf*, 632 F. Supp. at 1168. When RTZ's expert ran a corrected regression analysis with a conduct period beginning in September 2022, it showed a statistically significant difference in the revenue trends between RTZ and non-RTZ customers *before* September 2022. "[W]here, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702. Scientific conclusions cannot depend upon the arbitrary choice of parameters.*" Reed Const. Data Inc.*, 49 F. Supp. 3d at 407.

5. Hult's RTZ-Client Classification Error Invalidates His Model

A final flaw in Hult's methodology is his error in identifying the "treated" group—clients

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

who used RTZ and were allegedly affected by RTZ's conduct. For every entity that was ever flagged as an "RTZ client," Hult attributed the *entirety* of each such client's revenue from July 2020 to July 2025 to the "Clients Using RTZ" group, regardless of *when* that entity first became an RTZ customer. (Lee Decl., Ex. 1 [Hult Rep.] at Ex. 7; Lee Decl., Ex. 3 [Schwechheimer Rep.] at ¶ 52.) Because many of these entities did not actually become RTZ customers until much later than July 2020, this error skews Hult's analysis and inflates his damages calculations. (*Id.*) As demonstrated by RTZ's expert, correcting this one erroneous data point in the difference-in-differences analysis results in a divergence between the "treated" and "control" groups that *pre-dates* RTZ's alleged wrongful conduct by approximately a year. (Lee Decl., Ex. 3 [Schwechheimer Rep.] at ¶ 52 & Table 4.) *See Reed Const. Data Inc.*, 49 F. Supp. 3d at 407.

### D. Hult's Opinions of CRM-Based Losses ($8,942,498) Are Unreliable

#### 1. These Opinions Rest on Unverified, Self-Serving Plaintiff Designations

Intus fails to show that Hult did more than blindly accept Intus's self-identified █ opportunities allegedly lost as a result of RTZ's conduct without validating that the CRM data Intus sent to him tied to any source data. Intus oddly argues that Hult "validated" the CRM data by relying on "CRM data extracts" provided by Intus and his "discussions with Intus personnel." (Opp. at 17:4-16.) But this just doubles down on the statement that Hult relied on (1) what Intus told him in CRM data extracts and (2) Intus's verbal repetition. That is not a "validation" via source data; it is just a longer way of saying Hult blindly adopted the CRM data as accurate based on Intus's mere say-so—despite the many discrepancies in the CRM data that would have led any reasonable expert to seek verifying source data rather than relying on unsupported assumptions. *McGlinchy*, 845 F.2d at 807. Instead, Hult explicitly assumed all █ "opportunities" "that Intus contends were lost as a result of RTZ's information blocking conduct" were lost only for that reason: "I assume this list is true and correct for the purposes of my analysis." (Lee Decl., Ex. 1 [Hult Rep.] at ¶ 57.) Hult never even saw any CRM data identifying any opportunity loss reason other than RTZ's alleged conduct. (*Id.*, Ex. 11 [Hult Tr.] at 93:3-15.)

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

### 2. The CRM Data Is Riddled with Anomalies That Hult Simply Ignores

Hult also assumed that Intus maintained its CRM data in the "ordinary course of business." (Lee Decl., Ex. 11 [Hult Tr.] at 75:8-10.) Yet the CRM data shows just the opposite. A full ▮ of the ▮ CMR entries Hult relied upon were recorded with a "Closed Date" (noting when the opportunity was lost) that pre-date the "Created Date" (when the record was first entered into the system), revealing that the entries were created in hindsight rather than contemporaneously. (*Id.*, Ex. 3 [Schwechheimer Rep.] at ¶¶ 23–25 & Table 1.)

Hult admits that these were not contemporaneous business records; when Hult asked about the data inconsistencies, he was told by an unidentified Intus employee that in addition to clerical errors, Intus also "revisited" entries and changed the CRM data. (*Id.*, Ex. 11 [Hult Tr.] at 113:15-114:4.) Hult was also told that Intus has no log of changes it made to the CRM data, making it impossible for Hult to identify what changes were made, or even whether Intus serially altered the CRM data it provided to him. (*Id.* at 114:6-115:12.) This admits that the CRM data are ***not*** contemporaneous records made in the ordinary course of business. *See, e.g., Seattle-First Nat. Bank v. Randall*, 532 F.2d 1291, 1296 (9th Cir. 1976) ("'[A]ny trustworthy habit of making regular business records will ordinarily involve the making of the record contemporaneously.'") (quoting 5 Wigmore, Evidence 1526 (3rd ed. 1940); *Kincaid & King Const. Co. v. U. S. for Use of Olday*, 333 F.2d 561, 564 (9th Cir. 1964). It is also an admission that the CRM data are inherently unreliable because they contain an unknowable number of unidentified data changes that Intus made in hindsight (presumably, once it decided to litigate).

Intus seeks to minimize this issue, arguing that only ▮ of the opportunities Hult relies upon had date differences greater than eight days. (Opp. at 20:7-10.) First, the fact that 17 of these entries had date discrepancies shows that Hult's assumption that the CRM data provided by Intus "is true and correct" is not grounded in sufficient facts and data. (See Lee Decl., Ex. 1 [Hult Rep.] at ¶ 57.) Second, ▮ of those ▮ entries had date discrepancies that ranged from a difference of 40 days up to 1,377 days, and the *average* difference was 641 days (nearly two years). (*Id.*, Ex. 3 [Schwechheimer Rep.] at ¶¶ 24–25 & Table 1.) Despite this obvious

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

unreliability in the CRM data, Hult nonetheless blindly accepted the CRM data as "true and correct" without any effort to validate it. Hult also ignored the fact that Intus labeled █ of the █ CRM entries as "lost" due to "EMR data blocking" before the entities at issue had even become customers of RTZ, effectively backdating Intus's claimed "losses" by an average of over a year. (*Id.* ¶ 26 & Table 2.) Intus's Opposition makes no attempt to explain this obvious reliability failure in the CRM data and Hult's resulting opinions.

Nor did Hult address the fact that █ of the █ CRM entries were marked "closed" *before* September 14, 2022—Hult's assumed date when RTZ's wrongful conduct began and caused these losses. (*Id.* ¶ 27.) Obviously, a cause comes before the effect; it does not work in reverse. While Hult excluded █ of those clearly incorrect entries from his analysis (*Id.*, Ex. 11 [Hult Tr.] at 124:25-127:15), he provides no justification for his continued assumption that the CRM data was "true and correct," nor any explanation for why he excluded only █ of these █ erroneous entries. Intus's Opposition is also silent on this issue. Given the systemic unreliability of the CRM data Intus cherry-picked for Hult's use, his CRM-based opinions are not rooted in sufficient facts or data to pass muster under Rule 702.

### 3. Intus' Own Sales Records Contradict Hult's Claimed Losses

A diligent comparison of Intus's actual sales records with its CRM-recorded "lost" opportunities shows that Intus in fact earned revenue from the very same products and clients Hult erroneously claims resulted in lost revenue. For example, as to Neighborhood Healthcare PACE, Intus's CRM data claims the 2023 and 2024 ICS Consulting opportunities were "lost," while Intus's monthly sales records confirm Intus posted revenues from the same customer for the same products over the same time period in which these sales were supposedly "lost." (Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 39.) Intus argues that these discrepancies are explainable because a customer "may" have continued paying Intus while declining an expansion, renewal, or "new product opportunity" (Opp. at 21:26-28), but cites no evidence for that speculation or support in Hult's report. Further, "renewals" and "new product opportunities" are not relevant, because the purportedly "lost" sales are for the *ongoing* sales of the *same product*—not a

- 11 -                                         Case No. 4:24-cv-01132-JST

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

renewal or a new product. Hult's failure to validate his purported "lost" revenue figures with Intus's actual sales data cannot be salvaged by speculative attorney theories about what "may" explain the evidence that Hult uses to calculate millions of "lost" dollars never actually lost.

4.   Hult's Renewal Revenue Projection ($3,696,519) Is Unreliable

Hult's renewal projection for the CRM damages category stacks speculation upon speculation to create a pyramid of inferences that cannot support his opinions. *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1021 (N.D. Cal. 2018), *aff'd,* 815 F. App'x 117 (9th Cir. 2020) (rejecting lost profits analysis of expert who "relied on 'no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises'"); *Azco Biotech, Inc. v. Qiagen, N.V.*, No. 12CV2599 BEN (DHB), 2015 WL 12516014, at *2 (S.D. Cal. Nov. 12, 2015) (excluding lost profits opinion where expert failed to base claims upon historical data or a similarly situated company; "Unestablished businesses generally cannot recover lost profits because such damages are 'uncertain, contingent and speculative.'").

Hult starts with a ▮ "win rate" that he blindly accepted and made no attempt to validate, based solely on Intus's self-reported wins/losses in a 10-month period from January 1, 2025 to October 15, 2025. (Lee Decl., Ex. 11 [Hult Tr.] at 131:23-133:16.) Hult ignored Intus's win/loss rate for all other periods—both before 2025 and after October 15, 2025—and assumes that Intus's handpicked slice of win/loss data is "representative" of the whole without any factual basis. (*Id.* at 136:5-139:14.) Intus sidesteps this and instead argues that a recent win rate is "more likely" to be a fair representation of the percentage of opportunities it might have won during the CRM damages period. (Opp. at 23:11-14.) But Intus cites no evidence to support its argument, because there is none. (*See id.*) In fact, Hult's CRM damages period begins in September 2022, so it is nonsensical to ignore all win/loss data from 2022 to October 2025. (Lee Decl., Ex. 1 [Hult Rep.] at Ex. 6.) Indeed, of the ▮ "lost" opportunities he identifies, ▮ were "lost" in 2022, 2023, and 2024—compared with only seven in 2025 and 2026. (*Id.*, Ex. 1 [Hult Rep.] at Ex. 5.) He offers no factual support for his assumption that the narrow, 10-month period he used for his

- 12 -                                    Case No. 4:24-cv-01132-JST

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

"win rate" is "representative." Indeed, it actually *excludes* Intus's most recent win/loss data from October 15, 2025 through early 2026, despite Intus's argument that recency equals accuracy.

Atop this speculative "win rate," Hult stacked a ▮ renewal probability. The ▮% renewal rate depends on Hult's unsupported assumptions that (a) Intus would have won each of the CRM opportunities at a ▮% rate; (b) that the hypothetically-won contracts would have renewed at a ▮ rate; and (c) that every "renewed contract would have the same terms as the original contract in terms of length and revenue." (*Id.*, Ex. 1 [Hult Rep.] at ¶ 63.)

Finally, Hult stacks yet another inference: a ▮ annual price escalator based on his assumption that 100% of the theoretically-renewed contracts would have contained such a price increase. (*Id.* at ¶ 64.) Intus's argument that this is supported by data is unavailing; Hult merely states that Intus "may" apply price escalations on renewal, and based upon his "understanding" that "Intus sought to include such price escalator provisions in all contracts around the beginning of 2025" (an understanding for which Hult identifies no data source at all), so he assumed that all renewals "with an implementation date in 2025 or later incorporate and apply a ▮ percent annual price escalator." (*Id.*) Of course, Hult *could* have verified whether Intus's real-world contract renewals with implementation dates in 2025 or later actually contained ▮ price escalations— but he did not. Instead, he simply assumed that 100% of the theoretical "renewals" of contracts that never existed would include ▮ price escalations. This is not "sufficient facts or data" upon which to base an expert opinion. Hult then tosses the issue to the jury to decide if "a different escalator rate applies, or that escalators were included and/or exercised" less than 100% of the time. (*Id.*) But an expert who asks the jury to decide the issue for him is not providing testimony that is "helpful" to the trier of fact—he is simply introducing confusion and prejudice.

### E.  Hult's $164,658 in Unreliable "Labor Costs" Includes AI-Generated Nonsense

As to Hult's reliance on AI-generated "labor costs" which he did nothing to verify (Lee Decl., Ex. 1 [Hult Rep.] ¶ 94 at Ex. 11), Intus offers no explanation. Instead, it argues that RTZ "identifies no calculation error" in the AI-generated figure. (Opp. at 24:16.) Not only is that an impossible task given that neither Hult nor Intus disclose *how* AI came up with this figure, but

Case No. 4:24-cv-01132-JST

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

more importantly it misplaces the burden of proof. It is the *proponent's* burden to demonstrate reliability. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he proponent must demonstrate to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."). Hult's blind reliance on AI-generated output falls far short of the required standard.

In fact, Hult never verified any of the purported RTZ-related "labor costs" included in his total, which he simply accepted on blind faith. (Lee Decl., Ex. 11 [Hult Tr.] at 188:11-23.) Instead, he again tosses the issue to the jury: "I assume these labor costs are causally attributed to RTZ's conduct for my analysis, but I leave it to be proven at trial." (*Id.*, Ex. 1 [Hult Rep.] ¶ 94.) His unwillingness to opine that his data inputs are reliable and his decision to leave that to the jury essentially concedes that this opinion fails Rule 702's threshold gatekeeping requirement. *See Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 803 (N.D. Tex. 2018), *aff'd*, No. 3:11-CV-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018) ("the Federal Rules of Evidence require an expert to do more than blindly accept numbers provided by any party in calculating lost profits"); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (finding data used by expert to be unreliable because expert blindly accepted the data and did not "independently verif[y] the reliability of the data before opining on plaintiffs' future sales").

Hult's "calculations" of labor costs have no methodology at all; as he merely adopted the black-box numbers Intus handed to him, there is no "method" to test. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) ("In order for a scientific technique to be reliable, there must be evidence in the record indicating the methodology 'can be or has been tested.' … The question is whether an expert's methodology can be "challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'") (citations omitted).

### F.  Hult Ignored Alternative Causes, Rendering His Opinions Unreliable

One relevant factor in the Daubert analysis is "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 advisory committee's note to

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

2000 amendment. As explained in the Motion, Hult simply ignores the many obvious alternative causes for Intus's failure to evolve from a brand-new start-up into a meteoric success within the span of five years, rendering his methodology unreliable. (Mot. at 21:6-27.)

Intus argues that Hult's difference-in-differences regression analysis takes care of all that, because such an analysis is designed to "isolate the effect of the [alleged wrongful] conduct while controlling for other factors that could affect revenue." (Opp. at 24:27-28.) But the facts belie that explanation. First, as explained above, Hult failed to respect the essential requirements of a difference-in-differences methodology, rendering his conclusions unreliable. Second, Hult used that methodology only for his third category of "unobservable" damages, and thus it cannot salvage his other two damages categories because it has no application to them.

Intus's argument that Hult accounted for other causes as to the CRM-based damages via his "win rate" and "renewal rates" fares no better. (Opp. at 25:13-20.) As explained above, Hult's use of a ▮▮ "win rate" and ▮▮ "renewal rate" does not cure the reliability problem because those figures themselves suffer from a host of methodological deficiencies that inflated both rates, and thus they cannot form a reliable basis for Hult's calculations.

Finally, Intus does not claim that Hult accounted for obvious alternative causes as to his first category of damages (lost revenue from pre-existing contracts), thus conceding he did not. Nor could Intus claim otherwise, given that Hult simply assumed that 100% of these losses were caused by RTZ, based solely on Intus's say-so. (Lee Decl., Ex. 1 [Hult Rep.] at ¶¶ 16-17.)

### G. Hult's Profit-Margin Conversion Opinion Is Unreliable

Hult's use of the highest seven-*month* period of Intus's gross profit margins as his purported "average" for purposes of calculating a nearly seven-*year* period of lost profits is methodologically unsound. Intus concedes that as a new business, its "financial performance was highly volatile." (Opp. at 26:16.) Indeed, Intus's profits swung wildly "f▮▮▮▮▮▮ ▮▮▮." (Lee Decl., Ex. 1 [Hult Rep.] at ¶ 96.) But Hult's solution of applying only Intus's most favorable seven-month profit period while deceptively labeling it an "average" is not science—it is advocacy. By applying this artificially high gross margin to less profitable product sales made

- 15 -                                Case No. 4:24-cv-01132-JST

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2

in 2022-2024 (rather than the actual average profit margin of 33.1%), Hult inflates his damages calculations resulting in a lost profit figure that is more than double Intus's actual cumulative gross profits from 2021 to July 2025. (Lee Decl., Ex. 3 [Schwechheimer Rep.] ¶ 67.) Nor can Hult's use of just seven months of data be explained by Intus's argument that the most recent gross margins are more representative; notably, Hult did not consider Intus's profit margins after July 2025 because Intus withheld that data from him. (Lee Decl., Ex. 1 [Hult Rep.] at ¶ 98.)

### H.  Hult's Application of a Risk-Free Treasury Rate Is Unreliable

Intus does not (and cannot) dispute that the U.S. 1-year Treasury rate is inapplicable to a venture-capital-backed startup that did not launch its first product until 2020, has never achieved consistent profitability, and whose gross profit margins have fluctuated from - ███████ Even Hult hedges his bet, stating that he could apply a different future discount rate if the jury finds "a different discounting approach should be used." (Lee Decl., Ex. Ex. 1 [Hult Rep.] at ¶100.) But again, asking the jury to choose a methodology is not "helpful" to the trier of fact. Further, while Intus argues that Hult's application of a risk-free rate is defensible because his initial calculations were purportedly "conservative" and adjusted for risk, as shown above, that simply is not accurate. Hult's repeated methodological errors systematically inflated his damages calculations. His use of a risk-free discount rate is just the inflationary cherry on top.

Dated:  July 7, 2026

NOSSAMAN LLP
DAVID C. LEE
KASIA PENN

By: _____
                          David C. Lee

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

RTZ ASSOCIATES, INC'S REPLY ISO MOT. TO EXCLUDE EXPERT OPINIONS OF KRISTOPHER HULT (REFILED PURSUANT TO THE COURT'S ORDER ON THE ADMINISTRATIVE MOTIONS TO SEAL, DKT NO. 189)

70568244.v2