UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTUSCARE, INC.,

Plaintiff,

v.

RTZ ASSOCIATES, INC.,

Defendant.

Case No. 24-cv-01132-JST

**ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Re: ECF Nos. 145, 146, 160, 161

Before the Court are the parties' motions to exclude expert testimony.  The Court will deny Defendant RTZ Associates, Inc.'s motion to exclude testimony by Kristopher Hult, ECF No. 145. It will grant in part and deny in part the remaining motions: RTZ's motion to exclude testimony by Shawn Fleury, ECF No. 146, and Plaintiff IntusCare, Inc.'s motions to exclude testimony by Peter Schwechheimer, ECF No. 160, and Traci Creegan, ECF No. 161.

## I.      BACKGROUND

Intus and RTZ both work with Program of All-Inclusive Care for the Elderly ("PACE") facilities, which provide care to elderly patients who live in non-institutional settings in the community.  RTZ developed the PACECare software system and licenses it to PACE facilities to help manage data, including patients' electronic health information ("EHI").  Some PACE facilities also contract with Intus, which designed a product to analyze data from patients' electronic health records to help identify risks and improve care.

The parties dispute whether RTZ has improperly blocked Intus's access to data, including EHI, contained in PACECare.  Intus asserts three claims for relief: intentional interference with contractual relations; intentional interference with prospective economic advantage; and violation of California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  ECF

No. 25. Its UCL claim is based on its contention that RTZ unlawfully engaged in "information blocking," in violation of the 21st Century Cures Act and its implementing regulations. *See* 42 U.S.C. § 300jj-52(a)(1)(A)–(B)(i) (defining "information blocking"). RTZ has asserted four counterclaims: violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; trespass to chattels; and violation of the UCL. ECF No. 41.

The Court denied Intus's motion for partial summary judgment on its UCL claim. ECF No. 84. "RTZ oppose[d] summary judgment on grounds that disputed facts exist[ed] over whether it engaged in information blocking and, even if it did, whether an exception applie[d]. RTZ [did] not contest that it must comply with the Cures Act—i.e., that it is an 'actor' as defined by 45 C.F.R. § 171.100." *Id.* at 5. After concluding that Intus "met its initial burden of demonstrating that RTZ engaged in facial information blocking," *id.* at 7 (citation modified), the Court addressed RTZ's arguments that it satisfied the Cures Act's manner and infeasibility exceptions. Under the manner exception, "[a]n actor's practice of limiting the manner in which it fulfills a request to access, exchange, or use electronic health information will not be considered information blocking when . . . the actor is technically unable to fulfill the request or cannot reach agreeable terms with the requestor to fulfill the request in the manner requested." 45 C.F.R. § 171.301(a)(1). Under the infeasibility exception, "[a]n actor's practice of not fulfilling a request to access, exchange, or use electronic health information due to the infeasibility of the request will not be considered information blocking" when, among other conditions, "[t]he actor could not reach agreement with a requestor." 45 C.F.R. § 171.204(a)(4). The Court concluded that the applicability of these exceptions could not be resolved on summary judgment because "[w]hether RTZ was unable to reach agreement with Intus—because of Intus's withdrawal from negotiations or otherwise—or whether RTZ was more unwilling than unable to reach a mutually agreeable solution with Intus, is a disputed question of material fact." ECF No. 84 at 8 (citation modified).

## II.    LEGAL STANDARD

"[A] proponent of expert testimony must always establish the admissibility criteria of Rule 702 [of the Federal Rules of Evidence] by a preponderance of the evidence." *Engilis v. Monsanto*

*Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).  "[T]here is no presumption in favor of admission." *Id.*

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)).  The question "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).  Thus, courts should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969.  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## III.    INTUS'S MOTION TO EXCLUDE TESTIMONY BY TRACI CREEGAN

Intus seeks to exclude Traci Creegan, one of RTZ's experts, from offering four opinions relating to liability: "1) that RTZ is not an actor under the Cures Act, 2) that RTZ did not violate the Cures Act [by engaging in information blocking], 3) that the manner exception applies to

3

RTZ's conduct, and 4) that Intus departed from industry standards." ECF No. 161 at 21.

The parties dispute whether the Court has already decided that RTZ is an actor under the Cures Act and that RTZ engaged in information blocking. The Court did not decide the former, but it did decide the latter. At summary judgment, "RTZ [did] not contest that it must comply with the Cures Act—i.e., that it is an 'actor' as defined by 45 C.F.R. § 171.100." ECF No. 84 at 5. That risked the Court's granting summary judgment to Intus even though RTZ disputes whether it was an actor, but it did not result in an adjudication on the merits. RTZ is not precluded from arguing at trial that it is not an actor under the Cures Act.

However, RTZ did dispute at summary judgment whether it engaged in information blocking under the statute. The Court explained, "Intus bears the burden of showing that RTZ engaged in facial information blocking, and then the burden shifts to RTZ to show that its actions were not information blocking because a regulatory exception applies." ECF No. 84 at 5 (citation modified). It concluded that Intus "met its initial burden of demonstrating that RTZ engaged in facial information blocking"—i.e., that there were no genuine issues of material fact on that question. *Id.* (citation modified). The Court now specifies that this issue is "deemed established for purposes of the trial of the case." Civil L.R. 56-3. Creegan's testimony on whether RTZ engaged in information blocking is excluded because that issue has already been established.

In addition, her opinion on that question, as well as her opinions that RTZ is not an actor and that the manner exception applies, is improper expert testimony because:

> an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. This prohibition of testimony on an ultimate issue of law recognizes that, when an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.

*United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (emphasis in original) (citation modified). "Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation modified). An expert does not cross the line into impermissible testimony when they, for example, "provide[] a professional opinion about whether a course of conduct comported

United States District Court
Northern District of California

with the standard of care prevalent in the medical community," even if they use phrases that may appear in the elements of a statute, so long as the phrases are "used in their ordinary, everyday sense and do not have a separate, distinct and specialized legal significance apart from common parlance." *Diaz*, 876 F.3d at 1199 (citation modified).  However, experts may not "draw[] conclusions concerning the proper construction of laws and regulations" or opine on "whether or not . . . conduct was a violation of . . . law." *Navarro v. Hamilton*, No. 5:16-CV-1856 CAS (SPx), 2019 WL 351873, at *3 (C.D. Cal. Jan. 28, 2019) (citation modified).

Two cases relied on by RTZ illustrate the distinction between permissible and impermissible testimony.  In the first case, the court explained that an expert may provide testimony on accounting principles that does "not use any specialized legal terms to describe [a defendant's] compliance with proper billing practices," but that does not mean that the expert "will be free to opine that [the defendant] did not violate federal law, for that remains a question for the jury to determine." *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, No. 15-cv-02383-RS, 2018 WL 5013580, at *3 (N.D. Cal. Oct. 16, 2018).  In the second case, which involved a claim for breach of fiduciary duty, the court held that an expert "may offer opinions that touch on various financial regulations, as long as he can articulate his understanding of what each regulation requires based on his experience and why actions taken by [the defendant] fall short of these requirements and expectations," but the expert cannot opine that the defendant "breached its fiduciary duties, because that is a legal conclusion that encroaches on the job of the fact finder." *Snead v. Wright*, 625 F. Supp. 3d 936, 940 (D. Alaska 2022).  Testimony "becomes excludable when it includes an opinion on what legal conclusion should be reached by the trier of fact." *Id.*

In this case, Creegan opines that "RTZ is not 'an actor' subject to the information blocking regulations"; that "RTZ's conduct did not constitute information blocking as defined by federal regulation"; and that "[e]ven if RTZ's conduct could be construed as information blocking, which it was not, the circumstances satisfy the factual conditions of the Manner Exception."  Creegan Report ¶ 15 (ECF No. 183-3).  These opinions are improper expert testimony.  Whether RTZ is liable for violating the information-blocking provisions of the Cures Act—including whether RTZ

United States District Court
Northern District of California

5

is a covered "actor" and whether an exception applies—is for the jury to decide.  This is a not a case where "the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case."  *Diaz*, 876 F.3d at 1199.

Creegan may, however, testify as to industry standards and whether the parties complied with them.  Such "testimony [does] not improperly embrace" the ultimate issues the jury must decide.  *Hangarter*, 373 F.3d at 1016.  Although Intus asserts that "Creegan does not actually set out any industry standards or practices," ECF No. 148 at 19, that is inaccurate.  As just one example, Creegan states, "Common practice is to exchange EHI using industry-standard tools such as exported reports (e.g., Excel, CSV, TXT) exchanged via SFTP, APIs, or interfaces (HL-7, FHIR) to facilitate information exchange."  Creegan Report ¶ 106.  Additionally, Intus acknowledges Creegan's testimony on "established health IT practices and accepted processes" and standard practices concerning "user access and credential management."  ECF No. 148 at 20 (quoting Creegan Report ¶¶ 97, 100).

Intus argues that Creegan's opinions on industry standards are irrelevant, but that is incorrect.  To determine whether the manner exception applies, the jury will need to consider whether RTZ made "at least some reasonable efforts" to reach an agreement with Intus to share information.  *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 233 (4th Cir. 2025).  Whether the parties complied with industry standards bears on that question and is therefore relevant.  This includes some testimony contained in other parts of Creegan's report— for example, that "RTZ offered the standard expanded reports, which are exported as a flat file, in a CSV format, an alternative machine-readable method of accessing EHI as early as July 2021," Creegan Report ¶ 91, and testimony regarding "common industry practice in 'Software-as-a-Service' (SaaS) arrangements," under which "the client licenses the right to use the software system but does not acquire any ownership of the system itself," *id.* ¶ 57.

In accord with the above discussion, Intus's motion to exclude Creegan's testimony is granted in part and denied in part.  Creegan may not testify that RTZ is not an actor under the Cures Act; that RTZ did not engage in information blocking as defined in the Cures Act; or that,

6

even if RTZ did engage in information blocking, the manner exception applies to RTZ's conduct. However, Creegan may testify on compliance with industry standards.

**IV.     RTZ'S MOTION TO EXCLUDE TESTIMONY BY SHAWN FLEURY**

Shawn Fleury is Intus's rebuttal expert to Creegan.  RTZ seeks to exclude the opinions expressed by Fleury in paragraphs 25 through 38 of his expert report.  ECF No. 152-8 at 9.

The Court denies the motion as to paragraphs 25 through 31 about system access and compliance with industry standards.  Although RTZ correctly observes that much of this testimony interprets email correspondence that presumably will be before the jury, it also opines on how the requests expressed in the emails relate to standard industry practice.  For example, Fleury opines:

> There is no indication anywhere in Ms. Creegan's report that Intus sought or obtained access to any source code or other proprietary, programmatic components of PACECare beyond the UI [User Interface].  In my experience, a mere request for access to a UI does not immediately raise security concerns; rather, the context in which the request is made must be considered.  A request from a client's vendor, at the client's behest, with a full explanation of the purpose for the request, does not raise security concerns.  Furthermore, I have seen many examples of platform vendors choosing to provide access to a third party via a UI.  It is not an uncommon practice as Ms. Creegan attempts to construe it.  It is relatively common for parties to agree to share information via a mechanism that works for both parties, whether we are discussing APIs, Secure File Transfer Protocol ("SFTP"), or direct UI.  Each method has its own strengths and weaknesses, and a request for any of them would not raise a security concern.

Fleury Report ¶ 29 (ECF No. 152-9).  Similarly, he opines:

> Under standard industry practice, the client can specify the external system, independent contractor, or vendor that should receive access to and integrate with its EHI on an EHR.  It is not a deviation from standard practice for the client to allow the independent contractor or vendor to specify and negotiate the technical, security, and contractual issues with the EHR provider, with the client's consent and knowledge.

*Id.* ¶ 31.  RTZ is incorrect when it argues that Fleury's opinions "would not assist the jury's understanding."  ECF No. 152-8 at 9.  Intus is entitled to present Fleury's testimony to counter Creegan's testimony regarding industry standards.  To the extent RTZ disagrees with Fleury's reading of the email correspondence, it is free to challenge Fleury's interpretations on cross-

United States District Court
Northern District of California

examination.[1]

Paragraphs 32 through 38 of Fleury's report seek to rebut paragraphs 108 through 114 of Creegan's report, in which Creegan considers audit logs of user activity to conclude that Intus accessed "PACECare modules well beyond the scope of its stated data needs." Creegan Report ¶ 114. The Court grants the motion to exclude the opinions expressed in paragraph 34. In that paragraph, Fleury states, "The email notes that Medications are included under the Patient data that is being requested, which *likely corresponds* to the 'redirect.main.meds.new' module. As such, Ms. Creegan's opinion that this module falls outside of the request is unsupported and factually incorrect." Fleury Report ¶ 34 (emphasis added). He continues, "Also significant is the inclusion of the abbreviation 'etc.' in the requirements, which indicates that additional data elements may be necessary to complete [Intus's] responsibilities to its customer." *Id.* Fleury has no basis for opining on what "etc." in an email not written by him might refer to. Moreover, he testified at his deposition that he was "not trying to interpret what other data elements [the author of the email] could have meant by having et cetera in there." Fleury Dep. 103:15–17 (ECF No. 174-1). To be admissible, expert testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Paragraph 34 of Fleury's report does not meet that test and is excluded.

However, the Court finds no basis to exclude the remaining paragraphs in this section of Fleury's report. RTZ does not argue, for example, that it is improper for Fleury to comment on "the number of times that certain modules were accessed by [Intus's] assigned accounts" to conclude that he "would expect a higher volume of audit log entries if there was systematic data mapping occurring by Intus," Fleury Report ¶ 38, or to opine that the audit logs contain no evidence "that Intus exceeded the permissions of the accounts which had been provisioned by RTZ," *id.* ¶ 36. The Court will not bar such testimony.

---

[1] RTZ argues for the first time in its reply brief that Fleury "lacks the experience and credentials" "to opine on what is standard in the HealthIT industry." ECF No. 179-3 at 11. The Court does not consider this argument because it was raised only on reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

United States District Court
Northern District of California

RTZ's motion is granted as to paragraph 34 of Fleury's expert report and denied as to the remaining challenged paragraphs.

## V. RTZ'S MOTION TO EXCLUDE TESTIMONY BY KRISTOPHER HULT

Dr. Kristopher Hult is Intus's damages expert. He bases his analysis on his "understand[ing] that starting in September 2022, RTZ refused to allow Intus access to the electronic medical records (EMR) data stored in RTZ's PACECare and later prohibited Intus's clients from providing access to Intus." Hult Report ¶ 7 (ECF No. 182-3). He states that his "calculations can be adjusted should the finder of fact determine an alternative appropriate timeframe." *Id.* ¶ 11. Hult identifies three sources of lost revenue. First, Intus had pre-existing contracts prior to September 2022 under which "Intus was paid a contracted amount in exchange for services that depended on Intus having access to their client's data in PACECare. Once RTZ's conduct began, Intus could no longer fully perform its services and stopped receiving the contractually owed payments from several clients. . . ." *Id.* ¶ 16. Second, "Intus bid for new or expanded work with PACE programs and, according to [Intus's customer relationship management] records, lost the opportunity because of RTZ's information blocking conduct." *Id.* ¶ 18. Hult did not assume that Intus would have won all its bids and instead applied Intus's win rate for 2025. *Id.* ¶ 19. Third, "[i]n the but-for world in which RTZ did not engage in information blocking and Intus could fully perform its services, existing RTZ-using clients would have been expected to renew or expand their business with Intus and additional PACE programs using RTZ would have been expected to become new Intus clients." *Id.* ¶ 20. "[S]ome of these renewals, expansions, and new client relationships did not occur" because of RTZ's conduct. *Id.* Hult estimated the lost revenue from this third category "by performing a common econometric analysis known as a difference-in-differences analysis, which measures whether and by how much Intus's revenue from RTZ-using clients grew more slowly than its revenue from similar non-RTZ clients before and after RTZ's information blocking took effect." *Id.* ¶ 21.

RTZ does not challenge Hult's economic expertise or the economic principles that he applies, but it does challenge the factual bases for some of his opinions. These critiques go to weight and not admissibility. As the Ninth Circuit has explained, the Court's role at this stage of

the proceedings is not "to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). Instead, the Court "is to determine the scientific validity of an expert's principles and methodology, not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record. That is for the litigants to argue, and for the jury to decide." *Id.* (citation modified).

For example, RTZ argues that Hult's testimony incorrectly assumes that any information blocking started in September 2022, when RTZ sent Intus a cease-and-desist letter, even though Intus acknowledged in discovery responses that it continued to log in to PACECare after that date. Hult testified at his deposition that the relevant question is whether Intus had "a loss of access that affected their ability to perform their services," and not whether Intus had "no access to data." Hult Dep. 50:5–7 (ECF No. 182-5). He assumed that if Intus "stopped collecting revenue on an existing contract," that meant that Intus was "unable to serve those clients in the way that would collect that revenue." *Id.* at 55:24–56:2. RTZ disputes the factual basis for Hult's testimony, but that does not render Hult's opinions unreliable. If the jury agrees with RTZ's interpretation of the facts and concludes that Intus still had access to data after September 2022 that was sufficient for Intus to perform its services, then it can discount Hult's testimony accordingly. "The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hangarter*, 373 F.3d at 1017 n.14 (citation modified).

Similarly, while RTZ cites evidence that Intus stopped collecting on some of its contracts "in an effort to show our commitment to our partners while we work to negotiate with RTZ to resume automatic access to the data," ECF No. 152-5 at 2, it is for the jury to decide whether that evidence is sufficient to undermine Hult's testimony about lost profits, including whether Intus's decision to stop collecting revenue was caused by RTZ's conduct. Likewise, RTZ may raise at trial other critiques of Hult's opinions, including whether his consideration of lost opportunities was inflated; whether he reasonably chose September 2023 rather than September 2022 as the cutoff date for his difference-in-differences analysis; whether he should have considered a longer

10

United States District Court
Northern District of California

period in calculating Intus's win rate; whether any of the damages he attributes to RTZ's conduct is actually due to other factors; whether he should have independently verified labor cost or other data provided to him by Intus; and what discount rate should be used to determine the present value of any future lost profits.  RTZ's competing damages expert, Peter Schwechheimer, concludes, "The opinions and damages calculations proffered by Dr. Hult in his expert report are the product of inference, assumption, and supposition whose mathematically teased results collapse under the slightest scrutiny."[2]  Schwechheimer Rebuttal Report ¶ 5 (ECF No. 183-8).  But "[t]he fact that two experts may disagree does not make one of the experts unreliable.  Answering the question of which expert is more persuasive is left to the jury to decide."  *Union Pac. R.R. Co. v. Winecup Gamble, Inc.*, No. 3:17-cv-0477-LRH-CLB, 2023 WL 4053479, at *4 (D. Nev. June 16, 2023) (citing *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001)).  Indeed, the Ninth Circuit has cited with approval language specifically addressing lost profits:  "As to the reasonableness of the assumptions underlying the experts' lost profit analysis, criticisms of an expert's method of calculation are a matter for the jury's consideration in weighing that evidence."  *Humetrix*, 268 F.3d at 919 (citation modified).

Although RTZ has presented reasons why a jury might discount the weight of Hult's opinions, whether to credit his testimony is for the jury to decide.  The Court is satisfied that Hult's testimony is admissible under Rule 702 and denies RTZ's motion to exclude it.

## VI.   INTUS'S MOTION TO EXCLUDE TESTIMONY BY PETER SCHWECHHEIMER

Peter Schwechheimer is RTZ's damages expert.  Intus seeks to exclude Schwechheimer's opinions regarding RTZ's damages if RTZ were to prevail on its counterclaims.  Schwechheimer opines on the "economic damages resulting from [Intus's] unauthorized access to and use of RTZ's PACECare software," providing one figure for June 2021 through December 2024 and a second figure if the jury were to determine that the unauthorized access continued through at least December 2025.  Schwechheimer Report ¶ 5 (ECF No. 183-5).  He opines that Intus "was unjustly

---

[2] As discussed below, Intus seeks to exclude Schwechheimer's testimony regarding RTZ's damages.  Intus does not challenge the admissibility of any of Schwechheimer's rebuttal testimony.

enriched by its ongoing system access to RTZ's PACECare software," and that this "would likely manifest in a shorter development cycle, accelerated market entry, and additional venture capital funding." *Id.* ¶ 6. He states that he has "been advised that the information and data necessary to undertake a complete and thorough [analysis] of [Intus's] unjust enrichment (e.g., documents regarding [Intus's] development and commercial launch of its CareHub EHR software) would benefit from a full production from Intus," *id.*, and that he could not assess "[w]hether and the extent to which [Intus's] unauthorized access to PACECare resulted in lost profits (on lost EHR software sales) and/or price erosion damages to RTZ" because of "the paucity of information from Intus regarding the commercial launch and subsequent customer-level sales records for its CareHub EHR software," *id.* ¶ 7.

Some of Intus's criticisms of Schwechheimer's testimony go to weight and not admissibility. For example, Intus argues that Schwechheimer improperly attributes lost profits to RTZ based on contracts that Intus contends were acquired by Collabrios Health. However, as the Court has previously observed, Intus has cited no "evidence that [Schwechheimer's] report characterizes the contracts as belonging to or having been assigned to Collabrios. At a hearing held on May 11, 2026, counsel for RTZ indicated that the contracts belonged to RTZ but were serviced by Collabrios, and counsel for Intus cited no contrary evidence." ECF No. 143 at 2. While Intus remains free to argue at trial that any damages do not accrue to RTZ, the dispute between the parties regarding the relationship between RTZ and Collabrios does not render Schwechheimer's opinions inadmissible.

Similarly, Intus argues that Schwechheimer's analysis is unreliable because he "uses an agreement [between Intus and Tabula Rasa HealthCare Group, Inc., a former RTZ competitor] that was never executed and on which no money was paid as his only source of support for what Intus would have paid for access." ECF No. 147 at 14. However, RTZ has presented evidence that the agreement was executed. ECF No. 163-1 at 28–34. The jury is free to credit or discredit Schwechheimer's reliance on that contract as "a meeting of the minds as to what the value of providing access . . . to data was worth" even if no money was ever paid. Schwechheimer Rough Dep. 117:6–9 (ECF No. 147-1); *see Alaska Rent-A-Car*, 738 F.3d at 970 (challenges to various

12

aspects of expert testimony "comparing the unknown to an analogous known experience" "go to the weight of the testimony and its credibility, not its admissibility").

Intus's remaining challenges do go to admissibility, and the Court accordingly excludes portions of Schwechheimer's testimony. First, Schwechheimer may not testify about the classification by Laura Emery, Senior Product Manager at Collabrios, of various PACECare modules accessed by Intus as High, Medium, or Low, with High modules being ones "that provided insight into PACECare's organizational structure and/or included features or functions common to standard EHR software." Schwechheimer Report ¶ 38. Schwechheimer acknowledged that comparing the modules to other PACE systems on the market was "beyond [his] expertise," and he does not know whether Emery performed that task. Schwechheimer Rough Dep. 39:18–23. He also explained that his opinion is not dependent on which specific modules Intus accessed. *Id.* at 58:11–20. RTZ argues, "Schwechheimer's discussion of the PACECare modules is not offered as an independent damages calculation; rather it provides context for the jury's understanding of what Intus accessed and why that access was harmful to RTZ." ECF No. 168-4. But that testimony can come from Emery herself. In fact, Schwechheimer testified that he hasn't "done anything yet" with the classifications from Emery, but if CareHub "includes some or all of those particular features or functions [that may not have been available in any competitor product but PACECare, that] *could be* very relevant to my damages calculation." Schwechheimer Dep. 40:18–41:16 (ECF No. 163-1) (emphasis added).

Second, Schwechheimer may not testify that accessing PACECare allowed Intus to develop CareHub on an accelerated schedule. Schwechheimer opines that, by accessing PACECare's modules, IntusCare unjustly benefited "both in terms of lower development costs and, consequently, accelerated competitive entry with market-approved functionality," and that the value of that benefit "is both knowable and measurable given access to documents relevant to [Intus's] development and commercial launch of its CareHub software." Schwechheimer Report ¶ 41. RTZ intends to present evidence that "Intus commenced development of CareHub in early 2024 and went live by May 2025," which RTZ argues is "a remarkably rapid development cycle for an EMR product." ECF No. 168-4 at 14. But when asked at his deposition if he could

13

United States District Court
Northern District of California

"identify any specifics with respect to CareHub that show this massive development short cut," Schwechheimer responded, "I know there has been a discovery issue about this, but I haven't seen any of the recent discovery on CareHub to be able to substantiate this."[3]  Schwechheimer Rough Dep. 63:6–12.  Moreover, Schwechheimer relied on deposition testimony from Michael Zawadski, RTZ's CEO, to reach his conclusions, but he adds nothing to Zawadski's testimony about how Intus might have gained a "'massive leg up in product development'" because "the type of unauthorized access to PACECare that [Intus employees enjoyed] revealed 'the entire organizational principle of the system' that 'took years to develop.'"  Schwechheimer Report ¶ 40 (quoting Zawadski Dep.).  In fact, Schwechheimer never "ask[ed] Mr. Zawadski what he thought an appropriate timeline from development to market would be," nor did he "do any analysis of what an appropriate timeline would be for the development of a product like CareHub." Schwechheimer Rough Dep. 27:7–13.  He relied solely on Zawadski for "the value he believed that you would acquire if you had unfettered access to their system."  *Id.* at 28:2–4.  Under these circumstances, the Court is not persuaded to allow Schwechheimer to opine on Intus's potential accelerated development of CareHub.

Third, Schwechheimer may not testify about Intus's raising of capital.  Schwechheimer acknowledged that he was providing that testimony as "just background context" and not because it "specifically go[es] into a damage calculation."  Schwechheimer Rough Dep. 77:10–11, 78:2. According to RTZ, "Schwechheimer is not opining that Intus intended to access PACECare in order to raise capital.  Rather, when asked why he included reference to capital raises, Schwechheimer explained that he was opining on the 'incentives of a small start-up company at that time.'"  ECF No. 168-4 at 15 (quoting Schwechheimer Rough Dep. 74:15–18).  However, notwithstanding RTZ's characterization to the contrary, that testimony goes to Intus's state of mind—a topic on which courts "routinely exclude" expert testimony.  *Siring v. Or. State Bd. of*

---

[3] RTZ states that Intus "has largely failed" to produce records it was ordered to produce by May 15, 2026, "concerning CareHub's development timeline and developer files," and that this "is a subject of ongoing discovery disputes."  ECF No. 168-4 at 15.  However, the docket reflects no live discovery disputes before the magistrate judge, and the Court therefore does not rely on RTZ's assertions that it has not received discovery that Intus has been ordered to produce.

*Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases).

Finally, Schwechheimer may not testify about what the law requires, including that disgorgement of profits is an available remedy under the California Comprehensive Computer Data Access and Fraud Act. Schwechheimer Report ¶¶ 51–52. As the Court explained when considering whether to limit Creegan's testimony, instructing the jury on the law is the province of the court. *Hangarter*, 373 F.3d at 1016. RTZ cites *United States v. Scabo*, 593 F.2d 837, 843 (8th Cir. 1979), for the proposition that "minor references to legal standards in [an] expert report do not require wholesale exclusion." ECF No. 168-4 at 16. But that case is entirely distinguishable. It concerned expert testimony on "[t]he structure of a gambling enterprise," which "is not something with which most jurors are familiar," and "jargon foreign to all those who are not connected with the business." *Scabo*, 593 F.2d at 844. The case said nothing about an expert opining on what types of remedies a party "would be entitled" to recover under the law, Schwechheimer Report ¶ 51, or what a plaintiff must do "to show 'damage or loss' under" a particular statute, *id.* ¶ 52. These are legal conclusions that are inappropriate subjects of expert testimony.

Intus's motion to exclude Schwechheimer's testimony is granted in part and denied in part as discussed above.

### CONCLUSION

In sum, the Court denies the motion to exclude testimony by Kristopher Hult. It grants in part and denies in part the motions to exclude testimony by Traci Creegan, Shawn Fleury, and Peter Schwechheimer. The parties shall meet and confer in good faith to plan trial testimony by these experts consistent with this order. If they cannot reach full agreement, they shall raise their remaining disputes in the joint pretrial conference statement.

**IT IS SO ORDERED.**

Dated: July 8, 2026

_____
JON S. TIGAR
United States District Judge

15