NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:  415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:  949.833.7878

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>            Plaintiff,<br><br>      vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>            Defendants, | Case No:      4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**DEFENDANT AND CROSS-COMPLAINANT RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS *IN LIMINE***<br><br>[*Concurrently filed with: (1) Declaration of David C. Lee In Support of RTZ's Omnibus Motions in Limine; (2) [Proposed] Order Granting Defendant and Cross-Complainant RTZ's Omnibus Motions in Limine*]<br><br>Date:        July 31, 2026<br>Time:        2:00 p.m.<br>Courtroom:  6 |
| RTZ ASSOCIATES, INC.,<br><br>            Counter-claimant,<br><br>      vs.<br><br>INTUS CARE, INC.,<br><br>            Counter-defendant. | |

Case No. 4:24-cv-01132-JST

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

# TABLE OF CONTENTS

I.      LEGAL STANDARD GOVERNING MOTIONS IN LIMINE .........................................1

II.     MIL NO. 1 TO EXCLUDE INTUS'S INTERNAL EVALUATION,
        SCRUTINY, LEGAL OR BUSINESS ASSESSMENT, REASONS,
        RATIONALE, OR DECISION-MAKING CONCERNING RTZ'S NDA ........................1

        A.      Factual Background .............................................................................................2

                1.      Evan Jackson's Testimony...............................................................2

                2.      John Robert Felton's Testimony. .....................................................3

                3.      Alex Rothberg's Testimony. ............................................................5

        B.      Legal Argument ....................................................................................................6

                1.      Evidence Regarding Intus's Privileged Evaluation of RTZ's
                        NDA Is Irrelevant and Inadmissible Under Rules 401 and 402. ................6

                2.      Even If Marginally Relevant, Such Evidence Should Be
                        Excluded Under Rule 403...............................................................6

                3.      Fairness and the Sword-and-Shield Doctrine Require
                        Exclusion.........................................................................7

                4.      The Scope of the Requested Exclusion Is Appropriately
                        Tailored. ........................................................................9

III.    MIL NO. 2 TO EXCLUDE EVIDENCE RE SUMMARY JUDGMENT
        ORDER ..............................................................................................9

        A.      Factual Background .............................................................................................10

        B.      Evidence of the Court's Prior MSJ Order Is Irrelevant and Thus
                Inadmissible, Because the Court Made No Binding Determinations for
                Trial............................................................................................11

        C.      Evidence of the Court's Prior MSJ Order Is More Prejudicial Than
                Probative and Would Lead to Juror Confusion....................................................14

IV.     MIL NO. 3 TO EXCLUDE ALLEGED "UNOBSERVABLE" DAMAGES....................17

        A.      Factual Background .............................................................................................17

        B.      Evidence of Legally-Unavailable Damages May Be Excluded.............................20

        C.      Evidence of the So-Called "Unobservable" Damages Is Irrelevant and
                Thus Inadmissible, Because Such Damages Are Legally Unavailable .................20

        D.      Evidence of the So-Called "Unobservable" Damages Is More
                Prejudicial Than Probative and Would Lead to Juror Confusion........................25

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

V.    MIL NO. 4 TO EXCLUDE EVIDENCE OF COLLABRIOS CONDUCT AND USE OF HIGH DESERT EMAILS ..................................................................26

      A.    Factual Background ........................................................................27

            1.    Intus's Claims Are Directed Solely at RTZ's Pre-Acquisition Conduct. ..................................................................27

            2.    Collabrios's Post-Lawsuit Acquisition of RTZ Assets. ...........................27

            3.    The PACECare Agreements Belong to RTZ. ..........................................27

            4.    This Court's Prior Orders Confirm Collabrios's Non-Party Status. ...................................................................28

            5.    The High Desert Emails Concern a Collateral Contract Dispute Between Collabrios and High Desert. ...........................................28

      B.    Legal Argument ..........................................................................29

            1.    Collabrios Evidence Is Irrelevant Under Rules 401 and 402. ....................29

            2.    Any Marginal Probative Value Is Substantially Outweighed by Prejudice and Confusion Under Rule 403. ..................................29

            3.    The High Desert Emails Are Inadmissible Because They Concern a Non-Party Contract Dispute, Not Information Blocking. ...............................................................30

            4.    Collabrios's Conduct Cannot Be Attributed to RTZ. ..............................31

            5.    The Court's Prior Rulings Foreclose Trial-by-Ambush on Collabrios and High Desert Issues. ...........................................31

VI.   MIL NO. 5 TO EXCLUDE EXPERT TESTIMONY ABOUT CONTRACT INTERPRETATION AS IRRELEVANT .....................................................32

      A.    Factual Background ........................................................................33

            1.    The PACECare Agreement Section 7.1 ..................................................33

            2.    Fleury's Opinions. ..................................................................34

            3.    Fleury's Deposition Admissions ..................................................34

      B.    Legal Argument ..........................................................................35

            1.    Fleury's Opinions Are Unreliable and Based on Speculation ..................35

      C.    Fleury's Opinions Constitute Improper Legal Conclusions and Contract Interpretation That Invade the Province of the Court ..........................36

      D.    Fleury's Opinions Are Irrelevant Under Rule 402 ............................................37

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

E.    Even if Marginally Relevant, Fleury's Opinions Should be Excluded Under Rule 403 ........................................................................................................38

VII.    CONCLUSION.................................................................................................................39

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
No. 16-CV-00923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018) ...............................14

*Baugh v. Detroit Club Mgmt. Co.*,
No. 22-CV-11427, 2026 WL 948709 (E.D. Mich. Apr. 8, 2026)..........................................15

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003) (en banc) ..................................................................................7

*CDA of Am. Inc. v. Midland Life Ins. Co.*,
No. 01-CV-837, 2006 WL 5349266 (S.D. Ohio Mar. 27, 2006)......................................15, 16

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...........................................................................................................21

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992) ..................................................................................................7

*Cleveland v. Johnson*,
209 Cal. App. 4th 1315 (2012) ...............................................................................................31

*Crow Tribe of Indians v. Racicot*,
87 F.3d 1039 (9th Cir. 1996) .............................................................................................33, 36

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) ...........................................................................................21, 24

*Damabeh v. 7-Eleven, Inc.*,
No. 5:12-CV-1739-LHK, 2013 WL 1915867 (N.D. Cal. May 8, 2013) ...............................22

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) ..................................................................................................35

*Giovanetti v. Trs. of California State Univ.* (*Humboldt State Univ.*),
No. C-04-5514-NJV, 2007 WL 9735004 (N.D. Cal. Sept. 5, 2007) ......................................12

*Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*,
No. C 03-05340 JF, 2005 WL 832398 (N.D. Cal. Mar. 30, 2005)....................................24, 25

*GPNE Corp. v. Apple Inc.*,
108 F. Supp. 3d 839 (N.D. Cal. 2015) ...................................................................................15

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ..................................................................................................37

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

*Hawkins v. Maury Cnty. Bd. of Educ.*,
No. 1:12-CV-0184, 2019 WL 13260543 (M.D. Tenn. Mar. 21, 2019) ...................................15

*Hodge v. Superior Ct.*,
145 Cal. App. 4th 278 (2006) ...........................................................................................21

*Kassim v. City of Schenectady*,
415 F.3d 246 (2d Cir. 2005).......................................................................................20, 26

*Katzir's Floor & Home Design, Inc. v. M-MLS.com*,
394 F.3d 1143 (9th Cir. 2004) ........................................................................................31

*Key v. Qualcomm Inc.*,
129 F.4th 1129 (9th Cir. 2025) ......................................................................................21

*Luce v. United States*,
469 U.S. 38 (1984)..............................................................................................................1

*Margolin v. Nat'l Ass'n of Immigr. Judges*,
146 S. Ct. 1285 (2026)..............................................................................................10, 12

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988) ..........................................................................................35

*Miller v. Glenn Miller Prods., Inc.*,
454 F.3d 975 (9th Cir. 2006) ..........................................................................................36

*Nationwide Transp. Fin. v. Cass Info Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) ........................................................................................36

*O'Connor v. Uber Techs., Inc.*,
58 F. Supp. 3d 989 (N.D. Cal. 2014) ..............................................................................21

*Old Chief v. United States*,
519 U.S. 172 (1997)..........................................................................................................29

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ..........................................................................................38

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
No. 16-CV-01393-JST, 2021 WL 3504669 (N.D. Cal. June 14, 2021) ................................14

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
50 Cal. 3d 1118 (1990) ...................................................................................................13

*Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*,
254 F.R.D. 568 (N.D. Cal. 2008).......................................................................................7

*Pinnacle Sys., Inc. v. XOS Techs., Inc.*,
No. C-02-03804-RMW, 2003 WL 21397845 (N.D. Cal. May 19, 2003) ...........................23

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
    946 F. Supp. 2d 957 (N.D. Cal. 2013), *aff'd,* 609 F. App'x 497 (9th Cir. 2015) .....................24

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
    360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) .........21, 22, 23

*Ray v. Alad Corp.*,
    19 Cal. 3d 22 (1977) ............................................................................................................31

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
    131 F.4th 205 (4th Cir. 2025) ..............................................................................................16

*Republican Nat'l Comm. v. Google LLC*,
    742 F. Supp. 3d 1099 (E.D. Cal. 2024), *aff'd sub nom. Republican Nat'l
    Comm. v. Google Inc.*, No. 24-5358, 2026 WL 125195 (9th Cir. Jan. 16, 2026)........21, 24, 25

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
    No. 12-CV-05847-WHO, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013)..............................23

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
    2 Cal. 5th 505 (2017) .............................................................................................13, 21, 23

*S.E.C. v. Retail Pro, Inc.*,
    No. 08CV1620-WQH-RBB, 2011 WL 589828 (S.D. Cal. Feb. 10, 2011) .............................14

*Sonora Diamond Corp. v. Superior Court*,
    83 Cal. App. 4th 523 (2000) .................................................................................................31

*T.D.W. v. Riverside Cnty.*,
    No. EDCV 08-232CAS(JWJX), 2009 WL 2252072 (C.D. Cal. July 27, 2009)...............20, 26

*Tennenbaum v. Deloitte & Touche*,
    77 F.3d 337 (9th Cir. 1996) ...................................................................................................7

*TPS Utilicom Servs., Inc. v. AT & T Corp.*,
    223 F. Supp. 2d 1089 (C.D. Cal. 2002) ...........................................................................22, 23

*United States v. Amlani*,
    169 F.3d 1189 (9th Cir. 1999) ................................................................................................8

*United States v. Bestfoods*,
    524 U.S. 51 (1998)................................................................................................................31

*United States v. Curtin*,
    489 F.3d 935 (9th Cir. 2007) ................................................................................................30

*United States v. Dean*,
    980 F.2d 1286 (9th Cir. 1992) ..........................................................................................11, 20

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

*United States v. Hitt*,
    981 F.2d 422 (9th Cir. 1992) ...............................................................................................30

*United States v. Nobles*,
    422 U.S. 225 (1975)................................................................................................................7

*United States v. Scholl*,
    166 F.3d 964 (9th Cir. 1999) ...............................................................................................36

*Weil v. Investment/Indicators, Research & Mgmt., Inc.*,
    647 F.2d 18 (9th Cir. 1981) ...................................................................................................8

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ..........................................................................................21, 22

*Williams v. Board of Regents of University System of Georgia*,
    629 F.2d 993 (5th Cir. 1980) .................................................................................................1

*Wyatt Tech. Corp. v. Malvern Instruments Inc.*,
    No. CV 07-08298DDP(MANX), 2009 WL 2365647 (C.D. Cal. July 29,
    2009), *aff'd*, 526 F. App'x 761 (9th Cir. 2013) ................................................................22, 23

**Statutes**

18 U.S.C. § 1030.................................................................................................................10, 13

42 U.S.C. § 300jj-52(a)(3) .........................................................................................................16

Cal Bus. & Prof. Code § 17000 *et seq.*...............................................................................10, 17

Cal Bus. & Prof. Code §§ 17200 *et seq.* .....................................................................................17

Cal. Penal Code § 502.........................................................................................................10, 13

California Computer Data Access and Fraud Act.......................................................................10

Computer Fraud and Abuse Act .................................................................................................10

**Other Authorities**

45 C.F.R. §§ 171.101, 171.102...................................................................................................11

45 C.F.R. §§ 171.201–206 and §§ 171.301–303 .......................................................................16

Fed. R. Evid. 402 ................................................................................................................ *passim*

Federal Rule of Civil Procedure 56(g)..................................................................................12, 14

Federal Rule of Evidence 401 ............................................................................................ *passim*

Federal Rules of Evidence 103(d) and 104(c) .............................................................................1

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Local Rule 56-3...............................................................................................................................12, 14

Rule 33/34.....................................................................................................................................................28

Rule 403 ................................................................................................................................ *passim*

Rule 702(b) ........................................................................................................................................36

Rules 401 and 402............................................................................................................6, 27, 29, 38

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

## I.  LEGAL STANDARD GOVERNING MOTIONS IN LIMINE

Courts have inherent authority to hear "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered."  *Luce v. United States*, 469 U.S. 38, 40-41 & fn. 2 (1984).  In limine rulings are necessary to avoid a futile attempt to "unring the bell" when prejudicial evidence is offered at trial, and to minimize sidebar conferences and disruptions during trial.  Federal Rules of Evidence 103(d) and 104(c) allow the Court to hear and determine the question of the admissibility of evidence outside the presence or hearing of the jury.  *Williams v. Board of Regents of University System of Georgia*, 629 F.2d 993, 999–1000 (5th Cir. 1980).

## II.  MIL NO. 1 TO EXCLUDE INTUS'S INTERNAL EVALUATION, SCRUTINY, LEGAL OR BUSINESS ASSESSMENT, REASONS, RATIONALE, OR DECISION-MAKING CONCERNING RTZ'S NDA

This motion presents a straightforward question of fairness: May a party invoke the attorney-client privilege to shield from discovery the factual bases for its evaluation of a contract, and then turn around at trial and offer testimony, evidence, and argument about those very facts?  The answer, under binding Ninth Circuit authority, is no.

During discovery, Defendant RTZ deposed three witnesses of Plaintiff Intus—Evan Jackson, John Robert Felton, and Alexander Rothberg (Intus's three founders and also officers)—each of whom was asked to explain Intus's evaluation of RTZ's NDA, including Intus's impressions, objections, reasons for refusing or redlining the NDA, and the organization's related decision-making process.[1]  In response, each witness testified that his impressions and decisions were formed by legal counsel, that his discussions about the NDA occurred in counsel's presence, and that he could not separate any independent recollection from privileged attorney-client communications. Plaintiff's counsel repeatedly instructed witnesses not to answer on privilege grounds. Having erected a wall of privilege around the substance of Intus's NDA evaluation during

---

[1] Laura Ferrara (Intus's original Chief Strategy Officer) was similarly asked about her involvement with any review of RTZ's NDA and she unambiguously testified that she had no conversations with anyone at Intus (or beyond) about RTZ's NDA other than merely transmitting a copy of it to Robbie Felton.  (Lee Decl., Ex. 1 [Ferrara Tr.] 40:1-41:18 ["So I did not have any communication with anybody about the NDA."])

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

discovery, Plaintiff should not now be permitted to present a curated, one-sided narrative at trial that RTZ's NDA was unreasonable, predatory, or not negotiated in good faith—nor that Intus as an organization carefully scrutinized or was justified in refusing the NDA—because RTZ was denied any opportunity to probe the factual foundations of those assertions in pre-trial discovery.

RTZ does not seek to exclude basic, undisputed historical facts—such as that RTZ sent an NDA, that Intus did not sign the initial version, that Intus transmitted an access agreement and subsequent redlines, or that certain communications were produced in discovery and are independently admissible. Rather, RTZ seeks to exclude opinion, characterization, state-of-mind, organizational-evaluation, and reasonableness evidence and argument that necessarily depends upon the very communications Intus withheld from discovery as attorney-client privileged.

### A.   Factual Background

In or about September 2022, RTZ provided Intus with a proposed NDA to access RTZ's proprietary PACECare software system. Intus has alleged that RTZ's refusal to permit Intus system user access to PACECare absent an NDA constitutes "information blocking" in violation of the 21st Century Cures Act. In deposition, RTZ sought to explore the bases for Intus' refusal to execute RTZ's standard NDA form. The deposition testimony of Intus's witnesses reveals that Intus's entire evaluation of—and response to—RTZ's NDA was directed by, informed by, and inseparable from privileged attorney-client communications.

### 1.   Evan Jackson's Testimony.

RTZ first deposed Evan Jackson, an Intus founder and executive. Jackson testified that he was not personally involved in the NDA negotiations with RTZ and learned about the status secondhand. When asked about the basis for his knowledge of Intus's NDA-related communications with RTZ, counsel for Intus provided the following instruction:

> *Also just to -- to the extent this gets into attorney-client privilege or legal strategy or something that you learned from Alex, Julie or -- I think it was only them at the time -- I'm going to instruct you not to answer; but otherwise, you can.* (Lee Decl., Ex. 2 [Jackson Tr.] at 162:8-13.)

/ / /

/ / /

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

After that instruction, Jackson offered the following assessment of RTZ's NDA:

> *Based on our attorney's review, a third-party attorney's review, and board review, it was not reasonable.* (*Id*. at 162:15-17.)

When pressed further to identify what in the NDA made Intus hesitant to sign, counsel objected "*to the extent it invades the province of attorney-client privilege*," and Jackson testified:

> *Like I shared, we received guidance from our counsel.* (*Id*. at 163:8-9.)

Jackson was then asked whether, as he sat there at his deposition, he understood the reasons why RTZ's standard NDA was objectionable to Intus. He responded:

> *Through guidance from our counsel. I don't know if I'm able to disclose the nature of those conversations with our counsel.* (*Id*. at 164:1-4.)

When asked whether he recalled anything specific about RTZ's NDA that was objectionable, counsel objected "*to the extent you learned about this or created this impression based on attorneys' guidance or advice.*" (*Id*. at 165:1-3.) Jackson conceded the NDA "*felt very predatory*" but immediately qualified that *"a lot of the specifics were shared through conversation with our counsel."* (*Id*. at 165:5-8.) When asked what gave him the impression that RTZ's NDA was predatory, counsel objected again to the extent the impression was based on conversations with or legal advice from counsel. Jackson was then asked whether he could answer. His response: "*Nope.*" (*Id*. at 165:5-19.)

### 2.    John Robert Felton's Testimony.

RTZ also deposed John Robert ("Robbie") Felton, another founder and Intus's Chief Executive Officer. Felton's testimony was even more categorical in attributing all NDA-related decisions and impressions to legal counsel.

When asked who at Intus was the decision-maker in September 2022 about whether Intus would sign NDAs, Felton answered simply: "*Legal counsel.*" (Lee Decl., Ex. 4 [Felton Tr.] at 78:18.)  When asked whether management ultimately made the decision based on counsel's input, Felton testified: "*We were heavily deferential to our legal counsel.*" (*Id*. at 78:22-23.)   After counsel cautioned Felton not to disclose attorney-client communications, Felton stated: "*I'd say substantive -- any and all substantive conversation was most likely with legal counsel. At the time,*

*it was A. Chiulli."* (*Id.* at 79:6-8.) When asked whether he recalled any discussions about RTZ's NDA outside the presence of counsel, Felton testified:

> *I'm sure there was some discussion about the receipt of it, but we -- any discussion around the details of the NDA we were workshopping with legal, as far as I remember.* (*Id.* at 79:17-20.)

Counsel for Intus then delivered the following instruction regarding Felton's independent impressions:

> *If you had an independent recollection that had nothing to do with your conversations with Alex [Chiulli], he's entitled to know that. If you're just going to spit back what Alex told you, he's not entitled to know that. So if you can draw that line in your head, you know, stuff that you developed independently of Alex [Chiulli] about the NDA, tell him. If you can't or it's all going to be some sort of privileged discussion, then it's privileged and I'd instruct you not to answer.* (*Id.* at 80:7-15.)

Felton subsequently confirmed that he did not recall any discussions about whether Intus was willing or unwilling to execute RTZ's NDA "*in the absence of legal counsel's opinion.*" (*Id.* at 83:11-20.)  Felton then made the critical admission: "*Yes. Our -- our opinions were primarily formed by legal counsel."* (*Id.* at 84:22-23.)  Counsel reinforced the privilege instruction:

> *Well, because I'm instructing him not to disclose privileged information is why he's not testifying about them. So yes. It's the same admonition. If there's communications you had with counsel about this, don't disclose them. If there are other communications that don't involve counsel or involve third-party communications with RTZ, you can tell him about that.* (*Id.* at 85:1-8.)

Felton's response was unequivocal:

> *I don't recall any specific communications that were not either with or informed by counsel.* (*Id.* at 85:9-11.)

Regarding the decision to redline RTZ's NDA, Felton testified it "*was the directive of legal counsel.*" (*Id.* at 85:24.) Intus's alternative access agreement that it sent in lieu of redlines to RTZ's proposed NDA was prepared by counsel (Mr. Chiulli), and the decision to send it to RTZ was "*by our counsel.*" (*Id.* at 90:15-22.) Felton testified he did not think he read any of the language in the access agreement and that "*counsel read it.*" (*Id.* at 90:25-91:1.)

/ / /

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

When asked why Intus proposed the alternative access agreement rather than redlining or signing RTZ's NDA, Felton answered: "*I assume it was at the directive of counsel.*" Asked whether he had an independent recollection beyond that, he answered: "*No.*" (*Id*. at 91:12-18.)

Regarding later redlines to RTZ's initial NDA, Felton testified that "*[o]ur legal counsel redlined the NDA*" and that he was not touching the document himself but was "*sure*" he was in conversations with legal counsel discussing the NDA as it was redlined. (*Id*. at 137:11-18.) He confirmed that all internal discussions about the content of the redlines "*would have been with counsel, at least to my recollection*" and agreed he was "*unable to provide*" testimony about internal conversations about the redlines because they would be privileged. (*Id*. at 142:1-10.)

Notably, Felton opined that RTZ's decision not to accept Intus's redlines was "*unreasonable,*" but explained this was because the redline was "*drafted by our legal counsel*" and he had no specifics about why the redline was rejected: "*I don't have any specifics around why this NDA redline was not accepted. So I -- I can't get into the specifics of, I guess, what was rejected and why.*" (*Id*. at 143:8-19.)

### 3.    Alex Rothberg's Testimony.

RTZ also deposed Alexander Rothberg, Intus's co-founder and original Chief Information Officer. Rothberg's testimony confirmed the same pattern.  When asked about his impressions of RTZ's NDA and information blocking, Rothberg testified: "*In a vacuum, a reasonable NDA negotiated in good faith might be fine.*" (Lee Decl., Ex. 3 [Rothberg Tr.] at 214:6-7.)  But he qualified that his impression "*as a result of conversation with counsel*" was that RTZ was not "*operating in good faith with a reasonable NDA.*" (*Id*. at 214:7-10.) When asked whether he provided input about his thoughts or impressions of the NDA, Rothberg testified:

> *Only -- I mean, any conversation that would have involved me with the NDA would have been with counsel. They may have solicited my opinion -- I'm sure they did -- of -- I don't know. I would have been in the room, at least.* (*Id*. at 218:20-24.)

When counsel clarified he was not asking for privileged discussions but for Rothberg's own independent impressions after reviewing the NDA, Rothberg gave the dispositive answer:

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

*Honestly, I guess the impression that I have about the NDA is shaped by my counsel's opinion of it. I don't know that I had any independent opinion of it.* (*Id*. at 219:4-7.)

### B.    Legal Argument

#### 1.    Evidence Regarding Intus's Privileged Evaluation of RTZ's NDA Is Irrelevant and Inadmissible Under Rules 401 and 402.

Under Federal Rule of Evidence 401, evidence is relevant only if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402.

Intus's witnesses uniformly testified that they cannot separate their impressions of RTZ's NDA from the legal advice they received from counsel. Jackson testified his conclusion that the NDA was "*not reasonable*" was "*[b]ased on our attorney's review, a third-party attorney's review, and board review.*" (Lee Decl., Ex. 2 [Jackson Tr.] at 162:15-17.) Rothberg testified: "*the impression that I have about the NDA is shaped by my counsel's opinion of it. I don't know that I had any independent opinion of it.*" (Lee Decl., Ex. 3 [Rothberg Tr.] at 219:4-7.) Felton testified that "*[o]ur opinions were primarily formed by legal counsel.*" (Lee Decl., Ex. 4 [Felton Tr.] at 84:22-23.) Because Intus's evaluation of RTZ's NDA was concededly formed through privileged attorney-client communications, and because that privileged content was withheld from discovery, there is no competent, nonprivileged evidentiary basis for testimony about Intus's NDA evaluation. Any testimony or argument that the NDA was unreasonable or predatory would necessarily rest on, and implicitly disclose, the substance of privileged legal advice. Such testimony lacks an independent evidentiary foundation and is therefore irrelevant to any fact of consequence that the jury could properly consider. Fed. R. Evid. 401, 402.

#### 2.    Even If Marginally Relevant, Such Evidence Should Be Excluded Under Rule 403.

Even assuming *arguendo* that some minimal relevance exists, the probative value of Intus's NDA-evaluation evidence is substantially outweighed by the danger of unfair prejudice to RTZ. Fed. R. Evid. 403. RTZ was denied any meaningful opportunity to probe the factual and analytical foundations of Intus's NDA evaluation during discovery. If Plaintiff is permitted to offer testimony

- 6 -                                    Case No. 4:24-cv-01132-JST

at trial that RTZ's NDA was unreasonable, predatory, or not in good faith, RTZ will be unable to cross-examine witnesses on the substance of their conclusions because the underlying reasoning has been cloaked in privilege. This creates an unfairly one-sided presentation that would mislead the jury and unfairly prejudice RTZ.

Moreover, permitting Intus's witnesses to testify that the NDA "*felt very predatory"* (Lee Decl., Ex. 2 [Jackson Tr.] at 165:5-8) or that RTZ's refusal to accept Intus's redlines was "*unreasonable*" (Lee Decl., Ex. 4 [Felton Tr.] at 143:8-10)—while simultaneously preventing RTZ from inquiring into the actual basis for those characterizations—would confuse the issues and mislead the jury into believing these conclusions rest on some independent factual foundation, when in truth the witnesses themselves acknowledge they rest on privileged legal advice.

### 3.     Fairness and the Sword-and-Shield Doctrine Require Exclusion.

The Ninth Circuit has long recognized that the attorney-client privilege "may not be used as both a sword and a shield." *Bittaker v. Woodford*, 331 F.3d 715, 719-20 (9th Cir. 2003) (en banc). A party may not invoke the privilege to prevent discovery of the factual bases for its position and then affirmatively present testimony at trial that depends upon those privileged communications. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (holding that implied waiver applies where a party "puts the advice of an attorney in issue" and fairness requires disclosure); *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340-41 (9th Cir. 1996) (privilege may be waived when the holder "puts privileged matter at issue").

The Supreme Court has recognized the related principle that a litigant may not "present" protected material to a factfinder "while at the same time" depriving the opposing party of the opportunity to inquire into its foundations. *United States v. Nobles*, 422 U.S. 225, 239-40 (1975). Exclusion is an appropriate remedy when a party refuses to disclose protected materials supporting offered testimony. *Id.* at 241.

Courts in this District have applied these principles to prevent parties from selectively invoking privilege to gain an unfair tactical advantage. In *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 575-76 (N.D. Cal. 2008), the court held that privilege cannot be used to prejudice an opponent by selective disclosure or withholding of privileged material central to a

- 7 -                                          Case No. 4:24-cv-01132-JST

claim or defense. *See also Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (fairness limits selective invocation of privilege).

The record here presents a textbook case of sword-and-shield abuse. Intus's witnesses testified:

- Jackson: His conclusion that RTZ's NDA was "not reasonable" was based on "our attorney's review, a third-party attorney's review, and board review." He could not answer what made the NDA predatory: "Nope." (Lee Decl., Ex. 2 [Jackson Tr.] at 162:15-17, 165:5-19.)

- Felton: "Our opinions were primarily formed by legal counsel." "I don't recall any specific communications that were not either with or informed by counsel." The decision to redline was "the directive of legal counsel." (Lee Decl., Ex. 4 [Felton Tr.] at 84:22-23, 85:9-11.)

- Rothberg: "[T]he impression that I have about the NDA is shaped by my counsel's opinion of it. I don't know that I had any independent opinion of it." (Lee Decl., Ex. 3 [Rothberg Tr.] at 219:4-7.)

Having invoked privilege to block RTZ's discovery into the foundations of Intus's NDA evaluation, Intus cannot now present that evaluation to the jury through testimony that the NDA was unreasonable, predatory, or not in good faith, or through argument that Intus's organizational assessment of or response to the NDA was justified. To permit such evidence would give Intus the full benefit of the privileged communications at trial—establishing its preferred narrative of RTZ's conduct—while depriving RTZ of any ability to test, challenge, or rebut that narrative through cross-examination into the underlying attorney-client communications.

RTZ does not seek to compel waiver of the privilege. The appropriate remedy is narrower and less intrusive: exclusion. Because Intus chose to assert the privilege during discovery, it must accept the corresponding limitation that it cannot use the fruits of those privileged communications as evidence or argument at trial. *See United States v. Amlani*, 169 F.3d 1189, 1195-96 (9th Cir. 1999) (recognizing that fairness principles require limitations when a party places privileged communications at issue).

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

### 4. The Scope of the Requested Exclusion Is Appropriately Tailored.

RTZ emphasizes that this motion does not seek to exclude all evidence concerning the NDA. Undisputed historical facts—that RTZ transmitted an NDA to Intus, that Intus did not sign the original version, that Intus sent an access agreement and subsequent redlines, and the content of non-privileged documents produced in discovery—remain admissible as ordinary evidence of what occurred.

What must be excluded is the layer of opinion, characterization, and evaluation that Intus's own witnesses concede is inseparable from their privileged communications with counsel. Specifically, the Court should preclude:

(a) Evidence or testimony concerning Intus's internal evaluation, scrutiny, legal or business assessment, reasons, rationale, or decision-making concerning RTZ's NDA or Intus's redlines or access agreement, except for nonprivileged facts disclosed in discovery;

(b) Any testimony or evidence that RTZ's NDA was unreasonable, predatory, not in good faith, or improperly conditioned data access, to the extent such testimony rests on witness impressions formed by counsel or internal privileged communications withheld during discovery; and

(c) Any argument that Intus reasonably refused, redlined, or replaced RTZ's NDA based on privileged communications or counsel-directed analysis.

This scope is neither overbroad nor punitive. It simply holds Intus to the consequences of its own privilege assertions and ensures that the trial proceeds on a level playing field.

## III.   MIL NO. 2 TO EXCLUDE EVIDENCE RE SUMMARY JUDGMENT ORDER

RTZ seeks an order barring Intus from offering any evidence, testimony or argument relating to this Court's prior order denying Intus's motion for partial summary judgment against RTZ (the "Order," Dkt. No. 84).  RTZ anticipates that Intus will introduce evidence or argument referencing the Order in an effort to suggest that the Court has already found that RTZ violated the Cures Act by engaging in "information blocking," which would falsely imply to the jury that this Court has already predetermined RTZ's liability.

Permitting Intus to place such evidence in front of the jury would be highly prejudicial to RTZ, and would confuse and mislead the jury as to the factual issues and claims they will be deciding.  Moreover, the Order is irrelevant because it did ***not*** make a binding determination of any issue for purposes of trial.  While RTZ is cognizant of the Court's subsequent order deeming

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

one issue established for trial (i.e., "that Intus 'met its initial burden of demonstrating that RTZ engaged in facial information blocking'" (Dkt. No. 203 at 4:13-16), this Motion is necessary to present and preserve RTZ's complete argument on this issue.[2]

### A.    Factual Background

On April 2, 2024, Intus filed its operative Amended Complaint alleging claims against RTZ for intentional interference with contractual relations; intentional interference with prospective economic advantage; and violation of California's unfair competition law ("UCL"), California Business & Professions Code section 17000 *et seq*. (Dkt. No. 25.)  On June 20, 2024, RTZ filed counterclaims against Intus for violation of the California Computer Data Access and Fraud Act (Cal. Penal Code § 502); violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030); trespass to chattels; violation of the UCL; and inducing breach of contract.  (Dkt. No. 41.)

On April 18, 2025, Intus moved for partial summary judgment only as to its UCL claim, which was based on its contention that RTZ unlawfully engaged in "information blocking" in violation of the 21st Century Cures Act ("Cures Act") and its implementing regulations.  (Dkt. No. 56.)  On September 11, 2025, this Court issued its Order Denying Plaintiff's Motion for Partial Summary Judgment (the "Order," Dkt. No. 84).  In analyzing RTZ's conduct pursuant to the Cures Act, the Order stated that "Intus bears the burden of showing that RTZ 'engaged in facial information blocking,' and 'then the burden shifts to [RTZ] to show that its actions were *not* information blocking because a regulatory exception applies.'"  (Order, Dkt. No. 84, at 5:24-27 [citation omitted].)  The Order held that while Intus had met its initial burden of showing RTZ had engaged in facial "information blocking" for purposes of the motion (*Id.* at 6:1-7:3), summary

---

[2] Further, neither party requested an order deeming any issue established for trial in their summary judgment briefing.  Nor was such a request presented in any properly-noticed motion for reconsideration.  Civil L.R. 7-9 ("No party may notice a motion for reconsideration without first obtaining leave of Court to file the motion.").  Because neither party requested such relief, the subsequent order deeming this issue established for trial did not "adhere to the principle of party presentation"—i.e., "that points not argued will not be considered." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (quotation/citation omitted).  The subsequent order also violated RTZ's due process rights, as RTZ was provided no notice of any motion seeking such an order, nor an opportunity to oppose any such request.

Case No. 4:24-cv-01132-JST

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

judgment would be denied because there were material disputes of fact as to whether RTZ's conduct was *not* "information blocking" pursuant to regulatory exceptions (*Id.* at 7:4-9:13).[3]

### B. Evidence of the Court's Prior MSJ Order Is Irrelevant and Thus Inadmissible, Because the Court Made No Binding Determinations for Trial

It is axiomatic that only evidence relevant to a claim or defense is admissible. Fed. R. Evidence ("FRE") 402. The Court has no discretion to admit irrelevant evidence. *United States v. Dean*, 980 F.2d 1286, 1288-89 (9th Cir. 1992). Here, the prior Order has no relevance to the jury's determination of RTZ's liability under Intus's claims.

Initially, the Order made no determinations for purposes of trial. First, as this Court recently said, it did not decide whether RTZ is an actor and "RTZ is not precluded from arguing at trial that it is not an actor under the Cures Act." (Dkt. No. 203 at 4:4-8.) A determination that RTZ is an "actor" is a necessary prerequisite to any finding that it engaged in "information blocking" in violation of the Cures Act, because the Act applies only to actors. 45 C.F.R. §§ 171.101, 171.102. Unless and until the jury decides whether RTZ is an actor, it is not yet possible to have a determination as to whether it engaged in "information blocking" under the Cures Act.

Second, the Court denied partial summary judgment because it found there were material disputes of fact concerning whether RTZ's conduct was *not* "information blocking" under the regulatory exceptions to the Cures Act. (Order, Dkt. No. 84, at 7:4-9:13.) Intus nevertheless seeks to reference the Order's ruling that RTZ satisfied its initial burden of proof in an effort to suggest to the jury that it must find that RTZ's actions constitute "information blocking" unless it also finds that a regulatory exception applies. But that would mislead the jury by erroneously suggesting that this Court has already determined RTZ is an "actor" that has engaged in wrongful "information blocking," and must be found liable unless RTZ proves a regulatory exception applies. The fact is that the Order made no such ruling for purposes of trial.

---

[3] The Court's Order further stated that, "RTZ does not contest that it must comply with the Cures Act – i.e., that it is an "actor" as defined by [the Act]." (*Id.* at 5:20-22.)

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

As the Court is well aware, although the Federal Rule of Civil Procedure 56(g) gives courts discretion to issue a summary judgment order treating a material fact as established for trial, the Court's Local Rule 56-3 explicitly provides that statements made in an order denying a motion for summary judgment are **not** "issues deemed established for purposes of the trial" unless the Order itself actually specifies such an effect:

> 56-3.    Issues Deemed Established
> Statements contained in an order of the Court denying a motion for summary judgment or summary adjudication shall not constitute issues deemed established for purposes of the trial of the case, unless the Court so specifies.

Civil L.R. 56-3.

*Here, the Order specified no such trial effect.*  Indeed, the Order did not even *mention* Rule 56(g) or Local Rule 56-3, let alone specify that it resolved any issue for purposes of trial. (*See generally* Order, Dkt. No. 84.)

Thus, as this District has held, "[t]he language by which a court denies summary judgment … does not set out 'the law of the case'" and, as mandated by Local Rule 56-3, the Order's discussion of the merits of Intus's UCL claim are nonbinding because the Order "did not specify that any elements of that claim were deemed established for the purposes of trial." *Giovanetti v. Trs. of California State Univ.* (*Humboldt State Univ.*), No. C-04-5514-NJV, 2007 WL 9735004, at *2 (N.D. Cal. Sept. 5, 2007).  *See also Aguirre v. California*, No. 16-CV-05564-HSG, 2018 WL 1948702, at *3 (N.D. Cal. Apr. 25, 2018) (rejecting motion in limine seeking to apply a summary judgment order at trial: "It is true that the Court had discretion to enter an order under Rule 56(g) at summary judgment. In this case, however, it simply did not do so, and no reasonable reading of the order could lead to such a conclusion.").  Nor did Intus's summary judgment motion ever even *ask* the Court to issue any findings for trial under Rule 56(g) and Local Rule 56-3.  (See generally Dkt. No. 56.)  *See also Margolin*, 146 S. Ct. at 1288 (courts decide "only the questions presented.") (quotation/citation omitted).

Further, it makes sense that the Order did not specify a binding trial ruling under Local Rule 56-3, given the context of this case.  As explained in the advisory committee's comments to the 2010 amendments regarding Rule 56(g):

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

> The court must take care that this determination does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.
>
> …. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

Here, RTZ was confident that the Cures Act regulatory exceptions would defeat summary judgment, and thus it did not need to respond to every argument raised (e.g., its non-"actor" status)—but that should not mean that RTZ is now barred from presenting evidence that it is not an "actor" or that its conduct was not "information blocking" under the Cures Act even without relying on the regulatory exceptions.

Moreover, the facts regarding RTZ's alleged "information blocking" conduct must be tried in any event, because those same facts also underlry multiple claims and counterclaims that were not considered in the summary judgment ruling.  For example, Intus's claims for intentional interference with contractual relations and intentional interference with prospective economic advantage both depend on whether it can prove its allegations that RTZ interfered with Intus's contractual and economic relationships by intentionally refusing to allow Intus to access electronic heath data stored in RTZ's PACECare software system.  (*See* Dkt. No. 25, ¶¶37, 45.) *See also Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (claim for intentional interference with contract requires proof of "defendant's intentional acts designed to induce a breach or disruption of the contractual relationship"); *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017) (claim for intentional interference with economic relationship requires proof of "intentionally wrongful acts designed to disrupt the relationship").

Similarly, RTZ's counterclaims for violation of the California Computer Data Access and Fraud Act (Cal. Penal Code § 502), violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), trespass to chattels, and violation of the UCL rely on whether RTZ can prove its allegations

that it did not permit Intus access to its PACECare software system to extract data. (*See* Dkt. No. 41, ¶¶53-54, 62-63, 71, 77.) As such, the facts and evidence regarding RTZ's actions in refusing to grant Intus access to its PACECare software must be presented to the jury for purposes of all these other claims and counterclaims, in any case.

As this Court has recognized, when related facts "must be tried in any event," the better course is to decline to enter a Rule 56(g)/Local Rule 56-3 order. *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-CV-01393-JST, 2021 WL 3504669, at *12 (N.D. Cal. June 14, 2021). *See also Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-CV-00923-BLF, 2018 WL 11230167, at *8 (N.D. Cal. May 21, 2018) (finding the issues were "better illuminated by the trial of related facts that must be tried in any event" and declining to issue Rule 56(g) order).

This Court clearly did *not* issue a Rule 56(g)/Local Rule 56-3 order here, nor is there any reason to reconsider that decision at this late stage (especially as Intus never moved for reconsideration under Civil L.R. 7-9). Thus, the Order does not make any facts in dispute "more probable or less probable" as required for relevance. *See* FRE 401. Accordingly, evidence regarding the Order is irrelevant and should be excluded.

**C.    Evidence of the Court's Prior MSJ Order Is More Prejudicial Than Probative and Would Lead to Juror Confusion**

Even if evidence regarding the Order were relevant—which it is not—the evidence should nonetheless be excluded under FRE 403 as unfairly prejudicial and likely to confuse the jury. Under FRE 403, the Court must determine whether the "probative value is substantially outweighed by a danger of one or more of the following: *unfair prejudice, confusing the issues, misleading the jury*, undue delay, wasting time, or needlessly presenting cumulative evidence." (emphasis added).

Courts routinely exclude evidence of summary judgment orders as too prejudicial for trial. For example, in *S.E.C. v. Retail Pro, Inc.*, No. 08CV1620-WQH-RBB, 2011 WL 589828 (S.D. Cal. Feb. 10, 2011), the court granted a motion in limine to exclude evidence of its summary judgment order, finding "that evidence of, or reference to, the Court's summary judgment Order presents a substantial risk of jury confusion and unfair prejudice to Defendant." *Id*. at *4. *See*

*also GPNE Corp. v. Apple Inc.*, 108 F. Supp. 3d 839, 855 (N.D. Cal. 2015) (plaintiff's "arguments misconstrue the effect of the Court's denial of [defendant]'s motion for summary judgment, and are exactly why courts typically exclude reference to prior orders under Federal Rule of Evidence 403 as presenting a substantial risk of jury confusion and unfair prejudice."); *Baugh v. Detroit Club Mgmt. Co.*, No. 22-CV-11427, 2026 WL 948709, at \*5 (E.D. Mich. Apr. 8, 2026) (collecting cases; "Relying on Federal Rule of Evidence 403, trial courts generally exclude from trial any evidence of summary judgment decisions, finding a risk that the jury will misinterpret the significance of those rulings."); *Hawkins v. Maury Cnty. Bd. of Educ.*, No. 1:12-CV-0184, 2019 WL 13260543, at \*2 (M.D. Tenn. Mar. 21, 2019) (granting motion in limine to exclude reference to summary judgment order and collecting cases; "As a general principle, a court's ruling on summary judgment represents a matter of law based on discrete issues that 'have no purpose or place at trial.'"); *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 WL 5349266, at \*13 (S.D. Ohio Mar. 27, 2006) (granting motion in limine to exclude reference to summary judgment order, and holding that "evidence of or references to [statements made in the Court's prior summary judgment order] do not have a tendency to make the existence of any fact of consequence to make the determination of this action more or less probable" and would be "too prejudicial to introduce to the jury at trial").

Here, evidence regarding the Order is far more prejudicial than probative. Any reference to statements in the Order indicating that the Court found RTZ an "actor" or engaged in "information blocking" under the Cures Act would falsely imply to the jury that this Court has already determined that RTZ engaged in wrongful conduct, and that its liability has been pre-determined – despite this Court's acknowledgement that the "actor" status remains at issue.

Further, it would confuse the jury by suggesting that the disputed issue of "information blocking" has already been decided against RTZ. The jury must determine for itself whether RTZ's conduct was—or was not—"information blocking" under the Cures Act, ***including under regulatory exceptions that define actions that explicitly are <u>not</u> "information blocking."*** The Cures Act clearly provided that the Secretary of the U.S. Department of Health and Human Services ("HHS") "shall identify reasonable and necessary activities that ***do not constitute***

*information blocking*".  42 U.S.C. § 300jj-52(a)(3) (emphasis added).  HHS then promulgated regulations identifying certain practices (the "exceptions") that by statutory definition "*will not be considered information blocking.*"  45 C.F.R. §§ 171.201–206 and §§ 171.301–303 (emphasis added).  *See also Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 231 (4th Cir. 2025) (defendant may prove "that its actions were *not* information blocking because a regulatory exception applies").  Should Intus be permitted to introduce evidence of statements in the Court's order indicating that RTZ engaged in "information blocking" it would be thoroughly confusing to a jury, which is likely to mistakenly believe that finding has already been made— when in fact, the jury must decide for itself whether or not RTZ's conduct qualifies as "information blocking," with or without application of the regulatory exceptions.

Additionally, evidence of the Order would be unfairly prejudicial with respect to the other claims and counterclaims to be tried.  As explained above, the jury must decide whether RTZ or Intus acted wrongfully for purposes of other claims or counterclaims that are not premised on the Cures Act (e.g., RTZ's counterclaims for violation of laws governing unauthorized access to computer systems).  Those claims are based on related evidence regarding RTZ's refusal to allow Intus to access its PACECare software, and Intus's actions to access it notwithstanding that refusal.  Reference to the Order's statements that RTZ engaged in "information blocking" is likely to lead the jury to erroneously believe that this Court has already found that RTZ acted wrongfully, thus causing unfair prejudice as to these separate and distinct counterclaims.

On the other hand, excluding this evidence would not deprive Intus of any evidence with probative value, as the Order does not make any material fact more or less probable.  *See, e.g., CDA of Am. Inc.*, 2006 WL 5349266, at *13 ("evidence of or references to [statements in summary judgment order] do not have a tendency to make the existence of any fact of consequence to make the determination of this action more or less probable" and were "too prejudicial to introduce to the jury at trial").  Accordingly, evidence regarding the Order is highly prejudicial and likely to confuse the jury, has no probative value, and should be excluded.

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

## IV.    MIL NO. 3 TO EXCLUDE ALLEGED "UNOBSERVABLE" DAMAGES

RTZ seeks an order excluding any and all evidence or argument relating to Intus's alleged "unobservable" damages from the disruption of business relationships as to third parties with whom Intus had no existing business relationships.  Damages for alleged "disruption" of non-existing business relationships are unavailable to Intus as a matter of law and the evidence would thus be irrelevant, and allowing such evidence and argument in this case would unfairly prejudice RTZ and cause jury confusion.

Intus asserts three claims: (1) intentional interference with contractual relations; (2) intentional interference with prospective economic advantage; and (3) violation of California's unfair competition law, Cal Bus. & Prof. Code §§ 17200 *et seq.*  (Dkt. No. 25.)  None of its claims allow Intus to recover for the purported "disruption" of hoped-for—but not yet existing—relationships with third parties.  Nonetheless, Intus's damages expert, Dr. Hult ("Hult") purports to calculate so-called "unobservable" damages from the alleged disruption of relationships that *did not yet exist* between Intus and third parties in the market, on the basis that Intus might have developed future business relationships with such potential customers.  The law plainly does not authorize recovery of such a remedy under any of Intus's claims here.

Accordingly, evidence or argument relating to alleged "unobservable" damages from RTZ's purported interference with relationships as to third parties with whom Intus did not have any existing business relationship should be excluded as irrelevant, given that there is no such remedy available to Intus as a matter of law.  Moreover, permitting Intus to place such evidence in front of the jury would be highly prejudicial to RTZ, and would confuse and mislead the jury as to the alleged injuries and remedies that are actually at issue and legally possible in this case.

### A.    Factual Background

On April 2, 2024, Intus filed its operative Amended Complaint alleging claims against RTZ for intentional interference with contractual relations; intentional interference with prospective economic advantage; and violation of California's unfair competition law ("UCL"), California Business & Professions Code section 17000 *et seq.*  (Dkt. No. 25.)

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Intus's damages expert Hult opined on three categories of alleged damages: (1) losses from existing contracts between Intus and its customers (Lee Decl., Ex. 5 [Hult Report], ¶¶16 & 46); (2) losses from observable business opportunities (i.e., renewed or expanded contracts) with customers with whom Intus had existing relationships (*Id.*, ¶¶18 & 61-65); and (3) losses from "unobservable" "potential business opportunities" that are not identifiable in any of Intus's data because Intus did not compete for these theoretical "opportunities" (*Id.*, ¶¶20 & 66-67).  It is the third category (the "unobservable" losses) that are at issue in this motion.

Hult explained that in contrast to the first two categories in which "Intus had an actual or expected contract," this "third source of lost revenue comes from opportunities that are unobservable to Intus.  They are unobservable in the sense that they were potential business opportunities that Intus was foreclosed from competing on…." (*Id.*, ¶¶66-67.)  He posited that there are two types of customers who may represent "unobservable" losses: (1) past Intus clients who "may have been interested in pursuing additional business opportunities with Intus" but did not do so; and (2) "potential new clients for Intus" who "may never have approached Intus" about potential business opportunities.  (*Id.*, ¶¶68-69.)  Intus and Hult could not identify any specific lost opportunity from (1) any past client who did not return to Intus with new business or (2) any potential client who had never before done business with Intus.  Thus, Hult instead used a model to compare (a) how Intus's revenue actually grew in the market, against (b) how he posits Intus's revenue would have grown in the market "but for" RTZ's alleged conduct.  (*Id.*, ¶¶71-73.)  Hult's analysis looked only at "market outcomes" as he was unable to tie any loss to any specific customer: "[Y]ou can't really back out which customers would have purchased or not purchased the product…." (Lee Decl., Ex. 6 [Hult Tr.] at 155:4-19.)  Accordingly, Hult could not and did not do any "customer by customer analysis of a likely transaction" and instead merely looked at market outcomes in the aggregate. (*Id.* at 157:1-11.)  Put simply, Hult calculated "unobservable" damages based on a theory of lost opportunities in the market—but he did not (and cannot) identify any loss from any *specific* customer who was in an *existing* economic relationship with Intus that contained the probability of future economic benefit.

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

To calculate the so-called "unobservable" damages, Hult started with a list of PACE programs who were clients *of RTZ*. (Lee Decl., Ex. 5 [Hult Rep.] ¶70 & Ex. 7.) Hult excluded from his calculations the first listed group of 10 PACE programs for which Intus had records of lost revenue. (*Id.*) The second group on Hult's list were 9 PACE programs "that produced revenue for Intus *at some point*, but do not have any affirmatively recorded lost opportunities"—i.e., past customers who were not in an ongoing relationship with Intus. (*Id.*, emphasis supplied.) Hult explained that the 9 past Intus customers only produced historical revenue and that he does not claim to attribute any "lost" revenue directly to any one of these 9 past customers: "Nine have some revenue, but none of that revenue is lost revenue." (Lee Decl., Ex. 6 [Hult Tr.] at 174:22-175:7.) The third and final group on Hult's list are the 33 "PACE programs that have *never* produced revenue for Intus and would, therefore, be *potential new clients* for Intus." (*Id.*, emphasis supplied.) These 33 "potential new clients" never had any relationship with Intus, as there was no existing contract, no receipt of any revenue, and no current paid engagement relationship with Intus. (Lee Decl., Ex. 6 [Hult Tr.] at 148:11-22.) These were merely "potential clients, but not current clients." (*Id.* at 149:9-13.)

Intus admittedly did not even attempt to compete for business opportunities with the second and third groups of "potential clients," and thus there are no bids, draft contracts, term sheets, statements of work, letters of intent, proposals, or invoicing to show any existing business relationships with Intus. (*Id.* at 151:9-152:25.) The only reason these programs appear in Hult's damages calculations is because they were *customers of RTZ*—not because they had any existing business relationship with *Intus*. (*Id.* at 154:16-155:3.)[4] Hult also admits that he cannot identify which specific clients within the 9 past Intus clients or 33 "potential new clients" would tie to the alleged "unobservable" losses because "with these types of analyses, you don't know where the data would have come from out of those two buckets, but those are the two potential sources of that lost revenue." (*Id.* at 149:14-150:5.)

---

[4] Hult's theory is that every customer of RTZ's was a potential customer of Intus. (Lee Decl., Ex. 6 [Hult Tr.] at 154:24-155:3.)

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Hult thus used these second and third groups of "potential clients" as data for his calculations of alleged "unobservable" losses. (Lee Decl., Ex. 5 [Hult Report], ¶70.) Starting with these speculative data points, Hult piled on even more speculation (as detailed in RTZ's *Daubert* motion) (*Id.* at ¶¶71-86), to ultimately opine that Intus "lost" $883,406 in revenue from *unidentified* potential clients in the market between September 2023 and July 2025 (*Id.* at ¶84), plus a further $3,164,653 in "lost revenues from unobservable lost revenue opportunities" in the market after July 2025 (*Id.* at ¶86), for a grand total "unobservable" revenue loss of $4,048,059 (*Id.* at ¶92 & Ex. 10). But these are merely claims of generalized potential market losses—they are ***not*** losses tied to the disruption of any *specific relationship* with any *specific customer*. As explained herein, these so-called "unobservable" losses are in fact damages that are unavailable to Intus under any legal theory in this case.

### B.    Evidence of Legally-Unavailable Damages May Be Excluded

A motion in limine may properly be used to exclude evidence and arguments pertaining to remedies that are not legally available to a party, such as those Intus seeks here. *See, e.g., Kassim v. City of Schenectady,* 415 F.3d 246, 250 (2d Cir. 2005) (motion in limine proper to limit compensatory damage award to property loss and 30 days of lost profits); *T.D.W. v. Riverside Cnty.*, No. EDCV 08-232CAS(JWJX), 2009 WL 2252072, at *5-7 (C.D. Cal. July 27, 2009) (excluding evidence of damages for plaintiffs' pain and suffering that were unavailable as a matter of law pursuant to a motion in limine).

### C.    Evidence of the So-Called "Unobservable" Damages Is Irrelevant and Thus Inadmissible, Because Such Damages Are Legally Unavailable

Only evidence relevant to a claim or defense is admissible. Fed. R. Evidence ("FRE") 402. The Court has no discretion to admit irrelevant evidence. *United States v. Dean*, 980 F.2d 1286, 1288-89 (9th Cir. 1992). Here, evidence regarding Intus's alleged "unobservable" damages based on "potential clients" in the market with whom Intus speculates it might have developed future relationships is irrelevant, because damages for the alleged disruption of not-yet-existing business relationships is not a remedy available under any of Intus's three claims.

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Initially, Intus's claim for intentional interference with contractual relations obviously provides a damages remedy only for the disruption of existing contracts, which are not present in Hult's "unobservable" damages. *See, e.g., CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007) (claim requires "a valid contract between plaintiff and a third party"). As to Intus's claim under the UCL, it does not provide any damages remedy at all— "equitable relief" is "the only relief afforded by the UCL." *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1141 (9th Cir. 2025); *see also Hodge v. Superior Ct.*, 145 Cal. App. 4th 278, 284 (2006); *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999). "'Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims.'" *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1112 (E.D. Cal. 2024), *aff'd sub nom. Republican Nat'l Comm. v. Google Inc.*, No. 24-5358, 2026 WL 125195 (9th Cir. Jan. 16, 2026) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003)).

Finally, Intus's claim for intentional interference with prospective economic advantage requires an ***existing*** economic relationship with the ***probability*** of future economic benefit to the plaintiff before any damages remedy is available. *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017) (holding that submitting a bid to a public entity does not create an existing relationship, but merely the hope of one); *CRST*, 479 F.3d at 1107-08. That relationship must have "existed at the time of the defendant's allegedly tortious acts lest liability be imposed for actually and intentionally disrupting a relationship which has yet to arise." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 526 (1996). *See also O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 997 (N.D. Cal. 2014) (collecting cases and holding "the 'relationship' that forms the basis of the intentional interference tort must have existed at the time of the allegedly tortious conduct."). As this District has stated, "[t]o show an economic relationship, the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference. …. [A] mere hope for an economic relationship and a desire for future benefit is inadequate…." *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1016 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) (internal quotations/citations omitted).

70557756.v3

*Prostar* is instructive. Plaintiff was a wireless services company that created a delivery driver application it intended to sell to Domino's Pizza franchisees. Plaintiff alleged it had developed relationships with franchisees but Domino's interfered with these relationships when it refused to allow plaintiff to sell its application to the franchisees. 360 F. Supp. 3d at 1004-05. The Court rejected plaintiff's argument that a viable claim was presented because "the market here is 'finite and specifically identifiable'—namely, Domino's franchisees", and held it was not sufficient to lump together such an undifferentiated group. *Id.* at 1017. *Prostar* relied upon *Westside, supra*, 42 Cal. App. 4th 507, which similarly held a "plaintiff's 'interference with the market theory' was insufficient to show 'an economic relationship with a prospective buyer which was reasonably likely to produce a future beneficial sale of its property.'" *Prostar*, 360 F. Supp. 3d at 1016 (quoting *Westside*, 42 Cal. App. 4th at 528).

Similarly here, Intus seeks to present evidence of alleged lost profits based upon (a) *past* relationships with 9 clients, and (b) 33 theoretical "potential new clients" with whom it has never had a relationship. Intus then extrapolates that data into testimony regarding alleged lost opportunities with unidentified "potential clients" in the market—without tying those speculative "losses" to any specific existing business relationship with any specific customer. But "an expectation of an economic relation is not actionable. Rather, an expectation of economic advantage based on an already-existing and ongoing economic relationship is required." *TPS Utilicom Servs., Inc. v. AT & T Corp.*, 223 F. Supp. 2d 1089, 1106 (C.D. Cal. 2002); *see also Wyatt Tech. Corp. v. Malvern Instruments Inc.*, No. CV 07-08298DDP(MANX), 2009 WL 2365647, at *24 (C.D. Cal. July 29, 2009), *aff'd*, 526 F. App'x 761 (9th Cir. 2013) (claim unavailable where "[p]laintiff's evidence addresses no specific relationship with any specific customer"); *Damabeh v. 7-Eleven, Inc.*, No. 5:12-CV-1739-LHK, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013) (claim unavailable "because Plaintiff has not identified the specific relationship with which Defendant is alleged to have interfered" and it is essential to show "that Defendant interfered with Plaintiff's relationship with a particular individual.").

Here, Intus's claimed lost profits from future "potential clients" whose business it did not compete for and with whom it had no existing relationship is the very same kind of "interference

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

with the market" or "lost opportunity" claim that courts have repeatedly held is "too speculative: 'it assumes what normally must be proved, i.e., that it is reasonably probable the plaintiff would have received the expected benefit had it not been for the defendant's interference.'" *Roy Allan Slurry Seal, Inc.*, 2 Cal. 5th at 516 (quoting *Westside*, 42 Cal. App. 4th at 523). *See also, e.g., Prostar*, 360 F. Supp. 3d at 1016-17 (relationship with Domino's franchisees plaintiff intended to sell to was insufficient); *TPS Utilicom*, 223 F. Supp. 2d at 1106 (relationship with "customers residing in markets" plaintiff planned to serve was insufficient); *Pinnacle Sys., Inc. v. XOS Techs., Inc.*, No. C-02-03804-RMW, 2003 WL 21397845, at *6 (N.D. Cal. May 19, 2003) (relationship with "the 'market' and [plaintiff's] 'potential customers'" was insufficient); *Wyatt Tech. Corp.*, 2009 WL 2365647, at *24 (relationship with "existing and future customers" expected to generate revenue from "maintenance contracts and renewals, new customer sales" and similar was insufficient). Such "relationships with 'potential customers' are insufficient because they are nothing more than 'speculative economic relationship[s].'" *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO, 2013 WL 5694452, at *20 (N.D. Cal. Oct. 18, 2013).

Intus's claimed relationship with potential clients in the market is insufficient, because a *specific* customer relationship must be identified. For example, in *Rheumatology Diagnostics*, plaintiffs were providers of clinical laboratory services who claimed defendants had conspired to exclude them from Aetna and BSC health insurance networks, and were thus driving clients away from plaintiffs. As the Court explained, to establish the requisite existing relationship, "a seller of some good must show 'an existing relationship with an identifiable buyer.'" *Id.* at *20 (quoting *Westside*, 42 Cal. App. 4th at 522, 527). Plaintiffs could not merely identify the market of "all Aetna- and BSC-contracted patients and physicians" because "claiming that each of the universe of such individuals has an 'identifiable' and 'existing' economic relationship with the plaintiffs is simply too speculative and hypothetical. As *Westfield Center Associates* correctly reasons, to say that the plaintiffs have an economic relationship with all Aetna- and BSC-contracted patients and physicians is assuming what needs to be proved." *Id.* at *21.

Yet Intus impermissibly seeks to use "interference with the market" evidence at trial, without identifying any specific client relationship with which RTZ supposedly interfered. As

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Intus argued in its Opposition to the *Daubert* motion regarding Hult: "All programs in the PACE space are potential Intus clients. …. Intus is going to secure some of those contracts and lose others. But, when RTZ [allegedly interferes], Intus loses all of them." (Dkt. 166 at 11:7-11.) But the mere fact that Intus views "all programs in the PACE space" as potential clients does not turn them into *existing* business relationships that present a likelihood of expected benefit to Intus.

Intus cannot obtain damages from such alleged "unobservable" losses in the market without identifying any specific client contract it expected to secure absent RTZ's alleged interference (e.g., a client who subsequently broke off contract negotiations)—which it cannot do. As such, pursuant to the cases cited above, the "unobservable" damages are not legally available to Intus, and such evidence is irrelevant and should be excluded. *See also, e.g., Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013), *aff'd,* 609 F. App'x 497 (9th Cir. 2015) (striking claim for interference with prospective business advantage where counterplaintiffs "have not identified any specific opportunities that [they] lost"); *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C 03-05340 JF, 2005 WL 832398, at *9 (N.D. Cal. Mar. 30, 2005) (relationships with "repeat customers" and expectation of "future and prospective sales" to those customers was too speculative and did not "rise to the level of the requisite *promise* of future economic advantage") (internal quotations/citations omitted).

In addition to the lack of any existing economic relationship, the "unobservable" damages also fail to satisfy the second part of the first element: the "probability of future economic benefit to the plaintiff." *CRST,* 479 F.3d at 1107-08. "Overall, courts have narrowly construed this element, requiring specific facts to show that a benefit was almost certain." *Republican Nat'l Comm.*, 742 F. Supp. 3d at 1122. "The fact that a plaintiff has a preexisting business relationship with a party is not sufficient; the plaintiff must provide details about the impending contract or other economic benefit." *Id.* "For example, the failure to specify what the terms were, when the contracts were being negotiated (*e.g.*, whether those contracts fell through before, during, or after Defendant's alleged ... acts), and how much money, if any, Plaintiff lost as a result dooms a claim." *Id.* at 1123 (quotation/citation omitted).

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Here, Intus seeks to present evidence of alleged "unobservable" damages devoid of any specific facts showing an impending contract with any potential client because it relies on its "interference with the market" theory.  There is no suggestion that Intus was in active contract negotiations with any potential clients that were disrupted by RTZ, nor any other "specific facts to show that a benefit was almost certain." *Republican Nat'l Comm.*, 742 F. Supp. 3d at 1122.  To the contrary, because these are merely theorized business opportunities that Intus had no knowledge of and did not compete for (as Hult admitted), "they generated no bids, proposals, or contracts and therefore do not appear in Intus's CRM, invoicing systems, or other internal data." (Lee Decl., Ex. 5 [Hult Rep.] at ¶20.)  Nothing is known about the terms of these potential contracts with unspecified potential clients—Hult admits these are merely contracts he posits "might have existed and I can't give you any information about that contract because there's not – there's no information in the record about what that contract would look like, which would be in the third bucket [of "unobservable" damages]."   (Lee Decl., Ex. 6 [Hult Tr.] at 44:20-45:1.)   These "unobservable" damages would be unavailable due to the lack of a probable future benefit even if every "potential client" in the market had previously done business with Intus (which is patently not the case). *See Republican Nat'l Comm.*, 742 F. Supp. 3d at 1123 ("[Plaintiff] has failed to point to any case where a past economic relationship standing alone was enough to show the reasonable probability of a future benefit, and the Court has been unable to find one in its own review."); *Google Inc.*, 2005 WL 832398, at *9 (claimed expectation based on "repeat customers" was "expressing merely a 'hope ... and a desire' for unspecified future sales to unspecified returning customers").

As such, there was no "probability" of benefit to Intus, which further demonstrates that the evidence of "unobserved" damages is irrelevant and should be excluded.

**D.    Evidence of the So-Called "Unobservable" Damages Is More Prejudicial Than Probative and Would Lead to Juror Confusion**

Even if evidence of claimed losses from potential clients with whom Intus had no existing business relationship could be relevant—which it is not—the evidence should nonetheless be excluded because any "probative value is substantially outweighed by a danger of one or more of

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

the following: *unfair prejudice, confusing the issues, misleading the jury*, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403 (emphasis added).

As explained, the evidence has no probative value because the purported "unobservable" damages are simply not legally available to Intus. Evidence and arguments regarding remedies that are not legally available to a party are properly excluded from trial. *See Kassim,* 415 F.3d at 250 (motion in limine proper to limit compensatory damage award to property loss and 30 days of lost profits); *T.D.W.*, 2009 WL 2252072, at *5-7 (excluding evidence of damages for plaintiffs' pain and suffering that were unavailable as a matter of law pursuant to a motion in limine).

Further, the evidence is plainly more prejudicial than probative. Any reference to alleged lost profits from potential clients with whom Intus had no existing business relationship would falsely imply to the jury that such damages are legally available to be awarded to Intus, when in fact they are not, thus introducing juror confusion and error. Accordingly, this evidence is highly prejudicial and likely to confuse the jury, has no probative value, and should be excluded.

## V.   MIL NO. 4 TO EXCLUDE EVIDENCE OF COLLABRIOS CONDUCT AND USE OF HIGH DESERT EMAILS

RTZ seeks an order barring Intus from introducing at trial any evidence, argument, or reference concerning the post-acquisition conduct, actions, omissions, and communications of non-party Collabrios Health LLC ("Collabrios") with customers who executed RTZ's PACECare agreements, including for instance the email communications between Collabrios and High Desert PACE. Collabrios is not a party to this action. This Court denied Intus's motion for leave to add Collabrios as a defendant because Intus was not diligent in seeking amendment. (Dkt. 123 at 2–3.) The Court subsequently denied reconsideration (Dkt. 143.), and limited discovery to prevent Intus from circumventing those rulings (Dkt. 181 at 3.). None of Intus's claims—intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition—are directed at Collabrios or concern Collabrios's post-acquisition customer interactions. The High Desert emails are even farther afield: they concern communications between Collabrios and High Desert about rights and obligations under a PACECare agreement,

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

not any alleged information blocking by RTZ.[5] Such evidence would be irrelevant under Federal Rules of Evidence 401 and 402, and any marginal probative value would be substantially outweighed by the risk of unfair prejudice, jury confusion, and waste of time under Rule 403.

### A.    Factual Background

#### 1.    Intus's Claims Are Directed Solely at RTZ's Pre-Acquisition Conduct.

Intus filed its First Amended Complaint ("FAC") on April 2, 2024, naming only RTZ as a defendant. (Dkt. 25.) The claims arise from RTZ's alleged conduct beginning in September 2022—specifically, that RTZ demanded Intus sign an NDA as a condition of access to electronic health records on PACECare, sent cease-and-desist letters to PACE organizations, and ultimately prohibited Intus from receiving customer data. (Dkt. 25, FAC ¶¶ 14–21, 33–72.) The alleged wrongful acts occurred before Collabrios's acquisition of RTZ assets in October 2024.

#### 2.    Collabrios's Post-Lawsuit Acquisition of RTZ Assets.

In October 2024—months after this lawsuit was filed—Collabrios acquired RTZ's assets. (Dkt. 98 at 4–5; Dkt. 103 at 1–3.) RTZ and Collabrios are separate legal entities. RTZ is a wholly owned subsidiary of Collabrios, but RTZ did not merge with Collabrios and continues its own operations. (Dkt. 95 at 5; Dkt. 130 at 1.) Critically, the acquisition was an asset purchase; Collabrios did not assume RTZ's liabilities. (*Id.*)

#### 3.    The PACECare Agreements Belong to RTZ.

The PACECare agreements at issue were executed by RTZ and remain RTZ's contracts. While Collabrios services those agreements operationally, the contracts have not been assigned to Collabrios. At the May 11, 2026 hearing, RTZ's counsel confirmed that the contracts belonged to RTZ but were serviced by Collabrios; Intus cited no contrary evidence. (Dkt. 143 at 2.) RTZ remains the contracting party and the entity damaged by any customer termination. (Dkt. 144 at 3–4.)

---

[5] Indeed, as detailed in RTZ's Letter Brief (Dkt. 130), Intus produced the High Desert emails seven weeks after the close of discovery, and on this basis alone should be excluded due to prejudice – as this Court has previously acknowledged (*See* Dkt. 181.).

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

**4.    This Court's Prior Orders Confirm Collabrios's Non-Party Status.**

This Court has repeatedly reinforced Collabrios's non-party status:

**Magistrate Judge Tse's Discovery Order (Dkt. 97):** Collabrios need not respond to Intus's discovery requests because "a non-party is not required to respond to Rule 33/34 discovery" and Intus had not established that RTZ controls Collabrios's documents. (Dkt. 97 at 2.)

**Denial of Leave to Amend (Dkt. 123):** The Court denied Intus's motion to add Collabrios as a defendant, finding Intus was not diligent in seeking amendment after learning of the acquisition in October 2024. (Dkt. 123 at 2–3.)

**Denial of Reconsideration (Dkt. 143):** The Court denied Intus's motion for leave to seek reconsideration, noting Intus cited no evidence that RTZ's expert report characterized the contracts as belonging to Collabrios and no authority that the acquisition caused Collabrios to be automatically added as a party. (Dkt. 143 at 2.)

**Lathrop Deposition Scope Order (Dkt. 181):** The Court limited the scope of Intus's deposition of Kevin Lathrop (Collabrios' President) to his percipient knowledge of the FAC's allegations and his discussions with RTZ's experts. The Court barred all other inquiry into the RTZ-Collabrios relationship, corporate dealings, current operations, and High Desert communications. The Court stated Intus "cannot use [the] deposition to circumvent" its prior rulings. (Dkt. 181 at 3.)

**5.    The High Desert Emails Concern a Collateral Contract Dispute Between Collabrios and High Desert.**

The email communications between Collabrios and High Desert do not concern Intus's pleaded allegations that RTZ blocked Intus's access to PACECare data beginning in September 2022. They concern a separate dispute between non-party Collabrios and High Desert over contractual rights and obligations under a PACECare agreement, including issues Intus sought to explore through Kevin Lathrop. The Court has already barred use of the High Desert documents in the Lathrop deposition. (Dkt. 181 at 3.)

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

B.    **Legal Argument**

1.    **Collabrios Evidence Is Irrelevant Under Rules 401 and 402.**

Evidence is relevant only if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402.

Intus's claims are pleaded against RTZ and concern RTZ's alleged refusal to provide Intus access to PACECare data beginning in September 2022. (Dkt. 25, FAC ¶¶ 14–21, 33–72.) Collabrios's post-acquisition communications with PACECare customers in 2025 and 2026 do not make any fact of consequence regarding RTZ's alleged pre-acquisition information-blocking conduct more or less probable. Such evidence concerns a different entity's conduct, at a different time, under different circumstances. It is not probative of any element of Intus's interference or unfair competition claims against RTZ.

The Court has already recognized this boundary. In limiting the Lathrop deposition to "percipient knowledge of allegations in the FAC (RTZ's alleged information-blocking efforts by refusing Intus access to PACECare absent an NDA)," the Court drew the precise relevance line RTZ asks this Court to enforce at trial. (Dkt. 181 at 2–3.) The Court has previously determined that Intus "cannot use [the] deposition to circumvent" its prior rulings (Dkt. 181 at 3.) and it should not be allowed to do so at trial either.

2.    **Any Marginal Probative Value Is Substantially Outweighed by Prejudice and Confusion Under Rule 403.**

Even assuming arguendo that Collabrios evidence has some marginal relevance, it should be excluded because its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." Fed. R. Evid. 403. "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Admitting evidence of Collabrios's customer interactions would:

- **Invite the jury to punish RTZ for a non-party's actions**—precisely the "improper basis" Rule 403 guards against.

- 29 -                                          Case No. 4:24-cv-01132-JST

- **Confuse the issues** by requiring mini-trials about Collabrios's corporate structure, post-acquisition customer service practices, and contract-termination disputes that are entirely collateral to the claims at issue.

- **Waste time and cause undue delay** as RTZ would be forced to explain and rebut Collabrios's separate business decisions to avoid unfair inferences.

District courts have broad discretion to exclude evidence under Rule 403 where the risk of confusion outweighs probative value. *See United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007); *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).

### 3. The High Desert Emails Are Inadmissible Because They Concern a Non-Party Contract Dispute, Not Information Blocking.

It is expected that Intus seeks to introduce email correspondence between Collabrios and High Desert and present testimony concerning the subject matters within those emails.[6] The High Desert emails are not information-blocking evidence. They are communications between Collabrios and High Desert concerning asserted rights and obligations under a PACECare agreement—i.e., a contract dispute between a non-party and a PACECare customer. (Dkt. 130, at Exh. B; Dkt. 144 at 3–4; Dkt. 181 at 3.) Whether Collabrios and High Desert disagreed about contract release, termination, transition logistics, fees, or related obligations says nothing about whether RTZ unlawfully interfered with Intus's data access beginning in September 2022. The emails and any related testimony therefore fail Rule 401 and are inadmissible under Rule 402.

Nor can Intus recast the subject matter within those emails as relevant by invoking RTZ's damages theory. A customer-side dispute between Collabrios and High Desert over PACECare contract obligations does not prove or disprove any pleaded information-blocking allegation against RTZ. Its only practical effect would be to invite jurors to decide this case based on collateral dissatisfaction with a non-party's contract administration – subject matters having nothing to do with allegations against RTZ.[7] Rule 403 forbids that detour.

---

[6] The High Desert emails at issue include the following: (i) all High Desert emails attached as Exhibit B to Dkt. 130 (RTZ's joint letter brief regarding the High Desert communications produced after close of discovery) and (ii) INTUS019811 (which is subsumed entirely within the High Desert emails addressed in and attached to Dkt. 130.).

[7] Indeed, on June 26, 2026, Intus filed a separate lawsuit against Collabrios in Contra Costa County Superior Court (Case No. C26-02211) alleging facts specifically at issue in the High Desert emails.

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

### 4. Collabrios's Conduct Cannot Be Attributed to RTZ.

Even if Collabrios's post-acquisition conduct were otherwise relevant (which it is not), it cannot be imputed to RTZ. The Supreme Court has long recognized that "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted); *see also Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) (corporate separateness of affiliated entities); *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).

Here, the undisputed record establishes that Collabrios acquired RTZ's assets but did not assume RTZ's liabilities. (Dkt. 95 at 5; Dkt. 130 at 1.) Under California's settled rule, a corporation that purchases the assets of another does not assume the seller's liabilities unless an exception applies—none of which Intus has even pleaded, let alone proved. *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977); *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012). Collabrios's post-acquisition conduct is therefore legally irrelevant to RTZ's liability.

### 5. The Court's Prior Rulings Foreclose Trial-by-Ambush on Collabrios and High Desert Issues.

Admitting Collabrios evidence or the High Desert emails or testimony about their content at trial would allow Intus to accomplish through the back door what this Court has repeatedly denied through the front. The Court denied leave to add Collabrios as a defendant (Dkt. 123.), denied reconsideration (Dkt. 143.), sustained the Magistrate's non-party discovery ruling (Dkt. 97), and limited the Lathrop deposition to prevent Intus from circumventing those orders (Dkt. 181 at 3). The Court specifically barred use of the untimely produced High Desert documents in the Lathrop deposition and recognized that allowing questioning about them would be unfair because RTZ could not depose High Desert on the same communications after discovery closed. (Dkt. 181 at 3.) Permitting Intus to parade those emails or their authors/recipients before the jury would

---

As such, Intus thereby concedes that the High Desert emails are disconnected from the instant lawsuit and are being litigated in a separate lawsuit and forum.

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

effectively relitigate successor-liability, corporate-relationship, and Collabrios/High Desert contract issues—topics outside the claims actually pleaded and to be tried against RTZ.

The Court should therefore enter an order precluding Intus, its counsel, witnesses, and experts from offering any evidence, eliciting any testimony, referring to, displaying, using, or arguing at trial regarding Collabrios Health LLC's post-acquisition conduct, actions, omissions, customer communications, customer-service interactions, contract-termination negotiations, revenue arrangements, corporate relationship with RTZ, operational or financial interactions with RTZ, or communications with customers who executed RTZ's PACECare agreements, including the email communications between Collabrios and High Desert PACE concerning rights and obligations under the PACECare agreement.

## VI.    MIL NO. 5 TO EXCLUDE EXPERT TESTIMONY ABOUT CONTRACT INTERPRETATION AS IRRELEVANT

Intus has designated Shawn Fleury as a rebuttal expert witness in this action. Fleury is a cybersecurity consultant. He is not a lawyer, a contract-drafting professional, or an expert in software licensing. Yet in his Rebuttal Report and at deposition, Fleury purports to interpret the PACECare Software as a Service Agreement (the "PACECare Agreement" or "Agreement") and to opine that its Section 7.1 prohibits PACECare customers from sharing "expanded exports"— CSV files containing electronic health information ("EHI")—with third parties such as Intus. (Lee Decl., Ex. 8 [Fleury Rebuttal Report] ¶¶ 22, 24; Lee Decl., Ex. 7 [Fleury Tr.] at 50:11–52:18.)

This so-called opinion reaches a central issue in this case. Intus's has accused RTZ of "information blocking in violation of the 21st Century Cures Act ("Cures Act") by requiring that Intus execute an NDA before gaining system user access to RTZ's proprietary PACECare software licensed to PACECare customers. RTZ contends that Intus has never been deprived of access to the data it needs for its analytics services because the PACECare system allows customers to generate "expanded exports" containing the EHI data Intus needs – without Intus ever needing to access PACECare.  Intus's expert improperly attempts to interpret the PACECare contract as defining "expanded exports" to mean "reports."

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

Fleury's opinion fails on every axis of admissibility. First, it is unreliable and speculative: Fleury concedes he does not know what the term "reports" means in the context of the PACECare Agreement, did not draft the Agreement, never spoke with anyone at RTZ about its meaning, did not evaluate the expanded-export functionality, and is unaware of whether RTZ considers expanded exports to be "reports." (Lee Decl., Ex. 7 [Fleury Tr.] at 47:9–14, 52:2–23.)

Second, Fleury's opinion constitutes an impermissible legal conclusion. Contract interpretation is a question of law for the Court. *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996). Fleury himself acknowledged he is "not providing a legal perspective" but claims he is offering his view "as a practitioner from a cybersecurity perspective." (*Id*. at 46:1–14.) An expert may not simply repackage a legal conclusion as an "industry" observation.

As such, Fleury's contractual interpretation of "report" should be excluded as irrelevant under Federal Rule of Evidence 402 or, alternatively, under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

The Court should grant this motion and exclude Fleury's testimony and opinions interpreting the PACECare Agreement as prohibiting PACECare customers from sharing expanded exports containing EHI data with Intus or other third parties, and any derivative opinions premised on that interpretation.

### A.   Factual Background

#### 1.   The PACECare Agreement Section 7.1

Section 7.1 of the PACECare Agreement provides, in relevant part, that RTZ "owns all aspects of the PACECare product, including but not limited to source code, system logic/functionality, screen layout/design, and documents/forms/reports." (Lee Decl., Ex. 9 [PACECare Agreement] at § 7.1. It further states that the customer agrees it will not seek to reverse engineer PACECare or provide—and will "expressly inform staff not to provide" (a) account credentials or other forms of access to PACECare; (b) screenshots or other visual/written/oral descriptions of PACECare; or (c) forms/documents/reports produced by PACECare to "any internal software development team or third-party—specifically including competing or

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

potentially competing software vendors, including Intus Care, Epic Systems, Salesforce, and others." (*Id.*) Section 7.1 further provides that "any third-party access, excluding state and federal auditors, to PACECare requires a signed NDA and prior written approval by RTZ," and that "RTZ in its sole discretion may deny or revoke third-party access to or integration with PACECare at any time for any reason." (*Id.*) Separately, Section 7.2 provides that the "CLIENT owns all data and information it enters into PACECare" and that "RTZ acquires no rights to that CLIENT data or information." (*Id.*, at § 7.2.)

### 2. Fleury's Opinions

In paragraph 22 of his Rebuttal Report, Fleury quotes Section 7.1's prohibition on customers providing "forms/documents/reports produced by PACECare" to third parties and asserts that "RTZ has restricted access regarding how clients can and cannot share data with parties such as Intus." (*See* Lee Decl., Ex. 8 [Fleury Rebuttal Report] ¶ 22.)

In paragraph 24, Fleury opines that the PACECare Agreement "does not limit sharing of reports only to entities seeking to reverse engineer PACECare" but rather "broadly prohibits sharing 'forms/documents/reports produced by PACECare' with any third party, regardless of the purpose of the third party's use of the data." (*Id.* ¶ 24.)

In paragraphs 31 and 35, Fleury further opines that RTZ "deviated from common industry practices" by not following its customer's request to permit Intus access and that RTZ "was not the owner of EHI" and "should have had no role in determining which data a customer's authorized third party should or should not access." (*Id.* ¶¶ 31, 35.)

### 3. Fleury's Deposition Admissions

At deposition, Fleury made a series of critical admissions undermining his contractual-interpretation opinions:

**Lack of knowledge regarding expanded exports.** Fleury admitted he "had not evaluated the PACECare capability that allows a PACE customer to generate an expanded export containing EHI data." (Lee Decl., Ex. 7 [Fleury Tr.] at 47:8–14.) He acknowledged that an expanded export could be generated as a CSV file. (*Id.* at 47:13–15.) He had not independently evaluated whether Intus's population-health system ingests CSV files. (*Id.* at 47:16–20.)

**Awareness of contrary evidence.** Fleury agreed RTZ had "specifically informed Intus that it could obtain expanded reports/exports directly from PACE customers to obtain the EHI data needed to populate Intus's pop-health system." (*Id.* at 48:7–14.) He was aware that Intus

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

created data maps and EHI extraction guidelines giving PACE customers step-by-step instructions on how to generate expanded exports. (*Id.* at 48:2–6.)

**Inability to opine on actual customer conduct.** Fleury testified he "had not seen specific outputs of customers generating expanded exports" and could not opine whether PACE customers in fact generated them. (*Id.* at 50:5–10.)

**No evidence of RTZ prohibition.** Fleury admitted he "was not aware of any evidence that RTZ prevented a PACE customer from providing expanded reports/exports to Intus." (*Id.* at 51:1–7.) He was also "not aware of evidence demonstrating RTZ directed a PACE customer not to provide Intus with expanded exports" beyond the Agreement language itself. (*Id.* at 51:16–52:8.)

**No knowledge of RTZ's drafting intent.** Fleury admitted he "was not involved in drafting the PACECare Agreement and had not spoken with anyone at RTZ about what the language means." (*Id.* at 52:2–7.) When asked whether he knows if RTZ considers the expanded export to be a "report" within Section 7.1, Fleury answered: "No." (*Id.* at 52:15–18.)

**Acknowledgment that expanded reports were permitted.** Fleury admitted the only evidence he had seen revealed that "RTZ specifically directed Intus to get the expanded export from common customers." (*Id.* at 56:10–24.)

**No evidence of selective enforcement.** Fleury admitted he had not seen evidence that RTZ permitted some common customers to generate expanded exports but prohibited others from doing so. (*Id.* at 56:15–57:4.)

**B.      Legal Argument**

**1.      Fleury's Opinions Are Unreliable and Based on Speculation**

An expert's opinion must be grounded in sufficient facts and data, not conjecture. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (expert opinion based on speculation rather than supported by facts is properly excluded); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806–07 (9th Cir. 1988) (conclusory, unsupported expert opinions are insufficient). Here, Fleury's central opinion—that Section 7.1 prohibits PACECare customers from sharing expanded exports with Intus—rests on nothing more than speculation untethered to any reliable factual foundation.

First, Fleury concedes he has no idea what the term "reports" means in the context of the PACECare Agreement as applied to expanded exports. He admitted he "had not evaluated the PACECare capability that allows a PACE customer to generate an expanded export containing EHI data." (Lee Decl., Ex. 7 [Fleury Tr.] at 47:9–14.) He testified he "was not involved in drafting the PACECare Agreement and had not spoken with anyone at RTZ about what the language means." (*Id.* at 52:2–7.) And when asked directly whether he was aware whether RTZ considers an expanded export to be a "report" within Section 7.1, he answered unequivocally: "No." (*Id.* at

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3

52:15–18.) An expert who does not know what the critical contractual term means, has never spoken to the drafter, and has never evaluated the functionality he purports to classify is not offering a reliable opinion—he is guessing.

Second, the factual record that Fleury *did* encounter affirmatively contradicts his opinion. Fleury agreed RTZ had "specifically informed Intus that it could obtain expanded reports/exports directly from PACE customers." (*Id.* at 47:21–48:1) He acknowledged he saw "evidence in which RTZ specifically directed Intus to get the expanded export from common customers." (*Id.* at 56:4–7.) He admitted he "was not aware of any evidence that RTZ prevented a PACE customer from providing expanded reports/exports to Intus." (*Id.* at 51:1–7.) And he admitted he was "not aware of evidence demonstrating RTZ directed a PACE customer not to provide Intus with expanded exports" beyond the contract language itself. (*Id.* at 51:9–15.) An expert opinion that contradicts all available evidence is the paradigmatic "analytical gap" that *Joiner* instructs courts to reject. 522 U.S. at 146.

Third, Fleury's own testimony reveals the speculative nature of his interpretation. He admitted that "the problem with the language" is that "RTZ could choose at any point to interpret 'reports' either to exclude or include exports of data." (Lee Decl., Ex. 7 [Fleury Tr.] at 55:3–7.) This frank acknowledgment that the contractual term might or might not cover expanded exports—depending entirely on how one "chooses" to read it—is a concession that his opinion is not grounded in what the contract actually means but in what it *could hypothetically* mean. Such speculation fails the "sufficient facts or data" requirement of Rule 702(b) and the reliability standard of *Daubert*.

### C.    Fleury's Opinions Constitute Improper Legal Conclusions and Contract Interpretation That Invade the Province of the Court

It is well settled in the Ninth Circuit that an expert witness may not offer testimony that amounts to a legal conclusion. *Nationwide Transp. Fin. v. Cass Info Sys., Inc.*, 523 F.3d 1051, 1058–59 (9th Cir. 2008); *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999). Likewise, contract interpretation is a question of law for the Court. *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006)

70557756.v3

(whether a contract is ambiguous and whether it is reasonably susceptible to a proffered interpretation are questions of law). An expert may not usurp the Court's role by opining on how contractual language should be interpreted.

This is precisely what Fleury does. In paragraph 24 of his Report, Fleury expressly opines on what he characterizes as "the plain language of the contract," concluding that Section 7.1 "broadly prohibits sharing 'forms/documents/reports produced by PACECare' with any third party regardless of the third party's purpose." (Lee Decl., Ex. 8 [Fleury Rebuttal Rep.] ¶ 24.) At deposition, when asked what qualifies him to interpret "the plain language of the contract," Fleury offered that he was speaking "as a practitioner from a cybersecurity perspective" and clarified that he was "not providing a legal perspective." (*Id.*, Ex. 7 [Fleury Tr.] at 45:18–46:8.)

Fleury's self-characterization does not save his opinions. Regardless of whether he labels his analysis "cybersecurity" or "legal," the substance of his opinion is contract interpretation: he reads a contractual term ("forms/documents/reports"), determines its scope, and concludes the Agreement prohibits certain conduct. That is a legal conclusion, full stop. An expert cannot offer opinions as to legal issues that will be determined by the court. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).

### D.    Fleury's Opinions Are Irrelevant Under Rule 402

Evidence is relevant only if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence that is not relevant is inadmissible. Fed. R. Evid. 402.

A cybersecurity expert's lay reading of contractual language does not tend to make any fact of consequence more or less probable. The meaning of the contract will be determined by the Court as a matter of law; Fleury's opinion on what the contract "means" is therefore directed at a non-issue from the jury's perspective and has no tendency to prove or disprove any fact the jury will be asked to decide.

Moreover, Fleury's opinions lack any factual foundation that could supply relevance. He did not evaluate the expanded-export functionality, did not independently assess whether Intus ingests CSV files, could not recall whether he reviewed Intus's data maps, never spoke with RTZ

70557756.v3

about the contract's meaning, and reviewed only materials provided by counsel. (Lee Decl., Ex. 7 [Fleury Tr.] at 47:8–25, 48:15–49:13, 52:5–7.) Because his opinions rest on no independent factual investigation, they have no tendency to make any disputed fact more or less probable and are irrelevant under Rules 401 and 402.

**E.      Even if Marginally Relevant, Fleury's Opinions Should be Excluded Under Rule 403**

Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Here, any conceivable probative value of Fleury's testimony is substantially outweighed by multiple Rule 403 dangers.

**Confusion of the issues and misleading the jury**.  Permitting a credentialed expert to opine on the meaning of a contract invites the jury to defer to that expert on what is ultimately a legal question for the Court. The imprimatur of expert testimony would mislead the jury into believing that contract interpretation is a technical factual question within the expert's domain, rather than a legal determination governed by established principles of contract law. This is precisely the type of testimony that sows confusion between questions of law and questions of fact. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860–61 (9th Cir. 2014).

**Unfair prejudice**. Fleury's opinions carry a significant risk of unfair prejudice because they would allow Plaintiff to launder a legal argument through the vehicle of expert testimony, lending it unearned credibility in the eyes of the jury. Fleury's "cybersecurity perspective" is a veneer for a contract-interpretation conclusion that counsel could argue directly—but presenting it through an expert witness unfairly elevates the argument beyond what its substance warrants. The jury may give disproportionate weight to Fleury's conclusion simply because it is presented by a designated expert, rather than evaluating the contractual language on the terms the Court instructs.

**Waste of time**. Admitting Fleury's opinions would also necessitate extensive cross-examination and potentially rebuttal testimony on a topic—contract meaning—that the Court can

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE

70557756.v3

and should resolve as a matter of law. This expenditure of trial time on a legal question dressed up as expert opinion is precisely the inefficiency Rule 403 is designed to prevent.

**The evidence Fleury did review undermines, rather than supports, his conclusion**. The record Fleury himself encountered—RTZ directing Intus to obtain expanded exports from common customers—directly contradicts his opinion that the contract prohibits such sharing. (Lee Decl., Ex. 7 [Fleury Tr.] at 47:21–48:1, 56:4-7.) An expert opinion contradicted by the expert's own factual record carries negligible probative value while presenting maximum risk of juror confusion.

For the foregoing reasons, Defendant RTZ respectfully requests that this Court grant this motion in limine and enter an order precluding Plaintiff's expert, Shawn Fleury, from offering any testimony or opinions interpreting the PACECare Agreement as prohibiting PACECare customers from sharing expanded exports containing EHI data with Intus or other third parties, including any derivative opinions premised on that interpretation—including but not limited to opinions that RTZ restricted access to or deviated from industry practice in connection with customers sharing expanded exports.

## VII.    CONCLUSION

For the foregoing reasons, RTZ respectfully requests that the Court order that any evidence, argument, or mention of the evidence addressed above in its MILs 1-5 be excluded and that Intus, its attorneys, and all other persons participating in the trial on its behalf be admonished not to refer to such matters during the trial.

Dated:  July 10, 2026                          NOSSAMAN LLP
                                                             DAVID C. LEE
                                                             KASIA PENN


                                                             By: /s/ *David C. Lee*
                                                                      David C. Lee
                                                             Attorneys for Defendant and Counterclaimant
                                                             RTZ ASSOCIATES, INC.

DEFENDANT AND CROSS-COMPLAINANT RTZ'S OMNIBUS MOTIONS IN LIMINE
70557756.v3