NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:  415.398.3600
Facsimile:   415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>             Plaintiff,<br><br>      vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>             Defendants, | Case No:      4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**DECLARATION OF DAVID C. LEE IN SUPPORT OF DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS *IN LIMINE***<br><br>[*Concurrently filed with: (1) RTZ's Omnibus Motions in Limine; (2) [Proposed] Order Granting RTZ's Omnibus Motions in Limine*]<br><br>Date:        July 31, 2026<br>Time:        2:00 p.m.<br>Courtroom: 6 |
| RTZ ASSOCIATES, INC.,<br><br>             Counter-claimant,<br><br>      vs.<br><br>INTUS CARE, INC.,<br><br>             Counter-defendant. | |

DECLARATION OF DAVID C. LEE ISO RTZ'S MOTIONS IN LIMINE
70574854.v2

**DECLARATION OF DAVID C. LEE**

I, David C. Lee, declare as follows:

1.     I am an attorney at law admitted to practice in this Court, and a partner of Nossaman LLP, counsel of record in this action for Defendant and Counterclaimant RTZ Associates, Inc. ("RTZ").  I make this declaration in support of RTZ's Omnibus Motions in Limine. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts.

2.     Attached as **Exhibit 1** is a true and correct copy of the relevant portions of the transcript of the deposition of Laura Ferrara, taken on March 17, 2026.

3.     Attached as **Exhibit 2** is a true and correct copy of the relevant portions of the transcript of the deposition of Evan Jackson, taken on April 9, 2026.

4.     Attached as **Exhibit 3** is a true and correct copy of the relevant portions of the transcript of the deposition of Alexander Rothberg, taken on February 27, 2026.

5.     Attached as **Exhibit 4** is a true and correct copy of the relevant portions of the transcript of the deposition of John Robert Felton, taken on April 8, 2026.

6.     Attached as **Exhibit 5** is a true and correct copy of the Expert Report of Dr. Kristopher Hult, dated April 23, 2026, which was previously filed under seal as Exhibit 2, Dkt. No. 182-4. The Court subsequently granted the request to seal that exhibit in its Order, Dkt. No. 189. The unredacted version of the Report was filed by Intus as Dkt. No. 182-3.

7.     Attached as **Exhibit 6** is a true and correct copy of the relevant portions of the transcript of the deposition of Dr. Kristopher Hult, taken on May 22, 2026. A rough draft of the transcript containing the same redactions was previously filed under seal as Exhibit 4, Dkt. No. 182-6. The unredacted version of the rough draft was filed at Dkt. No. 182-5. The Court subsequently granted the request to seal that exhibit in its order, Dkt. No. 189. Exhibit 6 is the final, official version of the transcript and reflects the same redactions that were applied to the version filed at Dkt. No. 182-6.

8.     The Parties met and conferred on July 9, 2026, regarding whether Exhibit 6 should be the subject of a motion to seal. In light of the Court's Order, Dkt. No. 189, the Parties

do not believe that a motion to seal is necessary. Should the Court determine otherwise, RTZ will promptly file a motion to seal Exhibit 6.

9.     Attached as **Exhibit 7** is a true and correct copy of the relevant portions of the transcript of the deposition of Shawn Fleury, taken on May 25, 2026.

10.     Attached as **Exhibit 8** is a true and correct copy of the Expert Rebuttal Report of Shawn Fleury, dated May 12, 2026.

11.     Attached as **Exhibit 9** is a true and correct copy of the PACECare Agreement produced by RTZ in discovery, which has been Bates stamped as RTZ0006181.

12.     On June 30, 2026, the parties met and conferred by video teleconference about the proposed motions in limine pursuant to Section E of this Court's Civil Jury Trial Standing Order. On July 1, 2026, and on July 9, 2026, the parties followed up with further meet-and confer efforts. The parties could not stipulate to the relief requested in RTZ's Omnibus Motions in Limine.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Dated this 10th day of July 2026 in San Francisco, California.

DAVID C. LEE

DECLARATION OF DAVID C. LEE ISO RTZ'S MOTIONS IN LIMINE
70574854.v2

# EXHIBIT 1

# Deposition Transcript

Case Number: 4:24-CV-01132-JST
Date: March 17, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# LAURA L. FERRARA

Reported by:
Cindy C. Jenkins



CERTIFIED COPY

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q.    And that document is the NDA that's referred in the e-mail below, which is from Dylan Clements at RTZ sent to you on September 1, 2022, which reads, "Laura, I have attached the requested NDA;" is this correct?

A.    Correct.

Q.    What was your reaction to the NDA requirement by RTZ?

A.    Dylan made it known to me that we needed an NDA for me to be able to access Neighborhood Healthcare's EMR to do the work that I was contracted to do.  My reaction was simply to ask Robbie to have it signed.

Q.    Did you have any conversations with Robbie about signing the NDA?

A.    No, I did not.

Q.    So to your recollection, Robbie didn't respond to your e-mail?

A.    Not that I recall, no.

Q.    Did you have any communications with anybody else at Intus about the NDA?

A.    No, I did not.

Q.    Okay.  Like nobody at all, by e-mail, phone, video, chat message, you did not communicate with anybody at Intus about

the --

A.    I did not read it, and I didn't -- no.  So I did not have any communication with anybody about the NDA.

Q.    At that time, you were chief strategy officer; is that correct?

A.    That is correct.

Q.    So if you were -- from your position as the chief strategy officer, did you do anything about the NDA requirement?

A.    I sent it to Robbie.

Q.    Anything else?

A.    No.  It was out of my responsibility.

Q.    And did you have any discussion with RTZ about the NDA?

A.    Outside of this e-mail, no, I did not.

Q.    Okay.  I'm going to stop sharing my screen.  So the NDA was never signed; is that correct?

A.    I don't know.

Q.    Do you know about the cease and desist issued by RTZ in relation to not signing the NDA?

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of Alabama, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 3/17/2026          _____

Cynthia C. Jenkins, 470

# EXHIBIT 2

# Deposition Transcript

Case Number: 4:24-cv-01132-JST

Date: April 9, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# EVAN JACKSON - VOL II



Reported by:
MARIE STRIEGLER

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

these discussions; you just learned secondhand?

A     I wasn't personally involved with the discussions but, you know -- yes.

Q     Do you have an understanding whether -- firsthand understanding or whether you received it from somebody else -- about the reasons why Intus didn't accept RTZ's standard NDA form?

ATTORNEY BESHAI:  Also just to -- to the extent this gets into attorney-client privilege or legal strategy or something that you learned from Alex, Julie or -- I think it was only them at the time -- I'm going to instruct you not to answer; but otherwise, you can.

Thank you.

THE WITNESS:  Absolutely.  Based on our attorney's review, a third-party attorney's review, and board review, it was not reasonable.

And again, I think, as I expressed through the conversations with PACElogic and TruChart, truly what we were looking for is a data access agreement.

BY ATTORNEY LEE:

Q     Ms. Runyon asked -- or at least posed the question to you:  What is in the NDA that is hesitant for IntusCare to sign.

A     Yes.

EVAN JACKSON                                                          JOB NO. 2173676
NOVEMBER 25, 2025

Q    And your email in response doesn't actually answer that question.

As you sit here today, can you answer that question?

ATTORNEY BESHAI:  Objection.  Same objection to the extent it invades the province of attorney-client privilege.

THE WITNESS:  Like I shared, we received guidance from our counsel.

BY ATTORNEY LEE:

Q    Okay.  So as you sit here today, you don't know one way or the other what about RTZ's standard NDA was objectionable to Intus?

ATTORNEY BESHAI:  Objection.  Misstates the testimony.

THE WITNESS:  It was through conversations with our counsel.

BY ATTORNEY LEE:

Q    Which I get.

My question is:  As you sit here today, you don't know the reasons why?

ATTORNEY BESHAI:  Objection.  Misstates the testimony.

THE WITNESS:  Yeah.

ATTORNEY LEE:  You can answer.

THE WITNESS:  Through guidance from our counsel.  I don't know if I'm able to disclose the nature of those conversations with our counsel.

BY ATTORNEY LEE:

Q    Okay.  If you can answer but you're not going to answer because you're going to heed the instruction, then just tell me that.

If you don't know, then just tell me you don't know.

If you can answer the question without invading the privilege, then just give me that information.

A    Yeah.  It was through conversation with our counsel.

Q    Okay.  Do you know if you've ever actually personally reviewed RTZ's NDA?

A    I believe so.

Q    Have you read NDAs other than RTZ's NDA?

A    Yes.

Q    How many NDAs do you think you've read over the years?

A    A few.

Q    Do you recall anything specific about RTZ's NDA that, to you, was objectionable?

A    Yeah.

ATTORNEY BESHAI:  Objection to the extent you learned about this or created this impression based on attorneys' guidance or advice.

THE WITNESS:  Uh-huh.  Uh-huh.

Yeah, I think, really for me, it felt very predatory.  But again, I think a lot of the specifics were shared through conversation with our counsel.

BY ATTORNEY LEE:

Q    Okay.  What -- that you recall, what gave you the impression that RTZ's NDA was predatory?

ATTORNEY BESHAI:  Objection again to the extent that you created this impression based on conversations with or legal advice from your attorney.

THE WITNESS:  Yeah.  I did.

BY ATTORNEY LEE:

Q    So you can't answer that question?

A    Nope.

Q    Okay.

A    What I can say is that, you know, we tried to operate in good faith in the back-and-forth to get something that we could work together on.

Q    If you could turn back to Exhibit 33.  I told you that we were going to just go down a little

REPORTER'S CERTIFICATION

I, Marie Striegler, Certified Shorthand Reporter, a court reporter in and for the State of California, do hereby certify:

That the foregoing witness named in the proceeding was duly sworn to testify the truth, the whole truth, and nothing but the truth; that said proceeding was taken down in stenograph writing by me remotely to the best of my ability and thereafter transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

The undersigned Certified Shorthand Reporter further certifies to be neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name this  23rd  day  of  April  2026.

_____
MARIE STRIEGLER, CSR NO. 6032

# EXHIBIT 3

# Deposition Transcript

Case Number: 4:24-cv-01132-JST

Date: February 27, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# ALEXANDER ROTHBERG



Reported by:
Sonya Lopes

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q.  My question is specific.  Do you believe that RTZ's requirement for an NDA to access PaceCare is an instance of information blocking?

MR. BESHAI:  Objection.  Calls for a legal conclusion.

A.  My -- I would say in a vacuum, a reasonable NDA negotiated in good faith might be fine.  My impression as a result of conversation with counsel is not that I've had someone operating in good faith with a reasonable NDA.

Q.  Does Intus require NDAs for third-party vendors accessing CareHub?

A.  I'm not sure.

Q.  Who would know?

A.  Probably Robbie.

Q.  Okay.  Do you have an understanding as to whether or not Intus has required any third party to execute an NDA to access PACE -- CareHub?

A.  I'm not sure if we've required anyone to sign an NDA.  I could -- I mean, still slightly speculative.  But I would say with more confidence there's at least one vendor that has accessed CareHub without an NDA.  I don't know if we've required it.

Q.  And what vendor is that?

this is what's going on."

Q.   So you were trying to facilitate a pass-off of the NDA issue to Laurie?

A.   Yeah.  I mean, I'm certainly not saying that, you know, "Hey, sign it."  I mean, Robbie's in charge of me, not the other way around.  You know, this is sort of a -- I mean, I think I'm just passing along what's going on, then getting out of there.

Q.   You're aware that at some point, RTZ presented an NDA to Intus for consideration.

A.   I'm aware of that.

Q.   And based upon what I think your prior responses are, that's an NDA that you reviewed.

A.   I think I have seen it.

Q.   Okay.  So you reviewed it.

A.   Sure.

Q.   Did you provide input about your thoughts and impressions of the NDA?

A.   Only -- I mean, any conversation that would have involved me with the NDA would have been with counsel.  They may have solicited my opinion -- I'm sure they did -- of -- I don't know.  I would have been in the room, at least.

Q.   Which I get.  I'm not asking for

discussions that you had with your counsel.  What I'm asking for are your impressions having reviewed the NDA and what impressions you may have had.

A.   Yeah.   Honestly, I guess the impression that I have about the NDA is shaped by my counsel's opinion of it.  I don't know that I had any independent opinion of it.

Q.   Okay.  Were you involved in the development of Intus's responsive agreement to RTZ's NDA?

MR. BESHAI:  Objection.  Vague as to "responsive agreement."

Q.   Sure.  Let me see if I can provide some context.

RTZ provides an NDA to Robbie Felton. Robbie Felton distributes that to who he distributes it to, responds to RTZ, and says "We'll return your NDA with some redlines" and, instead of providing a redline version of an agreement, provided some other form of data access agreement.

Were you ever involved in the development of a data access agreement prepared by Intus for accessing PaceCare?

A.   I think that I would have been consulted because our lawyer at the time was also not technical.  So he probably would have said -- you

                    CERTIFICATE OF REPORTER

        I, SONYA LOPES, Registered Professional

Reporter and Notary Public, do hereby declare:

        That prior to being examined, the witness named

in the foregoing deposition was by me duly sworn

pursuant to Section 30(f)(1) of the Federal Rules of

Civil Procedure and the deposition is a true record

of the testimony given by the witness.

        That said deposition was taken down by me in

shorthand at the time and place therein named and

thereafter reduced to text under my direction.

        That the witness requested to review the

transcript and make any changes to the transcript.

As a result of that review pursuant to Section 30(e)

of the Federal Rules of Civil Procedure, the changes

made by the witness are appended to the transcript.

        I further declare that I have no interest in

the event or the action.

        I declare under penalty of perjury under the

laws of the United States of America that the

foregoing is true and correct.

        Witness my hand this 12th day of March, 2026.

_____

Sonya Lopes                    My Commission Expires:

Notary Public                  October 28, 2027

# EXHIBIT 4

# Deposition Transcript

Case Number: 4:24-cv-01132-JST

Date: April 8, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# JOHN ROBERT FELTON

# CONFIDENTIAL



**CERTIFIED COPY**

Reported by:
JENNIFER L. BERNIER

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q.   All right.  If you turn to the first page of the exhibit, Ms. Ferrara now weighs in and says: Thanks, Dylan.  Can you provide the NDA that you would like us to sign?

Do you see that?

A.   Yes.

Q.   All right.  And Dylan provides a copy of the requested NDA.  And then if we look at the email at the top of the first page, Ms. Ferrara writes to you and says:  Good morning, Robbie.  Who has the authority to sign this document and other similar documents in the future?

Do you see that?

A.   I do see that.

Q.   Okay.  Who at this point in September of '22 was the decision-maker at Intus about whether or not they would sign NDAs?

A.   Legal counsel.

Q.   But ultimately, somebody in the management team is going to make a decision based on whatever counsel may get, correct?

A.   We were heavily deferential to our legal counsel.

Q.   Okay.  Do you recall having discussions internally about RTZ's NDA and its contents?

MR. WEIR:  Since you raised legal counsel being involved, I just caution you that you can answer the question as long as you're not disclosing communications that you had with legal counsel about these issues.

THE WITNESS:  Right.

I'd say substantive -- any and all substantive conversation was most likely with legal counsel.  At the time, it was A. Chiulli.

(Reporter clarification.)

THE WITNESS:  A. Chiulli, Alex -- sorry, Alex Chiulli.

BY MR. LEE:

Q.   Okay.  So I want to make sure I'm understanding.

Do you recall having any discussions about RTZ's NDA outside of the presence of counsel?

A.   I'm sure there was some discussion about the receipt of it, but we -- any discussion around the details of the NDA we were workshopping with legal, as far as I remember.

Q.   Okay.  Did you develop any independent impressions about the language within RTZ's NDA?

A.   I'm sure at the time I had assumptions surrounding it that were -- were confirmed by legal or reviewed by legal.

Q.   Okay.  What were your independent impressions of the NDA?

A.   My independent impression?

MR. WEIR:  Just make sure you understand.  So he's drawing a distinction there.  If you had a --

I presume you're okay with this.

If you had an independent recollection that had nothing to do with your conversations with Alex, he's entitled to know that.  If you're just going to spit back what Alex told you, he's not entitled to know that.  So if you can draw that line in your head, you know, stuff that you developed independently of Alex about the NDA, tell him.  If you can't or it's all going to be some sort of privileged discussion, then it's privileged and I'd instruct you not to answer.

Does that make sense?  Can you understand --

THE WITNESS:  Yeah.

MR. WEIR:  -- the line that's been drawn there?

THE WITNESS:  Yeah.

BY MR. LEE:

Q.   Yeah.

A.   I'd say most of my feelings towards it, which were confirmed eventually by legal, is that was a right to revoke data access at any point in time which wasn't palatable.

personally have; you just heard about them secondhand?

A.   Correct.

Q.   Okay.  Anything else about RTZ's NDA that you developed an impression independent of discussions that you had with legal counsel?

A.   Not that I recall.

Q.   Okay.  So just to put a bow on this, so you've told me about all of the impressions that you can recall concerning RTZ's NDA?

MR. WEIR:  Well, that weren't -- that weren't --

THE WITNESS:  That weren't privileged.

BY MR. LEE:

Q.   That aren't informed by counsel --

A.   The legal, yeah.

Q.   Okay.  Do you recall having discussions internally about whether or not Intus -- separate and apart from legal counsel discussions, Intus was willing or unwilling to execute RTZ's NDA?

A.   I'd say not in the -- not in the absence of legal counsel's opinion.

Q.   Okay.

A.   To my recollection.

Q.   Okay.  And so at least as you sit here today, you're not able to provide testimony about any conversations concerning Intus's acceptance or

nonacceptance of RTZ's NDA because that's all privileged?

A. When we receive documents of a legal nature, our first directive is to share it with legal counsel for review. So immediately after sharing, I assume it was shared with legal counsel and we began discussions from there.

Q. Which I appreciate, but I -- I want you to listen to my question and answer that question. Okay?

MR. LEE: Would you mind reading my last question back?

(Record read as requested.)

THE WITNESS: Can you reframe the question or restate it?

BY MR. LEE:

Q. Yes.

As you sit here today, you're unable to testify about discussions of whether Intus was or was not going to sign RTZ's NDA because any discussions that you recall would have been with legal counsel on that subject, correct?

A. Yes. Our -- our opinions were primarily formed by legal counsel.

Q. Okay. And you're not going to testify about those opinions because they're privileged?

MR. WEIR:  Well, because I'm instructing him not to disclose privileged information is why he's not testifying about them.  So yes.

It's the same admonition.  If there's communications you had with counsel about this, don't disclose them.  If there are other communications that don't involve counsel or involve third-party communications with RTZ, you can tell him about that.

THE WITNESS:  Okay.  I don't recall any specific communications that were not either with or informed by counsel.

BY MR. LEE:

Q.   Okay.  Can you tell me who -- I'll ask it differently.

You're aware that Intus opted not to sign the NDA that it presented to -- I'm sorry -- that had been presented by RTZ, correct?

A.   We opted to redline it.

Q.   In lieu of signing the version that was presented to you?

A.   Yes.

Q.   Okay.  Can you tell me whose decision it was to redline it, or is that privileged?

A.   It was the directive of legal counsel.

MR. WEIR:  Yeah.  You were just discussing it,

A.   I believe so, yes.

Q.   Okay.  And this isn't a marked-up or redlined version of RTZ's NDA.  This is a different document, correct?

A.   I don't remember.  I don't have the previous version in front of me.

Q.   Okay.  Well, we looked at it before, Exhibit 47.  So you can dig in here for Exhibit 47.

And that's the Pinni Friedman email that had the RTZ NDA.  And you would agree that what you sent on September 13th, 2022 isn't a redline version of the RTZ NDA.  Instead, it's a different agreement, correct?

A.   I'd say it has some similar components, but it is a different agreement.

Q.   Okay.  And is this an agreement, this access agreement that you attached to your email, one that had been prepared by Mr. Chiulli?

A.   Yes.

Q.   Okay.  And so you made the decision that in lieu of sending a redlined version of RTZ's NDA, to send him the agreement that had been prepared by Mr. Chiulli?

A.   Yes, by our counsel.

Q.   Okay.  Were you at all involved in preparing any of the language in the access agreement attachment?

A.   I don't think I read any of the language.  I

think counsel read it.

Q.   Okay.  Do you recall whether or not, prior to sending this agreement to RTZ, you had any internal discussions outside of the presence of counsel about the content of this access agreement?

A.   I don't recall.

Q.   Okay.  Do you recall having any discussions internally outside of the presence of counsel about sending this access agreement to RTZ in lieu of redlines to the RTZ NDA?

A.   I don't recall.

Q.   Do you have an understanding as to why Intus was proposing this form of access agreement instead of redlining or signing RTZ's NDA?

A.   I assume it was at the directive of counsel.

Q.   So you don't have an independent recollection beyond that?

A.   No.

Q.   Okay.  Do you have -- well, let me ask this.

Did you review this access agreement prior to sending it to RTZ?

A.   Yes.

Q.   Okay.  Do you have an understanding or did you develop any impressions as to what this particular access agreement provided to Intus that RTZ's NDA did

discussed, Intus is comfortable using RTZ's NDA and sought to keep redlines to a minimal for clarity.

And then he attaches what has been marked -- previously marked as Exhibit 50.

(Deposition Exhibit 50 was previously marked for identification.)

BY MR. LEE:

Q.   And these are redlines of RTZ's initial NDA. Do you see that?

A.   Yes.

Q.   Okay.  Were you at all involved in redlining the NDA?

A.   Our legal counsel redlined the NDA.

Q.   Yes, which I get.  My question is whether you were involved in that effort at all.

A.   I don't think I was touching the document, but I'm sure I was on conversations or calls with our legal counsel discussing the NDA as it was being redlined.

Q.   Okay.  Now, you had mentioned before, in the service disruption emails that we looked at previously, that Intus was engaging in diligent efforts to try and reach an agreement with RTZ.  Is this one of the forms of diligent effort?

A.   I don't recall.

Q.   Okay.

Q.   Do you recall having any discussions internally outside of the presence of counsel about the content of these redlines?

A.   I think all conversations would have been with counsel, at least to my recollection.

Q.   And so you're unable to provide me testimony about any internal conversations that you may have had about these redlines because they would otherwise be privileged?

A.   Yes.

Q.   Okay.  Do you have an understanding as to whether or not RTZ reacted to these redlines?

A.   I don't -- I don't have the rest of the email chain, so I'm not sure.

MR. WEIR:  Are you asking him independent of the documents we're looking at or --

MR. LEE:  Yes.

THE WITNESS:  I'd have to see the email chain to know one way or another.

BY MR. LEE:

Q.   Okay.  So as you sit here today, you don't have any independent recollection of those discussions?

A.   Without -- without seeing the email chain, I can't say one way or another.  Like there's clearly more to this email chain.

Q.   We can assume, I think, that RTZ didn't accept these redlines, correct?

A.   I think that's most definitely the case.

Q.   Okay.

A.   These are redlines we produced, right?

Q.   Yes.

A.   Then --

Q.   Do you believe that RTZ's decision not to accept these redlines was reasonable or unreasonable?

A.   I would say unreasonable.

Q.   Okay.  And why would you say unreasonable?

A.   Because they -- I mean, they were -- this was a redline that was drafted by our legal counsel with a direct business purpose to meet a client need, and clearly RTZ did not feel the need to meet that client need.

And I don't have any specifics around why this NDA redline was not accepted.  So I -- I can't get into the specifics of, I guess, what was rejected and why.

Q.   Do you agree that reasonable minds can differ on whether or not the proposed redline changes are acceptable or unacceptable?

MR. WEIR:  Objection.  Vague.

THE WITNESS:  Can you reframe the question?

CONFIDENTIAL

C E R T I F I C A T E

I, JENNIFER L. BERNIER, CSR, RMR, CRR, a

Certified Shorthand Reporter for the State of Illinois,

do hereby certify:

That JOHN ROBERT FELTON, the witness whose

deposition is hereinbefore set forth, was duly sworn by

me and that such deposition is a true record of the

testimony given by such witness.

I further certify that I am not related to any

of the parties to this action by blood or marriage; and

that I am in no way interested in the outcome of this

matter.

IN WITNESS WHEREOF, I have hereunto set my

hand this April 20, 2026.

_____

JENNIFER L. BERNIER, CSR, RMR, CRR

Certified Shorthand Reporter

Registered Merit Reporter

Certified Realtime Reporter

Illinois CSR No. 084.004190

# EXHIBIT 5

# Exhibit 2

MANATT, PHELPS & PHILLIPS, LLP
Charles E. Weir (Bar No. 211091)
CWeir@manatt.com
Andrew Beshai (Bar No. 308030)
ABeshai@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Plaintiff*
INTUSCARE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| INTUSCARE, INC.<br><br>Plaintiff,<br><br>v.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>Defendants. | Case No. 4:24-cv-1132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**PLAINTIFF INTUSCARE, INC.'S DISCLOSURE OF EXPERT TESTIMONY UNDER FED. R. CIV. P. 26**<br><br>Complaint Filed: February 23, 2024<br>Amended Complaint Filed: April 2, 2024<br>Counterclaims Filed: June 20, 2024 |

Pursuant to Federal Rule of Civil Procedure 26, Plaintiff IntusCare, Inc. ("Intus") discloses the identities and written report of the following expert witness:

**Kristopher Hult, PhD**

Under Federal Rule of Civil Procedure 26(a)(2)(B), the opening report of Kristopher Hult, PhD is served as an enclosure to this disclosure. The report contains:

1. A complete statement of all opinions Mr. Hult will express and the basis and reasons for

PLAINTIFF'S EXPERT DISCLOSURE

402999037.1
404675696.2

them.

2. A list of the documents and materials that Mr. Hult considered in forming his opinions. (Hult Report, Exhibit 2). The documents, facts, and data that Mr. Hult considered are also identified throughout the report.

3. Mr. Hult's qualifications and professional curriculum vitae. (*Id.* § I(A) and Exhibit 1).

4. All publications authored by Mr. Hult in the previous 10 years. (*Id.* § I(A) and Exhibit 1).

5. A list of all other cases in which, during the previous 4 years, Mr. Hult testified as an expert at trial or by deposition. (*Id.* Exhibit 1).

6. Mr. Hult's hourly rate is $875.

Intus reserves the right to supplement these disclosures, to disclose additional expert testimony, and to rebut any expert testimony that Defendant discloses.

Dated: April 23, 2026
 
MANATT, PHELPS & PHILLIPS, LLP


By: */s/ Charles E. Weir*
    Charles E. Weir
    Andrew Beshai


    *Attorneys for*
    *Plaintiff*
    INTUSCARE, INC.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -        PLAINTIFF'S EXPERT DISCLOSURE

402999037.1
404675696.2

Highly Confidential – Attorney's Eyes Only

**INTUS CARE, INC.,**
                **Plaintiff,**
        **vs.**
**RTZ ASSOCIATES, INC.; and DOES 1
through 10,**
                **Defendants,**

**Case No: 4:24-cv-01132-JST**

**Expert Report of Dr. Kristopher Hult**

April 23, 2026

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

Highly Confidential – Attorney's Eyes Only

**Table of Contents**

**I.  Introduction**..................................................................................................................**3**

    A.  Qualifications and Experience ........................................................................3

    B.  Assignment......................................................................................................3

    C.  Understanding of Claims and Scope of My Analysis .....................................4

    D.  Materials Relied Upon ....................................................................................5

**II.  Summary of Opinions**...................................................................................................**5**

       1.  Pre-Existing Contracts ............................................................................6

       2.  Contracts that Intus Competed for but Lost as a Result of RTZ's Conduct..........6

       3.  Contracts that Intus was Unable to Compete for as a Result of RTZ's Conduct..7

       4.  Conversion of Lost Revenue to Lost Profits............................................8

**III.  Background** .....................................................................................................................**8**

    A.  Intus      8

    B.  RTZ       9

    C.  Data      9

       1.  Intus's Revenue by Client, Product, and Month ...................................10

       2.  Intus's CRM Data ..................................................................................10

       3.  Intus's Invoicing Data............................................................................11

       4.  Other Data ..............................................................................................11

**IV.  Summary of the Harm to Intus** ...................................................................................**11**

    A.  The Economic Relationship Between RTZ's PACECare and Intus's Health Analytics Business ................................................................................................11

    B.  The But-For World Had RTZ's Information Blocking Not Occurred .............13

    C.  Overview of Damages Analysis Methodology ................................................14

**V.  Sources of Lost Revenue to Intus** ...............................................................................**14**

    A.  First Source of Lost Revenue: Lost Revenue from Pre-Existing Contracts.....................15

       1.  Affected Clients .....................................................................................15

       2.  Quantification of Harm ..........................................................................16

    B.  Second Source of Lost Revenue: Lost Revenue from Affirmatively Recorded Business Opportunities................................................................................................18

       1.  Affected Clients and Opportunities........................................................18

       2.  Quantification of Harm ..........................................................................19

       3.  Lost Revenue from Contract Renewals..................................................21

       4.  Price Escalators in Contract Renewals...................................................22

    C.  Third Source of Lost Revenue: Lost Revenue from Unobservable Business Opportunities     22

       1.  Affected Clients .....................................................................................23

       2.  Quantification of Harm ..........................................................................26

Highly Confidential – Attorney's Eyes Only

3.  Main Regression Specification ............................................................28

D.  Summary of Lost Revenue Estimates ...............................................36

**VI. Summary of Lost Profits to Intus ................................................................36**

1.  Other Considerations.........................................................................37

2.  Intus's Profit Margin ........................................................................37

3.  Discounting Future Lost Profits .......................................................40

4.  Summary of Lost Profits ...................................................................40

Highly Confidential – Attorney's Eyes Only

## I.     INTRODUCTION

### A.   Qualifications and Experience

1)     I am an economist and a Director at NERA Economic Consulting.  NERA is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal issues.  I received a Ph.D., M.A., and B.A. in Economics from the University of Chicago, and a B.S. in Mathematics from the University of Chicago.  Prior to joining NERA, I was a Principal at Charles River Associates in their Antitrust and Competition practice for ten years.

2)     My areas of expertise are in the economics of antitrust, competition, industrial organization, and healthcare.  I have written a number of articles and have been asked to speak numerous times on issues and topics involving competition, particularly in healthcare markets.  I have worked on a variety of litigation matters calculating damages in healthcare and antitrust.

3)     My publications are listed in my curriculum vitae, which is appended to this report as **Exhibit 1**.  I have conducted academic research on a variety of healthcare and economic issues and published articles in books and journals such as the American Journal of Health Economics, Value in Health, Elgar Encyclopedia of the Economics of Competition and Regulation, and the Economic Dimensions of Personalized and Precision Medicine.  In addition, I have presented to a number of organizations, including the Congressional Budget Office, the American Society of Health Economists, the American Health Lawyers Association, and the U.S. Food and Drug Administration.

### B.   Assignment

4)     I was retained by counsel for IntusCare Inc. ("Intus") to opine on the damages caused by RTZ Associates, Inc.'s ("RTZ") refusal to provide Intus access to PACE providers' data kept on RTZ's electronic medical record ("EMR") program, PACECare, and RTZ's alleged prohibition on PACE entities, which are former, actual, or prospective clients of Intus, from

3

Highly Confidential – Attorney's Eyes Only

providing Intus access to PACECare ("RTZ's information blocking conduct").[1]   My initial opinions concerning this assignment are explained in detail throughout this report.

5)      Because discovery is ongoing, I may supplement or refine my opinions as warranted by any relevant new information, new claims, additional data or documents produced into the record, and/or new analyses or opinions by other experts in this matter.  While my opinions are preliminary in that sense, they are grounded in the significant information and data I have already reviewed and analyzed, as explained in this report.

6)      NERA's compensation for my time is $875 per hour.  Similarly, NERA's compensation for my staff's time is at standard hourly rates.  No payments to NERA are contingent upon the outcome of this case or upon the nature of my opinions.

## C.  Understanding of Claims and Scope of My Analysis

7)      I understand that starting in September 2022, RTZ refused to allow Intus access to the electronic medical records (EMR) data stored in RTZ's PACECare and later prohibited Intus's clients from providing access to Intus.[2]  Intus contends that RTZ engaged in tortious conduct that caused Intus to suffer ongoing economic and reputational damages, including decreased opportunities to renew and expand existing contracts, enter into new contracts with existing Intus clients, and attract new clients.[3]

8)      In accordance with my assignment, I have calculated the damages to Intus that are caused by RTZ's information blocking conduct under the assumption that RTZ's conduct has already been found to be tortious.  I have been asked to calculate damages to Intus for any potential or actual Intus client that resulted from RTZ's conduct.  While I understand that the conduct is still ongoing, I have been asked to estimate damages on potential or actual contracts

---

[1] Intus Care, Inc. v. RTZ Associates, Inc., No. 4:24-cv-1132-JST (N.D. Cal.), Amended Complaint for Intentional Interference with Contractual Relations, Intentional Interference with Prospective Economic Advantage, and Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq., filed April 2, 2024 ("Amended Complaint").

[2] Amended Complaint at ¶ 15.  For simplicity, I refer to electronic health records and electronic medical records, referred to as EHR or EMR systems respectively, as EMR in my report.  There is no significant distinction between these terms for the purposes of estimating damages.

[3] Amended Complaint at ¶ 48.

4

Highly Confidential – Attorney's Eyes Only

starting in September 2022 that were impacted by RTZ's conduct as well as the potential renewal of these contracts.

9) My analysis quantifies the economic effect on Intus caused by RTZ's information blocking conduct. To do so, I compare the likely but-for world had RTZ not engaged in information blocking and instead continued to allow Intus access to the data on PACECare, with the actual world in which RTZ blocked Intus's access to the data on PACECare.

10) Further, should additional information or data become available in the record, or should I be asked to conduct further analysis as to a particular alleged conduct, I reserve the right to supplement my analysis accordingly.

11) As I discuss below, my analysis provides a methodology that can be adjusted to match the ultimate factual findings in this case. For example, while my calculations assume RTZ's conduct had an effect starting in September 2022, my calculations can be adjusted should the finder of fact determine an alternative appropriate timeframe.

### D. Materials Relied Upon

12) **Exhibit 2** lists the materials I have relied upon for this report. Many of the footnotes in this report cite these materials and other publicly available sources (e.g., websites and academic literature).

## II. SUMMARY OF OPINIONS

13) I have been asked to evaluate and quantify damages to Intus arising from RTZ's information-blocking that began in September 2022. I understand that Intus's business model requires access to its clients' clinical and administrative data stored in an EMR system such as RTZ's PACECare. When RTZ blocked Intus's access to this data, it impaired Intus's ability to deliver services to its clients and, as a result, Intus suffered economic harm.

14) In this report, I evaluate and quantify damages related to RTZ's information blocking conduct based on the information available to me. My analysis assumes that RTZ's information-blocking conduct began in September 2022. I compare the likely but-for world had RTZ not engaged in information blocking and instead continued to allow Intus access to the data

5

Highly Confidential – Attorney's Eyes Only

on PACECare, with the actual world in which RTZ blocked Intus's access to the data on PACECare.

15) There are three sources of lost revenue (and thus lost profits) to Intus that I quantify:

### 1.   Pre-Existing Contracts

16) The first source of lost revenue comes from existing contracts that Intus had in place prior to the start of RTZ's conduct in September 2022. Under these contracts, Intus was paid a contracted amount in exchange for services that depended on Intus having access to their client's data in PACECare. Once RTZ's conduct began, Intus could no longer fully perform its services and stopped receiving the contractually owed payments from several clients, including Community PACE at Home, Senior Care Partners PACE, BoldAge PACE, and Neighborhood PACE.

17) To calculate this source of lost revenue, I rely on Intus's invoicing records. For each affected client and month, I identify the amount Intus was contractually entitled to receive in the but-for world where RTZ did not engage in information blocking and Intus fully performed its already-contracted services. I then compare these but-for amounts to the payments received in the actual world where RTZ blocked Intus's access to PACECare. The difference between the but-for contractual amounts and the actual payments received represents the lost revenue caused by RTZ's conduct for these pre-existing contracts.

### 2.   Contracts that Intus Competed for but Lost as a Result of RTZ's Conduct

18) The second source of lost revenue comes from business opportunities that Intus competed for but lost as a result of RTZ's conduct. These opportunities are affirmatively recorded in Intus's customer relationship management, or CRM, system. In these opportunities, Intus bid for new or expanded work with PACE programs and, according to the CRM records, lost the opportunity because of RTZ's information blocking conduct. In the but-for world in which RTZ did not engage in information blocking and Intus could fully offer its services, Intus would have been expected to secure a portion of these opportunities and earn the associated revenues. In the actual world in which RTZ blocked Intus's access to PACECare, Intus instead lost revenue from these opportunities.

Highly Confidential – Attorney's Eyes Only

19)     For each of these opportunities, the CRM data identify the contract's expected revenue based on the per member monthly fee, the number of participants, the expected contract length, and one-time fees.  In the but-for world without RTZ's information blocking, these expected amounts represent the revenues Intus would have anticipated earning from the subset of opportunities it would have won.[4]  However, recognizing that Intus may not have won all of these contracts even absent RTZ's conduct, I adjust the but-for revenue using the conservative assumption that Intus would have won only ▮▮▮▮ of these contracts, which is Intus's win rate across ▮▮▮▮▮▮ in 2025.[5]

### 3.    *Contracts that Intus was Unable to Compete for as a Result of RTZ's Conduct*

20)     The third source of lost revenue comes from business opportunities that existing or potential clients using RTZ likely would have pursued with Intus, but that Intus was unable to compete for because of RTZ's conduct.  In the but-for world in which RTZ did not engage in information blocking and Intus could fully perform its services, existing RTZ-using clients would have been expected to renew or expand their business with Intus and additional PACE programs using RTZ would have been expected to become new Intus clients.  In the actual world with RTZ's conduct, some of these renewals, expansions, and new client relationships did not occur.  This lost revenue is "unobservable" because Intus was unable to compete for these opportunities, so they generated no bids, proposals, or contracts and therefore do not appear in Intus's CRM, invoicing systems, or other internal data.

21)     I estimate this source of lost revenue by performing a common econometric analysis known as a difference-in-differences analysis, which measures whether and by how much Intus's revenue from RTZ-using clients grew more slowly than its revenue from similar non-RTZ clients before and after RTZ's information blocking took effect.  In the but-for world without RTZ's information blocking, Intus's revenue from RTZ-using clients would be expected to grow at a similar rate to comparable non-RTZ clients.  In the actual world with RTZ's information blocking

---

[4] The monthly revenues per opportunity appear relatively consistent between the forecasted revenues in the CRM data and the actual revenues received in the Invoicing data.  For example, the median revenue for the lost opportunities in the CRM data is ▮▮▮ and the median revenue in July 2025 in the Invoice data is ▮▮▮.  *See* backup material.

[5] Specifically, it represents Intus win rate across the ▮▮▮▮▮ between January 1, 2025 and October 15, 2025.  I understand that the data shows two opportunities with win rates in December 2025 because of how the dates are classified in the data when those opportunities were revisited by employees at Intus. *See* Intus 019847.xlsx.

7

Highly Confidential – Attorney's Eyes Only

in place, I find that Intus's revenue from non-RTZ clients grew faster than its revenue from RTZ-using clients. As I discuss, the difference between these growth rates after controlling for observable differences is a conservative estimate of the amount of unobservable revenue Intus lost as a result of RTZ's conduct.

### 4. Conversion of Lost Revenue to Lost Profits

22) To estimate total lost profits to Intus, I aggregate the lost revenue from these three sources and apply a conservative estimate of Intus's incremental profit margin. I also include labor costs identified by Intus as being related to RTZ's conduct. I find that Intus suffered ███████████ in lost profits as a result of RTZ's conduct.

## III. BACKGROUND

### A. Intus

23) Intus is a health analytics company that contracts with organizations operating the Program of All-Inclusive Care for the Elderly ("PACE") programs. Intus provides an analytics platform to health care providers that synthesizes data from the PACE programs' electronic health records to identify risks, visualize trends, and optimize patient care.[6] It was founded in 2019 and launched its first product in 2020, and it currently serves over 70 PACE programs.[7] Intus provides several products to its clients, including IntusCare PRISM, IRIS Risk Adjustment, and CareHub.[8]

24) Intus's IntusCare PRISM, formerly known as Population Health and Utilization Suite, is a suite of products designed for PACE organizations that analyzes EMR data and other relevant data sources to provide population health services and/or utilization management services to their clients. Population health services identify high-risk participants, recommend system-wide improvements, and integrate preventive population health strategies, while utilization

---

[6] Amended Complaint at ¶ 1.

[7] Intus Care, "About Us," https://intuscare.com/about-intuscare/ (accessed April 21, 2026).

[8] For Intus, a client is an organization (typically a PACE program operator or a related healthcare provider organization) that has engaged Intus (by contract or other paid agreement) to receive Intus products and/or services.

management services ensure care is consistent with clinical standards, patient needs, and multi-disciplinary clinical and care-coordination team decisions.[9]

25)    Intus's IRIS Risk Adjustment is a revenue integrity system for PACE organizations that uses artificial intelligence ("AI") and consultants to optimize medical reimbursement through risk adjustment.  It utilizes EMR and other data sources to provide real-time analytics on revenue and patient outcomes.[10]  Intus's CareHub is an EMR designed and built for PACE.[11]

### B.   RTZ

26)    RTZ is a software and services company that provides cloud-based software for healthcare case management and administration specifically developed to support the needs of PACE   programs.[12]    RTZ   operates   PACECare,   an   electronic   health-record   and participant-management platform serving PACE programs and related long-term-care providers. I understand that RTZ was acquired by CollabriOS Health in 2024.[13]  **Exhibit 7,** *infra*, shows the ▇▇▇▇▇▇▇ PACE programs that use RTZ's PACECare.[14]

### C.   Data

27)    I primarily use three types of datasets to conduct my analysis.  With the exception of RTZ's client list, I understand that these datasets are currently or were maintained by Intus and used in their ordinary course of business.  I also understand that Intus's Invoicing data was used as its main source of invoicing data until September 2024 but is no longer used or maintained by Intus.  Since September 2024, Intus has transitioned to a new accounting system.

---

[9] Intus Care, "PRISM, PACE Population Health & Utilization Management," https://intuscare.com/population-health-utilization/ (accessed April 21, 2026).

[10] Intus Care, "Intus Revenue Integrity System," https://intuscare.com/iris-risk-adjustment/ (accessed April 21, 2026).

[11] Intus Care, "CareHub PACE EMR," https://intuscare.com/carehub/ (accessed April 21, 2026).

[12] Amended Complaint at ¶ 5.

[13] PR Newswire, "AHP Announces the Formation of Collabrios Health: A Leading Provider of Integrated Technology Infrastructure Solutions for PACE Programs," October 10, 2024, https://www.prnewswire.com/news-releases/ahp-announces-the-formation-of-collabrios-health-a-leading-provider-of-integrated-technology-infrastructure-solutions-for-pace-programs-302273477.html (accessed September 24, 2025).

[14] RTZ0008248-49; National PACE Association, "Find a PACE Program," https://www.npaonline.org/find-a-pace-program (accessed April 17, 2026).

Highly Confidential – Attorney's Eyes Only

### 1. *Intus's Revenue by Client, Product, and Month*

28)     The first dataset I use is Intus's Revenue data, which is a dataset of Intus's monthly revenues broken down by client and Intus's analytics product.  The first month with revenue is July 2020, and the revenue data runs through July 2025.  The data allows me to analyze the historical activity of Intus clients before and after RTZ's information blocking conduct.

### 2. *Intus's CRM Data*

29)     The second type of dataset I use is from Intus's customer relationship management ("CRM") data that classifies potential business opportunities, the total contract value, the reason the business opportunity was lost (if the business opportunity was lost), the number of covered lives, along with other information.  I have three subsets of Intus's CRM data.

30)     The first subset allows me to identify potential business opportunities Intus competed for but lost as a result of RTZ's information blocking conduct and the amount of expected revenue associated with these opportunities.

31)     For this subset of the data, I understand that I have Intus's CRM data restricted to the list of potential business opportunities that Intus contends were lost as a result of RTZ's information blocking conduct and not the entire universe of Intus's CRM data.  Thus, as a starting point, I assume the provided opportunities were lost as a result of RTZ's information blocking conduct.  Should the finder of fact determine that fewer of the opportunities were lost as a result of RTZ's information, my same calculations and methods would apply to that smaller set of data.  Similarly, should the finder of fact identify even more opportunities that were lost as a result of RTZ's information, my same calculations and methods would apply to that larger set of data.

32)     The second subset of CRM data allows me to calculate the renewal rate of Intus's contracts.  I understand this pull of the CRM data includes opportunities that resulted in executed contracts (Closed/Won), excluding any Closed/Lost, Proposal, Demo, SQL, or Contract Negotiation opportunities since those did not materialize into contracts.  One-time fee agreements are also excluded because they are fixed-term and not subject to renewal.

10

Highly Confidential – Attorney's Eyes Only

33)     The third subset of the CRM data allows me to calculate Intus's win rate on the █ ████████ that Intus competed for between January and mid-October 2025.[15]

### 3. Intus's Invoicing Data

34)     The third dataset I use is Intus's Invoicing data which shows the revenue that was contractually owed to Intus by its clients as well as any revenue that was foregone due to RTZ's conduct.  This data allows me to see which Intus clients did not make payments on pre-existing contracts (up to October 2024) as a result of RTZ's information blocking conduct.

### 4. Other Data

35)     I use several additional data sources for my analysis.  First, I use the list of clients that RTZ produced to be able to identify which actual or potential clients of Intus can be separated into clients that use or do not use RTZ.[16]  Second, I use a data source produced by Intus that contains Intus's labor costs related to RTZ's conduct.[17]  Third, I use Intus's financial statements to measure their profit margin.[18]

## IV.     SUMMARY OF THE HARM TO INTUS

36)     In this section I discuss the economics of the relationship between RTZ and Intus and how to estimate the harm to Intus from RTZ's information blocking conduct.  Intus's allegations are consistent with economic theory in a setting in which information blocking causes lost profits.

### A. The Economic Relationship Between RTZ's PACECare and Intus's Health Analytics Business

37)     PACE organizations, like other types of healthcare providers, often store their patients' medical records on an EMR system.[19]  Providers use EMRs to electronically store information on their patients' medical and treatment history, including diagnoses, medications,

---

[15] These data are not adjusted to remove the opportunities that could have been impacted by RTZ's conduct.  Removing such opportunities would likely increase Intus's historical win rate.

[16] RTZ0008248-49.

[17] Intus 018876_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx.

[18] Intus 018878_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx.

[19] Health IT Playbook, "Electronic Health Records," https://www.healthit.gov/playbook/electronic-health-records/ (accessed October 4, 2025).

11

immunizations, lab results, and clinician notes.  PACE organizations generally choose an EMR provider to serve as an electronic repository for their medical and treatment history data, and these organizations can choose from a variety of EMR providers including RTZ's PACECare, Epic, PACELogic, CareCompass, and Intus's CareHub.[20]

38)  As discussed, Intus is a health analytics company that integrates financial, clinical, and administrative data with electronic health records, claims, and accounting systems to identify trends and clinical risks among Intus's clients' patients.[21]  By synthesizing client data, Intus predicts patients at high risk for hospitalization, readmission, or new chronic disease, reduces costs through early risk detection, and improves performance via trend analysis and best-practice identification—enabling better care coordination and targeted services.[22]  To provide value-added services to its clients, Intus requires access to its clients' data stored in an EMR system.  RTZ's PACECare is one such EMR system.

39)  The business relationship between Intus and RTZ can be likened to that between a brokerage firm and a financial advisor.[23]  An EMR such as RTZ's PACECare is similar to a brokerage account in that it safely custodians a client's portfolio by holding records of a client's assets and transactions.  In this analogy, Intus is similar to a financial advisor which, with access to information about their client's holdings and transactions data from the brokerage firm, analyzes performance, identifies risk, and can give recommendations to the client.  If RTZ, like a brokerage firm, prevented their clients from sharing the clients' own records with Intus, it is similar to a brokerage firm preventing their clients from easily and efficiently sharing their portfolio holdings and history with that client's financial advisor so the advisor can perform its service (which the client desires) effectively to the client.

---

[20] CareVention HealthCare, "PACElogic," https://careventionhc.com/services/ehr-integrated-technology-solutions/pacelogic/ (accessed April 20, 2026); PPi, "Who We help," https://www.ppi.com/whowehelp/ (accessed April 20, 2026).

[21] Amended Complaint at ¶ 1.

[22] Amended Complaint at ¶ 11.

[23] This type of relationship is known in the economics literature as a vertical relationship, and the example illustrates vertical foreclosure.  In this case, RTZ, as the upstream custodian of the records (the key input), restricted customers' ability to share that data with Intus, thereby denying Intus (a downstream service provider) the access needed to compete and provide services.  *See, e.g.,* Ordover, Janusz A., Garth Saloner, and Steven C. Salop, "Equilibrium Vertical Foreclosure," *American Economic Review,* Vol. 80, No. 1, 1990, pp. 127-142; Hart, Oliver and Jean Tirole, "Vertical Integration and Market Foreclosure," *Brookings Papers on Economic Activity, Microeconomics,* 1990, pp. 205-286.

Highly Confidential – Attorney's Eyes Only

**B.    The But-For World Had RTZ's Information Blocking Not Occurred**

40)    I understand that Intus alleges that beginning in September 2022 RTZ stopped giving Intus direct access to patient data stored in RTZ's PACECare system, inserted contract provisions and sent letters to Intus's clients preventing those clients from granting Intus access (and deactivated prior Intus accounts), forced clients to provide only manual data exports, and prevented or increased the cost, complexity, and delay in Intus's ability to receive Intus's clients' data and, in turn, provide analytics work.[24]

41)    Assuming RTZ's information blocking conduct starting in September 2022 has been found to be tortious, the objective underlying the calculation of damages in this case is to quantify the difference between the actual economic position of Intus and the economic position they would have attained absent the information blocking conduct.[25]  This quantification requires the construction of a hypothetical world (called a "but-for world") that is otherwise identical to the Plaintiff's actual outcomes, except for any identifiable effects that were caused by RTZ's information blocking conduct.[26]

42)    This but-for world compares the revenue Intus would have earned absent RTZ's information blocking conduct with the revenue realized by Intus.  Lost revenue is the difference between those two amounts, and the but-for world should differ from the actual world only in outcomes that are causally attributable to RTZ's conduct.  For example, if Intus would have won

---

[24] Amended Complaint at ¶¶ 19-20.

[25] "We then set forth the standard general approach to damages quantification, with particular focus on defining the harmful event and the alternative, often called the but-for scenario.  In principle, the difference between the plaintiff's economic value in the but-for scenario and in actuality measures the loss caused by the harmful act of the defendant," National Research Council, Federal Judicial Center, Global Affairs, Committee on Science, Law, and Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, *Reference Manual on Scientific Evidence*, National Academies Press, 2011, at 429. "The concept underlying most economic damages assessments is that of the 'but-for' world.  For example, in the case of a price-fixing agreement, the but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages." van Dijk, Theon, and Frank Verboven "Quantification of Damages," American Bar Association Section of Antitrust Law, 2008, pp. 2331-2348 at 2332.

[26] "Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved. Because the but-for scenario differs from what actually happened only with respect to the harmful act, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's value arising from other sources. Thus, a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss caused by the harmful act," *Reference Manual on Scientific Evidence* at 432; American Bar Association Section of Antitrust Law, "Chapter 4: Quantifying Damages," *Proving Antitrust Damages: Legal and Economic Issues*, 3rd Edition, Section of Antitrust Law, American Bar Association, 2017.

13

Highly Confidential – Attorney's Eyes Only

a $30,000 contract from a client that relies on RTZ's PACECare, but that client declined to engage with Intus because of RTZ's information blocking conduct, then that $30,000 contract constitutes lost revenue to Intus. These lost revenues are then converted into lost profits using Intus's profit margins to estimate damages to Intus as a result of RTZ's information blocking conduct.

### C.  Overview of Damages Analysis Methodology

43)  My analysis proceeds in several steps. First, I quantify the reduction in Intus's revenue that is caused by RTZ's information blocking conduct from contracts that existed prior to the alleged conduct. As I show, there are several Intus clients that did not pay Intus revenue that was already contractually agreed as a result of the conduct. Second, I quantify the reduction in Intus's revenue from contracts that Intus competed for (and, therefore, show up in the CRM data), but Intus lost as a result of RTZ's information blocking conduct. As I show, Intus's ordinary course records document how it lost out on revenue from potential business opportunities between 2022 and 2025 as a result of RTZ's conduct. Third, I quantify the reduction in Intus's revenue from other opportunities that Intus would have won but do not show up in the CRM data because existing or potential clients knew of RTZ's information blocking conduct. Fourth, I quantify other costs borne by Intus that are caused by RTZ's information blocking conduct including labor costs. Finally, I explain how my estimates of lost revenue can be converted into lost profits incurred by Intus.

## V.    SOURCES OF LOST REVENUE TO INTUS

44)  As discussed previously, I quantify three main sources of lost revenue to Intus by comparing Intus's revenues in the but-for world in which RTZ did not engage in information blocking to the actual world in which RTZ did. First, revenue from contracts that were in place and generated revenue for Intus prior to the start of RTZ's conduct in September 2022, but payments on these contracts were interrupted or reduced after RTZ's conduct started. Second, revenue from new opportunities that Intus competed for after RTZ's conduct started, but Intus did not win the opportunity as a result of RTZ's conduct. Third, revenue from opportunities that Intus was foreclosed from bidding on as a result of RTZ's conduct.

14

45) To avoid any potential double counting of lost revenue, each of these three sources is mutually exclusive, meaning that a contract can be categorized into one of these three categories, but it cannot be categorized in more than one category.[27] I examine each of these three potential sources of lost revenue in turn.

## A. First Source of Lost Revenue: Lost Revenue from Pre-Existing Contracts

46) The first source of lost revenue to Intus comes from opportunities that Intus already had contracts for and was collecting revenue from prior to September 2022. During this time, Intus was serving its clients by accessing their data stored on RTZ systems. Once RTZ's information blocking conduct began in September 2022, Intus could no longer serve these clients, and thus did not collect contractually obligated revenue from these clients starting in October 2022.

### 1. *Affected Clients*

47) Lost revenue from pre-existing contracts can be measured with Intus's Invoicing data. This dataset shows clients that were generating revenue for and being invoiced by Intus prior to September 2022, but Intus stopped collecting revenue after RTZ's conduct. The Invoicing data show that there are four pre-existing clients that had revenue that was already contractually agreed to Intus but was ultimately foregone due to RTZ's information blocking conduct. These clients are Community PACE at Home, Senior Care Partners PACE, BoldAge PACE, and Neighborhood PACE.[28] These clients had payments up to September 2022, but then the payments stopped for between 9 and 24 months, depending on the client.

48) Evidentiary examples from BoldAge and Community PACE at Home are consistent with lost revenue occurring for pre-existing contracts as observed in Intus's Invoicing data.

### a. *BoldAge*

---

[27] For example, the first source is for contracts that were in place prior to September 2022 and, by definition, the second source are for contracts that were not competed for until September 2022. In addition, I do not estimate any lost revenue for the third source using clients that had lost revenue from either of the first two sources (even if such potential lost revenue exists). This assumption is conservative because Intus could have affirmatively recorded and unobservable lost revenue from their clients that use RTZ.

[28] In Intus's Invoicing data, BoldAge PACE is listed as BoldAge. Neighborhood PACE is listed as Neighborhood Healthcare in Intus's Revenue data.

Highly Confidential – Attorney's Eyes Only

49) In a January 5, 2023 email exchange, Intus informed BoldAge that it "decided to pause subscription billing for our RTZ customers" while they negotiated with RTZ to "resume automated access to the data," and that Intus will provide platform access at no subscription fee in the meantime.[29] This message shows an example of how Intus lost revenue because it was unable to collect subscription billing revenue from BoldAge.

50) In total, as shown in Intus's Invoicing data, Intus had ▮▮▮▮▮▮▮ in foregone revenue from pre-existing contracts with BoldAge during the period from November 2022 to October 2024.[30]

### b. Community PACE at Home

51) On March 13, 2024, Community PACE at Home sent an email which served as a notice of their intent to terminate their existing agreement with Intus Care for a planned mock audit because they "received a cease-and-desist letter from RTZ's legal representation and are unable to grant any new access to Intus employees" and "any Intus employees who were previously granted access have had their accounts deactivated."[31]

52) In total, as shown in Intus's Invoicing data, Intus had ▮▮▮▮▮ in foregone revenue from pre-existing contracts with Community PACE at Home during the period from October 2022 to June 2023.[32]

### 2. Quantification of Harm

53) Lost revenue from pre-existing contracts can be calculated as the contracted rate times the number of enrollees within each month and for each client. The total lost revenue is then quantified by summing the lost revenue across each of the relevant months and clients. My calculation can be easily modified to add or remove certain clients and/or months from the lost

---

[29] Intus 019841.

[30] *See* **Exhibit 4**.

[31] Intus 019841-42.

[32] *See* **Exhibit 4**.

Highly Confidential – Attorney's Eyes Only

revenue calculation by excluding any observations if the finder of fact finds that some of the revenue was not lost as a result of RTZ's conduct.

54)    **Exhibit 3** provides a detailed monthly breakdown of the lost revenue from each of these four Intus clients by month.[33]  For example, Community PACE at Home had a contract with Intus that was expected to produce between ▮▮▮▮▮▮▮ per month in revenue from October 2022 to June 2023, with ▮▮▮▮ in revenue total during this period.  However, Intus received no revenue from this contract starting after October 2022.[34]

55)    **Exhibit 4** summarizes the lost revenue from these four contracts.  Taken together, these four contracts represent ▮▮▮▮▮ in lost revenue to Intus.[35]

---

[33] **Exhibit 3** is located at the end of the report due to the size of the exhibit.  As noted in **Exhibit 4**, Intus did receive a small amount of revenue from Senior Care Partners PACE in October 2022.  I exclude this revenue from the lost profit calculation in **Exhibit 13**.

[34] **Exhibit 3** shows the lost revenue by month for each of these contracts

[35] I understand that the revenue received by Intus is not always equivalent to the contractually owed for that contract.  For example, Intus collected an average monthly revenue of ▮▮▮▮▮ from Senior Care Partners PACE and had an average monthly invoicing amount of ▮▮▮▮ between April and September 2022.  Similarly, Intus collected an average monthly revenue of ▮▮▮▮ from Community PACE at Home and had an average monthly invoicing amount of ▮▮▮ between April and September 2022.  *See* backup material.

17

Highly Confidential – Attorney's Eyes Only

# Exhibit 4
# Lost Revenue from Intus's Pre-Existing Contracts
# Due to EMR Data Blocking

| Customer | Lost Revenue Start Date | Lost Revenue End Date | Months | Lost Revenue |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| Community PACE at Home | October 2022 | June 2023 | 9 | $  ██████ |
| Senior Care Partners PACE | October 2022 | July 2023 | 10 | ██████ [1] |
| BoldAge | November 2022 | October 2024 | 24 | ██████ |
| Neighborhood PACE | November 2022 | June 2023 | 8 | ██████ |
| | | | **Total:** | $  ██████ |

[1] Less ██████ that Intus collected despite EMR data blocking.

Note: Lost revenue is calculated by multiplying each affected customer's number of enrollees in each month by Intus's monthly rate.

Sources: Intus 018874_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx;
Intus 018877_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx.

## B. Second Source of Lost Revenue: Lost Revenue from Affirmatively Recorded Business Opportunities

56)    The second potential source of lost revenue comes from business opportunities that Intus lost as a result of RTZ's information blocking that are affirmatively recorded in Intus's CRM data.  In other words, Intus competed for and had an opportunity to win a contract but lost that contract due to RTZ's information blocking conduct.

### 1. Affected Clients and Opportunities

57)    I was provided with Intus's CRM data, which identifies ██ contract opportunities across ██ PACE entities that Intus contends were lost as a result of RTZ's information blocking conduct.[36]  I assume this list is true and correct for the purposes of my analysis.  The CRM data directly reflect the reasons why Intus lost these opportunities, as the system is used to understand

[36] There are ██ opportunities listed in the CRM data with an implementation commencement date before September 2022 which I do not include in the lost revenue calculation.

18

Highly Confidential – Attorney's Eyes Only

such causes. Since the CRM data cover opportunities not yet won and the Invoicing data cover already contracted opportunities, these two sources of lost revenue do not overlap.

### 2. Quantification of Harm

58)   With the contract opportunities identified, quantifying the lost revenue from these opportunities can be done using CRM data's foregone revenue calculation. This lost revenue is calculated based on the contracted rate, the number of members, the number of months of the contract, and the one-time fees in the contract. For example, if a contract covers 300 members at a contracted rate of $15 per member per month for 12 months and has a one-time implementation fee of $6,000, then the expected revenue from that contract is $60,000 (=300*$15*12 +$6,000). Since this contract is identified in the data as being lost as a result of RTZ's information blocking conduct, all $60,000 of revenue from this contract would count towards lost revenue.

59)   It is possible that while Intus did not win a bid due to RTZ's conduct, nonetheless another competitor would ultimately have won the bid. For example, consider if Intus and a competitor were competing for an opportunity, but Intus lost the bid due to RTZ's conduct. It could also be the case that the client preferred Intus's competitor for this opportunity absent RTZ's conduct. To adjust for this possibility, I assume that in the but-for world Intus only won a share of the opportunities that they lost due to RTZ's conduct using Intus's actual win rate of ▮ percent.[37] While this win rate is likely a conservative estimate of its win rate on the opportunities with lost revenue as a result of RTZ's conduct in the CRM data,[38] I assume that this win rate is representative of Intus's win rate on these opportunities.[39] In other words, instead of counting the entire lost contract value as lost revenue, I assume that Intus had a ▮ percent

---

[37] *See* Intus 019847.xlsx.

[38] This win rate is likely conservative because the opportunities being considered are identified as being lost due to RTZ's conduct and not due to some reason that suggests that Intus was not the preferred provider. In addition, this win rate could include opportunities that were lost as a result of RTZ's conduct.

[39] This assumption is reasonable because it uses Intus's observed, overall win rate as the baseline for what would have happened in the but-for world. The assumption is conservative because it is likely that since Intus identifies these opportunities as being lost as a result of RTZ's conduct, that absent RTZ's conduct, Intus would have won these opportunities at higher rate. Using the average win rate tends to understate (not overstate) the number of wins Intus would have achieved absent the conduct. For example, if all of these opportunities were ones that Intus would have won absent RTZ's conduct then we would not need to make this adjustment at all.

19

Highly Confidential – Attorney's Eyes Only

chance of winning that opportunity and, therefore, would have collected ▉ percent of the contract revenue associated with that opportunity.

60)    **Exhibit 5** shows each of the ▉ business opportunities that Intus competed for but did not win as a result of RTZ's information blocking conduct.[40]   These business opportunities resulted in ▉▉▉▉▉ in lost revenue to Intus.

61)    **Exhibit 6** plots the timing of revenue Intus would expect to receive from clients with lost revenue in the CRM data.  The blue line represents the revenue that Intus actually received from these clients, and the red line represents the but-for revenue which is a combination of the revenue Intus received and the revenue that Intus lost from these clients as a result of RTZ's conduct.[41]  Because the business opportunities involve contracts of up to 36 months, in the but-for world Intus would expect to receive revenue from these opportunities in the CRM data into the future.  Specifically, **Exhibit 6** shows the revenue that Intus would have expected to collect on these opportunities in the but-for world through April 2029 (the axis label skips every other month).[42]

---

[40] **Exhibit 5** is located at the end of the report due to the size of the exhibit.

[41] The red line does not include lost revenue from the potential renewal of these contracts.

[42] This exhibit presents the revenue from the CRM data, adjusted by Intus's win rate.

20

Highly Confidential – Attorney's Eyes Only

**Exhibit 6**
**Actual v. But-For World Revenue for Clients with Lost Opportunities**
**Due to EMR Data Blocking**
**November 2020 - April 2029**

Note: "But-For World Revenue" assumes Intus would win 58% of revenue lost due to EMR data blocking, collect any one-time fees in the month each opportunity's implementation begins, and collect monthly revenue starting in that same month and continuing for the full duration of the opportunity.

Sources: Intus 018877_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx; Intus 018880_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx; Intus 019847.xlsx.

### 3.   *Lost Revenue from Contract Renewals*

62)    **Exhibit 6** shows revenue from contracts that are observed in the CRM data, but it does not consider that such contracts are often renewed after their initially won term.[43]   To account for the possibility that some of these contracts would have been renewed and provided additional ongoing revenue to Intus in the but-for world, I estimate additional lost revenue from the potential renewal of these contracts.

63)    To calculate lost revenue from contract renewals, I use an estimate of Intus's renewal rate from their CRM data.  This renewal rate measures the share of contracts that are renewed as opposed to contracts that are lost.  Using CRM data, Intus had a win rate of ▮ percent, and of

---

[43] I understand that Intus's contracts frequently had auto-renewal. *See* Intus 019846.

21

the opportunities that Intus won, they had a renewal rate of ▮ percent.[44]  This renewal rate is measured by the number of renewal opportunities as a share of the number of renewal and lost opportunities.  In other words, for each contract in the CRM data, I assume that it would be renewed with probability of ▮ percent (=▮ percent x ▮ percent) and this renewed contract would have the same terms as the original contract in terms of length and revenue.

### 4.  Price Escalators in Contract Renewals

64)    I understand that Intus includes price escalator provisions that may be applied upon contract renewal, and that Intus's renewal language permits an increase in prices of either ▮ percent or an increase based on changes in CPI at the time of renewal.[45]  I also understand that Intus sought to include such price escalator provisions in all contracts around the beginning of 2025.  To reflect price increases that would occur when contracts are renewed in the but-for world, I assume that renewals for contracts in the CRM data with an implementation date in 2025 or later incorporate and apply a ▮ percent annual price escalator.[46]  If the finder of fact determines that a different escalator rate applies, or that escalators were included and/or exercised for only a subset of renewals, my calculations can be adjusted accordingly.

65)    These contract renewals account for ▮▮▮▮▮ in lost revenue after discounting and price escalators.[47]

## C.  Third Source of Lost Revenue: Lost Revenue from Unobservable Business Opportunities

66)    The first two sources of lost revenue come from expected revenue affirmatively recorded in either Intus's Invoicing or CRM data.  These are sources of revenue for which Intus

---

[44] *See* Intus 018879_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx and Intus 018880_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx.

[45] Intus 019846.

[46] I use a ▮ percent escalator because it is a specified, known rate (rather than an estimate or forecast of future CPI).  In addition, CPI inflation is often greater than ▮ percent.  *See* Federal Reserve Bank of Minneapolis, "Consumer Price Index," https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913- (accessed April 21, 2026).

[47] *See* backup for calculation and **Section VI.3** for discussion of discounting methodology.

22

Highly Confidential – Attorney's Eyes Only

had an actual or expected contract, but these sources of revenue did not materialize for Intus as a result of RTZ's information blocking conduct.

67)    The third source of lost revenue comes from opportunities that are unobservable to Intus.  They are unobservable in the sense that they were potential business opportunities that Intus was foreclosed from competing on because RTZ was denying Intus access to the clients' electronic health data.  Since Intus did not compete for these opportunities, they do not appear in Intus's CRM or Invoicing data.

### 1.   Affected Clients

68)    There are two types of lost revenue that are not observed in Intus's data.  The first comes from existing Intus clients that use RTZ as their EMR source, but do not have any affirmatively recorded lost opportunities in the CRM or Invoicing data.  For example, consider an existing Intus client that used RTZ's PACECare and was aware of RTZ's information blocking conduct.  This client may have been interested in pursuing additional business opportunities with Intus (either future contracts or contracts for additional products) that it did not pursue with Intus as a result of RTZ's conduct.

69)    The second comes from potential new clients for Intus, but because these clients were aware of RTZ's conduct, Intus did not compete for these opportunities.  As a result, Intus's CRM data does not capture any potential lost revenue opportunity.  For example, consider a prospective client that used RTZ's PACECare that would have been interested in pursuing business opportunities with Intus but was aware of RTZ's information blocking conduct.  This client may never have approached Intus about that potential business opportunity and it, therefore, would not be captured in Intus's CRM or Invoicing data.

70)    **Exhibit 7** provides a list of all the PACE programs that RTZ identified as being clients.[48]   The first category includes PACE programs that had affirmatively recorded lost revenue from either the CRM or Invoicing data.  Because of potential double counting and to be conservative, I do not estimate any unobserved lost revenue for these programs.  The second

---

[48] RTZ0008248-49.

23

Highly Confidential – Attorney's Eyes Only

category is PACE programs that produced revenue for Intus at some point, but do not have any affirmatively recorded lost opportunities. There are nine such programs listed in the exhibit. The third category is PACE programs that have never produced revenue for Intus and would, therefore, be potential new clients for Intus. There are ▮ such programs listed in the exhibit. As discussed, I only estimate unobserved lost revenues for the second and third categories in this exhibit.

24

Highly Confidential – Attorney's Eyes Only

**Exhibit 7**
**PACE Programs Using RTZ**
**March 2026**

| Program Name | Go Live Date | Discontinue Date |
|:---:|:---:|:---:|
| (1) | (2) | (3) |
| *Affirmatively Recorded Lost Revenue* | | |
| | 2015-10-01 | 2026-08-01 |
| | 2024-04-16 | |
| | 2023-10-23 | |
| | 2024-04-16 | |
| | 2024-11-01 | |
| | 2022-09-19 | |
| | 2024-07-01 | |
| | 2021-08-01 | |
| | 2022-05-01 | |
| | 2021-10-21 | |
| *Already Contracted with Intus* | | |
| | 2025-06-02 | |
| | 2024-03-01 | 2026-08-01 |
| | 2024-03-01 | 2026-08-01 |
| | 2024-08-05 | 2026-08-01 |
| | 2024-07-01 | |
| | 2017 | |
| | 2025 | |
| | 2006 | 2024-02-01 |
| | 2024-12-02 | |
| *Have Not Contracted with Intus* | | |
| | 2021-03-01 | 2025-02-28 |
| | 2016-05-26 | |
| | 2015 | |
| | 2024-10-21 | |
| | 2016-02-01 | |
| | 2023-07-01 | |
| | 2024-08-26 | |
| | 2008-05-01 | |
| | 2013-02-01 | |
| | 2024-07-01 | |
| | 2024-06-01 | 2026-08-01 |
| | 2024-12-02 | |
| | 2024-07-01 | |
| | 2006-01-01 | |
| | 2020-09-01 | 2024-12-31 |
| | 2024-05-01 | |
| | 2022-09-04 | |
| | 2024-12-02 | |
| | 2025-05-05 | |
| | 2024-05-27 | |

25

| | |
|---|---|
| 2014-11-01 | 2023-05-01 |
| 2022-03-01 | |
| 2024-02-19 | |
| 2025 | |
| 2022-12-05 | |
| 2023-05-01 | |
| 2024-02-01 | |
| 2025-03-31 | |
| 2021-11-01 | |
| 2025-03-02 | |
| 2018-06-01 | |
| 2019-12-01 | |
| 2024-11-01 | |

Sources: Intus 018874_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx;
Intus 018877_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx;
Intus 018880_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx;
RTZ0008248-RTZ0008249.

### 2. *Quantification of Harm*

71)    To quantify the unobservable revenue that Intus lost as a result of RTZ's conduct, I compare how Intus's revenue grew for clients that were impacted by RTZ's conduct (i.e., Intus clients that used RTZ as their EMR supplier) compared to clients that were not impacted by RTZ's conduct (i.e., Intus clients that did not use RTZ as their EMR supplier).  This analysis assumes that but-for RTZ's conduct, Intus would have had comparable levels of revenue growth for these two sets of clients.[49]  This assumption is reasonable because outside of the firm that hosts their electronic health records, these clients face similar market forces, pricing, and sales practices.

72)    **Exhibit 8** illustrates revenue growth for two groups of Intus clients from July 2020 through July 2025.  The blue line shows revenue from Intus clients that used RTZ as their EMR supplier, and the red line shows revenue from Intus clients that did not use RTZ.  The pattern in **Exhibit 8** is reasonable in light of Intus's business trajectory and the market context including

---

[49] This type of analysis for calculating damages is sometimes referred to as a yardstick approach.  *See, e.g.,* McCrary, Justin, and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014, pp. 63-74 at 63.

Highly Confidential – Attorney's Eyes Only

the growth in the PACE organizations and enrollment.[50]  Intus is a relatively young company, having launched in 2020, and it operates in a growing PACE market.  Consistent with this growth potential, Intus experienced significant revenue growth among non-RTZ clients over this period. It is therefore reasonable to expect that RTZ-using clients would have exhibited similar growth in the absence of RTZ's conduct.  Instead, **Exhibit 8** shows that after mid-2023, revenue from non-RTZ clients continued to grow rapidly while revenue from RTZ-using clients declined, which is consistent with RTZ's conduct suppressing Intus's growth among RTZ-using clients.



**Exhibit 8**
**Trend in Intus's Revenue**
**July 2020 - July 2025**

Note: Chart excludes revenue from CareHub.

Chart includes revenue from clients that had affirmatively recorded lost revenue from either the CRM or Invoicing data.

Sources: Intus 018877_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx; RTZ0008248-RTZ0008249.

---

[50] ATI Advisory, "A Look at PACE Growth by the Numbers: States, Organizations, and Enrollment," October 25, 2025, https://atiadvisory.com/resources/wp-content/uploads/2025/10/ATI_PACE-Growth-Oct-25.pdf (accessed April 22, 2026); National PACE Association, "PACE by the Numbers," October 2023, https://www.npaonline.org/docs/default-source/uploadedfiles/pdfs/infographic-pdf/npa-infographic-oct2023.pdf?sfvrsn=719af013_1 (accessed April 22, 2026); National PACE Association, "PACE Reaches Major Milestone with 200 Programs Nationwide," February 26, 2026, https://www.npaonline.org/about-npa/news/news/2026/02/26/pace-reaches-major-milestone-with-200-programs-nationwide (accessed April 23,2026).

Highly Confidential – Attorney's Eyes Only

73)     This approach to calculating lost revenue is known as a difference-in-differences approach because it compares two sets of differences.[51]  Specifically, it compares the change in revenue over time (before versus during the conduct) and the difference in that change between the two groups (Intus clients that are RTZ users versus non-RTZ users) after controlling for observable differences in product purchases.  By comparing the differences in revenues between these groups over time, this approach provides an estimate of the impact of RTZ's conduct on Intus clients that were impacted by the conduct.

74)     To implement this difference-in-differences approach, I run a regression analysis.[52] Running a regression allows me to control for observable factors that could impact changes in revenues over time that are unrelated to RTZ's conduct and ensure that I am capturing the change in revenues that could result from RTZ's conduct.  The regression framework also makes it easy to calculate the magnitude of the effect, to determine statistical significance, and to run robustness checks (for example, testing pre-period trends or estimating alternative specifications).

### 3.  Main Regression Specification

75)     A regression measures how an outcome of interest (known as the dependent variable) is impacted by a set of explanatory variables.[53]  My regression specification is set up to provide a simple and straightforward way to estimate the differential growth between clients that were and were not impacted by RTZ's conduct.[54]  In my regression, the outcome of interest is the revenue received by Intus.[55]  I use the natural log of revenue in my regression specification which allows me to estimate the changes in revenues in proportional terms instead of changes in dollars,

---

[51] Kennedy, Peter, *A Guide to Econometrics,* John Wiley & Sons, 2008, p. 414.

[52] Reduced-form regression analysis is a statistical technique used to explain the variation in one variable (referred to as the dependent variable, e.g., revenue) by other variables (referred to as independent variables e.g., Intus product, revenue type, etc.) Baker, Jonathan and Daniel Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique," *American Law and Economics Review*, Vol. 1, No. 1, 1999, pp. 386-435 at 391.

[53] Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 5th ed., South-Western Cengage Learning, 2012, pp. 63-64.

[54] An alternative way to specify the regression is to look at the trend in revenue between the two client groups of interest (those that do and do not use RTZ).  In my backup, I run a regression specification that looks at the differential growth rates between clients that use and do not use RTZ using time trends.  That regression also shows significantly higher growth rate for non-RTZ-using clients.  I also ran a version of the differences-in-differences regression that includes customer fixed effects which looks at how revenues change within a client.

[55] For my regression specification, I use the revenue aggregated by month, revenue type (fixed or recurring), Intus product, and whether the client used RTZ as their EMR provider.

28

Highly Confidential – Attorney's Eyes Only

which is preferable when comparing clients or products with different revenue levels.[56]  The set of explanatory variables that I include are indicators for each Intus product in the data (Consulting, IRIS, Pop Health, and UMaaS)[57], the revenue type (fixed, recurring, or implementation revenue), an indicator for whether the revenue was from clients that used RTZ as their EMR provider, and a conduct period indicator (defined as any month including or after September 2023).

76)     The key variable in the regression is an interaction term of whether the revenue was from clients that used RTZ as their EMR provider and the conduct period indicator, which measures the differential impact of RTZ's information blocking conduct on the revenue growth of Intus's clients that used RTZ as their EMR provider during the conduct period, relative to clients that did not use RTZ as their EMR provider.[58]

77)     The coefficient of interest for estimating lost profits is the coefficient on the interaction term.[59]  This term measures whether, and by how much, revenues during the conduct period for non-impacted clients (Intus clients that did not use RTZ as their EMR provider) differed compared with impacted clients (Intus clients that did use RTZ) after controlling for other factors that could impact revenue (like product and contract type).  Specifically, the ratio of the growth of non-impacted clients to impacted clients can be calculated by exponentiating the coefficient on the interaction term.[60]

78)     There are several additional considerations in my analysis.  First, the cutoff I use for the difference-in-differences analysis is September 2023.  While Intus's conduct began in September 2022, there are two reasons that I use September 2023 as the cutoff.  First, there is a delay between RTZ's conduct and the resulting impact on revenue with some contracts taking

---

[56] Kennedy, p. 123.

[57] CareHub is excluded from the regression because it is an EMR product and may not be impacted in the same way.

[58] The difference-in-differences design differences out any contemporaneous shocks that affect both groups similarly (e.g., general macroeconomic growth), so additional macro covariates are not necessary for identification.

[59] *See e.g.,* Cameron, A. Colin, and Pravin K. Trivedi, *Microeconometrics: Methods and Applications*, Cambridge University Press, 2005, pp. 55-57.

[60] In other words, exp(interaction coefficient) = growth of non-impacted clients / growth of impacted clients.

Highly Confidential – Attorney's Eyes Only

over one year between the date signed and revenue received.[61]  Since this analysis focuses on potential lost revenue from contracts that Intus would have competed for after September 2022, Intus would not have started receiving revenue from these opportunities in the but-for world until after September 2022.  Second, this analysis is restricted to clients who had no affirmatively recorded lost revenue with Intus and, therefore, had limited revenue with Intus prior to September 2022.  This approach is conservative and reliable for two reasons.  First, it is possible that some clients could have unobservable lost revenue prior to September 2023, but I do not calculate any such lost revenue.  Second, these clients, which did not have any affirmatively recorded lost revenue with Intus, had low levels of revenue with Intus prior to September 2023 because most of these potential clients had not contracted with Intus yet, so applying the growth rate to estimate their but-for revenue results in a conservative and more reliable estimate of lost revenue.[62]

79)    Second, I weight my regression by total revenue.  Weighting a regression gives observations with more revenue proportionally more influence estimating the regression coefficients.  For example, if Pop Health has $10,000 in recurring revenue in a month and IRIS has $1,000 in recurring revenue in that same month, then the Pop Health observation would have ten times the influence on the regression estimates than the IRIS observation.

80)    Third, I restrict my analysis to impacted clients who do not have lost revenue in the CRM and Invoicing data to avoid potential double counting of lost revenue.  I consider the lost revenue for those clients separately in Sections V.A and V.B.  This exclusion is conservative, because it is possible that these clients did have unobserved lost revenue, but I do not calculate any such lost revenue.

81)    Fourth, I ignore 2020 since it is a partial startup year that isn't representative of Intus's overall revenue growth.  This restriction excludes a small amount of revenue from the regression, and it is conservative because it removes months prior to the conduct that had small amounts of

---

[61] For example, the Invoice data shows that BoldAge - Crestwood Center had an opportunity with a signed date of November 18, 2024, an effective date of November 20, 2025, and started collecting revenue on March 26, 2026. *See* Intus 019846.xlsx.

[62] Using September 2023 as the cut-off instead of September 2022 is more reliable because it offers a larger revenue base in the pre-period to estimate the coefficient of interest.

Highly Confidential – Attorney's Eyes Only

revenue for Intus clients that did not use RTZ as their EMR supplier.[63]  Finally, I exclude Intus's CareHub products from the regression because CareHub is an EMR product, so it may not be impacted in the same way by RTZ's conduct.

82)     The results of my regression analysis are presented in **Exhibit 9**.  The exhibit shows the regression coefficients for the various controls including revenue type (Implementation and Recurring), the product (IRIS, Pop Health, UMaaS), and indicators for whether the client used RTZ as their EMR supplier (RTZ client) and whether the revenue was collected during the conduct period (Post-RTZ Conduct).[64]

---

[63] Because these months have a small amount of revenue for Intus clients that did not use RTZ as their EMR supplier, removing them will reduce the estimated increase in revenue during the conduct period for Intus clients that did not use RTZ as their EMR supplier.

[64] Because the dependent variable is the log of revenue, the coefficients calculate how much each of the controls impacts revenue in percentage terms when properly transformed.  This transformation is the (exp(coefficient) - 1) * 100%.  In other words, the IRIS coefficient can be interpreted as showing that IRIS products had 225% (=(exp(1.179) - 1)*100%) higher revenues on average than the baseline product (which is Consulting).

31

Highly Confidential – Attorney's Eyes Only

**Exhibit 9**
**Regression Analysis of RTZ and Non-RTZ Customers**
**January 2021 - July 2025**

| Explanatory Variable | Dependent Variable: Log of Revenue Estimate |
|---|---|
| (1) | (2) |
| Intercept | 8.443 *** |
| | (0.245) |
| Revenue Type | |
| Implementation | -0.954 *** |
| | (0.219) |
| Recurring | 0.478 *** |
| | (0.167) |
| Product | |
| IRIS | 1.179 *** |
| | (0.139) |
| Pop Health | 1.035 *** |
| | (0.111) |
| UMaaS | 0.354 *** |
| | (0.134) |
| Non-RTZ Client | 0.639 *** |
| | (0.212) |
| Post-RTZ Conduct | 0.107 |
| | (0.219) |
| Non-RTZ Client * Post-RTZ Conduct | 0.790 *** |
| | (0.240) |
| Observations | 310 |
| R-squared | 0.648 |

Notes: An observation in the regression is a unique combination of revenue type, product, month, and whether the revenue is from an RTZ customer.

"Implementation" and "Recurring" indicate revenue type. The reference group is "Fixed".

"IRIS", "Pop Health", and "UMaaS" indicate product. The reference group is "Consulting".

"Non-RTZ Client" indicates that the Intus client is not an RTZ client.

"Post-RTZ Conduct" indicates any month September 2023-onward.

"*" denotes the result is statistically significant at $p < 0.1$; "**" denotes the result is statistically significant at $p < 0.05$; "***" denotes the result is statistically significant at $p < 0.01$.

Sources: Intus 018877_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx;
Intus 018880_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx;
RTZ0008248-RTZ0008249.

Highly Confidential – Attorney's Eyes Only

83)    **Exhibit 9** shows that the coefficient on the interaction term ("Non-RTZ Client * Post-RTZ Conduct") is positive and statistically significant. This coefficient indicates that, after September 2023, Intus's revenue increased more for clients not affected by RTZ's conduct (non-RTZ clients) than for clients affected by RTZ's conduct (RTZ-using clients). In other words, RTZ-using clients experienced materially slower revenue growth in the actual world than similarly situated non-RTZ clients during the conduct period.

84)    I use the interaction coefficient from **Exhibit 9** (0.790) to estimate the average increase in revenue for the relevant RTZ-using clients in the but-for world (i.e., absent RTZ's conduct). In the actual world, total revenue from these clients increased from ████████ before September 2023 to ████████ during and after September 2023. The regression coefficient of 0.790 on the interaction term implies that non-RTZ clients' average revenue grew by a factor of 2.202 (= exp(0.790)) relative to RTZ-using clients, after accounting for baseline group differences and common time trends. Applying this proportional growth differential to the revenue for relevant RTZ-using clients implies that, in the but-for world, revenue from these clients would have been ████████ during and after September 2023.[65] The difference between but-for revenue and actual revenue implies lost revenue of ████████████████████ for these impacted clients. This estimate is less than the revenue Intus would expect from fewer than three median-revenue 36-month opportunities in its CRM data.[66]

### a.    Lost Revenue Beyond July 2025

---

[65] **Exhibit 9** estimates an interaction coefficient of 0.790 for "Non-RTZ Client * Post-RTZ Conduct," implying non-RTZ clients' revenue growth was on average 2.202 times that of RTZ-using clients during the post period (exp(0.790) = 2.202). The actual growth factor for RTZ-using clients is ████████████ = 3.119. The implied but-for growth for RTZ-using clients is therefore 3.119 × 2.202 = 6.869, giving a but-for revenue of ████████████████ Lost revenue is therefore ████████████████████████ In basic terms, this interaction coefficient estimates how much faster the revenue of non-RTZ clients grew relative to RTZ-using clients after September 2023, accounting for baseline differences and common trends. Because the model uses the natural logarithm of revenue, exponentiating the coefficient translates the difference in log growth into a multiplicative factor on the original revenue scale. This means the coefficient captures the proportional difference in revenue growth between the two groups attributable to RTZ's conduct. Applying this factor to the actual growth of RTZ-using clients provides an estimate of what their revenue growth would have been absent RTZ's conduct (the but-for scenario). An equivalent way to compute but-for post-period revenue is to apply the multiplicative factor directly to actual post-period revenue: ████████████████████████

[66] The median 36-month opportunity in Intus's CRM data has ████████ in revenue. It is also less than the revenue from each of the four highest revenue opportunities listed in CRM data. *See* Intus 018880_HIGHLY CONFIDENTIAL   ATTORNEYS EYES ONLY.xlsx.

33

Highly Confidential – Attorney's Eyes Only

85)    The difference-in-differences estimate is based on Intus's monthly revenue data, which end in July 2025.  As a result, it captures unobservable lost revenue only to the extent that the associated revenue would have been realized on or before July 2025.  To estimate the portion of unobservable lost revenue that would have been collected after July 2025, I use Intus's CRM data to estimate how much revenue from affirmatively recorded lost opportunities would have been collected before versus after July 2025.  This approach is likely conservative because the CRM data reflect opportunities Intus had already competed for, whereas unobservable lost revenue also includes opportunities Intus would have competed for (and earned a higher share of revenue from) in the future.

86)    I calculate that 78.2 percent of the lost revenue from contracts in the CRM data that came from lost business opportunities since September 2022 would be collected in the but-for world after July 2025.[67]  This result means that the lost revenue calculation above only captures a share of the total lost revenue because these opportunities would have continued collecting revenue after July 2025, which is the last date in Intus's revenue data.  Assuming that lost revenues from unobservable lost revenue opportunities have similar contract duration and implementation dates as the lost revenue affirmatively recorded in the CRM data, future lost revenue from these unobservable opportunities can be calculated by scaling up the lost revenue calculated prior to July 2025 by the share of affirmatively recorded lost revenue that was collected prior to July 2025.  In other words, since the lost revenue from July 2025 or before is ▮▮▮▮▮▮ and 78.2 percent of the lost revenue came after July 2025, then the lost revenue from after July 2025 is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[68]

### b.  Robustness Checks

87)    In this section I conduct several empirical checks to determine the sensitivity of the results of the regression model in **Exhibit 9** to some of the underlying assumptions of the model.  Specifically, I perform four checks which are included in my backup.

---

[67] *See* backup material.

[68] The components of the formula in the text are rounded for simplicity, however, the estimate of lost revenue is calculated using the precise unrounded values.

Highly Confidential – Attorney's Eyes Only

88)     First, I examine whether the results hold when using revenue in dollars and not in logs.  As discussed, logs are a common way to adjust the dependent variable (or variable of interest in a regression) because it allows the regression coefficients to be interpreted in percentage changes instead of dollar changes.[69]  Similar to the results above, I find positive and statistically significant differences in the growth of revenue for Intus clients that do not use RTZ and use RTZ as their EMR supplier when running the regression with the dependent variable in levels.

89)     Second, I examine whether the results hold when using different cut-off dates to define the conduct period, which is the period in which Intus's revenues would be expected to be impacted by RTZ's conduct.  The main specification uses September 2023, but I also use January 2024, and January 2025 as robustness checks.  Again, I find positive and statistically significant differences in the growth of revenue for Intus clients that do not use RTZ and use RTZ as their EMR supplier.

90)     Third, I modify some of the regression specifications including removing the weighting and the restriction to ignore data from 2020.  I find positive and statistically significant differences in the growth of revenue for Intus clients that do not use RTZ and use RTZ as their EMR supplier.

91)     Finally, I run a regression analysis to test whether the two groups of interest (Intus clients that use RTZ as their EMR supplier and those that do not) have statistically different levels of revenue or trends in revenue prior to September 2023, after controlling for the same variables (product and revenue type) that were controlled for in **Exhibit 9**.[70]  The results of this regression, presented in my backup, show that there are not statistically different levels or trends in revenue between these two client groups prior to September 2023 that would be driving differential growth rates between these client groups.  In other words, there is no evidence that there are

---

[69] Greene, William H., *Econometric Analysis*, 8th ed., Pearson, 2018; Wooldridge, Jeffrey M., *Econometric Analysis of Cross Section and Panel Data,* 2nd ed., MIT Press, 2010, Chapter 2.

[70] This is known as the parallel trends or common trends assumption.  *See, e.g.,* Cameron and Trivedi (2005), p. 770.

35

differences in the revenue growth between impacted and non-impacted clients that would affect the interpretation of my regression analysis in **Exhibit 9**.

### D.   Summary of Lost Revenue Estimates

92)   To calculate Intus's total lost revenue, I sum up the three sources of lost revenue. **Exhibit 10** summarizes the total lost revenue to Intus as a result of RTZ's information blocking conduct.

**Exhibit 10**
**Intus's Lost Revenue**
**Due to EMR Data Blocking**

| Source | Lost Revenue |
|---|---|
| (1) | (2) |
| Intus's Pre-Existing Contracts | |
| Lost Opportunities in Intus's CRM Data | |
| Regression Analysis of RTZ and Non-RTZ Customers | |
| **Total:** | |

Notes: "Lost Opportunities in Intus's CRM Data" assumes Intus would win ▮ of revenue lost due to EMR data blocking and renew ▮ of that revenue.

"Regression Analysis of RTZ and Non-RTZ Customers" estimates Intus's but-for growth rate from September 2023-July 2025, applies that to Intus's actual revenue from RTZ users pre-September 2023, and scales the result by the percent of "Lost Opportunities in Intus's CRM Data" post-July 2025.

Lost revenue 2027-onward is discounted using the 1-year U.S. treasury rate.

Sources: **Exhibits 4**, **6**, **9**.

Intus 018877_HIGHLY CONFIDENTIAL   ATTORNEYS   EYES ONLY.xlsx; Intus 019846.xlsx.

U.S. 1 Year Treasury, https://www.cnbc.com/quotes/US1Y (accessed April 20, 2026).

## VI.   SUMMARY OF LOST PROFITS TO INTUS

93)   In the previous sections, I calculated lost revenues, but to calculate Intus's lost profits there are two additional steps required.  First, I consider other cost considerations outside of lost

36

Highly Confidential – Attorney's Eyes Only

revenue including additional labor costs incurred by Intus as a result of RTZ's information blocking conduct. Second, I convert Intus's lost revenues to lost profits using Intus's profit margin.

### 1. Other Considerations

94)    In addition to lost revenue, Intus incurred additional labor costs related to RTZ's conduct. I understand that Intus has compiled a set of labor costs that they find to be impacted by RTZ's conduct which I have summarized in **Exhibit 11**, below. I understand that these labor items consist of Intus technical and operational work undertaken to respond to RTZ related items, including building and adjusting RTZ data integrations and EMR pipelines to restore data flows, performing RTZ data updates and uploads, and producing comparison/extraction analyses to diagnose and mitigate RTZ-related disruptions. I assume these labor costs are causally attributed to RTZ's conduct for my analysis, but I leave it to be proven at trial.

**Exhibit 11**
**Summary of Labor Costs**
**September 2022 - April 2025**

| Estimation Method | Cost |
|---|---|
| (1) | (2) |
| Cost Estimated at Task Creation | |
| Cost Estimated at Task Completion | |
| Cost Estimated by GPT[1] | |
| **Total:** | |

[1] Intus estimates labor costs using a custom GPT model when human review is not available.

Note: Costs include Intus's estimates of labor costs from tasks done by Intus employees on RTZ's EMR data.

Source: Intus 018876_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx.

### 2. Intus's Profit Margin

95)    When calculating Intus's lost profits, it is essential to account not just for the revenue it would have earned in the but-for world but also for the incremental costs it would have incurred

37

Highly Confidential – Attorney's Eyes Only

serving those additional clients. For these purposes, profit margin is the share of revenue remaining after deducting incremental costs, so lost profits can be calculated by applying the profit margin to the revenue. For example, if Intus would have held a $30,000 contract in the but-for world but would have faced $18,000 of incremental costs to perform the work, the profit on that contract would be $12,000 (=$30,000 − $18,000), which equals a 40 percent profit margin ($12,000 / $30,000). Thus, Intus's lost profits are calculated by applying the appropriate profit margin to the forgone revenue (or equivalently by subtracting the incremental costs from that revenue).

96)     In economics, the profit margin that captures how much profit firms make on incremental sales (i.e. the sales that Intus would have made in the but-for world but did not make in the actual world) is known as an incremental profit margin.[71] Incremental profit margins are difficult to estimate for a variety of reasons.[72] Two of the reasons it is difficult to estimate incremental profit margins in this case are that (1) it is difficult to determine incremental profit margins from profit and loss statements, which calculate average gross profit margins and (2) Intus is a young and growing company which can make it more difficult to calculate the proper margin.[73] For example, Intus calculates a gross profit margin in their ordinary course of business in their financial statements, and their gross profit margins from 2021 to 2025 (through July) range from ███████████████████.[74]

97)     I approximate Intus's incremental profit margin using Intus's average gross profit margins in 2025 by product. This profit margin is likely conservative because the incremental margins for Intus products, and particularly their analytics software products, are likely to be

---

[71] Sacher, Seth B., and John D. Simpson. "Estimating Incremental Margins for Diversion Analysis," *Antitrust Law Journal*, Vol. 83, 2020, pp. 527-556 at 527 ("Incremental profits are the net change in profits associated with the discrete change in output over the time period relevant to the matter and effect being considered. The incremental profit margin ("incremental margin") is the average difference between price and incremental cost over this change in output.").

[72] *See, e.g.,* Sacher and Simpson (2020), pp. 527-556 at 538 ("While accounting data often can provide accurate estimates of the incremental margin of interest in a diversion and pricing pressure analysis, a variety of factors can also confound the accurate measure of these incremental margins.").

[73] Sacher and Simpson (2020), pp. 527-556 at 544 ("A firm's position in its life cycle could affect margins in a similar manner. For example, historical data could overstate margins for declining firms if their prices are likely to decline in the future or if they will face higher variable costs from operating at a less efficient scale. The converse could be true for firms that have more recently entered a market and are currently charging low prices with the goal of establishing a foothold and charging higher prices once this is accomplished.").

[74] *See* Intus 018878_HIGHLY CONFIDENTIAL  ATTORNEYS  EYES ONLY.xlsx.

Highly Confidential – Attorney's Eyes Only

very high.  For example, running a given analytics software on an extra client would likely have an incremental profit margin in excess of the gross profit margins from Intus's financial statements since there is very little cost involved with running software.  Should additional information or data become available in the record on Intus's incremental profit margin, it would be straightforward to adjust my lost profit calculation.

98)     **Exhibit 12** lists Intus's gross profit margins from January to July of 2025, which are the only months for which I have data in 2025.  These margins range from ███████████ percent depending on the product, with an overall rate of ████ percent.

## Exhibit 12
## Intus's Gross Profit Margin
## January 2025 - July 2025

| Product<br>(1) | Revenue<br>(2) | Cost of<br>Goods Sold<br>(3) | Gross Profit<br>(4)<br>(2) - (3) | Gross<br>Margin<br>(5)<br>[(2) - (3)] / (2) |
| --- | --- | --- | --- | --- |



Source: Intus 018878_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx.

99)     To estimate lost profits, I use the gross profit margin that corresponds to the product of interest when possible and the average gross profit margin when I do not know which product was responsible for the lost profit.  For the opportunities in the CRM data that do not identify the product, I apply the average margin including CareHub since the CRM data includes CareHub opportunities, but for the third source of lost revenue (unobserved opportunities) I apply the average margin excluding CareHub since the regression does not include CareHub opportunities.  For example, if there is $1,000 in lost revenue from a Population Health opportunity, then that opportunity has $766 in lost profits (= $1,000 * 76.6 percent).

39

Highly Confidential – Attorney's Eyes Only

### 3. *Discounting Future Lost Profits*

100)   Because some of the lost revenue occurs in the future, I discount any future lost profits to present value using the U.S. 1-year Treasury rate of 3.65 percent.[75]   The detailed discount calculations are shown in my backup.  U.S. Treasury rates are a reasonable discount rate because they provide a market-observed, low-risk benchmark that reflects the time value of money for cash flows.  Because my lost profit calculation is conservative,[76] as discussed in this report, it does not reflect a level of uncertainty from the projection of future lost profits that would require incorporating risk into the discount calculation.[77]  If the ultimate factual findings determine that a different discounting approach should be used, I can apply that discount rate to my lost profit calculations.

### 4. *Summary of Lost Profits*

101)   **Exhibit 13** summarizes the various components of lost profits to Intus.  For the first two sources of revenue, I know which product the lost revenue comes from, so I apply that product's margin as shown in **Exhibit 12**.  For the third source of revenue, I do not separately identify which product the revenue came from, so I take a weighted average of the gross margin across the different products based on sales of September 2023.  My backup also includes a calculation of Intus's lost profits by year.

---

[75] U.S. 1 Year Treasury, https://www.cnbc.com/quotes/US1Y (accessed April 20, 2026).

[76] My lost-profit estimate is conservative for several reasons, among others.  First, for opportunities identified in Intus's CRM as having been lost due to RTZ's conduct, I assume Intus would have won these opportunities at the same rate as their overall historical win rate (████████).  Second, I convert lost revenues to lost profits using Intus's average gross profit margins (by product where available, and an overall average when product is not identified), rather than an incremental profit margin, which for Intus's software and analytics offerings would typically be expected to be higher.  Third, I do not include lost revenue from the potential renewal of pre-existing contracts with lost revenue.  Fourth, for the regression-based (unobservable) component, I define the post-conduct period as beginning in September 2023, which is conservative because (i) some unobservable lost revenue may have occurred prior to September 2023 but is not included, and (ii) the impacted clients included in that regression-based calculation had relatively low pre-September 2023 revenues, so applying the estimated growth rate to that lower baseline yields a lower (and therefore conservative) but-for revenue and lost-revenue estimate. Finally, to avoid potential double counting, I do not apply any unobservable lost-revenue estimates to clients that already have affirmatively recorded lost revenue in the invoicing or CRM-based calculations, even though those clients could also have experienced additional unobservable losses.

[77] It can be acceptable to use a risk-free discounting rate even if a lost profit calculation is not conservative.  *See, e.g.,* Albrecht, Gary R. "Compensatory Damages and the Appropriate Discount Rate: A Comment," *Journal of Forensic Economics*, Vol. 6, No. 3, 1993, pp. 271-272 at 271 ("…a risk-free rate is the appropriate rate to be used to calculate the present value of an expected future loss in order to properly compensate the individual. Discounting by using a rate reflecting risk is appropriate only when the future loss being discounted is not the expected future loss (e.g. capitalizing current earnings in a business valuation).").

Highly Confidential – Attorney's Eyes Only

## Exhibit 13
## Intus's Lost Profits
## Due to EMR Data Blocking

| Source | Lost Profits |
|---|---|
| (1) | (2) |
| Intus's Pre-Existing Contracts | |
| Lost Opportunities in Intus's CRM Data | |
| Regression Analysis of RTZ and Non-RTZ Customers | |
| Labor Costs | |
| **Total:** | |

Notes: Lost profits are calculated by applying product-specific profit margins to the lost revenue summarized in Exhibit 10. "Labor Costs" are listed with no adjustment.

The analysis uses Intus's total profit margin when the product is unknown.

Sources: **Exhibits 10**, **12**, **5**, **11**.

Signed this April 23, 2026:

Kristopher Hult, Ph.D.

41

Highly Confidential – Attorney's Eyes Only

**Exhibit 1**

**CV**

Highly Confidential – Attorney's Eyes Only



# Kristopher Hult
Director

NERA
155 North Wacker Drive
11th floor
Chicago, Illinois 60606
312 573 2800
Kristopher.Hult@nera.com



## Overview

Dr. Kristopher Hult is a Director in the Antitrust & Competition team at NERA.  He is an experienced antitrust economist specializing in applying economic principles and data analysis to complex issues at the intersection of antitrust and healthcare.  His expertise encompasses a broad spectrum of antitrust and intellectual property cases, ranging from damages resulting from patent infringement, biosimilar entry, rebate structures in pharmaceuticals, and health insurance mergers.  He regularly provides highly technical data analysis to a variety of complex datasets such as insurance claims, patient enrollment, financial, and patient treatment history data.

Dr. Hult also has significant experience in damages calculations stemming from allegations of collusion across a variety of markets and antitrust issues in regulated markets, such as railroads and public utilities.  His work consistently withstands the scrutiny and rigor of complex litigation because it is based on providing answers that are consistent with both data and economic theory while helping clients achieve their desired results.  As an experienced writer and speaker, he has made significant contributions to the economics of pharmaceutical innovation and personalized medicine including publications in academic journals and book chapters.

Dr. Hult completed his doctoral studies in economics at the University of Chicago.  He has published and presented academic research on quantifying the impact of medical innovation and technological change and pay-for-delay cases in pharmaceuticals.

## Education

| | |
|---|---|
| **University of Chicago**<br>PhD, Economics | 2015 |
| **University of Chicago**<br>MA, Economics | 2011 |
| **University of Chicago**<br>BS, Mathematics; BA, Economics | 2007 |

43

Highly Confidential – Attorney's Eyes Only

## Honors and Professional Activities

Law360 Health Care Editorial Board, 2024

Munk Fellowship, University of Chicago Economics Department

Social Science Fellowship, University of Chicago Economics Department

The Goldberg Award in Economics, Best Honors Thesis, University of Chicago, 2007

## Professional Experience

| | |
|---|---|
| **NERA**<br>Director, Chicago | 2025 – Present |
| **Charles River Associates**<br>Principal, Chicago | 2020 – 2025 |
| **Charles River Associates**<br>Associate Principal, Chicago | 2018 – 2020 |
| **Charles River Associates**<br>Senior Associate, Chicago | 2015 – 2018 |
| **University of Chicago**<br>Research Assistant for Prof. Kevin Murphy, Chicago | 2013 – 2014 |
| **University of Chicago**<br>Research Assistant for Prof. Gary Becker, Chicago | 2009 – 2013 |
| **Becker Center at University of Chicago**<br>Research Professional, Chicago | 2007 – 2009 |

## Selected Consulting Experience

**Patent Litigation**

*Re Biogen '755 Patent Litigation.*

**Antitrust Litigation**

*Blue Cross Blue Shield Antitrust Litigation.*

*In Re Rail Freight Fuel Surcharge Antitrust Litigation.*

*In Re Delta Dental Antitrust Litigation.*

*In re Broiler Chicken Grower Antitrust Litigation.*

*In re Turkey Antitrust Litigation.*

44

Highly Confidential – Attorney's Eyes Only

**Mergers**

GTCR acquisition of Surmodics in medical device lubricious coatings

UnitedHealth acquisition of Change Healthcare

Uber Eats – Postmates food delivery merger

Cedar Fair Entertainment Company and Six Flags Entertainment Corporation merger

Tapestry Inc.'s acquisition of Capri Holdings

**Other Matters**

*Gene R. Romero, et al., v. Allstate Insurance Company, et al.*

# Working Papers

Hult, Kristopher J. "Incremental Innovation and Pharmaceutical Productivity." Working Paper, University of Chicago, 2014

Hult, Kristopher J., and Tomas J. Philipson. "Public Liabilities and Health Care Policy." No. w18571. *National Bureau of Economic Research*, 2012

Hult, Kristopher J. "Do Pricing Algorithms Change How We Approach the Antitrust Analysis of Collusion?" Working Paper, 2026.

# Publications

Hult, Kristopher J. "Pay for Delay Patent Cases." Elgar Encyclopedia of the Economics of Competition and Regulation (2024)

Hult, Kristopher J., and Tomas J. Philipson. "The Value of Medical Innovation versus Industry Rewards." *Value in Health* 26, no. 3 (2023): 320-327

Hult, Kristopher J., Sonia Jaffe, and Tomas J. Philipson. "How Does Technological Change Affect Quality-Adjusted Prices in Health Care? Systematic Evidence from Thousands of Innovations." *American Journal of Health Economics* 4, no. 4 (2018): 433-453

Hult, Kristopher J. "Measuring the Potential Health Impact of Personalized Medicine: Evidence from Multiple Sclerosis Treatments." In *Economic Dimensions of Personalized and Precision Medicine*. University of Chicago Press, Ernst R. Berndt et al. eds. 2018.

# Selected Presentations and Speeches

Presenter, Global Competition Review, Antitrust in Life Sciences (2025)

Presenter, Fordham Antitrust Conference, Economic Analysis of Pricing Algorithms (2025)

Presenter, American Health Law Association, The Complexities of AI in Health Care (2024)

Highly Confidential – Attorney's Eyes Only

Guest, American Health Law Association Podcast, Issues Around AI in Antitrust and Healthcare (2024)

Presenter, Congressional Budget Office, Annual Panel of Health Advisers Meeting (2023)

Presenter, University of Chicago Economics, The Role of Technological Change in Driving Health Trends Conference (2021)

Invited Speaker, Columbia University's Precision Medicine: Ethics, Politics, and Culture Project (2017)

Presenter, International Health Economics Association Congress (2017)

Presenter, NBER Economic Dimensions of Personalized and Precision Medicine Conference (2017)

Presenter, Caribbean Health Economics Symposium (2016)

Presenter, ASHEcon Biennial Conference (2016)

Presenter, NBER Economic Dimensions of Personalized and Precision Medicine Pre-Conference (2016)

Presenter, FDA Center for Drug Evaluation and Research (2015)

Presenter, University of Chicago Health Economics Workshop (2015)

Co-Presenter, Stanford Graduate School of Business AME Seminar (2013)

Highly Confidential – Attorney's Eyes Only

## Exhibit 2

## Materials Relied Upon

### Intus Data

Intus 018874_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx

Intus 018876_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx

Intus 018877_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx

Intus 018878_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx

Intus 018879_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx

Intus 018880_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx

Intus 019841

Intus 019846.xlsx

Intus 019847.xlsx

### RTZ Data

RTZ0008248-49

### Legal Filings

Intus Care, Inc. v. RTZ Associates, Inc., No. 4:24-cv-1132-JST (N.D. Cal.), Amended Complaint for Intentional Interference with Contractual Relations, Intentional Interference with Prospective Economic Advantage, and Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq., filed April 2, 2024.

### Journal Articles and Other Publications

Albrecht, Gary R. "Compensatory Damages and the Appropriate Discount Rate: A Comment," *Journal of Forensic Economics*, Vol. 6, No. 3, 1993, pp. 271-272.

American Bar Association Section of Antitrust Law, "Chapter 4: Quantifying Damages," *Proving Antitrust Damages: Legal and Economic Issues*, 3rd Edition, Section of Antitrust Law, American Bar Association, 2017.

Baker, Jonathan and Daniel Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique," *American Law and Economics Review*, Vol. 1, No. 1, 1999, pp. 386-435.

Cameron, A. Colin, and Pravin K. Trivedi, *Microeconometrics: Methods and Applications*, Cambridge University Press, 2005.

Greene, William H., *Econometric Analysis*, 8th ed., Pearson, 2018.

Hart, Oliver and Jean Tirole, "Vertical Integration and Market Foreclosure," *Brookings Papers on Economic Activity, Microeconomics,* 1990, pp. 205-286.

47

Highly Confidential – Attorney's Eyes Only

Kennedy, Peter, *A Guide to Econometrics,* John Wiley & Sons, 2008.

McCrary, Justin, and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014, pp. 63-74.

National Research Council, Federal Judicial Center, Global Affairs, Committee on Science, Law, and Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, *Reference Manual on Scientific Evidence*, National Academies Press, 2011.

Ordover, Janusz A., Garth Saloner, and Steven C. Salop, "Equilibrium Vertical Foreclosure," *American Economic Review,* Vol. 80, No. 1, 1990, pp. 127-142.

Sacher, Seth B., and John D. Simpson. "Estimating Incremental Margins for Diversion Analysis," *Antitrust Law Journal*, Vol. 83, 2020, pp. 527-556.

van Dijk, Theon, and Frank Verboven "Quantification of Damages," American Bar Association Section of Antitrust Law, 2008, pp. 2331-2348.

Wooldridge, Jeffrey M., *Econometric Analysis of Cross Section and Panel Data,* 2nd ed., MIT Press, 2010.

Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 5th ed., South-Western Cengage Learning, 2012, pp. 63-64.

**Websites**

ATI Advisory, "A Look at PACE Growth by the Numbers: States, Organizations, and Enrollment," October 25, 2025, https://atiadvisory.com/resources/wp-content/uploads/2025/10/ATI_PACE-Growth-Oct-25.pdf (accessed April 22, 2026).

CareVention HealthCare, "PACElogic," https://careventionhc.com/services/ehr-integrated-technology-solutions/pacelogic/ (accessed April 20, 2026).

Federal Reserve Bank of Minneapolis, "Consumer Price Index," https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913- (accessed April 21, 2026).

Health IT Playbook, "Electronic Health Records," https://www.healthit.gov/playbook/electronic-health-records/ (accessed October 4, 2025).

Intus Care, "About Us," https://intuscare.com/about-intuscare/ (accessed April 21, 2026).

Intus Care, "CareHub PACE EMR," https://intuscare.com/carehub/ (accessed April 21, 2026).

Intus Care, "Intus Revenue Integrity System," https://intuscare.com/iris-risk-adjustment/ (accessed April 21, 2026).

Intus Care, "PRISM, PACE Population Health & Utilization Management," https://intuscare.com/population-health-utilization/ (accessed April 21, 2026).

National PACE Association, "Find a PACE Program," https://www.npaonline.org/find-a-pace-program (accessed April 17, 2026).

Highly Confidential – Attorney's Eyes Only

National PACE Association, "PACE by the Numbers," October 2023, https://www.npaonline.org/docs/default-source/uploadedfiles/pdfs/infographic-pdf/npa-infographic-oct2023.pdf?sfvrsn=719af013_1 (accessed April 22, 2026).

National PACE Association, "PACE Reaches Major Milestone with 200 Programs Nationwide," February 26, 2026, https://www.npaonline.org/about-npa/news/news/2026/02/26/pace-reaches-major-milestone-with-200-programs-nationwide (accessed April 23,2026).

PPi, "Who We help," https://www.ppi.com/whowehelp/ (accessed April 20, 2026).

*PR Newswire,* "AHP Announces the Formation of Collabrios Health: A Leading Provider of Integrated Technology Infrastructure Solutions for PACE Programs," October 10, 2024, https://www.prnewswire.com/news-releases/ahp-announces-the-formation-of-collabrios-health-a-leading-provider-of-integrated-technology-infrastructure-solutions-for-pace-programs-302273477.html (accessed September 24, 2025).

U.S. 1 Year Treasury, https://www.cnbc.com/quotes/US1Y (accessed April 20, 2026).

Highly Confidential – Attorney's Eyes Only

**Exhibit 3**
**Lost Revenue from Intus's Pre-Existing Contracts**
**Due to EMR Data Blocking**

| Customer/Month | Monthly Rate | Number of Patients | Lost Revenue |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| | | | (2) * (3) |

50

Highly Confidential – Attorney's Eyes Only



¹ Less ▮▮▮▮▮▮ that Intus collected despite EMR data blocking.

² Missing data.

³ Reflects a flat fee.

Note:  Lost revenue is calculated by multiplying each affected customer's number of enrollees in each month by Intus's monthly rate.

Sources:  Intus 018874_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx;
Intus 018877_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx.

Highly Confidential – Attorney's Eyes Only

**Exhibit 5**
**List of Lost Opportunities in Intus's CRM Data**
**Due to EMR Data Blocking**

| Customer/Opportunity (1) | Implementation Commencement Date (2) | One-Time Fees (4) | Monthly Revenue (5) | Contract Duration (6) | Total Contract Value (7) (4) + [(5) * (6)] |
|---|---|---|---|---|---|



52

Highly Confidential – Attorney's Eyes Only



Source: Intus 018880_HIGHLY CONFIDENTIAL   ATTORNEYS  EYES ONLY.xlsx.

# EXHIBIT 6

# Deposition Transcript

Case Number: 4:24-cv-01132-JST
Date: May 22, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

## KRISTOPHER HULT - HIGHLY CONFIDENTIAL – AEO

**CERTIFIED COPY**

Reported by:
Julia E. King



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

like that.  It's not sort of in the Bucket 3 category where we look at changes in revenue, but we can't really tie that to any specific contract or client.

Q   So I don't mean to quibble here.  I'm trying to understand, then, whether or not your Category Two, Lost Revenues, is projecting lost revenue based on actual contracts or potential contracts?

A   Right.  So I think for the purposes of how I'm using those terms here, I'm thinking of those as actual contracts in the sense -- not that they materialized because they did not turn into revenue generating contracts, but there was information about that contract on the record.

So I think that potential and actual distinction here, they would actually fall into actual contracts; meaning, that there's just some -- there's something I can base that specific contract on.  A potential contract is one where I don't -- I'm just trying to identify that there are some contracts where they might have existed and I can't give you any information about that contract because there's not -- there's no information in the record about what that contract would look like, which

would be the third bucket.

Q    Looking back at Paragraph 8, you make this reference to starting your damage analysis in September of 2022.  What is significant about September 2022 for purposes of your analysis?

A    That was from -- that was sort of what I had understood the start of the conduct period to be.  I believe there was some -- in the complaint, there is some e-mails and changes in the access that they had at that time, Intus had.

Q    Okay.  So if we look at Paragraph 7 of your report where you state, "I understand the starting -- I'm sorry -- I understand that starting in September 2022, RTZ refused to allow Intus access to the EMR data stored in RTZ's PACECare."  Do you see that?

A    Yes.

Q    Okay.  And so that is the information blocking event that you referenced throughout your report, correct?

A    That is the liability issue that I am estimating damages from, related to information blocking.

Q    And that's the starting point for your damage accrual, correct?

page.  Okay.

Q    So that's correct, right?

A    Correct.

Q    Okay.  And then Exhibit 7, if you flip to the next page, you label these programs as, "have not contracted with Intus."  Do you see that?

A    Yes.

Q    All right.  And you identify ▉ customers or clients under that category, right?

A    Correct.

Q    And for those ▉ programs, you're not claiming that Intus had an existing contract, right?

A    I do not see any existing contract with Intus.

Q    And you're not claiming that Intus had ever received revenue from them, correct?

A    Correct.  I do not see any -- I have not seen any revenue from those clients as well.

Q    And for these ▉ programs, you're not claiming that Intus had any current paid engagement with them, right?

A    Correct.

Q    And your report defines at Paragraph 23, specifically Note 8, defines an Intus client as an organization that has engaged Intus, quote, "by

contract or other paid agreement to receive Intus products or services."  Correct?

A    Hold on.  Let me see that --

Q    I'm sorry, so is that correct?

A    So I define -- yes, I define client here as in paragraph -- I forget -- Footnote 8 at what you said, organization has engaged Intus to receive products or services.

Q    And so under that definition, the ▮ programs that you've listed as "Have Not Contracted with Intus," were not Intus clients, right?

A    They were potential clients, but not current clients.

Q    So this portion of your third kind of damages category is not based on lost revenue from Intus customers, it's based on revenue that you say Intus might have earned from entities that never had been an Intus customer before, correct?

A    It can come from both.  So there's the already -- it could come from customers who had contracted with Intus, but did not have lost revenue, or from the third list on here, which are ones that did not contract -- did not contract with Intus.  So it's from both.

                The way that you calculate it, you

can't really determine as a standard -- with these types of analyses, you don't know where the data would have come from out of those two buckets, but those are the two potential sources of that lost revenue.

Q    Right, but we're dealing with the ■ that haven't contracted with Intus, right?

A    Right.  I just want to be clear that the third bucket also looks at those in the second bucket, the second bucket is the wrong word.  The second list of Exhibit 7 as well.

Q    I'm not following your response.  My understanding from your analysis with respect to the third source of lost revenue is that it is measuring revenue from these ■ entities that you have listed, right?

A    There's -- as I talk about, there's two types.  One is this already contracted but had no lost revenue, and the second is had not contracted, so both of those.  So 68 is about the already contracted; 69 is about the have not contracted, and both of those get picked up in Bucket 3.

Q    Paragraph 20 states -- you can flip to that.  It states that, "the third category involves opportunities that generated no bids, proposals, or

contracts."  Do you see that?

A    Paragraph 20?

Q    Yeah.

A    Correct.

Q    And it also states that these alleged opportunities do not appear in Intus's CRM invoicing systems or other internal data, right?

A    Sorry.  Yes, correct.

Q    Okay.  And, sorry, if we jump back to Paragraph 67, you state that Intus did not compete for these opportunities, right?

A    Correct.  Did not compete in any way that they would have appeared in any observable -- record observable data.

Q    And 67, Paragraph 67, also states that, because Intus did not compete for these opportunities, that's the reason why they don't appear in the CRM or invoicing data.

A    Correct.

Q    For the ███ "Have Not Contracted with Intus Programs," you don't identify any bids submitted by Intus with regard to those opportunities, correct?

A    No, I don't submit any specific bids.  I'm looking at -- no, I do not.

Q    Okay.  And you don't identify any draft

KRISTOPHER HULT - HIGHLY CONFIDENTIAL – AEO                              JOB NO. 2743450
MAY 22, 2026

contracts, term sheets, statements of work, or letters of intent between Intus and any of those three -- ▮ programs, right?

A    My opinion is based on an econometric metric analysis of the revenue, not on a specific contract.

Q    Okay.  My question is, you don't identify any draft contracts, term sheets, statements of work, or letters of intent between Intus or any of those ▮ programs, correct?

A    Correct.  I do not have any specific documents on contracts with those ▮.

Q    And you don't identify any proposals that Intus sent with respect to any of those ▮ programs, right?

A    Correct.  The point is to look at potential opportunities that you wouldn't necessarily observe in the data.

Q    You don't identify any invoicing records showing that any of these ▮ programs owed money to Intus, right?

A    Given that they haven't contracted, I would assume they have not.  I don't see anything in the -- I don't see any of these ▮ in the revenue data -- sorry, the invoicing data.

using RTZ would have been expected to become new Intus clients absent RTZ's alleged conduct.

A    I see that, yes.

Q    Okay.  Would you agree that that statement is an expectation in your model, but it isn't a statement based upon any signed agreement or any other documentation with those ▮ potential clients?

A    That statement is a matter of economics. A lot of times when you're thinking about behaviors, conducts like this, the effect would be both from potential opportunities you could observe, but most of the time when you're looking at damages, or a lot of the time at least, there are opportunities that do not observe as a matter of economics.  And that is how I would frame it.

Q    Okay.  The reason the ▮ programs enter into your analysis is that they were RTZ PACECare users, right?

A    Those ▮ were RTZ PACECare users, correct.

Q    All right.  And they don't enter your analysis because there's any existing commercial relationship with Intus, it's just simply the fact that they were RTZ users, right?

A    The third bucket is defined by being an RTZ user because we're trying -- investigating --

KRISTOPHER HULT - HIGHLY CONFIDENTIAL – AEO                        JOB NO. 2743450
MAY 22, 2026

examining whether those might have had lost revenue in ways that would not be observed in the data that we see.

Q    You didn't undertake or calculate any separate customer specific probabilities that each of these █ programs would have become an Intus customer, right?

A    No.  As an economist, we look at market outcomes.  So we're looking at what we see in the market.  We think about what the counterfactuals would be in the but-for world, and we isolate the conduct by making those comparisons not always looking at individual contracts in the same way if you had an analysis of consumers.  It's you can't really back out which customers would have purchased or not purchased the product, you would have to do an analysis of the equilibrium and look at what's happening in the market more generally and how that compares to what you would expect it to do.

Q    You didn't identify which Intus products any of these █ programs would supposedly have purchased, right?

A    In doing an analysis like this, I'm looking at total changes in revenue, not specific contracts for products.

examining whether those might have had lost revenue in ways that would not be observed in the data that we see.

Q   You didn't undertake or calculate any separate customer specific probabilities that each of these ▮ programs would have become an Intus customer, right?

A   No.  As an economist, we look at market outcomes.  So we're looking at what we see in the market.  We think about what the counterfactuals would be in the but-for world, and we isolate the conduct by making those comparisons not always looking at individual contracts in the same way if you had an analysis of consumers.  It's you can't really back out which customers would have purchased or not purchased the product, you would have to do an analysis of the equilibrium and look at what's happening in the market more generally and how that compares to what you would expect it to do.

Q   You didn't identify which Intus products any of these ▮ programs would supposedly have purchased, right?

A   In doing an analysis like this, I'm looking at total changes in revenue, not specific contracts for products.

Q    Instead, at least for this category of damage, you're using an aggregated -- I think I'll use the word, "econometric model," rather than by a customer by customer analysis of a likely transaction, true?

A    That's true.  It's looking at aggregate outcomes, not trying to predict the behavior of a given customer or the specifics of the given contract.  It's looking at what we think would have happened to aggregate outcome, which is standard way to apply economics in this situation.

Q    Sorry, bear with me.  Paragraph 69 states that the -- sorry, hold on.  Yeah.  States that the second type of unobservable revenue comes from potential new clients that were aware of RTZ's conduct.  Do you see that?

A    Yeah.

Q    Okay.  Did you evaluate any evidence that demonstrated that these ■ programs, in fact, had awareness of RTZ's alleged conduct?

A    No.  My analysis is not looking sort of program by program, but looking at the outcomes that we see in the data.

Q    So I'm assuming, then, based on that response, that you didn't identify any

modeling, but they're excluded from your regression analysis, correct?

A    They're included in Exhibit 8, which is a plot of revenues.  They're excluded when I do an econometric analysis specific to Bucket 3.

Q    Okay.  And so you were saying with respect to document Intus 18877, which is up on the screen, that you didn't use all of the data depicted in that in order to run your analysis.  You took out the CareHub related data.  What other data did you take out in addition to CareHub?

A    The data that is used in the regression is the customers that are in Bucket 3, and the customers that are in the comparison group.  That's the way that you run a difference-in-differences is having a cohort on which you're applying a specific coefficient, which is the growth, and then the comparison group, which is the clients that did not use RTZ.  Because that's how you would properly structure a diff-in-diff to isolate the effect of the conduct in Bucket 3.

Q    So if your regression analysis is only including the ██ potential customers identified on your Exhibit 7, I mean, we can agree that there's no like, no revenue, right?

A    No, it's -- I think you can do -- it's the nine and the second then, the already contracted. So there's no revenue from the other ones, from those ██.  The ██ have no revenue.

Q    Right.

A    Nine have some revenue, but none of that revenue is lost revenue.  And so I'm going to compare the revenue from the Bucket 3 category, and I'm going to say, how would Intus's revenue have grown from this category using as a benchmark the non-RTZ clients as a benchmark.  And so that produces an estimate of the counterfactual growth rate for the bucket specific to the Bucket 3 customers, which could either be those who are the nine already with revenue, or it could also be that one of the ██ would have, in the but-for world, had a contract with Intus.

Q    What would your -- how would your analysis or calculation change if you used the same population of RTZ using customers in your Exhibit 8 in your regression analysis?

A    Sorry, can you repeat that?

Q    Sure.  How would your regression analysis change if it actually incorporated the same data points or data variables used and depicted in your

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, licensed by the State of Florida, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was not requested.

IN WITNESS THEREOF, I have this date subscribed my name.

DATED: June 1, 2026          _____

Julia E. King, RPR, CRR, CRC

# EXHIBIT 7

# Deposition Transcript

Case Number: 4:24-cv-01132-JST
Date: May 25, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# SHAWN FLEURY



CERTIFIED COPY

Reported by:
MIKEN M. COBBS

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

of, this common industry practice.

Q    In Paragraph 22 of your report you cite a provision from the PACECare agreement that prohibits clients from sharing, quote, forms/documents/reports produced by PACECare, closed quote, with competitors.

You see that?

A    I do.

Q    And then you criticize Ms. Creegan for not analyzing this provision, right?

A    I do.

Q    Okay.  In Paragraph 24 of your report, you opine on the plain language of the contract.

You see that?

A    I do.

Q    And I should state, you opine on, quote, the plain language of the contract; am I correct?

A    Yes.

Q    Okay.  What qualifies you to interpret the plain language of the contract?

A    So, based on my experience reviewing these contracts, again, from a healthcare perspective, and more broadly across other industries, I do read, sort of, that quote that's later on in that paragraph about forms, documents, reports produced by PACECare as pretty clear language to me.

Now, I'm not providing a legal perspective there.  I'm just providing as a practitioner who has done many assessments and how I would help the organization from a cybersecurity perspective parse what this did allow them to do from a sharing perspective, versus what was not allowed.  Again, not from a legal perspective, but from a cybersecurity perspective.

Q    Okay.  We can agree that you have never qualified as an expert in contract interpretation, correct?

A    There have been components of contracts in the testimony referenced in my CV, yes.

Q    Okay.  So, is your answer that you have qualified as an expert witness on contract interpretation?

A    To the extent that my report included components of a contract between the two parties, and off the top of my head, there is at least two of the engagements where that was included, that was allowed by the courts for me to opine on gaps for not as it related to contracts, yes.

Q    Are you aware that the PACECare system -- first of all, if I say "PACECare,"  do you know what I'm referring to?

A    Yeah.  So, this is the -- yes.  For the purpose of this report, yes.

Q    Okay.  And you understand that PACECare is the EHR system or EMR system developed by and licensed by RTZ?

A    Yes.

Q    Okay.  So, are you aware that the PACECare system has functionality that allows a PACE customer to generate an expanded export containing EHI data?

A    I have not evaluated that capability.  I do know that it's brought up in Ms. Creegan's report as a capability.

Q    Okay.  And do you have an understanding that that expanded report could be generated as a CSV file?

A    Yes.

Q    And are you further aware that Intus's pop health system specifically ingests CSV files like -- I'm sorry -- CSV files containing EHI data?

A    I've done no evaluation -- independent evaluation.  I'll take you for your word on that one.

Q    Okay.  Are you also aware that RTZ specifically informed Intus that it could obtain these expanded reports directly from PACE customers in order to get the EHI data that Intus needed to populate its pop health system?

A     Yes.

Q     Are you aware that Intus created data maps and EHI extraction guidelines that provided PACE customers with step-by-step instructions on how to generate expanded exports?

A     Yes.

Q     Are you aware that Intus represented to its PACE customers that these guidelines would populate the expanded exports with all of the EHI data that Intus needed to power its pop health platform?

A     I don't know if I specifically reviewed any document on that specific topic, but to the extent that -- let me just stop there.  I'm not sure if I viewed any document specifically that went that far.

Q     Is it fair to say that the only documents that you had reviewed in this action are those that were provided to you by counsel?

A     Yes.

Q     Did you specifically ask for information from counsel?

A     We have a standard list of items, like assessments that have been conducted, et cetera, that we would typically provide.  In this case we didn't ask for third-party assessments, because it was sort of beyond the scope of a rebuttal opinion, in my opinion.

So, no, there was not other requests that we made as it related to requests for documentation beyond what was provided.

Q    Okay.  Are you aware of whether counsel provided you with copies of Intus's data maps and extraction guidelines?

A    I can't recall.

Q    Is that material that you would have identified in your materials relied upon portion of your expert report?

A    Yes.

Q    But as you sit here today, you don't recall, one way or the other, whether you reviewed data maps or extraction guidelines?

A    I can't recall.

Q    Do you recall whether or not you reviewed the NativeScripts?

A    I did review the NativeScripts.

Q    Are you aware of the fact that Intus dedicated staff to assisting PACE customers on how to generate expanded exports?

A    I know they worked with their clients on it, yes.

Q    Are you aware that Intus instructed PACE customers on how to transmit the expanded exports to

SHAWN FLEURY
MAY 25, 2026                                                      JOB NO. 2743510

Intus?

A    I know they worked with their clients on how to transmit data, yes.

Q    Are you aware that PACE customers, in fact, generated these expanded exports?

A    I don't know if I have any specific outputs of that.  So, as I sit here today, I cannot opine on that.  I have not seen an extraction along those lines.

Q    If a PACE customer, in fact, generated those expanded exports and provided them to Intus, would that impact your opinions in this matter at all?

A    I would be concerned from a contractual standpoint that they are at odds with what is allowed from a reporting standpoint.

Q    Who is at odds?

A    The PACECare with -- from a SaaS perspective, with the SaaS agreement being specifically not allowing reports, and we talked about this being a report, an extraction being a report.  I think you're potentially at odds -- PACECare and RTZ in this case, of being at odds of that specific language within the report.  Whether a verbal authorization is provided or not, the written agreement disallows reports to be provided.  So, that would be my concern, if I'm reviewing the contract between the entities.

Q    Are you aware of any evidence in this case that RTZ prevented a PACE customer from providing expanded reports to Intus?

MR. BESHAI:  Objection.  Vague as to "prevented."

You can answer, Shawn.

A    No.

BY MR. LEE:

Q    Are you aware of any evidence demonstrating that RTZ directed any PACE customer not to provide Intus with expanded report -- exports?

A    Beyond the language in the SaaS agreements that this allowed it --

Q    Are you --

A    -- no.

Q    -- aware of any evidence demonstrating that RTZ directed any PACE customer not to provide Intus with expanded exports?

A    It's -- in the SaaS agreement itself that they were updating in the 2023 -- 2022/2023 time frame, they specifically disallowed the provision of reports to Intus.  So, I do view the extraction of data, even if it's 2CSV, as a report from the system.

So, yes, in that context, then yes, they are telling their PACECare facilities, "you can't do this."

And it's part of the agreement itself.

Q    Is it fair to say that you weren't involved in the drafting of the PACECare agreement?

A    I was not.

Q    Is it fair to say that you haven't talked with anybody at RTZ about what that language means?

A    I have not.

Q    Is it fair to say that you have no idea whether or not an expanded export that can be generated through the functionality of PACECare falls within the definition of report?

A    Of reporting functionality of the system, I would say yes, that does, by definition, fall under a report, the definition of a report.

Q    Sir, my question was:  Are you aware of whether RTZ considers the expanded export to be a report within Section 7.1 of its agreement?

A    No.

Q    So, it's fair to say that your interpretation is nothing more than your interpretation, right?

MR. BESHAI:  Objection.  Argumentative. Misstates the testimony.

Go ahead, Shawn.

A    Yeah.  So, my opinion here is based on evaluating this type of cybersecurity language for

MR. BESHAI: Objection. Assumes facts not in evidence, and an incomplete hypothetical.

A       That's the problem with the language. They can choose, at any point in time, to interpret that language how they want to. As we sit here today, they can interpret reports to not include the export of data.

Tomorrow they can say, do you know what? The export of data, because it uses reporting function within the tool, does constitute a report. It is just an unacceptable risk based on my review of these type of contracts.

BY MR. LEE:

Q       You would agree that the only evidence you've seen in this case is RTZ directing Intus to get expanded exports from its common customers, correct?

MR. BESHAI: Objection. Vague as to "only evidence you've seen in this case," and overbroad as to "only evidence you've seen in this case."

BY MR. LEE:

Q       Well, you haven't seen any evidence whereby RTZ is prohibiting Intus from getting expanded exports, right?

MR. BESHAI: Objection. Asked and answered.

MR. LEE: You can answer again.

A    Other than the contracts specifically prohibiting it, no.

BY MR. LEE:

Q    Okay.  And you have seen evidence in which RTZ has specifically directed Intus to get the expanded export from their common customers, correct?

A    Yes.

Q    And you haven't seen anything in the evidence establishing that RTZ was discriminating between the common customers who could generate expanded exports versus those who could not generate expanded exports, correct?

A    I'm not sure I'm parsing the question correctly.  What I've seen is from a software agreement --

Q    Sir --

A    -- certain entities being excluded.

Q    My question is very specific.

A    Okay.

Q    You haven't seen any evidence in this case that RTZ has permitted certain common customers to generate expanded exports, and prohibited other common customers from generating expanded exports, correct?

A    Other than the SaaS agreement language, no.

Q    At Paragraph 23 you state, quote, in this

case Intus did have authorized user accounts at certain points in time, and those accounts were either provisioned by RTZ on behalf of their mutual clients or by the clients directly.

Do you see that?

A    I do.

Q    What is the basis of that statement?

A    They had accounts into the system.  Intus would not have been able to create those accounts absent somebody else either -- absent somebody else provisioning it for them.  Whether that be RTZ provisioning the accounts.  Whether it be the facilities provisioning the accounts.  Somebody had to provision the accounts that were then leveraged by Intus.

Q    Have you seen any evidence establishing that RTZ provisioned any accounts for Intus?

A    No, I can't tell you -- the reason this language is in here is I can't tell whether RTZ was provisioning them or the clients were provisioning them.

Q    And you don't know one way or the other as you sit here?

A    Correct.

Q    But we can agree that there's no evidence

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time set forth; that the witness in the foregoing proceedings, prior to testifying, was administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, a review of the transcript (  ) was (  ) was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  06/10/2026

_____

MIKEN M. COBBS

CSR NO. 10702

# EXHIBIT 8

MANATT, PHELPS & PHILLIPS, LLP
Charles E. Weir (Bar No. 211091)
CWeir@manatt.com
Andrew Beshai (Bar No. 308030)
ABeshai@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Plaintiff*
INTUSCARE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTUSCARE INC.

             Plaintiff,

    v.

RTZ ASSOCIATES, INC.; and DOES 1
through 10,

             Defendants.

Case No. 4:24-cv-1132-JST

Assigned to: Hon. Jon S. Tigar

**PLAINTIFF INTUSCARE INC.'S
DISCLOSURE OF EXPERT
TESTIMONY UNDER FED. R. CIV. P.
26**

Complaint Filed: February 23, 2024
Amended Complaint Filed: April 2, 2024
Counterclaims Filed: June 20, 2024

Pursuant to Federal Rule of Civil Procedure 26, Plaintiff IntusCare Inc. ("Intus") discloses

the identities and written report of the following expert witness:

**Shawn R. Fleury**

Under Federal Rule of Civil Procedure 26(a)(2)(B), the rebuttal report of Shawn R. Fleury

is served as an enclosure to this disclosure. The report contains:

1.  A complete statement of all opinions Mr. Fleury will express and the basis and reasons for

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S EXPERT DISCLOSURE

them.

2. A list of the documents and materials that Mr. Fleury considered in forming his opinions. (Fleury Report, Appendix B). The documents, facts, and data that Mr. Fleury considered are also identified throughout the report.

3. Mr. Fleury's qualifications and professional curriculum vitae. (*Id*. at Appendix A).

4. A list of all other cases in which, during the previous 4 years, Mr. Fleury testified as an expert at trial or by deposition. (*Id.*).

5. Mr. Fleury's hourly rate is $550.

Intus reserves the right to supplement these disclosures, to disclose additional expert testimony, and to rebut any expert testimony that Defendant discloses.

Dated: May 12, 2026

MANATT, PHELPS & PHILLIPS, LLP

By: */s/ Charles E. Weir*
Charles E. Weir
Andrew Beshai

*Attorneys for Plaintiff*
INTUSCARE INC.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -   PLAINTIFF'S EXPERT DISCLOSURE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE INC.<br><br>       Plaintiff,<br><br>  v.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>       Defendants. | Case No. 4:24-cv-1132-JST |

**REBUTTAL REPORT OF SHAWN FLEURY**

May 12, 2026

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.    INTRODUCTION

1.  I have been retained to serve as an expert witness by Epstein Becker & Green, P.C. ("Counsel" or "EBG"), on behalf of its client, Intus Care, Inc. ("Client" or "Intus"). I have been asked to provide my rebuttal opinion regarding the litigation between Client and RTZ Associates, Inc. and their successors ("RTZ").

2.  The opinions set forth in this report are based on my education, training, and experience, in addition to my review of the materials provided, and consultation with my team. I reserve the right to modify, amend, or add to these opinions if additional information is provided or becomes known to me.

3.  The documents I reviewed regarding this matter include, but are not limited to, the expert report of Traci Creegan, and documentation, security artifacts, and relevant materials that were obtained in the discovery process.

4.  My Curriculum Vitae is appended to this report as Appendix A, and the list of documents I have reviewed is in Appendix B.

## II.    QUALIFICATIONS

5.  My name is Shawn Fleury. I am a cybersecurity expert with approximately twenty-nine (29) years of risk management, incident response, and consulting experience. Over the course of my professional career, I have had the opportunity to assist in the assessment, development and/or strengthening of hundreds of cybersecurity programs across the private and public sectors. I am intimately familiar with the industry standards and best practices that should be included in a cybersecurity program, and I hold first-hand experience designing and implementing these practices. Additionally, I have been retained by hundreds of clients to evaluate their cybersecurity posture (including protective measures, tools and technologies, operational practices, etc.) and identify direct recommendations to enhance their cybersecurity program. I have provided cybersecurity services to organizations across a wide range of industries, including healthcare, health technology, financial, insurance, hospitality, manufacturing, energy, transportation, and government.

6.  In addition to conducting risk assessments and cybersecurity program reviews for corporations and government agencies, I have also been engaged by regulators to assist them in their examinations assessing cybersecurity programs for effectiveness. My role in these engagements has been to conduct security evaluations of corporations, assist regulators in understanding the security posture of these organizations, and provide observations on the completeness of the security programs.

7.  I am currently a Managing Director at Aletheian Labs ("Aletheian Labs"), a digital forensics and cybersecurity consulting firm. In my role at Aletheian Labs I provide expert witness and investigation services, including on engagements opining on whether an organization had a reasonable security program.

8.  Prior to my current role, I was a Vice President at Kivu Consulting ("Kivu"). In my role at Kivu, I led the Advisory Services organization, the Incident Response organizations, and the Managed Security Services organization. Through leading these organizations, I have an in-depth visibility into the tactics and techniques that threat actors are using to target and attack organizations; as well as the security controls that organizations can implement to address the risk of attack.

9.  Before joining Kivu, I was a Senior Director at Palo Alto Networks ("PANW"). In this role, I provided advisory services to corporate executives and boards regarding cybersecurity risk management, information security management, and risk management oversight. Additionally, I was frequently

engaged as a trusted advisor to assess the posture of organizational cybersecurity programs and identify opportunities for enhancement.

10. Prior to my role at PANW, I was a Director at The Crypsis Group ("Crypsis"). During my time at Crypsis, I was responsible for building the company's cybersecurity risk management service offering. While my roles and responsibilities at Crypsis were like those at PANW, I also spent a significant amount of time crafting the techniques that Crypsis consultants leveraged to deliver proactive cybersecurity services to clients.

11. Prior to The Crypsis Group, I served as a Director on the Global Cyber Risk Services practice at the global consultancy of Alvarez & Marsal ("A&M"). During my time at A&M, I conducted hundreds of cybersecurity risk assessments, in which I evaluated the organizational risk posture of both domestic and international organizations. While I worked with many different frameworks and standards at A&M, many risk assessments were conducted by leveraging the National Institute of Standards and Technology ("NIST") Cybersecurity Framework ("CSF") for control evaluation. My goal while delivering cyber risk assessments was to evaluate each organization's cybersecurity program and information security practices to identify opportunities for the enhancement of their cybersecurity posture.

12. Before joining A&M, I was a Senior Forensics Consultant at Forward Discovery Inc., a cybersecurity company that specialized in cyber risk management services. While at Forward Discovery Inc., my primary responsibility was assisting organizations with understanding their potential risk exposures. I accomplished this by analyzing each individual organization across people, process, and technology to gain a full understanding of their cybersecurity ecosystem. After fully comprehending a client's unique risk posture, I would identify security controls that could be implemented to mitigate the aforementioned risks.

13. Prior to joining Forward Discovery, I held Security Analyst roles at Dell, Inc and United Services Automobile Association ("USAA"), a financial institution headquartered in San Antonio, Texas. During my time at USAA, I was involved with third-party risk assessments for key vendors to ensure that each vendor implemented security in accordance with USAA contractual requirements.

14. I spent several years as a Computer Crime Investigator for the United States Air Force Office of Special Investigations ("OSI"). During my time with OSI, I investigated computer crimes impacting Air Force systems and/or people.

15. I have been a lecturer for the United States Department of State, Diplomatic Security Service, Cyber Training Program. As a lecturer, I have developed and delivered cyber strategy, cybersecurity, and cyber-terrorism seminars for foreign government officials, law enforcement management, and senior corporate executives in overseas countries. I deliver these seminars to assist the US government in achieving their goal of providing awareness and training to nation-states in combating cyber-related crime/terrorism. The content of my seminars include instruction on cybersecurity standards and best practices that other countries may use to protect their critical assets from cyber threat actors.

16. Neither Aletheian Labs, nor I, are involved in any aspect of the litigation matter at issue. Neither Aletheian Labs, nor I, have any financial interest in the pending litigation matter or its outcome. I am independent of the parties involved and their legal representatives. My bill rate is $550 an hour.

### III.    EXECUTIVE SUMMARY

17. I have conducted a detailed review of information pertaining to this matter, including the Expert Report of Traci Creegan and documentation made available by counsel during the discovery process. I have developed the opinions reflected in this report.

18. During my career, I have assessed the controls that companies implement around third-party access and have responded to incidents that included SaaS platforms.

19. Based on my experience conducting risk assessments, responding to incidents (including of SaaS platforms), testifying on reasonable security matters, and helping organizations implement cybersecurity controls to mitigate third party access risk, I am providing rebuttal opinions related to Ms. Creegan's opinions regarding: 1) SaaS Agreements and arrangements; 2) System Access;  and 3) the Audit Log produced in this case. It is my opinion that Ms. Creegan overstates the uniformity of certain purported industry standards, and misstates or misinterprets the facts presented in this matter, which leads her to improperly opine that "it was Intus's conduct, not RTZ's, that departed from established industry standards".[1]

20. Specifically, I rebut and respond to the following points raised by Ms. Creegan:
    i.   There is a common industry practice in Software as a Service ("SaaS") arrangements;
    ii.  Read-only access would have raised security concerns; and
    iii. Audit logs prove Intus' access exceeded the scope of its stated data need.

### IV.    REBUTTAL OF TRACI CREEGAN OPINIONS

#### A.  SOFTWARE AS A SERVICE ("SaaS") AGREEMENTS

21. Ms. Creegan opined that "in [her] experience, the ownership structure outlined in the [PACECare] Agreement reflects common industry practice in 'Software-as-a-Service' (SaaS) arrangements. Under this type of model, the client licenses the right to use the software system but does not acquire any ownership of the system itself. The client retains full ownership of its data."[2] While the level of uniformity of software service arrangements is debatable, I agree that in this instance the PACECare Agreement Ms. Creegan cites provides that RTZ does not own any of "the data and information that [the PACE program] enters into PACECare."[3]

22. Ms. Creegan further opines that because the software vendor (here, RTZ) does not own any of the data in PACECare, its "role is to provide, maintain, and support the system, not to own, manage, or exercise control over the access to, exchange of, or use of the client's data."[4] Again, while this is certainly a model that can apply to SaaS arrangements, it is not categorically true and it depends on the industry, applicable laws and the contract terms. Moreover, this statement is inconsistent with the facts of this case where RTZ has not taken a hands-off approach to access to and use of the client's data. Instead, RTZ has restricted access regarding how the client can and cannot share its data with parties such as Intus. RTZ included provisions in its SaaS agreements that its PACE clients could not "provide (and will expressly inform staff not to provide): . . . forms/documents/reports produced by PACECare to any internal software development team or third-party—specifically but not limited to

---

[1] *Creegan Report* ⁋ 115
[2] *Creegan Report* ⁋ 57
[3] RTZ0006181 at §7.2.
[4] *Creegan Report* ⁋ 57

other software vendors competing with or seeking to compete with RTZ, including but not limited to Tabula Rasa Healthcare, Intus Care, Epic Systems, and Salesforce as well as their affiliates and agents."[5] Ms. Creegan did not consider or analyze this contract provision in reaching her conclusion. A contract provision in a SaaS agreement prohibiting the client (here, the PACE program) from sharing reports of its data with an independent contractor (here, Intus) is highly relevant to the analysis of whether the SaaS vendor is exercising control over "the access to, exchange of, or use of the client's data." Ms. Creegan's failure to address this provision undermines her opinion that it was Intus, as opposed to RTZ, that was operating outside of certain industry norms.

23. Further discussing SaaS agreements, Ms. Creegan opines that "the software vendor typically retains control of user account provisioning to ensure accurate tracking and application of licensing and pricing requirements, a function of license management, not data control."[6] Ms. Creegan relies on this observation to ultimately conclude that RTZ did not exercise control over the access to, exchange of, or use of the client's data. Ms. Creegan's opinion rests only on account provisioning and licensing/pricing requirements to reach this conclusion, and overlooks other important considerations. As explained above, Ms. Creegan did not consider or analyze the provisions in the SaaS agreement restricting PACE clients' ability to share reports of their data with independent contractors, such as Intus. Additionally, there are plenty of SaaS providers that allow for Single Sign On ("SSO"), self-service portals, or other mechanisms for allowing customers to manage their own user accounts. Ms. Creegan is factually wrong in her opinion that software vendors typically retain control over user provisioning. It is common for software vendors to sell a certain number of seats and the contracting party can apportion those seats to whomever they want. It is more uncommon for software vendors such as RTZ to dictate to clients who can and cannot receive access, and how data stored on its software system can flow among the client's organization and vendors. In this case, Intus did have authorized user accounts at certain points in time and those accounts were either provisioned by RTZ, on behalf of their mutual clients, or by the clients directly.

24. Ms. Creegan notes that: "[the PACECare agreement] prohibits clients from attempting to reverse engineer the system or provide access to third parties for that purpose. These restrictions govern how PACECare may be accessed and used as a software system; they have no bearing on whether PACE facilities can access, exchange, or use their own EHI."[7] However, the PACECare SaaS agreement does not limit the sharing of reports to only those entities seeking to reverse engineer the PACECare system. Rather, the language of the agreement is broad and prohibits sharing "forms/documents/reports produced by PACECare"[8] with any third party, regardless of the purpose of the third party's use of the data. Ms. Creegan, therefore, appears to have added her own narrow interpretation to the agreement that is not found in the plain language of the contract. For that reason, Ms. Creegan's conclusion that the restrictions in the SaaS agreement "have no bearing on whether PACE facilities can access, exchange, or use their own EHI" rests on an incomplete reading of the PACECare SaaS agreement including, but not limited to, the contract terms.

---

[5] RTZ0000814; RTZ0000819; RTZ0000824; RTZ0000827; RTZ0000847
[6] *Creegan Report.* ¶ 58
[7] *Creegan Report* ¶ 61
[8] RTZ0000814; RTZ0000819; RTZ0000824; RTZ0000827; RTZ0000847

## B.  SYSTEM ACCESS

25.  Ms. Creegan opines that Intus' "request for 'read-only access to [RTZ's] system' further illustrates the problem. A request of this nature, seeking access to the EHR UI rather than to specific EHI, would immediately raise security concerns for any EHR vendor and require further discussion before any action could be taken. As stated in paragraph 50, it is not standard practice for an EHR developer to provide system-level UI access in response to a request for EHI."[9] For this proposition, Ms. Creegan relies on a single quote extracted from a larger email thread.[10]

26.  Before responding to Ms. Creegan's points, it is important to place the quote she relies on in the context of the larger email exchange. The thread begins with a client, Senior Care Partners, asking its independent contractor, Intus, to send API specifications to RTZ so that Intus could access Senior Care Partners' data and provide its analytics service. A representative from RTZ responds to the thread and invites Intus to provide its API specifications for review. There is no indication in the email thread that RTZ was unable or unwilling to provide API access at this point. Intus' Alex Rothberg responds with the data that Intus needs to service its client and states, "I hope that this will provide a sufficient backdrop for a more in-depth technical conversation about how you are most comfortable with providing regular access to the information." Nowhere in the initial response does Mr. Rothberg ask for User Interface ("UI") access; quite the opposite, he invites a conversation with RTZ to see how it is "most comfortable with providing regular access to the information". RTZ does not respond. Roughly one week later, Intus' Evan Jackson follows up and asks RTZ for a status update. RTZ does not respond. Another week passes and Senior Care Partners follows up. RTZ then responds, stating that it "does not have any questions on what was shared" by Intus, and asks Intus to re-send its API specifications. The next day, Mr. Rothberg responds that Intus would like "read-only access to [PACECare]" but only "as a starting point." Mr. Rothberg goes on to explain that the goal would be to consume the clients' data from PACECare "via API or otherwise," and he requests "read-only access" in order to assess "what the structures and promises of [RTZ's] data output are" to inform further discussion.

27.  Ms. Creegan's opinion that Intus, through Mr. Rothberg, sought read-only access to PACECare is missing the context of the larger email. From this single quote, Ms. Creegan concludes that Intus sought "access to the EHR UI rather than to specific EHI," which according to Ms. Creegan would "immediately raise security concerns for any EHR vendor and require further discussion before any action could be taken."[11] This conclusion is misplaced for several reasons.

28.  First, the context of the email indicates that Intus was seeking read-only access "as a starting point" and that its goal was to consume the clients' data from PACECare "via API or otherwise." Put differently, the context of the larger email casts doubt on the notion that system-level access was Intus' goal at the time. Additionally, the read-only access being requested is via API not via UI. In fact, at no point in the email that Ms. Creegan is relying on did Intus request UI access to the system. In her response to the email thread, Ms. Emery proposes to "set up a call to discuss the details of the transmission." This phrasing does not indicate UI access, as UI access would not typically be phrased as the transmission of data; there is nothing in this email to indicate that either party was discussing

---

[9] *Creegan Report* ¶ 75
[10] INTUS 001464 - INTUS 001473
[11] *Creegan Report* ¶ 75

the use of UI access at this point in time. As such, Ms. Creegan misinterprets the facts or was not provided with all of the facts, and the opinion omits crucial context.

29. Second, the notion that Mr. Rothberg's request would "immediately raise security concerns" is unfounded. As I noted, the reference to "read-only access" was in reference to read-only API access. Ms. Creegan's interpretation of the request is inaccurate in the API use case. If we consider Ms. Creegan's incorrect interpretation of UI access being requested, I still find her opinion inaccurate. Ms. Creegan failed to explain what security concerns were implicated, as the UI access is the same access that RTZ provides to all of its PACE clients. There is no indication anywhere in Ms. Creegan's report that Intus sought or obtained access to any source code or other proprietary, programmatic components of PACECare beyond the UI. In my experience, a mere request for access to a UI does not immediately raise security concerns; rather, the context in which the request is made must be considered. A request from a client's vendor, at the client's behest, with a full explanation of the purpose for the request, does not raise security concerns. Furthermore, I have seen many examples of platform vendors choosing to provide access to a third party via a UI. It is not an uncommon practice as Ms. Creegan attempts to construe it. It is relatively common for parties to agree to share information via a mechanism that works for both parties, whether we are discussing APIs, Secure File Transfer Protocol ("SFTP"), or direct UI. Each method has its own strengths and weaknesses, and a request for any of them would not raise a security concern.

30. Third, Ms. Creegan notes that Mr. Rothberg's request would "require further discussion before any action could be taken," but she ignores the portions of the email thread where Mr. Rothberg invites further discussion by stating: "I hope that this will provide for a more in depth technical conversation about how you are most comfortable with providing regular access to the information."[12] Not only does Ms. Creegan fail to analyze this part of the email thread, but she also does not reference ensuing emails after May 2021 in which Intus acknowledges RTZ's right to secure its program and proposes, "using a data extract approach, [to] only access the programs' EHI."[13] Again, Ms. Creegan failed to consider the full context of negotiations before concluding that Intus' request posed a security concern.

31. Ms. Creegan also opines that "Under standard industry practice, EHR vendors do not initiate or implement interfaces or data exchange connections to third-party vendors unless a mutual client, the healthcare organization that owns and controls the EHI, requests such an integration. Because the EHI belongs to the client, not the EHR vendor, the client is responsible for determining which external systems or vendors should receive, access, or exchange that information. Accordingly, EHR vendors generally rely on their customers to specify the third-party systems they wish to integrate with, and any proposed integration typically requires technical, security, and contractual assessments before it can be enabled. It is against this backdrop of established industry practice that Intus' conduct must be evaluated."[14] Under standard industry practice, the client can specify the external system, independent contractor, or vendor that should receive access to and integrate with its EHI on an EHR. It is not a deviation from standard practice for the client to allow the independent contractor or vendor to specify and negotiate the technical, security, and contractual issues with the EHR provider, with the client's consent and knowledge. That is exactly what was occurring in this matter. Rothberg Deposition Exhibit 63 is a 3-party conversation between RTZ (platform provider), Intus (third-party

---

[12] Rothberg Deposition Exhibit 63
[13] RTZ0000208
[14] *Creegan Report* ⁋ 93

vendor) and Senior Care Partners P.A.C.E. (customer). A close reading of the email highlights the fact that the customer was making the request for integration services. RTZ deviated from common industry practices in that it did not follow its client's (and the owner of the data) request to permit Intus' access.

## C. AUDIT LOGS

32. Ms. Creegan opines that "Audit log evidence confirms Intus's access exceeded the scope of its stated data need".[15] However, this opinion is incorrect and conflicts with the facts.[16]

33. First, Ms. Creegan bases her opinion on one email chain[17] where Mr. Rothberg, in an email dated April 26, 2021, listed the following requirements[18]:

> "Patient:
>     Name, Medicare ID, Medicaid ID, Race, Address, Living Situation, Birthday,
> Enrollment Status, Diagnosis Codes (ICD-10), Care Team, Care
>     Facility, Careplan, Gender, Medications, Disenrollment Reason, MemberId
>
> Utilization:
>     All incident data including Falls, Burns, Infections, General
>         -time occurred, time discovered, reported by, patient, location, severity,
> etc
>     All admissions including Inpatient, SNF, ALF, ER, etc.
>         -start date, end date, principalDX, admittingDX, facility name, admission
> type, discharge status, etc."

34. The email notes that Medications are included under the Patient data that is being requested, which likely corresponds to the "redirect.main.meds.new" module. As such, Ms. Creegan's opinion that this module falls outside of the request is unsupported and factually incorrect. Also significant is the inclusion of the abbreviation "etc." in the requirements, which indicates that additional data elements may be necessary to complete Intus' responsibilities to its customer. My review of the modules that Ms. Creegan characterizes as "beyond the scope" determined that each of them could reasonably be categorized into the types of data that Intus was requesting. Additionally, there is at least one follow-up email[19] from Mr. Rothberg to Mr. Zawadski on May 27, 2021, which contained a spreadsheet[20] where additional data elements were outlined.

35. Second, RTZ was not the owner of the EHI in the system. This is made clear in the contracts between RTZ and its customers and, as such, RTZ should have had no role in determining which data a

---

[15] *Creegan Report* VI.C.

[16] The fact that this opinion is faulty impacts the accuracy of any opinions relying on this opinion, including opinions by Peter Schwechheimer.

[17] INTUS 001464 – INTUS 001473

[18] See INTUS 001467 – INTUS 001468 for the complete email content.

[19] INTUS 001519

[20] INTUS 001520

customer's authorized third party should or should not access. If RTZ had concerns, it was free to raise them with its customers, but as Ms. Creegan concedes it was ultimately the customers' responsibilities, as the data owner, to make such a determination.

36. Third, there is no evidence in the logs[21] that Intus exceeded the permissions of the accounts which had been provisioned by RTZ. If Intus' access should have been limited, that could have been accomplished during the account provisioning process, of which my understanding is that RTZ was provisioning Intus accounts in the 2021 – 2022 timeframe. Additionally, if certain modules were so sensitive as to raise confidentiality concerns surrounding what RTZ claims is proprietary information, RTZ itself could have structured its access in such a way as to render those modules off limits to users. After all, my understanding is that Intus could access only the areas of PACECare that were also available to the PACE clients. Put differently, RTZ's concern that access to certain modules posed security or confidentiality concerns is belied by the fact that RTZ made those modules available to its PACE clients and to Intus. Ms. Creegan does not address or account for these facts in any way.

37. Fourth, Ms. Creegan had access to PACECare, but makes no mention of doing anything to evaluate its functionality or the various fields in the audit log. For example, the audit logs[22] all contain the word "redirect." That may be part of the reporting function and not a direct user interface. There is no way to determine what the mode of access was without reviewing the database schema, which Ms. Creegan does not indicate she did while forming her opinion, even though it was available to her.

38. Finally, the number of times that certain modules were accessed by Intus' assigned accounts is noteworthy. Table 1 details the total number of audit log entries for each module name identified by Ms. Creegan as being accessed "outside of [the] scope"[23] or "unrelated to the scope"[24] of Intus' stated data needs.[25] As evident in Table 1, 13 of the 19 modules were accessed fewer than 100 times. I would expect a higher volume of audit log entries if there was systematic data mapping occurring by Intus.

| Module Name | Count of Audit Log Entries |
|---|---|
| redirect.issue.manager | 78 |
| redirect.main.advancedirective | 35 |
| redirect.main.assessmentManager.specific | 8 |
| redirect.main.careplan | 5 |
| redirect.main.claims | 16 |
| redirect.main.efilecabinet | 123 |
| redirect.main.meds.new | 723 |
| redirect.main.membership | 2 |
| redirect.main.notegrievance | 17 |
| redirect.main.notesManagement | 12,886 |
| redirect.main.pacequalitydata2018 | 206 |

---

[21] RTZ0008378

[22] RTZ0008378

[23] *Creegan Report* ⁋ 109

[24] *Creegan Report* ⁋ 111

[25] As aforementioned, this opinion is incorrect and conflicts with the facts. As such the number of Audit Log Entries for a module is ultimately immaterial.

Rebuttal Report of Shawn Fleury                                                                 Page | 9

| Module Name | Count of Audit Log Entries |
|---|:---:|
| redirect.main.physicianOrder | 4 |
| redirect.main.prospectmanager | 169 |
| redirect.main.psychiatricNotesManagement | 39 |
| redirect.main.recording | 13 |
| redirect.main.service.v2 | 7 |
| redirect.main.servicePlan | 2 |
| redirect.main.vitalSignsList | 349 |
| redirect.to.outreach.inquiry | 51 |
| **Grand Total** | **14,733** |

*Table 1: Count of Audit Log Entries for Modules*

## V.    CONCLUSION

39. For the reasons stated above, it is my opinion that Ms. Creegan overstates the uniformity of certain purported industry standards and misstates or misinterprets certain facts presented in this matter. Specifically, Ms. Creegan's opinion that Intus' requests and conduct was outside of industry norms is incorrect. Based on the facts of the case, it is my opinion that it was RTZ who deviated from industry norms related to SaaS contracting arrangements and claimed security concerns. I also find that Ms. Creegan's opinion that the audit log evidence confirms Intus' access exceeded the scope of its stated data needs is incorrect and conflicts with the facts.

/s/ Shawn R. Fleury
May 12, 2026

# APPENDIX A

# ALETHEIAN LABS
## DIGITAL FORENSICS

# Shawn R. Fleury

**ALETHEIAN LABS**
**Managing Director, January 2026 to Present**
Gulf Breeze, FL
Mobile: (234) 244-7236
shawn@althlabs.com

Provide digital forensic and cybersecurity consulting services in litigation matters, regulatory inquiries, and internal investigations.

**KIVU CONSULTING**
**Vice President, Advisory Services,** November 2023 – January 2026
Gulf Breeze, FL
Mobile: (234) 244-7236

Led incident response, proactive, and managed security advisory teams, with responsibility for team utilization, quality assurance, and business development. Directed and executed complex incident response, post-breach remediation, and cybersecurity transformation engagements. Designed and delivered advisory services to help clients identify, assess, and mitigate cybersecurity risk.

Significant cases included:

- Testifying expert in a business email compromise matter involving a seven-figure fraudulent wire transfer, providing opinions on security controls, business practices, and industry standards.
- Testifying expert in a business email compromise matter involving multiple wire transfers, providing opinions on security controls, business practices, industry standards, and the normal course of business between the parties.

**UNIT 42 SECURITY CONSULTING - PALO ALTO NETWORKS (Formerly Crypsis; Acquired in 2020)**
**Senior Director,** September 2020 – November 2023
**Director,** May 2019 – September 2020
Gulf Breeze, FL

Provided proactive risk management services based on information security best practices. Led digital forensics and incident response teams supporting internal investigations, data breach incidents, litigation matters, and regulatory inquiries.

Significant cases included:

- Consulting expert for a large global financial services company in data breach litigation, leading a team that evaluated the reasonableness of cybersecurity controls and supported expert report development and deposition strategy.
- Engaged as a testifying expert for a regional healthcare organization involved in data breach litigation alleging a lack of reasonable security in place at the time a data breach occurred.
- Provided strategic cybersecurity services to a large municipality that had suffered a ransomware attack, enabling operational recovery, development of an improved security posture, and facilitating long-term risk mitigation.
- Advised the Security Steering Committee for a large health care organization and audited the progress of the effectiveness and efficiency for the cybersecurity program that was being developed and implemented.
- Provided investigative support to a state Attorney General's office, including defining data request scope, document review, and advising on industry best practices and regulatory requirements.

**ALVAREZ & MARSAL (Formerly Forward Discovery; Acquired in 2012)**
**Director,** September 2012 – May 2019
**Senior Forensics Consultant,** November 2010 – September 2012
New York, NY

Managed network intrusion response efforts, including investigation and remediation activities. Conducted acquisition and forensic analysis of digital media to support investigations and legal matters. Led e-discovery investigations and provided consulting services involving personal computers, file servers, email systems, mobile devices, and removable media. Provided investigative consulting related to intellectual property theft, intrusion detection, and analysis of end-user computer activity. Delivered instruction and training in digital forensics, including mobile device analysis, incident response, and Macintosh forensics.
Significant cases included:



- Testifying expert for a case involving a Payment Card Industry (PCI) data breach. Provided an expert report, deposition, and testimony on the facts related to the case.
- Consulting and testifying expert for a case involving the ownership of a system that had been acquired during the acquisition of a regional primary educational institution. Conducted a forensic analysis of the system and reviewed documents related to the acquisition process. Provided multiple expert reports during the engagement.
- Conducted hundreds of security assessments while employed at A&M. The assessments included work with organizations in the following industry verticals: Insurance, Financial, Health Care, Retail, Government, and Manufacturing. Additionally, led the efforts to develop a pre-bind insurance assessment methodology while at A&M.
- Conducted an 8-week NIST risk and gap evaluation of a major healthcare insurer who served more than 50M insured. The assessment included reviewing audits, policies, HIPAA compliance, HITrust Certification, and 800-53 self-attestations. During the assessment over sixty-five leadership and SME interviews were conducted. A report was provided to the State insurance regulator to assist the regulator with a better understanding of how they could better utilize NIST to conduct future NAIC examinations.
- Provided Cellebrite Certification Course training to law enforcement agencies on the collection of digital evidence from cellular devices.

## U.S. DEPARTMENT OF STATE ANTI-TERRORISM ASSISTANCE PROGRAM
**Instructor,** January 2011 – November 2019
Washington DC

Provided advisement, training, briefings, and presentations to foreign law enforcement officers on areas including cyberterrorism and cybercrime. Provided technical computer investigation training to law enforcement and governmental agencies worldwide. Created course content on digital forensics, network forensics, and mobile device forensics.

These courses included:

- Basic Incident Response Course, Colombian National Police Bogota, Medellin
- Cellular Communications Forensics Course, Multiple Locations: India, Mexico
- Encase I, Jordanian National Police, Amman Jordan
- Encase II, Multiple Locations: New York, Texas, Jordan
- Introduction to Digital Forensics Investigations, Jamaica
- Identification and Seizure of Digital Evidence, Multiple Locations: Trinidad and Tobago, Mexico
- Principles of Internet Investigations Course, Bosnia
- Mastering Macintosh Forensics, Mexico City, Mexico
- XRY and Cellebrite Training Course, Jordan
- Social Media Investigations Course, Kosovo

## DELL TECHNOLOGIES
**Security Analyst,** August 2007 – November 2010
Round Rock, TX

## USAA
**Security Analyst,** August 2005 – November 2007
San Antonio, TX

## U.S. AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS
**Computer Crime Investigator,** January 2003 – May 2005
San Antonio, TX

Investigative support for crimes alleged to have been committed by Air Force personnel. Types of cases included murder investigations and child exploitation investigations. Provided information security briefs to bases supported by Detachment 401.

## U.S. AIR FORCE
**Communication and Electronic Specialist,** October 1997 – December 2002
Multiple Duty Stations

## EDUCATION
**PARK UNIVERSITY**
B.S., Management/Computer Systems Information, 2006

**COMMUNITY COLLEGE OF THE AIR FORCE**
Associate in Applied Science, Criminal Justice, 2004
Associate in Applied Science, Electronic Systems Technology, 2002

## TESTIMONY

September 2025: Provided deposition testimony for Gideons International v Monex, Inc f/k/a Tempus, Inc, State Court of Tennessee.

July 2025: Provided oral testimony for American Deposit Management v. Iron Bend in Wisconsin Arbitration.

May 2025: Provided a declaration for Gideons International v Monex, Inc f/k/a Tempus, Inc, State Court of Tennessee.

April 2025: Provided deposition testimony for American Deposit Management v. Iron Bend in Wisconsin Arbitration

January 2025: Provided a declaration for American Deposit Management v. Iron Bend in Wisconsin Arbitration.

September 2019: Provided oral testimony on the findings identified in a PFI Report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A. State Court of Illinois, Case No. 2016-L-006874.

April 2019: Provided deposition on the findings identified in a PFI Report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A., State Court of Illinois, Case No. 2016-L-006874.

March 2019: Provided a declaration on the findings identified in a PFI Report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A., State Court of Illinois, Case No. 2016-L-006874.

August 2018: Provided a declaration related to the sale of certain assets and the ownership of data thereafter for Cadence Education, LLC, v. James L. Vore, et al., State Court of Kansas.

March 2017: Provided a declaration related to proposed redactions of a PFI report for Park Hotels & Resorts, Inc. v. BMO Harris Bank N.A., State Court of Illinois, Case No. 2016-L-006874.

March 2014: Provided expert report and oral testimony related to the alleged theft of intellectual property in CMA v. Lakshminarayanan Thiagarajan, State Court of Virginia.

## PRESENTATIONS

April 2025: Evolution of Crisis Communication Panel - NetDiligence Conference
November 2024: Tackling the AI Threat Landscape - KivuCast
October 2024: Ransomware Advisory Board – NetDiligence Conference
October 2023: Unit 42 Current Threat Assessment & Predictions – CyberCon 2023
May 2022: Cyber Security in the Ransomware Age – Professional Liability Defense Federation
February 2022: Unit 42 Breach Readiness Cybersecurity Leaders Exchange – Palo Alto Networks
August 2020: Insider Threats and Hunting with the Enemy – Blackhat USA 2020
October 2019: GDPR Update – NetDiligence Conference
September 2019: Fines of Fury (CCPA) - Dorsey
March 2017: M&A Transactions: Negotiating the Deal with Due Diligence – The Knowledge Group

# APPENDIX B

# APPENDIX B: Documents Reviewed

**Case Materials:**
All documents cited in my report that are not cited herein.
Complaint filed on February 23, 2024
Amended Complaint filed on April 02, 2024
Defendant RTZ Associates, Inc.'s Answer to First Amended Complaint and Counterclaims filed on June 20, 2024
Plaintiff's Intus Care, Inc.'s Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One and Appendix A dated December 16, 2024
Plaintiff's Intus Care, Inc.'s Motion for Partial Summary Judgment filed on April 18, 2025 (REDACTED)
Amended Scheduling Order filed on September 30, 2025
Defendant's Disclosure of Experts dated April 23, 2026
Intus Database Log.xlsx

**Deposition Materials**
Deposition Transcript of Lauri Wertz dated August 19, 2025
Deposition Transcript of Evan Jackson dated November 25, 2025
Deposition Transcript of Michael Zawadski dated February 23, 2026
Deposition Transcript of Alexander Rothberg dated February 27, 2026
Deposition Transcript of Evan Walters dated March 16, 2026
Deposition Transcript of John Robert Felton dated April 8, 2026
Exhibit 23 - Deposition of Lauri Wertz dated August 19, 2025
Exhibit 28 – Deposition of Evan Jackson dated November 25, 2025
Exhibit 49 - Deposition of Michael Zawadski dated February 23, 2026
Exhibit 50 - Deposition of Michael Zawadski dated February 23, 2026
Exhibit 63 - Deposition of Alexander Rothberg dated February 27, 2026
Exhibit 66 - Deposition of Alexander Rothberg dated February 27, 2026

**Production Data**
Intus 001350.yaml
Intus 001351.yaml
Intus 001352.yaml
Intus 001353.yaml
Intus 001354.yaml
Intus 001355.yaml
Intus 001356.yaml
Intus 001357.yaml
Intus 001358.yaml
Intus 001359.yaml
Intus 001360.yaml
Intus 001361.yaml
Intus 001362.yaml
Intus 001363.yaml
Intus 001364.yaml
Intus 001519.pdf
Intus 001520.xlsx
Intus 002105.pdf

# APPENDIX B: Documents Reviewed

Intus 002205.pdf
Intus 002384.pdf
Intus 002989.pdf
Intus 003704.pdf
Intus 003831.yaml
Intus 003832.yaml
Intus 003833.yaml
Intus 003834.yaml
Intus 003835.yaml
Intus 003836.yaml
Intus 003837.yaml
Intus 003838.yaml
Intus 003839.yaml
Intus 003840.yaml
Intus 003841.yaml
Intus 003842.yaml
Intus 003843.yaml
Intus 003844.yaml
Intus 003845.yaml
Intus 004131.pdf
RTZ0000020.pdf
RTZ0000189.pdf
RTZ0000243.pdf
RTZ0000477.pdf
RTZ0000512.pdf
RTZ0000660.pdf
RTZ0000668.pdf
RTZ0000807.pdf
RTZ0000809.pdf
RTZ0000814.pdf
RTZ0000819.pdf
RTZ0000824.pdf
RTZ0000827.pdf
RTZ0000847.pdf
RTZ0002801.pdf
RTZ0005665.pdf
RTZ0006181.pdf
RTZ0007280.pdf
RTZ0007671.pdf
RTZ0008378.XLSX
RTZ0008384.pdf

## PROOF OF SERVICE

*IntusCare Inc. v. RTZ Associates, Inc.*
U.S.D.C. – Northern District of California Case No. 4:24-cv-1132-JST

I, Rebecca Blake, declare as follows:

I am employed in Los Angeles County, Los Angeles, California.  I am over the age of eighteen years and not a party to this action.  My business address is MANATT, PHELPS & PHILLIPS, LLP, 2049 Century Park East, Suite 1700, Los Angeles, California  90067. On **May 12, 2026**, I served the within:

### PLAINTIFF INTUSCARE INC.'S DISCLOSURE OF EXPERT TESTIMONY UNDER FED. R. CIV. P. 26

on the interested parties in this action addressed as follows:

| | |
|---|---|
| David C. Lee, Esq.<br>NOSSAMAN LLP<br>50 California Street, 34th Floor<br>San Francisco, California 94111<br>Phone: 415.398.3600<br>Fax:   415.398.2438<br>Email: dlee@nossaman.com<br><br>Assistant: Marlene Wiman<br>Email: mwiman@nossaman.com | *Attorneys for Defendant*<br>RTZ ASSOCIATES, INC |
| Kasia Penn, Esq.<br>NOSSAMAN LLP<br>18101 Von Karman Avenue, Suite 1800<br>Irvine, California 92612<br>Phone: 949.833.7800<br>Fax:   949.833.7878<br>Email: kpenn@nossaman.com | *Attorneys for Defendant*<br>RTZ ASSOCIATES, INC. |

☒   **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically from my e-mail address, rblake@manatt.com at Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the person(s) at the electronic mail addresses listed above.  The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on **May 12, 2026**, at Los Angeles, California.

Rebecca Blake

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

PROOF OF SERVICE

404785217

# EXHIBIT 9

# PACECare Agreement
## "Software as a Service"

This Agreement is by and between **Region VII Area Agency on Aging, dba/ Sunrise PACE (CLIENT)**, a domestic not-for-profit corporation registered and operating in the State of Michigan, and **RTZ Associates, Inc., dba/ RTZ Systems (RTZ)**, incorporated and headquartered in the State of California. This Agreement specifies the rights, obligations, and requirements governing the provision and use of RTZ's **PACECare software** – a cloud-based, "off-the-shelf" commercial software product designed to support the business needs of Programs of All-Inclusive Care for the Elderly (PACE). This Agreement shall be effective when fully executed by both parties (the "Effective Date").

**I      Services:**

1.1    RTZ will provide CLIENT with access to a copy of the current version (v.2021) of PACECare – configured for CLIENT – via a "software as a service" model. CLIENT is entitled to receive all general updates to this version of PACECare during the Term of this Agreement at no additional cost. The content and schedule of general PACECare updates will be solely determined by RTZ; however, RTZ will make any data collection/reporting changes required to meet evolving national (i.e. CMS and NPA) reporting requirements in a timely manner at no additional cost. For the Term of this Agreement RTZ hereby grants CLIENT a non-exclusive license to access and use PACECare (including all successor versions thereof) as provided for herein.

1.2    RTZ will provide system set-up and implementation services necessary for CLIENT to access and use PACECare as intended under this Agreement. Optional services are outlined in Attachment C ("Pricing") and can be purchased at the discretion of CLIENT. "Go-Live" shall be defined as the date upon which CLIENT first saves data in the production system.

1.3    RTZ will host PACECare in accordance with the Service Level Agreement (SLA) incorporated in Attachment B. In addition to the production (i.e. "live") environment, for 30 days both before and after the Go-Live date, RTZ will also provide a sandbox environment in support of acceptance testing and training activities (the SLA shall not apply to this sandbox site). As a cloud-based service, use of PACECare requires a computer or mobile device with internet access and a web-browser. CLIENT assumes responsibility for purchasing and supporting all software and hardware used to access PACECare.

1.4    RTZ will provide CLIENT with no-cost technical support via phone and email during normal RTZ business hours.

1.5    RTZ warrants that PACECare – as provided to CLIENT: (a) will be free from coding errors and defects, (b) will perform as specified / presented by RTZ, (c) will meet or exceed industry security and disaster recovery standards, and (d) will not infringe

page 1 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                     RTZ0006181

upon, violate, or misappropriate any foreign or United States patent, copyright, trademark, trade secret or any other intellectual property or proprietary right of any third-party. RTZ will promptly correct any component of PACECare which does not conform with any of the foregoing representations and warranties at no charge to CLIENT.

**II      Pricing:**

**Redacted**

**III     Term:**

3.1    This Agreement shall go into effect immediately upon execution by both parties ("Effective Date") and have an Initial Term of three (3) years from the system go-live date. For clarity, CLIENT is purchasing thirty-six (36) consecutive months of service at the rate identified in Attachment C.

3.2    At the end of the Initial Term (and then at the end of each subsequent renewal term) this Agreement shall automatically renew in twelve (12) month increments Redacted Redacted ) unless CLIENT gives written notice of its intent to discontinue use of services to RTZ at least thirty (30) calendar days prior to the expiration of the then current term, or RTZ gives written notice of its intent to discontinue the provision of services to CLIENT at least ninety (90) calendar days prior to the expiration of the then current term.

3.3    At the end of the term, all use licenses shall expire and no further obligation to provide services on the part of RTZ will exist.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                    RTZ0006182

**IV    Termination:**

4.1

> # Redacted

4.2    Termination for Cause.  In the event of a material breach of any clause, condition, or covenant of this Agreement by one party, the non-breaching party may terminate the Agreement if the breaching party does not cure the breach within thirty (30) calendar days of receiving written notice of such breach.

4.3    Upon the effective date of termination of this Agreement, all use licenses shall expire.  In the event of termination, RTZ shall deliver to CLIENT a copy of all CLIENT data.  Specifically, RTZ will provide up to two sets of files – one preliminary set of files for review, and one final set of files for migration to a new system.  RTZ will provide said data in an electronic format (.CSV or equivalent). CLIENT assumes ultimate responsibility for checking files for accuracy/completeness and notifying RTZ of any errors/omissions.  Files will only include CLIENT data; i.e. they will not include PACECare data such as (but not limited to) validations/constraints, triggers, algorithms, or stored procedures.  RTZ will not provide a data dictionary or schema; however, upon request RTZ will participate in one phone call with CLIENT staff (and only CLIENT staff) not to exceed one hour in length in which RTZ can clarify fields/files as needed.  CLIENT understands that Agreement pricing does not include transition assistance, such as (but not limited to) data translation, conversion, or migration assistance. At its sole discretion, CLIENT may engage RTZ at its standard hourly rate identified in Attachment C to provide data translation or other transition-related services.

4.4    All terms and conditions of this Agreement that would reasonably be interpreted as surviving termination of this Agreement will be deemed to survive termination of this Agreement.

**V    Relationship of the Parties and Their Employees:**

5.1    Nothing in this Agreement shall be construed to create an employer/employee relationship between CLIENT and RTZ or its personnel, and personnel shall not be eligible for any employee benefits programs of CLIENT, nor shall they have any claim against CLIENT for vacation pay, sick leave, retirement benefits, Social Security, Workers Compensation, disability or unemployment insurance benefits, or any other employee benefits of any kind.

**VI    Confidentiality:**

6.1    All information concerning CLIENT or its members which may be made available to RTZ personnel by CLIENT during the course of the Agreement shall be deemed to be confidential, and RTZ personnel shall not be permitted or required by RTZ to

page 3 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

disclose any such information to any third party (except subcontractors engaged as part of RTZ's provision of services to CLIENT) without the express written consent of CLIENT, except when required by law. RTZ agrees that its personnel shall use the information they acquire during the term of this Agreement for the benefit of CLIENT. Disclosure and use of Protected Health Information (as defined in HIPAA) is governed by the Business Associates Agreement (Attachment B) attached hereto and made part of this agreement. RTZ understands and agrees that: (1) all records concerning any individual made or kept by any public officer or agency in connection with the administration of any provision of the Welfare and Institutions Code relating to any form of public social services for which grants-in-aid are received by that State from the Federal Government will be confidential, and will not be open for examination for any purpose not directly connected with the administration of such public social services, and (2) no person will publish, disclose or use or permit or cause to be published, disclosed or used, any confidential information pertaining to a client, applicant or recipient.

6.2    RTZ agrees to cause all of its employees, agents, subcontractors and partners to comply with these provisions.

**VII    Ownership:**

7.1    RTZ owns all aspects of the PACECare product, including but not limited to source code, system logic/functionality, screen layout/design, and documents/forms/reports. CLIENT agrees that it will not seek to reverse engineer PACECare or provide (and will expressly inform staff not to provide): (a) account credentials or other form of access to PACECare, (b) screenshots or other forms of visual, written, or oral descriptions of PACECare, or (c) forms/documents/reports produced by PACECare to any internal software development team or third-party – specifically but not limited to other software vendors competing with or seeking to compete with RTZ, including but not limited to Tabula Rasa Healthcare, Epic Systems, and Salesforce as well as their affiliates and agents. No ownership equity in PACECare shall accrue to CLIENT through its use of PACECare under this Agreement.

7.2    CLIENT owns all data and information that it enters into PACECare. RTZ shall not acquire any rights to any such CLIENT data or information, and further, shall only use participant data – including de-identified participant data – to fulfill its obligations under this Agreement.

7.3    CLIENT agrees not to provide RTZ with any electronic files or printed documents for incorporation into PACECare that contain any information that CLIENT does not solely own or otherwise have the rights to use, copy, and disseminate in the manner contemplated by this Agreement (and CLIENT assumes sole responsibility for clarifying and ensuring ownership and usage rights). CLIENT agrees to indemnify, defend, and hold harmless RTZ (and its principals, employees, and agents) from any and all actions, claims, losses, damages, penalties, and costs (including costs for reasonable attorney fees) that are reasonably caused by its request to incorporate intellectual property owned by a third-party into PACECare that CLIENT does not have the right to use.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                    RTZ0006184

7.4    To support clinical and practice management, at the request of the CLIENT its copy of PACECare may include compatibility with assessment formats, data structures, and/or data coding / classifications owned by a third-party (examples may include interRAI HC, DSM 5, CPT, ICD-10, and LOINC). CLIENT is responsible for determining and remitting any/all use-licensing costs directly to the appropriate party.

## VIII    Dispute Resolution:

8.1    Each Party must provide the other Party with written notification of any controversy, dispute, or disagreement arising out of or relating to this Agreement or the breach thereof. The receiving Party shall respond to any disputes with 10 business days, and the Parties shall attempt in good faith to resolve such dispute, including requiring a member of each Party's respective executive management team to participate in this dispute resolution process. Should parties not reach a resolution within 30 calendar days (or a timeline mutually agreed upon by both parties in writing), the dispute shall be referred to mediation. Unless otherwise mutually agreed upon in writing by both parties, mediation services shall be provided by the Bar Association of San Francisco. If mediation is unsuccessful, either party may pursue remedies available to it at law that are consistent with the terms of this Agreement, in any court of competent jurisdiction per Section IX.

## IX    Choice of Law / Situs:

9.1    This Agreement shall be governed by the laws of the State of California. In the event that CLIENT initiates any legal proceedings against RTZ, such legal proceeding shall be brought in any state court situated in Contra Costa County (California) or any federal court located in the San Francisco Bay Area (California) and parties expressly submit to the exclusive jurisdiction of and venue in such court.

## X    Entire Agreement:

10.1    This Agreement, including Attachments A, B, and C, constitute the entire agreement of the parties hereto, and all previous communications between the parties, whether written or oral, with respect to the subject matter of this Agreement, are hereby superseded. No amendment, change or modification of this Agreement shall be effective unless in writing and signed by the parties hereto.

10.2    If any part of this Agreement is declared invalid or becomes inoperative for any reason, such invalidity or failure shall not affect the validity and enforceability of any other provision.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                    RTZ0006185

**XI    Notices:**

11.1    All notices affecting this Agreement must be in writing (via email or mail) to the undersigned or to the individual reasonably assumed to be his/her successor or the appointed representative regarding matters herein.

**XII    Waiver of Breach:**

12.1    A waiver of a breach of any provision of this contract by either Party will not operate or be construed as a waiver of any subsequent breach.

**XIII    Non-Exclusion:**

13.1    RTZ represents and warrants to CLIENT that neither it nor any of its affiliates: (a) are excluded from participation in any federal health care program, as defined under 42 U.S.C. § 1320a-7b(f), for the provision of items or services for which payment may be made, either directly or indirectly (e.g., through inclusion in a Medicare cost report), under such federal health care program; and (b) has arranged or contracted (by employment or otherwise) with any employee, agency or agent that such party or its affiliates knows or should know are excluded from participation in any federal program, to provide items or services hereunder.  RTZ represents and warrants to CLIENT that no final adverse action, as such term is defined under 42 U.S.C. §1320a-7.e(g), has occurred or is pending or threatened against such contractor or its affiliates or, to their knowledge, against any employee or agent engaged to provide services under this Agreement.

**XIV    Omnibus Reconciliation Act:**

14.1    RTZ hereby agrees that, subject to the legality and applicability of Section 952 of the Omnibus Reconciliation Act of 1980 and implementing regulations: (i) until the expiration of four (4) years after the furnishing of services under this contract, RTZ shall make available, upon written request of an appropriate federal official, this contract and any books, documents and records of RTZ that are necessary to certify the nature and extent of the costs of such services; and (ii) if RTZ carries out any of the duties of this contract through a subcontract with a value or cost of $10,000 or more over a twelve (12) month period, with an organization related to RTZ, such subcontract shall contain a clause similar to subparagraph (i) above, making available the subcontract and the books, documents, and records of such related organization which are necessary to verify the nature and extent of the costs of the subcontracted services, upon written request of an appropriate federal official.

**XV    General Provisions:**

15.1    Proper use and safeguarding of the system and its data is the responsibility of both parties.  CLIENT shall create and enforce rules related to accessing and handling consumer data in PACECare.

page 6 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                                                RTZ0006186

15.2    Liability.  Except in the event of gross negligence or willful misconduct, under no circumstance shall either Party's total liability under this Agreement exceed the annual amount paid or payable to RTZ under this Agreement.

15.3    Indemnification.  RTZ shall indemnify and hold CLIENT harmless from and shall defend CLIENT against any claims brought by a third-party against CLIENT for losses, injuries, damages, penalties, expenses, including reasonable attorney fees, caused by conduct of RTZ, or its employees, officers, agents, or subcontractors, in violation of this Agreement, except to the extent that CLIENT participated in, caused, or otherwise contributed to any such claim or damages through its own errors or omissions.  RTZ shall make itself, and any subcontractors, employees, or agents assisting RTZ in the performance of its obligations under this Agreement, available to CLIENT, at no cost to CLIENT, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against CLIENT, its directors, officers, or employees based upon claimed violations of the Privacy or Security Rules or other applicable laws, except where RTZ or its subcontractor, employee, or agent is named as an adverse party.

CLIENT shall indemnify and hold RTZ harmless from and shall defend RTZ against any claims brought by a third-party against RTZ for losses, injuries, damages, penalties, expenses, including reasonable attorney fees, caused by conduct of CLIENT, or its employees, officers, agents, or subcontractors, in violation of this Agreement, except to the extent that RTZ participated in, caused, or otherwise contributed to any such claim or damages through its own errors or omissions. CLIENT shall make itself, and any subcontractors, employees, or agents assisting CLIENT in the performance of its obligations under this Agreement, available to RTZ, at no cost to RTZ,  to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against RTZ, its directors, officers, and/or employees based upon claimed violations of the Privacy Rule or Security Rule or other applicable laws, except where CLIENT or its subcontractor, employee, and/ or agent is named as an adverse party.

15.4    Use of Name.  Neither Party may use the logo or any identifying symbol of the other Party for any purpose without the other Party's express prior written permission, which may be given or withheld for any reason.  Neither Party may use the name of the other Party in marketing materials, press releases, or other public announcements in connection with the services to be provided under this Agreement without the other Party's express written prior permission, which may be given or withheld for any reason.  Any permission granted under this Section shall be revoked automatically upon the expiration or termination of this Agreement.

15.5    Force Majeure.  Neither party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or interruption of service resulting from Acts of God, civil or military authority, acts of war or terrorism, or riots or insurrections.  If, notwithstanding RTZ's disaster recovery/business continuity plan, a Force Majeure event renders RTZ unable to perform its obligations under this Agreement or materially impacts the functionality or accessibility of PACECare for a period of ten (10) or more consecutive days, then CLIENT shall have the right to terminate this Agreement for cause without penalty.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    RTZ0006187

This Agreement may be executed by electronic or hard-copy signature and in any number of counterparts, each of which shall be deemed to be one and the same instrument.  The exchange of executed copies of this Agreement by facsimile, scanner/e-mail or other electronic transmission will constitute effective execution and delivery of this Agreement for all purposes.  Signatures of the Parties transmitted by such methods will be treated in all respects as having the same effect as an original signature.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date specified herein.

| **RTZ Associates, Inc.** | **Sunrise PACE (Region VII Area Agency on Aging)** |
|---|---|
| | DocuSigned by: |
| | *Bob Brown* |
| | CF4F3B98A34F44B... |
| Signature of authorized representative | Signature of authorized representative |
| Michael Zawadski | Bob Brown |
| Printed name | Printed name |
| President | Executive Director |
| Title | Title |
| May 27, 2021 | 6-3-2021 |
| Date | Date |

page 8 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                                      RTZ0006188

## ATTACHMENT A

## Business Associate Agreement (BAA)

This HIPAA Business Associate Agreement ("BAA") is entered into by and between **RTZ Associates, Inc.** ("Business Associate") and **Sunrise PACE** ("Covered Entity") (collectively "the Parties").

Covered Entity has engaged Business Associate to perform services on its behalf. Covered entity possesses Protected Health Information ("PHI") (defined below). Covered Entity and Business Associate intend to: (i) protect the privacy and provide for the security of PHI disclosed pursuant to this BAA and (ii) comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191, as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH"), Public Law 111-5, and the regulations promulgated thereunder by the U.S. Department of Health & Human Services (the "HIPAA Regulations"), and other applicable federal and state laws.

**NOW, THEREFORE**, the Parties agree as follows:

**Article 1.      Definitions.**

a.      "Breach" means the acquisition, access, use, or disclosure of PHI in a manner not permitted under subpart E of 45 CFR Part 164 that compromises the security or privacy of the PHI (within the meaning of 45 CFR 164.402).

b.      "Designated Record Set" shall have the meaning given to such term under the Privacy Rule, including, but not limited to, 45 CFR 164.501.

c.      "Electronic Protected Health Information" or "ePHI" means PHI that is transmitted by or maintained in electronic media as defined in 45 CFR 160.103.

d.      "Privacy Rule" shall mean the HIPAA regulations codified at 45 CFR Parts 160 and 164, Subparts A and E.

e.      "Protected Health Information" or "PHI" shall have the meaning given to such term under the Privacy Rule, including, but not limited to, 45 CFR 164.103, and is the information created or received by Business Associate from or on behalf of Covered Entity, including, but not limited to, ePHI.

f.      "Secretary" shall mean the Secretary of the U.S. Department of Health & Human Services or designee.

g.      "Unsecured PHI" means PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in regulations or other guidance issued under Section 13402(h)(2) of HITECH.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                                    RTZ0006189

**Article 2.      Obligations of Business Associate.**

1.      <u>Permitted Uses</u>.  Except as otherwise limited in this BAA or by law, Business Associate may: (i) use or disclose PHI to perform functions, activities or services for, or on behalf of, Covered Entity, provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity; (ii) use PHI to carry out the legal responsibilities of Business Associate; (iii) conduct any other use or disclosure permitted or required by HIPAA or applicable federal or state law; or (iv) use PHI for the proper management and administration of Business Associate.

2.      <u>Permitted Disclosures</u>.  Business Associate shall not disclose PHI except for the purpose of performing its obligations under the Agreement or as required by law.  In the event Business Associate has not received prior instructions from the Covered Entity and the Business Associate is unclear whether or not a specific disclosure is necessary to perform its obligations under the Agreement, then Business Associate shall obtain clarification and consent from the Covered Entity prior to any disclosure.  Business Associate shall not disclose PHI in any manner that would constitute a violation of the Privacy Rule or HITECH if so disclosed by the Covered Entity. If Business Associate discloses PHI to a third party, Business Associate must obtain, prior to making any such disclosure, (i) reasonable written assurances from such third party that such PHI will be held confidential as provided pursuant to this BAA and only disclosed as required by law or for the purposes for which it was disclosed to such third party, and (ii) a written agreement from such third party to immediately notify Business Associate of any breaches of confidentiality of the PHI, to the extent it has obtained knowledge of such breach.

3.      <u>Appropriate Safeguards</u>.  Business Associate shall use appropriate physical, technical, and administrative safeguards (i) to prevent use or disclosure of PHI other than as permitted under this BAA or as required by law and (ii) to reasonably and appropriately protect the confidentiality, integrity, and availability of the ePHI that Business Associate creates, receives, maintains, or transmits on behalf of the Covered Entity.

4.      <u>Reporting of Improper Use or Disclosure</u>.  Business Associate shall report in writing to Covered Entity any access, use, or disclosure of PHI not permitted by this BAA promptly and in no case later than 60 calendar days, after discovery.

5.      <u>Reporting of a Breach</u>.  Business Associate shall, in accordance with the requirements of 45 CFR 164.410, promptly notify Covered Entity in writing, of a Breach of Unsecured PHI. Business Associate also shall, without unreasonable delay, but in no event later than sixty (60) calendar days after the discovery of a Breach of Unsecured PHI, notify affected Individuals, the Secretary, and media of such Breach to the extent required under, and in accordance with the requirements of, 45 CFR 164.400 et seq. (Subpart D). To the extent provided under 45 CFR 164.404(a)(2), a Breach shall be treated as discovered as of the first day on which such Breach is known, or by exercising reasonable diligence would have been known, to any person, other than the person committing the Breach, who is an employee, officer, or agent of Business Associate.

6.      <u>Business Associate's Agents</u>.  Business Associate shall ensure that any agent, including a subcontractor, to whom it provides PHI agrees in writing to the same restrictions and conditions that apply to Business Associate to such PHI and implement the safeguards required above with respect to ePHI. Business Associate shall implement and maintain sanctions against

page 10 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                    RTZ0006190

agents and subcontractors that violate such restrictions and conditions and shall mitigate such effects of any such violation.

7.     Mitigation.  Business Associate shall mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a Breach relating to Business Associate or any of its agents or subcontractors.

8.     Access to PHI.  Business Associate shall provide access to an Individual, at the request of the Individual or the Covered Entity, to PHI in a Designated Record Set maintained by, or in the possession of, Business Associate in the time and manner required of a Covered Entity under 45 CFR 164.524 or as required by law. Any denial of access to such PHI determined by Business Associate shall be the sole responsibility of Business Associate, including, but not limited to, resolution or reporting of all appeals and/or complaints arising therefrom. Business Associate shall promptly report all such requests and their resolution to Covered Entity. Business Associate shall promptly notify the Covered Entity of any request made to the Business Associate that extends to other PHI.

9.     Amendment of PHI.  Business Associate shall make a determination on any authorized request by an Individual for amendment(s) to PHI in a Designated Record Set maintained by, or in the possession of, Business Associate in the time and manner required of a Covered Entity under 45 CFR 164.526 or as required by law. Any denial of such a request for amendment of PHI determined by Business Associate shall be the responsibility of Business Associate, including, but not limited to, resolution or reporting of all appeals, and complaints arising therefrom. Business Associate shall report all approved amendments or statements of disagreement/rebuttals in accordance with 45 CFR 164.526. Business Associate shall also promptly report all such requests and their resolution to Covered Entity.

10.     Documentation of Disclosures.  Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for a Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528. At a minimum, such documentation shall include: (i) the date of disclosure; (ii) the name of the entity or person who received PHI and, if known, the address of the entity or person; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose of the disclosure that reasonably informs the Individual of the basis for the disclosure, or a copy of the Individual's authorization, or a copy of the written request for disclosure. Business Associate shall retain such documentation for such period as is set forth in the Privacy Rule or other applicable laws.

11.     Accounting of Disclosures.   Business Associate agrees to provide to the Covered Entity the information required to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule upon the Covered Entity's request.

12.     Governmental Access to Records.  Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI available to Covered Entity or to the Secretary for purposes of determining Covered Entity's compliance with the Privacy Rule.

page 11 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006191

DocuSign Envelope ID: BB2D64E5-6DCB-421F-A9G9-1E7F80C0950F

13.    HITECH Compliance. Business Associate shall:

(i)    not receive, directly or indirectly, any impermissible remuneration in exchange for PHI or ePHI, except as permitted by HITECH § 13405(d);

(ii)    comply with the marketing and other restrictions applicable to business associates contained in HITECH § 13406;

(iii)    to the extent required under HITECH § 13404, fully comply with the applicable requirements of 45 CFR 164.502(e)(2) for each use or disclosure of PHI;

(iv)    to the extent required under HITECH § 13401, fully comply with 45 CFR 164.308, 164.310, 164.312, and 164.316; and

(v)    to the extent required under HITECH §§ 13401 and 13404, comply with the additional privacy and security requirements that apply to covered entities in the same manner and to the same extent as Covered Entity is required to do so.

**Article 3.    Obligations of Covered Entity.**

1.    Delegation to Business Associate.  As set forth in this BAA, Covered Entity hereby delegates to Business Associate Covered Entity's responsibility to provide access, amendment, and accounting rights to Individuals with respect to PHI in any Designated Record Set maintained by, or in the possession of, Business Associate. It is understood that Business Associate will interact with the Individual directly, up to and including resolution of any appeals or reporting of complaints under HIPAA or applicable federal or state law. Further, Covered Entity hereby delegates to Business Associate the Covered Entity's obligations with respect to notice of Breaches of Unsecured PHI. In accordance with this BAA, Business Associate shall notify affected Individuals, Covered Entity, the Secretary, and media (if required by law) of such Breach within sixty (60) calendar days after discovery. Such notice shall comply with the notification requirements set forth in HITECH, 45 CFR Parts 160 and 164 (specifically, 45 CFR 164.410), and any other associated regulations.

2.    Notice of Privacy Practices.  Covered Entity shall provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with 45 CFR 164.520, as well as any changes to such notice. Business Associate shall not distribute its own notice to Individuals. Business Associate shall not be responsible for the content of Covered Entity's notice of privacy practices nor any error or omission in such notice.

3.    Changes in Permission by Individual.  Covered Entity shall provide Business Associate with any changes in, or revocation of, permission by an Individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

page 12 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                    RTZ0006192

4.      Restrictions on PHI.  Covered Entity shall notify Business Associate of any restriction upon the use or disclosure of PHI to which Covered Entity has agreed, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

5.      Permissible Requests by Covered Entity.  Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Covered Entity, except for Business Associate's use of PHI for its proper management and administration or to carry out its legal responsibilities under this BAA.

6.      Disclosure to Third Parties.  Covered Entity may request that Business Associate disclose PHI directly to another party. Covered Entity agrees that all such disclosures requested by Covered Entity shall be for purposes of Covered Entity's treatment, payment or health care operations, or otherwise permitted or required under HIPAA or other applicable law.

## Article 4.      Use of Limited Data Sets.

The parties agree, for purposes of complying with 45 CFR 164.502(b)(1), to limit, to the extent practicable, any use, disclosure and requests of PHI to a "limited data set" (as defined in 45 CFR 164.514(e)(2)) or, if needed by the Business Associate or Covered Entity, to the minimum necessary PHI to accomplish the intended purpose of such use, disclosure or request.

## Article 5.      Term and Termination.

1.      Term.  The term of this BAA shall commence as of the Effective Date, and shall terminate when all of the PHI provided by either party to the other, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity or, if it is infeasible to return or destroy PHI, protections are extended to such information.

2.      Termination for Cause.  If either party violates or breaches a material term of this BAA, the non-breaching party shall provide a written notice of the breach and a reasonable opportunity to the other party to cure the breach or end the violation within thirty (30) calendar days or as otherwise agreed upon in writing by both parties.  If neither cure nor termination is feasible, the non-breaching party may report the problem to the Secretary.

3.      Effect of Termination.

(i)      Upon termination of this BAA, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

(ii)      In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of the PHI is infeasible, Business Associate shall extend the protections of this BAA to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

page 13 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                    RTZ0006193

## Article 6.    Miscellaneous.

1.    Amendment.  The Parties agree to take such action as is necessary to amend this BAA from time to time as is required for Covered Entity to comply with the requirements of HIPAA or HITECH and any applicable any other laws or regulations.

2.    Waiver.  No delay or omission by either party to exercise any right or remedy under this BAA will be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future.

3.    Survival.  The respective rights and obligations of Business Associate and Covered Entity shall survive the termination of this BAA.

4.    Severability.  In the event any part or parts of this Agreement are held to be unenforceable, the remainder of this BAA will continue in effect.

5.    Assignment.  This BAA is not assignable by either party without the other party's written consent.

6.    Prior Agreement.  This BAA shall replace and supersede any prior business associate agreement between the parties.

**IN WITNESS WHEREOF, the parties hereto have duly executed this BAA as of the Effective Date.**

FOR:
**RTZ Associates, Inc.**

_____
Signature of authorized representative

Michael Zawadski
_____
Printed name

President
_____
Title

May 27, 2021
_____
Date

FOR:
**Sunrise PACE (Region VII Area Agency on Aging)**

DocuSigned by:
*Bob Brown*
CF4F3B98A34F44B
_____
Signature of authorized representative

Bob Brown
_____
Printed name

Executive Director
_____
Title

6-3-2021
_____
Date

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                    RTZ0006194

## ATTACHMENT B

### Service Level Agreement (SLA)

PACECare will conform to the following standards during the Term of the Agreement with CLIENT:

After Go-Live the production system shall be available 24 hours a day excluding any scheduled maintenance / downtime.

Any scheduled maintenance shall occur overnight outside of CLIENT-defined hours of operation.

For the purposes of this SLA, "downtime" is defined as a period of time during which no individuals with (a) active system credentials and (b) functional internet connections / web-browsers can sign-in to and use the system. (The inability of one or more CLIENT users to sign-in to and use the system due to a local/regional internet, web-browser, computer/device, or account issue shall not be considered downtime.)

For the purposes of this SLA, "downtime" has two classifications: excusable and non-excusable.

For the purposes of this SLA, "excusable downtime" is defined as a period of time during which the system is not available due to: (a) scheduled maintenance, (b) a CLIENT request to take the system offline, or (c) a force majeure event. All other downtime shall be considered "non-excusable" downtime.

RTZ guarantees that the system availability will meet or exceed 99.5% in any given full calendar month excluding any excusable downtime. If non-excusable downtime exceeds 0.5% in any given calendar month, in addition to any other remedies available to CLIENT, RTZ shall credit CLIENT according to the following schedule:

| Service Level (availability per month excluding excusable downtime) | Service Level Credit (percent of monthly fee) |
| --- | --- |
| 99% – 99.499% | 5% |
| 98% – 98.999% | 10% |
| 97% – 97.999% | 15% |
| 95% – 96.999% | 25% |
| 90% – 94.999% | 50% |

In order to obtain a service level credit for a given calendar month, CLIENT must notify RTZ in writing within the first ten (10) consecutive business days of the following month. Upon receipt of such notification, RTZ shall use system logs to quantify downtime and determine the service level credit due. CLIENT shall not obtain any credits other than those specified above. Credit shall be applied against the next CLIENT invoice. In the event CLIENT has already paid the contracted amount in full (and no further invoices shall issue as a result), RTZ shall remit to CLIENT the credit due within 30 days.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006195

## ATTACHMENT C

### Pricing

# Redacted

page 16 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006196

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006197