NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile:  415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:  949.833.7878

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RTZ ASSOCIATES, INC.; and DOES 1 through 10, <br><br> Defendants, <br><br>---<br><br> RTZ ASSOCIATES, INC., <br><br> Counter-claimant, <br><br> vs. <br><br> INTUS CARE, INC., <br><br> Counter-defendant. | Case No:    4:24-cv-01132-JST <br><br> Assigned to: Hon. Jon S. Tigar <br><br> **DECLARATION OF DAVID C. LEE IN SUPPORT OF DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S OPPOSITION TO INTUS'S MOTIONS *IN LIMINE*** <br><br> [*Concurrently filed with RTZ's Oppositions to Intus's Motions in Limine*] <br><br> Date:    July 31, 2026 <br> Time:    2:00 p.m. <br> Courtroom: 6 |

**DECLARATION OF DAVID C. LEE**

I, David C. Lee, declare as follows:

1.      I am an attorney at law admitted to practice in this Court, and a partner of Nossaman LLP, counsel of record in this action for Defendant and Counterclaimant RTZ Associates, Inc. ("RTZ").  I make this declaration in support of RTZ's Oppositions to Intus's Motions in Limine. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts.

2.      Attached as **Exhibit 1** is a true and correct copy of the PACECare Agreement produced by RTZ in discovery, which has been Bates stamped as RTZ0006181.

3.      Attached as **Exhibit 2** is a true and correct copy of the relevant portions of the transcript of the deposition of Michael Zawadski, taken on taken on February 23, 2026.

4.      Attached as **Exhibit 3** is a true and correct copy of the relevant portions of the transcript of the deposition of John Robert Felton, taken on April 8, 2026.

5.      Attached as **Exhibit 4** is a true and correct copy of the relevant portions of the transcript of the deposition of Evan Walters, taken on March 16, 2026.

6.      Attached as **Exhibit 5** is a true and correct copy of the relevant portions of the transcript of the deposition of Shawn Fleury, taken on May 25, 2026.

7.      Attached as **Exhibit 6** is a true and correct copy of a document produced by RTZ during discovery, which have been Bates stamped RTZ0000807–808.

8.      Attached as **Exhibit 7** is a true and correct copy of a document produced by RTZ during discovery, which have been Bates stamped RTZ0008384.

9.      Attached as **Exhibit 8** is a true and correct copy of documents produced by Intus during discovery, which have been Bates stamped as INTUS001464–001473, and which were also introduced as Exhibit 63 in the Deposition of Alexander Rothberg, taken on February 27, 2026.

10.      Attached as **Exhibit 9** is a true and correct copy of the relevant portions of the deposition transcript of Evan Jackson, taken on November 25, 2025.

///

DECLARATION OF DAVID C. LEE ISO RTZ'S OPPOSITION TO INTUS'S MOTIONS IN LIMINE
70587745.v1

11.    Attached as **Exhibit 10** is a true and correct copy of an email from Miranda Carter of Community PACE to Amanda Muniz of RTZ, which was introduced as Exhibit 2 during the deposition of Miranda Carter, taken on July 28, 2025.

12.    Attached as **Exhibit 11** is a true and correct copy of the relevant portions of the deposition transcript of Miranda Carter, taken on July 28, 2025.

13.    Attached as **Exhibit 12** is a true and correct copy of a document produced by RTZ during discovery, which has been Bates stamped RTZ0000809-RTZ000813, which was previously introduced as Exhibit 48 during the deposition of Michael Zawadski, taken on February 23, 2026.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Dated this 17th day of July 2026 in San Francisco, California.

_____
DAVID C. LEE

DECLARATION OF DAVID C. LEE ISO RTZ'S OPPOSITION TO INTUS'S MOTIONS IN LIMINE
70587745.v1

# EXHIBIT "1"

DocuSign Envelope ID: BB2D6455-6DCB-4215-A9G9-1E7F80C0950F

# PACECare Agreement
## "Software as a Service"

This Agreement is by and between **Region VII Area Agency on Aging, dba/ Sunrise PACE (CLIENT)**, a domestic not-for-profit corporation registered and operating in the State of Michigan, and **RTZ Associates, Inc., dba/ RTZ Systems (RTZ)**, incorporated and headquartered in the State of California.  This Agreement specifies the rights, obligations, and requirements governing the provision and use of RTZ's **PACECare software** – a cloud-based, "off-the-shelf" commercial software product designed to support the business needs of Programs of All-Inclusive Care for the Elderly (PACE).  This Agreement shall be effective when fully executed by both parties (the "Effective Date").

**I      Services:**

1.1      RTZ will provide CLIENT with access to a copy of the current version (v.2021) of PACECare – configured for CLIENT – via a "software as a service" model.  CLIENT is entitled to receive all general updates to this version of PACECare during the Term of this Agreement at no additional cost.  The content and schedule of general PACECare updates will be solely determined by RTZ; however, RTZ will make any data collection/reporting changes required to meet evolving national (i.e. CMS and NPA) reporting requirements in a timely manner at no additional cost.  For the Term of this Agreement RTZ hereby grants CLIENT a non-exclusive license to access and use PACECare (including all successor versions thereof) as provided for herein.

1.2      RTZ will provide system set-up and implementation services necessary for CLIENT to access and use PACECare as intended under this Agreement.  Optional services are outlined in Attachment C ("Pricing") and can be purchased at the discretion of CLIENT.  "Go-Live" shall be defined as the date upon which CLIENT first saves data in the production system.

1.3      RTZ will host PACECare in accordance with the Service Level Agreement (SLA) incorporated in Attachment B.  In addition to the production (i.e. "live") environment, for 30 days both before and after the Go-Live date, RTZ will also provide a sandbox environment in support of acceptance testing and training activities (the SLA shall not apply to this sandbox site).  As a cloud-based service, use of PACECare requires a computer or mobile device with internet access and a web-browser.  CLIENT assumes responsibility for purchasing and supporting all software and hardware used to access PACECare.

1.4      RTZ will provide CLIENT with no-cost technical support via phone and email during normal RTZ business hours.

1.5      RTZ warrants that PACECare – as provided to CLIENT: (a) will be free from coding errors and defects, (b) will perform as specified / presented by RTZ, (c) will meet or exceed industry security and disaster recovery standards, and (d) will not infringe

page 1 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                RTZ0006181

upon, violate, or misappropriate any foreign or United States patent, copyright, trademark, trade secret or any other intellectual property or proprietary right of any third-party. RTZ will promptly correct any component of PACECare which does not conform with any of the foregoing representations and warranties at no charge to CLIENT.

## II Pricing:

# Redacted

## III Term:

3.1 This Agreement shall go into effect immediately upon execution by both parties ("Effective Date") and have an Initial Term of three (3) years from the system go-live date. For clarity, CLIENT is purchasing thirty-six (36) consecutive months of service at the rate identified in Attachment C.

3.2 At the end of the Initial Term (and then at the end of each subsequent renewal term) this Agreement shall automatically renew in twelve (12) month increments [Redacted] [Redacted]) unless CLIENT gives written notice of its intent to discontinue use of services to RTZ at least thirty (30) calendar days prior to the expiration of the then current term, or RTZ gives written notice of its intent to discontinue the provision of services to CLIENT at least ninety (90) calendar days prior to the expiration of the then current term.

3.3 At the end of the term, all use licenses shall expire and no further obligation to provide services on the part of RTZ will exist.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006182

**IV    Termination:**

4.1

<div style="border:1px solid black; text-align:center">

# Redacted

</div>

4.2    Termination for Cause.  In the event of a material breach of any clause, condition, or covenant of this Agreement by one party, the non-breaching party may terminate the Agreement if the breaching party does not cure the breach within thirty (30) calendar days of receiving written notice of such breach.

4.3    Upon the effective date of termination of this Agreement, all use licenses shall expire.  In the event of termination, RTZ shall deliver to CLIENT a copy of all CLIENT data.  Specifically, RTZ will provide up to two sets of files – one preliminary set of files for review, and one final set of files for migration to a new system.  RTZ will provide said data in an electronic format (.CSV or equivalent). CLIENT assumes ultimate responsibility for checking files for accuracy/completeness and notifying RTZ of any errors/omissions.  Files will only include CLIENT data; i.e. they will not include PACECare data such as (but not limited to) validations/constraints, triggers, algorithms, or stored procedures.  RTZ will not provide a data dictionary or schema; however, upon request RTZ will participate in one phone call with CLIENT staff (and only CLIENT staff) not to exceed one hour in length in which RTZ can clarify fields/files as needed.  CLIENT understands that Agreement pricing does not include transition assistance, such as (but not limited to) data translation, conversion, or migration assistance. At its sole discretion, CLIENT may engage RTZ at its standard hourly rate identified in Attachment C to provide data translation or other transition-related services.

4.4    All terms and conditions of this Agreement that would reasonably be interpreted as surviving termination of this Agreement will be deemed to survive termination of this Agreement.

**V    Relationship of the Parties and Their Employees:**

5.1    Nothing in this Agreement shall be construed to create an employer/employee relationship between CLIENT and RTZ or its personnel, and personnel shall not be eligible for any employee benefits programs of CLIENT, nor shall they have any claim against CLIENT for vacation pay, sick leave, retirement benefits, Social Security, Workers Compensation, disability or unemployment insurance benefits, or any other employee benefits of any kind.

**VI    Confidentiality:**

6.1    All information concerning CLIENT or its members which may be made available to RTZ personnel by CLIENT during the course of the Agreement shall be deemed to be confidential, and RTZ personnel shall not be permitted or required by RTZ to

<div style="text-align:center">page 3 of 17</div>

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                    RTZ0006183

DocuSign Envelope ID: BB2D6455-6DCB-4215-A9G9-1E7F80C0950F

disclose any such information to any third party (except subcontractors engaged as part of RTZ's provision of services to CLIENT) without the express written consent of CLIENT, except when required by law. RTZ agrees that its personnel shall use the information they acquire during the term of this Agreement for the benefit of CLIENT. Disclosure and use of Protected Health Information (as defined in HIPAA) is governed by the Business Associates Agreement (Attachment B) attached hereto and made part of this agreement. RTZ understands and agrees that: (1) all records concerning any individual made or kept by any public officer or agency in connection with the administration of any provision of the Welfare and Institutions Code relating to any form of public social services for which grants-in-aid are received by that State from the Federal Government will be confidential, and will not be open for examination for any purpose not directly connected with the administration of such public social services, and (2) no person will publish, disclose or use or permit or cause to be published, disclosed or used, any confidential information pertaining to a client, applicant or recipient.

6.2     RTZ agrees to cause all of its employees, agents, subcontractors and partners to comply with these provisions.


**VII     Ownership:**

7.1     RTZ owns all aspects of the PACECare product, including but not limited to source code, system logic/functionality, screen layout/design, and documents/forms/reports. CLIENT agrees that it will not seek to reverse engineer PACECare or provide (and will expressly inform staff not to provide): (a) account credentials or other form of access to PACECare, (b) screenshots or other forms of visual, written, or oral descriptions of PACECare, or (c) forms/documents/reports produced by PACECare to any internal software development team or third-party – specifically but not limited to other software vendors competing with or seeking to compete with RTZ, including but not limited to Tabula Rasa Healthcare, Epic Systems, and Salesforce as well as their affiliates and agents. No ownership equity in PACECare shall accrue to CLIENT through its use of PACECare under this Agreement.

7.2     CLIENT owns all data and information that it enters into PACECare. RTZ shall not acquire any rights to any such CLIENT data or information, and further, shall only use participant data – including de-identified participant data – to fulfill its obligations under this Agreement.

7.3     CLIENT agrees not to provide RTZ with any electronic files or printed documents for incorporation into PACECare that contain any information that CLIENT does not solely own or otherwise have the rights to use, copy, and disseminate in the manner contemplated by this Agreement (and CLIENT assumes sole responsibility for clarifying and ensuring ownership and usage rights). CLIENT agrees to indemnify, defend, and hold harmless RTZ (and its principals, employees, and agents) from any and all actions, claims, losses, damages, penalties, and costs (including costs for reasonable attorney fees) that are reasonably caused by its request to incorporate intellectual property owned by a third-party into PACECare that CLIENT does not have the right to use.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     RTZ0006184

7.4    To support clinical and practice management, at the request of the CLIENT its copy of PACECare may include compatibility with assessment formats, data structures, and/or data coding / classifications owned by a third-party (examples may include interRAI HC, DSM 5, CPT, ICD-10, and LOINC). CLIENT is responsible for determining and remitting any/all use-licensing costs directly to the appropriate party.

## VIII    Dispute Resolution:

8.1    Each Party must provide the other Party with written notification of any controversy, dispute, or disagreement arising out of or relating to this Agreement or the breach thereof. The receiving Party shall respond to any disputes with 10 business days, and the Parties shall attempt in good faith to resolve such dispute, including requiring a member of each Party's respective executive management team to participate in this dispute resolution process. Should parties not reach a resolution within 30 calendar days (or a timeline mutually agreed upon by both parties in writing), the dispute shall be referred to mediation. Unless otherwise mutually agreed upon in writing by both parties, mediation services shall be provided by the Bar Association of San Francisco. If mediation is unsuccessful, either party may pursue remedies available to it at law that are consistent with the terms of this Agreement, in any court of competent jurisdiction per Section IX.

## IX    Choice of Law / Situs:

9.1    This Agreement shall be governed by the laws of the State of California. In the event that CLIENT initiates any legal proceedings against RTZ, such legal proceeding shall be brought in any state court situated in Contra Costa County (California) or any federal court located in the San Francisco Bay Area (California) and parties expressly submit to the exclusive jurisdiction of and venue in such court.

## X    Entire Agreement:

10.1    This Agreement, including Attachments A, B, and C, constitute the entire agreement of the parties hereto, and all previous communications between the parties, whether written or oral, with respect to the subject matter of this Agreement, are hereby superseded. No amendment, change or modification of this Agreement shall be effective unless in writing and signed by the parties hereto.

10.2    If any part of this Agreement is declared invalid or becomes inoperative for any reason, such invalidity or failure shall not affect the validity and enforceability of any other provision.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006185

**XI    Notices:**

11.1    All notices affecting this Agreement must be in writing (via email or mail) to the undersigned or to the individual reasonably assumed to be his/her successor or the appointed representative regarding matters herein.

**XII    Waiver of Breach:**

12.1    A waiver of a breach of any provision of this contract by either Party will not operate or be construed as a waiver of any subsequent breach.

**XIII    Non-Exclusion:**

13.1    RTZ represents and warrants to CLIENT that neither it nor any of its affiliates: (a) are excluded from participation in any federal health care program, as defined under 42 U.S.C. § 1320a-7b(f), for the provision of items or services for which payment may be made, either directly or indirectly (e.g., through inclusion in a Medicare cost report), under such federal health care program; and (b) has arranged or contracted (by employment or otherwise) with any employee, agency or agent that such party or its affiliates knows or should know are excluded from participation in any federal program, to provide items or services hereunder.  RTZ represents and warrants to CLIENT that no final adverse action, as such term is defined under 42 U.S.C. §1320a-7.e(g), has occurred or is pending or threatened against such contractor or its affiliates or, to their knowledge, against any employee or agent engaged to provide services under this Agreement.

**XIV    Omnibus Reconciliation Act:**

14.1    RTZ hereby agrees that, subject to the legality and applicability of Section 952 of the Omnibus Reconciliation Act of 1980 and implementing regulations: (i) until the expiration of four (4) years after the furnishing of services under this contract, RTZ shall make available, upon written request of an appropriate federal official, this contract and any books, documents and records of RTZ that are necessary to certify the nature and extent of the costs of such services; and (ii) if RTZ carries out any of the duties of this contract through a subcontract with a value or cost of $10,000 or more over a twelve (12) month period, with an organization related to RTZ, such subcontract shall contain a clause similar to subparagraph (i) above, making available the subcontract and the books, documents, and records of such related organization which are necessary to verify the nature and extent of the costs of the subcontracted services, upon written request of an appropriate federal official.

**XV    General Provisions:**

15.1    Proper use and safeguarding of the system and its data is the responsibility of both parties.  CLIENT shall create and enforce rules related to accessing and handling consumer data in PACECare.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    RTZ0006186

DocuSign Envelope ID: BB2D6455-6DCB-421F-A9C9-1F7F80C0950F

15.2   Liability.  Except in the event of gross negligence or willful misconduct, under no circumstance shall either Party's total liability under this Agreement exceed the annual amount paid or payable to RTZ under this Agreement.

15.3   Indemnification.  RTZ shall indemnify and hold CLIENT harmless from and shall defend CLIENT against any claims brought by a third-party against CLIENT for losses, injuries, damages, penalties, expenses, including reasonable attorney fees, caused by conduct of RTZ, or its employees, officers, agents, or subcontractors, in violation of this Agreement, except to the extent that CLIENT participated in, caused, or otherwise contributed to any such claim or damages through its own errors or omissions.  RTZ shall make itself, and any subcontractors, employees, or agents assisting RTZ in the performance of its obligations under this Agreement, available to CLIENT, at no cost to CLIENT, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against CLIENT, its directors, officers, or employees based upon claimed violations of the Privacy or Security Rules or other applicable laws, except where RTZ or its subcontractor, employee, or agent is named as an adverse party.

CLIENT shall indemnify and hold RTZ harmless from and shall defend RTZ against any claims brought by a third-party against RTZ for losses, injuries, damages, penalties, expenses, including reasonable attorney fees, caused by conduct of CLIENT, or its employees, officers, agents, or subcontractors, in violation of this Agreement, except to the extent that RTZ participated in, caused, or otherwise contributed to any such claim or damages through its own errors or omissions.  CLIENT shall make itself, and any subcontractors, employees, or agents assisting CLIENT in the performance of its obligations under this Agreement, available to RTZ, at no cost to RTZ,  to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against RTZ, its directors, officers, and/or employees based upon claimed violations of the Privacy Rule or Security Rule or other applicable laws, except where CLIENT or its subcontractor, employee, and/ or agent is named as an adverse party.

15.4   Use of Name.  Neither Party may use the logo or any identifying symbol of the other Party for any purpose without the other Party's express prior written permission, which may be given or withheld for any reason.  Neither Party may use the name of the other Party in marketing materials, press releases, or other public announcements in connection with the services to be provided under this Agreement without the other Party's express written prior permission, which may be given or withheld for any reason.  Any permission granted under this Section shall be revoked automatically upon the expiration or termination of this Agreement.

15.5   Force Majeure.  Neither party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or interruption of service resulting from Acts of God, civil or military authority, acts of war or terrorism, or riots or insurrections.  If, notwithstanding RTZ's disaster recovery/business continuity plan, a Force Majeure event renders RTZ unable to perform its obligations under this Agreement or materially impacts the functionality or accessibility of PACECare for a period of ten (10) or more consecutive days, then CLIENT shall have the right to terminate this Agreement for cause without penalty.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                                                    RTZ0006187

This Agreement may be executed by electronic or hard-copy signature and in any number of counterparts, each of which shall be deemed to be one and the same instrument. The exchange of executed copies of this Agreement by facsimile, scanner/e-mail or other electronic transmission will constitute effective execution and delivery of this Agreement for all purposes. Signatures of the Parties transmitted by such methods will be treated in all respects as having the same effect as an original signature.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date specified herein.

| **RTZ Associates, Inc.** | **Sunrise PACE (Region VII Area Agency on Aging)** |
|---|---|
| | DocuSigned by: *Bob Brown* CF4F3B98A34F44B... |
| Signature of authorized representative | Signature of authorized representative |
| Michael Zawadski | Bob Brown |
| Printed name | Printed name |
| President | Executive Director |
| Title | Title |
| May 27, 2021 | 6-3-2021 |
| Date | Date |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006188

# ATTACHMENT A

## Business Associate Agreement (BAA)

This HIPAA Business Associate Agreement ("BAA") is entered into by and between **RTZ Associates, Inc.** ("Business Associate") and **Sunrise PACE** ("Covered Entity") (collectively "the Parties").

Covered Entity has engaged Business Associate to perform services on its behalf. Covered entity possesses Protected Health Information ("PHI") (defined below). Covered Entity and Business Associate intend to: (i) protect the privacy and provide for the security of PHI disclosed pursuant to this BAA and (ii) comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191, as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH"), Public Law 111-5, and the regulations promulgated thereunder by the U.S. Department of Health & Human Services (the "HIPAA Regulations"), and other applicable federal and state laws.

**NOW, THEREFORE**, the Parties agree as follows:

**Article 1.        Definitions.**

a.        "Breach" means the acquisition, access, use, or disclosure of PHI in a manner not permitted under subpart E of 45 CFR Part 164 that compromises the security or privacy of the PHI (within the meaning of 45 CFR 164.402).

b.        "Designated Record Set" shall have the meaning given to such term under the Privacy Rule, including, but not limited to, 45 CFR 164.501.

c.        "Electronic Protected Health Information" or "ePHI" means PHI that is transmitted by or maintained in electronic media as defined in 45 CFR 160.103.

d.        "Privacy Rule" shall mean the HIPAA regulations codified at 45 CFR Parts 160 and 164, Subparts A and E.

e.        "Protected Health Information" or "PHI" shall have the meaning given to such term under the Privacy Rule, including, but not limited to, 45 CFR 164.103, and is the information created or received by Business Associate from or on behalf of Covered Entity, including, but not limited to, ePHI.

f.        "Secretary" shall mean the Secretary of the U.S. Department of Health & Human Services or designee.

g.        "Unsecured PHI" means PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in regulations or other guidance issued under Section 13402(h)(2) of HITECH.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006189

**Article 2.        Obligations of Business Associate.**

1.        <u>Permitted Uses</u>.  Except as otherwise limited in this BAA or by law, Business Associate may: (i) use or disclose PHI to perform functions, activities or services for, or on behalf of, Covered Entity, provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity; (ii) use PHI to carry out the legal responsibilities of Business Associate; (iii) conduct any other use or disclosure permitted or required by HIPAA or applicable federal or state law; or (iv) use PHI for the proper management and administration of Business Associate.

2.        <u>Permitted Disclosures</u>.  Business Associate shall not disclose PHI except for the purpose of performing its obligations under the Agreement or as required by law.  In the event Business Associate has not received prior instructions from the Covered Entity and the Business Associate is unclear whether or not a specific disclosure is necessary to perform its obligations under the Agreement, then Business Associate shall obtain clarification and consent from the Covered Entity prior to any disclosure.  Business Associate shall not disclose PHI in any manner that would constitute a violation of the Privacy Rule or HITECH if so disclosed by the Covered Entity. If Business Associate discloses PHI to a third party, Business Associate must obtain, prior to making any such disclosure, (i) reasonable written assurances from such third party that such PHI will be held confidential as provided pursuant to this BAA and only disclosed as required by law or for the purposes for which it was disclosed to such third party, and (ii) a written agreement from such third party to immediately notify Business Associate of any breaches of confidentiality of the PHI, to the extent it has obtained knowledge of such breach.

3.        <u>Appropriate Safeguards</u>.  Business Associate shall use appropriate physical, technical, and administrative safeguards (i) to prevent use or disclosure of PHI other than as permitted under this BAA or as required by law and (ii) to reasonably and appropriately protect the confidentiality, integrity, and availability of the ePHI that Business Associate creates, receives, maintains, or transmits on behalf of the Covered Entity.

4.        <u>Reporting of Improper Use or Disclosure</u>.  Business Associate shall report in writing to Covered Entity any access, use, or disclosure of PHI not permitted by this BAA promptly and in no case later than 60 calendar days, after discovery.

5.        <u>Reporting of a Breach</u>.  Business Associate shall, in accordance with the requirements of 45 CFR 164.410, promptly notify Covered Entity in writing, of a Breach of Unsecured PHI. Business Associate also shall, without unreasonable delay, but in no event later than sixty (60) calendar days after the discovery of a Breach of Unsecured PHI, notify affected Individuals, the Secretary, and media of such Breach to the extent required under, and in accordance with the requirements of, 45 CFR 164.400 et seq. (Subpart D). To the extent provided under 45 CFR 164.404(a)(2), a Breach shall be treated as discovered as of the first day on which such Breach is known, or by exercising reasonable diligence would have been known, to any person, other than the person committing the Breach, who is an employee, officer, or agent of Business Associate.

6.        <u>Business Associate's Agents</u>.  Business Associate shall ensure that any agent, including a subcontractor, to whom it provides PHI agrees in writing to the same restrictions and conditions that apply to Business Associate to such PHI and implement the safeguards required above with respect to ePHI. Business Associate shall implement and maintain sanctions against

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006190

agents and subcontractors that violate such restrictions and conditions and shall mitigate such effects of any such violation.

7.     Mitigation.  Business Associate shall mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a Breach relating to Business Associate or any of its agents or subcontractors.

8.     Access to PHI.  Business Associate shall provide access to an Individual, at the request of the Individual or the Covered Entity, to PHI in a Designated Record Set maintained by, or in the possession of, Business Associate in the time and manner required of a Covered Entity under 45 CFR 164.524 or as required by law. Any denial of access to such PHI determined by Business Associate shall be the sole responsibility of Business Associate, including, but not limited to, resolution or reporting of all appeals and/or complaints arising therefrom. Business Associate shall promptly report all such requests and their resolution to Covered Entity. Business Associate shall promptly notify the Covered Entity of any request made to the Business Associate that extends to other PHI.

9.     Amendment of PHI.  Business Associate shall make a determination on any authorized request by an Individual for amendment(s) to PHI in a Designated Record Set maintained by, or in the possession of, Business Associate in the time and manner required of a Covered Entity under 45 CFR 164.526 or as required by law. Any denial of such a request for amendment of PHI determined by Business Associate shall be the responsibility of Business Associate, including, but not limited to, resolution or reporting of all appeals, and complaints arising therefrom. Business Associate shall report all approved amendments or statements of disagreement/rebuttals in accordance with 45 CFR 164.526. Business Associate shall also promptly report all such requests and their resolution to Covered Entity.

10.    Documentation of Disclosures.  Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for a Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528. At a minimum, such documentation shall include: (i) the date of disclosure; (ii) the name of the entity or person who received PHI and, if known, the address of the entity or person; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose of the disclosure that reasonably informs the Individual of the basis for the disclosure, or a copy of the Individual's authorization, or a copy of the written request for disclosure. Business Associate shall retain such documentation for such period as is set forth in the Privacy Rule or other applicable laws.

11.    Accounting of Disclosures.   Business Associate agrees to provide to the Covered Entity the information required to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule upon the Covered Entity's request.

12.    Governmental Access to Records.  Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI available to Covered Entity or to the Secretary for purposes of determining Covered Entity's compliance with the Privacy Rule.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     RTZ0006191

DocuSign Envelope ID: BB2D6455-6DCB-421F-A9C9-157F80C0950F

13.     HITECH Compliance. Business Associate shall:

(i)     not receive, directly or indirectly, any impermissible remuneration in exchange for PHI or ePHI, except as permitted by HITECH § 13405(d);

(ii)     comply with the marketing and other restrictions applicable to business associates contained in HITECH § 13406;

(iii)     to the extent required under HITECH § 13404, fully comply with the applicable requirements of 45 CFR 164.502(e)(2) for each use or disclosure of PHI;

(iv)     to the extent required under HITECH § 13401, fully comply with 45 CFR 164.308, 164.310, 164.312, and 164.316; and

(v)     to the extent required under HITECH §§ 13401 and 13404, comply with the additional privacy and security requirements that apply to covered entities in the same manner and to the same extent as Covered Entity is required to do so.

**Article 3.     Obligations of Covered Entity.**

1.     Delegation to Business Associate.  As set forth in this BAA, Covered Entity hereby delegates to Business Associate Covered Entity's responsibility to provide access, amendment, and accounting rights to Individuals with respect to PHI in any Designated Record Set maintained by, or in the possession of, Business Associate. It is understood that Business Associate will interact with the Individual directly, up to and including resolution of any appeals or reporting of complaints under HIPAA or applicable federal or state law. Further, Covered Entity hereby delegates to Business Associate the Covered Entity's obligations with respect to notice of Breaches of Unsecured PHI. In accordance with this BAA, Business Associate shall notify affected Individuals, Covered Entity, the Secretary, and media (if required by law) of such Breach within sixty (60) calendar days after discovery. Such notice shall comply with the notification requirements set forth in HITECH, 45 CFR Parts 160 and 164 (specifically, 45 CFR 164.410), and any other associated regulations.

2.     Notice of Privacy Practices.  Covered Entity shall provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with 45 CFR 164.520, as well as any changes to such notice. Business Associate shall not distribute its own notice to Individuals. Business Associate shall not be responsible for the content of Covered Entity's notice of privacy practices nor any error or omission in such notice.

3.     Changes in Permission by Individual.  Covered Entity shall provide Business Associate with any changes in, or revocation of, permission by an Individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

page 12 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                                              RTZ0006192

DocuSign Envelope ID: BB2D6455-6DCB-421F-A9C9-1F7F80C0950F

4.      Restrictions on PHI. Covered Entity shall notify Business Associate of any restriction upon the use or disclosure of PHI to which Covered Entity has agreed, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

5.      Permissible Requests by Covered Entity. Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Covered Entity, except for Business Associate's use of PHI for its proper management and administration or to carry out its legal responsibilities under this BAA.

6.      Disclosure to Third Parties. Covered Entity may request that Business Associate disclose PHI directly to another party. Covered Entity agrees that all such disclosures requested by Covered Entity shall be for purposes of Covered Entity's treatment, payment or health care operations, or otherwise permitted or required under HIPAA or other applicable law.

## Article 4.      Use of Limited Data Sets.

The parties agree, for purposes of complying with 45 CFR 164.502(b)(1), to limit, to the extent practicable, any use, disclosure and requests of PHI to a "limited data set" (as defined in 45 CFR 164.514(e)(2)) or, if needed by the Business Associate or Covered Entity, to the minimum necessary PHI to accomplish the intended purpose of such use, disclosure or request.

## Article 5.      Term and Termination.

1.      Term. The term of this BAA shall commence as of the Effective Date, and shall terminate when all of the PHI provided by either party to the other, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity or, if it is infeasible to return or destroy PHI, protections are extended to such information.

2.      Termination for Cause. If either party violates or breaches a material term of this BAA, the non-breaching party shall provide a written notice of the breach and a reasonable opportunity to the other party to cure the breach or end the violation within thirty (30) calendar days or as otherwise agreed upon in writing by both parties. If neither cure nor termination is feasible, the non-breaching party may report the problem to the Secretary.

3.      Effect of Termination.

(i)      Upon termination of this BAA, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

(ii)      In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of the PHI is infeasible, Business Associate shall extend the protections of this BAA to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                    RTZ0006193

**Article 6.      Miscellaneous.**

1.      Amendment.  The Parties agree to take such action as is necessary to amend this BAA from time to time as is required for Covered Entity to comply with the requirements of HIPAA or HITECH and any applicable any other laws or regulations.

2.      Waiver.  No delay or omission by either party to exercise any right or remedy under this BAA will be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future.

3.      Survival.  The respective rights and obligations of Business Associate and Covered Entity shall survive the termination of this BAA.

4.      Severability.  In the event any part or parts of this Agreement are held to be unenforceable, the remainder of this BAA will continue in effect.

5.      Assignment.  This BAA is not assignable by either party without the other party's written consent.

6.      Prior Agreement.  This BAA shall replace and supersede any prior business associate agreement between the parties.


**IN WITNESS WHEREOF, the parties hereto have duly executed this BAA as of the Effective Date.**


FOR:                                                    FOR:

**RTZ Associates, Inc.**                                **Sunrise PACE (Region VII Area Agency on Aging)**

DocuSigned by:

*Bob Brown*

CF4F3B98A34F44B
_____        _____
Signature of authorized representative       Signature of authorized representative

Michael Zawadski                             Bob Brown
_____        _____
Printed name                                  Printed name

President                                     Executive Director
_____        _____
Title                                         Title

May 27, 2021                                  6-3-2021
_____        _____
Date                                          Date

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY                    RTZ0006194

## ATTACHMENT B

### Service Level Agreement (SLA)

PACECare will conform to the following standards during the Term of the Agreement with CLIENT:

After Go-Live the production system shall be available 24 hours a day excluding any scheduled maintenance / downtime.

Any scheduled maintenance shall occur overnight outside of CLIENT-defined hours of operation.

For the purposes of this SLA, "downtime" is defined as a period of time during which no individuals with (a) active system credentials and (b) functional internet connections / web-browsers can sign-in to and use the system. (The inability of one or more CLIENT users to sign-in to and use the system due to a local/regional internet, web-browser, computer/device, or account issue shall not be considered downtime.)

For the purposes of this SLA, "downtime" has two classifications: excusable and non-excusable.

For the purposes of this SLA, "excusable downtime" is defined as a period of time during which the system is not available due to: (a) scheduled maintenance, (b) a CLIENT request to take the system offline, or (c) a force majeure event. All other downtime shall be considered "non-excusable" downtime.

RTZ guarantees that the system availability will meet or exceed 99.5% in any given full calendar month excluding any excusable downtime. If non-excusable downtime exceeds 0.5% in any given calendar month, in addition to any other remedies available to CLIENT, RTZ shall credit CLIENT according to the following schedule:

| Service Level (availability per month excluding excusable downtime) | Service Level Credit (percent of monthly fee) |
|---|---|
| 99% – 99.499% | 5% |
| 98% – 98.999% | 10% |
| 97% – 97.999% | 15% |
| 95% – 96.999% | 25% |
| 90% – 94.999% | 50% |

In order to obtain a service level credit for a given calendar month, CLIENT must notify RTZ in writing within the first ten (10) consecutive business days of the following month. Upon receipt of such notification, RTZ shall use system logs to quantify downtime and determine the service level credit due. CLIENT shall not obtain any credits other than those specified above. Credit shall be applied against the next CLIENT invoice. In the event CLIENT has already paid the contracted amount in full (and no further invoices shall issue as a result), RTZ shall remit to CLIENT the credit due within 30 days.

page 15 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

## ATTACHMENT C
### Pricing

# Redacted

page 16 of 17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006196

DocuSign Envelope ID: BB2D6455-6DCB-421F-A9G9-1F7F80G0950F



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

RTZ0006197

NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800

Attorneys for Defendant and Counterclaimant
RTZ ASSOCIATES, INC.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>    Plaintiff,<br><br>  vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>    Defendants, | Case No:  4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT AND COUNTER-CLAIMANT RTZ ASSOCIATES, INC.'S MOTIONS IN LIMINE**<br><br>[*Concurrently filed with: (1) RTZ's Omnibus Motions in Limine; (2) Declaration of David C. Lee in Support of RTZ's Omnibus Motions in Limine*]<br><br>Date:   July 31, 2026<br>Time:   2:00 p.m.<br>Courtroom: 6 |
| RTZ ASSOCIATES, INC.,<br><br>    Counter-claimant,<br><br>  vs.<br><br>INTUS CARE, INC.,<br><br>    Counter-defendant. | |

- 1 -           Case No. 4:24-cv-01132-JST

[PROPOSED] ORDER GRANTING RTZ'S MOTIONS IN LIMINE

70576065.v1

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Pursuant to Federal Rules of Evidence 401, 403, and 802 and this Court's Standing Order for Civil Jury Trials Section E, Defendant and Cross-Complainant RTZ Associates, Inc. ("RTZ" or "Defendant") filed the below listed Motions in Limine (the "Motions"). The Motions came on for hearing on July 31, 2026, in Courtroom 6 before the Honorable Jon S. Tigar. The parties appeared through their counsel of record.

Having read the parties' papers and considered the arguments of counsel and the relevant legal authority, the Court rules as follows regarding the Motions below:

| No. | Description of Motion in Limine | Ruling |
|-----|--------------------------------|--------|
| 1. | Motion To Exclude Intus's Internal Evaluation, Scrutiny, Legal or Business Assessment, Reasons, Rationale, or Decision-Making Concerning RTZ's NDA | ☐ Granted ☐ Denied |
| 2. | Motion To Exclude Evidence Re Summary Judgment Order | ☐ Granted ☐ Denied |
| 3. | Motion To Exclude Alleged "Unobservable" Damages | ☐ Granted ☐ Denied |
| 4. | Motion To Exclude Evidence of Collabrios Conduct and Use of High Desert Emails | ☐ Granted ☐ Denied |
| 5. | Motion To Exclude Expert Testimony About Contract Interpretation as Irrelevant. | ☐ Granted ☐ Denied |

**IT IS SO ORDERED.**

Dated: _____, 2026

_____
Honorable Jon S. Tigar
United States District Judge

- 2 -                                        Case No. 4:24-cv-01132-JST
[PROPOSED] ORDER GRANTING RTZ'S MOTIONS IN LIMINE

70576065.v1

# EXHIBIT "2"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____

)

INTUSCARE INC.,                    )

)

Plaintiff,          )

)

vs.                                ) No. 4:24-cv-1132-JST

)

RTZ ASSOCIATES, INC.; and          )

DOES 1 through 10,                 )

)

Defendants.         )

_____)

VIDEOTAPED DEPOSITION OF MICHAEL ZAWADSKI

San Francisco, California

Monday, February 23, 2026

Volume I

Reported by:

CATHERINE A. NOLASCO, RMR, CRR, BS

CSR No. 8239

Job No. CA 7889273

PAGES 1 - 205

Page 1

A    There's data in a system that follows 10:52:23 prescribed industry norms that don't give up any proprietary work product but do give information to a knowledgeable third party to do a discrete task. That's usually the provenance of an API, in terms of 10:52:46 going through, or a data file that gets created.

Q    So did RTZ, in the '22, '23 time period -- did it have clients that worked with Peak?

A    We did.

Q    And did the information that sat on the 10:53:12 RTZ system -- was that shared with Peak?

A    It was.

Q    And I think you've already previewed this, but how was that shared?

A    There is a data file that was made 10:53:28 available -- I don't know the exact mechanics of the last mile, but there was a data file created for Peak, that Peak had access to, after negotiating what they needed to get, so they could get efficient information.  It was an older data file.  It was not 10:53:41 just in '22.  I don't know the year it was first done.

Q    And what about some of these other companies that we talked, about like Capstone? Did -- same deal with Capstone?

10:53:57

Page 53

A    Capstone had an NDA and a prescribed way

10:53:59

of accessing a discrete set of data.

Q    Do you remember what that was?

A    I don't remember a huge amount of detail,

but they had a very narrow ask regarding how they

10:54:17

analyzed a certain subset of data they needed.

Q    And what about Meridian?

A    We had no interactions with Meridian in

part because they did a parallel thing to us.  So if

you used Meridian's system, I think they also sold

10:54:30

you analysis; but if you didn't use their system, I

don't think they were selling you analysis.

Q    Okay.  So as far as -- are there any

other -- as you sit here today, any other third

parties that were providing services to PACE

10:54:45

entities that needed information from the RTZ system

to provide the services that the PACE entity had

hired them to provide?

A    There were a number of requests for

interfaces, especially as you get into the 2020s and

10:55:04

you start going through; and we set up a process to

evaluate those interfaces, because we got so many

requests and it was hard to keep up with them all.

And so there was a methodology where people would

send a request to interfaces, and they would go

10:55:24

Page 54

through, and we'd try to figure out what we could

10:55:26

do.  But they were really, like -- over time, like, an overwhelming number of requests for people who wanted to interface.

Q    All right.  So just -- can you give me

10:55:36

a -- how many are we talking about here?

A    The number who asked, I don't know, because we really tried to figure out how we could get to the most important by basically going in and trying to figure out, you know, what would be a way

10:55:47

of going through and analyzing what was coming through.

But, like, ones that come immediately to mind are, like, Labcorp and Quest, which were interfaces to work on labs.  And since, you know,

10:55:58

labs and prescriptions are sort of the life blood of a -- you know, a PACE organization, in terms of how they need to talk to the world, those were ones that got top billing, in terms of going through.

Q    And -- but Labcorp and Quest, they

10:56:19

would -- they would need -- were they actually adding data to the system?

A    Yes.

Q    So they would actually need some sort of user interface, correct?

10:56:27

Page 55

A      No, they do it all through API.

10:56:29

Q      Anybody else you can think of?

A      Bronson Medical Group.  There was a imaging group, which I don't remember who it was. There were other record systems, like Athena and

10:56:47

Epic.

Q      And who was responsible for processing those requests at RTZ?

A      There was, over time, basically an interfaces group of people who would get them and

10:57:06

work on them, but, I mean, trying to triage and sort them was always a big task.

Q      So how many -- we've talked about NDAs and these agreements that you -- served part of just any NDA.

10:57:26

Do you have a sense, as you're sitting here, how many NDAs RTZ signed related to information access to the PACECare system?

A      More than a handful seems right.  I don't know the exact number.

10:57:40

Q      So I'm interpreting that as kind of more than five, less than ten type thing?

A      I'm not sure of the number, just because they came in on a rolling basis, and some of the entities would work with multiple single entities

10:57:57

Page 56

and some would not.

10:58:00

I mean, the interfaces were, in and of themselves, a very overwhelming number of requests on them.

Q    So the -- I guess what I'm -- so let's

10:58:09

take the Labcorp one.

So what -- what was the solution?  What did you do?

A    Labcorp had a file format that they gave us.  They had basically structured data, that was in

10:58:23

a classic format, that would go out, and we produced that file, and then they produced a return file, rough cut.

So I was not involved in the day-to-day, but -- and that's more or less the same process for

10:58:42

Quest.

Q    And then that return file would get uploaded into the PACECare system so that it would --

A    Comes back as data.

10:58:52

Q    Okay.  As far as the user -- and I think you called it the user -- experience of the user interface -- who would -- did RTZ provide user access to any third parties that were working with PACE programs?

10:59:23

Page 57

them efficiently.

11:02:44

To do so, you had to create commonality across organizations that was accurate, workflows that were efficient, things that would resonate, different reporting standards, come up with new

11:02:52

variables and new things that would move things along, such as where you put in reports.

That was the work of 20 years, of trying to figure out how to make an organization really function.

11:03:04

Q    So let me make sure I understand.

For each organization that PACECare -- that RTZ was working with and used PACECare, were they all the same across all the platforms or was there a great -- was there a bunch of customization

11:03:22

that was done for each -- each PACE program?

A    Negligible customization, in large part because customization isn't necessarily that friendly, although there is some state variations on reports, there is some settings files where people

11:03:37

can make some adjustments, but the idea was to find uniformity to make a best-of-breed function.

Q    All right.  And -- and so, I guess, what is it that the user is seeing that you -- that you were concerned that somebody like Intus might see?

11:04:11

Page 60

MR. LEE:  Objection.  Asked and answered.

11:04:15

You can answer again.

THE WITNESS:  I mean, really, just everything.  Once you see how someone builds and creates something, you now hyper-speed forward their

11:04:24

development of anything else.  And once you see it, you're not going to unsee it, if you're coming in with a trained eye.

BY MR. WEIR:

Q    But the -- I mean, the product -- every --

11:04:38

every user that you sell this to sees -- sees that interface, right?

A    They see parts of the interface because it's job-specific.

Q    So I'm just trying to get at the -- you

11:04:56

know, where the -- you know, where the sausage making, you know, actually stops and where the, you know, proprietary information that you're describing begins.

So, I mean, what -- you know, there's a --

11:05:13

so there's a layout to the -- to the product, right?

A    Correct.

Q    And what is -- in your view, is there something special about the layout, that if an Intus, for example, saw the layout, that it would

11:05:29

Page 61

just give them this massive leg up in product

11:05:32

development?

A    Yes.

Q    And what is that?  What's -- what's -- what's that specialty?  What is it?

11:05:37

A    It's global.  The entire organizational principle of the system took years to develop.  The individual items that are called out and work done took years to develop.  It's a cumulative set of knowledge, in terms of how it's set up, that shows

11:05:53

progression from the last 20 years of all the updates based on accumulated user feedback, understandings about what people understood and what they didn't.

It's the basis of why SaaS company stocks,

11:06:06

that don't have proper protections, have now gone in half in the last year, because they say, "Go create me a Salesforce," or "Go create me a CrowdStrike," or "Go create me an Adobe."

Once you have seen somebody create

11:06:21

something, the source code, the easy and cheap part to rip off, can be done.  You're just putting it through a Xerox machine.  It's what you Xerox that really is special.

Q    And do you think anybody has, as you put

11:06:40

Page 62

client, in two or three minutes, could create a data

11:09:39

export that Intus -- that would include all the data Intus would need to perform its analytic services?

A    The first time you're going to pick off all these variables.  So the first time is going to

11:09:51

be more than two to three minutes, but subsequent times, you could go in and say, "Run this file," place it on an FTP folder in your organization, and you'd be done.  And I think you could do that in less than five minutes, yes.

11:10:03

Q    There was -- at some point in time, Intus was having their clients -- their mutual clients with RTZ run an automated script over the system to create the output file.

Are you familiar with that?

11:10:24

A    I think there was multiple automated scripts or automated things, so I'm not sure which one you're referencing.

But the one I'm probably most familiar with, if you're in the expanded export world, is

11:10:39

they basically took those two to three minutes the client would have to spend and tried to create a bot to do it, was my understanding.

Q    Okay.  And RTZ had an issue with that?

A    We did have an issue with that.

11:10:55

Page 65

Q       Why?

11:10:57

A       Because it doesn't follow the regular
parameters of a user logging into the system, so it
has some security concerns on it.

Q       What are those security concerns?

11:11:05

A       We don't know what else the bot is doing
as it goes through.

Q       I'm not sure I follow that.
If you have the script, wouldn't you know
exactly what the bot is doing on your system?

11:11:19

A       We didn't have the script.  We just had
found out subsequently what it was doing and what it
was running.  In fact, I think that's a big part of
some of the discovery, is trying to figure out
exactly what it's doing.  So we never knew exactly

11:11:31

what it was doing.

Q       So how does the back end of the sys- --
the RTZ or the PACECare system work?
So can you tell -- Community PACE ran
these ten reports on this time period, and this is

11:11:49

the information they -- they pulled up.
Is that something that RTZ can tell from
its system without actually having to go to
Community PACE to get it?

A       I'm going to answer the question very

11:12:04

Page 66

precisely, not so much that I think it's a tricky

11:12:06

answer, but I just want to make sure we're aligned in our understanding.

The client has an instance of the tool. Many clients put in -- you know, they -- they're

11:12:16

going to use the tools they go through.

Our responsibility is to have security procedures on how that works. Like, don't give away passwords or use them for different things.

When a client uses the tool, their copy of

11:12:34

the system creates an audit log for them that is visible to them. As the sellers of the system, if they asked us to look at their audit log, we would be able to. And if we felt there was an emergent security threat, we have permission to. But we

11:12:54

don't maintain their security log at the user level.

And I hope that was helpful, because it just -- it is a very precise answer, but it's important precision to --

    Q    No, no. And sometimes -- you are more

11:13:07

familiar with the technical aspects of how the system works than I am. So sometimes -- sometimes my language may be imprecise, which is -- so the -- but back to, I guess, my -- my question.

If you had a concern that Intus -- at some

11:13:25

Page 67

on your plate, you're like:  Is this the final-final

12:54:09

that I really respond to, or do I wait for the asks

to evolve?

        Q    What do you recall -- you mentioned some

communications and the ask evolving.

12:54:17

            What do you recall about that?  What

communications?

        A    You know, if you look at this time period,

November of '22, I think we ran into each other.  I

think that's the year of the Seattle PACE

12:54:27

conference, where we talked there.

            This is kind of like you're on, you know,

a circuit, where, you know, when we come into the

PACE world, which was approximately half of my

world, they were one of the topics that was talked

12:54:44

about, and they would come up.

            And it was unclear where they were

ultimately going, so I wanted to talk to David and

say, "When are we at something final that's going to

be enduring, and when is the ask going to change

12:54:55

again?"

            And so there really was this idea:  Is

this the final-final and we dig in, or do we wait

for more evolution of the ask?

            And, indeed, they eventually then switched

12:55:06

Page 95

to try to buy us, in terms of going through.  So the

12:55:07

ask did change again.

Q    Okay.  When was that?

A    When did they try to buy us?

Q    Yeah.

12:55:17

A    That was '23.

It wasn't completely out of the blue.
They, you know, started conversations about
collaboration and partnership in different
directions.

12:55:27

You know, I think, for context, you have
Robbie and Evan, who are young, energetic, and have
one focus going on a hundred miles an hour.  And you
have RTZ, which has a whole lot of clients, a whole
lot of deliverables.  And it's hard to focus that

12:55:49

time to go into it.  And there really was a desire
to figure out how to get closure.

And I really did, you know -- I mean, this
came up in Evan's deposition, too.  I mean, I think
the really ironic part was there was an interest in

12:56:02

getting something done.  We just could never do it
because the ask kept evolving from our side.

And I think their business model and what
they wanted to produce kept evolving, too.  They
were in constant motion of who they were, what they

12:56:13

Page 96

status, can we move this along, we've got clients
14:20:12
who seem very concerned about -- about this --
        A    Well --
        Q    -- anything of that ilk?
        A    I mean, the process was with David and
14:20:22
Chiulli, at that point, to try to go forward with
it.
                And it looks like, from the documents you
provided me today, that we got something back in mid
November on it.
14:20:34
        Q    Well -- but I guess my question is a
little bit different.
                Did you --
        A    Okay.
        Q    Did you -- did you care about the concerns
14:20:40
being raised by Mr. Glenn?
        A    I mean, I think I cared too much about all
these clients and their concerns.  And I mean that
genuinely.
                I mean, they are trying to balance
14:20:53
multiple entities that they have obligations for,
and they're trying to do about 50 different things.
So there's always just this aspect of triaging.  And
you have these -- I mean, the whole concept of PACE
and, by extension, PACECare, is burdened by the fact
14:21:07

Page 142

that you have 200-person health plans that

14:21:10

approximate what Kaiser does.  They provide direct services.  They buy services from the outside world. They run a day center.  They run a clinic.  And yet they have almost no staff and a small footprint.

14:21:21

So PACE is always about one catastrophic item to the next.  I mean, it is why some of them are trying to get bigger and doing a good job of it, but it is really a challenge for the model, especially as it gets more regulated.

14:21:36

Q    The -- all right.  Do you remember talking to --

Is it Mr. Glenn or Dr. Glenn?

A    Mr. Glenn.

Q    Mr. Glenn.

14:21:49

Do you remember -- do you remember talking to him around this time, saying, you know, "Hey, let me follow up on this.  Let me see where we're at. Let me see if I can push this along," anything to that effect?

14:21:59

A    He was calling me with some regularity on different things with their setup, so I had multiple conversations with him.  I don't think this was the highlight of any of these conversations.  Maybe one of them, but, I mean, we talked on a whole bunch of

14:22:10

Page 143

topics a whole bunch of times.

14:22:13

Q    Would he send you emails on those other topics?

A    He probably would.  Definitely on the Labcorp issue.  That was one we went back and forth

14:22:19

on.

And then also, when I was doing an AI project, I remember talking to some of his other staff, like, six months ago.  So, I mean, there was different things that would come up.

14:22:36

Q    But I assume, on this, you didn't reach out to Robbie and say, "Hey, you know, look, we've got a joint client here.  It looks like they have some pretty big issues.  You know, let's move this along, and we've got to get this figured out"?

14:22:47

A    No, because it went to counsel at that point in time.

Q    Did you view it, as of this -- well, you wrote this here.  So your argument is with Intus, not RTZ.

14:22:56

So you viewed this as the ball was in Intus's court?

A    I did.

Q    I mean, did -- did you care, one way -- did you really care, one way or the other, whether

14:23:11

Page 144

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:    03/09/2026

Catherine A. Nolasco, RMR, CRR, BS

CSR No. 8239

Page 202

# EXHIBIT "3"

# Deposition Transcript

Case Number: 4:24-cv-01132-JST

Date: April 8, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# JOHN ROBERT FELTON

# CONFIDENTIAL



Reported by:
JENNIFER L. BERNIER

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

data.  So we built that for them, and they paid us for it.

Q.   And this was obviously after the formation of Intus?

A.   Yes.

Q.   And this was in the time frame of that August to October 2020 and the development of Pop Health?

A.   Correct.

Q.   Okay.  Was PACE Rhode Island, for all intent and purpose, Intus's first customer?

A.   Correct.

Q.   Do you know what EMR they used?

A.   PACElogic and Greenway PrimeSuite.

Q.   Did the Pop Health program that was offered to Rhode Island PACE involve an automated script?

A.   Yes.

Q.   Okay.  So in other words, an automated script was deployed to extract data from the PACElogic system to populate the Pop Health dashboard?

A.   Correct.

Q.   Okay.  How did, to the best of your knowledge, Intus generate the automated script in order to extract the data from PACElogic?

A.   I'm not technical, but I know our engineers built out just scripts to automate the downloading of

information and reports.

Q.   Mindful that you're not necessarily technical in nature, do you have an understanding as to whether or not access to PACElogic would have been required in order to develop those scripts?

A.   Yes.

Q.   Okay.  Are you aware or did you know whether anyone from PACE -- from Intus, yourself included, approached Tabula Rasa to get permission to access PACElogic in order to develop this automated script?

A.   Over the course of a number of years, we had many conversations with Tabula Rasa, and then they signed a data access agreement.

Q.   Which we'll get to.

A.   Yes.

Q.   My question is with respect to the Rhode Island PACE development of Population Health, your first customer.  Had you informed Tabula Rasa that you were accessing the interface of PACElogic in order to develop the automated script?

A.   I don't recall, but it's our perspective and opinion that it's the PACE program's information and data, so they can provide access to that information however they'd like to.

Q.   And is that your understanding as the CEO of

Intus?

A.    Yes.

Q.    Okay.  And so your understanding is that because the electronic health record is maintained in an EMR, a PACE organization is entitled to allow anybody into that EMR?

A.    They're allowed to provide that clinical information to whoever is providing contractually obligated services to -- to them.  I think that's the spirit of the Cures Act.

Q.    Okay, which -- which we'll get to.

But you understand that there's a difference between system user access to an EMR and access to data, right?

MR. WEIR:  Object.  It's vague.

If you understand...

THE WITNESS:  Can you clarify?

BY MR. LEE:

Q.    Sure.  And we'll use PACElogic as an example, Rhode Island, you know, PACE's EMR at the time.  Okay?

You recognize that PACElogic is owned by Tabula Rasa, correct?

A.    Was, is my understanding.

Q.    Was at the time?

A.    Yes.

A.   Yes.

Q.   Okay.  PACECare presumably is one of those systems that IntusCare was presently not able to offer that experience, correct?

A.   Correct.

Q.   Okay.  What other EHR systems was Intus unable to offer that experience?

A.   We were only targeting programs who were on PACElogic, TruChart, and RTZ, and RTZ was the only one that we were not able to integrate with.

Q.   Okay.  But you referenced Epic Systems, eClinicalWorks, and Athenahealth.

A.   Yes.  Epic Systems, eClinicalWorks, and Athenahealth have FHIR APIs.

Q.   And would a FHIR API --

MR. LEE:  FHIR, F-H-I-R.

THE REPORTER:  Thank you.

BY MR. LEE:

Q.   -- API allow for this customer experience?

A.   Yes.  Or HL7 or direct database interfacing, like various means could get to a, quote/unquote, seamless integration.

Q.   How many contracts did Intus have with PACE organizations using Epic's system?

A.   I don't recall.

Q.    Was it more than one?

A.    I don't recall.  I mean, we have a list of clients we could provide which EMRs they were on at that time.

Q.    Okay.  How many clients -- PACE clients that Intus contracted with used eClinicalWorks?

A.    I think over the course of the business, one.

Q.    And was data extracted to Intus's Pop Health system?

A.    I don't think they're a Pop Health client.

Q.    Okay.  Was the Epic Systems PACE organization client a Pop Health client?

A.    We do have -- or we did have Epic Systems clients that were on Pop Health.

Q.    Okay.  And when you say "clients," more than two?

A.    I don't remember the exact number.

Q.    What about Athenahealth?  Did Intus have PACE organization clients using Athenahealth systems?

A.    We currently have PACE organizations using Athena.

Q.    Okay.  What about as of February 3rd, 2023?

A.    I don't recall.

Q.    Do you recall whether or not Intus has access agreements with Epic Systems, eClinicalWorks, or

Athenahealth?

A.   We do not.  But they all have, to my knowledge, public APIs or HL7 interfaces or ways to extract data that are more accessible than PACECare.

Q.   If we go to the next section, growth and opportunity, paragraph 1 states, second or third sentence in:  Currently -- kind of the middle of the first paragraph -- currently, 40 PACE programs use IntusCare's software and services, with four of them using RTZ's PACECare for their EHR data.

Do you see that?

A.   Yes.

Q.   And so as of February 3rd, 2023, Intus only had four PACE organization clients using PACECare, correct?

A.   According to this, yes.

Q.   And presumably, that's a fact that you would have checked before you sent this business case off?

A.   I may have just -- or whoever was drafting this may have just asked how many RTZ clients do we have, and someone responded four.

Q.   You don't have any reason to doubt the accuracy of that, correct?

A.   No, no reason to doubt the accuracy.

Q.   Okay.  Moving on in that first paragraph:

portion states:  For example, IntusCare and TRHC have a data access agreement that allows mutual IntusCare and TRHC customers to seamlessly integrate a program's EHR into IntusCare's service -- services and software.

Do you see that?

A.   Yes.

Q.   Okay.  And so this appears to suggest that the seamless integration that Intus enjoyed with PACElogic or TruChart was by virtue of its agreement, correct?

A.   Yes.

Q.   And is it your understanding that the agreement between Intus and Tabula Rasa for this seamless integration allowed for Intus to have system user access to PACElogic or TruChart?

A.   Yes.

Q.   How did the seamless integration process work for PACElogic and TruChart?

A.   I --

Q.   Just -- just at a high level.

A.   Yeah.  I believe it was supposed to have some, like, more high fidelity integration mechanism, but in the end, they just were fine with the script-based integration.

Q.   Meaning automated script?

A.   Yes.

the exhibit, that's your signature on this agreement, correct?

A.   Yeah.

Q.   Okay.  I just want clarification.  This is the agreement that you had referenced in the business case that we discussed previously, right?

A.   Yes.

Q.   All right.  And I presume that this EHR Data Use and Access Agreement that Intus signed with Tabula Rasa is an agreement that you had reviewed prior to signing this?

A.   Yes.

Q.   Okay.  And at some level, Intus, in approaching RTZ with its business case, was looking to have a similar type -- albeit different, but a similar type of arrangement, correct?

A.   Yes.

Q.   Okay.

A.   To match or exceed.

Q.   Do you recall whether or not, in any discussions that you had with RTZ -- either during the business case discussions or later -- discussing Intus's potential acquisition of RTZ?

A.   Yes.

Q.   Okay.  When did those discussions, to the

go-rounds for you in going through an acquisition discussion, right?

A.   Yes.

Q.   Okay.  And notwithstanding that -- you know, that rather seismic potential, you don't have any memory of discussions or contents of the diligence letter?

A.   Not specifically.

Q.   Okay.

A.   If you have it, I'd be happy to react to it.

Q.   Why were you personally excited by the opportunity of acquiring RTZ?

A.   The ability to do more positive work for the PACE programs.

Q.   Okay.  You go on to write:  Our deal team has adopted the code name "Project Justice League" as RTZ and Intus join forces to create a more sustainable world for PACE.

I've got to ask:  Where did the name Project Justice League come from?

A.   I -- I think it was just a product of two or multiple forces coming together to do good for the world, like it was ultimately, as I wrote there, creating a more sustainable and better world for a program that's so important for seniors across the country.

A.    Of 2024.

Q.    All right.  But you learned about the RTZ rejection of the letter -- I'm sorry -- the indication of interest in 2023, correct?

A.    Yes.

Q.    Okay.  Do you recall having internal discussions outside the presence of counsel at Intus about next steps to take with RTZ after the acquisition discussions had stalled?

A.    I don't recall.

Q.    You don't recall any discussions?

A.    No.  I think we mostly moved on from it, and it was like a client relationship management point from then on out.

Q.    Okay.  At some point, Intus opted to file a complaint with the ONC alleging information blocking, correct?

A.    Correct.

Q.    Okay.  When was the decision to file that complaint made?

A.    I think sometime between when acquisition discussions fell through and the filing of the complaint.

Q.    Okay.  Do you recall having discussions outside the presence of counsel with Intus management

product.

Q.    And by setting up the integration, you mean the deployment of the automated script?

A.    Yes.

Q.    Do you know how you got this particular link? Is this something that you asked for personally?

A.    I don't recall.

Q.    Okay.  Do you recall having any discussions with any PACE program clients wherein you were asking for their URLs?

A.    I don't recall.  And that really wasn't my responsibility.

Q.    Okay.  But I mean, in this particular instance, it certainly seemed to be something that you were forwarding to your colleague, right?

A.    Yeah.  I mean, specifically the Senior Care Partners, I had a relationship with their leadership team.

Q.    Were you ever issued account credentials to PACECare?

A.    Me personally?

Q.    Yes.

A.    Possibly.

Q.    Okay.  Do you recall instances in which you personally accessed PACECare?

A.   No.  I wouldn't have accessed PACECare.  I would have given the credentials to our team.

Q.   Okay.  And so, in other words, credentials that you would have gotten would have just been provided to others who would then use that access to -- or use those login credentials to access PACECare?

A.   If I was provisioned credentials, our engineering team would set up the automated script to -- through the credentials.

Q.   Okay.

A.   But I don't recall a specific instance where my name and last name was utilized.  It could have been, but I don't remember specifically.

Q.   Okay.  But in any event, you don't recall any instances where you actually accessed PACECare and navigated the user interface?

A.   Yeah, on both nontechnical and nonclinical.  So I was not the person logging in.

MR. LEE:  Okay.

(Deposition Exhibit 123 was marked for identification.)

THE REPORTER:  Exhibit 123.

BY MR. LEE:

Q.   Mr. Felton, you've been handed Exhibit 123, which is an email thread between you and

C E R T I F I C A T E

I, JENNIFER L. BERNIER, CSR, RMR, CRR, a Certified Shorthand Reporter for the State of Illinois, do hereby certify:

That JOHN ROBERT FELTON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this April 20, 2026.

_____

JENNIFER L. BERNIER, CSR, RMR, CRR

Certified Shorthand Reporter

Registered Merit Reporter

Certified Realtime Reporter

Illinois CSR No. 084.004190

# EXHIBIT "4"

# Deposition Transcript

Case Number: 4:24-CV-01132-JST
Date: March 16, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# Evan Walters

Reported by:
Cindy C. Jenkins



CERTIFIED COPY

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q.    (By Mr. Lee) What were you looking at to answer that question?

A.    I was going to look at the specification of the pipeline.

Q.    And what is the specification of a pipeline?

A.    This is just the configuration that defines what it does.

Q.    When you say "the configuration that defines what it does," you're talking about the configuration of the automated script?

A.    Yeah.  I'm sorry.  I was second-guessing myself.  We are no longer accessing PACECare.

Q.    And when did, to the best of your knowledge, that access cease?

A.    I would -- I can't give you a date.

Q.    Okay.  Can you give me a year?

A.    That would have been 2025.

Q.    And what was the reason for which Intus stopped accessing PACECare?

A.    Let's see.  I'm trying to think which -- the last organization we had access

to was -- yeah, I don't remember the specifics.  But the way that we access it was no longer available to us.

Q.    What way are you describing or referencing?

A.    Using customer credentials.

Q.    And when you say "using customer credentials," are you referring to using the credentials of a PACE organization's employees' credentials?  Or are you talking about a PACE organization issuing PACECare credentials to Intus?

A.    Using a customer's -- a customer's employee's credentials.  Since RTZ was no longer allowing us to access via an account provision specifically for us, we got access to the data that our customers were authorizing us to access using one of their credentials.

Q.    Have you heard of the term within Intus, "reintegration"?

A.    Yes.

Q.    What does reintegration mean to you?

A.    In the case where we, you know,

or not the automated script was first deployed in 2021 or 2022.  I think you said that the timeframes might be a little bit blurry.  If you wanted to find out when Intus's automated script was first used, how would you find that out?

A.     I mean, I'd look at the -- the -- our version control system to see when we first put the pipeline configuration in place.

Q.     And what is a version control system?

A.     It's a tool that software engineers use to track changes to their code base over time.

Q.     Does it also track the use of those code base systems?

A.     No.  The use would have -- you know, a more direct artifact of the use of the code would have been -- would be logs, but we don't have logs for that far back.

Q.     All right.  So -- and I'll come back to that in a moment.  So if you wanted to find out when the automated script was completed and first deployed, you would go to

the version control system?

A.    Yeah.  The reason I say that now is because I know that access logs are no longer available.

Q.    Okay.  What do you mean that "access logs are no longer available"?

A.    So it's standard practice in software engineering to generate an artifact of the execution of some process that can be used by engineers to debug issues, to understand what their system is doing.  But it's also standard practice to only retain those logs for a sensible period of time.  It doesn't make sense to keep access logs from ten years ago because they won't help us debug the system now.  So really it's only relevant to keep access logs for, you know, months instead of years.

Q.    Okay.  I want to make sure I'm understanding.

What does an access log, log?

A.    It could log a variety of things.  You know, it could be -- you know, it could log just the errors, for example, if there's something that's gone wrong with the

this action; correct?

A.    That's right.

Q.    Okay.  And that was a log that you developed by mining the storage files in order to get an understanding as to when files may have been downloaded?

A.    That's right.

Q.    Okay.  I presume that, in the development of that log, you had an occasion to review the system logs that you say have been purged?

A.    No.  No.  You're saying -- you're asking wouldn't I have needed to review the access logs to determine that I needed this alternative method?

Q.    Well, I guess, yes.  I'll ask you your question.

A.    The answer is, no, I didn't need to do that.

Q.    Well, why wouldn't you just go to the access logs first as opposed to not even looking at the access logs and instead embarking on this -- what I understood was the alternate method of looking at the storage

files?

A.      And the reason for that is that the system that orchestrates access had been completely torn down and rebuilt.  So I knew for a fact that they didn't exist.

Q.      And when was that system torn down and rebuilt?

A.      That was the end of -- yeah, it must have been the beginning of 2025, end of 2024.  I don't know specifically.

Q.      Okay.  Are you aware of whether or not you were ever instructed not to have access logs purged?

A.      No.

Q.      Have you ever heard of a litigation hold?

A.      No.

Q.      A litigation hold is a directive to retain information about matters related to a pending or threatened litigation.

Have you ever been told about a litigation hold?

A.      No.

Q.      Are you the one who was responsible for the purging of the access

expected, we would have access to the access logs or behaving -- where behaving as expected means, it's building a historical record of our access to all external systems. And that's the qualification that I was trying to give, is that, likely that's not true. That for it to behave in a way that you need in order to provide this historical record, well, it would have to be doing something that it's not doing.

Q. Okay. I don't mean to quibble with words here. I'm not understanding your response.

My understanding is that, you didn't have access -- my understanding of your testimony is that you didn't have access to the access logs because the data didn't go back that far because of the tearing down and rebuilding process that you described. As a result, you had to go an alternate route, which was to review storage files in order to try and reconstruct information from files that had been downloaded; am I correct so far?

A. Yes, that's right.

Q. All right. So if you had the

legacy access logs and they were, to your words, acting properly, the login information by Intus into PACECare could have been gleaned from those access logs; correct?

A.    So if we had access logs, we could have -- we could have gotten the information that you wanted from them, but we didn't have access logs.

Q.    Right.  You didn't have access logs because that depository of information was essentially eliminated when you moved to the new system?

A.    Right.  It was no longer -- we only use it for debugging.  And so when we -- when we, you know, moved to our new platform, it didn't make sense to retain it.

Q.    And that move occurred in 2025?

MR. WEIR:  Objection, misstates the testimony.

THE WITNESS:  I don't remember specifically when.  I can give an approximate time, but...

Q.    (By Mr. Lee) Please give me the approximate time.

A.    It must have been before I went

easiest would be -- you know, I think, the customer success team has an airflow table. That might be the simplest way to see who's using what.

Q.    Does the data team maintain records on that?

A.    Yes.  We have the configuration of our pipeline, which would contain that information as well.

Q.    At this point in time, mindful of your testimony that Intus no longer access PACECare, what other EHRs does Intus access for purposes of its PopHealth program?

A.    TruChart and PACELogic.

Q.    Any others?

A.    Well, we have our direct integration with Elation.  And that's it.

Q.    Is the direct integration with Elation related to the CareHub product?

A.    Yes.

Q.    So on the PopHealth side, are there any other EHRs that Intus accessed beyond TruChart and PACELogic?

A.    Not currently, no.

Q.    All right.  I'm going to introduce

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

Do you see that?

A.    Yes.

Q.    Okay.  And it has, again, the URL with the pacecare.com domain.  And under that it says, username: Ewalters.  Do you see that?

A.    Yes.

Q.    I presume that's referring to you?

A.    Yes.

Q.    Okay.  And so a user account was set up for you; correct?

A.    That's right.

Q.    Okay.  Do you recall whether you personally used that user account?

A.    Yes, I did.

Q.    Okay.  Did others also use that user account besides you?

A.    Yes, those who are authorized to use it.

Q.    And who was authorized to use it?

A.    I couldn't give the list of people who are authorized.

Q.    And why is that?

A.    I don't remember it.

Q.    Is it memorialized anywhere?

A.    No.

Q.    I think I know the answer to this, but I'll ask just to tie a bow on it.  Why would you be accessing Beacon Care's PACECare account?

A.    So our customer, Beacon of Life, authorized us to access it in order to pull their data.

Q.    And when you say "pull their data," you're talking about deploying the automated script that would create the automated data pipeline?

A.    That's right.

Q.    If we go down to the third one, Senior Care Partners PACE, the username is rfelton.  Do you have an understanding as to whether that refers to Robbie Felton?

A.    Yes, that refers to Robbie Felton.

Q.    Okay.  Why would Robbie Felton, to the best of your knowledge, be issued user accounts?

A.    So it was -- it was common practice for all of our customers, really, to provision access to someone, whoever the -- maybe first contact or, you know, whoever it

made sense for them to provision an account for. And then that account became our access point. And then access -- you know, access to that -- those credentials was authorized based on who needed access and who was authorized to have access.

Q. And when you say "authorized," you mean authorized internally within Intus?

A. Authorized by our customers.

Q. So I want to make sure I'm understanding. So the customers would issue a user account, in this instance, in the name of R. Felton, and then say others, in addition to R. Felton or Robbie Felton, are authorized to access our account?

A. That's right. Their understanding was that this account would be used by our automated pipeline, as well as anyone who needed it in order to set up this integration, or anyone else who needed access to the data, like, someone who's working for consulting services.

Q. And the use of, in this particular instance, the R. Felton account would give the user access to the interface; correct?

us in the direction of it.  And then once we've found it, we'd update our scripts.

Q.   Would Intus, you know, either you or one of your team members access PACECare in order to understand the extraction method for that particular piece of data?

A.   Yes, that was necessary and the expected use.  Rather, that was the expectation of our customer.

Q.   Do you know whether Intus has developed automated scripts for other EHRs?

A.   We have, yes.

Q.   Which other EHRs?

A.   PACELogic and TruChart.

Q.   Any others beyond those two?

A.   No, no others.  We have -- we're talking about Web driving; right?

Q.   Yes.

A.   No, no others.

Q.   Does Intus have other extraction methods that it uses with other EHRs besides Web driving?

A.   Well, we talked about FHIR integrations, which we had -- you know, we had attempted to integrate with a client

A.    All right.  I'm looking at it.

Q.    Okay.  And she responds, "We actually have a credential issuance section built into our platform."  Do you see that?

A.    Uh-huh, yes.

Q.    Okay.  Was the credential issuance section something that had been developed in response to RTZ's NDA request?

A.    So, you know, I'm working on denting my -- I didn't spend any time developing on the PopHealth app.

Q.    Okay.  Whether you did or not, do you have an understanding as to whether or not this particular feature, this credential issuance section was added to the PopHealth app in response to RTZ's request and requirement of an NDA?

A.    Yeah, I think it's -- it's -- it's -- this is a value-add for all of our customers.  As you've shown through some of the other e-mails, they will -- you know, there's some -- they're a little bit loose in how they are sharing credentials.  And so this is -- this is a secure way for them to share credentials.

Q. Okay. She's -- he goes on to write, "When you log into IntusCare, go to settings, and you will see an EHR connection info section. You simply input your EMR login credentials there, and it will securely allow our data team to access the relevant reports for integration." Do you see that?

A. Yes.

Q. Okay. And so I read that as kind of a resumption of the automated script process that results from this set of directions; correct?

A. Yes.

Q. In other words, the PACE organization enters its PACECare login credentials into Intus's system to reactivate the automated data pipeline; right?

A. That's right. Or this -- this -- these credentials will be used by the automated process.

Q. Got it. And then, as she states -- Ms. Banerjee states, "Through that process, the Intus data" -- "data team can then access the relevant reports;" correct?

A. Yes.

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of Alabama, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.     DATED:      3/16/2026

_____

Cynthia C. Jenkins, 470

# EXHIBIT "5"

# Deposition Transcript

Case Number: 4:24-cv-01132-JST
Date: May 25, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# SHAWN FLEURY



**CERTIFIED COPY**

Reported by:
MIKEN M. COBBS

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

source code, system logic/functionality, screen layout design, and documents/forms/reports.  Client agrees that it will not seek to reverse engineer PACECare or provide, and will expressly inform staff not to provide, (a) account credentials or other form of access to PACECare."

Do you see that?

A    I do.

Q    Under your understanding, and your apparent ability to interpret contracts, is that a prohibition imposed by RTZ against allowing its customers to provision account log-in credentials to third parties?

A    Based on this language, yes.

Q    As an expert in cybersecurity, is it your opinion that a software developer operates outside of industry norms if they can contractually restrict third-party access to a proprietary software system?

A    I think it's gray, meaning I've seen many different agreements, and some software vendors are more permissive from a contractual standpoint, and some aren't.  There's no one size fits all.

Q    So, again, my question just focuses, to the extent you're able to answer it, on industry norms.

Is RTZ acting outside of industry norms if it

Q    Are you familiar with that rule's requirement for unique user identification?

A    Yes.

Q    And what does that mean to you?

A    That, from a logging prospective, unique accounts be created for each user so that you can log activity.

Q    And so, I think you've said this.  You agree that the provision requires that each user be assigned a unique name and/or number for identifying and tracking user identity, correct?

A    Name or number sounds right.  I don't have the security rule up in front of me, but yes, it sounds accurate.

Q    Okay.  Are you aware that Intus obtained log-in credentials directly from the PACE facilities and then used those shared credentials to access PACECare?

A    I know that there are claims of shared use of credentials, yes.

Q    Are you aware that Intus's own executives testified that credential sharing was a common practice, quote, common practice within Intus's operations?

A    I don't know if I read that part of the

deposition or not.  If you want to pull it up.

Q    Well, it's part of Evan Walter's deposition.

Is that one that you read?

A    I do not read his whole deposition.  I read parts of his deposition.

Q    Okay.  Let's assume, for the sake of this question, that Intus has, in fact, conceded that credential sharing was a, quote, common practice, closed quote, within Intus's operations.

In your view, is that in keeping with HIPAA security rule?

A    No.  Look, from a HIPAA security role, they want -- or they require the enforcement of unique user identification.

Q    And so, do I understand your answer to be that, assuming that Intus, as a common practice, shared log-in credentials, that would be something, again, in your cybersecurity expert opinion, as being in violation of the HIPAA security rule, correct?

MR. BESHAI:  Objection.  Calls for legal conclusion.  Incomplete hypothetical.

A    The HIPAA security rule requires unique passwords or users -- user ID.  So, I would say, to the extent that shared credentials were being leveraged, it definitely is not best practice.  Could be a violation,

depending on was it a system?  Was it a user?  I think there's components there.

I also think there's ways to address it very quickly once shared accounts -- the use of shared accounts is identified to move beyond shared accounts to make sure that there's always unique user accounts.

BY MR. LEE:

Q    Are you aware that Mr. Felton testified in deposition that he would give credentials, quote, to the team, closed quote, rather than accessing the system himself?

A    I think that falls in line with potential use of shared credentials.

Q    Would you agree that sharing credentials among multiple unnamed users undermines the ability to monitor, attribute, or audit user activity?

A    It can, yes.

Q    As part of your document review, were you aware that senior care partners director of risk management stated to Intus, quote, we are not comfortable using a current stack credentials to log in for other purposes, this can create compliance issues and put Tim, parentheses, or other staff members at risk?

A    Is that the same email, the follow up?  I

don't know if it is or not, but is it the same email that follows up --

MR. LEE:   Uh-oh.   Did we lose him?   Boy, it's him and me.

MR. BESHAI:   Yeah, you guys are just committed to prolonging today, aren't you?

MR. LEE:   I know.

THE WITNESS:   I'm sorry this time.

So, I'm back.   I did hear your question.

MR. LEE:   Yeah.   Go ahead and answer.

A    I believe that's the same email, and correct me if I'm wrong, where the follow up to that response was Mr. Rothberg, or others, saying, let's go -- or the individual saying let's explore other options for doing that.

Was that the same email, or same document, or was that a separate document where that conversation occurred?

BY MR. LEE:

Q    As I sit here, I'm not sure which email you're referencing.  I'm just referring to the SCP email in which they express a concern about the use of log-in credentials for other purposes?

A    I think raising a concern is important for any relationship, but I also believe there's at least

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time set forth; that the witness in the foregoing proceedings, prior to testifying, was administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, a review of the transcript (  ) was (  ) was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  06/10/2026


_____

MIKEN M. COBBS

CSR NO. 10702

# EXHIBIT "6"

 IntusCare

**Intus Care - RTZ**
**"Data Access" Business Case**

## I.  Introduction

Intus Care is a healthcare analytics platform that synthesizes healthcare data to identify risks, visualize trends, and optimize patient care for managed care programs.  Intus Care looks forward to demoing its software and presenting its 2023 plans to RTZ.  In advance, please find the following "Intus Care – RTZ Data Access Business Case" for RTZ's consideration.  Though Intus Care offers services outside of the PACE technology market, this business case is PACE focused.   Intus Care reserves all rights.

## II.  PACE Programs

Intus Care acts as a business associate of numerous PACE programs.  It ingests data from the program's electronic health records ("EHR") and other relevant sources to provide its services and populate data dashboards for the programs.  The program's EHRs are housed in EHR systems including RTZ System's ("RTZ") PACECare and Tabula Rasa Health Care's ("TRHC") PACElogic and/or TruChart, as well as EPIC Systems, EClinicalWorks, and AthenaHealth.

Intus Care provides (or seeks to provide) a customer experience in which each PACE program's EHRs are seamlessly integrated into Intus Care's services and software without any additional or manual effort by a PACE program or its administrators. Intus Care is presently able to offer such an experience in some but not all instances depending on the EHR system and/or vendor.

### a.  Growth and Opportunity

Intus Care has seen substantial growth in the PACE technology market over the past year.  It is poised to further expand its footprint in the PACE technology market by serving more PACE programs and offering additional services.  Currently, 40 PACE programs use Intus Care's software and services, with 4 of them using RTZ's PACECare for their EHR data. Intus Care projects that 30 additional programs, not currently using RTZ's PACECare, will sign with them in 2023.  This presents a significant opportunity and potential for collaboration between the two companies RTZ and Intus Care.

By collaborating with Intus Care, RTZ would be able to (1) match or exceed offerings of other EHR providers like TRHC, EPIC Systems, EClinicalWorks, and AthenaHealth; (2) expand its customer base, revenues, and market exposure; (3) receive direct payment from Intus Care; and (4) maintain and improve client relationships. Specifically:

1. *Match or Exceed other EHR Systems*: Intus Care can integrate with most EHR systems and companies (e.g., TRHC, EPIC Systems, EClinicalWorks, and AthenaHealth) to fluidly access EHR data, but not RTZ. Intus Care desires to offer the seamless data integration irrespective of the EHR system or company, avoiding outliers.

    a. For example, Intus Care and TRHC have a data access agreement that allows mutual Intus Care and TRHC customers to seamlessly integrate a program's EHR into Intus Care's services and software. TRHC has no equity in or shareholder relationship with Intus Care, nor has either been prospected or proposed.

RTZ0000807



**Intus Care - RTZ**
**"Data Access" Business Case**

2. ***Expanded Customer Base and Revenues:*** Intus Care is positioned to promote RTZ as a "preferred" EHR vendor and/or partner including to an additional 70+ potential PACE programs, resulting in increased market exposure, customer base, and revenues for RTZ.

   a. For example, current market dynamics have caused numerous PACE programs to seek transitions to new EHR systems. The ability to integrate with Intus Care can positively influence these programs towards transitioning to RTZ's PACECare, presenting the opportunity for RTZ to obtain additional customers and revenues.

3. ***Direct Payment:*** Intus Care is willing pay RTZ $2 PMPM in direct payment for all mutual Intus Care and RTZ customers, governed by "data access" agreement allowing for streamlined data integration between Intus Care and RTZ.

4. ***Positive Client Relationship Management:*** Mutual customers (i.e., PACE programs) of Intus Care and RTZ are required to have program employees manually download EHR data per RTZ's direction, resulting in frustration and regular inquiry from the program's administrators regarding collaboration between Intus Care and RTZ. Intus Care looks forward to the opportunity to positively convey and promote collaboration with RTZ to current and prospective customers.

RTZ0000808

# EXHIBIT "7"



## Formal Indication of Interest

RF  RobbieFelton<robbie@intus.care>

To: mike@rtzassociates.com

Cc: Mace Wolf <mace.wolf@intus.care>

Mon 7/24/2023 7:12 PM

! High importance

Some content in this message has been blocked because the sender isn't in your Safe senders list.    Trust sender    Show blocked content

Indication of Interest (Project... ∨
107 KB

Hello Mike,

I hope you are well.

Thank you for your time and effort coordinating with Mace thus far.

We are excited by this opportunity and our board appreciated the content of your diligence letter. Our deal team has adopted the codename Project Justice League as RTZ and Intus join forces to create a more sustainable world for PACE.

Please see the attached official indication of interest outlining deal value, timing, and some conditions for closing. If this is agreeable to you, we can queue up signatures and get some time scheduled to cover next steps as we'll need to be efficient to have a chance to set this in motion before NPA.

Looking forward to moving forward and seeing you in-person in the Bay Area.

Best,
Robbie Felton

**Robbie Felton**
Founder/CEO

734-604-5758

intuscare.com

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (734-604-5758), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

CONFIDENTIAL

RTZ0008384

 Outlook

---

## Formal Indication of Interest

---

**From** Robbie Felton <robbie@intus.care>

**Date** Mon 7/24/2023 7:12 PM

**To** mike@rtzassociates.com <mike@rtzassociates.com>

**Cc** Mace Wolf <mace.wolf@intus.care>

---

📎 1 attachment (107 KB)

Indication of Interest (Project Justice League).pdf;

Hello Mike,

I hope you are well.

Thank you for your time and effort coordinating with Mace thus far.

We are excited by this opportunity and our board appreciated the content of your diligence letter. Our deal team has adopted the codename Project Justice League as RTZ and Intus join forces to create a more sustainable world for PACE.

Please see the attached official indication of interest outlining deal value, timing, and some conditions for closing. If this is agreeable to you, we can queue up signatures and get some time scheduled to cover next steps as we'll need to be efficient to have a chance to set this in motion before NPA.

Looking forward to moving forward and seeing you in-person in the Bay Area.

Best,
Robbie Felton

**Robbie Felton**
Founder/CEO

734-604-5758

intuscare.com

---

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (734-604-5758), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R.,

CONFIDENTIAL RTZ0008385

Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

CONFIDENTIAL

RTZ0008386

**DRAFT**
**PROJECT JUSTICE LEAGUE: INDICATION OF INTEREST**

Dear Mr. Zawadski:

We hereby submit this formal and non-binding Indication of Interest (the "IOI") to acquire 100% of the equity of Justice League ("Justice" or the "Company"). This proposal is contingent upon the completion of a comprehensive due diligence review, negotiation of a mutually acceptable definitive Purchase Agreement and receipt of all necessary approvals.

1. <u>Proposed Purchase Price</u>: The proposed purchase price for the Transaction is estimated to range between $38 million and $45 million, with a cash component of $25 million to $30 million. The balance of the purchase price would be comprised of debt and/or equity securities.

2. <u>Closing Conditions</u>: The successful completion of the Transaction is subject to various conditions, including but not limited to:

    a. Completion of financial, business, tax, accounting, technical, and legal due diligence examination by the Purchaser. The results of these examinations must be satisfactory to the Purchaser.
    b. Delivery of a Quality of Earnings report, to be facilitated by the Purchaser.
    c. Successful negotiation of mutually acceptable employment contracts for key personnel of Justice.
    d. Negotiation, execution, and delivery of a mutually acceptable Purchase Agreement by all involved parties.
    e. Final approval by the Board of Directors of the Purchaser upon reaching a mutually acceptable Purchase Agreement.

3. <u>Due Diligence</u>: The Purchaser, along with its advisors, have initiated the due diligence process. The Purchaser believes that the remaining diligence requests can be completed within 45 days.

4. <u>Exclusivity</u>: Until the Purchase Agreement is finalized, or until the earlier of 60 days. Justice agrees to refrain from considering or engaging in discussions related to alternative Acquisition Proposals.

5. <u>Confidentiality</u>: All discussions and documents relating to the Transaction shall be considered confidential in accordance with the Non-Disclosure Agreement executed by the parties on July 17th, 2023.

6. <u>Validity and Enforceability of the IOI</u>: This IOI is valid until midnight, Eastern Time, on August 2nd, 2023. If not countersigned and returned by this date, this IOI will terminate. This IOI is non-binding and does not create any legal obligations, except for the provisions outlined in sections 5 and 6, which shall be legally binding upon execution of this IOI.

CONFIDENTIAL                                                                 RTZ0008387

7. <u>Contact Information</u>: For any further queries related to this IOI, please feel free to contact Robbie Felton or Brian McCarthy at the respective contact details provided below:

Robbie Felton
Chief Executive Officer
Intus Care, Inc.
(734) 604-5758
robbie@intus.care

Brian McCarthy
M&A Advisor
BMC Health Partners
(917) 837-9361
brian@bmchealthpartners.com

We look forward to furthering discussions on this opportunity. If the terms listed in this document are agreeable, please provide your signature below. Should you have any queries or require additional information, please do not hesitate to get in touch with us.

Yours sincerely,

*R. Felton*

Robbie Felton
Chief Executive Officer
(734) 605-5758
robbie@intus.care

<u>Countersignature:</u>

By: _____

Name:

Title:

# EXHIBIT "8"

| From: | Michael Zawadski |
|---|---|
| Sent: | Thursday, May 13, 2021 4:25 PM EDT |
| To: | Alex |
| CC: | Laura Emery; Alex Lueth; Evan Jackson; Nicole Holmes; Carinna Sias (carinna@rtzassociates.com); Melanie Martinez; Reagan Parker; Tim Cooper; interfaces@rtzassociates.com |
| Subject: | Re: Intus Care & SCPP RTZ Integration |

Alex,

If the week of the 24th is best for you would you have 12:30PM EST available on the 26th? Let me know and I can send an invite.

Take care,

**Michael Zawadski, JD**  Corporate Office | 510.986.8700

**President**



On Thu, May 13, 2021 at 1:21 PM Alex <alex@intus.care> wrote:

Hello Laura,

I am not sure that we have effectively communicated the nature of the relationship. As a starting off point, we would like *read-only* access to your system. We provide additional analytics to SCP, and in order to do this we need to extract patient information from your system. You will not be consuming any service or API that we use. The business relationship is one where we would consume your information, via API or otherwise to populate our system. For this reason, I am not sure what that sample file from us would look like. We are prepared to build data transformation layers into our system to interpret information in whatever format you publish it, although of course the modern standard protocols are easiest. For this reason, all we need to know is how to get access, and ideally what the structures and promises of your data output are, again depending on protocol.

With this, please let us know if there is anything additionally required from us given the nature of the relationship. Let's move forward with setting up a call to discuss enabling us read-only access to SCP via your system. My team has wide availability the week of May 24th if there are a couple of times that work for you to propose.

Thank you,

**Alex Rothberg**

Founder/CTO

Intus Care, Inc.

CONFIDENTIAL

Intus 001464



---

**From:** Laura Emery <laura@rtzassociates.com>
**Date:** Wednesday, May 12, 2021 at 8:43 AM
**To:** Alex Lueth <A.Lueth@seniorcarepartnersmi.org>
**Cc:** Evan Jackson <evan@intus.care>, "alex@intus.care" <alex@intus.care>, Nicole Holmes <N.Holmes@seniorcarepartnersmi.org>, "Carinna Sias (carinna@rtzassociates.com)" <carinna@rtzassociates.com>, Melanie Martinez <melanie@rtzassociates.com>, Reagan Parker <reagan@rtzassociates.com>, Tim Cooper <t.cooper@seniorcarepartnersmi.org>, "interfaces@rtzassociates.com" <interfaces@rtzassociates.com>
**Subject:** Re: Intus Care & SCPP RTZ Integration


Alex,


Thanks for checking back. We have reviewed the initial information provided (by Alex at Intus) which outlines the information in the file but did not see the detailed specification (API information, sample file, transmission information, etc.) referenced earlier on the thread. For Evan or Alex at Intus, if you can please send / resend that information that would be great.


At this point, we don't have any questions on what was shared. We are happy to set up a call to discuss the details of the transmission and if we can review a sample file and any other standard information you have available in advance of that call, that would be great. Please let us know if you have any questions.


Take care,

Laura

--

**CONFIDENTIAL**

**Intus 001465**

**Laura Emery**



On Wed, May 12, 2021 at 4:51 AM Alex Lueth <A.Lueth@seniorcarepartnersmi.org> wrote:

Hi Evan!  Has there been any movement on this?

Alex

**From:** Evan Jackson <evan@intus.care>
**Sent:** Wednesday, May 5, 2021 12:15 PM
**To:** Alex <alex@intus.care>; Laura Emery <laura@rtzassociates.com>
**Cc:** Nicole Holmes <N.Holmes@seniorcarepartnersmi.org>; Alex Lueth <A.Lueth@seniorcarepartnersmi.org>; Carinna Sias (carinna@rtzassociates.com) <carinna@rtzassociates.com>; Melanie Martinez <melanie@rtzassociates.com>; Reagan Parker <reagan@rtzassociates.com>; Tim Cooper <t.cooper@seniorcarepartnersmi.org>; interfaces@rtzassociates.com
**Subject:** Re: Intus Care & SCPP RTZ Integration

Good afternoon,

Following up on our previous email.

Please let us know what the next steps are in securing access in order to make this transition as seamless as possible for Senior Care Partners. Thanks! Please advise.

CONFIDENTIAL

**Intus 001466**

Best,

Evan

∎

---

**From:** Alex <alex@intus.care>
**Sent:** Monday, April 26, 2021 7:27 PM
**To:** Laura Emery <laura@rtzassociates.com>; Evan Jackson <evan@intus.care>
**Cc:** Nicole Holmes <N.Holmes@seniorcarepartnersmi.org>; Alex Lueth <A.Lueth@seniorcarepartnersmi.org>; Carinna Sias (carinna@rtzassociates.com) <carinna@rtzassociates.com>; Melanie Martinez <melanie@rtzassociates.com>; Reagan Parker <reagan@rtzassociates.com>; Tim Cooper <t.cooper@seniorcarepartnersmi.org>; interfaces@rtzassociates.com <interfaces@rtzassociates.com>
**Subject:** Re: Intus Care & SCPP RTZ Integration

Hello All,

I am so excited to be working with you all at RTZ, and appreciate your assistance with this integration to provide a seamless and
easy transition process for SCP with respect to our system. Below is a full spec of information that Intus Care pulls out of the
partner's EHR system. I hope that this will provide a sufficient backdrop for a more in depth technical conversation about how you are most comfortable with providing regular access to the information. In order to reduce burden on our client's EHR systems (you), and to ensure uptime, our solution stores all of the information in our own databases. Our requirements with respect to your system require the ability to pull the following information ranging from once weekly to once daily in an automated way, at a time that can be configured so as not to load your system (such as 2am when client traffic is low.)

Patient:
        Name, Medicare ID, Medicaid ID, Race, Address, Living Situation, Birthday, Enrollment Status, Diagnosis Codes (ICD-10), Care Team, Care
        Facility, Careplan, Gender, Medications, Disenrollment Reason, MemberId

Utilization:
        All incident data including Falls, Burns, Infections, General
                - time occurred, time discovered, reported by, patient, location, severity, etc
        All admissions including Inpatient, SNF,ALF, ER, etc.

CONFIDENTIAL

Intus 001467

- start date, end date, principalDX, admittingDX, facility name, admission type, discharge status, etc.

Please let us know what next steps are in securing access; we are looking forward to working with your team.

**Alex Rothberg**

Founder/CTO

Intus Care, Inc.

 IntusCare

**From:** Laura Emery <laura@rtzassociates.com>
**Date:** Friday, April 23, 2021 at 1:13 PM
**To:** Evan Jackson <evan@intus.care>
**Cc:** Nicole Holmes <N.Holmes@seniorcarepartnersmi.org>, Alex Lueth <A.Lueth@seniorcarepartnersmi.org>, "Carinna Sias (carinna@rtzassociates.com)" <carinna@rtzassociates.com>, Melanie Martinez <melanie@rtzassociates.com>, Reagan Parker <reagan@rtzassociates.com>, Tim Cooper <t.cooper@seniorcarepartnersmi.org>, "alex@intus.care" <alex@intus.care>, "interfaces@rtzassociates.com" <interfaces@rtzassociates.com>
**Subject:** Re: Intus Care & SCPP RTZ Integration

Evan,

Thanks for your note and glad to meet virtually as well. I've added interfaces@rtzassociates to this thread, please include them when you forward your API information. This email lists includes the team members that will be reviewing the API and we will follow-up as we have any additional questions.

**CONFIDENTIAL**

**Intus 001468**

Take care,

Laura

--

**Laura Emery** | corporate office | 510.936.6700

Error! Filename not specified.

On Fri, Apr 23, 2021 at 10:07 AM Evan Jackson <evan@intus.care> wrote:

Thank you for making the connection Alex,

It's a pleasure to virtually meet you all! Glad to help assist in this process.

I am CC'ing our CTO, Alex Rothberg, who will be sending over our API specifications document. Thanks and Happy Friday!

Best,

Evan

Error! Filename not specified.

_____

CONFIDENTIAL

Intus 001469

**From:** Nicole Holmes <N.Holmes@seniorcarepartnersmi.org>
**Sent:** Friday, April 23, 2021 11:08 AM
**To:** Alex Lueth <A.Lueth@seniorcarepartnersmi.org>; Laura Emery <laura@rtzassociates.com>; Evan Jackson <evan@intus.care>; Carinna Sias (carinna@rtzassociates.com) <carinna@rtzassociates.com>; Melanie Martinez <melanie@rtzassociates.com>; Reagan Parker <reagan@rtzassociates.com>
**Cc:** Tim Cooper <t.cooper@seniorcarepartnersmi.org>
**Subject:** RE: Intus Care & SCPP RTZ Integration

Please let me know what is needed ☺

All the best,

*Nicole Holmes,* NHA

**From:** Alex Lueth <A.Lueth@seniorcarepartnersmi.org>
**Sent:** Friday, April 23, 2021 11:47 AM
**To:** Laura Emery <laura@rtzassociates.com>; Evan Jackson <evan@intus.care>; Carinna Sias (carinna@rtzassociates.com) <carinna@rtzassociates.com>; Melanie Martinez <melanie@rtzassociates.com>; Reagan Parker <reagan@rtzassociates.com>
**Cc:** Nicole Holmes <N.Holmes@seniorcarepartnersmi.org>; Tim Cooper <t.cooper@seniorcarepartnersmi.org>
**Subject:** Intus Care & SCPP RTZ Integration

Happy Friday!

I'm writing to introduce you to each other.

RTZ team – this is Evan from Intus who can help get you started on the integration within PCO. I have requested that he send you an API specifications document to get things started.

Evan – here is the RTZ team!

CONFIDENTIAL

Intus 001470

Looking forward to getting things transitioned over – Nicole can assist as needed.

Alex

Alexandria Lueth, MHSA, CPA

Director of IDT Operations and Risk Management

Senior Care Partners P.A.C.E.

Program of All-inclusive Care for the Elderly (PACE)



| | |
|---|---|
| **Battle Creek || (269) 441-9300** | **Kalamazoo || (269) 488-5460** |
| 200 W Michigan Ave | 445 W Michigan Ave, Kalamazoo, MI 49007 |
| Suite 103 | |
| Battle Creek, MI 49017 | **Portage || (269) 280-9560** |
| | 800 E Milham Ave, Portage, MI 49002 |
| **Direct:** (269) 441-9332 | |
| **Cell:** (269) 267-4169 | **Albion || (517) 680-4410** |
| **Fax:** (269) 269-441-9329 | 290 B Drive N, Albion, MI 49224 |

Email: a.lueth@seniorcarepartnersmi.org
WEBSITE | DONATE | ENROLL | FACEBOOK | CAREERS

*This email may contain sensitive and confidential personal health information that is being sent for the sole use of the intended recipient. If the reader of this message is not the intended recipient, you are hereby notified that any viewing, dissemination, distribution or copy of this email message is strictly prohibited. Per regulation, all personal health information will be maintained confidentially. If you have received and/or are viewing this email in error, please immediately notify the sender and delete this email from your system. Thank you for your attention and cooperation.*

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this

**CONFIDENTIAL**

**Intus 001471**

message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you

CONFIDENTIAL

Intus 001472

have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

CONFIDENTIAL

Intus 001473

Case 4:24-cv-01132-JST   Document 210-1   Filed 07/17/26   Page 104 of 125

# EXHIBIT "9"

# Deposition Transcript

Case Number: 4:24-cv-01132-JST
Date: November 25, 2025

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# Evan Jackson

CERTIFIED COPY

Reported by:
LORI STOKES



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

our previous emails.  Maybe it was towards the beginning of that year.

Q    Okay.

A    I don't know.

Q    To the best of your knowledge, did Huron Valley utilize the automated script process that we've described?

A    When?

Q    Between the time that PACEcare was implemented and June 19, 2024.

A    Not to my knowledge.

Q    Are you aware of whether Huron Valley ever used the automated script process?

A    When they were on TruChart.

Q    Between the date that PACEcare was implemented for Huron Valley and at least June 19, 2024, did Huron Valley utilize the manual process?

A    Between when?

Q    Between the date PACEcare was implemented for Huron Valley and this email.

A    I don't know.

Q    You don't know if they used the manual process.

Is that your testimony?

A    They did at some point from the Brio

STATE OF CALIFORNIA     )
                        )
                        )

CERTIFICATE OF REPORTER

I, LORI STOKES, do hereby certify that the witness in the foregoing deposition was by me duly affirmed to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed under my direction and supervision; that the foregoing is a full, complete and true record of said testimony; that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of December, 2025.

_____

LORI STOKES, CSR No. 12732

# EXHIBIT "10"

Case 4:24-cv-01132-JST    Document 210-1    Filed 07/17/26    Page 109 of 125



7.28.25

**Exhibit 2**

Michelle M. Abraham

 

---

## RE: Community PACE/Intus - RTZ Medications Report Failing

---

**From** Miranda Carter <mcarter@communitypace.com>

**Date** Mon 3/11/2024 11:40 AM

**To** Amanda Muniz <amanda@rtzsystems.com>

**Cc** PCO Support Team <pcosupport@pacecare.com>; Kelsey Bruno <kbruno@communitypace.com>

📎 1 attachment (249 KB)
Community RTZ Addendum.pdf;

Hey Amanda,

I've attached an updated Addendum to our Contract with Intus Care. Please review the attachment with your team. We are looking to create access for our Mock Audit no later than the end of the week to start our pre-audit process. I look forward to hearing from you.

Thank you,

*Miranda Carter*

**Human Resource Manager/
Executive Administrative Assistant**

P: (231) 652-4618

F: (231) 652-4620

E: mcarter@communitypace.com



---

**From:** Amanda Muniz <amanda@rtzsystems.com>
**Sent:** Thursday, March 7, 2024 2:27 PM
**To:** Miranda Carter <mcarter@communitypace.com>
**Cc:** PCO Support Team <pcosupport@pacecare.com>
**Subject:** Re: Community PACE/Intus - RTZ Medications Report Failing

Miranda,

Thanks for forwarding this over. After reviewing it doesn't look like this applies. I am sending it to our outside Counsel to verify. I will let you know when I hear back.

-Thank you, Amanda

**Amanda Muniz | She/Her/Hers**
**Corporate Office | 510.986.6700**



On Fri, Mar 1, 2024 at 1:54 PM Amanda Muniz <amanda@rtzsystems.com> wrote:

Hi Miranda,

Thanks for the feedback. I will check-in with my team and get back to you with more information.

-Amanda

**Amanda Muniz | She/Her/Hers**
**Corporate Office | 510.986.6700**



On Fri, Mar 1, 2024 at 8:19 AM Miranda Carter <mcarter@communitypace.com> wrote:

Hi Amanda!

I've been researching into this further, I'm wondering what the steps are to make sure we have an NDA in place for Intus Care? I've attached our contract with Intus Care which includes a BAA, is this sufficient?

Thank you,

*Miranda Carter*
**Human Resource Manager/**
**Executive Administrative Assistant**
P: (231) 652-4618
F: (231) 652-4620
E: mcarter@communitypace.com



**From:** Amanda Muniz <amanda@rtzsystems.com>
**Sent:** Wednesday, February 14, 2024 4:02 PM
**To:** Miranda Carter <mcarter@communitypace.com>
**Cc:** pcosupport@pacecare.com; PCO Support <pcosupport@rtzassociates.com>
**Subject:** Re: Community PACE/Intus - RTZ Medications Report Failing

Miranda,

Appreciate your reply, that's news to me. Wondering if you can share what they sent to confirm that?

-Thank you, Amanda

**Amanda Muniz** | She/Her/Hers
**Corporate Office | 510.986.6700**



On Wed, Feb 14, 2024 at 6:02 AM Miranda Carter <mcarter@communitypace.com> wrote:

Okay, I just verified that Intus is actually part of Tabula Rasa a corporate umbrella – they should have the save access and NDA as Peak and Pharmastar!  I thought they were part of the same company, but I don't work with them a ton so needed to verify.

*Miranda Carter*

**Human Resource Manager/**
**Executive Administrative Assistant**

P: (231) 652-4618

F: (231) 652-4620

E: mcarter@communitypace.com

CommunityPACE
At Home, INC. A Program of All-Inclusive Care for the Elderly

---

**From:** Amanda Muniz <amanda@rtzsystems.com>
**Sent:** Tuesday, February 13, 2024 7:27 PM
**To:** pcosupport@pacecare.com
**Cc:** Miranda Carter <mcarter@communitypace.com>; PCO Support <pcosupport@rtzassociates.com>
**Subject:** Re: Community PACE/Intus - RTZ Medications Report Failing

Hi Miranda,

Just wanted to circle back on this thread. Please note, PACECare access by any third party (Capstone, etc.) is allowed but requires a signed NDA between our organizations. The company you referenced doesn't have one on file. Any current accounts should be deactivated.

Feel free to reach out with any questions, Amanda

**Amanda Muniz** | She/Her/Hers
**Corporate Office | 510.986.6700**

On Mon, Feb 12, 2024 at 7:43 PM PCO Support Team <pcosupport@pacecare.com> wrote:

> Hi Miranda,
>
> Thank you for checking in and apologies for the delay. Our development team is working on this issue and rest assured that we will let you know as soon as this issue has been fixed and deployed at the live site. Thank you for your patience in this matter. Please feel free to reach out with any questions.
>
>
> Thank you,
> RTZ Support Team
>
> On Tue, Feb 13, 2024 at 11:01 AM Miranda Carter <mcarter@communitypace.com> wrote:
>
>> Hi there!
>>
>> I just wanted to touch base on this ticket. Intus Care is still having trouble running a general medication report. It's continuing to show them the same error previously sent in a screenshot - has there been any updates to the ticket or information I can relay to Intus Care while they're trying to find work arounds?
>>
>> Thank you,
>>
>> *Miranda Carter*
>>
>> **Human Resource Manager/**
>> **Executive Administrative Assistant**
>>
>> P: (231) 652-4618
>>
>> F: (231) 652-4620
>>
>> E: mcarter@communitypace.com
>>
>> _____
>>
>> **From:** PCO Support Team <pcosupport@pacecare.com>
>> **Sent:** Wednesday, January 10, 2024 5:50:19 PM
>> **To:** Miranda Carter <mcarter@communitypace.com>
>> **Cc:** PCO Support <pcosupport@rtzassociates.com>; Amanda Muniz <amanda@rtzsystems.com>
>> **Subject:** Re: FW: Community PACE/Intus - RTZ Medications Report Failing
>>
>> Hi Miranda,
>>
>> Thank you for your email. We submitted a ticket to our development team for review and resolution. The reference ID is 284215.
>> We will provide you with an update as soon as we have one.
>>
>> Thank you,
>> RTZ Support Team

On Thu, Jan 11, 2024 at 4:26 AM Miranda Carter <mcarter@communitypace.com> wrote:

Hi team!

Below is an issue Intus is reporting when running a medications report. Please see screenshot below.

Thank you,

*Miranda Carter*

**Human Resource Manager/**

**Executive Administrative Assistant**

P: (231) 652-4618

F: (231) 652-4620

E: mcarter@communitypace.com



---

**From:** Mackenzie Yates <myates@communitypace.com>
**Sent:** Wednesday, January 10, 2024 3:11 PM
**To:** Miranda Carter <mcarter@communitypace.com>
**Subject:** Fwd: Community PACE/Intus - RTZ Medications Report Failing

Bad timing since you just had a meeting with her, sorry!

Get Outlook for iOS

---

**From:** Maria Greene <maria.greene@intus.care>
**Sent:** Tuesday, January 9, 2024 5:53 PM
**To:** Mackenzie Yates <myates@communitypace.com>
**Cc:** Evan Walters <evan.walters@intus.care>; Sneha Banerjee

<[sneha.banerjee@intus.care](mailto:sneha.banerjee@intus.care)>

**Subject:** Community PACE/Intus - RTZ Medications Report Failing

Hi Mackenzie,

Our data team notified me that when they try to general Community PACE's medications report, it fails if "start date" and/or "end date" is selected (please seen screenshot below).

**Can you please communicate this issue to RTZ for resolution?**



Please let me know if you'd like additional context.

Thank you!

## Maria Greene

Senior Client Success Manager

Intus Care Inc.

(608) 692-3612

maria.greene@intus.care



This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

# EXHIBIT "11"

# Deposition Transcript

Case Number: 4:24-cv-01132-JST
Date: July 28, 2025

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# Miranda Lynn Carter



**CERTIFIED COPY**

Reported by:
Michelle M. Abraham

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

THE WITNESS:  I do think it should have been verified with Intus whether or not we had one and I believe that's when we provided the contract and addendum to make sure that we were following that protocol.

BY MS. PENN:

Q    And you would agree it would have to be Intus to verify that they're actually part of a corporate umbrella, correct?

MR. BESHAI:  Objection to the extent the question is, "did Intus verify this?"  Lacks foundation.  Otherwise, speculation.

THE WITNESS:  Correct.  I feel like they -- we should have -- it should have been -- it should have came from them.  Unfortunately, it was a misunderstanding on our side.

BY MS. PENN:

Q    Do you know if it came from them?

A    No.  There's no specific grounds that show it came from them.

Q    Did you try to verify it with Intus in any way?

A    I personally did not.

Q    Do you know if anybody tried at Community PACE?

A    I can't speak 100 percent on that.  I'm not sure.

Q    What kind of impact this information had on you

MIRANDA LYNN CARTER                                                JOB NO. 1784120
JULY 28, 2025

REPORTER'S CERTIFICATE

I, MICHELLE ABRAHAM, certified shorthand reporter No. 14303, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken by me in shorthand at the time and place herein named and were thereafter transcribed into typewriting under my direction, said transcript being a true and correct transcription of my shorthand notes;

That pursuant to Federal Rule 30(e), transcript review was requested.

I further certify that I have no interest in the outcome of this action.

In witness whereof, I have hereunto subscribed my name this 10th day of August 2025.

*Michelle M. Abraham*

MICHELLE ABRAHAM
CSR No. 14303

**EXHIBIT "12"**

Message
_____

**From:**       Michael Zawadski [mike@rtzassociates.com]
**Sent:**       9/14/2022 12:32:46 PM
**To:**         Robbie Felton [robbie@intus.care]
**CC:**         laura@rtzsystems.com; David C. Lee [/o=Nossaman/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=65390a52f4034421a9b8c0a88f86e83b-Lee, David C.]
**Subject:**    [External] Re: Catching up and NDA for RTZ integration
**Attachments:** 60985387_1 - 09.14.22 LTR to R. Felton.PDF

Robbie,

On September 7 you indicated that you have "a few redlines" to our NDA. What I received yesterday morning is an entirely different "access agreement" that omits or decapitates all material terms of our offered agreement.

The offered document is neither as implied from previous emails, nor in any way usable. Given this string of events I have attached a letter for clarity. Please hand it off to the appropriate member of your organization.

Take care,

**Michael Zawadski, JD** | corporate office | 510.986.6700 | He/Him/His
**RTZ** systems

On Tue, Sep 13, 2022 at 9:31 AM Robbie Felton <robbie@intus.care> wrote:
Hello Mike,

I hope you had a nice weekend. Attached here is an updated document. I can send via DocuSign if you are ready to execute. Thank you!

Please let me know if you have any questions or concerns. Happy to hop on a call to discuss.

Best,
Robbie Felton

**Robbie Felton**          📞   734-604-5758
Founder/CEO               📎   intuscare.com

**Exhibit**

**48**

**Zawadski**

02/23/2026     C.A.N.

RTZ0000809

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (734-604-5758), and then delete this message.

**From:** Robbie Felton <robbie@intus.care>
**Sent:** Thursday, September 8, 2022 3:15 PM
**To:** Michael Zawadski <mike@rtzassociates.com>
**Subject:** Re: Catching up and NDA for RTZ integration

Hi Mike,

Thanks for the response! I will send over the redlines shortly.

What's your upcoming availability for a call?

Best,
Robbie Felton

**From:** Michael Zawadski <mike@rtzassociates.com>
**Sent:** Wednesday, September 7, 2022 12:02 PM
**To:** Robbie Felton <robbie@intus.care>
**Cc:** laura@rtzsystems.com <laura@rtzsystems.com>
**Subject:** Re: Catching up and NDA for RTZ integration

Robbie,

Nice to hear from you. Your welcome to send over the redlines. If you'd like a call we should have our Lawyers join at this point.

Mike

On Wed, Sep 7, 2022 at 8:53 AM Robbie Felton <robbie@intus.care> wrote:
Hello Mike,

I hope you have been well!

One of our team members sent over an NDA that they received from RTZ for our Beacon PACE integration. Do you have a moment to chat about it? I have a few redlines that we would need to make before moving forward. I can send an updated version over to you if that is easier. Thank you!

Best,
Robbie Felton

**Robbie Felton** | 📞 734-604-5758

RTZ0000810

| Founder/CEO | | intuscare.com |
|---|---|---|

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (734-604-5758), and then delete this message.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

--
Take care,


**Michael Zawadski, JD** | corporate office | 510.986.6700 | He/Him/His

**RTZ** systems

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This e-mail message and any documents attached to it are confidential and may contain information that is protected from disclosure by various federal and state laws, including the HIPAA privacy rule (45 C.F.R., Part 164). This information is intended to be used solely by the entity or individual to whom this message is addressed. If you are not the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this message without the sender's written permission is strictly prohibited and may be unlawful. Accordingly, if you have received this message in error, please notify the sender immediately by return e-mail or call (insert phone number), and then delete this message.

RTZ0000811

 **NOSSAMAN** LLP

**ATTORNEYS AT LAW**

50 California Street
34th Floor
San Francisco, CA 94111
T 415.398.3600
F 415.398.2438

David C. Lee
D 415.438.7235
dlee@nossaman.com

Refer To File # 503730-0001

**VIA EMAIL**
**robbie@intus.care**

September 14, 2022

Robbie Felton
Intus Care, Inc.
225 Dyer Street
Providence, RI 02903

      Re:    RTZ Associates, Inc.

Dear Mr. Felton:

      We are legal counsel to RTZ Associates, Inc. ("RTZ"). As you are aware, RTZ provides electronic health record software to numerous PACE programs nationwide through software-as-a-service ("SaaS") agreements with end-user customers. RTZ's agreements with those PACECare customers contain confidentiality and access limitation provisions that bar those customers from granting third-party access to RTZ's software without RTZ's written consent.

      Notwithstanding, we have learned that Intus Care, Inc. ("Intus") has gained access to RTZ's PACECare product on multiple occasions without RTZ's written approval or consent. Indeed, RTZ specifically communicated to you (directly) that a Nondisclosure Agreement ("NDA") was required prior to any Intus access to PACECare. To date, no NDA has been executed, and in the absence of one, Intus has no rights or permission to access RTZ's software product.

      Accordingly, we therefore demand that Intus cease and desist from accessing or attempting to access RTZ's PACECare solution through RTZ's customer base unless and until RTZ provides its written consent to such access. In the absence of such consent, any access by Intus could expose it to liability under multiple legal theories, including but not limited to, violation of California's Business & Professions Code section 17200, et seq. (unfair business practices), misappropriation of trade secrets (both state and federal claims), and inducing breach of contract.

      We further demand that Intus preserve all communications and documents (both internal and external) relating to each and every instance of Intus's access to RTZ's PACECare software, including but not limited to, all emails, texts, notes, IMs, chat logs, work files, project files, and shared materials. Specifically, we insist that Intus discontinue any retention/destruction policies

60980873.v1

RTZ0000812

Robbie Felton
September 14, 2022
Page 2

or systems that would or could result in the destruction of such evidence.  Obviously, Intus's destruction/loss/deletion/alteration of such communications and documents would constitute spoliation of evidence.

As you can appreciate, RTZ aggressively protects its technology and products.  As such, our expectation is that Intus will respect the proprietary nature of RTZ's PACECare product.  To the extent it does not, we will respond accordingly without further notice to you.

Sincerely,

David C. Lee
Nossaman LLP

DCL:dl

60980873.v1

RTZ0000813