EPSTEIN BECKER & GREEN, P.C.
Charles E. Weir (SBN 211091)
Andrew M. Beshai (SBN 308030)
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone:     310.556.8861
Facsimile:     310.553.2165
cweir@ebglaw.com
abeshai@ebglaw.com

Attorneys for Plaintiff
INTUSCARE INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUSCARE INC., | Case No. 4:24-cv-01132-JST |
| Plaintiff, | *Assigned to Hon. Jon S. Tigar* |
| v. | **PLAINTIFF INTUSCARES INC.'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE** |
| RTZ ASSOCIATES, INC.; and DOES 1 through 10, | |
| Defendant. | *Filed concurrently with: 1) Declaration of Andrew Beshai; 2) Declaration of Kristopher Hult* |
| | Pretrial Conference: July 31, 2026 Time: 2:00 p.m. Crtrm: 6 |
| | Complaint Filed: February 23, 2024 Amended Complaint Filed: April 2, 2024 Counterclaims Filed: June 20, 2024 |

1

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE
FIRM:70846344v2

**OPPOSITION TO MIL NO.1 TO EXCLUDE INTUS' INTERNAL EVALUATION, SCRUITNY, LEGAL OR BUSINESS ASSESSMENT, REASONS, RATIONALE, OR DECISION-MAKING CONCERNING RTZ'S NDA**

## I.    INTRODUCTION & FACTUAL BACKGROUND

RTZ's motion in limine ("MIL") No. 1, seeking to exclude Intus' "impressions, objections, reasons for refusing or redlining the NDA," should be denied. While Intus does not intend to waive the attorney client privilege regarding communications with attorneys, based on questions to three Intus witnesses RTZ seeks a blanket ruling seeking to exclude testimony and argument by Intus about Intus's evaluation of the NDA and why it believed it was unreasonable, predatory, and not negotiated in good faith by RTZ. There is no basis for such a sweeping exclusion of testimony and argument about RTZ's NDA. There is a lengthy email exchange between Intus and RTZ, spanning over six months and 36 pages of substance, detailing Intus' positions regarding the NDA. RTZ did not ask Evan Jackson or Alex Rothberg a single question about those emails, and it asked Robbie Felton about only one document that was exchanged as part of that protracted correspondence. Instead, RTZ asked questions about communications between Intus and its counsel for which proper objections were asserted. Now it seeks to bar all testimony and argument about the non-privileged materials.

To try to preclude Intus' witnesses from testifying about relevant issues, RTZ also misrepresents the testimony of the Intus witnesses during their depositions and what the privilege was asserted over. For example, Robert Felton, Intus's CEO and cofounder provided deposition testimony about the NDA provisions RTZ demanded and why those provisions were unworkable. Specifically, he testified that Intus had an issue with the NDA because it contained "a right to revoke data access at any point in time which wasn't palatable." Thus, the premise of RTZ's motion, that certain Intus executives did not provide their individual views for not entering into the NDA is not even accurate. And the fact that the two other executives RTZ discussed in their motion testified about having limited involvement in the discussions and learned things second hand via Intus' counsel, is not a basis for a blanket prohibition on NDA related testimony. To state the obvious, just because one Intus executive had limited knowledge and involvement of the NDA negotiations, doesn't mean that other witnesses don't have non-privileged testimony to

2

provide. Again, there is a substantial amount of non-privileged communications, testimony and evidence on Intus' views on the NDA negotiations, the fact that a few witnesses did not reveal attorney-client communications about the subject does not bar Intus from discussing these issues and the non-privileged evidence at trial. RTZ's effort to create a blanket prohibition on testimony and argument on Intus's "impressions, objections, reasons for refusing or redlining the NDA" should be rejected.

Moreover, these issues can be handled as the evidence, if any, on these issues comes in. It is Intus' view that RTZ cannot satisfy its affirmative defense that the manner exception applies by pointing to its offer of an NDA. Should the Court agree with Intus, it may very well moot much of this motion. And, if during trial Intus seeks to waive privilege and speak about attorney client communications (which it does not intend to do) that it previously shielded, those issues can be addressed on a question-by-question basis. To exclude an entire area of testimony and argument (privileged or not) because three Intus witnesses did not testify about communications with their counsel is inappropriate. The motion should be denied.

## II.    ARGUMENT

The crux of RTZ's motion is that it was "denied any opportunity to probe the factual foundations of" Intus' objection to the NDA in pre-trial discovery because Intus did not waive the attorney-client privilege. (Mot. at 2:4.) This is wrong. Intus properly asserted privilege over RTZ's efforts to probe attorney-client communications. Intus does not intend to waive the attorney client privilege at trial. That does not mean, however, that Intus is precluded from providing testimony or argument about a large swath of issues related to the NDA and the NDA negotiations that are not privileged. Cherry picking deposition testimony from three Intus' executives where privilege was asserted does not form a basis for excluding testimony and argument about why Intus believed that NDA was not reasonable or appropriate.

There are 36 pages of emails between Intus and RTZ, spanning over six months, about the NDA. (Declaration of Andrew Beshai ("Beshai Decl."), Ex. B.) Those emails set forth in detail why Intus believed the NDA terms were unreasonable and predatory. (*Id.*) RTZ did not ask Evan Jackson or Alex Rothberg a single question about those emails, and it asked Robbie Felton about

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2

only one document that was exchanged as part of that protracted correspondence. (*Id*., Ex. A at 136:10-137:18.) Why would Intus be precluded from arguing the contents of that thread or having Intus witnesses explain why Intus was taking those positions or how those issues impact Intus' business? Certainly, email communications between Intus and RTZ are not privileged. Intus should not be precluded from using evidence and eliciting testimony from any witness because RTZ failed to ask questions on the topic.

RTZ also omits key portions of deposition testimony. Contrary to RTZ's arguments, Mr. Felton provided a rationale for why Intus declined to sign the NDA. Intus had an issue with the NDA because it contained "a right to revoke data access at any point in time which wasn't palatable," and Intus formed this "impression from conversations . . . with clients" about the value of uninterrupted data access. (*Id*., Ex. A at 80:22-25; 82:23-24.) This information is not privileged and no privilege was asserted. Why would Mr. Felton be precluded from providing the same testimony he provided during his deposition? RTZ is, therefore, wrong to claim it "will be unable to cross-examine witnesses on the substance of their conclusions because the underlying reasoning has been cloaked in privilege." (Mot. at 7:1-3.)

RTZ also seeks to use testimony about a lack of involvement in the NDA discussions by one witness as a basis to exclude all testimony on the matter. RTZ points out that Mr. Jackson, for example, testified that he had no role in the discussions and received information second hand from lawyers. (Mot. at 2:20-22.) The fact that Mr. Jackson played a limited role and received updates from counsel is not a basis to preclude all Intus witnesses from testifying about the NDA negotiations and the reasons why they could not sign RTZ's proposed NDA.

Nor is the sword-and-shield doctrine implicated here. Intus asserted privilege over communications between Intus and its counsel regarding the NDA. The doctrine comes into play when a party seeks to selectively waive privilege to introduce evidence it likes, but block the production of evidence that it does not like. That dynamic is not present here. Intus properly asserted privilege over attorney-client communications. It is not seeking to partially waive privilege over those communications. Moreover, Intus is not trying to hide its reasoning for not signing the NDA by asserting privilege. As explained, Mr. Felton articulated one of the key problems Intus had

4

with the NDA. Other problems are specifically identified in emails between Intus and RTZ representatives. (*Id.*, Ex. B.) RTZ elicited the testimony from Mr. Felton and has been in possession of the email communications on these issues for years. The sword-and-shield doctrine is, therefore, inapplicable. And, it certainly does not justify sweeping exclusion of non-privileged material and argument about that material that was produced in discovery. [cite case].

RTZ's cases are inapposite, as they deal with the scope of waiver when either the claim at issue implicates privileged communications or there has already been a privilege waiver in discovery—neither of which exist here. *See Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003) (explaining that the issue involved "a claim of ineffective assistance of counsel," and whether the defendant "waive[ed] the attorney-client privilege as to all communications with his allegedly ineffective lawyer"); *Phoenix Sols. Inc. v. Wells Fargo Bank*, N.A., 254 F.R.D. 568, 576 (N.D. Cal. 2008) (addressing the scope of waiver where a party produces some, but not all, privileged "drafts and other documents"); *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 339 (9th Cir. 1996) (addressing scope of waiver and holding that "mere agreement to waive the privilege . . . unaccompanied by a disclosure of privileged documents, did not constitute a waiver of [a party's] right to claim that privilege subsequently"); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (addressing scope of waiver and holding that "the disclosure of information resulting in the waiver of the attorney-client privilege constitutes waiver 'only as to communications about the matter actually disclosed'"); *United States v. Nobles*, 422 U.S. 225, 239 (1975) (holding that "by electing to present the investigator as a witness," a criminal defendant "waived the privilege with respect to matters covered in his testimony").

The Court should deny RTZ's MIL No. 1 in its entirety.

**OPPOSITION TO MIL NO. 2: MOTION TO EXCLUDE EVIDENCE RE SUMMARY JUDGMENT ORDER**

**I.      INTRODUCTION & FACTUAL BACKGROUND**

RTZ seeks to exclude Intus from offering evidence, testimony or argument relating to the Court's summary judgment order. (Dkt. 89.) The motion is really nothing more than an attempt to rehash arguments that RTZ has already lost in prior motions. Intus does not plan to offer

5

"evidence" or "testimony" discussing the Court's summary judgment order. As this Court has held, however, the issue of whether RTZ "engaged in facial information blocking" is "deemed established for purposes of the trial of the case" and "testimony on whether RTZ engaged in information blocking is excluded because that issue has already been established." (Dkt. 203 at 15-17.) Accordingly, Intus does intend to inform the jury that the blocking element has been established and to ask the Court to instruct the jury in that regard. As detailed in prior briefing, instructing the jury on elements that have already been established serves the important purpose of judicial economy and Rule 56's role in narrowing the issues for trial.

RTZ's motion is not really seeking to preclude discussion of summary judgment motions and rulings. Rather, what the motion is really seeking is to withhold from the jury that the blocking conduct element has already been established. RTZ's multiple arguments are all misplaced.

First, as RTZ admits, the issue of what was and was not established on summary judgment has been decided. RTZ is purporting to bring the motion to "present and preserve" its arguments. That is nothing more than an improper request for reconsideration. None of the reconsideration elements are met.

Second, RTZ makes various incorrect assertions about the regulations and "information blocking." RTZ claims that the jury should not be told that RTZ's conduct constituted information blocking because there are other elements to the claim and RTZ could establish an exception which would mean that RTZ is not liable. To establish a violation of the Cures Act, Intus must show two things—that RTZ is an Actor and that it engaged in information blocking conduct. The second element is established. The Court made clear that the Actor element has not been and will be decided by the jury, and (contrary to RTZ's arguments) Intus has no intent to inform the jury that the Actor issue has been resolved. There is nothing confusing about asking the jury to determine if the facts establish RTZ is an Actor under the statutory definitions. Similarly, if the jury concludes RTZ is an Actor, there is nothing confusing about asking the jury to determine if RTZ established the elements of one of the exceptions. Contrary to RTZ's claims

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2

there is nothing difficult or confusing about informing the jury that one element of the information blocking claim is met and presenting these other issues to the jury for resolution.

Third, RTZ misrepresents Local Rule 56-3 as requiring some sort of magic language in a summary judgment ruling that an issue is "deemed established for trial"—the Rule requires no such thing.

Fourth, the Court should reject RTZ's argument that the conduct "must be tried" for other claims so the Court should reverse itself regarding the information blocking element. RTZ is wrong on what issues will and will not need to be tried and cites to no authority that requires the Court to ask the jury to revisit issues that have already been resolved.

All of RTZ's arguments fail. The Court should deny MIL No. 2.

## II.    ARGUMENT

### A.    Motion in Limine No. 2 Is an Improper Motion to Reconsider

RTZ's motion is a procedurally improper motion to reconsider. The Court's summary judgment order established that Intus had met its initial burden to demonstrate RTZ's conduct was information blocking. (Dkt. 89.) The Court was also unequivocal in its *Daubert* order that the issue of whether RTZ engaged in information blocking is "deemed established for purposes of the trial of the case." (Dkt. 203.) The thrust of RTZ's motion in limine no. 2 is that the Court's rulings on this issue were incorrect and that the Court should revisit them. Under the applicable rules regarding reconsideration, RTZ would have been required to show a sudden change in controlling law, newly discovered facts, or clear error. RTZ does not even try to satisfy these elements in its motion. Nor has RTZ even sought leave of Court to bring such a motion, as required by the local rules. Civ. L.R. 7-9(a).

### B.    Whether RTZ's Conduct Constitutes Information Blocking Is Unquestionably Relevant.

To try to generate a legal basis for its request to exclude evidence, RTZ oddly asserts that the ruling regarding blocking conduct is irrelevant and cites FRE 401 and 403. (Mot. at 11:5-24.) It is difficult to think of anything more relevant than whether or not an element of a claim has been established. Liability under the Cures Act hinges on two prongs: (1) whether an entity is an "actor," and (2) whether the entity engaged in "information blocking" conduct. *See* 42 U.S. Code

7

§ 300jj-52; 45 C.F.R. §§ 170, 171.  That Intus has established an element of the Cures Act is, of course, directly relevant.

RTZ argues that the determination that it engaged in information blocking conduct is irrelevant because Intus must first established that RTZ was an Actor. Specifically, RTZ claims that "[a] determination that RTZ is an 'actor' is a necessary prerequisite to any finding that it engaged in 'information blocking'" (Mot. at 11:12-13.). This argument also fails. The Actor element is separate and distinct from the blocking conduct element. It is not necessary to determine whether RTZ is an actor to determine whether the conduct itself constitutes information blocking. Indeed, a non-actor can engage in the act of information blocking, it just can't be liable for that conduct under the Cures Act. Similarly, RTZ claims it may establish the manner exception as an affirmative defense and if it does the finding it engaged in information blocking conduct would be irrelevant. Like the Actor issue, RTZ's affirmative defense is separate from the blocking conduct element. If RTZ establishes its affirmative defense, it will have avoided liability, but that doesn't mean it didn't engage in information blocking conduct as defined in the Cures Act.

Based on the misguided notion that the Actor determination or the absence of the manner exception are some sort of prerequisite to finding blocking conduct, RTZ argues the fact that it engaged in "information blocking" is both irrelevant and inadmissible under Fed R. Evid. 401 and 402 and that Intus should be excluded from introducing the summary judgment order as "evidence" and that courts "routinely exclude" such evidence at trial.  (*Id*. at 9-10.) As a threshold issue, Intus does not seek to introduce the summary judgment order as "evidence." Instead, the jury should be instructed that the element of "information blocking" has been established. No mention of "summary judgment" is necessary.[1] As detailed above the various elements of the information blocking claim and RTZ's affirmative defense are separate and distinct. Like any claim with multiple elements, to establish liability all elements must be present. But that does not

---

[1] Establishing issues for the case at the summary judgment phase is common and creates judicial economy. "Summary judgment is a tool designed to increase judicial efficiency by allowing undisputed cases to be resolved without incurring the expense and time required for trial, and defense counsels' chronic oversight frustrates the purpose of Rule 56." *Pierce v. Skolnik*, No. 3:10-CV-0239-ECR-VPC, 2012 WL 28839, at *1 (D. Nev. Jan. 5, 2012).

8

mean one element becomes "irrelevant" and cannot be discussed unless the jury first determines all other elements are present. RTZ cites to no authority that would support such a proposition.[2]

The cases RTZ cites to for the proposition that courts "routinely" exclude summary judgment orders as "evidence" are inapposite. In *S.E.C. v. Retail Pro, Inc.*, for example, the plaintiff sought a Rule 56(g) order that the court had established ten facts relating to claims that were dismissed on summary judgment and wanted to use those findings at trial as the facts related to the remaining claims. No. 08CV1620-WQH-RBB, 2011 WL 589828 at *3 (S.D. Cal. Feb. 10, 2011). The district court noted the fact that the remaining claims were subject to different standards than those dismissed at summary judgment created a risk the jury would be confused. *Id*. None of those issues are present here. In RTZ's citation to *Baugh v. Detroit Club Mgmt. Co.*, the court actually denied the motion in limine finding "the Court's conclusion on summary judgment" *was* "relevant and unduly prejudicial." No. 22-CV-11427, 2026 WL 948709 at *5 (M.D. Tenn. Mar. 21, 2019). The rest of the cited cases are similarly distinguishable. *See also GPNE Corp. v. Apple Inc.*, 108 F. Supp. 3d 839, 855 (N.D. Cal. 2015) ("[C]ourts order on summary judgment did nothing more than find issues of fact for the jury. It did not resolve any fact-finding or issues of infringement[.]")); *Hawkins v. Maury Cnty. Bd. of Educ.*, No. 1:12-CV-0184, 2019 WL 13260543, at *2 (M.D. Tenn. Mar. 21, 2019) (plaintiff attempted to introduce summary judgment order because it "stoked the Defendants' animus" and to try to show continued pattern of retaliation resulting from that order); *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 WL 5349266, at *13 (S.D. Ohio Mar. 27, 2006) (both parties moved to exclude evidence or reference to the summary judgment order and the court agreed that "any extraneous statements made in that Order and Opinion are not binding").

RTZ's relevance arguments all fail.

---

[2] What RTZ is essentially asking for is to create a revised order of proof requirement, such that the information blocking determination is only relevant if the jury first determines RTZ is an Actor and also determines that RTZ's affirmative defense is inapplicable. RTZ cites to no authority to support such a proposition.

**C.**   **There Is Nothing Misleading or Prejudicial About Instructing the Jury That an Element of the Cures Act Has Been Established.**

RTZ argues that should there be any indication at trial that RTZ engaged in information blocking, it would "mislead the jury by erroneously suggesting that this Court has already determined RTZ is an 'actor' […]" (Mot. at 11:21-22.). There is no risk of misleading the jury here. There is nothing unusual, let alone misleading, about an element of a claim being established prior to trial and instructing the jury to consider only the other elements of the claim. Here, if the jury finds RTZ is not an actor, the analysis ends there. If the jury finds RTZ is an actor, it skips the second step of determining whether information blocking occurs and goes straight to the question of whether RTZ established an exception. There is nothing misleading about such instructions or Intus commenting on them and, as described in the next section, it directly serves Rule 56's purpose of judicial economy. Summary judgment is the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Planned Parenthood of the Great Nw. & the Hawaiian Islands v. Wasden*, 564 F. Supp. 3d 895, 901 (D. Idaho 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)) (alterations in original).

**D.**   **RTZ Misinterprets Civil L.R. 56-3.**

Summary judgment narrows issues for trial where appropriate. This function reflects the core judicial economy rationale underlying Rule 56. *See Magic Link Garment Ltd. V. ThirdLove, inc.*, 445 F. Supp. 3d 346, 355 (N.D. Cal. 2020) ("[C]ourts may rely upon Rule 56 to determine certain facts or elements of a claim as established and thereby dispose of the need to adjudicate them at trial.") (internal citations omitted); *Unicorn Energy AG v. Tesla Inc.*, 740 F. Supp. 3d 930, 958 (N.D. Cal. 2024) ("When the parties have briefed and argued summary judgment, judicial efficiency is best served by dealing directly with those arguments rather than avoiding them."). The Court here was well within its authority and discretion to narrow the issues for trial by deeming information blocking an established issue for trial.

RTZ narrowly interprets L.R. 56-3 to mean that a court must use certain magic language in order to deem a fact established in a summary judgment order. As set forth in prior briefing on

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2

these exact same issues, RTZ's position is incorrect. (Dkt. 198 at 12:17-13:9; Dkt. 201 at 6:26-10:17.) In *GSI Tech., Inc. v. United Memories, Inc.*, for instance, the defendant "[clung] to its position" that a non-compete expired when the contract ended, despite the court explicitly holding the provision survived the termination in its summary judgment order. No. 5:13-CV-01081-PSG, 2016 WL 3017544, at *8 (N.D. Cal. May 26, 2016), aff'd, 721 F. App'x 591 (9th Cir. 2017). The court instructed the jury in accordance with its summary judgment findings and defendant argued in a post-trial motion—as RTZ does here—that the summary judgment ruling was not binding under L.R. 56-3. *Id*. The court rejected the argument finding it sufficient that the order "held that there was 'no genuine dispute'" as to the continued validity of the non-compete provision. *Id*. There is no magic language required under L.R. 56-3. Here, in its summary judgment order, the Court did deem the issue of information blocking established. It explained that RTZ's conduct of preventing Intus from obtaining direct access to PACECare "falls within the umbrella of 'information blocking' addressed by the Cures Act," and that "given the broad definition of 'information blocking,' . . . Intus has met its initial burden of demonstrating that RTZ 'engaged in facial information blocking.'" (Dkt. 89 at 6:28-7:3.) To remove any doubt that this issue has been deemed adjudicated under L.R. 56-3, the Court then stated in its *Daubert* Order: "The Court now specifies that [the] issue [of whether RTZ engaged in information blocking] is 'deemed established for purposes of the trial of the case.' Civil L.R. 56-3." (Dkt. 203 at 15-16.) Oddly, RTZ insists that the "Court clearly did not issue a Rule 56(g)/Local Rule 56-3 order here." (Mot. at 14:11-12.) This is wrong. Indeed, not only does the Court's *Daubert* Order track the specific language of Rule 56-3, it also cites to the rule to shed any doubt about the preclusive effect of its holding. This alone defeats RTZ's MIL No. 2.

RTZ's cases are inapposite. Each one involves parties attempting to weaponize the mere discussion of evidence in a summary judgment order to exclude evidence at trial relating to those unresolved facts. First, the order in *Giovanetti v. Humboldt* "discuss[ed] the merits of the various pieces of Plaintiff's retaliation claim" without specifying any elements were deemed established for trial. *Giovanetti v. Trs. of California State Univ. (Humboldt State Univ.),* No. C 04 5514 NJV, 2007 WL 9735004, at *2 (N.D. Cal. Sept. 5, 2007). The Court here certainly did more than

11

"discuss the merits of various pieces" of Intus' Cures Act claim. The Court reviewed the undisputed material facts and concluded that RTZ's conduct constituted information blocking—a conclusion it reiterated, explicitly citing to Rule 56-3, in its *Daubert* order. Next, RTZ cites to *Aguirre v. California* in which the defendant moved to limit plaintiff's statements and conduct at trial to only the evidence referenced in the court's summary judgment order. No. 16-CV-05564-HSG, 2018 WL 1948702, at *3-4 (N.D. Cal. Apr. 25, 2018). But the court "made clear that the facts to which it referred in finding a triable issue . . . were not an exhaustive enumeration of the facts on which Plaintiff could try her case" and thus the court "did not factually limit Plaintiff to statements and conduct it cited as examples of possible interference for purposes of trial." *Id.* *4. Intus is not seeking any such relief here, and *Aguirre* did not involve an established element in the summary judgment order.

Finally, RTZ's citation to the 2010 advisory committee comments to Rule 56(g) also misses the mark. The comments indicate a court "may" refrain from treating a "fact" as established at trial if it concludes "that it is better to leave open for trial facts and issues." The comments focus on "facts" that a party chooses not to dispute, as opposed to entire "elements" that are fully litigated and resolved on summary judgment. The situation contemplated by the comments is one in which a non-moving party disputes some, but not all, facts proffered by the moving party because the non-moving party "may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant." If the court in that situation ultimately denies summary judgment, the non-moving party should then not be precluded from disputing the facts that it refrained from addressing on summary judgment. *See Brown v. DirecTV, LLC*, No. CV 13-1170-DMG (EX), 2022 WL 2117803, at *3 (C.D. Cal. May 19, 2022) (interpreting the comments to mean that "[t]he fact that [a party] chose not to dispute certain specific facts at summary judgment therefore does not preclude it from doing so at trial"). The comments, therefore, do not at all address the situation here where an entire element has been adjudicated and deemed established for trial.

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2

### E.      RTZ's Argument About Multiple Claims Fails

RTZ argues the information blocking conduct "must be tried in any event" because the conduct underlies multiple claims. (Dkt. 207, p. 13). Neither the Cures Act nor the element at issue (information blocking) is implicated in RTZ's counterclaims. For Intus' claims, if RTZ is an Actor, then it has violated the Cures Act (barring an exception). This violation would also establish the interference element in Intus' other torts and thus would not need to be "tried in any event." While RTZ does not identify what evidence would have to be presented regardless of whether the blocking conduct element is established, even assuming that some evidence of RTZ's blocking conduct is admitted at trial, that does not warrant revisiting the establishment of an element.

RTZ cites to a decision by this Court in which the Court acknowledged it may "enter an order stating any material fact" and if the "court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-CV-01393-JST, 2021 WL 3504669, at *12 (N.D. Cal. June 14, 2021) (internal citations omitted). That analysis further acknowledges that "partial summary judgment is not a judgment at all but merely a pretrial adjudication that certain issues shall be deemed established." *Id.* Here, that is exactly what the Court's order on Intus' partial summary judgment did—"adjudicate[ed] that certain issues shall be deemed established" at trial. The circumstances and procedural posture were distinguishable in *Oracle*, however. There the Court declined to grant partial summary judgment and declined to limit Oracle's infringement claims. In other words, there was no finding akin to the Court's finding in the partial summary judgment order here. It is entirely within the Court's discretion to narrow the issues for trial vis-à-vis a summary judgment order. And nothing in *Oracle* or elsewhere stands for the rule that a court is prevented from deeming established an issue on summary judgment because there may be some evidence that overlaps with the issue that is ultimately admitted at trial.

The Court should deny RTZ's MIL No. 2

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2

## OPPOSITION TO MIL NO. 3: MOTION TO EXCLUDE ALLEGED "UNOBSERVABLE" DAMAGES

### I.    INTRODUCTION & FACTUAL BACKGROUND

RTZ's MIL No. 3 is nothing more than a motion for reconsideration of the Court's *Daubert* ruling, and the Court should reject it on that basis alone. As part of his lost profits analysis, Intus' expert, Kristopher Hult, identifies 42 PACE programs that Intus was deterred from contracting with as a result of RTZ's wrongful conduct. The crux of RTZ's MIL No. 3 is that Hult's report supposedly fails to show the probability of an economic benefit from these 42 PACE programs. Put differently, RTZ contends that Intus has failed to adduce evidence regarding one category of damages as it relates to Intus' intentional interference with prospective economic advantage claim. But that is what the trial is for, and there is no basis to preclude Hult's damages analysis at this stage. This is especially true where, as this Court has already noted, "RTZ does not challenge Hult's economic expertise or the economic principles that he applies," nor could RTZ do so at this point, as the *Daubert* briefing deadlines have long passed. (Dkt. 203 at 9:26-28.)

In his report, Hult identifies three categories of damages. First, there are damages stemming from pre-existing contracts that Intus had to cancel or discount as a result of RTZ's information blocking conduct. (Hult Report ¶ 16.)[3] RTZ does not challenge the first category of damages in its MIL No. 3. Second, there are affirmatively recorded damages based on business opportunities that Intus competed for and lost as a result of RTZ's conduct. (Hult Report ¶ 18.) RTZ also does not challenge the second category of damages.

RTZ challenges only the third category of damages in MIL No. 3. The third category of damages captures lost revenue from "business opportunities that existing or potential clients using RTZ likely would have pursued with Intus, but that Intus was unable to compete for because of RTZ's conduct." (Hult Report ¶ 20.) To calculate damages in the third category, Hult considered 42 specifically identified PACE programs that were not otherwise already included in his damage categories one and two. Among those 42 PACE programs are a combination of

---

[3] A redacted version of Hult's Report is filed at Dkt. 190-3. An unredacted version is filed under seal at Dkt. 190-4.

14

programs that Intus previously produced revenue from and other programs where Intus had not. For these programs, Hult analyzed how RTZ's conduct impacted the contracting rates of PACE programs. Observing that non-RTZ clients were contracting with Intus at a significantly higher rate than RTZ clients, Hult was able to perform a regression analysis to estimate the number of lost contracts from the group of 42 PACE programs customers as a result of RTZ's conduct. There is nothing speculative about the market data and the rates at which Intus was acquiring clients.

Hult dubs this third category of damages "unobservable business opportunities." (Hult Report ¶ 67.) They are not "unobservable damages" as RTZ dubs them in an effort to exclude them. Economic damages necessarily involve estimating unobserved outcomes. (Declaration of Kristopher Hult ("Hult Decl.") at ¶ 1.) Obviously if the prospective economic benefit had come to pass, there would be no damages and no claim. The objective of a damages analysis is to estimate what would have occurred in the but-for world and compare those unobserved outcomes to what actually occurred. (*Id*.) Because the but-for world never occurred, it cannot be directly observed. Economists therefore rely on accepted methodologies (including benchmark analyses, yardstick comparisons, regression analysis, and other econometric techniques) to estimate the revenues and profits that would likely have occurred absent the challenged conduct. (*Id*.) To substantiate Hult's regression-based damages figure in category three, Intus need only prove (which it will) that of these 42 business relationships, there was a probability of future economic benefit that would have resulted in the equivalent of three additional opportunities. (Hult Report at ¶ 84.) At trial, Intus intends to prove that it would have acquired three additional contracts from the pool of 42 PACE programs specifically identified by Hult's in the category three damages but for RTZ's tortious interference.

## II.    ARGUMENT

To prevail on its claim of intentional interference with prospective economic advantage, Intus will prove at trial that it had "a business relationship [with] the probability of future economic benefit" with more than one "specific third party"—namely the 42 PACE programs specifically listed in Hult's report. *Silicon Labs Integration, Inc. v. Melman*, No. C-08-04030-

RMW, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010). Intus need only show that its "business relationship" with these third parties "contained the probability of future economic benefit." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (1996). Nine of these PACE programs had previously done business with and produced revenue for Intus prior to RTZ's blocking conduct; there is unquestionably a business relationship between Intus and these nine entities that existed at the time of RTZ's interference. (Hult Report ¶ 70; Ex. 7.); *see Silicon Labs*, 2010 WL 890140, at *2 (finding an economic relationship to be sufficient where the plaintiff included "specific references to potential customers with which it had previous sales relationships"). The other 33 PACE programs also promised a probability of future economic benefit in light of Intus' active competition for business with both organizations that had previously generated revenue for Intus and prospective new customers. (Hult Decl. at ¶ 2.) The third category is simply the continuation of that same competitive process for opportunities that never became affirmatively recorded because the alleged information-blocking conduct prevented those opportunities from developing into identifiable bids, proposals, or contracts. (*Id*.) Moreover, Intus was a growing company operating in a growing PACE market, and Hult's report documents substantial revenue growth among Intus' non-RTZ clients during the relevant period. (Hult Decl. at ¶ 3.)[4]

The damages figure Hult calculated relies on only *three contracts* that Intus could have secured from these 42 PACE programs. Put differently, to substantiate Hult's regression-based damages figure in category three, Intus need only prove (which it will) that of these 42 business relationships, there was a probability of future economic benefit that would have resulted in the equivalent of three additional opportunities. (Hult Report at ¶ 84.) This evidence is therefore relevant to Intus' claims.

RTZ cannot dispute that Hult's report specifically identifies PACE programs that had established business relationships with Intus to substantiate the third category of damages.

---

[4] It is therefore economically reasonable (and entirely consistent with the observed market evidence) to conclude that, absent the alleged conduct, Intus would have continued generating growth through both additional business from organizations that had previously generated revenue for Intus and the acquisition of new customers. (Hult Decl. ¶ 3.)

16

FIRM:70846344v2

Instead, RTZ argues that Intus has failed to show "any specific relationship with which RTZ supposedly interfered." (Mot. at 23:28.)[5] But that is what the trial is for. Intus will present evidence to show these business relationships would have yielded economic benefit but for RTZ's wrongful conduct. RTZ's motion in limine is just a disguised summary judgment motion, inviting this Court to adjudicate the interference claim now. The Court should reject this invitation. "[M]otions in limine should not be used as disguised motions for summary judgment." *Altair Instruments, Inc. v. Telebrands Corp*, No. CV 19-8967 PSG (JCX), 2021 WL 5238787, at *1 (C.D. Cal. Feb. 18, 2021); *Miller v. Kowa Am. Corp.*, No. 215CV05671CASEX, 2016 WL 6102315, at *4 (C.D. Cal. Oct. 18, 2016) (refusing to entertain a motion in limine that was "nothing more than a stealth summary judgment motion").

Another fundamental flaw throughout RTZ's motion is its mischaracterization of Intus' third category of damages as "unobservable damages." (Mot. at 20:24-26.) The damages are very much observable and have been calculated by Intus' expert. (Hult Report ¶ 20.) The distinction Hult makes in his report is between affirmatively recorded opportunities (the second category of damages) and other lost opportunities (the third category, which is at issue here). (Hult Decl. at ¶ 4.) This difference reflects only a difference in the evidence—not a difference in the underlying economic harm or the methodology used to estimate it. (*Id.*) Some alleged losses were recorded in Intus' CRM or invoicing records. (*Id.*) Other opportunities, however, were never affirmatively recorded because the challenged conduct prevented them from progressing into identifiable bids, proposals, contracts, or invoices. (*Id.*) Rather than ignoring those losses, economists estimate their aggregate value using accepted econometric methods based on observed market outcomes. (*Id.*) Accordingly, the absence of an affirmatively recorded transaction is not evidence that no economic loss occurred; it simply reflects the circumstance for which accepted economic

---

[5] This same argument is repackaged in a number of different ways throughout the motion, but substantively it is the same argument: "[Intus fails to tie its] speculative 'losses' to any specific existing business relationship with any specific customer." (*Id.* at 22:15-16); "Intus' claimed relationship with potential clients in the market is insufficient, because a specific customer relationship must be identified." (Mot. at 23:15-16); "[Intus fails to show] any specific client contract it expected to secure absent RTZ's alleged interference." (Mot. at 24:7-8)

17

damages methodologies are designed. (*Id.*) To characterize the third category of damages as "unobservable damages," is to fundamentally misunderstand Hult's analysis.

Equally flawed is RTZ's reliance on *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020). The *Prostar* court held that "there is insufficient evidence . . . that Prostar had existing economic relationships with the franchisees or the probability of future benefit." *Id*. at 1017. The problem in *Prostar* is that the plaintiff had not specified customers with which it had business relationships that would yield an economic benefit—instead, the plaintiff "lump[ed] together allegations regarding the undifferentiated group of 11,000 Domino's stores worldwide or its 5,000 domestic stores." *Id*. Thus, the Court was rejecting a market interference theory. That is not Intus's argument. Here, Intus has specified PACE programs by name with which it had business relationships and the possibility of future economic benefit. Additionally, the plaintiff in *Prostar* relied on "[p]resentations at trade shows and expressions of interest" as the basis for its economic relationship; not so here, where Intus has identified specific PACE programs with which it has previously done business and produced revenue. *Id*.

The Court should deny RTZ's MIL No. 3.

## OPPOSITION TO MIL NO. 4: MOTION TO EXCLUDE EVIDENCE OF COLLABRIOS CONDUCT AND USE OF HIGH DESERT EMAILS

In its Motion in Limine No. 4, RTZ seeks an order barring Intus from introducing at trial any evidence, argument or reference concerning the post-acquisition conduct of Collabrios Health LLC ("Collabrios") as irrelevant under FRE 401 and 402 and as more prejudicial than probative under FRE 403. In particular, RTZ seeks to exclude emails relating to one of the terminating PACE facilities, High Desert. But the evidence is relevant to RTZ's counterclaims and damages sought. Excluding the evidence would hamstring Intus in its ability to defend against RTZ's counterclaims.

RTZ filed counterclaims seeking to recover damages based on the cancellation of three PACECare contracts, including High Desert. On April 23, 2026, RTZ served its damages expert report on Intus. In the report, RTZ notes that Intus "went live with [CareHub] in May 2025" and

18

seeks damages based on lost profits from "three PACE facility customers that have subsequently migrated from PACECare to [CareHub]," one of which is High Desert PACE. (Schwechheimer Report at ¶¶ 67-68.)[6] All of this happened post-acquisition. Intus intends to rebut RTZ's damages by, among other things, arguing that RTZ is the wrong party to recover lost profits under the three contracts and thus RTZ cannot demonstrate the causation elements of its counterclaims.

In its motion in limine, RTZ continues to ignore the clear tie between its counterclaims and the evidence RTZ now seeks to exclude. For example, RTZ argues that the emails are inadmissible because they relate to a "non-party contract dispute, not information blocking." (Dkt. 207 at 30:7-8.) In connection with its counterclaims, however, RTZ seeks damages stemming from the termination of the High Desert PACE contract, which happened well after the October 2024 acquisition. It follows that evidence relating to the contract termination is relevant and therefore Collabrios' post-acquisition conduct relating to that termination is relevant too. RTZ cannot have it both ways by seeking damages relating to the same evidence it seeks to exclude. It also does not matter that Collabrios is a "non-party" despite RTZ resting much of its argument on that fact. Indeed, the fact that Collabrios is a non-party is Intus' point. Collabrios, not RTZ, is the entity that was receiving the revenue under these contracts identified by RTZ's damages expert. Thus, Collabrios, not RTZ, is the party that lost the revenue and any associated profits. Intus cannot be precluded from including evidence that establishes the money went to a non-party and RTZ was thus not damaged. In its *Daubert* ruling the Court specifically stated that "Intus remains free to argue at trial that any damages do not accrue to RTZ." (Dkt. 203 at 12:18.) RTZ cannot have it both ways by seeking damages relating to those terminations while also trying to keep out evidence relating to the terminations and who was receiving revenue from those contracts.

Relatedly, and unpersuasive is RTZ's argument that the evidence RTZ seeks to exclude relates to a "collateral contract dispute." (Dkt. 207 at 28:19.). RTZ brought five counterclaims all relating to the termination of PACE care contracts, including High Desert's. Despite RTZ's

---

[6] The Schwechheimer Report is filed at Dkt. 197-3.

19

attempts to downplay this as an irrelevant, collateral dispute, it is directly relevant to the theories and damages RTZ intends to put before the jury.

RTZ also attempts to revise history with respect to the production of the High Desert emails. RTZ argues in its motion that Intus "produced the High Desert emails seven weeks after the close of discovery." (Dkt. 207 at n.5.) But many of the High Desert emails were produced during the discovery period. (Beshai Decl., Ex. C.) To the extent any emails were produced outside the discovery period, the Magistrate Judge held there was no discovery violation because these came voluntarily from a third party. (Dkt. 141 at 1). Intus was not precluded from relying on those documents at trial. The ruling instead was limited to the questioning of the President of Collabrios, Kevin Lathrop during his deposition, not the use of the High Desert emails at trial. (*Id.*). The holding is therefore narrower than RTZ represents and inconsistent with the relief sought in the instant motion. Indeed, the ruling directly undercuts RTZ's position in its MIL.

Finally, Intus is not attempting to relitigate the issue of successor liability. The issue of successor liability was never litigated, so there is nothing to "relitigate." Moreover, Intus is simply trying to defend against RTZ's counterclaims by demonstrating to the jury that after the Collabrios acquisition, RTZ was not the party receiving the money on the High Desert contract. Thus, RTZ has no basis to claim lost profits. The documents also shed light on why the contracts were terminated. Excluding the evidence would prevent Intus from the defenses it is entitled to present to the jury. The Court should deny the motion.

### OPPOSITION TO MIL NO. 5: MOTION TO EXCLUDE EXPERT TESTIMONY ABOUT CONTRACT INTERPRETATION AS IRRELEVANT

#### I.      INTRODUCTION & FACTUAL BACKGROUND

At issue in RTZ's MIL No. 5 is Shawn Fleury's rebuttal opinion about industry norms pertaining to Software-as-a-Service ("SaaS") agreements, like the PACECare contracts at issue. MIL No. 5 is a Daubert motion disguised as a motion in limine. Indeed, RTZ cites Daubert in its motion and relies upon a Daubert analysis as a basis to exclude the testimony. The Court in this case specifically "adjusted the pretrial and trial dates to accommodate the parties' desire to adjudicate Daubert motions before trial." (Dkt. 127.) The purpose of this accommodation from

20

the Court was "to permit the resolution of [the Daubert] motions to inform the parties' pretrial and trial preparation." (*Id.*) The parties have already briefed—and the Court has already decided—the *Daubert* motions at issue.  MIL no. 5 is, therefore, untimely and should be denied on that basis alone.

Even if the Court were to entertain MIL No. 5 on the merits, Fleury's opinion should still be allowed to proceed because it is sound rebuttal testimony. First, Fleury takes on Creegan's opinion that the PACECare contract is a standard SaaS agreement that affords RTZ the right "to provide, maintain, and support the system, not to own, manage, or exercise control over the access to, exchange of, or use of the client's data." (Creegan Report ¶ 56.)[7] RTZ relies on Creegan's opinion to argue that under the PACECare contracts, RTZ did not control access to, exchange of, or use of the PACE clients' data and, therefore, could not have engaged in information blocking. As an initial matter, the Court has already excluded this opinion when it ruled that "Creegan's testimony on whether RTZ engaged in information blocking is excluded because that issue has already been established." (Dkt. 203 at 4:16-17.) Creegan, therefore, should not be offering this opinion at trial, which would eliminate the need for Fleury to provide rebuttal opinion. Additionally, Creegan's testimony regarding contract interpretation is inadmissible because that is not the proper role of an expert.

But even if Creegan's opinion about the PACECare contracts somehow still comes in (it should not), Fleury should be allowed to rebut it. Fleury points out a provision in the PACECare contracts that Creegan completely ignores and undercuts her opinions: A section that prohibits PACE customers from sharing any "forms/documents/reports produced by PACECare" with any third party and expressly names "Intus Care" as one such third party. According to Fleury, "A contract provision in a SaaS agreement prohibiting the client (here, the PACE program) from sharing reports of its data with an independent contractor (here, Intus) is highly relevant to the analysis of whether the SaaS vendor is exercising control over 'the access to, exchange of, or use of the client's data.'" (Fleury Report ¶ 22.)[8] He then points out that "Ms. Creegan's failure to

---

[7] The Creegan Report is filed at Dkt. 198-2.
[8] The Fleury Report is filed at Dkt. 191-2.

21

FIRM:70846344v2

address this provision undermines her opinion." (*Id*.)

Next, Fleury rebuts Creegan's opinion about the PACECare agreements by pointing out her cherry picking of contract terms and inappropriately narrow view of the contract's plain language. According to Creegan, because the PACECare agreement "prohibits clients from attempting to reverse engineer the system or provide access to third parties for that purpose" such restrictions "have no bearing on whether PACE facilities can access, exchange, or use their own EHI." (Creegan Report ¶ 61.) Put differently, Creegan interprets the PACECare agreements to mean that any restrictions on sharing reports is only to prohibit clients or their vendors from reverse engineering the system. Fleury points out the flaws in Creegan's analysis by noting that the plain language of the contract "does not limit the sharing of reports to only those entities seeking to reverse engineer the PACECare system. Rather, the language of the agreement is broad and prohibits sharing 'forms/documents/reports produced by PACECare' with any third party, regardless of the purpose of the third party's use of the data." (Fleury Report ¶ 24.)

Finally, Fleury addresses Creegan's industry standards testimony that EMR vendors, like RTZ, "generally rely on their customers to specify the third-party systems they wish to integrate with." (Creegan Report ¶ 93.) Fleury rebuts this opinion by pointing out that the access requests here were initiated by the PACE customer and "RTZ deviated from common industry practices in that it did not follow its client's (and the owner of the data) request to permit Intus' access." (Fleury Report ¶ 31.) Likewise, Fleury opines that "RTZ should have had no role in determining which data a customer's authorized third party should or should not access." (*Id*. at ¶ 35.) Indeed, according to Fleury, the provision prohibiting PACE customers from sharing reports of their own data with Intus indicates RTZ "was operating outside of certain industry norms." (*Id*. at ¶ 22.)

The Court should, therefore, deny RTZ's MIL No. 5.

## II.   ARGUMENT

### A.   The Court Should Deny RTZ's MIL No. 5 Because It Is An Untimely *Daubert* Motion

This Court set a *Daubert* motions briefing schedule on May 4, 2026. (Dkt. 127.) The Court noted in the order that it had "adjusted the pretrial and trial dates to accommodate the

FIRM:70846344v2

parties' desire to adjudicate Daubert motions before trial and to permit the resolution of those motions to inform the parties' pretrial and trial preparation." (*Id*.) After the parties have fully briefed the *Daubert* expert issues and the Court has issued its ruling, RTZ now brings a belated *Daubert* motion under the guise of a motion in limine. RTZ can label the motion however it wishes, but this is a *Daubert* motion. Consider, for instance, the relief sought. The motion is styled as a "Motion to Exclude Expert Testimony," (Mot. at 32:11), and it argues that Fleury's expert opinion "constitutes an impermissible legal conclusion." (*Id*. at 33:6.) The motion further contends that Fleury's expert opinion "is unreliable and speculative" because "[a]n expert's opinion must be grounded in sufficient facts and data, not conjecture." (*Id*. at 35:15.) Elsewhere, RTZ characterizes Fleury's conclusion as "[a]n expert opinion that contradicts all available evidence." (*Id*. at 36:11-12.) Indeed, RTZ removes all doubt that this is a *Daubert* motion when it argues that Fleury's rebuttal opinion does not meet "the reliability standard of *Daubert*" and proceeds to cite to a number of cases about excluding experts under the *Daubert* standard. (*Id*. at 36:20-37:3.)

RTZ's MIL No. 5 is unquestionably a *Daubert* motion, and it should be denied as untimely.

### B. <u>Fleury Is Not Interpreting a Contract—He Is Rebutting Creegan's SaaS Agreement Opinions</u>

As noted above, Creegan's opinion about the PACECare contracts should not come in for two reasons. First, the only relevance of the opinion is to argue that RTZ did not control access to, exchange of, or use of the PACE clients' data and, therefore, could not have engaged in information blocking. But this issue has been adjudicated: "Creegan's testimony on whether RTZ engaged in information blocking is excluded because that issue has already been established." (Dkt. 203 at 4:16-17.) Second, even if this were still a live issue, Creegan should not be offering this opinion at trial because contract interpretation is not the proper subject of expert testimony expert.

In the event the Court allows Creegan to opine that Intus has never been deprived of access to the data it needs because the PACECare contracts do not afford RTZ control over "the

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2

access to, exchange of, or use of the client's data," (it should not), Fleury should at least be entitled to offer a rebuttal opinion regarding those same contracts. This Court has already held that "Intus is entitled to present Fleury's testimony to counter Creegan's testimony regarding industry standards." (Dkt. 203 at 7:26-27.)  And any testimony from Fleury about the PACECare contracts would be to counter Creegan's testimony regarding industry standards surrounding SaaS agreements. The role of the rebuttal expert is "'to contradict or rebut evidence on the same subject matter identified by' the opposing party's expert witness." *Avila v. Ford Motor Co.*, 796 F. Supp. 3d 593, 598 (N.D. Cal. 2025) (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)). "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Huawei Techs., Co., Ltd. v. Samsung Electronics Co., Ltd.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018). "[O]pining on methods and facts [the other side's] experts did not consider are precisely the type of rebuttal testimony the court would expect." *Laflamme v. Safeway, Inc.*, No. 3:09-CV-00514, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010). It would be patently unfair to allow Creegan to provide testimony about her (incorrect) views of a contract, but bar Intus from providing rebuttal expert testimony on the same contract. RTZ's arguments to the contrary are meritless.

First, RTZ is wrong to characterize Fleury's rebuttal opinion as contract interpretation. Fleury does not purport to define RTZ's contract limitation on sharing "forms/documents/reports." Instead, he is pointing out that Creegan's analysis of the PACECare contract as a standard SaaS agreement is flawed. Contrary to Creegan's opinion that the PACECare contact did not allow RTZ control over access, exchange, or use of PACE customers' data, there is a contract provision explicitly prohibiting PACE customers from sharing—or accessing and exchanging—reports of their data with Intus. According to Fleury, such a provision not only undermines Creegan's opinion, but it also deviates from industry norms because "RTZ should have had no role in determining which data a customer's authorized third party should or should not access." (Fleury Report at ¶ 35.) RTZ makes much of the notion that Fleury cannot definitively state whether the term "reports" in the PACECare contract encompasses "expanded exports." RTZ's attempted semantic games to avoid contract language it now doesn't like is a red

24

herring. Fleury is not opining that reports and expanded exports mean the same thing.[9] He is pointing out that RTZ has imposed restrictions on PACE programs as to how they can share their data, which deviates from standard industry practice.

Next, RTZ contends that because other evidence in the record contradicts Fleury's opinion, it should be excluded. RTZ is wrong both as to the facts and the law. As a factual matter, RTZ is wrong to argue that because it informed Intus to obtain expanded reports/exports directly from PACE customers that must mean RTZ did not restrict its customers' ability to share reports. RTZ's argument presents only one side of the conversation—what it was telling Intus—and even that presentation is misleading. The expanded exports were suggested to Intus as a temporary, stopgap measure while RTZ feigned that it was working on integrating the two companies, not as a workaround after RTZ cut off access. (Beshai Decl., Ex. D.) And the fundamental question is whether RTZ was telling PACE clients the same thing about expanded exports, or whether those clients were left to guess as to whether they were precluded from sharing reports because of a contract provision that prohibited sharing "forms/documents/reports." These facts, therefore, are not contrary evidence. As a legal matter, just because there are some facts tending to undermine an expert opinion (again, the facts here do no such thing), that goes to weight not admissibility, as this Court has already held. (Dkt. 203 at 9:26-28.)

Finally, because Fleury is not engaged in contract interpretation, RTZ's remaining evidentiary objections fail. There is no risk of prejudice or juror confusion because this is not an instance where an expert is putting his imprimatur on a specific contract interpretation. Fleury is simply pointing out a provision that allows RTZ control over PACE customers' access, use, and exchange of their data, which deviates from industry norm for SaaS agreements and undermines Creegan's opinion. It would be patently unfair to allow Creegan to offer her narrow interpretation that the provision prohibiting sharing reports merely "prohibits clients from attempting to reverse engineer the system" without allowing Fleury to zoom out and simply highlight other provisions that speak more broadly to restricted access. Nor is there a risk of extensive cross-examination on

[9] For RTZ's argument to make any sense it must mean that Creegan is doing exactly what RTZ is accusing Fleury of doing. Neither expert should be giving an "opinion" about what the contracts mean.

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE
FIRM:70846344v2

this topic. As explained, Fleury will simply give his opinion that there is a provision broadly prohibiting sharing reports. If RTZ then wants to offer its so-called counter evidence about the distinction between expanded exports and reports, it may do so, but it will not be a topic on which to cross-examine Fleury.

In any event, the Court should deny RTZ's MIL No. 5 as moot because the contract provision at issue in this MIL pertains to an issue—whether RTZ has engaged in information blocking—that has been adjudicated. And even if MIL No. 5 is somehow not moot, Fleury should be allowed to offer rebuttal testimony on SaaS agreement industry practice.

Dated: July 17, 2026

EPSTEIN BECKER & GREEN, P.C.

By:   */s/ Charles E. Weir*

Charles E. Weir
Andrew M. Beshai

Attorneys for Plaintiff
INTUSCARE INC.

---

26

PLAINTIFF'S OPPOSITION TO RTZ ASSOCIATES, INC.'S OMNIBUS MOTIONS IN LIMINE

FIRM:70846344v2