Charles E. Weir (SBN 211091)
Andrew M. Beshai (SBN 308030)
EPSTEIN BECKER & GREEN, P.C.
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone:    310.556.8861
Facsimile:    310.553.2165
cweir@ebglaw.com
abeshai@ebglaw.com

Attorneys for Plaintiff
INTUS CARE, INC.

David C. Lee (SBN 193743)
Kasia Penn (SBN 306056)
NOSSAMAN LLP
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone:    415.398.3600
Facsimile:    415.398.2438
dlee@nossaman.com
kpenn@nossaman.com

Attorneys for Defendant and Counter-Claimant
RTZ ASSOCIATES INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTUS CARE, INC.,<br><br>             Plaintiff,<br><br>      v.<br><br>RTZ ASSOCIATES, INC. and DOES 1 through 10,<br><br>             Defendants. | Case No. 4:24-cv-01132-JST<br><br>*Assigned to Hon. Jon S. Tigar, Crtrm. 6*<br><br>**JOINT PRETRIAL STATEMENT**<br><br>Pretrial Conf.: July 31, 2026<br>Trial: August 24, 2026 |

JOINT PRETRIAL STATEMENT
FIRM:70902219v3

1.    **Substance of the Action.**

Brief Description of the Parties

Plaintiff and Counterdefendant IntusCare Inc. ("Intus") provides Data analytics and support services to PACE program to assist them with operations and improve patient care. PACE stands for Program of All-Inclusive Care for the Elderly, a U.S. Medicare/Medicaid program designed to help frail, older adults continue living in their own homes and communities instead of moving into a nursing home. Intus' services assist PACE programs with optimizing and improving patient care. To perform its services, Intus needs access to the patient data that belongs to the PACE programs. This data is stored in electronic medical records ("EMR") or electronic health records ("EHR") software. Defendant RTZ Associates, Inc. ("RTZ") operates an EMR/EHR called PACECare, which many PACE programs license to store their patients' data.

Defendant and Counterclaimant RTZ has serviced the PACE industry for over two decades developing software tools designed to assist PACE organizations in administering care to their PACE members. RTZ owns, develops, and licenses PACECare, its proprietary, cloud-based electronic health record software system to PACE facilities pursuant to PACECare Agreements that permit the licensed facility to access and use the system while preserving RTZ's exclusive ownership of all aspects of the PACECare system, including its source code, system logic and functionality, screen layout and design, and associated reports and documentation. Those Agreements acknowledge that the licensed PACE facilities own the patient data they input into PACECare, but that RTZ owns the PACECare system. Those agreements expressly prohibit facilities from granting system access to any third party—including competitors—without RTZ's consent.

Intus' Claims and Defenses

Intus claims that RTZ has engaged in information blocking in violation of the Cures Act, excluding Intus from accessing the electronic health data it needs to service its PACE customers. RTZ has done this by sending Intus a cease-and-desist letter prohibiting Intus from accessing RTZ's PACECare system. RTZ has also threatened PACE programs with suit if they worked with Intus and included standard provisions in its contracts prohibiting PACE programs from sharing reports of their data with Intus. RTZ's unlawful information blocking conduct serves as the basis

2

FIRM:70902219v3

for Intus' Unfair Competition Law ("UCL") claim. RTZ also interfered with Intus' contracts and prospective economic advantage based on the same conduct. Not only was RTZ's conduct unlawful, but it also constitutes unfair and fraudulent behavior violating the UCL and intentionally interfering with Intus' contracts and prospective economic advantage.

<u>RTZ's Defenses to Intus' Claims</u>

RTZ denies the material allegations of the First Amended Complaint and disputes that its conduct gives rise to any cognizable liability. Among other things, Intus' claims rest on the premise that RTZ engaged in unlawful "information blocking" under the 21st Century Cures Act and its implementing regulations because RTZ declined to give Intus authorized access to PACECare absent an NDA. RTZ denies each element of that theory. First, RTZ does not qualify as an "actor" within the meaning of the Cures Act and 45 C.F.R. § 171.102. Second, RTZ's conduct does not constitute "information blocking" as defined under the Act and its regulations given the access that Intus had to the EHI data it needed for its services even without needing to access PACECare; while RTZ acknowledges the Court's recent ruling that Intus has established facial information blocking, it contends that "information blocking" is not established unless (1) Intus proves that RTZ is an actor, and (2) no exception to information blocking applies. Third, RTZ's pertinent conduct — namely, declining to permit an unauthorized, non-licensed competitor to access its proprietary system absent an executed nondisclosure or access agreement — falls within the "Manner" exception to information blocking set forth at 45 C.F.R. § 171.103, because RTZ was willing to provide access through an alternative, reasonable manner (i.e., execution of an NDA or negotiated access agreement) that Intus refused to accept. Fourth, RTZ denies Intus' tort claims for intentional interference with contractual relations and intentional interference with prospective economic advantage, denying that it acted with any improper motive or by improper means, and asserting that its conduct was privileged and justified by its legitimate interest in protecting its proprietary software and enforcing its own valid license agreements. Fifth, RTZ denies Intus' equitable claim seeking declaratory and/or injunctive relief under California Bus. & Prof. Code § 17200, and asserts that it did not engage in any unlawful, unfair, or fraudulent business practice.  RTZ has also pled affirmative defenses including failure to state a claim,

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

waiver, estoppel and consent, unclean hands, failure to mitigate, competition privilege, and the applicable statutes of limitations.

RTZ's Counterclaims

RTZ has asserted counterclaims against Intus for (1) violation of the California Computer Data Access and Fraud Act, Cal. Penal Code § 502; (2) violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (3) trespass to chattels; (4) unfair competition under California Business & Professions Code § 17200 et seq.; and (5) inducing breach of contract. In brief, RTZ alleges that Intus, without RTZ's knowledge or consent, wrongfully accessed RTZ's proprietary PACECare system by exploiting the login credentials of RTZ's PACE facility licensees, covertly developed and deployed an automated script to extract protected data from PACECare, and continued accessing the PACECare through the use of unauthorized login credentials despite RTZ's demands to cease and desist such conduct absent an NDA. RTZ further alleges that Intus exploited such access to accelerate development of its competing CareHub product.

Intus' Defenses to RTZ's Counterclaims

Intus defends against RTZ as follows. As to the California Computer Data Access and Fraud Act and the Computer Fraud and Abuse Act, Intus did not access PACECare in an unauthorized manner; instead, it was given permission by the PACE customers to access data belonging to the PACE customers for the purpose of providing services contracted for by the PACE customers. The only data Intus ever obtained from PACECare is electronic health information belonging to the PACE customers who authorized Intus' access—not belonging to PACECare. As to the trespass to chattels claim, Intus contends that RTZ cannot prove any harm or disruption to its system, which is required to prevail. If RTZ cannot prevail on any of these three claims, it also cannot prevail on its Unfair Competition Law claim, which require one of these other claims as a predicate. Also, as to the inducing breach of contract claim, RTZ cannot prove that it was harmed by Intus' access to PACECare. RTZ's theory is that Intus' competing product, CareHub, benefitted from accelerated development as a result of Intus' access to PACECare. But RTZ has no evidence of this and has not even attempted to quantify the measure of damages resulting from PACECare access. Finally, as to all counterclaims, RTZ cannot prove

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

any damages associated with Intus' access because that access did not result in damage, disruption, or interference with the PACECare system.

Operative Pleadings

The operative pleadings are Intus's First Amended Complaint, filed April 2, 2024 (Dkt. No. 25), and RTZ's Answer to the First Amended Complaint and Counterclaims, filed June 20, 2024 (Dkt. No. 41).

**2.      Relief Requested.**

Intus seeks the following requested relief:

1. Lost profits and compensatory damages in the amount of $7,301,505, as set forth below:

    a.      Intus' pre-existing contracts: $108,183

    b.      Lost opportunities in Intus' CRM data: $4,864,543

    c.      Regression analysis of RTZ and Non-RTZ Customers: $2,164,121

    d.      Labor costs: $164,658

2. Injunctive and equitable relief as appropriate, including an injunction barring RTZ from denying access to the electronic health record data documented by the Intus Clients and stored on PACECare.

RTZ seeks the following requested relief:

1. Compensatory damages:

    a.      Lost profit and disgorgement damages consisting of:

        i.      Economic damages ranging from $430,000 to $550,000 arising from Intus' unauthorized access to and data extraction from RTZ's PACECare system.

        ii.      Lost profit damages totaling approximately $1,161.959 arising from Intus' expedited entry into the PACE EMR market.

2. Injunctive and equitable relief as appropriate, including an injunction barring Intus's continued unauthorized access to RTZ's PACECare system, including through the use of automated scripts.

FIRM:70902219v3

**3.    Undisputed Facts.**

1.    At all times relevant to this case, RTZ owned the PACECare system, a proprietary cloud-based electronic health record software system designed for and licensed to Programs of All-Inclusive Care for the Elderly ("PACE") organization nationwide.

2.    PACE organizations contractually licensed to use PACECare are contractually barred from providing account credentials to the PACECare system to any third-party, including Intus.

3.    PACE organizations contractually licensed to use PACECare own the electronic health information ("EHI") data stored within their PACECare application, but do not own the software application.  RTZ does not own the EHI stored in the PACECare application.

4.    RTZ is not a Health Care Provider as defined in the 21st Century Cures Act (42 U.S.C. § 300jj(3); 45 C.F.R. § 171.102; 85 Fed. Reg. 25,642, 25,811 (May 1, 2020).

5.    RTZ is not a Health IT Developer of Certified Health IT as defined in the 21st Century Cures Act (45 C.F.R. § 171.102; 42 U.S.C. § 300jj-11(c)(5); 85 Fed. Reg. 25,642, 25,813-15 (May 1, 2020).

**4.    Disputed Factual Issues.**

The parties dispute all material facts except as otherwise set forth in Section 3.

**5.    Agreed Statement.**

Not applicable.

**6.    Stipulations.**

Consistent with Section 3 above (Undisputed Facts) the parties have stipulated that: (1) RTZ is not a (i) health care provider or (ii) certified health IT as defined and/or used within the 21st Century Cures Act; and (2) Intus will not introduce evidence of its ONC Complaint in this trial. The parties have also stipulated to the admissibility of certain exhibits as set forth in Appendix A. Finally, the parties have stipulated to waive objections as to the scope of cross-examination so as to not have to recall witnesses in all instances, allowing for a more streamlined presentation of testimony.

FIRM:70902219v3

## 7. **Witnesses to be Called.**

Intus Witnesses

| | |
|---|---|
| Robbie Felton (1.5 hours) | - General knowledge about: (i) IntusCare ("Intus"), (ii) its products, (iii) how RTZ's data blocking affected Intus' business, (iv) Intus' access negotiations with RTZ, and (v) the development of CareHub. |
| Evan Jackson (1.5 hours) | - General knowledge about: (i) Intus, (ii) its products, (iii) how RTZ's data blocking affected Intus' business, (iv) Intus' access negotiations with RTZ, and (v) the development of CareHub. |
| Alex Rothberg (1.5 hours) | - General knowledge about: (i) Intus, (ii) its products, (iii) how RTZ's data blocking affected Intus' business, (iv) Intus' access negotiations with RTZ, and (v) the development of CareHub. |
| Laura Ferrara (.75 hour) | - General knowledge about: (i) Intus, and (ii) its products. |
| Alex Chiulli (.75 hours) | - Intus' access negotiations with RTZ |
| Alex Lueth (.75 hour) | - General knowledge about: (i) Senior Care Partners PACE, (ii) Senior Care Partners use of PACECare and |

7

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

| | |
|---|---|
| | interactions with RTZ, (iii) RTZ's products and product operations. |
| Miranda Carter (.75 hour) | - General knowledge about: (i) Community at Home PACE, (ii) its use of RTZ and Intus products and services; (iii) Community at Home PACE/Intus relationship and interactions. |
| Jeff Glenn (.75 hour) | - General knowledge about: (i) Neighborhood PACE, (ii) its use of RTZ and Intus products and services; (iii) Neighborhood PACE/Intus relationship and interactions. |
| Sharon Melancorn (.75 hour) | - General knowledge about: (i) High Desert PACE, (ii) its use of RTZ and Intus products and services; (iii) High Desert PACE/Intus relationship and interactions. |
| Will Mimms (.5 hour) | - General knowledge about: (i) IntusCare ("Intus"), (ii) its products, (iii) how RTZ's data blocking affected Intus' business. |
| Michael Lee (.5 hour) | - General knowledge about Intus' accounting and record-keeping practices |
| Kristopher Hult (1.5 hour) | - Expert and rebuttal opinion concerning damages |

8

JOINT PRETRIAL STATEMENT

| Shawn Fleury (1 hour) | - Rebuttal testimony |

RTZ Witnesses

| WITNESS | SUBJECT |
| --- | --- |
| Michael Zawadski (1.5 hours) | - General knowledge about: (i) RTZ, (ii) its products, (iii) PACECare customers, contracts, development, operation, licensing and use; (iv) RTZ/Intus relationship and interactions. |
| Laura Emery (1 hour) | - General knowledge about: (i) RTZ, (ii) PACECare operation and system modules; (iii) RTZ/Intus relationship and interactions. |
| Kevin Lathrop (0.5) | - General knowledge about: (i) PACECare, including its data exchange processes, (ii) PACECare audit logs. |
| Traci Creegan (1.5 hours) | - Expert opinions concerning RTZ's PACECare system, including its data exchange processes, system access request assessments, and electronic HealthIT industry standards. |
| Peter Schwechheimer (2.5 hours) | - Expert and rebuttal opinions concerning damages analysis. |

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

| | |
|---|---|
| Alex Lueth (0.5 hour) | - General knowledge about: (i) Senior Care Partners use of PACECare and interactions with RTZ, (ii) RTZ's products and product operations. |
| Robbie Felton (1.5) | - General knowledge about: (i) Intus, (ii) its products; (iii) RTZ/Intus relationship and interactions; (iv) Intus's customer interactions; (v) Intus's contracts. |
| Alex Rothberg (1 hour) | - General knowledge about: (i) Intus, (ii) its products; (iii) RTZ/Intus relationship and interactions; (iv) Intus technologies and product deployment; and (v) Intus's interactions with customers. |
| Evan Jackson (0.75 hour) | - General knowledge about: (i) Intus, (ii) its products; (iii) RTZ/Intus relationship and interactions; (iv) Intus's contracting, sales and marketing; and (v) Intus's revenues. |
| Laura Ferrara (1.25 hour) | - General knowledge about: (i) Intus, (ii) its products; (iii) Intus relationships and interactions with customers; and (iv) Intus technologies, product marketing strategies, and deployment. |
| Evan Walters (1.5) | - General knowledge about: (i) Intus, (ii) its products; (iii) Intus product development and development of Intus |

10

JOINT PRETRIAL STATEMENT

| | |
|---|---|
| | extraction processes and methodologies; (iv) Intus access to EMRs including PACECare. |
| Lauri Wertz (0.5 hours) | - General knowledge about: (i) Intus's product deployment and integration; (ii) RTZ/Intus interactions; (iii) Intus's interactions with customers. |
| Miranda Carter (0.5 hours) | - General knowledge about: (i) Community at Home PACE, (ii) its use of RTZ and Intus products and services; (iii) Community at Home PACE/Intus relationship and interactions. |

**8.    Exhibits, Schedules, and Summaries.**

Attached as Appendix A is the parties' exhibit list, including stipulations and objections.[1]

**9.    Disputed Legal Issues.**

The parties' disputed legal issues have been briefed in the disputed jury instructions and motions in limine. The proposed jury instructions, including the disputed instructions with each party's concise legal arguments, are filed as Appendix B.

**10.    Pending Motions or Matters.**

There are no motions or other matters that must be resolved prior to trial, other than the pending motions in limine.

**11.    Bifurcation or Separate Trial of Issues.**

The Court has adjudicated RTZ's motion to bifurcate, and there are no remaining bifurcation or separate trial of issues to be resolved.

---

[1] The parties have resolved a majority of the issues surrounding the objections to exhibits but are continuing to discuss the exhibits and reserve the right to make further changes or objections,

11

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

**12.    Use of Discovery Responses.**

1.  Both parties intend to use deposition testimony from the individuals below. The parties' deposition designations, objections and responses to those objections are filed as Appendix C.

    a.  Deposition of Miranda Carter

    b.  Deposition of Lauri Wertz

    c.  Deposition of Alex Lueth

    d.  Deposition of Evan Walters

    e.  Deposition of Melanie Martinez

    f.  Deposition of Kevin Lathrop

2.  RTZ intends to use the following discovery responses:

    a.  Intus Responses to Interrogatories (Set One) and Appendix A

    b.  Intus Responses to Requests for Admissions (Set One)

    c.  Intus Responses to Requests for Production of Documents (Set One)

**13.    Estimate of Trial Time.**

The parties estimate eight days of trial, including jury selection.

**14.    Settlement Discussion.**

The parties are continuing to engage in good-faith settlement discussions.

**15.    Miscellaneous.**

Testimony of Alex Chiulli

RTZ objects to the appearance of Alex Chiulli (Intus's counsel of record in this action) on Intus's Trial Witness List given the clear privilege issues and the implications addressed in RTZ's Motion In Limine No. 1. to Exclude Intus's Internal Evaluation, Scrutiny, Legal or Business Assessment, Reasons, Rationale, or Decision-Making Concerning RTZ's NDA. As asserted in that MIL, Intus has cloaked Intus's review and reaction to RTZ's NDA in privilege thereby creating prejudice to the extent Mr. Chiulli is permitted to testify. Intus asserts that it intends to call Mr. Chiulli to testify about non-privileged exchanges he had with RTZ's counsel regarding access negotiations. Indeed, RTZ has made much of the NDA negotiations as a defense to its

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

information blocking. Intus believes it should be able to call the witness that engaged in those negotiations. Other than as a potential witness, Mr. Chiulli will play no role in the trial.

Expert Testimony

Per the Court's Order on Motions to Exclude Expert Testimony (Dkt. 203), RTZ's planned trial testimony by its experts Traci Creegan and Peter Schwechheimer.

RTZ's Position Re: Creegan

Per the Court's Order on Motions to Exclude Expert Testimony (Dkt. 203), RTZ intends to elicit testimony from Ms. Creegan concerning the architecture and functionality of the PACECare system, the manner in which PACE facilities access their own data through PACECare, the industry-standard methods by which electronic health information is exchanged in the HealthIT industry (including exported reports in machine-readable formats, SFTP, APIs, and interface standards such as HL-7 and FHIR), and whether the parties' conduct comported with those industry standards. As the Court expressly held, Ms. Creegan "may testify on compliance with industry standards" and may testify "as to industry standards and whether the parties complied with them." (Dkt. 203 at 6–7.) Consistent with the Court's Order, RTZ maintains that Ms. Creegan will not offer opinion testimony at trial on the following ultimate "legal conclusions" identified by the Court: (1) that RTZ is not an "Actor" under the Cures Act; (2) that RTZ did not engage in information blocking; and (3) that the Manner Exception applies to RTZ's conduct. (Dkt. 203.) As addressed below, Intus claims that Ms. Creegan cannot testify about *any* topics addressed in Paragraphs 32 - 116 of her Expert Report – the *entirety* of her Report other than the "Executive Summary" and "Background" sections.  This ignores the Court's express ruling that Ms. Creegan is permitted to testify about industry standards/norms and the parties' compliance and/or noncompliance with such standards/norms – all of which exist and operate within the regulatory frameworks of the HealthIT industry. These opinions are asserted throughout the entirety of her report, including (notably) Paragraphs 93 - 116. Intus further claims that Ms. Creegan cannot opine on *any* subjects bearing on issues touching on RTZ's Actor status, including preventing her from mentioning or referencing the existence of health information networks and exchanges (HIN/HIEs), how HIN/HIEs are understood and viewed within the HealthIT industry, or Ms. Creegan's analysis of the factual predicates of concerning RTZ's PACECare system and

13

JOINT PRETRIAL STATEMENT

how that system's data exchange processes operate and whether such operations fit within HealthIT industry standards and norms. Such testimony does not constitute opinions about ultimate "legal conclusions." Finally, Intus's claim that Ms. Creegan is barred from "interpret[ing] emails" again exceeds the scope of the Court's *Daubert* ruling and is inconsistent with this Court's *Daubert* ruling concerning the allowable testimony from Intus's expert witness (Shawn Fleury). (Dkt. 203.) Intus can cross-examine Ms. Creegan on such issues.  As stated above, Ms. Creegan does not intend to present or offer any opinions on the ultimate "legal conclusions" delineated in the Court's Order. (Dkt. 203.)  However, contrary to Intus's position, that Order does not eradicate the *entirety* of Ms. Creegan's Report or opinions contained in that Report – except as to those legal conclusions specified by the Court. (Dkt. 203.)

RTZ specifically responds to Intus's three points concerning Ms. Creegan's report:

- Paragraphs 32-43: The Court's Order does not bar Ms. Creegan from describing, as a technical and industry matter, how the PACECare system is architected and how its data-exchange processes function (including whose data a licensed facility accesses through the system and whether the system enables the exchange of information among unaffiliated facilities) and how those functions compare to the functions performed by health information networks and exchanges as they are understood within the HealthIT industry. That testimony describes system architecture and industry practice. It does not instruct the jury on the legal definition or direct the verdict. The jury will be instructed on the legal definition of HIN/HIE and will apply the facts.

- Paragraphs 44–65: The testimony within these paragraphs bearing on industry standards and the manner in which RTZ made data available remains relevant to the Manner Exception, which the jury must still decide, and to that extent is not rendered irrelevant by the facial-information-blocking ruling.

- Paragraphs 66–116: Ms. Creegan may testify to the industry-standard significance of the parties' documented conduct and communications which is factual, experience-based testimony that bears on the Manner Exception and does not

FIRM:70902219v3

require divining any party's state of mind. This is the same category of testimony the Court permitted from Intus's rebuttal expert, Shawn Fleury.

<u>Intus's Position Re: Creegan</u>

RTZ provided its position regarding the scope of Creegan's testimony on July 23, 2026, and it contains no detail about the actual paragraphs from Ms. Creegan's report or substance of testimony that they expect to elicit from Ms. Creegan. Intus' position is that Ms. Creegan should be limited to her review of the audit logs and only the industry standards that remain germane to the case. As such, she should not be allowed to present testimony as to any of the following topics:

- o Whether RTZ satisfies the definition of Health Information Exchange or Health Information Network ("HIN/HIE") under the Cures Act. Such testimony fails for the same reasons as the Court held Ms. Creegan cannot testify that RTZ is an "Actor." Indeed, it is functionally the same testimony as Creegan testifying that RTZ is not an Actor. There is a specific legal definition of HIN/HIE, which the jury will be instructed on. It is the jury's role to apply the facts to the law and determine whether RTZ is an HIN/HIE. Ms. Creegan does not offer anything of value beyond making the ultimate legal conclusion that RTZ is not an HIN/HIE, and as a result not an Actor. Worse yet, Ms. Creegan's opinion discards the statutory language entirely in lieu of a definition of her own creation that favors RTZ's position. (*See* Intus' MIL No. 7.) Allowing Ms. Creegan to opine that RTZ is not an HIN/HIE is just a step removed from the Court's prohibition on any testimony that RTZ is not an actor. In other words, it would make no sense to preclude Ms. Creegan from opining that RTZ is an actor but then allow her to opine that RTZ does not meet any of the definitions underlying the Actor designation, such as HIN/HIE. Therefore, Ms. Creegan should not be allowed to testify as to paragraphs 32-43 of her report.

- o Whether RTZ engaged in facial information blocking. The Court has already ruled that the issue of whether RTZ has engaged in facial information blocking has been adjudicated for purposes of trial. Paragraphs 44-65 of Ms. Creegan's report fall under the heading of "EVEN IF RTZ WAS CONSIDERED AN ACTOR, ITS

15

FIRM:70902219v3

CONDUCT DID NOT MEET THE REGULATORY DEFINITION OF INFORMATION BLOCKING." Putting aside that this entire section boils down to improper statements of the law and legal conclusion from Ms. Creegan, it is also now irrelevant since the Court has deemed this issue adjudicated.

o   Opinions in which Ms. Creegan interprets emails and divines a party's intent and state of mind. Throughout paragraphs 66-116, Creegan offers opinions about the motives of each party, whether a specific party was confused by a request for access, and whether a party negotiated in good faith. (*See also* Dkt. 198 at 16:15-21:9.) For instance, Ms. Creegan cannot opine on whether Intus properly or improperly understood the applicable regulatory obligations (paragraphs 97-99). None of this is proper expert testimony, and it should all be excluded.

o   Conclusory statements regarding the audit logs. Ms. Creegan should not be allowed to testify that the audit logs establish that Inuts' access supposedly exceeded its data needs. She has no basis to make such a claim, as she does throughout paragraphs 108-114), but she can testify that the access exceeds the scope of the materials in the automated script.

o   Intus' credential-sharing practices deviated from industry-standard user access (paragraphs 100-107). The issue of whether Intus' credential-sharing practices adhered to industry norms is not related to any claim or defense. None of Intus' claims implicate the credential-sharing practice. And all of RTZ's counterclaims include legal standards and definitions that do not require resort to testimony about industry standard surrounding credential-sharing practices (i.e., RTZ's counterclaims do not reference industry standard or practice).

In sum, Intus' position is that Ms. Creegan's testimony should be limited to two areas: 1) her review of the access logs (but without any testimony about Intus' overall business needs, which she does not have a basis to opine on), and 2) industry standards unrelated to facial information blocking (such as common practice around and the meaning of "industry-standard tools such as exported reports (e.g., Excel, CSV, TXT) exchanged via SFTP, APIs, or interfaces (HL-7, FHIR) to facilitate information exchange").

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

RTZ's Position Re: Schwechheimer

RTZ maintains that Peter Schwechheimer will not offer opinion testimony at trial on the following topics: (1) the Module classifications by Laura Emery and whether High modules provided insight into PACECare's organizational structure and/or included features or functions common to standard EHR software; (2) that Intus's access to PACECare allowed Intus to develop CareHub on an accelerated schedule; (3) Intus's raising of capital; and (4) that disgorgement of profits is an available remedy under the California Comprehensive Computer Data Access and Fraud Act. (Dkt. 203.) As with its argument concerning Ms. Creegan's testimony, Intus seeks to overstate the effect of the Court's *Daubert* ruling on Mr. Schwechheimer's permissible testimony. Intus claims that Mr. Schwechheimer is only permitted to testify on subjects addressed in Paragraphs 55-71 of his Report and nothing more. Mr. Schwechheimer's understanding and knowledge of the factual underpinnings concerning the parties' interactions and activities all provide context for his damage analysis opinions – the same as with Intus's damages expert Dr. Hult, who likewise incorporates a robust and lengthy "Background" into his expert Report. Therefore, Intus's attempt to limit Mr. Schwechheimer's testimony to the content of Paragraphs 55-71 of his Report overstates the scope of the Court's *Daubert* ruling. Had the Court intended to limit Mr. Schwechheimer's opinions to Paragraphs 55-71, its Order would have reflected that. It did not and should not in response to Intus's statement below. RTZ intends to respect the testimonial limitations of the Court's Order; Mr. Schwechheimer will avoid opining on those topics set forth in the Court's Order (Dkt. 203).

Intus's Position Re: Schwechheimer

Like Creegan, RTZ fails to provide an indication of what testimony it intends to elicit from Mr. Schwechheimer that would comply with the Court's ruling. Intus' position is that Mr. Schwechheimer's testimony should be limited to his calculations related to lost profits for three PACE programs and calculations related to the monthly access fee (paragraphs 55-71 of his report) as well as his rebuttal testimony). Any other testimony runs afoul of the Court's *Daubert* ruling.

FIRM:70902219v3

Voir Dire Questions

The parties intend to supplement the standard civil jury questionnaire (https://cand.uscourts.gov/sites/default/files/wp-content/uploads/forms/SurveyMonkey_Civil-questionnaire_01-01-2025.pdf) with the following case specific questions:

- Are you familiar with Program of All-Inclusive Care for the Elderly ("PACE")?

- Are you currently, or were you ever, enrolled in a PACE program or had a family member or friend enrolled in a PACE program?

- Do you have any experience with healthcare technology, like an electronic medical records system?

- Do you have any cybersecurity or information technology experience?

- This case involves a dispute between two companies — one that provides electronic medical records software to clinics and hospitals, and one that analyzes healthcare data. Do you have strong feelings, positive or negative, about large healthcare technology companies?

- Have you heard of the term "information blocking" in the context of exchanging health data between systems?

Verdict Forms

The parties have filed their respective proposed verdict forms on the docket.

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order will supplement the pleadings and govern the course of trial of this case, unless modified by the Court to prevent manifest injustice

Dated: July 24, 2026                              EPSTEIN BECKER & GREEN, P.C.

                              By:    */s/ Charles E. Weir*
                                     Charles E. Weir
                                     Andrew M. Beshai

                                     Attorneys for Plaintiff
                                     INTUS CARE, INC.

18
JOINT PRETRIAL STATEMENT

FIRM:70902219v3

Dated:  July 24, 2026                    NOSSAMAN LLP

                                    By:    */s/ David C. Lee*
                                           David C. Lee
                                           Michele C. Kirrane
                                           Kasia Penn

                                           Attorneys for Defendant
                                           RTZ ASSOCIATES, INC.

JOINT PRETRIAL STATEMENT

FIRM:70902219v3

# Appendix A:
# Joint Exhibit List

| Exhibit No. | Bates No./Dep. Ex. No. | End Bates | Brief Description | Sponsoring Witness(es) | Admissibility/Objections | Response to Objections |
|---|---|---|---|---|---|---|
| 1 | Dep. Ex. 1 (no bates) | | Carter deposition subpoena | Miranda Carter | Object – relevance | |
| 2 | Dep. Ex. 2 (no bates) | | Email thread – Carter, Amanda Muniz, Kelsey Bruno - re: Community PACE/Intus – RTZ Medications Report Failing | Miranda Carter | Stipulated | |
| 3 | Dep. Ex. 2A (no bates) | | Intus-Community PACE at Home Contract, 11/2020 | Miranda Carter | Stipulated | |
| 4 | Dep. Ex. 2B (no bates) | | Data Integration Addendum - Community-Intus, 5/4/2023 | Miranda Carter | Stipulated | |
| 5 | Dep. Ex. 3 (no bates) | | Email thread – Carter, Amanda Muniz, Kelsey Bruno - re: Community PACE/Intus – RTZ Medications Report Failing | Miranda Carter | Stipulated | |
| 6 | Dep. Ex. 4 (no bates) | | Email thread – Carter, Amanda Muniz, Kelsey Bruno - re: Community PACE/Intus – RTZ Medications Report Failing | Miranda Carter | Stipulated | |
| 7 | Dep. Ex. 5 (no bates) | | Email thread – Evan Jackson, Miranda Carter, others re: Community PACE at Home Mock Audit | Miranda Carter | Stipulated | |
| 8 | Dep. Ex. 6 (no bates) | | Email thread – Selina Lindley, Miranda Carter, others re: Community PACE at Home Mock Audit | Miranda Carter | Stipulated | |
| 9 | Dep. Ex. 7 (no bates) | | Email thread – Carter, Amanda Muniz, Kelsey Bruno - re: Community PACE/Intus – RTZ Medications Report Failing | Miranda Carter | Stipulated | |
| 10 | Dep. Ex. 8 (no bates) | | Email from Carter to Kelsey Bruno re: Deactivated Intus Accounts | Miranda Carter | Stipulated | |
| 11 | Dep. Ex. 9 (no bates) | | Email thread – Selina Lindley, Miranda Carter, others re: Community PACE at Home Mock Audit | Miranda Carter | Stipulated | |
| 12 | Dep. Ex. 10 (no bates) | | Email thread – Selina Lindley, Laura Ferrara, Miranda Carter, others re: Community PACE + Intus Care Mock Audit | Miranda Carter | Stipulated | |
| 13 | Dep. Ex. 11 (Intus 004172-Intus 004174) | | Email thread - Bobbi Runyon, Melanie Martinez, Evan Jackson, Lauri Wertz, Laura Ferrara re: Fw: RTZ/IntusCare Integration | Lauri Wertz | Stipulated | |
| 14 | Dep. Ex. 12 (Intus 001668-Intus 001669) | | Email thread – Lauri Wertz, Yehuda Czermak, Evan Walters, Gregory Pulley re: RE: EXTERNAL_Re: Intus Care <> Beacon of Life : data integration | Lauri Wertz | Stipulated | |
| 15 | Dep. Ex. 13 (Intus 001738) | | Email from Lauri Wertz to Marina Lomeli, Sandra Mireles, Jeffrey Glenn, and Evan Walters re: Intus Care – data integration | Lauri Wertz | Stipulated | |
| 16 | Dep. Ex. 14 (Intus 001731-Intus 001737) | | Email thread - Marina Lomeli, Laura Ferrara, Jeffrey Glenn, Sandra Mireles, Lauri Wertz, Juan Cristo re: Follow Up | Lauri Wertz | Stipulated | |
| 17 | Dep. Ex. 15 (Intus 002205-Intus 002211) | | Email thread – Evelyn Thompson, Lauri Wertz, Wenxing Li, Yehuda Czermak, Laura Ferrara re: [Follow-up] RTZ Intus collaboration | Lauri Wertz | Stipulated | |
| 18 | Dep. Ex. 16 (Intus 002384-Intus 002385) | | Email thread – Laura Ferrara, Lauri Wertz, Sarah Berry re: Intus Care - manual reports from RTZ | Lauri Wertz | Stipulated | |
| 19 | Dep. Ex. 17 (Intus 002194) | | Email from Lauri Wertz to Sarah Berry re: Intus Care - manual reports | Lauri Wertz | Stipulated | |
| 20 | Dep. Ex. 18 (Intus 002406) | | Email from Lauri Wertz to Astrid Forbito, Debra Fisher, Healery Godisan, and Heather Washington re: Intus Care Onboarding - follow up notes | Lauri Wertz | Stipulated | |

70617179.v2

| | | | | | |
|---|---|---|---|---|---|
| 21 | Dep. Ex. 19 (Intus 002502-Intus 002504) | | Email thread - Lauri Wertz, Astrid Forbito, Alysia Ogburn, Mary John-Williams re: IntusCare - EHR data | Lauri Wertz | Stipulated |
| 22 | Dep. Ex. 20 (Intus 003089-Intus 003095) | | Email thread - Lauri Wertz, Janet Huang, Astrid Forbito, Joanne Won, Alysia Ogburn, Jeffrey Berkey re: RTZ Process Solution (Intus Care | Neighborhood) | Lauri Wertz | Stipulated |
| 23 | Dep. Ex. 21 (Intus 003026-Intus 003027) | | Email thread - Sarah Berry, Lauri Wertz, Melanie Gustman re: Automating Intus Care | Lauri Wertz | Stipulated |
| 24 | Dep. Ex. 22 (Intus 003117-Intus 003120) | | Email thread - Sneha Banerjee, Mark Valladolid, Lauri Wertz, Alex, Evan Walters, Cassandra da Rosa re: Intus Care <> St. Paul's PACE EHR integration | Lauri Wertz | Stipulated |
| 25 | Dep. Ex. 23 (Intus 001801-Intus 001804) | | Email thread - Malorie Marquardt, Evan Walters, Lauri Wertz re: Community PACE <> Intus Care: migration to RTZ | Lauri Wertz | Stipulated |
| 26 | Dep. Ex. 24 (Intus 002049-Intus 002052) | | Email thread - Lauri Wertz, Malorie Marquardt, Evan Walters re: Community PACE <> Intus Care: migration to RTZ | Lauri Wertz | Stipulated |
| 27 | Dep. Ex. 25 (Intus 002002-Intus 002009) | | Email thread - Laura Emery, Lauri Wertz, Melanie Martinez, Amanda Muniz, Evelyn Thompson, Bobbi Runyon, Yehuda Czermak re: Integration with Intus Care | Lauri Wertz | Stipulated |
| 28 | Dep. Ex. 26 (Intus 002137-Intus 002138) | | Email thread - Bobbi Runyon, Lauri Wertz, Evan Jackson, Melanie Martinez, Yehuda Czermak re: RTZ/IntusCare Integration | Lauri Wertz | Stipulated |
| 29 | Dep. Ex. 27 (Intus 002189) | | Email from Lauri Wertz to Alex Lueth re: Intus Care - RTZ reports | Lauri Wertz | Stipulated |
| 30 | Dep. Ex. 28 (Intus 001390-Intus 001391) | | Email(s) re: integration with RTZ | Evan Jackson | Stipulated |
| 31 | Dep. Ex. 29 (Intus 001414-Intus 001418) | | Email(s) re: Intus Care and SCPP RTZ integration | Evan Jackson | Stipulated |
| 32 | Dep. Ex. 30 (Intus 001538 - Intus001542 | | Email(s) re: Data requirements description | Evan Jackson | Stipulated |
| 33 | Dep. Ex. 31 (Intus 001563-Intus 001565) | | Email(s) re: ENCRYPT MAIL - Intus team access to RTZ live site | Evan Jackson | Stipulated |
| 34 | Dep. Ex. 32 (Intus 005118 - Intus 005122) | | Email(s) re: LifeCircles x Intus Care next steps | Evan Jackson | Stipulated |
| 35 | Dep. Ex. 33 (Intus 002851-Intus 002855) | | Email(s) re: RTZ integration conversation [Intus Care - BoldAge PACE] | Evan Jackson | Stipulated |
| 36 | Dep. Ex. 34 (Intus 002139-Intus 002141) | | Email(s) re: RTZ/IntusCare Integration | Evan Jackson | Stipulated |
| 37 | Dep. Ex. 35 (Intus 002935-Intus 002937) | | Email(s) re: Intus Care - BoldAge PACE | Evan Jackson | Stipulated |
| 38 | Dep. Ex. 36 (Intus 004131) | | Email(s) re: Robbie Felton | Evan Jackson, Robbie Felton | Stipulated |
| 39 | Dep. Ex. 37 (Intus 002989-Intus 002991) | | Email(s) re: RTZ Process Solution (Intus Care - Senior Care Partners) | Evan Jackson | Stipulated |
| 40 | Dep. Ex. 38 (Intus 003019-Intus 003022) | | Email(s) re: RTZ Process Solution (IntusCare - Neighborhood) | Evan Jackson, Alex Lueth | Stipulated |
| 41 | Dep. Ex. 39 (Intus 003598-Intus 003599) | | Email(s) re: Integration update | Evan Jackson | Stipulated |
| 42 | Dep. Ex. 40 (Intus 003704-Intus 003708) | | Email(s) re: Integration Update | Evan Jackson | Stipulated |
| 43 | Dep. Ex. 41 (Intus 003986-Intus 003989) | | Email(s) re: Uploads Needed | Evan Jackson | Stipulated |
| 44 | Dep. Ex. 42 (Intus 008117-Intus 008119) | | Email(s) re: Quick EHR question | Evan Jackson | Stipulated |
| 45 | Dep. Ex. 43 (Intus 006661-Intus 006662) | | Email(s) re: EMR | Evan Jackson | Stipulated |

70617179.v2

| | | | | Author/Witness | Objection | |
|---|---|---|---|---|---|---|
| 46 | Dep. Ex. 44 (Intus 001588-Intus 001590) | | Email(s) re: Intus Care Website Submission | Evan Jackson | Stipulated | |
| 47 | Dep. Ex. 45 (Intus 001634-Intus 001636) | | Email(s) re: IntusCare Contract Followup | Evan Jackson | Stipulated | |
| 48 | Dep. Ex. 47 (RTZ0002768-RTZ0002771) | | Email series dated 9/1/2022, "Subject: Re: Intus Care access to PCO" and attachment | Michael Zawadski | Stipulated | |
| 49 | Dep. Ex. 48 (RTZ0000809-RTZ0000813) | | Email series, "Subject: [External] Re: Catching up and NDA for RTZ integration" and attachment | Michael Zawadski | Stipulated | |
| 50 | Dep. Ex. 49 (RTZ0007671-RTZ0007676) | | Email series, "Subject: Re: Catching up and NDA for RTZ integration" and attachment | Michael Zawadski | Stipulated | |
| 51 | Dep. Ex. 50 (Intus 004125-Intus 004128) | | "Request for PACECare Access / Non-Disclosure Agreement" | Michael Zawadski | Stipulated | |
| 52 | Dep. Ex. 51 (RTZ0000020-RTZ0000033) | | Email series, "Subject: [External] RE: Intus Care/RTZ Associates: Data Integration/Data Extract" | Michael Zawadski | Stipulated | |
| 53 | Dep. Ex. 52 (RTZ0005586-RTZ0005587) | | Email series, "Subject: Re: NDA for Secure Transportation" | Michael Zawadski | Stipulated | |
| 54 | Dep. Ex. 53 (RTZ0007693-RTZ0007695) | | Email series, "Subject: Re: FW: Service Disruption" | Michael Zawadski | Stipulated | |
| 55 | Dep. Ex. 54 (RTZ0000814-RTZ0000818) | | "Amendment 2 to PACECare License Agreement" | Michael Zawadski, Melanie Martinez | Stipulated | |
| 56 | Dep. Ex. 55 (RTZ0000847-RTZ0000866) | | "PACECare Agreement 'Software as a Service'" | Michael Zawadski | Stipulated | |
| 57 | Dep. Ex. 56 (Intus 002191-Intus 002193) | | Email series, "Subject: FW: Disclosure Agreements" | Michael Zawadski | Stipulated | |
| 58 | Dep. Ex. 57 (no bates) | | "Electronic Health Record Data Use and Access Agreement, Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc." | Michael Zawadski | Stipulated | |
| 59 | Dep. Ex. 58 (RTZ0000477-RTZ0000483) | | Email series, "Subject: [External] RE: Intus Care/RTZ Associates: Data Integration/Data Extract" | Michael Zawadski | Object – hearsay | **Hearsay:** This is an email chain between an agent for RTZ and Intus' representative regarding the acccess negotiations. The statements were "made by a person whom RTZ authorized to make a statement on the subject" and are "being offered against" RTZ. Fed. R. Evid. 801(d)(2)(C). These emails and attachments are also business records, as they are: 1) records of the parties' access negotiations; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule"). |
| 60 | Dep. Ex. 59 (RTZ0000606-RTZ0000614) | | Email series, "Subject: RE: Intus Care/RTZ Associates: Data Integration/Data Extract" | Michael Zawadski | Object – hearsay | **Hearsay:** This is an email chain between an agent for RTZ and Intus' representative regarding the acccess negotiations. The statements were "made by a person whom RTZ authorized to make a statement on the subject" and are "being offered against" RTZ. Fed. R. Evid. 801(d)(2)(C). These emails and attachments are also business records, as they are: 1) records of the parties' access negotiations; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule"). |
| 61 | Dep. Ex. 60 (RTZ0002765-RTZ0002767) | | Email series, "Subject: Re: Intus Care Collaboration" | Michael Zawadski | Stipulated | |
| 62 | Dep. Ex. 61 (RTZ0004198-RTZ0004204) | | Email series, "Subject: Re: FW: New Intus Care Features - IT Support Needed" | Michael Zawadski | Stipulated | |
| 63 | Dep. Ex. 62 (Intus 004591-Intus 004595) | | Email correspondence with Vorro, dated March 2021 | Alex Rothberg | Stipulated | |
| 64 | Dep. Ex. 63 (Intus 001465-Intus 001470) | | Email correspondence, April and May 2021 | Alex Rothberg | Stipulated | |
| 65 | Dep. Ex. 64 | | e-mail correspondence from May to July of 2021 | Alex Rothberg | Stipulated | |
| 66 | Dep. Ex. 65 | | September 2022 e-mail correspondence | Alex Rothberg | Stipulated | |
| 67 | Dep. Ex. 66 (Intus 000024-Intus 000029) | | EHR data map RTZ | Alex Rothberg | Stipulated | |
| 68 | Dep. Ex. 67 (Intus 005118-Intus 005122) | | February 15, 2024 email with attachment re: LifeCircles/IntusCare next steps | Alex Rothberg, Evan Jackson | Stipulated | |
| 69 | Dep. Ex. 68 (Intus 003117-Intus 003119) | | June 2023 email correspondence with St. Paul's Senior Services (partial range - only pp. 3117-3119 referenced in testimony) | Alex Rothberg | Stipulated | |

| | | | | | |
|---|---|---|---|---|---|
| 70 | Dep. Ex. 69 (Intus 003704-Intus 003708) | | January and February 2024 email correspondence with Brio/LifeCircles re: integration update | Alex Rothberg, Evan Jackson | Stipulated |
| 71 | Dep. Ex. 70 (Intus 004132) | | January 18, 2024 email | Alex Rothberg | Stipulated |
| 72 | Dep. Ex. 71 (no bates found in transcript) | | July and August 2022 email correspondence re: Community PACE / NDA to Robbie Felton | Alex Rothberg | Stipulated |
| 73 | Dep. Ex. 72 (RTZ0005845-RTZ0005846) | | Email thread - Carinna Sias, Tim Cooper, others - re: filtering queries for printable & electronic documentation | Melanie Martinez | Stipulated |
| 74 | Dep. Ex. 73 (RTZ0005971) | | Email from Tim Cooper to Carinna Sias, others - re: intro to RTZ quick-start guide | Melanie Martinez | Stipulated |
| 75 | Dep. Ex. 74 (RTZ0005714-RTZ0005720) | | Email thread - Alex Lueth, Laura Emery, others - re: IntusCare & SCPP RTZ integration | Melanie Martinez | Stipulated |
| 76 | Dep. Ex. 75 (RTZ0001993-RTZ0001998) | | Email thread - Melanie Martinez, Malorie Marquardt, others - re: updates | Melanie Martinez | Stipulated |
| 77 | Dep. Ex. 76 (Intus 002002-Intus 002009) | | Email thread - Amanda Muniz, Melanie Martinez, others re: Integration with IntusCare | Melanie Martinez | Stipulated |
| 78 | Dep. Ex. 77 (RTZ0000814-RTZ0000818) | | "Amendment 2 to PACECare License Agreement" | Melanie Martinez | Stipulated |
| 79 | Dep. Ex. 78 (RTZ0000847-RTZ0000866) | | "PACECare Agreement 'Software as a Service'" | Melanie Martinez | Stipulated |
| 80 | Dep. Ex. 79 (RTZ0002772-RTZ0002774) | | Email thread - Melanie Martinez, Bobbi Runyon, others re: RTZ/IntusCare Integration | Melanie Martinez | Stipulated |
| 81 | Dep. Ex. 80 (RTZ0002775) | | Email thread - Laura Emery, Melanie Martinez, others re: Intus NDA | Melanie Martinez | Stipulated |
| 82 | Dep. Ex. 81 (RTZ0005586-RTZ0005587) | | Email thread - Melanie Martinez, Daniel Diaz, others re: NDA for Secure Transportation | Melanie Martinez | Stipulated |
| 83 | Dep. Ex. 82 (RTZ0002733-RTZ0002735) | | Email thread - Ryan Gadia, Kristin Prentiss, others re: H7027 - Esperanza Coding and Risk Adjustment Services | Melanie Martinez | Stipulated |
| 84 | Dep. Ex. 83 (RTZ0005604) | | Email thread - Kyle Mendez, Melanie Martinez, others re: PCO Vendor Access: IntusCare | Melanie Martinez | Stipulated |
| 85 | Dep. Ex. 84 (RTZ0002765-RTZ0002767) | | Email thread - Cassandra da Rosa, PCO Support, others re: IntusCare Collaboration | Melanie Martinez | Stipulated |
| 86 | Dep. Ex. 85 (RTZ0007693-RTZ0007695) | | Email thread - Robbie Felton, Alex Lueth, others re: Service Disruption | Melanie Martinez | Stipulated |
| 87 | Dep. Ex. 86 (RTZ0007273-RTZ0007275) | | Email thread - Michael Zawadski, Alex Lueth, others - re: need for emergency plan when PCO is down | Melanie Martinez | Stipulated |
| 88 | Dep. Ex. 87 (no bates) | | Intus' Objections and Responses to RTZ's Interrogatories, Set One | Evan Walters | Stipulated |
| 89 | Dep. Ex. 88 (Intus 001797-Intus 001800) | | Email thread between Evan Walters, Lauri Wertz, and Beacon re: Re: EXTERNAL_Re: EXTERNAL_Re: Intus Care <> Beacon of Life : data integration | Evan Walters, Lauri Wertz | Stipulated |
| 90 | Dep. Ex. 89 (Intus 001763-Intus 001765) | | Email thread - Neighborhood, Lauri Wertz, Evan Walters re: Intus Care - data integration | Evan Walters, Lauri Wertz | Stipulated |
| 91 | Dep. Ex. 90 (Intus 001793-Intus 001796) | | Email thread - Community, Evan Walters, Lauri Wertz re: Community PACE <> Intus Care : migration to RTZ | Evan Walters | Stipulated |
| 92 | Dep. Ex. 91 (Intus 001801-Intus 001804) | | Email thread - Malorie Marquardt, Evan Walters, Lauri Wertz, others re: NDA to Access PACECare | Evan Walters | Stipulated |
| 93 | Dep. Ex. 92 (Intus 003028-Intus 003030) | | Email thread - Lauri Wertz, Community, Evan Walters, Joanne Won re: Fw: RE: Automating Intus Care | Evan Walters, Lauri Wertz | Stipulated |

70617179.v2

| | | | | | |
|---|---|---|---|---|---|
| 94 | Dep. Ex. 93 (Intus 003474-Intus 003483) | | Email thread - Sneha Banerjee, Heidi Gras (LifeCircles), Evan Walters re: Intus Care | Evan Walters | Stipulated |
| 95 | Dep. Ex. 94 (Intus 003580-Intus 003589) | | Email thread - Sneha Banerjee, Heidi Gras (LifeCircles), Evan Walters re: Intus Care | Evan Walters | Stipulated |
| 96 | Dep. Ex. 95 (Intus 003604-Intus 003614) | | Email thread - Sneha Banerjee, Heidi Gras (LifeCircles), Evan Walters re: RTZ-Intus Care Data Map - Q1 2024.xlsx | Evan Walters | Stipulated |
| 97 | Dep. Ex. 96 (Intus 003908) | | Email from Evan Walters to Brio re: rtz-data-extraction-guide.pdf | Evan Walters | Stipulated |
| 98 | Dep. Ex. 98 (Intus 013514-Intus 013517) | | Email thread - Laura Ferrara, William Mims, Evan Jackson, others re: SCPP Standing Meeting | Laura Ferrara | Stipulated |
| 99 | Dep. Ex. 99 (Intus 004150-Intus 004158) | | Email from Laura Ferrara to Robbie Felton re: Authority to Sign NDA | Laura Ferrara | Stipulated |
| 100 | Dep. Ex. 100 (Intus 002205-Intus 002211) | | Email thread - Lauri Wertz, Evelyn Thompson, Laura Ferrara, others re: [Follow-up] RTZ Intus collaboration | Laura Ferrara, Evan Walters, Lauri Wertz | Stipulated |
| 101 | Dep. Ex. 101 (Intus 014251) | | Email from Evan Jackson to Laura Ferrera re:Data Use Addendum (Community PACE).pdf | Laura Ferrara, Evan Jackson | Stipulated |
| 102 | Dep. Ex. 102 (Intus 007034-Intus 007035) | | Email with meeting invitation from Laura Ferrara to Boldage re: BoldAge x IntusCare - Executive Brief | Laura Ferrara | Stipulated |
| 103 | Dep. Ex. 103 (Intus 014704-Intus 014710) | | Email thread - Robbie Felton, Boldage, Enfield Capital Partners re: Introduction Presentation - Intus Care <> Enfield/BoldAge | Robbie Felton | Stipulated |
| 104 | Dep. Ex. 104 (Intus 014785-Intus 014794) | | Email thread - Robbie Felton, Boldage, Enfield Capital Partners re: Intus_Care_-_Series_A-3_Term_Sheet(4098253.5).pdf | Robbie Felton | Stipulated |
| 105 | Dep. Ex. 105 (no bates) | | 10/3/2024 Press Release | Robbie Felton | Stipulated |
| 105A | Dep. Ex. 105 Intus018723 | | CareHub Client List | | |
| 106 | Dep. Ex. 106 (Intus 004150-Intus 004158) | | Email from Laura Ferrara to Robbie Felton re: Authority to Sign NDA | Robbie Felton | Stipulated |
| 107 | Dep. Ex. 107 (Intus 004498-Intus 004500) | | Intus Care User Agreement - Upham's PACE - 01/11/2020 | Robbie Felton | Stipulated |
| 108 | Dep. Ex. 108 (Intus 004162) | | Email from Robbie Felton to Laura Ferrara, Alex Rothberg, Evan Jackson re temporary downtime in Intus Care data pipeline | Robbie Felton | Stipulated |
| 109 | Dep. Ex. 109 (Intus 004163) | | Email from Laura Ferrara to Robbie Felton, Alex Rothberg, Evan Jackson re temporary downtime in Intus Care data pipeline | Robbie Felton, Laura Ferrara | Stipulated |
| 110 | Dep. Ex. 110 (Intus 002062) | | Email from Robbie Felton to Alex Lueth re: Service Disruption | Robbie Felton | Stipulated |
| 111 | Dep. Ex. 111 (Intus 002089-Intus 002091) | | Email from Robbie Felton to Alex Lueth re: Service Disruption | Robbie Felton, Alex Lueth | Stipulated |
| 112 | Dep. Ex. 112 (Intus 002041-Intus 002044) | | Email from Robbie Felton to Michael Zawadski re: Catching up and NDA for RTZ Integration | Robbie Felton | Stipulated |
| 113 | Dep. Ex. 113 (RTZ0000770-RTZ0000806) | | Email from Alex Chiulli to David Lee re: Intus Care - RTZ Business Case - 2.3.23.pdf | Robbie Felton, C. Alexander Chiulli | Stipulated |
| 114 | Dep. Ex. 114 (RTZ0000807-RTZ0000808) | | Intus Care - RTZ "Data Access" Business Case | Robbie Felton | Stipulated |
| 115 | Dep. Ex. 115 (RTZ0008384-RTZ0008388) | | Email from Robbie Felton to Michael Zawadski, cc Mace Wolf, re: Formal Indication of Interest | Robbie Felton | Stipulated |
| 116 | Dep. Ex. 116 (no bates) | | Correspondence from Intus's Legal Counsel to Nossaman LLP providing notice of filing of information blocking complaint | Robbie Felton | Stipulated |

| No. | Exhibit | Description | Witness | Status |
|---|---|---|---|---|
| 117 | Dep. Ex. 117 (Intus 004651) | Email from Robbie Felton to Alex Rothberg with link to healthit.gov on information blocking claims | Robbie Felton | Stipulated |
| 118 | Dep. Ex. 118 (Intus 004530) | Email from Matt Becker to Evan Jackson and Robbie Felton with link to Cures Act Final Rule: Information Blocking Exceptions (healthit.gov) | Robbie Felton | Stipulated |
| 119 | Dep. Ex. 119 (no bates) | Declaration of Robbie Felton ISO Intus' Motion for Partial Summary Judgment | Robbie Felton | Stipulated |
| 120 | Dep. Ex. 120 (Intus 004130) | Email from Robbie Felton to Alex Rothberg and Evan Jackson with excerpt of unspecified RTZ contract | Robbie Felton | Stipulated |
| 121 | Dep. Ex. 121 (Intus 004131) | Email from Evan Jackson to Robbie Felton and Alex Rothberg with excerpt of RTZ contract | Robbie Felton | Stipulated |
| 122 | Dep. Ex. 122 (Intus 004615) | Email from Robbie Felton to Alex Rothberg, Samuel Prado, Evan Walters with SCP PACECare link | Robbie Felton | Stipulated |
| 123 | Dep. Ex. 123 (Intus 004133-Intus 004136) | Emails between Kathryn McGuire (McGuire Advisor, LLC), Manu Oregon (Atheneum.ai), and Robbie Felton re: FW: Atheneum Consultation Request - PACE Software Solutions | Robbie Felton | Stipulated |
| 124-129 | Omitted Intentionally | | | |
| 130 | Dep. Ex. 130 (no bates) | Email thread - Alex Lueth, Evan Jackson, Robbie Felton re: Demonstration - Intus Care Risk Scoring Software Program | Alex Lueth, Evan Jackson, Robbie Felton | Stipulated |
| 131 | Dep. Ex. 131 (no bates) | Email thread - Alex Lueth, Evan Jackson, Robbie Felton re: Demonstration - Intus Care Risk Scoring Software Program | Alex Lueth, Evan Jackson, Robbie Felton | Stipulated |
| 132 | Dep. Ex. 132 (Intus 001389) | Email from Alex Lueth to Evan Jackson re: Integration with RTZ | Alex Lueth | Stipulated |
| 133 | Dep. Ex. 133 (Intus 001456-Intus 001463) | Email thread - Alex Lueth, Laura Emery, Alex Rothberg, Evan Jackson, Melanie Martinez, others re: Intus Care & SCPP RTZ Integration | Alex Lueth, Alex Rothberg | Stipulated |
| 134 | Dep. Ex. 134 (RTZ0006558-RTZ0006560) | Email thread - Alex Rothberg, Evan Jackson, Michael Zawadski, Evan Walters, Alex Lueth re: Data requirements description | Alex Lueth, Alex Rothberg, Evan Jackson | Stipulated |
| 135 | Dep. Ex. 135 (RTZ0006561-RTZ0006564) | Email thread - Alex Rothberg, Evan Jackson, Michael Zawadski, Evan Walters, Alex Lueth re: Data requirements description | Alex Lueth, Alex Rothberg, Evan Jackson | Stipulated |
| 136 | Dep. Ex. 136 (RTZ0006810-RTZ0006813) | Email thread - Alex Lueth, Evan Jackson, Michael Zawadski, others re: Data requirements description | Alex Lueth | Stipulated |
| 137 | Dep. Ex. 137 (RTZ0006819-RTZ0006824) | Email thread - Michael Zawadski, Alex Lueth, others re: Data requirements description | Alex Lueth | Stipulated |
| 138 | Dep. Ex. 138 (Intus 001560) | Email from Alex Lueth to Tim Cooper re: Intus Team Access to RTZ Live Site | Alex Lueth | Stipulated |
| 139 | Dep. Ex. 139 (Intus 001561-Intus 001562) | Email(s) re: ENCRYPT MAIL - Intus team access to RTZ live site | Alex Lueth | Stipulated |
| 140 | Dep. Ex. 140 (Intus 002062) | Email from Robbie Felton to Alex Lueth re: Service Disruption | Alex Lueth | Stipulated |
| 141 | Dep. Ex. 141 (Intus 002068-Intus 002069) | Email from Alex Lueth to Robbie Felton re: RE: Service Disruption | Alex Lueth | Stipulated |
| 142 | Dep. Ex. 142 (RTZ0007691-RTZ0007692) | Email from Alex Lueth to Michael Zawadski, Laura Emery re: FW: Service Disruption | Alex Lueth | Stipulated |
| 143 | Dep. Ex. 143 (RTZ0007693-RTZ0007695) | Email thread - Michael Zawadski, Alex Lueth, others re: FW: Service Disruption | Alex Lueth | Stipulated |

| # | Dep. Ex. | | Description | Witness | Objection | Notes |
|---|---|---|---|---|---|---|
| 144 | Dep. Ex. 144 (RTZ0008309-RTZ0008310) | | Email thread - Alex Lueth, Michael Zawadski, Laura Emery, Sally Berglin (SCP MI) re: data agreement | Alex Lueth, Michael Zawadski | Stipulated | |
| 145 | Dep. Ex. 145 (Intus 002190) | | Email - Lauri Wertz to Alex Lueth re: Intus Care - RTZ Reports | Alex Lueth, Lauri Wertz | Stipulated | |
| 146 | Dep. Ex. 146 (no bates) | | Offer of Employment from RTZ to Alex Lueth | Alex Lueth | Stipulated | |
| 147 | Dep. Ex. 147 (no bates) | | Signed Offer Letter from RTZ to Alex Lueth | Alex Lueth | Stipulated | |
| 148 | Dep. Ex. 148 (RTZ 0008012) | | Email from Alex Lueth to Michael Zawadski re: New Horizons Staff Log 9.25.2024.xlsx | Alex Lueth, Michael Zawadski | Stipulated | |
| 149 | Dep. Ex. 149 (RTZ0005243) | | Email from Alexandria Lueth to Colleen Bottens, others re: Intus Care Coding | Alex Lueth | Stipulated | |
| 150 | Dep. Ex. 150 (RTZ0004435-RTZ0004436) | | Email thread - Ryan Gadia, Kristin Prentiss, Alex Lueth, others - re: H7027 - Esperanza coding and risk adjustment services | Melanie Martinez, Alex Lueth | Stipulated | |
| 151 | Dep. Ex. 151 (RTZ0002733-RTZ0002735) | | Email thread - Melanie Martinez, Alexandria Lueth, others re: H7027 - Esperanza Coding and Risk Adjustment Services | Alex Lueth | Stipulated | |
| 152 | Dep. Ex. 152 (RTZ0001678) | | Email from Alex Lueth to Brio re: New Custom Export Report Module | Alex Lueth | Stipulated | |
| 153 | Dep. Ex. 153 (no bates) | | Signed Offer Letter from RTZ to Alex Lueth | Alex Lueth, Michael Zawadski | Stipulated | |
| 154 | Dep. Ex. 154 (no bates) | | Defendant's Disclosure of Experts | Peter Schwechheimer | Object – relevance, hearsay | |
| 155 | Dep. Ex. 155 (RTZ0000807-RTZ0000808) | | Intus Care - RTZ "Data Access" Business Case | Peter Schwechheimer | Stipulated | |
| 156 | Dep. Ex. 156 (no bates) | | Electronic Health Record Data Use and Access Agreement - Tabula Rasa HealthCare Group, Inc., and Intus Care, Inc. | Peter Schwechheimer | Stipulated | |
| 157 | Dep. Ex. 157 (no bates) | | Excel Spreadsheet - Sections by Importance | Peter Schwechheimer | Stipulated | |
| 158 | Dep. Ex. 158 (no bates) | | Disclosure of Rebuttal Experts | Peter Schwechheimer | Object – relevance, hearsay | |
| 159 | Dep. Ex. 159 | | Deposition Notice | Kris Hult | Stipulated | |
| 160 | Dep. Ex. 160 (no bates) | | Expert Report | Kris Hult | Object – relevance, hearsay | |
| 161 | Dep. Ex. 161 (Intus 019841-Intus 019845) | | Damages Emails | Evan Jackson | Object – relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. |
| 162 | Dep. Ex. 162 (Intus 18880) | | RTZ CRM Data Spreadsheet | Kris Hult | Stipulated | |
| 163 | Dep. Ex. 163 (Intus 19847) | | Win/Loss Opportunities Spreadsheet | Kris Hult | Stipulated | |
| 164 | Dep. Ex. 164 (no bates) | | Expert Rebuttal Report | Kris Hult | Object – relevance, hearsay | |
| 165 | Dep. Ex. 165 (no bates) | | Defendant RTZ Associates, Inc.'s Notice of Deposition of Plaintiff's Expert Shawn R. Fleury and Request for Production of Documents | Shawn Fleury | Object – relevance, hearsay | |
| 166 | Dep. Ex. 166 (no bates) | | Plaintiff Intus Care Inc.'s Disclosure of Expert Testimony under Fed. R. Civ. P. | Shawn Fleury | Object – relevance, hearsay | |
| 167 | Dep. Ex. 167 (no bates) | | PACECare Agreement "Software as a Service" | Shawn Fleury | Stipulated | |
| 168 | Dep. Ex. 168 (Intus 001464-Intus 001473) | | Email chain - Michael Zawadski, Alex Rothberg, Laura Emery, Alex Lueth, Evan Jackson, Melanie Martinez, others re: Intus Care & SCPP RTZ Integration | Shawn Fleury, Alex Rothberg, Michael Zawadski | Stipulated | |

70617179.v2

| No. | Bates / Identifier | Relevance / Foundation / Hearsay / Prejudice Notes | Objections | Witness | Description |
|---|---|---|---|---|---|
| 169 | Dep. Ex. 169 (no bates) | | Stipulated | Shawn Fleury | Expert Report of Traci Creegan, April 22, 2026, Confidential Subject to Protective Order |
| 170 | Dep. Ex. 170 (no bates) | | Object – relevance, hearsay | Creegan | Expert Report of Traci Creegan dated April 22, 2026 |
| 171 | Dep. Ex. 171 | | Stipulated | Kevin Lathrop | Summary Pro Forma Income Statement |
| 172 | Dep. Ex. 172 (Intus019811-Intus 019820) | | Stipulated | Kevin Lathrop | Email Exchange re High Desert PACE Request |
| 173 | Dep. Ex. 173 (RTZ0008378) | | Stipulated | Kevin Lathrop | Excel Spreadsheet |
| 174 | Dep. Ex. 174 (RTZ0008389) | | Stipulated | Kevin Lathrop | Excel Spreadsheet |
| 175 | Dep. Ex. 175 (RTZ0008390) | | Stipulated | Kevin Lathrop | Excel Spreadsheet |
| | Intus 002161-Intus 002164 | | Stipulated | Melanie Martinez, Evan Jackson | Email thread – Beacon, Melanie Martinez, Evan Jackson re: RTZ/IntusCare Integration |
| 200 | RTZ0001320-RTZ0001329 | | Stipulated | Miranda Carter | Email thread – Evan Walters, Miranda Carter, PCO Support Team, Amanda Muniz, Kelsey Bruno re: Community PACE/Intus - RTZ Medications Report Failing |
| 201 | Intus 020385-Intus 020386 | | Stipulated | Laura Ferrara, Evan Jackson | Slack message re Intus expectation of losing UM contracts with Thorne and Huron Valley because of RTZ |
| 202 | | | | | |
| | RTZ0005490 | | Stipulated | Michael Zawadski, Melanie Martinez | Email thread – Martinez, Zawadski, Pinni Friedman re: Intus Care access to PCO |
| 300 | Intus 002035-Intus 002038, RTZ0007682-RTZ0007685 | | Stipulated | Michael Zawadski, Robbie Felton | Email thread – Felton, Zawadski, Laura Emery re: Catching up and NDA for RTZ Integration |
| 301 | Intus 020556 | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc .*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – authenticity, foundation, hearsay, relevance, 403 (prejudicial) | Evan Jackson | |
| 302 | RTZ0008296-RTZ0008300 | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc .*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – hearsay (portions), relevance, 403 (prejudice). Stipulated as to authenticity and foundation | Lauri Wertz, Melanie Martinez | Email thread – Wertz, Martinez, Amanda Muniz, Yehuda Czermak re: Integration with Intus Care |
| 303 | Intus 016716-Intus 016720 | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc .*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object -authenticity, foundation, hearsay, 403 (prejudice), relevance | Will Mimms | Email thread - Will Mimms and PACE SEMI re: Data Import/Export - PACECare Online/Intus Care |
| 304 | Intus 003249-Intus 003250 | | Stipulated | Lauri Wertz | Email thread - Lauri Wertz & Community re: Re: Login info |

| # | Bates | | Description | Witness | Objection | Response |
|---|-------|---|-------------|---------|-----------|----------|
| 305 | Intus 053042 | | Slack message from Courtney Zhu re High Desert being blocked | Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 306 | Intus 053218-Intus 053219 | | Slack message from Sneha Banerjee re Brio integration problems due to RTZ | Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 307 | Intus 020349 | | Slack message from Sneha Banerjee re Brio (Huron Valley and Thome) problems due to RTZ blocking | Robbie Felton, Will Mimms | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 308 | Intus 019906-Intus 019907 | | Slack message thread re loss of mock audit sale to Community due to RTZ blocking | Laura Ferrara, Robbie Felton, Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 309 | Intus 020400-Intus 020402 | | Slack message thread re inability to access Thome EMR and get Thome data once they transitioned to RTZ | Laura Ferrara | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 310 | Intus 020720 | | Slack message thread re Collabrios/RTZ revoking access to PCO for Intus for multiple PACE programs | Will Mimms | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Herasay**: These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |

| # | Bates | | Description | Witness | Objections | Response |
|---|---|---|---|---|---|---|
| 311 | Intus 020678-Intus 020679 | | Slack message re Brio termination of UM and Pop Health with RTZ data blocking as cited reason for termination | Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 312 | Intus 020814 | | Slack message re inabillity to do UM work in current Thome contract since they got RTZ | Laura Ferrara | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 313 | Intus 020523-Intus 020524 | | Slack message re message from New Horizons informing Intus of email from RTZ saying they could not grant Intus PCO access because of "active litigation" with no anticipated timeline for resolving the issue | Laura Ferrara, Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 314 | Intus 020853 (but also see Intus 020256) | | Slack message re LSS Living transitioning to RTZ and unhappy with anticipated blocking | Will Mimms | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 315 | Intus 020260 | | Slack message re High Desert not getting database access to RTZ and being told not getting extracts either | Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |
| 316 | Intus 020794 | | Slack message re work done for ICS before medical record access was blocked due to RTZ | Laura Ferrara, Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any predjudice because this show the deterrent effect of RTZ's conduct. |

| # | Bates | Description | Witness | Objections | Relevance/Prejudice |
|---|-------|-------------|---------|-----------|---------------------|
| 317 | Intus 020525-Intus 020527 | Slack message re RTZ denying EMR access for client New Horizons | Laura Ferrara | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance:** These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. |
| 318 | Intus 020862-Intus 020863 | Slack message re RTZ/Collabrios revoking intus access for multiple clients | Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance:** These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. |
| 319 | Intus 020395 | Slack message re Huron Valley concerned about losing Intus UM services due to lack of RTZ access | Laura Ferrara, Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance:** These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. |
| 320 | Intus 020568 | Slack message re deal with SE PACE not being viable if no RTZ access | Will Mimms | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance:** These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. |
| 321 | RTZ0000824-RTZ0000826 | Emergency Limited Service Agreement - St. Paul's PACE | Michael Zawadski | Stipulated | |
| 322 | RTZ0000827-RTZ0000846 | PACECare Agreement "Software as a Service" – Brio Living Services | Michael Zawadski | Stipulated | |
| 323 | RTZ0000887-RTZ0000905 | PACECare Agreement "Software as a Service" – PACE Southeast Michigan | Michael Zawadski | Stipulated | |
| 324 | RTZ0000912-RTZ0000931 | PACECare Agreement "Software as a Service" - Blue Ridge Independence at Home, Inc. | Michael Zawadski | Stipulated | |
| 325 | RTZ0000932-RTZ0000950 | PACECare Agreement "Software as a Service" – Capital Health LIFE, Inc. | Michael Zawadski | Stipulated | |
| 326 | RTZ0000951-RTZ0000970 | PACECare Agreement "Software as a Service" – Chinatown Service Center | Michael Zawadski | Stipulated | |
| 327 | RTZ0000991-RTZ0001013 | PACECare Agreement "Software as a Service" – Esperanza Health Centers | Michael Zawadski | Stipulated | |
| 328 | RTZ0001014-RTZ0001033 | PACECare Agreement "Software as a Service" - Family HealthCare Network | Michael Zawadski | Stipulated | |
| 329 | RTZ0001034-RTZ0001053 | PACECare Agreement "Software as a Service" - High Desert PACE | Michael Zawadski | Stipulated | |
| 330 | RTZ0001054-RTZ0001083 | PACECare Agreement "Software as a Service" – PACE at Hudson Headwaters, Inc. | Michael Zawadski | Stipulated | |
| 331 | RTZ0001104-RTZ0001122 | PACECare Agreement "Software as a Service" - LIFE COORDINATED COMMONWEALTH PACE Inc | Michael Zawadski | Stipulated | |

70617179.v2

| No. | Bates | Relevance / Prejudice | Objection | Witness | Description |
|---|---|---|---|---|---|
| 332 | RTZ0001143-RTZ0001164 | | Stipulated | Michael Zawadski | PACECare Agreement "Software as a Service" – PACE Northeast Michigan |
| 333 | RTZ0001165-RTZ0001183 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports. **Hearsay:** The contracts are relevant for deterrent effect on the reader (the PACE customer), not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – foundation, 403 (prejudice), relevance, hearsay. Stipulate as to authenticity. | Michael Zawadski | PACECare Agreement "Software as a Service" (for CollabriOS) -360 PACE |
| 334 | RTZ0002776-RTZ0002800 | | Stipulated | Michael Zawadski | PACECare Agreement "Software as a Service" - Tungsten Health Holdings LLC |
| 335 | RTZ0001209-RTZ0001227 | | Stipulated | Michael Zawadski | PACECare Agreement "Software as a Service" - Silver Star PACE |
| 336 | RTZ0001228-RTZ0001246 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports, not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – foundation, 403 (prejudice), relevance, hearsay. Stipulate as to authenticity. | Michael Zawadski | PACECare Agreement "Software as a Service" (for CollabriOS) - The Basics at Jan Werner |
| 337 | RTZ0001247-RTZ0001279 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports, not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – 403 (prejudice, waste of time/cumulative), relevance, hearsay (depending on what it is offered for). Stipulate as to authenticity and foundation. | Michael Zawadski | PACECare Agreement "Software as a Service" - VieCare Inc. |
| 338 | RTZ0008113-RTZ0008121 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports, not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – foundation, 403 (prejudice), relevance, hearsay. Stipulate as to authenticity. | Michael Zawadski | Limited Service Agreement for TruChart Web Hosting "Software as a Service" - Capital Health LIFE, Inc. |
| 339 | RTZ0008130-RTZ0008150 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports, not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – foundation, 403 (prejudice), relevance, hearsay. Stipulate as to authenticity. | Michael Zawadski | PACECare Agreement "Software as a Service" - Upham's |
| 340 | RTZ0008151, RTZ0008152-RTZ0008155 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports, not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – foundation, 403 (prejudice), relevance, hearsay. Stipulate as to authenticity. | Michael Zawadski | Amendment 1 to PACECare Agreement - New Horizons Living |
| 341 | RTZ0008207-RTZ0008229 | **Relevance:** These contracts are relevant to show RTZ's blocking conduct because they contain provisions prohibiting sharing of reports, not for the truth of the matter asserted. **Foundation:** Zawadski has the knowledge and knowledge to testify about this. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. | Object – foundation, 403 (prejudice), relevance, hearsay. Stipulate as to authenticity. | Michael Zawadski | PACEHero Agreement - Inspira Health Network LIFE Inc. |
| 342 | RTZ0000819-RTZ0000823 | | Stipulated | Michael Zawadski | Amendment 2 to PACECare License Agreement - Beacon Ventures, LLC dba BoldAge PACE |
| 343 | RTZ0001084-RTZ0001103 | | Stipulated | Michael Zawadski | PACECare Agreement "Software as a Service" - Lawndale Christian Health Center |
| 344 | RTZ0001123-RTZ0001142 | | Stipulated | Michael Zawadski | PACECare Agreement "Software as a Service" - PACE CNY |
| 345 | RTZ0002820-RTZ0002823 | | Stipulated | Michael Zawadski | Amendment 1 to PACECare Online License Agreement - St. Paul's PACE |
| 346 | Intus 0001474-Intus 0001483 | | Stipulated | Michael Zawadski, Alex Rothberg, Alex Lueth | Email thread - Alex Rothberg, Michael Zawadski, Laura Emery, Evan Jackson, Melanie Martinez, others re: Re: Intus Care & SCPP RTZ Integration |
| 347 | RTZ0003832-RTZ0003835 | | Stipulated | Carinna Slas (RTZ), Michael Zawadski, Melanie Martinez, Alex Lueth | Email thread - SCP MI, Michael Zawadski, Melanie Martinez, Alex Lueth, others re: RE: Filtering queries for printable & electronic documentation |
| 348 | Intus 0001989-Intus 0001993 | | Stipulated | Melanie Martinez, Lauri Wertz | Email thread - Lauri Wertz, Melanie Martinez, Amanda Muniz, Yehuda Czermak re: Re: Integration with Intus Care |
| 349 | RTZ0002381 | | Stipulated | Evan Jackson | Email from Evelyn Thompson (Beacon) to Amanda Muniz re: Report |

| No. | Bates | Description | Names | Status | Objection / Argument |
|---|---|---|---|---|---|
| 350 | Intus 004167 | Email thread - Laura Ferrara, Beacon, Robbie Felton, Evan Jackson, Alex Rothberg re: FW: RTZ Integration | Bobbi Runyon (Beacon), Robbie Felton, Alex Rothberg, Evan Jackson, Laura Ferrara | Stipulated | |
| 351 | Intus 014529 | Email thread - Sneha Banerjee, Evan Watters, LifeCircles, others re: Next Steps - Re: Lifecircles <> Intus Care - discuss RTZ integration solution | Evan Jackson | Stipulated | |
| 352 | Intus 002919-Intus 002927 | Email thread - Bailey Dahlgren, Boldage, Evan Jackson, Robbie Felton, Alex Rothberg re: RTZ Integration Conversation (Intus Care \| BoldAge PACE) | Michael Czernak (Boldage) | Stipulated | |
| 353 | Intus 0002359-Intus 0002363; Intus 0002364-Intus 0002369 | Email thread - Neighborhood and Lauri Wertz re: Re: RTZ reports for Intus Care | Astrid Forbito (Neighborhood), Lauri Wertz | Stipulated | |
| 354 | Intus 0002818-Intus 0002824 | Email thread - Jeanne Kim, Healery Godisan (Neighborhood), others re: Compliance and Operational Update | Healery Godisan (Neighborhood), Jeanne Kim (Intus) | Stipulated | |
| 355 | Intus 0002833-Intus 0002841 | Email thread - Jeanne Kim, Healery Godisan (Neighborhood), others re: Compliance and Operational Update | Healery Godisan (Neighborhood), Jeanne Kim (Intus) | Stipulated | |
| 356 | Intus 020770-Intus 020771 | Slack thread re: Huron Valley unhappy with UM because of problems with data from received in SFTP pulls from RTZ | Laura Ferrara | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance:** These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. These were produced as part of a rolling process that RTZ agreed to, and only after the issue was litigated. The fact that it was produced after close of discovery only reflects that RTZ waited until the eve of the deadline to move to compel, and by the time the issue had been adjudicated, discovery had closed. |
| 357 | Intus 0002992-Intus 0002994 | Email thread - Alex Lueth, Evan Jackson, Tim Cooper, Robbie Felton, others re: RTZ Process Solution (Intus Care \| Senior Care Partners) | Alex Lueth (SCP MI), Evan Jackson | Stipulate | |
| 358 | Intus 0003792-Intus 0003797 | Email thread - Evan Jackson, Brio, Robbie Felton, others - Re: [External]Re: Integration Update | Sara Wild (Brio), Evan Jackson | Stipulate | |
| 359 | Intus 003601-Intus 003602 | Email from Evan Jackson to Brio re: RTZ DATA MAP.xlsx | Evan Jackson | Stipulate | |
| 360 | Intus 001581 | Email from Will Mimms to SCP MI re: RTZ DATA MAP.xlsx | Will Mimms, Laura Ferrara | Stipulate | |
| 361 | Intus 001625-Intus 001627 | Email from Will Mimms to SCP MI re: RTZ Data Map (1).pdf | Will Mimms | Stipulate | |
| 362 | Intus 002343-Intus 002344 | Email from Lauri Wertz to Beacon re: EHR Data Map RTZ.pdf | Lauri Wertz | Stipulate | |
| 363 | Intus 0002452-Intus 0002456 | Email thread between Intus and Neighborhood re: Intus Care Onboarding - follow up notes (sending data map) | Evan Jackson | Stipulate | |
| 364 | Intus 002102-Intus 002104 | Email thread between Intus and Neighborhood re: RTZ Data Map (5) (1).pdf | Laura Ferrara | Stipulate | |
| 365 | Intus 002221 | Email from Lauri Wertz to Malorie Marquardt (Community) re: Fw: Intus Care - manual reports (sending data map) | Lauri Wertz | Stipulate | |
| 366 | Intus 003266 | Email from Lauri Wertz to St. Paul's PACE re: Data Map | Lauri Wertz | Stipulate | |

| # | Bates | | Description | Sponsoring Witness | Objections | Response to Objections |
|---|---|---|---|---|---|---|
| 367 | Intus 020416 + attachment | | Slack message re data extraction guide for Brio | Evan Jackson | Object – authenticity, foundation, prejudice (produced after close of discovery), hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. These were produced as part of a rolling process that RTZ agreed to, and only after the issue was litigated. The fact that it was produced after close of discovery only reflects that RTZ waited until the eve of the deadline to move to compel, and by the time the issue had been adjudicated, discovery  had closed. |
| 368 | Intus 0003782-Intus 0003785 | | Email thread - Evan Jackson, Community, Laura Ferrara re: Community PACE at Home Mock Audit | Community PACE (Kelsey Bruno), Evan Jackson (Intus) | Stipulated | |
| 369 | Intus 0002359-Intus 0002363 | | Email thread - Astried Forbito and Lauri Wertz re: RTZ reports for Intus Care | Astrid Forbito (Neighborhood) | Stipulated | |
| 370 | Intus 020812 | | Slack thread between Courtney Zhu and Evan Jackson re: Capital Health Life | Courtney Zhu (Intus), Evan Jackson (Intus) | Object – authenticity, foundation, prejudice (produced after close of discovery), relevance, hearsay | **Relevance**: These emails and slack communications relating to blocking issues Intus encountered, such as complaints from PACE customers and the deterrent effect of RTZ's conduct are relevant to prove Intus' claims that RTZ interfered with its contracts and prospective economic advantage. **Authenticity/Foundation:** An Intus representative with knowledge of the authenticity of the document will testify as to its authenticity. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various interactions between Intus and its customers/prospective customers, or internal records reflecting those customer interactions ; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc* ., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to the customers' state of mind and show the effect on the listener, as they demonstrate the deterrent effect RTZ's conduct had on these customers and prospective customers. **Prejudice:** The probative value is much higher than any prejudice because this show the deterrent effect of RTZ's conduct. These were produced as part of a rolling process that RTZ agreed to, and only after the issue was litigated. The fact that it was produced after close of discovery only reflects that RTZ waited until the eve of the deadline to move to compel, and by the time the issue had been adjudicated, discovery  had closed. |
| 371 | Intus 016946-Intus 016954 | | Email thread - Bobbi Runyon, Evan Jackson re: Intus Care Software Demo (BoldAge) | Evan Jackson | Stipulated | |
| 372 | Intus 0002134-Intus 0002136 | | Email thread - Bobbi Runyon, Laura Ferrara, Lauri Wertz re: RE: RTZ Integration | Bobbi Runyon (Beacon), Laura Ferrara, Lauri Wertz | Stipulated | |
| 373 | RTZ0002736 | | Email - Colleen Bottens (LSS Living), Drew Redman (LSS Living), Alex Lueth re: Intus RTZ Access | Colleen Bottens (LSS Living), Alex Lueth | Stipulated | |
| 374 | Intus 004186-Intus 004190 | | Email thread - Laura Ferrara, Evan Jackson, Robbie Felton, Alex Rothberg re: FW: Disclosure Agreements | Laura Ferrara, Evan Jackson, Robbie Felton, Alex Rothberg | Stipulated | |
| 375 | RTZ0007626-RTZ0007628, RTZ0007632-RTZ0007634, RTZ0007638-RTZ0007642 + remainder of family | | Email thread - Beacon, Amanda Muniz, Melanie Martinez - re: Integration with Intus Care | Evelyn Thompson (Beacon) | Stipulated | |
| 376 | RTZ0008230-RTZ0008233 | | Email thread - Collabrios, BoldAge, Michael Zawadski re: Intus Access to PCO | Michael Czermak (Boldage), Michael Zawadski | Object – authenticity, foundation, hearsay, relevance (Collabrios conduct) | |
| 377 | Intus 0002153-Intus 0002156 | | Email thread - Evan Jackson, Bobbi Runyon, Lauri Wertz re: RTZ/IntusCare Integration | Bobbi Runyon (Beacon) | Stipulate | |
| 378 | Intus 0002732-Intus 0002735 | | Email thread - Michael Czermak, Laura Ferrara, Evan Jackson, others re: RTZ integration | Michael Czermak (Boldage) | Stipulate | |
| 379 | Intus 020597 + attachment | | Slack message re Capital Health life termination notice | Evan Jackson | Object – foundation, authenticity, 403 (prejudice), relevance, hearsay. | |

| No. | Bates | | Description | Author/Recipient | Objection | Response |
|---|---|---|---|---|---|---|
| 380 | RTZ0001468- (RTZ0001461-RTZ0001474) | | Email thread - Laura Emery, Evan Jackson, Nicole Holmes, Alex Lueth, Carinna Sias, Melanie Martinez, Reagan Parker, Tim Cooper, Alex Rothberg re: Intus Care & SCPP RTZ Integration | Laura Emery, Evan Jackson | Stipulated | |
| 381 | RTZ0001467- (RTZ0001461-RTZ0001474) | | Email thread - Alex Rothberg, Laura Emery, Evan Jackson, Nicole Holmes, Alex Lueth, Carinna Sias, Melanie Martinez, Reagan Parker, Tim Cooper re: Intus Care & SCPP RTZ Integration | Alex Rothberg, Laura Emery, Evan Jackson | Stipulated | |
| 382 | Intus 005701-Intus 005704 | | Email thread - Sneha Banerjee, Evan Walters, LifeCircles, others re: Census Numbers Question | Evan Jackson | Stipulated | |
| 383 | Intus 005711-Intus 005717 | | Email thread - Sneha Banerjee, Courtney Zhu, LifeCircles, others re: Census Numbers Question | Evan Jackson | Stipulated | |
| 384 | RTZ0001540 | | Email thread - Michael Zawadski, Alex Rothberg, Evan Walters re: Data requirements description | Alex Rothberg, Michael Zawadski | Object – relevance. Stipulate as to authenticity and foundation. | |
| 385 | RTZ0001539 (RTZ0001538-RTZ0001539) | | Email thread - Alex Rothberg, Michael Zawadski re: Data requirements description | Alex Rothberg, Michael Zawadski | Object – relevance. Stipulate as to authenticity and foundation. | These emails are relevant as they pertain to access negotiations, which are at the heart of this case. |
| 386 | Intus 009287 | | Email thread - Evan Jackson, Alex Lueth, Alex Rothberg re: RTZ Transition | Evan Jackson, Alex Lueth | Stipulated | These emails are relevant as they pertain to access negotiations, which are at the heart of this case. |
| 387 | Intus 001535 | | Email thread - Michael Zawadski, Evan Jackson, Alex Rothberg, Evan Walters, Alex Lueth re: Data requirements description | Evan Jackson, Michael Zawadski, Alex Rothberg | Stipulated | |
| 388 | Intus 0001570-Intus 0001571 | | Email - Carinna Sias to Evan Jackson re: PACE Conference Follow Up | Carinna Sias, Evan Jackson | Stipulated | |
| 389 | RTZ0007399-RTZ0007401 | | Email thread - Evan Jackson, SCP MI, Laura Emery re: Intus support for Marketing/Enrollment | Evan Jackson | Stipulated | |
| 390 | Intus 002039-Intus 002040 | | Sept. 14, 2022 cease and desist | Robbie Felton, Michael Zawadski | Stipulated | |
| 391 | Intus 004523-004526 | | Redlined draft of Request for PACECare Access / Non-Disclosure Agreement (Intus's redline) | Robbie Felton, C. Alexander Chiulli | Stipulated | |
| 392 | RTZ 000655 | | Email - Robbie Felton to Michael Zawadski re: Catching up and NDA for RTZ integration | Robbie Felton, Michael Zawadski | Stipulated | |
| 393 | RTZ 000654 | | Email - Robbie Felton to Michael Zawadski re: Catching up and NDA for RTZ integration | Robbie Felton, Michael Zawadski | Stipulated | |
| 394 | RTZ 000653 | | Email thread - Michael Zawadski, Robbie Felton, Laura Emery, David C. Lee re: Catching up and NDA for RTZ integration | Michael Zawadski, Robbie Felton | Stipulated | |
| 395 | RTZ0000652-RTZ0000656 | | Email thread - Michael Zawadski, Robbie Felton, Laura Emery re: Catching up and NDA for RTZ integration | Michael Zawadski, Robbie Felton | Stipulated | |
| 396 | RTZ 0000440 to 0000476 | | Email chain (10/13/22-2/27/23) - C. Alexander Chiulli, David C. Lee re: Intus Care/RTZ Associates: Data Integration/Data Extract | C. Alexander Chiulli, David C. Lee | Object – hearsay. Stipulate as to authenticity and foundation. | |
| 397 | Intus 0003127-Intus 0003129 | | Email thread - Melanie Martinez, Cassandra da Rosa, PCO Support, Laura Emery, Dragos Craciun, Mark Valladolid, Andrew Madriaga, Lauri Wertz, Alex Rothberg, Michael Zawadski re: Intus Care Collaboration | Melanie Martinez, Cassandra da Rosa | Stipulated | **Hearsay:** This is an email chain between RTZ's counsel, David Lee--an agent for RTZ--and Intus' counsel regarding the access negotiations. Mr. Lee's statements were "made by a person whom RTZ authorized to make a statement on the subject" and are "being offered against" RTZ. Fed. R. Evid. 801(d)(2)(C). These emails and attachments are business records, as they are: 1) records of the parties' access negotiations; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule"). The statements from Mr. Lee's counter-party, Alex Chiulli (Intus' counsel in the negotiations), are necessary for context and are admissible under the rule of completeness. Fed. R. Evid. 106. |

| No. | Bates | Description | Witness | Objections | Relevance |
|---|---|---|---|---|---|
| 398 | Intus 053068-Intus 053119 | | Robbie Felton | Object – foundation, authenticity, relevance, hearsay. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 399 | Intus 053043-Intus 053054 | CalOptima Health RFP for PACE EMR - Intus Proposal CareHub / Intus CareHub PACE EMR System packet | Robbie Felton | Object – foundation, authenticity, relevance, hearsay. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 400 | Intus 053178-Intus 053210 | Sun River Health RFP - Intus CareHub proposal | Robbie Felton | Object – authenticity, foundation, 403, hearsay, relevance. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 401 | Intus 052650-Intus 052688 | Oct. 17, 2024 presentation re. Intus, CareHub | Robbie Felton | Object – authenticity, foundation, hearsay, relevance. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 402 | Intus 052603-Intus 052649 | Jan. 16, 2025 presentation re. Intus, CareHub | Robbie Felton | Object – authenticity, foundation, hearsay, relevance. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 403 | Intus 022238-Intus 022240 | Email from Robbie Felton to PACE programs re: Kick-Off Meeting Invitation – CareHub Steering Committee | Robbie Felton | Object – relevance. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 404 | Intus 032823-Intus 032824 | Email from Sneha Banerjee to PACE programs re: Prep Information for Tomorrow's CareHub SteerCo Kick-off | Robbie Felton, Laura Fe[...] | Object – relevance. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |

| # | Document | Description | Objection | Witness | Relevance |
|---|----------|-------------|-----------|---------|-----------|
| 405 | Intus 032825-Intus 032830, Intus 032831-Intus 032852 | Email from Sneha Banerjee to PACE programs re: Follow Up Info | Intus Care CHSC Kick-Off + attachment: Intus CareHub SteerCo Meeting 1 - 052924.pdf | Object – relevance. Stipulate as to authenticity and foundation. | Robbie Felton, Laura Fe | Relevance: These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. Hearsay: These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. Volterra Semiconductor Corp. v. Primarion, Inc., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 406 | Intus 022249-Intus 022251 | Email from Robbie Felton to Loretto (as example) re: Kick-Off Meeting Invitation - CareHub Steering Committee | Object – relevance. Stipulate as to authenticity and foundation. | Robbie Felton | Relevance: These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. Hearsay: These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. Volterra Semiconductor Corp. v. Primarion, Inc., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 407 | Intus 023356-Intus 023362 | Email from Ross Colt to Intus re: Re: Follow Up Info | Intus Care CHSC Kick-Off | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | Robbie Felton, Laura Fe | Relevance: These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. Hearsay: These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. Volterra Semiconductor Corp. v. Primarion, Inc., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 408 | Intus 052244-Intus 052247 | Email thread between Evan Jackson and Providence re: Re: Intus Care Check-In | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | Evan Jackson | Relevance: These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. Hearsay: These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. Volterra Semiconductor Corp. v. Primarion, Inc., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 409 | Intus 051861-Intus 051868 | Email thread between Neighborhood and Intus re: : Introduction to Robbie Felton - HER | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | Robbie Felton | Relevance: These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. Hearsay: These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. Volterra Semiconductor Corp. v. Primarion, Inc., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 410 | Intus 051977-Intus 051984 | Email thread between McGregor PACE and Intus re: CareHub Participation Letter Next Steps | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | Robbie Felton, Evan Jac | Relevance: These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. Hearsay: These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. Volterra Semiconductor Corp. v. Primarion, Inc., No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |

| | | | | | |
|---|---|---|---|---|---|
| 411 | Intus 034411-Intus 034413 | | Email thread between Intus and Boldage re: : CareHub Steerco Call Request: Finance Leadership Reporting Needs | Alex Rothberg | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 412 | Intus 051099-Intus 051110 | | Email thread between Intus and PACE-RI re: CareHub Enrollments & Disenrollments Feedback | Evan Jackson | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 413 | Intus 033583-Intus 033587 | | Email thread between Intus and Rocky Mountain PACE re: Intus/RM PACE Quarterly Business Review | Evan Jackson | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 414 | Intus 033457-Intus 033464 | | Email thread between Intus and Midland Care re: The future | Evan Jackson | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 415 | Intus 041522, Intus 041523-Intus 041533 | | Carehub cost details (email to PACE Place) | Evan Jackson | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 416 | Intus 026834-Intus 026843 | | Email thread between Intus and multiple PACE programs showing Q4 steering committee meeting and onsite follow up | Evan Jackson | Object – relevance, hearsay. Stipulate as to authenticity and foundation. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Herasay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.* , No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule"). Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |

| # | Description | | Witness | Objections | Response |
|---|---|---|---|---|---|
| 417 | Intus 018849 | Carehub assessments screenshot | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance. | **Relevance:** These emails relating to CareHub are relevant to rebut RTZ's allegations that CareHub was the product of fraud or misappropriation. The emails demonstrate the detailed process of developing CareHub by showing the multiple steering committee meetings and feedback sessions between Intus and PACE programs, culminating in the creation of CareHub. Intus is entitled to present its side of the story and rebut the accusation that CareHub was allegedly the product of fraud or misappropriation. Intus intends to do so by having witnesses testify about the CareHub development process and the concomitant emails that were part of that process. **Hearsay:** These emails and attachments are business records, as they are: 1) records of the various meetings and input solicited and given surrounding CareHub development; 2) the emails were sent at the time of the events by someone with knowledge; 3) the emails were sent in the course of Intus' regularly conducted activity; and 4) sending the emails was a regular practice of that activity. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. C-08-05129 JCS, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (allowing "an email sent from [a customer] to [the plaintiff] providing technical guidelines" under the "business record exception to the hearsay rule") Additionally, the emails are not hearsay because they pertain to Intus' state of mind, as they demonstrate that Intus did not fraudulently develop CareHub. |
| 418 | Intus 018851 | Carehub calendar screenshot | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance. | **Authenticity:** These are screenshots that were produced to RTZ in discovery showing the features and functionality of CareHub. Alex Rothberg, who is intimately familiar with CareHub and took the screenshots, has the foundation to testify as to their authenticity. **Hearsay:** These are not admitted for the truth of the matter; rather, these are admitted to show the features and functionality of CareHub. **Relevance:** RTZ has alleged that Intus misappropriated the features and functionality of PACECare to create CareHub. Intus is entitled to introduce screenshots of CareHub to rebut this allegation. |
| 419 | Intus 018852 | Carehub enrollments screenshot | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance. | **Authenticity:** These are screenshots that were produced to RTZ in discovery showing the features and functionality of CareHub. Alex Rothberg, who is intimately familiar with CareHub and took the screenshots, has the foundation to testify as to their authenticity. **Hearsay:** These are not admitted for the truth of the matter; rather, these are admitted to show the features and functionality of CareHub. **Relevance:** RTZ has alleged that Intus misappropriated the features and functionality of PACECare to create CareHub. Intus is entitled to introduce screenshots of CareHub to rebut this allegation. |
| 420 | Intus 018850 | Carehub quality inbox screenshot | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance. | **Authenticity:** These are screenshots that were produced to RTZ in discovery showing the features and functionality of CareHub. Alex Rothberg, who is intimately familiar with CareHub and took the screenshots, has the foundation to testify as to their authenticity. **Hearsay:** These are not admitted for the truth of the matter; rather, these are admitted to show the features and functionality of CareHub. **Relevance:** RTZ has alleged that Intus misappropriated the features and functionality of PACECare to create CareHub. Intus is entitled to introduce screenshots of CareHub to rebut this allegation. |
| 421 | Websites, videos | https://careventionhc.com/truchart-national-user-group-2022-recording/ | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Authenticity:** These are screenshots that were produced to RTZ in discovery showing the features and functionality of CareHub. Alex Rothberg, who is intimately familiar with CareHub and took the screenshots, has the foundation to testify as to their authenticity. **Hearsay:** These are not admitted for the truth of the matter; rather, these are admitted to show the features and functionality of CareHub. **Relevance:** RTZ has alleged that Intus misappropriated the features and functionality of PACECare to create CareHub. Intus is entitled to introduce screenshots of CareHub to rebut this allegation. |
| 422 | Websites, videos | https://careventionhc.com/pacelogic-user-group-conference-2023/ | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 423 | Websites, videos | https://vimeo.com/752858822/3c75e171ef?fl=pl&fe=cm | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 424 | Websites, videos | https://vimeo.com/858848087/4101f3e798 | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 425 | Websites, videos | https://vimeo.com/858848370/2b313ccd58 | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |

| # | Type | | | Source | Objections | Relevance |
|---|---|---|---|---|---|---|
| 426 | Websites, videos | | | https://vimeo.com/858848798/82cc88857e<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 427 | Websites, videos | | | https://vimeo.com/858849087/0f6b532536<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 428 | Websites, videos | | | https://vimeo.com/858849544/f5a4459ea5<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 429 | Websites, videos | | | https://vimeo.com/858849903/c3066411f5<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 430 | Websites, videos | | | https://vimeo.com/858424639/f00f696185<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 431 | Websites, videos | | | https://vimeo.com/858425107/b028eb8e3b<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 432 | Websites, videos | | | https://vimeo.com/858425572/d916b5c4e9<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 433 | Websites, videos | | | https://vimeo.com/858426242/2cd3e13e8a<br>Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |

70617179.v2

| No. | Bates Begin | Bates End | Description | Witness | Objection | Response |
|---|---|---|---|---|---|---|
| 434 | Websites, videos | | https://vimeo.com/858426622/00599aff12 | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 435 | Websites, videos | | https://vimeo.com/858426825/6293a4cd7e | Alex Rothberg | Object – authenticity, foundation, hearsay, relevance, prejudice (produced after close of discovery) | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available for anyone to access and review. **Authenticity/Foundation:** These emails are publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 436 | Intus 018874 | | Invoicing spreadsheet for list of Intus clients | Kris Hult | Stipulated | **Relevance:** These are publicly available videos and slide shows showcasing, in granular detail, the features and functionality (including reporting functionality) of two EMRs that RTZ's successor, Collabrios, acquired--TruChart and PACELogic. These are available publicly on the website of Anew Health, one of the companies that merged with RTZ to form Collabrios. These videos and presentations tend to undermine RTZ's claims that the features and functionality of EMRs is some trade secret in the industry; indeed, the company that merged with RTZ had its features and functionality publicly available, and Mr. Rothberg can authenticate them by testifying as to his process for obtaining them. **Hearsay:** These exhibits are not introduced for the truth of the matter asserted (i.e., the accuracy of the substance in the presentations); rather, the mere existence of this material on a public forum for anyone to access is the point. **Prejudice:** There is no prejudice to RTZ. This material has been publicly available for over four years, and it is housed on the website of the company with which RTZ merged. |
| 437 | Intus 018876 | | Intus staff time report | Kris Hult | Stipulated | |
| 438 | Intus 018877 | | Revenue summary (for multiple PACE programs and Intus products | Kris Hult | Stipulated | |
| 439 | Intus 018878 | | Intus P&L, balance sheet, cash flow | Kris Hult | Stipulated | |
| 440 | Intus 018879 | | Intus deals database | Kris Hult | Stipulated | |
| 441 | Intus 019846 | | Invoice spreadsheet re Pop Health | Kris Hult | Stipulated | |
| 442 | Intus 019847 | | Won/lost opportunities list | Kris Hult | Stipulated | |
| 443 | RTZ0008248-49 | | RTZ client list | Kris Hult | Stipulated | |
| 444 | 2024-05-24 - RTZ's RFP, Set 1 | N/A | Discovery requests | Michael Zawadski | Stipulated | |
| 500 | Intus 001574 | Intus 001574 | Email attaching EHR Data Map | Will Mims, Laura Ferrara | Stipulated | |
| 501 | Intus 001575 | Intus 001580 | EHR Data Map | Will Mims, Laura Ferrara | Stipulated | |
| 502 | Intus 001653 | Intus 001655 | Data integration between Beacon and Intus | Lauri Wertz | Stipulated | |
| 503 | Intus 001702 | Intus 001707 | Data integration between Neighborhood Healthcare and Intus | Laura Ferrara, Jeffrey Glen | Stipulated | |
| 504 | Intus 001708 | Intus 001713 | Data integration between Neighborhood Healthcare and Intus | Laura Ferrara, Jeffrey Glen | Stipulated | |
| 505 | Intus 001739 | Intus 001739 | Data integration between Neighborhood Healthcare and Intus | Laura Ferrara, Jeffrey Glen | Stipulated | |
| 506 | Intus 001740 | Intus 001747 | Data integration between Neighborhood Healthcare and Intus | Laura Ferrara, Lauri Wertz | Stipulated | |
| 507 | Intus 001766 | Intus 001773 | Data integration between Neighborhood Healthcare and Intus | Laura Ferrara, Lauri Wertz | Stipulated | |
| 508 | Intus 001808 | Intus 001812 | Intus' use of PACECare at Neighborhood Health | Laura Ferrara | Stipulated | |
| 509 | Intus 001813 | Intus 001817 | Intus' use of PACECare at Neighborhood Health | Laura Ferrara | Stipulated | |
| 510 | Intus 001818 | Intus 001823 | Intus' use of PACECare at Neighborhood Health | Laura Ferrara | Stipulated | |
| 511 | Intus 001830 | Intus 001835 | Intus' use of PACECare at Neighborhood Health | Laura Ferrara | Stipulated | |
| 512 | Intus 001836 | Intus 001842 | Intus' use of PACECare at Neighborhood Health | Laura Ferrara | Stipulated | |
| 513 | Intus 001843 | Intus 001894 | Training Manual for PACECare | Laura Emery | Stipulated | |
| 514 | Intus 002010 | Intus 002015 | CAP data update and password change for Neighborhood | Laura Emery | Stipulated | |
| 515 | Intus 002053 | Intus 002056 | Intus' account at Community Pace; NDA | Lauri Wertz | Stipulated | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 516 | Intus 002075 | Intus 002078 | NDA status | Laura Ferrara | Stipulated | |
| 517 | Intus 002092 | Intus 002095 | Data map for RTZ | Laura Ferrara | Stipulated | |
| 518 | Intus 002096 | Intus 002101 | Data map for RTZ | Laura Ferrara | Stipulated | |
| 519 | Intus 002111 | Intus 002113 | Temporary downtime of Intus data pipeline | Robbie Felton, Laura Ferrara | Stipulated | |
| 520 | Intus 002114 | Intus 002119 | Data map for RTZ | Laura Ferrara | Stipulated | |
| 521 | Intus 002124 | Intus 002124 | Temporary downtime of Intus data pipeline | Laura Ferrara | Stipulated | |
| 522 | Intus 002161 | Intus 002164 | Integration between Intus Care and RTZ for Beacon of Life | Micheal Zawadski, Laura Emery | Stipulated | |
| 523 | Intus 002172 | Intus 002173 | Data map for RTZ | Laura Ferrara | Stipulated | |
| 524 | Intus 002174 | Intus 002179 | Data map for RTZ | Laura Ferrara | Stipulated | |
| 525 | Intus 002393 | Intus 002395 | Manual reports from Community Pace | Laura Ferrara | Stipulated | |
| 526 | Intus 002403 | Intus 002405 | Steps to extract data from RTZ for uploading in IntusCare | Alex Rothberg | Stipulated | |
| 527 | Intus 002943 | Intus 002945 | Automation of data pipeline at BoldAge and data integration addendum | Alex Rothberg | Stipulated | |
| 528 | Intus 002948 | Intus 002949 | Automation of data pipeline at Senior Care Partners and data integration addendum | Alex Rothberg, Evan Jackson | Stipulated | |
| 529 | Intus 002951 | Intus 002953 | Automation of data pipeline at Senior Care Partners and data integration addendum | Alex Rothberg, Evan Jackson | Stipulated | |
| 530 | Intus 002956 | Intus 002958 | Automation of data pipeline at Neighborhood and data integration addendum | Alex Rothberg, Evan Jackson | Stipulated | |
| 531 | Intus 002959 | Intus 002960 | Automation of data pipeline at Community Pace and data integration addendum | Alex Rothberg, Evan Jackson | Stipulated | |
| 532 | Intus 002961 | Intus 002961 | Data Integration Addendum | Evan Jackson | Stipulated | |
| 533 | Intus 002962 | Intus 002964 | Automation of data pipeline at Community Pace and data integration addendum | Alex Rothberg, Evan Jackson | Stipulated | |
| 534 | Intus 002965 | Intus 002967 | Automation of data pipeline at Bold Age and data integration addendum | Alex Rothberg, Evan Jackson | Stipulated | |
| 535 | Intus 002971 | Intus 002973 | Data integration addendum with Bold Age | Evan Jackson | Stipulated | |
| 536 | Intus 003004 | Intus 003006 | Data integration addendum with Neighborhood | Evan Jackson | Stipulated | |
| 537 | Intus 003007 | Intus 003009 | Partially executed data integration addendum with Neighborhood | Evan Jackson | Stipulated | |
| 538 | Intus 003010 | Intus 003010 | Partially executed data integration addendum with Neighborhood | Evan Jackson | Stipulated | |
| 539 | Intus 003011 | Intus 003013 | Fully executed data integration addendum with Neighborhood | Evan Jackson | Stipulated | |
| 540 | Intus 003014 | Intus 003014 | Fully executed data integration addendum with Neighborhood | Evan Jackson | Stipulated | |
| 541 | Intus 003015 | Intus 003017 | Fully executed data integration addendum with Neighborhood | Evan Jackson | Stipulated | |
| 542 | Intus 003036 | Intus 003040 | Entering Neighborhood's credentials into Intus Care | Lauri Wertz | Stipulated | |
| 543 | Intus 003041 | Intus 003049 | Automating Intus Care at Community PACE | Lauri Wertz, Alex Rothberg | Stipulated | |
| 544 | Intus 003233 | Intus 003246 | Issues at Neighborhood with automated pipeline | Lauri Wertz | Stipulated | |
| 545 | Intus 003255 | Intus 003257 | Issues at Community PACE with automated pipeline | Lauri Wertz | Stipulated | |

70617179.v2

| No. | Bates | Description | Sponsor | Status |
|---|---|---|---|---|
| 546 | Intus 003258 | Automated pipeline at Community PACE | Lauri Wertz | Stipulated |
| 547 | Intus 003270 | Automated pipeline at Community PACE | Lauri Wertz | Stipulated |
| 548 | Intus 003273 | Data integration addendum with Beacon of Life | Lauri Wertz | Stipulated |
| 549 | Intus 003275 | Data integration addendum with Bold Age | Lauri Wertz, Evan Jackson, Robbie Felton | Stipulated |
| 550 | Intus 003277 | Data integration addendum with Neighborhood | Lauri Wertz, Evan Jackson, Jeff Glenn | Stipulated |
| 551 | Intus 003284 | Data integration addendum with Neighborhood | Lauri Wertz, Evan Jackson | Stipulated |
| 552 | Intus 003288 | Executed data integration addendum with Neighborhood | Lauri Wertz, Evan Jackson | Stipulated |
| 553 | Intus 003523 | Automated pipeline at Community PACE | Lauri Wertz | Stipulated |
| 554 | Intus 003590 | Automated pulling of data at BoldAge | Evan Jackson | Stipulated |
| 555 | Intus 003593 | Automated pipeline at Neighborhood | Evan Jackson | Stipulated |
| 556 | Intus 003626 | Daily file expert and pipeline at Life Circles | Evan Jackson, Robbie Felton | Stipulated |
| 557 | Intus 003736 | Data integration addendum with Community | Lauri Wertz, Evan Jackson | Stipulated |
| 558 | Intus 003747 | Data integration addendum with Community | Lauri Wertz, Evan Jackson | Stipulated |
| 559 | Intus 003846 | Automation scripts | Evan Jackson | Stipulated |
| 560 | Intus 003915 | RTZ Data Extraction Guide | Alex Rothberg | Stipulated |
| 561 | Intus 004631 | Beacon integration | Alex Rothberg | Stipulated |
| 562 | Intus 004634 | Custom Export Reporting | Alex Rothberg | Stipulated |
| 563 | Intus 005120 | Data extraction guide | Alex Rothberg | Stipulated |
| 564 | Intus 006152 | Chat accompanying video call re integration of care plans directly into TruChart, PACELogic and RTZ | Alex Rothberg | Stipulated |
| 565 | Intus 014789 | Terms Sheet for Stock Financing of Intus | Robbie Felton | Stipulated |
| 566 | Intus 014799 | Preferred stock | Robbie Felton | Stipulated |
| 567 | Intus 014830 | Emails about stocks and financing | Robbie Felton | Stipulated |
| 568 | Intus 016959 | Intus' cashflow | Robbie Felton | Stipulated |
| 569 | Intus 018454 | Overview of IRIS (Intus Revenue Integrity System) | Robbie Felton | Stipulated |
| 570 | Intus 018507 | Internal messages re automated script | Robbie Felton, Evan Jackson | Stipulated |
| 571 | Intus 018624 | Internal messages re pause of data pipeline | Robbie Felton | Stipulated |
| 572 | Intus 020380 | Slack messages re automated script at Brio | Evan Jackson | Stipulated |
| 573 | Intus 020386 | Slack messages re contracts with PACE facilities | Robbie Felton, Laura Ferrara | Stipulated |
| 574 | Intus 020437 | Slack messages re Neighborhood EMR | Evan Jackson, Laura Ferrara | Stipulated |
| 575 | Intus 020444 | Neighborhood EMR | Laura Ferrara | Stipulated |
| 576 | Intus 020546 | Slack messages re Habitat EMR | Evan Jackson | Stipulated |
| 577 | Intus 020555 | Slack messages re Habitat EMR | William Mims, Laura Ferrara | Stipulated |

| No. | Bates (Begin) | Bates | Description | Author/Recipients | Status |
|---|---|---|---|---|---|
| 578 | Intus 020621 | Intus 020621 | Slack messages re New Horizons EMR | Evan Jackson | Stipulated |
| 579 | Intus 020651 | Intus 020651 | Pace Logic and TruChart high priority targets, RTZ opportunities | Evan Jackson | Stipulated |
| 580 | Intus 020699 | Intus 020699 | Navigating RTZ | Laura Ferrara | Stipulated |
| 581 | Intus 020726 | Intus 020728 | Slack messages re New Horizons login | Laura Ferrara, Robbie Felton | Stipulated |
| 582 | Intus 020823 | Intus 020823 | Slack messages re Capital Health EMR | Evan Jackson, Alex Rothberg | Stipulated |
| 583 | Intus 020824 | Intus 020824 | Slack messages re Capital Health EMR | Alex Rothberg, Laura Ferrara | Stipulated |
| 584 | Removed | | | | Stipulated |
| 585 | Removed | | | | Stipulated |
| 586 | Removed | | | | Stipulated |
| 587 | Removed | | | | Stipulated |
| 588 | Intus 021873 | Intus 021873 | CareHub launch and other updates | Laura Ferrara, Evan Jackson, Will Mims | Stipulated |
| 589 | Removed | | | | Stipulated |
| 590 | Removed | | | | Stipulated |
| 591 | Removed | | | | Stipulated |
| 592 | Removed | | | | Stipulated |
| 593 | Intus 023304 | Intus 023305 | Agreement with ArchCare | Laura Ferrara, Evan Jackson | Stipulated |
| 594 | Intus 023306 | Intus 023319 | Agreement with ArchCare | Laura Ferrara, Evan Jackson | Stipulated |
| 595 | Intus 023553 | Intus 023572 | CareHub Agreement with K-Day PACE | Robbie Felton, Evan Jackson | Stipulated |
| 596 | Intus 033899 | Intus 033911 | Investor Presentation | Robbie Felton | Stipulated |
| 597 | Intus 039374 | Intus 039375 | Board meeting minutes | Evan Jackson | Stipulated |
| 598 | Intus 048597 | Intus 048627 | May 1, 2024 Board of Directors presentation | Evan Jackson | Stipulated |
| 599 | Intus 052339 | Intus 052339 | CareHub agreement with BoldAge | Evan Jackson | Stipulated |
| 600 | Intus 052346 | Intus 052371 | Order form b/w Intus and High Dessert | Evan Jackson | Stipulated |
| 601 | Intus 052372 | Intus 052404 | Order form b/w Intus and Community PACE | Evan Jackson | Stipulated |
| 602 | Intus 052405 | Intus 052407 | Order form amendment b/w Intus and High Desert | Evan Jackson | Stipulated |
| 603 | Intus 052408 | Intus 052408 | Amendment to order b/w Intus and BoldAge | Evan Jackson | Stipulated |
| 604 | RTZ0000847 | RTZ0000866 | PACECare agreement with High Desert | Michael Zawadski | Stipulated |
| 605 | RTZ0000909 | RTZ0000911 | Amendment to PACECare agreement between Beacon and RTZ | Michael Zawadski | Stipulated |
| 606 | RTZ0001320 | RTZ0001329 | Emails re Intus Care being part of Tabula Rasa corporate umbrella | Michael Zawadski, Laura Emery | Stipulated |
| 607 | RTZ0001334 | RTZ0001338 | NDA for PACECare requirement | Michael Zawadski, Laura Emery | Stipulated |
| 608 | RTZ0002741 | RTZ0002742 | Intus' use of PACECare at Community PACE | Lauri Wertz | Stipulated |
| 609 | RTZ0002752 | RTZ0002753 | NDA for BoldAge requirement | Michael Zawadski, Laura Emery | Stipulated |
| 610 | RTZ0002754 | RTZ0002764 | Emails b/w Intus and RTZ re Intus' use of PACECare | Michael Zawadski | Stipulated |
| 611 | RTZ0002801 | RTZ0002802 | Amendment to PACECare agreement with Beacon | Michael Zawadski | Stipulated |
| 612 | RTZ0002803 | RTZ0002819 | Amendment to PACECare agreement with Beacon | Michael Zawadski | Stipulated |
| 613 | RTZ0005679 | RTZ0005680 | Introductory email from Intus to RTZ | Michael Zawadski, Robbie Felton | Stipulated |
| 614 | RTZ0005972 | RTZ0005975 | Senior Care Partner's EMR data | Michael Zawadski | Stipulated |

| | | | | | |
|---|---|---|---|---|---|
| 615 | RTZ0006181 | RTZ0006197 | PACECare agreement with Sunrise PACE | Michael Zawadski | Stipulated |
| 616 | RTZ0007280 | RTZ0007297 | PACECare agreement with Community PACE | Michael Zawadski | Stipulated |
| 617 | RTZ0008378 | RTZ0008378 | RTZ logs | Laura Emery | Stipulated |
| 618 | RTZ0008389 | RTZ0008378 | RTZ logs | Laura Emery | Stipulated |
| 619 | RTZ0008390 | RTZ0008390 | RTZ logs | Laura Emery | Stipulated |
| 620 | RTZ0000477 | RTZ0000489 | Email chain from A. Chiulli to D. Lee re Intus Care - RTZ - Data Extract Agreement | Michael Zawadski | Stipulated |
| 621 | Appendix A to Intus Responses to Interrogatories, Set 1 | NA | Appendix A to Intus Responses to Interrogatories, Set 1 | Alex Rothberg | Stipulated |
| 622 | 2025-08-18 - Intus' Resp to RTZ RFA | NA | 2025-08-18 - Intus' Resp to RTZ RFP | Robbie Felton | Stipulated |
| 623 | | | | | |

70617179.v2

# Appendix B:
# Jury Instructions

EPSTEIN BECKER & GREEN, P.C.
Charles E. Weir (Bar No. 211091)
Andrew Beshai (Bar No. 308030)
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone: 310.556.8861
Facsimile: 310.553.2165
CWeir@ebglaw.com
abeshai@ebglaw.com

*Attorneys for Plaintiff*
INTUSCARE INC.

NOSSAMAN LLP
DAVID C. LEE (SBN 193743)
dlee@nossaman.com
MICHELE C. KIRRANE (SBN 215448)
mkirrane@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile:  415.398.2438

NOSSAMAN LLP
KASIA PENN (SBN 306056)
kpenn@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:  949.833.7878

*Attorneys for Defendant*
RTZ ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

| | |
|---|---|
| INTUS CARE, INC.,<br><br>        Plaintiff,<br><br>    vs.<br><br>RTZ ASSOCIATES, INC.; and DOES 1 through 10,<br><br>        Defendants, | Case No:     4:24-cv-01132-JST<br><br>Assigned to: Hon. Jon S. Tigar<br><br>**JOINT PROPOSED JURY INSTRUCTIONS**<br><br>Pretrial Conf: July 31, 2026 at 2:00 p.m.<br>Trial Date: August 24, 2026 at 8:00 a.m. |

**TABLE OF CONTENTS**

| No. | Title | Source | Disputed? |
|---|---|---|---|
| 1. | Duty of Jury | Ninth Circuit Model Jury Instruction 1.3 | No |
| 2. | Claims and Defenses | Ninth Circuit Model Jury Instruction 1.5 | No |
| 3. | Burden of Proof—Preponderance of the Evidence | Ninth Circuit Model Jury Instruction 1.6 | No |
| 4. | Burden of Proof—Clear and Convincing Evidence | Ninth Circuit Model Jury Instruction 1.7 | No |
| 5. | What is Evidence | Ninth Circuit Model Jury Instruction 1.9 | No |
| 6. | What is Not Evidence | Ninth Circuit Model Jury Instruction 1.10 | No |
| 7. | Evidence for Limited Purpose | Ninth Circuit Model Jury Instruction 1.11 | No |
| 8. | Direct and Circumstantial Evidence | Ninth Circuit Model Jury Instruction 1.12 | No |
| 9. | Ruling on Objections | Ninth Circuit Model Jury Instruction 1.13 | No |
| 10. | Credibility of Witnesses | Ninth Circuit Model Jury Instruction 1.14 | No |
| 11. | Conduct of the Jury | Ninth Circuit Model Jury Instruction 1.15 | No |
| 12. | Publicity During Trial | Ninth Circuit Model Jury Instruction 1.16 | No |
| 13. | No Transcript Available to Jury | Ninth Circuit Model Jury Instruction 1.17 | No |
| 14. | Taking Notes | Ninth Circuit Model Jury Instruction 1.18 | No |
| 15. | Questions to Witnesses by Jurors During Trial | Ninth Circuit Model Jury Instruction 1.19 | No |
| 16. | Bench Conferences and Recesses | Ninth Circuit Model Jury Instruction 1.20 | No |
| 17. | Outline of Trial | Ninth Circuit Model Jury Instruction 1.21 | No |
| 18. | Cautionary Instructions | Ninth Circuit Model Jury Instruction 2.1 | No |
| 19. | Stipulations of Fact | Ninth Circuit Model Jury Instruction 2.3 | No |
| 20. | Deposition in Lieu of Live Testimony | Ninth Circuit Model Jury Instruction 2.5 | No |
| 21. | Impeachment Evidence—Witness | Ninth Circuit Model Jury Instruction 2.10 | No |
| 22. | Use of Interrogatories | Ninth Circuit Model Jury Instruction 2.12 | No |
| 23. | Use of Requests for Admission | Ninth Circuit Model Jury Instruction 2.13 | No |
| 24. | Expert Opinion Testimony | Ninth Circuit Model Jury Instruction 2.14 | No |
| 25. | Charts and Summaries Not Received in Evidence | Ninth Circuit Model Jury Instruction 2.15 | No |
| 26. | Evidence in Electronic Format | Ninth Circuit Model Jury Instruction 2.17 | No |
| 27. | Duty to Deliberate | Ninth Circuit Model Jury Instruction 3.1 | No |
| 28. | Consideration of Evidence—Conduct of the Jury | Ninth Circuit Model Jury Instruction 3.2 | No |
| 29. | Communication with Court | Ninth Circuit Model Jury Instruction 3.3 | No |
| 30. | Return of Verdict | Ninth Circuit Model Jury Instruction 3.5 | No |
| 31. | Corporations and Partnerships—Fair Treatment | Ninth Circuit Model Jury Instruction 4.1 | No |

RTZ ASSOCIATES, INC.'S PROPOSED JURY INSTRUCTIONS

| 32. | Damages Arising in the Future—Discount to Present Cash Value | Ninth Circuit Model Jury Instruction 5.4 | No |
|---|---|---|---|
| 33. | Party Having Power to Produce Better Evidence | CACI 203 | No |
| 34. | **DISPUTED:** Willful Suppression of Evidence | CACI 204 | **Yes** |
| 35. | Causation: Substantial Factor | CACI No. 220 | No |
| 36. | **DISPUTED:** Custom or Practice | CACI 413 | **Yes** |
| 37. | Substantial Factor | CACI 430 | No |
| 38. | **DISPUTED:** Alleged Information Blocking Under the 21st Century Cures Act – Limited Purpose | 42 U.S.C. § 300jj-52; 45 C.F.R. Part 171; ONC FAQ: "What happens after I report information blocking through the information blocking portal on ONC's website, HealthIT.gov?", https://healthit.gov/faq/what-happens-after-i-report-information-blocking-through-information-blocking-portal-oncs/; *Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.,* 131 F.4th 205, 227–228 (4th Cir. 2025) | **Yes** |
| 39. | **DISPUTED:** Introduction to the 21st Century Cures Act / Information Blocking Rules | 21st Century Cures Act and the Public Health Services Act; 84 Fed. Reg. 7424, 7516 (June 30, 2020). Definition of interoperability: https://healthit.gov/interoperability/ | **Yes** |
| 40. | Information Blocking – Definition and Issues to Decide | Special Instruction No. 3; 42 U.S.C. § 300jj-52(a); 45 C.F.R. §§ 171.102, 171.103; Order Denying Partial Summary Judgment, ECF No. 84 at 5–8; Order on Motions to Exclude Expert Testimony, July 8, 2026, Dkt. No. 203 at 4–6 | No |
| 41. | **DISPUTED:** Information Blocking – Electronic Heath Information Defined | Special Instruction No. 4; 45 C.F.R. § 171.102; 45 C.F.R. §§ 160.103; 164.501; 45 C.F.R. § 171.103. | **Yes** |
| 42. | **DISPUTED:** Access to Electronic Health Information Distinguished from Access to Software | Special Instruction No. 5; 45 C.F.R. §§ 171.102; 171.103; 171.301(b). | **Yes** |
| 43. | **DISPUTED:** Information Blocking – Covered Actor Requirement | Special Instruction No. 6; 42 U.S.C. § 300jj-52(a)(1); 45 C.F.R. § 171.100, § 171.102; *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642, 25,811-15 (May 1, | **Yes** |

JOINT PROPOSED JURY INSTRUCTIONS

| | | | |
|---|---|---|---|
| | | 2020); Order on Motions to Exclude Expert Testimony, Dkt. No. 203 at 4-6. | |
| 44. | Information Blocking – Health Information Network or Health Information Exchange Defined | 45 C.F.R. § 171.102; 85 Fed. Reg. 25,642, 25,811-13 (May 1, 2020); ONC, *Information Blocking Actors* Fact Sheet (Apr. 2024), https://www.healthit.gov/wp-content/uploads/2025/06/IB_Actors_Fact_Sheet_508.pdf | No |
| 45. | **DISPUTED:** Information Blocking – What Is Not a Health Information Network or Health Information Exchange | 45 C.F.R. § 171.102; 85 Fed. Reg. 25,642, 25,802, 25,811-13 (May 1, 2020); ONC, *Information Blocking Actors* Fact Sheet (Apr. 2024), https://www.healthit.gov/wp-content/uploads/2025/06/IB_Actors_Fact_Sheet_508.pdf | **Yes** |
| 46. | **DISPUTED:** Information Blocking – Health Information Network or Health Information Exchange Requirements | 45 C.F.R. § 171.102; Order on Motions to Exclude Expert Testimony, July 8, 2026, Dkt. No. 203 at 4 | **Yes** |
| 47. | **DISPUTED:** Exceptions to Information Blocking | 45 C.F.R. §§ 171.201-171.206. *See 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25642, 25794, 25280 (June 30, 2020) (codified at 45 C.F.R. §§ 170, 171). | **Yes** |
| 48. | **DISPUTED:** Information Blocking – Manner Exception | 45 C.F.R. § 171.301(a)(1), (b); 85 Fed. Reg. 25642, 25676-25679 (May 1, 2020); 89 Fed. Reg. 1192 (Jan. 9, 2024); *Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.,* 131 F.4th 205, 233 (4th Cir. 2025) | **Yes** |
| 49. | **DISPUTED:** The Manner Exception— Agreeable Terms | 45 C.F.R. § 171.301; *Cf.* 45 C.F.R. § 171.303, Licensing Exception | **Yes** |
| 50. | **DISPUTED:** Information Blocking – Manner Exception – Request Requirement | Special Instruction No. 13; 45 C.F.R. § 171.301(a); 85 Fed. Reg. 25,642, 25,676–25,679 (May 1, 2020); ONC FAQ, "What role does a "requestor" play under the alternative manner condition of the Manner Exception?", https://healthit.gov/faq/what-role-does-a-requestor-play-under-the-alternative-manner-condition-of-the-manner-exception/ | **Yes** |
| 51. | Information Blocking – Manner Exception – Alternative Manner Sequencing | Special Instruction No. 14; 45 C.F.R. § 171.301(a) (alternative manner; order of | No |

JOINT PROPOSED JURY INSTRUCTIONS

| | | | |
|---|---|---|---|
| | | priority) and (b); 85 Fed. Reg. 25,642, 25,676–25,679 (May 1, 2020); 89 Fed. Reg. 1192 (Jan. 9, 2024). | |
| 52. | Intentional Interference with Contractual Relations | CACI 2201 | No |
| 53. | Intentional Interference with Prospective Economic Advantage | CACI 2202 | No |
| 54. | Inducing Breach of Contract | CACI No. 2200 | No |
| 55. | **DISPUTED:** Compensatory Damages – Inducing Breach of Contract | Special Instruction No. 32; Cal. Civ. Code § 3333; CACI 3900, 3903; *Quelimane Co. v. Stewart Title Guaranty Co.,* 19 Cal.4th 26, 55 (1998); *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990) | **Yes** |
| 56. | **DISPUTED:** Unclean Hands | *See Metal Jeans, Inc. v. Metal Sport, Inc., et al.*, 987 F.3d 1242 (9th Cir. Feb. 16, 2021). | **Yes** |
| 57. | Mitigation of Damages | CACI 3931 | No |
| 58. | Failure to Mitigate | CACI 358 | No |
| 59. | Punitive Damages —RTZ's Claims Against Intus — First Phase | CACI 3946 | No |
| 60. | Punitive Damages —RTZ's Claims Against Intus — Second Phase | CACI 3949 | No |
| 61. | Punitive Damages - Intus' Claims Against RTZ — First Phase | CACI 3946 | No |
| 62. | Punitive Damages - Intus' Claims Against RTZ — Second Phase | CACI 3949 | No |
| 63. | **DISPUTED:** Trespass to Chattels—Computer Systems | CACI 2101. "Sources and Authority" (citing *Casillas v. Berkshire Hathaway Homestate Ins. Co.* (2022)) 79 Cal.App.5th 755, 764 [294 Cal.Rptr.3d 841].) | **Yes** |
| 64. | Compensatory Damages – Trespass to Chattels | Cal. Civ. Code § 3333; CACI 3903; *Intel Corp. v. Hamidi,* 30 Cal.4th 1342, 1350–1353 (2003); *eBay, Inc. v. Bidder's Edge, Inc.,* 100 F. Supp.2d 1058, 1069–1071 (N.D. Cal. 2000) | No |
| 65. | **DISPUTED:** Federal Computer Fraud and Abuse Act | Special Instruction No. 17 | **Yes** |
| 66. | Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)(4)) (CFAA) | Ninth Circuit Pattern Criminal Instrs. No. 15.29, Damage to a Protected Computer | No |

JOINT PROPOSED JURY INSTRUCTIONS

| | | | |
|---|---|---|---|
| | | Causing Loss (18 U.S.C. § 1030(a)(5)(C)); "protected computer" definition can be found here: 18 USC § 1030(e)(2). | |
| 67. | **DISPUTED:** Violation of the CFAA – Section 1030(a)(4) | 18 U.S.C. § 1030(a)(4) & (g); Ninth Circuit Manual of Model Criminal Jury Instructions, No. 15.26, *United States v. Nosal* 844 F.3d 1024, 1027–1028, 1035–1038 (9th Cir. 2016); *LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1133 (9th Cir. 2009); *Facebook, Inc. v. Power Ventures, Inc.* 844 F.3d 1058, 1067–1068 (9th Cir. 2016) | **Yes** |
| 68. | Violation of the CFAA – Section 1030(a)(5)(C) | 18 U.S.C. § 1030(a)(5)(C) & (g); Ninth Circuit Manual of Model Criminal Jury Instructions, No. 15.29; *United States v. Nosal,* 844 F.3d 1024, 1027–1028, 1035–1038 (9th Cir. 2016); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067–1068 (9th Cir. 2016) | **No** |
| 69. | Violation of the Computer Fraud and Abuse Act – Protected Computer Defined | 18 U.S.C. § 1030(e)(2)(B) | No |
| 70. | **DISPUTED:** Violation of the Computer Fraud and Abuse Act – Intent to Defraud Defined | *United States v. Nosal,* 844 F.3d 1024, 1027–1028, 1035–1038 (9th Cir. 2016); *eBay Inc. v. Digital Point Solutions, Inc.* 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009); *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,* 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008) | **Yes** |
| 71. | **DISPUTED:** Violation of the Computer Fraud and Abuse Act – Without Authorization Defined | *United States v. Nosal,* 844 F.3d 1024, 1034–1038 (9th Cir. 2016); *LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1132-1135 (9th Cir. 2009); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067–1068 (9th Cir. 2016) | **Yes** |
| 72. | **DISPUTED:** Without Authorization — Defined | Ninth Circuit Pattern Criminal Instrs. No. 15.21; California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502) or the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030); *U.S. v.* | **Yes** |

| | | | |
|---|---|---|---|
| | | *Nosal (Nosal I)*, 676 F.3d 854, 863 (9th Cir. 2012); *see Nosal I*, 676 F.3d at 861; *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016) | |
| 73. | **DISPUTED:** Violation of California Comprehensive Computer Data Access and Fraud Act – Definition of "Access" | CACI 1813; Cal. Penal Code, § 502(b)(1); *United States v. Christensen,* 828 F.3d 763, 789 (9th Cir. 2016) | **Yes** |
| 74. | **DISPUTED:** Violation of California Comprehensive Computer Data Access and Fraud Act – Without Permission Defined | Special Instruction No. 16; *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067–1069 (9th Cir. 2016); *United States v. Christensen,* 828 F.3d 763, 789 (9th Cir. 2016) | **Yes** |
| 75. | **DISPUTED:** Violation of California Unfair Competition Law ("UCL"), § 17200 et seq. | *Zhang v. Super. Ct.*, 57 Cal. 4th 364, 372 (2013) (citing Cal. Bus. & Prof. Code § 17204). Cal. Bus. & Prof. Code § 17200. | **Yes** |
| 76. | **DISPUTED:** CDAFA & CFAA—Password Sharing | California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502) or the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030); *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 863 (9th Cir. 2012); *See Nosal I*, 676 F.3d at 861; *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016) | **Yes** |
| 77. | **DISPUTED:** RTZ's Counterclaims—Data at Issue | *Garrabrants v. Erhart*, 98 Cal. App. 5th 486, 507 (2023); Cal. Penal Code § 502(e)(1)). | **Yes** |
| 78. | **DISPUTED:** CFAA—Statute of Limitations | CACI No. 454; 18 U.S.C. § 1030(g) | **Yes** |
| 79. | **DISPUTED:** CFAA—Damages | 18 U.S.C. § 1030(e)(11); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) (quoting *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2012) (en banc)). | **Yes** |
| 80. | **DISPUTED:** CDAFA—Damages | California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502(e)(1)); *Lineberry v. AddShopper, Inc.*, No. 23-CV-01996-VC, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025). | **Yes** |

| 81. | Violation of the Computer Fraud and Abuse Act – Damage and Loss Defined | 18 U.S.C. § 1030(e)(8), (e)(11); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1066 (9th Cir. 2016) | No |
|---|---|---|---|
| 82. | **DISPUTED:** Damages Overview – Categories and Proof | Ninth Circuit Model Jury Instructions Nos. 1.6, 5.1; CACI Nos. 200, 3900, 3940; Cal. Civ. Code, § 3333; *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747, 774 (2012) | **Yes** |
| 83. | **DISPUTED:** Damages – Causation | CACI 430, 3901; Ninth Circuit Model Civil Jury Instruction No. 5.1 | **Yes** |
| 84. | No Duplicative Damages | *Tavaglione v. Billings*, 4 Cal.4th 1150, 1158–59 (1993); CACI 3934 | **No** |
| 85. | **DISPUTED:** Compensatory Damages – Lost Profits – Generally | CACI No. 3903N; *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal.4th 747, 774 (2012); *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 883 (2002) | **Yes** |
| 86. | **DISPUTED:** Compensatory Damages - Violation of California Comprehensive Computer Data Access and Fraud Act | Cal. Penal Code, § 502(e)(1); Order Denying Motion for Relief from Non-Dispositive Pretrial Order (May 11, 2026), Dkt. 136 | **Yes** |
| 87. | **DISPUTED:** Compensatory Damages – Intus' Intentional Interference Claims | CACI 2201, 2202, 3901, 3903N | **Yes** |
| 88. | **DISPUTED:** Compensatory Damages - Violation of the Federal Computer Fraud and Abuse Act | Special Instruction No. 30; 18 U.S.C. §§ 1030(e)(11), 1030(g); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1066 (9th Cir. 2016); *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004) | **Yes** |

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 1

**Duty of Jury**

Members of the jury: You are now the jury in this case. It is my duty to instruct you on the law.

These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it. You will be allowed to keep this set of instructions to refer to throughout the trial. These instructions are not to be taken home and must remain in the jury room when you leave in the evenings. At the end of the trial, these instructions will be collected, and I will give you a final set of instructions. It is the final set of instructions that will govern your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.2 Duty of Jury

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 2

**Claims and Defenses**

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff Intus Care, Inc. ("Intus") asserts that the defendant, RTZ Associates, Inc. ("RTZ") denied Intus from accessing electronic health records belonging to Intus' customers. Intus contends that RTZ's conduct was prohibited by the 21st Century CURES Act, and that no statutory exception applies. Intus also alleges that RTZ intentionally interfered with contracts between Intus and PACE programs that were Intus' clients; and intentionally interfered with economic relationships between Intus and its existing and prospective PACE program customers that probably would have resulted in an economic benefit to Intus. Intus has the burden of proving these claims.

The defendant RTZ denies those claims and also contends that its practices satisfied one or more exceptions established by federal regulations concerning electronic health information. RTZ has the burden of proving that an exception applies. Intus denies that any exception applies.

RTZ asserts counterclaims against Intus. RTZ claims that Intus accessed RTZ's PACECare system without RTZ's permission or authorization, using log-in credentials issued to RTZ's PACE facility customers and an automated script, in violation of the California Comprehensive Computer Data Access and Fraud Act and the federal Computer Fraud and Abuse Act, and that this conduct constituted a trespass to chattels, and induced RTZ's customers to breach their agreements with RTZ. RTZ has the burden of proving these counterclaims.

Intus denies RTZ's counterclaims and argues that RTZ operated with unclean hands and is, therefore, not entitled to any recovery in this case.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.5 Claims and Defenses

Instruction No. 3

**Burden of Proof—Preponderance of the Evidence**

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.6 Burden of Proof—Preponderance of the Evidence

Instruction No. 4

**Burden of Proof—Clear and Convincing Evidence**

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.7 Burden of Proof—Clear and Convincing Evidence

Instruction No. 5

**What is Evidence**

The evidence you are to consider in deciding what the facts are consists of:

    1.    the sworn testimony of any witness;

    2.    the exhibits that are admitted into evidence;

    3.    any facts to which the lawyers have agreed; and

    4.    any facts that I [may instruct] [have instructed] you to accept as proved.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.9 What is Evidence

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 6

**What is Not Evidence**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.      Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they [may say] [have said] in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.      Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

3.      Testimony that is excluded or stricken, or that you [are] [have been] instructed to disregard, is not evidence and must not be considered. In addition, some evidence [may be] [was] received only for a limited purpose; when I [instruct] [have instructed] you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

4.      Anything you may [see or hear] [have seen or heard] when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.10 What is Not Evidence

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 7

**Evidence for Limited Purpose**

Some evidence may be admitted only for a limited purpose.

When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purpose.

[The testimony [you are about to hear] [you have just heard] may be considered only for the limited purpose of [*describe purpose*] and not for any other purpose.]

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.11 Evidence for Limited Purpose

Instruction No. 8

## Direct and Circumstantial Evidence

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.12 Direct and Circumstantial Evidence

Instruction No. 9

**Ruling on Objections**

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered, or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.13 Ruling on Objections

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 10

**Credibility of Witnesses**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1. the opportunity and ability of the witness to see or hear or know the things testified to;

2. the witness's memory;

3. the witness's manner while testifying;

4. the witness's interest in the outcome of the case, if any;

5. the witness's bias or prejudice, if any;

6. whether other evidence contradicted the witness's testimony;

7. the reasonableness of the witness's testimony in light of all the evidence; and

8. any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.14 Credibility of Witnesses

Instruction No. 11

## Conduct of the Jury

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, or computer, or any other electronic means, via email, text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, the platform "X" formerly known as Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, the media or press, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case, and how long you expect the trial to last. But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it[, although I have no information that there will be news reports about this case]; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use the Internet or any other resource to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved— including the parties, the witnesses or the lawyers— until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

JOINT PROPOSED JURY INSTRUCTIONS

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.15 Conduct of the Jury

Instruction No. 12

## **Publicity During Trial**

If there is any news media account or commentary about the case or anything to do with it, you must ignore it. You must not read, watch, or listen to any news media account or commentary about the case or anything to do with it. The case must be decided by you solely and exclusively on the evidence that will be received in the case and on my instructions as to the law that applies. If any juror is exposed to any outside information, please notify me immediately.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.16 Publicity During Trial

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 13

## No Transcript Available to Jury

I urge you to pay close attention to the trial testimony as it is given. During deliberations you will not have a transcript of the trial testimony.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.17 No Transcript Available to Jury

Instruction No. 14

**Taking Notes**

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you go to the jury room to decide the case. Do not let notetaking distract you. When you leave, your notes should be left in the [courtroom] [jury room] [envelope in the jury room]. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.18 Taking Notes

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 15

**Questions to Witnesses by Jurors During Trial**

Only the lawyers and I are allowed to ask questions of witnesses. A juror is not permitted to ask questions of witnesses. If, however, you are unable to hear a witness or a lawyer, please raise your hand and I will correct the situation.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.19 Questions to Witnesses by Jurors During Trial (option 1).

Instruction No. 16

**Bench Conferences and Recesses**

From time to time during the trial, it became necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom, or by calling a recess. Please understand that while you were waiting, we were working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we have done what we could to keep the number and length of these conferences to a minimum. I did not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.20 Bench Conferences and Recesses

Instruction No. 17

**Outline of Trial**

Trials proceed in the following way: First, each side may make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what that party expects the evidence will show. A party is not required to make an opening statement.

Intus will then present evidence, and counsel for RTZ may cross-examine. Then RTZ may present evidence, and counsel for Intus may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.

After that, you will go to the jury room to deliberate on your verdict.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 1.21 Outline of Trial

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 18

## Cautionary Instructions

**At the End of Each Day of the Case:**

As I indicated before this trial started, you as jurors will decide this case based solely on the evidence presented in this courtroom. This means that, after you leave here for the night, you must not conduct any independent research about this case, the matters in the case, the legal issues in the case, or the individuals or other entities involved in the case. This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as television and newspapers. You also must not communicate with anyone, in any way, about this case. And you must ignore any information about the case that you might see while browsing the Internet or your social media feeds.

**At the Beginning of Each Day of the Case:**

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here. So you must not learn any additional information about the case from sources outside the courtroom. To ensure fairness to all parties in this trial, I will now ask each of you whether you have learned about or shared any information about this case outside of this courtroom, even if it was accidental.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.1 Cautionary Instructions

Instruction No. 19

**Stipulations of Fact**

The parties have agreed to certain facts [to be placed in evidence as Exhibit __ ] [that will be read to you]. You must therefore treat these facts as having been proved.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.3 Stipulations of Fact

Instruction No. 20

**Deposition in Lieu of Live Testimony**

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.

Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.5 Deposition in Lieu of Live Testimony

Instruction No. 21

**Impeachment Evidence —Witness**

The evidence that a witness lied under oath on a prior occasion or has inconsistencies in their testimony may be considered, along with all other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other purpose.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.10 Impeachment Evidence

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 22

**Use of Interrogatories**

Evidence [will now be] [was] presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.12 Use of Interrogatories

Instruction No. 23

**Use of Requests for Admission**

Evidence [will now be] [was] presented to you in the form of admissions to the truth of certain facts. These admissions were given in writing before the trial, in response to requests that were submitted under established court procedures. You must treat these facts as having been proved.

Source / Authority

Ninth Circuit Manual of Model Civil Jury Instructions, 2.13 Use of Requests for Admissions

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 24

**Expert Opinion Testimony**

You have heard testimony from the parties' experts in this case, including their opinions and the reasons for those opinions. This opinion testimony is allowed, because of the specialized knowledge, skill, experience, training, or education of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's specialized knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.14 [Expert] Opinion Testimony

Instruction No. 25

**Charts and Summaries Not Received in Evidence**

Certain charts and summaries not admitted into evidence [may be] [have been] shown to you to help explain the contents of books, records, documents, or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 2.15 Charts and Summaries Not Received in Evidence

Instruction No. 26

**Evidence in Electronic Format**

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer, projector, printer, and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer; and how to print the exhibits. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note through the [clerk] [bailiff]. If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the [clerk] [bailiff], signed by your foreperson or by one or more members of the jury. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with [the clerk] [the bailiff] present for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the court technician or any nonjuror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data [disk] from the jury room, and do not copy any such data.

Source / Authority

Ninth Circuit Manual of Model Civil Jury Instructions, 2.15 Evidence in Electronic Format

Instruction No. 27

**Duty to Deliberate**

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 3.1 Duty to Deliberate

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 28

### Consideration of Evidence—Conduct of the Jury

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

> Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, the platform "X" formerly known as Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

> Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it[, although I have no information that there will be news reports about this case]; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses, or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings[, and a mistrial could result that would require the entire trial process to start over]. If any juror is exposed to any outside information, please notify the court immediately.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 3.2 Consideration of Evidence—Conduct of the Jury

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 29

## Communication with Court

If it becomes necessary during your deliberations to communicate with me, you may send a note through the [marshal] [bailiff], signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 3.3 Communication with Court

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 30

## Return of Verdict

A verdict form has been prepared for you. [*Explain verdict form as needed.*] After you have reached unanimous agreement on a verdict, your [presiding juror] [foreperson] should complete the verdict form according to your deliberations, sign and date it, and advise the [clerk] [bailiff] that you are ready to return to the courtroom.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 3.5 Return of Verdict

Instruction No. 31

## Corporations and Partnerships—Fair Treatment

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 4.1 Corporations and Partnerships—Fair Treatment

Instruction No. 32

### Damages Arising in the Future—Discount to Present Cash Value

Any award for future economic damages must be for the present cash value of those damages.

Present cash value means the sum of money needed now, which, when invested at a reasonable rate of return, will pay future damages at the times and in the amounts that you find the damages would have been received.

The rate of return to be applied in determining present cash value should be the interest that can reasonably be expected from safe investments that can be made by a person of ordinary prudence, who has ordinary financial experience and skill. You should also consider decreases in the value of money that may be caused by future inflation.

Source / Authority
Ninth Circuit Manual of Model Civil Jury Instructions, 5.4 Damages Arising in the Future—Discount to Present Cash Value

Instruction No. 33

## Party Having Power to Produce Better Evidence

You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence.

Source / Authority
CACI 203

Instruction No. 34

**DISPUTED: Willful Suppression of Evidence**

You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party.

Source / Authority
CACI 204

**RTZ's Position: Willful Suppression of Evidence**

The record supports the inclusion of this instruction. Evan Walters (Intus' staff software engineer and former Vice President of Data and Infrastructure) admitted the destruction of evidence in his deposition. Walters testified that Intus' access logs reflecting its access to RTZ's PACECare system no longer exist because the system was torn down and rebuilt, and the repository was eliminated.  (Walters Depo, 61:22–62:18, 66:21–67:5.)

The destruction of this evidence occurred after the preservation demand, after the filing of the action and after filing of the action, and after discovery requests specifically seeking the logs. (Id. at 67:6–10, 72:25–73:16.)

The access logs would have shown the extent, frequency, and manner of Intus' access to PACECare, including its use of borrowed credentials and its automated script. On these facts, the jury may find that Intus intentionally destroyed evidence it was obligated to preserve and may infer that the logs would have been unfavorable to Intus.

**Intus' Response**

There is no basis in the record for this instruction. RTZ is wrong on the facts and the law. As for the law, a Willful Suppression instruction is appropriate only where there is evidence of intentional, willful suppression—not a mere loss of records. *Sprague v. Equifax, Inc.*, 166 Cal. App. 3d 1012, 1051 (1985) (allowing the instruction where the procedure purging relevant records "was not instituted until after the present suit was filed" resulting in a loss of records the party would "have been expected to possess"). Indeed, one of the cases cited in the CACI "Directions for Use" explains, "This instruction is designed for the relatively *rare case* where there has *actually been a fraudulent suppression* of evidence. ... It is prejudicial error to give this instruction if there is no showing of *fraudulent* suppression." *Contra Costa Cnty. v. Nulty*, 237 Cal. App. 2d 593, 594 (1965) (emphasis in original). Indeed, where information that was once lost is subsequently "restored or replaced through additional discovery," a spoliation or willful suppression instruction is not appropriate. *Fiteq Inc v. Venture Corp.*, No. 13-CV-01946-BLF, 2016 WL 1701794, at *3 (N.D. Cal. Apr. 28, 2016).

There is no evidence of any loss of the information that RTZ claims to seek. Intus provided the information that RTZ claims would be in the logs. (Deposition Transcript of Evan Walters at 64:2-7; *see*

- 45 -
JOINT PROPOSED JURY INSTRUCTIONS

*also* Intus' Interrogatory Responses). Intus also provided RTZ with the automated script. Thus, the information RTZ seeks was never lost and was produced. Moreover, not only was the information provided by Intus, but it is information that RTZ already had. RTZ's own system tracks all of the access points in much more detail than anything Intus would have. This includes the manner of the access, which credentials were used, and what parts of PACECare were accessed. Indeed, RTZ's own expert purports to review these access logs and the very information that RTZ is now claiming was lost.

Not only is the information RTZ complains about produced by both parties, but there is no evidence that the access logs were intentionally, willfully, or fraudulently suppressed. Intus' staff software engineer, Evan Walters, explained that the data at issue was not purged or destroyed. As Mr. Walters testified, "It is not a purge. To clarify, it's something [Intus] did in the natural and expected course of the development of our company. . . . We hired new platform engineers whose responsibility was to improve our platform, extend it. And, as a part of that, we transferred the system that was previously running the pipeline to this new platform. And in doing so, you know, we lost access to the logs that were, you know, on the previous system." (*Id*. at 69:10-20.). Mr. Walter's further explained that this did not mean that the information in the logs was lost or destroyed. The information was still available "by looking at our storage system. So we were able to look at which files were downloaded when, and from that, produce a record of when our system could have accessed PACECare." (*Id*. at 64:2-7.). Since the information in the logs was produced by both parties it is impossible to reach the conclusion that there was some sort of fraudulent effort to hide evidence going on. Routine system updates that do not eliminate the underlying data does not give rise to evidence spoliation.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 35

**Causation: Substantial Factor**

You will be tasked with analyzing whether RTZ's conduct was "substantial factor" in causing harm to Intus as to Intus' claim and whether Intus' conduct was a "substantial factor" in causing harm to RTZ. A "substantial factor" in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.

The standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical in bringing about the injury.

Source / Authority
CACI No. 220

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 36

**DISPUTED: Custom or Practice**

You may consider customs or practices in the community in deciding whether Intus or RTZ acted reasonably. Customs and practices do not necessarily determine what a reasonable person would have done in Intus' or RTZ's situation. They are only factors for you to consider.

Following a custom or practice does not excuse conduct that is unreasonable. You should consider whether the custom or practice itself is reasonable.

Source / Authority
CACI No. 413

JOINT PROPOSED JURY INSTRUCTIONS

**RTZ's Position: Custom or Practice**

Custom and practice evidence is relevant to the disputed reasonableness questions in this case, including industry norms governing access to proprietary healthcare software systems, control of log-in credentials, and the use of confidentiality conditions such as RTZ's NDA requirement. CACI No. 413 permits the jury to consider the customs or practices of the community in deciding whether a party acted reasonably.  Because the parties dispute whether RTZ's access conditions and Intus' credential use conformed to accepted industry practice, the instruction assists the jury. Further, the Court has already held that industry custom and practice are relevant and that RTZ's expert Traci Creegan may testify about them at trial.  (July 8, 2026 Order (Dkt. 203).)

**Intus' Position**

RTZ is improperly attempting to frame the issues in the case as disputed "reasonableness questions" related to industry norms. That is incorrect. The issue in the case related to the applicability of exceptions to the information blocking rules are set forth in statutes and regulations. RTZ is either going to be able to meet the elements of the manner exception or, if it relying on an NDA negotiation, the licensing exception or it will be unable to meet those elements. None of the elements in either exception speak to industry practice. Not only is RTZ misframing the issue, but CACI No. 413 would not even apply if RTZ's framing were correct. CACI No. 413 is appropriate only in ordinary negligence cases. It is part of the 400 negligence series in the CACI instructions and the "Directions for Use" associated with CACI No. 413 reinforce this point. The directions refer to the "standard of care," a negligence element that is not present here. In addition, the instructions provide that the "instruction may be used if the standard of care is within common knowledge." And the "Sources and Authority" section of CACI No. 413 references exclusively negligence cases. This is not a negligence case, and the industry standards RTZ intends to present are not within common knowledge. *Osborn v. Irwin Mem'l Blood Bank*, 5 Cal. App. 4th 234, 277 (1992). Finally, again while RTZ has tried to improperly frame the issue in the case as one of reasonableness against industry norms, the "custom and practice" instruction they seek has nothing to do with industry norms or accepted industry practices.

Instruction No. 37

**Substantial Factor**

A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.

Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.

Source / Authority
CACI No. 430

Instruction No. 38

**DISPUTED: Alleged Information Blocking Under the 21st Century Cures Act –
Limited Purpose**

Intus contends that RTZ engaged in information blocking in violation of the 21st Century Cures Act and its implementing regulations.

The 21st Century Cures Act does not itself give a private party such as Intus the right to sue for, or to recover damages for, information blocking. You may consider evidence concerning alleged information blocking only for the limited purpose of deciding whether Intus has proved the wrongful conduct element for that supports its claim for intentional interference with prospective economic advantage.

A finding that RTZ engaged in information blocking does not by itself establish liability on any claim, and you may not award damages solely because you conclude that the federal information-blocking regulations were violated.

Source / Authority
42 U.S.C. § 300jj-52; 45 C.F.R. Part 171; ONC FAQ: "What happens after I report information blocking through the information blocking portal on ONC's website, HealthIT.gov?", https://healthit.gov/faq/what-happens-after-i-report-information-blocking-through-information-blocking-portal-oncs/; *Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.,* 131 F.4th 205, 227–228 (4th Cir. 2025)

**RTZ's Position: Alleged Information Blocking — Limited Purpose**

This instruction is necessary to prevent the jury from treating the information-blocking evidence as a freestanding basis for liability. The Cures Act's information-blocking provisions confer no private right of action. Because Intus cannot sue directly for information blocking, that evidence is relevant only to the independent-wrongfulness element of its interference claim. The instruction correctly limits the jury's use of the evidence (Fed. R. Evid. 105) and forecloses an impermissible award premised solely on a regulatory violation.

**Intus' Position**

There is no risk here of an "award premised solely on a regulatory violation" because the verdict form in this case clearly instructs the parties as to the bases on which liability can be premised. There is not even space on the verdict form to impose "freestanding" liability based on the Cures Act. This instruction is, therefore, unnecessary. It is also prejudicial and confusing because it infuses a nuanced legal point—whether the Cures Act provides a private right of action—that has no bearing on the issues here and for which the jury is not responsible. "Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002), opinion amended on denial of reh'g, 335 F.3d 833 (9th Cir. 2003).

RTZ is also wrong on the law. This Court has already determined that Intus can proceed with its claims when in its order denying RTZ's motion to dismiss the First Amended Complaint, this Court concluded that Cures Act violations could support state law claims. (Dkt. 37 at 19-20.). Thus, whether or not there is a standalone right of action is irrelevant. This conclusion was consistent with the Fourth Circuit's conclusion that the Cures Act can serve as the predicate for an unfair competition claim. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, No. 24-1773, 2025 WL 779691, at *13 (4th Cir. Mar. 12, 2025) (explaining the lack of a federal statutory private right of action does not bar a plaintiff from relying on violations of that statute as evidence supporting a state law claim). The mere fact that the Cures Act does not include a private right of action does not preclude any of Intus' claims. *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1049 (S.D. Cal. 2018) (holding that a UCL claim premised on a statute without a private right of action is barred "only if that statute has an express bar to private enforcement, as reflected in the statute's text or legislative history.").

Instruction No. 39

**DISPUTED: Introduction to the 21st Century Cures Act / Information Blocking Rules**

The 21st Century Cures Act (the "Information Blocking Rules") was designed to accelerate medical product development, promote interoperability, and support patients. Interoperability simply means the ability of different computer systems, software, or devices to seamlessly share information. Interoperability helps clinicians deliver safe, effective, patient-centered care.

The Information Blocking Rules are meant to avert practices that increase the cost, complexity, or other burden associated with accessing, exchanging, or using electronic health information ("EHI"). "Actors" are therefore prohibited from interfering with or discouraging access to, exchange of, or use of EHI under the Information Blocking Rules.

Source / Authority
21st Century Cures Act and the Public Health Services Act (42 U.S.C. 300jj-52, and its implementing regulations including 45 CFR Part 171); 84 Fed. Reg. 7424, 7516 (June 30, 2020).
Definition of interoperability: https://healthit.gov/interoperability/

**Intus' Position: Introduction to 21st Century Cures Act / Information Blocking Rules**

In meet-and-confer correspondence, RTZ argued that this instruction is inappropriate because it "implies a private enforcement right." RTZ is wrong. Nothing about the proposed instruction suggests or implies that the Cures Act has a private right of action. It is a neutral instruction explaining the purpose of the Cures Act and Information Blocking rules. It is also not clear why even if it did, it would have any impact on the jury. This Court has already determined that Intus can proceed with its claims when in its order denying RTZ's motion to dismiss the First Amended Complaint, this Court concluded that Cures Act violations could support state law claims. (Dkt. 37 at 19-20.) This conclusion was consistent with the Fourth Circuits conclusion that the Cures Act can serve as the predicate for an unfair competition claim. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, No. 24-1773, 2025 WL 779691, at *13 (4th Cir. Mar. 12, 2025) (explaining the lack of a federal statutory private right of action does not bar a plaintiff from relying on violations of that statute as evidence supporting a state law claim). The mere fact that the Cures Act does not include a private right of action does not preclude any of Intus' claims. *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1049 (S.D. Cal. 2018) (holding that a UCL claim premised on a statute without a private right of action is barred "only if that statute has an express bar to private enforcement, as reflected in the statute's text or legislative history.")

**RTZ's Position**

This instruction is unnecessary. The only information-blocking exception at issue in this case is the Manner Exception (for which there are multiple proposed instructions). If the Court instructs on the Manner Exception, that instruction (not a policy narrative) will supply the governing law. Even if some introductory instruction were warranted, Intus's version is not neutral. It recites only the access-favoring purposes of the Cures Act, adds an "interoperability" definition that no element requires, and is disjointed as a whole.

Intus's reliance on the order denying RTZ's motion to dismiss (Dkt. 37) does not help. That the Cures Act may serve as a predicate for a state-law claim is a legal question the Court has already resolved. It does not follow that the jury needs an argumentative overview of the statute's policy goals. (*Bird v. Lewis & Clark College*, 303 F.3d 1015, 1022 (9th Cir. 2002) [affirming denial of proposed civil jury instructions that were argumentative and misleading because they were manifestly intended to

influence the jury toward accepting one party's evidence]; *United States v. Price*, 980 F.3d 1211, 12-17-1218 (9th Cir. 2019) [holding that as a matter of statutory interpretation, the court itself—not the jury instruction—performs the interpretive work and considers the statute's language, purpose, history, and past decisions to determine whether the district court properly instructed the jury].)

Intus's proposed instruction does not correspond to any disputed element the jury must decide and would only invite confusion. (Fed. R. Evid. 403.)

Instruction No. 40

**Information Blocking – Definition and Issues to Decide**

"Information blocking" is a practice by a covered actor that, except as required by law or permitted by a regulatory exception, is likely to interfere with, prevent, or materially discourage access to, exchange of, or use of electronic health information, where the actor knows or should know that the practice is likely to have that effect.

The Court has already determined that RTZ engaged in facial information blocking. That established fact does not by itself mean that RTZ engaged in information blocking in violation of federal law. Two issues remain for you to decide:

1.      Whether RTZ is a covered "actor" subject to the information-blocking regulations. Intus bears the burden of proving that RTZ is a covered actor by a preponderance of the evidence.

2.      Whether RTZ's practices satisfied a regulatory exception. RTZ bears the burden of proving that an exception applies by a preponderance of the evidence.

If Intus does not prove that RTZ is a covered actor, or if RTZ proves that its practices satisfied a regulatory exception, then RTZ did not engage in information blocking in violation of federal law.

Authority / Source
42 U.S.C. § 300jj-52(a); 45 C.F.R. §§ 171.102, 171.103; Order Denying Partial Summary Judgment, ECF No. 84 at 5–8; Order on Motions to Exclude Expert Testimony, July 8, 2026, Dkt. No. 203 at 4–6.

Instruction No. 41

**DISPUTED: Information Blocking – Electronic Heath Information Defined**

The information-blocking regulations concern "electronic health information," or "EHI." Electronic health information means electronic protected health information. This is the patient health information contained in the medical, billing, and similar records maintained by or for a health care provider or health plan.

Electronic health information is the information contained in those records. It is not the software system in which that information is created, stored, or displayed. The functionality, user interface, source code, software architecture, and log-in credentials of a software platform are not electronic health information.

Authority / Source
45 C.F.R. § 171.102 (definitions of "electronic health information" and "access"); 45 C.F.R. §§ 160.103, 164.501; 45 C.F.R. § 171.103.

**RTZ's Position: Electronic Health Information Defined**

This instruction supplies the regulatory definition of "electronic health information" (EHI) and correctly explains that EHI is the patient information *contained in* the records - not the software system in which that information is created, stored, or displayed. The regulation defines EHI by reference to electronic protected health information; the functionality, interface, source code, architecture, and log-in credentials of a platform are not EHI. This instruction ensures the jury distinguishes between access to EHI and access to PACECare itself, a distinction central to Intus' information-blocking theory and RTZ's defenses thereto.

**Intus' Position**

The distinction RTZ seeks to draw between access to EHI and access to PACECare was part of its argument, advanced primarily by Traci Creegan in her expert report, that RTZ did not engage in information blocking. According to Ms. Creegan, because RTZ made the EHI available in a different way (ostensibly through reports, but Intus disputes that as well), it could not have engaged in information blocking by merely preventing access to its system. That argument was rejected by this Court on summary judgment, and in its *Daubert* Order, the Court made clear that the issue of "facial information blocking" has been adjudicated and will not be tried. The distinction RTZ seeks to make in Special Instruction No. 4, therefore, relates solely to a defunct theory and will only serve to confuse the jury and prejudice Intus. "Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 42

**DISPUTED: Access to Electronic Health Information**
**Distinguished from Access to Software**

Electronic health information and the software systems in which that information is stored are distinct. The information-blocking regulations concern access to, exchange of, and use of electronic health information. These regulations do not grant or govern direct access to another party's proprietary software platform, user interface, source code, or log-in credentials for the software system in which electronic health information is stored.

Authority / Source
45 C.F.R. §§ 171.102; 171.103; 171.301(b).

**RTZ's Position: Access to Electronic Health Information
Distinguished from Access to Software**

This instruction correctly states that the information-blocking regulations govern access to, exchange of, and use of EHI - not direct access to another party's proprietary software platform, interface, source code, or log-in credentials. The regulations are about the information, not about a right to enter a particular vendor's system.

The instruction is necessary because Intus's theory conflates the two: it treats a claimed entitlement to EHI as if it were an entitlement to log into PACECare itself. This instruction is needed to prevent that improper and prejudicial conflation.

**Intus' Position**

RTZ is wrong on the law and the facts. There are various manners in which parties can be given access to information stored on the PACECare system, including direct access to the system. Intus can and did request that manner of access. Thus, the "distinction" RTZ is trying to draw is a misapplication of the law and the facts. Moreover, the distinction RTZ seeks to draw between access to EHI and access to PACECare was part of its argument, advanced primarily by Traci Creegan in her expert report, that RTZ did not engage in information blocking. According to Ms. Creegan, because RTZ made the EHI available in a different way (ostensibly through reports, but Intus disputes that as well), it could not have engaged in information blocking by merely preventing access to its system. That argument was rejected by this Court on summary judgment, and in its *Daubert* Order, the Court made clear that the issue of "facial information blocking" has been adjudicated and will not be tried. The distinction RTZ seeks to make in Special Instruction No. 4, therefore, relates solely to a defunct theory and will only serve to confuse the jury and prejudice Intus. "Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).

Instruction No. 43

### DISPUTED: Information Blocking – Covered Actor Requirement

The information-blocking regulations apply only to certain entities called "actors."

An entity is subject to the information-blocking provisions only if it qualifies as one of the following three types of actors:

1. A Health Care Provider;

2. A Health Information Network ("HIN") or Health Information Exchange ("HIE"); or

3. A Health IT Developer of Certified Health IT.

Intus bears the burden of proving that RTZ qualified as to at least one of these categories during the period relevant to its information-blocking claim.

If Intus does not prove that RTZ qualified as one of these categories, then RTZ was not an actor subject to the information-blocking regulations, and you must find that RTZ did not engage in information blocking in violation of federal law.

Authority
42 U.S.C. § 300jj-52(a)(1); 45 C.F.R. § 171.100, § 171.102; *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642, 25,811-15 (May 1, 2020); Order on Motions to Exclude Expert Testimony, Dkt. No. 203 at 4-6.

**RTZ's Position: Covered Actor Requirement**

RTZ will not agree to the requested omission of the last paragraph, which directs that if Intus fails to prove RTZ qualified as one of the three enumerated categories (health care provider, HIN/HIE, or health IT developer of certified health IT), then RTZ was not an actor and did not engage in information blocking. This is a correct and necessary statement that ties the definitions to the dispositive question the jury must decide.

Omitting this instruction would leave the jury with the categories but no guidance, inviting the erroneous assumption that any software company is an "actor." The paragraph tracks 45 C.F.R. §§ 171.100, 171.102, correctly places the burden on Intus, and is consistent with the Court's ruling (Dkt. 203) that RTZ may argue it is not an actor.

**Intus' Position:**

Intus objects to RTZ's superfluous language in the jury instructions that if "Intus does not prove that RTZ qualified as one of these categories, then RTZ was not an actor subject to the information-blocking regulations, and you must find that RTZ did not engage in information blocking in violation of federal law." This is argumentative, and the Court has directed that "[s]pecial instructions, if any, must be complete, accurate, balanced, clear, and non-argumentative." The instruction should quote the statutory definition of "Actor" from the Cures Act verbatim without the editorializing efforts by RTZ. Contrary to RTZ's position, removing the excess language would not invite any assumption whatsoever.

Instruction No. 44

**Information Blocking – Health Information Network or
Health Information Exchange Defined**

A. "Health Information Network" or "Health Information Exchange" means an entity that:

1. Determines, controls, or has the discretion to administer a requirement, policy, or agreement governing the use of technology or services for access to, exchange of, or use of electronic health information;

2. Enables the exchange of electronic health information among more than two unaffiliated individuals or entities, other than itself; and

3. Enables those unaffiliated individuals or entities to exchange electronic health information with each other for treatment, payment, or healthcare operations purposes.

Intus bears the burden of proving each of these elements by a preponderance of the evidence.

Authority / Source
45 C.F.R. § 171.102; 85 Fed. Reg. 25,642, 25,811-13 (May 1, 2020); ONC, *Information Blocking Actors* Fact Sheet (Apr. 2024), https://www.healthit.gov/wp content/uploads/2025/06/IB_Actors_Fact_Sheet_508.pdf

Instruction No. 45

**DISPUTED: Information Blocking – What Is Not a Health Information Network or Health Information Exchange**

Not every entity that stores electronic health information or connects electronically with another entity is a Health Information Network or Health Information Exchange.

The mere existence of direct or point-to-point exchanges between a customer and a particular vendor, laboratory, pharmacy, or other third party does not by itself establish that the software developer is a Health Information Network or Health Information Exchange.

Likewise, the fact that software contains electronic health information, interfaces with other products, or permits electronic communication with another system does not by itself establish that the software developer is a Health Information Network or Health Information Exchange.

An entity is also not a Health Information Network or Health Information Exchange merely because it acts as an intermediary that provides electronic health information from one entity to another.

An entity that provides electronic health information from one party to another, in a bilateral exchange, is not a Health Information Network or Health Information Exchange. A bilateral exchange occurs where the intermediary performs a service on behalf of one entity to deliver electronic health information to another entity, and no actual exchange takes place among all of the entities. In that situation, the intermediary provides a service to one party, rather than enabling the entities themselves to exchange electronic health information with each other, and it is not a Health Information Network or Health Information Exchange on that basis.

If you find that the evidence establishes only separate bilateral exchanges between individual customers and specific third parties, and does not establish a framework that enables unaffiliated entities to exchange electronic health information with each other, then RTZ does not qualify as a Health Information Network or Health Information Exchange.

Authority / Source
45 C.F.R. § 171.102; 85 Fed. Reg. 25,642, 25,802, 25,811-13 (May 1, 2020); ONC, *Information Blocking Actors* Fact Sheet (Apr. 2024), https://www.healthit.gov/wp-content/uploads/2025/06/IB_Actors_Fact_Sheet_508.pdf

**RTZ's Position: What Is Not a Health Information Network or
Health Information Exchange**

This instruction properly explains that not every entity that stores EHI or connects electronically with another entity is a HIN or HIE, and that bilateral, point-to-point exchanges (where an intermediary delivers EHI on behalf of one party to another) do not make the developer a HIN or HIE.

This is a correct statement of the regulation and the ONC commentary, and it is necessary to RTZ's defense that its arrangements are bilateral services rather than a network enabling unaffiliated entities to exchange EHI *with each other*. Omitting it would leave the jury free to erroneously equate ordinary data storage or connectivity with HIN/HIE status.

**Intus' Position:**

The instruction is legally and factual wrong. This instruction is nothing more than RTZ's theory of the case, and it is a theory unmoored from the regulatory language.

The regulations define HIE/HIN as an "entity that determines, controls, or has the discretion to administer any requirement, policy, or agreement that permits, enables, or requires the use of any technology or services for access, exchange, or use of electronic health information: (1) Among more than two unaffiliated individuals or entities . . . that are enabled to exchange with each other; and (2) That is for a treatment, payment, or health care operations purpose . . . ." 45 C.F.R. § 171.102. "[T]wo parties are affiliated if one has the power to control the other, or if both parties are under the common control or ownership of a common owner." *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25642, 25801 (May 1, 2020).

RTZ recognizes that this definition dooms its case, and so it attempts to change the definition by focusing on "direct or point-to-point exchanges"—language that appears nowhere in the regulations. Indeed, the promulgating agency recognized that there would be industry players, like RTZ, attempting to narrow the definition to evade liability. ONC warned against this when it cautioned that "any further limitation" on the definition "would be artificial and would not capture the full range of entities that should be considered networks under the information blocking provision." *21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25642, 25801 (May 1, 2020), available at https://www.govinfo.gov/content/pkg/FR-2020-05-01/pdf/2020-07419.pdf.

JOINT PROPOSED JURY INSTRUCTIONS

"Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 46

**DISPUTED: Information Blocking – Health Information Network or Health Information Exchange Requirements**

Intus contends that RTZ is a covered actor because RTZ is a "health information network or health information exchange."

To prove this, Intus must prove all of the following:

1. That RTZ determines, controls, or has the discretion to administer a requirement, policy, or agreement governing the use of technology or services to access, exchange, or use electronic health information;

2. That the requirement, policy, or agreement enables more than two unaffiliated entities (not counting RTZ itself) to exchange electronic health information with each other; and

3. That the exchange is for a treatment, payment, or health care operations purpose.

It is not enough that RTZ develops, licenses, or operates software in which electronic health information is stored, or that RTZ's customers use that software in their own operations. The question is whether RTZ itself controls or administers the exchange of electronic health information among unaffiliated entities that exchange it with each other.

If Intus fails to prove any one of these elements, then RTZ is not a covered actor, and you must find that RTZ did not engage in information blocking in violation of federal law.

Authority / Source
45 C.F.R. § 171.102; Order on Motions to Exclude Expert Testimony, July 8, 2026, Dkt. No. 203 at 4 (RTZ "is not precluded from arguing at trial that it is not an actor")

**RTZ's Position: Health Information Network or Health Information Exchange Requirements**

This instruction sets out the three conjunctive elements of the HIN/HIE definition and correctly allocates the burden to Intus. The instruction makes explicit that it is not enough that RTZ develops, licenses, or operates software containing EHI.  The question is whether RTZ itself controls or administers the exchange of EHI among more than two unaffiliated entities that exchange it with each other for treatment, payment, or healthcare-operations purposes.

The Court's July 8, 2026 Order (Dkt. 203) confirms RTZ may argue at trial that it is not an actor. The instruction tracks the regulation and preserves that defense.

**Intus' Position**

Intus has no objection to including the statutory definition of HIN/HIE, which is a central issue in this case. However, that definition should track only the language of 45 C.F.R. § 171.102, without the following superfluous language: "It is not enough that RTZ develops, licenses, or operates software in which electronic health information is stored, or that RTZ's customers use that software in their own operations. The question is whether RTZ itself controls or administers the exchange of electronic health information among unaffiliated entities that exchange it with each other. If Intus fails to prove any one of these elements, then RTZ is not a covered actor, and you must find that RTZ did not engage in information blocking in violation of federal law." This language is simply RTZ's attempt to argue its case through the jury instructions, and it should not be permitted.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 47

**DISPUTED: Exceptions to Information Blocking**

There are limited, narrow exceptions to information blocking. The exceptions are subject to strict conditions to ensure that they do not extend protection to practices that raise information blocking concerns.

Source / Authority
45 C.F.R. §§ 171.201-171.206. *See 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25642, 25794, 25280 (June 30, 2020) (codified at 45 C.F.R. §§ 170, 171).

**Intus' Position: Exceptions to Information Blocking (general)**

Intus is "entitled to an instruction about [its] theory of the case if it is supported by law and has foundation in the evidence. . . . A district court therefore commits error when it rejects proposed jury instructions that are properly supported by the law and the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009).

Here, Intus is entitled to an instruction informing the jury that the exceptions to Information Blocking are intended to be narrowly tailored and subject to strict conditions. The agency which promulgated the Information Blocking exceptions, the Office of the National Coordinator for Health Information Technology ("ONC"), has explained "that each exception is intended to be tailored, through appropriate conditions, so that it is limited to the reasonable and necessary activities that it is designed to protect and does not extend protection to other activities or practices that could raise information blocking concerns." *See 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25642, 25791, 25280 (May 1, 2020).

RTZ's argument that NDA negotiations can be a basis for the application of the Manner Exception potentially necessitates this instruction and puts at issue the limited nature of the information blocking exceptions. As Intus argued in its Motion in Limine No. 10, NDA negotiations are expressly governed by a different exception (the Licensing Exception); therefore, disagreements over the terms of an NDA cannot satisfy the Manner Exception. This conclusion flows naturally from ONC's intentional design: The exceptions are narrowly tailored and "limited to the reasonable and necessary activities that [each] is designed to protect." If RTZ is permitted to present their claim that failed NDA negotiations can support the manner exception (which it shouldn't be), the jury should be instructed about this point of law as it deliberates on RTZ's defense.

**RTZ's Position**

This instruction is unnecessary for the same reasons as the "introduction" instruction: only one exception (the Manner Exception) is at issue, so a general instruction cataloguing the "limited" and "narrow" nature of the exceptions as a class serves no purpose except to disparage RTZ's defense before its elements are presented.

A party's entitlement to a theory-of-the-case instruction does not extend to slanted instructions that comment on the weight of the evidence or invite favorable inferences on disputed facts. (*Jenkins v.*

*Union Pac. R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994).)

Characterizing the exceptions as "subject to strict conditions" so as not to "extend protection to practices that raise information blocking concerns" is advocacy concerning the alleged purpose of the exceptions, not a statement of the elements (that are clearly defined in the proposed instructions).

Instruction No. 48

**DISPUTED: Information Blocking – Manner Exception**

RTZ contends that its practices satisfied the manner exception. Under that exception, an actor's practice of limiting the manner in which it fulfills a request to access, exchange, or use electronic health information is not information blocking. To establish this exception, RTZ must prove both of the following:

1. That RTZ was technically unable to fulfill the request in the manner requested, or could not reach agreeable terms with Intus to fulfill the request in the manner requested; and

2. That RTZ fulfilled, or offered to fulfill, the request in an alternative manner permitted by the regulation, without unnecessary delay.

RTZ "could not reach agreeable terms" with Intus if RTZ made at least some reasonable efforts to reach an agreement with Intus and the parties nevertheless failed to agree. The exception does not require RTZ to have granted access in the particular manner Intus requested, or to have made every possible effort to reach agreement.

In deciding whether RTZ made at least some reasonable efforts, you may consider all of the circumstances of the parties' dealings, including the terms each party proposed and its reasons for them, whether each party's conduct was consistent with industry standards, and whether either party discontinued or withdrew from negotiations. You may also consider whether RTZ offered to make electronic health information available in an alternative manner, such as through standard exported reports or file transfers.

RTZ bears the burden of proving the elements of this exception by a preponderance of the evidence. If RTZ proves that its practices satisfied the manner exception, then those practices were not information blocking.

Authority / Source
45 C.F.R. § 171.301(a)(1), (b); 85 Fed. Reg. 25642, 25676-25679 (May 1, 2020);
89 Fed. Reg. 1192 (Jan. 9, 2024); *Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.,* 131 F.4th 205, 233 (4th Cir. 2025)

**RTZ's Position: Manner Exception**

Intus states it is "fine with this as long as it strictly tracks the statutory language." It does. There is no Ninth Circuit or CACI model instruction on the Manner Exception (or on any part of the information-blocking regulations) so RTZ has drafted from the regulation itself. This instruction tracks 45 C.F.R. § 171.301(a)(1) and (b). It states the two conditions RTZ must prove and it properly places the burden on RTZ.

The regulation is dense and unusually difficult to parse, and the jury cannot be left to decode § 171.301 on its own. The instruction therefore explains the operative phrase "could not reach agreeable terms" using the agency's own commentary and controlling authority.  This does not add to or alter the regulation. Rather, it makes the regulation intelligible.

Because the Manner Exception has several moving parts (the two threshold conditions, the definition of a qualifying request, and the ordered alternative-manner sequence) RTZ divided the subject into three focused instructions (Nos. 12, 13, and 14) rather than one unreadable block. That structure aids juror comprehension and mirrors the regulation's own organization.

**Intus' Position**

This instruction does not capture the Manner Exception and misstates the law. The jury must be instructed that the Manner Exception relates to the manner of the exchange of information, a party cannot point to any failure to reach any agreement on any issue and claim it satisfies the Manner Exception. For example, NDA negotiations that do not touch on the manner of the information exchange cannot satisfy the Manner Exception. As Intus argued in its Motion in Limine No. 10, NDA negotiations are expressly governed by a different exception (the Licensing Exception), which was an intentional decision by the promulgating agency to keep NDAs "no broader than necessary to prevent" disclosure of trade secrets. See 45 C.F.R. § 171.303; 84 Fed. Reg. 7424, 7549. If ONC had wanted disagreement over the terms of an NDA to satisfy the Manner Exception, it would have said so. It did not. Instead, ONC specifically addressed the issue of NDAs under the Licensing Exception "In reading a statute, the Court must not 'look merely to a particular clause,' but consider 'in connection with it the whole statute.'" *Dada v. Mukasey*, 554 U.S. 1, 128 (2008). "This rule of interpretation applies equally to regulations," and the Court must "read the entire regulation in context." *Lezama-Garcia v. Holder*, 666

F.3d 518, 531 n.13 (9th Cir. 2011). Here, the interpretive canon, "the specific governs over the general," leads to a single conclusion: NDA negotiations are not governed by the Manner Exception; they are, instead, treated under the Licensing Exception. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017). The jury should be instructed about this point of law as it deliberates on RTZ's defenses.

Additionally, the last two paragraphs of Special Instruction No. 12 do not have any legal support. They are, instead, RTZ's effort to argue its theory of the case through jury instructions. For instance, RTZ wishes to include language instructing the jury to consider "whether RTZ offered to make electronic health information available in an alternative manner, such as through standard exported reports or file transfers." This is a misstatement of the alternative manner rules. Not only is this is improper here (alternative manner is addressed in a different instruction), but it is also divorced from the statutory text and merely parrots RTZ's theory of the case. RTZ also includes language about the burden and that if it proves it satisfied the Manner Exception, then its practices were not information blocking. Neither of these additions is proper.

Instruction No. 49

**DISPUTED: The Manner Exception—Agreeable Terms**

RTZ must prove it was unable to reach agreeable terms with Intus regarding the technical method, format, and transport mechanism by which the electronic health information is delivered to satisfy the "agreeable terms" element of the manner exception.

Disagreement about the terms of a non-disclosure agreement cannot satisfy the Manner Exception.

Source / Authority
45 C.F.R. § 171.301; *Cf.* 45 C.F.R. § 171.303, Licensing Exception.

**Intus' Position: Manner Exception — Agreeable Terms**

"If a party's proposed instruction has brought an issue to the district court's attention the court commits error if it omits the instruction altogether, rather than modifying it to correct the perceived deficiency." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1235 (9th Cir. 2011) (cleaned up). The mere fact "that the instructions [were] formulated to expound a party's theory more clearly does not mean they are inadequate." *Binkovich v. Barthelemy*, 672 F. App'x 648, 650 (9th Cir. 2016).

As Intus argued in its Motion in Limine No. 10, NDA negotiations are expressly governed by a different exception (the Licensing Exception), which was an intentional decision by the promulgating agency to keep NDAs "no broader than necessary to prevent" disclosure of trade secrets. *See* 45 C.F.R. § 171.303; 84 Fed. Reg. 7424, 7549. If ONC had wanted disagreement over the terms of an NDA to satisfy the Manner Exception, it would have said so. It did not. Instead, ONC specifically addressed the issue of NDAs under the Licensing Exception "In reading a statute, the Court must not 'look merely to a particular clause,' but consider 'in connection with it the whole statute.'" *Dada v. Mukasey*, 554 U.S. 1, 128 (2008). "This rule of interpretation applies equally to regulations," and the Court must "read the entire regulation in context." *Lezama-Garcia v. Holder*, 666 F.3d 518, 531 n.13 (9th Cir. 2011). Here, the interpretive canon, "the specific governs over the general," leads to a single conclusion: NDA negotiations are not governed by the Manner Exception; they are, instead, treated under the Licensing Exception. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017). The jury should be instructed about this point of law as it deliberates on RTZ's defenses.

**RTZ's Position**

This instruction is argumentative and misstates the scope of the regulation. Intus purports to confine the "agreeable terms" element of § 171.301(a) to "the technical method, format, and transport mechanism" by which EHI is delivered, and claims that "[d]isagreement about the terms of a non-disclosure agreement cannot satisfy the Manner Exception." No language in § 171.301 limits the "agreeable terms" inquiry. The instruction litigates the merits of RTZ's defense under the guise of a definition and improperly invites a favorable inference on a disputed fact. (*United States v. Hall*, 552 F.2d 273, 275 (9th Cir. 1977) [holding that a court is not required to accept a proposed instruction intended to influence the jury towards accepting one party's evidence, and that an instruction dictating

the result of a factual issue invades the jury's fact-finding role.].)

The claim that NDA negotiations are "expressly governed" solely by the Licensing Exception (§ 171.303) and therefore can never bear on the Manner Exception, reads a mutual-exclusivity rule into the regulations that does not exist. The Manner Exception's own text is disjunctive: An actor must fulfill a request unless it is "technically unable" *or* "cannot reach agreeable terms with the requestor." (45 C.F.R. § 171.301(a)(1).) Whether the parties could "reach agreeable terms" is thus embedded in the regulation itself, and evidence of the parties' negotiations, including the proposed NDA and related communications, bears directly on that inquiry. *(Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 233 (4th Cir. 2025) ["cannot reach agreeable terms" requires "at least some reasonable efforts and articulable reasons why the parties cannot come to an agreement"].) Nothing in the regulations makes a disagreement over confidentiality terms categorically irrelevant to whether the parties reached "agreeable terms" under § 171.301(a).

Further, Intus's instruction is contrary to the Court's summary judgement order, which stated the jury must consider whether RTZ made "at least some reasonable efforts" to reach agreement regarding the sharing of information (Dkt. 203 at 6). An instruction telling the jury that a disagreement over NDA terms "cannot satisfy the Manner Exception" would remove from the jury the very fact question the Court has already reserved for it.

Instruction No. 50

**DISPUTED: Information Blocking – Manner Exception – Request Requirement**

The manner exception concerns an actor's response to a request to access, exchange, or use electronic health information. To qualify as such a request:

1. The request must seek to access, exchange, or use electronic health information. A request for access to a software system, its user interface, or log-in credentials is not a request to access, exchange, or use electronic health information; and

2. The request must specify the technology, or the content and transport standards, by which the requestor seeks to access, exchange, or use the electronic health information.

If a request seeks electronic health information but does not specify the technology or standards for the manner sought, the actor has no obligation to fulfill it in that manner and may instead fulfill it in an alternative manner permitted by the regulation.

Authority / Source

45 C.F.R. § 171.301(a); 85 Fed. Reg. 25,642, 25,676–25,679 (May 1, 2020); ONC FAQ, "What role does a "requestor" play under the alternative manner condition of the Manner Exception?", https://healthit.gov/faq/what-role-does-a-requestor-play-under-the-alternative-manner-condition-of-the-manner-exception/

**RTZ's Position: Manner Exception — Request Requirement**

This instruction explains what qualifies as a "request" under the Manner Exception. It tracks 45 C.F.R. § 171.301(a), which frames the exception as an actor's response to a request to access, exchange, or use electronic health information and directs the actor to determine the "content and manner" requested. There is no model instruction on this point, so the language is drawn from the regulation and the agency's explanatory guidance.

The instruction makes two regulatory requirements concrete for the jury: (1) that a qualifying request must seek to access, exchange, or use EHI; and (2) that the request must specify the technology, or the content and transport standards, by which the requestor seeks the EHI. Both points come directly from § 171.301(a) and the ONC commentary. They reinforce the same system-versus-data line drawn in RTZ's other instructions and are necessary so the jury does not mistake Intus' demand for direct system access for a qualifying EHI request.

Breaking this "request" requirement out from the exception's other elements is what allows the jury to apply a difficult regulation step by step rather than have to tackle it as a single unintelligible paragraph.

**Intus' Position**

The Manner Exception contains two sub-parts. The first is 45 C.F.R. § 171.301(a), which RTZ nearly captures Special Instruction No. 12 (Intus does not object to the portion of Special Instruction No. 12 that tracks the statutory language verbatim). The second is 45 C.F.R. § 171.301(b), which addresses what happens if the parties cannot agree and an alternative method is needed—this is captured in Special Instruction No. 14, to which Intus has not objected because it tracks the statutory language. There is no need for Special Instruction No. 13, which is untethered from any regulation or statutory language, and will mislead the jury. This instruction is designed to rehash RTZ's argument that has already been rejected. RTZ includes the following language: "A request for access to a software system, its user interface, or log-in credentials is not a request to access, exchange, or use electronic health information." The distinction RTZ seeks to draw between access to EHI and access to PACECare was part of its argument, advanced primarily by Traci Creegan in her expert report, that RTZ did not engage in information blocking. According to Ms. Creegan, because RTZ made the EHI available in a different

way (ostensibly through reports, but Intus disputes that as well), it could not have engaged in information blocking by merely preventing access to its system. That argument was rejected by this Court on summary judgment, and in its *Daubert* Order, the Court made clear that the issue of "facial information blocking" has been adjudicated and will not be tried. The distinction RTZ seeks to make in Special Instruction No. 4, therefore, relates solely to a defunct theory and will only serve to confuse the jury and prejudice Intus. This instruction is, therefore, unnecessary and argumentative.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 51

### Information Blocking – Manner Exception – Alternative Manner Sequencing

If an actor does not fulfill a request in the manner requested because it is technically unable to do so or cannot reach agreeable terms, the actor may fulfill the request in an alternative manner.  There is a specific priority sequence for the alternative manner in which an actor may fulfill a request. The actor must proceed through each tier in order and may advance to the next tier only if it is technically unable to fulfill the request at the prior tier:

1. The actor must fulfill the request using technology certified as specified by the requestor. If the actor does not have certified technology, or the requestor does not specify certified technology, this tier does not apply.

2. The actor must fulfill the request using content and transport standards specified by the requestor and published by the Federal Government or a standards developing organization accredited by the American National Standards Institute. If the requestor does not specify any such standards, this tier does not apply.

3. The actor must fulfill the request in an alternative machine-readable format, including the means to interpret the electronic health information, agreed upon with the requestor.

Fulfilling a request at a permitted tier satisfies the alternative-manner requirement, even if it is not the manner the requestor preferred. In determining whether RTZ offered an alternative manner permitted by the regulations, you may consider whether RTZ offered electronic health information in a machine-readable format, such as a standard CSV export, and whether Intus specified any certified technology or published standards.

Authority / Source
45 C.F.R. § 171.301(a) (alternative manner; order of priority) and (b); 85 Fed. Reg. 25,642, 25,676–25,679 (May 1, 2020); 89 Fed. Reg. 1192 (Jan. 9, 2024).

Instruction No. 52

## Intentional Interference with Contractual Relations

Intus claims that RTZ intentionally interfered with the contract between Intus and PACE program customers. To establish this claim, Intus must prove all of the following:

1.  That there were contracts between Intus and its customers;

2.  RTZ knew of the contracts;

3.  RTZ's conduct prevented performance or made performance more expensive or difficult;

4.  RTZ intended to disrupt the performance of the contracts or knew that disruption of performance was certain or substantially certain to occur;

5.  That Intus was harmed; and

6.  That RTZ's conduct was a substantial factor in causing Intus' harm.

Source / Authority
CACI 2201

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 53

**Intentional Interference with Prospective Economic Advantage**

Intus claims that RTZ intentionally interfered with an economic relationship between Intus and existing and prospective PACE program customers that probably would have resulted in an economic benefit to Intus. To establish this claim, Intus must prove all of the following:

1. That Intus and one or more PACE program customers or prospective customers were in an economic relationship that probably would have resulted in an economic benefit to Intus;

2. That RTZ knew of those relationships;

3. That RTZ engaged in [specify conduct determined by the court to be wrongful];

4. That by engaging in this conduct, RTZ intended to disrupt the relationships, or knew that disruption of the relationships was certain or substantially certain to occur;

5. That the relationship was disrupted;

6. That Intus was harmed; and

7. That RTZ's conduct was a substantial factor in causing Intus' harm.

Source / Authority
CACI No. 2202

Instruction No. 54

**Inducing Breach of Contract**

RTZ claims that Intus intentionally caused one or more PACE facilities to breach their PACECare Agreements with RTZ. To establish this claim, RTZ must prove all of the following:

1.      That there was a contract between RTZ and one or more PACE facilities, which prohibited the PACE facilities from providing account credentials or other forms of access to the PACECare system to any third party without RTZ's consent;

2.      That Intus knew of the contract;

3.      That Intus intended to cause one or more PACE facilities to breach the contract;

4.      That Intus' conduct caused one or more PACE facilities to breach the contract, by sharing their PACECare log-in credentials with Intus or permitting Intus to access the PACECare system through those credentials;

5.      That RTZ was harmed; and

6.      That Intus' conduct was a substantial factor in causing RTZ's harm.

Authority / Source
CACI 2200; *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55 (1998); *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 1129 (1990); *Bed, Bath & Beyond of La Jolla*, 52 Cal.App.4th 867 (1997)

Instruction No. 55

**DISPUTED: Compensatory Damages – Inducing Breach of Contract**

If you find that Intus intentionally induced one or more PACE facilities to breach their PACECare Agreements with RTZ, you must decide the amount of money that will reasonably compensate RTZ for the harm caused by the induced breaches. Because this claim is based on Intus' wrongful conduct rather than on a contract between RTZ and Intus, RTZ may recover for all harm proximately caused by the induced breaches, whether or not that harm could have been anticipated.

Recoverable damages may include:

1.      the reasonable value of the access to the PACECare system that Intus obtained as a result of the induced breaches. In determining that value, you may consider what a party in Intus' position would have paid RTZ for authorized access to the PACECare system;

2.      the reasonable cost of investigating and responding to the breaches, including the cost of identifying and invalidating log-in credentials shared or used in breach of the PACECare Agreements; and

3.      any other economic loss that RTZ proves was proximately caused by the induced breaches.

You may not award the same loss more than once, even if it is recoverable under more than one of RTZ's claims.

Authority / Source
Cal. Civ. Code § 3333; CACI 3900, 3903; *Quelimane Co. v. Stewart Title Guaranty Co.,* 19 Cal.4th 26, 55 (1998); *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990)

**RTZ's Position: Compensatory Damages — Inducing Breach of Contract**

Intus disputes this instruction, but proposes no competing inducing-breach-damages instruction. As with the other counterclaims, Intus' set would leave the jury to award (or deny) damages on RTZ's inducement claim with no instruction on the applicable measure. RTZ's instruction states the correct measure and explains an important point to the jury: because inducing breach of contract is a tort based on Intus' own wrongful conduct (not a contract claim between RTZ and Intus) RTZ may recover for all harm proximately caused by the induced breaches, whether or not that harm was foreseeable at the time of contracting.

**Intus' Position**

Intus proposes the Court adopt a neutral form of CACI 3901 and 3903N.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 56

### DISPUTED: Unclean Hands

Intus claims that RTZ is barred from recovering damages from any of its claims because RTZ has "unclean hands." For the defense to apply, Intus must prove: (1) RTZ engaged in inequitable conduct; and (2) the inequitable conduct relates directly to the subject matter of RTZ's own claims.

Source / Authority

*See Metal Jeans, Inc. v. Metal Sport, Inc., et al.*, 987 F.3d 1242 (9th Cir. Feb. 16, 2021).

## Intus' Position: Unclean Hands

Intus pleads unclean hands as an affirmative defense to RTZ's counterclaims. (Dkt. 48, p. 9). Intus' proposed jury instruction follows the recognized elements of the defense as applied in the Ninth Circuit: party claiming unclean hands must first "must prove the plaintiff engaged in inequitable conduct and second, that plaintiff's conduct relates to the claim which it has asserted against the defendant." *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009), *aff'd,* 404 F. App'x 496 (Fed. Cir. 2010) (internal citations omitted). California courts have further recognized that whether the doctrine of unclean hands applies is a question of fact. *Kendall-Jackson Winery, Ltd. v. Superior Ct.,* 76 Cal. App. 4th 970, 978, 90 Cal. Rptr. 2d 743, 749 (1999), *as modified on denial of reh'g* (Jan. 3, 2000). It follows, then, that a jury may appropriately determine whether the RTZ's hands were unclean. This is consistent with additional Ninth Circuit case law finding equitable defenses were appropriately put before the jury. *See, e.g., United States v. Harvey,* 661 F.2d 767, 774 (9th Cir. 1981) (finding "the district court correctly instructed the jury" as to the elements of equitable estoppel).[1]

Intus recognizes this is an equitable issue that will be decided by the Court and provides the jury instruction to the extent an advisory jury verdict is desired by the court. *See* Fed. R. Civ. P. 39(c).

## RTZ's Position

This instruction is not necessary because unclean hands is an equitable defense that is not tried to a jury.  The court decides it, retaining discretion to empanel an advisory jury under Rule 39(c). (*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc.*, 621 F.3d 981 (9th Cir. 2010) [holding that application of the equitable doctrine of unclean hands is committed to the trial court's discretion]; *Cal-Agrex, Inc. v. Tassell*, 258 F.R.D. 340, 348 (N.D. Cal. 2009) [holding court could decide equitable unclean-hands defense without submitting it to the jury; concluding unclean hands was not an "issue properly before the jury," so refusal to give an unclean-hands jury instruction was not error].)

---

[1] The Ninth Circuit held the district court correctly instructed the jury as to five elements for the equitable estoppel defense. Intus' proposed instruction appropriately includes only four elements – the fifth element discussed in *U.S. v. Harvey* related specifically to cases against the federal government where "affirmative government misconduct" must be proven.

While *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999), observes that "[w]hether the doctrine of unclean hands applies is a question of fact," it does not hold that a *jury* must resolve that fact. Intus's fallback under Rule 39(c) is not a basis for including the instruction as of right.  Whether to use an advisory jury is for the Court to decide before instructions are settled.

The instruction also exceeds the defense as pleaded. Intus's First Affirmative Defense asserted unclean hands only "based on RTZ's wrongdoing as alleged in the Amended Complaint" (Dkt. 48) - the conduct underlying Intus's own claims, not any inequitable conduct tied to RTZ's counterclaims. That boilerplate cross-reference without any facts, did not give RTZ fair notice of the theory Intus now seeks to put to the jury. *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1172 (N.D. Cal. 2010) [concluding defendant did not allege sufficient facts to provide notice of its defenses].)

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 57

**Mitigation of Damages**

If you decide either party is responsible for the original harm, that party is not entitled to recover damages for harm to its property that the other party proves the offending party could have avoided with reasonable efforts or expenditures.

You should consider the reasonableness of the liable party's efforts in light of the circumstances facing that party at the time, including its ability to make the efforts or expenditures without undue risk or hardship.

If the prevailing party made reasonable efforts to avoid harm, then your award should include reasonable amounts that it spent for this purpose.

Source / Authority
CACI 3931

Instruction No. 58

**Failure to Mitigate**

If Intus induced the breach of the contract(s) and the breach caused harm, RTZ is not entitled to recover damages for harm that Intus proves RTZ could have avoided with reasonable efforts or expenditures. You should consider the reasonableness of RTZ's efforts in light of the circumstances facing it at the time, including RTZ's ability to make the efforts or expenditures without undue risk or hardship. If RTZ made reasonable efforts to avoid harm, then your award should include reasonable amounts that RTZ spent for this purpose.

Source / Authority
CACI No. 358

Instruction No. 59

**Punitive Damages —RTZ's Claims Against Intus —  First Phase**

If you decide that Intus' conduct caused RTZ harm, you must decide whether that conduct justifies an award of punitive damages. The amount, if any, of punitive damages will be an issue decided later.

At this time, you must decide whether RTZ has proved that Intus engaged in that conduct with malice, oppression, or fraud. To do this, RTZ must prove one of the following by clear and convincing evidence:

1.    That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Intus who acted on behalf of Intus; or

2.    That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of Intus; or

3.    That one or more officers, directors, or managing agents of Intus knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means that Intus acted with intent to cause injury or that Intus' conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when the person is aware of the probable dangerous consequences of the person's conduct and deliberately fails to avoid those consequences.

"Oppression" means that Intus 's conduct was despicable and subjected RTZ to cruel and unjust hardship in knowing disregard of its rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that Intus intentionally misrepresented or concealed a material fact and did so intending to harm RTZ.

An employee is a "managing agent" if the person exercises substantial independent authority and judgment in the person's corporate decision making so that the person's decisions ultimately determine corporate policy.

Source / Authority
CACI 3946

Instruction No. 60

**Punitive Damages —RTZ's Claims Against Intus — Second Phase**

You must now decide the amount, if any, that you should award RTZ in punitive damages. The purpose of punitive damages are to punish a wrongdoer for the conduct that harmed the other party and to discourage similar conduct in the future.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors ~~for each defendant~~ in determining the amount:

(a)    How reprehensible was ~~that defendant's~~ Intus' conduct? In deciding how reprehensible ~~a defendant's~~ Intus' conduct was, you may consider, among other factors:

1.    Whether the conduct caused physical harm;

2.    Whether ~~that defendant's~~ Intus disregarded the health or safety of others;

3.    Whether RTZ was financially weak or vulnerable and ~~that defendant's~~ Intus knew RTZ was financially weak or vulnerable and took advantage of it;

4.    Whether ~~that defendant's~~ Intus' conduct involved a pattern or practice; and

5.    Whether ~~that defendant's~~ Intus acted with trickery or deceit.

(b)    Is there a reasonable relationship between the amount of punitive damages and RTZ's harm or between the amount of punitive damages and potential harm to RTZ that Intus knew was likely to occur because of its conduct?

(c)    In view of ~~that defendant's~~ Intus' financial condition, what amount is necessary to punish it and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Intus has substantial financial resources. Any award you impose may not exceed Intus' ability to pay.

Punitive damages may not be used to punish ~~a defendant~~ Intus for the impact of its alleged misconduct on persons or entities other than RTZ.

Source / Authority
CACI 3949

Instruction No. 61

**Punitive Damages - Intus' Claims Against RTZ —  First Phase**

If you decide that RTZ's conduct caused Intus harm, you must decide whether that conduct justifies an award of punitive damages. The amount, if any, of punitive damages will be an issue decided later.

At this time, you must decide whether Intus Care, Inc. has proved that RTZ engaged in that conduct with malice, oppression, or fraud. To do this, Intus must prove one of the following by clear and convincing evidence:

1. That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of RTZ who acted on behalf of RTZ; or

2. That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of RTZ; or

3. That one or more officers, directors, or managing agents of RTZ knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means that RTZ acted with intent to cause injury or that RTZ's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when the person is aware of the probable dangerous consequences of the person's conduct and deliberately fails to avoid those consequences.

"Oppression" means that RTZ's conduct was despicable and subjected Intus to cruel and unjust hardship in knowing disregard of its rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that RTZ intentionally misrepresented or concealed a material fact and did so intending to harm Intus.

An employee is a "managing agent" if the person exercises substantial independent authority and judgment in the person's corporate decision making so that the person's decisions ultimately determine corporate policy.

Source / Authority
CACI 3946

Instruction No. 62

### Punitive Damages - Intus' Claims Against RTZ — Second Phase

You must now decide the amount, if any, that you should award Intus in punitive damages. The purpose of punitive damages are to punish a wrongdoer for the conduct that harmed the other party and to discourage similar conduct in the future.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors ~~for each defendant~~ in determining the amount:

(a)    How reprehensible was ~~that defendant's~~RTZ's conduct? In deciding how reprehensible ~~a defendant's~~RTZ's conduct was, you may consider, among other factors:

      1.    Whether the conduct caused physical harm;

      2.    Whether ~~the defendant~~RTZ disregarded the health or safety of others;

      3.    Whether Intus was financially weak or vulnerable and ~~the defendant~~RTZ knew Intus was financially weak or vulnerable and took advantage of it;

      4.    Whether ~~the defendant's~~RTZ's conduct involved a pattern or practice; and

      5.    Whether ~~the defendant~~RTZ acted with trickery or deceit.

(b)    Is there a reasonable relationship between the amount of punitive damages and Intus' harm ?

(c)    In view of ~~that defendant's~~RTZ's financial condition, what amount is necessary to punish it and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because a defendant has substantial financial resources.

Punitive damages may not be used to punish ~~a defendant~~RTZ for the impact of its alleged misconduct on persons or entities other than Intus.

Source / Authority
CACI 3949

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 63

## DISPUTED: Trespass to Chattels—Computer Systems

Because RTZ claims trespass to chattels based on unauthorized access to a computer system, RTZ must prove damage or disruption to that computer system.

Source / Authority

CACI 2101. "Sources and Authority" (citing *Casillas v. Berkshire Hathaway Homestate Ins. Co.* (2022) 79 Cal.App.5th 755, 764 [294 Cal.Rptr.3d 841].)

**Intus' Position: Trespass to Chattels — Computer Systems**

In the "Sources and Authority" to CACI 2101 ("Trespass to Chattels – Essential Factual Elements"), the instructions include "[A] plaintiff alleging trespass to chattels based on unauthorized access to a computer system must allege damage or disruption to that computer system." (quoting *Casillas v. Berkshire Hathaway Homestate Ins. Co.,* 79 Cal. App. 5th 755, 764, 294 Cal. Rptr. 3d 841, 847 (2022)). In *Casillas*, the court dismissed a trespass to chattels claim when there was no damage or disruption to the computer system. *Id.* The court further found "threatened harm to the [] computer system" was not enough to support a trespass claim. *Id.* Intus' instruction tracks the same language quoted in CACI. The instruction serves the purpose of further shaping for the jury how the tort plays into an unauthorized access scenario, as RTZ alleges occurred here. The jury should be instructed in accordance with California law with respect to RTZ's trespass to chattels claim and thus the instruction is appropriate.

**RTZ's Position**

This instruction also creates a ceiling designed to exclude RTZ's actual, legally recoverable harm. RTZ does not dispute that a trespass-to-chattels plaintiff must show damage or disruption to the system.  RTZ objects that Intus's instruction, read together with its "may only recover" damages instruction, is engineered to suggest that RTZ's only cognizable injury is physical impairment of hardware, ignoring the burden Intus placed on the PACECare system and the resources RTZ was forced to expend to investigate, monitor, and contain the unauthorized access.

That "threatened harm" alone is insufficient does not immunize a defendant who actually accessed and burdened the system. (*eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069–71 (N.D. Cal. 2000).) Any "damage or disruption" instruction must be harmonized with a damages instruction that permits the jury to consider the actual system burden and RTZ's response costs, so the jury is not misled into equating "damage or disruption" solely with hardware failure. RTZ's competing instruction (No. 31) provides that measure.

Instruction No. 64

**Compensatory Damages – Trespass to Chattels**

If you find that Intus committed trespass to chattels, you must decide the amount of money that will reasonably compensate RTZ for the harm caused by Intus's unauthorized access to and use of the PACECare system. RTZ is not required to prove physical damage to a computer in order to recover.

1.  the reduction in the value of the PACECare system caused by the intrusion, or the reasonable cost of repairing or restoring the system to the condition it was in before the intrusion; and

2.  reasonable compensation for the impairment of the PACECare system's capacity or resources, or for the loss of use of any portion of the system, during the period of unauthorized use.

**Authority:**    Cal. Civ. Code § 3333; CACI 3903; *Intel Corp. v. Hamidi,* 30 Cal.4th 1342, 1350–1353 (2003); *eBay, Inc. v. Bidder's Edge, Inc.,* 100 F. Supp.2d 1058, 1069–1071 (N.D. Cal. 2000

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 65

**DISPUTED: Federal Computer Fraud and Abuse Act**

RTZ claims that Intus violated two separate provisions of the Federal Computer Fraud and Abuse Act ("CFAA").  If you find that Intus violated at least one of the CFAA provisions described in the instructions that follow, you should find for RTZ and against Intus on the CFAA claim. If you do not find that Intus violated the CFAA, then you must find against RTZ on its CFAA claim.

Authority / Source

**RTZ's Position: Federal Computer Fraud and Abuse Act**

This is a short introduction instruction, which simply tells the jury that RTZ asserts two separate CFAA provisions and that proof of either suffices for a verdict for RTZ on the CFAA claim. That is an accurate statement of RTZ's pleaded theories.  The instruction orients the jury to the two provisions that follow and prevents confusion between them. It states no contested proposition of law.

**Intus' Position**

The instruction is superfluous. The Court should instruct the jury consistent with Ninth Circuit's Model Instruction 15.29. The pattern instruction does not contemplate separate instructions for the various subsections, which will serve to confuse and mislead the jury.

Instruction No. 66

**Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)(4)) (CFAA)**

For RTZ to prove that Intus violated the Computer Fraud and Abuse Act ("CFAA"), RTZ must prove each of the following elements:

1.  Intus intentionally accessed a protected computer system (used in or affecting inter-state or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States);

2.  As a result of the Intus' access, Intus caused the impairment of the integrity and availability of the computer;

3.  As a result of the Intus' access, Intus caused a loss to RTZ; and

4.  Intus' transmission affected RTZ's computer system used in or affected interstate or foreign commerce or communication.

Source / Authority
Ninth Circuit Pattern Criminal Instrs. No. 15.29, Damage to a Protected Computer Causing Loss (18 U.S.C. § 1030(a)(5)(C)); "protected computer" definition can be found here: 18 USC § 1030(e)(2).

Instruction No. 67

**DISPUTED: Violation of the CFAA – Section 1030(a)(4)**

RTZ claims that Intus violated the CFAA by knowingly accessing the PACECare system without authorization and with the intent to defraud. To establish this claim, RTZ must prove all of the following:

1. That the PACECare system resides on protected computers;

2. Intus knowingly accessed the PACECare system without authorization;

3. Intus did so with the intent to defraud;

4. By accessing the PACECare system without authorization, Intus furthered the intended fraud and obtained something of value;

5. That as a result of that access, Intus caused damage or loss to RTZ;

6. RTZ's loss was at least $5,000 in value during any one-year period.

Authority / Source
18 U.S.C. § 1030(a)(4) & (g); Ninth Circuit Manual of Model Criminal Jury Instructions, No. 15.26, *United States v. Nosal* 844 F.3d 1024, 1027–1028, 1035–1038 (9th Cir. 2016); *LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1133 (9th Cir. 2009); *Facebook, Inc. v. Power Ventures, Inc.* 844 F.3d 1058, 1067–1068 (9th Cir. 2016)

**RTZ's Position: Violation of the CFAA, Section 1030(a)(4)**

This instruction correctly sets forth the elements of a civil claim under the cited section.  RTZ pleaded theories under two different sections and each is entitled to a separate instruction on their required elements.  Intus' proposal to reduce RTZ's CFAA charge to a single criminal model instruction would omit this theory entirely, in disregard of RTZ's actual claims.

**Intus' Position**

The evidence does not support that RTZ was in anyway defrauded. Without a shred of evidence of such fraud, the instruction is improper. The jury should not be instructed to determine whether Intus had an "intent to defraud" under the circumstances.

Instruction No. 68

**Violation of the CFAA – Section 1030(a)(5)(C)**

RTZ claims that Intus violated the CFAA by intentionally accessing the PACECare system without authorization and causing damage or loss. To establish this claim, RTZ must prove all of the following:

1. That the PACECare system resides on protected computers;

2. Intus intentionally accessed the PACECare system without authorization;

3. That as a result of that access, Intus caused damage or loss to RTZ; and

4. RTZ's loss was at least $5,000 in value during any one-year period.

Authority / Source
18 U.S.C. § 1030(a)(5)(C) & (g); Ninth Circuit Manual of Model Criminal Jury Instructions, No. 15.29; *United States v. Nosal,* 844 F.3d 1024, 1027–1028, 1035–1038 (9th Cir. 2016); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067–1068 (9th Cir. 2016)

Instruction No. 69

**Violation of the Computer Fraud and Abuse Act –
Protected Computer Defined**

A "protected computer" is a computer used in or affecting interstate or foreign commerce or communication. A computer or server connected to the Internet, including a cloud-based system accessed by users over the Internet, may be a protected computer.

Authority / Source
18 U.S.C. § 1030(e)(2)(B)

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 70

**DISPUTED: Violation of the Computer Fraud and Abuse Act –
Intent to Defraud Defined**

"Intent to defraud" means an intent to obtain something of value through unauthorized access to a computer.

Authority / Source
*United States v. Nosal,* 844 F.3d 1024, 1027–1028, 1035–1038 (9th Cir. 2016); *eBay Inc. v. Digital Point Solutions, Inc.* 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009); *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc*., 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008).

**RTZ's Position: CFAA — "Intent to Defraud" Defined**

Because "intent to defraud" is an element of RTZ's § 1030(a)(4) theory, the jury needs its definition.  Courts applying the CFAA have adopted this access-focused definition. (See *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000).)

**Intus' Position**

The evidence does not support that RTZ was in any way defrauded. Without a shred of evidence of such fraud, the instruction is improper. The jury should not be instructed to determine whether Intus had an "intent to defraud" under the circumstances.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 71

**DISPUTED: Violation of the Computer Fraud and Abuse Act –
Without Authorization Defined**

"Without authorization" means accessing a protected computer without permission.  Whether a person is authorized to access the PACECare system depends on the actions taken by RTZ to grant or deny permission to that person to use the system.  Only RTZ, as the owner of the PACECare system, may grant or deny authorization to access it. A person accesses the PACECare system without authorization when the person has not received permission from RTZ to use the system for any purpose, or when RTZ has rescinded permission and the person accesses the system anyway.

An authorized user of PACECare, such as an employee of a PACE facility, has no authority to give another person permission to access the system when RTZ has not granted, or has revoked, that person's access. A person who accesses the system using the log-in credentials of an authorized user acts without authorization if RTZ has not permitted that person to access the system.

Authority / Source
*United States v. Nosal,* 844 F.3d 1024, 1034–1038 (9th Cir. 2016); *LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1132-1135 (9th Cir. 2009); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067–1068 (9th Cir. 2016)

**RTZ's Position: CFAA — "Without Authorization" Defined**

A definition of "without authorization" is necessary because that phrase is the central, and dispositive, element of RTZ's CFAA counterclaims, and the jury cannot apply it without being told whose permission controls. Intus' proposed definition is drawn from the Ninth Circuit criminal pattern instruction (No. 15.21) and defines "without authorization" as acting without permission from "the owner *or the entity which controls the right of access*." That language is designed to conflate access to RTZ's computer *system* with access to the electronic health information on it, and to imply that a PACE facility (a mere licensed user) could confer on Intus the authority to enter RTZ's system. It cannot. Intus compounds the problem by pairing its definition with authority (*Nosal I*, *ExactLogix*, *Lateral Link*) to suggest that a third party's use of borrowed credentials is never unauthorized access — the very legal conclusion that would undermine RTZ's counterclaims.

RTZ's instruction correctly states the law: Only RTZ, as the owner of the PACECare system, may grant or deny authorization to access it; an authorized user, such as a PACE-facility employee, has no power to re-delegate access that RTZ withheld or revoked. (See *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067–68 (9th Cir. 2016) [access is unauthorized where the system owner has withheld or revoked permission, notwithstanding a third party's valid credentials]; *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009) [authorization "depends on actions taken by the" owner].) Intus' reliance on *Nosal I* is misplaced. That case addressed an insider's misuse of *his own* authorized access, not a competitor's entry into a system it was never permitted to access. (*United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012).) Without RTZ's instruction, the jury could be misled into treating a licensee's credentials as RTZ's consent, thus improperly resolving the dispositive access question against RTZ as a matter of instruction rather than on the facts.

**Intus' Position**

Intus agrees that the jury should be instructed as to the definition of "without authorization." However, RTZ's proposed instruction is wrong on the law and the facts. Intus' proposed instruction,

which tracks Ninth Circuit Model Criminal Instructions 15.21, achieves that. RTZ's instruction, on the other hand, is misleading and prejudicial. Nowhere in the pattern instructions nor in the law does it state that "Only RTZ, as the owner of the PACECare system, may grant or deny authorization to access it." As noted above, PACECare access can be granted by the PACE programs. RTZ created the product and the contractual relationships with PACE programs in that manner. They cannot ask the Court to create a jury instruction that contradicts that fact. That is RTZ's interpretation and argument. *See White*, 312 F.3d at 1012 ("Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading."); *see also Dang,* 422 F.3d at 805 ("In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered.")

Courts have made clear that the CFAA and CDAFA are not intended to sweep in password or credential sharing as "unauthorized access." *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 861 (9th Cir. 2012) (noting that "it's very common for people to let [others] check their email or access their online accounts. . . . few imagine they might be marched off to federal prison for doing so"); *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020) (rejecting CFAA claim on grounds that the court "knows of no cases in which a federal court has deemed simple password sharing between a principal and an agent a violation of that antihacking law"); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016) ("The doctrine of lenity requires an interpretation of [CDAFA] that avoids criminalizing" computer access through false credentials). Thus, the jury should be instructed, consistent with the law, that password sharing does not constitute a violation of the statutes.

The cases cited by RTZ are not analogous to the fact pattern here and to the extent they speak to the purposes of CFAA, the cases are supportive of Intus' "Without Access" instruction. The third party in *Facebook, Inc. v. Power Ventures, Inc.* for example, did not have "valid credentials" as RTZ suggests. 844 F.3d at 1067–68. Instead, the Ninth Circuit described that the third party began a promotional campaign that offered users options to "like" and "share" the campaign and then, once a user clicked yes, the third-party infiltrated Facebook's systems to share the promotions. These were not "valid credentials" like the credentials belonging to and shared with by the PACE programs. Facebook users

did not provide the third party with their usernames or passwords. Rather, the third party found a backdoor entry into Facebook's systems to promote their own business and used it even after they were told to desist. Here, Intus is coordinating the exchange of EHI to better coordinate and support healthcare. The owner of the data expressly provided Intus access. This context matters – it was not a promotional campaign on Facebook involving users who unknowingly were providing the third-party access to Facebook's systems. The Court should reject RTZ's attempts to bake their argument and interpretation into the "without authorization" which is sufficiently addressed by Model Instruction 15.21.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 72

**DISPUTED: Without Authorization —Defined**

A person uses a computer "without authorization" when the person has not received permission from the owner or the entity which controls the right of access to the computer for any purpose, or when the owner or entity which controls the right of access to the computer has withdrawn or rescinded permission to use the data and the person uses the computer anyway.

Source / Authority

Ninth Circuit Pattern Criminal Instrs. No. 15.21; California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502) or the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030); *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 863 (9th Cir. 2012). *See Nosal I*, 676 F.3d at 861; *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016)

JOINT PROPOSED JURY INSTRUCTIONS

**Intus' Position: Without Authorization — Defined**

Intus' proposed instruction directly tracks the language of Ninth Circuit Criminal Pattern Instruction 15.21:

> "A person uses a computer "without authorization" when the person has not received permission from the [owner] [[person who] or [entity which] controls the right of access to the computer] for any purpose, or when the [owner] [[person who] or [entity which] controls the right of access to the computer] has withdrawn or rescinded permission to use the computer and the person uses the computer anyway."

Intus cited under Sources / Authority for the proposed instruction cases holding password credentialing was not "unauthorized access." This is consistent with the pattern instruction which contemplates the owner or entity in control can provide permissions. But Intus' proposed instruction itself does not add any language from those cases to the proposed instruction, it simply tracks 15.21. Notably, that RTZ describes the proposed instruction as including "a credential-sharing carve-out" seems to underscore the fact that password sharing is inherently recognized as permissible conduct in the CFAA landscape. In other words, RTZ seems to agree that the language of the pattern instruction itself lends itself to the conclusion that password sharing is permissible.

**RTZ's Position**

The dispositive authorization question in this case is whether Intus's access using PACE facilities' log-in credentials was "without authorization" when RTZ, the owner of PACECare, withheld permission. Model Criminal Instruction 15.21 does not answer that question. It states only a generic definition of "without authorization" and says nothing about access obtained through a legitimate user's shared credentials.

RTZ's proposed instruction supplies the controlling rule. Under Ninth Circuit law, authorization to access a computer "depends on actions taken by the" owner, and a legitimate account-holder's sharing of valid credentials does not authorize a third party the owner has not permitted. (*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132–35 (9th Cir. 2009); *United States v. Nosal*, 844 F.3d 1024, 1034–38 (9th Cir. 2016); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067–68 (9th Cir. 2016).) RTZ's proposed instruction correctly states the controlling law and identifies the precise question the jury must decide.

Instruction No. 80

JOINT PROPOSED JURY INSTRUCTIONS

**DISPUTED: Violation of California Comprehensive Computer Data Access and Fraud Act – Essential Factual Elements**

RTZ claims that Intus violated the California Comprehensive Computer Data Access and Fraud Act. To establish this claim, RTZ must prove all of the following:

1. That RTZ is the owner of the PACECare computer system, including the servers on which PACECare data is stored and organized;

2. That Intus knowingly did at least one of the following:

    a. accessed and used the PACECare system by logging into PACECare with the log-in credentials of PACE facility users;

    b. installed and ran an automated script that used the log-in credentials of PACE facility users to extract data from PACECare;

    c. took, copied, or made use of data from the PACECare system to provide charged services to its customers;

3. That Intus' conduct was without RTZ's permission;

4. That RTZ was harmed; and

5. That Intus' conduct was a substantial factor in causing RTZ's harm.

Authority:  CACI 1812; Cal. Penal Code, § 502 (c)(1), (c)(2), (c)(3), (c)(7), (e)(1)

**RTZ's Position: CDAFA, Essential Factual Elements**

RTZ rejects Intus' latest proposed changes and will not agree to modify the instruction to address the data. RTZ's instruction includes the specific prohibited acts, which the CACI instructs users to do. That is the case-specific tailoring the pattern instruction requires, not improper argument.

Further, Intus' proposed data-ownership language is irrelevant and designed to mislead. RTZ's CDAFA claim concerns Intus' unauthorized access to and use of the PACECare computer *system* (which RTZ indisputably owns or leases) not ownership of the information residing on it. Penal Code section 502 protects the "owner or lessee of the computer, computer system, computer network, computer program, *or* data"; the statute's protection of the system owner does not turn on who owns the data stored there. (Cal. Penal Code § 502(e)(1).) Telling the jury the data does not "belong to RTZ" invites the erroneous conclusion that RTZ lacks a protectable interest, conflating access to RTZ's system (the gravamen of the claim) with data ownership (irrelevant to it). That is confusing and unfairly prejudicial. (Fed. R. Evid. 403.)  It is also unnecessary because one of the stipulated facts for trial states that RTZ does not own the EHI data, so the jury will already be informed of that fact.

**Intus' Position**

Intus objects to RTZ's CACI 1812 as drafted for two reasons.

First, for element two, CACI instructs the parties to "specify one or more prohibited acts from Pen. Code, § 502(c)." This means RTZ must list the specific sub-sections of CDAFA that are at issue, using the statutory language. This is not an opportunity for RTZ to argue its case through the jury instructions by presenting its theory of the case. But that is exactly what RTZ intends to do by including its arguments that Intus "installed and ran an automated script that used the log-in credentials of PACE facility users to extract data from PACECare" or "took, copied, or made use of data from the PACECare system to provide charged services to its customers."

Second, an instruction about data ownership is critical here because RTZ's language risks misleading the jury. There is no dispute that RTZ does not have a claim for Intus taking data from the PACECare system that belongs to the PACE programs. Thus, the parties agree that Intus's proposed addition accurately reflects the law and the appropriate legal standard. RTZ's proffered language invites confusion on this issue and asks the jury to find liability under CDAFA merely because Intus

"extract[ed] data from PACECare" or "took, copied, or made use of data from the PACECare system." "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Dang v. Cross*, 422 F.3d 800, 805 (9th Cir. 2005). Here, the jury must understand that not all data on PACECare is actionable—the electronic health information belonging to the PACE programs is not owned by RTZ and cannot form the basis for liability under CDAFA. In *Garrabrants v. Erhart*, the appellate court reversed and remanded for retrial because the jury "instruction[s] failed to require the jury to decide whether [plaintiff] owned the at-issue data such that he had standing to bring his claim." 98 Cal. App. 5th 486, 507 (2023) (quoting Cal. Penal Code § 502(e)(1)). The prejudice to the defendant arose because the instructions did not make clear that the plaintiff's "interest in the data at issue must be an ownership interest," so the jury "could have construed the instruction as simply asking whether [defendant] took, copied, or used confidential or financial information concerning [plaintiff] but belonging to someone else." *Id*. 508–09. The same risk of prejudice exists here. If not properly instructed, the jury could misunderstand and hold Intus liable for its use of the PACE program's data that is only stored on RTZ's PACECare, as opposed to data that is actually owned by RTZ.

Instruction No. 73

**DISPUTED: Violation of California Comprehensive Computer Data Access and Fraud Act – Definition of "Access"**

The term "access" means to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network. This includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly.

A person can access a computer, computer system, or computer network in different ways. For example, access can be accomplished by sitting down at a computer and using the mouse and keyboard, or by using a wireless network or some other method or tool to gain remote entry.

Authority / Source
CACI 1813; Cal. Penal Code, § 502(b)(1); *United States v. Christensen,* 828 F.3d 763, 789 (9th Cir. 2016)

**RTZ's Position: CDAFA, Definition of Access**

The challenged sentence correctly states California law and is essential to RTZ's theory; deleting it would endorse Intus' incorrect premise that using valid credentials can never violate section 502.

Liability under section 502 turns on whether access is "without permission" from the system owner - not on whether the credentials used happened to be valid. A person who logs in with a valid password but without the owner's permission, and then takes or uses data improperly, violates the statute. (*United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016) [holding that section 502(c) reaches one who accesses a computer without permission, and that logging in with a valid password and then improperly taking or using data is conduct the statute prohibits]; *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067–69 (9th Cir. 2016) [holding that a third party accesses a system "without authorization" once the owner withholds or revokes permission, even though it used valid login credentials supplied by consenting users].) Deleting the sentence would leave the jury with the false impression that Intus' use of PACE facilities' credentials was lawful merely because the credentials worked.

**Intus' Position**

Intus objects to RTZ's proposed modification, adding the following language to CACI No. 1813: "This includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." The proposed modification is an incorrect statement of the law and is prejudicial.

First, courts have made clear that the CFAA and CDAFA are not intended to sweep in password or credential sharing as "unauthorized access." *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 861 (9th Cir. 2012) (noting that "it's very common for people to let [others] check their email or access their online accounts. . . . few imagine they might be marched off to federal prison for doing so"); *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020) (rejecting CFAA claim on grounds that the court "knows of no cases in which a federal court has deemed simple password sharing between a principal and an agent a violation of that antihacking law"); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct.

7, 2016) ("The doctrine of lenity requires an interpretation of [CDAFA] that avoids criminalizing" computer access through false credentials).

Second, there already exists an instruction on the meaning of "Without Premission"— Ninth Circuit Criminal Pattern Instruction 15.21, so not only is the language a misstatement of the law, there is no need for it.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 74

**DISPUTED: Violation of California Comprehensive Computer Data Access and Fraud Act – Without Permission Defined**

Acting "without permission" means acting without the permission of RTZ, the owner of the PACECare computer system. Permission granted by a customer or authorized user of a computer system is not the same as permission granted by the system's owner. A person may act without permission even when using valid log-in credentials, if those credentials were issued to someone else and the system's owner has not consented to that person's use of the system. This is true whether the credentials are used by a person directly or by an automated script installed by that person.

Authority / Source
*Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067–1069 (9th Cir. 2016); *United States v. Christensen,* 828 F.3d 763, 789 (9th Cir. 2016)

**RTZ's Position: CDAFA — "Without Permission" Defined**

This instruction correctly defines "without permission" under Penal Code section 502 and explains that permission from a customer or authorized user is not the owner's permission, as discussed in the cited case law.

This is important to RTZ's CDAFA counterclaim and a correct statement of law. Intus' contrary position - that valid credentials mean permission - is a disputed issue and cannot be resolved against RTZ by omitting the definition. Intus relies on *United States v. Nosal (Nosal I)*, 676 F.3d 854 (9th Cir. 2012), and district-court cases applying it (*ExactLogix*, *Lateral Link*), for the proposition that password or credential sharing cannot constitute unauthorized access. Those authorities are inapposite. *Nosal I* addressed an *insider* (an employee with his own authorized access) who used that access in violation of his employer's use restrictions; the court held only that the CFAA does not criminalize an authorized user's *misuse* of information he was permitted to obtain. (676 F.3d at 863–64.) That is not this case. Intus was never an authorized user of PACECare.  It is a competitor that entered RTZ's system using credentials issued to third parties (the PACE facilities), which RTZ never permitted it to use. The controlling authority for that scenario is *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067–69 (9th Cir. 2016), squarely holds that a third party accesses a system "without authorization" when the owner has not permitted its access, even though it used valid credentials supplied by consenting users.

**Intus' Position**

RTZ's instruction is pure argument. RTZ directs the jury to conclude *only* RTZ could grant permission to access the PACE programs. This is legally and factually incorrect. PACECare credentials can be issued by the PACE Programs themselves. (Depo. Tr. K. Lathrop, 38:21-39:2, 39:21-25). RTZ cannot create a system that permits others to grant access to PACECare and then seek to have the Court instruct the jury in a way directly contrary to the facts. Moreover, evidence in the form of the contracts between RTZ and PACE clients will be presented to the jury. Those contracts state that EMR data stored on PACECare belongs to the PACE programs themselves, not to RTZ. RTZ's proposed instruction, therefore, is confusing and legally wrong. The jury should not be instructed that only RTZ can grant

permission to access the programs. *See White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003) ("Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading."); *see also Dang. v. Cross,* 422 F.3d 800, 805 (9th Cir. 2005) ("In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered."). Rather, the jury should be instructed consistent with the model instructions which state "the owner *or the entity which controls the right of access*." Ninth Circuit Model Jury Instruction 15.21. Not only does the model instruction reflect the law, it is necessary for the jury based on the facts of this case.

Courts have made clear that the CFAA and CDAFA are not intended to sweep in password or credential sharing as "unauthorized access." *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 861 (9th Cir. 2012) (noting that "it's very common for people to let [others] check their email or access their online accounts. . . . few imagine they might be marched off to federal prison for doing so"); *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020) (rejecting CFAA claim on grounds that the court "knows of no cases in which a federal court has deemed simple password sharing between a principal and an agent a violation of that antihacking law"); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016) ("The doctrine of lenity requires an interpretation of [CDAFA] that avoids criminalizing" computer access through false credentials). Thus, the jury should be instructed, consistent with the law, that password sharing does not constitute a violation of the statutes.

In RTZ's citation to the Ninth Circuit's *Facebook, Inc. v. Power Ventures* decision is distinguishable in important ways and does not change the fact that password sharing is not a violation. 844 F.3d 1058, 1067–69 (9th Cir. 2016). A third party accessed Facebook user data and sent messages on behalf of those users to promote its business; even then, the third party violated CFAA only *after* it received a cease-and-desist and then continued to access the data. *Id.* That is not the same as here where the owners of the data, the PACE programs themselves, expressly granted Intus permission to access the data for purposes of coordinating care and never revoked their permissions. Moreover, as *Facebook* acknowledges, "*Nosal I* was most concerned with transforming 'otherwise innocuous behavior into

federal crimes simply because a computer is involved.'" *Id.* 1069. Here, the jury should not be instructed that the innocuous act of password sharing constitutes a violation, as this proposed instruction suggests. Certainly, neither the state nor federal anti-hacking statutes were meant to criminalize information sharing in support of patient care. The "without permission" special instruction is an incorrect statement of law.

Instruction No. 75

**DISPUTED: Violation of California Unfair Competition Law ("UCL"), § 17200 *et seq.***

To prove that either party violated California's Unfair Competition Law ("UCL") claim, the other party must show that it has suffered an injury in fact, that is, an economic injury caused by unfair competition. Unfair competition includes any unlawful, unfair or fraudulent business act or practice.

**RTZ's Position**

Intus's proposed three Unfair Competition Law ("UCL") instructions are not needed.  A UCL claim is equitable and carries no right to a jury trial, which is why RTZ proposed no UCL instructions of its own. (*Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal. 5th 279, 335 (2020) [UCL claims are equitable and afford "no right to a jury trial … either as a statutory or constitutional matter"]; *Hodge v. Superior Court*, 145 Cal. App. 4th 278, 284–86 (2006) [UCL remedies are equitable, and borrowing an "unlawful"-prong predicate imports only the liability standard, not any jury-trial right]; *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839–44 (9th Cir. 2020) [federal courts apply equitable principles to UCL claims seeking restitution].) RTZ reserves its objections to the substance of the three instructions should the Court elect to submit any UCL question to an advisory jury.

**Intus' Position**

Intus recognizes this is an equitable issue that will be decided by the Court and provides the jury instruction to the extent an advisory jury verdict is desired by the court. *See* Fed. R. Civ. P. 39(c).

Source / Authority
*Zhang v. Super. Ct.*, 57 Cal. 4th 364, 372 (2013) (citing Cal. Bus. & Prof. Code § 17204); Cal. Bus. & Prof. Code § 17200.

Instruction No. 76

### DISPUTED: CDAFA & CFAA—Password Sharing

Password sharing among Intus and the Intus Clients who use PACECare is not a violation of CDAFA or CFAA, nor does password sharing otherwise constituted unauthorized "access".

Source / Authority

California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502) or the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030); *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 863 (9th Cir. 2012); *See Nosal I*, 676 F.3d at 861; *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016)

**Intus' Position: CDAFA & CFAA — Password Sharing**

The jury should be instructed that password sharing is not a violation of the California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502) or the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030). This is not controversial and is well established by law. Intus' clients expressly granted Intus access to their data via their credentials to the RTZ system—the contracts between RTZ and PACE clients make clear that the EMR data stored on PACECare belongs to the PACE programs themselves, not to RTZ.

Courts have made clear that the CFAA and CDAFA are not intended to sweep in password or credential sharing as "unauthorized access." *U.S. v. Nosal (Nosal I)*, 676 F.3d 854, 861 (9th Cir. 2012) (noting that "it's very common for people to let [others] check their email or access their online accounts. . . . few imagine they might be marched off to federal prison for doing so"); *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 278 (N.D. Ill. 2020) (rejecting CFAA claim on grounds that the court "knows of no cases in which a federal court has deemed simple password sharing between a principal and an agent a violation of that antihacking law"); *Lateral Link Grp., LLC v. Springut*, No. LA CV14-05695 JAK (JEMX), 2016 WL 11785212, at *3 (C.D. Cal. Oct. 7, 2016) ("The doctrine of lenity requires an interpretation of [CDAFA] that avoids criminalizing" computer access through false credentials). Thus, the jury should be instructed, consistent with the law, that password sharing does not constitute a violation of the statutes.

**RTZ' Position**

This instruction states an inaccurate legal conclusion designed to undermine RTZ's counterclaims. Intus asks the Court to instruct that "password sharing is not a violation" of CDAFA or the CFAA as a categorical matter, relying on *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (*Nosal I*), and district-court cases applying it. Those authorities are inapposite. *Nosal I* addressed an *insider* (an employee with his own authorized access) and held only that the CFAA does not criminalize an authorized user's *misuse* of information he was permitted to obtain. (676 F.3d at 863–64.) Intus is not an insider, but a competitor that entered RTZ's system using credentials shared by third parties without RTZ's permission.

The controlling authority for that scenario holds the opposite of what Intus proposes. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067–69 (9th Cir. 2016) holds that a third party accesses a system "without authorization" once the owner has not permitted its access, even though it used valid credentials supplied by consenting users. Under CDAFA, a person who logs in with a valid password but without the owner's permission, and then takes or uses data, violates section 502. (*United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016).)  Whether Intus's access was authorized turns on RTZ's licensing terms and its express refusal of access, not on the abstract permissibility of "password sharing."

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 77

**DISPUTED: RTZ's Counterclaims—Data at Issue**

The parties have stipulated that the electronic health information data stored on PACECare does not belong to RTZ; instead, it belongs to the PACE customers who contract with RTZ to store their patient's health information on the PACECare system. As you analyze whether Intus accessed, used, damaged, or interfered with any data in this case, you are instructed that the electronic health information data belonging to the PACE programs cannot serve as the basis for liability under any of RTZ's counterclaims.

Source / Authority
*Garrabrants v. Erhart*, 98 Cal. App. 5th 486, 507 (2023); Cal. Penal Code § 502(e)(1)).

**Intus' Position: RTZ's Counterclaims—Data at Issue**

Intus is "entitled to an instruction about [its] theory of the case if it is supported by law and has foundation in the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). The parties have stipulated, and RTZ has conceded throughout this case, that the electronic health information data stored on PACECare does not belong to RTZ; instead, it belongs to the PACE customers who contract with RTZ to store their patient's health information on the PACECare system. California's Comprehensive Computer Data Access and Fraud Act ("CDAFA") "authorizes 'the owner or lessee of the ... data who suffers damage or loss by reason of a violation of [the statute]" to bring a civil suit." *Garrabrants v. Erhart*, 98 Cal. App. 5th 486, 507 (2023) (quoting Cal. Penal Code § 502(e)(1)). The jury is, therefore, entitled to an instruction that any alleged CDAFA violation premised on unauthorized access or use of data must involve data owned by RTZ—not the PACE programs. In *Erhart*, the appellate court reversed and remanded for retrial because the jury "instruction[s] failed to require the jury to decide whether [plaintiff] owned the at-issue data such that he had standing to bring his claim." *Id*. The prejudice to the defendant arose because the instructions did not make clear that the plaintiff's "interest in the data at issue must be an ownership interest," so the jury "could have construed the instruction as simply asking whether [defendant] took, copied, or used confidential or financial information concerning [plaintiff] but belonging to someone else." *Id*. 508–09. The same risk of prejudice exists here. If not properly instructed, the jury could misunderstand and hold Intus liable for its use of the PACE program's data that is only stored on RTZ's PACECare, as opposed to data that is actually owned by RTZ.

**RTZ's Position**

Intus's proposed data-ownership language is irrelevant, confusing, and designed to mislead. The instruction is also unnecessary because  the parties' stipulated facts for trial already state that RTZ does not own the EHI data, so the jury will be informed of that fact without this argumentative instruction. RTZ's counterclaims concern Intus's unauthorized access to and interference with the PACECare computer *system* (which RTZ indisputably owns) not ownership of the information residing on it. Penal Code section 502 protects the "owner or lessee of the computer, computer system, computer network, computer program, *or* data."  The statute's protection of the system owner does not turn on who owns the data stored there. (Cal. Penal Code § 502(e)(1); *see also* 18 U.S.C. § 1030(a)(5), (g).) Telling the

jury the data does not "belong to RTZ" in an instruction invites the erroneous conclusion that RTZ lacks a protectable interest, conflating access to RTZ's system (the gravamen of the claim) with data ownership (irrelevant to it).

Intus's reliance on *Garrabrants v. Erhart*, 98 Cal. App. 5th 486 (2023), does not support its instruction. *Erhart* addressed a plaintiff's standing where the instructions failed to require the jury to decide whether the plaintiff owned the *at-issue data*. It did not hold that a system owner loses its CDAFA or CFAA interest in unauthorized access to its own computer system merely because third parties own data residing on it. Because the proposed language injects an irrelevant issue that would confuse the jury and unfairly prejudice RTZ, it should be excluded. (Fed. R. Evid. 403.) The instruction is also unnecessary. The parties' stipulated facts for trial already state that RTZ does not own the EHI data, so the jury will be informed of that fact without this argumentative instruction.

Instruction No. 78

**DISPUTED: CFAA—Statute of Limitations**

Intus contends that RTZ's CFAA claim was not filed within the time set by law. To succeed on this defense, Intus must prove that RTZ's claimed harm occurred before June 20, 2022.

Source / Authority
CACI No. 454; 18 U.S.C. § 1030(g)

**Intus' Position: CFAA — Statute of Limitations**

It is unclear what RTZ's basis could be for objecting to the statute of limitations instruction on RTZ's CFAA claim. The instruction states simply that, "Intus contends that RTZ's CFAA claim was not filed within the time set by law. To succeed on this defense, Intus must prove that RTZ's claimed harm occurred before June 20, 2022." The proposed instruction directly tracks the language of CACI 454. The specific date is supported by 18 U.S.C. § 1030(g): "No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage."

RTZ brought its counterclaim on June 20, 2024 and the proposed instruction's reference to June 20, 2022 is thus consistent with the two-year limitations period. In response to the counterclaim, Intus plead statute of limitations as an affirmative defense. (Dkt. No. 48, 16th Affirmative Defense). The jury should be instructed that RTZ is time-barred from any recovery under the CFAA for harm that occurred before June 20, 2022, consistent with the statute and Intus' affirmative defense.

**RTZ's Position**

The instruction misstates the accrual rule and improperly asserts a date. The CFAA period runs "within 2 years of the date of the act complained of *or the date of the discovery of the damage*." (18 U.S.C. § 1030(g) (emphasis added).) Intus inserted a single cutoff date and ignored the alternative discovery language. By telling the jury that RTZ's claim is time-barred for any harm "that occurred before June 20, 2022" without accounting for the discovery prong, Intus's proposal would foreclose recovery for conduct RTZ could not have discovered until later.

Further, the instruction is not supported by Intus's answer. Intus's Sixteenth Affirmative Defense pleaded only that RTZ's counterclaims are "in their totality or in part, time barred by the applicable statute of limitations and/or laches." (Dkt. 48.) It identified no limitations period, no accrual date, and no particular counterclaim, giving RTZ no fair notice of the theory Intus now advances. (*Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1172 (N.D. Cal. 2010) [concluding defendant did not allege sufficient facts to provide notice of its defenses].)

Having pleaded the defense only in the abstract, Intus cannot now supply through a jury instruction the specific two-year CFAA period and the specific June 20, 2022 cutoff date that appear nowhere in its answer. RTZ objects to the instruction on this independent ground as well.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 79

**DISPUTED: CFAA—Damages**

The only damages available under the CFAA are damages based on "revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." Lost profits from allegedly misappropriated data are not available under the CFAA.

Source / Authority
18 U.S.C. § 1030(e)(11); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) (quoting *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2012) (en banc)).

**Intus' Position: CFAA — Damages**

Intus' CFAA instruction is to an offense, conducting a damage assessment, and restoring consistent with CFAA, related case law, and the damages pled by RTZ in this case. Notwithstanding, RTZ suggests that this instruction oversimplifies the permitted damages and omits part of the statute. The portion of the statute RTZ likely refers to as omitted is that damages may include "the cost of responding the data, program, system, or information to its condition prior to the offense …" U.S.C. § 1030(e)(11). It is unclear what RTZ intends to argue with respect to purported damages tied to "responding to an offense" or "damage assessment" or "restoring the data"—there has been no evidence RTZ incurred any such damage nor does RTZ's damages expert quantified such numbers.

The Ninth Circuit in *Andrews v. Sirius XM Radio Inc.*, emphasized the importance of limiting damages available under CFAA, and the jury should consistently be instructed of that here:

> The statute's "loss" definition—with its references to damage assessments, data restoration, and interruption of service—clearly limits its focus to harms caused by computer intrusions, not general injuries unrelated to the hacking itself. […] any theory of loss must conform to the limited parameters of the CFAA's definition. And although the definition does include "revenue lost," that refers *only* to losses that occurred "because of interruption of service."

*Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019). Instructing the jury to consider damages relating to "responding to an offense" under these circumstances does the opposite of keeping CFAA damages tailored. The additional language in the statute is likely to confuse the jury.

**RTZ's Position**

Intus's instruction tells the jury that the "only" CFAA damages available are those based on "interruption of service." That misstates the statute. The CFAA defines "loss" in two independent parts: (1) "the cost of responding to an offense, conducting a damage assessment, and restoring the [system]"; and (2) "revenue lost … or other consequential damages incurred because of interruption of service." (18 U.S.C. § 1030(e)(11).) The "interruption of service" language modifies only the second category. The first-category costs of responding, assessing, and restoring are recoverable regardless of any interruption. Intus quotes only the second category and omits the first, and concludes lost profits are not recoverable. The court in *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004), specifically held that loss of business and business goodwill constituted recoverable economic damages under CFAA.

Intus's cited case of *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) ties CFAA "loss" to the full set of categories in § 1030(e)(11), including the first-category response costs. RTZ pleads exactly such loss under § 1030(g). Whether RTZ proves those costs is a question for the jury, not a basis for instructing the CFAA's first damages category out of existence.

Instruction No. 80

**DISPUTED: CDAFA—Damages**

Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. RTZ must articulate its theory of loss in a concrete way.

Source / Authority
California Computer Data Access and Fraud Act ("CDAFA") (Cal. Pen. Code § 502(e)(1)); *Lineberry v. AddShopper, Inc.*, No. 23-CV-01996-VC, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025).

**Intus' Position: CDAFA — Damages**

The jury should be instructed that, consistent with CDAFA, the plaintiff must be able to articulate the theory of loss "in a concrete way." *Lineberry v. AddShopper, Inc.,* No. 23-CV-01996-VC, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025). The statute itself states "Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." Cal. Pen. Code § 502(e)(1). The instruction merely states the law.

**RTZ's Position**

Intus's instruction recites only § 502(e)(1)'s verification-cost language and implies those are the sole recoverable damages. However, § 502(e)(1) provides that compensatory damages "shall *include*" verification costs (a floor, not a ceiling). The statute authorizes "compensatory damages" generally, and the verification-cost clause adds to that recovery. (Cal. Penal Code § 502(e)(1).)

The instruction's last sentence (that "RTZ must articulate its theory of loss in a concrete way") compounds the error. That phrase comes from *Lineberry v. AddShopper, Inc.*, No. 23-CV-01996-VC, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025), which addressed the sufficiency of a *complaint* at the pleading stage, not the measure of damages at trial. Importing a pleading standard into the jury charge would confuse the jury and improperly raise RTZ's burden. RTZ's instruction states the § 502(e)(1) measure correctly and should be given.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 81

**Violation of the Computer Fraud and Abuse Act –
Damage and Loss Defined**

"Damage" means any impairment to the integrity or availability of data, a program, a system, or information.

"Loss" means any reasonable cost to the victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. Loss may also include the value of employee time spent analyzing, investigating, and responding to unauthorized access, including time spent identifying and invalidating log-in credentials created or used without authorization and investigating the operation of an automated script on the system.

Authority
18 U.S.C. § 1030(e)(8), (e)(11); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1066 (9th Cir. 2016)

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 82

## DISPUTED: Damages Overview – Categories and Proof

Your role in this case is to decide what damages, if any, either party is entitled to receive. You should base your decision on all of the evidence, regardless of which party presented it.

There are two categories of damages in this case that you may award.

The first category of damages that you must consider are called compensatory damages. The purpose of compensatory damages is to put a party in as good a position as they would have been had wrongful conduct not occurred. The party seeking damages has the burden of proving compensatory damages by a preponderance of the evidence. This means that you must be persuaded by the evidence that the claim of damages is more probably true than not true.

The second category that you may consider is punitive damages. Both parties seek punitive damages: Intus on its intentional interference claims, and RTZ on its Sts under the California Comprehensive Computer Data Access and Fraud Act, for trespass to chattels, and for inducing breach of contract. You may award punitive damages if you find that a party has proven by clear and convincing evidence that the other party's conduct was done with fraud, oppression, or malice.

In determining the amount of damages, if any, to award, you should be guided by dispassionate common sense. You must use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts in the evidence. You may not award damages based on sympathy, speculation or guesswork.

Authority / Source
Ninth Circuit Model Jury Instructions Nos. 1.6, 5.1; CACI Nos. 200, 3900, 3940; Cal. Civ. Code, § 3333; *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747, 774 (2012)

**RTZ's Position: Damages Overview — Categories and Proof**

Intus would prefer that the Ninth Circuit Model Instructions 1.6 and 5.1 be split into two separate instructions. However, it identifies no misstatement of law - only a preference for separation. There is no rule prohibiting the consolidation of related instructions into a single, coherent instruction. Courts routinely combine related concepts to reduce repetition and juror confusion, and a single damages overview orients the jury to both compensatory and punitive damages before the claim-specific instructions. RTZ's instruction correctly states the burden of proof, the compensatory-damages standard, and the clear-and-convincing standard for punitive damages, and it applies evenly to both parties.

**Intus' Position**

RTZ does not explain how Special Instruction No. 24 is any more coherent than following the pattern instructions, or why a "single damages overview" is needed. The model instructions contemplate separate instructions for compensatory and punitive damages and RTZ has not provided a compelling reason to combine them. In fact, because compensatory and punitive damages are separate analyses, combining the instructions risks jury confusion.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 83

**DISPUTED: Damages – Causation**

A party may recover damages only for harm that was caused by the other party's wrongful conduct. Conduct causes harm if the harm would not have occurred without the conduct and the conduct was a substantial factor in bringing about the harm. A substantial factor is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor, but it does not have to be the only cause of the harm.

In deciding causation, you must distinguish harm caused by the wrongful conduct you have found from harm caused by other factors, including lawful competition, a party's own business decisions, the decisions of customers made for independent reasons, or general market conditions. A party may not recover damages for losses that would have occurred anyway, or that resulted from causes other than the conduct you have found to be wrongful.

Authority / Source
CACI 430, 3901; Ninth Circuit Model Civil Jury Instruction No. 5.1

**RTZ's Position: Damages — Causation**

A combined causation instruction is proper and efficient.  RTZ's version states the substantial-factor standard correctly while adding the necessary point that a party may not recover for harm caused by lawful competition, its own business decisions, customers' independent choices, or general market conditions.

The apportionment principle is a correct statement of law and is essential in a competitor dispute where much of the claimed harm may have independent causes. Separating the instructions (as requested by Intus) would not add clarity.

**Intus' Position**

Any purported efficiency in combining instructions is defeated by the risk of confusing and misleading the jury in Special Instruction No. 25. RTZ combines three different pattern instructions and additionally throws in the "lawful competition" reference, a reference that is not found in any of those cited pattern instructions. Lawful competition is not a defense to all of the claims at issue. Highlighting just one defense in the damages instruction improperly elevates the importance of the defense. The pattern instructions are the clear and best path to instructing the jury efficiently and without the risk of confusion and thus the Court should apply CACI 430 and 3901.

Instruction No. 84

**No Duplicative Damages**

Each party asserts multiple claims arising from the same events, and some claims seek compensation for the same items of harm. A party is entitled to be compensated only once for each item of harm it has proved, no matter how many legal claims that harm supports. If you find for a party on more than one claim, you must not award damages for the same loss more than once. The special verdict form asks you to state your damages findings by category of harm rather than by claim; you should determine the amount of each category once, based on all the evidence.

Authority / Source
*Tavaglione v. Billings*, 4 Cal.4th 1150, 1158–59 (1993); CACI 3934

Instruction No. 85

**DISPUTED: Compensatory Damages – Lost Profits – Generally**

Both Intus and RTZ seek damages measured in whole or in part by lost profits. To recover damages for lost profits, a party must prove that it is reasonably certain it would have earned profits but for the other party's wrongful conduct.

To decide the amount of damages for lost profits, you must determine the gross amount the party would have received but for the other party's conduct, and then subtract from that amount the expenses, including the value of labor, materials, and other costs, that the party would have had if the conduct had not occurred.

The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss. Lost profits may not be based on speculation.

For anticipated profits from prospective business, the evidence must show with reasonable certainty both that the profits would have been earned and their amount. Lost profits may not be recovered if it is uncertain whether any profit would have been earned at all.

Authority / Source
CACI No. 3903N; *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal.4th 747, 774 (2012); *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 883 (2002)

JOINT PROPOSED JURY INSTRUCTIONS

**RTZ's Position: Compensatory Damages — Lost Profits**

Intus requests the omission of language that supports the well-settled rule that anticipated profits from prospective business must be proved with reasonable certainty and may not be recovered where it is uncertain whether any profit would have been earned at all. (*Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002).)  The language Intus wants to cut is the language that protects Intus from an overreaching lost-profits award and protects RTZ from a speculative one.

RTZ's instruction is accurate and useful because it states not only what lost profits are, but the standard of proof the jury must apply before awarding them. Deleting it would leave the jury without the governing standard for anticipated profits.

**Intus' Position**

RTZ seeks to add unnecessary language to CACI No. 3903N that is not a correct statement of the law. The proposed instruction tracks CACI up and until RTZ adds language that "Lost profits may not be based on speculation. For anticipated profits from prospective business, the evidence must show with reasonable certainty both that the profits would have been earned and their amount. Lost profits may not be recovered if it is uncertain whether any profit would have been earned at all." The CACI model instruction already states that there "must be a reasonable basis for computing the loss" – in other words, it can't be mere speculation. The additional language also seeks to undercut the proper statement of law in the CACI instruction that "lost profits need not be calculated with mathematical precision." By tacking on the additional language, RTZ seeks to improperly increase Intus's burden of proof. *See White,* 312 F.3d at 1012 ("Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading."); *see also Dang,* 422 F.3d at 805 ("In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered.") The Court should adopt a neutral version of CACI 3903N.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 86

**DISPUTED: Compensatory Damages - Violation of California Comprehensive Computer Data Access and Fraud Act**

If you find that Intus violated the California Comprehensive Computer Data Access and Fraud Act, you must decide the amount of money that will reasonably compensate RTZ for the harm caused by the violation. These damages shall include amounts sufficient to compensate RTZ for the harm it suffered as a result of any violations, including any expenditure reasonably and necessarily incurred by RTZ to verify that its computers, computer system, computer network, computer program, and/or data was or was not altered, damaged, or deleted by the access.

Damages may also include the reasonable value of the access to and use of the PACECare system that Intus wrongfully obtained. In determining that value, you may consider what a party in Intus' position would have paid RTZ for authorized access to the PACECare system.  RTZ is not required to prove physical damage to a computer in order to recover these damages.

You may also award disgorgement of benefits unjustly obtained by Intus as a result of the violation if you find that such benefits were obtained through the conduct that violated the California Comprehensive Computer Data Access and Fraud Act. In determining the amount of any disgorgement, you may consider the value of the unauthorized access and use of the PACECare system or any benefit Intus obtained from that access.

Any award must be based on the evidence and may not duplicate any other damages awarded.

Authority / Source
Cal. Penal Code, § 502(e)(1); Order Denying Motion for Relief from Non-Dispositive Pretrial Order (May 11, 2026), Dkt. 136

JOINT PROPOSED JURY INSTRUCTIONS

**RTZ's Position: Compensatory Damages — CDAFA**

Intus' competing instruction makes verification costs the only category it names, and implies those are the *only* recoverable damages. This misreads the statute.  Section 502(e)(1) authorizes compensatory damages generally and then specifies that they "shall *include*" verification costs. It does not limit recovery to verification costs alone. Section 502(e)(1) authorizes recovery of "compensatory damages" and then provides that "[c]ompensatory damages *shall include* any expenditure reasonably and necessarily incurred … to verify" the integrity of the system or data. Compensatory relief includes the reasonable value of the wrongful access and the defendant's unjust benefit, not verification costs alone. (*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016) [affirming § 502 liability and addressing compensatory relief beyond verification costs]; *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–600 (9th Cir. 2020) [§ 502 permits recovery measured by the value of the wrongfully obtained access/data and the defendant's unjust enrichment].)

RTZ's instruction should be used as it states the measure correctly and completely. Intus' instruction also includes an argumentative final sentence untethered to the measure of damages.

**Intus' Position**

RTZ's proposed instruction is a misstatement of the law. RTZ combines four different pattern instructions (CACI 2201, 2202, 3901, 3903N) and puts its spin on the evidence related to Intus's lost profits calculations. There is no need for the instruction or RTZ's description of the evidence supporting Intus's lost profits claim. The model instructions already instruct the jury on damages and causation. There is nothing further that is needed. Moreover, RTZ's proposed instruction further omits more neutral language from CACI 3901, for example, "Intus does not have to prove the exact amount of damages that will provide reasonable compensation for the harm." RTZ seems to suggest the opposite in the statement that "the total amount you aware must not exceed the loss Intus actually proved[.]" Intus proposes the Court adopt a neutral version of CACI 3901 and 3903N in lieu of RTZ's proposed damages instructions.

JOINT PROPOSED JURY INSTRUCTIONS

Instruction No. 87

**DISPUTED: Compensatory Damages – Intus' Intentional Interference Claims**

If you decide that Intus has proved either or both of its claims for intentional interference with contractual relations or intentional interference with prospective economic advantage, you must decide the amount of damages that will reasonably compensate Intus for harm caused by RTZ's wrongful conduct. Intus claims the following categories of harm:

1. Lost profits from Intus' pre-existing contracts with its PACE program clients, including contracts that were terminated, suspended, or reduced;

2. Lost profits from specific prospective business opportunities that Intus claims it lost, as reflected in its business records;

3. [Lost profits from additional prospective business opportunities that Intus claims were foreclosed, as estimated through statistical analysis; and]

4. Additional labor and other costs that Intus claims it incurred in responding to RTZ's conduct, including the cost of workaround measures to obtain client data.

You may award damages in a category only if Intus proves that it suffered that harm, that RTZ's wrongful conduct caused it, and the amount of the loss with reasonable certainty, all as explained in these instructions. The total amount you award must not exceed the loss Intus actually proved, and you may not award the same loss more than once even if it appears in more than one category or supports more than one claim.

Authority/ Source
CACI 2201, 2202, 3901, 3903N

**RTZ's Position: Compensatory Damages — Intus' Intentional Interference Claims**

Intus disputes this instruction, but offers nothing in its place for its *own claims*. This instruction accurately sets forth the categories of damages Intus may recover on its interference claims and correctly conditions any award on Intus' proof of the harm, causation, and amount with reasonable certainty. If Intus' objections are sustained and RTZ's instruction is rejected, the jury would be asked to award interference damages with no guidance on what those damages consist of or how to prove them, risking confusion and error.

**Intus' Position**

Special Instruction No. 29 attempts to over broaden the damages actually permitted under CDAFA. The jury should be instructed that, consistent with CDAFA, the plaintiff must be able to articulate the theory of loss "in a concrete way." *Lineberry v. AddShopper, Inc.,* No. 23-CV-01996-VC, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025). The statute itself states "Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." Cal. Pen. Code § 502(e)(1). RTZ adds to the proposed instruction beyond what is contemplated in the statute. For example, the law does not permit RTZ to recover for the value of the access and use of the PACECare system or disgorgement of benefits. The statute lists permitted damages and neither of these are included. RTZ's citation to *In re Facebook* does not save their instruction. The court in that case was addressing a standing issue, not what a party can recover in damages under the act. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). The Court should adopt Intus' proposed instruction which aligns with the law and the record in this case.

Instruction No. 88

**DISPUTED: Compensatory Damages –**
**Violation of the Federal Computer Fraud and Abuse Act**

If you find that Intus violated any of the provisions of the CFAA described above, you may award RTZ damages under the CFAA. These damages may include:

1.    costs of responding to the violation;

2.    costs of conducting a damage assessment;

3.    costs of restoring the data, program, system, or information to its prior condition;

4.    lost revenues or costs incurred due to interruption of service;

5.    costs of investigating the violation;

6.    costs of identifying the violation; and

7.    lost profits, lost sales, lost contracts, lost customers, or other

business losses that RTZ proves were caused by the violation and are

recoverable under the Computer Fraud and Abuse Act.

Authority
18 U.S.C. §§ 1030(e)(11), 1030(g); *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1066 (9th Cir. 2016); *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004)

**RTZ's Position: Compensatory Damages — CFAA**

Intus proposes a competing CFAA-damages instruction that is expressly intended to replace RTZ's more specific instructions (Nos. 23, 29, and 30).  Intus' instruction misstates the statutory definition of "loss" by quoting only half of it.  RTZ's instruction is complete.

The CFAA defines "loss" in two independent parts: (1) the cost of responding to the offense, assessing the damage, and restoring the system; and (2) revenue lost or other consequential damages from an interruption of service. 18 U.S.C. § 1030(e)(11). The interruption-of-service requirement applies only to the second category. Response, assessment, investigation, and restoration costs are recoverable "loss" whether or not any service was interrupted. (*Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019).) RTZ's instruction states the measure correctly because it lists the first-category costs (responding, assessing, restoring, investigating, and identifying) as recoverable independent of any interruption, and accounts separately for interruption-based losses. RTZ's instruction supplies the correct statutory measure and draws the distinction the statute requires.

**Intus' Position**

Intus' proposed CFAA damages instruction is consistent with CFAA, related case law, and the damages pled by RTZ in this case. RTZ appears to try to spread its damages instructions over as many pages and theories as possible to make it seem like there are lots of ways for the jury to give them money. This is not appropriate. And RTZ has never put forth damages theories relating to the many categories it lists in its instruction, for example costs relating to "responding, assessing, restoring" etc. The Ninth Circuit in *Andrews v. Sirius XM Radio Inc.*, emphasized the importance of limiting damages available under CFAA, and the jury should consistently be instructed of that here:

> The statute's "loss" definition—with its references to damage assessments, data restoration, and interruption of service—clearly limits its focus to harms caused by computer intrusions, not general injuries unrelated to the hacking itself. […] any theory of loss must conform to the limited parameters of the CFAA's definition. And although the definition does include "revenue lost," that refers *only* to losses that occurred "because of interruption of service."

*Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019). The Court should thus adopt Intus' version of the damages instruction and decline to instruct the jury of the many, irrelevant ways a party can be awarded damages under the statute, according to RTZ.

# Appendix C:

# Deposition Designations

**MELANIE MARTINEZ DEPOSITION DESIGNATION**

| Designation (Yellow)[1] | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 8:1-4 | | | 12:8-10 | | |
| 8:10-9:12 | Relevance (this Court has already ruled that Collabrios Health LLC operations and conduct are beyond the scope of this litigation). | This is relevant to show Martinez's tenure and explain her background. | 18:9-13 | | |
| 10:12-11:10 | Objection to 10:14-18 only: Relevance (this Court has already ruled that Collabrios Health LLC operations and conduct are beyond the scope of this litigation). | This is relevant to show Martinez's tenure and explain her background. | 18:19-22 | | |
| 11:20-12:7 | | | 19:21-20:16 | | |
| 15:17-16:6 | | | 31:22-32:5 | | |
| 17:6-11 | | | 37:21-23 | | |
| 17:16-18:8 | | | 38:5-23 | | |
| 18:23-25 | Mischaracterizes testimony | The witness understands the question and then clarifies her testimony in the answer. | 39:2-40:7 | | |
| 19:4-6 | | | 48:9-20 | | |
| 19:8-20 | | | 50:4-8 | | |

---

[1] Throughout this document and the highlighted transcripts filed concurrently, yellow highlights represent Intus designations and blue highlights represent RTZ designations.

| Designation (Yellow)[1] | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 20:17-21:6 | | | 54:23-55:15 | Relevance[2] Lacks Foundation | Intus's relevance objection is without merit. Intus's ability to access the EHI data it required for its services through the receipt of "manual" reports (also known as "expanded exports") bear directly on two issues: (1) RTZ's positions with regard to its NDA negotiations with Intus given Intus's ability to access its needed EHI without needing to access RTZ's PACECare system as a basis to evaluate the reasonable |

---

[2] All "Relevance" objections made by Intus throughout this document object to testimony relating to whether the process of PACE programs manually pulling data from PACECare afforded Intus the same data it would have obtained through seamless integration. This point about whether the manual data pulls created a burden pertains exclusively to the facial information blocking element, which the Court has already adjudicated and which has no role in the trial. (*See* Dkt. 203.)

| Designation (Yellow)[1] | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | efforts and articulable reasons why RTZ and Intus could come to an agreement i.e., Intus did not need system access to obtain the data because a viable and reasonable alternative access to data existed (Dkt. 84, 8:8-28); and (2) RTZ's establishment of the Manner Exception to information blocking, i.e., RTZ's provisioning of an alternative machine-readable format to Intus containing requested EHI in lieu of Intus's requested manner of access, i.e., system user |

| Designation (Yellow)[1] | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | access to PACECare. 45 CFR 171.301(a)(1) (Dkt. 84). Further, this Court has already ruled that evidence of HealthIT industry standards are proper for trial including the "common practice [to] exchange EHI using industry-standard tools **such as exported reports** (e.g., Excel, CSV, TXT)…" (Dkt. 203.) (This response is hereinafter, "**Relevance Response A**").[3] <br><br> Foundation: The witness's response is based on her direct knowledge of the facts. |

[3] This "**Relevance Response A**" applies to each Relevance objection asserted by Intus as defined in Footnote 1, above).

| Designation (Yellow)[1] | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 24:19-25:22 | | | 61:18-62:6 | | |
| 29:13-18 | | | 63:19-25 | Speculation | Form objections waived (FRCP 32(d)(3)(B).). |
| 29:21-30:23 | | | 64:3-8 | | |
| 36:17-37:16 | | | 94:5-20 | Relevance | See **Relevance Response A** above. |
| 60:23-61:11 | | | | | |
| 62:7-10 | | | | | |
| 64:9-13 | | | | | |
| 86:22-87:4 | | | | | |
| 92:13-16 | | | | | |
| 92:24-93:2 | | | | | |
| 93:20-94:4 | | | | | |

**MIRANDA CARTER DEPOSITION DESIGNATION**

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 22:22-24:3 | | | 4:15-24 | | |
| 24:9-16 | | | 29:14-18 | | |
| | | | 34:24-35:6 | | |
| 26:4-25 | | | 41:11-42:17 | Vague as to "Impact" | <u>Vague</u>: The witness responded to the question evidencing her comprehension of what was asked. |
| 29:7-12 | | | 42:25-43:8 | | |
| 30:9-31:1 | | | 45:1-4 | Leading Lacks Foundation | <u>Leading</u>: Form objections waived (FRCP 32(d)(3)(B).) |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | <u>Foundation</u>: Form objections waived (FRCP 32(d)(3)(B).) The question does not lack foundation and seeks the witness' understanding of the origin of a statement she made. |
| 35:15-36:8 | | | 51:23-52:8 | | |
| 37:24-38:7 | | | 52:18-53:6 | | |
| 39:2-13 | | | 53:16-23 | | |
| 40:2-10 | | | 54:4-11 | Non-responsive Lacks Foundation | <u>Non-responsive</u>: The witness's response is a direct answer to the question asked and is therefore responsive. <br><br> <u>Foundation</u>: The question does not lack foundation: it asks whether the witness "knows" the facts posed in the question; a question the witness actually answered. |
| 40:14 | | | 57:1-8 | Relevance | This excerpt is provided for context, i.e., to |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | demarcate the commencement of Intus's counsel's cross-examination. |
| 43:15-44:19 | | | 65:5-19 | Relevance | See **Relevance Response A** (above). |
| 45:6-8 | | | 66:7-11 | Relevance | See **Relevance Response A** (above). |
| 45:12-15 | | | 66:17-25 | Relevance | See **Relevance Response A** (above). |
| 45:17-21 | | | | | |
| 46:14-47:2 | | | | | |
| 59:4-60:14 | | | | | |
| 64:22-65:4 | | | | | |
| 67:17-68:3 | | | | | |
| 68:5-6 | | | | | |
| 68:8-69:8 | | | | | |
| 70:8-71:14 | | | | | |

**ALEXANDRIA LUETH DEPOSITION DESIGNATION**

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | 11:14-24 | | |
| 9:8-22 | | | 16:22-17:12 | | |
| 10:6-10 | | | 17:18-25 | | |
| 10:22-11:13 | | | 20:11-17 | | |
| 12:3-11 | | | 25:2-4 | | |
| 13:5-21 | | | 29:20-30:1 | | |
| 13:24-14:16 | | | 30:12-20 | Relevance | See **Relevance Response A** (above). |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 14:25-16:12 | Relevance. | This is relevant background about how the PACE programs operate and function. | 32:16-18 | Relevance | See **Relevance Response A** (above). |
| 18:8-19:2 | | | 33:5-9 | | |
| 19:16-20:10 | | | 37:14-22 | | |
| 22:13-23:11 | | | 41:22-24 | | |
| 23:24-25:1 | | | 42:6-20 | Non-responsive Lacks Foundation | Form objections waived (FRCP 32(d)(3)(B).) <br><br> Non-responsive: The witness responded to the question asked (i.e., the integration sequence) and thus was responsive. <br><br> Foundation: The witness answered based on her personal knowledge; foundation is therefore established. |
| 26:14-27:17 | Lacks foundation <br><br> Speculative <br><br> Mischaracterizes testimony | The witness indicated she understood and responded accordingly | 43:13-23 | | |
| 27:23-24 | | | 44:13-17 | Relevance | See **Relevance Response A** (above). |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 28:2-5 | | | 47:21-48:13 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) <br><br> Foundation: The witness responds based on personal knowledge. <br><br> Speculation: The witness responds based on personal knowledge. |
| 28:17-29:3 | Speculative | Form objections waived (FRCP 32(d)(3)(B).) as to 28:17-25. | 49:5-8 | | |
| 29:7-11 | | | 51:25-52:5 | | |
| 29:13-19 | | | 52:13-53:2 | | |
| 30:2-11 | | | 53:8-9 | | |
| 31:4-20 | | | 59:2-5 | | |
| 31:25-32:15 | | | 60:16-25 | | |
| 33:10-34:5 | | | 62:6-63:1 | | |
| 36:10-17 | Lacks foundation | The witness opined on her own impression, which she has foundation to do. | 63:11-64:19 | Relevance | See **Relevance Response A** (above). |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 37:6-12 | Vague | The witness understood the question and responded. | 66:12-67:3 | Speculation | Form objections waived (FRCP 32(d)(3)(B).)<br><br>Speculation:<br>The witness responds based on personal knowledge. |
| 37:23-38:14 | | | 75:10-76:1 | | |
| 42:21-43:12 | | | 76:6-12 | Relevance | See **Relevance Response A** (above). |
| 43:24-44:2 | Vague<br><br>Lacks foundation | Vague<br>The witness understood the question and responded.<br><br>Lacks Foundation<br>The witness was the person consuming the data analytics service and has the foundation to testify about her preferred method. | 87:14-19 | Relevance 403 | Relevance:<br>Witness response bears on her impressions and experience with RTZ as a basis to work for the company. |
| 44:5-12 | | | 89:4-10 | | |
| 45:4-15 | Lacks foundation | The document speaks for itself and | 90:5-9 | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | Mischaracterizes document | the witness has the foundation to testify about her preferred method of using Intus' services. | | | |
| 45:19-24 | | | 91:22-24 | | |
| 46:16-47:20 | | | 93:23-24 | | |
| 50:14-51:24 | | | 97:18-98:18 | | |
| 57:24-59:1 | | | 99:5-13 | | |
| 59:22-24 | Mischaracterizes document | The document speaks for itself and the witness is on the email, so she can testify about the contents. | 102:15-21 | | |
| 60:3-15 | | | 103:2-7 | | |
| 61:4-11 | | | 109:14-18 | | |
| 61:19-62:5 | Relevance | This is relevant to show that Intus employees were using their own names and emails, so there was no attempt to defraud or conceal. | 118:12-16 | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 65:2-66:6 | Vague as to "important service." | The witness understood and responded. | 119:21-25 | Relevance | This excerpt is provided for context, i.e., to demarcate the commencement of RTZ's counsel's cross-examination. |
| 66:9-10 | | | 120:5-121:8 | | |
| 70:14-24 | Speculative | The witness opined on her own impression, which she has foundation to do. | 121:17-24 | | |
| 71:3-4 | | | 123:3-5 | | |
| 72:11-74:8 | | | 123:24-125:20 | Lacks Foundation Speculation | Foundation: The witness is responding based on personal knowledge and her direct involvement in the email communication implicated by the question. Speculation: The witness is responding based on personal knowledge. |
| 74:12-75:9 | | | 127:7-10 | | |
| 77:14-19 | | | 127:24-129:4 | Lacks Foundation | Foundation: The witness is responding based on personal |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | knowledge and her direct involvement in the email communication implicated by the question. |
| 84:17-19 | Speculative | | 129:12-132:25 | Argumentative Asked and Answered Lacks Foundation Speculation Relevance | Relevance: See **Relevance Response A** (above). Foundation: The witness is speaking based on her personal knowledge in her capacity as an employee of the PACE organization implicated by the questions. Speculation: There is no speculation.  The witness is speaking based on her personal knowledge in her capacity as an employee of the PACE organization implicated by the questions. Argumentative/Asked and Answered: Objections without merit.  The |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | questions posed are neither argumentative, and were not previously asked. |
| 84:21 | | | 133:16-137:24 | Relevance Calls for Legal Conclusion Vague as to "HIPAA concerns" | Relevance: See **Relevance Response A** (above). In addition, the questions and answers go directly to issues of EHI access within the context of HealthIT industry norms which this Court has already ruled is relevant. Further, the testimony is directly relevant to the witness's concerns about the login credential use requested by Intus and her stated concerns as expressed in the implicated email in which she states that Intus's request could create "compliance" issues.<br><br>Legal Conclusion: This objection has no merit. The witness was the PACE |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | | | | organization's compliance officer and can speak to HIPAA "concerns" (as opposed to violations). <br><br> Vague: <br>The witness's response is not vague and addresses her concerns about the login credential use requested by Intus and her stated concerns as expressed in the implicated email in which she states that Intus's request could create "compliance" issues. |
| 86:11-14 | | | 138:3-139:5 | Relevance | Relevance: <br>This testimony is relevant to the issue of why this PACE customer stopped using Intus's data analytics services and states that disengagement resulted from her team's lack of use of Intus's tool as opposed to RTZ's conduct. |
| 89:1-3 | Relevance | This is relevant to show RTZ's | | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | motive to block Intus' access. RTZ was a competitor creating a competing product intended to obviate the need for Intus. This pertains to motive, credibility, RTZ's good faith in access negotiations (an element of the Manner Exception), and Intus' unclean hands defense. (hereinafter "Relevant to RTZ's Motive"). | | | |
| 89:11-90:4 | Relevance | Relevant to RTZ's Motive | | | |
| 90:10-14 | Relevance | Relevant to RTZ's Motive | | | |
| 90:22-91:13 | Relevance | Relevant to RTZ's Motive | | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 92:12-18 | Relevance | Relevant to RTZ's Motive | | | |
| 92:23-93:4 | Relevance | Relevant to RTZ's Motive | | | |
| 93:15-22 | Relevance | Relevant to RTZ's Motive | | | |
| 93:25-94:18 | Relevance | Relevant to RTZ's Motive | | | |
| 94:20-21 | | | | | |
| 95:6-96:11 | Relevance (Collabrios is not at issue in this case) | Most of this testimony pertains to the witness' time working at RTZ. And the portion pertaining to Collabrios is to establish her tenure. | | | |
| 97:4-17 | | | | | |
| 98:19-99:4 | | | | | |
| 99:16-20 | | | | | |
| 100:23-101:7 | Vague<br><br>Unintelligible | The witness understood and answered. | | | |
| 101:11 | | | | | |
| 101:19-102:14 | | | | | |
| 103:22-104:14 | | | | | |
| 107:20-23 | | | | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 109:4-5 | Relevance<br><br>Speculative<br><br>Lacks foundation | This is relevant to Intus' defense that any revenues accrued to Collabrios not RTZ after October 2024. The witness has the foundation to testify about this given that she worked at both companies. | | | |
| 109:11-12 | | | | | |
| 111:6-112:16 | Vague as to "core commonalities" and "sort and filter"<br><br>Lacks foundation | The witness understood and answered the question.<br><br>The witness has foundation to respond, as she has experience with all the EMRs about which she testified. | | | |
| 112:18-22 | | | | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 112:25-113:4 | | | | | |
| 113:6-8 | | | | | |
| 139:15-20 | Speculative | The witness is not speculating. She opined that she does not recall a time in which Intus accessed SCP's PCO account without first asking SCP. | | | |
| 139:24-140:2 | Speculative | The witness is not speculating. She opined that she does not recall a time in which Intus accessed SCP's PCO account without first asking SCP. | | | |

**KEVIN LATHROP DEPOSITION DESIGNATION**

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 26:9-27:2 | | | 39:7-9 | | |
| 27:8-28:1 | | | 40:14-17 | | |
| 29:4-30:8 | Objection to 30:2-8 only: Relevance (this Court has already ruled that Collabrios Health LLC issues are beyond the scope of this litigation). | This testimony is relevant to establish the witness' role. This testimony does not probe the relationship between RTZ and Collabrios, which was the crux of the Court's order. | 78:4-79:11 | | |
| 31:7-9 | | | 80:5-15 | | |
| 31:25-32:10 | | | 82:16-21 | | |
| 33:9-34:25 | | | | | |
| 35:8-12 | Mischaracterizes testimony | The witness subsequently answers and clarifies his testimony. | 82:25-83:9 | | |
| 35:19-36:6 | | | 83:22-84:19 | | |
| 36:10-21 | | | 86:14-21 | | |
| 38:21-39:6 | Vague | The witness responded to the question evidencing his comprehension of what was asked. | 86:24-87:7 | | |
| 39:10-11 | | | 88:4-8 | | |
| 39:21-40:13 | Vague | The witness responded to the question evidencing his comprehension of what was asked. | 88:24-90:17 | | |
| 40:19-42:12 | | | 91:18-92:7 | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 43:19-23 | | | 92:24-93:23 | | |
| 51:2-18 | | | 94:7-18 | Leading | Leading: The questions are not leading and do not suggest the answer. |
| 51:23-54:16 | | | 95:7-23 | Vague Leading | Leading: The questions are not leading and do not suggest the answer. Vague: The questions are not vague and address audit logs the witness had prepared. |
| 55:24-56:1 | | | 96:17-97:24 | Leading | Leading: The questions are not leading and do not suggest the answer. |
| 57:8-13 | | | 98:8-99:2 | Leading | Leading: The questions are not leading and do not suggest the answer. |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 59:5-60:7 | | | 107:12-18 | | |
| 60:24-61:6 | | | | | |
| 61:15-21 | | | | | |
| 62:18-22 | | | | | |
| 64:6-22 | Relevance (this Court has already ruled that Collabrios Health LLC issues are beyond the scope of this litigation). | The Court specifically allowed questioning as to Mr. Lathrop's conversations with RTZ's experts (Dkt. 181). | | | |
| 67:3-15 | | | | | |
| 79:12-80:4 | | | | | |
| 80:16-25 | | | | | |
| 82:5-10 | | | | | |
| 82:15 | | | | | |
| 83:10-14 | | | | | |
| 83:20 | | | | | |
| 84:20-24 | | | | | |
| 85:5-6 | | | | | |
| 104:3-16 | Objection to 104:12-16: Relevance (this Court has already ruled that Collabrios Health LLC issues are beyond the scope of this litigation). | This testimony is relevant to establish how PACECare functioned. This testimony does not probe the relationship between RTZ and Collabrios, which was the crux of the Court's order. | | | |
| 105:15-21 | | | | | |
| 106:9-107:11 | | | | | |
| 107:19-111:22 | | | | | |

| Designation (Yellow) | Objection | Response to Objection | Counter-designation (Blue) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 112:12-19 | | | | | |

## EVAN WALTERS DEPOSITION DESIGNATION

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 5:2-6 | | | 42:25-43:21 | | |
| 12:13-13:12 | | | 48:24-49:2 | | |
| 16:11-18:6 | | | 49:24-50:9 | | |
| 18:10-17 | | | 57:9-15 | | |
| 18:22-20:17 | | | 62:5-18 | | |
| 23:13-18 | | | 63:5-64:7 | | |
| 24:15-25:9 | | | 69:4-70:10 | | |
| 26:1-14 | | | 70:22-71:9 | | |
| 27:22-28:4 | | | 90:16-22 | | |
| 29:2-9 | | | 94:13-25 | | |
| 43:22-44:3 | | | | | |
| 47:12-48:23 | | | 110:4-23 | | |
| 49:3-13 | | | | | |
| 50:10-53:7 | Leading Relevance | Leading:<br><br>Form objections waived (FRCP 32(d)(3)(B).)<br><br>Leading permitted for adverse witness (FRE 611(c).<br><br>Relevance: See **Relevance Response A** (above). | | | |
| 56:4-11 | Lacks Foundation Speculation | Form objections waived | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | (FRCP 32(d)(3)(B).) | | | |
| 59:16-60:15 | Lacks Foundation Speculation Relevance | <u>Relevance:</u> See **Relevance Response A** (above).<br><br><u>Foundation / Speculation:</u> Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 65:16-66:8 | | | | | |
| 76:9-23 | | | | | |
| 77:10-78:22 | | | | | |
| 79:10-21 | | | | | |
| 84:13-21 | | | | | |
| 85:4-20 | | | | | |
| 86:17-90:15 | Lacks Foundation Speculation | <u>Foundation:</u> Form objections waived (FRCP 32(d)(3)(B).)<br><br><u>Speculative:</u> Not speculative. The witness responds based on personal knowledge. | | | |
| 90:23-93:22 | | | | | |
| 95:1-96:12 | Lacks Foundation Speculation | <u>Foundation:</u> The witness responds based on personal knowledge | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | about an login account issued to him.<br><br>Speculative: The witness responds based on personal knowledge about an login account issued to him. | | | |
| 98:9-14 | | | | | |
| 99:9-101:22 | | | | | |
| 102:10-103:6 | | | | | |
| 106:5-22 | | | | | |
| 108:18-109:3 | | | | | |
| 109:15-110:3 | | | | | |
| 112:2-14 | | | | | |
| 119:1-120:11 | | | | | |
| 120:20-121:2 | | | | | |
| 123:20-125:21 | | | | | |
| 127:20-128:15 | Leading Argumentative | Form objections waived (FRCP 32(d)(3)(B).)<br><br>Leading: Leading permitted for adverse witness (FRE 611(c). | | | |
| 130:13-19 | | | | | |
| 134:4-135:2 | | | | | |
| 139:3-7 | Lacks Foundation Speculation | Form objections waived | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | (FRCP 32(d)(3)(B).) | | | |
| 142:15-143:13 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 147:19-148:16 | Lacks Foundation Speculation Incomplete Hypothetical | Foundation: The witness is responding based on his impressions and reactions for which he has a foundation to do.<br><br>Speculation: The witness is not speculating. He is answering based on his own impressions and reactions.<br><br>Incomplete hypothetical: The hypothetical fits within the zone of knowledge for this witness and his experience with system access. | | | |
| 148:21-24 | | | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 150:14-22 | | | | | |
| 153:1-15 | Leading | Form objections waived (FRCP 32(d)(3)(B).)<br><br>Leading:<br>Leading permitted for adverse witness (FRE 611(c). | | | |
| 159:6-22 | | | | | |
| 162:11-163:1 | | | | | |
| 172:10-17 | | | | | |
| 173:23-174:16 | | | | | |
| 190:23-191:5 | | | | | |
| 197:13-198:2 | | | | | |
| 198:9-199:20 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 200:1-22 | Relevance | See **Relevance Response A** (above). | | | |
| 206:13-207:6 | Relevance | See **Relevance Response A** (above). | | | |
| 215:25-217:25 | Lacks Foundation Speculation | Foundation: The witness is responding based on his personal knowledge<br><br>Speculation: | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | The witness is not speculating. He is answering based on his personal knowledge. | | | |
| 218:18-21 | | | | | |
| 223:5-224:6 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 225:1-226:23 | | | | | |
| 232:18-233:5 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 234:5-13 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 234:17-236:12 | | | | | |
| 236:23-237:5 | Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 237:17-238:18 | Vague as to "Ferrara Process" | Vague: The term is not vague and was defined earlier in the deposition to which the witness acknowledges he understands. | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 239:7-8 | Vague as to "Ferrara Process" | <u>Vague:</u> The term is not vague and was defined earlier in the deposition to which the witness acknowledges he understands. | | | |
| 245:4-247:7 | | | | | |

## LAURI WERTZ DEPOSITION DESIGNATION

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 6:16-7:3 | | | 39:19-24 | | |
| 20:5-18 | | | 46:4-13 | | |
| 21:2-23:1 | | | 82:13-83:1 | | |
| 25:6-11 | | | | | |
| 26:7-28:7 | | | | | |
| 33:23-34:4 | | | | | |
| 34:7-35:5 | | | | | |
| 37:16-24 | | | | | |
| 38:22-39:18 | Relevance Improper Opinion on another party's state of mind | <u>Relevance:</u> This bears on the reasonableness of RTZ's NDA negotiations and the industry norms of access to HealthIT | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | systems which this Court has already deemed relevant for trial. This is not improper opinion of another's state of mind – the testimony speaks to the witness's state of mind. | | | |
| 40:25-41:2 | | | | | |
| 41:7-42:3 | | | | | |
| 45:19-46:3 | | | | | |
| 50:17-24 | | | | | |
| 51:12-53:2 | | | | | |
| 53:9-24 | | | | | |
| 55:6-17 | | | | | |
| 56:4-8 | | | | | |
| 57:7-12 | | | | | |
| 57:19-58:10 | | | | | |
| 65:10-17 | | | | | |
| 66:1-67:6 | | | | | |
| 67:12-14 | Vague as to "Reaction" Lacks Foundation Speculation | Vague: The term "reaction" is not vague and is used in its ordinary and plain meaning. Moreover, the witness answered the question indicating she understood it. | | | |
| 69:2-16 | | | | | |
| 71:1-72:2 | | | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 72:9-11 | | | | | |
| 73:5-10 | | | | | |
| 74:3-76:9 | Lacks Foundation Speculation Relevance | Form objections waived (FRCP 32(d)(3)(B).) | | | |
| 78:6-11 | Relevance | See **Relevance Response A** (above). | | | |
| 78:15-79:15 | | | | | |
| 81:25-82:12 | | | | | |
| 83:22-84:14 | Lacks Foundation | Foundation: The witness answered based on her personal knowledge; foundation is therefore established. | | | |
| 85:8-14 | Relevance | Relevance: See **Relevance Response A** (above). | | | |
| 85:23-86:17 | Relevance | Relevance: See **Relevance Response A** (above). | | | |
| 86:25-89:12 | | | | | |
| 90:1-91:5 | Relevance | Relevance: See **Relevance Response A** (above). | | | |
| 97:19-99:12 | Relevance | Relevance: See **Relevance Response A** (above). | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| 100:3-13 | | | | | |
| 100:17-101:21 | Leading | Leading:<br><br>Form objections waived (FRCP 32(d)(3)(B).)<br><br>Leading permitted for adverse witness (FRE 611(c). | | | |
| 106:7-108:1 | Relevance | See **Relevance Response A** (above). In addition, the questions and answers go directly to issues of EHI access within the context of HealthIT industry norms which this Court has already ruled is relevant. Further, the testimony is directly relevant to Intus's login credential practices and access methodology relative to industry norms and Intus's | | | |

| Designation (Blue) | Objection | Response to Objection | Counter-designation (Yellow) | Objection to Counter-designation | Response to Objection |
|---|---|---|---|---|---|
| | | compliance with those norms. | | | |
| 109:6-23 | Leading Lacks Foundation Speculation | Form objections waived (FRCP 32(d)(3)(B).) <br><br> Leading: <br><br> Leading permitted for adverse witness (FRE 611(c). | | | |
| 131:9-16 | | | | | |
| 131:24-132:22 | Relevance | See **Relevance Response A** (above). | | | |
| 134:11-135:7 | Relevance | See **Relevance Response A** (above). | | | |
| 135:15-23 | Relevance | See **Relevance Response A** (above). | | | |

# Melanie Martinez

# Highlighted Transcript

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTUSCARE, INC.,                    ) CASE NO. 4:24-CV-1132-JST
                                    )
          PLAINTIFF,                )
                                    )
     v.                             )
                                    )
RTZ ASSOCIATES, INC.; AND           )
DOES 1 THROUGH 10,                  )
                                    )
          DEFENDANTS.               )
_____)


DEPOSITION OF MELANIE MARTINEZ

FRIDAY, MARCH 6, 2026

CALIFORNIA


FILE  CA 7946249

REPORTED BY  MARK McCLURE, CRR

CAL CSR 12203

Page 1

DEPOSITION OF MELANIE MARTINEZ, 10:07 A.M., FRIDAY, MARCH 6, 2026, VIA VERITEXT REMOTE TECHNOLOGY, BEFORE MARK McCLURE, C.S.R. #12203, CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA.

APPEARANCES OF COUNSEL:

ON BEHALF OF THE PLAINTIFF INTUSCARE, INC.:

      (APPEARING VIA VIDEOCONFERENCE)

      MANATT, PHELPS & PHILLIPS LLP

      BY:  ANDREW BESHAI, ESQ.

      2049 CENTURY PARK EAST, SUITE 1700

      LOS ANGELES, CALIFORNIA 90067

      310.312.4000

      ABESHAI@MANATT.COM

ON BEHALF OF THE DEFENDANT RTZ ASSOCIATES, INC.:

      (APPEARING VIA VIDEOCONFERENCE)

      NOSSAMAN LLP

      BY:  DAVID C. LEE, ESQ.

      50 CALIFORNIA STREET, 34TH FLOOR

      SAN FRANCISCO, CALIFORNIA 94111

      415.398.3600

      DLEE@NOSSAMAN.COM

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

```
                          I N D E X
WITNESS                EXAMINATION                    PAGE
MELANIE MARTINEZ
                     BY MR. BESHAI                      5



                     E X H I B I T S
NUMBER                    DESCRIPTION                  PAGE
EXHIBIT 72    EMAIL THREAD - CARINNA SIAS, TIM     23
              COOPER, OTHERS - RE: FILTERING
              QUERIES FOR PRINTABLE &
              ELECTRONIC DOCUMENTATION -
              RTZ0005845 - RTZ0005846 - 2 PAGES
EXHIBIT 73    EMAIL FROM TIM COOPER TO CARINNA     25
              SIAS, OTHERS - RE: INTRO TO RTZ
              QUICK-START GUIDE - RTZ0005971 -
              1 PAGE

EXHIBIT 74    EMAIL THREAD - ALEX LUETH, LAURA     31
              EMERY, OTHERS - RE: INTUSCARE &
              SCPP RTZ INTEGRATION - RTZ0005714
              - RTZ0005720 - 7 PAGES
EXHIBIT 75    EMAIL THREAD - MELANIE MARTINEZ,     45
              MALORIE MARQUARDT, OTHERS - RE:
              UPDATES - RTZ0001993 - RTZ0001998
              - 6 PAGES

EXHIBIT 76    EMAIL THREAD - AMANDA MUNIZ,         53
              MELANIE MARTINEZ, OTHERS - RE:
              INTEGRATION WITH INTUSCARE -
              INTUS 002002 - INTUS 002009 - 8
              PAGES

EXHIBIT 77    AMENDMENT 2 TO PACECARE LICENSE      65
              AGREEMENT - RTZ0000814 -
              RTZ0000818 - 5 PAGES

EXHIBIT 78    PACECARE AGREEMENT - RTZ0000847 -    68
              RTZ0000866 - 20 PAGES
```

Page 3

```
                          I N D E X
                        E X H I B I T S
  NUMBER                  DESCRIPTION                PAGE
  EXHIBIT 79    EMAIL THREAD - MELANIE MARTINEZ,      70
                BOBBI RUNYON, OTHERS - RE:
                RTZ/INTUSCARE INTEGRATION -
                RTZ0002772 - RTZ00002774 - 3
                PAGES
  EXHIBIT 80    EMAIL THREAD - LAURA EMERY,           77
                MELANIE MARTINEZ, OTHERS - RE:
                INTUS NDA - RTZ0002775 - 1 PAGE
  EXHIBIT 81    EMAIL THREAD - MELANIE MARTINEZ,      79
                DANIEL DIAZ, OTHERS - NDA FOR
                SECURE TRANSPORTATION -
                RTZ0005586 - RTZ0005587 - 2 PAGES

  EXHIBIT 82    EMAIL THREAD - RYAN GADIA,            81
                KRISTIN PRENTISS, OTHERS - RE:
                H7027 - ESPERANZA CODING AND RISK
                ADJUSTMENT SERVICES - RTZ0002733
                - RTZ0002735 - 3 PAGES

  EXHIBIT 83    EMAIL THREAD - KYLE MENDEZ,           84
                MELANIE MARTINEZ, OTHERS - RE:
                PCO VENDOR ACCESS: INTUSCARE -
                RTZ0005604 - 1 PAGE
  EXHIBIT 84    EMAIL THREAD - CASSANDRA DA ROSA,     85
                PCO SUPPORT, OTHERS - RE:
                INTUSCARE COLLABORATION -
                RTZ0002765 - RTZ0002767 - 3 PAGES

  EXHIBIT 85    EMAIL THREAD - ROBBIE FELTON,         89
                ALEX LUETH, OTHERS - RE: SERVICE
                DISRUPTION - RTZ0007693 -
                RTZ0007695 - 3 PAGES
  EXHIBIT 86    EMAIL THREAD - MICHAEL ZAWADSKI,      91
                ALEX LUETH, OTHERS - RE: NEED FOR
                EMERGENCY PLAN WHEN PCO IS DOWN -
                RTZ0007273 - RTZ0007275 - 3 PAGES
```

Page 4

FRIDAY, MARCH 6, 2026, 10:07 A.M.

MELANIE MARTINEZ,

having been sworn, was examined

and testified as follows:


EXAMINATION

BY MR. BESHAI:

Q.    Good morning, Ms. Martinez.

A.    Hello.

Q.    Where are you based today?

A.    California.

Q.    And are you at home, in an office?

A.    I'm at home, in my office.

Q.    Is there anyone else with you in the room?

A.    No.

Q.    Have you ever had your deposition taken before?

A.    No.

Q.    Well, let me go through some initial advisory points, and then we'll jump in.

I don't anticipate we'll go past 3:00 o'clock today, maybe even sooner, but just a heads-up.  That's my estimate.

A.    Okay.

Page 5

Q.   So you're under oath, as Mark just mentioned, which means that you will be testifying today just as if you were in court before a judge or a jury.  It has -- your testimony has the same force and effect as if it were a courtroom testimony.

Please answer everything verbally, with audible answers, like "yes" or "no," rather than nodding or saying "uh-huh," because Mark won't be able to take that down, our court reporter.

Wait until the question is finished.  I know sometimes you might anticipate what I'm going to ask, or I might speak too slowly, but give me a chance to get my question out, and then you can begin your answer.  This helps ensure that the transcript isn't just a hodgepodge of interruption.

If you don't understand a question, please let me know, and I'll rephrase it.  I won't know if you understood or misunderstood unless you tell me.  At the end of this, you'll have an opportunity to review your testimony and correct things that you think you maybe misunderstood or if you misspoke.

So you'll get to do that, but I want to caution you that I get to use any of those corrections against you, if you have to testify.  So it's better to clarify things here on the record and avoid any adverse

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

inferences later on.

Also, take your time.  If you need to think about a question, it's not a race.

And then, as for breaks, we can take as many breaks as you'd like at any time you'd like.  The only rule is, if there's a question pending, I would ask that we not take a break until you have given your answer.

David, your attorney, might make objections for the record.  I'm still entitled to an answer.  So if I ask a question, unless David instructs you not to answer, we'll note his objection for the record, but I still expect an answer.

And let's see, the last thing is, if I show you a document during the deposition, which I expect to show you a few today, please take the time you need to review it before answering any questions about it.

Okay?

A.  Okay.

Q.  All right.  So now, hopefully, you'll never have to do this again, but next time they ask you, you can say "yes, I have," and avoid that last five minutes of nonsense.

Can you tell me your current role?  You're at Collabrios, correct?

A.  Correct.

Page 7

Q.   What's your current role?

A.   Implementation manager.

Q.   In Collabrios?

Well, RTZ became Collabrios in October 2024.

MR. LEE:  Objection.  Lacks foundation.  Calls for speculation.

You can answer, if you know.

THE WITNESS:  I don't know.

BY MR. BESHAI:

Q.   Well, at one point, were you working for a company called RTZ?

A.   Yes.

Q.   But now you're working for Collabrios?

A.   Yes.

Q.   So something changed, right?

A.   Yes.

Q.   Okay.  And in your own words and to the best of your knowledge, what changed?

A.   We combined some companies and created a new company.  I honestly don't know.  That's all I know.

Q.   Okay.  That's fine.  And this is not a test, and I know you're not a mergers and acquisitions lawyer, but because you're an employee, you're on the ground, to your knowledge, RTZ combined with some other companies and created Collabrios, is that right?

Page 8

A.   I don't know.  We are called Collabrios now. I signed new paperwork under Collabrios, so I don't know what that means.  I have no idea.

Q.   You signed new employment paperwork under Collabrios?

A.   Yes.

Q.   Okay.  Is your email account @Colabrios.whatever?

A.   Yes.

Q.   In your day-to-day, do you interact with anybody who had an RTZ account?

A.   No.

Q.   You've been there, at Collabrios, for over a year, correct?

A.   Yes.

Q.   So you received a W-2 for 2025, at least?

A.   Theoretically, although I haven't seen it yet.

Q.   Did you receive one for 2024?

A.   Yes.

Q.   Did it say "Collabrios" --

A.   I don't remember.

Q.   Sorry, Melanie.  Let me just finish the question, and then I will get your answer.

It sounds like you don't remember, but let me just ask it.

Page 9

Do you recall if it said "Collabrios" in the W-2 form for 2024?

A.   I do not remember.

Q.   Okay.  Before the transition from RTZ to Collabrios, what was your role at RTZ?

A.   I don't really know how to answer that because I didn't really have one specific role.  We all just assisted where needed.  So implementation, but also account management, QA.

I mean, yeah, I don't know what my role was, my title was.  I don't remember.

Q.   When did you start at RTZ?

A.   2012.

Q.   So you were there from 2012 until this merger you described?

A.   Yes.

Q.   Do you recall when the merger was?

A.   I believe it was January of 2025.

Q.   Between 2012 and January 2025, would you say that what you just described for me about having multiple roles remained consistent throughout the entire 13 years?

A.   Yes.

Q.   You mentioned three different roles.  You said implementation manager, account manager and QA.

Page 10

A.    Those were the tasks I was doing that would fall under those roles, yes.

Q.    Could we walk through those?

I don't need the nitty-gritty granular everyday, but generally, what those entailed.

And let's start with implementation manager.

A.    So if we had a new client that was going to use the system, I would help them set it up, configure things, train them on different areas.  That's really it.

Q.    What about QA?

A.    Testing new features or testing potential bugs in the system and writing up tickets.

Q.    And what was the third one you said?

A.    Account management.

Q.    Yeah.

What is that?

A.    Just basically doing weekly calls with clients and answering questions.

Q.    Was part of your job facilitating access for clients?

A.    Yes.

Q.    When we say "clients," I'm using that phrase to mean PACE facilities or PACE entities.

Is that who you understand it to be?

Page 11

A.    Yes.

Q.    Like, Senior Care Partners would be an example?

A.    Yes.

Q.    As part of your job, did clients sometimes ask for access for their vendors?

A.    Yes.

Q.    Were you the one who helped them obtain that access?

A.    Sometimes.

Q.    How many other implementation managers were there, let's say, in 2024?

A.    I don't really know everyone's title.  I know there were others that helped with implementation. Maybe me and one other person.

Q.    Would that be Laura Emery?

A.    Yes.

Q.    So other than you and Laura Emery, you don't recall anyone else really having this in their bucket of tasks?

A.    I don't recall anyone else.

Q.    When did Laura Emery start at RTZ?

A.    I don't know.  It was before me.

Q.    She was there when you got there?

A.    Uh-huh.

Page 12

Q.   This is a perfect example of one of the examples we talked about.  You've got to say "yes."

A.   Yes.

Q.   Okay, cool.  Thanks.

And so she was there before you got there.

Between 2012 and, let's say, 2025, when you became Collabrios, was it just you two that mainly handled the tasks that fall under the implementation manager bucket?

A.   Yes.

Q.   Now that you're Collabrios, is it still just you and Laura, or are there other folks doing the implementation manager task?

A.   There's others.

Q.   How many more?

A.   I don't know, but somewhere around 10.

Q.   Is that just because the additional companies you combined with just had more clients and so there's more need?

A.   I'm not sure why there's more now.  We're just a bigger company.

Q.   When you -- let's go back to the tasks as an implementation manager.

When a company or a client would ask for assistance with a vendor, vendor access, would you --

Page 13

would they propose an email address that came from the vendor, or was it a client email address that was tied to the vendor?

MR. LEE:  Objection.  Vague and ambiguous.

You can answer, if you understand it.

THE WITNESS:  I don't understand the question.

BY MR. BESHAI:

Q.   I'm going to be honest with you.  I really don't understand that question either, so let me try this again.

Let's say you're dealing with Senior Care Partners, okay, and their domain name is @seniorcarepartners, right, and let's say they have an RN company that they contract with, @speedyrn.

When a PACE entity reaches out to you, like Senior Care Partners, and says, hey, I want access for @speedyrn because they need our data to do X, Y and Z, and then you're facilitating that access, are you giving access to someone at Speedyrn to access PACECare or are you giving access to someone at Senior Care who will then share those credentials with Speedyrn?

MR. LEE:  Objection.  Lacks foundation.

You can answer, if you understand.

THE WITNESS:  I don't really understand.

Page 14

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

BY MR. BESHAI:

Q.   I'll rephrase it.

You said part of your job was facilitating access for vendors and for PACE clients, right?

A.   Yes.

Q.   Let's start with PACE clients.

For the PACE clients, is it the case that they would give you an email address that was the user account they would use to enter PACECare, and then you would register that somewhere so you know which email accounts have been given access?

MR. LEE:  Objection.  Lacks foundation.  Calls for speculation.

You can answer, if you understand.

THE WITNESS:  I don't understand.  I'm sorry.

BY MR. BESHAI:

Q.   That's okay.  Maybe it's partially -- I'm not being clear.

Is there -- to your knowledge -- and maybe this is just outside of your bucket, but I would be surprised if it was.

To your knowledge, is there -- did you, at RTZ, keep a list anywhere of the email addresses to which you gave access to PACECare?

A.   In the initial implementation, yes, they would

Page 15

have a configuration sheet they might fill out with their staff profiles so that we can get their staff put in correctly.

But after that, we would train them to put in their own staff. So I would not have been keeping a list of staff members after the initial pass.

Q.    Okay.  So for the initial pass, it would be -- like, andrewBeshai@seniorcare would be an email that you know this is the -- I guess, in the initial pass, this is the email that Senior Care is going to use to access PACECare?

MR. LEE:  Objection.  Mischaracterizes the witness's testimony.  Lacks foundation.

You can answer, if you understand.

THE WITNESS:  I'm not sure I understand, no.

BY MR. BESHAI:

Q.    Well, you testified that, in the initial pass -- and maybe I misunderstood, but as I understand it, in the initial pass, the PACE entities would give you the emails of the personnel that they have designated to access PACECare.

Did I understand that correctly?

A.    So they would put on a spreadsheet the list of names and various other information, in which emails were included, yes.

Page 16

Q.   And when you say "in which emails were included," meaning these are the emails that I, as Senior Care, would like to have access to, PACECare?

A.   Correct, except it's not really the emails, it's the user, but each user would have an email.

Q.   Right, that's a better way to put it.  Thank you.

So these are the folks, the personnel at Senior Care that I want to have access to, and these are their emails?

A.   Yes.

Q.   Okay.  And this is a spreadsheet that the PACE entity would send to you?

A.   Sometimes.  Sometimes we might fill it in for them.

Q.   But, in some way, whether you fill it in or whether they send it, as part of the onboarding process, you would get initial emails -- sorry, initial names and corresponding emails of PACE folks, who you knew were going to be accessing the system?

A.   Yes, correct.

Q.   Where would you keep those emails and names?

A.   Do you mean the spreadsheet or do you mean the actual accounts?

Q.   Well, let's start with the spreadsheets.

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

Were those spreadsheets kept anywhere in particular?

A.    I would have put them in a ticket to request that the accounts be set up.

Q.    Okay.  And then what about the actual accounts?

A.    Then the accounts would have been set up in the software, as staff profiles.

Q.    To your knowledge, was there any central repository or database that had all the personnel names from the various PACE entities so that you knew these are the people to whom we've given access?

A.    There is no central repository, no.

Q.    Okay.  Do you know how RTZ kept track of the people to whom they had given access?

A.    Do you mean, like, the contracting people, to charge them, or what do you mean?

Q.    Well, maybe I'll take a step back.

Was there a system at RTZ for keeping track of the PACE personnel who were in those spreadsheets that were designated in the initial cut?

A.    Not that I'm aware of.

Q.    After this initial cut, you mentioned that those initial folks would then give access to the rest of their employees?

Page 18

MR. LEE: Objection. Mischaracterizes the witness's prior testimony.

You can answer.

THE WITNESS: I mean, we would eventually train them to create their own accounts and to change passwords. Yes, that would be the goal.

BY MR. BESHAI:

Q. And at that point, if they create accounts and change their passwords, it was -- was it your understanding that they might create an account for a new person at the PACE entity that wasn't originally listed in that spreadsheet?

A. Yes.

Q. Did RTZ have an issue with that at all?

A. I mean, I don't think so.

Q. Let's now move to vendors. We talked about earlier -- you said that the initial PACE -- or you said that the PACE entities sometimes wanted access for their vendors.

A. Yes.

Q. Now, the spreadsheet process you talked about where the PACE entity would send you a spreadsheet or you would fill it in, in consultation with them, was that the same process for vendor access?

A. No.

Q.    Okay.   Can you tell me what the process was for vendor access?

A.    The client would request access for their vendor.   I would, or whoever received that request, request an NDA be created, and then we would send the NDA to the client.   They would have the vendor fill it out, and then we would return that back to the contracting folks, and it depended on the client, who would eventually create that account.

Q.    When you say "it depended on the client," who would eventually create that account?   You mean the client would sometimes have the vendor create the account?

A.    No.   The client would create the account for the vendor, as if -- just like they did their internal accounts.   It's all in the same spot.

Q.    Okay, got it.

Were there instances where the client created an account for the vendor but used the domain name of the vendor itself instead of the client?

A.    Do you mean that they put their email address they -- they gave them an internal email address?

Q.    The opposite, that they allowed the vendor to use their -- you know, Speedy RN example used address instead of the Senior Care Partners email address.

Page 20

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A. My understanding is they should have always used their external email address.

Q. Okay. When was the NDA process implemented?

A. I don't remember.

Q. Was it there when you first started in 2012?

A. No.

Q. Can you estimate -- this is not a memory test, I'm not holding you to, like, precision, but do you have a sense that it was about five years in? Ten years in?

A. All the years run together. I'm sorry. I don't. I'd have to go back and look through emails to even guess.

Q. That's okay. I prefer this answer rather than you making something up.

A. Yeah.

Q. Let me jump into some documents.

Well, before I do that, did your role change at all after the merger with Collabrios?

A. Yes.

Q. How so?

A. Well, now we have teams, so I'm not doing training anymore. You know, I haven't done any on-site with clients anymore. Many ways. Every way, pretty much.

Q. So what are your primary duties now?

Page 21

A.    So now I'm doing implementation, but just focusing on the implementation process.

Q.    So are you still assisting PACE entities in getting access to PACECare?

A.    Yes.

Q.    And then are you still doing QA?

A.    That's not part of my job title, but sometimes I do things that I don't necessarily need to be doing, but yes, I do sometimes do QA, if I think I spot something.

Q.    Okay.  And then account management -- are you still doing some of that?

A.    Only for a short while post implementation.

Q.    Okay.  So it sounds like the main duties that have fallen off since you became -- since RTZ became Collabrios is, you're not doing as much account management and you're not doing as much training of other folks?

MR. LEE:  Before you answer, objection to the extent it mischaracterizes the corporate relationship between RTZ and Collabrios.

You can answer, if you understand.

THE WITNESS:  I mean, I don't know.  I'd have to get into everything I do all day.  I mean, yes, those are included in the things that I no longer do.

Page 22

BY MR. BESHAI:

Q.   I'm going to show you a document that has been marked Exhibit 72.

(Exhibit 72 marked for identification.)

BY MR. BESHAI:

Q.   I'll give you a chance to read this and then I'll ask you some questions about it.

Can you scroll up and down on your own, Melanie, or do I need to do it for you?

A.   I can scroll.

Q.   Excellent.  I'll let you do that, and when you're ready, we can talk about this email.

A.   Okay, I read it.

Q.   Okay.  Do you recall this particular email?

A.   I do not.

Q.   I would not be surprised.  But you're copied on it.

Do you see your email there?

A.   I do.

Q.   Okay.  Do you remember who Angie Hall was?

A.   Vaguely.  The name is familiar.

Q.   I'm going to say, based on her email domain name, she's an employee of Senior Care Partners.

Does that sound right?

A.   Yes.

Page 23

Q.   And Carinna -- Carinna, was she one of your colleagues at RTZ?

A.   Yes.

Q.   For the record, this is RTZ0005845.

In this email, Angie is asking Carinna -- she's saying, "I will be creating our user guides next week and will need direction on sorting and pulling the reports in a manner that will satisfy our needs (we are specifically looking for a report that pulls a comprehensive record - all documents including scanned documents - by a participant and date range)."

So do you know what Angie meant by "creating user guides"?

MR. LEE:   Objection.   Calls for speculation.

But you can answer, if you know.

THE WITNESS:   I can only guess.   I don't know for sure.

BY MR. BESHAI:

Q.   Well, let me ask a more broad question.

Were user guides the type of thing that PACE entities routinely asked RTZ to create?

A.   Yes.

Q.   What is a user guide?

A.   Like, a walkthrough of how to do certain things in the system.

Page 24

Q.   Did the user guide have, like, part of the interface with the layout of the buttons so that the PACE entity would know where to pull things from?

A.   Typically, yeah, there would be screenshots.

Q.   And you would, like, create these and then send them to the PACE entity?

A.   Well, the process has changed, but yes, the goal was that the PACE entity would have them in their hands.

Q.   I'm sorry, can you say that again?

It kind of broke up.

A.   The goal was, yes, that it would end up in their hands.

The process by which we got it to them has changed many times over the years.

Q.   Were you concerned about sending out your user layout to PACE entities?

A.   Personally, no.

Q.   Did you ever learn of a concern at the company about sending out user interface or user layouts to PACE entities?

A.   No.  We often provided user guides.

Q.   Let's go back.

(Exhibit 73 marked for identification.)

MR. BESHAI:  This is Exhibit 73.  Let me know

Page 25

when you can see it.

THE WITNESS:  I can see it.

BY MR. BESHAI:

Q.   I have a similar question about this one.

So this is from Tim Cooper, at Senior Care Partners, to Carinna, Laura and you, and he says, "I'm looking through our folder of RTZ documentation for some high-level reference material that I can use to create a quick reference guide for our users."

When he says "RTZ documentation," was there some sort of just a generic welcome packet that had RTZ documentation that you would send to new clients?

A.   No.

Q.   Do you have a sense of what Tim Cooper means when he says "our folder of RTZ documentation"?

MR. LEE:  Objection.  Calls for speculation.

You can answer, if you understand.

THE WITNESS:  I would only be able to guess.

BY MR. BESHAI:

Q.   I don't want you to guess, but let me ask it this way.  He says, "Here are some high-level reference material."

Was the reference material that had, like we talked about, the layouts of PACECare -- was that something that you regularly shared with PACE entities

when they joined as new clients?

MR. LEE:  Objection.  Vague and ambiguous as to the meaning of high-level reference material.

You can answer, if you understand.

THE WITNESS:  In the system, there were built-in reference materials.  So that would be the only thing that I know of that we would have sent to them -- or not even sent to them, they would access through the system directly.

BY MR. BESHAI:

Q.  When you say "in the system," you mean in PACECare?

A.  Yes.

Q.  Okay.  You've heard of Intus, I'm guessing?

A.  Yes.

Q.  That's why we're here today, right?

Can you tell me -- just give me an estimate of, how many times have you spoken with colleagues about the RTZ -- or the Intus versus RTZ lawsuit?

A.  I haven't spoken to colleagues about it.  I was told not to.

Q.  Okay.  To prepare for today's deposition, did you meet with Mr. Lee or any other attorneys?

A.  Yes, I met with Mr. Lee.

Q.  How many times?

Page 27

A.   Once right before this call, to check in, and once before, so two.

Q.   How long was the check-in before this call?

A.   Fifteen minutes, maybe.

Q.   And the prior check-in, how long was that?

A.   Maybe two hours.

Q.   And did you go over documents with Mr. Lee?

A.   Yes.

Q.   I don't want to know the substance of the documents, but generally, were they emails and contracts, or what kind of documents were they?

A.   Emails.

Q.   Do you recall when you first learned that RTZ was being sued?

A.   I do not recall, no.

Q.   To the best of your understanding -- and I don't want, like, a legal treatise, probably couldn't give one if I even asked -- but just in general, what is your understanding of what the lawsuit is about?

A.   That Intus is suing RTZ for blocking information from them.

Q.   Do you know what kind of information?

A.   Data.  I mean system data.

Q.   Specifically -- again, I'm asking your understanding.

Page 28

Specifically within PACECare?  Is that your understanding?

A.   Yes.

Q.   Are you also aware that RTZ has filed counterclaims against Intus?

A.   I'm not aware of that.

Q.   So when -- so no one has ever talked to you about counterclaims against Intus?

A.   Not that I recall.

Q.   Have you ever seen the answers and counterclaims that were filed in court against Intus?

A.   No.

Q.   Given your role in the company and your interaction with PACE entities and facilitating access, if there were issues causing the system, like overloading the system or downtimes caused by a particular PACE entity, is that something you would hear about?

A.   I'm not sure I understand your question.

Q.   Sure.

Let's say there's a PACE entity that gives access to 100 employees, and it's so bad that it slows the system down in an onerous way.

Is that something you would hear about?

A.   Probably not these days, but back when I

Page 29

worked at RTZ, yes.

Q. In 2021, is that something that, in your role, you would have heard about?

A. Most likely, yes.

Q. What about in 2022?

A. Yes.

Q. 2023?

A. Yes.

Q. And then it sounds like a dumb exercise, but last year, 2024?

A. No, not really.

Q. So 2021 through 2023, if some users' access created a burden to the system and overloaded the system, it's something you would have heard about, right?

A. Most likely, yes.

Q. And you said nobody talked to you about any counterclaims that RTZ filed against Intus, correct?

A. I don't recall ever hearing about that, no.

Q. Okay. Do you ever recall hearing about Intus's access causing inordinate system strain or overloading the system?

A. No.

MR. BESHAI: I want to show you the next exhibit. This is going to be Exhibit 74.

Page 30

(Exhibit 74 marked for identification.)

THE WITNESS:  I can see it now.

BY MR. BESHAI:

Q.   You can see it?

Great.  I'll give you a chance to take a look at it.

A.   Do you want me to read all seven pages or just focus on the first one?

MR. LEE:  You should read enough to make yourself --

MR. BESHAI:  You don't need to -- sorry, David.

MR. LEE:  Feel comfortable with understanding what's there.

THE WITNESS:  Okay.  Well, I'm almost done, so I'll just finish.

BY MR. BESHAI:

Q.   Yeah, that's fine.

A.   Okay.

Q.   And you're copied on this email, correct?

A.   Yes.

Q.   All right.  Do you recall this time period, around May 2021, when Intus first reached out to RTZ for access?

A.   Yes.

Page 31

Q.    What do you recall about it generally?

A.    I recall there were discussions of an interface, potentially, and then there were discussions of access to the system.  That's really all I recall.  I wasn't involved in any of it.

Q.    Do you have a technical background?

A.    No, I don't.

Q.    I should have started with this.

Can you just briefly walk me through your education after high school.

A.    Sure.  I went to undergrad at Santa Clara University, and then I went to grad school at San Francisco State for general gerontology.

Q.    What was your undergrad degree in?

A.    I had a double major in psych and English.

Q.    And then gerontology -- that was just the name of the master's program, the master's in gerontology?

A.    Yes.

Q.    Any degrees or certificates after the master's?

A.    No.

Q.    And what year was that that you graduated with the master's?

A.    That's a great question.  I think it was 2010.

Q.    Okay.

Page 32

A.   It might have been 2012.  I don't remember.

Q.   Well, let me ask you this.  This might help clarify things.

Did you work anywhere before RTZ?

A.   Yes.

Q.   Like, not high school, like, if you were at Dairy Queen, I don't care.

After college but before RTZ, did you work anywhere?

A.   Yes.

Q.   Where?

A.   I worked for an SRO in San Francisco as their coordinator, doing training for the members that lived there.

And I worked for a Section 8 apartment building as their coordinator, trying to get resources for them there in Berkeley.

Q.   Do you recall roughly what years you had those two jobs?

A.   2010 -- I don't remember.  I really don't.  It was all between 2008 and 2012, when I started at RTZ.  I don't remember.

Q.   So the master's would have been in that time period, because you had it before you started at RTZ?

A.   I did have it before I started at RTZ, yes.

Page 33

Q.   All right.  And just to go back to the first question, so no technical background for you?

A.   No.

Q.   Do you recall -- around this time when Intus was first reaching out, do you recall having discussions with anyone else -- Laura Emery, Mike Zawadski -- about any issues about giving them access to PACECare?

MR. LEE:  Objection.  Vague and ambiguous in use of the term "concern."

You can answer, if you understand, though.

THE WITNESS:  I mean --

MR. BESHAI:  I said "issues," but "concerns" works as well, that's fine.  I get the objection.

Q.   But you can answer, if you recall anything.

A.   I don't recall any specific conversations, but yes, I mean, I had lots of conversations with them about vendors and, you know, how we deal with the vendors.

Q.   Have you ever heard of the phrase "automated script" in the context of your work?

A.   Yes.

Q.   And just generally speaking, not talking about a specific PACE entity, but generally speaking, how do you understand that phrase?

A.   To me, that would mean a script that runs nightly, or whatever -- whatever the frequency is, and

Page 34

just runs on its own.

Q.   Do you know if any PACE entities use an automated script?

A.   I knew of some in the past.  I can't speak to what's happening at the moment with Collabrios.

Q.   That's a good clarification.  Let me clarify.

Between 2021 and 2024, were you aware of any PACE entities that were using an automated script?

A.   I can think of one script, so yes.

Q.   Which one are you thinking of?

A.   There was a Peak script that would run and send authorization files once a week to Peak.

Q.   What are authorization files?

A.   It would have been authorized services that the client had put in the system that needed to go to their TPA.

Q.   Okay.  And what is a TPA?

A.   A third-party administrator for processing claims.

Q.   Who was their TPA?

A.   Peak is the TPA.

Q.   So Peak is not the PACE entity?

A.   No.  Many PACE entities used Peak at the time.

Q.   And was there a way to tell when the automated script was the user as opposed to a human user?

Page 35

MR. LEE:  Objection.  Vague and ambiguous.

You can answer, if you understand.

THE WITNESS:  I don't understand.

BY MR. BESHAI:

Q.   Do you know what an audit trail is?

A.   Yes.

Q.   Can you, in your own words, explain what it is?

A.   It's a history of what happened in whatever situation you're talking about.

Q.   Was there an audit trail for access to PACECare?

MR. LEE:  Objection.  Vague and ambiguous.

Are you referring to -- in connection with the Peak automated script?

MR. BESHAI:  No, in general.  In general.

Q.   Did RTZ maintain or have audit trails showing access to PACECare, regardless of the entity?

A.   Yes, there was an audit log that would have shown who logged in.

Q.   Have you ever seen that log before?

A.   Yes.

Q.   I'm going to ask you some questions about what the log might have shown.

You said it showed who logged in?

Page 36

A.    Yes.

Q.    And when you say "who," would it show you a username?  Would it show you an email address?  What would it show for the "who"?

A.    I believe username.  Actually, no, not username.  I apologize.  Like, actual name, first and last name.

Q.    Okay.  Was that different -- like, if I were to create a username -- it wouldn't be Andrew Beshai -- would I just come up with my own name?  How did username differ from the human names?

A.    User names were created manually when the accounts were created.

Q.    So the audit log would show who accessed.

Would it show the time of access?

A.    I believe so, yes.

Q.    Would it show the duration of how long that user spent in the system?

A.    I don't remember if it showed logout time, so I don't know.

Q.    Would it show where within PACECare the user navigated and clicked?

A.    Some of the areas, yes.

Q.    Can you explain what you mean by "some of the areas"?

Page 37

A.   It wasn't like a fully built-out audit trail. It didn't show you every click in every area.

Q.   Okay.  Which areas would it not show you?

A.   I can't remember.  That's too long ago.

Q.   Do you recall if there was some methodology of, like, here are the areas that we're going to have it show and here are the areas we're not going to have it show?

A.   No, I don't think any of that was purposeful. I think it was just a lack of full coding in that area because nobody really used it.

Q.   Nobody really used the audit log?

A.   Not on a regular basis, like the rest of the system, where we're focused on what users are going to see the most.

Q.   Can users see the audit log, or is that just what RTZ would see?

A.   It was permission based, so if they had permission, yes, users could access it.

Q.   As part of your duties, did you have anything to do with the audit log in terms of, like, regularly reviewing it or pulling it up, for whatever reason?

A.   No.

Q.   So how are you familiar with it?

A.   Because I'm just familiar with the system and

Page 38

I've been working with the system for a long time.

Q. So you said you did not regularly have to pull it up.

But are there situations where you were like, okay, actually, I need the audit log to solve this problem?

A. I wouldn't have used the audit log for that, no.

Q. Okay. Not to belabor the point, but if you didn't have to use it to solve any problems at work, and it wasn't a regular part of your duties to consult it, why would you even need to know about it?

A. Because I trained on the system, so I would be familiar with all the modules, and I did QA in the system.

So if a client had reported something and asked us to look into it, I may have popped in there looking for bugs and things like that.

Q. Okay. So maybe I just didn't ask my question well. This is what I was getting at.

So sometimes in -- when you had your QA hat on, if a client reached out and said, there's a glitch, or something, you would go to the audit log?

A. I would go to the audit log to -- like, if they reported that they went there to see their login

Page 39

time and they couldn't see it, or something, that would be the thing I would go there for, to see if I could re-create the issue, try to find a bug and then put a ticket in to fix the bug.

But there was never a time where I would be going there to tell them if someone logged in or, like, what page they went to, or something like that.

Q.    Okay, that's helpful.

Do you know what the -- what RTZ's preservation policy was when it came to audit logs?

A.    I do not know.

Q.    When I say "preservation policy," I mean, like, hey, we've got to keep the audit logs for six months and then we delete them.

Do you understand that's what I mean by "preservation policy"?

A.    No, I guess, I don't understand the question.

Q.    I'll rephrase it.

So I'm using the phrase "preservation policy" as synonymous with, like, document or record retention policy.  We have a policy that says, after X number of months or years, you can delete these emails or you can delete these documents.

Does that make sense, that principle?

A.    Yes.

Page 40

Q.   So now that we've clarified the term, are you aware of whether there was a preservation or document retention policy with regard to audit logs?

A.   I was not aware of any policy, no.

Q.   What about emails?

A.   Also not aware of a policy there.

Q.   Is it the case that when you transitioned from RTZ it Collabrios, your email provider transitioned from Gmail to Outlook?

A.   Yes.

Q.   As you currently sit here today, are you able to access your old emails from back in the Gmail-RTZ days, or was everything wiped clean and you started over?

A.   I can't access my Gmail anymore.

Q.   So when you started, I think you said January 2025, it was a clean slate for your emails?

A.   Yes.  Well, to access the Gmail, yes, I can't access it.

Q.   That's my question.

So you started, like, a new company, new user -- well, new domain name, new email provider, right?

A.   Yes.

Q.   And I think you already answered this, but you

Page 41

don't know if there was a document retention policy or preservation policy with regard to emails at RTZ?

A.   I was not aware of one.

Q.   Okay.  You said that you remember hearing about the lawsuit, correct?

A.   Yes.

Q.   The lawsuit between Intus and RTZ, right?

A.   Yes.

Q.   Do you remember when you first learned about it?

A.   I do not remember.

Q.   At any point, did anyone from the legal team or from RTZ alert you about or tell you about something called a litigation hold?

MR. LEE:  Objection.  To the extent it reveals conversations you may have had with legal counsel, I'm going to instruct you not to answer.

If you can answer the question without relying upon communications that you may have had with legal counsel, you can provide that information.

Does that make sense?

THE WITNESS:  I've never heard of that term, so I'll just say that, I don't know what that means.

BY MR. BESHAI:

Q.   Okay.  I'll ask it slightly differently.

Page 42

Did anyone ever tell you, hey, we're in litigation now, you can't delete anything, we've got to keep all our emails because we're in the middle of litigation?  Did that ever happen at any point with respect to the Intus-RTZ lawsuit?

A.    No one ever told me that, but I always kept all my emails.

Q.    Okay.  At any point after January 2024, did anyone ever ask you to search for emails that had to do with Intus?

MR. LEE:  Hold on.

Andrew, just so we don't have to do this every time, when you ask that type of question, I'm assuming you're talking about people other than legal counsel?

MR. BESHAI:  Yes.

MR. LEE:  Okay.

MR. BESHAI:  Yes.

MR. LEE:  So the question to you, then, Melanie, is:  Did anybody, other than legal counsel, ask you to, you know, fill in the blank?

So, again, same instruction, to the extent you can answer without resorting to communications you had with legal counsel, you can provide that information, but I will instruct you not to answer to the extent your answer relies upon communications with legal counsel.

Page 43

Okay?

THE WITNESS:  Who is legal counsel?  Just you?

MR. LEE:  It would be any lawyer.  So any lawyer for RTZ.

THE WITNESS:  Okay.  Then yes, I was asked to go through my emails.

BY MR. BESHAI:

Q.  And what were you asked to search for?

A.  Any reference to Intus.

Q.  When you say "any reference to Intus," I want to understand, like, the search methodology that you did.

Did you just look for any time Intus was mentioned in an email?

A.  Any time Intus was mentioned or any time an Intus email domain was on an email.

Q.  Okay.  Other than the instruction to search for any email related to Intus, or that mentioned Intus, were there any other instructions for your search?

A.  I think we were supposed to limit it to certain clients as well at first, but I just pulled everything because I didn't want to be asked to do it again, but those were the only rules I remember.

Q.  Do you remember who the clients were?

A.  I do not.

Page 44

Q.   I would be amazed if you did.  So no worries.
This was, like, two years ago.  You have hundreds of
clients.

MR. BESHAI:  We've been going over an hour.
I'd be happy to continue, but if you would like to take
a break, we can take a five-minute break, ten-minute
break, or whatever you would like.

THE WITNESS:  Can we just take a five-minute
break?

MR. BESHAI:  Absolutely.

(A short recess was taken.)

MR. BESHAI:  Melanie, I want to show you this
next document.  This is Exhibit 75.

(Exhibit 75 marked for identification.)

BY MR. BESHAI:

Q.   In particular, I want you to focus on this
third bullet point, but I'll give you a chance to look
at the whole thing.

A.   Okay.

Q.   Do you recall Malorie Marquardt?

A.   Yes.

Q.   Who was she?

A.   I don't recall her role, but I worked with her
when I implemented Community PACE.

Q.   And Amanda Muniz was a co-worker at RTZ?

Page 45

A.   Yes.

Q.   What was her role?

A.   Account management, generally, I guess.

Q.   So this email we're looking at, which is Bates RTZ0001993 -- am I correct to characterize this as part of Community PACE's request to get access for Intus?

A.   Can you say that again?

Q.   Sure.

This email that we're looking at, August 8th, 2022, email -- and I read the Bates number -- is this part of your ongoing conversation with Community PACE stemming from their request to get access to PACECare for Intus?

A.   Yes.

Q.   And looking here at this third bullet point, "We'll need an account for IntusCare."

This is Malorie asking, "We'll need an account for IntusCare; we're currently contracted with them for data analysis and utilization management.  They stated they'll just need a single account that has reporting functionality.  I wasn't sure if I'd assign that to one of their reps?  If so, we can use Evan Walters."

Then you respond, "We are working on an NDA for IntusCare - as soon as I have that, I will send it over, and we can get that account created."

Page 46

Do you see that?

A.   Yes.

Q.   Okay.  What does it mean when someone requests a single account that has a reporting function only?

MR. LEE:  Objection.  Calls for speculation to the extent you're asking her to interpret the email that was sent to her.

But if you can answer the question, go ahead.

THE WITNESS:  I wouldn't know specifically what that request would mean.

BY MR. BESHAI:

Q.   Do you know what reporting functionality means generally in terms of access to PACECare?

A.   There's different areas of reporting, so I would need to clarify what you mean, but, I mean, I am aware of reports of the system, yes.

Q.   Sitting here today, you read this email from Malorie back when she sent it, and you responded.

Do you understand what she meant?

She asked for a single account that has reporting functionality.

A.   I do not, no.

Q.   She also says she wasn't sure if she assigned that to one of their, meaning Intus, reps.

And then she mentions Evan Walters.

Was it something that PACE entities sometimes did, that they assigned an account to a vendor's representative?

MR. LEE:  Objection.  Lacks foundation.  Calls for speculation.

You can answer, if you understand.

THE WITNESS:  I don't understand exactly, no.

BY MR. BESHAI:

Q.  Okay.  Well, I'll rephrase it.  So you said that you had worked with PACE entities to onboard them and their vendors to PACECare, correct?

A.  No.  We would onboard the PACE clients to the system.

And they may have vendors that also want access, or they want to do an interface, or something, but we wouldn't onboard the vendors specifically.

Q.  So if a PACE entity wanted to onboard a vendor, you said there was an NDA requirement, correct?

A.  If their vendor wanted to access the system, there was an NDA requirement, yes.

Q.  Okay.  And once the NDA was signed, did you then help onboard that vendor, or did the PACE entities handle it themselves?

A.  It would depend on the vendor.  I mean, there's many vendors that access PCO.

Page 48

Q.    Sure.

And for those who access PCO, were you helping onboard them, or did you just let the PACE entity handle that all?

A.    It would depend on the vendor.  I can think of vendors that I have done trainings for in the past because many clients use them, but I can also think of vendors that I have never even spoken to that they may contract with and do things with.  So it would really just be dependent.

Q.    Okay.  And your response here to Malorie is that, "We" -- meaning RTZ -- "are working on an NDA for IntusCare."

Do you recall this time period when you were working on an NDA for IntusCare?

A.    Well, I was never specifically working on it, but yes, I do recall a time period when we were trying to get one established.

Q.    Did you have any conversations with anyone within RTZ, not lawyers, but Laura Emery, Mike Zawadski, any of your colleagues, about the process of negotiating this NDA with Intus?

A.    No.

Q.    Did you have any insight, like, again, usually through conversations, about the different sticking

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

points or deal points in the NDA process between Intus and RTZ?

A.   No.

Q.   So is it fair to say that your role was limited to kind of telling the PACE entities, hey, we're working on an NDA, and then just waiting for the higher-ups to send you the NDA when it was done?

A.   Yes.

Q.   In terms of just dealing with -- not your total role, but just in terms of your touch points with the NDA process, correct?

A.   Yes, I was just the go-between.

Q.   I didn't want to use that phrase, Melanie, because you're so much more than that, but yes, that's what I'm getting at.  Okay.

Is this an example here of you kind of being the go-between, telling a PACE entity that wants Intus to access their data, to say, hey, we're working on a NDA, we'll get back to you?

A.   Yes.

Q.   Who was your go-to person to check on the progress of an NDA?

A.   Laura or Mike.

Q.   Anybody else?

A.   No, not really.

Page 50

Q.    Do you know -- and again, this might draw an objection, but I'm asking if you know, not in general -- do you know if Laura was in the weeds on negotiating the NDA?

A.    I do not know.

Q.    You don't know, okay.

So this is August 2022.

Do you see that?

A.    Yes.

Q.    I'm going to go back to one of the exhibits we saw earlier.  This is Exhibit 74, and I'm going to share it.

Can you see it on my screen?

A.    No.

MR. BESHAI:  Then I have to go back to the -- I thought there might be a quicker way to do it.  This is Exhibit 74.

MR. LEE:  Do you want her to look at Exhibit 74?

BY MR. BESHAI:

Q.    Do you have access to the exhibits, the four that I've marked so far?

A.    Yes.

Q.    All right.  Can I trouble you to pull up 74.

MR. LEE:  We can't look at them side by side,

Page 51

so we can't see 74 and 75 at the same time.

MR. BESHAI:  Okay, thank you for that.  Let's just look at 74 for now.

MR. LEE:  Okay.

THE WITNESS:  I have it.

BY MR. BESHAI:

Q.   The email we just looked at, which was 75 -- do you agree with me that that was August 2022?

A.   Yes.

Q.   Okay.  This email, which we've looked at previously, is dated -- and this is Exhibit 74 -- it says it's dated May 2021, correct?

A.   Yes.

Q.   And I believe, when I asked you about this, you testified that this was part of Intus's initial reach-out to RTZ to kind of rate the relationship and get access to PACECare, correct?

A.   Based on what I'm looking at, yes, it looks like one of the initial times we talked to them, but I don't recall it specifically.

Q.   Okay.  So this is May 2021, and we looked at the NDA first being discussed or being discussed in August 2022.

Do you have any recollection or -- any recollection of any discussions or emails between May

Page 52

2021 and August 2022 about granting Intus access to PACECare?

A.   Nothing that I can recall.

Q.   Okay.

MR. BESHAI:  Let's go to the next one.  This is going to be Exhibit 76.

(Exhibit 76 marked for identification.)

BY MR. BESHAI:

Q.   Go ahead and pull it up.

A.   Okay.

Q.   So just take a look at it, and then I'll ask you some questions.  It's again, just like what your counsel said, to familiarize yourself with it.  You don't have to know everything in it.

A.   Okay.

Q.   Okay.  I want to draw your attention to page 3, which is stamped Intus 2004.

A.   Okay.

Q.   Are you there?

A.   Yes.

Q.   So there's an email from you to Evelyn Thompson, at Beacon PACE.

And I'm going to read you the part I'm curious about.  Before you answer, if you need to look at the rest of the email, like scroll down, I'll let you do

Page 53

that.  But let me read you this part first.

You say, "Hello, Evelyn.  For IntusCare, they have direct access to our system to run exports, which appears is what is in your screenshot.  However, there is no specific integration with PCO."

And then you get into the technicals of what's in the screenshot.

So I'll ask my question, and if it requires you to keep scrolling and looking at the rest of the email, that's fine, but if you know, you can tell me.

What did you mean by "they have direct access to our system to run exports"?

A.   I'm not sure why I worded it that way, but my understanding is that they were getting, like, Excel files and exports of the data from the client.

Q.   So when you said "direct access," you don't mean that Intus was logging in to PACECare?

A.   That was never my understanding, correct.

Q.   So, as of 2022, you understood that Intus was getting, like you said, data downloaded by the PACE entity and sent to Intus?

A.   Yes.

Q.   And did RTZ have any issues with a PACE entity downloading patient data and sending it to a vendor?

MR. LEE:   Objection.   Lacks foundation.   Calls

Page 54

for speculation.

To the extent you can answer the question, based on your personal knowledge, go ahead.

THE WITNESS:  I'm not aware of a company policy or anything like that.

BY MR. BESHAI:

Q.    Okay.  I'll ask it from your particular vantage point, as the account manager or implementation manager.

Was there any point where you were instructed by anyone at RTZ to reach out to a PACE entity and say, hey, I understand you've been pulling exports and sending them to your vendor, you can't do that?

Did that ever happen?

A.    No, not that I recall.

Q.    As I understand this email, you were aware that, at least between Beacon and Intus, that's exactly what Beacon was doing, correct?

A.    Yes.

Q.    Okay.  Was it your understanding, at this time, that Beacon had one of their staff pull data and then send it to Intus?

A.    I mean, that's my general understanding of what happened, but I don't recall, really, any of these specific -- I never involved myself in it, honestly, so

Page 55

I don't know who was doing what, specifically.

Q.   Okay.   Do you recall learning that, actually, instead of a human being pulling data from PACE entities and sending it to Intus, it was actually an automatic script being used to pull the data?

A.   I do not recall that, no.

Q.   Okay.   As you sit here today, are you aware of whether Intus ever used an automated script?

A.   I am not.

Q.   As you sit here today, are you aware of any policy that RTZ ever had against the use of automated scripts?

A.   I guess, I'm not sure I understand the question.

Because my understanding of an automated script is that it's a file that we're creating, or a script that we're running from the system, so I'm not quite sure what you're referencing by scripts that they're running.

Q.   Good clarification.   Let me rephrase the question.

Are you aware of whether a PACE entity or any PACE entity used an automated script that either they or Intus created to pull data instead of having a human being do it?

Page 56

A.    I am not aware of that, no.

Q.    Okay.  Does that clarify what I meant by an automated script is different than what RTZ would have created, right?

A.    Yes.

Q.    So I have to ask my other question again, too.

Are you aware of any policy that RTZ had against a PACE entity or its vendor creating an automated script to do the same thing that a human staff member would have done?

A.    I'm not aware of anything.

Q.    And at any point, did you have to reach out, or were you instructed to reach out to any PACE entity and tell them, hey, you or your vendor created this automated script and it's pulling data, you can't do that?

A.    No.

Q.    Okay.  When you say "specific integration with PCO" here -- back on Bates number Intus 2004, and the email dated August 31st, 2022, you say there's no "specific integration with PCO."

What does that mean?

A.    Like, an interface between the two systems where we're sending information back and forth, and they are connected on the back end somehow.

Page 57

Q.   Okay.  When you -- there's a lot of pronouns. Let me make sure I get this.

When you say they're connected on the back end, you mean there's no interface between PACECare and Intus's system such that data is flowing from PACECare directly to whatever the PACE's system is?

THE WITNESS:  Correct.  Or back --

BY MR. BESHAI:

Q.   Sorry, say that last part again.

A.   Or back the other way, from Intus's system to PCO.

Q.   That's called a specific integration?

A.   I mean, that would be an integration.  So I was just saying that there was no integration that I was aware of between the two systems.

Q.   Were there other instances where RTZ created integrations between PACECare and a vendor?

A.   Yes.

Q.   Can you give me an example of one?

A.   Quest Labs.

Q.   Is that a situation where RTZ would have created a script?

A.   That's too technical for me.  I'm not sure how we're doing it.

Q.   No worries.  Okay.

Page 58

866-299-5127          calendar-ca@veritext.com          www.veritext.com

Let me just go through this.  I only have a few more questions.  All right.

I want to go up to Intus 2002.

Lauri Wertz, from Intus, is emailing the group, and that includes you, and she says, "Hello, All. I was asked to check back with your team as it seems that our login account has either been disabled or the password has been reset.  If anyone has any information, could you please let me know."

Do you see that?

A.   Yes.

Q.   Do you recall RTZ ever disabling Intus's account or resetting Intus's password?

A.   Yes.

Q.   Tell me about this.

A.   There has been several times when the client, I'm assuming, created the account for Intus because there were accounts in there without an NDA, and we have happened upon those and disabled them.

Q.   When you say the client created the account for Intus, how did you know it was an account for Intus as opposed to Beacon, I think, just like a normal Beacon account?

A.   The only way we would have known is by the email or by them telling us.

Page 59

Q.   When you say "by the email," you mean when you go to that spreadsheet we talked about at the very beginning of the deposition that had personnel names? It would have had an Intus.care domain name?

MR. LEE:  Objection.  Lacks foundation.

You can answer, if you can.

THE WITNESS:  It wouldn't have been on the spreadsheet, because that would have happened initially. These accounts would have been created sometime after implementation.

BY MR. BESHAI:

Q.   That's a good point.

So when you say -- I asked you, how would you know if it's an Intus account?

And you said, one way is, it would have been by the email.

Where are you seeing this email?  Is it in the audit log?  Is it -- where are you seeing this email that has "Intus" in it?

A.   The most likely place would have been directly in the staff information section of the system, where the accounts actually exist.

Q.   So there's a part of PACECare that's called the staff information section?

A.   Yes.

Page 60

Q.   And that's something you can access on your end, RTZ can?

A.   Yes.

Q.   And you're saying that one way you knew that Intus accessed PACECare is because, in the staff information section, it had an Intus domain name, correct?

A.   I don't know if that's one of the ways we knew, but that would have been one of the most likely ways to have identified an account from within Intus, yeah.

Q.   Sitting here today, you don't remember how you knew it was an Intus account?

A.   I do not recall this specific time, no.

Q.   And you're just giving me -- you're saying, just generally, we know who is behind that account?

A.   Yes.

Q.   And one way is in the staff -- what section again?  What was it called?

A.   Staff information.

Q.   Staff information section.

What's another way that you would have known the account -- that Intus was behind it?

A.   I've been on calls before where the clients have said, oh, my Intus person is looking at this, or

Page 61

doing this, and we know there's not an NDA.

So that's how we knew.

Q.    And any other ways?

A.    I mean, you could run a staff report, but if that's -- that's not a way that I have ever done it, but that would be a way to see the staff, yes.

Q.    And would a staff report just give you the same information that's in the staff information section on PACECare?

A.    In a spreadsheet format, yes.

Q.    So the difference between a staff report and the staff information section is the staff report is a spreadsheet export, whereas the staff information section is an interface itself?

A.    Correct, and you're looking at one account at a time.

Q.    Okay.  But it has the same information, just differently formatted?

A.    I would have to look at all the data points, but yes, it should be generally the same information.

Q.    Okay.  And so you recall, then, around this time, that you did -- not you personally, but RTZ disabled Intus's login account?

A.    Yes.

Q.    Was it you personally who did it?

Page 62

A.    No.

Q.    Do you recall who would have done it?

A.    I don't remember.

Q.    And then Laura responds, "IntusCare was provided an NDA in mid August, and we're still waiting its return.  Prior to any access to the application, staff should sign and be familiar with the terms."

This is consistent with what you told, I think it was, Beacon -- but what you told the other PACE entity in the email we looked at previously, correct?

A.    Yes.

Q.    And you testified earlier that you never had any conversations with colleagues about the NDA process, the NDA negotiation process?

A.    Correct.

Q.    Were you instructed at all to offer the PACE entities alternative methods of access?

Let me scratch that.  Let me ask it again.

Were you instructed at all to offer the PACE entities alternative methods by which they could provide the necessary data to Intus while this NDA process was pending?

A.    I don't recall timing exactly, but, I mean, the way that they would have received the data would have been those files, yes, the extracts, the reports.

Page 63

Q.   Right.  So you're sharing with me now the way to do it.

What I'm asking is, were you ever instructed by anyone at RTZ, hey, we can't give Intus direct access because of this NDA, but please tell the PACE entities that, if they want, they can just pull the data and send it to Intus?

A.   Yes, that's what we told them.

Q.   Oh, you were instructed to tell them that?

A.   I mean, I don't remember a specific conversation instructing me to tell them that, but yes, that was the general -- that's what I generally remember us saying.

Q.   Did you have any role whatsoever in drafting the contracts between RTZ and the PACE entities?

A.   No.

Q.   Have you ever seen one of the contracts between RTZ and the PACE entities?

A.   Yes.

Q.   In what context?

A.   Many contexts.  Trying to understand how to implement them, primarily.

MR. BESHAI:  Let's look at one together.  I'm going to pull up the Beacon contract.  Give me one moment.  This will be Exhibit 77.

Page 64

(Exhibit 77 marked for identification.)

BY MR. BESHAI:

Q.    I'll pull it up.  This is Beacon.

You mentioned, Melanie, that you've seen contracts in the past.

Is this one that you've seen before, the Beacon contract?

MR. LEE:  This is an amendment, correct?

MR. BESHAI:  Sorry, yes, it is an amendment to the contract between PACE and Beacon -- between PACE Toll (phonetic) and Beacon.

THE WITNESS:  I don't remember ever seeing this, but it's possible.

BY MR. BESHAI:

Q.    I should have clarified earlier.

When I said, have you looked at contracts, I should have also asked, did you look at any amendments to the contracts?

A.    Probably.  I don't remember.  I mean, I didn't do a lot with these.

Q.    Okay.  And you had no role in coming up with ideas for provisions to include in the amendments?

A.    No, no role.

Q.    Okay.  I want to draw your attention to Bates -- the page with Bates number RTZ 817.  No, I'm

Page 65

sorry, 818.  Let me know when you're there.

A.   I see it.

Q.   Do you see the section called Ownership?

A.   Yes.

Q.   Go to the second sentence of that where it says "Client agrees it will not."

I'm going to read a provision for you and then I'm going to ask you if you have any knowledge about it.

"Client agrees that it will not seek to reverse engineer PACECare or provide (and will expressly inform staff not to provide): (a) account credentials or other forms of access to PACECare; (b) screenshots or other forms of visual, written, or oral descriptions of PACECare, or (c) forms/documents/reports/extracts produced by PACECare to any internal software development team or third party - specifically but not limited to other software vendors competing with or seeking to compete with RTZ, including but not limited to" -- blah, blah, blah -- "IntusCare."

Do you see the part I read there?

A.   Yes.

Q.   I'm going to focus on subsection (c).  It basically -- this provision says that the client, the PACE entity agrees not to provide forms, documents, reports, extracts produced by PACECare to a number of

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

folks, including IntusCare.

Do you see that?

A.   Yes.

Q.   Earlier, you testified that you were instructed to tell these PACE entities that they could always just pull the reports and extracts and send them to Intus, correct?

A.   Again, I don't know if I was instructed specifically to do that, but I do recall that being the process, yes.

Q.   You're right, you did say that.  I apologize. You said you don't remember if you were instructed to, but that's what you did.

That was the protocol, right?

A.   As far as I recall, yes.

Q.   Okay.  Have you ever seen this contract provision before, this subsection (c) that I read for you?

A.   No.

Q.   Are you surprised to learn that PACE entities were actually prohibited from sharing reports and extracts with Intus?

MR. LEE:  I'm going to object to this line of questioning for two reasons.  One, this specific issue was discussed at length in the deposition of Mike

Page  67

Zawadski, and that particular provision was specifically explained to be in response to the creation of a data link for Beacon, which is the reason why the extract language was specifically inserted into this particular subsection (c) in the regular PCO agreements. "Extract" was not included in the language, and so, as Mr. Zawadski explained, this was a very unique situation involving a data link that had specifically been provided to Beacon.

So if you're going to ask these questions, I would certainly ask that you try and build a foundation, because the earlier portion of this amendment addresses the creation of that data link.

So I just want that on the record.

So to the extent that you are attempting to have this witness kind of explain her prior testimony in connection with this specific document, I just want to provide that context for the record.

MR. BESHAI: Okay. I mean, you know what, let's look at a different contract. We don't have to look at this one.

Let's go to Exhibit 78.

(Exhibit 78 marked for identification.)

BY MR. BESHAI:

Q. This is titled "PACECare agreement" and it's

Page 68

between High Desert and RTZ.

Are you familiar with this agreement?

A.   No.

Q.   Do you recall ever seeing it before?

A.   No.

Q.   Okay.  Let's go to -- I'm not going to belabor this, but just spend another two or three minutes on this.  Let's go to RTZ 850.

A.   Okay.

Q.   So look at section 7.1, under Ownership.

A.   Okay.

Q.   And the language I'm focused on is "Client agrees it will not" -- this is the second sentence at 7.1, "Client agrees it will not seek to reverse engineer PACECare or provide (and will expressly inform staff not to provide)" --

Go to subsection (c).

-- "forms, documents, reports produced by PACECare to" a number of folks and third parties, including IntusCare.

Do you see that there?

A.   Yes.

Q.   Did any PACE entities ever raise this issue with you, that they felt -- raised with you a concern that they felt they couldn't provide information to

Page 69

Intus because of this language?

A. No.

MR. BESHAI: I think we're at Exhibit 79 now. Give me one moment to stamp and share.

(Exhibit 79 marked for identification.)

MR. BESHAI: Do you have 79?

MR. LEE: It should be RTZ 2772, right?

THE WITNESS: I see it.

BY MR. BESHAI:

Q. Can you take a look at it. It's only two pages of substance, so just take a look.

A. Okay.

Q. All right. Do you recall who Bobbi Runyon was?

A. The name is familiar, but I don't recall their title.

Q. Okay. And it's familiar because this person was at Beacon PACE and you interacted with him a lot?

A. Yes.

Q. In this email, from September 2022, Bobbi Runyon says, "Melanie, I'd like to understand what the hesitation or holdup is with the integration between RTZ and IntusCare for Beacon of Life. The system is very important to us and we would like to get moving forward with the implementation, and understand there are some

Page 70

challenges on your side.  Intus Care works with many PACE programs across the country and have integrated successfully."

And then he asks for -- or they ask for a timeline or, alternatively, a phone call.

Do you see that?

A.   Yes.

Q.   And then you respond, "Hello" -- to Bobbi -- "Thanks for the email.  IntusCare has so far refused to sign the NDA, and in order to allow any outside vendor, we do require an NDA be signed."

I'm just skipping across, but that's the gist of what you're saying, correct?

A.   Yes.

Q.   Bobbi then follows up and says, "Would you mind providing some times in the next couple of weeks that we can hop on a call together with IntusCare and get this resolved."

Right?

A.   Yes.

Q.   And then you respond, "Thanks for the email. This matter has been handed over to outside counsel so I cannot comment or meet to discuss this."

Right?

A.   Yes.

Page 71

Q. Okay. Let's take these one at a time.

So starting with the first email from Bobbi, on September 21st, 2022, it looks like Beacon is concerned -- well, what was your understanding about why Bobbi sent this email?

A. They wanted to interface with Intus and PCO.

Q. Were there other PACE entities around this time that were reaching out and saying, like, hey, what's going on? We really need access for Intus?

A. I do not remember the time frames. I really don't.

Q. Leaving time frames aside, you do recall generally there was a point in time when RTZ -- and we looked at this email -- deactivated Intus's access?

A. Yes.

Q. At that time, when RTZ inactivated Intus's access, around that same time frame, do you recall other entities like Intus reaching out to say, hey, what can we do to fix this?

A. I don't recall the time frame, but I do recall PACE organizations reaching out, wanting access for Intus, yes, but I can't specify time frames at all.

Q. I'm not asking for date or time or year.

I'm just saying, do you recall that around the time that access was deactivated that it prompted a

Page 72

number of PACE entities to reach out and say, hey, like, can you help us fix this?

MR. LEE: Objection. Vague and ambiguous as to the term "a number of." Also lacks foundation.

But you can answer, if you understand.

THE WITNESS: Yeah, I don't recall one being the cause of the other, like us deactivating it and then that making other clients email.

I really can't remember how they were associated in the timeline.

BY MR. BESHAI:

Q. Okay. So you respond to Bobbi and you say "Thanks for the email. Intus has so far refused to sign the NDA we provided."

Right?

A. Yes.

Q. You didn't tell him that, you know, we're negotiating the NDA, you said Intus has refused, correct?

A. That's what I wrote there, yes.

Q. Who did you talk to, to learn that Intus had refused to sign the NDA?

A. Probably Mike, but that's a guess. It would have been Mike or Laura.

Q. Okay. Because you weren't part of the NDA

Page 73

discussions, right?

A.   Correct.

Q.   Sorry, it's -- sometimes the audio gets garbled.

Can you say that again?

A.   That's correct, I wasn't part of any of those conversations.

Q.   So other than Mike and Laura, is there anyone else from whom you would have learned information about the ongoing NDA discussions?

A.   No.

Q.   Do you recall if they told you -- Mike or Laura told you to phrase the answer this way, that Intus has so far refused to sign the NDA?

A.   I don't recall anyone specifically telling me to say it that way, no.

Q.   Okay.  And you agree with me that there's a difference between saying Intus has refused versus we're negotiating the NDA, correct?

A.   Not necessarily, because they would have had to refuse it, to begin with, to negotiate it.  So I feel like they would maybe be the same thing.

Q.   Okay.  But you don't recall where you came up with that particular phrase, that they refused to sign the NDA?

Page 74

A.    I don't.

Q.    Okay.  Bobbi responds, "Would you mind providing some times in the next couple of weeks that we can hop on a call together with IntusCare and get this resolved."

Do you see that?

A.    I do.

Q.    Did you raise this offer from Beacon with anybody else at RTZ?

A.    I don't remember.

Q.    Because then, you respond, "Thanks for the email.  This matter has been handed over to outside counsel so I can't comment or meet to discuss this."

Do you see that?

A.    Yes.

Q.    Is this something you unilaterally decided to tell him, or did someone instruct you, guide you to answer this way?

A.    I would have either known that if anyone asks for something at this point, we're going to say, no, you know, we're working on it, working on an NDA, or, again, because I don't remember the time frame specifically, I would have brought this to Mike or Laura and said, you know, how are we replying these days to these requests?

Q.    Okay.  So either way, it would have been

Page 75

guidance you got either because it was just general guidance or because, specifically, you raised this and you got guidance on how to respond?

A.   Yes.

Q.   And the guidance would have come from either Mike or Laura, correct?

A.   Yes.

Q.   So they were telling you to tell PACE entities that you can't talk further because the matter has been handed over to outside counsel, correct?

A.   Correct.  Because I wouldn't have been the right person to talk to on those calls anyway.  We would have been wasting everyone's time.

MR. BESHAI:  Okay.  I think it's been another hour.

Here's my proposal.  We take a ten-minute break now, and I think I can have us out of here by 1:30.  2:00, at the latest, but likely 1:30.

If that's a possibility, Melanie, would it be okay to forego a lunch break and just take a little break now and then power through until 1:30/2:00?

THE WITNESS:  Yes.  Because I thought we were going to be done by 1:00, and my husband does go to work later, so I need to be done by 2:00, for sure.

MR. BESHAI:  It will be 2:00, for sure.  Maybe

Page 76

even 1:30.

So why don't we do, like, a six-minute break now, come back at 12:10, and then we can just power through and get the rest of it done.

Dave, is that okay with you, too?

MR. LEE:  Honestly, it's more of a question for the witness and the court reporter.  It's fine with me.

MR. BESHAI:  Okay, then 12:10, we'll resume.

MR. LEE:  Perfect.  Thank you.

(A short recess was taken.)

MR. BESHAI:  I'm going to stamp the next exhibit and introduce it.

(Exhibit 80 marked for identification.)

MR. BESHAI:  This is an email from September 1st, 2022.  It's from -- well, I'll give you a moment to look at it and then I'll ask you some questions.

THE WITNESS:  I see it.

BY MR. BESHAI:

Q.   Let's first look at the subject line.

You see, it says "Re: Intus NDA"?

A.   Yes.

Q.   And then the email from Mike Zawadski, at the bottom, says, "Do we have it back yet?  If not, that is our response to Intus to all questions."

Page 77

Right?  You see that?

A.  Yes.

Q.  And then you say, "Okay, thanks."

And Laura says, "Confirmed too - thanks Mike."

I have a couple questions on this.

First, you'd agree with me that the only RTZ folks on this email thread are you and Laura Emery and Mike Zawadski?

A.  Yes.

Q.  And he's giving you guidance on how to respond until the NDA is returned?

A.  Yes.

Q.  And is the reason that no one else is on this email thread -- is that because, to your knowledge, you and Laura were the two people interacting most with PACE entities about this issue?

A.  Yes.

Q.  Is Laura -- what's the -- what's her title at this time in 2022?

A.  I don't remember.

Q.  Would you say, in the organizational hierarchy, she was equal to you?  Above you?  Below you?

A.  She was above me.

Q.  Okay.  Do you remember what -- this is the only email we got.

Page 78

I wish I had more to show you, but do you remember what Mike Zawadski meant when he said "that is our response to Intus"?  What was the response?

A.   I don't remember.

Q.   Okay.  Do you recall ever having a conversation with Mike and Laura about, for instance, trying to meet Intus halfway or negotiate with them?

A.   No.  I wasn't involved in those conversations.

Q.   Okay.

MR. BESHAI:  Let's keep going.

This has been stamped 81.

(Exhibit 81 marked for identification.)

MR. BESHAI:  I'll give you a chance to look at it.

THE WITNESS:  Okay.

BY MR. BESHAI:

Q.   So this is between you and Juan Vidal, from a little over a year ago, year and a half ago.

Do you see that?

A.   Yes.

Q.   And do you know who Juan Vidal is?

A.   Yes.  He works at Esperanza.

Q.   Juan and you -- is it fair to say you're discussing not an Intus-related NDA, but just an NDA with one of their transportation managers?

Page 79

A.    Yes.  So it looks like it's for Secure Transportation.

Q.    Okay.  You respond, at the end of this chain, and you say, "Hi, Juan.  I also wanted to note that going forward the NDAs should come from us.  Several reasons for that: (1) We want to be able to update the NDA over time.  (2) We have slightly different NDAs for different types of access."

And then "3) There are some entities (such as Intus) where signing an NDA is not appropriate at this point in time and access is being handled through different means."

Do you see that?

A.    Yes.

Q.    What did you mean by item 3?

A.    I'm assuming I meant the legal stuff happening, but there -- this would have probably been an example where I would have asked for guidance, and someone would have told me kind of how to phrase it.

Q.    Okay.  So this is another example of what we saw before, where you'd go to Mike or Laura, and they're just saying, hey, this is the message --

A.    Yeah, with different names --

Q.    Okay.

MR. BESHAI:  So let's go back.  This is going

Page 80

to be Exhibit 82.

(Exhibit 82 marked for identification.)

BY MR. BESHAI:

Q.   Can you see it?

A.   Yes.

Q.   Is the exhibit -- it's blocking it, isn't it.

Just take a moment to look at this, and then I'll ask my question.

A.   Okay.

Q.   This is from someone at Esperanza, again, Ryan Gadia, right?

A.   Yes.  Gadia.

Q.   Gadia.

Are you familiar with this person?

A.   Yes.

Q.   Now, it looks like -- this is November 2024. So a year and a half ago, year and a few months ago.  He says Esperanza is basically moving forward with Intus as their coding and analytics partner.

And then he mentions that he has previously talked about an NDA with RTZ.

And then he asks you to send the NDA to Sneha, from Intus, right?

A.   Yes.

Q.   Sneha says thank you, and to please share it

Page 81

over.

Correct?

A.   Yes.

Q.   And then you say -- then you take the chain offline, right, and go to other folks you work with, Alex Lueth, Cheyenne Bradley and Kristin Prentiss.  And you ask Alex, "Any specific wording we should use to reply to this since they have the Intus employee on this thread?"

Do you see that?

A.   Yes.

Q.   Were you concerned that the message might have to be different because there was an Intus employee on the thread?

A.   Well, my concern was more so -- like, where do we stand?  What do we say?  I don't know what is happening with this whole Intus thing, so what do I say to them?

Q.   And Alex Lueth -- when did she start at RTZ?

A.   I don't remember.  She was -- maybe 2023.

Q.   Was she at Senior Care Partners before that?

A.   Yes.

Q.   When she came into RTZ, what was her role?

A.   I don't remember her title.  Product evolutionist, I think.

Page 82

Q.   Product evolutionist?

A.   I think.  But that may be wrong.  I think it's something along those lines.

Q.   All right.  That's a very techy role.  I've never heard of an evolutionist, outside of biology, maybe.  Okay.

So was she -- in the hierarchy chain, was she a little bit above you?  Is that why you're taking guidance from her?

A.   She was my supervisor for a while.

Q.   She was?  Where did she stand in relation to Laura Emery in the hierarchy?

A.   I don't know.  We didn't have an official hierarchy printed thing or anything like that.

Q.   No org chart?

A.   No org chart.  Thank you.  That's what I was looking for.

Q.   Okay.

MR. DESHAI:  Let me see what the next email I want to go over is.

MR. LEE:  I'm sorry, Andrew, are we done with No. 82?

MR. BESHAI:  Yes, we are.

MR. LEE:  Thank you.

MR. BESHAI:  Sure.

Page 83

Here's another one I want to talk about.  This is going to be Exhibit 83.

(Exhibit 83 marked for identification.)

THE WITNESS:  Okay.

BY MR. BESHAI:

Q.    This is from, basically, a year ago, and it's Kyle Mendez, from Habitat Health, and it looks like he's asking for Intus to be onboarded as their vendor, correct?

A.    Yes.

Q.    And you respond, "At this time we are not able to allow Intus employees access to PCO due to ongoing litigation between the entities."

A.    Yes.

Q.    Okay.  Who would you have consulted in January 2025 to know what to say in response here?

A.    I don't remember.  Maybe Laura.

Q.    Okay.  But it would still have been the folks in the universe that we talked about -- Laura, Mike, or maybe Alex?

A.    I don't think Alex was working there anymore.  It may have been someone else, and I may have said, hey, I got this email, can you tell me what to say?

I really don't remember.  We've had so much process and shift in supervisors.

Page 84

Q.   Sure.

MR. DESHAI:  Give me one moment here.  I'm looking at Exhibit 84.

(Exhibit 84 marked for identification.)

BY MR. BESHAI:

Q.   Take a moment, look at it, and I'll ask you some questions.

A.   Okay.

Q.   So this is someone named Cassandra da Rosa, from St. Paul's PACE.

Do you see that?

A.   Yes.

Q.   And they want to contract with Intus, and she's reaching out, asking about bringing the teams together to come up with an access agreement, is that right?

A.   Well, it says "bringing the teams together to get this moving forward," but I don't know what --

Q.   Fair enough.

The idea being getting access to the data, correct?

A.   Yes.

Q.   When we talk about data, is it your understanding that this data belongs to the PACE entities?

Page 85

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A.    I don't know who it belongs to.

Q.    Okay.  In your experience over the last 13 years, was there ever a time when anyone from the PACE entities or Intus requested access to the source code of PACECare?

A.    We've had that request before, yes.  I don't recall from who specifically.

Q.    Do you recall if it was from Intus?

A.    I don't think it was from Intus, no.

Q.    So you're saying a PACE entity wanted access to RTZ's source code?

A.    Well, they wanted access to -- do you mean -- maybe I need clarification.

Are we talking about the code of the system now, or are we talking about, like, the source of the data tables and that type of stuff?

Q.    Let's start with the system, like, the program source code that went in to build the system, PACECare system.

A.    Okay.  Yeah, I'm not aware of anyone that's asked for that.

Q.    So, to your knowledge, staying with Intus, any requests that you fielded for access to Intus has just been access to the user interface?

A.    Yes, access to have a staff account to log in,

Page 86

yes.

Q.   The same kind of access that the PACE entity itself would have?

A.   Yes.

Q.   Your response here to Cassie -- Cassandra -- is, "Thank you for the email!  Unfortunately, at this time we would be unable to move forward with any calls to implement this project.  There is no established integration collaboration between RTZ and Intus, and while we have had several discussions between our team and theirs, we have yet to reach a conclusion on how best to move forward.  Currently, the process is with the legal teams/management and I don't have any further information."

So you'd agree with me that this is the second instance we've seen of a PACE entity asking for some sort of call between RTZ, Intus and themselves to try to chart a path forward?

A.   I believe this is the second one we've looked at, yes.

Q.   Do you recall that ever happening, other than the two instances we looked at here today?

A.   Not specifically, no.

Q.   Do you recall having conversations at all with Mike or Laura about, hey, these folks want to talk,

Page 87

maybe we should talk.

A.   I mean, yes, I would have definitely brought this and said, hey, the client wants to review this, or, you know, the client is asking for a call, but, I mean, we've got lots of requests for calls, so I wouldn't necessarily have just accepted any call in.  I may not have been the right person.

Q.   And do you remember what the messaging was from Mike, Laura and others about whether RTZ should engage with these kinds of calls?

A.   I remember that they said, you know, there's discussions happening on whether the NDA can be signed or not, or, what's going to happen with that, and that -- until that, we aren't doing any calls, because without that, there's nothing to implement.

Q.   As you sit here today, do you know if there's an NDA with Intus?

A.   I do not know.

Q.   I mean, the fact that you're sitting here today means there's no --

A.   I can assume so, yes.  I don't know.

Q.   And we saw this process start in around 2022, correct, the NDA process, when you first reached out and told Intus they needed one, correct?

A.   I believe so, yes.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q.   Do you know why it still hasn't been done?
Have you heard anything, or do you have any sense?

MR. LEE:  Objection.  Calls for speculation.

You can answer, if you know.

THE WITNESS:  Yea, I mean, I don't know.  All
I know is there's been no agreement on the two sides.

MR. BESHAI:  This will be Exhibit 85.

(Exhibit 85 marked for identification.)

BY MR. BESHAI:

Q.   I know you're not on this email, but I still
want you to look at it, because I have some questions
about conversations surrounding this.

A.   Okay.

Q.   Okay.  Like I said, you're not on this email,
but did you ever -- when Alex moved from Senior Care
Partners, did you ever have conversations with her about
access being cut off in September 2022?

A.   No.

Q.   Did you ever have PACE entities reaching out
in frustration about Intus access being cut off in 2022
or at any point thereafter?

A.   Yes.

Q.   Can you tell me which PACE entities come to
mind?

A.   Oh, that I probably can't.  I mean, there is a

Page 89

very recent example, if you want that one, but this was just a couple weeks ago.

Q.   Sure, I'll take the latest example.

A.   Sure.  Well, there was -- Intus employees with accounts in our PACE CNY client's site that I know leadership disabled.

Q.   And did, then, the CNY folks reach out, and they were frustrated?

A.   I mean, they mentioned it on a call, but that wouldn't have been something that I would have discussed with them.  That would have gone to somebody above me.

Q.   Okay.  So it sounds like what you gave me is an example of a recent Intus account being deactivated, right?

A.   Yes.

Q.   With CNY, correct?

A.   Yes.

Q.   My question was a little different.

My question was -- I'd asked you if you have examples of PACE entities reaching out in frustration after the access to Intus was cut off, and you said, yes, and then I said, can you give me examples.

So other than the CNY instance, do you have examples of those?

A.   I recall other times where there were Intus

Page 90

employees in clients' copies that we disabled because they were found, but I don't remember who or when.

Q.   Okay.

MR. BESHAI:   I'm going to show you Exhibit 86.

(Exhibit 86 marked for identification.)

BY MR. BESHAI:

Q.   I know you're not on this one, but again, it's a subject matter that I'd like to probe your knowledge on.

A.   Okay.

Q.   So I know you're not on the email, but you'd agree with me that this is -- the general topic of this email is "Downtime for PACECare and figuring out a backup plan," correct?

A.   Yes.

Q.   Okay.   Were there ever any similar reachouts to this directed at you from PACE entities complaining that PACECare was down or there was system strain or anything like that?

A.   Yes.

Q.   At any point -- well, let me ask you this.

When you were to get those kind of emails, what did you do with them?

A.   Well, it would depend on what kind of email it was.   If the system was actively down, I'd reach out to

Page 91

IT to check it.  If we knew what time period of when it was down, we might put a ticket in to find a root cause.

If it was just, like, a general, you know, hey, we don't like our site going down, then maybe we would try to figure out the days and times we knew it was going to go down and share that with the client.  I mean, it really depended on the specific scenario.

Q.  Were you ever part of communications after the system outage issue was solved?  Were you part of communications about, okay, here's why this happened, because of X, Y, Z?

A.  Yes.

Q.  As you sit here today, were you ever part of any conversation in which a system outage or system strain was attributed to Intus?

A.  No.

MR. BESHAI:  I think I'm done with exhibits, but now, I just have a few questions.  I think we might be able to get out of here by 1:00.

MR. LEE:  You just made everybody's afternoon.

MR. BESHAI:  I know, I know.  Oh, wait, there's a folder with 20 more documents.

Just kidding.  The documents are done.

Q.  All right, let me ask you this.

Were you ever asked to investigate, monitor or

Page 92

address Intus's access of PACECare?

A.    No.

Q.    Okay.   In those instances, where you came across Intus access, and I think you mentioned this could have happened in a few ways:   One, you spot an Intus domain name, or, two, on a call you learn from staff at a PACE entity that Intus users are in the system, right?   Those are kind of the two ways you described?

A.    Yes.

Q.    When you do learn of Intus access and you are then required to deactivate Intus access, what does that process look like?

A.    I would have just told whoever my supervisor was, and that's really the extent of how I was involved.

Q.    Who does the actual deactivation?

A.    I'm not sure.

Q.    Okay.   I'm just going through my notes here. Give me a moment.

Are you aware of whether there's ever been increased hosting fees attributed to Intus?

A.    I'm not aware of anything related to that.

Q.    Okay.   Are you aware of any intellectual property that Intus improperly took from PACECare?

A.    I'm not aware of anything.

Page 93

Q.   Have you ever had a conversation with anybody about Intus improperly taking intellectual property from PACECare?

A.   No.

Q.   At some point, when Intus had its access blocked and while the NDA negotiations were ongoing, is it your understanding that PACE entities would just manually create these exports and send them to Intus?

A.   Yes.

Q.   Okay.  And are you aware of how much longer it would take for someone from Intus -- sorry, for someone from the PACE entities to do this manual process versus having Intus access the system and do it themselves?

A.   It shouldn't take any difference in time.  It would be the same reports, I would think.

Q.   Are you aware of how much longer it would take to have a human being do it versus having an automated script do it?

A.   I'm not aware, but I can imagine there would be a significant time difference.

MR. BESHAI:  I think that's it.  That's all I have.

David, do you have any questions?

MR. LEE:  No questions.

MR. BESHAI:  Okay.  Thank you for your time,

Page 94

Melanie.  I appreciate it.

THE WITNESS:  Thank you.

(The proceedings concluded at 12:43 p.m.)

--oOo--

Page 95

DEPONENT'S DECLARATION

I, MELANIE MARTINEZ, hereby declare:

I have read the foregoing deposition transcript and identify it as my own and approve same.

I declare under penalty of perjury under the laws of the State of California that the foregoing testimony is true and correct.

Dated this _____ day of _____, 2026, at _____, California.

_____

MELANIE MARTINEZ

Page 96

STATE OF CALIFORNIA          )

COUNTY OF SANTA BARBARA   )    ss.

I, Mark McClure, C.S.R. No. 12203, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was { } was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 19 day of March, 2026.

Certified Shorthand Reporter

State of California

CSR No. 12203

Page 97

ANDREW BESHAI, ESQ.

ABESHAI@MANATT.COM

March 19, 2026

RE: Intuscare, Inc. v. RTZ Associates, Inc. Et Al.

3/6/2026, Melanie Martinez, (#7946249).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
   to schedule a time to review the original transcript at
   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
   Transcript - The witness should review the transcript and
   make any necessary corrections on the errata pages included
   below, notating the page and line number of the corrections.
   The witness should then sign and date the errata and penalty
   of perjury pages and return the completed pages to all
   appearing counsel within the period of time determined at
   the deposition or provided by the Code of Civil Procedure.
   Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of
   Counsel - Original transcript to be released for signature
   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the
   time of the deposition.

Page 98

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 99

**[& - 850]**

| & | |
|---|---|
| **&**  2:8 3:10,15 98:24 99:9 | |

| 0 | |
|---|---|
| **002002**  3:21 | |
| **002009**  3:21 | |

| 1 | |
|---|---|
| **1**  1:7 3:13 4:8 4:16 80:6 99:1 | |
| **10**  1:7 13:16 | |
| **100**  29:22 | |
| **10:07**  2:1 5:1 | |
| **1132**  1:4 | |
| **12203**  1:25 2:3 97:4,25 | |
| **12:10**  77:3,9 | |
| **12:43**  95:3 | |
| **13**  10:22 86:2 | |
| **1700**  2:9 | |
| **17688**  97:23 | |
| **19**  97:21 98:3 | |
| **1:00**  76:23 92:19 | |
| **1:30**  76:18,18 77:1 | |
| **1:30/2:00**  76:21 | |
| **1st**  77:16 | |

| 2 | |
|---|---|
| **2**  3:11,22 4:10 9:16 10:2 80:7 | |
| **20**  3:25 92:22 | |
| **2002**  59:3 | |
| **2004**  53:17 57:19 | |

**2008**  33:21
**2010**  32:24 33:20
**2012**  10:13,14 10:19 13:6 21:5 33:1,21
**2021**  30:2,12 31:23 35:7 52:12,21 53:1
**2022**  30:5 46:10 51:7 52:8,23 53:1 54:19 57:20 70:20 72:3 77:16 78:19 88:22 89:17,20
**2023**  30:7,12 82:20
**2024**  8:4 9:18 10:2 12:12 30:10 35:7 43:8 81:16
**2025**  9:16 10:18,19 13:6 41:17 84:16
**2025.520**  98:9 98:12
**2026**  1:16 2:2 5:1 96:9 97:22 98:3
**2049**  2:9
**21st**  72:3
**23**  3:9
**25**  3:12

**2772**  70:7
**2:00**  76:18,24 76:25

| 3 | |
|---|---|
| **3**  4:5,13,18,21 4:23 53:17 80:9,15 | |
| **3/6/2026**  98:5 | |
| **30**  99:1 | |
| **31**  3:14 | |
| **310.312.4000**  2:10 | |
| **31st**  57:20 | |
| **34th**  2:15 | |
| **3:00**  5:22 | |

| 4 | |
|---|---|
| **415.398.3600**  2:16 | |
| **45**  3:17 | |
| **4:24**  1:4 | |

| 5 | |
|---|---|
| **5**  3:4,23 | |
| **50**  2:15 | |
| **53**  3:19 | |

| 6 | |
|---|---|
| **6**  1:16 2:2 3:18 5:1 | |
| **65**  3:22 | |
| **68**  3:24 | |

| 7 | |
|---|---|
| **7**  3:16 | |
| **7.1**  69:10,14 | |

**70**  4:4
**72**  3:9 23:3,4
**73**  3:12 25:24 25:25
**74**  3:14 30:25 31:1 51:11,17 51:19,24 52:1 52:3,11
**75**  3:17 45:13 45:14 52:1,7
**76**  3:19 53:6,7
**77**  3:22 4:7 64:25 65:1
**78**  3:24 68:22 68:23
**79**  4:4,9 70:3,5 70:6
**7946249**  1:23 98:5

| 8 | |
|---|---|
| **8**  3:21 33:15 | |
| **80**  4:7 77:14 | |
| **81**  4:9,11 79:11 79:12 | |
| **817**  65:25 | |
| **818**  66:1 | |
| **82**  4:11 81:1,2 83:22 | |
| **83**  4:14 84:2,3 | |
| **84**  4:14,17 85:3 85:4 | |
| **85**  4:17,19 89:7 89:8 | |
| **850**  69:8 | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[86 - amendments]**

| | | | |
|---|---|---|---|
| **86**  4:22 91:4,5 | 41:18,19 46:6 | 19:5,8 20:16 | 87:15 91:12 |
| **89**  4:19 | 46:12 47:13 | 37:13 59:18 | **agreement**  3:23 |
| **8th**  46:9 | 48:15,19,25 | 60:9,22 90:5 | 3:24 68:25 |
| **9** | 49:2 50:18 | **acquisitions** | 69:2 85:15 |
| | 51:21 52:17 | 8:22 | 89:6 |
| **90067**  2:10 | 53:1 54:3,11 | **action**  97:20 | **agreements** |
| **91**  4:22 | 54:16 61:1 | **actively**  91:25 | 68:5 |
| **94111**  2:15 | 63:6,17 64:4 | **actual**  17:24 | **agrees**  66:6,9 |
| | 66:12 72:9,14 | 18:5 37:6 | 66:24 69:13,14 |
| **a** | 72:17,21,25 | 93:16 | **ahead**  47:8 |
| **a.m.**  2:1 5:1 | 80:8,11 84:12 | **actually**  37:5 | 53:9 55:3 |
| **abeshai**  2:11 | 85:15,20 86:4 | 39:5 56:2,4 | **al**  98:4 |
| 98:2 | 86:10,12,23,24 | 60:22 67:21 | **alert**  42:13 |
| **able**  6:8 26:18 | 86:25 87:2 | **additional** | **alex**  3:14 4:20 |
| 41:11 80:6 | 89:17,20 90:21 | 13:17 | 4:22 82:6,7,19 |
| 84:11 92:19 | 93:1,4,11,12 | **address**  14:1,2 | 84:20,21 89:15 |
| **above**  78:22,23 | 94:5,13 | 15:8 20:21,22 | **allow**  71:10 |
| 83:8 90:11 | **accessed**  37:14 | 20:24,25 21:2 | 84:12 |
| 98:6 | 61:5 | 37:3 93:1 | **allowed**  20:23 |
| **absolutely** | **accessing**  17:20 | **addresses** | **alternative** |
| 45:10 | **account**  9:7,11 | 15:23 68:12 | 63:17,20 |
| **accepted**  88:6 | 10:9,25 11:15 | **adjustment** | **alternatively** |
| **access**  4:15 | 15:9 19:10 | 4:13 | 71:5 |
| 11:20 12:6,9 | 20:9,11,13,14 | **administrator** | **amanda**  3:19 |
| 13:25 14:16,18 | 20:19 22:11,16 | 35:18 | 45:25 |
| 14:19,19,20 | 46:3,16,17,20 | **adverse**  6:25 | **amazed**  45:1 |
| 15:4,11,24 | 46:25 47:4,20 | **advisory**  5:20 | **ambiguous** |
| 16:10,21 17:3 | 48:2 55:8 59:7 | **afternoon** | 14:4 27:2 34:8 |
| 17:9 18:12,15 | 59:13,17,20,21 | 92:20 | 36:1,13 73:3 |
| 18:24 19:18,24 | 59:23 60:14 | **ago**  38:4 45:2 | **amendment** |
| 20:2,3 22:4 | 61:10,13,16,23 | 79:18,18 81:17 | 3:22 65:8,9 |
| 27:8 29:14,22 | 62:15,23 66:11 | 81:17 84:6 | 68:12 |
| 30:12,21 31:24 | 86:25 90:13 | 90:2 | **amendments** |
| 32:4 34:7 | **accounts**  15:11 | **agree**  52:8 | 65:17,22 |
| 36:11,18 37:15 | 17:24 18:4,6,7 | 74:17 78:6 | |
| 38:19 41:12,15 | | | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[analysis - back]**

**analysis** 46:19
**analytics** 81:19
**andrew** 2:9
  37:9 43:12
  83:21 98:1
**andrewbeshai**
  16:8
**angeles** 2:10
**angie** 23:20
  24:5,12
**answer** 6:6,13
  7:7,9,11,12 8:7
  9:23 10:6 14:5
  14:23 15:14
  16:14 19:3
  21:13 22:19,22
  24:15 26:17
  27:4 34:10,14
  36:2 42:17,18
  43:22,24,25
  47:8 48:6
  53:24 55:2
  60:6 73:5
  74:13 75:18
  89:4
**answered**
  41:25
**answering** 7:16
  11:19
**answers** 6:7
  29:10
**anticipate** 5:22
  6:11
**anybody** 9:11
  43:19 50:24

75:9 94:1
**anymore** 21:22
  21:23 41:15
  84:21
**anyway** 76:12
**apartment**
  33:15
**apologize** 37:6
  67:11
**appearances**
  2:6
**appearing** 2:8
  2:13 98:18
  99:7
**appears** 54:4
**application**
  63:6
**appreciate** 95:1
**appropriate**
  80:10
**approve** 96:5
**area** 38:2,10
**areas** 11:9
  37:23,25 38:3
  38:6,7 47:14
**aside** 72:12
**asked** 24:21
  28:18 39:17
  44:5,8,22
  47:20 52:14
  59:6 60:13
  65:17 80:18
  86:21 90:19
  92:25

**asking** 24:5
  28:24 46:17
  47:6 51:2 64:3
  72:23 84:8
  85:14 87:16
  88:4
**asks** 71:4 75:19
  81:22
**assign** 46:21
**assigned** 47:23
  48:2
**assistance**
  13:25
**assisted** 10:8
**assisting** 22:3
**associated**
  73:10
**associates** 1:7
  2:12 98:4
**assume** 88:21
**assuming** 43:13
  59:17 80:16
**attempting**
  68:15
**attention** 53:16
  65:24
**attorney** 7:8
**attorneys** 27:23
**attributed**
  92:15 93:21
**audible** 6:7
**audio** 74:3
**audit** 36:5,11
  36:17,19 37:14
  38:1,12,16,21

39:5,7,23,24
  40:10,13 41:3
  60:18
**august** 46:9
  51:7 52:8,23
  53:1 57:20
  63:5
**authorization**
  35:12,13
**authorized**
  35:14
**automated**
  34:18 35:3,8
  35:24 36:15
  56:8,11,15,23
  57:3,9,15
  94:17
**automatic** 56:4
**avoid** 6:25 7:21
**aware** 18:22
  29:4,6 35:7
  41:2,4,6 42:3
  47:16 55:4,16
  56:7,10,22
  57:1,7,11
  58:15 86:20
  93:20,22,23,25
  94:10,16,19

**b**

**b** 3:7 4:2 66:12
  99:1
**back** 13:22
  18:18 20:7
  21:11 25:23
  29:25 34:1

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

**[back - care]**

| | | | |
|---|---|---|---|
| 41:12 47:18 50:19 51:10,15 57:19,24,25 58:3,7,10 59:6 77:3,24 80:25 | **berkeley**  33:17 **beshai**  2:9 3:4 5:8 8:9 14:7 15:1,16 16:16 19:7 23:1,5 | **biology**  83:5 **bit**  83:8 **blah**  66:19,19 66:19 | **bullet**  45:17 46:15 **burden**  30:13 **buttons**  25:2 |

**background** 32:6 34:2
**backup** 91:14
**bad** 29:22
**barbara** 97:2
**based** 5:11 23:22 38:18 52:18 55:3
**basically** 11:18 66:23 81:18 84:6
**basis** 38:13
**bates** 46:4,10 57:19 65:25,25
**beacon** 53:22 55:17,18,21 59:22,22 63:9 64:24 65:3,7 65:10,11 68:3 68:9 70:18,23 72:3 75:8
**beginning** 60:3
**behalf** 2:7,12
**belabor** 39:9 69:6
**believe** 10:18 37:5,16 52:14 87:19 88:25
**belongs** 85:24 86:1

24:18 25:25
26:3,19 27:10
30:24 31:3,11
31:17 34:12
36:4,16 37:9
42:24 43:15,17
44:7 45:4,10
45:12,15 47:11
48:8 51:15,20
52:2,6 53:5,8
55:6 58:8
60:11 64:23
65:2,9,14
68:19,24 70:3
70:6,9 73:11
76:14,25 77:9
77:12,15,19
79:10,13,16
80:25 81:3
83:23,25 84:5
85:5 89:7,9
91:4,6 92:17
92:21 94:21,25
98:1
**best** 8:17 28:16 87:12
**better** 6:24 17:6
**bigger** 13:21

**blank** 43:20
**blocked** 94:6
**blocking** 28:20 81:6
**bobbi** 4:4 70:13 70:20 71:8,15 72:2,5 73:12 75:2
**bottom** 77:24
**bradley** 82:6
**break** 7:7 45:6 45:6,7,9 76:17 76:20,21 77:2
**breaks** 7:4,5
**briefly** 32:9
**bringing** 85:14 85:17
**broad** 24:19
**broke** 25:11
**brought** 75:23 88:2
**bucket** 12:19 13:9 15:20
**bug** 40:3,4
**bugs** 11:12 39:18
**build** 68:11 86:18
**building** 33:16
**built** 27:6 38:1

**c**

**c** 2:14 66:14,22 67:17 68:5 69:17
**c.s.r.** 2:3 97:4
**ca** 1:23 98:9,12 98:21
**cal** 1:25
**california** 1:2 1:17 2:4,10,15 2:15 5:12 96:7 96:10 97:1,5 97:24
**call** 28:1,3 71:5 71:17 75:4 87:17 88:4,6 90:9 93:6
**called** 8:11 9:1 42:14 58:12 60:23 61:19 66:3
**calls** 8:5 11:18 15:12 24:14 26:16 47:5 48:4 54:25 61:24 76:12 87:7 88:5,10 88:14 89:3
**care** 12:2 14:11 14:16,20 16:10 17:3,9 20:25

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[care - concerned]

23:23 26:5 33:7 71:1 82:21 89:15
**carinna** 3:9,12 24:1,1,5 26:6
**case** 1:4 15:7 41:7 97:16
**cassandra** 4:17 85:9 87:5
**cassie** 87:5
**cause** 73:7 92:2
**caused** 29:16
**causing** 29:15 30:21
**caution** 6:23
**ccp** 98:9,12
**central** 18:9,13
**century** 2:9
**certain** 24:24 44:21
**certainly** 68:11
**certificates** 32:19
**certified** 2:3 97:24
**certify** 97:5,19
**chain** 80:3 82:4 83:7
**challenges** 71:1
**chance** 6:12 23:6 31:5 45:17 79:13
**change** 19:5,9 21:17

**changed** 8:15 8:18 25:7,15
**characterize** 46:5
**charge** 18:17
**chart** 83:15,16 87:18
**check** 28:1,3,5 50:21 59:6 92:1
**cheyenne** 82:6
**civil** 98:19,21
**claims** 35:19
**clara** 32:11
**clarification** 35:6 56:20 86:13
**clarified** 41:1 65:15
**clarify** 6:25 33:3 35:6 47:15 57:2
**clean** 41:13,17
**clear** 15:18
**click** 38:2
**clicked** 37:22
**client** 11:7 13:24 14:2 20:3,6,8,10,12 20:14,18,20 35:15 39:16,22 54:15 59:16,20 66:6,9,23 69:12,14 88:3 88:4 92:6

**client's** 90:5
**clients** 11:18,21 11:23 12:5 13:18 15:4,6,7 21:23 26:12 27:1 44:21,24 45:3 48:12 49:7 61:24 73:8 91:1
**cny** 90:5,7,16 90:23
**code** 86:4,11,14 86:18 98:9,12 98:19,21
**coding** 4:12 38:10 81:19
**colabrios.wh...** 9:8
**collaboration** 4:18 87:9
**collabrios** 7:24 8:3,4,13,25 9:1 9:2,5,13,20 10:1,5 13:7,11 21:18 22:16,21 35:5 41:8
**colleagues** 24:2 27:18,20 49:21 63:13
**college** 33:8
**combined** 8:19 8:24 13:18
**come** 37:10 76:5 77:3 80:5 85:15 89:23

**comfortable** 31:13
**coming** 65:21
**comment** 71:23 75:13
**communicati...** 42:19 43:22,25 92:8,10
**community** 45:24 46:6,11
**companies** 8:19 8:24 13:17
**company** 8:11 8:20 13:21,24 14:14 25:19 29:13 41:21 55:4
**compete** 66:18
**competing** 66:17
**complaining** 91:17
**complete** 97:13
**completed** 98:7 98:17 99:6
**completion** 97:17 99:10
**comprehensive** 24:10
**concern** 25:19 34:9 69:24 82:15
**concerned** 25:16 72:4 82:12

Page 5

**[concerns - database]**

concerns 34:12
concluded 95:3
conclusion
  87:11
configuration
  16:1
configure 11:8
confirmed 78:4
connected
  57:25 58:3
connection
  36:14 68:17
consistent
  10:21 63:8
consult 39:11
consultation
  19:23
consulted
  84:15
contact 98:9,20
context 34:19
  64:20 68:18
contexts 64:21
continue 45:5
contract 14:14
  49:9 64:24
  65:7,10 67:16
  68:20 85:13
contracted
  46:18
contracting
  18:16 20:8
contracts 28:11
  64:15,17 65:5
  65:16,18

conversation
  46:11 64:11
  79:6 92:14
  94:1
conversations
  34:15,16 42:16
  49:19,25 63:13
  74:7 79:8
  87:24 89:12,16
cool 13:4
cooper 3:9,12
  26:5,14
coordinator
  33:13,16
copied 23:16
  31:20
copies 91:1
corporate
  22:20
correct 6:20
  7:24,25 9:14
  17:4,21 30:18
  31:20 42:5
  46:5 48:11,18
  50:11 52:12,17
  54:18 55:18
  58:7 61:7
  62:15 63:10,15
  65:8 67:7
  71:13 73:19
  74:2,6,19 76:6
  76:10,11 82:2
  84:9 85:21
  88:23,24 90:16
  91:14 96:8

97:13
corrections
  6:23 98:14,15
  99:3,4
correctly 16:3
  16:22
corresponding
  17:19
counsel 2:6
  42:16,20 43:14
  43:19,23,25
  44:2 53:13
  71:22 75:13
  76:10 98:18,22
  99:7
counterclaims
  29:5,8,11
  30:18
country 71:2
county 97:2
couple 71:16
  75:3 78:5 90:2
court 1:1 6:3,9
  29:11 77:7
courtroom 6:5
create 19:5,8
  19:10 20:9,11
  20:12,14 24:21
  25:5 26:8 37:9
  40:3 94:8
created 8:19,25
  20:5,18 30:13
  37:12,13 46:25
  56:24 57:4,14
  58:16,22 59:17

59:20 60:9
creating 24:6
  24:12 56:16
  57:8
creation 68:2
  68:13
credentials
  14:21 66:11
crr 1:24
csr 1:25 97:25
curious 53:23
current 7:23
  8:1
currently 41:11
  46:18 87:12
cut 18:21,23
  89:17,20 90:21
cv 1:4

**d**

d 3:1 4:1
da 4:17 85:9
dairy 33:7
daniel 4:9
data 14:17
  28:23,23 46:19
  50:18 54:15,20
  54:24 55:21
  56:3,5,24
  57:15 58:5
  62:19 63:21,24
  64:6 68:2,8,13
  85:20,23,24
  86:16
database 18:10

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[date - downtimes]**

date  24:11
  72:23 98:16
  99:5
dated  52:11,12
  57:20 96:9
dave  77:5
david  2:14 7:8
  7:10 31:12
  94:23
day  9:10,10
  22:24 96:9
  97:21
days  29:25
  41:13 75:24
  92:5
deactivate
  93:12
deactivated
  72:14,25 90:13
deactivating
  73:7
deactivation
  93:16
deal  34:17 50:1
dealing  14:11
  50:9
decided  75:16
declaration
  96:1
declare  96:3,6
defendant  2:12
defendants  1:8
definitely  88:2
degree  32:14

degrees  32:19
delete  40:14,22
  40:23 43:2
depend  48:24
  49:5 91:24
depended  20:8
  20:10 92:7
dependent
  49:10
deponent's
  96:1
deposition  1:15
  2:1 5:17 7:14
  27:22 60:3
  67:25 96:4
  97:7,10,16
  98:19,23,25
  99:8,10
described
  10:15,20 93:9
description  3:8
  4:3
descriptions
  66:13
desert  69:1
deshai  83:19
  85:2
designated
  16:21 18:21
determined
  98:18,23 99:7
development
  66:16
diaz  4:9

differ  37:11
difference
  62:11 74:18
  94:14,20
different  10:24
  11:9 37:8
  47:14 49:25
  57:3 68:20
  80:7,8,12,23
  82:13 90:18
differently
  42:25 62:18
direct  54:3,11
  54:16 64:4
directed  91:17
direction  24:7
  97:12
directly  27:9
  58:6 60:20
disabled  59:7
  59:19 62:23
  90:6 91:1
disabling  59:12
discuss  71:23
  75:13
discussed  52:22
  52:22 67:25
  90:10
discussing
  79:24
discussions
  32:2,3 34:5
  52:25 74:1,10
  87:10 88:12

disruption  4:20
district  1:1,2
dlee  2:16
document  7:14
  23:2 40:20
  41:2 42:1
  45:13 68:17
documentation
  3:10 26:7,10
  26:12,15
documents
  21:16 24:10,11
  28:7,10,11
  40:23 66:14,24
  69:18 92:22,23
doing  11:1,18
  13:12 21:21
  22:1,6,8,12,16
  22:17 33:13
  55:18 56:1
  58:24 62:1
  88:14
domain  14:12
  20:19 23:22
  41:22 44:16
  60:4 61:6 93:6
double  32:15
downloaded
  54:20
downloading
  54:24
downtime
  91:13
downtimes
  29:16

Page 7

**[drafting - exactly]**

drafting 64:14
draw 51:1
  53:16 65:24
due 84:12
duly 97:7
dumb 30:9
duration 37:17
duties 21:25
  22:14 38:20
  39:11

**e**

e 3:1,7 4:1,2
  98:9,12 99:1
earlier 19:17
  51:11 63:12
  65:15 67:4
  68:12
east 2:9
education
  32:10
effect 6:4
either 14:9
  56:23 59:7
  75:19,25 76:1
  76:5
electronic 3:10
email 3:9,12,14
  3:17,19 4:4,7,9
  4:11,14,17,19
  4:22 9:7 14:1,2
  15:8,10,23
  16:8,10 17:5
  20:21,22,25
  21:2 23:12,14
  23:18,22 24:5

31:20 37:3
41:8,22 44:14
44:16,16,18
46:4,9,10 47:6
47:17 52:7,10
53:21,25 54:10
55:16 57:20
59:25 60:1,16
60:17,18 63:10
70:20 71:9,21
72:2,5,14 73:8
73:13 75:12
77:15,23 78:7
78:14,25 83:19
84:23 87:6
89:10,14 91:11
91:13,24
emailing 59:4
emails 16:20,24
  17:1,2,4,10,18
  17:19,22 21:11
  28:10,12 40:22
  41:5,12,17
  42:2 43:3,7,9
  44:6 52:25
  91:22
emergency
  4:23
emery 3:15 4:7
  12:16,18,22
  34:6 49:20
  78:7 83:12
employee 8:23
  23:23 82:8,13

employees
  18:25 29:22
  84:12 90:4
  91:1
employment
  9:4
engage 88:10
engineer 66:10
  69:14
english 32:15
ensure 6:14
entailed 11:5
enter 15:9
entire 10:21
entities 11:24
  16:19 18:11
  19:18 22:3
  24:21 25:17,21
  26:25 29:14
  35:2,8,23 48:1
  48:10,22 50:5
  56:3 63:17,20
  64:5,15,18
  67:5,20 69:23
  72:7,18 73:1
  76:8 78:16
  80:9 84:13
  85:25 86:4
  89:19,23 90:20
  91:17 94:7,12
entitled 7:9
entity 14:15
  17:13 19:11,22
  25:3,6,8 29:17
  29:21 34:22

35:22 36:18
48:17 49:3
50:17 54:21,23
55:11 56:22,23
57:8,13 63:10
66:24 86:10
87:2,16 93:7
equal 78:22
errata 98:14,16
  99:3,5
esperanza 4:12
  79:22 81:10,18
esq 2:9,14 98:1
established
  49:18 87:8
estimate 5:24
  21:7 27:17
et 98:4
evan 46:22
  47:25
evelyn 53:21
  54:2
event 97:20
eventually 19:4
  20:9,11
everybody's
  92:20
everyday 11:5
everyone's
  12:13 76:13
evolutionist
  82:25 83:1,5
exactly 48:7
  55:17 63:23

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[examination - formatted]**

| | | | |
|---|---|---|---|
| **examination** 3:2 5:7 | **experience** 86:2 | **familiarize** 53:13 | 44:21 52:22 54:1 72:2 |
| **examined** 5:4 97:6 | **explain** 36:7 37:24 68:16 | **far** 51:22 67:15 71:9 73:13 74:14 | 77:20 78:6 88:23 |
| **example** 12:3 13:1 20:24 50:16 58:19 80:18,20 90:1 90:3,13 | **explained** 68:2 68:7 | **features** 11:12 | **five** 7:21 21:9 45:6,8 |
| | **export** 62:13 | **federal** 97:16 99:1,8,9 | **fix** 40:4 72:19 73:2 |
| | **exports** 54:3,12 54:15 55:12 94:8 | **feel** 31:13 74:21 | **floor** 2:15 |
| **examples** 13:2 90:20,22,24 | **expressly** 66:10 69:15 | **fees** 93:21 | **flowing** 58:5 |
| **excel** 54:14 | | **felt** 69:24,25 | **focus** 31:8 45:16 66:22 |
| **excellent** 23:11 | **extent** 22:20 42:15 43:21,24 47:6 55:2 68:15 93:15 | **felton** 4:19 | **focused** 38:14 69:12 |
| **except** 17:4 | | **fielded** 86:23 | **focusing** 22:2 |
| **exercise** 30:9 | | **fifteen** 28:4 | **folder** 26:7,15 92:22 |
| **exhibit** 3:9,12 3:14,17,19,22 3:24 4:4,7,9,11 4:14,17,19,22 23:3,4 25:24 25:25 30:25,25 31:1 45:13,14 51:11,17,18 52:11 53:6,7 64:25 65:1 68:22,23 70:3 70:5 77:13,14 79:12 81:1,2,6 84:2,3 85:3,4 89:7,8 91:4,5 | **external** 21:2 | **figure** 92:5 | |
| | **extract** 68:3,5 | **figuring** 91:13 | **folks** 13:12 17:8,19 18:24 20:8 22:18 67:1 69:19 78:7 82:5 84:18 87:25 90:7 |
| | **extracts** 63:25 66:14,25 67:6 67:22 | **file** 1:23 56:16 | |
| | | **filed** 29:4,11 30:18 | |
| | **f** | **files** 35:12,13 54:15 63:25 | |
| | **facilitating** 11:20 14:18 15:3 29:14 | **fill** 16:1 17:14 17:16 19:23 20:6 43:20 | **follows** 5:5 71:15 98:8 |
| | **facilities** 11:24 | **filtering** 3:9 | **force** 6:4 |
| | **fact** 88:19 | **find** 40:3 92:2 | **forego** 76:20 |
| | **fair** 50:4 79:23 85:19 | **fine** 8:21 31:18 34:13 54:10 77:7 | **foregoing** 96:4 96:7 97:7,15 |
| **exhibits** 51:10 51:21 92:17 | **fall** 11:2 13:8 | **finish** 9:22 31:16 | **form** 10:2 |
| **exist** 60:22 | **fallen** 22:15 | **finished** 6:10 | **format** 62:10 |
| **expect** 7:12,14 | **familiar** 23:21 38:24,25 39:14 63:7 69:2 70:15,17 81:14 | **first** 21:5 28:13 31:8,23 34:1,5 37:6 42:9 | **formatted** 62:18 |

Veritext Legal Solutions

866-299-5127       calendar-ca@veritext.com       www.veritext.com

**[forms - half]**

forms 66:12,13 66:14,24 69:18
forth 57:24
forward 70:24 80:5 81:18 85:18 87:7,12 87:18
found 91:2
foundation 8:5 14:22 15:12 16:13 48:4 54:25 60:5 68:11 73:4
four 51:21
frame 72:17,20 75:22
frames 72:10 72:12,22
francisco 2:15 32:13 33:12
frcp 99:1
frequency 34:25
friday 1:16 2:1 5:1
frustrated 90:8
frustration 89:20 90:20
full 38:10
fully 38:1
function 47:4
functionality 46:21 47:12,21
further 76:9 87:13 97:19

**g**

gadia 4:11 81:11,12,13
garbled 74:4
general 28:18 32:13 36:16,16 51:2 55:23 64:12 76:1 91:12 92:3
generally 11:5 28:10 32:1 34:21,22 46:3 47:13 61:16 62:20 64:12 72:13
generic 26:11
gerontology 32:13,16,17
getting 22:4 39:20 50:15 54:14,20 85:20
gist 71:12
give 6:12 15:8 16:19 18:24 23:6 27:17 28:18 31:5 45:17 58:19 62:7 64:4,24 70:4 77:16 79:13 85:2 90:22 93:19
given 7:7 15:11 18:12,15 29:13
gives 29:21

giving 14:18,20 34:7 61:15 78:10
glitch 39:22
gmail 41:9,12 41:15,18
go 5:20,22 13:22 21:11 25:23 28:7 34:1 35:15 39:23,24 40:2 44:6 47:8 50:12,17,21 51:10,15 53:5 53:9 55:3 59:1 59:3 60:2 66:5 68:22 69:6,8 69:17 76:23 80:21,25 82:5 83:20 92:6
goal 19:6 25:8 25:12
going 6:11 11:7 14:8 16:10 17:20 23:2,22 30:25 36:23 38:6,7,14 40:6 42:17 45:4 51:10,11 53:6 53:23 64:24 66:7,8,22 67:23 68:10 69:6 72:9 75:20 76:23 77:12 79:10

80:5,25 84:2 88:13 91:4 92:4,6 93:18
good 5:9 35:6 56:20 60:12
grad 32:12
graduated 32:22
granting 53:1
granular 11:4
great 31:5 32:24
gritty 11:4
ground 8:23
group 59:5
guess 16:9 21:12 24:16 26:18,20 40:17 46:3 56:13 73:23
guessing 27:14
guidance 76:1 76:2,3,5 78:10 80:18 83:9
guide 3:13 24:23 25:1 26:9 75:17
guides 24:6,13 24:20 25:22

**h**

h 3:7 4:2
h7027 4:12
habitat 84:7
half 79:18 81:17

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[halfway - initial]

halfway  79:7
hall  23:20
hand  97:21
handed  71:22
   75:12 76:10
handle  48:23
   49:3
handled  13:8
   80:11 98:8
hands  25:9,13
happen  43:4
   55:14 88:13
happened  36:9
   55:24 59:19
   60:8 92:10
   93:5
happening  35:5
   80:17 82:17
   87:21 88:12
happy  45:5
hat  39:21
heads  5:23
health  84:7
hear  29:17,24
heard  27:14
   30:3,14 34:18
   42:22 83:5
   89:2
hearing  30:19
   30:20 42:4
hello  5:10 54:2
   59:5 71:8
help  11:8 33:2
   48:22 73:2

helped  12:8,14
helpful  40:8
helping  49:2
helps  6:14
hesitation
   70:22
hey  14:16
   40:13 43:1
   50:5,18 55:12
   57:14 64:4
   72:8,18 73:1
   80:22 84:22
   87:25 88:3
   92:4
hi  80:4
hierarchy
   78:22 83:7,12
   83:14
high  26:8,21
   27:3 32:10
   33:6 69:1
higher  50:7
history  36:9
hodgepodge
   6:14
hold  42:14
   43:11
holding  21:8
holdup  70:22
home  5:13,14
honest  14:8
honestly  8:20
   55:25 77:6
hop  71:17 75:4

hopefully  7:19
hosting  93:21
hour  45:4
   76:15
hours  28:6
huh  6:8 12:25
human  35:25
   37:11 56:3,24
   57:9 94:17
hundreds  45:2
husband  76:23

i

idea  9:3 85:20
ideas  65:22
identification
   23:4 25:24
   31:1 45:14
   53:7 65:1
   68:23 70:5
   77:14 79:12
   81:2 84:3 85:4
   89:8 91:5
identified
   61:10
identify  96:5
imagine  94:19
implement
   64:22 87:8
   88:15
implementati...
   8:2 10:8,25
   11:6 12:11,14
   13:8,13,23
   15:25 22:1,2
   22:13 55:8

   60:10 70:25
implemented
   21:3 45:24
important
   70:24
improperly
   93:24 94:2
inactivated
   72:16
include  65:22
included  16:25
   17:2 22:25
   68:6 98:14
   99:3
includes  59:5
including  24:10
   66:18 67:1
   69:20
increased
   93:21
inferences  7:1
inform  66:11
   69:15
information
   16:24 28:21,22
   42:20 43:23
   57:24 59:8
   60:21,24 61:6
   61:20,21 62:8
   62:8,12,13,17
   62:20 69:25
   74:9 87:14
initial  5:20
   15:25 16:6,7,9
   16:17,19 17:18

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[initial - keep]**

| | | | |
|---|---|---|---|
| 17:18 18:21,23 18:24 19:17 52:15,19 | **intellectual** 93:23 94:2 | 54:19,21 55:17 55:22 56:4,8 | 67:1 69:20 70:23 71:9,17 |
| **initially** 60:8 | **interact** 9:10 | 56:24 57:19 | 75:4 98:4 |
| **inordinate** 30:21 | **interacted** 70:18 | 59:3,4,17,21,21 60:14,19 61:5 | **investigate** 92:25 |
| **inserted** 68:4 | **interacting** 78:15 | 61:6,10,13,23 61:25 63:21 | **involved** 32:5 55:25 79:8 |
| **insight** 49:24 | **interaction** 29:14 | 64:4,7 67:7,22 70:1 71:1 72:6 | 93:15 |
| **instance** 79:6 87:16 90:23 | **interested** 97:19 | 72:9,18,22 73:13,18,21 | **involving** 68:8 |
| **instances** 20:18 58:16 87:22 93:3 | **interface** 25:2 25:20 32:3 48:15 57:23 | 74:13,18 77:21 77:25 79:3,7 79:24 80:10 | **issue** 19:14 40:3 67:24 69:23 78:16 92:9 |
| **instruct** 42:17 43:24 75:17 | 58:4 62:14 72:6 86:24 | 81:18,23 82:8 82:13,17 84:8 | **issues** 29:15 34:7,12 54:23 |
| **instructed** 55:10 57:13 | **internal** 20:15 20:22 66:15 | 84:12 85:13 86:4,8,9,22,23 | **item** 80:15 |
| 63:16,19 64:3 64:9 67:5,8,12 | **interpret** 47:6 | 87:9,17 88:17 88:24 89:20 | **j** |
| **instructing** 64:11 | **interruption** 6:15 | 90:4,13,21,25 92:15 93:4,6,7 | **january** 10:18 10:19 41:16 |
| **instruction** 43:21 44:17 | **intro** 3:12 | 93:11,12,21,24 94:2,5,8,11,13 | 43:8 84:15 |
| **instructions** 44:19 | **introduce** 77:13 | **intus's** 30:21 | **job** 11:20 12:5 15:3 22:7 |
| **instructs** 7:10 | **intus** 3:21,21 4:8 27:14,19 | 52:15 58:5,10 59:12,13 62:23 | **jobs** 33:19 |
| **integrated** 71:2 | 28:20 29:5,8 | 72:14,16 93:1 | **joined** 27:1 |
| **integration** 3:15,20 4:5 | 29:11 30:18 31:23 34:4 | **intus.care** 60:4 | **jst** 1:4 |
| 54:5 57:18,21 58:12,13,14 | 42:7 43:5,10 44:9,10,13,15 | **intuscare** 1:4 2:7 3:15,20 4:5 | **juan** 79:17,21 79:23 80:4 |
| 70:22 87:9 | 44:16,18,18 46:6,13 47:24 | 4:15,18 46:16 46:18,24 49:13 | **judge** 6:3 |
| **integrations** 58:17 | 49:22 50:1,17 53:1,17 54:17 | 49:15 54:2 63:4 66:19 | **jump** 5:21 21:16 |
| | | | **jury** 6:3 |
| | | | **k** |
| | | | **keep** 15:23 17:22 40:13 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

[keep - line]

43:3 54:9 79:10
**keeping** 16:5 18:19
**kept** 18:1,14 43:6
**kidding** 92:23
**kind** 25:11 28:11,22 50:5 50:16 52:16 68:16 80:19 87:2 91:22,24 93:8
**kinds** 88:10
**knew** 17:19 18:11 35:4 61:4,9,13 62:2 92:1,5
**know** 6:10,17 6:17 8:7,8,20 8:20,22 9:1,2 10:6,10 12:13 12:13,23 13:16 15:10 16:9 18:14 20:24 21:22 22:23 24:12,15,16 25:3,25 27:7 28:9,22 34:17 35:2 36:5 37:20 39:12 40:9,11 42:1 42:23 43:20 47:9,12 51:1,2 51:3,5,6 53:14

54:10 56:1 59:9,21 60:14 61:8,16 62:1 66:1 67:8 68:19 73:17 75:21,24 79:21 82:16 83:13 84:16 85:18 86:1 88:4,11 88:16,18,21 89:1,4,5,6,10 90:5 91:7,11 92:3,21,21
**knowledge** 8:18,24 15:19 15:22 18:9 55:3 66:8 78:14 86:22 91:8
**known** 59:24 61:22 75:19
**kristin** 4:12 82:6
**kyle** 4:14 84:7

**l**

**labs** 58:20
**lack** 38:10
**lacks** 8:5 14:22 15:12 16:13 48:4 54:25 60:5 73:4
**language** 68:4 68:6 69:12 70:1

**latest** 76:18 90:3
**laura** 3:14 4:7 12:16,18,22 13:12 26:6 34:6 49:20 50:23 51:3 63:4 73:24 74:8,13 75:23 76:6 78:4,7,15 78:18 79:6 80:21 83:12 84:17,19 87:25 88:9
**lauri** 59:4
**laws** 96:7
**lawsuit** 27:19 28:19 42:5,7 43:5
**lawyer** 8:22 44:3,4
**lawyers** 49:20
**layout** 25:2,17
**layouts** 25:20 26:24
**leadership** 90:6
**learn** 25:19 67:20 73:21 93:6,11
**learned** 28:13 42:9 74:9
**learning** 56:2
**leaving** 72:12
**lee** 2:14 8:5 14:4,22 15:12

16:12 19:1 22:19 24:14 26:16 27:2,23 27:24 28:7 31:9,13 34:8 36:1,13 42:15 43:11,16,18 44:3 47:5 48:4 51:18,25 52:4 54:25 60:5 65:8 67:23 70:7 73:3 77:6 77:10 83:21,24 89:3 92:20 94:24
**legal** 28:17 42:12,16,19 43:14,19,23,25 44:2 80:16 87:13 98:7
**length** 67:25
**level** 26:8,21 27:3
**license** 3:22
**life** 70:23
**likely** 30:4,16 60:20 61:9 76:18
**limit** 44:20
**limited** 50:5 66:17,18
**line** 67:23 77:20 98:15 99:4

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[lines - mean]**

| | | | |
|---|---|---|---|
| lines 83:3 | 52:3 53:11,24 | 99:3 | marquardt |
| link 68:3,8,13 | 62:19 64:23 | making 21:14 | 3:17 45:20 |
| list 15:23 16:6 | 65:17 68:20,21 | 73:8 | martinez 1:15 |
| 16:23 | 69:10 70:10,11 | malorie 3:17 | 2:1 3:3,17,20 |
| listed 19:12 | 77:17,20 79:13 | 45:20 46:17 | 4:4,7,9,15 5:3,9 |
| litigation 42:14 | 81:7 85:6 | 47:18 49:11 | 96:3,15 98:5 |
| 43:2,4 84:13 | 89:11 93:13 | management | master's 32:17 |
| little 76:20 | looked 52:7,10 | 10:9 11:15 | 32:17,20,23 |
| 79:18 83:8 | 52:21 63:10 | 22:11,17 46:3 | 33:23 |
| 90:18 | 65:16 72:14 | 46:19 87:13 | material 26:8 |
| lived 33:13 | 87:19,22 | manager 8:2 | 26:22,23 27:3 |
| llp 2:8,14 | looking 24:9 | 10:25,25 11:6 | materials 27:6 |
| locked 98:12 | 26:7 39:18 | 13:9,13,23 | matter 71:22 |
| 99:1 | 46:4,9,15 | 55:8,9 | 75:12 76:9 |
| log 36:19,21,24 | 52:18 54:9 | managers | 91:8 |
| 37:14 38:12,16 | 61:25 62:15 | 12:11 79:25 | mcclure 1:24 |
| 38:21 39:5,7 | 83:17 85:3 | manatt 2:8 | 2:3 97:4 |
| 39:23,24 60:18 | looks 52:18 | manatt.com | mean 10:10 |
| 86:25 | 72:3 80:1 | 2:11 98:2 | 11:24 17:23,23 |
| logged 36:20 | 81:16 84:7 | manner 24:8 | 18:16,17 19:4 |
| 36:25 40:6 | los 2:10 | manual 94:12 | 19:15 20:11,21 |
| logging 54:17 | lot 58:1 65:20 | manually 37:12 | 22:23,24 27:11 |
| login 39:25 | 70:18 | 94:8 | 28:23 34:11,16 |
| 59:7 62:23 | lots 34:16 88:5 | march 1:16 2:2 | 34:24 37:24 |
| logout 37:19 | lueth 3:14 4:20 | 5:1 97:21 98:3 | 40:12,15 47:3 |
| logs 40:10,13 | 4:22 82:6,19 | mark 1:24 2:3 | 47:10,15,15 |
| 41:3 | lunch 76:20 | 6:1,8 97:4 | 48:24 54:11,17 |
| long 28:3,5 | | marked 23:3,4 | 55:23 57:22 |
| 37:17 38:4 | **m** | 25:24 31:1 | 58:4,13 60:1 |
| 39:1 | made 92:20 | 45:14 51:22 | 62:4 63:23 |
| longer 22:25 | main 22:14 | 53:7 65:1 | 64:10 65:19 |
| 94:10,16 | maintain 36:17 | 68:23 70:5 | 68:19 80:15 |
| look 21:11 31:5 | major 32:15 | 77:14 79:12 | 86:12 88:2,4 |
| 39:17 44:13 | make 7:8 31:9 | 81:2 84:3 85:4 | 88:19 89:5,25 |
| 45:17 51:18,25 | 40:24 42:21 | 89:8 91:5 | 90:9 92:7 |
| | 58:2 98:14 | | |

**[meaning - needs]**

| | | | |
|---|---|---|---|
| **meaning** 17:2 27:3 47:24 49:12 | **merger** 10:14 10:17 21:18 | **modules** 39:14 | 46:23 48:18,20 48:21 49:12,15 |
| **means** 6:2 9:3 26:14 42:23 47:12 80:12 88:20 | **mergers** 8:22 **message** 80:22 82:12 | **moment** 35:5 64:25 70:4 77:16 81:7 85:2,6 93:19 | 49:22 50:1,6,7 50:11,19,22 51:4 52:22 59:18 62:1 |
| **meant** 24:12 47:19 57:2 79:2 80:16 | **messaging** 88:8 **met** 27:24 **methodology** 38:5 44:11 | **monitor** 92:25 **months** 40:14 40:22 81:17 | 63:5,13,14,21 64:5 71:10,11 73:14,18,22,25 |
| **meet** 27:23 71:23 75:13 79:7 | **methods** 63:17 63:20 | **morning** 5:9 **move** 19:16 87:7,12 | 74:10,14,19,25 75:21 77:21 78:11 79:24,24 |
| **melanie** 1:15 2:1 3:3,17,20 4:4,7,9,15 5:3 9:22 23:9 | **michael** 4:22 **mid** 63:5 **middle** 43:3 **mike** 34:6 | **moved** 89:15 **moving** 70:24 81:18 85:18 **multiple** 10:21 | 80:7,10 81:21 81:22 88:12,17 88:23 94:6 **ndas** 80:5,7 |
| 43:19 45:12 50:13 65:4 70:21 76:19 | 49:20 50:23 67:25 73:23,24 74:8,12 75:23 | **muniz** 3:19 45:25 | **necessarily** 22:8 74:20 88:6 |
| 95:1 96:3,15 98:5 | 76:6 77:23 78:4,8 79:2,6 | **n** | **necessary** 63:21 98:14 99:3 |
| **member** 57:10 **members** 16:6 33:13 | 80:21 84:19 87:25 88:9 **mind** 71:16 | **n** 3:1 4:1 **name** 14:12 20:19 23:21,23 | **need** 4:22 7:2 7:15 11:4 13:19 14:17 |
| **memory** 21:7 **mendez** 4:14 84:7 | 75:2 89:24 **minute** 45:6,6,8 76:16 77:2 | 32:16 37:6,7 37:10 41:22 60:4 61:6 | 22:8 23:9 24:7 31:11 39:5,12 46:16,17,20 |
| **mentioned** 6:1 10:24 18:23 44:14,15,18 | **minutes** 7:21 28:4 69:7 **mischaracteri...** | 70:15 93:6 **named** 85:9 97:7,11 | 47:15 53:24 72:9 76:24 86:13 |
| 65:4 90:9 93:4 **mentions** 47:25 81:20 | 16:12 19:1 22:20 **misspoke** 6:21 **misunderstood** 6:18,21 16:18 | **names** 16:24 17:18,22 18:10 37:11,12 60:3 80:23 **navigated** 37:22 **nda** 4:8,9 20:5 20:6 21:3 | **needed** 10:8 35:15 88:24 **needs** 24:8 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[negotiate - outside]

negotiate  74:21
  79:7
negotiating
  49:21 51:3
  73:18 74:19
negotiation
  63:14
negotiations
  94:6
never  7:19 40:5
  42:22 49:8,16
  54:18 55:25
  63:12 83:5
new  8:19 9:2,4
  11:7,12 19:11
  26:12 27:1
  41:21,21,22,22
nightly  34:25
nitty  11:4
nodding  6:7
nonsense  7:22
normal  59:22
northern  1:2
nossaman  2:14
nossaman.com
  2:16
notating  98:15
  99:4
note  7:11 80:4
notes  93:18
november
  81:16
number  3:8 4:3
  40:21 46:10
  57:19 65:25

66:25 69:19
73:1,4 98:15
99:4

**o**

o'clock  5:22
oath  6:1
object  67:23
objection  7:11
  8:5 14:4,22
  15:12 16:12
  19:1 22:19
  24:14 26:16
  27:2 34:8,13
  36:1,13 42:15
  47:5 48:4 51:2
  54:25 60:5
  73:3 89:3
objections  7:8
obtain  12:8
october  8:4
offer  63:16,19
  75:8
office  5:13,14
  98:11
official  83:13
offline  82:5
oh  61:25 64:9
  89:25 92:21
okay  5:25 7:17
  7:18 8:17,21
  9:7 10:4 13:4
  14:12 15:17
  16:7 17:12
  18:5,14 20:1
  20:17 21:3,13

22:11,14 23:13
23:14,20 27:14
27:22 30:20
31:15,19 32:25
35:17 37:8
38:3 39:5,9,19
40:8 42:4,25
43:8,16 44:1,5
44:17 45:19
47:3 48:9,21
49:11 50:15
51:6 52:2,4,10
52:21 53:4,10
53:15,16,18
55:7,20 56:2,7
57:2,18 58:1
58:25 62:17,21
65:21,24 67:16
68:19 69:6,9
69:11 70:12,17
72:1 73:12,25
74:17,23 75:2
75:25 76:14,20
77:5,9 78:3,24
79:5,9,15 80:3
80:20,24 81:9
83:6,18 84:4
84:15,18 85:8
86:2,20 89:13
89:14 90:12
91:3,10,16
92:10 93:3,18
93:23 94:10,25
old  41:12

onboard  48:10
  48:12,16,17,22
  49:3
onboarded
  84:8
onboarding
  17:17
once  28:1,2
  35:12 48:21
onerous  29:23
ongoing  46:11
  74:10 84:12
  94:6
ooo  95:4
opportunity
  6:19
opposed  35:25
  59:22
opposite  20:23
oral  66:13
order  71:10
org  83:15,16
organizational
  78:21
organizations
  72:21
original  97:15
  98:10,20,22
originally
  19:11
outage  92:9,14
outlook  41:9
outside  15:20
  71:10,22 75:12
  76:10 83:5

Veritext Legal Solutions
866-299-5127　　calendar-ca@veritext.com　　www.veritext.com

**[overloaded - person]**

| | | | |
|---|---|---|---|
| **overloaded** 30:13 | 76:8 78:15 85:10,24 86:3 86:10 87:2,16 89:19,23 90:5 90:20 91:17 93:7 94:7,12 | 70:11 98:14,17 98:17 99:3,6,6 | **past** 5:22 35:4 49:6 65:5 |
| **overloading** 29:16 30:22 | | **paperwork** 9:2 9:4 | **path** 87:18 |
| **own** 8:17 16:5 19:5 23:8 35:1 36:7 37:10 96:5 | | **park** 2:9 | **patient** 54:24 |
| | **pace's** 46:6 58:6 | **part** 11:20 12:5 15:3 17:17 22:7 25:1 38:20 39:11 46:5,11 52:15 53:23 54:1 58:9 60:23 66:20 73:25 74:6 92:8,9,13 | **paul's** 85:10 |
| **ownership** 66:3 69:10 | **pacecare** 3:22 3:24 14:19 15:9,24 16:11 16:21 17:3 22:4 26:24 27:12 29:1 34:7 36:12,18 37:21 46:12 47:13 48:11 52:17 53:2 54:17 58:4,5 58:17 60:23 61:5 62:9 66:10,12,14,15 66:25 68:25 69:15,19 86:5 86:18 91:13,18 93:1,24 94:3 | | **pco** 4:15,17,23 48:25 49:2 54:5 57:19,21 58:11 68:5 72:6 84:12 |
| **p** | | | **pdf** 98:12 99:1 |
| **p.m.** 95:3 | | **partially** 15:17 | **peak** 35:11,12 35:21,22,23 36:15 |
| **pace** 11:24,24 14:15 15:4,6,7 16:19 17:12,19 18:11,20 19:11 19:17,18,22 22:3 24:20 25:3,6,8,17,20 26:25 29:14,17 29:21 34:22 35:2,8,22,23 45:24 46:11 48:1,10,12,17 48:22 49:3 50:5,17 53:22 54:20,23 55:11 56:3,22,23 57:8,13 63:9 63:16,19 64:5 64:15,18 65:10 65:10 66:24 67:5,20 69:23 70:18 71:2 72:7,21 73:1 | | **participant** 24:11 | **penalty** 96:6 98:16 99:5 |
| | | **particular** 18:2 23:14 29:17 45:16 55:7 68:1,4 74:24 | **pending** 7:6 63:22 |
| | | **parties** 69:19 | **people** 18:12,15 18:16 43:14 78:15 |
| | | **partner** 81:19 | **perfect** 13:1 77:10 |
| | | **partners** 12:2 14:12,16 20:25 23:23 26:6 82:21 89:16 | **period** 31:22 33:24 49:14,17 92:1 98:18 99:7 |
| | **packet** 26:11 | **party** 35:18 66:16 | **perjury** 96:6 98:17 99:6 |
| | **page** 3:2,8,13 4:3,8,16 40:7 53:16 65:25 98:15 99:4 | **pass** 16:6,7,9 16:18,19 | **permission** 38:18,19 |
| | **pages** 3:11,16 3:18,21,23,25 4:6,10,13,18,21 4:23 31:7 | **password** 59:8 59:13 | **person** 12:15 19:11 50:21 61:25 70:17 76:12 81:14 |
| | | **passwords** 19:6 19:9 | |

Page 17

**[person - pull]**

88:7
**personal** 55:3
**personally**
25:18 62:22,25
**personnel**
16:20 17:8
18:10,20 60:3
**pertains** 97:15
**phelps** 2:8
**phillips** 2:8
**phone** 71:5
**phonetic** 65:11
**phrase** 11:23
34:18,23 40:19
50:13 74:13,24
80:19
**place** 60:20
97:11
**plaintiff** 1:5 2:7
**plan** 4:23 91:14
**please** 6:6,16
7:15 59:9 64:5
81:25
**point** 8:10 19:8
39:9 42:12
43:4,8 45:17
46:15 55:8,10
57:12 60:12
72:13 75:20
80:11 89:21
91:21 94:5
**points** 5:21
50:1,1,10
62:19

**policy** 40:10,12
40:16,19,21,21
41:3,4,6 42:1,2
55:5 56:11
57:7
**popped** 39:17
**portion** 68:12
**possibility**
76:19
**possible** 65:13
**post** 22:13
**potential** 11:12
**potentially**
32:3
**power** 76:21
77:3
**precision** 21:8
**prefer** 21:13
**prentiss** 4:12
82:6
**prepare** 27:22
**preservation**
40:10,12,16,19
41:2 42:2
**pretty** 21:23
**previously**
52:11 63:10
81:20
**primarily**
64:22
**primary** 21:25
**principle** 40:24
**printable** 3:10
**printed** 83:14

**prior** 19:2 28:5
63:6 68:16
97:6
**probably** 28:17
29:25 65:19
73:23 80:17
89:25
**probe** 91:8
**problem** 39:6
**problems** 39:10
**procedure**
98:19,21
**proceedings**
95:3 97:14,17
**process** 17:17
19:21,24 20:1
21:3 22:2 25:7
25:14 49:21
50:1,11 63:13
63:14,21 67:10
84:25 87:12
88:22,23 93:13
94:12
**processing**
35:18
**produced**
66:15,25 69:18
**product** 82:24
83:1
**profiles** 16:2
18:8
**program** 32:17
86:17
**programs** 71:2

**progress** 50:22
**prohibited**
67:21
**project** 87:8
**prompted**
72:25
**pronouns** 58:1
**property** 93:24
94:2
**proposal** 76:16
**propose** 14:1
**protocol** 67:14
**provide** 42:20
43:23 63:20
66:10,11,24
68:18 69:15,16
69:25
**provided** 25:22
63:5 68:9
73:14 98:19
99:8
**provider** 41:8
41:22
**providing**
71:16 75:3
**provision** 66:7
66:23 67:17
68:1
**provisions**
65:22
**psych** 32:15
**pull** 25:3 39:2
51:24 53:9
55:21 56:5,24
64:6,24 65:3

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[pull - regular]**

67:6
**pulled** 44:21
**pulling** 24:7
38:22 55:12
56:3 57:15
**pulls** 24:9
**purposeful**
38:9
**put** 16:2,4,23
17:6 18:3
20:21 35:15
40:3 92:2

**q**

**qa** 10:9,25
11:11 22:6,9
39:14,21
**queen** 33:7
**queries** 3:10
**quest** 58:20
**question** 6:10
6:13,16 7:3,6
7:10 9:23 14:6
14:9 24:19
26:4 29:19
32:24 34:2
39:19 40:17
41:20 42:18
43:13,18 47:8
54:8 55:2
56:14,21 57:6
77:6 81:8
90:18,19
**questioning**
67:24

**questions** 7:16
11:19 23:7
36:23 53:12
59:2 68:10
77:17,25 78:5
85:7 89:11
92:18 94:23,24
**quick** 3:13 26:9
**quicker** 51:16
**quite** 56:18

**r**

**r&s** 99:1,9
**race** 7:3
**raise** 69:23
75:8
**raised** 69:24
76:2
**range** 24:11
**rate** 52:16
**rather** 6:7
21:13
**reach** 52:16
55:11 57:12,13
73:1 87:11
90:7 91:25
**reached** 31:23
39:22 88:23
**reaches** 14:15
**reaching** 34:5
72:8,18,21
85:14 89:19
90:20
**reachouts**
91:16

**read** 23:6,13
31:7,9 46:10
47:17 53:23
54:1 66:7,20
67:17 96:4
**reading** 98:24
99:9
**ready** 23:12
**really** 10:6,7
11:9 12:13,19
14:8,24 17:4
30:11 32:4
33:20 38:11,12
49:9 50:25
55:24 72:9,10
73:9 84:24
92:7 93:15
**reason** 38:22
68:3 78:13
**reasons** 67:24
80:6
**recall** 10:1,17
12:19,21 23:14
28:13,15 29:9
30:19,20 31:22
32:1,2,4 33:18
34:4,5,14,15
38:5 45:20,23
49:14,17 52:20
53:3 55:15,24
56:2,6 59:12
61:14 62:21
63:2,23 67:9
67:15 69:4
70:13,15 72:12

72:17,20,20,24
73:6 74:12,15
74:23 79:5
86:7,8 87:21
87:24 90:25
**receive** 9:18
**received** 9:16
20:4 63:24
**recent** 90:1,13
**recess** 45:11
77:11
**recollection**
52:24,25
**record** 6:25 7:9
7:11 24:4,10
40:20 68:14,18
**reduced** 97:12
**reference** 26:8
26:9,21,23
27:3,6 44:9,10
**referenced** 98:6
**referencing**
56:18
**referring** 36:14
**refuse** 74:21
**refused** 71:9
73:13,18,22
74:14,18,24
**regard** 41:3
42:2
**regardless**
36:18
**register** 15:10
**regular** 38:13
39:11 68:5

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

**[regularly - room]**

**regularly** 26:25 38:21 39:2
**related** 44:18 79:24 93:22
**relation** 83:11
**relationship** 22:20 52:16
**released** 98:22
**relies** 43:25
**relying** 42:18
**remained** 10:21
**remember** 9:21 9:24 10:3,11 21:4 23:20 33:1,20,22 37:19 38:4 42:4,9,11 44:23,24 61:12 63:3 64:10,12 65:12,19 67:12 72:10 73:9 75:10,22 78:20 78:24 79:2,4 82:20,24 84:17 84:24 88:8,11 91:2
**remote** 2:2
**rephrase** 6:17 15:2 40:18 48:9 56:20
**reply** 82:8
**replying** 75:24
**report** 24:9 62:4,7,11,12

**reported** 1:24 39:16,25
**reporter** 2:4 6:9 77:7 97:24
**reporting** 46:20 47:4,12 47:14,21
**reports** 24:8 47:16 63:25 66:14,25 67:6 67:21 69:18 94:15
**repository** 18:10,13
**representative** 48:3
**reps** 46:22 47:24
**request** 18:3 20:3,4,5 46:6 46:12 47:10 86:6
**requested** 86:4 99:1,9,10
**requests** 47:3 75:24 86:23 88:5
**require** 71:11
**required** 93:12 97:18 98:20
**requirement** 48:18,20
**requires** 54:8
**reset** 59:8

**resetting** 59:13
**resolved** 71:18 75:5
**resorting** 43:22
**resources** 33:16
**respect** 43:5
**respond** 46:23 71:8,21 73:12 75:11 76:3 78:10 80:3 84:11
**responded** 47:18
**responds** 63:4 75:2
**response** 49:11 68:2 77:25 79:3,3 84:16 87:5
**rest** 18:24 38:13 53:25 54:9 77:4
**resume** 77:9
**retention** 40:20 41:3 42:1
**return** 20:7 63:6 98:17 99:6
**returned** 78:11
**reveals** 42:15
**reverse** 66:10 69:14
**review** 6:19 7:16 88:3

97:17 98:8,10 98:13 99:2
**reviewing** 38:22
**right** 7:19 8:15 8:25 14:13 15:4 17:6 23:24 27:16 28:1 30:15 31:22 34:1 41:23 42:7 51:24 57:4 59:2 64:1 67:11,14 70:7 70:13 71:19,24 73:15 74:1 76:12 78:1 81:11,23 82:5 83:4 85:16 88:7 90:14 92:24 93:8
**risk** 4:12
**rn** 14:14 20:24
**robbie** 4:19
**role** 7:23 8:1 10:5,7,10 21:17 29:13 30:2 45:23 46:2 50:4,10 64:14 65:21,23 82:23 83:4
**roles** 10:21,24 11:2
**room** 5:15

Veritext Legal Solutions
866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[root - scripts]**

**root** 92:2
**rosa** 4:17 85:9
**roughly** 33:18
**routinely** 24:21
**rtz** 1:7 2:12
3:12,15 4:5 8:4
8:11,24 9:11
10:4,5,12
12:22 15:23
18:14,19 19:14
22:15,21 24:2
24:21 26:7,10
26:11,15 27:19
27:19 28:13,20
29:4 30:1,18
31:23 33:4,8
33:21,24,25
36:17 38:17
41:8,12 42:2,7
42:13 43:5
44:4 45:25
49:12,20 50:2
52:16 54:23
55:11 56:11
57:3,7 58:16
58:21 59:12
61:2 62:22
64:4,15,18
65:25 66:18
69:1,8 70:7,22
72:13,16 75:9
78:6 81:21
82:19,23 87:9
87:17 88:9
98:4

**rtz's** 40:9 86:11
**rtz00002774**
4:5
**rtz0000814**
3:23
**rtz0000818**
3:23
**rtz0000847**
3:24
**rtz0000866**
3:25
**rtz0001993**
3:18 46:5
**rtz0001998**
3:18
**rtz0002733**
4:13
**rtz0002735**
4:13
**rtz0002765**
4:18
**rtz0002767**
4:18
**rtz0002772** 4:5
**rtz0002775** 4:8
**rtz0005586**
4:10
**rtz0005587**
4:10
**rtz0005604**
4:16
**rtz0005714**
3:15
**rtz0005720**
3:16

**rtz0005845**
3:11 24:4
**rtz0005846**
3:11
**rtz0005971**
3:13
**rtz0007273**
4:23
**rtz0007275**
4:23
**rtz0007693**
4:20
**rtz0007695**
4:21
**rule** 7:6
**rules** 44:23
99:8
**run** 21:10
35:11 54:3,12
62:4
**running** 56:17
56:19
**runs** 34:24 35:1
**runyon** 4:4
70:13,21
**ryan** 4:11
81:10

| s |
| --- |

**s** 3:7 4:2
**san** 2:15 32:12
33:12
**santa** 32:11
97:2
**satisfy** 24:8

**saw** 51:11
80:21 88:22
**saying** 6:8 24:6
58:14 61:4,15
64:13 71:13
72:8,24 74:18
80:22 86:10
**says** 14:16 26:6
26:10,15,21
40:21 47:23
52:12 59:5
66:6,23 70:21
71:15 77:21,24
78:4 81:18,25
85:17
**scanned** 24:10
**scenario** 92:7
**schedule** 98:10
**school** 32:10,12
33:6
**scpp** 3:15
**scratch** 63:18
**screen** 51:13
**screenshot** 54:4
54:7
**screenshots**
25:4 66:12
**script** 34:19,24
35:3,8,9,11,25
36:15 56:5,8
56:16,17,23
57:3,9,15
58:22 94:18
**scripts** 56:12
56:18

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[scroll - software]**

| | | | |
|---|---|---|---|
| **scroll** 23:8,10 53:25 | **seen** 9:17 29:10 36:21 64:17 65:4,6 67:16 87:16 | **service** 4:20 | 74:24 98:16 99:5 |
| **scrolling** 54:9 | | **services** 4:13 35:14 | **signature** 97:23 98:22,24,24 99:9 |
| **sealed** 98:20 | **send** 17:13,17 19:22 20:5 25:6 26:12 35:12 46:24 50:7 55:22 64:6 67:6 81:22 94:8 | **set** 11:8 18:4,7 | |
| **search** 43:9 44:8,11,17,19 | | **seven** 31:7 | **signed** 9:2,4 48:21 71:11 88:12 |
| **second** 66:5 69:13 87:15,19 | | **several** 59:16 80:5 87:10 | |
| | | **share** 14:21 51:11 70:4 81:25 92:6 | **significant** 94:20 |
| **section** 33:15 60:21,24 61:6 61:18,21 62:8 62:12,14 66:3 69:10 | | | **signing** 80:10 |
| | **sending** 25:16 25:20 54:24 55:13 56:4 57:24 | **shared** 26:25 | **similar** 26:4 91:16 |
| | | **sharing** 64:1 67:21 | **single** 46:20 47:4,20 |
| **secure** 4:10 80:1 | | **sheet** 16:1 | **sit** 41:11 56:7 56:10 88:16 92:13 |
| **see** 7:13 23:18 26:1,2 31:2,4 38:15,16,17 39:25 40:1,2 47:1 51:8,13 52:1 59:10 62:6 66:2,3,20 67:2 69:21 70:8 71:6 75:6 75:14 77:18,21 78:1 79:19 80:13 81:4 82:10 83:19 85:11 | **senior** 12:2 14:11,16,20 16:10 17:3,9 20:25 23:23 26:5 82:21 89:15 | **shift** 84:25 | |
| | | **short** 22:13 45:11 77:11 | **site** 21:22 90:5 92:4 |
| | | **shorthand** 2:3 97:11,24 | **sitting** 47:17 61:12 88:19 |
| | **seniorcare** 16:8 | **show** 7:13,15 23:2 30:24 37:2,3,4,14,15 37:17,21 38:2 38:3,7,8 45:12 79:1 91:4 | **situation** 36:10 58:21 68:7 |
| | **seniorcarepar...** 14:13 | | **situations** 39:4 |
| | **sense** 21:9 26:14 40:24 42:21 89:2 | | **six** 40:13 77:2 |
| | | **showed** 36:25 37:19 | **skipping** 71:12 |
| | | **showing** 36:17 | **slate** 41:17 |
| | **sent** 27:7,8 47:7 47:18 54:21 72:5 | **shown** 36:20,24 | **slightly** 42:25 80:7 |
| **seeing** 60:17,18 65:12 69:4 | | **sias** 3:9,12 | **slowly** 6:12 |
| **seek** 66:9 69:14 | **sentence** 66:5 69:13 | **side** 51:25,25 71:1 | **slows** 29:22 |
| **seeking** 66:18 | **september** 70:20 72:3 77:15 89:17 | **sides** 89:6 | **sneha** 81:22,25 |
| **seems** 59:6 | | **sign** 63:7 71:10 73:13,22 74:14 | **software** 18:8 66:15,17 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[solutions - surrounding]**

| | | | |
|---|---|---|---|
| **solutions**  98:7 | 48:16 49:16 | 62:12,12,13 | **street**  2:15 |
| **solve**  39:5,10 | 52:20 56:1 | 63:7 66:11 | **stuff**  80:16 |
| **solved**  92:9 | 66:16 67:9 | 69:15 86:25 | 86:16 |
| **somebody** | 68:1,4,8 74:15 | 93:7 | **subject**  77:20 |
| 90:11 | 75:22 76:2 | **stamp**  70:4 | 91:8 |
| **soon**  46:24 | 86:7 87:23 | 77:12 | **subsection** |
| **sooner**  5:23 | **specify**  72:22 | **stamped**  53:17 | 66:22 67:17 |
| **sorry**  9:22 | **speculation**  8:6 | 79:11 | 68:5 69:17 |
| 15:15 17:18 | 15:13 24:14 | **stand**  82:16 | **substance**  28:9 |
| 21:10 25:10 | 26:16 47:5 | 83:11 | 70:11 |
| 31:11 58:9 | 48:5 55:1 89:3 | **start**  3:13 | **successfully** |
| 65:9 66:1 74:3 | **speedy**  20:24 | 10:12 11:6 | 71:3 |
| 83:21 94:11 | **speedyrn**  14:14 | 12:22 15:6 | **sued**  28:14 |
| **sort**  26:11 | 14:17,19,21 | 17:25 82:19 | **suing**  28:20 |
| 87:17 | **spend**  69:7 | 86:17 88:22 | **suite**  2:9 |
| **sorting**  24:7 | **spent**  37:18 | **started**  21:5 | **supervisor** |
| **sound**  23:24 | **spoken**  27:18 | 32:8 33:21,24 | 83:10 93:14 |
| **sounds**  9:24 | 27:20 49:8 | 33:25 41:13,16 | **supervisors** |
| 22:14 30:9 | **spot**  20:16 22:9 | 41:21 | 84:25 |
| 90:12 | 93:5 | **starting**  72:2 | **support**  4:17 |
| **source**  86:4,11 | **spreadsheet** | **state**  2:4 32:13 | **supposed**  44:20 |
| 86:15,18 | 16:23 17:12,23 | 96:7 97:1,5,24 | **sure**  13:20 |
| **speak**  6:12 35:4 | 19:12,21,22 | 98:9,12 | 16:15 24:17 |
| **speaking**  34:21 | 60:2,8 62:10 | **stated**  46:19 | 29:19,20 32:11 |
| 34:22 | 62:13 | **states**  1:1 | 46:8,21 47:23 |
| **specific**  10:7 | **spreadsheets** | **staying**  86:22 | 49:1 54:13 |
| 34:15,22 54:5 | 17:25 18:1,20 | **stemming** | 56:13,18 58:2 |
| 55:25 57:18,21 | **sro**  33:12 | 46:12 | 58:23 76:24,25 |
| 58:12 61:14 | **ss**  97:2 | **step**  18:18 | 83:25 85:1 |
| 64:10 67:24 | **st**  85:10 | **sticking**  49:25 | 90:3,4 93:17 |
| 68:17 82:7 | **staff**  16:2,2,5,6 | **stipulation** | **surprised** |
| 92:7 | 18:8 55:21 | 98:21 | 15:21 23:16 |
| **specifically** | 57:9 60:21,24 | **strain**  30:21 | 67:20 |
| 24:9 28:24 | 61:5,18,20,21 | 91:18 92:15 | **surrounding** |
| 29:1 47:9 | 62:4,6,7,8,11 | | 89:12 |

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[sworn - thread]**

**sworn** 5:4 97:7
**synonymous**
  40:20
**system** 11:8,13
  17:20 18:19
  24:25 27:5,9
  27:11 28:23
  29:15,16,23
  30:13,14,21,22
  32:4 35:15
  37:18 38:14,25
  39:1,13,15
  47:16 48:13,19
  54:3,12 56:17
  58:5,6,10
  60:21 70:23
  86:14,17,18,19
  91:18,25 92:9
  92:14,14 93:8
  94:13
**systems** 57:23
  58:15

**t**

**t** 3:7 4:2
**tables** 86:16
**take** 6:8 7:2,4,7
  7:15 18:18
  31:5 45:5,6,8
  53:11 70:10,11
  72:1 76:16,20
  81:7 82:4 85:6
  90:3 94:11,14
  94:16
**taken** 5:17
  45:11 77:11

97:10
**talk** 23:12
  73:21 76:9,12
  84:1 85:23
  87:25 88:1
**talked** 13:2
  19:16,21 26:24
  29:7 30:17
  52:19 60:2
  81:21 84:19
**talking** 34:21
  36:10 43:14
  86:14,15
**task** 13:13
**tasks** 11:1
  12:20 13:8,22
**team** 42:12
  59:6 66:16
  87:10
**teams** 21:21
  85:14,17 87:13
**technical** 32:6
  34:2 58:23
**technicals** 54:6
**technology** 2:2
**techy** 83:4
**tell** 6:18 7:23
  20:1 27:17
  35:24 40:6
  42:13 43:1
  54:10 57:14
  59:15 64:5,9
  64:11 67:5
  73:17 75:17
  76:8 84:23

89:23
**telling** 50:5,17
  59:25 74:15
  76:8
**ten** 21:9 45:6
  76:16
**term** 34:9 41:1
  42:22 73:4
**terms** 38:21
  47:13 50:9,10
  63:7
**test** 8:21 21:7
**testified** 5:5
  16:17 52:15
  63:12 67:4
**testify** 6:24
  97:8
**testifying** 6:2
**testimony** 6:4,5
  6:20 16:13
  19:2 68:16
  96:8
**testing** 11:12
  11:12
**thank** 17:6 52:2
  77:10 81:25
  83:16,24 87:6
  94:25 95:2
**thanks** 13:4
  71:9,21 73:13
  75:11 78:3,4
**theirs** 87:11
**theoretically**
  9:17

**thing** 7:13
  24:20 27:7
  40:2 45:18
  57:9 74:22
  82:17 83:14
**things** 6:20,25
  11:9 22:8,25
  24:25 25:3
  33:3 39:18
  49:9
**think** 6:20 7:2
  19:15 22:9
  32:24 35:9
  38:9,10 41:16
  41:25 44:20
  49:5,7 59:22
  63:8 70:3
  76:14,17 82:25
  83:2,2 84:21
  86:9 92:17,18
  93:4 94:15,21
**thinking** 35:10
**third** 11:14
  35:18 45:17
  46:15 66:16
  69:19
**thompson**
  53:22
**thought** 51:16
  76:22
**thread** 3:9,14
  3:17,19 4:4,7,9
  4:11,14,17,19
  4:22 78:7,14
  82:9,14

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[three - understood]**

| | | | |
|---|---|---|---|
| **three** 10:24 69:7 | **title** 10:11 12:13 22:7 70:16 78:18 82:24 | **trainings** 49:6 | **typically** 25:4 |
| **ticket** 18:3 40:4 92:2 | | **transcript** 6:14 96:5 97:13,16 97:17 98:6,8 98:10,13,13,22 99:2,2 | **u** |
| **tickets** 11:13 | **titled** 68:25 | | **uh** 6:8 12:25 |
| **tied** 14:2 | **today** 5:11,23 6:2 7:15 27:16 41:11 47:17 56:7,10 61:12 87:22 88:16,20 92:13 | **transition** 10:4 | **unable** 87:7 |
| **tim** 3:9,12 26:5 26:14 | | **transitioned** 41:7,8 | **under** 6:1 9:2,4 11:2 13:8 69:10 96:6,6 97:12 |
| **time** 7:2,5,15 7:20 31:22 33:23 34:4 35:23 37:15,19 39:1 40:1,5 43:13 44:13,15 44:15 49:14,17 52:1 55:21 61:14 62:16,22 72:1,8,10,12,13 72:16,17,20,22 72:23,25 75:22 76:13 78:19 80:7,11 84:11 86:3 87:7 92:1 94:14,20,25 97:11 98:10,18 98:25 99:7 | | **transportation** 4:10 79:25 80:2 | **undergrad** 32:11,14 |
| | **today's** 27:22 | **treatise** 28:17 | **understand** 6:16 11:25 14:5,6,9,23,24 15:14,15 16:14 16:15,18,22 22:22 26:17 27:4 29:19 34:10,23 36:2 36:3 40:15,17 44:11 47:19 48:6,7 55:12 55:16 56:13 64:21 70:21,25 73:5 |
| | **together** 21:10 64:23 71:17 75:4 85:15,17 | **trouble** 51:24 | |
| | **told** 27:21 43:6 63:8,9 64:8 74:12,13 80:19 88:24 93:14 | **true** 96:8 97:13 | |
| | | **truth** 97:8,8,9 | |
| | | **try** 14:9 40:3 68:11 87:17 92:5 | |
| | **toll** 65:11 | **trying** 33:16 49:17 64:21 79:7 | |
| | **took** 93:24 | | |
| | **topic** 91:12 | **two** 13:7 28:2,6 33:19 45:2 57:23 58:15 67:24 69:7 70:10 78:15 87:22 89:6 93:6,8 | **understanding** 19:10 21:1 28:16,19,25 29:2 31:13 54:14,18 55:20 55:23 56:15 72:4 85:24 94:7 |
| | **total** 50:10 | | |
| | **touch** 50:10 | | |
| **timeline** 71:5 73:10 | **tpa** 35:16,17,20 35:21 | | |
| | **track** 18:14,19 | **type** 24:20 43:13 86:16 | |
| **times** 25:15 27:18,25 52:19 59:16 71:16 75:3 90:25 92:5 | **trail** 36:5,11 38:1 | | |
| | **trails** 36:17 | **types** 80:8 | |
| | **train** 11:9 16:4 19:5 | **typewriting** 97:12 | **understood** 6:18 54:19 |
| **timing** 63:23 | **trained** 39:13 | | |
| | **training** 21:22 22:17 33:13 | | |

Veritext Legal Solutions

866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[unfortunately - whatsoever]**

| | | | |
|---|---|---|---|
| **unfortunately** 87:6 | **using** 11:23 35:8 40:19 | **vidal** 79:17,21 **videoconfere...** 2:8,13 | **wants** 50:17 88:3 |
| **unilaterally** 75:16 | **usually** 49:24 **utilization** 46:19 | **visual** 66:13 | **wasting** 76:13 **way** 17:6,16 21:23 26:21 |
| **unique** 68:7 | | **w** | 29:23 35:24 |
| **united** 1:1 | **v** | **w** 9:16 10:2 | 51:16 54:13 |
| **universe** 84:19 | **v** 1:6 98:4 | **wait** 6:10 92:21 | 58:10 59:24 |
| **university** 32:12 | **vague** 14:4 27:2 34:8 36:1 | **waiting** 50:6 63:5 | 60:15 61:4,18 61:22 62:5,6 |
| **update** 80:6 | 36:13 73:3 | **waived** 98:24 | 63:24 64:1 |
| **updates** 3:18 | **vaguely** 23:21 | 98:24 | 74:13,16 75:18 |
| **ups** 50:7 | **vantage** 55:8 | **waiving** 98:21 | 75:25 |
| **use** 6:23 11:8 | **various** 16:24 | **walk** 11:3 32:9 | **ways** 21:23 |
| 15:9 16:10 | 18:11 | **walkthrough** | 61:8,10 62:3 |
| 20:24 26:8 | **vendor** 4:15 | 24:24 | 93:5,8 |
| 34:9 35:2 | 13:25,25 14:2 | **walters** 46:22 | **we've** 18:12 |
| 39:10 46:22 | 14:3 19:24 | 47:25 | 40:13 41:1 |
| 49:7 50:13 | 20:2,4,6,12,15 | **want** 6:22 | 43:2 45:4 |
| 56:11 82:7 | 20:19,20,23 | 14:16 17:9 | 52:10 84:24 |
| **used** 20:19,24 | 48:18,19,22,24 | 26:20 28:9,17 | 86:6 87:16,19 |
| 21:2 35:23 | 49:5 54:24 | 30:24 31:7 | 88:5 |
| 38:11,12 39:7 | 55:13 57:8,14 | 44:10,22 45:12 | **weeds** 51:3 |
| 56:5,8,23 | 58:17 71:10 | 45:16 48:14,15 | **week** 24:7 |
| **user** 15:8 17:5 | 84:8 | 50:13 51:18 | 35:12 |
| 17:5 24:6,13 | **vendor's** 48:2 | 53:16 59:3 | **weekly** 11:18 |
| 24:20,23 25:1 | **vendors** 12:6 | 64:6 65:24 | **weeks** 71:16 |
| 25:16,20,20,22 | 15:4 19:16,19 | 68:14,17 80:6 | 75:3 90:2 |
| 35:25,25 37:12 | 34:17,17 48:11 | 83:20 84:1 | **welcome** 26:11 |
| 37:18,21 41:22 | 48:14,16,25 | 85:13 87:25 | **went** 32:11,12 |
| 86:24 | 49:6,8 66:17 | 89:11 90:1 | 39:25 40:7 |
| **username** 37:3 | **verbally** 6:6 | **wanted** 19:18 | 86:18 |
| 37:5,6,9,10 | **veritext** 2:2 | 48:17,19 72:6 | **wertz** 59:4 |
| **users** 26:9 | 98:7,9,11,20 | 80:4 86:10,12 | **whatsoever** |
| 30:12 38:14,16 | **versus** 27:19 | **wanting** 72:21 | 64:14 |
| 38:19 93:7 | 74:18 94:12,17 | | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[wiped - zawadski]**

| | | |
|---|---|---|
| **wiped**  41:13 | 49:16 50:6,18 | **z** |
| **wish**  79:1 | 75:21,21 84:21 | |
| **witness**  3:2 8:8 | **works**  34:13 | **z**  14:17 92:11 |
| 14:6,24 15:15 | 71:1 79:22 | **zawadski**  4:22 |
| 16:15 19:4 | **worries**  45:1 | 34:6 49:20 |
| 22:23 24:16 | 58:25 | 68:1,7 77:23 |
| 26:2,18 27:5 | **writing**  11:13 | 78:8 79:2 |
| 31:2,15 34:11 | **written**  66:13 | |
| 36:3 42:22 | **wrong**  83:2 | |
| 44:2,5 45:8 | **wrote**  73:20 | |
| 47:9 48:7 52:5 | **x** | |
| 55:4 58:7 60:7 | | |
| 65:12 68:16 | **x**  3:1,7 4:1,2 | |
| 70:8 73:6 | 14:17 40:21 | |
| 76:22 77:7,18 | 92:11 99:9 | |
| 79:15 84:4 | **y** | |
| 89:5 95:2 97:6 | | |
| 97:21 98:13,16 | **y**  14:17 92:11 | |
| 99:2,5 | **yea**  89:5 | |
| **witness's**  16:13 | **yeah**  10:10 | |
| 19:2 | 11:16 21:15 | |
| **worded**  54:13 | 25:4 31:18 | |
| **wording**  82:7 | 61:11 73:6 | |
| **words**  8:17 | 80:23 86:20 | |
| 36:7 | **year**  9:14 30:10 | |
| **work**  33:4,8 | 32:22 72:23 | |
| 34:19 39:10 | 79:18,18 81:17 | |
| 76:23 82:5 | 81:17 84:6 | |
| **worked**  30:1 | **years**  10:22 | |
| 33:12,15 45:23 | 21:9,9,10 | |
| 48:10 | 25:15 33:18 | |
| **worker**  45:25 | 40:22 45:2 | |
| **working**  8:10 | 86:3 | |
| 8:13 39:1 | | |
| 46:23 49:12,15 | | |

Page 27

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Miranda Lynn Carter

# Highlighted Transcript

# Deposition Transcript

Case Number: 4:24-cv-01132-JST

Date: July 28, 2025

**In the matter of:**

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# Miranda Lynn Carter



**CERTIFIED COPY**

Reported by:
Michelle M. Abraham

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--


INTUS CARE, INC.,                )
                                 )
         Plaintiff,              )
                                 )
 vs.                             ) CASE NO. 4:24-cv-01132-JST
                                 )
RTZ ASSOCIATES, INC.; and        )
DOES 1 through 10,               )
                                 )
         Defendants.             )
_____)
                                 )
RTZ ASSOCIATES, INC.,            )
                                 )
         Counter-claimant,       )
                                 )
 vs.                             )
                                 )
INTUS CARE, INC.,                )
                                 )
         Counter-defendant.  )
_____)

--oOo--

REMOTE DEPOSITION OF

MIRANDA LYNN CARTER

MONDAY, JULY 28, 2025

--oOo--


REPORTED BY:  MICHELLE M. ABRAHAM, CSR 14303

A P P E A R A N C E S


FOR THE PLAINTIFF:

        MANATT, PHELPS & PHILLIPS, LLP
        BY:  ANDREW BESHAI, Attorney at Law
        2049 Century Park East, Suite 1700
        Los Angeles, CA 90067
        ABeshai@manatt.com

FOR THE DEFENDANT AND COUNTER-CLAIMANT:

        NOSSAMAN LLP
        BY:  KASIA PENN, Attorney at Law
        18101 Von Karman Avenue, Suite 1800
        Irvine, CA 92612
        kpenn@nossaman.com


ALSO PRESENT:

        DAVID LEE, Attorney at Law


                    --oOo--

                              I N D E X

EXAMINATION BY:                                            PAGE

Ms. Penn                                                   4

Mr. Beshai                                                 57
                            --oOo--


                         E X H I B I T S

EXHIBIT          DESCRIPTION                               PAGE
NO.

Exhibit 1     Subpoena                                     11

Exhibit 2     Email dated 3/11/2024                        15

Exhibit 2A    Contract                                     17

Exhibit 2B    Community RTZ Addendum                       17

Exhibit 3     Email dated 3/18/2024                        18

Exhibit 4     Email dated 2/14/2024                        19

Exhibit 5     Email dated 3/19/2024                        19

Exhibit 6     Email dated 3/12/2024                        20

Exhibit 7     Email dated 3/14/2024                        20

Exhibit 8     Email dated 3/13/2024                        21

Exhibit 9     Email dated 2/28/2024                        21

Exhibit 10    Email dated 3/1/2024                         22


                            --oOo--

REMOTE DEPOSITION OF MIRANDA LYNN CARTER, taken by the attorney for the Defendant and Counter-Claimant on Zoom, commencing at 9:07 a.m. on Monday, July 28, 2025, before Michelle M. Abraham, Certified Shorthand Reporter No. 14303, in and for the State of California.

The following proceedings were had and taken, to wit:

--oOo--

PROCEEDINGS

MIRANDA LYNN CARTER,

having been first duly sworn, testified as follows:

EXAMINATION

(Rule 29 Stipulation was read by the reporter.)

BY MS. PENN:

Q    Good morning.  My name is Kasia Penn and I work at Nossaman.  I represent RTZ Associates in this case and the case is between Intus Care, Inc. and RTZ Associates, Inc.  And I want to make sure that when I say:  "RTZ," you'll know that I'm referring to RTZ Associates, Inc. Will you know that?

A    Yes.

Q    And when I say:  "Intus," you will know that I'm referring to Intus Care, Inc. one of the parties?

A    Correct.  Yes.

Q    Thank you.  And before we proceed, I would like

to inform everybody that we may be using or designating part of this deposition transcript as confidential or attorney eyes only confidential pursuant to the protective order that we have signed in this case.

THE REPORTER:  And then just let me know so I can bind it separately when we enter confidential and when we exit confidential.

MS. PENN:  Absolutely.  Thank you.

BY MS. PENN:

Q    Okay.  Ms. Carter, have you ever been deposed before?

A    Have I ever been what?

Q    Deposed before.

A    No.

Q    No.  Have you ever testified under oath in any legal proceedings such as in a case at court?

A    I don't believe I have, no.

Q    Okay.  Then I will go over some ground rules so that we all know and you're aware of how this deposition will be going forward.  So I will be answering -- I will be asking you questions and you'll be answering them under oath, do you understand that?

A    Yes.

Q    And do you understand that it's the same oath that you would be taking, for example, if you were

examined in the courtroom?

A     Yeah.  Yep.

Q     And I want to make sure that the court reporter can take your deposition correctly, so I ask that you answer yes or no because the court reporter cannot really record answers that are, like, a head nod or head shake. So just going to be easier for our court reporter.

A     Absolutely.

Q     Thank you.  And I will try to speak clearly and I will try not to cut you off.  So again, we have -- our court reporter has an easier job with that and I would ask that you do the same, okay?

A     Uh-huh.  Absolutely.

Q     And if you don't understand any of my questions, please let me know, will you?

A     Will -- will do.  Yes.

Q     Thank you.  But if you do answer my question, I will assume that you understood the question.

A     Correct.

Q     Thank you.  And we will be taking breaks.  If you do want to take a break during this deposition, just let us know.  That's no problem.  I will ask, though, that you take a break after you answer my question so you're not taking a break when I ask you a question and then you don't answer and say:  "Oh, I want to take a

break."  Would that be okay?

A    Correct.  Yep.  That's fine.

Q    Thank you.  And do you understand that the oath that you took today at the beginning of this deposition requires you to tell the truth, the whole truth, and nothing but the truth, do you understand?

A    I do.

Q    Are you represented by anybody today?

A    I am not.

Q    And because I'm entitled to your full, complete, and accurate testimony, I have to ask if you're any medications or any drugs of any sort that would prevent you from giving your best testimony today?

A    No.

Q    Is there any reason today that you could not give a full, accurate, complete testimony?

A    I don't believe there's any reason why I cannot.

Q    Okay.  And because we're all remote today, I wanted to go over some rules because this deposition is remote.  So I'm in a different room.  You're in a different room.  Everybody's basically somewhere else, so I want to cover a few extra items because of that.  Is there anybody in the room right now with you?

A    There is not, no.

Q    Will you tell me if anybody comes in?

A    I will, yes.

Q    And do you agree to answer my questions based on your recollection without looking at any documents, your phone, any open programs in your computer unless I ask you to do that?

A    Yes.  I can do that.

Q    Thank you.  So do you understand that also means you cannot communicate with anybody during this deposition by, for example, texting somebody and asking any questions --

A    Correct.  Yes, I understand.

Q    And other than the computer that you're using right now to connect to this deposition, I see you're holding a phone, correct?

A    I -- I'm actually listening to you on my phone, yes.  Yep.

Q    Oh, okay.  Got it.  Got it.  And I think we don't -- we -- we can't get around that.  But I ask that you don't look at any messages coming on your phone or any emails or any other calls coming in.

A    Correct.  Yes.

Q    Are there any other electronic devices that are visible to you right now?

A    There are not.  No.  Just my laptop that is open.

Q    Okay.  And on that laptop, do you have any other programs other than this Zoom connection?

A    Nope.  I've closed everything out with our lag.

Q    Thank you.  And if you lose our internet connection or -- or your internet connection or connection to this deposition, will you please try to reconnect and rejoin?

A    Absolutely.  Absolutely.

Q    Thank you.  And I apologize.  I have a, like, a little bit of a lag in sound.  Can we please stop for a moment and go off the record?

THE REPORTER:  Mr. Beshai, are you okay to go off the record?

MR. BESHAI:  Yeah.  That's fine.

THE REPORTER:  Off at 9:14.

(Off record:  9:14 a.m.)

(On record:  9:20 a.m.)

THE REPORTER:  Let's go back on at 9:20.

BY MS. PENN:

Q    Ms. Carter, we're back.  Are there any copies of -- hard copy documents next to you?

A    No, there are not.

Q    Okay.  So let's talk about your preparation for this deposition.  Who did you talk to about this deposition?

A    My current executive director, Christine Runions.

Q    Uh-huh.

A    And then as well as my emails with you and I believe David was tagged in those ones.

Q    Anybody --

A    That is all I spoke to.

Q    So you didn't talk at anybody at -- with anybody at Intus?

A    I personally did not, no.

Q    And you didn't communicate with legal counsel for Intus?

A    I did not, no.

Q    Did you review any documents to prepare for today's deposition?

A    I went through the emails that I provided as well as the attachments that were in those emails.

Q    Did any of the documents that you reviewed help to remember anything about this case?

A    Yeah.  I would say, yeah.

Q    Can you elaborate more what -- what you -- what the documents helped you remember?

A    I would -- originally I wasn't sure where the communication came between Intus and RTZ and my connection with that so looking back at my emails showed

kind of a start of that conversation to the end.  So I was able to pinpoint where the beginning of the conversations came between the two companies.

Q   And other than the beginning of the conversation, anything else that the documents helped you recall?

A   I don't think so.

Q   I'm going to momentarily display the subpoena that was served on you.

A   Uh-huh.

Q   I'm introducing this subpoena as Exhibit 1.

(Defendant's Exhibit 1 marked for identification.)

BY MS. PENN:

Q   I am now having difficulty with presenting the exhibit.  Can we please go off the record again?  I apologize.

MR. BESHAI:  No objection.  That's fine.

MS. PENN:  Thank you.

THE REPORTER:  Off at 9:23.

(Off record:  9:23 a.m.)

(On record:  9:30 a.m.)

BY MS. PENN:

Q   Welcome back, Ms. Carter.  I apologize for the interruption.  Okay.  I will now present as Exhibit 1 the

subpoena that was served on you.  Can you view the subpoena?

A    I can.  It's a little small but I can see it.

Q    Let me zoom in.  Does that help?

A    Better, yes.

Q    Do you recognize the subpoena?

A    I do.

Q    Do you understand that the subpoena required you to search for responsive definitions -- definitions, responsive documents before this deposition?

A    Yes.

Q    And you sent me a number of documents, correct?

A    I did, yes.

Q    Did you send me all responsive documents?

A    I believe so, yes.

Q    Can you please tell me what you did to look for documents responsive to this subpoena?

A    These were all found in Microsoft Outlook so I searched via the search for key words like RTZ.  My main contact at that point in time with RTZ was Amanda Muniz so I searched her name as well as Intus, Intus Care so that it would pull through to all of the -- anything that was connected to Intus as well as RTZ.

Q    Do you know if any of the -- if -- do you know if the policy of your employer to delete some documents,

like some emails after -- after certain period of time?

A    I don't believe that they -- I don't know exactly, no.

Q    So you don't know if there's, like, a archive for older documents, older emails that would be in your email box?

A    As far as I'm aware, anything that I was in contact with, I still was able to access.

Q    Thank you.  And do you sometimes save emails, like, on your desktop computer in addition to having them in your email box?

A    I do not, no.

Q    Okay.  So you've collected and provided all responsive documents that the subpoena called for, correct?

A    I believe so, yes.

Q    Did anybody help you with the search for the documents or did you do it alone or by yourself?

A    I did it alone.  I did ask my coworkers to see if theirs had anything different, but as far as I'm aware, that was everything that I provided was just from myself.

Q    So the coworkers who you asked about additional documents, they didn't provide any documents that you did not produce today?

A     No.   Because I was not CCed on them and they were not in my possession.

Q     To your knowledge, there were no documents that were deleted that would be responsive to --

A     No.   To my knowledge, there was not.

Q     Okay.   I'm now going to present and show you the documents that you sent me on Friday, the documents responsive to this subpoena.

Are you able to view this email chain right now that I'm displaying?

MR. BESHAI:  I don't --

THE WITNESS:  I do not.

MR. BESHAI:  -- see anything on the screen.

MS. PENN:  I'm sorry.

(Clarification by the court reporter.)

MR. BESHAI:  Oh, I just said:  "I don't see anything on the screen."

(Clarification by the court reporter.)

MS. PENN:  You do not?

MR. BESHAI:  But maybe, Ms. Carter, maybe it's just me, do you see anything on the screen?

THE WITNESS:  I cannot see anything, no.

MS. PENN:  Okay.  How about now?

THE WITNESS:  Yes.

BY MS. PENN:

Q    Ms. Carter, you can see it, correct?

A    Yes.  If you could just zoom in on the email a little bit.

MS. PENN:  Mr. Beshai, you can also see right now the exhibit?

MR. BESHAI:  Yes, thank you.

MS. PENN:  Thank you.  I'm introducing this as Exhibit 2.

(Defendant's Exhibit 2 marked for identification.)

BY MS. PENN:

Q    And this is one of the documents you send me, Ms. Carter, correct?

A    Correct.

Q    And you received or sent this email as this is a chain.  I'll scroll down for everybody to see the chain of emails.  You received and sent emails on this chain in the scope of your responsibility to send you these at Community PACE, correct?

(Clarification by the court reporter.)

THE WITNESS:  I apologize.  What was that?

BY MS. PENN:

Q    This email that I'm displaying, this email chain right now that I'm displaying as Exhibit 2, you received emails in this chain or send emails in this chain in the

scope of your employment at Community PACE, correct?

A   Correct.

Q   I see you're hesitating.  Can you --

A   I am not -- I don't do -- yes.  I am not in charge of contracts so I did provide what I was given when it came to contracts, NDA information or BAAs.  I -- that is not something I do for my job.

Q   So all I'm asking is really whether you send emails in this chain or received them just in your regular, you know, everyday work at Community PACE as an employee of Community PACE?

A   Outside of the contract information, yes, everything was inside my scope.

Q   And when you say except for contract, can you please explain what you mean?

A   I do not write contracts.  I don't -- I don't do anything on the legal side of contracts.  That was just provided to me by our executive director at the time as I was kind of, as you would say, like, a middleman or liaison between our team and then the RTZ.

Q   Even that contract then, I will go back to marking this contract in a second.  You do -- you did receive it because you were employed at Community PACE and for no other reason, right?

A   Yeah.  Yeah.

Q    Okay.  I'm going to introduce contract as Exhibit 2A.

(Defendant's Exhibit 2A marked for identification.)

BY MS. PENN:

Q    Is this the contract that you're referring to?

A    This was the contract that was provided to me and then I sent on to RTZ, yes.

Q    Did you sent to RTZ?  Okay.  And that looks like a contract that you send me among the emails or attachments on Friday --

A    Yes.

Q    -- correct?

A    Correct.

Q    I'll go back to the Exhibit 2 for a moment.  And here at the top of this email, it lists an attachment, correct?

A    Correct.

Q    And the attachment is Community RTZ Addendum dot PDF, correct?

A    Correct.

Q    Okay.  Going to introduce this addendum as our Exhibit 2B.

(Defendant's Exhibit 2B marked for identification.)

BY MS. PENN:

Q    I'll zoom in.  Is that the addendum that the email is referring to, the attachment?

A    Correct.  Yes.

Q    And that looks like the document that you send me among others on Friday, correct?

A    Correct.

Q    And you received this addendum, again, in the scope of your duties, your work for Community PACE?

A    Yes.

Q    Okay.  I'm going to momentarily show, present the other documents that I received from you on Friday. I'm showing you as Exhibit 3 another email that you sent on Friday.  Do you recognize this email?

(Defendant's Exhibit 3 marked for identification.)

THE WITNESS:  I do, yes.

BY MS. PENN:

Q    Do you want me to scroll down or -- or zoom in or is that the way I'm displaying is fine for you?

A    That's fine.

Q    So same question.  You received this email as part of your job, your work for Community PACE, correct?

A    I did, yes.

Q    Thank you.  Okay.  I'm now presenting Exhibit 4,

which is another of the emails that I received from you on Friday.

          (Defendant's Exhibit 4 marked for

          identification.)

BY MS. PENN:

     Q    Do you recognize this email?

     A    I do, yes.

     Q    Does it look like the document that you send me on Friday?

     A    It is, yes.

     Q    And same question, you received this document or send this email -- sorry.  You either send or received this email as part of your work at Community PACE, correct?

     A    Correct.

     Q    Okay.  Thank you.  I'm now showing you Exhibit Number 5.

          (Defendant's Exhibit 5 marked for

          identification.)

BY MS. PENN:

     Q    Do you recognize this email?

     A    I do.

     Q    Does it look like one of the emails you send me on Friday?

     A    It is, yes.

Q    And again, you received this email as part of your work at Community PACE?

A    Correct.  Correct.

Q    Thank you.  Okay.  I'm now going to introduce Exhibit 6.

(Defendant's Exhibit 6 marked for identification.)

BY MS. PENN:

Q    Do you recognize this email?

A    I do, yes.

Q    And that's one of the emails you send me on Friday, correct?

A    Correct.  Yes.

Q    And also you send and received this email chain as part of your work at Community PACE?

A    Correct.

Q    I'm now introducing Exhibit 7.

(Defendant's Exhibit 7 marked for identification.)

BY MS. PENN:

Q    Do you recognize this email chain?

A    I do, yes.

Q    And it's one of the emails that you send me on -- or documents you send me on Friday, correct?

A    Correct.

Q    And same question like before and this email was sent/received by you as part of the scope of your job at Community PACE?

A    Correct.

Q    Okay.  Thank you.  I'm now introducing Exhibit 8.

        (Defendant's Exhibit 8 marked for

        identification.)

BY MS. PENN:

Q    Do you recognize this email?

A    I do, yes.

Q    And that's the email, one of the emails you send me on Friday?

A    Correct.  It is.

Q    And you send that email as part of your work at Community PACE?

A    Yes.

Q    I'm now introducing Exhibit 9.

        (Defendant's Exhibit 9 marked for

        identification.)

BY MS. PENN:

Q    Do you recognize this email?

A    I do.

Q    It's one of the documents you send me on Friday, correct?

A    Correct.

Q    And you received or sent emails in this email chain as part of your work at Community PACE, correct?

A    Correct.  Correct.

Q    Okay.  I'm now introducing Exhibit 10.

(Defendant's Exhibit 10 marked for identification.)

BY MS. PENN:

Q    Do you recognize this email?

A    I do, yes.

Q    And it's one of the documents you send me on Friday?

A    Correct.

Q    And you received or send this communication as part of your work at Community PACE, correct?

A    Correct.

Q    Okay.  I think I now showed you and introduced all the documents that you send me on Friday.  Were any other documents that -- are there any other documents that are responsive to that subpoena?

A    I do not believe so, no.

Q    Okay.  Then let's talk about your background a little bit since now we have all the exhibits out of the way and the ground rules for the deposition.  Who is your employer right now?

A     Community PACE at Home.

Q     And what's your role at Community PACE?

A     I'm current leader.

Q     I'm sorry?

A     The quality director.

Q     Quality director.  Thank you.  And is that the role that you held since you started working at Community PACE?

A     No.  It is not.

Q     Okay.  Can you tell me the other roles that you held since you started?

A     Yep.  I was hired in as an executive administrative assistant.  And then I transitioned into human resources still continued to do some of the administrative assistants for the executive director and then I transferred into quality.

Q     And when did you transfer to quality?

A     It was I would say May or June of last year so 2024.

Q     Okay.  And when -- you said that you were executive administrative assistant, correct?  Do you remember when you held that role exactly?

A     Yep.  So I started with Community PACE in that role October 18th of 2022 and then I kind of played a hand in that role until I took over the quality director.

Q    Okay.  Thank you.  Where did you work before?

A    Corewell Health.  It is a hospital corporation in the state of Michigan.

(Clarification by the court reporter.)

THE WITNESS:  Corewell is C-O-R-E-W-E-L-L and then Health.  They were previously Spectrum Health.

BY MS. PENN:

Q    And how long did you work there?

A    Shoot.  I believe at least five years.

Q    Okay.  Let's talk about your educational background for a moment.  What's the highest educational institution that you attended?

A    I have a bachelor's degree in health care.

(Clarification by the court reporter.)

THE WITNESS:  A bachelor's degree in health care administration.

BY MS. PENN:

Q    Thank you.  I am now going to go back to one of our exhibits, Exhibit 2.  Is this big enough for you to see it, Ms. Carter?

A    It is.

Q    Okay.  I'll scroll down in this email chain. Okay.  Do you see this email that right now I'm displaying on the screen, part of Exhibit 2, it's dated January 11th, 2024 send at 4:26 a.m.?

A    Correct.

Q    Okay.  And it is you who send the email, correct?

A    Correct.

Q    And do you mind reading out loud that -- that two-line email or two-sentence long email?

A    Yep.  It says:  "Below is an issue in reporting when running a medication report.  Please see screenshot below."

Q    Okay.  So let's talk about Intus.  When did you first hear about Intus?

A    I heard the name Intus on and off a little bit talked through when our administration people were talking but not something I was super familiar with at the time.

Q    And when would be that time that the administrative people were talking about Intus, would you be able to tell me approximately when you -- when the conversations were taking place?

A    I -- they were conversations that I heard in passing so unfortunately I don't -- I couldn't give you a time frame exactly and I don't know the context behind this.  I just heard the name.

Q    Do you think it was before the January 11th, 2024 when you send this email?

A     I'm sure it was.

Q     Okay.

A     I guess.

Q     Do you know what Intus does?

A     I only know a little bit at this point in time because we -- after a cease and desist letter was provided to us we kind of cut ties so I did not get it to Intus.

Q     Just tell me whatever you know.

A     At this point I know we recently were at a PACE meet and greet and I was made aware that they have started an EMR, an electronic medical record system. They also do kind of, like, quality dash focus as well as what I did know at that point in time was that -- or around this time is that they did kind of, like, mock audits to help work through audit processes.

Q     And is that the information that kind of knew at the time around this January 11th, 2024 email or is that more recent information?  I didn't hear exactly the beginning of your sentence.  I apologize.

A     Sure.  It was more recent.  In later emails there was the conversation about a mock audit.  That is kind of when I learned that they provided those.  And then I just learned this past year in May they had started making their own EMR.

Q    I'm so sorry.  The last sentence was breaking up a little bit.

MS. PENN:  Ms. Abraham, did you hear the last sentence?

(Record read back.)

MS. PENN:  Thank you.  When --

THE WITNESS:  Correct.  That is what I said.

BY MS. PENN:

Q    Thank you.  When did you start working with Intus?

A    The -- I personally have not worked a ton with them.  The only thing that I started was around this January email when another staff member had provided their issues that she was having with them and I forwarded that information on to RTZ.

Q    Uh-huh.

A    So I guess you can say my time frame working with them started around this January email.

Q    Got it.  Thank you.  Do you know when Community PACE started working with Intus?

A    I do not, no.

Q    Okay.  So let's talk about this medications report that your email mentions here and an issue that you're referring to.  Can you please tell me more about the issue, if you recall?

A    I, again, didn't have a ton.  If you scroll down, I didn't have a ton of hands in this.  This was just forwarded to me by our -- she was the quality director at that time.

Q    Uh-huh.

A    So the email that was provided was from an Intus staff.  It sounds like they were trying to run a medications report and they were unable to.  It was getting an error.

Q    Okay.  And I apologize.  I will just circle back to one of the things for a moment that you mentioned a minute or so ago.  You said that you learned that Intus started doing their own EMR, am I correct?

A    Yes.  I -- at a meet and greet in Michigan and I believe that was in May that it was a PACE Association.

Q    And that's --

A    Meet and greet.

Q    And this was May of last year, 2024?

A    No.  May of 2025 I believe it was.  I'd have to double check my dates.  I'm sorry.  It probably wasn't May.  The meet and greet was -- I'd have to verify my date on that.

Q    Understood.

A    It was -- it was in 2025, though.

Q    I'm sorry.  You said it was or it wasn't?  It

was breaking up a little bit.

A    It was in 2025.

Q    I'm so sorry.  Still didn't catch that.

A    It was in 2025.

Q    Okay.

A    I would have to verify the date.

Q    Uh-huh.  And can you tell me a little bit more what exactly you recall that you learned about Intus doing their own EMR?

A    Honestly, it was they called a meet and greet.  It reminds me of almost like speed dating.  So you just kind of go through --

(Clarification by the court reporter.)

THE WITNESS:  I apologize.

(Clarification by the court reporter.)

THE WITNESS:  A little better?  Okay.  The meet and greet is like a speed dating.  So we had a group of probably six to eight people --

(Clarification by the court reporter.)

MR. BESHAI:  Thank you, Ms. Abraham.  I mean, don't want to go, I can't hear anything either.

MS. PENN:  Same.

THE WITNESS:  Do you want me to step outside and assess the problem?  I apologize.

THE REPORTER:  Can we go off the record for a

moment?

MS. PENN:  Yes, please.

MR. BESHAI:  Sure.

THE REPORTER:  Off at 10:03.

(Off record:  10:03 a.m.)

(On record:  10:20 a.m.)

THE REPORTER:  Let's go on at 10:20.

BY MS. PENN:

Q    Ms. Carter, we're back from the break.  Let's talk about the speed dating event again that you had said.

A    Yes.

Q    Go ahead.

A    So the meet and greet is PACE Association.  It reminds me of, like, a speed dating situation where you -- hand full of us go and we meet different corporations.  They just kind of give us a quick little spiel about what their company has to offer and there's lots of different types of companies that join on that. So I didn't get a ton of information because I was also juggling some work stuff too via emails so I kind of just sat back and, like, let the rest of the team listen to what Intus was presenting at that point in time, but they were speaking about, like, their mock audit options as well as that they were starting to design an EMR.  I

didn't get a ton of information on the EMR but.

Q    Do you know from Intus who was presenting?

A    I don't know who was at that meet and greet, no.

Q    And if I repeat --

A    Not by name.

Q    -- then names, would that refresh your recollection?

A    Honestly, I couldn't tell you for sure who was there.

Q    Uh-huh.  Mean, how many people or how many individuals from Intus you think were there?

A    I believe there were -- if I remember correctly, I believe there were two people at that table.

Q    And were there males or females?

A    I believe they were males.

Q    Two of them were males?

A    Correct.

Q    Okay.  Do you remember anything about them, like, you know, approximate age or maybe the way they looked?

A    Honestly, I mean, I could give you an estimate on their age.  I thought maybe, like, 30s, early 40s.  I honestly couldn't tell you specifically, no.

Q    But it was these two individuals who talked about and communicated the EMR development that you heard

about, right?

A    Correct.

Q    Okay.  And do you recall who was there with you from your coworkers?

A    Yeah.  We had a pretty large group of people that were there compared to most other places.

Q    Do you recall their names by any chance?

A    For sure Christine Runions was there.  Kelsey Bruno was there.  There was a Kaitlyn Schumacher and I'm not sure -- I'd have to think back at who else was sitting at that table at that point in time because people were going in and out so.

Q    And do you remember anything any more specific about this EMR that the two Intus individuals shared?

A    No.  Like I said, I was kind of juggling some work emails and stuff during that time frame so I was -- I had stepped back and I only heard just bits and pieces here and there while I was trying to juggle multiple things.

Q    Understood.  And even, like, basic information, like, is it in development or was it already developed, do you recall that?

A    I don't, no.

Q    Understood.  Thank you.  I'm going to go back to the exhibit, the email chain that we started discussing,

the one about the medication report.

A    Uh-huh.

Q    Can you view my screen?  Can you view the Exhibit 2 that I'm sharing right now?

A    I do see it, yes.

Q    Okay.  And the size of the font is all good for you to see?

A    Yes.

Q    Okay.  Do you know, like, why there was any issue running this report?

A    I don't know the reasoning.  I don't know the reasoning behind why it was not --

Q    Do you know -- I'm sorry for cutting you off. Do you know how this -- this report would be run? Like --

A    Unfortunately, I don't know that either.

Q    But isn't it true that Intus would have to connect to an RTZ system at PACE -- at Community PACE to run their report, correct?

A    Correct.

Q    And this is why you contacted the RTZ support team because there were some issues with that connection, correct?

A    Correct.

Q    Do you know how Intus was accessing the RTZ

system at Community PACE?

A    They -- from what I'm aware, they had -- there were accounts made so they had a -- like a user name and a login.

Q    Were these accounts made for Intus by Community PACE?

A    That I'm unsure.  I believe they were done prior to me having a hand in this.

Q    Okay.  So when the accounts were made, what kind of login information would Intus be using to access these accounts?

MR. BESHAI:  Objection.  Lacks foundation.  You can answer, Ms. Carter.  I don't know -- Ms. Penn, I don't know that we talked about objections.  If we did, I apologize.  But I will be objecting to a few things, Ms. Carter, and I'm not your lawyer so I can't instruct you not to answer so you will -- you have to answer the question, but these just for the record for future proceedings, okay?

THE WITNESS:  Okay.

MS. PENN:  I will just withdraw the question and I will ask the question another way.

BY MS. PENN:

Q    Was Intus using any login credentials that were issued to employees of Community PACE to access RTZ

system?

A     They were utilizing logins.  There was -- I can't remember which exhibit it was.  But there was an exhibit in which I had sent to you showing that those accounts had been deactivated.  That is how they were -- or that's how they were accessing as far as I'm aware.

Q     Okay.  And I will go to that exhibit right now.  This was exhibit -- is this the exhibit that you're referring to?

A     Correct.  Yes.

Q     And this is an email dated March 13th, 2024?

A     Correct.

Q     And it was sent by you, correct?

A     Correct.

Q     Can you describe -- or can you actually read out loud this email first, please?

A     Yep.  This email was sent from me to our executive director at Community PACE, Kelsey Bruno.  I said:  "Hi, Kelsey.  Please see the following accounts that had Intus emails attached that were deactivated in RTZ as of March 13th, 2024 at 2:25 p.m.  These accounts were found by pulling a user report in RTZ and filtering by email to find those who had at Intus Care."

So it was Daniel Prado and an Alexander Rothberg.  "Please let me know if you have any other

questions."

Q     Were you the one who deactivated these accounts?

A     I am, yes.

Q     Were there any other accounts that you deactivated or just these two?

A     These two were the ones that I was able to find pulling that user report in RTZ filtering by the "at Intus Care" email.

Q     Do you know of any other accounts that were deactivated but maybe not by you?

A     Not that I'm aware of.

Q     Do you know who created these accounts?

A     I do not.

Q     Do you know who authorized that these accounts be created?

A     I do not.

Q     Can you tell me more how this account would actually work?

MR. BESHAI:  Objection.  Lacks foundation.

MS. PENN:  I'll withdraw.

BY MS. PENN:

Q     Do you know how this account was created?

A     I do not.

Q     Do you know if login credentials issued by RTZ to Community PACE employees were used to create these

accounts?

A    I am not sure.

Q    Were these accounts then created in RTZ system PACE care?

A    I can only assume and say that they were because that would be the only way that they'd be able to utilize the system.

(Clarification by the court reporter.)

MS. PENN:  PACE care, correct.  Would you like me to spell it?

THE REPORTER:  Please.

MS. PENN:  P-A-C-E, C-A-R-E.

BY MS. PENN:

Q    And I'm sorry.  Ms. Abraham, can you please read the last answer from the witness?

THE REPORTER:  Of course.  One moment.

MS. PENN:  Thank you.

(Record read back.)

BY MS. PENN:

Q    And by the system, you mean PACE care, correct?

A    Correct.

Q    And what do you mean by utilize?

A    To be able to pull reports or access reports.

Q    So they would need to access PACE care to pull the reports, correct?

A    As far as I'm aware.

Q    Do you know why these accounts were deactivated?

A    I was requested to deactivate these accounts after we had received a cease and desist letter from RTZ. Our team had decided to withdraw working from Intus due to that cease and desist letter and so I was requested to remove all access as we were not utilizing them.

Q    And the reports that Intus was running, could the same information be provided manually to Intus?

MR. BESHAI:  Objection.  Lacks foundation.

MS. PENN:  I will withdraw.

BY MS. PENN:

Q    What's in the reports, the medication reports, do you know?

A    Unfortunately, no.  It's not something that I utilized on a regular basis.

Q    But it would be fair to assume that it's some information that pertains to patients?

MR. BESHAI:  Objection.  Calls for speculation.

BY MS. PENN:

Q    You can answer.

A    It would have something -- I don't know if the patient's name specifically would be in there.  A medications report would at least have name of the medications that I'm aware of.  I don't know if it would

have patient information in it specifically.

Q    So let's circle back a little bit.  What does Community PACE do as a company?

A    Community PACE is a program of all-inclusive care for the elderly so we provide care to the aging group of 55 and up.  We have a primary care doctor.  We also provide, like, therapy services, recreational services, dietary needs, kind of all of the above.

Q    So it's fair to say that Community PACE would have information about various issues, health care information of the patients that it services or it has, right?

A    We do --

MR. BESHAI:  Objection.  Vague and ambiguous.  Sorry, Ms. Carter.  I got to --

THE WITNESS:  Oh.

MR. BESHAI:  -- get the --

THE WITNESS:  That's okay.

MR. BESHAI:  -- objection out first and then you're more than welcome to answer.  Objection as to various issues.

BY MS. PENN:

Q    You can answer.

MR. BESHAI:  Misstates --

BY MS. PENN:

Q   Sorry.  No.

A   Community PACE would have information on patient participants as.

Q   Which would likely include information about medications that individuals either are prescribed or take, correct?

A   Correct.

Q   So the medication reports that we're discussing are about medications that patients of Community PACE either take or prescribed, maybe were taking, correct?

MR. BESHAI:  Objection.  Lacks foundation.

BY MS. PENN:

Q   You can answer.

A   As far as I'm aware, yes.

Q   So just back to the ground rule because I didn't cover it, so though Mr. Beshai objects to some of my questions, once he's done objecting, you can answer.

A   Yes.

Q   Thank you.  The same information or I'm sorry. The information about medications that patients were taking or prescribed could be provided to Intus by having, you know, a printed out report, like a physical copy, correct?

MR. BESHAI:  Objection.  Vague as to the information to be provided and calls for -- well, and

lack of foundation.  You can answer, Ms. Carter.

THE WITNESS:  Sorry.  I just wanted to make sure you were finished.  Waiting to make --

MR. BESHAI:  Yes.

THE WITNESS:  -- sure there was no lag.

MR. BESHAI:  I appreciate it.  Thank you.

THE WITNESS:  Yes.  Of course.  Yeah.  I mean, I'm sure there was a way it could have been provided manually.

BY MS. PENN:

Q    Okay.  Thank you.  I am going to go back to the prior exhibit, which was Exhibit 2.  Ms. Carter, do you see part of the Exhibit 2 email dated February 13th, 2024 on the screen right now?

A    I do.

Q    And you're one of the recipients of this email from Amanda Muniz, correct?

A    I am, yes.

Q    And this email is talking about an NDA, correct?

A    Correct.  Yep.

Q    Is this the first time around this February 13th, 2024 email that you learned about the requirement of an NDA?

A    It is, yes.

Q    Did you have any discussions with Intus about

the NDA requirement?

A    No.  But I had a verbal communication with our executive director and then she is who later provided me the addendum and contract to provide to Amanda and the PCO support.

Q    But you didn't talk to anybody at Intus about it?

A    I personally did not, no.

Q    And after receiving this email from Amanda Muniz, did you communicate with Intus about the NDA requirement in any way?

A    I personally did not.

Q    Was the requirement or did the fact that or did the information that an NDA was required, did it have an impact on you?

MR. BESHAI:  Objection.  Vague --

THE WITNESS:  Yes.

MR. BESHAI:  -- as to impact.

BY MS. PENN:

Q    Can answer.

A    Yeah.  Sorry.

(Clarification by the court reporter.)

MR. BESHAI:  Yeah.  I was saying as to impact. Thank you, Ms. Abraham.

THE WITNESS:  Yes.  It had an impact on me

because obviously I wanted to make sure that we were following the correct protocols so I wanted to make sure we had the right documentation in place for the accessing of RTZ.

BY MS. PENN:

Q    To your knowledge, did Intus acknowledge that they didn't have an NDA?

A    That I'm not aware of.

Q    This is another email in this long chain of emails, part of Exhibit 2.  This is an email send on February 14, 2024.  Do you see this email?

A    I do, yes.

Q    And it was sent by you, correct?

A    Correct, yes.

Q    Can you please read out loud the email?

A    Yep.  I said:  "Okay.  I just verified that Intus is actually part of Tabula Rasa, a corporate umbrella.  They should have had access and an NDA as well as or as Peak and Pharmastar.  I thought that they were part of the same company but I don't work with them a ton so just needed to verify."

Q    You said that Intus was actually part of a Tabula Rasa, a corporate umbrella because somebody told you that?

A    They did, yes.

Q    Who told you that?

A    My executive director at the time, Kelsey Bruno. There was a bit of confusion because of the name change of Tabula Rasa a couple times as well as the companies that worked with them.

Q    I'm sorry.  The name change, I didn't get that. Whose name change?

A    Tabula Rasa.  They had a couple different names prior to or at least another name.

Q    Do you know --

A    So there was confusion on our part.

Q    Understood.  Do you know the other names that?

A    I'm not 100 percent sure.  I believe maybe it was CareVention prior to Tabula Rasa but I couldn't verify for sure.  That was prior to me working with PACE.

Q    Did you confirm this information in any way that Intus was part of a Tabula Rasa corporate company?

A    It was just a verbal communication with my executive director.

Q    Wouldn't you agree that it would not be your executive director or Community PACE that could actually confirm that information, that this would have to be confirmed by Intus?

MR. BESHAI:  Objection.  Lacks foundation, argumentative.

THE WITNESS:  I do think it should have been verified with Intus whether or not we had one and I believe that's when we provided the contract and addendum to make sure that we were following that protocol.

BY MS. PENN:

Q    And you would agree it would have to be Intus to verify that they're actually part of a corporate umbrella, correct?

MR. BESHAI:  Objection to the extent the question is, "did Intus verify this?"  Lacks foundation. Otherwise, speculation.

THE WITNESS:  Correct.  I feel like they -- we should have -- it should have been -- it should have came from them.  Unfortunately, it was a misunderstanding on our side.

BY MS. PENN:

Q    Do you know if it came from them?

A    No.  There's no specific grounds that show it came from them.

Q    Did you try to verify it with Intus in any way?

A    I personally did not.

Q    Do you know if anybody tried at Community PACE?

A    I can't speak 100 percent on that.  I'm not sure.

Q    What kind of impact this information had on you

after you learned that?

MR. BESHAI:  Objection.  Vague as to impact and vague as to this information.

THE WITNESS:  Yeah.  Could you be a little bit more specific?  I'm sorry.

BY MS. PENN:

Q   Did it change in any way your attitude right now to Intus?

A   No.

(Clarification by the court reporter.)

MS. PENN:  Attitude.

THE WITNESS:  It did not, no.

BY MS. PENN:

Q   And the way you were handling right now the problem change the way you were handling the problem, which started with the medication report issues?

A   Well, once we found out that we didn't feel like there was the correct paperwork in place, obviously we cut all ties and cut off the access for the RTZ so.

Q   And you said that you learned it from Kelsey Bruno, correct?

A   Correct.  It was a verbal conversation with her, yes.

Q   Did she tell you how she verified that?

A   She did not.

Q    Did she say anything else about this?

A    No.  She did not.

Q    And this is the top of that email where you said you attached an updated addendum, do you see that?

A    Yes.  Yes.

Q    And this is an email that you send on March 11th, 2021; is that right?

A    Correct.

MR. BESHAI:  Objection.  Sorry, Ms. Penn.  That misstates -- you said 2021.

MS. PENN:  Oh, I'm so sorry.

MR. BESHAI:  That's okay.  Just, you know, clean record.

MS. PENN:  Thank you.

BY MS. PENN:

Q    The email -- this email you send on March 11th, 2024, correct?

A    Correct.  Yes.

Q    Okay.  Thank you.  I'm now going to go to that addendum, which we previously marked as Exhibit 2B.  Do you see the exhibit on the screen?

A    Yes.  I do.

Q    And paragraph 2 reads the EHR download, correct?

A    That is what it says, yes.

Q    Would you be able to read out loud this entire

paragraph for us?

A    Sure.

Q    Thank you.

A    Can you zoom it in just a little bit more?

Q    This too big?

A    Nope.  That's perfect.  It says:  "The client represents and warrants that it has the authority, ability, and right to use an automated script by and through its login credentials solely to download the EHR data from the EHR system and that its use of the automated script and/or such use and/or access of the EHR system and/or EHR data is by its election and does not violate and/or breach any law, statute, regulation, rule, contract, and/or agreement to which the client is subject and/or party."

Q    Are you aware of any discussions between Intus and Community PACE about this language that you just --

A    I am not aware.  No.

Q    Are you aware of any discussions in general between Intus and Community PACE regarding this addendum?

A    Not that I'm aware of, no.

Q    To your knowledge, was Community PACE involved in negotiating this addendum?

A    I am not sure.

Q    If there were any discussions between Community

PACE and Intus about this addendum, who at Community would likely be present at those discussions?

A    Normally it would be the executive director.  So if you scroll down, whoever the executive director was at that time that signed it.  Oh, sorry.  It looks like our CFO was the one that signed this one.  So either the CFO or executive director are in the communications when it comes to addendums.

Q    And at that time when this was signed, who was the executive director?

A    I would have to verify on the date specifically.  It would have been either Kelsey Bruno -- I'd have to verify the date honestly.  I'm sorry.

Q    No problem.  And if it wasn't Kelsey Bruno, do you know who else could it be?

A    The executive director prior to her was Sarah Berry.

Q    Okay.  Do you know why this addendum was signed?

A    I do not, no.

MR. BESHAI:  Objection.  Lacks --

THE WITNESS:  Oh, sorry.

MR. BESHAI:  Sorry, Ms. Carter.  I need to get my objection on the record.  Objection.  Lacks foundation.  Now, you can answer.

THE WITNESS:  I do not, no.

BY MS. PENN:

Q    And the second paragraph, the one that you read out loud for us, the addendum mentions an automated script, do you see that?

A    I do see that.

Q    Do you know what an automated script does or did?

A    I do not.

Q    So you don't know anything about this automated script in this addendum?

A    I personally do not, no.

Q    Do you know about an automated script in relation to Intus, Intus's work with Community PACE?

MR. BESHAI:  Objection --

THE WITNESS:  I --

MR. BESHAI:  -- asked and answered.  Sorry, Ms. Carter.  If you just give me, like, a beat before you answer.

THE WITNESS:  Yep.

MR. BESHAI:  Objection.  Asked and answered.  Please, go ahead.

THE WITNESS:  I personally do not, no.

BY MS. PENN:

Q    Are you aware that Intus installed an automated script as --

MR. BESHAI:  Objection.  Lacks -- whoops.
Sorry, Ms. Penn.

MS. PENN:  That's okay.

BY MS. PENN:

Q    Are you aware that Intus installed an automated
script on Community PACE to access RTZ system?

MR. BESHAI:  Objection.  Lacks foundation.

THE WITNESS:  I personally was not aware of
anything.

BY MS. PENN:

Q    Prior to receiving this addendum, which here we
see was signed signature dates in May of 2023, did Intus
have access to PACE care, the RTZ system?

A    I am unsure of if they did.

Q    Did anybody explain to you why this addendum was
signed?

A    They did not.

Q    Did you have any conversations with anybody at
Community PACE about this addendum?

MR. BESHAI:  Objection.  Asked and answered.

THE WITNESS:  I did not.

BY MS. PENN:

Q    I'm just looking for the exhibit.  I apologize.
My exhibit list shut down for a second.  I am now
presenting Exhibit 10 or viewing Exhibit 10.  Can you see

it on my screen, Ms. Carter?

A    I can, yep.

Q    This is an email from February 24th, 2024.  And you're one of the recipients of this email, correct?

A    I was, yes.

Q    And this is about the Intus Care mock audit, correct?

A    Correct.

MR. BESHAI:  I'm sorry to interrupt, Ms. Penn. I think you just said:  "February 24, 2024."  I believe this is February 28th, 2024; is that right?

MS. PENN:  You're absolutely right.  I, again, apologize.  I --

MR. BESHAI:  No problem.

MS. PENN:  Clearly reading the dates incorrectly.  Thank you for correcting me.

BY MS. PENN:

Q    I would like to direct your attention to part of this phase 1 part of the email.  And the very last bullet point here, can you please read the last bullet point that's on the --

A    Yep.

Q    -- screen?

A    It says:  "Community PACE to grant access to EMR by March 25th, 2024 or sooner if possible for the Intus

Care mock audit team to begin review of participant medical records as well as appeals and grievance documentation that may be maintained in the medical record."

Q    This email suggests that Intus needs access to EMR by March 25th, 2024, correct?

MR. BESHAI:  Objection.  Calls for -- sorry.  Objection.  Lacks foundation.  Calls for speculation.

BY MS. PENN:

Q    The email literally reads that Community PACE is to grant access to EMR; is that correct?

MR. BESHAI:  Objection.  The document speaks for itself.

BY MS. PENN:

Q    And you can answer.

A    It does.  Yes.  It does say that.

Q    Didn't Intus already have access prior to March 25th, 2024, access to EMR?

A    I believe they are requesting that other individuals have access at that time.

Q    So they requesting, like, more access that they already had or additional individuals?

A    I believe so, yes.

Q    Do you know why?

A    With the mock audit, this is just an assumption,

that they had multiple different people that would look at different areas to audit through the EMR and the documentation on it from our staff.

Q    Do you know how this access prior to March 25th, 2024 was achieved?

MR. BESHAI:  Objection.  Lacks foundation.

THE WITNESS:  As far as I'm aware with this request, no other access was made because I had already been in communications with Amanda questioning the NDA and making sure we had the correct documentation in place prior to giving that access.

BY MS. PENN:

Q    But what I'm asking is a little bit different. So prior to this March 25th, 2024 date, you already said that Intus had access to EMR, it's just they were requesting additional access for additional individuals, correct?

A    That is what I can assume, yes.

Q    The access for the existing individuals, not the new one, how was that achieved, do you know?

A    I don't know.

Q    Was it achieved using login credentials issued to employees of Community PACE?

MR. BESHAI:  Objection.  Lacks foundation. Asked and answered.

BY MS. PENN:

Q   You can answer.

A   I personally do not know.  I don't -- I did not have a hand in that.

Q   Where did the activated accounts that we talked about some time ago during this deposition, were these deactivated accounts in relation to this access prior to March 25th, 2024?

A   I am unaware of the exact date when they received their access.

Q   But they would -- the access would be received or taken place prior to March 25th, 2024, wouldn't it?

MR. BESHAI:  Objection.  Whoop.  Objection.  Lacks foundation.  Calls for speculation.

THE WITNESS:  I would say that they would have had access prior to the date that I deactivated them.

BY MS. PENN:

Q   Uh-huh.  And the date of the email regarding the deactivation -- the date of the deactivation is March 13th, 2024, correct?

A   Correct.

Q   So it is before March 25th, 2024 in the mock trial email; is that correct?

MR. BESHAI:  Objection --

THE WITNESS:  Correct.

MR. BESHAI:  I believe it's mock audit.

BY MS. PENN:

Q   Mock audit, yes, I apologize.

MR. BESHAI:  No problem.

THE WITNESS:  Correct.

BY MS. PENN:

Q   Okay.  Thank you.  So since the deactivation email is dated March 13th, 2024, Intus had access to EMR prior to March 25th, 2024?

A   There -- there were the two staff members that had access to prior to March 25th, 2024, yes.

Q   And I'm sorry.  I didn't get it.  There were staff members?

A   Those two names that were listed there, sorry.

Q   Thank you.  I do not have right now any additional questions.  Would we like to take a break?

MR. BESHAI:  Yeah.  I have a few.  I might go 20 minutes, 30 minutes but it would be good to take a short break now and then maybe reconvene at 11:15 if that's okay with everyone.  It's, like, 12 minutes.

MS. PENN:  Sure.  Works for me.

MR. BESHAI:  Great.  Thank you.

THE REPORTER:  Off at 11:04.

(Off record:  11:04 a.m.)

(On record:  11 :15 a.m.)

THE REPORTER:  Okay.  Back on the record at 11:15.

MR. BESHAI:  Thank you, Ms. Abraham.

CROSS-EXAMINATION

BY MR. BESHAI:

Q    All right.  Ms. Carter, this is your first deposition you've ever been a part of?

A    Correct, yes.

Q    Is it as much fun as you'd like to believe?

A    It's been great.

Q    Okay.  All right.  Well, I won't keep you too long.  Did you speak with RTZ's counsel in this case?

A    I did not, no.

Q    You never had a phone call with them?

A    No.

Q    Okay.  But you emailed, you exchanged emails with them?

A    I guess, let me backtrack.  Let me verify.  We previously did, like, weekly or biweekly phone calls speaking about the system and, like, what we needed help with but no counsel calls.

Q    Oh, I meant, like, Ms. Penn, Mr. Lee, did you ever speak --

A    No.

Q    -- to them by phone for today's -- okay.  That's

what I meant.

A    I did not, no.

Q    Okay.  And then still keeping with Ms. Penn and Mr. Lee, did you exchange emails with them in the lead-up to this deposition?

A    Just the emails in which they -- I verified the link and how to get access to today's meeting as well as providing them copies of those emails and the exhibits that were provided.

Q    And the exhibits that we looked at today that Ms. Penn showed you, is that the entirety of everything you provided to -- to her and Mr. Lee?

A    I believe so.

Q    Okay.  Okay.  Were there any emails that were more substantive than that, you know, discussing your knowledge or your experience at Community PACE or was it all just logistics and --

A    Yeah.  It was primarily logistics.  Primarily logistics.  I believe there was just one comment in which I stated that I was not super familiar with the Intus itself and so I had apologized for not having the correct documentation in place and making sure we tried to get that.

Q    Okay.  Did you consult any other -- well, I don't want to know what you said but I just want to know

if you did consult any other lawyers before this deposition?

A    I did not, no.

Q    Okay.  I want to talk a little bit about the meet and greet the, quote, unquote, "speed dating event" --

A    Yes.

Q    -- that you described.  Okay.

A    Yeah.

Q    This took place earlier this year.  You thought it was May but you're not sure?

A    Correct.

Q    And where -- where was this?

A    It was located in oh, I'm sorry, I'm mixing up the date that we went to Lansing.  I would have to verify the exact town, I'm sorry.

Q    Are you based in Michigan?

A    Yes.

Q    Oh, okay.  So this is somewhere in Michigan?

A    Yes.  Yes.

Q    And where is your office?

A    Our office is located in Newaygo, Michigan.

Q    Okay.  This meet and greet, who was it hosted by?

A    The PACE Association of Michigan.

Q    Oh, okay.  So Community PACE is just one PACE entity we'll say?

A    Correct.  Yep.  I believe every PACE entity in the state of Michigan was present.

Q    Okay.  Do you know how many there are in Michigan?

A    There's a lot of us.  I can't give you an exact number, no.

Q    That's fine.  That's fine.  And is it the fact that everyone had a table and then vendors would come around and talk to you all or did the vendors have tables and you all would go around to them?

A    Vendors had tables and all the entities were the ones that transitioned through.

Q    Okay.  So you were there with your folks and you weren't really paying attention that much you said because you had a lot of work?

A    Yep.  I was half and half, yep.

Q    You were what, I'm sorry?

A    I was half and half work trying to multitask, yes.

Q    Okay.  Okay.  And then one of the tables was sponsored -- Intus had a table there?

A    Intus did have a table there, yes.

Q    Okay.  And you mentioned that you remember them

discussing their EMR, right?

A    Yes.

Q    But you don't recall any specifics about the EMR, the discussion about the EMR, anything like that?

A    No.  They had a border -- like, I think it was a demo on a screen kind of just showing stuff but, again, I was not paying close enough attention to be able to tell you what they were actually showing.

Q    Okay.  I want to go back to your role at Community PACE because I know Ms. Penn touched on it but I just want to understand more.  As -- did you say your current role is quality coordinator?

A    Quality director, yep.

Q    Quality director.  How long have you been in that role?

A    I believe it was May or June of last year, 2024.

Q    A little over a year.  What do you do as a quality director?

A    So I'm actually trying to get into things a little bit more.  I took the role and then ended up on maternity leave directly afterwards --

Q    Okay.

A    -- so I'm really just jumping into things.

Q    Okay.

A    So I personally am looking at, like, our

utilization, trying to make sure that we are doing the best we can with the funds that we're given as well as giving the best care to our participants.

Q    And --

A    And I am -- go ahead.

Q    No, please.  Continue.

A    I was just going to say I'm also kind of, like, a liaison to go through.  I'm not sure how familiar you are with PACE but, like, our grievances and appeals and service determination requests so, like, receiving those from our participants and making sure that I put correct actions in place or work with our administration to put correct actions in place for the better of our participants.

Q    And are your participants healthcare providers or the actual patients who are getting -- the elderly patients?

A    Sure.  The patients that when I say: "Participants," sorry, I am meaning the patients.

Q    Okay.  When -- before you were the quality director, you said you were an executive administrative assistant; is that right?

A    Correct.  Yes.

Q    So the emails that we saw today that basically span early 2024, those emails were all when you were

still the executive administrative assistant?

A    Yeah.  I was transitioning out of executive administrative assistant into human resources at that point in time.  There was, like, a little bit of a lapse they were not replacing my position and so I was just kind of helping --

Q    Okay.

A    -- our executive director with things, yes.

Q    And is the executive administrative assistant essentially the assistant to the executive director?

A    Yes.  Yeah.  I also at that point in time helped any of our other directors in the -- in the administration.  So I helped our quality director do things as well as our clinic director if she had, like, clerical work that needed help.

Q    As part of that, you were looked like interacting or interfacing with Intus, correct?

A    I didn't get a ton of access with Intus until that first initial email and that came from our previous quality director.  I was kind of, like, a middleman with RTZ as their, like, super user, almost trying to help out our team with the tickets and issues that we were having and, you know, relaying that information back and forth between the two.  So our previous quality director had forwarded me that concern that they were having and

that's when I had forwarded on to RTZ.  So that was pretty much the beginning of my knowledge in real detail, I guess, with Intus.

Q    So that was kind of a one-off situation.  That wasn't part of your normal duties?

A    No.  I -- like I said previously, I had heard of the name Intus but not really, like, details on exactly what Intus might have been providing for Community.

Q    Okay.  Now that you've been brought into this orbit probably more than you'd like, can you describe for me what it is you understand Intus does for Community PACE?

A    Yeah.  So I mean, as far as I'm aware at that time we were I think that they were, again, this is just my speculation.  I'm not 100 percent sure.  I think that they were running reports for us.  Again, I don't know a ton prior to that.  I think that there was, like, some sort of quality dashboard but I did not really have a hand in that and what it looks like and then we were looking at utilizing for a mock audit.  That was really where I was going to come in place.

Q    What's a mock audit?

A    A mock audit is when a third-party company comes in and goes through all of your EMR and does very similar audit regulations to what either, like, CMS or state

would, so we are just trying to better prepare for a CMS audit.  So looking at utilizing them to help go through some of the things that we may need to better ourselves on in the future when it came to an audit.

Q     And at the time, Intus was going to do this mock audit for you?

A     As -- yes.

Q     Did the mock audit ever happen?

A     It did not.

Q     With anyone, not Intus, not anyone?

A     No.  No one.

Q     You were asked by Ms. Penn about alternative ways to transmit data to Intus, do you recall that?

A     Yes.

Q     Right.  Like, what access was turned off by RTZ.  Ms. Penn's question was, did Community PACE consider other ways or was it feasible to get other -- to get the same data to Intus through other avenues, right?

A     That was the question, yep.

Q     That was the question.  Okay.  And your answer was you just have no idea?

MS. PENN:  Objection.

(Clarification by the court reporter.)

MS. PENN:  Misstates testimony.

THE WITNESS:  Sorry.  I believe -- the question

up a little bit.

(Clarification by the court reporter.)

THE WITNESS:  Nope.  You're fine.  I'm just mixing the question up just a little bit.  Will you repeat it, sir?

BY MR. BESHAI:

Q    Yeah.  No problem.  Ms. Penn had asked you about what alternative ways there was to get Intus the data that Intus had been accessing through RTZ's EMR after RTZ turned off access, do you recall that question?

A    Yes.

Q    And --

MS. PENN:  It misstates testimony.

MR. BESHAI:  Well, I haven't said what her testimony was yet.

BY MR. BESHAI:

Q    But I guess my next question would be, do you recall what your answer was to that?

A    It was that if I remember correctly we -- was there a manual way that we could provide information to Intus --

Q    Can you explain to me -- oh, sorry.  Go ahead.  Go ahead.

A    No.  And sorry.  Instead of them accessing it electronically.

Q    How do you know about this manual alternative?

A    This is just an assumption from me playing with the system itself.  I can pull a report of any kind for the most part and download it either via Notepad or Excel.  So my thought when she mentioned manual would be to download it as an Excel or a Notepad and then forward it via email.  But that is not something I provided.

Q    Got it.  So this is just your own speculation given your familiarity with the PACE care system?

A    Correct.  Yes.

Q    Did you ever speak to anyone at Community PACE about this manual alternative?

A    I did not, no.

Q    Are you aware if a manual alternative was ever attempted?

A    I am not aware of any manual alternative, no.

Q    Have you reviewed any communications or studies about how feasible or efficient a manual alternative would be?

A    Not recently, no.

Q    At any point?

A    On my side of things running reports and providing them to, like, CMS it would not be efficient in any way, shape, or form for whoever is the one collecting that data.  I would not say it would be efficient, no.

Q    So it's your testimony, based on your experience with the PACE care system, that a manual alternative would likely not be as efficient as the automated script?

MS. PENN:  Leading.

THE WITNESS:  Likely it would not be as efficient, no.

BY MR. BESHAI:

Q    Do you know how many patients' data is being pulled by -- or was being pulled by Intus's program for analysis?

A    I could just give you a guess between 95 to 105.

Q    What's the overall patient population of Community PACE?

A    I believe our current census is 118 participants and that fluctuates monthly by patients deceasing and then new enrollees.

Q    And you said about 95 to 105 of those had data that was being pulled by Intus based on your knowledge?

A    That is what I'm going to estimate our census was around the time frame that this was occurring.

Q    Okay.  And how long would it take you to pull 95 to 105 patient reports if you had to do it every day?

A    It would depend on, I guess, what kind of reports.  If it was just strictly an Excel spreadsheet, it would take a few minutes.  It would just be likely

upload to someone else or somewhere else that would be inefficient.

Q    So the process of downloading, reviewing, and then uploading if that's something you had to do every day, would you say that would take a couple hours a day?

MS. PENN:  Objection.

THE WITNESS:  Yeah.  I would say -- oh, sorry. Go ahead.

MS. PENN:  I'm done.  Thank you.

THE WITNESS:  Okay.

(Clarification by the court reporter.)

MS. PENN:  I'm sorry.  Do you have issues now with hearing me?

THE REPORTER:  No.  I think it's just when you speak at the same time.  I did hear objection.

MS. PENN:  Okay.  The objection was leading. Thank you.

THE WITNESS:  Yes.  I would say probably a couple hours give or take.

BY MR. BESHAI:

Q    Okay.  Let's look at one of the exhibits that was shown.  I'm going to -- can I just share my screen, Ms. Abraham, would that be okay?

MR. BESHAI:  All right.  Ms. Penn, do you have any objections that I just pull up, okay, the exhibit?

MS. PENN: No.

MR. BESHAI: All right. So let me share my screen.

BY MR. BESHAI:

Q Ms. Carter, let me know when you can see my screen.

A I can now.

Q Okay. So this is the Wednesday, March 13, 2024 email that we looked at when Ms. Penn was questioning you and it's from Kelsey Bruno to a few folks at Intus and you're copied, correct?

A Correct.

Q And could you just read the first paragraph starting -- first full paragraph starting with: "Please accept"?

A Yep. It said: "Please accept this as a written notice that Community PACE will not be proceeding with the planned mock audit. We have received a cease and desist letter from RTZ's legal representation and are unable to grant any new access to Intus employees. Additionally, any Intus employees who were previously granted access have had their accounts deactivated."

Q Okay. And then just the next one-sentence paragraph under that.

A "Please also accept this as a notice of

Community PACE's intent to terminate our existing agreement with Intus Care effectively immediately."

Q    Did you talk at all with Ms. Bruno about the cease and desist when RTZ sent it?

A    Not really, no.  I believe she was -- I'm not exactly sure how she received a copy of the cease and desist letter.  She had just let me know that there was one present.  That was most of what the conversation was.

Q    And she just told you this in person, like: "Hey, we got a cease and desist from RTZ"?

A    Yep.  Cease and desist from RTZ and then that we were going to not continue on with the mock audit and she requested at that point in time that I terminate the previously existing accounts.

Q    So before that cease and desist, to your knowledge, did Community PACE have any intention of terminating its relationship with Intus?

A    I cannot speak on that specifically.  The fact that we're going through with a mock audit, I would say no.  But again, it's not something that I would have decided on or been part of the decision.

Q    Okay.  Did you have any other discussions with Ms. Bruno or anyone else about the cease and desist?

A    No.

Q    Let me just take a look and see if I have any

other questions.  One moment.  Okay.  That's all I have.  Thank you, Ms. Carter.  But I don't know if Ms. Penn has any additional questions.

MS. PENN:  Let me just check my notes very quickly.  No further questions.

THE REPORTER:  Mr. Beshai, do you need a copy?

MR. BESHAI:  Yes, please.

THE REPORTER:  Is it okay to go off the record?

MS. PENN:  Yes.

MR. BESHAI:  It's fine by me.

THE REPORTER:  Off at 11:36.

(Proceedings concluded at 11:36 a.m.)

MIRANDA LYNN CARTER                                           JOB NO. 1784120
JULY 28, 2025

                         REPORTER'S CERTIFICATE


             I, MICHELLE ABRAHAM, certified

shorthand reporter No. 14303, in and for the State of

California, do hereby certify:

             That prior to being examined, the witness

named in the foregoing proceedings was by me duly sworn

to testify to the truth, the whole truth, and nothing but

the truth;

             That said proceedings were taken by me in

shorthand at the time and place herein named and were

thereafter transcribed into typewriting under my

direction, said transcript being a true and correct

transcription of my shorthand notes;

             That pursuant to Federal Rule 30(e),

transcript review was requested.

             I further certify that I have no interest in

the outcome of this action.

             In witness whereof, I have hereunto

subscribed my name this 10th day of August 2025.



                         *Michelle M. Abraham*
                         MICHELLE ABRAHAM
                         CSR No. 14303

Deponent's Correction Sheet


     To add testimony, indicate "Add" and print the exact words you wish to add.  To delete testimony, indicate "Delete" and print the exact words you wish to delete.


     I, MIRANDA LYNN CARTER, have the following changes to my transcript:


PAGE          LINE       CHANGE (add/delete)

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

_____        _____      _____

MIRANDA LYNN CARTER, Date _____

I hereby declare under penalty of perjury that I have read the foregoing transcript and certify that: (check one)

_____ I have no corrections.

_____ I have made corrections as reflected on the attached Deponent's Correction Sheet and I now approve my deposition as true and correct.

Dated:_____ at _____, California.


_____
MIRANDA LYNN CARTER

MIRANDA LYNN CARTER
JULY 28, 2025

JOB NO. 1784120

## Exhibits

**Exhibit 1** 3:8 11:11, 12,25

**Exhibit 2** 3:9 15:8,9, 24 17:15 24:19,24 33:4 41:12,13 43:10

**Exhibit 2A** 3:10 17:2,3

**Exhibit 2B** 3:11 17:23,24 47:20

**Exhibit 3** 3:12 18:13, 15

**Exhibit 4** 3:13 18:25 19:3

**Exhibit 5** 3:14 19:16, 17,18

**Exhibit 6** 3:15 20:5,6

**Exhibit 7** 3:16 20:17, 18

**Exhibit 8** 3:17 21:5, 6,7

**Exhibit 9** 3:18 21:18, 19

**Exhibit 10** 3:19 22:5, 6 51:25

### -

**--ooo--** 4:8

### 1

**1** 11:11,12,25 52:19

**10** 22:5,6 51:25

**100** 44:13 45:23 64:15

**105** 68:11,17,22

**10:03** 30:4,5

**10:20** 30:6,7

**11** 56:25

**118** 68:14

**11:04** 56:23,24

**11:15** 56:19 57:2

**11:36** 72:11,12

**11th** 24:25 25:24 26:18 47:7,16

**12** 56:20

**13** 70:8

**13th** 35:11,21 41:13, 22 55:20 56:8

**14** 43:11

**14303** 4:5

**15** 56:25

**18th** 23:24

### 2

**2** 15:8,9,24 17:15 24:19, 24 33:4 41:12,13 43:10 47:23

**20** 56:17

**2021** 47:7,10

**2022** 23:24

**2023** 51:12

**2024** 23:19 24:25 25:25 26:18 28:18 35:11,21 41:13,22 43:11 47:17 52:3,10,11, 25 53:6,18 54:5,14 55:8,12,20,22 56:8,9,11 61:16 62:25 70:8

**2025** 4:3 28:19,24 29:2,4

**24** 52:10

**24th** 52:3

**25th** 52:25 53:6,18 54:4,14 55:8,12,22 56:9,11

**28** 4:3

**28th** 52:11

**29** 4:13

**2:25** 35:21

**2A** 17:2,3

**2B** 17:23,24 47:20

### 3

**3** 18:13,15

**30** 56:18

**30s** 31:22

### 4

**4** 18:25 19:3

**40s** 31:22

**4:26** 24:25

### 5

**5** 19:17,18

**55** 39:6

### 6

**6** 20:5,6

### 7

**7** 20:17,18

### 8

**8** 21:6,7

### 9

**9** 21:18,19

**95** 68:11,17,21

**9:07** 4:3

**9:14** 9:15,16

**9:20** 9:17,18

**9:23** 11:20,21

**9:30** 11:22

### A

**a.m.** 4:3 9:16,17 11:21, 22 24:25 30:5,6 56:24, 25 72:12

**ability** 48:8

**Abraham** 4:4 27:3 29:20 37:14 42:24 57:3 69:23

**absolutely** 5:8 6:8, 13 9:8 52:12

**accept** 70:15,16,25

**access** 13:8 34:10,25 37:23,24 38:7 43:18 46:19 48:11 51:6,13 52:24 53:5,11,17,18,20, 21 54:4,8,11,15,16,19 55:7,10,11,16 56:8,11 58:7 63:18 65:15 66:10 70:20,22

**accessing** 33:25 35:6 43:3 66:9,24

**account** 36:17,22

**accounts** 34:3,5,9, 11 35:5,19,21 36:2,4,9, 12,14 37:1,3 38:2,3 55:5,7 70:22 71:14

**accurate** 7:11,16

**achieved** 54:5,20,22

**acknowledge** 43:6

**actions** 62:12,13

**activated** 55:5

**actual** 62:16

**addendum** 17:19,22 18:2,8 42:4 45:3 47:4, 20 48:20,23 49:1,18 50:3,10 51:11,15,19

**addendums** 49:8

**addition** 13:10

**additional** 13:23 53:22 54:16 56:16 72:3

**Additionally** 70:21

**administration** 24:16 25:13 62:12 63:13

**administrative** 23:13,15,21 25:17 62:21 63:1,3,9

**age** 31:19,22

**aging** 39:5

**agree** 8:2 44:20 45:6

**agreement** 48:14 71:2

**ahead** 30:13 50:21 62:5 66:22,23 69:8

**Alexander** 35:24

**all-inclusive** 39:4

**alternative** 65:12 66:8 67:1,12,14,16,18 68:2

**Amanda** 12:20 41:17 42:4,9 54:9

**ambiguous** 39:14

**analysis** 68:10

**and/or** 48:11,12,13, 14,15

**answering** 5:20,21

**answers** 6:6

**apologize** 9:9 11:17, 24 15:21 26:20 28:10 29:14,24 34:15 51:23 52:13 56:3

**apologized** 58:21

**appeals** 53:2 62:9

**approximate** 31:19

**approximately** 25:18

**archive** 13:4

**areas** 54:2

**argumentative** 44:25

**assess** 29:24

**assistant** 23:13,21 62:22 63:1,3,9,10

**assistants** 23:15

**Associates** 4:16,17, 19

**Association** 28:15 30:14 59:25

**assume** 6:18 37:5 38:17 54:18

**assumption** 53:25 67:2

**attached** 35:20 47:4

**attachment** 17:16, 19 18:3

**attachments** 10:17 17:11

**attempted** 67:15

**attended** 24:12

**attention** 52:18 60:16 61:7

**attitude** 46:7,11

**attorney** 4:2 5:3

**audit** 26:16,22 30:24 52:6 53:1,25 54:2 56:1, 3 64:20,22,23,25 65:2, 4,6,8 70:18 71:12,19

**audits** 26:16

**authority** 48:7

**authorized** 36:14

**automated** 48:8,11 50:3,6,9,12,24 51:5 68:3

**avenues** 65:18

**aware** 5:19 13:7,21 26:11 34:2 35:6 36:11 38:1,25 40:14 43:8 48:16,18,19,21 50:24 51:5,8 54:7 64:13 67:14,16

---

**B**

**BAAS** 16:6

**bachelor's** 24:13,15

**back** 9:18,20 10:25 11:24 16:21 17:15 24:18 27:5 28:10 30:9, 22 32:10,17,24 37:18 39:2 40:15 41:11 57:1 61:9 63:23

**background** 22:22 24:11

**backtrack** 57:18

**based** 8:2 59:17 68:1, 18

**basic** 32:20

**basically** 7:21 62:24

**basis** 38:16

**beat** 50:17

**begin** 53:1

**beginning** 7:4 11:2, 4 26:20 64:2

**Berry** 49:17

**Beshai** 9:12,14 11:18 14:11,13,16,20 15:4,6 29:20 30:3 34:12 36:19 38:10,19 39:14,17,19, 24 40:11,16,24 41:4,6 42:16,18,23 44:24 45:9 46:2 47:9,12 49:20,22 50:14,16,20 51:1,7,20 52:9,14 53:7,12 54:6,24 55:13,24 56:1,4,17,22 57:3,5 66:6,14,16 68:7 69:20,24 70:2,4 72:6,7, 10

**big** 24:19 48:5

**bind** 5:6

**bit** 9:10 15:3 22:23 25:12 26:5 27:2 29:1,7 39:2 44:3 46:4 48:4 54:13 59:4 61:20 63:4 66:1,4

**bits** 32:17

**biweekly** 57:19

**border** 61:5

**box** 13:6,11

**breach** 48:13

**break** 6:21,23,24 7:1 30:9 56:16,19

**breaking** 27:1 29:1

**breaks** 6:20

**brought** 64:9

**Bruno** 32:9 35:18 44:2 46:21 49:12,14 70:10 71:3,23

**bullet** 52:19,20

---

**C**

**C-A-R-E** 37:12

**C-O-R-E-W-E-L-L** 24:5

**California** 4:5

**call** 57:14

**called** 13:14 29:10

**calls** 8:20 38:19 40:25 53:7,8 55:14 57:19,21

**care** 4:17,23 12:21 24:13,15 35:23 36:8 37:4,9,20,24 39:5,6,10 51:13 52:6 53:1 62:3 67:9 68:2 71:2

**Carevention** 44:14

**Carter** 4:1,10 5:10 9:20 11:24 14:20 15:1, 13 24:20 30:9 34:13,16 39:15 41:1,12 49:22 50:17 52:1 57:6 70:5 72:2

**case** 4:16,17 5:4,16 10:19 57:12

**catch** 29:3

**CCED** 14:1

**cease** 26:6 38:4,6 70:18 71:4,6,10,11,15, 23

**census** 68:14,19

**Certified** 4:4

**CFO** 49:6

**chain** 14:9 15:16,17, 23,25 16:9 20:14,21 22:3 24:22 32:25 43:9

chance 32:7

change 44:3,6,7 46:7,15

charge 16:5

check 28:20 72:4

Christine 10:1 32:8

circle 28:10 39:2

clarification 14:15, 18 15:20 24:4,14 29:13, 15,19 37:8 42:22 46:10 65:23 66:2 69:11

clean 47:12

clerical 63:15

client 48:6,14

clinic 63:14

close 61:7

closed 9:3

CMS 64:25 65:1 67:23

collected 13:13

collecting 67:24

commencing 4:3

comment 58:19

communicate 8:8 10:11 42:10

communicated 31:25

communication 10:24 22:14 42:2 44:18

communications 49:7 54:9 67:17

Community 15:19 16:1,10,11,23 17:19 18:9,23 19:13 20:2,15 21:3,16 22:3,15 23:1,2, 7,23 27:19 33:18 34:1, 5,25 35:18 36:25 39:3, 4,9 40:2,9 44:21 45:22 48:17,20,22,25 49:1 50:13 51:6,19 52:24 53:10 54:23 58:16 60:1 61:10 64:8,11 65:16 67:11 68:13 70:17 71:1, 16

companies 11:3 30:19 44:4

company 30:18 39:3 43:20 44:17 64:23

compared 32:6

complete 7:10,16

computer 8:4,12 13:10

concern 63:25

concluded 72:12

confidential 5:2,3, 6,7

confirm 44:16,22

confirmed 44:23

confusion 44:3,11

connect 8:13 33:18

connected 12:23

connection 9:2,5,6 10:25 33:22

consult 58:24 59:1

contact 12:20 13:8

contacted 33:21

context 25:22

continue 62:6 71:12

continued 23:14

contract 16:12,14, 21,22 17:1,6,7,10 42:4 45:3 48:14

contracts 16:5,6,16, 17

conversation 11:1, 5 26:22 46:22 71:8

conversations 11:3 25:19,20 51:18

coordinator 61:12

copied 70:11

copies 9:20 58:8

copy 9:21 40:23 71:6 72:6

Corewell 24:2,5

corporate 43:17,23 44:17 45:7

corporation 24:2

corporations 30:17

correct 4:24 6:19 7:2 8:11,14,21 12:12 13:15 15:1,13,14,19 16:1,2 17:13,14,17,18,20,21 18:4,6,7,23 19:14,15 20:3,12,13,16,24,25 21:4,14,25 22:1,3,4,13, 15,16 23:21 25:1,3,4 27:7 28:13 31:17 32:2 33:19,20,23,24 35:10, 12,13,14 37:9,20,21,25 40:6,7,10,23 41:17,19, 20 43:2,13,14 45:8,12 46:18,21,22 47:8,17,18, 23 52:4,7,8 53:6,11 54:10,17 55:20,21,23, 25 56:5 57:8 58:21 59:12 60:3 62:11,13,23 63:17 67:10 70:11,12

correcting 52:16

correctly 6:4 31:12 66:19

counsel 10:11 57:12, 21

Counter-claimant 4:2

couple 44:4,8 69:5,19

court 5:16 6:3,5,7,11 14:15,18 15:20 24:4,14 29:13,15,19 37:8 42:22 46:10 65:23 66:2 69:11

courtroom 6:1

cover 7:22 40:16

coworkers 13:19,23 32:4

create 36:25

created 36:12,15,22 37:3

credentials 34:24 36:24 48:9 54:22

CROSS-EXAMINATION 57:4

current 10:1 23:3 61:12 68:14

cut 6:10 26:7 46:19

cutting 33:13

## D

Daniel 35:24

dash 26:13

dashboard 64:18

data 48:10,12 65:13, 18 66:8 67:25 68:8,17

date 28:22 29:6 49:11, 13 54:14 55:9,16,18,19 59:15

dated 24:24 35:11 41:13 56:8

dates 28:20 51:12 52:15

dating 29:11,17 30:10,15 59:5

David 10:5

day 68:22 69:5

deactivate 38:3

deactivated 35:5,20 36:2,5,10 38:2 55:7,16 70:22

deactivation 55:19 56:7

deceasing 68:15

decided 38:5 71:21

decision 71:21

Defendant 4:2

defendant's 11:12 15:9 17:3,24 18:15 19:3,18 20:6,18 21:7,19 22:6

definitions 12:9

degree 24:13,15

delete 12:25

deleted 14:4

**demo** 61:6

**depend** 68:23

**deposed** 5:10,13

**deposition** 4:1 5:2, 19 6:4,21 7:4,19 8:9,13 9:6,24,25 10:15 12:10 22:24 55:6 57:7 58:5 59:2

**describe** 35:15 64:10

**design** 30:25

**designating** 5:1

**desist** 26:6 38:4,6 70:19 71:4,7,10,11,15, 23

**desktop** 13:10

**detail** 64:2

**details** 64:7

**determination** 62:10

**developed** 32:21

**development** 31:25 32:21

**devices** 8:22

**dietary** 39:8

**difficulty** 11:15

**direct** 52:18

**directly** 61:21

**director** 10:1 16:18 23:5,6,15,25 28:4 35:18 42:3 44:2,19,21 49:3,4, 7,10,16 61:13,14,18 62:21 63:8,10,13,14,20, 24

**directors** 63:12

**discussing** 32:25 40:8 58:15 61:1

**discussion** 61:4

**discussions** 41:25 48:16,19,25 49:2 71:22

**display** 11:8

**displaying** 14:10 15:23,24 18:20 24:24

**doctor** 39:6

**document** 18:5 19:8,11 53:12

**documentation** 43:3 53:3 54:3,10 58:22

**documents** 8:3 9:21 10:14,18,22 11:5 12:10, 12,14,17,25 13:5,14,18, 24 14:3,7 15:12 18:12 20:24 21:24 22:11,18, 19

**dot** 17:19

**double** 28:20

**download** 47:23 48:9 67:4,6

**downloading** 69:3

**drugs** 7:12

**due** 38:5

**duly** 4:11

**duties** 18:9 64:5

---

### E

**earlier** 59:10

**early** 31:22 62:25

**easier** 6:7,11

**educational** 24:10, 11

**effectively** 71:2

**efficient** 67:18,23,25 68:3,6

**EHR** 47:23 48:9,10,11, 12

**elaborate** 10:21

**elderly** 39:5 62:16

**election** 48:12

**electronic** 8:22 26:12

**electronically** 66:25

**email** 13:6,11 14:9 15:2,15,23 17:16 18:3, 13,14,22 19:6,12,13,21

20:1,9,14,21 21:1,10, 12,15,22 22:2,9 24:22, 23 25:2,6,25 26:18 27:13,18,23 28:6 32:25 35:11,16,17,23 36:8 41:13,16,19,22 42:9 43:9,10,11,15 47:3,6,16 52:3,4,19 53:5,10 55:18,23 56:8 63:19 67:7 70:9

**emailed** 57:16

**emails** 8:20 10:4,16, 17,25 13:1,5,9 15:17,25 16:9 17:10 19:1,23 20:11,23 21:12 22:2 26:21 30:21 32:16 35:20 43:10 57:16 58:4, 6,8,14 62:24,25

**employed** 16:23

**employee** 16:11

**employees** 34:25 36:25 54:23 70:20,21

**employer** 12:25 22:25

**employment** 16:1

**EMR** 26:12,25 28:13 29:9 30:25 31:1,25 32:14 52:24 53:6,11,18 54:2,15 56:8 61:1,4 64:24 66:9

**end** 11:1

**ended** 61:20

**enrollees** 68:16

**enter** 5:6

**entire** 47:25

**entirety** 58:11

**entities** 60:13

**entitled** 7:10

**entity** 60:2,3

**error** 28:9

**essentially** 63:10

**estimate** 31:21 68:19

**event** 30:10 59:6

**Everybody's** 7:21

**everyday** 16:10

**exact** 55:9 59:16 60:7

**EXAMINATION** 4:12

**examined** 6:1

**Excel** 67:5,6 68:24

**exchange** 58:4

**exchanged** 57:16

**executive** 10:1 16:18 23:12,15,21 35:18 42:3 44:2,19,21 49:3,4,7,10,16 62:21 63:1,2,8,9,10

**exhibit** 11:11,12,16, 25 15:5,8,9,24 17:2,3, 15,23,24 18:13,15,25 19:3,16,18 20:5,6,17,18 21:5,7,18,19 22:5,6 24:19,24 32:25 33:4 35:3,4,7,8 41:12,13 43:10 47:20,21 51:23, 24,25 69:25

**exhibits** 22:23 24:19 58:8,10 69:21

**existing** 54:19 71:1, 14

**exit** 5:7

**experience** 58:16 68:1

**explain** 16:15 51:15 66:22

**extent** 45:9

**extra** 7:22

**eyes** 5:3

---

### F

**fact** 42:13 60:9 71:18

**fair** 38:17 39:9

**familiar** 25:14 58:20 62:8

**familiarity** 67:9

**feasible** 65:17 67:18

**February** 41:13,21 43:11 52:3,10,11

**feel** 45:12 46:17

**females** 31:14

**filtering** 35:22 36:7

**find** 35:23 36:6

**fine** 7:2 9:14 11:18 18:20,21 60:9 66:3 72:10

**finished** 41:3

**fluctuates** 68:15

**focus** 26:13

**folks** 60:15 70:10

**font** 33:6

**form** 67:24

**forward** 5:20 67:6

**forwarded** 27:15 28:3 63:25 64:1

**found** 12:18 35:22 46:17

**foundation** 34:12 36:19 38:10 40:11 41:1 44:24 45:10 49:24 51:7 53:8 54:6,24 55:14

**frame** 25:22 27:17 32:16 68:20

**Friday** 14:7 17:11 18:6,12,14 19:2,9,24 20:12,24 21:13,24 22:12,18

**full** 7:10,16 30:16 70:14

**fun** 57:9

**funds** 62:2

**future** 34:18 65:4

---

**G**

---

**general** 48:19

**give** 7:16 25:21 30:17 31:21 50:17 60:7 68:11 69:19

**giving** 7:13 54:11 62:3

**good** 4:15 33:6 56:18

**grant** 52:24 53:11 70:20

**granted** 70:22

**great** 56:22 57:10

**greet** 26:11 28:14,17, 21 29:10,17 30:14 31:3 59:5,23

**grievance** 53:2

**grievances** 62:9

**ground** 5:18 22:24 40:15

**grounds** 45:18

**group** 29:17 32:5 39:6

**guess** 26:3 27:17 57:18 64:3 66:17 68:11, 23

---

**H**

---

**half** 60:18,20

**hand** 23:25 30:16 34:8 55:4 64:19

**handling** 46:14,15

**hands** 28:2

**happen** 65:8

**hard** 9:21

**head** 6:6

**health** 24:2,6,13,15 39:10

**healthcare** 62:15

**hear** 25:11 26:19 27:3 29:21 69:15

**heard** 25:12,20,23 31:25 32:17 64:6

**hearing** 69:13

**held** 23:7,11,22

**helped** 10:22 11:5 63:11,13

**helping** 63:6

**hesitating** 16:3

**Hey** 71:10

**highest** 24:11

**hired** 23:12

**holding** 8:14

**Home** 23:1

**honestly** 29:10 31:8, 21,23 49:13

**hospital** 24:2

**hosted** 59:23

**hours** 69:5,19

**human** 23:14 63:3

---

**I**

---

**idea** 65:21

**identification** 11:13 15:10 17:4,25 18:16 19:4,19 20:7,19 21:8,20 22:7

**immediately** 71:2

**impact** 42:15,18,23, 25 45:25 46:2

**include** 40:4

**incorrectly** 52:16

**individuals** 31:11, 24 32:14 40:5 53:20,22 54:16,19

**inefficient** 69:2

**inform** 5:1

**information** 16:6,12 26:17,19 27:15 30:20 31:1 32:20 34:10 38:9, 18 39:1,10,11 40:2,4, 19,20,25 42:14 44:16, 22 45:25 46:3 63:23 66:20

**initial** 63:19

**inside** 16:13

**installed** 50:24 51:5

**institution** 24:12

**instruct** 34:16

**intent** 71:1

**intention** 71:16

**interacting** 63:17

**interfacing** 63:17

**internet** 9:4,5

**interrupt** 52:9

**interruption** 11:25

**introduce** 17:1,22 20:4

**introduced** 22:17

**introducing** 11:11 15:7 20:17 21:5,18 22:5

**Intus** 4:17,22,23 10:9, 12,24 12:21,23 25:10, 11,12,17 26:4,8 27:10, 20 28:6,12 29:8 30:23 31:2,11 32:14 33:17,25 34:5,10,24 35:20,23 36:8 38:5,8,9 40:21 41:25 42:6,10 43:6,17, 22 44:17,23 45:2,6,10, 20 46:8 48:16,20 49:1 50:13,24 51:5,12 52:6, 25 53:5,17 54:15 56:8 58:20 60:23,24 63:17, 18 64:3,7,8,11 65:5,10, 13,18 66:8,9,21 68:18 70:10,20,21 71:2,17

**Intus's** 50:13 68:9

**involved** 48:22

**issue** 25:7 27:23,25 33:10

**issued** 34:25 36:24 54:22

**issues** 27:14 33:22 39:10,21 46:16 63:22 69:12

**items** 7:22

---

**J**

---

**January** 24:25 25:24 26:18 27:13,18

MIRANDA LYNN CARTER
JULY 28, 2025

JOB NO. 1784120

**job**  6:11 16:7 18:23 21:2

**join**  30:19

**juggle**  32:18

**juggling**  30:21 32:15

**July**  4:3

**jumping**  61:23

**June**  23:18 61:16

---

**K**

**Kaitlyn**  32:9

**Kasia**  4:15

**keeping**  58:3

**Kelsey**  32:8 35:18,19 44:2 46:20 49:12,14 70:10

**key**  12:19

**kind**  11:1 16:19 23:24 26:7,13,15,17,23 29:12 30:17,21 32:15 34:9 39:8 45:25 61:6 62:7 63:6,20 64:4 67:3 68:23

**knew**  26:17

**knowledge**  14:3,5 43:6 48:22 58:16 64:2 68:18 71:16

---

**L**

**lack**  41:1

**Lacks**  34:12 36:19 38:10 40:11 44:24 45:10 49:20,23 51:1,7 53:8 54:6,24 55:14

**lag**  9:3,10 41:5

**language**  48:17

**Lansing**  59:15

**lapse**  63:4

**laptop**  8:24 9:1

**large**  32:5

**law**  48:13

**lawyer**  34:16

**lawyers**  59:1

**lead-up**  58:4

**leader**  23:3

**leading**  68:4 69:16

**learned**  26:23,24 28:12 29:8 41:22 46:1, 20

**leave**  61:21

**Lee**  57:22 58:4,12

**legal**  5:16 10:11 16:17 70:19

**letter**  26:6 38:4,6 70:19 71:7

**liaison**  16:20 62:8

**link**  58:7

**list**  51:24

**listed**  56:14

**listen**  30:22

**listening**  8:15

**lists**  17:16

**literally**  53:10

**located**  59:14,22

**login**  34:4,10,24 36:24 48:9 54:22

**logins**  35:2

**logistics**  58:17,18,19

**long**  24:8 25:6 43:9 57:12 61:14 68:21

**looked**  31:20 58:10 63:16 70:9

**lose**  9:4

**lot**  60:7,17

**lots**  30:19

**loud**  25:5 35:16 43:15 47:25 50:3

**LYNN**  4:1,10

---

**M**

**made**  26:11 34:3,5,9 54:8

**main**  12:19

**maintained**  53:3

**make**  4:18 6:3 41:2,3 43:1,2 45:4 62:1

**making**  26:25 54:10 58:22 62:11

**males**  31:14,15,16

**manual**  66:20 67:1,5, 12,14,16,18 68:2

**manually**  38:9 41:9

**March**  35:11,21 47:6, 16 52:25 53:6,17 54:4, 14 55:8,12,19,22 56:8, 9,11 70:8

**marked**  11:12 15:9 17:3,24 18:15 19:3,18 20:6,18 21:7,19 22:6 47:20

**marking**  16:22

**maternity**  61:21

**meaning**  62:19

**means**  8:7

**meant**  57:22 58:1

**medical**  26:12 53:2,3

**medication**  25:8 33:1 38:13 40:8 46:16

**medications**  7:12 27:22 28:8 38:24,25 40:5,9,20

**meet**  26:11 28:14,17, 21 29:10,16 30:14,16 31:3 59:5,23

**meeting**  58:7

**member**  27:13

**members**  56:10,13

**mentioned**  28:11 60:25 67:5

**mentions**  27:23 50:3

**messages**  8:19

**Michelle**  4:4

**Michigan**  24:3 28:14 59:17,19,22,25 60:4,6

**Microsoft**  12:18

**middleman**  16:19 63:20

**mind**  25:5

**minute**  28:12

**minutes**  56:18,20 68:25

**MIRANDA**  4:1,10

**misstates**  39:24 47:10 65:24 66:13

**misunderstandin g**  45:14

**mixing**  59:14 66:4

**mock**  26:15,22 30:24 52:6 53:1,25 55:22 56:1,3 64:20,22,23 65:5,8 70:18 71:12,19

**moment**  9:11 17:15 24:11 28:11 30:1 37:16 72:1

**momentarily**  11:8 18:11

**Monday**  4:3

**monthly**  68:15

**morning**  4:15

**multiple**  32:18 54:1

**multitask**  60:20

**Muniz**  12:20 41:17 42:10

---

**N**

**names**  31:6 32:7 44:8,12 56:14

**NDA**  16:6 41:19,23 42:1,10,14 43:7,18 54:9

**needed**  43:21 57:20

63:15

**negotiating** 48:23

**Newaygo** 59:22

**nod** 6:6

**normal** 64:5

**Nossaman** 4:16

**Notepad** 67:4,6

**notes** 72:4

**notice** 70:17,25

**number** 12:12 19:17 60:8

**O**

**oath** 5:15,22,24 7:3

**objecting** 34:15 40:17

**objection** 11:18 34:12 36:19 38:10,19 39:14,19,20 40:11,24 42:16 44:24 45:9 46:2 47:9 49:20,23 50:14,20 51:1,7,20 53:7,8,12 54:6,24 55:13,24 65:22 69:6,15,16

**objections** 34:14 69:25

**objects** 40:16

**occurring** 68:20

**October** 23:24

**offer** 30:18

**office** 59:21,22

**older** 13:5

**one-off** 64:4

**one-sentence** 70:23

**open** 8:4,25

**options** 30:24

**orbit** 64:10

**order** 5:4

**originally** 10:23

**Outlook** 12:18

**P**

**P-A-C-E** 37:12

**p.m.** 35:21

**PACE** 15:19 16:1,10, 11,23 18:9,23 19:13 20:2,15 21:3,16 22:3,15 23:1,2,8,23 26:10 27:20 28:15 30:14 33:18 34:1, 6,25 35:18 36:25 37:4, 9,20,24 39:3,4,9 40:2,9 44:15,21 45:22 48:17, 20,22 49:1 50:13 51:6, 13,19 52:24 53:10 54:23 58:16 59:25 60:1, 3 61:10 62:9 64:12 65:16 67:9,11 68:2,13 70:17 71:16

**PACE's** 71:1

**paperwork** 46:18

**paragraph** 47:23 48:1 50:2 70:13,14,24

**part** 5:2 18:23 19:13 20:1,15 21:2,15 22:3,15 24:24 41:13 43:10,17, 20,22 44:11,17 45:7 52:18,19 57:7 63:16 64:5 67:4 71:21

**participant** 53:1

**participants** 40:3 62:3,11,14,15,19 68:14

**parties** 4:23

**party** 48:15

**passing** 25:21

**past** 26:24

**patient** 39:1 40:2 68:12,22

**patient's** 38:23

**patients** 38:18 39:11 40:9,20 62:16,17,18,19 68:15

**patients'** 68:8

**paying** 60:16 61:7

**PCO** 42:5

**PDF** 17:20

**Peak** 43:19

**Penn** 4:14,15 5:8,9 9:19 11:14,19,23 14:14, 19,23,25 15:4,7,11,22 17:5 18:1,18 19:5,20 20:8,20 21:9,21 22:8 24:7,17 27:3,6,8 29:22 30:2,8 34:13,21,23 36:20,21 37:9,12,13,17, 19 38:11,12,20 39:22, 25 40:12 41:10 42:19 43:5 45:5,16 46:6,11,13 47:9,11,14,15 50:1,23 51:2,3,4,10,22 52:9,12, 15,17 53:9,14 54:12 55:1,17 56:2,6,21 57:22 58:3,11 61:10 65:12,22, 24 66:7,13 68:4 69:6,9, 12,16,24 70:1,9 72:2,4, 9

**Penn's** 65:16

**people** 25:13,17 29:18 31:10,13 32:5,12 54:1

**percent** 44:13 45:23 64:15

**perfect** 48:6

**period** 13:1

**person** 71:9

**personally** 10:10 27:11 42:8,12 45:21 50:11,22 51:8 55:3 61:25

**pertains** 38:18

**Pharmastar** 43:19

**phase** 52:19

**phone** 8:4,14,15,19 57:14,19,25

**physical** 40:22

**pieces** 32:17

**pinpoint** 11:2

**place** 25:19 43:3 46:18 54:10 55:12 58:22 59:10 62:12,13 64:21

**places** 32:6

**planned** 70:18

**played** 23:24

**playing** 67:2

**point** 12:20 26:5,10, 14 30:23 32:11 52:20 63:4,11 67:21 71:13

**policy** 12:25

**population** 68:12

**position** 63:5

**possession** 14:2

**Prado** 35:24

**preparation** 9:23

**prepare** 10:14 65:1

**prescribed** 40:5,10, 21

**present** 11:25 14:6 18:11 49:2 60:4 71:8

**presenting** 11:15 18:25 30:23 31:2 51:25

**pretty** 32:5 64:2

**prevent** 7:12

**previous** 63:19,24

**previously** 24:6 47:20 57:19 64:6 70:21 71:14

**primarily** 58:18

**primary** 39:6

**printed** 40:22

**prior** 34:7 41:12 44:9, 14,15 49:16 51:11 53:17 54:4,11,14 55:7, 12,16 56:9,11 64:17

**problem** 6:22 29:24 46:15 49:14 52:14 56:4 66:7

**proceed** 4:25

**proceeding** 70:17

**proceedings** 4:6 5:16 34:19 72:12

**process** 69:3

**processes** 26:16

**produce** 13:25

**program** 39:4 68:9

**programs** 8:4 9:2

**protective** 5:4

**protocol** 45:4

**protocols** 43:2

**provide** 13:24 16:5 39:5,7 42:4 66:20

**provided** 10:16 13:13,21 16:18 17:7 26:7,23 27:13 28:6 38:9 40:21,25 41:8 42:3 45:3 58:9,12 67:7

**providers** 62:15

**providing** 58:8 64:8 67:23

**pull** 12:22 37:23,24 67:3 68:21 69:25

**pulled** 68:9,18

**pulling** 35:22 36:7

**pursuant** 5:3

**put** 62:11,12

**Q**

**quality** 23:5,6,16,17, 25 26:13 28:3 61:12,13, 14,18 62:20 63:13,20, 24 64:18

**question** 6:17,18,23, 24 18:22 19:11 21:1 34:18,21,22 45:10 65:16,19,20,25 66:4,10, 17

**questioning** 54:9 70:9

**questions** 5:21 6:14 8:2,10 36:1 40:17 56:16 72:1,3,5

**quick** 30:17

**quickly** 72:5

**quote** 59:5

**R**

**Rasa** 43:17,23 44:4,8, 14,17

**read** 4:13 27:5 35:15 37:14,18 43:15 47:25 50:2 52:20 70:13

**reading** 25:5 52:15

**reads** 47:23 53:10

**real** 64:2

**reason** 7:15,17 16:24

**reasoning** 33:11,12

**recall** 11:6 27:25 29:8 32:3,7,22 61:3 65:13 66:10,18

**receive** 16:23

**received** 15:15,17,24 16:9 18:8,12,22 19:1, 11,12 20:1,14 22:2,14 38:4 55:10,11 70:18 71:6

**receiving** 42:9 51:11 62:10

**recent** 26:19,21

**recently** 26:10 67:20

**recipients** 41:16 52:4

**recognize** 12:6 18:14 19:6,21 20:9,21 21:10,22 22:9

**recollection** 8:3 31:7

**reconnect** 9:7

**reconvene** 56:19

**record** 6:6 9:11,13, 16,17 11:16,21,22 26:12 27:5 29:25 30:5,6 34:18 37:18 47:13 49:23 53:4 56:24,25 57:1 72:8

**records** 53:2

**recreational** 39:7

**referring** 4:19,23 17:6 18:3 27:24 35:9

**refresh** 31:6

**regular** 16:10 38:16

**regulation** 48:13

**regulations** 64:25

**rejoin** 9:7

**relation** 50:13 55:7

**relationship** 71:17

**relaying** 63:23

**remember** 10:19,22 23:22 31:12,18 32:13 35:3 60:25 66:19

**reminds** 29:11 30:15

**remote** 4:1 7:18,20

**remove** 38:7

**repeat** 31:4 66:5

**replacing** 63:5

**report** 25:8 27:23 28:8 33:1,10,14,19 35:22 36:7 38:24 40:22 46:16 67:3

**reporter** 4:4,13 5:5 6:3,5,7,11 9:12,15,18 11:20 14:15,18 15:20 24:4,14 29:13,15,19,25 30:4,7 37:8,11,16 42:22 46:10 56:23 57:1 65:23 66:2 69:11,14 72:6,8,11

**reporting** 25:7

**reports** 37:23,25 38:8,13 40:8 64:16 67:22 68:22,24

**represent** 4:16

**representation** 70:19

**represented** 7:8

**represents** 48:7

**request** 54:8

**requested** 38:3,6 71:13

**requesting** 53:19,21 54:16

**requests** 62:10

**required** 12:8 42:14

**requirement** 41:22 42:1,11,13

**requires** 7:5

**resources** 23:14 63:3

**responsibility** 15:18

**responsive** 12:9,10, 14,17 13:14 14:4,8 22:20

**rest** 30:22

**review** 10:14 53:1

**reviewed** 10:18 67:17

**reviewing** 69:3

**role** 23:2,7,22,24,25 61:9,12,15,20

**roles** 23:10

**room** 7:20,21,23

**Rothberg** 35:25

**RTZ** 4:16,17,18,19 10:24 12:19,20,23 16:20 17:8,9,19 27:15 33:18,21,25 34:25 35:21,22 36:7,24 37:3 38:4 43:4 46:19 51:6,13 63:21 64:1 65:15 66:9 71:4,10,11

**RTZ's** 57:12 66:9 70:19

**rule** 4:13 40:15 48:13

**rules** 5:18 7:19 22:24

**run** 28:7 33:14,19

**Runions** 10:2 32:8

**running** 25:8 33:10 38:8 64:16 67:22

**S**

**Sarah** 49:16

**sat**  30:22

**save**  13:9

**Schumacher**  32:9

**scope**  15:18 16:1,13 18:9 21:2

**screen**  14:13,17,21 24:24 33:3 41:14 47:21 52:1,23 61:6 69:22 70:3,6

**screenshot**  25:8

**script**  48:8,11 50:4,6, 10,12,25 51:6 68:3

**scroll**  15:16 18:19 24:22 28:1 49:4

**search**  12:9,19 13:17

**searched**  12:19,21

**send**  12:14 15:12,18, 25 16:8 17:10 18:5 19:8,12,23 20:11,14,23, 24 21:12,15,24 22:11, 14,18 24:25 25:2,25 43:10 47:6,16

**sent/received**  21:2

**sentence**  26:20 27:1,4

**separately**  5:6

**served**  11:9 12:1

**service**  62:10

**services**  39:7,8,11

**shake**  6:6

**shape**  67:24

**share**  69:22 70:2

**shared**  32:14

**sharing**  33:4

**Shoot**  24:9

**short**  56:18

**Shorthand**  4:4

**show**  14:6 18:11 45:18

**showed**  10:25 22:17 58:11

**showing**  18:13 19:16 35:4 61:6,8

**shown**  69:22

**shut**  51:24

**side**  16:17 45:15 67:22

**signature**  51:12

**signed**  5:4 49:5,6,9, 18 51:12,16

**similar**  64:24

**sir**  66:5

**sitting**  32:11

**situation**  30:15 64:4

**size**  33:6

**small**  12:3

**solely**  48:9

**sooner**  52:25

**sort**  7:12 64:18

**sound**  9:10

**sounds**  28:7

**span**  62:25

**speak**  6:9 45:23 57:12,23 67:11 69:15 71:18

**speaking**  30:24 57:20

**speaks**  53:12

**specific**  32:13 45:18 46:5

**specifically**  31:23 38:23 39:1 49:11 71:18

**specifics**  61:3

**Spectrum**  24:6

**speculation**  38:19 45:11 53:8 55:14 64:15 67:8

**speed**  29:11,17 30:10,15 59:5

**spell**  37:10

**spiel**  30:18

**spoke**  10:7

**sponsored**  60:23

**spreadsheet**  68:24

**staff**  27:13 28:7 54:3 56:10,13

**start**  11:1 27:9

**started**  23:7,11,23 26:12,25 27:12,18,20 28:13 32:25 46:16

**starting**  30:25 70:14

**state**  4:5 24:3 60:4 64:25

**stated**  58:20

**statute**  48:13

**step**  29:23

**stepped**  32:17

**Stipulation**  4:13

**stop**  9:10

**strictly**  68:24

**studies**  67:17

**stuff**  30:21 32:16 61:6

**subject**  48:14

**subpoena**  11:8,11 12:1,2,6,8,17 13:14 14:8 22:20

**substantive**  58:15

**suggests**  53:5

**super**  25:14 58:20 63:21

**support**  33:21 42:5

**sworn**  4:11

**system**  26:12 33:18 34:1 35:1 37:3,7,20 48:10,12 51:6,13 57:20 67:3,9 68:2

**T**

**table**  31:13 32:11 60:10,23,24

**tables**  60:11,13,22

**Tabula**  43:17,23 44:4, 8,14,17

**tagged**  10:5

**taking**  5:25 6:20,24 25:19 40:10,21

**talk**  9:23,24 10:8 22:22 24:10 25:10 27:22 30:10 42:6 59:4 60:11 71:3

**talked**  25:13 31:24 34:14 55:5

**talking**  25:14,17 41:19

**team**  16:20 30:22 33:22 38:5 53:1 63:22

**terminate**  71:1,13

**terminating**  71:17

**testified**  4:11 5:15

**testimony**  7:11,13, 16 65:24 66:13,15 68:1

**texting**  8:9

**therapy**  39:7

**thing**  27:12

**things**  28:11 32:19 34:15 61:19,23 63:8,14 65:3 67:22

**third-party**  64:23

**thought**  31:22 43:19 59:10 67:5

**tickets**  63:22

**ties**  26:7 46:19

**time**  12:20 13:1 16:18 25:15,16,22 26:5,14,15, 18 27:17 28:4 30:23 32:11,16 41:21 44:2 49:5,9 53:20 55:6 63:4, 11 64:14 65:5 68:20 69:15 71:13

**times**  44:4

**today**  7:4,8,13,15,18 13:25 58:10 62:24

**today's**  10:15 57:25 58:7

**told**  43:23 44:1 71:9

**ton**  27:11 28:1,2 30:20 31:1 43:20 63:18 64:17

MIRANDA LYNN CARTER
JULY 28, 2025

JOB NO. 1784120

**top**  17:16 47:3

**touched**  61:10

**town**  59:16

**transcript**  5:2

**transfer**  23:17

**transferred**  23:16

**transitioned**  23:13
  60:14

**transitioning**  63:2

**transmit**  65:13

**trial**  55:23

**true**  33:17

**truth**  7:5,6

**turned**  65:15 66:10

**two-line**  25:6

**two-sentence**  25:6

**types**  30:19

### U

**Uh-huh**  6:13 10:3
  11:10 27:16 28:5 29:7
  31:10 33:2 55:18

**umbrella**  43:18,23
  45:8

**unable**  28:8 70:20

**unaware**  55:9

**understand**  5:22,24
  6:14 7:3,6 8:7,11 12:8
  61:11 64:11

**understood**  6:18
  28:23 32:20,24 44:12

**unquote**  59:5

**unsure**  34:7 51:14

**updated**  47:4

**upload**  69:1

**uploading**  69:4

**user**  34:3 35:22 36:7
  63:21

**utilization**  62:1

**utilize**  37:6,22

**utilized**  38:16

**utilizing**  35:2 38:7
  64:20 65:2

### V

**vague**  39:14 40:24
  42:16 46:2,3

**vendors**  60:10,11,13

**verbal**  42:2 44:18
  46:22

**verified**  43:16 45:2
  46:24 58:6

**verify**  28:21 29:6
  43:21 44:15 45:7,10,20
  49:11,13 57:18 59:15

**view**  12:1 14:9 33:3

**viewing**  51:25

**violate**  48:13

**visible**  8:23

### W

**Waiting**  41:3

**wanted**  7:19 41:2
  43:1,2

**warrants**  48:7

**ways**  65:13,17 66:8

**Wednesday**  70:8

**weekly**  57:19

**Whoop**  55:13

**whoops**  51:1

**wit**  4:7

**withdraw**  34:21
  36:20 38:5,11

**words**  12:19

**work**  4:15 16:10 18:9,
  23 19:13 20:2,15 21:15
  22:3,15 24:1,8 26:16
  30:21 32:16 36:18
  43:20 50:13 60:17,20
  62:12 63:15

**worked**  27:11 44:5

**working**  23:7 27:9,
  17,20 38:5 44:15

**Works**  56:21

**write**  16:16

**written**  70:16

### Y

**year**  23:18 26:24
  28:18 59:10 61:16,17

**years**  24:9

### Z

**zoom**  4:3 9:2 12:4
  15:2 18:2,19 48:4

Alexandra Leuth

Highlighted Transcript

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


Case No.:


INTUS CARE, INC.,

                    Plaintiff,

vs.

RTZ ASSOCIATES, INC., and DOES 1
through 10,


                    Defendants.

_____/


REMOTE VIDEOTAPED DEPOSITION OF

ALEXANDRIA LUETH


Tuesday, April 28, 2026

1:18 p.m. - 5:33 p.m. (EDT)


Stenographically Reported By:

Kimberly Fontalvo, Realtime Reporter

Realtime Systems Administrator


Page 1

APPEARANCES:

On behalf of Plaintiff:

        MANATT
        2049 Century Park Boulevard
        Los Angeles, CA  90067
        BY:  ANDREW BESHAI, ESQ.
        abeshai@manatt.com

On behalf of Defendant:
        NOSSAMAN LLP
        50 California Street, 34th Floor
        San Francisco, CA  94111
        BY:  DAVID C. LEE, ESQ.
        dlee@nossaman.com

On behalf of Deponent:

        MCGUIRE WOODS
        Two Embarcadero Center, Suite 1300
        San Francisco, CA  94111
        BY:  SHAILIKA SHAH KOTIYA, ESQ.
        skotiya@mcguirewoods.com

ALSO PRESENT:  Shawna Hayes, Videographer

Page 2

I N D E X

| Examination | | Page |
|---|---|---|
| Direct | By Mr. Beshai | 7 |
| Cross | By Mr. Lee | 120 |
| Redirect | By Mr. Beshai | 139 |
| Certificate of Oath | | 141 |
| Certificate of Reporter | | 142 |
| Read and Sign Letter to Witness | | 143 |
| Errata Sheet (forwarded upon execution) | | 144 |

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

EXHIBITS

No.                                                      Page

Exhibit 37         Previously Marked                     133

Exhibit 130        Email thread                          21

Exhibit 131        Email thread                          25

Exhibit 132        Email                                 31

Exhibit 133        Email thread                          34

Exhibit 134        Email thread                          38

Exhibit 135        Email                                 41

Exhibit 136        Email thread                          46

Exhibit 137        Email thread                          48

Exhibit 138        Email                                 49

Exhibit 139        Email                                 59

Exhibit 140        Email                                 61

Exhibit 141        Email                                 64

Exhibit 142        Email                                 65

Exhibit 143        Email                                 66

Exhibit 144        Email thread                          71

Exhibit 145        Email thread                          75

Exhibit 146        Offer of Employment                   80

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

| Exhibit 147 | Signed Offer Letter | 85 |
| Exhibit 148 | Email | 96 |
| Exhibit 149 | Email thread | 101 |
| Exhibit 150 | Email thread | 103 |
| Exhibit 151 | Email thread | 105 |
| Exhibit 152 | Email | 106 |
| Exhibit 153 | Letter | 108 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

VIDEOGRAPHER: Good afternoon. We are going on the record at 1:18 p.m. Eastern Time, on April 28, 2026.

Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place, unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Alexandria Lueth, taken by counsel for Plaintiff in the matter of IntusCare, Inc. versus RTZ Associates, Inc., et al., filed in the United States District Court, Northern District of California, case Number 4:24-cv-1132-JST.

My name is Shawna Hynes representing Veritext Legal Solutions and I am the videographer.

I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding,

Page 6

please state them at the time of your appearance.

Counsel and all present will now state   1:20:13PM
their appearances and affiliations for the
record, beginning with the noticing attorney.

MR. BESHAI:  Good morning, Andrew Beshai   1:20:21PM
on behalf of McGuire Woods IntusCare, Inc.,
Plaintiff.

MS. KOTIYA:  Good morning.  Shailika   1:20:30PM
Kotiya here on behalf of the witness,
Alexandria Lueth.

MR. LEE:  Good morning.  David Lee,   1:20:41PM
counsel for RTZ Associates, Inc.

THE COURT REPORTER:  Kimberly Fontalvo,   1:20:48PM
stenographic reporter, NCRA 028421.

Ms. Lueth, would you raise you right hand,   1:20:48PM
please.

Do you swear, or affirm, the testimony you   1:20:48PM
are about to give will be the truth, the whole
truth and nothing but the truth?

THE WITNESS:  Yes.   1:20:48PM

DIRECT EXAMINATION   1:20:48PM

BY MR. BESHAI:   1:20:48PM

Q.   Good morning, Ms. Lueth.  Well, good   1:21:16PM
afternoon for you -- almost evening, really.

Page 7

A.    Thank you.                                    1:21:21PM

Q.    So, have you ever been deposed before?      1:21:21PM

A.    I have not.                                  1:21:24PM

Q.    You have not.  Ordinarily, there are a      1:21:25PM
million instructions that I would go through with
you, but in the interest of time I will address them
if they arise.

       For example, if you're mumbling or not     1:21:34PM
saying yes, I'm going to address it in the moment.

       There are two instructions that are worth  1:21:39PM
addressing off the bat.  Number 1, your attorney may
object at certain points.  If she does, I'm still
entitled to an answer.  Her objection is just for
the record, unless she instructs you not to answer.
Okay?

A.    Okay.                                        1:22:00PM

Q.    If she says "vague" or "calls for           1:22:01PM
speculation" or whatever, the record will note the
objection; but then you still have to give me your
answer, if you can answer the question.

       Number 2, I'm entitled to seven hours.  I  1:22:12PM
don't think I will go that long -- for all of our
sakes I hope it doesn't go that long.  But also
because we're going to go at least three, four hours
there may be -- you know, you might want to take a

Page 8

break.

Just let me know at any time you want to take a break.  The only rule is if there's a question pending.  So, if I've asked you a question you have not answered yet, you can't take a break. You have to answer my question and then take it.  1:22:26PM

A.    Got it.  1:22:37PM

Q.    So, can you tell me a little bit about your educational background after high school?  1:22:39PM

A.    Sure.  After high school I went to Hope College in Holland, Michigan and got a degree in accounting.  1:22:45PM

And then I received my master's from University of Michigan in health services administration.  1:22:52PM

Q.    What year was that?  1:22:58PM

A.    I graduated in 2018.  1:23:00PM

Q.    And health services administration, is the idea with that degree that folks would go on to become hospital administrators or clinic directors or any leadership in the healthcare place?  1:23:03PM

A.    Healthcare leadership, correct.  1:23:19PM

Q.    What was your first job after graduating in 2018?  1:23:22PM

A.    Auditor.  1:23:26PM

Page 9

Q.   For whom?                                          1:23:27PM

A.   Plante Moran.                                      1:23:28PM

Q.   What is that?                                      1:23:30PM

A.   Plante Moran is an accounting firm in the         1:23:32PM
midwest.

Q.   At some point you started at                      1:23:38PM
Senior Care Partners?

A.   Correct.                                           1:23:42PM

Q.   When was that?                                     1:23:43PM

A.   October of 2012.                                   1:23:44PM

Q.   So, you were there before you went to             1:23:48PM
Plante Moran?

A.   Sorry.  I graduated from my undergraduate         1:23:53PM
in 2005.  My graduate degree was 2018.

Q.   Got it.  So you started at                        1:24:03PM
Senior Care Partners in 2012?

A.   Correct.                                           1:24:07PM

Q.   And then when did you work at the                 1:24:09PM
accounting firm?

A.   2005 through 2012.                                 1:24:14PM

Q.   Oh, okay, got it.                                  1:24:17PM

From 2012 through when you left                         1:24:18PM
Senior Care Partners, you were there at
Senior Care Partners?

A.   Correct.                                           1:24:25PM

Page 10

Q.    Then you got your master's while still    1:24:25PM
employed by Senior Care Partners?

A.    Correct.    1:24:31PM

Q.    What was your role at    1:24:31PM
Senior Care Partners?

A.    I started as the chief financial officer.    1:24:35PM
And then I became the CEO.   And then my tenure I
finished as director of operations and risk
management by the time I left.

Q.    When did you leave?    1:24:50PM

A.    That was in January of 2024.    1:24:53PM

Q.    So you were there for 12 years?    1:24:57PM

A.    Correct.    1:24:59PM

Q.    Twelve-plus.    1:25:00PM

      The last position you held, you said    1:25:01PM
risk --

A.    Risk management.    1:25:06PM

Q.    What did that job entail?    1:25:07PM

A.    I was in charge of our compliance    1:25:10PM
department, medical records, and kind of our
healthcare solutions, electronic healthcare
solutions platforms.

Q.    How long did you hold that position?    1:25:23PM

A.    That one was from '21 to '24.    1:25:25PM

Q.    Is Senior Care Partners part of the PACE    1:25:33PM

Page 11

universe?

A.    Yes.                                                1:25:40PM

Q.    Can you briefly describe for me what PACE        1:25:40PM
is?

A.    Sure.   PACE is a program of all-inclusive      1:25:41PM
care for the elderly, funded by Medicaid and
Medicaid, under capitated financing model.  It is --
cares for seniors who mostly meet both Medicare and
Medicaid qualifications, long-term care, who would
otherwise be in a skilled nursing facility if they
weren't in PACE, or could be funded.

Q.    PACE helps them like continue to live           1:26:08PM
independently?

A.    Correct.                                         1:26:12PM

Q.    And is there, like, treatment administered      1:26:13PM
at the Senior Care Partners' location?  Is it a
clinic or is it just an administrative entity that
helps put folks in touch of primary care physicians,
et cetera?

        MS. KOTIYA:  Objection.  Compound.             1:26:30PM

        You can answer if you understand.              1:26:30PM

        THE WITNESS:  Did you object?  I didn't        1:26:32PM
    hear you.

        MS. KOTIYA:  I just said objection.            1:26:36PM
    Compound.

Page 12

You can answer.   1:26:39PM

A.   Can you repeat the question, Andrew?   1:26:39PM

BY MR. BESHAI:   1:26:41PM

Q.   Sure.  No problem.   1:26:41PM

Is there healthcare administered onsite at   1:26:44PM
Senior Care Partners or is it more an administrative
arm that coordinates care?

A.   Both.  So PACE has clinics.  But physical   1:26:53PM
buildings, that the participants -- the code for
PACE refers to them as "participants" rather than
patients.  So I'll probably say "participants" most
of the time.

They have a site where participants come   1:27:08PM
for an adult day center and they have a clinic and
rehab onsite.  Care is also performed in the home,
so there are direct care employees of PACE, as well
as administrative.

Q.   Were you able to see a tangible difference   1:27:23PM
in the live of these folks who were part of the
Senior Care Partners' network?

A.   Yes.   1:27:30PM

MS. KOTIYA:  Objection, vague.   1:27:31PM

BY MR. BESHAI:   1:27:34PM

Q.   Why did you leave Senior Care Partners   1:27:34PM
initially?

Page 13

A.    When I was working as an auditor in public    1:27:43PM
accounting, I saw clients who had -- I had clients
who were running PACE programs, and I really
appreciated the model that provided really good care
for seniors and also did it at a lower cost than
Medicare and Medicaid.   I found the outcomes to be
really appealing.

Q.    And when you started at    1:28:06PM
Senior Care Partners, you said you were CFO?

A.    Yes.    1:28:14PM

Q.    And then after how many years did you    1:28:15PM
transition to CEO?

A.    That was in 2015.    1:28:20PM

Q.    And then from 2015 until 2021 you were    1:28:25PM
CEO?

A.    2019 is when I was no longer the CEO.    1:28:32PM

Q.    What were your priorities or prerogatives    1:28:38PM
as CEO?  Did you have a vision for how you wanted to
lead Senior Care Partners?

A.    I wanted to just do -- carry on the    1:28:50PM
program.  And we were in a growth mindset, so we in
process -- when I started they had one center, were
opening up a second, and we eventually got to four,
so we were growth driven to serve more participants.

Q.    Where did Senior Care Partners gets its    1:29:10PM

Page 14

funding?

A.   Medicare and Medicaid, mostly.   1:29:12PM

Q.   You mentioned it was a cheaper option than Medicare and Medicaid.  How is it cheaper if the funding is also coming from them?   1:29:15PM

A.   Medicare and Medicaid pay PACE params on a capitated model, not for a fee-for-service model, as opposed to traditional HealthCare reimbursement.   1:29:22PM

Q.   "Capitated" means per person.  You just get a certain set amount every year or month?   1:29:35PM

A.   Yes, we receive the same amount from Medicaid.  And then Medicare was a set amount for a year based on the participant's acuity and diagnoses.   1:29:39PM

Q.   Regardless whether services are rendered, you are paid the amount, right?   1:29:51PM

A.   That's correct.   1:29:55PM

Q.   Just because I'm curious, how would that be cheaper?  What if someone doesn't utilize any services and yet Medicare and Medicare are still paying, versus someone who only gets paid for services they utilize?   1:29:57PM

A.   That's correct.   1:30:11PM

PACE -- when you give really good geriatric care, sometimes it's less care.  And   1:30:11PM

Page 15

sometimes it's different care.  So the most expensive care is inpatient.  But if you can deliver that care at home or in the PACE center, as I described, then it can cost less than traditional methods.

Q.    And am I also correct to understand that maybe there's even a preventative versus treatment aspects, so if you can administer care that prevents the need for hospitalization, that's also a cost saving measure?      1:30:30PM

A.    Yes, we also did a lot of preventative care and a lot of goals care conversations.      1:30:44PM

Q.    Did you have -- do you know what "EMR" is, electronic medical records system?      1:30:53PM

A.    I do.      1:30:58PM

Q.    I would hope so.      1:30:59PM

A.    Otherwise, we're done.      1:31:06PM

Q.    Sorry?  Well, we wouldn't be done.  I would have way more questions because I would have e-mails that would raise concern if you didn't know what that was.      1:31:07PM

When you started all the Senior Care Partners, what EMR was the company using?      1:31:17PM

A.    The company when I began was using a      1:31:26PM

Page 16

product called TruChart.

Q.    And who -- what company oversees/administers TruChart?    1:31:32PM

A.    Mediture.    1:31:38PM

Q.    At any point during your tenure in any role at Senior Care Partners, did the company switch EMR providers?    1:31:41PM

A.    Yes.    1:31:50PM

Q.    Who did you switch to?    1:31:51PM

A.    We switched to Pace Care Online.    1:31:53PM

Q.    When was that?    1:31:57PM

A.    Approximately 2021.    1:31:59PM

Q.    And what was the purpose of what drove that transition?    1:32:01PM

A.    Mediture had given us -- they were sunsetting their program.  So at some point it was no longer going to be an option.    1:32:07PM

Q.    Did you shop around and look for others or did someone just tell you you should do Pace Care?    1:32:16PM

A.    We did shop around.    1:32:23PM

Q.    And what about Pace Care appealed to you such that it was the provider ultimately chosen?    1:32:24PM

A.    There only a couple of different options at the time, and it seemed to me to be the most streamlined option in the market.    1:32:34PM

Page 17

Q.   Do you know if Senior Care Partners is still using Pace Care?    1:32:46PM

A.   I don't know.    1:32:50PM

MS. KOTIYA:  Objection.  Speculation.    1:32:50PM

You can answer.    1:32:56PM

MR. BESHAI:  I think she did.    1:32:56PM

BY MR. BESHAI:    1:32:56PM

Q.   How is information input into the EMR, whether it's TruChart or Pace Care at Senior Care Partners?    1:32:56PM

A.   When I was there?    1:33:06PM

Q.   Yes.    1:33:08PM

A.   When I was there most information was input by direct care professionals who were caring for the participants and would document their interactions with the participants.    1:33:09PM

Q.   So these are like physicians, PAs, and nurses?    1:33:24PM

A.   As well as dieticians, social workers, lots of others.    1:33:27PM

Q.   Was it important to you to have an ability to analyze this information for studying patient outcomes?    1:33:37PM

A.   The electronic medical record is a place that stores and takes in a lot of data and    1:33:49PM

Page 18

information.  Anything you can get back out of it and put together in useful terms is really helpful.

Q.   When you had RTZ -- sorry, Pace Care -- the program itself didn't analyze the data, correct, it just stored it?   1:34:07PM

MR. LEE:  Objection.  Calls for speculation.  Lacks foundation.   1:34:20PM

You can answer if you understand.   1:34:23PM

A.   Okay.   1:34:26PM

Are you asking -- could we get reports, are you asking?   1:34:28PM

BY MR. BESHAI:   1:34:32PM

Q.   Well, let me take a step back to address that objection, and then maybe this will help clarify.   1:34:32PM

Did you ever personally use Pace Care during your time at Senior Care Partners?   1:34:39PM

A.   Yes.   1:34:46PM

Q.   You accessed it and logged in?   1:34:47PM

A.   Correct.   1:34:48PM

Q.   And you sorted and filtered and looked at data inside it?   1:34:49PM

A.   I did.   1:34:54PM

Q.   So you are familiar with how it works?   1:34:55PM

A.   Correct.   1:34:57PM

Page 19

Q.    Going back to my question, you can    1:35:02PM
generate reports from Pace Care, correct?

A.    Yes.    1:35:08PM

Q.    Can you give me an example of a report    1:35:10PM
that you would generate from Pace Care?

A.    One that I frequently run would be    1:35:14PM
hospitalizations or ER visits.  I would want to look
at a given time frame and see how many people went
to the hospital, so I run a report and be able to
get that and see that.

Q.    So there is some analysis that you could    1:35:30PM
do with the data that you, Alex Lueth, could do with
the data from Pace Care, correct?

MS. KOTIYA:  Objection.  Mischaracterizes    1:35:39PM
the witness's testimony.

You may answer.    1:35:45PM

A.    I could extract data that I was looking    1:35:46PM
for.

BY MR. BESHAI:    1:35:50PM

Q.    Were there other analytics features in    1:35:50PM
Pace Care, like trend analysis or any other
analytics features in Pace Care?

A.    I don't recall.    1:36:02PM

Q.    At some point did you hear about    1:36:05PM
IntusCare?

Page 20

A.   Yes.                                              1:36:08PM

Q.   When was that?                                   1:36:10PM

A.   I don't recall.                                  1:36:13PM

MR. BESHAI:  Could I -- let's start with             1:36:13PM
the documents.  I'm going to pull up a document
and let me know if you can see it.

Do you have your Exhibit Share up?                   1:36:20PM

A.   I have it open.                                  1:36:22PM

(Discussion off the record.)                         1:36:35PM

(Thereupon, marked as Exhibit 130.)                  1:36:55PM

MS. KOTIYA:  Counsel, I'm not seeing any             1:36:58PM
exhibits.

(Discussion off the record.)                         1:37:17PM

THE WITNESS:  Now I can.                             1:37:21PM

BY MR. BESHAI:                                         1:37:22PM

Q.   With any of the exhibits I'm going to show      1:37:22PM
you, and there's a couple dozen that we'll go
through, take a moment, look at it, and then when
you are ready, just look up at the camera and I'll
know that I can start asking my questions.

A.   Okay.                                            1:37:57PM

Q.   Do you remember this email?                     1:37:59PM

A.   I do not.                                        1:38:00PM

Q.   I don't blame you.  This was almost seven       1:38:01PM
years ago.

Page 21

Do you remember generally reaching out or    1:38:05PM
having an initial introduction with the IntusCare
folks?

A.    Yeah, I don't remember who I spoke with    1:38:11PM
first or anything, but I know a relationship started
with them as a vendor.

Q.    Do you remember how you learned about    1:38:20PM
them?

A.    I do not.    1:38:22PM

Q.    Were you excited to be working with them?    1:38:26PM

A.    I said in this email I'm excited to    1:38:33PM
introduce them to the team, so it seems like I was.

Q.    Do you recall what means the    1:38:39PM
Senior Care Partners had that led you to reach out
to a healthcare data analytics company like Intus?

A.    Yeah, we were looking for a way to more    1:38:55PM
easily see our data that was an electronic medical
record.

Q.    Can you explain what you mean by "more    1:39:02PM
easily"?

A.    When we talked earlier about pulling data    1:39:05PM
from Pace Care Online, it was a process to extract
data and do some manipulation with Excel.

Intus's product offered a way to log into    1:39:19PM
their system and see that kind of at your

Page 22

fingertips.  It would be updating routinely and would have the information, some of those key statistics.  So like I said, reducing hospitalizations, ER visits.  Those external visits outside of the PACE center's walls, those are the most costly; so we were incentivized to reduce those as much as possible.

So those were key data points that we looked at on a routine basis and Intus would be able to supply the information to us in more streamline fashion.                                                    1:39:49PM

Q.   Is it fair to say that Intus's product    1:40:03PM
expedited your analysis of information to help
improve patient outcomes?

MS. KOTIYA:  Objection as to form.    1:40:12PM

MR. BESHAI:  Sorry?    1:40:17PM

MS. KOTIYA:  Objection as to form.  Are    1:40:18PM
you able to hear me okay?

MR. BESHAI:  I generally can.    1:40:22PM

MS. KOTIYA:  You can answer.    1:40:26PM

A.   Can you say that question again, please?    1:40:29PM

(Discussion off the record.)    1:40:37PM

BY MR. BESHAI:    1:40:39PM

Q.   Is it fair to say that the Intus analytics    1:40:39PM
product expedited your analysis of data from the EMR

Page 23

to assist with optimizing patient outcomes?

A.   We had the hope that it could do that. 1:40:55PM
And I think one of the benefits is that in pulling
the data at PACE, there was me and a couple others
on this team, healthcare analytics team, who could
pull data and do the analysis.

With Intus -- that's me pulling the 1:41:12PM
spreadsheet, doing some massaging.  Clinical staff
don't know how or don't want to do, or, frankly, I
didn't want them using their skilled time to do
that.

Intus would put it directly in the hands 1:41:24PM
of not only me as administrative staff, but also the
clinical team.

Does that make sense? 1:41:32PM

Q.   It makes sense.  My question is you said 1:41:34PM
you had the hope that it would do that.  Did it not
expedite your review of the data?

A.   It did for me.  I had a hard time getting 1:41:45PM
my staff engaged with the product internally.

Q.   Sorry.  Go ahead. 1:41:58PM

A.   So it streamlined things for me so I 1:42:00PM
didn't have to manually pull data.

Q.   Is it a burden to have to manually pull 1:42:07PM
data?

Page 24

A.    It takes time and time is money, right?    1:42:14PM

Q.    So yes?    1:42:19PM

A.    I don't know.  It takes longer.  So it's    1:42:23PM
easier when you don't have to.

MR. BESHAI:  Let me show you another    1:42:32PM
email.

THE WITNESS:  Should I go back then?    1:42:38PM

MR. BESHAI:  Right now you can't see    1:42:41PM
anything on Exhibit Share, correct?

THE WITNESS:  I see 130.    1:42:44PM

MR. BESHAI:  What's going to happen is as    1:42:46PM
I pull new ones, it will replace what we're
seeing.

THE WITNESS:  Got it.    1:42:52PM

(Thereupon, marked as Exhibit 131.)    1:42:53PM

BY MR. BESHAI:    1:43:07PM

Q.    Do you see 131?    1:43:07PM

A.    Now I can.  I have to refresh, so just let    1:43:09PM
me know.

Q.    I want to look at the top email there.    1:43:52PM
You are telling --

Do you remember who Evan Johnson and    1:43:57PM
Robbie Felton were?

A.    I do.    1:44:01PM

Q.    Who are they?    1:44:02PM

Page 25

A.   I believe that they started the company.   1:44:05PM
I don't know which titles each holds.

Q.   You're telling them here about some of the   1:44:13PM
data that you would like to have pulled and analyzed
by Intus, correct?

A.   Yes.   1:44:24PM

Q.   Things like falls, pressure ulcers, ER   1:44:24PM
visits, hospitalizations, correct?

A.   Correct.   1:44:30PM

Q.   Also telling them that you want to run   1:44:31PM
some of these patient events by race and other
demographics to further analyze the data, correct?

A.   Correct.   1:44:45PM

Q.   To your understanding, where was Intus   1:44:52PM
pulling the data from?

MR. LEE:   Objection.   Lacks foundation.   1:45:01PM
Calls for speculation.

BY MR. BESHAI:   1:45:05PM

Q.   Just your understanding.   As you   1:45:05PM
understood it, where is the patient data stored such
that Intus would need to pull it?

A.   The data comes from Pace Care where our   1:45:13PM
staff would input.

Q.   The clinical staff that we talked about,   1:45:18PM
correct?

Page 26

A.    Correct.                                           1:45:21PM

Q.    So the process goes, patient comes in,             1:45:23PM
there's an event, pressure ulcer, hospitalization,
et cetera, clinical staff inputs that data into
Pace Care.   That would be roughly step one, correct?

A.    Correct.                                           1:45:39PM

Q.    Then Intus pulls that data and populates          1:45:41PM
their analytics tool, based on your understanding,
correct?

A.    Correct.                                           1:45:51PM

Q.    Then you log into the analytics tool and         1:45:51PM
you can see at a glance the kind of analysis that
helps you do your job, correct?

A.    Yes.                                               1:46:01PM

Q.    When you said this process streamlined            1:46:02PM
some of the manual review you would otherwise have
to do yourself, correct?

        MS. KOTIYA:   Objection.  Mischaracterizes      1:46:11PM
her testimony.

        MR. LEE:   Join.                                1:46:16PM

        THE WITNESS:   What did David say?              1:46:21PM

        MR. LEE:   Just joining the objection.          1:46:23PM

A.    Having Intus made it quicker to have this         1:46:27PM
information at my fingertips.

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

BY MR. BESHAI:                                      1:46:33PM

Q.   And this information was assisting you in      1:46:33PM
analyzing the data to improve patient outcomes,
correct?

A.   Correct, that was the goal.                    1:46:47PM

Q.   Do you remember what Intus's analytics         1:46:50PM
tool was called?

A.   I do not.  I remember calling it Intus.        1:46:57PM

Q.   We'll call it "Intus" then.                    1:47:01PM

A.   Okay.                                           1:47:03PM

Q.   Intus couldn't do its job without the          1:47:04PM
patient health data, correct?

     MS. KOTIYA:  Objection.  Speculation.           1:47:10PM

A.   Intus couldn't show me the data without        1:47:17PM
the data from Pace Care.

BY MR. BESHAI:                                       1:47:22PM

Q.   Intus couldn't analyze your patients'          1:47:22PM
data, unless it had access to your patients' data, I
know it sounds simple, but that is basically how it
worked, right?

A.   Correct, the product took the data and         1:47:36PM
rearranged it into really pictorial view.

Q.   So --                                           1:47:44PM

A.   Another thought.  Graphs, pictures, those       1:47:48PM
kinds of things.

Page 28

Q.    So if Intus was prohibited from accessing Pace Care, it couldn't provide the analytics you needed, correct?    1:47:53PM

MR. LEE:  Objection.  Calls for speculation.    1:48:04PM

MS. KOTIYA:  Join that.    1:48:06PM

A.    They needed the data somehow.  I do know there was a time where I started sending them the data manually.  I would download reports from Pace Care and sent them over to Intus.  They had to get the data somehow.    1:48:08PM

BY MR. BESHAI:    1:48:23PM

Q.    Why did you have to send them the data manually?    1:48:23PM

A.    As I recall at some point their -- they were no longer given access directly to Pace Care. They were asked to stop accessing Pace Care Online.    1:48:31PM

Q.    Who asked them to do that?    1:48:46PM

A.    I believe RTZ asked them to do that.    1:48:50PM

Q.    How do you know that that's what happened?    1:48:54PM

A.    I was informed by Intus that they no long -- they had been asked to stop with a cease and desist letter.    1:48:58PM

Q.    Did you have a formal understanding as to why they were prohibited from accessing Pace Care?    1:49:08PM

Page 29

A.    I don't know why they said that.    1:49:15PM

Q.    And so as a result you -- when they told    1:49:20PM
you that, you still wanted to work with them and use
their analytics tool, correct?

A.    Yes.    1:49:31PM

Q.    So the workaround that you developed was    1:49:34PM
manually pulling the data, correct?

A.    Correct.  I was willing to do anything I    1:49:41PM
could do.  If my clinical team was going to use it,
I was happy to take on that function and send them
data.

Q.    How often did you pull data and send it to    1:49:52PM
them?

A.    I don't remember.    1:49:56PM

Q.    Once a week?    1:49:57PM

A.    I don't remember.    1:49:59PM

Q.    Do you have any general sense?  Like once    1:50:02PM
a day?  Once a week?

A.    That was six years ago.  I don't know.  I    1:50:08PM
don't.

Q.    Let's go back.    1:50:16PM

A.    Do you have a message that would refresh    1:50:18PM
my memory?

Q.    We will get there.    1:50:25PM

A.    Okay.    1:50:53PM

Page 30

Q.   Let's take a step back before we get to    1:50:53PM
your manual workaround.

A.   Okay.    1:50:59PM

Q.   At some point when you decided to move    1:51:00PM
forward with Intus, do you recall that there was an
integration process where you had to work to
integrate both Intus and Pace Care?

A.   I don't recall specifics of the process.    1:51:19PM

Q.   Not the specifics, but in general do you    1:51:22PM
remember that that was a process you had to go
through to kind of onboard the two programs
together?

A.   Yes, there would have been some effort    1:51:31PM
process to get the two connected, correct.

Q.   Did you act as kind of a liaison between    1:51:44PM
the two to try to get them connected so that you
could get the analytics tool running?

A.   That sounds right.  I was engaged -- they    1:51:52PM
were both vendors so I would have been the one
working with each of them.

MR. BESHAI:  I'm going to show you the    1:52:18PM
next exhibit.  This should be 132.

(Thereupon, marked as Exhibit 132.)    1:52:22PM

BY MR. BESHAI:    1:52:38PM

Q.   This is from you to Evan Jackson, correct?    1:52:38PM

Page 31

A.    It is.    1:52:41PM

Q.    Do you recall having these conversations    1:52:42PM
with Evan about how Intus would access RTZ?

A.    I think in setting up the EMR, the ideal    1:52:53PM
way to do that would be through an API interface
where no manual effort is needed by really any of
us.  I think we were trying to see if we could get
an API -- which I don't actually know what it stands
for -- but basically it's a way computer systems
talk.  So integration.  We were hopeful to set up
integration so the systems would talk to each other.

Q.    Were you also hopeful to have computers    1:53:27PM
talk to each other because it would avoid what you
just referred to as manual effort?

A.    Correct.    1:53:36PM

Q.    Why -- what's wrong with just doing it    1:53:39PM
yourself?

A.    Extra time.    1:53:43PM

Q.    This email is from you to Evan Jackson.    1:53:47PM
Nicole Holmes is she one of your    1:53:50PM
colleagues or who is Nicole Holmes?

A.    She worked for Senior Care Partners, also.    1:53:53PM
She was a center manager for a new center.  And I'm
thinking I must have had her helping me with some
things before that center opened, I think.  But she

Page 32

was with Senior Care Partners.

Q.   Sorry.                                                  1:54:14PM

A.   She was a SCP employee,                                1:54:15PM
Senior Care Partners.

Q.   You're telling Evan here, "We talked with              1:54:20PM
RTZ today on our call regarding the Intus interface.
They are asking for API specifications."

Do you see that?                                            1:54:29PM

A.   Yes.                                                   1:54:29PM

Q.   So was it RTZ that first asked for API                 1:54:30PM
specifications to onboard Intus?

A.   Yes, that was a common practice that we                1:54:38PM
had an API interface with our pharmacy, and so the
specifications is how you, from what I understand,
build -- it's like a recipe, how to build, if that
makes sense.  Like here's how you talk to our
computers.

Q.   And you mentioned a pharmacy.  Was this                1:55:00PM
another that you had that also needed to be
integrated with Pace Care?

A.   Yes, we had RTZ interface.                             1:55:10PM

Q.   For that integration, did RTZ send API                1:55:15PM
specifications to integrate the pharmacy?

A.   I think it works the other way.  I think               1:55:24PM
the vendor has to say this is what we need.

Page 33

Q.    Okay.    In here -- it looks likes here you    1:55:31PM
are asking Evan Jackson for -- RTZ asked you to
relay this to Evan Jackson, the API specifications,
correct?

A.    Correct.    1:55:52PM

MR. BESHAI:  Going to the next exhibit.    1:55:54PM
Can you see the next one?

(Thereupon, marked as Exhibit 133.)    1:56:23PM

A.    Yes.  This one is a little bit longer.    1:56:23PM
Give me a second.

BY MR. BESHAI:    1:56:35PM

Q.    Sure.    1:56:35PM

MS. KOTIYA:  Counsel, while the witness is    1:58:43PM
reviewing this email, we're coming close to an
hour, so after we go through questions about
this document, I think it might be a good time
for a break.

MR. BESHAI:  Yeah, that's fine, yeah.    1:58:55PM

A.    Okay, I'm ready.    1:59:12PM

BY MR. BESHAI:    1:59:13PM

Q.    Okay.  You still have it up?    1:59:13PM

A.    I do.    1:59:25PM

Q.    So, let's take this step by step.    1:59:31PM

Let's go to the April 23, 2021 email.    1:59:39PM

"Happy Friday!    1:59:43PM

Page 34

866-299-5127        calendar-ca@veritext.com        www.veritext.com

I'm writing to introduce you to each                    1:59:43PM

other."

Do you see that?                                        1:59:51PM

A.    I do.  Yes, I see it.                              1:59:52PM

Q.    Sometimes I'm thinking and it looks like          1:59:59PM

I'm not listening but I'm just thinking.

When I asked you earlier if you played                  2:00:04PM

somewhat of a liaison go-between role, and you said,

yes, is this an example of that?

A.    Yes, I was connecting the two parties.            2:00:14PM

Q.    Let's go to the email dated April 26, 2021        2:00:20PM

from Alex Rothberg.

A.    Okay.  "I'm so excited to be working with         2:00:46PM

you"?

Q.    Yes.  You are copied on this email,               2:00:54PM

correct?

A.    Yes.                                              2:01:02PM

Q.    So Alex says (as read), "I'm so excited to        2:01:04PM

be working with you all and appreciate your

assistance in this integration to provide a seamless

and easy transition process for SCP in respect to

our system.  Below is a full spec of information

that Intus pulls out of the partner's EHR system.  I

hope this will provide sufficient backdrop for a

more in depth technical conversation about how you

Page 35

are most comfortable with providing regular access

to the information."

Was it your impression that Intus was open   2:01:30PM
to a number of alternatives depending on what RTZ
preferred in terms of granting access?

MS. KOTIYA:  Objection.  Vague.   2:01:44PM

MR. LEE:  Also calls for speculation.   2:01:47PM

A.   I'm not sure what Intus was thinking.   2:01:49PM

BY MR. BESHAI:   2:01:52PM

Q.   Okay.  Well, I know you don't know what   2:01:52PM
they were thinking.  But I'm asking about what your
impression was because you were the liaison, you
were the go-between.  So what was your impression
about their willingness to be open to alternatives
to access?

A.   My impression is that they wanted to talk   2:02:11PM
with RTZ and figure out a plan.

Q.   You felt they were operating in good faith   2:02:17PM
based own your impressions to gain access?

A.   What do you mean when you say "good   2:02:25PM
faith"?

Q.   Earnestly wanted to gain access so they   2:02:28PM
could start the date analytics service?

MR. LEE:  Late objection.  Vague and   2:02:39PM
ambiguous as to access.  Are you saying access

Page 36

to data or are you saying access to the system?

MR. BESHAI:  I don't see a distinction    2:02:47PM
between those two, so I asked it the way I
asked it.  I can ask it again.

BY MR. BESHAI:    2:02:54PM

Q.    Did you feel like they were earnestly    2:02:54PM
engaging to gain access to the data on the system in
order to move forward with their data analytics
tool?

MR. LEE:  Same objection.    2:03:09PM

A.    It seemed like they wanted to figure out    2:03:11PM
how to get the data to do their role.

BY MR. BESHAI:    2:03:18PM

Q.    Let's go to the last one, May 13, 2021,    2:03:25PM
the top email.

A.    Okay.    2:03:35PM

Q.    This is from Alex Rothberg and you are    2:03:37PM
copied on here; Laura Emery from RTZ, correct?

A.    Yes.    2:03:45PM

Q.    Alex says, "we would like read-only access    2:03:45PM
to your system," meaning Pace Care, correct?

A.    Yes.    2:03:52PM

Q.    At any point in your discussions,    2:03:54PM
conversations, emails, in the integration process
did Intus ask for the ability to go in and edit and

Page 37

change information in Pace Care?

A.   Not that I recall.   2:04:13PM

Q.   At any point during these conversations   2:04:16PM
about integration, did RTZ ever express a concern
about security threats?

A.   I don't know.   2:04:29PM

Q.   You don't know or you don't remember?   2:04:32PM

A.   I don't remember anything about security,   2:04:34PM
no.

Q.   What about IP theft?  At any point during   2:04:38PM
these initial integration discussions, did RTZ ever
express concerns about protecting their proprietary
or intellectual property software?

A.   I don't recall anything.   2:04:56PM

MR. BESHAI:  I think your Counsel asked   2:04:59PM
for a break, which we are due for.  Why don't
we do a 10-minute break and come back at 11:15
[sic]?

VIDEOGRAPHER:  Off the record.  The time   2:05:19PM
is 2:05.

(Recess was held from 2:05 p.m. until 2:17 p.m.)   2:05:35PM

(Thereupon, marked as Exhibit 134.)   2:17:02PM

VIDEOGRAPHER:  This marks the beginning of   2:17:55PM
Media Number 2 in the deposition of Alexandria
Lueth.  We're back on the record.  The time is

Page 38

2:17.

MR. BESHAI:  I think the next document is    2:18:06PM
134.

A.    Okay.    2:19:33PM

BY MR. BESHAI:    2:19:33PM

Q.    May 27, 2021.  Before the break, we were    2:19:33PM
looking at emails from around April when you did the
first introduction.

A.    Okay.  Same year, 2021?    2:19:43PM

Q.    Yes.    2:19:53PM

A.    Okay.    2:19:53PM

Q.    Now we're May 2021.  Alex Rothberg writes    2:19:53PM
to Michael -- I'm not going to read the whole thing.
Take a look at it and let me know if the gist of
this is sending RTZ information to help facilitate
access.

MR. LEE:  Is Ms. Lueth on these e-mails?    2:20:22PM

MS. KOTIYA:  Counsel, it looks like    2:20:24PM
Ms. Lueth is only on the July 12, 2021 email,
so it does not appear that she was included
personally on this one.

MR. BESHAI:  Let me confirm that.  Yeah, I    2:20:44PM
see her up there.  Let me know if she's on the
others.

Page 39

BY MR. BESHAI:                                        2:20:52PM

Q.   Let's go to the July 12, email, July 12,        2:20:52PM
2021. At this point by July 12, 2021, had the
integration, to your memory, had the integration
been completed yet or was it still in progress?

MR. LEE:  Objection.  Vague and ambiguous            2:21:08PM
as to integration.

Are you talking integration between RTZ              2:21:10PM
and PCO?

MR. BESHAI:  Yes.                                    2:21:21PM

A.   I don't know.  Because I don't know when        2:21:23PM
we went live with PCO.

BY MR. BESHAI:                                       2:21:27PM

Q.   You're on this email.  It is from Evan          2:21:29PM
Jackson.

A.   Okay.                                           2:21:32PM

Q.   Who writes to Michael Zawadski.  By the         2:21:32PM
way, you know who Michael Zawadski is, correct?

A.   Correct, CEO.                                   2:21:40PM

Q.   He says (as read), "I'm writing to check        2:21:43PM
on status of our integration.  I know that you
mentioned there were tasks ahead of this on your
end, but as the SCP switch date approaches it is
important to push forward."

Do you recall having these kinds of emails           2:21:56PM

Page 40

or conversations where your go-live date is coming and yet there was no integration?

A.   Until you showed me this, I don't recall.   2:22:05PM But, yes, from this email it seems like we're getting closer.

Q.   At any point during these conversations   2:22:14PM discussing logistics of integration, was there ever a time that you recall that RTZ asked for information that Intus did not provide?

MR. LEE:  Objection.  Calls for   2:22:32PM speculation.

BY MR. BESHAI:   2:22:34PM

Q.   That you recall.   2:22:34PM

A.   That RTZ asked for something that Intus   2:22:39PM didn't send?  I don't recall.

Q.   Let me make sure I understand.  You don't   2:22:45PM recall either way or you don't remember any incident where RTZ asked for something and Intus delayed?

A.   I don't recall any incidents, or either   2:22:54PM way.  It was six years ago, I don't know.

Q.   Okay.   2:23:01PM

MR. BESHAI:  Let's go to the next email.   2:23:07PM

(Thereupon, marked as Exhibit 135.)   2:23:09PM

MR. BESHAI:  Should be there momentarily.   2:23:10PM

A.   It's there now.  I'm opening it.  Is this   2:23:55PM

Page 41

different?

BY MR. BESHAI:                                    2:24:17PM

Q.    Is this different than what we just looked    2:24:17PM
at?

A.    Mike's response, is that what's new?  Yes.    2:24:19PM

Q.    Mike is responding to Evan's email that    2:24:33PM
you are copied on, correct?

A.    I am copied, yes.    2:24:39PM

Q.    He says (as read), "Evan, Thanks for the    2:24:41PM
note.  As I previously shared with you and SCP,
other items on the implementation are in front of
this one."

Do you recall any conversations with    2:24:50PM
Michael Zawadski about where you were in the queue
for integration between Intus and PCO?

A.    I don't remember any specifics.  I know    2:25:06PM
that we would have prioritized things like a
pharmacy integration that would have directly
impacted participant care on day one.  So there was
kind of order of operations.

Q.    And then Michael Zawadski says (as read),    2:25:24PM
"I do believe the standard expanded exports can be
used for this purpose."

Do you know what "standard expanded    2:25:31PM
exports" are?

Page 42

A.    As I recall, there's a section of PCO that 2:25:38PM
had -- we talked about before we could pull data.
Mike is saying we can grab this data and send it to
you, until we have an integration ready.

Q.    Sorry, what was the last thing you added? 2:26:03PM

A.    That's a great question. 2:26:07PM

As I recall, that's kind of what the 2:26:09PM
section would have reports that I could pull
manually.

Q.    Reports like examples you provided 2:26:17PM
earlier, falls, hospitalizations, et cetera?

A.    Yes. 2:26:24PM

Q.    Fair to say that Michael Zawadski is 2:26:28PM
saying here is that while the integration is in
process, you can use standard expanded exports as a
workaround?

A.    That's what I read in this email. 2:26:43PM

Q.    Then let's go to what you recall.  Do you 2:26:47PM
remember then using standard extended exports during
this waiting period?

A.    I don't recall that long ago.  But this 2:26:56PM
email would lead me to think that's what we did for
some period of time.

Q.    Is it fair to say that standard expanded 2:27:08PM
exports are not the preferred method for getting the

Page 43

data for you as the ultimate user of the analytics tool?

MS. KOTIYA:  Objection.  Vague.                    2:27:25PM

MR. LEE:  Join.  Lacks foundation.                 2:27:27PM

A.    That it's not ideal for me?                  2:27:29PM

BY MR. BESHAI:                                     2:27:31PM

Q.    I didn't say ideal.  I said preferred        2:27:31PM
method?

A.    Preferred method.  A preferred method        2:27:35PM
would be something where I don't have to do manual
steps.  Referred would be some kind of direct
integration.

Q.    That's why this is phrased as a stopgap      2:27:45PM
measure, because ultimately you wanted to go live,
correct?

A.    Go-live -- we could go-live with manual      2:27:57PM
reports, so when you say go-live --

Q.    Let me rephrase the question.                2:28:04PM

What I meant is go-live in a way that the          2:28:06PM
data seamlessly is extracted from Pace Care into the
Intus analytics tool?

MR. LEE:  I want to make certain that              2:28:23PM
we're all following on the same continuum here.

When you were using the term go-live, are          2:28:28PM
you talking about go-live for PCO, or are you

Page 44

talking about implementation of Intus?

MR. BESHAI:  I will rephrase the question.   2:28:40PM

BY MR. BESHAI:                                        2:28:42PM

Q.   We're talking about the preferred method   2:28:42PM
here right now, Ms. Lueth?

A.   Of getting data preferred method to get   2:28:47PM
data from PCO to Intus.

Q.   Yes.                                            2:28:53PM

A.   Yes.                                            2:28:53PM

Q.   So my question was, as you read this      2:28:57PM
email, do you understand it to mean the standard
expanded exports are an interim stopgap measure
until the integration is done and the data is
seamlessly extracted from Pace Care to the Intus
analytics tool?

MR. LEE:  Objection.  Mischaracterizes the   2:29:24PM
document.  Lacks foundation.

You can answer if you understand.            2:29:28PM

A.   It is my understanding that doing the   2:29:32PM
reports would get them the data they need to do with
the analytics, and that the intention was still to
somehow integrate the systems, to remove them
manually from the reports.  That is what I believe
this is.

Page 45

Veritext Legal Solutions
866-299-5127      calendar-ca@veritext.com      www.veritext.com

BY MR. BESHAI:                                              2:29:49PM

Q.   During these integration talks, did you          2:29:49PM

ever come to hear the phrase "automated script"?

A.   I don't recall that phrase.                      2:29:58PM

Q.   Have you ever heard the phrase automated         2:30:00PM

script?

A.   Maybe.  I don't specifically remember            2:30:05PM

hearing that phrase.

Q.   Give me one moment.  Should be on your           2:30:09PM

screen now.

A.   Okay.                                            2:30:56PM

(Thereupon, marked as Exhibit 136.)          2:31:08PM

A.   Is this same email, new response?  Okay.         2:31:10PM

Go ahead.

BY MR. BESHAI:                                              2:31:27PM

Q.   You seem surprised when you -- what was          2:31:27PM

that reaction?

A.   Since this has come up, I couldn't               2:31:34PM

remember if we had used Intus with TruChart or not,

and this tells me I think we did.  Is that --

Q.   Why do you think so?                             2:31:48PM

A.   Because we hadn't gone live with PCO, and        2:31:49PM

yet I say we're using it daily.  So that would tell

me we were using it.

Q.   So one of the other things I was going to        2:32:06PM

Page 46

ask you when you say when we previously implemented, you are referring to a different EMR here?

A.   I think it's referring to implementing Intus with TruChart is what I think.   2:32:17PM

Q.   Have you ever implemented Intus with any other EMR?   2:32:27PM

A.   No, only used TruChart.   2:32:32PM

Q.   And at this point you hadn't implemented with Pace Care yet, correct?   2:32:35PM

A.   Correct, our go-live was October 11.   2:32:40PM

Q.   So when you implemented with TruChart, it only took about six weeks, correct?   2:32:47PM

A.   That is what this email says.   2:32:52PM

Q.   And yet here with Pace Care, it has been almost six months from the initial reach-out, correct?   2:32:56PM

A.   Based on these e-mails, yes.   2:33:07PM

Q.   So you're following up here with Michael Zawadski asking for an update, right?   2:33:13PM

A.   Correct.   2:33:20PM

Q.   Were you surprised it was six months as opposed to -- were you surprised it took six months and yet still no integration?   2:33:22PM

A.   I don't really remember.  I hadn't done a full implementation of an EMR and other plug-ins   2:33:37PM

Page 47

before, so I don't know.

Q.   Well, didn't you just testify that you had done Intus in TruChart before?    2:33:46PM

A.   We were implementing EMR at the same time as the others.    2:33:52PM

When I came to Pace Care the EMR was already implemented and we did an add-on, so that's a different implementation.    2:33:56PM

Q.   So you were new to both Pace Care and Intus during this time period?    2:34:05PM

A.   This time we were implementing them, trying to at the same time, with the EMR being the heaviest lift out of those things, right.    2:34:09PM

MR. BESHAI:  Let's go to the next email.    2:34:26PM

(Thereupon, marked as Exhibit 137.)    2:35:00PM

A.   Okay.  137 is open.    2:35:11PM

BY MR. BESHAI:    2:35:18PM

Q.   Again, do you see Michael Zawadski's response there?    2:35:18PM

A.   Yes.    2:35:25PM

Q.   Do you recall your reaction when you got this response?    2:35:30PM

A.   I do not.    2:35:34PM

Q.   You would agree with me he doesn't give you an estimated time, correct?    2:35:34PM

Page 48

A.   He does not.                                    2:35:42PM

Q.   Did you have any in-person conversations        2:35:44PM
with him around this time about integration?

A.   I don't recall.                                 2:35:51PM

Q.   Were you concerned given that it seemed         2:35:55PM
like this was dragging and there wasn't any
estimated time on the horizon?

A.   I don't remember how I felt about it, no.       2:36:09PM

MR. BESHAI:  I'll go on to the next one.             2:36:28PM

MR. LEE:  Did you say we're done with this           2:36:32PM
exhibit?

MR. BESHAI:  It will stay up until I                 2:36:35PM
repopulate.  That's just how it works.  But,
yes, we're done with this.  You still have it
up, right?

THE WITNESS:  No, but I can.                         2:36:58PM

BY MR. BESHAI:                                       2:37:00PM

Q.   I want you to recall the date of that           2:37:00PM
email?

A.   Michael's response was on 9/12/2021.            2:37:04PM

MR. BESHAI:  So here's the next one.                 2:37:09PM

(Thereupon, marked as Exhibit 138.)                  2:37:12PM

MR. BESHAI:  Should be 138 popping up                2:37:12PM
soon.

A.   October 6, 2021?                                2:37:35PM

Page 49

BY MR. BESHAI:                                              2:37:39PM

Q.   Yes.  Do you see it?                                  2:37:39PM

A.   I do.                                                 2:37:41PM

Q.   This is after your last exchange or after            2:37:45PM
your exchange that I just showed you with Michael
Zawadski, correct?

A.   It is after September, yes.                           2:37:53PM

Q.   And you are expecting a go-live date based           2:37:55PM
on this email of October 11, correct?

A.   That's correct.                                       2:38:01PM

Q.   Who is Tim Cooper?                                    2:38:05PM

A.   Tim was on my team.  I don't recall his              2:38:06PM
title, but he helped administer the EMR.

Q.   You're asking Tim here (as read), "Tim –             2:38:17PM
can you please give RTZ live site access to the
Intus team?"

     What is "RTZ live site access"?                      2:38:23PM

A.   I think that that is the distinction -- I            2:38:29PM
think we had a test site that we were using at
go-live and a live site, so I was probably trying to
distinguish between the test site and live site.

Q.   Okay.  So just I'm clear, live site access           2:38:42PM
is like Pace Care, like the actual program?

A.   Correct.                                             2:38:48PM

Q.   So you are asking Tim to give the Intus              2:38:50PM

Page 50

team access to Pace Care, correct?

A.    That's correct.                                    2:38:59PM

Q.    And then you say (as read), "They will be          2:39:01PM
able to start their interface without RTZ and just
do it by logging into the system as a user"; is that
correct?

A.    That is what this says.                            2:39:11PM

Q.    Do you recall asking Tim to give Intus             2:39:13PM
access to the system?

A.    I don't recall it until you showed me it.          2:39:20PM
But now that you showed me it, I see that I did
that.

Q.    Was the idea to have Intus just log in as          2:39:28PM
a user like you would be a user?

A.    That's what this reads.  And what I recall         2:39:33PM
that read-only access, that they could log in and
pull reports.

Q.    When Intus logged in, did you have to give         2:39:44PM
them credentials?

A.    Yes.                                               2:39:48PM

Q.    And at this point you were okay with              2:39:51PM
giving them credentials to log in to help you with
the data analytics process, correct?

A.    It appears.                                        2:40:06PM

Q.    When Intus logged in, they had read-only           2:40:07PM

Page 51

access, correct?

A.    I can't tell from memory or by this email,    2:40:15PM
but I would have as compliance officer would have
intended them to set up so they couldn't edit, but
just pull data.

Q.    You as a user only had read-only access to    2:40:29PM
Pace Care, correct?

A.    I could do things.  I could chart.    2:40:35PM

Q.    So you could input data -- I guess that's    2:40:38PM
true because your clinicians have to be able to
input data, correct?

A.    Yeah.    2:40:46PM

Q.    When you asked Tim to give Intus access,    2:40:47PM
it was supposed to be read-only access, right?

A.    I can't tell from that.  I would have    2:40:53PM
hoped I told him that.  I did not write that in this
email.

Q.    You as a user, you just mentioned you had    2:41:05PM
both read/write access, correct?

A.    Uh-huh.    2:41:09PM

Q.    Is there any ability that you had in    2:41:14PM
Pace Care, was it only as to your electronic health
information of your clients?

A.    Yes, my team could only access    2:41:23PM
Senior Care Partners' participants.

Page 52

Q.    And that data belongs to                    2:41:30PM

Senior Care Partners and not RTZ, correct?

MS. KOTIYA:  Objection.  Lack of                2:41:38PM

foundation.

BY MR. BESHAI:                                      2:41:42PM

Q.    You can answer.                            2:41:42PM

MS. KOTIYA:  You can answer.                    2:41:45PM

A.    From my understanding and agreements, the  2:41:46PM

data belongs to the client.    In Senior Care

Partners, the software belonged to RTZ in that

relationship.

BY MR. BESHAI:                                      2:41:58PM

Q.    And your ability to edit was only as to   2:41:58PM

the data that belonged to you, correct?

A.    Correct.  I couldn't access any data that  2:42:11PM

wasn't Senior Care Partners.

Q.    You couldn't access any proprietary       2:42:15PM

software belonging to RTZ for the purpose of

editing, correct?

MR. LEE:  Objection.  Vague and ambiguous.    2:42:29PM

Lacks foundation.  Calls for speculation.

A.    I don't understand the question.          2:42:35PM

BY MR. BESHAI:                                      2:42:36PM

Q.    You go into Pace Care and you just told me  2:42:36PM

that you did have some editing capabilities,

Veritext Legal Solutions
866-299-5127      calendar-ca@veritext.com      www.veritext.com

correct?

A.    Uh-huh.                                          2:42:45PM

Q.    This is one of the rules that I should          2:42:46PM
have said at the beginning.

A.    Yes.  Gotcha, yes.                              2:42:49PM

Q.    You're good.                                    2:42:52PM

So you go in and you had to -- you were               2:42:52PM
able to edit some things, correct?

A.    I could create notes and things like that      2:42:58PM
in my participant charts.

Q.    Correct.                                        2:43:04PM

We established that -- I think we have,               2:43:04PM
tell me if I'm wrong -- we've established that you
could edit your own clients' date -- your patients'
data, correct?

A.    Correct.                                        2:43:18PM

Q.    Was there any data that didn't belong to       2:43:18PM
your participants or patients that you could edit
inside Pace Care?

MR. LEE:  Same objection.  Vague and                 2:43:30PM
ambiguous.  Lacks foundation.  Calls for
speculation.

A.    Not that I am aware of.  I couldn't access      2:43:37PM
other participants other than Senior Care Partners.
So I don't really understand more of what you are

Page 54

asking.  I could chart in the system.

BY MR. BESHAI:                                            2:43:52PM

Q.   Were you able to access the source code of        2:43:52PM
the software?

A.   No, none.                                          2:43:56PM

Q.   Were you able to access any features of           2:43:58PM
the software that would change the layout or the way
it functioned?

MS. KOTIYA:  Objection.  Calls for               2:44:05PM
speculation.  Lacks foundation.  Vague and
ambiguous as to the term function.

You can answer.                                   2:44:14PM

A.   I could change the setup of some of the           2:44:18PM
field, like what appeared in the dropdown for my
staff, that kind of thing, but not -- source code
for sure no.

BY MR. BESHAI:                                            2:44:29PM

Q.   So you could change the way your data            2:44:29PM
appeared by demographics or type of incident,
correct?

A.   Yes, yes, fair to say.                            2:44:37PM

Q.   But you couldn't change, for example,            2:44:39PM
color scheme of the Pace Care?

A.   I don't think so.                                 2:44:46PM

Q.   You couldn't change the data fields?  You        2:44:47PM

Page 55

couldn't add new data fields yourself; could you?

A.   I could turn some on and off if we wanted    2:44:54PM
to use them or not, I think.  But not -- I couldn't
make up anything I wanted.

Q.   So why did you five days before your    2:45:07PM
go-live date, did you instruct Tim to give Intus
access to the system?

A.   I don't know.  I don't know what happened    2:45:23PM
between September and October here.

Q.   Before you gave Intus access to the    2:45:29PM
system, how were you getting the data to give to
them for the data analytics tool?

A.   So before October 11?    2:45:44PM

Q.   Well, before October 6.    2:45:46PM

A.   I think we established from the prior    2:45:48PM
email that they were able to get it directly from
Mediture.

Q.   Directly from --    2:46:00PM

A.   Mediture owns TruChart.  TruChart is what    2:46:01PM
I meant, the software.

Q.   I guess let me take a step back.    2:46:11PM

At some point you were using standard    2:46:12PM
expanded reports, right?

MS. KOTIYA:  Objection.  Mischaracterizes    2:46:18PM
the witness's testimony.

Page 56

A.    On October 6 we hadn't gone live with    2:46:23PM
Pace Care online.

BY MR. BESHAI:    2:46:29PM

Q.    So as of October 6 you were still using    2:46:29PM
TruChart as your EMR?

A.    Yes.    2:46:35PM

Q.    As your go-live date with Intus    2:46:36PM
approached, you wanted to give Intus access to the
RTZ site, Pace Care, so that they could start with
analytics tool; is that right?

A.    You said as go-live with Intus approached.    2:46:52PM
Did you mean as a go-live with PCO?

Q.    Maybe I should rephrase the question.    2:47:02PM

Does this October 11 date refer to our    2:47:03PM
go-live with Intus or RTZ/Pace Care?

A.    That was RTZ/Pace Care go-live October 11.    2:47:12PM

Q.    That make sense.    2:47:17PM

So all the e-mails we looked at over the    2:47:17PM
past -- from April of 2021 to October, when you are
referring to go-live date you're talking about
Senior Care Partners' go-live date with RTZ as your
EMR?

A.    Yes, yes, that is true.    2:47:31PM

Q.    And as that date approaches, you were    2:47:33PM
hoping that Pace Care would integrate with Intus so

Page 57

that when it goes live, your data analytics tool would also seamlessly go-live?

A.    The intention was that -- the hope was    2:47:49PM
that when RTZ/Pace Care went live that Intus would be able to extract data at that point.

Q.    And we saw previous e-mails where RTZ was    2:48:00PM
telling you, not yet, it's not a priority yet, but we'll get there, correct?

A.    Yes.    2:48:17PM

Q.    This got to a point where you were five    2:48:18PM
days from go-live and you still didn't have integration between RTZ and Intus, correct?

A.    Yes.    2:48:29PM

Q.    You wanted the access for the data    2:48:32PM
analytics tool, right?

A.    I wanted them to get the data without    2:48:36PM
manual pull, yes.

Q.    So here you are telling Tim, hey, can you    2:48:42PM
give them access because we're going live soon and I need them to get the data without the manual pull, right?

A.    That's what it seems like, yes.  That's    2:48:54PM
what I'm saying, yes.  This is what -- let's do this instead of the interface.

Q.    What do you mean by instead of the    2:49:10PM

Page 58

interface?

    A.   In lieu of having it ready.   2:49:13PM

    Q.   Oh, instead of the integration you were   2:49:17PM
hoping for this would just be --

    A.   Yes, yes.   2:49:23PM

    Q.   I see.   2:49:23PM

    MR. BESHAI:  We're on the next one.   2:49:48PM

    (Thereupon, marked as Exhibit 139.)   2:49:53PM

    A.   Okay.   2:50:43PM

  BY MR. BESHAI:   2:50:45PM

    Q.   So this is Tim Cooper on an email -- your   2:50:45PM
instructions to him to give access to Pace Care --
access to Intus to enter Pace Care, right?

    A.   Pace Care.   2:51:03PM

    (Reporter clarification.)   2:51:32PM

    A.   Sure.   2:51:33PM

    I was -- Tim is giving access to the Intus   2:51:33PM
team members to access the Pace Care software, that
version.

    Q.   You were copied on this email?   2:51:52PM

    A.   Yes.   2:51:54PM

    Q.   And it looks like Tim Cooper is creating   2:51:57PM
an account for Alex and he's asking for Alex's last
name.  Do you see that?

    MR. LEE:  Objection.  Mischaracterizes the   2:52:10PM

Page 59

document.

You can answer.    2:52:12PM

A.    He says can you please provide me Alex's    2:52:14PM
last name.

Q.    Go ahead.    2:52:17PM

A.    I'll get his account ready as well.  So,    2:52:22PM
yes, I'm assuming Alex Rothberg.

BY MR. BESHAI:    2:52:30PM

Q.    He's not talking about you here; is he?    2:52:30PM

A.    No, this is confusing.  But, no, I had    2:52:35PM
access.  He was trying to give it to Intus Alex.

Q.    To clarify, this is Tim Cooper trying to    2:52:43PM
give access to Alex Rothberg and he wants his last
name for credentials, correct?

A.    Correct.    2:52:52PM

Q.    So, is it your understanding that when the    2:52:53PM
Intus folks were logging in, they were using their
names as credentials?

MS. KOTIYA:  Objection.  Calls for    2:53:06PM
speculation.

A.    It says that, (as read) "Your RTZ username    2:53:09PM
should match your primary network username, and it
is all lowercase.  (Typically first initial,
followed by last name with no space between.)"

So that is what is Tim is saying.    2:53:21PM

Page 60

BY MR. BESHAI:    2:53:24PM

Q.   Right.  I want your understanding,    2:53:24PM
otherwise it is speculation.

So, did you have any understanding as to    2:53:29PM
folks from Intus were logging into this, what
usernames they were using?

A.   Using their name and password with their    2:53:39PM
names.

Q.   That's your independent recollection    2:53:42PM
correct?

A.   That's what I -- yes.    2:53:45PM

MR. BESHAI:  One moment I'm pulling up the    2:53:58PM
next.

(Thereupon, marked as Exhibit 140.)    2:54:02PM

BY MR. BESHAI:    2:54:40PM

Q.   The email we just looked at was October 6,    2:54:40PM
2021, correct?

A.   Yes.    2:54:48PM

Q.   Between October 2021 and September 2022,    2:54:48PM
did you ever get a communication from RTZ that they
had experienced a data breach?

A.   I don't recall that happening.    2:55:13PM

Q.   During that same time period, did you ever    2:55:18PM
get a communication from RTZ that the security of
their system was compromised in any way?

Page 61

A.    I do not recall such communication.    2:55:32PM

Q.    During that same time period, did you ever    2:55:36PM
get a communication from RTZ that they had concerns
about theft of their proprietary software?

A.    Not that I recall.    2:55:51PM

MR. BESHAI:   I would like to show you this    2:55:54PM
email.

THE WITNESS:   What number?    2:56:16PM

BY MR. BESHAI:    2:56:17PM

Q.    140?    2:56:17PM

A.    Okay.   I'm in.   Okay.    2:56:19PM

Q.    Do you remember getting this email?    2:56:51PM

A.    I don't remember the specifics of it, but    2:56:54PM
I do recall a time at some point an issue came up
with their access to Pace Care.

Q.    Do you remember your reaction to seeing    2:57:05PM
this email?

A.    I think I was surprised.    2:57:10PM

Q.    Why were you surprised?    2:57:14PM

A.    Because it was the first I had heard of    2:57:19PM
it.

Q.    When you say "it," first you've heard    2:57:21PM
of --

A.    An issue with data access.   This was the    2:57:27PM
first time it was brought to my attention that there

Page 62

was any concern.

Q. Just going back to what I asked you, again, between October 2021 and September 2022, no one from either side had approached you any issues about access, correct?                              2:57:38PM

A. I don't remember any issues coming out in that time.                                              2:57:52PM

Q. That's partially why you were surprised when you got this, right?                          2:57:56PM

A. Uh-huh.                                           2:58:02PM

Q. Were you frustrated by this little hiccup?        2:58:04PM

A. I don't know my feelings in 2022. I don't know.                                              2:58:13PM

Q. Did this interfere with your ability to access the data analytics tool?                      2:58:19PM

A. I believe we started sending them manual just to be going back to the report sending that was referenced earlier. So I think we got what we needed so we could continue using it with the clinical team.                                     2:58:30PM

Q. There wasn't any interruption until you got to the --                                    2:58:47PM

A. I don't know how that was.              2:58:52PM

Q. Who was in charge of doing the reports for the manual export?                              2:58:57PM

Page 63

A.    At Senior Care?                                    2:59:08PM

Q.    Yes.                                               2:59:11PM

A.    I would have asked Tim to do that.    As I         2:59:14PM
recall Tim would have been the one that I had do
that function.

Q.    Do you recall how often he did it?                 2:59:27PM

A.    I do not.                                          2:59:32PM

Q.    I'm going to go to another email now.              2:59:44PM

A.    Sorry, it was a little garbled.                    2:59:48PM

Q.    No problem.                                        2:59:52PM

      (Thereupon, marked as Exhibit 141.)               12:18:14PM

      MR. BESHAI:    Should be popping up shortly.        3:00:21PM

      THE WITNESS:    Okay.    I see a response from      3:00:38PM
me to Robbie September 18.

BY MR. BESHAI:                                           3:00:42PM

Q.    You're thanking him for the update and            3:00:47PM
you're saying we'll just have to do this manually
until the issue is resolved, correct?

A.    Correct.                                           3:00:55PM

Q.    This is what we talked about earlier you          3:00:55PM
delegated that role to Tim?

A.    That's what I would have done, I think.           3:01:00PM

      MR. BESHAI:  One moment.  Next one should          3:01:24PM
be up here shortly.  Let me know when you see
it.

Page 64

A.   Okay.                                          3:02:21PM

(Thereupon, marked as Exhibit 142.)               12:18:14PM

BY MR. BESHAI:                                      3:02:21PM

Q.   So this is an email from you to              3:02:21PM
Michael Zawadski and Laura Emery of RTZ, correct?

A.   Yes.                                          3:02:29PM

Q.   And do you recall sending this?              3:02:31PM

A.   I don't remember specifically sending        3:02:37PM
this, no.

Q.   Now seeing it, do you recall reaching out    3:02:41PM
to RTZ trying to figure out what happened?

A.   Yeah.  And also I think it was the same      3:02:46PM
day I emailed Robbie and Evan, I think, on the 18,
and said, hey, what's happening; how do we resolve
this?

Q.   Okay.  Did you have any phone               3:02:59PM
conversations or nonemail conversations with anyone
at RTZ about this access issue?

A.   I don't remember.                            3:03:11PM

Q.   You say, "It would have been nice to have    3:03:17PM
heads up prior to this happening," right?

A.   I did say that.                              3:03:23PM

Q.   What did you mean by that?                   3:03:26PM

A.   I was referencing probably the cease and    3:03:28PM
desist that they directed to cease access.  So I was

Page 65

surprised they didn't give me heads-up, and then I heard it from Intus since I was their client.

Q.    Is it fair to say that you would have liked to have known before they cut off access to someone who was providing an important service for you?    3:03:54PM

MR. LEE:  Objection.  Vague and ambiguous as to important service.    3:04:06PM

A.    I seem frustrated that Michael didn't communicate with me directly.    3:04:10PM

BY MR. BESHAI:    3:04:33PM

Q.    I'm going to show you the next email.    3:04:33PM

A.    143, correct?    3:04:54PM

(Thereupon, marked as Exhibit 143.)    12:18:14PM

BY MR. BESHAI:    12:18:14PM

Q.    Yes, this was his response to you.  Take a look.    3:04:55PM

A.    Okay.    3:05:05PM

Q.    Do you remember getting this response from Michael Zawadski?    3:05:06PM

A.    Not specifically.  Yes, he emailed back.    3:05:13PM

Q.    Not specifically, but generally, do you remember any response from Michael Zawadski, independent of this email?    3:05:20PM

A.    I just don't recall specifically what    3:05:29PM

Page 66

happened.  He would have responded to my concern as a client, yes, and we would have made a plan somehow.

Q.   He says (as read), "If you have a moment I   3:05:43PM would love to get your perspective on it.  Let me know when you have time to talk."

Do you see that?                                3:05:51PM

A.   I do.                                        3:05:54PM

Q.   Did you ultimately talk to him about this?  3:05:55PM

A.   I don't remember.  This implies he wanted   3:05:58PM a conversation.  I don't have any memory or recollection of a conversation.

Q.   He also says (as read), "IMO," which I       3:06:07PM take to mean "in my opinion."

A.   That's what I would read.                    3:06:13PM

Q.   (As read) "IMO it's an incredibly           3:06:14PM dishonest note."

And I believe he's referring to the          3:06:19PM message you forwarded him from Robbie, correct?

A.   I would agree.                               3:06:26PM

Q.   Let's take a look at the message from       3:06:31PM Robbie.

A.   September 16 message?                         3:06:41PM

Q.   Yes.                                          3:06:41PM

A.   Yes.                                          3:06:41PM

Page 67

Q.   The first paragraph says that they "want to alert you to a temporary downtime."   3:06:41PM

A.   Yes.   3:06:51PM

Q.   Is there anything dishonest about that, to your understanding?   3:06:52PM

A.   Not to my knowledge or understanding.   3:06:56PM

Q.   Robbie also apologizes for the inconvenience, correct?   3:06:59PM

A.   Sorry, yes, same paragraph, yes, he apologizes for the inconvenience.   3:07:09PM

Q.   Did you feel he was disingenuous or dishonest in his apology?   3:07:14PM

A.   I take that to be sincere.   3:07:20PM

Q.   Second paragraph.  Robbie explains that on September 14, 2022 RTZ directed Intus to stop accessing Pace Care product unless and until RTZ provides additional written consent?   3:07:24PM

Do you see that?   3:07:43PM

A.   I do.   3:07:44PM

Q.   Are you aware that there was a cease and desist signed by RTZ to IntusCare?   3:07:45PM

A.   I've been informed that that happened, yes.   3:07:50PM

Q.   Have you come to learn anything that in your mind makes this second paragraph dishonest?   3:07:55PM

Page 68

MS. KOTIYA:  Objection.  Lack of          3:08:03PM
foundation.

You can answer if you know.                3:08:05PM

A.    I didn't read it, so I don't know.   3:08:09PM

BY MR. BESHAI:                               3:08:12PM

Q.    Okay.  Let's go to the last paragraph.  I   3:08:12PM
will let you read it and then I'll ask you.

MR. LEE:  Just for clarity, are you asking   3:08:27PM
her what she thinks Mike Zawadski would have
viewed as dishonest?

MR. BESHAI:  No, I'm asking if there's any   3:08:35PM
information that she knows that would render
anything in the first two paragraphs a lie.

MR. LEE:  A lie?                             3:08:49PM

MR. BESHAI:  Yeah, dishonest.               3:08:50PM

MR. LEE:  Okay.  Is that the same for the   3:08:52PM
third paragraph that you are going to be
asking?

MR. BESHAI:  Once she's done reading it     3:08:59PM
we'll get to the question.

A.    Go ahead.                              3:09:04PM

BY MR. BESHAI:                               3:09:04PM

Q.    You have read it?                      3:09:04PM

A.    Yes.                                   3:09:06PM

Q.    Did you have any information, one way or   3:09:07PM

Page 69

another, as to whether any of the three sentences in this last paragraph were dishonest?

MS. KOTIYA:  Objection.  Lack of          3:09:20PM
foundation.

MR. LEE:  Also vague and ambiguous as to          3:09:22PM
the perspective as to who used it as dishonest.

You can answer if you understand.          3:09:30PM

A.   I take Robbie's comments here to be          3:09:34PM
sincere.

BY MR. BESHAI:          3:09:39PM

Q.   Did you at any point ask Michael Zawadski          3:09:39PM
like what do you mean by dishonest?

A.   I don't recall asking him that.          3:09:47PM

Q.   Did you ever, at any point in your          3:09:49PM
dealings with Intus, walk away with the impression
that any of the folks you interacted with were being
dishonest with you?

A.   Again, I found Robbie and Evan to be          3:10:04PM
sincere in their desire to help these programs.  So,
yeah, I trusted them.

Q.   Did you ever get a sense from Robbie or          3:10:14PM
Evan that they were using the PACE programs as a
pretext to get access to Pace Care to rip the system
off?

MS. KOTIYA:  Objection.  Calls for          3:10:38PM

Page 70

speculation.

BY MR. BESHAI:                                    3:10:40PM

Q.   Did you ever get the impression?            3:10:40PM

A.   No.                                          3:10:44PM

MR. BESHAI:  Just a few more and we'll           3:10:58PM
take a break.  But I think I have about 10 more
minutes on this section here.

THE WITNESS:  Okay.                              3:11:06PM

MR. BESHAI:  Let me know when you can see        3:11:07PM
this one.

(Thereupon, marked as Exhibit 144.)              3:12:04PM

A.   Okay.                                        3:12:46PM

BY MR. BESHAI:                                    3:12:47PM

Q.   Let's go to the first email.                3:12:47PM

A.   Yes.                                         3:12:50PM

Q.   April 26, 2023, correct?                     3:12:52PM

A.   Yep.                                          3:12:55PM

Q.   And you are sending some provisions from a   3:12:58PM
proposed agreement that Intus sent you, you're
sending that to RTZ to get their thoughts, right?

A.   Yes.                                          3:13:09PM

Q.   Because you don't want to breach your        3:13:09PM
contract with RTZ?

A.   Yes.                                          3:13:14PM

Q.   Look as the second provision, EHR            3:13:16PM

Page 71

download.

A.    Okay.                                                3:13:20PM

Q.    Did you understand this to mean that Intus    3:13:22PM
would get login credentials to run a script to pull
the same data that you were manually providing?

MR. LEE:  I'm sorry, can you repeat the    3:13:40PM
question one more time?  I wasn't sure I heard
that.

BY MR. BESHAI:                                            3:13:44PM

Q.    Sure.                                            3:13:44PM

The second provision there, EHR download,    3:13:44PM
do you see that?

A.    I do, yes.                                       3:13:50PM

Q.    Was it your understanding that this    3:13:51PM
provision, or under this provision you would be
giving Intus access to Pace Care to run a script to
pull the same data that you were providing them
manually?

MR. LEE:  Thank you.                                  3:14:11PM

A.    It seems like that I'm going to give them    3:14:12PM
login credentials solely to download the HR data
from the HR system using automated script.  So, yes.

BY MR. BESHAI:                                            3:14:26PM

Q.    You never had any other understanding as    3:14:26PM
to other purposes for accessing -- for Intus

Page 72

accessing Pace Care?

A.    That I would have been sending manually, yes.    3:14:36PM

Q.    And at this point you were continuing to send, "you" being Senior Care Partners, were continuing to send data manually to Intus, right?    3:14:38PM

A.    I think so.    I don't remember when we started doing that.    Was that '22, fall of '22, September?    3:14:48PM

Q.    Well, the email we looked at that had -- I don't want to testify for you, but we looked at the emails from fall '22 where this was discussed.    3:14:56PM

A.    Prior emails were from September '22.    And now we're in April '23.    So I believe in that time we continued to send reports manually.    3:15:07PM

Q.    And you wanted to keep working with Intus, correct?    3:15:18PM

A.    Yes.    3:15:23PM

Q.    You still valued the services they provided as of April 2023?    3:15:23PM

A.    Yes.    3:15:29PM

Q.    Why not just keep doing the manual workaround?    3:15:31PM

A.    I think Intus approached us with a different solution to take away the manual need.    3:15:36PM

Page 73

That's what -- they're coming up with a different solution to help you.

Q.    What was the appeal?  Why didn't you just say, oh, we're fine, manual thing, we'll just keep doing that.  3:15:51PM

A.    Because manual took more time.  And so I would do things -- I would take automated as opposed to manual approach to save time.  3:15:57PM

Q.    Did you ever personally have to do the manual pull or were you delegating?  3:16:11PM

A.    I delegated that.  3:16:18PM

Q.    You asked on April 26 for Michael Zawadski's opinion, right?  3:16:21PM

A.    Uh-huh.  3:16:27PM

Q.    And then on May 2 you ask him again, hey, can you tell us whether this violates the agreement?  3:16:29PM

A.    Yes.  3:16:37PM

Q.    Yes?  3:16:38PM

A.    Yes.  3:16:39PM

Q.    I take it that means he didn't respond to your April 26 email, correct?  3:16:39PM

A.    It appears so, yes.  So I'm following up.  3:16:45PM

Q.    And then on May 5 you ask again (as read), "Mike, Are you going to be able to confirm this or do we need to explore other options to get our data  3:16:51PM

Page 74

into Intus?"

A.   Correct.                                      3:17:02PM

Q.   I take it that means he didn't respond to     3:17:03PM
your May 2 email?

A.   Correct.                                       3:17:06PM

Q.   Did you ever get an answer from               3:17:08PM
Mike Zawadski about whether your proposed approach
would be okay?

A.   I don't remember.                             3:17:19PM

Q.   When you say (as read), "we do need to        3:17:21PM
explore other data to get our data into Intus," what
other options did you have in mind?

A.   Other than -- I don't know any other than     3:17:31PM
just continuing the manual reports.

MR. BESHAI:   Let me know if you see the           3:18:25PM
next one.

(Thereupon, marked as Exhibit 145.)                3:18:28PM

A.   Okay.                                          3:18:35PM

BY MR. BESHAI:                                      3:18:36PM

Q.   You've read it all?                            3:18:36PM

A.   Give me a minute.   Okay.                      3:18:39PM

Q.   Taking a step back, this is                   3:19:02PM
September 2022 -- to close the loop since you hadn't
fully remembered -- is this the kind of logistical
email that you would send to Intus to coordinate on

Page 75

the manual pulls?

MS. KOTIYA:  Objection.  Mischaracterizes    3:19:18PM
the document.  I don't think Ms. Lueth sent
this email.

BY MR. BESHAI:    3:19:29PM

Q.    Is this the kind of email you would    3:19:29PM
exchange with -- two companies would exchange, Intus
and Senior Care Partners, to coordinate on a manual
pull?

A.    This email is just Intus reaching out to    3:19:43PM
me saying what they need.  And it sounds like we're
trying to coordinate a time, frequency and timing.

Q.    But I think you testified to this earlier.    3:19:55PM
You don't remember, as you sit here today, how often
you would have someone pull the manual document and
send it to Intus?

A.    No, I don't remember.    3:20:06PM

MR. BESHAI:  Let's take the 10-minute    3:21:00PM
break while I transition to the next topic.  I
think we likely have less than two hours
remaining.  If it's okay with you-all, just
skip lunch, we could take longer break or power
through 10 minutes now and then finish the
rest.

MS. KOTIYA:  Let's do 15 minutes now and    3:21:32PM

Page 76

that should be fine.

VIDEOGRAPHER:  Off the record.  The time    3:21:43PM
is 3:21.

(Recess was held from 3:21 p.m. until 3:38 p.m.)    3:21:46PM

VIDEOGRAPHER:  Back on the record.  The    3:38:27PM
time is 3:38.

BY MR. BESHAI:    3:38:34PM

Q.    Welcome back, Ms. Lueth.    3:38:38PM

At some point you left    3:38:42PM
Senior Care Partners and then went to work for RTZ?

A.    I did.    3:38:50PM

Q.    When was that?    3:38:51PM

A.    The beginning of 2024, I believe.    3:38:51PM

Q.    Up until the beginning of 2024 when you    3:39:12PM
left, had the integration issues that we've been
talking about between RTZ or Pace Care or Intus, had
those been resolved or had you been doing the manual
workaround up until your departure?

A.    I don't recall integration ever happening.    3:39:35PM

Q.    What prompted the move to RTZ?    3:39:45PM

A.    I actually gave notice at    3:39:48PM
Senior Care Partners without any plans.  I just was
ready for a change and was -- after Mike learned
that I was leaving, he approached me and asked if I
wanted to join the team as they were growing and

Page 77

bring that PACE operation perspective to them.

Q.   And when you -- so the decision to leave    3:40:13PM
wasn't because you wanted to go to work for RTZ, it
was independent?

A.   Yes.    3:40:21PM

Q.   Why leave Senior Care Partners at all?    3:40:23PM

A.   I love growth and challenge.  And we had    3:40:29PM
opened our fourth center.  Kind of max'd out on
geographic space in terms to growth because in
Michigan you can't compete your assigned geographic
area.

So I was ready to move on and try    3:40:47PM
something different that would be a different
challenge.

MR. BESHAI:  Produced, which is your offer    3:40:56PM
of employment.  Give me a moment, I have to
pull this into Exhibit Share.

THE WITNESS:  Sure.    3:41:25PM

BY MR. BESHAI:    3:41:25PM

Q.   While I do this, you are aware -- did your    3:41:27PM
Counsel share with you that the subpoena for this
deposition also included a request for documents?

A.   Yes.    3:41:38PM

Q.   Not something that you talked about with    3:41:38PM
your counsel, but just generally you are aware that

Page 78

we requested documents from you.  Those documents were, you know, I think we had a few categories, but generally stuff about the data blocking issues at play here, Intus generally, et cetera, does that all sound familiar?

A.   Yes.                                          3:41:57PM

Q.   Did you do a search for records?            3:41:58PM

A.   I did.  I don't have anything personally.   3:42:00PM
When I left my employment with any of the companies, everything is theirs.  I did not keep anything.

Q.   Did you search through inboxes kind of     3:42:11PM
thing?

A.   Yes.                                          3:42:14PM

Q.   Would you have text messages between you    3:42:16PM
and Michael Zawadski or Melanie Martinez or anybody else talking about these issues?

A.   From 2020 to 2023.                           3:42:28PM

Q.   More like 2022 to 2025.                      3:42:30PM

A.   Maybe.  I would have to go back and look.   3:42:36PM
I don't know what's on my phone.

Q.   You discussed these issues meaning data     3:42:48PM
blocking, cease and desist, access to PACE entities and Intus over text?

A.   I don't recall that.  But it is possible.   3:42:57PM

          MR. BESHAI:  Just as heads-up, I may ask  3:43:01PM

your counsel to work with you to review those.

It is not intended to be invasive in any way.

If there's a thread with things that are none

of our business, feel free to redact them,

remove them.  But I will likely be asking your

counsel to go back and review those with you.

THE WITNESS:  Yeah, sure.                3:43:22PM

MR. BESHAI:  Let me pull in, like I said,    3:43:26PM

your employment records that you provided.

(Thereupon, marked as Exhibit 146.)       3:43:31PM

BY MR. BESHAI:  .                                3:44:19PM

Q.   Let me know when you can see it?         3:44:19PM

A.   Yes, I have it open.                     3:44:21PM

Q.   Say it again.                           3:44:24PM

A.   I have the document open.                3:44:25PM

Q.   I don't really care about the details to 3:44:28PM
be honest, the time line is what I care about.

This is dated October 31, 2023, right?   3:44:32PM

A.   Yep.                                     3:44:35PM

Q.   And you said you started early 2024.  And 3:44:37PM
so that's reflected here in this start date,
correct?

A.   Correct.                                 3:44:45PM

Q.   And when did you leave                   3:44:50PM
Senior Care Partners?

Page 80

A.    I think December '24.  I'm sorry, '23.                3:44:56PM

'23.

Q.    You left Senior Care Partners                        3:45:08PM

December 2023?

A.    I think so.                                          3:45:11PM

Q.    You left Senior Care Partners without a             3:45:18PM

plan, then Mike Zawadski approached you?

A.    I gave notice without a plan.  So I would           3:45:24PM

have given a very long notice to

Senior Care Partners, having been there for 12

years.

Q.    When did you give notice?                            3:45:34PM

A.    I don't recall the date.                             3:45:36PM

Q.    When did Mike Zawadski reach out to you?             3:45:39PM

A.    Don't know.                                          3:45:43PM

Q.    Did he do it in person?                              3:45:45PM

A.    I don't know.  Probably not because he's            3:45:49PM

in California.

Q.    Do you recall the email or text that you            3:45:56PM

got from him saying, hey, I heard you are on the

market?

A.    I do not.                                            3:46:02PM

Q.    How did he know that you were even                   3:46:10PM

available to hire?

A.    I don't know specifically how he knew.              3:46:14PM

Page 81

Q.   Are you friends with him?                      3:46:16PM

A.   We had a relationship, he was -- he was        3:46:19PM
the contact that I worked with.  I would work with
him while he was at RTZ.  He was really heavy in the
sales process, so I got to know him through that.

Q.   We saw some of those emails.                   3:46:35PM

A.   Right.                                          3:46:37PM

Q.   But were you friends outside of work?          3:46:43PM

A.   No.                                             3:46:46PM

Q.   I mean geography would make that hard, but     3:46:47PM
did you, like, have any sort of friendship either
remote outside of your role at Senior Care Partners
and his role at RTZ?

MS. KOTIYA:  Objection.  Relevance.             3:47:02PM

MR. BESHAI:  It's relevant as to               3:47:04PM
    credibility and bias down the line.  And
    relevant as to establishing this time line.

You can answer.                             3:47:12PM

MS. KOTIYA:  You can answer.                    3:47:14PM

A.   We have working relationships as a vendor      3:47:15PM
relationship and then as an employer relationship.

BY MR. BESHAI:                                       3:47:21PM

Q.   I guess what I'm trying to understand,         3:47:21PM
really not -- I'm not difficult, I'm not whatever --
but it doesn't make sense to me you are not friends

Page 82

with him, you didn't share your plans with him, and yet somehow he knew that you were giving notice and approached you to offer you a job?

MR. LEE:  Objection.  Mischaracterizes the   3:47:43PM witness's testimony.

A.   I don't remember how that happened.  I   3:47:47PM don't.

BY MR. BESHAI:   3:47:52PM

Q.   Is it possible -- go ahead.   3:47:52PM

A.   At some point I would have notified RTZ   3:47:55PM that I had plans to leave because we had such a close -- we met weekly with them, so...

Q.   So it could be that you actually did tell   3:48:05PM him, you just don't remember?

A.   Yeah, yeah, yeah.   3:48:09PM

Q.   Did you ever text him either about work   3:48:15PM stuff or text, about data blocking issues or core Pace access?

A.   We texted about work.  We would have   3:48:24PM texted about work stuff.  I don't remember texting about data blockage as you said.

Q.   Do you recall if you ever texted about   3:48:37PM Intus?

A.   I do not remember.   3:48:41PM

Q.   Have you spoken to him about this lawsuit?   3:48:43PM

Page 83

A.   I knew about it as an employee, because we    3:48:47PM
were asked to produce emails when I worked for RTZ
related to the lawsuit.

Q.   My question was a little different.  I    3:48:58PM
knew you said you know about it.  Obviously when
there's litigation preservation requests, a lot of
productions.

Did you talk to Mike about it?    3:49:07PM

A.   Yes.    3:49:09PM

Q.   What did you discuss?    3:49:15PM

A.   I don't remember details.  But I remember    3:49:18PM
speaking about the case and providing emails.  And
obviously knew about it and spoke -- I was trying to
communicate with him via email as a vendor back in
September of '22 when they asked Intus to get out of
the system.

Q.   As you sit here today, do you have an    3:49:45PM
understanding as to why Intus still doesn't have
access to PACECare?

MS. KOTIYA:  Objection.  Speculation.    3:49:58PM

A.   I do not.    3:50:01PM

BY MR. BESHAI:    3:50:03PM

Q.   Did you ever talk to Mike about like, hey,    3:50:03PM
there's this lawsuit, what would it take to get them
access, what's the sticking point?

Page 84

A.   I do not.                                          3:50:14PM

Q.   You never spoke to Mike about that?               3:50:16PM

A.   I never suggested a course of action to           3:50:19PM
Mike.

Q.   I'm not asking if you suggested it.  I'm          3:50:22PM
asking more like were you ever curious about why are
we spending all this money on this lawsuit; what's
the sticking point?

A.   I don't recall any conversations.                 3:50:34PM

Q.   So we looked at that letter that says             3:50:40PM
October 31, 2023.

A.   Yep.                                               3:50:44PM

Q.   Let me show you another one.                      3:50:44PM

A.   Yep.                                               3:50:49PM

     MR. BESHAI:  Should be up shortly.                 3:50:49PM

     (Thereupon, marked as Exhibit 147.)                3:51:15PM

  BY MR. BESHAI:                                        3:51:20PM

Q.   This appears to be the same letter with           3:51:20PM
your signature on it, like accepting the offer?

A.   That is what it appears, yes.                      3:51:28PM

Q.   What I guess I'm confused about, do you           3:51:36PM
have any sense why the date is different on this
one?  If you signed the original, it would have said
October 31?

A.   Is there anything else different?                  3:51:50PM

Page 85

Q.   It doesn't appear to be.  This is not a   3:51:55PM
gotcha.

A.   I don't know why it's different.   3:51:59PM

Q.   You don't remember, for example,   3:52:01PM
negotiations back and forth and it prompted them to
send you an additional or revised offer letter?

A.   I think I negotiated the dollar amount.   3:52:11PM

Q.   Do you remember any other deal points from   3:52:17PM
your transition?

A.   I do not.   3:52:21PM

Q.   You started early 2024 with RTZ?   3:52:30PM

A.   January 2024.   3:52:36PM

Q.   What was your role?   3:52:37PM

A.   I was the Pace Care Evolution Manager.   3:52:43PM

Q.   Pace Care Evolution Manager.  What does   3:52:48PM
that role entail?

A.   It was -- when I started I came in and   3:52:53PM
really trying -- I started with implementations.  My
first week on the job I helped implement.  It was
very -- I don't recall a job description.  It was
pretty loosely defined, and I just came on to help.
So in the beginning, I started with implementations
and helping getting new programs onboarded.

Q.   When you left Senior Care Partners, you   3:53:26PM
said you didn't have a plan?

Page 86

A.   Correct.                                          3:53:31PM

Q.   If RTZ had never come calling, did you           3:53:34PM
have any sense of, like, you know, I'll give it six
months, maybe I'll start looking at XYZ options?

A.   I don't remember what my plans were.  I          3:53:50PM
was really just in a place that I was really open to
whatever might come.  I know that sounds weird, but
I have strong faith that I was faithful that God
would give me the next step.  It sounds crazy but
that's what I did.

Q.   It only sounds crazy because you are             3:54:11PM
talking to three career lawyers -- to the average
person, that's not that crazy.

What was it about RTZ, what appealed to               3:54:20PM
you about them?

A.   I really do love PACE.  It was an                3:54:25PM
opportunity to continue working with PACE and the
ability to not just work with one but work with many
was the appeal to me.

Q.   And so implementation manager was your           3:54:37PM
title?

A.   Evolution Manager, whatever that means.          3:54:43PM

Q.   I can understand, one, involving PCO             3:54:53PM
itself by adding features or services; or two,
expanding the client base of PCO.  Which of those

Page 87

two was your understanding of the role?

A.    I think it was both and, because I had                3:55:09PM
worked in PACE for 12 years.  Mike saw that as an
opportunity to use that knowledge to help other
clients learn how to use it differently, better.
And also to provide feedback on how the system might
function or how it might feel to an end user, if
that makes sense.

Q.    Because you were formerly an end user?         3:55:39PM

A.    Yep.                                                         3:55:42PM

Q.    What were some of the features or services     3:55:45PM
that you discussed expanding Pace Care into with
Mike, or other leadership?

A.    We were adding -- as I recall, I was            3:55:59PM
heavily involved.  There were some new regulatory
requirements, and I was heavily involved in
compliance and reporting and auditing, and
compliance with regulatory items, and I recall there
was some new set and so I helped inform them on how
to capture the data and show the data in a way that
users could see their compliance really easily.

Q.    At that time were there any other services     3:56:38PM
doing that kind of work, providing compliance at a
glance?

A.    I don't know.                                   3:56:46PM

Page 88

Q.   At any point did Pace Care develop an analytics tool?                                        3:56:48PM

A.   I did.                                                       3:56:59PM

Q.   Was it similar to the one that has?                          3:57:00PM

A.   I did not see the final product.  I left before they launched the product, so I don't know what they launched.                                       3:57:03PM

Q.   When's the first you heard about the data analytics tool -- RTZ's data analytics tool.        3:57:10PM

A.   I don't know.                                               3:57:24PM

Q.   But you do have distinct memory of them developing it while you were there?                    3:57:25PM

A.   Yes.                                                        3:57:30PM

Q.   Tell me what you remember about the development of this data analytics tool.                  3:57:31PM

A.   I remember it was a way to help see data, to see comparison data, historical trends on some of those things we talked about, those key data points to running a PACE program that is both good outcomes and financials.  Like I said, your hospitalizations --                                     3:57:37PM

Q.   Falls?                                                     3:58:12PM

A.   -- falls, wounds, compliance things like wounds, skilled nursing rates, both rehab, short-term rehab and also long-term placement.       3:58:13PM

Page 89

There's probably 10 to 15 things that every PACE program should be watching and looking at.  And so I was hoping to bring those -- hoping to see if those more easily.

Q.    When you started January 2024, did you have a sense of whether this data analytics tool had been in the works for a long time or was it a brand new thing?                                              3:58:44PM

A.    I don't remember.                                  3:58:54PM

Q.    Did anyone at RTZ ever ask for your opinion about features or operability of this data analytics tool, because you were formerly an end user?                                                        3:58:57PM

A.    Yes.                                               3:59:08PM

Q.    Who asked you?                                     3:59:09PM

A.    I don't know.                                      3:59:10PM

Q.    Sorry?                                             3:59:12PM

A.    I don't know who specifically asked me.           3:59:13PM

Q.    But someone in the organization asked you for your thoughts?                                        3:59:16PM

A.    Yes.                                               3:59:19PM

Q.    And was this at a regular steering committee-type meetings or was it just a single time like, hey, Alex, what do you think about this?      3:59:20PM

A.    There weren't steering committee meetings.        3:59:36PM

Page 90

So probably would have been more of a one-on-one conversation with Mike or something.  I don't remember.

Q.   Do you remember if there was more that one meeting where you were asked for your opinion about different features of the data analytics tool?    3:59:51PM

A.   Yes.    4:00:02PM

Q.   Do you remember being shown features and you saying I would change this or I would tweak this?    4:00:03PM

A.   At RTZ?    4:00:10PM

Q.   Yes.    4:00:12PM

A.   Yeah.    4:00:13PM

Q.   How many meetings, roughly, would you say you had?    4:00:14PM

A.   I don't know.    4:00:18PM

Q.   Do you remember who was present at these meetings?    4:00:18PM

A.   I think Mike would have been there and development team members.  I can't remember names, but development team members.    4:00:25PM

Q.   Your testimony was this data analytics tool did not launch while you were at RTZ?    4:00:36PM

A.   Huh-uh.  It did not.    4:00:44PM

Q.   You caught yourself.    4:00:44PM

Page 91

A.    Yes.                                          4:00:51PM

No, is the answer, did not.                         4:00:51PM

Q.    Are you aware now sitting here whether it     4:00:53PM
has since launched, this analytics tool?

A.    I saw a post on Instagram, that they had      4:01:01PM
launched it.

Q.    Do you remember when you saw that post?       4:01:09PM

A.    No.                                           4:01:10PM

Q.    Do you know what the data analytics tool      4:01:11PM
is called?

A.    No.                                           4:01:14PM

Q.    You have some understanding of the           4:01:20PM
features of the data analytics tool based on these
meetings that you participated in, right?

A.    Correct.                                      4:01:25PM

Q.    Based on that understanding, does the data    4:01:27PM
analytics tool do somethings that are similar to
what Intus's data analytics' tool does?

        MS. KOTIYA:  Objection.  Lack of            4:01:38PM
    foundation and speculation.

        MR. LEE:  Join.                             4:01:42PM

   BY MR. BESHAI:                                   4:01:43PM

Q.    Based on your understanding of what you       4:01:43PM
saw.

A.    What we were working would have similar       4:01:49PM

Page 92

characteristics.  But those are the fundamental things that every PACE program is looking at throughout the country, hospitalizations, falls, the things you are required to report on.

Q.   At some point during your discussions    4:02:09PM
about this data analytics tool, did you ever form
the opinion that the aim behind the tool was to make
Pace Care a one-stop-shop?

        MS. KOTIYA:  Objection.    4:02:29PM

        MR. LEE:  Objection.  Vague and ambiguous.    4:02:32PM

    A.   Can you say that again?    4:02:35PM

  BY MR. BESHAI:    4:02:36PM

    Q.   Yeah.  Let me take a step back.  I'll ask    4:02:36PM
it in three different steps.

        Intus was providing a data analytics    4:02:44PM
service that Pace Care did not inherently have,
correct?

    A.   Correct.    4:02:56PM

    Q.   Then you get to RTZ and RTZ is developing    4:02:57PM
a data analysis program, correct?

    A.   I don't know about the timing, but at some    4:03:05PM
point they started, so yes.

    Q.   My question was when you got there, it was    4:03:12PM
in development, correct?

    A.   I don't know.  If it started before or    4:03:17PM

Page 93

after I got there.  I can't answer that.

Q.   During your tenure there, at some point it was in development?                                              4:03:21PM

A.   Yes, yes.                                                     4:03:25PM

Q.   So my question is as you had these meetings with, you said, the development team and Michael Zawadski, did you get the sense -- I don't want you to speculate, just from your impression -- this tool to be a one-stop-shop for PACE programs where they wouldn't need a data analytics tool, they could have everything here in one place?             4:03:27PM

A.   Yeah, I got the sense that we were trying to develop a product that was more inclusive of their needs that would, like you said in the beginning, take all the data that goes in and put it back in a more organized fashion.            4:03:51PM

Q.   Kind of like Intus had it in their dashboard?                                                     4:04:09PM

MS. KOTIYA:  Objection.                          4:04:17PM

A.   I don't know if the look was similar, but similar data points.                                          4:04:18PM

BY MR. BESHAI:                                          4:04:24PM

Q.   During your time at RTZ -- let me set parameters at the time.  January 2024 is when you started there?                                            4:04:24PM

Page 94

A.   Uh-huh.  Yes.                                      4:04:34PM

Q.   January 2024 you started there and then           4:04:40PM
you left -- tell me, when did you leave RTZ?

A.   I was done working with RTZ as of                 4:04:51PM
December 2024.

Q.   When you say that you were done working           4:05:03PM
with them, it's because they turned into CollabriOS,
right?

A.   I became a CollabriOS employee in January         4:05:08PM
of 2025.

Q.   How long did you work at CollabriOS?              4:05:14PM

A.   I stayed there until March 2025 as an             4:05:19PM
employee.

Q.   A few of these questions I'm going to have        4:05:26PM
to ask it as to both RTZ and CollabriOS just to
understand from you what exactly the policies were.

A.   Great.                                            4:05:34PM

Q.   During your time at RTZ, did you ever hear        4:05:34PM
of any data breaches?

A.   No.                                               4:05:43PM

Q.   Did anybody ever tell you that a vendor or        4:05:45PM
PACE program was trying to hack the Pace Care
system?

A.   No.                                               4:05:55PM

Q.   Did anybody ever tell you or did you hear         4:06:00PM

Page 95

in any other way that there was too much system strain on the Pace Care system because of Intus's use?

A.   No.                                                         4:06:12PM

Q.   Did anyone ever tell you that there was         4:06:14PM
too much system strain on the Pace Care system because of unauthorized access by any party?

A.   No.                                                         4:06:23PM

Q.   Did you ever hear anything about potential      4:06:27PM
efforts to rip off Pace Care's proprietary software?

A.   No.                                                         4:06:38PM

Q.   If these things had happened, would you         4:06:44PM
have heard about them?

        MR. LEE:  Objection.  Calls for              4:06:50PM
    hypothetical -- speculation, incomplete
    hypothetical.  Lacks foundation.

        You can answer if you know.                  4:06:56PM

A.   I don't know if I would have heard.             4:06:59PM

        MR. BESHAI:  So when you got to -- let's      4:07:07PM
    jump to a few emails that will help frame my
    next questions.  Just a moment.

A.   Okay.                                                       4:08:47PM

        (Thereupon, marked as Exhibit 148.)          12:18:14PM

  BY MR. BESHAI:

Q.   Did you read it?                                4:08:49PM

Page 96

A.   Just one page, yes.                                          4:08:50PM

Q.   It is a quick one.                                           4:08:52PM

A.   Yeah.                                                        4:08:54PM

Q.   This is an email between you and Michael                     4:08:59PM
Zawadski, correct?

A.   Correct.                                                     4:09:04PM

Q.   September 2024, so about nine months after                   4:09:04PM
you started, right?

A.   Okay.  Yep.                                                  4:09:07PM

Q.   You tell him, "Yesterday when I spoke with                   4:09:10PM
LSS/New Horizons, they mentioned that they had
created accounts for Intus in PCO."

A.   Correct.                                                     4:09:19PM

Q.   "I ran a log of accounts and noted 2 Intus                   4:09:19PM
team members who accessed PCO in early September."

     Right?                                                       4:09:26PM

A.   Correct.                                                     4:09:26PM

Q.   Was part of your job to regularly run logs                   4:09:27PM
of various PACE program accounts and see if Intus
had accessed Pace Care?

A.   No.                                                          4:09:48PM

Q.   So this was a one-off situation?                             4:09:48PM

A.   Yes.                                                         4:09:52PM

Q.   Do you have directions to run a log any                      4:09:54PM
time you heard that Intus may have accessed an

Page 97

account?

A.    No direction, no.    4:10:02PM

Q.    So, what prompted you then when    4:10:05PM
New Horizons mentioned they had created account for
Intus.  What prompted you to then run a log of
accounts and suss out whether Intus team members had
accessed PCO?

A.    I mean at this point, I believe we were    4:10:23PM
aware of and had already supplied all the e-mails
and knew of the litigation going on, and were
instructed to tell -- to inform Mike, someone higher
up basically anything related to Intus.

And so I think they might have been a new    4:10:35PM
client or maybe I was just new to helping them.  And
when they, you know, told me, I guess I chose to go
verify, you know, verify what they told me.  And
then I passed information along to Mike, as
instructed.

Q.    And were you able to tell from the logs    4:10:58PM
whether it's an Intus team member who accessed
Pace Care, correct?

A.    It would have showed their email, so I    4:11:08PM
could have seen the email address connected to that
account; would have been an Intus email.

Q.    Other than a PACE program telling you that    4:11:18PM

Page 98

an Intus employee had accessed their Pace Care account, was there any other way for you to know?

A.   I mean, I could have run a log at any time on any client.  I didn't.          4:11:34PM

Q.   So either someone tells you or you run the log yourself, those are two ways to know if Intus is accessing Pace Care, right?          4:11:40PM

A.   Correct, yes.          4:11:51PM

Q.   At any point, were you asked to run the log to determine whether Intus was accessing a PACE program's account because of concerns about system strain?          4:11:54PM

A.   No.          4:12:13PM

Q.   I think I asked this, but I want to confirm.          4:12:17PM

At any point were you informed that a certain PACE program's account was too slow or not operating ideally because of strain caused by Intus's access?          4:12:20PM

A.   Not that I recall.          4:12:37PM

Q.   Did you interface a lot with Pace Care -- with PACE programs?          4:12:42PM

A.   I did.          4:12:47PM

Q.   What percentage of the clients were -- strike that.          4:12:48PM

Page 99

Did you have specific PACE programs that          4:12:53PM
were just yours?

A.    At some point there were -- I took over       4:13:01PM
leading the, I don't know what we'll call it, client
support team, so there were a few members of that
team and I was leading them.  And so in effect all
of the PACE programs I worked with that were PCO
clients.

I had three or four people reporting to       4:13:24PM
me -- account managers, that's the word I want --
they were reporting to me at some point in my tenure
at RTZ.

Q.    If there was issues, would those account       4:13:38PM
managers elevate them to you?

A.    Correct, yes.                                   4:13:42PM

Q.    Would you elevate them to Mike or somebody      4:13:43PM
else?

A.    Yes.                                            4:13:46PM

Q.    Did Melanie Martinez work under you?           4:13:47PM

A.    She did.                                        4:13:48PM

Q.    What about Laura Emery?                         4:13:50PM

A.    Yes.                                            4:13:53PM

Q.    At any point did Melanie Martinez or           4:13:54PM
Laura Emery, or any of the other account managers,
complain to you about system strain associated with

Page 100

866-299-5127          calendar-ca@veritext.com          www.veritext.com

Intus?

A.   Not that I recall.                                    4:14:04PM

Q.   At any point did any account manager              4:14:07PM
complain to you that they discovered that Intus was
accessing parts of Pace Care that they were not
authorized -- that they didn't need to perform the
services they were performing?

          MS. KOTIYA:  Objection.  The question is      4:14:24PM
     complex, compound, confusing.

          You can answer if you understand it.          4:14:30PM

A.   I don't recall that happening.                     4:14:34PM

          MR. BESHAI:  I'm going to show you            4:14:50PM
     another.

          THE WITNESS:  Sure.                           4:14:52PM

          MR. BESHAI:  Here's another one.              4:15:12PM

          (Thereupon, marked as Exhibit 149.)           4:15:13PM

     A.   I'm done. okay.                               4:15:37PM

   BY MR. BESHAI:                                        4:15:59PM

     Q.   In this email you are informing LSS PACE     4:15:59PM
program that RTZ can't give them access to
Pace Care -- can't give Intus access to Pace Care,
correct?

     A.   Correct.                                      4:16:13PM

     Q.   And the reason you give is that there's      4:16:14PM
active litigation between RTZ and Intus, right?

Page 101

A.   That's what I was told, yes.                4:16:21PM

Q.   Who told you to say that?                   4:16:23PM

A.   I would have discussed it with Mike or      4:16:27PM
Doug.  Those were the two people we were supposed to
go with any Intus.  If the word Intus came up, talk
to Mike and Doug because this thing is happening.

Q.   "This thing" meaning litigation?           4:16:42PM

A.   Correct.                                    4:16:45PM

Q.   Who was Doug?                               4:16:46PM

A.   He was in charge of contracts.             4:16:48PM

Q.   So any time a PACE program brought up       4:16:51PM
Intus, you were told raise it directly with Mike
Zawadski?

A.   Correct.                                    4:16:59PM

Q.   Again, did you ever have conversations      4:17:02PM
with Mike during the course of your employment at
RTZ as to what RTZ's goal was in the lawsuit?

A.   I did not.                                  4:17:14PM

Q.   Or any discussions about what it would      4:17:16PM
take to resolve this and integrate Intus back in?

A.   I did not.                                  4:17:22PM

Q.   Did you personally feel any sort of way     4:17:24PM
about Intus not having access to Pace Care?

A.   Not really.  Since they started having      4:17:34PM
issues, I really just wanted to be no part of it and

Page 102

wanted them to figure it out.

Q.   Are you aware that part of the issue in      4:17:54PM
this case is a nondisclosure agreement that RTZ
asked Intus to sign?

A.   Yes, instructions were always that anyone    4:18:04PM
accessing the system, Pace Care, had to have signed
a nondisclosure agreement.

Q.   Do you have an understanding as to why       4:18:20PM
Intus and RTZ were never able to come to an
understanding about that NDA?

A.   I do not.                                     4:18:29PM

Q.   Couple more emails.                           4:18:36PM

A.   I'm ready.  I have it open.                   4:19:14PM

MR. BESHAI:  There's a few in this thread          4:19:17PM
so take your time.

(Thereupon, marked as Exhibit 150.)                4:19:22PM

(Discussion off the record.)                       4:19:24PM

BY MR. BESHAI:                                     4:21:02PM

Q.   Let's go to the bottom.  Are you familiar    4:21:02PM
with Esperanza?

A.   Yes.                                          4:21:14PM

Q.   Reaching out to -- Ryan is reaching out to   4:21:20PM
a couple of folks from RTZ -- Ryan from Esperanza o
a couple folks from RTZ explaining that they have
contracted with Intus.

Page 103

Do you see that on November 8, 2024?    4:21:37PM

A.    Yes.    4:21:40PM

Q.    He mentions the NDA and then says please    4:21:41PM
send NDA to Sneha from Intus, right?

A.    Yep.    4:21:50PM

Q.    And then Melanie responds (as read), "Hey    4:21:52PM
Ryan, at this time we're not able to allow Intus
employees to log into PCO due to ongoing
litigation," right?

A.    Yep.    4:22:01PM

Q.    And, again, this was the standard line    4:22:02PM
that -- essentially the company line that you were
told to relay to PACE programs, right?

A.    Yes, yes.    4:22:12PM

Q.    On November 12, 2024 Sneha responds, (as    4:22:21PM
read) "I believe our teams, PCO and Intus, are
meeting today, November 12, to discuss the NDA and
service model.  I'm confident this will be a
productive meeting."

Do you see that?    4:22:39PM

A.    I do.    4:22:40PM

Q.    Are you aware of any meeting in the fall    4:22:40PM
of 2024 between Intus and RTZ to talk about access?

A.    Only from this email do I recall.    4:22:49PM

Q.    Say that last part again.    4:22:56PM

Page 104

A.   I was not at a meeting between the two.   4:22:56PM

Q.   And then there's a follow-up here, couple   4:23:02PM
days later from Sneha, and she says, (as read) "PCO
and Intus will be meeting next Tuesday to review the
NDA."

Again, you are not aware of any subsequent   4:23:13PM
meeting after the one supposedly on the 12th, right?

A.   Correct, I don't know.   4:23:21PM

Q.   You weren't part of any conversations in   4:23:22PM
fall 2024 to discuss access to Pace Care?

A.   With PCO staff -- RTZ and Intus, no, I was   4:23:31PM
not part of those conversations.

MR. BESHAI:  Here's another one.   4:24:04PM

(Thereupon, marked as Exhibit 151.)   4:24:05PM

MR. LEE:  Is there a way we can move the   4:24:27PM
sticker.

(Discussion off the record.)   4:24:30PM

A.   Okay.   4:25:25PM

BY MR. BESHAI:   4:25:26PM

Q.   So this is the same thread as the one we   4:25:26PM
saw before.  You would agree this is a side thread
between the RTZ folks internally, right?

A.   Yes.   4:25:40PM

Q.   And Melanie Martinez asks you, "Any   4:25:41PM
specific wording we should use to reply since they,"

Page 105

Esperanza, "have the Intus employee on this thread,"
right?

    A.   Right.                       4:25:53PM

    Q.   Did you have different messages for Intus   4:25:53PM
versus PACE clients?

    A.   I don't remember.  I think same response.   4:25:59PM

    Q.   So, do you have an understanding of what   4:26:04PM
Melanie meant when she said, "Since the Intus
employee is on the thread"?

        MS. KOTIYA:  Objection.  Calls for   4:26:16PM
  speculation.

    A.   I think Melanie was coming to me as her   4:26:24PM
manager to say should I behave any different because
Intus is on this thread.

  BY MR. BESHAI:                       4:26:35PM

    Q.   Do you remember what your response was to   4:26:37PM
her?

    A.   I don't remember.                4:26:39PM

        Do you have it?             4:26:42PM

    Q.   No.                          4:26:44PM

    A.   Okay.  I don't think there was any   4:26:45PM
different kind of wording.  I think I kind of saw
what she replied.

        MR. BESHAI:  Can you see this 152.   4:27:31PM

        (Thereupon, marked as Exhibit 152.)   4:27:34PM

Page 106

A.   Yes.                                          4:27:41PM

BY MR. BESHAI:                                     4:27:41PM

Q.   So you are telling Sara and Katie from       4:27:41PM
Mybrio (as read), "As we discussed in our last
meeting, we're working on a new CER module that will
pull data from a different database rather than live
database.  The idea is that this will put less
strange and fewer occurrences of the system being
down."

Do you see that?                                  4:28:04PM

A.   I do.                                         4:28:05PM

Q.   Were they having an issue with the system    4:28:06PM
going down too frequently?

A.   I don't recall.                              4:28:15PM

Q.   Sorry, go ahead.                             4:28:19PM

A.   I don't recall.                              4:28:21PM

Q.   You don't mention Intus anywhere in this     4:28:24PM
email, correct?

A.   No, Intus is not in this email.              4:28:28PM

Q.   As we said before, you've never had an       4:28:30PM
issue brought to your attention in which Intus's
access caused system strain, right?

A.   Correct.                                      4:28:39PM

Q.   You said November or December 2024 is when    4:28:50PM
you transitioned to CollabriOS?

Page 107

A.   Yes.                                                    4:29:02PM

MR. BESHAI:  I'm going to show you a          4:29:04PM
letter that you produced this morning, or that
your counsel produced this morning.

(Thereupon, marked as Exhibit 153.)          12:18:14PM

BY MR. BESHAI:                                               12:18:14PM

Q.   Do you see that?                                 4:29:35PM

A.   Yes, I do.                                       4:29:37PM

Q.   This document is titled "CollabriOS RTZ        4:29:38PM
Offer of Employment."

Do you see that?                                4:29:49PM

A.   Yes.                                             4:29:49PM

Q.   Do you refer to it internally as               4:29:51PM
CollabriOS or CollabriOS RTZ?

A.   It was a time of transition.  I don't           4:30:01PM
remember.

Q.   Not just at this time, but at any point         4:30:04PM
did you refer to it -- you were there for three
months.  During those three months, did you
internally, you and your colleagues, refer to the
company you were working for as CollabriOS or
CollabriOS RTZ or RTZ?

A.   We would have started using the term            4:30:24PM
CollabriOS.

Q.   Going down to Page 2 on the signature page      4:30:32PM

Page 108

it says, "CollabriOS RTZ Offer of Employment,"
right?

A.    Yes.                                                      4:30:39PM

Q.    What was your understanding as to what was    4:30:40PM
happening to RTZ?

MS. KOTIYA:  Objection.  Relevance.                4:30:49PM
Speculation.  And lack of foundation.

MR. LEE:  Also vague and ambiguous as to           4:30:54PM
what was happening.

You can answer if you know.                        4:31:02PM

A.    I knew that CollabriOS was going to be the    4:31:04PM
future company that ran Pace Care Online.

BY MR. BESHAI:                                     4:31:17PM

Q.    Is it your understanding, as you sit here    4:31:17PM
today, from the time you were there at the company,
as of January 2025 CollabriOS was the entity
managing and overseeing Pace Care operations?

A.    I don't know the structure.                  4:31:33PM

MR. LEE:  Sorry I was going to interpose           4:31:42PM
an objection.

Calls for a legal conclusion.                      4:31:42PM

You can answer.                                     4:31:44PM

A.    I understood that I would start being paid   4:31:48PM
by CollabriOS.

Page 109

BY MR. BESHAI:    4:31:53PM

Q.    Even though this letter says RTZ Systems?    4:31:53PM

A.    Yeah.    4:31:58PM

Q.    Did you get a new email address?    4:31:59PM

A.    Yes.    4:32:02PM

Q.    What was the domain name?    4:32:03PM

A.    CollabriOS.com I would presume.    4:32:09PM

MR. BESHAI:  One moment.    4:32:24PM

BY MR. BESHAI:    4:33:02PM

Q.    When the company in transitioned to    4:33:02PM
CollabriOS, were there additional, to your
knowledge, additional EMRs that you began to manage?

MR. LEE:  Objection.  Vague and ambiguous    4:33:19PM
as to transitioned.

You can answer if you understand.    4:33:22PM

A.    Yes, CollabriOS was managing both    4:33:25PM
Pace Care Online and another one that I'm failing to
remember the name of.  I don't know if I can think
of it.

(Reporter clarification.)    4:33:57PM

BY MR. BESHAI:    4:33:57PM

Q.    PACELogic?    4:33:57PM

A.    Thank you.    4:33:59PM

Q.    To your understanding from being there,    4:33:59PM
working there, as of January 2025 CollabriOS was

Page 110

Veritext Legal Solutions
866-299-5127            calendar-ca@veritext.com            www.veritext.com

managing both Pace Care and PACELogic?

A.    Yes.                                              4:34:10PM

Q.    Were you then also tasked with fielding          4:34:10PM
requests and issues from PACELogic clients?

A.    No, I didn't know that system.  No.            4:34:21PM

Q.    Have you ever seen the PACELogic system?        4:34:29PM

A.    I have because that was one of the systems      4:34:32PM
we looked back at Senior Care Partners when we were
looking at moving from TruChart.

Q.    Have you seen -- have you seen TruChart?        4:34:42PM

A.    Yes.                                              4:34:48PM

Q.    And you've seen Pace Care?                       4:34:49PM

A.    Yes.                                              4:34:55PM

Q.    You spent some time navigating through          4:34:56PM
each of those EMRs?

A.    PACELogic I have not, I just had a demo.        4:35:01PM

Q.    But in the demo you saw its features, its       4:35:04PM
operability, some of what it could do?

A.    Yes.                                              4:35:10PM

Q.    Did you also see its user interface in the      4:35:11PM
demo?

A.    Meaning?                                          4:35:16PM

Q.    User interface, like the thing you as user      4:35:18PM
would be interacting with, the columns, rows, the
banners, all of that?

Page 111

A.   Yes.                                         4:35:26PM

Q.   And you've seen user interface for          4:35:27PM
Pace Care?

A.   Yes.                                        4:35:32PM

Q.   And you've seen user interface for          4:35:32PM
TruChart?

A.   Yes.                                        4:35:38PM

Q.   Would you agree with me that based on your  4:35:40PM
experience dealing with these three EMRs, there are
some core commonalities about the user interface
between all three?

     MR. LEE:   Objection.   Vague and ambiguous  4:35:59PM
as to core commonalities.

A.   There is a common data set that would go    4:36:09PM
each one and required documentation params that each
of them had its own way of capturing that data.

  BY MR. BESHAI:                                  4:36:24PM

Q.   So the data sets that each has to store is  4:36:24PM
largely dictated by the PACE needs, correct?

A.   PACE regulations really, but yes.           4:36:35PM

Q.   And does each of the three have some way    4:36:39PM
to sort and filter that data?

     MR. LEE:   Objection.   Vague and ambiguous  4:36:47PM
as to sort and filter.

A.   I cannot speak to PACELogic because I        4:36:53PM

Page 112

don't remember that part of the demo or didn't see it.

But both TruChart and PACECare had a place    4:37:00PM
where you could go pull reports and extract data.

BY MR. BESHAI:    4:37:07PM

Q.    And you could create customizable reports    4:37:07PM
in both TruChart and PACECare?

A.    Yes.    4:37:12PM

Q.    You mentioned earlier that in PACECare you    4:37:20PM
could turn off some data fields so that you can kind
of focus on the three or four categories you wanted
to look at, right?

A.    Mostly looking at demographics place.    4:37:31PM

Q.    You mean that mostly you could turn off    4:37:36PM
the demographics field?

A.    No, if you look in demographics, there's    4:37:41PM
like a page that holds all the participants'
demographics.

In PACECare there was a place where you    4:37:48PM
could document whether they had a beard or mustache.
I think we turned that off, like we don't need to do
that.  Like that's what I mean.

Q.    So did TruChart have similar feature you    4:38:09PM
could turn on and off different features?

A.    I don't remember.  It was too long ago.    4:38:17PM

Page 113

Q.   That's fair.  What do you recall about    4:38:20PM
some of the differences between Pace Care and
TruChart?

MS. KOTIYA:  Objection.    4:38:33PM

MR. LEE:  Objection.  Vague and ambiguous.    4:38:34PM

A.   I can't remember any specifics off the top    4:38:34PM
of my head.

BY MR. BESHAI:    4:38:50PM

Q.   Do you recall that there were some    4:38:50PM
similarities?

A.   Yes, again, the required set of    4:38:56PM
information for PACE is very specific.  So it would
have commonalities, yes.

Q.   After you were hired by CollabriOS, did    4:39:08PM
anything functionally change about your role?

A.   It was a time of change, right,    4:39:18PM
organization was changing a lot.  So there was a lot
of movement.

From what I recall, I was still leading    4:39:31PM
account managers, but that was being changed.  I
left kind of when all things were changing.

Q.   But in terms of your day-to-day, you were    4:39:42PM
still fielding complaints and issues from PACE
programs and managing the folks underneath you?

A.   I honestly don't remember.  We're talking    4:39:55PM

Page 114

about who is going to do what.  I think I was going to move out of that, more to like into a different role.  But, again, nothing really settled.  When I left, it was because, honestly, things were unsettled and I wasn't okay.  I needed more structure.

Q.   What was it about why did leave CollabriOS    4:40:20PM just three months in?

A.   Like I said, it was such a great time of    4:40:25PM change and I needed some more structure and to know what was my role and what I was doing and no one could tell me what I was doing.  And I didn't feel right.  I didn't do well under that.

Q.   Are you aware of after January 2025 what    4:40:49PM role did RTZ, as you understood it, play in managing PACECare?

MS. KOTIYA:  Objection.  Relevance and    4:41:06PM speculation.

MR. LEE:  Also vague and ambiguous and    4:41:14PM calls for a legal conclusion.

You can answer if you understand.    4:41:17PM

A.   I don't know what role RTZ played after    4:41:19PM January.

BY MR. BESHAI:    4:41:23PM

Q.   You said that you got a new domain name    4:41:23PM

Page 115

CollabriOS.com or something like that?

A.   Yes.    4:41:34PM

Q.   Did all your colleagues -- to your    4:41:36PM
knowledge, did your colleagues from RTZ also get new
email addresses?

A.   Yes.    4:41:44PM

Q.   Did anyone if, to your knowledge, from RTZ    4:41:49PM
not get a new CollabriOS email address?

A.   I don't know.    4:41:56PM

Q.   I know it was a while ago, but between    4:41:56PM
January and March 2025, do you recall emailing
anyone with an RTZ email address?

A.   I don't recall.    4:42:09PM

Q.   Do you recall if there were new contracts    4:42:10PM
entered into with PACE programs that bore the name
CollabriOS instead of RTZ?

A.   I don't know.    4:42:26PM

MR. BESHAI:  I think I have probably    4:42:30PM
another 20, 30 minutes, but I need to just go
through my notes and make sure it's the most
streamlined presentation possible.  Could we
take a 10-minute break and then come back and
we'll be nearly finished.  Is that okay?

MR. LEE:  Okay.    4:42:49PM

VIDEOGRAPHER:  Off the record.  The time    4:42:51PM

Page 116

is 4:42.

(Recess was held from 4:42 p.m. until 4:56 p.m.)    4:42:54PM

VIDEOGRAPHER:  This marks the beginning of    4:55:57PM
Media Number 3 in the deposition of Alexandria
Lueth.  Back on the record.  The time is 4:56.

BY MR. BESHAI:    4:56:07PM

Q.  Welcome back.  I think this is going to be    4:56:10PM
the last stretch.

Can you see Exhibit 138 that's up on the    4:56:15PM
screen?

A.  You are sharing or Exhibit Share?    4:56:26PM

Q.  Actually, if it's in your Exhibit Share,    4:56:28PM
just pull it up.  That would be great.

A.  138 is an email from me asking Tim to    4:56:33PM
give --

Q.  Yes.    4:56:39PM

A.  Yes, that's what I'm seeing.    4:56:39PM

Q.  Great.    4:56:42PM

Did you ever have conversations with RTZ    4:56:42PM
about this strategy or this approach here of being
discussed in this email?

A.  I don't recall discussing that with them.    4:57:00PM

Q.  Did they ever bring it up to you, hey,    4:57:03PM
Intus is using the credentials to access PACECare
while we finish the integration?

Page 117

A.    I don't remember them bringing it up.    4:57:16PM

Q.    As part of your role at RTZ and then    4:57:22PM
CollabriOS dealing with PACE programs, did you field
complaints about the PACECare system?

A.    Yes.    4:57:36PM

Q.    Can you tell me about some of the more    4:57:38PM
commonly occurring complaints?

A.    I think speed was a common issue that I    4:57:42PM
heard about.  Some down time issues were commented
about, especially like off hours and off dates,
things like that.

Q.    When you were at RTZ/CollabriOS did you    4:58:06PM
ever get complaints from PACE programs about the
manual process of extracting reports and then
sending them to Intus?

A.    I don't remember that being a complaint.    4:58:28PM

Q.    Other than the data analytics product that    4:58:34PM
we talked about while you were at RTZ, were there
any other nonPACECare products that you are aware
that RTZ was developing?

A.    I know RTZ also hosted other products for    4:58:54PM
other industries, so healthcare still.  But like
for, like, long-term care programs in the state and
services.  I forget what it was called.  But they
did host software solutions for nonPACE programs.

Page 118

Does that answer your question?   4:59:20PM

Q.   It does.   4:59:22PM

A.   Thank you.   4:59:24PM

Q.   In your conversations with Mike Zawadski   4:59:30PM
and others at RTZ, did you get the sense that they
viewed Intus as a competitor?

A.   I don't know.  There's -- I don't know if   4:59:48PM
I would say competitor at the time.  I mean, at some
point they just made an EMR, so now they are, I know
that, because I've seen like 10 posts they launched
EMR.  But I don't recall discussions about that.

Q.   And what are you currently doing for   5:00:19PM
work -- since -- when you left CollabriOS, because
that's over a year ago.

When you left CollabriOS, did you go to   5:00:28PM
another healthcare company or what did you end up
doing?

A.   I am a fractional CFO, so I went back to   5:00:36PM
my accounting roots.  I work with senior living net
based.

MR. BESHAI:  I think that's all I have.   5:00:47PM
Thank you for your time, Ms. Lueth.

Let me ask if either of the other Counsel   5:00:52PM
have any questions for you.

MR. LEE:  I do.  I don't know if anybody   5:01:00PM

Page 119

else does.

MS. KOTIYA:  Why don't you go first.    5:01:03PM

CROSS EXAMINATION                         5:01:06PM

BY MR. LEE:                                         5:01:10PM

Q.    Ms. Lueth, as I mentioned at the beginning    5:01:12PM
of the case, my name is David Lee, an attorney
representing RTZ Associates, Inc. in this case.
Thank you very much for your time today.

I have some follow-up questions based upon    5:01:24PM
some of the testimony that you provided to
Mr. Beshai.

I know that you have the exhibits    5:01:32PM
available to you.  If you wouldn't mind launching
Exhibit 132, please.

This is the exhibit or email, rather,    5:01:46PM
between you and Mr. Evan Jackson of Intus.  And you
write to him and say, "We talked with RTZ today on
our call regarding Intus interface.  They are asking
for API specifications."

So did I understand your testimony to be    5:02:06PM
that you had a conversation with RTZ, and RTZ
specifically stated if Intus is looking for access
to our system, have them send API specifications?

A.    I think we had a call.  And to do an    5:02:25PM
interface, you need API specifications.  So they

Page 120

were asking for those.

Q.   So, in other words, RTZ was asking for          5:02:33PM
Intus's API specifications?

A.   Yes.          5:02:39PM

Q.   They were doing so in an effort to          5:02:39PM
accommodate your requests and desire for potential
interface between Intus's system and PCO; is that
correct?

MR. BESHAI:  Objection.  Calls for          5:02:52PM
speculation.

BY MR. LEE:          5:02:54PM

Q.   Your answer was?          5:02:56PM

A.   I'm sorry, say the question again, please.          5:02:57PM

MR. LEE:  Madam Court Reporter, can you          5:03:28PM
read back the question, please?

(Requested portion read back.)          5:03:29PM

A.   RTZ wanted API specifications so that they          5:03:36PM
could create an interface between PCO and
IntusCare's system.

BY MR. LEE:          5:03:45PM

Q.   And this was in response to you making the          5:03:45PM
introduction between Intus and RTZ for purposes of
that interface, correct?

A.   Correct.          5:03:55PM

I'm sorry, say that again, David, I'm          5:03:58PM

Page 121

sorry.

Q.   And this was -- the idea of RTZ asking for      5:04:02PM
Intus's specifications was in response to you
introducing the parties for purposes of creating an
interface, correct?

A.   I don't know if I had introduced them yet,      5:04:22PM
but the goal was to get interface between the two
parties.

Q.   So if you could turn now to Exhibit 133,        5:04:31PM
this is the email that Mr. Beshai showed you.

And the top email from Alex Rothberg to           5:04:41PM
Laura Emery of RTZ states -- in response to, I
should say, to Ms. Emery's email saying, hey, you
didn't provide any API specifications.  Mr. Rothberg
says, (as read) "I'm not sure that we effectively
communicated the nature of the relationship.  As a
starting off point, we would like read-only access
to your system."

Do you see that?                                  5:05:09PM

A.   Yes.                                             5:05:11PM

Q.   He goes on to write, "We provide                5:05:12PM
additional analytics to SCP, and in order to do this
we need to extract patient information from your
system.  You will not be consuming any service or
API that we use.  The business relationship is one

where we would consume your information, via API otherwise populate our system."

Are you aware of any time in which Intus actually provided API specifications to RTZ?    5:05:37PM

A.    I don't recall seeing API specifications.    5:05:45PM

Q.    Are you aware of any instance in which Intus requested any form of interface with PCO?    5:05:49PM

A.    That Intus requested interface?    5:06:04PM

Q.    Correct?    5:06:07PM

A.    I don't think so.  I think it was me requesting the two interface.    5:06:08PM

Q.    And as we can at least see from Exhibit 133, it appears that Intus was simply seeking access to the PCO system, correct?    5:06:13PM

MR. BESHAI:  Objection.  Calls for speculation.  Lacks foundation.    5:06:25PM

BY MR. LEE:    5:06:29PM

Q.    I will read the words again in order to build the foundation.    5:06:29PM

"As a starting off point, we would like read-only access to your system."    5:06:32PM

Do you see that?    5:06:39PM

A.    I do.    5:06:41PM

Q.    Are you aware of any instance in which Intus was asking for something other than simply    5:06:41PM

Page 123

access to PACECare?

A.    I don't think so, other than when they    5:06:58PM
asked for reports later after they didn't have
access.  They asked me for specific reports for me
to pull and manually send them.

Q.    And when Mr. Rothberg states further along    5:07:11PM
in Exhibit 133 near the end of the first paragraph,
"For this reason, all we need to know is how to get
access."

Do you see that?    5:07:24PM

A.    Found it.  Yeah.    5:07:27PM

Q.    So that's an instance in which    5:07:28PM
Mr. Rothberg is reiterating Intus's desire to
accommodate its data needs by getting access to
PACECare, correct?

A.    Correct.    5:07:43PM

Q.    And you understand that his use of the    5:07:46PM
term access is system user access to PACECare,
correct?

MS. KOTIYA:  Objection.  Lacks foundation.    5:07:55PM
Calls for speculation.

A.    This email to me is saying that he wants    5:08:00PM
access to PACECare.

BY MR. LEE:    5:08:06PM

Q.    Again, as a user, correct?    5:08:06PM

Page 124

A.    As a user?  I would say yes.  I don't know any other way to get access other than as a user.    5:08:09PM

Q.    If we could look at Exhibit 138, please, this is an email in which you are asking Tim Cooper of SCP to provide Intus with live site access to PACECare, correct?    5:08:31PM

A.    Yes.    5:08:54PM

Q.    You state, (as read) "They will be able to start their interface without RTZ and just by logging into the system as a user," exclamation point.    5:08:54PM

Do you see that?    5:09:07PM

A.    Yes.    5:09:08PM

Q.    To the best your knowledge, was this approach that you describe in your email provided to you by Intus?    5:09:10PM

A.    I don't recall specifically who gave me that direction.  It seems from the email like I had talked to them and they said that this was a solution that we could use.    5:09:22PM

Q.    In other words, this isn't a solution that you came up with personally, correct?    5:09:42PM

A.    I don't remember.    5:09:46PM

Q.    Looking at Exhibit 138, I see that there aren't any representatives of RTZ on this email    5:09:48PM

Page 125

thread, correct?

A.    There are not.                                              5:09:58PM

Q.    If we look at Exhibit 139, this is the                      5:10:09PM
email that Mr. Cooper sent to Evan Jackson and
Robbie Felton?

      Do you see that?                                            5:10:26PM

A.    I do.                                                       5:10:26PM

Q.    And he writes, "Hi guys.  See login                         5:10:27PM
instructions below.  Can you please provide me
Alex's last name?  I'll get his account ready to go
as well."

      Do you see that?                                            5:10:36PM

A.    Yes.                                                        5:10:36PM

Q.    Does that refresh your recollection as to                   5:10:38PM
whether Mr. Cooper actually was providing login user
accounts to Evan Jackson, Robbie Felton, and
Alex Rothberg?

A.    This email looks like he is giving them                     5:10:55PM
access; their own user accounts.

Q.    Now, Mr. Beshai asked you about ways of                     5:11:05PM
knowing whether Intus would have access PCO.
Remember he asked "you could hear from your
client" -- do you remember that?

A.    I do.                                                       5:11:21PM

Q.    And he said "you could check the logs"?                     5:11:22PM

Page 126

A.    Uh-huh.    5:11:25PM

Q.    It's also true that you would know about    5:11:28PM
it if Intus informed you, correct?

MR. BESHAI:  Objection.  Argumentative.    5:11:35PM

A.    Intus could tell me they had access, yes.    5:11:39PM

BY MR. LEE:    5:11:41PM

Q.    At any point in the times you were working    5:11:41PM
at RTZ, did Intus ever inform you that it had user
access to PCO?

A.    I don't recall that happening.    5:11:55PM

Q.    Do you remember the email in which you    5:12:01PM
were informed by LSS/New Horizon that Intus had
gained access through user accounts?  Do you
remember that email generally?

MR. BESHAI:  Objection.  Mischaracterizes    5:12:17PM
the email.  It didn't say it gained access.  It
said they had access.

A.    Can we look at it?    5:12:24PM

MR. LEE:  Sure.  Hold on one second.    5:12:28PM

THE WITNESS:  I don't remember what    5:12:31PM
number.

MR. LEE:  That would be Exhibit 148.    5:12:34PM

BY MR. LEE:    5:12:44PM

Q.    Exhibit 148 is dated September 25, 2024.    5:12:44PM
Do you see that?    5:12:48PM

Page 127

A.    I do.                                          5:12:50PM

Q.    You write, "Yesterday I spoke with LSS/New    5:12:52PM

Horizons, they mentioned that they this created

accounts for Intus in PCO, but had since disabled

them."

      Do you see that?                              5:13:05PM

A.    Yes.                                           5:13:05PM

Q.    Are you aware of any instance in which         5:13:06PM

Intus informed RTZ that it had obtained accounts

from LSS?

A.    No.                                            5:13:18PM

Q.    Mr. Beshai showed you, or at least            5:13:20PM

explained to you that RTZ in September of 2022

issued a cease and desist demand asking Intus not to

access PCO without RTZ's written consent.

      Do you remember that?                          5:13:38PM

A.    I recall that.                                 5:13:39PM

Q.    This is almost two years later in             5:13:44PM

September of 2024.  Are you aware of any instance

between September 2022 and September 2024 of Intus

providing notice to RTZ that it had obtained access,

direct access to PCO?

      MR. BESHAI:  Objection.  Asked and            5:14:13PM

answered.

A.    For some of that period of time, I was not    5:14:17PM

Page 128

employed by RTZ, so I wouldn't have known.

But my time of employment at RTZ -- Intus    5:14:22PM
did not bring to my attention that they had an
account.

Q.    Are you aware of whether Intus ever    5:14:32PM
informed RTZ that Senior Care Partners had provided
user accounts to Intus representatives?

MR. BESHAI:  Objection.  Lacks foundation.    5:14:46PM
And calls for speculation.  I don't know that
answer.

BY MR. LEE:    5:15:02PM

Q.    Mr. Beshai asked you whether you were    5:15:02PM
aware of Intus exploiting access to PCO to "rip it
off."

Do you remember generally that question?    5:15:12PM

A.    I do.    5:15:15PM

Q.    Is it fair to say that you don't know what    5:15:17PM
Intus was doing with its access to PACECare?

A.    I don't know what they did.    5:15:28PM

Q.    So, in other words you don't know where    5:15:30PM
they may have gone within PACECare once they had SCP
login accounts, correct?

A.    I don't know that.    5:15:39PM

Q.    You don't know how long they would have    5:15:41PM
stayed in the system; do you?

Page 129

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

A.    No.    5:15:45PM

Q.    You didn't have check-ins with them to get    5:15:49PM
an understanding as to all of the different areas
that they may have gone using those SCP login
accounts, right?

A.    I don't recall discussing that with them.    5:16:00PM

Q.    So, fair to say that you have no idea what    5:16:02PM
Intus was using the user account access for PACECare
for, correct?

A.    I don't.    5:16:16PM

Q.    Looking at Exhibit 144.    This is the email    5:16:26PM
in which you are sending an excerpt of the data
integration addendum that Intus had provided to you
when it was discussing a new form of access to
PACECare.

Do you remember that?    5:16:54PM

A.    I remember reviewing this, yes.    5:16:56PM

Q.    Mr. Beshai didn't ask you about this new    5:17:01PM
form of access that Intus had proposed.    From other
witnesses in this case, my understanding is that
Intus came up with the system whereby the Pace
organization customer would log their own login
credentials into Intus's data analytics software,
which would then reinstate the automated data
extract.

Page 130

Is that consistent with your understanding?

MR. BESHAI:  Objection.  Lacks foundation. Calls for speculation.

A.    It seems vaguely familiar related to this email.

BY MR. LEE:

Q.    So, in other words, prior to the cease and desist letter from RTZ, Intus would gain access to PACECare by getting login credentials of its own issued by the Pace organization, correct?

A.    That is correct.

Q.    And, in fact, that's what Tim Cooper for SCP provided to Intus?

A.    Yes.

Q.    And then the cease and desist letter comes out and Intus is asked to stop accessing PCO and as a response to that you started providing manually-generated reports to Intus, correct?

A.    That's correct.

Q.    And by providing the manually-generated reports to Intus, Intus was able to provide its data analytics services to SCP, correct?

A.    Yes.

Q.    In other words, the manner of data

5:17:33PM
5:17:37PM
5:17:42PM
5:17:46PM
5:17:47PM
5:18:03PM
5:18:04PM
5:18:10PM
5:18:11PM
5:18:29PM
5:18:31PM
5:18:48PM
5:18:49PM

Page 131

exchange between SCP and Intus didn't impair Intus's ability to provide the services that you had contracted for, correct?

MR. BESHAI:  Objection.  Vague as to impair.  Vague as to manner.  Lacks foundation. Calls for speculation.                              5:19:03PM

A.    When we started providing the data manually on whatever frequency we decided, we could still get the analytics from Intus.            5:19:11PM

BY MR. LEE:                                        5:19:22PM

Q.    In other words, there wasn't any difference between the analytics services you were getting with automatic extract versus the manual report extract, correct?                          5:19:22PM

A.    Correct.                                5:19:36PM

BY MR. LEE:                                        5:20:00PM

Q.    You mentioned that as part of the manual extract process, SCP's clinical staff wouldn't be generating those reports, correct?           5:20:00PM

A.    No, I would have had that done on my team.    5:20:13PM

Q.    So, in other words, it wasn't a burden on the clinical staff to provide manual reports to Intus, correct?                            5:20:16PM

A.    Correct, the burden would have been on the administrative team.                        5:20:25PM

Page 132

(Discussion off the record.)    5:20:30PM

BY MR. LEE:    5:22:11PM

Q.    Hopefully you can see what's on the screen    5:22:11PM
here.

A.    Okay, I can see.    5:22:15PM

Q.    So for the record, I'm showing you what    5:22:19PM
has been marked as Exhibit 154.  This is an email
thread between Alex Lueth and Evan Jackson and
others and it carries the Bates stamp numbers --

MR. LEE:  Oh, I'm sorry, my apologies, we    5:22:36PM
don't have to re-mark this as an exhibit.  This
was already marked as Exhibit 37.  My
apologies.  We can fix that on the record
later.

BY MR. LEE:    5:22:54PM

Q.    I will take you to the bottom of    5:22:54PM
Exhibit 37.  And this is an email from Bailey
Dahlgren from Intus to a number of folks, including
Tim Cooper and you.

"During this call, Intus will share more    5:23:16PM
specific details on the process as well as a
review" -- I'm sorry -- "as well as review a brief
addendum to your contract that outlines the process
for securing accessing your data."

And then on April 26, 2023, Mr. Evan    5:23:37PM

Page 133

866-299-5127          calendar-ca@veritext.com          www.veritext.com

Jackson writes to you and Tim states, "It was great to connect with you today.  We are excited to resume automation of your data pipeline."

Now, a few moments ago we talked about the     5:23:51PM
new proposal that Intus had presented to you as a means of accessing PACECare in order to restart the automated pipeline of data after cease and desist letter.

Do you recall that?     5:24:09PM

A.    Yes.     5:24:10PM

Q.    Do you have an understanding as to whether     5:24:10PM
or not this particular email thread that we're looking at here was a part of those discussions?

A.    It seems to be referencing the same     5:24:22PM
data -- same contract amendment.

Q.    Meaning the data integration addendum?     5:24:30PM

A.    Correct.     5:24:34PM

Q.    Mr. Jackson goes on to write, "Per our     5:24:35PM
conversation, I have attached a brief data integration addendum for your review and signature. Once this is completed, Alex" -- presumably Alex Rothberg -- "will update your designated IntusCare representative's instance to give you the ability to start the automated pipeline.  As soon as these two items are completed, your system will be back up and

Page 134

running," exclamation mark.

Do you see that?    5:25:04PM

A.    Yes.    5:25:05PM

Q.    You respond on May 8, 2023, "Hi, We are    5:25:07PM
not comfortable using a current staff's credentials
to login for other purposes.  This can create
compliance issues and put Tim (or other staff
member) at risk.  We are trying to brainstorm
alternative ideas - we will get back to you next
week sometime."

Can you explain why you weren't    5:25:33PM
comfortable with Intus's new proposed method of
accessing PACECare?

A.    This email implies, and from my    5:25:46PM
recollection, they were asking us to have one of our
staff member put their credentials in somewhere
Intus would use their credentials.  I wasn't
comfortable with that as our compliance officer,
one, putting Tim at risk, and then other, the
organization at risk.  So I didn't -- ever since
I've gone through healthcare, you never give your
credentials to someone else.  So that was concerning
to me.

Q.    And you mentioned that this can create a    5:26:22PM
compliance issue.  Is the compliance issue that you

Page 135

were talking about that shared use of login credentials?

A.    Yes, if something happened or was done    5:26:36PM inappropriately using -- if someone else were using Tim's account, and they used it inappropriately, that would come back on Tim.  And I wasn't willing to put my staff members at risk and break HIPAA.

Q.    Is it your understanding that you, in your    5:26:56PM capacity as an employee at SCP, rejected Intus's proposal of using the login credentials of your employee to access PCO?

A.    Yeah, I think this email is me saying we    5:27:19PM don't want to move forward with that option.

Q.    Ms. Lueth, did Intus ever tell you that    5:27:29PM when it had login credentials to a Pace organization's system, login credentials that that Pace organization provided to Intus, that multiple Intus employees would share that login credential?

MR. BESHAI:  Objection.  Relevance.    5:27:51PM

BY MR. LEE:    5:27:55PM

Q.    You can answer.    5:27:56PM

A.    I was never told that.    5:27:57PM

Q.    Would that concern you?    5:27:58PM

A.    Like I said, in systems in healthcare, you    5:28:01PM use your own credential and you don't share them.

Page 136

So I would never do that personally.

Q.    If you had been made aware that Intus was sharing the SCP login credentials that had been issued to an individual, what would your reaction have been?    5:28:14PM

MR. BESHAI:  Objection.  Incomplete hypothetical.    5:28:30PM

A.    I don't know.  I probably would have had concern with that, just like internally if someone told me they sharing -- a staff member told me they were sharing their credentials, I would have had concern about that.    5:28:38PM

BY MR. LEE:    5:28:48PM

Q.    Do you view that type of sharing of unique login credential amongst multiple individuals to be a security issue?    5:28:48PM

MR. BESHAI:  Objection.  Vague as to security issue.  Calls for a legal opinion.    5:28:56PM

A.    No, I don't know what security -- it violates HIPAA, which is as far as I can go on that.    5:29:01PM

BY MR. LEE:    5:29:14PM

Q.    In other words, it would implicate HIPAA concerns, correct?    5:29:14PM

A.    Correct.    5:29:18PM

MR. BESHAI:  Objection.  Calls for a legal    5:29:18PM

Page 137

conclusion.  Vague as to HIPAA concerns.

BY MR. LEE:                                                    5:29:42PM

Q.    Mr. Beshai touched on this a bit in his          5:29:42PM
examination the reasons why Senior Care Partners
terminated its relationship with Intus.  I wanted to
make certain that I understood.

Did your decision to terminate the                     5:29:57PM
contract with Intus have anything to do with RTZ at
all?

A.    I don't remember the specifics, but             5:30:09PM
generally speaking I recall that I was having a hard
time getting my end users to use the system.  And so
as we do with all of our systems, you know, we would
do a review, and at some point I couldn't get my
interdisciplinary team, clinical teams, to use
Intus's solution as much as I wanted them to.

Q.    Did you have an understanding as to why          5:30:36PM
your clinical teams weren't using it?

A.    I think they just weren't seeing the value       5:30:45PM
in it.  Part of that they weren't putting in the
right information into the EMR to get it back, like
social, I couldn't get them to put that in the
diagnosis list.

So I couldn't get my team, it was really,              5:31:01PM
you know, highly reflective of my team's lack of use

Page 138

of the product.

Q.   And it was this team's lack of the use of     5:31:13PM
the product which ultimately drove your decision to
no longer use the Intus solution; is that correct?

A.   Correct.     5:31:24PM

MR. LEE:  That's all I have.  Thank you.     5:31:27PM

MS. KOTIYA:  I don't think I have any     5:31:33PM
clarifying.

MR. BESHAI:  I have a brief followup on     5:31:53PM
this.  Can you put it back up?   This will be
brief.

MR. LEE:  Sure.     5:31:59PM

REDIRECT EXAMINATION     5:31:59PM

BY MR. BESHAI:     5:32:08PM

Q.   Ms. Lueth, at any point after this email     5:32:11PM
where you told Intus that you didn't want to share
credentials, did they ever access PACECare with
Senior Care credentials, without your permission?

A.   Not to my knowledge.  I don't know.  I     5:32:30PM
don't recall looking.

MR. LEE:  Late objection.  Calls for     5:32:39PM
speculation.

BY MR. BESHAI:     5:32:42PM

Q.   To your knowledge, did you ever become     5:32:43PM
aware of unauthorized access using a

Page 139

Senior Care Partner's credentials by Intus?

A.    Not to my recollection, no.                          5:32:57PM

        MR. BESHAI:  I have nothing else.                   5:33:03PM

        MR. LEE:  Nothing else on my end.                  5:33:10PM

        MS. KOTIYA:  No questions on my end.  No            5:33:15PM

clarifying questions on my end.

        VIDEOGRAPHER:  We are off the record at            5:33:25PM

5:33 p.m. and this concludes today's testimony

given by Alexandria Lueth.  The total number of

media used was four and will be retained by

Veritext Legal Solutions.

        MR. BESHAI:  Can I get a rough?                     5:34:02PM

        MR. LEE:  I will take one as well.  Thank           5:34:09PM

you.  My email address is dlee@nossaman.com.

        (The deposition concluded at 5:33 p.m.)

Page 140

CERTIFICATE OF OATH

STATE OF COLORADO

I, the undersigned authority, certify

that ALEXANDRIA LUETH REMOTELY appeared before me

and was sworn on the 28th day of April, 2026.

Signed this 3rd day of May, 2026.

KIMBERLY FONTALVO

Notary Public, State of Colorado

My Commission No. 20214007135

Expires: 2/23/2029

Page 141

CERTIFICATE OF REPORTER

STATE OF COLORADO

I, Kimberly Fontalvo, Realtime Stenographer, (NCRA 028421), in and for the State of Colorado, do hereby certify:  That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings were made by me using machine shorthand, which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof; that before the completion of the deposition, review of the transcript was requested.

I further certify that I am neither financially interested in this action, nor a relative or employee of any attorney or any of the parties hereto.

KIMBERLY FONTALVO

Page 142

ALEXANDRA LUETH c/o skotiya@mcguirewoods.com

The above referenced transcript has been completed

by Veritext Legal Solutions and review of the

transcript is being handled as follows:

Per federal read and sign requested, FRCP

30(3)(1)(b)  - Locked PDF transcript.  The witness

should review the transcript and make any necessary

corrections on the errata pages included below,

noting the page and line number of the corrections.

The witness should then sign and date the errata and

penalty of perjury pages and return the completed

pages to all appearing counsel within the period of

time determined at the deposition provided by the

federal rules.

Page 143

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

ALEXANDRIA LUETH

PAGE     LINE        CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____              _____

Date                              ALEXANDRIA LUETH

Page 144

**[028421 - 2:17]**

| 0 |
|---|
| **028421**  7:15 142:6 |

| 1 |
|---|

**1**  1:7 6:12 8:11 143:9
**10**  1:7 38:17 71:6 76:18,23 90:1 116:22 119:10
**101**  5:3
**103**  5:4
**105**  5:5
**106**  5:6
**108**  5:7
**11**  47:10 50:9 56:13 57:14,16
**1132**  6:18
**12**  11:12 39:19 40:2,2,3 81:10 88:3 104:15,17
**120**  3:5
**12th**  105:7
**13**  37:14
**130**  4:4 21:10 25:10
**1300**  2:13
**131**  4:5 25:15 25:17
**132**  4:6 31:22 31:23 120:14
**133**  4:3,7 34:8 122:9 123:13 124:7

**134**  4:8 38:22 39:3
**135**  4:9 41:23
**136**  4:10 46:12
**137**  4:11 48:15 48:16
**138**  4:12 49:22 49:23 117:9,14 125:3,24
**139**  3:6 4:13 59:8 126:3
**14**  68:15
**140**  4:14 61:14 62:10
**141**  3:7 4:15 64:11
**142**  3:7 4:16 65:2
**143**  3:8 4:17 66:13,14
**144**  3:8 4:18 71:11 130:11
**145**  4:19 75:17
**146**  4:20 80:10
**147**  5:1 85:16
**148**  5:2 96:23 127:22,24
**149**  5:3 101:16
**15**  76:25 90:1
**150**  5:4 103:16
**151**  5:5 105:14
**152**  5:6 106:24 106:25
**153**  5:7 108:5

**154**  133:7
**16**  67:23
**18**  64:14 65:13
**1:18**  1:17 6:2

| 2 |
|---|

**2**  8:21 38:24 74:15 75:4 97:14 108:25
**2/23/2029**  141:25
**20**  116:19
**2005**  10:14,20
**2012**  10:10,16 10:20,22
**2015**  14:13,14
**2018**  9:17,24 10:14
**2019**  14:16
**2020**  79:17
**2021**  14:14 17:12 34:24 35:11 37:14 39:6,9,12,19 40:3,3 49:25 57:19 61:17,19 63:3
**20214007135**  141:24
**2022**  61:19 63:3,12 68:15 75:23 79:18 128:13,20
**2023**  71:16 73:20 79:17 80:18 81:4

85:11 133:25 135:4
**2024**  11:11 77:13,14 80:20 86:11,12 90:5 94:24 95:2,5 97:7 104:1,15 104:23 105:10 107:24 127:24 128:19,20
**2025**  79:18 95:10,12 109:16 110:25 115:14 116:11
**2026**  1:16 6:3 141:12,14
**2049**  2:4
**21**  4:4 11:24
**22**  73:8,8,12,13 84:15
**23**  34:24 73:14 81:1,2
**24**  11:24 81:1
**25**  4:5 127:24
**26**  35:11 71:16 74:12,21 133:25
**27**  39:6
**28**  1:16 6:3
**28th**  141:12
**2:05**  38:20,21
**2:17**  38:21 39:1

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[3 - action]**

| 3 | | |
|---|---|---|
| **3** 117:4 143:9 | | |
| **30** 116:19 143:9 | | |
| **31** 4:6 80:18 85:11,24 | | |
| **3190** 141:21 142:24 | | |
| **34** 4:7 | | |
| **34th** 2:8 | | |
| **37** 4:3 133:12 133:17 | | |
| **38** 4:8 | | |
| **3:21** 77:3,4 | | |
| **3:38** 77:4,6 | | |
| **3rd** 141:14 | | |

| 4 |
|---|
| **41** 4:9 |
| **46** 4:10 |
| **48** 4:11 |
| **49** 4:12 |
| **4:24** 6:18 |
| **4:42** 117:1,2 |
| **4:56** 117:2,5 |

| 5 |
|---|
| **5** 74:23 |
| **50** 2:8 |
| **59** 4:13 |
| **5:33** 1:17 140:8 140:15 |

| 6 |
|---|
| **6** 49:25 56:14 57:1,4 61:16 |

| 61 | 4:14 |
|---|---|
| **64** | 4:15 |
| **65** | 4:16 |
| **66** | 4:17 |

| 7 |
|---|
| **7** 3:5 |
| **71** 4:18 |
| **75** 4:19 |

| 8 |
|---|
| **8** 104:1 135:4 |
| **80** 4:20 |
| **85** 5:1 |

| 9 |
|---|
| **9/12/2021** 49:20 |
| **90067** 2:4 |
| **94111** 2:9,14 |
| **96** 5:2 |

| a |
|---|
| **abeshai** 2:5 |
| **ability** 18:21 37:25 52:21 53:13 63:14 87:18 132:2 134:23 |
| **able** 13:18 20:9 23:9,18 51:4 52:10 54:8 55:3,6 56:16 58:5 74:24 98:19 103:9 104:7 125:8 131:22 |

**above** 143:2
**accepting** 85:19
**access** 28:18 29:16 32:3 36:1,5,15,19,22 36:25,25 37:1 37:7,20 39:16 50:15,17,22 51:1,9,16 52:1 52:6,13,14,19 52:24 53:15,17 54:23 55:3,6 56:7,10 57:8 58:14,19 59:12 59:13,17,18 60:11,13 62:15 62:24 63:5,15 65:18,25 66:4 70:23 72:16 79:22 83:18 84:19,25 96:7 99:19 101:20 101:21 102:23 104:23 105:10 107:22 117:24 120:22 122:17 123:14,21 124:1,4,9,14,18 124:18,23 125:2,5 126:19 126:21 127:5,9 127:13,16,17 128:15,21,22 129:13,18

130:8,14,19 131:9 136:11 139:17,25
**accessed** 19:19 97:15,20,25 98:7,20 99:1
**accessing** 29:1 29:17,25 68:16 72:25 73:1 99:7,10 101:5 103:6 131:17 133:24 134:6 135:13
**accommodate** 121:6 124:14
**account** 59:23 60:6 98:1,4,24 99:2,11,17 100:10,13,24 101:3 114:20 126:10 129:4 130:8 136:5
**accounting** 9:12 10:4,19 14:2 119:19
**accounts** 97:12 97:14,19 98:6 126:16,19 127:13 128:4,9 129:7,22 130:5
**accurate** 142:14
**act** 31:15
**action** 6:23 85:3 142:19

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[active - answer]

active 101:25
actual 50:23
actually 32:8
  77:21 83:13
  117:12 123:4
  126:15
acuity 15:13
add 48:7 56:1
added 43:5
addendum
  130:13 133:23
  134:16,20
adding 87:24
  88:14
additional
  68:17 86:6
  110:11,12
  122:22
address 8:6,9
  19:13 98:23
  110:4 116:8,12
  140:14
addresses
  116:5
addressing
  8:11
administer
  16:8 50:13
administered
  12:15 13:5
administers
  17:3
administration
  9:15,18

administrative
  12:17 13:6,17
  24:13 132:25
administrator
  1:25
administrators
  9:20
adult 13:14
affiliations 7:4
affirm 7:18
afternoon 6:1
  7:25
ago 21:25
  30:19 41:20
  43:21 113:25
  116:10 119:14
  134:4
agree 6:11
  48:24 67:20
  105:21 112:8
agreement
  71:19 74:16
  103:3,7
agreements
  53:8
ahead 24:21
  40:22 46:14
  60:5 69:21
  83:9 107:15
aim 93:7
al 6:16
alert 68:2
alex 20:12
  35:12,18 37:17
  37:20 39:12

59:23 60:7,11
  60:13 90:24
  122:11 126:17
  133:8 134:21
  134:21
alex's 59:23
  60:3 126:10
alexandra
  143:1
alexandria
  1:13 6:13 7:11
  38:24 117:4
  140:9 141:10
  144:3,25
allow 104:7
alternative
  135:9
alternatives
  36:4,14
ambiguous
  36:25 40:6
  53:20 54:21
  55:11 66:7
  70:5 93:10
  109:8 110:13
  112:12,23
  114:5 115:19
amendment
  134:15
amount 15:10
  15:11,12,16
  86:7
analysis 20:11
  20:21 23:13,25
  24:6 27:12

93:20
analytics 20:20
  20:22 22:15
  23:24 24:5
  27:8,11 28:6
  29:2 30:4
  31:17 36:23
  37:8 44:1,21
  45:15,21 51:23
  56:12 57:10
  58:1,15 63:15
  89:2,9,9,15
  90:6,12 91:6
  91:22 92:4,9
  92:13,17,18
  93:6,15 94:10
  118:17 122:22
  130:23 131:23
  132:9,12
analyze 18:22
  19:4 26:12
  28:17
analyzed 26:4
analyzing 28:3
andrew 2:5 7:6
  13:2
angeles 2:4
answer 8:13,14
  8:20,20 9:6
  12:21 13:1
  18:5 19:8
  20:16 23:20
  45:18 53:6,7
  55:12 60:2
  69:3 70:7 75:6

**[answer - aware]**

82:18,19 92:2 94:1 96:17 101:10 109:10 109:22 110:15 115:21 119:1 121:12 129:10 136:21

**answered** 9:5 128:24

**anybody** 79:15 95:21,25 119:25

**api** 32:5,8 33:7 33:10,13,22 34:3 120:19,23 120:25 121:3 121:17 122:14 122:25 123:1,4 123:5

**apologies** 133:10,13

**apologizes** 68:7 68:10

**apology** 68:12

**appeal** 74:3 87:19

**appealed** 17:21 87:14

**appealing** 14:7

**appear** 39:20 86:1

**appearance** 7:2

**appearances** 2:1 7:4

**appeared** 55:14 55:19 141:10

**appearing** 143:21

**appears** 51:24 74:22 85:18,20 123:13

**appreciate** 35:19

**appreciated** 14:4

**approach** 74:8 75:7 117:20 125:15

**approached** 57:8,11 63:4 73:24 77:24 81:7 83:3

**approaches** 40:23 57:24

**approximately** 17:12

**april** 1:16 6:3 34:24 35:11 39:7 57:19 71:16 73:14,20 74:12,21 133:25 141:12

**area** 78:11

**areas** 130:3

**argumentative** 127:4

**arm** 13:7

**asked** 9:4 29:17 29:18,19,22

33:10 34:2 35:7 37:3,4 38:15 41:8,14 41:18 52:13 63:2 64:3 74:12 77:24 84:2,15 90:15 90:18,19 91:5 99:9,14 103:4 124:3,4 126:20 126:22 128:23 129:12 131:17

**asking** 19:10,11 21:20 33:7 34:2 36:11 47:19 50:14,25 51:8 55:1 59:23 69:8,11 69:18 70:13 80:5 85:5,6 117:14 120:18 121:1,2 122:2 123:25 125:4 128:14 135:15

**asks** 105:24

**aspects** 16:8

**assigned** 78:10

**assist** 24:1

**assistance** 35:20

**assisting** 28:2

**associated** 100:25

**associates** 1:7 6:15 7:13

120:7

**assuming** 60:7

**attached** 134:19

**attention** 62:25 107:21 129:3

**attorney** 7:5 8:11 120:6 142:20

**audio** 6:9

**auditing** 88:17

**auditor** 9:25 14:1

**authority** 141:8

**authorized** 101:6

**automated** 46:3,5 72:22 74:7 130:24 134:7,24

**automatic** 132:13

**automation** 134:3

**available** 81:24 120:13

**average** 87:12

**avoid** 32:13

**aware** 54:23 68:20 78:20,25 92:3 98:9 103:2 104:22 105:6 115:14 118:19 123:3,6 123:24 128:8

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[aware - breach]**

128:19 129:5
129:13 137:2
139:25

**b**

**b** 143:9
**back** 19:1,13
20:1 25:7
30:21 31:1
38:17,25 56:21
63:2,17 66:21
75:22 77:5,8
79:19 80:6
84:14 86:5
93:13 94:16
102:20 111:8
116:22 117:5,7
119:18 121:15
121:16 134:25
135:9 136:6
138:21 139:10
**backdrop**
35:24
**background**
9:9
**bailey** 133:17
**banners** 111:25
**base** 87:25
**based** 15:13
27:8 36:19
47:17 50:8
92:13,16,23
112:8 119:20
120:9
**basically** 28:19
32:9 98:12

**basis** 23:9
**bat** 8:11
**bates** 133:9
**beard** 113:20
**began** 16:25
110:12
**beginning** 7:5
38:23 54:4
77:13,14 86:22
94:15 117:3
120:5
**behalf** 2:2,7,11
7:7,10
**behave** 106:13
**believe** 26:1
29:19 42:22
45:23 63:16
67:18 73:14
77:13 98:8
104:16
**belong** 54:17
**belonged** 53:10
53:14
**belonging**
53:18
**belongs** 53:1,9
**benefits** 24:3
**beshai** 2:5 3:5,6
7:6,6,23 13:3
13:23 18:6,7
19:12 20:19
21:4,15 23:16
23:19,23 25:5
25:8,11,16
26:18 28:1,16

29:12 31:21,24
34:6,11,18,20
36:9 37:2,5,13
38:15 39:2,5
39:22 40:1,10
40:13 41:12,22
41:24 42:2
44:6 45:2,3
46:1,15 48:14
48:17 49:9,12
49:17,21,23
50:1 53:5,12
53:23 55:2,17
57:3 59:7,10
60:8 61:1,12
61:15 62:6,9
64:12,15,23
65:3 66:11,15
69:5,11,15,19
69:22 70:10
71:2,5,9,13
72:9,23 75:15
75:19 76:5,18
77:7 78:15,19
79:25 80:8,11
82:15,22 83:8
84:22 85:15,17
92:22 93:12
94:22 96:19,24
101:12,15,18
103:14,18
105:13,19
106:15,24
107:2 108:2,6
109:13 110:1,8

110:9,21
112:17 113:5
114:8 115:24
116:18 117:6
119:21 120:11
121:9 122:10
123:15 126:20
127:4,15
128:12,23
129:8,12
130:18 131:3
132:4 136:19
137:6,17,25
138:3 139:9,14
139:23 140:3
140:12
**best** 125:14
**better** 88:5
**bias** 82:16
**bit** 9:8 34:9
138:3
**blame** 21:24
**blockage** 83:21
**blocking** 79:3
79:22 83:17
**bore** 116:15
**bottom** 103:19
133:16
**boulevard** 2:4
**brainstorm**
135:8
**brand** 90:7
**breach** 61:21
71:22

Veritext Legal Solutions
866-299-5127   calendar-ca@veritext.com   www.veritext.com

**[breaches - certain]**

| | | | |
|---|---|---|---|
| **breaches** 95:19 | **calls** 8:17 19:6 | 22:14,22 26:22 | 118:23 129:6 |
| **break** 9:1,3,5 | 26:17 29:4 | 27:5 28:15 | 138:4 139:18 |
| 34:17 38:16,17 | 36:7 41:10 | 29:2,10,16,17 | 140:1 |
| 39:6 71:6 | 53:21 54:21 | 29:25 31:7 | **care's** 96:10 |
| 76:19,22 | 55:9 60:19 | 32:22 33:1,4 | **career** 87:12 |
| 116:22 136:7 | 70:25 96:14 | 33:20 37:21 | **cares** 12:8 |
| **brief** 133:22 | 106:10 109:21 | 38:1 42:19 | **caring** 18:14 |
| 134:19 139:9 | 115:20 121:9 | 44:20 45:14 | **carries** 133:9 |
| 139:11 | 123:15 124:21 | 47:9,14 48:6,9 | **carry** 14:20 |
| **briefly** 12:3 | 129:9 131:4 | 50:23 51:1 | **case** 1:2 6:17 |
| **bring** 78:1 90:3 | 132:6 137:18 | 52:7,22,25 | 84:12 103:3 |
| 117:23 129:3 | 137:25 139:21 | 53:2,9,16,24 | 120:6,7 130:20 |
| **bringing** 118:1 | **camera** 6:6 | 54:19,24 55:23 | **categories** 79:2 |
| **brought** 62:25 | 21:19 | 57:2,9,15,16,21 | 113:11 |
| 102:11 107:21 | **capabilities** | 57:25 58:4 | **caught** 91:25 |
| **build** 33:15,15 | 53:25 | 59:12,13,14,18 | **caused** 99:18 |
| 123:19 | **capacity** 136:9 | 62:15 64:1 | 107:22 |
| **buildings** 13:9 | **capitated** 12:7 | 68:16 70:23 | **cease** 29:22 |
| **burden** 24:24 | 15:7,9 | 72:16 73:1,5 | 65:24,25 68:20 |
| 132:21,24 | **capture** 88:20 | 76:8 77:10,16 | 79:22 128:14 |
| **business** 80:4 | **capturing** | 77:22 78:6 | 131:8,16 134:7 |
| 122:25 | 112:16 | 80:16,17,25 | **center** 2:13 |
| **c** | **care** 1:4 10:7 | 81:3,6,10 | 13:14 14:22 |
| **c** 2:9 143:1 | 10:16,23,24 | 82:12 86:14,15 | 16:3 32:23,23 |
| **ca** 2:4,9,14 | 11:2,5,25 12:6 | 86:24 88:12 | 32:25 78:8 |
| **california** 1:1 | 12:9,16,18 | 89:1 93:8,16 | **center's** 23:5 |
| 2:8 6:17 81:18 | 13:6,7,15,16,20 | 95:22 96:2,6 | **century** 2:4 |
| **call** 28:9 33:6 | 13:24 14:4,9 | 97:20 98:21 | **ceo** 11:7 14:12 |
| 100:4 120:18 | 14:19,25 15:25 | 99:1,7,21 | 14:15,16,18 |
| 120:24 133:20 | 15:25 16:1,2,3 | 101:5,21,21 | 40:19 |
| **called** 17:1 28:7 | 16:8,12,12,23 | 102:23 103:6 | **cer** 107:5 |
| 92:10 118:24 | 17:6,10,19,21 | 105:10 109:12 | **certain** 8:12 |
| **calling** 28:8 | 18:1,2,9,10,14 | 109:17 110:17 | 15:10 44:22 |
| 87:2 | 19:3,16,17 | 111:1,8,12 | 99:17 138:6 |
| | 20:2,5,13,21,22 | 112:3 114:2 | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

[certificate - complaints]

**certificate** 3:7,7 141:1 142:1
**certify** 141:8 142:7,18
**cetera** 12:19 27:4 43:11 79:4
**cfo** 14:9 119:18
**challenge** 78:7 78:14
**change** 38:1 55:7,13,18,22 55:25 77:23 91:9 114:15,16 115:10 144:5
**changed** 114:20
**changes** 144:2
**changing** 114:17,21
**characteristics** 93:1
**charge** 11:19 63:24 102:10
**chart** 52:8 55:1
**charts** 54:10
**cheaper** 15:3,4 15:19
**check** 40:20 126:25 130:2
**chief** 11:6
**chose** 98:15
**chosen** 17:22
**clarification** 59:15 110:20

**clarify** 19:15 60:12
**clarifying** 139:8 140:6
**clarity** 69:8
**clear** 50:22
**client** 53:9 66:2 67:2 87:25 98:14 99:4 100:4 126:23
**clients** 14:2,2 52:23 54:14 88:5 99:24 100:8 106:5 111:4
**clinic** 9:20 12:17 13:14
**clinical** 24:8,14 26:24 27:4 30:9 63:20 132:18,22 138:15,18
**clinicians** 52:10
**clinics** 13:8
**close** 34:14 75:23 83:12
**closer** 41:5
**code** 13:9 55:3 55:15
**collabrios** 95:7 95:9,11,15 107:25 108:9 108:14,14,21 108:22,24 109:1,11,16,24

110:11,16,25 114:14 115:7 116:8,16 118:3 118:12 119:13 119:15
**collabrios.com** 110:7 116:1
**colleagues** 32:21 108:20 116:3,4
**college** 9:11
**color** 55:23
**colorado** 141:4 141:23 142:3,6
**columns** 111:24
**come** 13:13 38:17 46:3,18 68:24 87:2,7 103:9 116:22 136:6
**comes** 26:22 27:2 131:16
**comfortable** 36:1 135:5,12 135:18
**coming** 15:5 34:14 41:1 63:6 74:1 106:12
**commented** 118:9
**comments** 70:8
**commission** 141:24

**committee** 90:23,25
**common** 33:12 112:14 118:8
**commonalities** 112:10,13 114:13
**commonly** 118:7
**communicate** 66:10 84:14
**communicated** 122:16
**communication** 61:20,24 62:1 62:3
**companies** 76:7 79:9
**company** 16:23 16:25 17:2,6 22:15 26:1 104:12 108:21 109:12,15 110:10 119:16
**comparison** 89:17
**compete** 78:10
**competitor** 119:6,8
**complain** 100:25 101:4
**complaint** 118:16
**complaints** 114:23 118:4,7

Page 7

**[complaints - correct]**

118:13
completed  40:5
134:21,25
143:2,19
completion
142:15
complex  101:9
compliance
11:19 52:3
88:17,18,21,23
89:23 135:7,18
135:25,25
compound
12:20,25 101:9
compromised
61:25
computer  32:9
computers
32:12 33:17
concern  16:20
38:4 63:1 67:1
136:23 137:9
137:12
concerned  49:5
concerning
135:22
concerns  38:12
62:3 99:11
137:23 138:1
concluded
140:15
concludes
140:8
conclusion
109:21 115:20

138:1
conducted  6:5
confident
104:18
confirm  39:22
74:24 99:15
confused  85:21
confusing
60:10 101:9
connect  134:2
connected
31:14,16 98:23
connecting
35:10
connection  6:7
consent  68:17
128:15
consistent
131:1
consume  123:1
consuming
122:24
contact  82:3
continue  6:10
12:12 63:19
87:17
continued
73:15
continuing
73:4,6 75:14
continuum
44:23
contract  71:23
133:23 134:15
138:8

contracted
103:25 132:3
contracts
102:10 116:14
conversation
35:25 67:11,12
91:2 120:21
134:19
conversations
16:12 32:2
37:24 38:3
41:1,6 42:13
49:2 65:17,17
85:9 102:15
105:9,12
117:19 119:4
cooper  50:11
59:11,22 60:12
125:4 126:4,15
131:13 133:19
coordinate
75:25 76:8,12
coordinates
13:7
copied  35:15
37:18 42:7,8
59:20
core  83:17
112:10,13
correct  9:22
10:8,17,25
11:3,13 12:14
15:17,23 16:6
19:4,20,25
20:2,13 25:9

26:5,8,9,12,13
26:25 27:1,5,6
27:9,10,13,17
28:4,5,12,21
29:3 30:4,7,8
31:14,25 32:15
34:4,5 35:16
37:18,21 40:18
40:19 42:7
44:15 47:9,10
47:12,16,20
48:25 50:6,9
50:10,24 51:1
51:2,6,23 52:1
52:7,11,19
53:2,14,15,19
54:1,8,11,15,16
55:20 58:8,12
60:14,15 61:10
61:17 63:5
64:18,19 65:5
66:13 67:19
68:8 71:16
73:17 74:21
75:2,5 80:22
80:23 87:1
92:15 93:17,18
93:20,24 97:5
97:6,13,17
98:21 99:8
100:15 101:22
101:23 102:8
102:14 105:8
107:18,23
112:19 121:8

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[correct - day]**

121:23,24
122:5 123:9,14
124:15,16,19
124:25 125:6
125:22 126:1
127:3 129:22
130:9 131:11
131:12,19,20
131:23 132:3
132:14,15,19
132:23,24
134:17 137:23
137:24 139:4,5
**corrections**
143:13,15
**cost** 14:5 16:4,9
**costly** 23:6
**counsel** 6:14
7:3,13 21:11
34:13 38:15
39:18 78:21,25
80:1,6 108:4
119:23 143:21
**country** 93:3
**couple** 17:23
21:17 24:4
103:12,23,24
105:2
**course** 85:3
102:16
**court** 1:1 6:16
7:14 121:14
**crazy** 87:9,11
87:13

**create** 54:9
113:6 121:18
135:6,24
**created** 97:12
98:4 128:3
**creating** 59:22
122:4
**credential**
136:18,25
137:15
**credentials**
51:19,22 60:14
60:18 72:4,21
117:24 130:23
131:10 135:5
135:16,17,22
136:2,10,15,16
137:3,11
139:17,18
140:1
**credibility**
82:16
**cross** 3:5 120:3
**curious** 15:18
85:6
**current** 135:5
**currently**
119:12
**customer**
130:22
**customizable**
113:6
**cut** 66:4
**cv** 6:18

**d**

**d** 3:1
**dahlgren**
133:18
**daily** 46:23
**dashboard**
94:18
**data** 18:25 19:4
19:22 20:12,13
20:17 22:15,17
22:21,23 23:8
23:25 24:4,6
24:18,23,25
26:4,12,15,20
26:22 27:4,7
28:3,12,14,15
28:18,18,21
29:7,9,11,13
30:7,11,12
37:1,7,8,12
43:2,3 44:1,20
45:6,7,13,20
51:23 52:5,9
52:11 53:1,9
53:14,15 54:15
54:17 55:18,25
56:1,11,12
58:1,5,14,16,20
61:21 62:24
63:15 72:5,17
72:21 73:6
74:25 75:11,11
79:3,21 83:17
83:21 88:20,20
89:8,9,15,16,17

89:18 90:6,11
91:6,22 92:9
92:13,16,18
93:6,15,20
94:10,15,21
95:19 107:6
112:14,16,18
112:22 113:4
113:10 118:17
124:14 130:12
130:23,24
131:22,25
132:7 133:24
134:3,7,15,16
134:19
**database** 107:6
107:7
**date** 36:23
40:23 41:1
49:18 50:8
54:14 56:6
57:7,14,20,21
57:24 80:21
81:13 85:22
143:17 144:25
**dated** 35:11
80:18 127:24
**dates** 118:10
**david** 2:9 7:12
27:21 120:6
121:25
**day** 13:14
30:18 42:19
65:13 114:22
114:22 141:12

Page 9

[day - dishonest]

141:14
days 56:5 58:11
  105:3
deal 86:8
dealing 112:9
  118:3
dealings 70:15
december 81:1
  81:4 95:5
  107:24
decided 31:4
  132:8
decision 78:2
  138:7 139:3
declare 144:20
defendant 2:7
defendants 1:9
defined 86:21
degree 9:11,19
  10:14
delayed 41:18
delegated
  64:21 74:11
delegating
  74:10
deliver 16:2
demand 128:14
demo 111:16
  111:17,21
  113:1
demographics
  26:12 55:19
  113:13,15,16
  113:18

department
  11:20
departure
  77:18
depending 36:4
depends 6:6
deponent 2:11
deposed 8:2
deposition 1:12
  6:4,13 38:24
  78:22 117:4
  140:15 142:15
  143:23
depth 35:25
describe 12:3
  125:15
described 16:4
description
  86:20
designated
  134:22
desire 70:19
  121:6 124:13
desist 29:23
  65:25 68:21
  79:22 128:14
  131:9,16 134:7
details 80:16
  84:11 133:21
determine
  99:10
determined
  143:23
develop 89:1
  94:13

developed 30:6
developing
  89:12 93:19
  118:20
development
  89:15 91:20,21
  93:24 94:3,6
diagnoses
  15:14
diagnosis
  138:23
dictated 112:19
dieticians
  18:19
difference
  13:18 132:12
differences
  114:2
different 16:1
  17:23 42:1,3
  47:2 48:8
  73:25 74:1
  78:13,13 84:4
  85:22,25 86:3
  91:6 93:14
  106:4,13,22
  107:6 113:24
  115:2 130:3
differently 88:5
difficult 82:24
direct 3:5 7:22
  13:16 18:14
  44:11 128:22
directed 65:25
  68:15

direction 98:2
  125:18 142:13
directions
  97:24
directly 24:12
  29:16 42:18
  56:16,18 66:10
  102:12
director 11:8
directors 9:20
disabled 128:4
discovered
  101:4
discuss 84:10
  104:17 105:10
discussed 73:12
  79:21 88:12
  102:3 107:4
  117:21
discussing 41:7
  117:22 130:6
  130:14
discussion 21:9
  21:13 23:22
  103:17 105:17
  133:1
discussions
  37:23 38:11
  93:5 102:19
  119:11 134:13
dishonest 67:17
  68:4,12,25
  69:10,15 70:2
  70:6,12,17

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[disingenuous - emails]**

**disingenuous** 68:11
**distinct** 89:11
**distinction** 37:2 50:18
**distinguish** 50:21
**district** 1:1,1 6:16,17
**dlee** 2:10 140:14
**document** 18:15 21:5 34:16 39:2 45:17 60:1 76:3,15 80:15 108:9 113:20 144:20
**documentation** 112:15
**documents** 21:5 78:22 79:1,1
**doing** 24:8 32:16 45:19 63:24 73:8,22 74:5 77:17 88:23 115:11 115:12 119:12 119:17 121:5 129:18
**dollar** 86:7
**domain** 110:6 115:25

**doug** 102:4,6,9
**download** 29:9 72:1,11,21
**downtime** 68:2
**dozen** 21:17
**dragging** 49:6
**driven** 14:24
**dropdown** 55:14
**drove** 17:13 139:3
**due** 38:16 104:8

**e**

**e** 3:1 16:20 39:17 47:17 57:18 58:6 98:9
**earlier** 22:21 35:7 43:11 63:18 64:20 76:13 113:9
**early** 80:20 86:11 97:15
**earnestly** 36:22 37:6
**easier** 25:4
**easily** 22:17,20 88:21 90:4
**eastern** 6:2
**easy** 35:21
**edit** 37:25 52:4 53:13 54:8,14 54:18

**editing** 53:19 53:25
**edt** 1:17
**educational** 9:9
**effect** 100:6
**effectively** 122:15
**effort** 31:13 32:6,14 121:5
**efforts** 96:10
**ehr** 35:23 71:25 72:11
**either** 41:17,19 63:4 82:11 83:16 99:5 119:23
**elderly** 12:6
**electronic** 11:21 16:14 18:24 22:17 52:22
**elevate** 100:14 100:16
**email** 4:4,5,6,7 4:8,9,10,11,12 4:13,14,15,16 4:17,18,19 5:2 5:3,4,5,6 21:22 22:11 25:6,20 32:19 34:14,24 35:11,15 37:15 39:19 40:2,14 41:4,22 42:6 43:17,22 45:11 46:13 47:13

48:14 49:19 50:9 52:2,17 56:16 59:11,20 61:16 62:7,12 62:17 64:8 65:4 66:12,24 71:14 73:10 74:21 75:4,25 76:4,6,10 81:19 84:14 97:4 98:22,23 98:24 101:19 104:24 107:18 107:19 110:4 116:5,8,12 117:14,21 120:15 122:10 122:11,13 124:22 125:4 125:15,18,25 126:4,18 127:11,14,16 130:11 131:6 133:7,17 134:12 135:14 136:12 139:15 140:14
**emailed** 65:13 66:21
**emailing** 116:11
**emails** 37:24 39:7 40:25 73:12,13 82:6 84:2,12 96:20

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[emails - expedite]**

103:12
**embarcadero**
2:13
**emery** 37:18
65:5 100:21,24
122:12
**emery's** 122:13
**employed** 11:2
129:1
**employee** 33:3
84:1 95:9,13
99:1 106:1,9
136:9,11
142:20
**employees**
13:16 104:8
136:18
**employer** 82:21
**employment**
4:20 78:16
79:9 80:9
102:16 108:10
109:1 129:2
**emr** 16:13,23
17:7 18:8
23:25 32:4
47:2,6,25 48:4
48:6,12 50:13
57:5,22 119:9
119:11 138:21
**emrs** 110:12
111:15 112:9
**engaged** 24:20
31:18

**engaging** 37:7
**entail** 11:18
86:16
**enter** 59:13
144:2
**entered** 116:15
**entities** 79:22
**entitled** 8:13,21
**entity** 12:17
109:16
**er** 20:7 23:4
26:7
**errata** 3:8
143:13,17
144:1
**especially**
118:10
**esperanza**
103:20,23
106:1
**esq** 2:5,9,14
**essentially**
104:12
**established**
54:12,13 56:15
**establishing**
82:17
**estimated**
48:25 49:7
**et** 6:15 12:19
27:4 43:11
79:4
**evan** 25:22
31:25 32:3,19
33:5 34:2,3

40:14 42:9
65:13 70:18,22
120:16 126:4
126:16 133:8
133:25
**evan's** 42:6
**evening** 7:25
**event** 27:3
**events** 26:11
**eventually**
14:23
**evolution** 86:14
86:15 87:22
**exactly** 95:16
**examination**
3:4 7:22 120:3
138:4 139:13
**example** 8:8
20:4 35:9
55:22 86:4
**examples** 43:10
**excel** 22:23
**excerpt** 130:12
**exchange** 50:4
50:5 76:7,7
132:1
**excited** 22:10
22:11 35:13,18
134:2
**exclamation**
125:10 135:1
**execution** 3:8
**exhibit** 4:3,4,5
4:6,7,8,9,10,11
4:12,13,14,15

4:16,17,18,19
4:20 5:1,2,3,4,5
5:6,7 21:7,10
25:9,15 31:22
31:23 34:6,8
38:22 41:23
46:12 48:15
49:11,22 59:8
61:14 64:11
65:2 66:14
71:11 75:17
78:17 80:10
85:16 96:23
101:16 103:16
105:14 106:25
108:5 117:9,11
117:12 120:14
120:15 122:9
123:13 124:7
125:3,24 126:3
127:22,24
130:11 133:7
133:11,12,17
**exhibits** 4:1
21:12,16
120:12
**expanded**
42:22,24 43:15
43:24 45:12
56:23
**expanding**
87:25 88:12
**expecting** 50:8
**expedite** 24:18

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

## [expedited - foregoing]

**expedited** 23:13,25
**expensive** 16:2
**experience** 112:9
**experienced** 61:21
**expires** 141:25
**explain** 22:19 135:11
**explained** 128:13
**explaining** 103:24
**explains** 68:14
**exploiting** 129:13
**explore** 74:25 75:11
**export** 63:25
**exports** 42:22 42:25 43:15,19 43:25 45:12
**express** 38:4,12
**extended** 43:19
**external** 23:4
**extra** 32:18
**extract** 20:17 22:22 58:5 113:4 122:23 130:25 132:13 132:14,18
**extracted** 44:20 45:14

**extracting** 118:14

**f**

**facilitate** 39:15
**facility** 12:10
**fact** 131:13
**facts** 144:20
**failing** 110:17
**fair** 23:12,24 43:13,24 55:21 66:3 114:1 129:17 130:7
**faith** 36:18,21 87:8
**faithful** 87:8
**fall** 73:8,12 104:22 105:10
**falls** 26:7 43:11 89:22,23 93:3
**familiar** 19:24 79:5 103:19 131:5
**far** 137:20
**fashion** 23:11 94:16
**feature** 113:23
**features** 20:20 20:22 55:6 87:24 88:11 90:11 91:6,8 92:13 111:17 113:24
**federal** 143:7 143:25

**fee** 15:7
**feedback** 88:6
**feel** 37:6 68:11 80:4 88:7 102:22 115:12
**feelings** 63:12
**felt** 36:18 49:8
**felton** 25:23 126:5,16
**fewer** 107:8
**field** 55:14 113:15 118:3
**fielding** 111:3 114:23
**fields** 55:25 56:1 113:10
**figure** 36:17 37:11 65:11 103:1
**filed** 6:16
**filter** 112:22,24
**filtered** 19:21
**final** 89:5
**financial** 11:6
**financially** 6:23 142:18
**financials** 89:20
**financing** 12:7
**fine** 34:18 74:4 77:1
**fingertips** 23:1 27:24
**finish** 76:23 117:25

**finished** 11:8 116:23
**firm** 10:4,19
**first** 9:23 22:5 33:10 39:8 60:23 62:20,22 62:25 68:1 69:13 71:14 86:19 89:8 120:2 124:7
**five** 56:5 58:10
**fix** 133:13
**floor** 2:8
**focus** 113:11
**folks** 9:19 12:18 13:19 22:3 60:17 61:5 70:16 103:23,24 105:22 114:24 133:18
**follow** 105:2 120:9
**followed** 60:24
**following** 44:23 47:18 74:22
**follows** 143:5
**followup** 139:9
**fontalvo** 1:24 7:14 141:22 142:5,25
**foregoing** 142:7,9,14 144:20

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[forget - go]**

| | | | |
|---|---|---|---|
| **forget** 118:24 | **francisco** 2:9 | **g** | 51:8,18 52:13 |
| **form** 23:15,17 | 2:14 | | 56:6,11 57:8 |
| 93:6 123:7 | **frankly** 24:9 | **gain** 36:19,22 | 58:19 59:12 |
| 130:14,19 | **frcp** 143:7 | 37:7 131:9 | 60:11,13 66:1 |
| **formal** 29:24 | **free** 80:4 | **gained** 127:13 | 72:20 75:21 |
| **formerly** 88:9 | **frequency** | 127:16 | 78:16 81:12 |
| 90:12 | 76:12 132:8 | **garbled** 64:9 | 87:3,9 101:20 |
| **forth** 86:5 | **frequently** 20:6 | **general** 30:17 | 101:21,24 |
| 142:8 | 107:13 | 31:9 | 117:15 134:23 |
| **forward** 31:5 | **friday** 34:25 | **generally** 22:1 | 135:21 |
| 37:8 40:24 | **friends** 82:1,8 | 23:19 66:22 | **given** 17:15 |
| 136:13 | 82:25 | 78:25 79:3,4 | 20:8 29:16 |
| **forwarded** 3:8 | **friendship** | 127:14 129:15 | 49:5 81:9 |
| 67:19 | 82:11 | 138:11 | 140:9 |
| **found** 14:6 | **front** 42:11 | **generate** 20:2,5 | **giving** 51:22 |
| 70:18 124:11 | **frustrated** | **generated** | 59:17 72:16 |
| **foundation** | 63:11 66:9 | 131:19,21 | 83:2 126:18 |
| 19:7 26:16 | **full** 35:22 47:25 | **generating** | **glance** 27:12 |
| 44:4 45:17 | **fully** 75:24 | 132:19 | 88:24 |
| 53:4,21 54:21 | **function** 30:10 | **geographic** | **go** 6:11 8:5,22 |
| 55:10 69:2 | 55:11 64:5 | 78:9,10 | 8:23,24 9:19 |
| 70:4 92:20 | 88:7 | **geography** | 21:17 24:21 |
| 96:16 109:7 | **functionally** | 82:10 | 25:7 30:21 |
| 123:16,19 | 114:15 | **geriatric** 15:25 | 31:10 34:15,24 |
| 124:20 129:8 | **functioned** | **getting** 24:19 | 35:8,11 36:13 |
| 131:3 132:5 | 55:8 | 41:5 43:25 | 37:14,25 40:2 |
| **four** 8:24 14:23 | **fundamental** | 45:6 56:11 | 41:1,22 43:18 |
| 100:9 113:11 | 93:1 | 62:12 66:19 | 44:14,16,16,17 |
| 140:10 | **funded** 12:6,11 | 86:23 124:14 | 44:19,24,25 |
| **fourth** 78:8 | **funding** 15:1,5 | 131:10 132:13 | 46:14 47:10 |
| **fractional** | **further** 26:12 | 138:12 | 48:14 49:9 |
| 119:18 | 124:6 142:13 | **gist** 39:14 | 50:8,20 53:24 |
| **frame** 20:8 | 142:18 | **give** 7:19 8:19 | 54:7 56:6 57:7 |
| 96:20 | **future** 109:12 | 15:24 20:4 | 57:11,12,15,16 |
| | | 34:10 46:9 | 57:20,21 58:2 |
| | | 48:24 50:15,25 | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[go - historical]

58:11 60:5 64:8 69:6,21 71:14 78:3 79:19 80:6 83:9 98:15 102:5 103:19 107:15 112:14 113:4 116:19 119:15 120:2 126:10 137:20

**goal** 28:5 102:17 122:7

**goals** 16:12

**god** 87:8

**goes** 27:2 58:1 94:15 122:21 134:18

**going** 6:2 8:9 8:24 17:17 20:1 21:5,16 25:11 30:9 31:21 34:6 39:13 46:25 58:19 63:2,17 64:8 66:12 69:17 72:20 74:24 95:14 98:10 101:12 107:13 108:2 108:25 109:11 109:19 115:1,1 117:7

**good** 6:1 7:6,9 7:12,24,24 14:4 15:24

34:16 36:18,20 54:6 89:19

**gotcha** 54:5 86:2

**grab** 43:3

**graduate** 10:14

**graduated** 9:17 10:13

**graduating** 9:23

**granting** 36:5

**graphs** 28:24

**great** 43:6 95:17 115:9 117:13,18 134:1

**growing** 77:25

**growth** 14:21 14:24 78:7,9

**guess** 52:9 56:21 82:23 85:21 98:15

**guys** 126:8

**h**

**hack** 95:22

**hand** 7:16

**handled** 143:5

**hands** 24:12

**happen** 25:11

**happened** 29:20 56:8 65:11 67:1 68:22 83:6 96:12 136:3

**happening** 61:22 65:14,21 77:19 101:11 102:6 109:5,9 127:10

**happy** 30:10 34:25

**hard** 24:19 82:10 138:11

**hayes** 2:17

**head** 114:7

**heads** 65:21 66:1 79:25

**health** 9:14,18 28:12 52:22

**healthcare** 9:21 9:22 11:21,21 13:5 15:8 22:15 24:5 118:22 119:16 135:21 136:24

**hear** 12:23 20:24 23:18 46:3 95:18,25 96:9 126:22

**heard** 6:8 46:5 62:20,22 66:2 72:7 81:20 89:8 96:13,18 97:25 118:9

**hearing** 46:8

**heaviest** 48:13

**heavily** 88:15 88:16

**heavy** 82:4

**held** 11:15 38:21 77:4 117:2

**help** 19:14 23:13 39:15 51:22 70:19 74:2 86:21 88:4 89:16 96:20

**helped** 50:13 86:19 88:19

**helpful** 19:2

**helping** 32:24 86:23 98:14

**helps** 12:12,18 27:13

**hereto** 142:21

**hey** 58:18 65:14 74:15 81:20 84:23 90:24 104:6 117:23 122:13

**hi** 126:8 135:4

**hiccup** 63:11

**high** 9:9,10

**higher** 98:11

**highly** 138:25

**hipaa** 136:7 137:20,22 138:1

**hire** 81:24

**hired** 114:14

**historical** 89:17

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[hold - inherently]**

| | | | |
|---|---|---|---|
| **hold** 11:23 127:19 | **hosted** 118:21 | **implementing** 47:3 48:4,11 | **incredibly** 67:16 |
| **holds** 26:2 113:17 | **hour** 34:15 | **implicate** 137:22 | **independent** 61:9 66:24 78:4 |
| **holland** 9:11 | **hours** 8:21,24 76:20 118:10 | **implies** 67:10 135:14 | **independently** 12:13 |
| **holmes** 32:20 32:21 | **hr** 72:21,22 | **important** 18:21 40:24 66:5,8 | **individual** 137:4 |
| **home** 13:15 16:3 | **huh** 52:20 54:2 63:10 74:14 91:24 95:1 127:1 | **impression** 36:3,12,13,16 70:15 71:3 94:8 | **individuals** 137:15 |
| **honest** 80:17 | **hynes** 6:19 | **impressions** 36:19 | **industries** 118:22 |
| **honestly** 114:25 115:4 | **hypothetical** 96:15,16 137:7 | **improve** 23:14 28:3 | **inform** 88:19 98:11 127:8 |
| **hope** 8:23 9:10 16:16 24:2,17 35:24 58:3 | **i** | **inappropriately** 136:4,5 | **information** 18:8,13,22 19:1 23:2,10 23:13 27:24 28:2 35:22 36:2 38:1 39:15 41:9 52:23 69:12,25 98:17 114:12 122:23 123:1 138:21 |
| **hoped** 52:16 | **idea** 9:19 51:13 107:7 122:2 130:7 | **inboxes** 79:11 | |
| **hopeful** 32:10 32:12 | **ideal** 32:4 44:5 44:7 | **incentivized** 23:6 | |
| **hopefully** 133:3 | **ideally** 99:18 | **incident** 41:17 55:19 | |
| **hoping** 57:25 59:4 90:3,3 | **ideas** 135:9 | **incidents** 41:19 | |
| **horizon** 49:7 127:12 | **imo** 67:13,16 | **included** 39:20 78:22 143:13 | |
| **horizons** 97:11 98:4 128:3 | **impacted** 42:19 | **including** 133:18 | **informed** 29:21 68:22 99:16 127:3,12 128:9 129:6 |
| **hospital** 9:20 20:9 | **impair** 132:1,5 | **inclusive** 12:5 94:13 | |
| **hospitalization** 16:9 27:3 | **implement** 86:19 | **incomplete** 96:15 137:6 | **informing** 101:19 |
| **hospitalizatio...** 20:7 23:4 26:8 43:11 89:21 93:3 | **implementati...** 42:11 45:1 47:25 48:8 87:20 | **inconvenience** 68:8,10 | **inherently** 93:16 |
| **host** 118:25 | **implementati...** 86:18,22 | | |
| | **implemented** 47:1,5,8,11 48:7 | | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[initial - intus]**

| | | | |
|---|---|---|---|
| **initial** 22:2 38:11 47:15 60:23 | 44:12 45:13 46:2 47:23 49:3 58:12 59:3 77:15,19 117:25 130:13 134:16,20 | **interim** 45:12 **internally** 24:20 105:22 108:13,20 137:9 | 56:6,10 57:7,8 57:11,15,25 58:4,12 59:13 59:17 60:11,17 61:5 66:2 |
| **initially** 13:25 | | **internet** 6:6 | 68:15 70:15 |
| **inpatient** 16:2 | | | 71:19 72:3,16 |
| **input** 18:8,14 26:23 52:9,11 | **intellectual** 38:13 | **interpose** 109:19 | 72:25 73:6,16 73:24 75:1,11 |
| **inputs** 27:4 | **intended** 52:4 80:2 | **interruption** 63:21 | 75:25 76:7,10 76:16 77:16 |
| **ins** 47:25 130:2 | | **introduce** | 79:4,23 83:23 |
| **inside** 19:22 54:19 | **intention** 45:21 58:3 | 22:12 35:1 | 84:15,18 93:15 94:17 97:12,14 |
| **instagram** 92:5 | **interacted** | **introduced** 122:6 | 97:19,25 98:5 |
| **instance** 123:6 123:24 124:12 128:8,19 134:23 | 70:16 | **introducing** 122:4 | 98:6,12,20,24 99:1,6,10 101:1,4,21,25 |
| | **interacting** 111:24 | **introduction** | |
| | **interactions** 18:16 | 22:2 39:8 121:22 | 102:5,5,12,20 102:23 103:4,9 |
| **instruct** 56:6 | | | 103:25 104:4,7 |
| **instructed** 98:11,18 | **interdisciplin...** 138:15 | **intus** 1:4 22:15 23:9,24 24:7 | 104:16,23 105:4,11 106:1 |
| **instructions** 8:5,10 59:12 103:5 126:9 | **interest** 8:6 | 24:12 26:5,14 26:21 27:7,23 | 106:4,8,14 107:17,19 |
| | **interested** 6:23 142:19 | 28:8,9,11,14,17 29:1,10,21 | 117:24 118:15 119:6 120:16 |
| **instructs** 8:14 | **interface** 32:5 | 31:5,7 32:3 | 120:18,22 |
| **integrate** 31:7 33:23 45:22 57:25 102:20 | 33:6,13,21 51:4 58:24 59:1 99:21 111:20,23 | 33:6,11 35:23 36:3,8 37:25 41:9,14,18 | 121:22 123:3,7 123:8,13,25 125:5,16 |
| **integrated** 33:20 | 112:2,5,10 120:18,25 | 42:15 44:21 45:1,7,14 | 126:21 127:3,5 127:8,12 128:4 |
| **integration** 31:6 32:10,11 33:22 35:20 37:24 38:4,11 40:4,4,7,8,21 41:2,7 42:15 42:18 43:4,14 | 121:7,18,23 122:5,7 123:7 123:8,11 125:9 **interfere** 63:14 | 46:19 47:4,5 48:3,10 50:16 50:25 51:8,13 51:18,25 52:13 | 128:9,14,20 129:2,5,7,13,18 |

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

[intus - knowledge]

130:8,13,19,21
131:9,14,17,19
131:22,22
132:1,9,23
133:18,20
134:5 135:17
136:14,17,18
137:2 138:5,8
139:4,16 140:1
**intus's**  22:24
23:12 28:6
92:18 96:2
99:19 107:21
121:3,7 122:3
124:13 130:23
132:1 135:12
136:9 138:16
**intuscare**  6:15
7:7 20:25 22:2
68:21 134:22
**intuscare's**
121:19
**invasive**  80:2
**involved**  88:15
88:16
**involving**  87:23
**ip**  38:10
**issue**  62:14,24
64:18 65:18
103:2 107:12
107:21 118:8
135:25,25
137:16,18
**issued**  128:14
131:11 137:4

**issues**  63:4,6
77:15 79:3,16
79:21 83:17
100:13 102:25
111:4 114:23
118:9 135:7
**items**  42:11
88:18 134:25

**j**

**jackson**  31:25
32:19 34:2,3
40:15 120:16
126:4,16 133:8
134:1,18
**january**  11:11
86:12 90:5
94:24 95:2,9
109:16 110:25
115:14,23
116:11
**job**  9:23 11:18
27:13 28:11
83:3 86:19,20
97:18
**johnson**  25:22
**join**  27:20 29:6
44:4 77:25
92:21
**joining**  27:22
**jst**  6:18
**july**  39:19 40:2
40:2,3
**jump**  96:20

**k**

**katie**  107:3
**keep**  73:16,22
74:4 79:10
**key**  23:2,8
89:18
**kimberly**  1:24
7:14 141:22
142:5,25
**kind**  11:20
22:25 27:12
31:11,15 42:20
43:7 44:11
55:15 75:24
76:6 78:8
79:11 88:23
94:17 106:22
106:22 113:10
114:21
**kinds**  28:25
40:25
**knew**  81:25
83:2 84:1,5,13
98:10 109:11
**know**  8:25 9:2
16:13,20 18:1
18:3 21:6,20
22:5 24:9 25:3
25:19 26:2
28:19 29:7,20
30:1,19 32:8
36:10,10 38:6
38:7 39:14,23
40:11,11,18,21
41:20 42:16,24

48:1 56:8,8
63:12,13,23
64:24 67:6
69:3,4 71:9
75:13,15 79:2
79:20 80:12
81:15,17,23,25
82:5 84:5 86:3
87:3,7 88:25
89:6,10 90:16
90:18 91:16
92:9 93:21,25
94:20 96:17,18
98:15,16 99:2
99:6 100:4
105:8 109:10
109:18 110:18
111:5 115:10
115:22 116:9
116:10,17
118:21 119:7,7
119:9,25
120:12 122:6
124:8 125:1
127:2 129:9,17
129:19,20,23
129:24 137:8
137:19 138:13
138:25 139:19
**knowing**
126:21
**knowledge**
68:6 88:4
110:12 116:4,7
125:14 139:19

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

[knowledge - live]

| | | | |
|---|---|---|---|
| 139:24 | 131:3 132:5 | **lee** 2:9 3:5 7:12 | **legal** 6:20 |
| **known** 66:4 | **largely** 112:19 | 7:12 19:6 | 109:21 115:20 |
| 129:1 | **late** 36:24 | 26:16 27:20,22 | 137:18,25 |
| **knows** 69:12 | 139:21 | 29:4 36:7,24 | 140:11 143:3 |
| **kotiya** 2:14 7:9 | **launch** 91:23 | 37:10 39:17 | **letter** 3:8 5:1,7 |
| 7:10 12:20,24 | **launched** 89:6 | 40:6 41:10 | 29:23 85:10,18 |
| 13:22 18:4 | 89:7 92:4,6 | 44:4,22 45:16 | 86:6 108:3 |
| 20:14 21:11 | 119:10 | 49:10 53:20 | 110:2 131:9,16 |
| 23:15,17,20 | **launching** | 54:20 59:25 | 134:8 |
| 27:18 28:13 | 120:13 | 66:7 69:8,14 | **liaison** 31:15 |
| 29:6 34:13 | **laura** 37:18 | 69:16 70:5 | 35:8 36:12 |
| 36:6 39:18 | 65:5 100:21,24 | 72:6,19 83:4 | **lie** 69:13,14 |
| 44:3 53:3,7 | 122:12 | 92:21 93:10 | **lieu** 59:2 |
| 55:9 56:24 | **lawsuit** 83:25 | 96:14 105:15 | **lift** 48:13 |
| 60:19 69:1 | 84:3,24 85:7 | 109:8,19 | **liked** 66:4 |
| 70:3,25 76:2 | 102:17 | 110:13 112:12 | **likely** 76:20 |
| 76:25 82:14,19 | **lawyers** 87:12 | 112:23 114:5 | 80:5 |
| 84:20 92:19 | **layout** 55:7 | 115:19 116:24 | **likes** 34:1 |
| 93:9 94:19 | **lead** 14:19 | 119:25 120:4,6 | **line** 80:17 |
| 101:8 106:10 | 43:22 | 121:11,14,20 | 82:16,17 |
| 109:6 114:4 | **leadership** 9:21 | 123:17 124:24 | 104:11,12 |
| 115:17 120:2 | 9:22 88:13 | 127:6,19,22,23 | 143:15 144:5 |
| 124:20 139:7 | **leading** 100:4,6 | 129:11 131:7 | **list** 138:23 |
| 140:5 | 114:19 | 132:10,16 | **listening** 35:6 |
| **l** | **learn** 68:24 | 133:2,10,15 | **litigation** 84:6 |
| | 88:5 | 136:20 137:13 | 98:10 101:25 |
| **lack** 53:3 69:1 | **learned** 22:7 | 137:21 138:2 | 102:7 104:9 |
| 70:3 92:19 | 77:23 | 139:6,12,21 | **little** 9:8 34:9 |
| 109:7 138:25 | **leave** 11:10 | 140:4,13 | 63:11 64:9 |
| 139:2 | 13:24 78:2,6 | **left** 10:22 11:9 | 84:4 |
| **lacks** 19:7 | 80:24 83:11 | 77:9,15 79:9 | **live** 12:12 |
| 26:16 44:4 | 95:3 115:7 | 81:3,6 86:24 | 13:19 40:12 |
| 45:17 53:21 | **leaving** 77:24 | 89:5 95:3 | 41:1 44:14,16 |
| 54:21 55:10 | **led** 22:14 | 114:21 115:4 | 44:16,17,19,24 |
| 96:16 123:16 | | 119:13,15 | 44:25 46:22 |
| 124:20 129:8 | | | |

Veritext Legal Solutions

866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[live - manual]**

47:10 50:8,15
50:17,20,20,21
50:22 56:6
57:1,7,11,12,15
57:16,20,21
58:1,2,4,11,19
107:6 125:5
**living** 119:19
**llp** 2:8
**location** 12:16
**locked** 143:9
**log** 22:24 27:11
51:13,16,22
97:14,24 98:5
99:3,6,10
104:8 130:22
**logged** 19:19
51:18,25
**logging** 51:5
60:17 61:5
125:10
**login** 72:4,21
126:8,15
129:22 130:4
130:22 131:10
135:6 136:1,10
136:15,16,18
137:3,15
**logistical** 75:24
**logistics** 41:7
**logs** 97:18
98:19 126:25
**long** 8:22,23
11:23 12:9
29:22 43:21

81:9 89:25
90:7 95:11
113:25 118:23
129:24
**longer** 14:16
17:17 25:3
29:16 34:9
76:22 139:4
**look** 17:18 20:7
21:18,19 25:20
39:14 66:17
67:21 71:25
79:19 94:20
113:12,16
125:3 126:3
127:18
**looked** 19:21
23:9 42:3
57:18 61:16
73:10,11 85:10
111:8
**looking** 20:17
22:16 39:7
87:4 90:2 93:2
111:9 113:13
120:22 125:24
130:11 134:13
139:20
**looks** 34:1 35:5
39:18 59:22
126:18
**loop** 75:23
**loosely** 86:21
**los** 2:4

**lot** 16:11,12
18:25 84:6
99:21 114:17
114:17
**lots** 18:20
**love** 67:5 78:7
87:16
**lower** 14:5
**lowercase**
60:23
**lss** 97:11
101:19 127:12
128:2,10
**lueth** 1:13 6:13
7:11,16,24
20:12 38:25
39:17,19 45:5
76:3 77:8
117:5 119:22
120:5 133:8
136:14 139:15
140:9 141:10
143:1 144:3,25
**lunch** 76:22

**m**

**machine**
142:12
**madam** 121:14
**made** 27:23
67:2 119:9
137:2 142:11
**mails** 16:20
39:17 47:17
57:18 58:6
98:9

**make** 24:15
41:16 44:22
56:4 57:17
82:10,25 93:7
116:20 138:6
143:11
**makes** 24:16
33:16 68:25
88:8
**making** 121:21
**manage** 110:12
**management**
11:9,17
**manager** 32:23
86:14,15 87:20
87:22 101:3
106:13
**managers**
100:10,14,24
114:20
**managing**
109:17 110:16
111:1 114:24
115:15
**manatt** 2:3
**manatt.com**
2:5
**manipulation**
22:23
**manner** 131:25
132:5
**manual** 27:16
31:2 32:6,14
44:10,16 58:17
58:20 63:16,25

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[manual - mike]**

73:22,25 74:4 74:6,8,10 75:14 76:1,8 76:15 77:17 118:14 132:13 132:17,22
**manually** 24:23 24:24 29:9,14 30:7 43:9 45:23 64:17 72:5,18 73:2,6 73:15 124:5 131:19,21 132:8
**march** 95:12 116:11
**mark** 133:11 135:1
**marked** 4:3 21:10 25:15 31:23 34:8 38:22 41:23 46:12 48:15 49:22 59:8 61:14 64:11 65:2 66:14 71:11 75:17 80:10 85:16 96:23 101:16 103:16 105:14 106:25 108:5 133:7,12
**market** 17:25 81:21

**marks** 38:23 117:3
**martinez** 79:15 100:19,23 105:24
**massaging** 24:8
**master's** 9:13 11:1
**match** 60:22
**matter** 6:14
**max'd** 78:8
**mcguire** 2:13 7:7
**mcguirewoo...** 2:15 143:1
**mean** 22:19 36:20 45:11 57:12 58:25 65:23 67:14 70:12 72:3 82:10 98:8 99:3 113:14,22 119:8
**meaning** 37:21 79:21 102:7 111:22 134:16
**means** 15:9 22:13 74:20 75:3 87:22 134:6
**meant** 44:19 56:20 106:8
**measure** 16:10 44:14 45:12

**media** 6:12 38:24 117:4 140:10
**medicaid** 12:6 12:7,9 14:6 15:2,4,6,12
**medical** 11:20 16:14 18:24 22:17
**medicare** 12:8 14:6 15:2,4,6 15:12,20,20
**mediture** 17:4 17:15 56:17,19
**meet** 12:8
**meeting** 91:5 104:17,19,22 105:1,4,7 107:5
**meetings** 90:23 90:25 91:14,18 92:14 94:6
**melanie** 79:15 100:19,23 104:6 105:24 106:8,12
**member** 98:20 135:8,16 137:10
**members** 59:18 91:20,21 97:15 98:6 100:5 136:7
**memory** 30:23 40:4 52:2

67:11 89:11
**mention** 107:17
**mentioned** 15:3 33:18 40:22 52:18 97:11 98:4 113:9 120:5 128:3 132:17 135:24
**mentions** 104:3
**message** 30:22 67:19,21,23
**messages** 79:14 106:4
**met** 83:12
**method** 43:25 44:8,9,9 45:4,6 135:12
**methods** 16:5
**michael** 39:13 40:17,18 42:14 42:21 43:13 47:18 48:18 50:5 65:5 66:9 66:20,23 70:11 74:12 79:15 94:7 97:4
**michael's** 49:20
**michigan** 9:11 9:14 78:10
**midwest** 10:5
**mike** 42:6 43:3 69:9 74:24 75:7 77:23 81:7,14 84:8 84:23 85:2,4

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[mike - notes]**

88:3,13 91:2 91:19 98:11,17 100:16 102:3,6 102:12,16 119:4
**mike's** 42:5
**million** 8:5
**mind** 68:25 75:12 120:13
**mindset** 14:21
**minute** 38:17 75:21 76:18 116:22
**minutes** 71:7 76:23,25 116:19
**mischaracteri...** 20:14 27:18 45:16 56:24 59:25 76:2 83:4 127:15
**model** 12:7 14:4 15:7,7 104:18
**module** 107:5
**moment** 8:9 21:18 46:9 61:12 64:23 67:4 78:16 96:21 110:8
**momentarily** 41:24
**moments** 134:4
**money** 25:1 85:7

**month** 15:10
**months** 47:15 47:21,22 87:4 97:7 108:19,19 115:8
**moran** 10:2,4 10:12
**morning** 7:6,9 7:12,24 108:3 108:4
**move** 31:4 37:8 77:20 78:12 105:15 115:2 136:13
**movement** 114:18
**moving** 111:9
**multiple** 136:17 137:15
**mumbling** 8:8
**mustache** 113:20
**mybrio** 107:4

**n**

**n** 3:1
**name** 6:19 59:24 60:4,14 60:24 61:7 110:6,18 115:25 116:15 120:6 126:10
**names** 60:18 61:8 91:20
**nature** 122:16

**navigating** 111:14
**ncra** 7:15 142:5
**nda** 103:10 104:3,4,17 105:5
**near** 124:7
**nearly** 116:23
**necessary** 143:11
**need** 16:9 26:21 33:25 45:20 58:20 73:25 74:25 75:10 76:11 94:10 101:6 113:21 116:19 120:25 122:23 124:8
**needed** 29:3,7 32:6 33:19 63:19 115:5,10
**needs** 94:14 112:19 124:14
**negotiated** 86:7
**negotiations** 86:5
**neither** 142:18
**net** 119:19
**network** 13:20 60:22
**never** 72:24 85:2,3 87:2 103:9 107:20 135:21 136:22 137:1

**new** 25:12 32:23 42:5 46:13 48:9 56:1 86:23 88:15,19 90:8 97:11 98:4,13 98:14 107:5 110:4 115:25 116:4,8,14 127:12 128:2 130:14,18 134:5 135:12
**nice** 65:20
**nicole** 32:20,21
**nine** 97:7
**nondisclosure** 103:3,7
**nonemail** 65:17
**nonpace** 118:25
**nonpacecare** 118:19
**northern** 1:1 6:17
**nossaman** 2:8
**nossaman.com** 2:10
**nossaman.com.** 140:14
**notary** 141:23
**note** 6:4 8:18 42:10 67:17
**noted** 97:14
**notes** 54:9 116:20

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[notice - optimizing]**

**notice** 77:21 81:8,9,12 83:2 128:21
**noticing** 7:5
**notified** 83:10
**noting** 143:15
**november** 104:1,15,17 107:24
**number** 6:18 8:11,21 36:4 38:24 62:8 117:4 127:21 133:18 140:9 143:15
**numbers** 133:9
**nurses** 18:18
**nursing** 12:10 89:24

**o**

**o** 103:23 143:1
**oath** 3:7 141:1 142:10
**object** 8:12 12:22
**objection** 8:13 8:19 12:20,24 13:22 18:4 19:6,14 20:14 23:15,17 26:16 27:18,22 28:13 29:4 36:6,24 37:10 40:6 41:10 44:3 45:16 53:3,20

54:20 55:9 56:24 59:25 60:19 66:7 69:1 70:3,25 76:2 82:14 83:4 84:20 92:19 93:9,10 94:19 96:14 101:8 106:10 109:6,20 110:13 112:12 112:23 114:4,5 115:17 121:9 123:15 124:20 127:4,15 128:23 129:8 131:3 132:4 136:19 137:6 137:17,25 139:21
**objections** 6:25
**obtained** 128:9 128:21
**obviously** 84:5 84:13
**occurrences** 107:8
**occurring** 118:7
**october** 10:10 47:10 49:25 50:9 56:9,13 56:14 57:1,4 57:14,16,19 61:16,19 63:3

80:18 85:11,24
**offer** 4:20 5:1 78:15 83:3 85:19 86:6 108:10 109:1
**offered** 22:24
**officer** 11:6 52:3 135:18
**oh** 10:21 59:3 74:4 133:10
**okay** 8:15,16 10:21 19:9 21:21 23:18 28:10 30:25 31:3 34:1,19 34:21 35:13 36:10 37:16 39:4,9,11 40:16 41:21 46:11,13 48:16 50:22 51:21 59:9 62:11,11 64:13 65:1,16 66:18 69:6,16 71:8,12 72:2 75:8,18,21 76:21 96:22 97:9 101:17 105:18 106:21 115:5 116:23 116:24 133:5
**onboard** 31:11 33:11
**onboarded** 86:23

**once** 30:15,17 30:18 69:19 129:21 134:21
**ones** 25:12
**ongoing** 104:8
**online** 17:10 22:22 29:17 57:2 109:12 110:17
**onsite** 13:5,15
**open** 21:8 36:3 36:14 48:16 80:13,15 87:6 103:13
**opened** 32:25 78:8
**opening** 14:23 41:25
**operability** 90:11 111:18
**operating** 36:18 99:18
**operation** 78:1
**operations** 11:8 42:20 109:17
**opinion** 67:14 74:13 90:11 91:5 93:7 137:18
**opportunity** 87:17 88:4
**opposed** 15:8 47:22 74:7
**optimizing** 24:1

**[option - participants]**

**option**   15:3
  17:17,25
  136:13
**options**   17:24
  74:25 75:12
  87:4
**order**   37:8
  42:20 122:22
  123:18 134:6
**ordinarily**   8:4
**organization**
  90:19 114:17
  130:22 131:11
  135:20 136:17
**organization's**
  136:16
**organized**
  94:16
**original**   85:23
**outcome**   6:24
**outcomes**   14:6
  18:23 23:14
  24:1 28:3
  89:19
**outlines**   133:23
**outside**   23:5
  82:8,12
**overseeing**
  109:17
**oversees**   17:3
**own**   36:19
  54:14 112:16
  126:19 130:22
  131:10 136:25

**owns**   56:19

**p**

**p.m.**   1:17,17
  6:2 38:21,21
  77:4,4 117:2,2
  140:8,15
**pace**   11:25 12:3
  12:5,11,12
  13:8,10,16
  14:3 15:6,24
  16:3 17:10,19
  17:21 18:2,9
  19:3,16 20:2,5
  20:13,21,22
  22:22 23:5
  24:4 26:22
  27:5 28:15
  29:2,10,16,17
  29:25 31:7
  33:20 37:21
  38:1 44:20
  45:14 47:9,14
  48:6,9 50:23
  51:1 52:7,22
  53:24 54:19
  55:23 57:2,9
  57:15,16,25
  58:4 59:12,13
  59:14,18 62:15
  68:16 70:22,23
  72:16 73:1
  77:16 78:1
  79:22 83:18
  86:14,15 87:16
  87:17 88:3,12

  89:1,19 90:1
  93:2,8,16 94:9
  95:22,22 96:2
  96:6,10 97:19
  97:20 98:21,25
  99:1,7,10,17,21
  99:22 100:1,7
  101:5,19,21,21
  102:11,23
  103:6 104:13
  105:10 106:5
  109:12,17
  110:17 111:1
  111:12 112:3
  112:19,20
  114:2,12,23
  116:15 118:3
  118:13 130:21
  131:11 136:15
  136:17
**pacecare**   84:19
  113:3,7,9,19
  115:16 117:24
  118:4 124:1,15
  124:18,23
  125:6 129:18
  129:21 130:8
  130:15 131:10
  134:6 135:13
  139:17
**pacelogic**
  110:22 111:1,4
  111:6,16
  112:25

**page**   3:4 4:2
  97:1 108:25,25
  113:17 143:15
  144:5
**pages**   143:13
  143:19,21
**paid**   15:16,21
  109:23
**paragraph**
  68:1,9,14,25
  69:6,17 70:2
  124:7
**paragraphs**
  69:13
**parameters**
  94:24
**params**   15:6
  112:15
**park**   2:4
**part**   11:25
  13:19 97:18
  102:25 103:2
  104:25 105:9
  105:12 113:1
  118:2 132:17
  134:13 138:20
**partially**   63:8
**participant**
  42:19 54:10
**participant's**
  15:13
**participants**
  6:7 13:9,10,11
  13:13 14:24
  18:15,16 52:25

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

[participants - point]

| | | | |
|---|---|---|---|
| 54:18,24 113:17 | past 57:19 | performing 101:7 | place 6:10 9:21 18:24 87:6 |
| participated 92:14 | patient 18:22 23:14 24:1 26:11,20 27:2 28:3,12 122:23 | period 43:20,23 48:10 61:23 62:2 128:25 143:21 | 94:11 113:3,13 113:19 142:8 |
| particular 134:12 | patients 13:11 28:17,18 54:14 54:18 | perjury 143:19 144:20 | placed 142:10 placement 89:25 |
| parties 6:10 35:10 122:4,8 142:20 | pay 15:6 | permission 139:18 | plaintiff 1:5 2:2 6:14 7:8 |
| partner's 35:23 140:1 | paying 15:21 pco 40:9,12 42:15 43:1 | person 15:9 49:2 81:16 87:13 | plan 36:17 67:2 81:7,8 86:25 |
| partners 10:7 10:16,23,24 11:2,5,25 12:16 13:6,20 13:24 14:9,19 14:25 16:23 17:6 18:1,10 19:17 22:14 32:22 33:1,4 52:25 53:2,10 53:16 54:24 57:21 73:5 76:8 77:10,22 78:6 80:25 81:3,6,10 82:12 86:24 111:8 129:6 138:4 | 44:25 45:7 46:22 57:12 87:23,25 97:12 97:15 98:7 100:7 104:8,16 105:3,11 121:7 121:18 123:7 123:14 126:21 127:9 128:4,15 128:22 129:13 131:17 136:11 | personally 19:16 39:21 74:9 79:8 102:22 125:22 137:1 | plans 77:22 83:1,11 87:5 |
| | | perspective 67:5 70:6 78:1 | plante 10:2,4 10:12 |
| | | pharmacy 33:13,18,23 42:18 | platforms 11:22 |
| | pdf 143:9 | phone 65:16 79:20 | play 79:4 115:15 |
| | penalties 144:20 | phrase 46:3,4,5 46:8 | played 35:7 115:22 |
| | penalty 143:19 | phrased 44:13 | please 6:4 7:1 7:17 23:21 50:15 60:3 104:3 120:14 121:13,15 125:3 126:9 |
| | pending 9:4 | physical 13:8 | |
| | people 20:8 100:9 102:4 | physicians 12:18 18:17 | |
| parts 101:5 | percentage 99:24 | pictorial 28:22 | plug 47:25 |
| party 6:22 96:7 | perform 101:6 | pictures 28:24 | plus 11:14 |
| pas 18:17 | performed 13:15 | pipeline 134:3 134:7,24 | point 10:6 17:5 17:16 20:24 29:15 31:4 37:23 38:3,10 40:3 41:6 47:8 51:21 56:22 |
| passed 98:17 | | | |
| password 61:7 | | | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[point - provide]**

58:5,10 62:14
70:11,14 73:4
77:9 83:10
84:25 85:8
89:1 93:5,22
94:2 98:8 99:9
99:16 100:3,11
100:23 101:3
108:17 119:9
122:17 123:20
125:11 127:7
138:14 139:15
**points** 8:12
23:8 86:8
89:18 94:21
**policies** 95:16
**popping** 49:23
64:12
**populate** 123:2
**populates** 27:7
**portion** 121:16
**position** 11:15
11:23
**possible** 23:7
79:24 83:9
116:21
**post** 92:5,7
**posts** 119:10
**potential** 96:9
121:6
**power** 76:22
**practice** 33:12
**preferred** 36:5
43:25 44:7,9,9
45:4,6

**prerogatives**
14:17
**present** 2:17
7:3 91:17
**presentation**
116:21
**presented**
134:5
**preservation**
84:6
**pressure** 26:7
27:3
**presumably**
134:21
**presume** 110:7
**pretext** 70:23
**pretty** 86:21
**preventative**
16:7,11
**prevents** 16:8
**previous** 58:6
**previously** 4:3
42:10 47:1
**primary** 12:18
60:22
**prior** 56:15
65:21 73:13
131:8 142:10
**priorities** 14:17
**prioritized**
42:17
**priority** 58:7
**probably** 13:11
50:20 65:24
81:17 90:1

91:1 116:18
137:8
**problem** 13:4
64:10
**proceeding**
6:25
**proceedings**
142:7,9,11
**process** 14:22
22:22 27:2,15
31:6,8,10,14
35:21 37:24
43:15 51:23
82:5 118:14
132:18 133:21
133:23
**produce** 84:2
**produced**
78:15 108:3,4
**product** 17:1
22:24 23:12,25
24:20 28:21
68:16 89:5,6
94:13 118:17
139:1,3
**productions**
84:7
**productive**
104:19
**products**
118:19,21
**professionals**
18:14
**program** 12:5
14:21 17:16

19:4 50:23
89:19 90:2
93:2,20 95:22
97:19 98:25
101:20 102:11
**program's**
99:11,17
**programs** 14:3
31:11 70:19,22
86:23 94:9
99:22 100:1,7
104:13 114:24
116:15 118:3
118:13,23,25
**progress** 40:5
**prohibited** 29:1
29:25
**prompted**
77:20 86:5
98:3,5
**property** 38:13
**proposal** 134:5
136:10
**proposed** 71:19
75:7 130:19
135:12
**proprietary**
38:12 53:17
62:4 96:10
**protecting**
38:12
**provide** 29:2
35:20,24 41:9
60:3 88:6
122:14,21

[provide - recall]

| | | | |
|---|---|---|---|
| 125:5 126:9 131:22 132:2 132:22 | pulled 26:4 | questions 16:19 21:20 34:15 95:14 96:21 119:24 120:9 140:5,6 | 96:25 104:6,16 105:3 107:4 121:15,16 122:15,17 123:18,21 125:8 143:7 144:20 |
| provided 14:4 43:10 73:20 80:9 120:10 123:4 125:15 129:6 130:13 131:14 136:17 143:23 | pulling 22:21 24:3,7 26:15 30:7 61:12 | | |
| | pulls 27:7 35:23 76:1 | queue 42:14 | |
| | purpose 17:13 42:23 53:18 | quick 97:2 | |
| | | quicker 27:23 | reading 69:19 |
| | purposes 72:25 121:22 122:4 135:6 | **r** | reads 51:15 |
| provider 17:22 | | race 26:11 | ready 21:19 34:19 43:4 59:2 60:6 77:23 78:12 103:13 126:10 |
| providers 17:7 | push 40:24 | raise 7:16 16:20 102:12 | |
| provides 68:17 | put 12:18 19:2 24:12 94:15 107:7 135:7,16 136:7 138:22 139:10 | | |
| providing 36:1 66:5 72:5,17 84:12 88:23 93:15 126:15 128:21 131:18 131:21 132:7 | | ran 97:14 109:12 | |
| | | rates 89:24 | really 7:25 14:3 14:4,7 15:24 19:2 28:22 32:6 47:24 54:25 80:16 82:4,24 86:18 87:6,6,16 88:21 102:24 102:25 112:20 115:3 138:24 |
| | | rather 13:10 107:6 120:15 | |
| | putting 135:19 138:20 | reach 22:14 47:15 81:14 | |
| provision 71:25 72:11,15,15 | **q** | reaching 22:1 65:10 76:10 103:22,22 | |
| provisions 71:18 | qualifications 12:9 | | |
| | | reaction 46:17 48:21 62:16 137:4 | realtime 1:24 1:25 142:5 |
| public 14:1 141:23 | quality 6:5,6 | | |
| | question 8:20 9:4,4,6 13:2 20:1 23:21 24:16 43:6 44:18 45:2,10 53:22 57:13 69:20 72:7 84:4 93:23 94:5 101:8 119:1 121:13 121:15 129:15 | read 3:8 35:18 37:20 39:13 40:20 42:9,21 43:17 45:10 50:14 51:3,16 51:25 52:6,14 52:19 60:21 67:4,13,15,16 69:4,7,23 74:23 75:10,20 | rearranged 28:22 |
| pull 21:5 24:6 24:23,24 25:12 26:21 30:12 43:2,8 51:17 52:5 58:17,20 72:4,17 74:10 76:9,15 78:17 80:8 107:6 113:4 117:13 124:5 | | | reason 101:24 124:8 144:5 |
| | | | reasons 138:4 |
| | | | recall 20:23 21:3 22:13 29:15 31:5,8 32:2 38:2,14 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[recall - remember]**

40:25 41:3,8
41:13,15,17,19
42:13 43:1,7
43:18,21 46:4
48:21 49:4,18
50:12 51:8,10
51:15 61:22
62:1,5,14 64:4
64:6 65:7,10
66:25 70:13
77:19 79:24
81:13,19 83:22
85:9 86:20
88:14,18 99:20
101:2,11
104:24 107:14
107:16 114:1,9
114:19 116:11
116:13,14
117:22 119:11
123:5 125:17
127:10 128:17
130:6 134:9
138:11 139:20
**receive**  15:11
**received**  9:13
**recess**  38:21
  77:4 117:2
**recipe**  33:15
**recollection**
  61:9 67:12
  126:14 135:15
  140:2
**record**  6:2,11
  7:5 8:14,18

18:24 21:9,13
22:18 23:22
38:19,25 77:2
77:5 103:17
105:17 116:25
117:5 133:1,6
133:13 140:7
142:11
**recorded**  6:9
  6:12
**recording**  6:5,9
**records**  11:20
  16:14 79:7
  80:9
**redact**  80:4
**redirect**  3:6
  139:13
**reduce**  23:6
**reducing**  23:3
**refer**  57:14
  108:13,18,20
**referenced**
  63:18 143:2
**referencing**
  65:24 134:14
**referred**  32:14
  44:11
**referring**  47:2
  47:3 57:20
  67:18
**refers**  13:10
**reflected**  80:21
**reflective**
  138:25

**refresh**  25:18
  30:22 126:14
**regarding**  33:6
  120:18
**regardless**
  15:15
**regular**  36:1
  90:22
**regularly**  97:18
**regulations**
  112:20
**regulatory**
  88:15,18
**rehab**  13:15
  89:24,25
**reimbursement**
  15:8
**reinstate**
  130:24
**reiterating**
  124:13
**rejected**  136:9
**related**  6:22
  84:3 98:12
  131:5
**relationship**
  22:5 53:11
  82:2,21,21
  122:16,25
  138:5
**relationships**
  82:20
**relative**  142:19
**relay**  34:3
  104:13

**relevance**
  82:14 109:6
  115:17 136:19
**relevant**  82:15
  82:17
**remaining**
  76:21
**remember**
  21:22 22:1,4,7
  25:22 28:6,8
  30:14,16 31:10
  38:7,8 41:17
  42:16 43:19
  46:7,19 47:24
  49:8 62:12,13
  62:16 63:6
  65:8,19 66:19
  66:23 67:10
  73:7 75:9
  76:14,17 83:6
  83:14,20,24
  84:11,11 86:4
  86:8 87:5
  89:14,16 90:9
  91:3,4,8,17,20
  92:7 106:6,16
  106:18 108:16
  110:18 113:1
  113:25 114:6
  114:25 118:1
  118:16 125:23
  126:22,23
  127:11,14,20
  128:16 129:15
  130:16,17

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[remember - rough]**

| | | | |
|---|---|---|---|
| 138:10 | 73:15 75:14 | **response** 42:5 | 95:8 97:8,16 |
| **remembered** | 113:4,6 118:14 | 46:13 48:19,22 | 99:7 101:25 |
| 75:24 | 124:3,4 131:19 | 49:20 64:13 | 104:4,9,13 |
| **remote** 1:12 | 131:22 132:19 | 66:16,19,23 | 105:7,22 106:2 |
| 82:12 | 132:22 | 106:6,16 | 106:3 107:22 |
| **remotely** | **representative's** | 121:21 122:3 | 109:2 113:12 |
| 141:10 | 134:23 | 122:12 131:18 | 114:16 115:13 |
| **remove** 45:22 | **representatives** | **rest** 76:24 | 130:5 138:21 |
| 80:5 | 125:25 129:7 | **restart** 134:6 | **rip** 70:23 96:10 |
| **render** 69:12 | **representing** | **result** 30:2 | 129:13 |
| **rendered** 15:15 | 6:19 120:7 | **resume** 134:2 | **risk** 11:8,16,17 |
| **repeat** 13:2 | **request** 78:22 | **retained** | 135:8,19,20 |
| 72:6 | **requested** 79:1 | 140:10 | 136:7 |
| **rephrase** 44:18 | 121:16 123:7,8 | **return** 143:19 | **robbie** 25:23 |
| 45:2 57:13 | 142:16 143:7 | **review** 24:18 | 64:14 65:13 |
| **replace** 25:12 | **requesting** | 27:16 80:1,6 | 67:19,22 68:7 |
| **replied** 106:23 | 123:11 | 105:4 133:22 | 68:14 70:18,21 |
| **reply** 105:25 | **requests** 84:6 | 133:22 134:20 | 126:5,16 |
| **repopulate** | 111:4 121:6 | 138:14 142:15 | **robbie's** 70:8 |
| 49:13 | **required** 93:4 | 143:3,11 | **role** 11:4 17:6 |
| **report** 20:4,9 | 112:15 114:11 | **reviewing** | 35:8 37:12 |
| 63:17 93:4 | **requirements** | 34:14 130:17 | 64:21 82:12,13 |
| 132:14 | 88:16 | **revised** 86:6 | 86:13,16 88:1 |
| **reported** 1:23 | **resolve** 65:14 | **right** 7:16 | 114:15 115:3 |
| **reporter** 1:24 | 102:20 | 15:16 25:1,8 | 115:11,15,22 |
| 3:7 7:14,15 | **resolved** 64:18 | 28:20 31:18 | 118:2 |
| 59:15 110:20 | 77:17 | 45:5 47:19 | **roots** 119:19 |
| 121:14 142:1 | **respect** 35:21 | 48:13 49:15 | **rothberg** 35:12 |
| **reporting** | **respond** 74:20 | 52:14 56:23 | 37:17 39:12 |
| 88:17 100:9,11 | 75:3 135:4 | 57:10 58:15,21 | 60:7,13 122:11 |
| **reports** 19:10 | **responded** 67:1 | 59:13 61:2 | 122:14 124:6 |
| 20:2 29:9 43:8 | **responding** | 63:9 65:21 | 124:13 126:17 |
| 43:10 44:17 | 42:6 | 71:20 73:6 | 134:22 |
| 45:20,23 51:17 | **responds** 104:6 | 74:13 80:18 | **rough** 140:12 |
| 56:23 63:24 | 104:15 | 82:7 92:14 | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[roughly - see]**

**roughly** 27:5 91:14
**routine** 23:9
**routinely** 23:1
**rows** 111:24
**rtz** 1:7 6:15 7:13 19:3 29:19 32:3 33:6,10,21,22 34:2 36:4,17 37:18 38:4,11 39:15 40:8 41:8,14,18 50:15,17 51:4 53:2,10,18 57:9,15,16,21 58:4,6,12 60:21 61:20,24 62:3 65:5,11 65:18 68:15,16 68:21 71:20,23 77:10,16,20 78:3 82:4,13 83:10 84:2 86:11 87:2,14 90:10 91:11,23 93:19,19 94:23 95:3,4,15,18 100:12 101:20 101:25 102:17 103:3,9,23,24 104:23 105:11 105:22 108:9 108:14,22,22 109:1,5 110:2

115:15,22 116:4,7,12,16 117:19 118:2 118:12,18,20 118:21 119:5 120:7,17,21,21 121:2,17,22 122:2,12 123:4 125:9,25 127:8 128:9,13,21 129:1,2,6 131:9 138:8
**rtz's** 89:9 102:17 128:15
**rule** 9:3
**rules** 54:3 143:25
**run** 20:6,9 26:10 72:4,16 97:18,24 98:5 99:3,5,9
**running** 14:3 31:17 89:19 135:1
**ryan** 103:22,23 104:7

---

**s**

**sakes** 8:23
**sales** 82:5
**san** 2:9,14
**sara** 107:3
**save** 74:8
**saving** 16:10
**saw** 14:2 58:6 82:6 88:3 92:5

92:7,24 105:21 106:22 111:17
**saying** 8:9 36:25 37:1 43:3,14 58:23 60:25 64:17 76:11 81:20 91:9 122:13 124:22 136:12
**says** 8:17 35:18 37:20 40:20 42:9,21 47:13 51:7 60:3,21 67:4,13 68:1 85:10 104:3 105:3 109:1 110:2 122:15
**scheme** 55:23
**school** 9:9,10
**scp** 33:3 35:21 40:23 42:10 122:22 125:5 129:21 130:4 131:14,23 132:1 136:9 137:3
**scp's** 132:18
**screen** 6:8 46:10 117:10 133:3
**script** 46:3,6 72:4,16,22
**seamless** 35:20
**seamlessly** 44:20 45:14

58:2
**search** 79:7,11
**second** 14:23 34:10 68:14,25 71:25 72:11 127:19
**section** 43:1,8 71:7
**securing** 133:24
**security** 38:5,8 61:24 137:16 137:18,19
**see** 13:18 20:8 20:10 21:6 22:17,25 25:8 25:10,17 27:12 32:7 33:8 34:7 35:3,4 37:2 39:23 48:18 50:2 51:11 59:6,24 64:13 64:24 67:7 68:18 71:9 72:12 75:15 80:12 88:21 89:5,16,17 90:3 97:19 104:1,20 106:24 107:10 108:7,11 111:20 113:1 117:9 122:19 123:12,22 124:10 125:12

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[see - signed]**

125:24 126:6,8
126:12 127:25
128:6 133:3,5
135:2
**seeing** 21:11
25:13 62:16
65:10 117:17
123:5 138:19
**seeking** 123:14
**seem** 46:16
66:9
**seemed** 17:24
37:11 49:5
**seems** 22:12
41:4 58:22
72:20 125:18
131:5 134:14
**seen** 6:7 98:23
111:6,10,10,12
112:2,5 119:10
**send** 29:13
30:10,12 33:22
41:15 43:3
73:5,6,15
75:25 76:16
86:6 104:4
120:23 124:5
**sending** 29:8
39:15 63:16,17
65:7,8 71:18
71:20 73:2
118:15 130:12
**senior** 10:7,16
10:23,24 11:2
11:5,25 12:16

13:6,20,24
14:9,19,25
16:23 17:6
18:1,10 19:17
22:14 32:22
33:1,4 52:25
53:2,9,16
54:24 57:21
64:1 73:5 76:8
77:10,22 78:6
80:25 81:3,6
81:10 82:12
86:24 111:8
119:19 129:6
138:4 139:18
140:1
**seniors** 12:8
14:5
**sense** 24:15,16
30:17 33:16
57:17 70:21
82:25 85:22
87:3 88:8 90:6
94:7,12 119:5
**sent** 29:10
71:19 76:3
126:4
**sentences** 70:1
**september** 50:7
56:9 61:19
63:3 64:14
67:23 68:15
73:9,13 75:23
84:15 97:7,15
127:24 128:13

128:19,20,20
**serve** 14:24
**service** 15:7
36:23 66:5,8
93:16 104:18
122:24
**services** 9:14
9:18 15:15,20
15:22 73:19
87:24 88:11,22
101:7 118:24
131:23 132:2
132:12
**set** 15:10,12
32:10 52:4
88:19 94:23
112:14 114:11
142:8
**sets** 112:18
**setting** 32:4
**settled** 115:3
**setup** 55:13
**seven** 8:21
21:24
**shah** 2:14
**shailika** 2:14
7:9
**share** 21:7 25:9
78:17,21 83:1
117:11,12
133:20 136:18
136:25 139:16
**shared** 42:10
136:1

**sharing** 117:11
137:3,10,11,14
**shawna** 2:17
6:19
**sheet** 3:8 144:1
**shop** 17:18,20
93:8 94:9
**short** 89:25
**shorthand**
142:12
**shortly** 64:12
64:24 85:15
**show** 21:16
25:5 28:14
31:21 62:6
66:12 85:13
88:20 101:12
108:2
**showed** 41:3
50:5 51:10,11
98:22 122:10
128:12
**showing** 133:6
**shown** 91:8
**sic** 38:18
**side** 63:4
105:21
**sign** 3:8 103:4
143:7,17
**signature** 85:19
108:25 134:20
141:21 142:24
**signed** 5:1
68:21 85:23
103:6 141:14

Veritext Legal Solutions
866-299-5127
calendar-ca@veritext.com
www.veritext.com

**[similar - started]**

| | | | |
|---|---|---|---|
| **similar** 89:4 92:17,25 94:20 94:21 113:23 | 59:18 62:4 96:10 118:25 130:23 | **source** 55:3,15 **space** 60:24 78:9 | 115:18 121:10 123:16 124:21 129:9 131:4 |
| **similarities** 114:10 | **solely** 72:21 **solution** 73:25 | **speak** 112:25 **speaking** 84:12 | 132:6 139:22 **speed** 118:8 |
| **simple** 28:19 | 74:2 125:20,21 | 138:11 | **spending** 85:7 |
| **simply** 123:13 123:25 | 138:16 139:4 **solutions** 6:20 | **spec** 35:22 **specific** 100:1 | **spent** 111:14 **spoke** 22:4 |
| **sincere** 68:13 70:9,19 | 11:21,22 118:25 140:11 | 105:25 114:12 124:4 133:21 | 84:13 85:2 97:10 128:2 |
| **single** 90:23 | 143:3 | **specifically** | **spoken** 83:25 |
| **sit** 76:14 84:17 109:14 | **somebody** 100:16 | 46:7 65:8 66:21,22,25 | **spreadsheet** 24:8 |
| **site** 13:13 50:15 50:17,19,20,21 | **somethings** 92:17 | 81:25 90:18 120:22 125:17 | **staff** 24:8,13,20 26:23,24 27:4 |
| 50:21,22 57:9 125:5 | **somewhat** 35:8 **soon** 49:24 | **specifications** 33:7,11,14,23 | 55:15 105:11 132:18,22 |
| **sitting** 92:3 | 58:19 134:24 | 34:3 120:19,23 | 135:7,16 136:7 |
| **situation** 97:22 | **sorry** 10:13 | 120:25 121:3 | 137:10 |
| **six** 30:19 41:20 47:12,15,21,22 | 16:18 19:3 23:16 24:21 | 121:17 122:3 122:14 123:4,5 | **staff's** 135:5 **stamp** 133:9 |
| 87:3 | 33:2 43:5 64:9 | **specifics** 31:8,9 | **standard** 42:22 |
| **skilled** 12:10 24:10 89:24 | 68:9 72:6 81:1 90:17 107:15 | 42:16 62:13 114:6 138:10 | 42:24 43:15,19 43:24 45:11 |
| **skip** 76:22 | 109:19 121:13 | **speculate** 94:8 | 56:22 104:11 |
| **skotiya** 2:15 143:1 | 121:25 122:1 133:10,22 | **speculation** 8:18 18:4 19:7 | **stands** 32:8 **start** 21:4,20 |
| **slow** 99:17 | **sort** 82:11 | 26:17 28:13 | 36:23 51:4 |
| **sneha** 104:4,15 105:3 | 102:22 112:22 112:24 | 29:5 36:7 41:11 53:21 | 57:9 80:21 87:4 109:23 |
| **social** 18:19 138:22 | **sorted** 19:21 **sound** 79:5 | 54:22 55:10 60:20 61:3 | 125:9 134:24 **started** 10:6,15 |
| **software** 38:13 53:10,18 55:4 | **sounds** 28:19 31:18 76:11 | 71:1 84:20 92:20 96:15 | 11:6 14:8,22 16:22 22:5 |
| 55:7 56:20 | 87:7,9,11 | 106:11 109:7 | 26:1 29:8 |

Veritext Legal Solutions
866-299-5127  calendar-ca@veritext.com  www.veritext.com

**[started - take]**

| | | | |
|---|---|---|---|
| 63:16 73:8 80:20 86:11,17 86:18,22 90:5 93:22,25 94:25 95:2 97:8 102:24 108:23 131:18 132:7 | **steps**  44:11 93:14 | **subpoena** 78:21 | **sworn**  141:12 |
| **starting**  122:17 123:20 | **sticker**  105:16 | **subsequent** 105:6 | **system**  16:14 22:25 35:22,23 37:1,7,21 51:5 51:9 55:1 56:7 56:11 61:25 70:23 72:22 84:16 88:6 95:23 96:1,2,6 96:6 99:11 100:25 103:6 107:8,12,22 111:5,6 118:4 120:23 121:7 121:19 122:18 122:24 123:2 123:14,21 124:18 125:10 129:25 130:21 134:25 136:16 138:12 |
| **state**  7:1,3 118:23 125:8 141:4,23 142:3 142:6 | **sticking**  84:25 85:8 | **sufficient**  35:24 | |
| **stated**  120:22 144:21 | **stop**  29:17,22 68:15 93:8 94:9 131:17 | **suggested**  85:3 85:5 | |
| **states**  1:1 6:16 122:12 124:6 134:1 | **stopgap**  44:13 45:12 | **suite**  2:13 | |
| **statistics**  23:3 | **store**  112:18 | **sunsetting** 17:16 | |
| **status**  40:21 | **stored**  19:5 26:20 | **supplied**  98:9 | |
| **stay**  49:12 | **stores**  18:25 | **supply**  23:10 | |
| **stayed**  95:12 129:25 | **strain**  96:2,6 99:12,18 100:25 107:22 | **support**  100:5 | |
| **steering**  90:22 90:25 | **strange**  107:8 | **supposed**  52:14 102:4 | |
| **stenographer** 142:5 | **strategy**  117:20 | **supposedly** 105:7 | **systems**  1:25 32:9,11 45:22 110:2 111:7 136:24 138:13 |
| **stenographic** 7:15 | **streamline** 23:10 | **sure**  9:10 12:5 13:4 34:12 36:8 41:16 55:16 59:16 72:7,10 78:18 80:7 101:14 116:20 122:15 127:19 139:12 | |
| **stenographic...** 1:23 | **streamlined** 17:25 24:22 27:15 116:21 | | |
| **step**  19:13 27:5 31:1 34:23,23 56:21 75:22 87:9 93:13 | **street**  2:8 | | **t** |
| | **stretch**  117:8 | **surprised** 46:16 47:21,22 62:18,19 63:8 66:1 | **take**  6:10 8:25 9:3,5,6 19:13 21:18 30:10 31:1 34:23 39:14 56:21 66:16 67:14,21 68:13 70:8 71:6 73:25 74:7,20 75:3 |
| | **strike**  99:25 | | |
| | **strong**  87:8 | | |
| | **structure** 109:18 115:6 115:10 | **suss**  98:6 | |
| | | **swear**  7:18 | |
| | **studying**  18:22 | **switch**  17:6,9 40:23 | |
| | **stuff**  79:3 83:17 83:20 | **switched**  17:10 | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[take - think]**

76:18,22 84:24 93:13 94:15 102:20 103:15 116:22 133:16 140:13

**taken** 6:13 142:7

**takes** 18:25 25:1,3

**talk** 32:10,11 32:13 33:16 36:16 67:6,9 84:8,23 102:5 104:23

**talked** 22:21 26:24 33:5 43:2 64:20 78:24 89:18 118:18 120:17 125:19 134:4

**talking** 40:8 44:25 45:1,4 57:20 60:9 77:16 79:16 87:12 114:25 136:1

**talks** 46:2

**tangible** 13:18

**tasked** 111:3

**tasks** 40:22

**team** 22:12 24:5,5,14 30:9 50:12,16 51:1 52:24 59:18 63:20 77:25

91:20,21 94:6 97:15 98:6,20 100:5,6 132:20 132:25 138:15 138:24

**team's** 138:25 139:2

**teams** 104:16 138:15,18

**technical** 35:25

**tell** 9:8 17:19 46:23 52:2,15 54:13 74:16 83:13 89:14 95:3,21,25 96:5 97:10 98:11,19 115:12 118:6 127:5 136:14

**telling** 25:21 26:3,10 33:5 58:7,18 98:25 107:3

**tells** 46:20 99:5

**temporary** 68:2

**tenure** 11:7 17:5 94:2 100:11

**term** 12:9 44:24 55:11 89:25,25 108:23 118:23 124:18

**terminate** 138:7

**terminated** 138:5

**terms** 19:2 36:5 78:9 114:22

**test** 50:19,21

**testified** 76:13

**testify** 48:2 73:11

**testifying** 142:10

**testimony** 7:18 20:15 27:19 56:25 83:5 91:22 120:10 120:20 140:8

**text** 79:14,23 81:19 83:16,17

**texted** 83:19,20 83:22

**texting** 83:20

**thank** 8:1 72:19 110:23 119:3 119:22 120:8 139:6 140:13

**thanking** 64:16

**thanks** 42:9

**theft** 38:10 62:4

**theirs** 79:10

**thereof** 142:14

**thing** 39:13 43:5 55:15 74:4 79:12 90:8 102:6,7 111:23

**things** 24:22 26:7 28:25 32:25 42:17 46:25 48:13 52:8 54:8,9 74:7 80:3 89:18,23 90:1 93:2,4 96:12 114:21 115:4 118:11

**think** 8:22 18:6 24:3 32:4,7,25 33:24,24 34:16 38:15 39:2 43:22 46:20,21 47:3,4 50:18 50:19 54:12 55:24 56:3,15 62:18 63:18 64:22 65:12,13 71:6 73:7,24 76:3,13,20 79:2 81:1,5 86:7 88:2 90:24 91:19 98:13 99:14 106:6,12,21,22 110:18 113:21 115:1 116:18 117:7 118:8 119:21 120:24 123:10,10 124:2 136:12 138:19 139:7

Page 34

**[thinking - trying]**

| | | | |
|---|---|---|---|
| **thinking** 32:24 | 20:8 24:10,19 | 120:8,17 134:2 | **transcript** |
| 35:5,6 36:8,11 | 25:1,1 29:8 | **today's** 140:8 | 142:16 143:2,5 |
| **thinks** 69:9 | 32:18 34:16 | **together** 19:2 | 143:9,11 144:2 |
| **third** 69:17 | 38:19,25 41:8 | 31:12 | **transcription** |
| **thought** 28:24 | 43:23 48:4,10 | **told** 30:2 52:16 | 142:14 |
| **thoughts** 71:20 | 48:11,12,25 | 53:24 98:15,16 | **transition** |
| 90:20 | 49:3,7 61:23 | 102:1,2,12 | 14:12 17:14 |
| **thread** 4:4,5,7 | 62:2,14,25 | 104:13 136:22 | 35:21 76:19 |
| 4:8,10,11,18,19 | 63:7 67:6 72:7 | 137:10,10 | 86:9 108:15 |
| 5:3,4,5 80:3 | 73:14 74:6,8 | 139:16 | **transitioned** |
| 103:14 105:20 | 76:12 77:2,6 | **took** 28:21 | 107:25 110:10 |
| 105:21 106:1,9 | 80:17 82:17 | 47:12,22 74:6 | 110:14 |
| 106:14 126:1 | 88:22 90:7,23 | 100:3 | **treatment** |
| 133:8 134:12 | 94:23,24 95:18 | **tool** 27:8,11 | 12:15 16:7 |
| **threats** 38:5 | 97:25 99:3 | 28:7 30:4 | **trend** 20:21 |
| **three** 8:24 70:1 | 102:11 103:15 | 31:17 37:9 | **trends** 89:17 |
| 87:12 93:14 | 104:7 108:15 | 44:2,21 45:15 | **truchart** 17:1,3 |
| 100:9 108:18 | 108:17 109:15 | 56:12 57:10 | 18:9 46:19 |
| 108:19 112:9 | 111:14 114:16 | 58:1,15 63:15 | 47:4,7,11 48:3 |
| 112:11,21 | 115:9 116:25 | 89:2,9,9,15 | 56:19,19 57:5 |
| 113:11 115:8 | 117:5 118:9 | 90:6,12 91:6 | 111:9,10 112:6 |
| **tim** 50:11,12,14 | 119:8,22 120:8 | 91:23 92:4,9 | 113:3,7,23 |
| 50:14,25 51:8 | 123:3 128:25 | 92:13,17,18 | 114:3 |
| 52:13 56:6 | 129:2 138:12 | 93:6,7 94:9,10 | **true** 52:10 |
| 58:18 59:11,17 | 142:8 143:23 | **top** 25:20 37:15 | 57:23 127:2 |
| 59:22 60:12,25 | **times** 127:7 | 114:6 122:11 | 144:21 |
| 64:3,4,21 | **timing** 76:12 | **topic** 76:19 | **trusted** 70:20 |
| 117:14 125:4 | 93:21 | **total** 140:9 | **truth** 7:19,20 |
| 131:13 133:19 | **title** 50:13 | **touch** 12:18 | 7:20 |
| 134:1 135:7,19 | 87:21 | **touched** 138:3 | **try** 31:16 78:12 |
| 136:6 | **titled** 108:9 | **traditional** | **trying** 32:7 |
| **tim's** 136:5 | **titles** 26:2 | 15:8 16:4 | 48:12 50:20 |
| **time** 6:2 7:1 8:6 | **today** 33:6 | **transcribed** | 60:11,12 65:11 |
| 9:2 11:9 13:12 | 76:14 84:17 | 142:13 | 76:12 82:23 |
| 17:24 19:17 | 104:17 109:15 | | 84:13 86:18 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[trying - value]**

94:12 95:22 135:8

**tuesday** 1:16 105:4

**turn** 56:2 113:10,14,24 122:9

**turned** 95:7 113:21

**tweak** 91:9

**twelve** 11:14

**two** 2:13 8:10 31:11,14,16 35:10 37:3 69:13 76:7,20 87:24 88:1 99:6 102:4 105:1 122:7 123:11 128:18 134:24

**type** 55:19 90:23 137:14

**typically** 60:23

**u**

**uh** 52:20 54:2 63:10 74:14 91:24 95:1 127:1

**ulcer** 27:3

**ulcers** 26:7

**ultimate** 44:1

**ultimately** 17:22 44:14 67:9 139:3

**unauthorized** 96:7 139:25

**under** 12:7 72:15 100:19 115:13 142:10 142:13 144:20

**undergraduate** 10:13

**underneath** 114:24

**undersigned** 141:8

**understand** 12:21 16:6 19:8 33:14 41:16 45:11,18 53:22 54:25 70:7 72:3 82:23 87:23 95:16 101:10 110:15 115:21 120:20 124:17

**understanding** 26:14,19 27:8 29:24 45:19 53:8 60:16 61:2,4 68:5,6 72:14,24 84:18 88:1 92:12,16 92:23 103:8,10 106:7 109:4,14 110:24 130:3 130:20 131:2 134:11 136:8 138:17

**understood** 26:20 109:23 115:15 138:6

**unique** 137:14

**unit** 6:12

**united** 1:1 6:16

**universe** 12:1

**university** 9:14

**unsettled** 115:5

**update** 47:19 64:16 134:22

**updating** 23:1

**use** 19:16 30:3 30:9 43:15 56:3 88:4,5 96:3 105:25 122:25 124:17 125:20 135:17 136:1,25 138:12,15,25 139:2,4

**used** 42:23 46:19 47:7 70:6 136:5 140:10

**useful** 19:2

**user** 44:1 51:5 51:14,14 52:6 52:18 88:7,9 90:13 111:20 111:23,23 112:2,5,10 124:18,25 125:1,2,10 126:15,19

127:8,13 129:7 130:8

**username** 60:21,22

**usernames** 61:6

**users** 88:21 138:12

**using** 16:24,25 18:2 24:10 43:19 44:24 46:23,24 50:19 56:22 57:4 60:17 61:6,7 63:19 70:22 72:22 108:23 117:24 130:4,8 135:5 136:4,4 136:10 138:18 139:25 142:12

**utilize** 15:19,22

**v**

**vague** 8:17 13:22 36:6,24 40:6 44:3 53:20 54:20 55:10 66:7 70:5 93:10 109:8 110:13 112:12,23 114:5 115:19 132:4,5 137:17 138:1

**vaguely** 131:5

**value** 138:19

Veritext Legal Solutions

866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[valued - working]**

| | | | |
|---|---|---|---|
| **valued** 73:19 | **w** | 102:22 105:15 | **witnesses** |
| **various** 97:19 | **waiting** 43:20 | 112:16,21 | 130:20 142:9 |
| **vendor** 22:6 | **walk** 70:15 | 125:2 | **woods** 2:13 7:7 |
| 33:25 82:20 | **walls** 23:5 | **ways** 99:6 | **word** 100:10 |
| 84:14 95:21 | **want** 8:25 9:2 | 126:20 | 102:5 |
| **vendors** 31:19 | 20:7 24:9,10 | **we've** 54:13 | **wording** |
| **verbatim** | 25:20 26:10 | 77:15 | 105:25 106:22 |
| 142:11 | 44:22 49:18 | **week** 30:15,18 | **words** 121:2 |
| **verify** 98:16,16 | 61:2 68:1 | 86:19 135:10 | 123:18 125:21 |
| **veritext** 6:20 | 71:22 73:11 | **weekly** 83:12 | 129:20 131:8 |
| 140:11 143:3 | 94:8 99:14 | **weeks** 47:12 | 131:25 132:11 |
| **version** 59:19 | 100:10 136:13 | **weird** 87:7 | 132:21 137:22 |
| **versus** 6:15 | 139:16 | **welcome** 77:8 | **work** 10:18 |
| 15:21 16:7 | **wanted** 14:18 | 117:7 | 30:3 31:6 |
| 106:5 132:13 | 14:20 30:3 | **went** 9:10 | 77:10 78:3 |
| **video** 6:9,12 | 36:16,22 37:11 | 10:11 20:8 | 80:1 82:3,8 |
| **videographer** | 44:14 56:2,4 | 40:12 58:4 | 83:16,19,20 |
| 2:17 6:1,21 | 57:8 58:14,16 | 77:10 119:18 | 87:18,18 88:23 |
| 38:19,23 77:2 | 67:10 73:16 | **when's** 89:8 | 95:11 100:19 |
| 77:5 116:25 | 77:25 78:3 | **willing** 30:8 | 119:13,19 |
| 117:3 140:7 | 102:25 103:1 | 136:6 | **workaround** |
| **videotaped** | 113:11 121:17 | **willingness** | 30:6 31:2 |
| 1:12 | 138:5,16 | 36:14 | 43:16 73:23 |
| **view** 28:22 | **wants** 60:13 | **witness** 3:8 6:8 | 77:18 |
| 137:14 | 124:22 | 7:10,21 12:22 | **worked** 28:20 |
| **viewed** 69:10 | **watching** 90:2 | 21:14 25:7,10 | 32:22 82:3 |
| 119:6 | **way** 16:19 | 25:14 27:21 | 84:2 88:3 |
| **violates** 74:16 | 22:16,24 32:5 | 34:13 49:16 | 100:7 |
| 137:20 | 32:9 33:24 | 62:8 64:13 | **workers** 18:19 |
| **virtually** 6:5 | 37:3 40:18 | 71:8 78:18 | **working** 14:1 |
| **vision** 14:18 | 41:17,20 44:19 | 80:7 101:14 | 22:10 31:20 |
| **visits** 20:7 23:4 | 55:7,18 61:25 | 127:20 143:9 | 35:13,19 73:16 |
| 23:4 26:8 | 69:25 80:2 | 143:17 | 82:20 87:17 |
| **vs** 1:6 | 88:20 89:16 | **witness's** 20:15 | 92:25 95:4,6 |
| | 96:1 99:2 | 56:25 83:5 | 107:5 108:21 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[working - zawadski's]**

110:25 127:7
**works**  19:24
33:24 49:13
90:7
**worth**  8:10
**wounds**  89:23
89:24
**write**  52:16,19
120:17 122:21
128:2 134:18
144:2
**writes**  39:12
40:17 126:8
134:1
**writing**  35:1
40:20
**written**  68:17
128:15
**wrong**  32:16
54:13

**x**

**x**  3:1
**xyz**  87:4

**y**

**yeah**  22:4,16
34:18,18 39:22
52:12 65:12
69:15 70:20
80:7 83:15,15
83:15 91:13
93:13 94:12
97:3 110:3
124:11 136:12

**year**  9:16 15:10
15:13 39:9
119:14
**years**  11:12
14:11 21:25
30:19 41:20
81:11 88:3
128:18
**yep**  71:17
80:19 85:12,14
88:10 97:9
104:5,10
**yesterday**
97:10 128:2

**z**

**zawadski**  40:17
40:18 42:14,21
43:13 47:19
50:6 65:5
66:20,23 69:9
70:11 75:7
79:15 81:7,14
94:7 97:5
102:13 119:4
**zawadski's**
48:18 74:13

Veritext Legal Solutions
866-299-5127            calendar-ca@veritext.com            www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Kevin Lathrop

# Highlighted Transcript

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,                     )

                 Plaintiff,         ) Case No.

     vs.                              ) 4:24-cv-01132-JST

RTZ ASSOCIATES, INC., and DOES )

1 through 10,                         )

              Defendants.        )

------------------------------)

REMOTE VIDEOTAPED DEPOSITION OF

KEVIN LATHROP

THURSDAY, JULY 16, 2026

10:06 A.M.

REPORTED BY:

SUSAN NELSON, C.S.R. No. 3202

JOB NO. 8299444

PAGES: 1-119

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


INTUS CARE, INC.,                    )

              Plaintiff,          ) Case No.

     vs.                          ) 4:24-cv-01132-JST

RTZ ASSOCIATES, INC., and DOES )

1 through 10,                        )

              Defendants.         )

------------------------------)


        Remote videotaped deposition of KEVIN LATHROP, the witness, taken on behalf of Plaintiff, commencing at 10:06 A.M., on THURSDAY, JULY 16, 2026, at Lake Saint Louis, Missouri, via Zoom, before SUSAN NELSON, C.S.R. No. 3202.

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

APPEARANCES OF COUNSEL APPEARING REMOTELY

FOR PLAINTIFF:

      EPSTEIN BECKER & GREEN, P.C.

      BY:  CHARLES E. WEIR, ESQ.

      1925 Century Park East, Suite 500

      Los Angeles, California 90067-2506

      (310) 556-8861

      cweir@ebglaw.com

FOR DEFENDANT RTZ ASSOCIATES, INC.:

      NOSSAMAN LLP

      BY:  DAVID C. LEE, ESQ.

      50 California Street, 34th Floor

      San Francisco, California 94111

      (415) 398-3600

      dlee@nossaman.com

Page 3

APPEARANCES OF COUNSEL (CONTINUED)


FOR COLLABRIOS HEALTH, LLC, AND THE WITNESS:

MCGUIREWOODS LLP

BY:  SHAILIKA SHAH KOTIYA, ESQ.

BAILEY MAHER, ESQ.

2 Embarcadero Center, Suite 1300

San Francisco, California 94111-3821

(415) 490-0918

skotiya@mcguirewoods.com

bmaher@mcguirewoods.com


ALSO PRESENT

MAY SEVIL, VIDEOGRAPHER

Page 4

```
                        I N D E X

WITNESS          EXAMINATION                PAGE

KEVIN LATHROP

            By Mr. Weir              9, 99

            By Mr. Lee              78




          QUESTIONS  INSTRUCTED  TO  NOT  ANSWER

                      PAGE/LINE

                        14/19

                        19/20
```

Page 5

```
                    E X H I B I T S

  NO.           PAGE      DESCRIPTION

  Exhibit 171   56        Summary Pro Forma Income

                          Statement

                          (1 Page)

  Exhibit 172   70        Email Exchange re High Desert

                          PACE Request

                          (Intus019811-19820)

  Exhibit 173   88        Excel Spreadsheet

                          (RTZ0008378)

  Exhibit 174   88        Excel Spreadsheet

                          (RTZ0008389)

  Exhibit 175   88        Excel Spreadsheet

                          (RTZ0008390)
```

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

LAKE SAINT LOUIS, MISSOURI;

THURSDAY, JULY 16, 2026;

10:06 A.M.

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:06 a.m. Pacific Time on July 16, 2026. Please note this -- this deposition is being conducted virtually. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Kevin Lathrop taken by counsel for Plaintiff in the matter of Intus Care, Inc., versus RTZ Associates, Inc., filed in the United States District Court for the Northern District of California, Case Number 4:24-cv-01132-JST.

My name is May Sevil, representing Veritext Legal Solutions, and I'm the videographer. The court reporter is Susan Nelson from the firm Veritext Legal Solutions. I am not related to any party in this action, nor am I financially interested in the

Page 7

outcome.                                                          10:08:06

If there are any objections to proceeding,                       10:08:07
please state them at the time of your appearance.                10:08:11

Counsel and all present, including remotely,                     10:08:14
will now state their appearances and affiliations for            10:08:17
the record, beginning with the noticing attorney.                10:08:20

MR. WEIR:  Charles Weir on behalf of                             10:08:24
Intus Care.                                                      10:08:27

MS. KOTIYA:  Shailika Kotiya on behalf of                        10:08:29
Collabrios Health and representing Kevin, defending              10:08:33
this deposition today.                                           10:08:38

MR. LEE:  Good morning.  David Lee on behalf                     10:08:39
of Defendant RTZ Associates, Inc.                                10:08:41

THE REPORTER:  And Bailey?                                       10:08:49

THE VIDEOGRAPHER:  Anyone else?                                  10:08:49

MS. MAHER:  Bailey Maher, representing                           10:08:54
Kevin Lathrop.                                                   10:08:56

THE VIDEOGRAPHER:  Thank you.                                    10:08:58

Will the court reporter please introduce                         10:09:02
yourself and administer the oath to the witness and              10:09:04
then counsel may begin.                                          10:09:07

THE REPORTER:  Good morning.  Susan Nelson,
California Certified Shorthand Reporter, license
number 3202.

And, sir, If you'll raise your right hand,

Page 8

please, I will swear you in.

KEVIN LATHROP,

having been first duly sworn, was

examined and testified as follows:

THE REPORTER:  Thank you.  Please proceed.

EXAMINATION

10:09:32

BY MR. WEIR:                                          10:09:32

Q.  Good afternoon, Mr. Lathrop.  Before we went   10:09:41
on the record, I think you had mentioned that you are   10:09:45
in Lake Saint Louis, Missouri.  Is that correct?   10:09:48

A.  Yes.                                            10:09:51

Q.  Is that -- are you in -- are you currently   10:09:51
in your home?                                       10:09:54

A.  I am.                                           10:09:55

Q.  Is there anybody else in the room with you?   10:09:56

A.  No.                                             10:09:59

Q.  Do you have any papers or documents with   10:09:59
you?                                                10:10:06

A.  Only the judge's order on what you can ask   10:10:06
me.                                                 10:10:11

Q.  Fair enough.  The -- is -- do you have any   10:10:11

Page 9

other, you know, like a cell phone or any device with    10:10:23
you that would allow you to communicate with folks    10:10:24
outside of the video and court reporter taking it    10:10:26
down?    10:10:30

A.  I have a cell phone.    10:10:31

Q.  I'm going to ask you that you don't, you    10:10:32
know, look at that cell phone or use it while we're    10:10:36
on the record.  If you communicate with your lawyers    10:10:38
and it's on the record, I'm entitled to that.  If    10:10:44
it's off the record, obviously, you can communicate    10:10:47
with them, but -- but I'd ask you not to, you know,    10:10:49
send messages while we're on the record.    10:10:54

Is that -- do you understand that?    10:10:57

A.  Yes.    10:10:58

THE REPORTER:  Excuse me, Counsel.    10:11:24

Mr. Lathrop, in the beginning, I said your
audio was really good, but now your volume seems to
have dropped.  So either your voice is dropping or
you're farther away from your microphone.

THE WITNESS:  Okay.

THE REPORTER:  If you could pump up that
output so we can all hear you better.

THE WITNESS:  Yeah.  How about now?

THE REPORTER:  That's slightly improvement.
We can work on it at a break, but just stay close to

Page 10

you microphone source and keep your voice up.

Please proceed.                                10:11:26

THE WITNESS:  Got it.                          10:11:26

BY MR. WEIR:                                           10:11:26

Q.  When we went through the introducing        10:11:33
everyone, it appears that you have -- you have        10:11:36
separate counsel here, folks from McGuireWoods.       10:11:42

Is that correct?                               10:11:46

A.  I -- I have McGuireWoods that I know of,     10:11:46
yes.                                                  10:11:50

Q.  And so you're -- you're not being           10:11:50
represented by David Lee for purposes of this         10:11:52
deposition?                                           10:11:55

A.  I am not.                                    10:11:56

Q.  And Collabrios is not represented by        10:11:57
David Lee for purposes of this deposition?            10:12:00

A.  No.                                          10:12:04

Q.  Was Collabrios ever represented by David Lee 10:12:04
as part of this litigation?                           10:12:10

A.  No.                                          10:12:17

Q.  Were you ever represented personally by     10:12:17
David Lee as part of this deposition?  Or part --     10:12:20

A.  No.                                          10:12:24

Q.  -- of this litigation, I should say.        10:12:25

Okay.  What did -- what did you do to           10:12:28

Page 11

prepare for your deposition today?　　　　　　　10:12:30

A.　I met with McGuireWoods.　　　　　　10:12:34

Q.　And who was in that meeting?　　　　10:12:41

A.　Shailika and another lady.  I don't remember　10:12:46
her name.　　　　　　　　　　　　　　　　10:12:50

Q.　Was it -- was it Bailey Maher?　　　10:12:51

A.　It was Bailey, yes.　　　　　　　　10:12:57

Q.　Okay.  Bailey was smiling in your response,　10:12:59
so I was thinking of --　　　　　　　　　　10:13:02

A.　Oh, I can't -- I can't -- I can only see　10:13:03
you.　　　　　　　　　　　　　　　　　　10:13:05

Q.　How long did that meeting last?　　　10:13:05

A.　About 40 minutes, I think.　　　　　10:13:10

Q.　And when was it?　　　　　　　　　10:13:12

A.　Oh.  It was Monday.　　　　　　　　10:13:20

Q.　Anything else you did to prepare for your　10:13:20
deposition?　　　　　　　　　　　　　　　10:13:29

A.　No.  Read the -- well, read the court order.　10:13:29

Q.　So this depo was going to -- scheduled　10:13:33
multiple times and taken off schedule.  The -- for　10:13:40
your -- for the previous times that it was scheduled,　10:13:45
did you do anything in the lead-up to the expected　10:13:48
date to prepare for your deposition that ultimately　10:13:51
was delayed till today?　　　　　　　　　　10:13:55

A.　No, I don't recall if I did or if I didn't,　10:14:01

Page 12

actually.                                                      10:14:04

Q.  So, for example, I think last time we ended    10:14:05
up canceling your deposition the day before it was    10:14:13
supposed to go forward.  Is it your recollection that    10:14:16
you did not have any prep sessions in advance of --    10:14:18
in advance of that prior deposition date?    10:14:23

A.  I probably -- I probably did have one, but I    10:14:25
don't recall specifically.    10:14:27

Q.  And the -- the 40-minute call you had on    10:14:29
Monday, do I have all of the people involved?  Was it    10:14:39
Bailey and Shailika were the only parti- -- and then    10:14:43
you, obviously, were the -- was that the extent of    10:14:45
the participants?    10:14:47

A.  Yes.    10:14:48

Q.  Was there anybody -- so nobody from Nossaman    10:14:48
was there?    10:14:52

A.  No.    10:14:53

Q.  Who else have you spoken with about your    10:14:53
deposition?    10:15:02

A.  Brett from McGuireWoods.  I don't remember    10:15:08
his last name actually.    10:15:14

Q.  Anybody else?    10:15:16

A.  No.    10:15:21

Q.  Have you talked to anybody at Nossaman about    10:15:21
your deposition?    10:15:27

Page 13

A.   No.   10:15:28

Q.   Have you talked to anybody at Nossaman about this case?   10:15:28   10:15:37

A.   Yes.   10:15:38

Q.   And who would that be?   10:15:44

A.   David Lee.   10:15:47

Q.   Anybody else?   10:15:48

A.   No.  I don't think so.   10:15:54

Q.   And, in those conversations with Mr. Lee, you did not at all talk about your deposition?   10:15:57   10:16:01

A.   Correct.   10:16:04

Q.   When was the last time you talked to Mr. Lee about this case?   10:16:06   10:16:21

A.   I don't recall the exact date.  It was about a bill, so it's really mechanical.   10:16:27   10:16:29

Q.   About a bill for legal fees?   10:16:31

A.   Yeah, it was a bill for legal fees, that's correct.   10:16:47   10:16:50

Q.   So is Collabrios paying for RTZ's defense in this case?   10:16:50   10:17:01

MR. LEE:  I'm going to object on the basis that this is beyond the scope of the deposition and the order.  I don't know what that has to do anything here, and I believe that the court specifically has addressed limitations on your questions concerning   10:17:02   10:17:04   10:17:08   10:17:10   10:17:12

Page 14

the interactions between RTZ and Collabrios.  So I'll    10:17:16

just state that for the record.    10:17:20

MR. WEIR:  Well, is there an instruction    10:17:27

that the witness is to not answer that question?    10:17:28

MS. KOTIYA:  Looking back at the order, the    10:17:32

order specifically says that questions about the    10:17:36

relationship between RTZ and Collabrios and how they    10:17:39

interact financially are barred.    10:17:42

So, based, on that, yes, I'm going to    10:17:45

instruct the witness not to answer.    10:17:47

MR. WEIR:  Okay.  So I guess -- I'm trying    10:17:56

to think of how to do this efficiently, 'cause I -- I    10:18:04

expect this will come up a lot.  I also expect us    10:18:09

having a fight about it.  I'm not going to convince    10:18:11

you of it, so I -- I -- can we just -- I'll ask the    10:18:16

questions.  If you're going to assert that, you know,    10:18:21

fine, and then, you know, we'll have a record and we    10:18:27

can review it.  And if I think I need to go back to    10:18:29

the judge and ask about, you know, having him answer    10:18:33

those questions, then it'll be what it'll be.    10:18:36

I -- does that work for you guys to proceed?    10:18:40

You know, again, I don't -- I suspect me getting into    10:18:44

an argument with you about the scope of the order is    10:18:47

probably going to be pretty useless, but I'm happy to    10:18:50

proceed --    10:18:52

Page 15

MS. KOTIYA:  Yeah.    10:18:52

MR. WEIR:  -- in -- in --    10:18:52

MS. KOTIYA:  Yeah:    10:18:52

MR. WEIR:  -- in different ways on that.    10:18:54

MS. KOTIYA:  Yes.  So here's what I would suggest.  We'll be stating objections, but, right now, I mean privilege aside, we only intend to instruct the witness not to answer if you're diving into questions that we believe are specifically barred pursuant to the court's order or are outside the scope of what the court has authorized to be asked, so.  And that includes Mr. Lathrop's percipient knowledge of the allegations in the complaint, RTZ's alleged information-blocking efforts, and, two, discussions that Mr. Lathrop had with RTZ's disclosed experts.    10:18:56 10:18:58 10:19:03 10:19:07 10:19:10 10:19:14 10:19:18 10:19:21 10:19:29 10:19:31 10:19:35 10:19:40

I think questions about the relationship between RTZ and Collabrios -- operational, transactional, corporate, financially -- are all specifically barred, in addition to the use of the High Desert document and questions about the receipt of revenues from PACE Care customers.    10:19:42 10:19:43 10:19:47 10:19:51 10:19:54 10:20:00

So maybe what -- I'm saying that all now to make it more efficient throughout the process.  If I'm objecting and I'll say instructing the witness    10:20:03 10:20:06 10:20:08

Page 16

not to answer pursuant to the court's order, that is    10:20:12

the basis for that objection, and, if it's anything    10:20:14

different, I'll state it differently.    10:20:18

MR. LEE:  And I'll just also note for the    10:20:22

record that any interactions and discussions that I    10:20:23

have had with Mr. Lathrop are in my capacity as    10:20:25

counsel of record for RTZ Associates, Inc., which is    10:20:29

a subsidiary of Collabrios, as we have already    10:20:34

informed the court RTZ has no employees.  So the    10:20:39

discussions that I've had with Mr. Lathrop would be    10:20:43

in connection with the representation of RTZ.    10:20:48

MR. WEIR:  Okay.  All right.  Let me -- fair    10:21:00

enough.  Let's proceed, and I think we'll just -- if    10:21:23

it's okay, we'll create the record, and then whatever    10:21:27

instructions are not to answer we will deal with    10:21:32

them.  And I -- if I don't withdraw the question    10:21:38

based upon, you know, the objection, then can we just    10:21:40

assume that I either disagree with the objection or    10:21:44

that think that it is -- should be fair game or    10:21:47

within the scope rather than having a debate every    10:21:53

time, which I don't expect to move the needle today.    10:21:57

So does that work for everybody?    10:22:01

MR. LEE:  Yeah.    10:22:05

MS. KOTIYA:  Yes.    10:22:05

MR. LEE:  That's fine with me.  We'll see    10:22:06

Page  17

how it goes.                                              10:22:09

MR. WEIR:  All right.                                     10:22:10

BY MR. WEIR:                                              10:22:11

Q.  So your discussions with -- you'd mentioned  10:22:14
your discussions with Mr. Lee were about a bill.         10:22:18

What other discussions have you had with         10:22:23
Mr. Lee about this case?                                 10:22:26

MS. KOTIYA:  Objection.  I think that calls  10:22:27
for privilege.                                           10:22:31

MR. LEE:  I agree.                               10:22:32

BY MR. WEIR:                                              10:22:34

Q.  How many times have you discussed this case  10:22:35
with Mr. Lee?                                            10:22:38

A.  I don't recall how many times.  I talk to a  10:22:42
lot of people every day.                                10:22:48

Q.  Would you say more than -- more than a       10:22:51
dozen?                                                  10:22:56

A.  Can't recall specifically.                   10:22:58

Q.  Can you give me any estimate at all?  More   10:23:00
than ten?  Twenty?                                      10:23:05

A.  If it's not specific, I can't.               10:23:08

Q.  Okay.  Anything at all about the number of   10:23:15
times that you --                                       10:23:18

A.  More than -- okay.  More than one.           10:23:19

Q.  More than one, okay.                          10:23:22

Page 18

A.  Yeah.                                          10:23:24

Q.  Do you think maybe more than five?            10:23:25

A.  I don't have the specif- -- I keep answering  10:23:30
the same thing.                                   10:23:33

Q.  Sir, I am entitled to your best recollection  10:23:36
as to the facts as you know them.  So --          10:23:41

A.  Yeah.                                          10:23:44

Q.  -- you know, if -- if it's truly the case     10:23:44
that you, as you sit here today, can't tell me    10:23:50
whether or not you've had more than five          10:23:52
conversations with David Lee, then it is what it is.  10:23:54
But I'm not asking you for an exact number, and I am  10:23:56
entitled to estimates in situations like this.    10:23:59

So if you have an estimate, please give it        10:24:03
to me.                                            10:24:05

A.  My best recollection is more than five.       10:24:06

Q.  Okay.  And, in each of those instances, were  10:24:15
the discussions about this lawsuit?               10:24:16

A.  Yes.                                           10:24:23

Q.  And what did you talk about?                  10:24:23

MS. KOTIYA:  Objection.  Calls for                10:24:46
privilege.                                        10:24:47

MR. LEE:  Join.                                    10:24:48

MS. KOTIYA:  I'm instructing the witness not      10:24:49
to answer.                                        10:24:52

Page 19

BY MR. WEIR:                                              10:24:58

Q.  Okay.  I should have asked for this at the          10:25:01
top.  You know, I'm not going to go through kind of     10:25:03
this is how a deposition works.  I'm assuming you've    10:25:08
either been deposed before or you've had those          10:25:11
conversations with your counsel.                        10:25:13

I do want -- I do want to ask you if there's            10:25:14
anything that you believe would prevent you from        10:25:16
giving your best testimony today.                       10:25:21

A.  Say that again.  Would believe that --              10:25:25

Q.  So, like, are you on any sort of medications        10:25:27
or anything like that that may prevent you --           10:25:30

A.  Oh.                                                  10:25:31

Q.  -- from giving your best testimony?                 10:25:31

A.  No, not on my medications.                          10:25:33

Q.  Is there anything you can think of that             10:25:35
would prevent you from giving your best testimony       10:25:37
today?                                                  10:25:38

A.  No.                                                 10:25:39

Q.  One of the things that -- we've seen this a         10:25:39
little bit already.  Sometimes my questions are not     10:25:47
the best.  They get a little clunky.  If you don't      10:25:49
understand a question, please ask me to clarify,        10:25:53
'cause, if you answer it, I'm going to assume you       10:25:57
understood it.                                          10:25:59

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Is that fair?                                         10:26:00

A.   Fair.                                            10:26:00

Q.   And then the other -- the other thing, I        10:26:01
like to try to take a break every hour or so, but if 10:26:04
you need a break, you know, sooner than that for     10:26:07
whatever reason, just let me know.  This is not an   10:26:08
endurance contest.                                   10:26:12

This is also not going to be an incredibly           10:26:13
long day, so we -- I don't think --                  10:26:15

A.   Okay.                                            10:26:18

Q.   -- we're going to need a lot of breaks, but     10:26:18
probably couple hours probably what we're going to   10:26:22
have.  So just a little -- little preview for         10:26:23
everybody.                                            10:26:27

I'd like to get a little bit of info about           10:26:27
your background.  Can you give me your -- your        10:26:31
educational background?                               10:26:39

A.   I have a highest level of education a master    10:26:43
of arts from Webster University in international      10:26:45
relations.                                            10:26:49

Q.   And when did you get that?                       10:26:49

A.   See, I have a lot of gray in my beard.  It's    10:26:55
probably I think 1994.                                10:26:58

Q.   The -- if you have a master's degree, I         10:27:05
assume you have a bachelor's degree from somewhere.   10:27:24

Page 21

So is my assumption correct?                              10:27:27

A.   Yeah, graduated in 1992.                             10:27:29

Q.   Also Webster University?                             10:27:33

A.   No, that was Eastern Illinois University.           10:27:35

Q.   And what is your degree in?                          10:27:37

A.   Political science and English.                       10:27:40

Q.   What did you do after you got your master's          10:27:43
degree?                                                   10:27:58

A.   Well, I was -- I was working.                        10:28:00

Q.   What was your job?                                   10:28:03

A.   At the time, I was a business analyst for an         10:28:08
insurance company.                                        10:28:12

Q.   Which insurance company?                             10:28:13

A.   Fireman's Fund Direct.                               10:28:19

Q.   How long did you work at Fireman's Fund?             10:28:21

A.   Probably three years, if I can recall.              10:28:25

Q.   That's going to take us like 97-ish, late            10:28:33
nineties?                                                 10:28:44

A.   Yeah.                                                10:28:45

Q.   Where did you work after Fireman's Fund?            10:28:47

A.   GMAC Insurance.                                      10:28:50

Q.   How long did you work there?                         10:28:52

A.   Probably around three years or so.                  10:28:59

Q.   Okay.  What's next?                                  10:29:10

A.   Citigroup.                                           10:29:13

Page 22

Q.  What did you do for Citigroup?                10:29:17

A.  I -- I led an analytical team.               10:29:21

Q.  What is -- what did that entail?             10:29:24

A.  Doing a lot of analysis for all of their     10:29:31
industries that they were in.  Birkholz.         10:29:34

Q.  What type of analysis?                       10:29:40

A.  A combination of business analysis and       10:29:46
technical analysis relative to systems and processes.  10:29:48

Q.  What type of systems?                         10:29:53

A.  They -- they had many different systems.     10:30:06
Huge company, as you can imagine, lots of different  10:30:09
tech stacks, so it was a wide variety.  But back  10:30:12
then, big mainframe systems.                     10:30:17

Q.  How long were you at Citigroup?              10:30:33

A.  Probably two years, I think, yeah.           10:30:36

Q.  And what did you do after Citigroup?         10:30:42

A.  I went and spent a year at Charter           10:30:48
Communications in a marketing role.              10:30:54

Q.  What's next?  You have a -- you have a       10:30:59
longer work history than I do.                   10:31:12

A.  I -- then, after Charter, I went back to     10:31:15
Fireman's Fund in a leadership role managing     10:31:19
technology and operations.                       10:31:25

Q.  How long did you do that?                    10:31:29

A.  Well, the parent company is Allianz, and so  10:31:32

Page 23

I probably stayed with those sets of companies for maybe nine years or so in various roles throughout the Allianz family, technology and operations roles.

Q.  When did you leave Allianz?

A.  I left Allianz in 2014.

Q.  To do what?

A.  I went to lead the provider side of TriZetto Corporation.

Q.  What is TriZetto Corporation?

A.  It's a mixture of payer and provider technology solutions and consulting solutions.

Q.  In the health care space?

A.  In the health care space, yes.

Q.  So it sounds like that TriZetto was your first foray into -- foray into health care?

A.  Well, Allianz had a bunch of health care solutions that I led in both Europe and the Americas before then.

Q.  How long were you at TriZetto?

A.  I was at TriZetto four -- about four years. They were purcha- -- we were purchased by Cognizant, so it became Cognizant.  But I was there, I left in 2018.

Q.  Did you leave in connection with the purchase?

Page 24

A.   No, I actually stayed on for about          10:33:50
two-and-a-half years with Cognizant after         10:33:54
acquisition.                                      10:33:57

Q.   All right.  So we're up to 2018.  What did   10:33:58
you do then?                                      10:34:05

A.   I went to a company called Transaction Data  10:34:06
Systems, which was a pharmacy management solution in   10:34:09
the independent pharmacy space.                   10:34:14

Q.   What was your role there?                    10:34:16

A.   I ran technology, operations, customer       10:34:20
support, account executives.  Many things there.  10:34:24

Q.   What was your title?                         10:34:30

A.   President.                                   10:34:43

Q.   And how long were you at Transaction Data    10:34:43
Systems?                                          10:34:52

A.   I left in the -- at the end of '21.          10:34:53

Q.   To do what?                                  10:35:01

A.   Well, I wanted to retire, but I got bored,   10:35:09
and I started my own consulting company, in concert   10:35:13
with taking the president role at Exela Technologies.   10:35:18

Q.   You said "Exela"?                            10:35:26

A.   Yeah, E-x-e-l-a.                             10:35:28

Q.   And you say you took the president role      10:35:31
there?                                            10:35:39

A.   I did.  I created -- well, they had a bunch  10:35:39

Page 25

of health care assets, and we created one P&L and -- 10:35:43

on the payer and provider side. 10:35:48

Q. What did -- what did Exela do? 10:35:57

A. They -- they did every -- anything you can 10:36:02
think of, mostly in health care. Core competencies 10:36:04
were managing payer contracts and managing EHRs for 10:36:09
large health systems. And we also did revenue cycle 10:36:17
management quite a bit as well on the provider side. 10:36:21

Q. In your roles prior to Exela, were you 10:36:24
exposed to EMR systems in any of your work? 10:36:44

A. Yes. 10:36:50

Q. That's not the -- not the greatest question. 10:36:50
Were -- were you -- did any of your job 10:36:54
involve where you were responsible for creating or 10:36:58
managing an EMR product? 10:37:04

A. Yes. 10:37:07

Q. Which one? 10:37:11

A. Transaction Data Systems. Exela. 10:37:13

Q. Is that it? Sorry, I was -- 10:37:23

A. We haven't got there yet, but, when I was 10:37:33
doing a lot of consulting, I did a lot of consulting 10:37:35
for EMR, EHR, and -- and specialty platform 10:37:38
companies. 10:37:45

Q. Yeah. All right. We'll get to there in a 10:37:45
second, so. And you were at Exela how long? 10:37:47

Page 26

A.    I was there just for a year till 2020 -- end of '22.    10:37:54  10:37:58

Q.    Then you had mentioned, as part of your consulting practice, work with EMR systems.  Describe that for me.    10:37:59  10:38:06  10:38:13

A.    I didn't catch your question there, Mr. Weir.  There was a little background noise.    10:38:14  10:38:17

Q.    Sorry about that.  The -- you had mentioned, as part of your consulting services, you had done some work in the EMR and EHR space.  I was just asking if you could describe that for me.    10:38:20  10:38:23  10:38:26  10:38:32

A.    Ah.  Yeah, so I -- I did a lot of work for private equity companies that owned those assets, and so it was -- a lot of it was on really project basis.  And so I did a lot of work on Surescripts, and a company called Experity, which is an urgent care EMR EA -- EMR PM system.  I did a fair amount of work on PrescribeWellness.  A fair amount of work on Cargill outcomes.  That's -- that's mostly -- a lot of the EMR specific stuff.    10:38:34  10:38:37  10:38:42  10:38:45  10:38:52  10:38:58  10:39:03  10:39:08  10:39:13

Q.    When you say "work," what type of work was it?    10:39:15  10:39:17

A.    It really varied.  You know, it could be anything from a technology assessment to security -- cyber security assessment, to operational review, to    10:39:20  10:39:23  10:39:28

Page 27

MSP review.  It was really project based.    10:39:33

Q.  When you say a tech assessment, I -- I --    10:39:36
well, let me ask you this way.    10:39:48

Are you involved -- were you involved in the    10:39:49
engineering aspect of any of this rebuilding any of    10:39:53
these systems or -- or is it more on the business    10:39:56
side where you're evaluating them from that    10:39:58
standpoint?    10:40:00

A.  Yeah, I'm not an engineer by -- by trade,    10:40:00
and I just led engineering teams and tech teams and    10:40:03
product teams.    10:40:06

Q.  So when you said you do a tech assessment,    10:40:07
what -- what does that mean?  What does that entail?    10:40:12

A.  Well, you can go for a couple hours on it,    10:40:18
but, generally, it's --    10:40:21

Q.  I don't want to do -- I don't want to do    10:40:21
that.  If you could -- if you could give me the    10:40:22
shortened version of that, I'd appreciate it.    10:40:24

A.  Yeah, it's really the -- the scaleability    10:40:26
and the vulnerability of the tech stack itself and    10:40:29
its -- its -- you can dive into pieces and parts of    10:40:32
each particular solution or technology solution.    10:40:34

So it really is assessing the, you know,    10:40:38
efficacy and the viability of the tech stack and does    10:40:42
it need modernized?  Does it -- is there security    10:40:46

Page 28

vulnerabilities?  Things like that.    10:40:50

Q.  Okay.  I think we were up to 22.  What --    10:40:54

A.  Yeah.    10:41:10

Q.  What did you do after you left Exela?    10:41:10

A.  That's where I was doing a lot of    10:41:16
consulting, working for myself.    10:41:21

Q.  And when -- when did that stop?    10:41:29

A.  At the end of '24.    10:41:35

Q.  And that's when you took the job with    10:41:37
Collabrios?    10:41:43

A.  Correct.    10:41:44

Q.  How did that come about?    10:41:44

A.  I met the private equity investors who were    10:41:49
at the time forming thesises and were looking for    10:41:55
technology leaders and got talking to them, and    10:42:03
that's how we shaped a relationship.  And they,    10:42:08
whether it was good or bad, convinced me to come on    10:42:12
board.    10:42:16

Q.  And had you worked with them before?    10:42:16

A.  I have not.    10:42:19

Q.  How did you come in contact with them?  They    10:42:19
just hunted you down?    10:42:26

A.  I've worked -- I worked with lot -- in my    10:42:28
past, a lot of private equity people, and so it's,    10:42:30
you know, kind of a, you know, word-of-mouth type    10:42:34

Page 29

scenario.                                                    10:42:36

Q.   And I think your -- correct me if I'm wrong,    10:42:37
but I think your Collabrios title currently is       10:42:46
president.   Is that right?                           10:42:50

A.   Correct.                                         10:42:52

Q.   Was that your title when you started at the     10:42:52
end of '24?                                           10:42:58

A.   Yes.                                             10:42:58

Q.   I assume when you were looking to taking the     10:43:15
job, you might have had some discussions with         10:43:19
Michael Zawadski.  Am I correct?                      10:43:22

A.   I did.                                           10:43:24

Q.   What -- what were those discussions about?       10:43:25
Or what do you recall were the discussions?           10:43:29

A.   Yeah, really about the market, the PACE          10:43:32
market, the government market, his vision of the      10:43:37
future.  You know, I cared a great deal about where   10:43:41
he wanted to take it, very important for me and --    10:43:47
and kind of what would be my autonomy relative to     10:43:49
product and tech.                                     10:43:53

Q.   And where did he want to take it?                10:43:59

A.   Big places.  Yeah, you know, he wanted to        10:44:01
grow the company in a -- in a healthy way and wanted  10:44:08
to get more into the government business and thought  10:44:11
there was natural adjacencies that made a lot of      10:44:14

Page 30

866-299-5127        calendar-ca@veritext.com        www.veritext.com

sense.    10:44:18

Q.   When you say "government business," what are    10:44:18
you referring to?    10:44:20

A.   We do a lot of business with the AAAs and    10:44:20
the state units on ageing and a lot of government    10:44:24
programs.    10:44:26

Q.   Is this the -- was this your first    10:44:30
experience in the PACE space?    10:44:34

A.   It was.    10:44:37

Q.   Anything else you remember about your    10:44:37
discussions with Michael Zawadski about taking the    10:44:50
job?    10:44:54

A.   No, it -- you know, his opinion on the    10:44:55
investors and, you know, just normal courting, trying    10:44:57
to convince each other that we're -- it's a good    10:45:00
opportunity.    10:45:03

Q.   Did you have any discussions with    10:45:04
Michael Zawadski about Intus Care?    10:45:12

A.   Can you frame, like, when we are courting?    10:45:15
Are we still on that or --    10:45:19

Q.   I was asking more in general, but that's a    10:45:20
fair clarifying question.  Why don't we start -- why    10:45:23
don't we start just in general, and then we'll narrow    10:45:25
if we have to.  So let me ask it again.    10:45:29

So have you had discussions with    10:45:31

Page 31

Michael Zawadski about Intus Care?

A. After I started, very general discussions with Michael, yes.

Q. And what -- what do you recall from those discussions?

A. Well, I mean Intus is our num- -- the number one competitor for PACE in the market, and so it was a lot around what do -- you know, what are they doing from a market position perspective and what is it in comparison to us and, you know, business discussions.

Q. Did you discuss this lawsuit with him?

A. I -- in generality, I was informed of the lawsuit. It -- it did come up at a board meeting, so really mechanical things. He was kind of handling that.

Q. When was the last time you spoke with Michael Zawadski?

A. We -- I talked to him probably a week ago, talking about World Cup games that we went to. Not together, but he took his kids, I took my kids.

Q. When was the last time you talked to him about business-related issues?

A. He's a board member, so probably our last monthly review which was probably a month ago.

Q. I assume when he was still an employee of

Page 32

the company you guys discussed the business    10:47:28

frequently.  Fair?    10:47:32

A.  Absolutely.    10:47:34

Q.  And so after he became a -- after he became    10:47:35
an employee, I assume that that cadence -- sounds    10:47:39
like that cadence may have dropped off quite a bit    10:47:42
and it's just board-related communications?    10:47:46

A.  That's right.    10:47:49

Q.  You said a moment ago Intus was your number    10:47:53
one competitor.  Have you had that belief the entire    10:47:56
time you worked for Collabrios?    10:48:04

A.  I view them as a competitor.  You know,    10:48:10
there's a lot of other things in the market, but, I    10:48:12
mean, they're -- they're a competitor for sure.    10:48:18

Q.  Let's talk a little bit about PACE Care.  I    10:48:20
assume you know what PACE Care is?    10:48:49

A.  I do.    10:48:52

Q.  Can you give me your quick description of    10:48:53
what PACE Care is and what it does.    10:49:02

A.  PACE Care is a -- in my words, an all-in-one    10:49:06
EHR designed for PACE, the PACE market.    10:49:16

Q.  You used the term "EHR."  Well, just so    10:49:34
there's no confusion, what -- why did you choose EHR,    10:49:41
and what does that mean?    10:49:45

A.  There is a nuance between EHR and EMR, in my    10:49:49

Page 33

view.  The electronic health record is how I view my                10:49:53
system.                                                              10:50:00

Q.  What is the nuanced difference you just                         10:50:05
referred to?                                                        10:50:10

A.  It's an -- the electronic health record                         10:50:11
versus the electronic medical record.                               10:50:14

Q.  What is the functional distinction that                         10:50:20
you're drawing?                                                     10:50:21

A.  To me, it's the -- where the medical record                     10:50:24
is within a portal accessible view whereas the health               10:50:29
record is an exchange view.                                         10:50:40

Q.  What do you mean by "an exchange view"?                          10:50:42

A.  It's a complete health record of a patient,                     10:50:50
so that's maybe the better way to say it.                           10:50:55

Q.  Whereas an EMR system is not displaying the                     10:50:59
complete health record of the patient?                              10:51:12

A.  For different -- you know, in PACE, it's one                     10:51:15
function, so maybe that's where we're getting hung up               10:51:18
whereas, in a provider scenario, there could be lots                10:51:21
of different other competencies that are contributing               10:51:26
to that.                                                           10:51:29

Q.  And you had mentioned that the -- the EHR                        10:51:42
aspect of it is a complete record, and I think you                  10:51:45
said it was an exchange system.                                     10:51:47

What -- what do you mean by that?                                10:51:49

Page 34

MR. LEE:  Objection.  Asked and answered.    10:51:52

You can answer, Kevin.  Sorry, don't mean to    10:52:06
instruct you.    10:52:08

MS. KOTIYA:  No.    10:52:08

THE WITNESS:  Okay.  I forgot the question    10:52:10
'cause --    10:52:13

BY MR. WEIR:    10:52:13

Q.  Well, you had -- you had -- you had kind of    10:52:13
described the EHR in a couple different ways, and one    10:52:15
of the words you used was that it was an exchange.  I    10:52:18
wanted to drill down on that a little more and    10:52:22
understand what you meant.    10:52:26

MR. LEE:  Objection.    10:52:28

THE WITNESS:  Oh, the --    10:52:29

MR. LEE:  Hold on.  Objection.    10:52:29
Mischaracterizes the witness's testimony.    10:52:31

Go ahead.    10:52:34

MS. KOTIYA:  You can still answer, Kevin.    10:52:35

THE WITNESS:  I'll answer the -- the health    10:52:39
record in an EHR has the ability to move from place    10:52:45
to place.  Does that make sense?    10:52:51

BY MR. WEIR:    10:52:59

Q.  Maybe.  When you say "move from place to    10:52:59
place," where is it moving?  From where to where?    10:53:02

A.  It could move from module to module within    10:53:09

Page 35

866-299-5127    calendar-ca@veritext.com    www.veritext.com

my platform.                                                10:53:12

Q.   And when you say the health record moves   10:53:13
from module to module, it means all of the data   10:53:19
associated with the patient can move from module to   10:53:23
module?   Is that what you're referring to?   10:53:27

A.   Yes.                                                10:53:27

Q.   And how is the data that is -- makes its way   10:53:46
into the system that comprises the health record, how   10:53:52
is -- how does -- how does that happen?   10:53:58

What is the -- what is the functionality   10:54:02
that allows the data to be input into the system to   10:54:04
create the health record?   10:54:08

A.   It's my -- I -- my -- at a very base level,   10:54:16
it's the system that captures what you're saying.   10:54:19

Q.   But, I guess, then captures it from -- from   10:54:29
where?   You know, like, so there's a physician sees a   10:54:34
patient whose records are stored on PACE Care, what   10:54:39
is the -- how did the -- how does that information   10:54:44
from that doctor's visit get input into PACE Care?   10:54:47

A.   That's really up to my client how they --   10:54:52
how they do that.   10:54:54

MR. LEE:   Charles, I'll just say for the   10:55:07
record I've, you know, been fairly lenient in terms   10:55:08
of this line of questioning.   But, again, I'm looking   10:55:13
at the scope of the allowable questions for this   10:55:16

Page 36

deposition, and this doesn't seem to be within it.   10:55:21

So are you intending to -- to continue down   10:55:25
this road in asking this particular witness all   10:55:31
manner of questions about the PACE Care system?   10:55:36

MR. WEIR:  Yes.   10:55:38

MR. LEE:  Okay.   10:55:40

MR. WEIR:  Or just what -- what he knows   10:55:41
about it.  I mean, it's -- I mean I -- I -- I read   10:55:43
the -- we read the order, I suppose, a little bit   10:55:50
differently.   10:55:55

The scope of his deposition is limited to   10:55:57
his percipient knowledge of the allegations alleged   10:56:01
in the first amended complaint.  So the -- the whole   10:56:03
complaint is about PACE Care.  He has a lot of   10:56:06
knowledge about PACE Care.   10:56:10

MR. LEE:  Well, it's i.e., RTZ's alleged   10:56:12
information-blocking efforts by refusing Intus access   10:56:16
to PACE Care absent an NDA.   10:56:20

MR. WEIR:  Yeah, but --   10:56:20

MR. LEE:  So I think -- I think the court   10:56:24
has specified kind of the -- the limitations here,   10:56:26
which this is witness's percipient knowledge as to   10:56:30
Intus's allegations that RTZ engaged in information   10:56:35
blocking.   10:56:39

MR. WEIR:  Yeah, and I think the system and   10:56:39

Page  37

how it works is directly relevant to the claims in 10:56:41

this case and what's alleged and I don't -- you know, 10:56:45

the whole -- the whole case is about PACE Care. 10:56:48

MS. KOTIYA:  I think at this point I'm okay 10:56:52

allowing this questioning to go forward based on my 10:56:56

read of the order in defending this deposition but 10:57:01

within reason.  I think at this point I'm -- I'm 10:57:05

okay. 10:57:09

MR. WEIR:  Yeah, I mean, look, I'm not -- 10:57:09

I'm not intending to have this last for, you know, 10:57:15

five hours about everybody coded at PACE Care.  But I 10:57:18

do -- I do think I'm entitled to, you know, his -- 10:57:23

what he knows about PACE Care and how it works and 10:57:27

how people use it, and so that's it. 10:57:31

MS. KOTIYA:  I think at this -- at this 10:57:36

point at least, I'm not inclined to instruct the 10:57:38

witness not to answer.  That might change based on 10:57:38

what David said.  So I think, for now, proceed. 10:57:44

MR. WEIR:  Okay.  All right. 10:57:47

BY MR. WEIR: 10:57:48

Q.  So -- all right.  So it's up -- it's up to 10:57:51
the client, I think you said, to set up how the 10:57:56
information capture that goes into the PACE Care 10:57:59
system is done.  Is that -- just to kind of reorient 10:58:02
ourselves. 10:58:07

Page 38

Do I have that right?   10:58:08

A.   Yeah, I mean the client drives that.   10:58:08

Q.   And does the PACE Care system, does it allow   10:58:12
for -- once the information is in the system, does it   10:58:18
allow for different users to access that information   10:58:22
for purposes of providing patient care?   10:58:28

MR. LEE:   Objection.   Vague and ambiguous.   10:58:33

MS. KOTIYA:   You may answer, Kevin, if you   10:58:38
understand it.   10:58:45

THE WITNESS:   Anyone that is credentialed   10:58:45
within my client can see the record.   10:58:46

MS. KOTIYA:   Counsel, I hate to -- I know   10:58:57
you're planning to take a break at about an hour.   10:59:00
And I just want to flag that I might need a restroom   10:59:04
break when you're ready at a stopping place.   10:59:08

MR. WEIR:   Yeah, a couple more questions   10:59:11
here and then --   10:59:14

MS. KOTIYA:   Good.   10:59:14

MR. WEIR:   -- we can do that.   Fair enough.   10:59:15

BY MR. WEIR:   10:59:16

Q.   The -- so, like, what about -- what about   10:59:17
like doctors who are treating the patients, can   10:59:24
they -- can they see these records?   10:59:30

A.   I mean, again, if a doctor is credentialed   10:59:31
by my client, yes.   10:59:34

Page 39

Q.   What about like lab companies?

A.   Can you be specific of your question?  Lab companies what?

Q.   Sure.  Like, you know, the patient has to have certain tests done, and they're done by Labcorp.  Does -- can Labcorp see these records that are on the PACE Care system?

A.   No.

Q.   Labcorp wouldn't -- doesn't have any access to the PACE Care system?

A.   Define "access" for me, please.

Q.   Any access, any access to information stored on the PACE Care system.

MR. LEE:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, it is vague and ambiguous to me, too.  You're -- when you say Labcorp are you talk- -- are you -- the company in general?

BY MR. WEIR:

Q.   Yeah.  Do you know what Labcorp -- I mean, I -- I assume there are -- Labcorp's a large company.  I assume there are PACE patients that -- that are on the PACE Care system that have labs read by Labcorp.

Is that your understanding as well?

A.   There is a relationship with Labcorp to have labs ordered, yes.

Page 40

Q.   And is that -- do those orders go through the PACE Care system?   11:01:15   11:01:21

A.   If that's the process of the -- of the workflow for the client, yes.   11:01:24   11:01:30

Q.   So, for the clients that have that workflow, how does it work?   11:01:32   11:01:43

A.   The client will order the lab within PACE Care, and -- and it will be sent if that workflow is connected to Labcorp to Labcorp, or it will be a paper order that the patient will take.   11:01:45   11:01:49   11:01:56   11:01:59

Q.   So, for at least some of the PACE Care clients, it's automatically sent -- the order's automatically sent to Labcorp through the PACE Care system?   11:02:07   11:02:11   11:02:14   11:02:18

A.   From the PACE Care system.   11:02:18

Q.   From the PACE Care system.   Okay.   11:02:21

And then Labcorp would get that from the PACE Care system.   And then do they put the results back into the PACE Care system?   11:02:23   11:02:26   11:02:29

A.   In some cases, they -- they send it into PACE Care, yes.   11:02:33   11:02:39

Q.   Are there any other -- are there any other entities that you can think of that are like -- that have a similar workflow to the Labcorp workflow that you just described?   11:02:40   11:02:53   11:02:58   11:03:03

Page 41

A.   Yes.   11:03:03

Q.   What are those?   11:03:06

A.   Payers.  Pharmacies.  Medical device companies in some cases.   11:03:09   11:03:27

Q.   Anything else?   11:03:38

A.   Generally, that's what I can think of.   11:03:40

Q.   What about like ambulances or anything like that?  Ambulance companies?   11:03:42   11:03:51

A.   Transportation companies, yes.   11:03:58

Q.   Any other health care services you can think of?   11:03:58   11:04:10

A.   Those are the big ones.   11:04:10

MR. WEIR:  All right.  Let's -- let's take our break.   11:04:13   11:04:15

THE WITNESS:  Okay.   11:04:19

THE VIDEOGRAPHER:  The time is 11:04 a.m. We're off the record.   11:04:20   11:04:23

(Recess taken.)   11:04:23

THE VIDEOGRAPHER:  The time is 11:16 a.m. We're back on the record.   11:16:02   11:16:13

BY MR. WEIR:   11:16:14

Q.  Just a couple more questions about PACE Care.   11:16:18   11:16:20

When you took the job with Collabrios, did you do a -- we talked about tech assessments before.   11:16:22   11:16:27

Page 42

Did you do a tech assessment of PACE Care?    11:16:30

A.  No.    11:16:36

Q.  Did you form any views on PACE Care as a product?  Good product, bad product.    11:16:36 / 11:17:02

A.  When?    11:17:06

Q.  When -- well, it sounds like you -- you had views and it may have changed.  So why don't we start with when you first started with the company, did you have views on PACE Care as a product?    11:17:07 / 11:17:16 / 11:17:18 / 11:17:21

A.  I looked at it and it seemed like there was a lot of opportunity.    11:17:24 / 11:17:31

Q.  How so?    11:17:33

A.  In my mind, a lot of opportunity for scaleability for new products.  I was pretty excited about that.    11:17:53 / 11:17:59 / 11:18:06

Q.  Did your review of PACE Care change over the last, I guess we're almost two years?    11:18:08 / 11:18:13

A.  No.    11:18:19

Q.  Have you ever seen CareHub?    11:18:19

A.  I have not.    11:18:35

Q.  Do you have any opinions about CareHub and whether it's a good product?    11:18:35 / 11:18:42

A.  No.    11:18:49

Q.  What is your understanding of the NDA negotiations that took place between Intus and RTZ?    11:18:56 / 11:19:15

Page 43

A.  I know that that was something Mike was handling, and generally just kind of the way you said it.  It was contractual.

Q.  What did he tell you about those negotiations, the NDA discussion?

A.  That in our con- -- in the -- in the RTZ contract, that that was an element.  That's --

Q.  Were there any discussions about whether he had any intention of entering into a nondisclosure agreement or some sort of information-sharing agreement with Intus?

A.  We didn't -- my recollection, we -- I never really talked with him directly about that, 'cause he was handling that.

Q.  Was anybody else involved in the NDA-related discussions with Intus that you're aware of?

MS. KOTIYA:  Objection --

THE WITNESS:  Not that I'm aware of --

MS. KOTIYA:  Oh, sorry.  Just limiting the scope of those questions to RTZ and Intus, his knowledge about RTZ and Intus.

MR. WEIR:  Okay.

MS. KOTIYA:  Yeah.

BY MR. WEIR:

Q.  So, from your perspective, it was just

Page 44

Mike Z?                                               11:21:05

A.  From my knowledge, yes.                      11:21:08

Q.  Did you ever review any of the markups or    11:21:16
proposals that Intus made?                            11:21:20

A.  When?                                         11:21:22

Q.  At any point in time.                         11:21:26

MS. KOTIYA:  Objection.  Should be limited    11:21:28
to the time any markups between Intus and RTZ --      11:21:33

MR. WEIR:  Yeah, all of these questions --    11:21:38

MS. KOTIYA:  -- and your knowledge.          11:21:39

MR. WEIR:  -- relate to the -- the NDA        11:21:39
discussions with -- the NDA that would have been      11:21:42
between RTZ and Intus.                                11:21:47

BY MR. WEIR:                                           11:21:53

Q.  Did you ever see any markup related to --    11:21:53
related to that negotiation?                          11:21:57

A.  "You" being -- yeah, getting specific,       11:21:59
that's helpful.  No.                                  11:22:04

Q.  Did you ask to review any of those?          11:22:13

A.  No.                                           11:22:16

Q.  Why not?                                      11:22:17

A.  Mike Z was handling that.                     11:22:25

Q.  Did you convey any strategies to him about   11:22:26
how he should handle it?                              11:22:45

A.  No.                                           11:22:52

Page 45

Q.   Did Michael Zawadski ever convey to you that    11:22:52
he didn't want Intus to have access to the PACE Care    11:23:24
system?    11:23:27

A.   I don't recall.    11:23:31

Q.   Did you form any opinions about whether you    11:23:51
wanted -- you wanted Intus to have access to the    11:23:53
PACE Care system?    11:23:57

A.   Form any opinions, no.    11:24:01

Q.   So you're ambivalent about whether they had    11:24:08
access or not?    11:24:11

MS. KOTIYA:   Objection.   Outside of the    11:24:13
scope of the court's order to the extent this    11:24:16
question is asking about his opinions as president of    11:24:18
Collabrios related to anything that is not backwards    11:24:24
looking to the time of RTZ.    11:24:30

MR. LEE:   Join.    11:24:34

BY MR. WEIR:    11:24:40

Q.   Do you understand where we left off after    11:24:40
all that what your instructions are?   Or do we need    11:24:43
to go back?    11:24:45

MS. KOTIYA:   Oh, my instructions?   So I --    11:24:45
you know, you can go ahead and --    11:24:46

MR. WEIR:   No, no, no, I -- I understand    11:24:47
what you're saying.   I was asking the witness.    11:24:49

MS. KOTIYA:   Okay.    11:24:50

Page 46

MR. WEIR:  I -- I -- I think he might have 11:24:51

been -- I understood your objection to be you're 11:24:53

going to allow him to answer questions as long as 11:24:56

it's cabined toward the RTZ-related interactions. 11:24:59

Is that correct? 11:25:08

MS. KOTIYA:  Correct.  His percipient 11:25:08

knowledge, but I -- I did instruct him not to answer 11:25:10

your question because your question was about his 11:25:12

opinions on -- presently on dealing with Intus.  So 11:25:15

that is going to conduct of Collabrios and is barred 11:25:20

by the court's order. 11:25:26

MR. LEE:  Join. 11:25:28

BY MR. WEIR: 11:25:29

Q.  Okay.  Did you form any opinions about 11:25:37

focusing on the time period where RTZ was negotiating 11:25:43

an NDA with -- with Intus, focusing on that action, 11:25:49

did you form any opinions about whether, you know, 11:26:00

from a business standpoint, it was -- it was good for 11:26:05

RTZ not to enter into that agreement? 11:26:08

MR. LEE:  Objection.  Vague and ambiguous as 11:26:13

to time.  Calls for speculation.  I -- I guess -- 11:26:16

and, I'm sorry, I don't -- I don't mean to interject 11:26:22

anything into the question that you've asked.  I just 11:26:27

want to make certain that I'm understanding. 11:26:30

I believe that the NDA discussions between 11:26:33

Page 47

RTZ and Intus occurred, Charles, and you can correct    11:26:35

me, but I believe it was roughly at 2022 and 2023    11:26:39

time frame.    11:26:42

And so is your question is Mr. Lathrop's    11:26:42

present-day views on what happened in the past in    11:26:48

forming his views now?    11:26:54

MR. WEIR:  Yeah, does he have -- did he ever    11:26:56

develop any views about -- I'm trying to get -- I'm    11:26:58

trying make sure I exhaust what he knows and what he    11:27:01

believes about what happened between RTZ and Intus    11:27:04

and the NDA discussion.  If he has any knowledge on    11:27:07

that or if he has any opinions about it or whether it    11:27:11

was a good idea or a bad idea is what I'm trying to    11:27:13

get it.    11:27:17

MS. KOTIYA:  But -- okay.  Got it.    11:27:18

MR. WEIR:  So.    11:27:19

MS. KOTIYA:  Okay.  With that -- with that    11:27:20

clarification, you may answer, Kevin.    11:27:22

MR. WEIR:  Does that help?    11:27:24

MS. KOTIYA:  If you understand the question.    11:27:25

MR. WEIR:  Let me -- let me try it again so    11:27:27

it's a cleaner record.    11:27:28

BY MR. WEIR:    11:27:28

Q.  So I want to focus on the -- the discussions    11:27:29

between Intus and RTZ about a nondisclosure    11:27:38

Page 48

agreement.  And my question to you is, you know, did    11:27:42

you form opinions or have views about those    11:27:49

discussions and whether it was a good idea or a bad    11:27:53

idea for RTZ to enter into an NDA with Intus or not    11:27:56

into an NDA with Intus?    11:28:00

     A.  No.    11:28:05

     Q.  No views one way or the other?    11:28:05

     A.  Correct.    11:28:08

     Q.  You'd mentioned a couple times that this was    11:28:09

something that Mike -- you knew Mike Z was handling    11:28:14

it.  Mike Zawadski was handling it.    11:28:18

          Have you told me everything you know and    11:28:21

understand about the NDA negotiations between Intus    11:28:23

and RTZ?    11:28:31

     A.  Yes.    11:28:34

          MR. LEE:  Charles, just for clarification,    11:28:57

are you talking outside of what's already been    11:28:59

developed within the litigation?  You're just asking    11:29:01

about the level of his knowledge of those NDA    11:29:03

discussions that -- I mean, obviously, those occurred    11:29:08

prior to his, you know, job at Collabrios.    11:29:12

          So are you asking whether he has exhausted    11:29:17

his knowledge of what he learned about those,    11:29:20

independent of what has been developed in the action?    11:29:22

          MR. WEIR:  Whether it's been developed in    11:29:25

Page 49

the action or not, I suppose I don't -- I don't know    11:29:28

why there's that distinction.  But I'm just asking    11:29:30

him, yeah, if he's told me everything he knows about    11:29:33

the discussions.    11:29:36

He said he had conversations with Mike about    11:29:37

it and knows something about them.  Doesn't seem like    11:29:40

he knows very much, but I just want to make sure what    11:29:45

he knows I -- I get from him.  Does that make sense?    11:29:47

MR. LEE:  Okay.    11:29:52

BY MR. WEIR:    11:29:52

Q.  Does that change -- with that clarification,    11:29:53

Mr. Lathrop, does that change your answer, or have we    11:29:55

exhausted your knowledge of the NDA discussions    11:30:00

between Intus and RTZ?    11:30:02

A.  I -- I stick with my answer.  You have what    11:30:05

I know about the NDA discussions.    11:30:09

Q.  What discussions did you have with    11:30:14

Michael Zawadski about Intus's information-blocking    11:30:17

claims?    11:30:22

A.  Just mechanical around the lawsuit.  Nothing    11:30:24

real specific, since he was handling that.  He was my    11:30:31

boss at the time, so I want to be clear on that.    11:30:33

Q.  Okay.  And when you say "mechanics around    11:30:42

the lawsuit," what -- what do you mean by that?    11:30:47

A.  That there was a lawsuit and it was centered    11:30:52

Page 50

around information blocking when he owned RTZ.    11:30:55

Q.  Okay.  Do you recall that you had a    11:31:13
discussion with a Mr. Peter Schwechheimer?    11:31:34

A.  Yes.    11:31:40

Q.  I think it was on April 22nd, 2026.  Does    11:31:44
that sound about right to you?    11:31:48

A.  It -- I'll go with that.  I don't know    11:31:50
specifically.    11:31:53

Q.  The -- how many conversations did you have    11:31:54
with Mr. Schwechheimer?    11:31:58

A.  One.    11:32:00

Q.  What do you remember from that conversation?    11:32:01

A.  I talked a lot about, like, profit and loss,    11:32:10
like a P&L construct.    11:32:15

Q.  And what do you remember telling him?    11:32:21

A.  Generally how cost of goods and margin for    11:32:29
my business works.  Or this business.  It's not my    11:32:35
business.    11:32:47

Q.  Did you talk about -- well, I guess anything    11:32:54
else more specific that you remember about profit and    11:33:07
loss discussions?    11:33:10

A.  It was really that.    11:33:11

Q.  Did you have discussions -- as part of that    11:33:13
discussion, did you talk about BoldAge PACE, that    11:33:23
entity?  Was that referenced?    11:33:29

Page 51

A.    We did -- we did talk about certain clients. 11:33:34
I don't -- I don't remember specifically which ones. 11:33:38
Yeah. 11:33:43

Q.    How about Community PACE? 11:33:44

A.    It's possible. 11:33:52

Q.    High Desert PACE? 11:33:54

A.    Yeah, it's possible. 11:34:01

Q.    What do you remember of the client 11:34:02
discussions?  What do you remember about the 11:34:08
discussions you had with Mr. Schwechheimer about 11:34:11
clients? 11:34:14

A.    My recollection is he asked if those were my 11:34:14
clients at the -- you know, at the time that we were 11:34:17
discussing. 11:34:21

Q.    At the time you were -- you were having the 11:34:24
discussion with Mr. Schwechheimer? 11:34:30

A.    Yes. 11:34:31

Q.    And what did you tell him? 11:34:34

A.    That I believe, if my recollection is right, 11:34:38
that two of them were still my clients. 11:34:40

Q.    And when you say "were my clients," what do 11:34:42
you -- what do you mean? 11:34:49

A.    That they were my current clients. 11:34:49

Q.    Whose clients?  When you say "my," what is 11:34:54
the "my"?  I mean they're not your -- they're not 11:35:06

Page 52

yours personally.  Right?    11:35:09

A.  Well, yeah, I'm here for Coll- -- as    11:35:10
Collabrios Health -- right? -- not Kevin Lathrop, so.    11:35:13

Q.  Okay.  So, at the time of your discussion    11:35:18
with Mr. Schwechheimer, you told him that two of the    11:35:25
three clients that he asked about were clients of    11:35:29
Collabrios Health?    11:35:36

A.  I believe so.    11:35:37

Q.  And do you remember which of the three    11:35:38
that -- I'm coming up with these three 'cause that's    11:35:45
what he put in his report.    11:35:48

So I'm -- do you remember which --    11:35:49

A.  I have --    11:35:50

Q.  -- of the -- which of the three between    11:35:51
BoldAge, Community, and High Desert were -- you told    11:35:53
him were Collabrios?    11:35:57

A.  Yeah, I -- for sure High Desert and -- and    11:35:59
BoldAge.  I can't remember exactly Community Life    11:36:03
specifics.    11:36:08

Q.  Anything else you recall about discussing    11:36:08
with him about the relationship with High Desert,    11:36:23
BoldAge, or Community?    11:36:29

A.  Not that I recall.    11:36:31

Q.  Do you recall discussing the revenues from    11:36:33
those three clients?    11:36:37

Page 53

A.   Yeah.   Like the profit and loss, yeah, the general construct of it.    11:36:39 / 11:36:43

Q.   Did you discuss with him how much profit and loss you thought Collabrios would make or not make relative to those three clients?    11:36:45 / 11:37:01 / 11:37:06

A.   No.    11:37:09

Q.   Have you seen his expert report?    11:37:10

A.   I have not read it.    11:37:14

Q.   Are you aware that he calculated lost profits numbers for BoldAge, Community, and High Desert?    11:37:15 / 11:37:24 / 11:37:26

A.   I haven't read it.    11:37:28

Q.   Independent from reading it, did you -- you know, do you have knowledge that he calculated lost profits figures for those three entities?    11:37:30 / 11:37:33 / 11:37:37

A.   Yeah, I figured that.    11:37:39

Q.   Did he tell you he was going to do that on the call?    11:37:41 / 11:37:45

A.   Hm.   I can't recall specifically that.    11:37:48

Q.   Did he ask you if there were any other -- any other clients that you should be looking at for purposes of calculating lost profits?    11:37:52 / 11:38:04 / 11:38:11

A.   I don't recall that question.    11:38:16

Q.   Did -- did you give him the three clients, BoldAge, Community, and High Desert?    11:38:17 / 11:38:25

Page 54

A.    What do you mean "give him"?    11:38:27

Q.    Trying to figure out which way the    11:38:29
information flowed, whether -- during the course of    11:38:33
the conversation, I can envision him saying,    11:38:35
"Mr. Lathrop, how -- you know, are there clients that    11:38:39
you think you've lost revenue on?"  And then you list    11:38:43
them out.  Or, alternatively, he could have said,    11:38:45
"I'm focused on these three.  What do you know about    11:38:50
these three?"    11:38:52

Do you remember which way that -- which way    11:38:53
the information was flowing?    11:38:55

A.   I don't recall exactly the specific    11:38:58
conversation about the three clients or it was --    11:39:02
what I recall is mostly talking about how cost of    11:39:04
goods and the profit works for PACE.    11:39:08

Q.   And when you say "PACE," I assume you're --    11:39:10
I assume you're referring to the PACE Care product?    11:39:30
Or were you referring more generally to multiple    11:39:34
products within PACE programs?    11:39:37

A.   I mean, I have multiple products within PACE    11:39:40
programs.  When I say "PACE," I'm delineating it    11:39:42
between my other lines of business.  So it's -- yeah,    11:39:45
so I think that's a good clarification question.    11:39:47

Q.   So, so your discussions with him were    11:39:50
centered upon PACE Care related products?    11:39:54

Page 55

A.   Yes.                                          11:39:57

Q.   And loss.  Okay.                             11:39:58

MR. WEIR:  I'm going introduce an exhibit,    11:40:22
see if I have the -- okay.  This is going to be 171.   11:40:24

(The document referred to was              11:40:24

marked as Exhibit 171.)                    11:41:14

BY MR. WEIR:                                          11:41:14

Q.   All right.  If I did this right, you should   11:41:15
be able to see it, what I've marked as 171.       11:41:17

A.   I think I did it right.  Okay.  It came up.   11:41:40

Q.   Do you have it or --                         11:41:47

A.   Oh, I'm sorry, you're waiting for me?  It    11:42:39
did come up.  I have it.  I see it.               11:42:41

Q.   Oh, you know what, it looks like you may     11:42:43
have frozen unless you were just being incredibly   11:42:45
still.                                            11:42:47

A.   I don't -- well, can -- I'm moving now.  Can   11:42:47
you see me?  I'm looking at the Veritext thing.   11:42:50

MS. KOTIYA:  Now you are frozen.             11:42:53

THE WITNESS:  Okay.                          11:42:56

THE REPORTER:  This is the reporter -- well,   11:42:56
he looks good again.  I was just going to say for the   11:42:56
videographer purposes, but he looks alive again.   11:42:56
Carry on.                                         11:43:09

THE WITNESS:  It took me -- it took me to     11:43:09

Page 56

Veritext, and so I -- it -- it stopped my tab, so I    11:43:11

had to come back in.    11:43:14

BY MR. WEIR:    11:43:14

Q.  I see.  So are you able to look at    11:43:16
Exhibit 171 and also be on the Zoom function?    11:43:19

A.  Yeah, I looked at it, so.  I'm on an iPad,    11:43:23
so I'd have to switch back and forth.    11:43:27

Q.  Oh, okay.  All right.  Well, that's --    11:43:29
hopefully this works.  The -- do you recognize    11:43:34
Exhibit 171?    11:43:37

A.  Yes.    11:43:37

Q.  What is it?    11:43:40

A.  It's a pro forma income statement.    11:43:42

MR. LEE:  Charles, would it be helpful just    11:43:47
to share it on the screen?    11:43:48

MR. WEIR:  Maybe.  Well, I don't know what    11:43:55
that does to the video.    11:43:59

MS. KOTIYA:  Yeah, will that impact the    11:44:01
videographer?    11:44:03

THE REPORTER:  That would be a video    11:44:17
question.  I think there's an option of showing both    11:44:17
the witness and the exhibit, but we need    11:44:17
videographer's response on this one.    11:44:20

THE VIDEOGRAPHER:  Yes, so it's fine.  I    11:44:20
have him pinned, spotlighted, and I also have another    11:44:22

Page 57

screen for the exhibit share.                              11:44:27

     MR. LEE:  I'll be honest, I'm not sure how    11:44:36
you share it, but.                                         11:44:39

     MR. WEIR:  Well, let's see.                  11:44:39

     THE WITNESS:  Yeah, you're doing great.     11:44:41
You're like a technologist, Mr. Weir.  You got it.        11:44:43

     MR. WEIR:  Now you're just making fun of me. 11:44:46

     THE WITNESS:  No, no.  That's impre- -- on  11:44:49
Zoom, that's impressive, honestly.                        11:44:51

     MR. WEIR:  All right.  The -- are we still   11:44:54
on record?  We probably are until I get settled.          11:44:54

     THE REPORTER:  We have been on record        11:44:54
forever on record, yes.                                    11:44:54

     MR. WEIR:  Well, we'll have our little       11:45:04
joking exchange there, I guess, captured for- --          11:45:06
forever.                                                   11:45:08

     Okay.  So where are we at?  I can see        11:45:10
everybody.  Can everybody see Exhibit 171?                11:45:12

     MR. LEE:  Yes.                               11:45:12

     THE WITNESS:  Yes.                           11:45:12

     MR. WEIR:  Okay.                             11:45:19

     MS. KOTIYA:  Yeah.                           11:45:19

     MR. WEIR:  And, Videographer, you're good?   11:45:20
You got the witness as well as 171 up?                    11:45:21

     THE VIDEOGRAPHER:  Yes.  So I have two       11:45:24

Page 58

computers, Counsel.  One is just for the witness only    11:45:27

and one is with the exhibit.    11:45:29

MR. WEIR:  Okay.  Sounds good.    11:45:32

BY MR. WEIR:    11:45:34

Q.  Mr. Lathrop, you were describing what    11:45:34
Exhibit 171 is and I think I ended up cutting you    11:45:38
off.  We got on a tangent.  Can you finish your    11:45:41
description of what 171 is.    11:45:45

A.  Yeah, it's -- it's a pro forma income    11:45:48
statement.    11:45:50

Q.  It's my understanding that -- that this was    11:45:51
something that you provided to Mr. Schwechheimer.    11:45:55

Is that correct?    11:45:59

A.  I provided it, yes.    11:45:59

Q.  What -- where did you -- where did you get    11:46:04
it?  Or did you create it?    11:46:11

A.  I got it from my financial -- my financial    11:46:14
officer.    11:46:19

Q.  Who is that?    11:46:20

A.  Michael Bruno.    11:46:25

Q.  And was this something that Mr. Bruno    11:46:27
created?    11:46:34

A.  I don't know that.    11:46:36

Q.  I assume you must have asked him for it.    11:46:38

What -- what do you -- what do you recall    11:46:48

Page 59

about your request?    11:46:50

A.  I asked him if there was any income    11:46:53
statements from prior to acquisition.    11:46:57

Q.  And why did you limit it to prior to    11:47:01
acquisition?    11:47:10

A.  I believe I was asked, in terms of the time    11:47:13
frame, for that.    11:47:17

Q.  Asked by who?    11:47:19

MS. KOTIYA:  Objection.  Calls for    11:47:23
privilege.    11:47:25

BY MR. WEIR:    11:47:25

Q.  Well, it could be Schwechheimer, I guess.    11:47:31

Did Mr. Schwechheimer ask you to -- ask you    11:47:33
for it?  I'll ask a -- I'll ask a narrower question.    11:47:34

Did Mr. Schwechheimer ask you to pull the    11:47:36
income statement from the pre-acquisition time frame?    11:47:40

A.  No.  I don't believe so, he asked it that    11:47:47
way.    11:47:54

Q.  Was it somebody working with    11:47:59
Mr. Schwechheimer?    11:48:00

A.  It -- yeah, it had to be.  I didn't just    11:48:04
develop, you know, the request.  Yeah, so it had to    11:48:08
be.    11:48:12

Q.  Okay.  And this has -- it looks like fiscal    11:48:12
year '22, fiscal year '23, and TTM24.    11:48:25

Page 60

                    Do you see that --                          11:48:31

        A.   Yeah.                                              11:48:31

        Q.   -- at the top?                                     11:48:32

        A.   I see it.                                          11:48:32

        Q.   What does "TTM24" mean?                            11:48:33

        A.   That's trailing 12 months.                         11:48:36

        Q.   Like, why were -- why did you pull the             11:48:39

trailing 12 months?                                            11:48:46

        A.   I didn't pull it.                                  11:48:47

        Q.   Or why did -- do you have an understanding         11:48:48

as to trailing 12 months from when?  What's the                11:48:52

12-month period that's being reviewed there?                   11:48:57

        A.   That's a good question.  I -- since I              11:49:00

don't -- I didn't develop this, yeah, I don't know.            11:49:02

        Q.   And these would have been RTZ's -- this            11:49:08

would have been RTZ's profit and loss figures?                 11:49:19

        A.   This would have been their income statement,       11:49:21

yes.                                                           11:49:23

        Q.   Is there a reason that you didn't include          11:49:23

2025?                                                          11:49:34

        A.   I don't recall.                                   11:49:39

        Q.   You mentioned earlier that you were asked to       11:49:40

pull a pre-acquisition.  Do you know why you're --             11:49:57

why you're limiting it to pre-acquisition?                     11:50:01

             MS. KOTIYA:  Objection, to the extent that        11:50:09

                                                       Page 61

the question's calling for privileged communications.  11:50:11
So instruct you not to answer in that regard, but if  11:50:14
there's -- if it doesn't, then you may answer.  11:50:18

THE WITNESS:  You double- -- did you  11:50:31
instruct me not to answer?  11:50:33

MR. WEIR:  That means --  11:50:36

MS. KOTIYA:  If -- well, it's -- it's --  11:50:38

MR. WEIR:  Let me ask -- let me ask a better  11:50:39
question.  11:50:38

MS. KOTIYA:  Yeah, maybe -- maybe rephrase  11:50:40
the question to not put potential privilege  11:50:41
communications at issue.  11:50:45

MR. WEIR:  Yeah, fair enough.  11:50:45

MS. KOTIYA:  That would be great.  11:50:46

BY MR. WEIR:  11:50:48

Q.  Let me -- let me get at this a different  11:50:49
way.  11:50:50

Is there anything on Exhibit 171 that would  11:50:50
be Collabrios figures?  11:50:54

A.  No.  11:50:56

Q.  Why do you know that?  11:50:56

A.  Because of the -- where it ends, the '24.  11:51:03

Q.  ^ QI Do you know if RTZ had any revenue and  11:51:24
loss -- or profits in 2025?  11:51:28

MR. LEE:  Objection.  That's beyond the  11:51:34

Page 62

scope of the order.                                        11:51:36

      MR. WEIR:  Well, it relates to this exhibit.  11:51:40
I mean --                                                 11:51:43

      MR. LEE:  No, it doesn't.                     11:51:43

      MS. KOTIYA:  Mr. Weir, can you repeat the     11:51:44
question.                                                 11:51:46

      MR. WEIR:  I said do you know if RTZ had      11:51:47
profits in 2025?                                          11:51:49

      MR. LEE:  Same objection.                     11:51:56

      MS. KOTIYA:  Is this specific to -- I think   11:52:00
I'm going to join the objection and instruct the          11:52:04
witness not to answer.  It's only part of the scope       11:52:07
of the deposition per the court's order if it was         11:52:12
part of his conversations with the expert,                11:52:14
Mr. Schwechheimer.                                        11:52:19

      MR. WEIR:  Well, he provided this.  I think   11:52:21
I'm entitled to -- he provided this to Schwechheimer      11:52:27
so he could rely on it.  I think I'm entitled to ask      11:52:29
him about 171.  Right?  And how it was arrived at and     11:52:32
the --                                                    11:52:36

      MS. KOTIYA:  '25 is not in 171.               11:52:39

      MR. WEIR:  Right, and I'm asking questions    11:52:42
trying to figure out why that's the case.                 11:52:44

      MR. LEE:  I'm going to stand on the           11:52:51
objection.                                                11:52:53

Page 63

MS. KOTIYA:  I'm inclined to stand on the    11:52:57
objection as well.    11:52:59

MR. WEIR:  That information about RTZ --    11:53:03
RTZ's profits is out of --    11:53:10

BY MR. WEIR:    11:53:10

Q.  Well, did you have any discussions with    11:53:18
Mr. Schwechheimer about -- you said you had    11:53:21
discussions with Mr. Schwechheimer about profits and    11:53:24
losses for your business.  Correct?    11:53:27

A.  Yes.    11:53:29

Q.  Did any of those discussions relate to    11:53:31
profits and losses for the year 2025?    11:53:35

A.  I don't recall if it was '25.    11:53:42

Q.  Were the -- the discussions you were having,    11:53:47
were they -- did they relate to -- well, in 2025, it    11:53:50
would have been Collabrios's profits and losses.    11:53:57
Correct?    11:53:59

A.  Correct.    11:54:00

Q.  And so did you have discussions with    11:54:01
Mr. Schwechheimer that touched upon Collabrios's    11:54:03
profits and losses in 2025 or 2026?    11:54:07

A.  I don't recall.    11:54:15

Q.  Back to Exhibit 171.  So the second line    11:54:20
here is "Recurring Revenue."    11:54:41

A.  Hm-hm.    11:54:45

Page 64

Q.   What revenue does that relate to, if you know?    11:54:46 11:54:48

A.   That's revenue that is contractually recurring.    11:54:48 11:54:52

Q.   So is that revenue going to be more than just revenue associated with PACE Care?    11:54:57 11:54:59

A.   I wasn't with RTZ at this time, so I can't answer that.    11:55:05 11:55:09

Q.   Okay.  And then non- -- "Nonrecurring Revenue," what's your understanding of that line?    11:55:15 11:55:18

A.   "Nonrecurring Revenue" means one-time episodic revenue.    11:55:20 11:55:23

Q.   There's a line here for "Hosting."  Do you know what that refers to?    11:55:25 11:55:46

A.   That would be a hosting expense.    11:55:48

Q.   I guess if you ask a simple question, you get a simple answer.    11:55:52 11:55:59

What -- hosting -- hosting what?  It's -- is this your, like, sort of a cost, you pay a third party to host the data that's ultimately stored, or do you not know?    11:56:01 11:56:06 11:56:11 11:56:15

A.   I mean, it could -- it could -- yeah, I don't -- it could be a lot of different things, Mr. Weir.    11:56:15 11:56:17 11:56:18

Q.   All right.  Then you have a "Gross Profit"    11:56:20

Page 65

line.  Next one down is "Payroll & Related."    11:56:31

Do you know what that refers to?    11:56:34

A.  That would be payroll and related expenses.    11:56:35

Q.  How is that different from a couple lines up    11:56:40
where it says "Direct Payroll & Related"?    11:56:42

A.  Direct payroll and related is normally what    11:56:49
you have as direct employees.  So on your -- on    11:56:54
your -- in your company, that is part of your    11:57:03
company.  And payroll related could be all kinds of    11:57:05
different things.  Vendors, consultants, et cetera.    11:57:07

Q.  Okay.  Do you know what is included --    11:57:15
there's a "Other Opex" line.  Do you know what's    11:57:22
included in the "Other Opex" line?    11:57:25

A.  I don't.    11:57:28

Q.  There's a line here "Diligence Adjusted    11:57:28
EBITDA."  Do you know what that refers to?    11:57:31

A.  Yeah, private equity's way of adjusting    11:57:35
EBITDA.    11:57:38

Q.  Do you know -- I mean, there was some    11:57:41
adjustments made to the figures.  Do you know what    11:57:43
drove those adjustments?    11:57:45

A.  I don't.    11:57:47

Q.  Next one down is "Pro Forma Adjustments."    11:57:49
Do you know what that one relates to?    11:57:52

A.  Yeah, it -- it's more adjustments that I'm    11:57:54

Page 66

not privy to, 'cause there could be all kinds of   11:57:57

things.   11:57:59

Q.   The -- back up to the "Gross Profit" line,   11:58:03
it's showing gross profit percentages of between 75   11:58:09
and 80 percent for the time period.   11:58:14

Do you see that?   11:58:18

A.   I see it.   11:58:19

Q.   Is that -- is that consistent with your   11:58:20
understanding of the industry with respect to profit   11:58:26
margins on products like PACE Care?   11:58:30

A.   Generally, yes.   11:58:34

Q.   So it wasn't like you saw this and went,   11:58:35
"Oh, gosh, this is totally wrong, there's no way   11:58:41
we're making 78 percent on this"?   11:58:44

A.   No.   11:58:48

Q.   Okay.  I'm going to stop sharing.   11:58:50

Did you personally have any direct   11:59:07
communications with BoldAge PACE -- let me take a   11:59:10
step back.   11:59:20

It's my understanding that BoldAge PACE is   11:59:20
no longer a customer of yours.  Is that correct?   11:59:22

A.   Technically, they're still a customer of   11:59:26
ours.   11:59:31

Q.   ^ QI What do you mean by that?   11:59:32

A.   They're still --   11:59:32

Page 67

MS. KOTIYA:  Objection.    11:59:39

THE WITNESS:  -- paying --    11:59:40

MS. KOTIYA:  Oh.  Objection.  We're getting    11:59:40
into the current business operations of    11:59:42
Collabrios Health, and this is outside the scope of    11:59:47
the court's order.  So I'm going to instruct the    11:59:49
witness not to answer this -- these questions.    11:59:52

BY MR. WEIR:    11:59:55

Q.  Did you have any -- did you have any    12:00:02
discussions with BoldAge PACE about their    12:00:07
termination?    12:00:09

MS. KOTIYA:  Same objection.    12:00:11

THE WITNESS:  I don't recall -- oh, sorry.    12:00:13

MS. KOTIYA:  That's okay.    12:00:16

MR. LEE:  I'm -- I'm -- yeah, I'm going to    12:00:17
object on the basis that this exceeds the scope of    12:00:19
the order.    12:00:26

BY MR. WEIR:    12:00:26

Q.  You had -- I think you testified earlier you    12:00:26
talked to Mr. Schwechheimer about BoldAge PACE.    12:00:29
Correct?    12:00:29

A.  Yes.    12:00:35

Q.  And, as part of that discussion, was    12:00:36
there -- did you discuss with him that that was a    12:00:40
contract that was either terminated or you expect it    12:00:44

Page 68

to be terminated?                                    12:00:47

A.  I don't recall.                              12:00:51

Q.  Do you recall any discussions with him about    12:00:51
why BoldAge PACE was -- that contract was being      12:01:02
terminated?                                          12:01:08

A.  No.                                          12:01:10

Q.  You don't recall, or you don't think it          12:01:10
happened?                                            12:01:14

A.  I don't recall.                              12:01:15

Q.  Same questions about Community PACE.  Do you     12:01:15
recall discussing with Mr. Schwechheimer that there  12:01:23
was an expectation -- or maybe it had already         12:01:27
happened -- that Community PACE, that contract would  12:01:30
be terminated?                                       12:01:33

A.  Yeah, I don't recall specifically around     12:01:33
the -- around the clients.                           12:01:35

Q.  Same thing with High Desert?                     12:01:38

A.  Same answer, I don't recall.                 12:01:45

Q.  Same answer?  Don't recall having any            12:01:47
discussions about termination or why their contract  12:01:50
was terminated?                                      12:01:53

A.  Yeah, I don't recall.                        12:01:53

Q.  ^ QI Do you know why the contract -- these       12:01:55
three contracts were terminated?                     12:02:08

MR. LEE:  Objection.  Exceeds the scope of       12:02:11

Page 69

the order.                                            12:02:15

MS. KOTIYA:  I join that objection and                12:02:15
instruct the witness not to answer.                   12:02:18

MR. WEIR:  All right.  Let's do -- all                12:03:04
right.  You should have 172.                          12:03:52

(The document referred to was                         12:03:54
marked as Exhibit 172.)                               12:03:54

THE WITNESS:  Do you want me to go to                 12:04:05
Veritext to look at it, or are you going to pull it    12:04:06
up?                                                   12:04:10

MR. WEIR:  Try to go to Veritext to look at            12:04:11
it.                                                   12:04:13

THE WITNESS:  All right.                              12:04:45

MS. KOTIYA:  Counsel, before we proceed on            12:04:47
this exhibit --                                       12:04:49

MR. WEIR:  Yup.                                       12:04:51

MS. KOTIYA:  -- my understanding is that              12:04:52
these High Desert emails were expressly excluded from  12:04:58
the scope of this deposition by the court's order.    12:05:05

MR. WEIR:  So there are two sets of                   12:05:08
High Desert emails, ones that were -- that we          12:05:13
received from High Desert after the close of           12:05:16
discovery and others that were produced, including    12:05:20
this, within the -- before the discovery cutoff.      12:05:23

MR. LEE:  And I'll note that what has been            12:05:29

Page 70

marked as Exhibit 172 is entirely captured within the    12:05:31
High Desert exhibits that were produced after close    12:05:34
of discovery and which are the subject of the court's    12:05:39
order.    12:05:43

MR. WEIR:  Okay.  So are you -- are you    12:05:45
going to instruct him not to answer any questions    12:05:49
about 172, despite the fact that it was produced    12:05:50
within the discovery time period?    12:05:54

MS. KOTIYA:  At this point, even -- it    12:05:57
sounds like there were duplicate emails, which I'm    12:06:01
not personally privy to as representing the witness    12:06:06
here, but these may have been disclosed in discovery    12:06:09
to RTZ.    12:06:13

If they were produced in duplicate as part    12:06:14
of the High Desert emails that were produced after    12:06:17
the close of discovery, well, those emails were put    12:06:20
specifically before the court, and the court ordered    12:06:25
that they could not properly be the subject of this    12:06:27
deposition.    12:06:30

So, at minimum, that's -- I think I'm going    12:06:31
to instruct the witness not to answer questions as    12:06:35
related to this email because it was expressly part    12:06:39
of the order, regardless of the Bates stamp at the    12:06:42
bottom of the document.    12:06:46

MR. WEIR:  Okay.  I mean I -- look, this is    12:06:49

Page  71

another one --                                              12:06:52

          MS. KOTIYA:  Yeah.                                12:06:52

          MR. WEIR:  -- that we have a dis- -- we have      12:06:52
a disagreement about, and we'll figure out whether --      12:06:53
we'll figure out whether we need to go to Judge Tigar      12:06:58
on it, 'cause I -- I mean, otherwise, I think we're        12:07:01
going to go round in a -- round in a circle.               12:07:03

          MS. KOTIYA:  And if I'm incorrect about          12:07:06
that, if this is not an exact duplicate of the email       12:07:09
that was subject of the court's order, then please         12:07:13
inform me.  But my understanding is that these are         12:07:18
identical emails, and that the court specifically          12:07:20
said they were -- they were barred from being              12:07:23
questioned about in this deposition.                       12:07:26

          MR. WEIR:  There were -- there were two --       12:07:28
there were two sets -- as I mentioned before, there        12:07:31
were two sets of production.  They are overlapping,        12:07:33
but --                                                     12:07:33

          MS. KOTIYA:  And this one was -- was             12:07:38
included in those documents that were subject to the       12:07:40
court's order?                                             12:07:43

          MR. WEIR:  I did not do a line by line, but      12:07:43
if that's David's representation, you know, we can         12:07:45
operate under that.  I still --                            12:07:49

          MS. KOTIYA:  Okay.                               12:07:50

Page 72

MR. WEIR:  -- don't think -- I don't --    12:07:51

MS. KOTIYA:  And that is --    12:07:52

MR. WEIR:  -- the order -- okay.  Yeah --    12:07:52

MS. KOTIYA:  Yeah.    12:07:54

MR. WEIR:  -- just so -- I don't think the    12:07:55
order intended to bar us.  The basis for the order    12:07:56
was he thought that the documents were produced late.    12:07:59
That this is not a document that was produced late.    12:08:04

So it sounds like I'm not going to convince    12:08:07
you about that and that you're going to stand on your    12:08:12
objection that questions about High Desert PACE and    12:08:14
emails about High Desert PACE, regardless of when    12:08:21
they were produced, you're not going to let him    12:08:24
answer questions about those.    12:08:27

MS. KOTIYA:  ^ QI Yeah, Counsel, I don't    12:08:28
have all the briefing in front of me, and I'm not    12:08:29
sure if you, in representing Intus, raised this    12:08:32
duplicate issue before the court.  But, faced with    12:08:35
the court's order that barred questioning on this    12:08:40
exact substantive document, I'm going to instruct the    12:08:43
witness not to answer.    12:08:45

MR. LEE:  I'll also just note for the record    12:08:46
that I believe the court's bigger and equal    12:08:50
concern -- or maybe not -- not bigger -- equal    12:08:52
concern is that because Collabrios is not a party to    12:08:55

Page 73

this action, questions directed to Collabrios about 12:08:58 Collabrios's interactions with clients is beyond the 12:09:02 scope of the allegations in this claim -- or in this 12:09:05 case that RTZ has engaged in information blocking. 12:09:08

So not only does Exhibit 172 fall within the 12:09:12 documents that the court has addressed in its order, 12:09:19 but my understanding is that Intus did raise this 12:09:22 issue, or at least had a footnote somewhere in its 12:09:27 briefing about this particular document, so the issue 12:09:32 was flagged to the court and the court, nevertheless, 12:09:35 has issued the order that it has issued. 12:09:37

So, on that basis, I believe that it's 12:09:40 inappropriate to go through these questions and 12:09:43 certainly questions concerning this exhibit. 12:09:46 Moreover, as you're undoubtedly aware, this is the 12:09:49 subject of an in limine motion anyways. 12:09:53

MR. WEIR:  Okay.  Well, we can -- I mean, 12:09:55 there's counterclaims in the case.  You're seeking 12:10:00 damages about High Desert.  We can go around and 12:10:02 around as to -- on this. 12:10:04

I suspect I'm not going to convince you to 12:10:05 my -- as to my position, so.  He's being instructed 12:10:10 not to answer so I -- I will not go through the 12:10:13 process of asking questions about this.  And, like I 12:10:17 said, if we -- I think it's -- your position's on the 12:10:19

Page 74

record, my position's on the record, and if we need    12:10:23
to go back to Judge Tigar about it, then -- then we    12:10:26
will.    12:10:30

Okay.  Let's do this.  We've been going    12:10:30
about another hour or so.  Why don't go of the    12:10:33
record, let me look at my notes, but we're close to    12:10:38
the end here, so.    12:10:41

THE VIDEOGRAPHER:  The time is 12:10 -- yes.    12:10:44
Go off the record, Counsel?    12:10:48

MR. WEIR:  Yes.    12:10:50

THE VIDEOGRAPHER:  The time is 12:10 p.m.    12:10:50
We're off the record.    12:10:53

(Recess taken.)    12:10:54

THE VIDEOGRAPHER:  The time is 12:22 p.m.    12:22:10
We're back on the record.    12:22:17

BY MR. WEIR:    12:22:18

Q.  Unless I'm misremembering, Mr. Lathrop, it    12:22:21
looks like your background changed little bit.  Did    12:22:24
you -- did you move?    12:22:27

A.  I had to plug in.    12:22:28

Q.  Okay.  But you're still -- you're still in    12:22:30
the same home that you were before?    12:22:32

A.  Yes.    12:22:35

Q.  And still nobody -- you're still alone.    12:22:35
There's not anybody in the room with you?    12:22:38

Page 75

A.   Yes, alone.                                    12:22:40

Q.   Okay.  Do you know who Laura Emery is?          12:22:42

A.   Yes.                                            12:22:50

Q.   Who is Laura Emery?                             12:22:50

A.   She works at Collabrios Health.                12:22:55

Q.   Are you familiar -- or did you talk to         12:22:57
Mr. Schwechheimer about ranking the various modules  12:23:10
that make up the PACE Care system?                  12:23:14

A.   No.                                            12:23:20

Q.   So let me give you a little more info and      12:23:21
see if this jogs your memory.                       12:23:27

So are you aware that Laura Emery provided           12:23:29
Mr. Schwechheimer with a ranking -- high, medium, low 12:23:32
ranking regarding modules within PACE Care?         12:23:39

A.   I'm not aware of that.                         12:23:44

Q.   Do you know why you were the person that was   12:23:46
tasked with interacting with Mr. Schwechheimer on the 12:24:03
profit and loss issues?                             12:24:07

A.   I don't know why.                              12:24:10

Q.   Do you know why Mike Zawadski was not -- not   12:24:11
the person that was having that interaction?        12:24:16

A.   I don't know why.                              12:24:19

Q.   All right.  Kind of a last cleanup question    12:24:34
here.  We've talked a lot about your conversation   12:24:40
with Mr. Schwechheimer.                             12:24:45

Page 76

Can you think of anything that we have not    12:24:48
discussed that you discussed with Mr. Schwechheimer?    12:24:50

A.  I don't recall anything.    12:24:56

Q.  So, we -- as you sit here today, you think    12:24:59
we've touched on everything you discussed with    12:25:02
Mr. Schwechheimer?    12:25:05

A.  Hm, in terms of what I know I discussed,    12:25:08
we've talked about it.    12:25:14

MR. WEIR:  Okay.  That's all -- that's all I    12:25:19
had.    12:25:22

MR. LEE:  Oh, that's all you have for your    12:25:26
examination.    12:25:29

MR. WEIR:  Yes.  I mean subject to, we have    12:25:29
outstanding disputes and whether those are resolved,    12:25:32
then we call him back.  I don't know what we're going    12:25:34
to do with those things.  But -- but, as far as    12:25:36
today -- so I guess -- I guess I'm technically    12:25:39
leaving the deposition open.  But, as far as today    12:25:41
right now, I don't have any further questions for    12:25:43
him.    12:25:46

MR. LEE:  I have -- I have a few questions.    12:25:47

Does anybody need to do anything    12:25:53
procedurally before I start?    12:25:55

MS. KOTIYA:  I don't think so.    12:25:59

MR. LEE:  All right.    12:26:00

Page 77

EXAMINATION                          12:26:01

12:26:01

BY MR. LEE:                          12:26:02

Q. Mr. Lathrop, for the record, my name is     12:26:02
David Lee. I'm one of the lawyers who is       12:26:03
representing RTZ Associates, Inc. Mr. Weir asked you   12:26:06
a clarifying question about your use of the term   12:26:14
"EHR."                               12:26:18

Do you remember that generally?      12:26:19

A. Yes.                              12:26:19

Q. And if I understood -- or recall correctly   12:26:22
your response, you stated that an EHR, in your view,   12:26:26
is an exchange view. And, again, as I understood or   12:26:30
recall your testimony, you explained that exchange   12:26:37
view to mean that it's a complete health record of a   12:26:40
patient. Is that correct?            12:26:43

A. Yes.                              12:26:46

Q. Okay. And then you went on to indicate that   12:26:46
what you meant by "exchange" when you said "exchange   12:26:52
view," is that it is a dataset that can move module   12:26:57
to module.                           12:27:01

Do I have that correctly?            12:27:01

A. Yes.                              12:27:01

Q. Or "correct" rather. And when you said   12:27:05
"module to module," as I understood it, that meant   12:27:08

Page 78

module -- module to module within the PACE Care    12:27:12

system.    12:27:17

    A.  Yes.    12:27:17

    Q.  Is that correct?    12:27:17

    A.  Yes.    12:27:20

    Q.  Okay.  Mr. Weir went on to ask you some    12:27:20
questions about exchanges of data from PACE Care to,    12:27:25
you know, other vendors, or what I'll term as    12:27:31
non-clients, including an entity like Labcorp.    12:27:37
       Do you remember that line of questioning?    12:27:40

    A.  Yes.  Yes.    12:27:43

    Q.  And my understanding is that you had    12:27:44
indicated that EHI might move from PACE Care to those    12:27:47
other entities such as labs or I think you'd    12:27:56
mentioned an ambulance service.    12:27:58
       Is that correct?    12:28:01

    A.  I did mention the labs.  Mr. Weir mentioned    12:28:05
the ambulance.    12:28:08

    Q.  Fair enough.  What other -- I believe that    12:28:09
you had identified a couple of other types of maybe    12:28:16
vendors or servers services or service companies that    12:28:19
might receive data from PACE Care.  I thought that    12:28:25
you had another couple of -- of examples of that.    12:28:31
       Do you recall that?    12:28:34

    A.  I do.    12:28:35

Page 79

Q. Okay. And what were some of those other types of vendors including labs?

A. Payers, pharmacies, and transportation companies, I believe is what I said.

Q. Got it. All right. Now, I want to make certain that I'm understanding.

Is it true that in those instances in which information or data is sent from the PACE Care system to, for instance, a lab, would you agree that those data exchanges are essentially kind of bilateral exchanges in which RTZ through PACE Care is simply performing a service kind of on behalf of the PACE organization and its members by providing that data to, you know, those vendors such as labs?

A. Yes.

Q. In other words, RTZ's PACE Care system is exchanging data among, you know, I guess these service providers in service of the members of the PACE organization. Correct?

A. Yes.

Q. And then, upon receipt of that data, these other vendors such as labs or payers or pharmacies, to the extent they modify that data, they send -- they simply send it back to PACE Care. Correct?

A. Yes.

Page 80

Q.  So, in other words, this isn't a situation   12:30:18
in which RTZ or the PACE Care system is exchanging   12:30:22
data among all these various entities, you know,   12:30:31
as -- as kind of an ecosystem.  Correct?   12:30:37

MR. WEIR:  Objection.  Vague.   12:30:40

MR. LEE:  I'll put it -- I'll -- I'll put it   12:30:43
differently.   12:30:45

BY MR. LEE:   12:30:45

Q.  This isn't a situation in which RTZ or the   12:30:45
PACE Care system is exchanging data among, for   12:30:48
instance, a lab which it then exchanges it with a   12:30:51
pharmacy which then may exchange that same data with   12:30:55
a transportation company.  Correct?   12:31:00

MR. WEIR:  Objection.   12:31:04

THE WITNESS:  I can on- -- sorry.   12:31:05

MR. WEIR:  That's -- objection, vague.  And   12:31:07
I'll make a leading objection also 'cause I'm not   12:31:10
sure whether this is going to be -- whether this is a   12:31:12
trial depo or not.   12:31:19

BY MR. LEE:   12:31:24

Q.  You can answer the question if you know.   12:31:24

MS. KOTIYA:  You can answer.   12:31:26

THE WITNESS:  I could only answer to   12:31:27
where -- how PACE Care interacts and exchanges data.   12:31:30
I have no knowledge of the other things you   12:31:34

Page 81

mentioned.                                              12:31:37

BY MR. LEE:                                             12:31:38

Q.  Fair enough.  Let me -- let me see if I            12:31:42
can -- if I can ask it this way.                        12:31:43

If you picture a bicycle wheel and the                 12:31:45
PACE Care system is at the hub and a lab is at the      12:31:52
end of the one of the spokes on the wheel side, is it   12:31:59
fair to say that the PACE Care system, to the extent    12:32:02
it exchanges data with that lab, just simply sends it   12:32:07
as a point-to-point exchange with the lab?             12:32:12

MR. WEIR:  Objection.  Vague.  It's also,              12:32:17
again, leading.                                         12:32:19

BY MR. LEE:                                             12:32:21

Q.  You can answer.                                     12:32:22

A.  Yes.                                                12:32:22

Q.  Okay.  And then, in that instance, am I             12:32:24
correct that the lab, to the extent it modifies data,   12:32:26
would simply send that data back to PACE Care in a      12:32:32
direct point-to-point exchange?                         12:32:38

MR. WEIR:  Same objections.                            12:32:41

THE WITNESS:  Yes.                                      12:32:43

BY MR. LEE:                                             12:32:44

Q.  And am I further correct that upon receipt          12:32:46
of -- well, I'll ask it differently.                    12:32:51

And if we're talking about, for instance, a            12:32:55

Page 82

payer, is it fair to say that, to the extent the    12:32:58

PACE Care system is exchanging data with a payer,    12:33:03

it's doing so along a different line of exchange.  In    12:33:09

other words, a separate spoke.    12:33:14

       MR. WEIR:  Objection.  It's vague -- vague    12:33:17

and it's a leading objection.    12:33:19

BY MR. LEE:    12:33:24

   Q.  You can answer.    12:33:25

   A.  Yes.    12:33:25

   Q.  And so is it fair to say that the type of    12:33:37

data exchanges that you have described are    12:33:39

point-to-point exchanges?  In other words, data is    12:33:45

going from PACE Care to the lab, and the lab is    12:33:47

simply sending that data back to PACE Care?    12:33:51

       MR. WEIR:  Objection.  Vague.  Lacks    12:33:54

foundation and leading.    12:33:58

BY MR. LEE:    12:34:02

   Q.  You can answer.    12:34:03

       MS. KOTIYA:  You can answer, Kevin.    12:34:03

       THE WITNESS:  Yes.    12:34:05

BY MR. LEE:    12:34:09

   Q.  Do you recall having any discussions with    12:34:20

Tracy Creegan?    12:34:23

   A.  Yes.    12:34:23

   Q.  And can you recall -- first of all, do you    12:34:24

Page 83

know who Tracy Creegan is?                          12:34:26

A.   Yes.   I met her one time, yeah.            12:34:28

Q.   Do you understand that she is an expert that    12:34:31
has been engaged for RTZ in this case?              12:34:34

A.   Oh, yes.                                    12:34:36

Q.   Okay.   Do you recall generally the subject    12:34:38
matter of the discussions you had with Ms. Creegan?    12:34:46

A.   Yes.                                        12:34:48

Q.   And, at a high level, can you describe what    12:34:49
those -- what discussions you had with her?         12:34:52

A.   Yeah.   At a high level, I talked about the    12:34:57
audit logs.   I talked about, in essence, some similar    12:35:02
questions that you all have asked around data       12:35:07
movement.                                           12:35:10

Q.   Can you -- to the best that you recall, can    12:35:13
you describe what discussions you had with her about    12:35:17
data movement?                                      12:35:21

A.   She was centering it around HIEs and things    12:35:27
of that sort.                                       12:35:33

Q.   And what is an HIE, to your understanding?    12:35:35

A.   It's a health information exchange.          12:35:39

Q.   Okay.   And, given your experience and       12:35:47
current role, what do you understand a health       12:35:51
information exchange to be?                          12:35:58

MR. WEIR:   Objection.   Lacks foundation.    12:36:00

Page 84

MS. KOTIYA:  You can answer.                12:36:06

THE WITNESS:  Can I answer that?            12:36:07

MS. KOTIYA:  Yeah, hm-hm.                   12:36:09

THE WITNESS:  Oh, okay.                     12:36:10

It's -- a health information exchange is an   12:36:11
entity that shares data.                    12:36:15

BY MR. LEE:                                 12:36:20

Q.  And what do you mean by "an entity that   12:36:21
shares data"?                              12:36:23

A.  It could be a state organization.  It could   12:36:27
be a federal organization.  It could be many   12:36:30
different things.                          12:36:32

Q.  Have you ever heard of the Cures Act?   12:36:33

A.  Excuse me.  Yes.                        12:36:41

Q.  Do you have an understanding as to whether   12:36:43
the Cures Act addresses the definition of an HIE?   12:36:46

MR. WEIR:  Objection.  Lacks foundation.    12:36:53

Oh, did you just ask him if he had an       12:36:57
understanding?                             12:36:59

MR. LEE:  Yes.                             12:36:59

MS. KOTIYA:  I think so.  What was your     12:36:59
objection?                                 12:37:01

MR. WEIR:  I said lacks foundation, but if   12:37:01
he's just asking him if he has an understanding,   12:37:04
then he's trying to set the foundation, so I withdraw   12:37:06

Page 85

objection.    12:37:08

          MS. KOTIYA:  You can answer, Kevin.    12:37:11

          THE WITNESS:  Generally, yes.    12:37:13

BY MR. LEE:    12:37:14

     Q.  And what is your general understanding?    12:37:14

          MR. WEIR:  Objection.  Lacks foundation.    12:37:17

          MS. KOTIYA:  You can answer that, Kevin.    12:37:22

          THE WITNESS:  That --    12:37:24

          MS. KOTIYA:  Yeah.    12:37:24

          THE WITNESS:  My -- I mean, generally, in my    12:37:25

words, it's the -- if you have the ability to    12:37:30

exchange data and access to data.    12:37:35

BY MR. LEE:    12:37:46

     Q.  You mentioned that, in your discussions with    12:37:58
Ms. Creegan, you also discussed audit logs.  Did I    12:38:00
hear that correctly?    12:38:05

     A.  Yes.    12:38:06

     Q.  Okay.  And what audit logs did you discuss?    12:38:09

     A.  I was asked to produce audit logs for her.    12:38:12

     Q.  And so these are PACE Care audit logs?    12:38:19

     A.  PACE Care, yes.    12:38:24

     Q.  Okay.  And was there a specific type of    12:38:25
log -- well, let me back up.    12:38:31

          What are these audit logs, to your best    12:38:33
recollection, logging?  The ones that you produced to    12:38:40

Page 86

Ms. Creegan.                                          12:38:44

A.  Oh.  Direct user access into PACE Care by         12:38:47
Intus.                                                12:38:54

Q.  And so do I understand correctly that the         12:38:54
audit logs that you had prepared reflected the access 12:38:57
events by Intus into PACE Care?                       12:39:06

A.  Yes.                                              12:39:06

MR. LEE:  Bear with me.  Charles, I'm not             12:39:18
sure how to do this.                                  12:39:36

MR. WEIR:  Do you want to go off the record           12:39:40
and have the discussion, or do you want the           12:39:42
discussion on the record?                             12:39:44

MR. LEE:  Yeah, why don't we go off the               12:39:45
record real quickly.                                  12:39:47

MR. WEIR:  Okay.                                       12:39:49

THE VIDEOGRAPHER:  The time is 12:39 p.m.              12:39:50
We're off the record.                                 12:39:53

(Recess taken.)                                        12:39:54

THE VIDEOGRAPHER:  The time is 12:42 p.m.              12:42:47
We're back on the record.                             12:42:54

BY MR. LEE:                                            12:42:59

Q.  Mr. Lathrop, before the break, we were            12:42:59
talking about the audit logs that you had had         12:43:01
prepared.                                             12:43:08

What I'd like to do is share my screen and            12:43:08

Page 87

show you these audit logs.  Before I do, I will for    12:43:12

the record will identify the three logs by Bates    12:43:21

range.    12:43:26

What is going to be marked as Exhibit 173 is    12:43:27

an Excel spreadsheet Bates-stamped with RTZ0008378,    12:43:32

Exhibit 174 carries the Bates stamp number    12:43:48

RTZ0008389, and Exhibit 175 is Bates-stamped    12:43:56

RTZ0008390.    12:44:10

(The documents referred to were    12:44:11

marked as Exhibit 173, Exhibit 174,    12:44:11

and Exhibit 175.)    12:44:13

BY MR. LEE:    12:44:13

Q.  All right.  So, with that, I will hopefully    12:44:14

be able to pull up Exhibit 173, which I believe is    12:44:15

this one.  All right.  Hopefully you can see that?    12:44:34

A.  Yeah, for an old guy, I can.    12:44:46

MR. WEIR:  Yeah, it's a little small, but I    12:44:49

can see it, too.    12:44:51

MR. LEE:  I don't know that I have a way to    12:44:52

blow it up.  Is that better?    12:44:55

THE WITNESS:  Oh, yeah, there you go.    12:45:00

That's impressive.  Okay.    12:45:01

BY MR. LEE:    12:45:01

Q.  All right.  Mr. Lathrop, I'm showing you    12:45:05

what has been marked as Exhibit 173.  Is this    12:45:08

Page 88

something that you're familiar with?    12:45:14

A.  Yes.    12:45:14

Q.  Is that one of the audit logs that you have been describing?    12:45:22    12:45:24

A.  Yes.    12:45:30

Q.  Okay.  And, at a high level, can you describe -- I mean I think -- I think you've touched on it already, but can you describe what this audit log shows?    12:45:30    12:45:32    12:45:35    12:45:38

A.  This audit log shows every time a user accesses my PACE Care system and logs that in. That's generally what it is.    12:45:42    12:45:51    12:46:02

Q.  Okay.  And is this -- sorry go to the right. There is in column S --    12:46:03    12:46:17

A.  Yup.    12:46:22

Q.  -- a column header that says "IP address." Do you see that?    12:46:23    12:46:27

A.  Yes.    12:46:27

Q.  Okay.  And it appears to be highlighted.  Do you have an understanding as to what an IP address is?    12:46:28    12:46:32    12:46:35

A.  Yes.    12:46:35

Q.  What is an IP address?    12:46:36

A.  It's the domain of the -- in essence, it's your tracker of the -- of your user and where you're    12:46:39    12:46:45

Page 89

accessing something from.

Q. Okay. Is there a reason why the IP address that exists in column S was selected?

A. That's the IP address that has been traced to Intus.

Q. And what do you mean by "traced to Intus"?

A. It's a registered IP for either their network or their physical office that is being used relative to a system.

Q. Okay. And, so for purposes of this audit report, it focus on the instances in which the entity or person accessing PACE Care was doing so from this IP address?

A. Yes.

Q. And, so that we're clear, your understanding is that this IP address is traced to Intus?

A. Yes.

Q. And so would this report reflect those instances in which Intus, through this IP address, accessed the PACE Care system for, I guess, it's unified or Loretto PACE CNY?

A. I'm trying to -- I don't know if I can see all your screen.

Q. Let me see. I believe that this is the first tab. Oh, maybe not. Sorry.

Page 90

So let me see if I can start this over.   12:49:05

We're looking at Exhibit 173 and I have   12:49:09
clicked on the tab at the bottom.  Do you see that,   12:49:16
tab 5126?   12:49:22

A.  Yes.   12:49:22

Q.  All right.  And there's a notation that says   12:49:30
"unified_log-lorettopacecny."  Do you see that?   12:49:33

A.  Yes.   12:49:39

Q.  Okay.  And what is that in reference to?   12:49:39

A.  That is a client of mine.   12:49:43

Q.  In other words, this is a PACE Care   12:49:47
customer?   12:49:50

A.  It's a PACE Care customer.   12:49:50

Q.  Okay.  And, again, if we go back to   12:49:52
column S, do you have an understanding as to whether   12:50:06
or not this IP address was traced to Intus?   12:50:11

A.  I don't.   12:50:18

Q.  Okay.  However, for purposes of this tab   12:50:20
which says "unified_log-communitypace" at the bottom.   12:50:28
Do you see that?   12:50:33

A.  Yes.   12:50:33

Q.  This is the IP address that we were looking   12:50:35
at before.  Correct?   12:50:38

A.  Yes.   12:50:39

Q.  And that is the IP address that you traced   12:50:40

Page 91

to Intus.  Correct?                          12:50:46

A.  Yes.                                      12:50:48

Q.  And so this particular log -- or this    12:50:49
particular PACE organization memorializes those   12:50:54
instances in which Intus had accessed Community    12:51:00
Pace's PACE Care system.  Correct?           12:51:04

A.  Yes.                                      12:51:07

Q.  Now, I just have to figure out how to stop    12:51:08
sharing.                                      12:51:29

MR. WEIR:  Well, go --                        12:51:29

MR. LEE:  Oh, okay.  Here we go.              12:51:33

THE VIDEOGRAPHER:  I can do it for you if    12:51:40
you'd like, Counsel.                          12:51:41

MR. LEE:  Okay.  That's great, thanks.        12:51:43

BY MR. LEE:                                    12:51:57

Q.  All right.  So the next exhibit in order is    12:51:58
Exhibit 174 I wanted to discuss.  Again, this is --    12:52:08
do you see that?                              12:52:16

A.  You got to make it a little bigger for me.    12:52:18
Sorry.                                        12:52:20

Q.  Oh, no, my -- my pleasure.  There we go.  Is    12:52:20
that helpful?                                 12:52:24

A.  There we go.                              12:52:24

Q.  Okay.  We're looking at Exhibit 174 and this    12:52:26
is the Excel spreadsheet Bates-stamped RTZ8389.    12:52:34

Is this another audit log that you had prepared?

A.    Yes.

Q.    Okay.    And is this organized in essentially the same way as the prior exhibit that we looked at?

A.    Generally.

Q.    Okay.    In other words, is this a log that was intended to reflect the instances in which Intus accessed PACE Care through a specific IP address?

A.    Oh, okay.    Yes.

Q.    Okay.    You mentioned before that you had traced the IP address that we looked at previously to Intus.    Do you remember that?

A.    Yes.

Q.    Okay.    There is a portion of this particular log, 8389, that says "IP location finder."

Do you see that?

A.    Yes.

Q.    Okay.    Is that the methodology through which you were able to determine that the IP address which is highlighted here, this 135.84.59.140 was traced to Intus?

A.    Yes.

MR. WEIR:    Objection.

THE WITNESS:    Whoops, sorry.

Page 93

THE REPORTER:  Repeat the objection.  I just    12:54:11
simply got the word "objection."    12:54:16

MR. WEIR:  Oh, sorry.  I objected because it    12:54:16
was leading.  And, again, not sure, David, if this is    12:54:20
a trial depo or not.    12:54:24

BY MR. LEE:    12:54:30

Q.  Can you describe how the IP location finder    12:54:31
kind of works?    12:54:35

A.  I can describe it generally.  If it's a    12:54:38
public domain, you put in the IP address, and it will    12:54:41
give you the registered location of the domain.    12:54:47

Q.  And did you come to learn that Intus's -- or    12:54:53
that this particular IP address was in the public    12:54:58
domain?    12:55:01

A.  Yes.    12:55:01

Q.  And, with it being in the public domain, was    12:55:03
that -- did that allow you to be able to trace it?    12:55:09

A.  Yes.    12:55:15

MR. WEIR:  Objection.  Leading.    12:55:15

BY MR. LEE:    12:55:17

Q.  And where did it trace to?    12:55:17

A.  Well, that's a tricky question.  It's an    12:55:22
Intus-registered domain, so somebody within the Intus    12:55:27
network was originating the access from there.    12:55:33

Q.  So it's --    12:55:38

Page 94

A.  I can't -- yeah, I can't answer physically where, but.    12:55:39 12:55:42

Q.  But, in any event, you came to learn that this highlighted IP address was associated with Intus?    12:55:43 12:55:47 12:55:51

A.  Yes.    12:55:51

Q.  I'm hopeful that you can see the next exhibit, 175, which is, again, Bates-stamped RTZ0008390.    12:56:32 12:56:40 12:56:48

Mr. Lathrop, is this the third version of an audit log that you had prepared?    12:56:52 12:56:57

A.  Yes.    12:56:57

Q.  And without reiterating what a -- what we've already gone through, is this audit log similar to -- to the other audit logs that we've already discussed?    12:57:01 12:57:05 12:57:11

A.  Yes.    12:57:15

Q.  And is it intended to reflect the same type of information that you previously described with regard to the other audit logs that we've looked at?    12:57:16 12:57:25 12:57:29

MR. WEIR:  Objection.  Vague.  Leading.    12:57:33

BY MR. LEE:    12:57:37

Q.  You can answer.    12:57:38

A.  Yes.    12:57:38

MR. LEE:  Sorry, I'm trying to figure out how to stop sharing.  Oh, did it stop sharing?    12:57:57 12:57:58

Page 95

MS. KOTIYA:  No.

MR. LEE:  Oh, it's still there?  Sorry.

MS. KOTIYA:  It is.

MR. WEIR:  You're still oversharing, David.

MR. LEE:  Yeah, I'm not -- yeah, I just -- I just don't have a stop share option I can --

MR. WEIR:  Hit the "more" button.

MR. LEE:  Yeah, I did.  That's where I usually see it.  I don't know.  Is the videographer able to stop sharing again?

THE REPORTER:  May, are you there?  This is Susan, the reporter.  There we go.                    12:58:54

THE VIDEOGRAPHER:  Yes, I just stopped his   12:58:54
screen.                                             12:58:54

MR. LEE:  Thank you.  Thank you very much.   12:58:54

BY MR. LEE:                                         12:58:54

Q.  Mr. Lathrop, with respect to these audit   12:59:10
logs that we have looked at and have marked as      12:59:16
exhibits, I believe that you testified that they were   12:59:19
prepared for Ms. Creegan?                           12:59:25

A.  Yes.                                        12:59:29

Q.  Is that correct?                            12:59:29

A.  Yes.                                        12:59:29

Q.  Were -- were these audit logs prepared by   12:59:34
employees reporting to you?                         12:59:39

Page 96

A.   Yes.   12:59:39

Q.   And does the information in these audit logs   12:59:46
derive from the PACE Care system?   12:59:51

A.   Yes.   12:59:51

Q.   To your knowledge, does the PACE Care system   12:59:58
log user access at the time of the access?   13:00:01

A.   Yes.   13:00:01

Q.   And, once the system logs the access, am I   13:00:07
correct that the data is then stored to the PACE Care   13:00:18
system?   13:00:22

A.   Yes.   13:00:22

Q.   Is the information -- and I'm just going to   13:00:29
group all of these audit logs.  Is the information   13:00:31
that is reflected in those audit logs maintained and   13:00:34
stored in the ordinary course of business?   13:00:37

MR. WEIR:  Objection.  Leading.   13:00:40

BY MR. LEE:   13:00:44

Q.   You can answer.   13:00:45

MS. KOTIYA:  You can answer that.   13:00:45

THE WITNESS:  Yes.   13:00:46

BY MR. LEE:   13:00:47

Q.   Okay.  After these logs were prepared, did   13:00:47
you review them?   13:00:51

A.   I did.   13:00:52

Q.   And, based on your review, to the best of   13:00:53

Page 97

your understanding, do they accurately reflect the    13:00:59

user access activity logs that it purports to -- to    13:01:03

record?    13:01:10

       MR. WEIR:  Objection.  Vague.  Leading.    13:01:11

BY MR. LEE:    13:01:13

   Q.  That was a messy question.  Let me see if I    13:01:13

can ask it a little differently.    13:01:15

      Based on your review, do these logs    13:01:17

accurately reflect the data that resides in the    13:01:20

PACE Care system?    13:01:23

      MR. WEIR:  Same objections.    13:01:24

BY MR. LEE:    13:01:28

   Q.  You can answer.    13:01:29

      MS. KOTIYA:  You can answer, Kevin.    13:01:29

      THE WITNESS:  Yes.    13:01:31

BY MR. LEE:    13:01:31

   Q.  As you sit here today, are you aware of any    13:01:32

errors or alterations in the logs from the time that    13:01:35

they were generated to today?    13:01:38

   A.  No.    13:01:42

   Q.  And is it fair to say that these logs were    13:01:42

created in the ordinary course of a -- of your    13:01:48

organization's regular business activity?    13:01:51

      MR. WEIR:  Objection.  Leading.    13:01:53

      MS. KOTIYA:  You can still answer that,    13:01:57

Page 98

Kevin.                                                    13:01:58

THE WITNESS:  Yes.                          13:01:59

MR. LEE:  Mr. Lathrop, that's all the       13:02:03

questions that I have.                                   13:02:03

MR. WEIR:  David, can you do me a favor and  13:02:07

email those three product logs?                          13:02:10

MR. LEE:  Yes, will do.                      13:02:14

MS. KOTIYA:  Charles, do you have any        13:02:16

additional questions?                                    13:02:17

MR. WEIR:  I have some -- yeah, I'll have    13:02:18

some follow-up questions regarding the audit logs and    13:02:19

what we just went through.  So why don't -- let's go     13:02:22

off the record.                                          13:02:26

THE VIDEOGRAPHER:  The time is 1:02 p.m.     13:02:29

We're off the record.                                    13:02:31

(Recess taken.)                              13:17:17

THE VIDEOGRAPHER:  The time is 1:17 p.m.     13:17:18

We're back on the record.                                13:17:21

                                                         13:17:21

FURTHER EXAMINATION                    13:17:21

                                                         13:17:23

BY MR. WEIR:                                              13:17:23

Q.  All right, Mr. Lathrop, I have some      13:17:27

follow-up questions regarding these audit logs and       13:17:30

your discussion.                                         13:17:34

Page 99

Was it just one discussion with Ms. Creegan?   13:17:35

A.   Yes.   13:17:38

Q.   All right.  So, hopefully, if this worked,   13:17:40
you should be able to go into exhibit share and pull   13:17:43
up Exhibit 173, which is the first of the three   13:17:47
spreadsheets that Mr. Lee showed you a moment ago.   13:17:53

A.   Okay.  Just a couple of rows.  Right?   13:18:14

Q.   Well, it's a spreadsheet, so it depends on   13:18:16
the tab you're on.   13:18:22

A.   Oh, I see the tabs now.   13:18:23

Q.   Okay.  So I'm going to make sure I   13:18:29
understand how this Exhibit 173 came to be.   13:18:32

So you were asked to have somebody on your   13:18:35
staff run audit logs.  Is that correct?   13:18:39

A.   Yes.   13:18:39

Q.   Oh, you're frozen.  Oh, there we go.   13:18:47

A.   I came back, yes.   13:18:50

Q.   Okay.  And who did -- who on your staff ran   13:18:54
those?   13:18:58

A.   I advised my chief technology officer, Jett   13:18:59
Reidy.   13:19:05

Q.   And the -- how was an audit log -- do you   13:19:09
know how an audit log is run?   13:19:15

A.   Generally.   13:19:20

Q.   So are you -- there's -- if you go to the   13:19:21

Page 100

log, there's a -- there's a number -- across the top,   13:19:25

there's a number of -- the columns have different --   13:19:29

different names.   13:19:36

A.   Yeah.  I see it.   13:19:41

Q.   So the -- is -- in running these logs, is   13:19:45

there a process of selecting certain inputs that you   13:19:55

want included in the log, or does -- when you run the   13:20:00

log, does it just include all of the data regarding   13:20:03

the interactions that a user had with PACE Care?   13:20:06

A.   Correct.  If there's data relative -- now,   13:20:10

remember, a user log is an access log, so it's --   13:20:13

it's -- it's really around the access.   13:20:17

Q.   Okay.  So if I wanted -- I guess my question   13:20:20

is, does the log in Exhibit 173, does that include   13:20:27

all of the data that is stored in PACE Care regarding   13:20:31

the -- regarding these various access events?   13:20:37

A.   It includes all of the fields where access   13:20:45

occurred.   13:20:50

Q.   So like, for example, column A says "unified   13:20:51

log ID," and column B says "log module updated."   13:20:58

Do you know if Jett Reidy did you say?  Do   13:21:06

you know if he --   13:21:11

A.   Yes.   13:21:11

Q.   -- if he selected all of the column headings   13:21:12

that are as -- as fields for -- as output fields for   13:21:18

Page 101

the audit log that we're seeing in Exhibit 173?                     13:21:23

A.  I can't answer that.                                            13:21:27

Q.  Does -- in the ordinary course of business,                    13:21:29
are you generating -- are you generating audit logs                13:21:41
similar to what we're seeing in Exhibit 173?                       13:21:49

A.  Yes.                                                           13:21:56

Q.  So were these -- was Exhibit 173 an existing                    13:21:57
document, or was it something that Mr. Reidy had to                13:22:02
generate so that it could be given to Ms. Creegan?                13:22:09

A.  It was -- this -- the one I'm looking at,                      13:22:16
this exhibit, was generated to provide Ms. Creegan.               13:22:18

Q.  And is the information that is in the log,                     13:22:25
is it consistent with the information that is -- when             13:22:28
the logs are generated in the ordinary course of                 13:22:34
business, is the information in Exhibit 173 the same              13:22:35
as the information that is in logs that are generated             13:22:41
in the ordinary course of business?                              13:22:44

A.  Yes.                                                           13:22:46

Q.  Okay.  Is there anything that any of the                       13:22:51
fields -- so I was looking at the columns that have               13:22:53
different names.  Were there any of the fields that               13:22:56
were left out in the logs that were generated for                13:22:58
Ms. Creegan?                                                       13:23:04

A.  I can't answer that.                                           13:23:06

Q.  In Exhibit 173, I don't -- I don't see a --                    13:23:07

Page 102

and maybe I'm wrong, maybe it's there.  I don't see a    13:23:22
user tab.    13:23:25

A.  Let me -- because I'm still -- you still    13:23:30
have 175 up.  173, got it.    13:23:32

Q.  Well, you should be able to pull it up,    13:23:35
whatever you're pulling up.    13:23:43

A.  I'll come back.  Can you guys hear me when    13:23:47
I'm on the exhibit or --    13:23:49

Q.  We can hear you.  You just freeze.    13:23:50

A.  Okay.  I -- 'cause I -- you're right, I can    13:23:52
scroll through it, if that's what you're asking.    13:23:55

Q.  Yeah, and you should be able to, you know,    13:23:57
pick the one from the admitted exhibits.  So you now    13:23:58
have control of the document as opposed to relying on    13:24:04
one of to us move it around.    13:24:07

A.  Yeah, I have 173 up.    13:24:08

Q.  Okay.  All right.  So if you compare 173 to    13:24:14
174.    13:24:18

A.  Yeah.    13:24:23

Q.  174, the first tab says "user," and in 173,    13:24:23
it doesn't have that tab.  Are you with me?    13:24:28

A.  Yes.    13:24:28

Q.  Do you know why 173 did not include the    13:24:33
"user" tab?    13:24:37

A.  I don't know specifically why.    13:24:40

Page 103

Q. So on Exhibit 1- -- does the -- does the    13:24:41
PACE Care system -- so I'm still on 174.    13:24:50
Does the PACE Care system, for purposes of    13:24:55
tracking who's logging in and doing what, does it log    13:24:57
the username?    13:25:03
A. Yes.    13:25:03
Q. So, and in that -- to your best of your    13:25:09
knowledge is -- well, I guess we know that because    13:25:16
it's showing access for folks, like under the Robbie    13:25:19
Felton username, going back to 2021. Correct?    13:25:24
A. Yes.    13:25:26
Q. So, at any point in time, Collabrios would    13:25:27
be able to see, because it's captured in the system,    13:25:34
that folks like Robbie Felton, Evan Walter had access    13:25:38
to PACE Care. Correct?    13:25:44
A. Yes.    13:25:49
Q. I forget your answer and it -- do you know    13:25:55
why Exhibits 173 and 175 do not have the "user" tab?    13:26:00
A. I do not.    13:26:06
Q. Okay. So if you can tell -- if you can tell    13:26:07
by the user access, so the Robbie Felton's log-in was    13:26:21
used on these days, why -- why the need to go to    13:26:28
the -- this IP address analysis?    13:26:35
MS. KOTIYA: Objection. Vague.    13:26:42
BY MR. WEIR:    13:26:44

Page 104

Q.  Do you understand the question?  I guess they're not all winners.  I can restate it if you don't understand.    13:26:45 13:26:50 13:26:51

A.  I mean -- yeah, go ahead and restate it.    13:26:52

Q.  So you went though the -- you had a bunch of questions that Mr. Lee asked you about, the IP address and, you know, how you figure out where the IP address is located, and, you know, all this tracking of things.    13:26:53 13:26:55 13:26:59 13:27:01 13:27:05

Why is any of that necessary?  Because you can just see that Robbie Felton's log-in was used on given dates.  Correct?    13:27:08 13:27:11 13:27:17

A.  Yeah.  Yeah.  The -- so for security and HIPAA reasons, we will always track back to the IP.    13:27:18 13:27:23

Q.  Okay.  But if you're trying to figure out how many -- how Intus -- or whether Intus was accessing PACE Care, you don't need to go -- you don't need to track back to the IP address.  You can just look and see where Robbie Felton's log-in was used.  Right?    13:27:30 13:27:32 13:27:35 13:27:39 13:27:41 13:27:45

A.  I could assume that, yes.    13:27:48

Q.  So it wasn't like it was some big secret that Intus was accessing the PACE Care system because they're using Intus Care log-ins.  Right?    13:27:50 13:27:54 13:28:00

MR. LEE:  Objection.  Vague and --    13:28:06

Page 105

90

THE WITNESS:  Is there a question?    13:28:07

MR. LEE:  Yeah, vague and ambiguous as to    13:28:08
"some big secret."    13:28:10

MS. KOTIYA:  I'll join that objection.    13:28:17

But you can answer, Kevin, if you understand    13:28:18
the question.    13:28:20

BY MR. WEIR:    13:28:22

Q.  Sorry, I can rephrase it if I -- I was being    13:28:22
colloquial.  But, at all points in time that there    13:28:25
are these Intus log-ins, the owner and operator of    13:28:29
PACE Care would be able to tell that Intus is logging    13:28:37
in with those log-ins, with those Intus log-ins.    13:28:41
Correct?    13:28:41

A.  Specific to the log-ins in the user ID,    13:28:49
correct.    13:28:52

Q.  Is there -- is there a reason why in the    13:28:53
audit logs for -- when you go past the user, can you    13:29:00
generate the audit log?  So, like, I'm in    13:29:07
Exhibit 174, first tab "unified" looks like "Loretto    13:29:12
PACE," can you generate a log where it also includes    13:29:16
as one of the fields the username?    13:29:21

A.  Yes.    13:29:21

Q.  Do you know -- do you know why that wasn't    13:29:30
done?    13:29:33

A.  Let me look.  You're on the "unified log    13:29:34

Page 106

90

Loretto PACE CNY"?    13:29:41

Q.   Yes, in Exhibit 174.    13:29:45

A.   Okay.   There's a log ID.    13:29:46

Q.   And -- and, yeah, if I missed it, then --    13:29:49

A.   Well, I'm just talking to myself maybe, but    13:29:52
there's -- there's a log ID.  Yeah, that tab does not    13:29:56
have what you're asking which is the username.    13:30:00

Q.   Can you generate an audit log that, you    13:30:04
know, similar to the one we're looking at, where you    13:30:11
just add the username as a field?    13:30:13

A.   Yes.    13:30:16

Q.   Okay.   So it does look like then there were    13:30:16
some choices made by Mr. Reidy in generating    13:30:19
Exhibit 170- -- Exhibits 173, -4, and -5?    13:30:26

A.   I don't think you can assume that.    13:30:29

Q.   Why not?    13:30:33

A.   Because the -- what the tabs you're seeing    13:30:37
is -- is a report.  It's a log report.    13:30:39

Q.   But isn't the log report generated based    13:30:47
upon the criteria that it is -- that PACE Care is --    13:30:49
PACE Care's given a set of criteria as to what    13:30:57
information you want in the log report, and it    13:30:59
generates the report?  Isn't that how it works?    13:31:01

A.   Well, that particular log report has    13:31:04
multiple tabs, 174.    13:31:06

Page 107

90

Q.   Hm-hm.    13:31:10

A.   So that is one log report.    13:31:12

Q.   Okay.   And I guess my question is, I thought    13:31:23
you had testified that, you know, for example,    13:31:26
for unif- -- for Loretta PACE -- or Loretto PACE, you    13:31:33
could add a column that has the username.   Correct?    13:31:41

A.   I don't remember what the context of the    13:31:47
question was that you're referring to.    13:31:53

Q.   So I'm trying to figure out -- maybe --    13:31:58
maybe my premise is wrong here.    13:32:00

If I wanted to run a log report and have it    13:32:03
only produce columns A, B, and C that you are seeing    13:32:09
in Exhibit 174, I would put that into the PACE Care    13:32:14
system, and it would generate that log report and it    13:32:18
would have three columns in it.    13:32:20

I could do that.   Right?    13:32:22

A.   I would -- I don't know specifically if I    13:32:25
have the ability -- custom, that's what you're    13:32:28
asking.    13:32:31

Q.   That's what I'm asking, custom for purposes    13:32:32
of generating these columns.    13:32:34

A.   Yeah, and I -- I don't know if there's the    13:32:36
ability to customize an auto log report.    13:32:37

Q.   Okay.   So you don't know one way or the    13:32:41
other whether Jett Reidy did any customization when    13:32:43

Page 108

90

he generated the log reports that we're seeing -- the 13:32:49

audit log reports that we're seeing as Exhibit 173, 13:32:52

'4, and '5.  Correct? 13:32:55

A.  What I can testify to is what my instruction 13:32:56

was. 13:32:59

Q.  Okay.  And what was your instruction? 13:33:00

A.  To generate auto log reports for a time 13:33:03

frame and identify user IDs. 13:33:06

Q.  Okay.  But you don't know whether or not the 13:33:09

information reflected in Exhibits 173, 174, and 175 13:33:18

is the product of selecting certain fields versus 13:33:23

other fields for purposes of generating the audit 13:33:26

logs? 13:33:34

A.  I can only go under what I was instructed, 13:33:34

so. 13:33:37

Q.  Okay.  So back to Exhibit 174, the user tab. 13:33:38

A.  Okay.  Okay. 13:33:58

Q.  Who issues the usernames? 13:34:02

A.  The PACE organization. 13:34:05

Q.  And how does that -- how does that work?  Do 13:34:10

they just send -- do they send you a list of 13:34:19

usernames that they want to have access?  Or is there 13:34:24

a limited number?  How does that work? 13:34:28

A.  The PACE -- the PACE org controls that. 13:34:30

Q.  So if they wanted to issue a hundred 13:34:33

Page 109

90

different usernames and access points, they would be    13:34:40

entitled to do that, or is there a limit?    13:34:45

A.    Based on the license agreement, it could    13:34:49

vary, but, yeah, you'd have to ask me specifically    13:34:51

about one.    13:34:54

Q.    All right.    Well, what about like Loretto    13:35:01

PACE, do they have a cap on the amount of usernames    13:35:05

that they can issue?    13:35:08

A.    I -- I haven't read their contract, so I    13:35:11

can't answer that.    13:35:13

Q.    Are there some contracts that don't have    13:35:14

caps on the amount of users -- usernames that PACE    13:35:18

programs can issue?    13:35:22

A.    In some cases, contracts vary based on    13:35:23

licenses, users.    There's a lot of different    13:35:27

variations.    13:35:32

Q.    Okay.    But is one of those variations that    13:35:35

is -- are there -- do you have any contracts in which    13:35:38

there are no limits placed upon the number of users    13:35:41

that a PACE program can issue?    13:35:43

A.    There are some that are like that.    13:35:47

Q.    All right.    Exhibit -- so on Exhibit 174,    13:35:49

the user tab, looking at column L.    13:36:09

Are you with me?    13:36:20

A.    Yeah.    13:36:22

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q. See the first one, you know, line 2, "client account is expected to be shared." 13:36:22 13:36:29

A. Yeah. 13:36:34

Q. Like line 8, "confirmed Intus employee account based on name." 13:36:35 13:36:39

This document that we're looking at, especially, in particular, column L, that isn't something that would have come out of the -- the audit reports. Correct? 13:36:42 13:36:45 13:36:47 13:36:53

A. Correct. 13:36:54

Q. So this -- do you know who -- do you know who wrote this in column L, Exhibit 174? 13:36:55 13:36:59

A. I don't know. 13:37:04

Q. But this wouldn't be something that would be kept in the -- or done in the ordinary course of business. Correct? 13:37:05 13:37:08 13:37:10

A. We were evaluating user access for violations. It could be. 13:37:14 13:37:18

Q. In this particular instance, was Exhibit -- was column L created for purposes of giving it to Ms. Creegan? 13:37:21 13:37:23 13:37:28

A. That's correct. 13:37:28

Q. All right. Briefly, on your conversation with Ms. Creegan, how long was the conversation? 13:37:30 13:37:49

A. Not more than an hour. 13:37:56

Page 111

90

Q.  How much of that time was spent talking about audit logs, if you remember?    13:37:58 13:38:05

A.  Hm.  Yeah, I don't recall.    13:38:10

Q.  I had audit logs and data movement.  What else do you remember about the data movement discussions?    13:38:12 13:38:19 13:38:23

A.  She asked me similar questions that you did around Quest and labs and things like that.    13:38:24 13:38:26

Q.  Anything else you can remember from that conversation?    13:38:31 13:38:38

A.  No.    13:38:38

Q.  And Mr. Lee had asked -- you used the phrase "point to point" a couple times in his examination.  Have you -- what did you understand that to mean?    13:39:23 13:39:26 13:39:30 13:39:34

A.  Point to point, A -- point A to point B.    13:39:38

Q.  Any further clarification you can give me on that?  Or is that it?    13:39:41 13:39:50

A.  That's my answer, yeah.    13:39:52

Q.  Okay.  Until preparing these audit logs or having them prepared, did you have any discussions with Michael Zawadski about it?    13:40:12 13:40:17 13:40:19

A.  No.    13:40:22

Q.  Other than counsel, did you -- and apparently -- well, let's see, I got Jett Reidy,    13:40:22 13:40:33

Page 112

90

Ms. Creegan.  Anybody else you discussed the audit                      13:40:37

logs with other than counsel?                                            13:40:44

    A.   Not that I can recall.                                          13:40:45

    Q.   Did you have an understanding as to why you                     13:40:50

were generating -- why you were being asked to                           13:40:53

generate these audit logs?                                               13:40:56

    A.   Yeah, I think I answered.  It was for the                       13:40:57

purposes of providing it to Ms. Creegan.                                 13:40:59

        MR. WEIR:  Okay.  All right.  I think                            13:41:04

that's -- I think that's it for me.                                      13:41:05

        David, anything else?                                           13:41:13

        MR. LEE:  Nothing on my end.                                     13:41:13

        MS. KOTIYA:  Nothing to follow up from us.                       13:41:16

        MR. WEIR:  All right.  I think we can go off                     13:41:20

the record.                                                              13:41:22

        THE VIDEOGRAPHER:  Susan, do you want to put                     13:41:23

orders on the record?                                                    13:41:23

        THE REPORTER:  Sure.  If any counsel wishes                      13:41:23

to purchase a copy of today's deposition, just let me                    13:41:23

know now.                                                                13:41:36

        MR. WEIR:  We will purchase a copy.  I need                      13:41:36

a rough.  What is our turnaround time?                                   13:41:38

        THE REPORTER:  Final delivery on regular                        13:41:38

turnaround time is ten business days from today.                         13:41:40

        MR. WEIR:  Are we on the record?                                 13:41:48

Page 113

90

THE REPORTER:  We are still on the record.

THE VIDEOGRAPHER:  Yes.

MR. WEIR:  Okay.  Can we go off -- can we go off the record?

THE REPORTER:  Just close it out.

MR. WEIR:  Yeah.                                    13:41:56

THE VIDEOGRAPHER:  This concludes today's     13:41:56
deposition of Kevin Lathrop.  The time is 1:42 p.m.   13:42:01
We're off the record.                                13:42:05

(Whereupon, at 1:42 p.m., the          13:42:05
virtual remote videotaped                13:42:05
deposition of KEVIN LATHROP was          13:42:05
adjourned.)

Page 114

90

STATE OF CALIFORNIA    )

County of Los Angeles ) ss.



        I, KEVIN LATHROP, hereby declare under the penalties of perjury of the laws of the United States that the foregoing is true and correct.

        Executed this _____ day of _____, 2026, at _____, California.



                   _____

                   KEVIN LATHROP

Veritext Legal Solutions

866-299-5127        calendar-ca@veritext.com        www.veritext.com

90

STATE OF CALIFORNIA   )

County of Los Angeles )  ss.

I, SUSAN NELSON, C.S.R. 3202, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth; that said virtual remote videotaped deposition was taken down by me stenographically at the time and place therein named to the best of my ability, and thereafter transcribed via computer-aided transcription under my direction, and the same is a true, correct and complete transcript of said proceedings;

Before completion of the deposition, review of the transcript [x] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the event of the action.

Witness my hand this 21st day of July, 2026.

Susan Nelson, C.S.R. No. 3202

State of California

Page 116

Shailika Shah Kotiya, Esq.

skotiya@mcguirewoods.com

July 21, 2026

RE: Intus Care, Inc. v. RTZ Associates Inc., Et Al.,

7/16/2026, Kevin Lathrop, (#8299444).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 117

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 118

Intus Care, Inc. v. RTZ Associates Inc., Et Al.,

Kevin Lathrop (#8299444)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

     (Kevin Lathrop)                         Date

Page 119

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

**[& - 90067-2506]**

**&**

**&** 3:4 66:1,5 117:24 118:9

**0**

**01132** 1:6 2:6 7:20

**1**

**1** 1:8 2:8 6:5 104:1 118:1
**1-119** 1:25
**10** 1:8 2:8
**10:06** 1:15 2:15 7:3,6
**11:04** 42:16
**11:16** 42:19
**12** 61:6,8,11,12
**12:10** 75:8,11
**12:22** 75:14
**12:39** 87:16
**12:42** 87:19
**1300** 4:7
**135.84.59.140** 93:21
**14/19** 5:10
**16** 1:14 2:15 7:2,7
**170** 107:14
**171** 6:3 56:4,6 56:9 57:5,10 58:18,24 59:6 59:8 62:18 63:19,21 64:23

**172** 6:6 70:5,7 71:1,7 74:5
**173** 6:9 88:4,10 88:14,25 91:2 100:5,12 101:14 102:1,5 102:7,15,25 103:4,16,17,20 103:23 104:18 107:14 109:2 109:10
**174** 6:11 88:6 88:10 92:17,24 103:18,20 104:2 106:19 107:2,25 108:13 109:10 109:16 110:22 111:12
**175** 6:13 88:7 88:11 95:8 103:4 104:18 109:10
**19/20** 5:11
**1925** 3:6
**1992** 22:2
**1994** 21:23
**1:02** 99:14
**1:17** 99:17
**1:42** 114:8,10

**2**

**2** 4:7 111:1

**2014** 24:5
**2018** 24:23 25:4
**2020** 27:1
**2021** 104:10
**2022** 48:2
**2023** 48:2
**2025** 61:20 62:24 63:8 64:12,15,21
**2025.520** 117:9 117:12
**2026** 1:14 2:15 7:2,7 51:5 64:21 115:9 116:22 117:3
**20381** 116:24
**21** 25:16 117:3
**21st** 116:22
**22** 27:2 29:2 60:25
**22nd** 51:5
**23** 60:25
**24** 29:8 30:7 62:22
**25** 63:21 64:13

**3**

**30** 118:1
**310** 3:8
**3202** 1:23 2:17 8:24 116:3,24
**34th** 3:14

**398-3600** 3:16

**4**

**4** 107:14 109:3
**40** 12:13 13:9
**415** 3:16 4:9
**490-0918** 4:9
**4:24** 1:6 2:6 7:20

**5**

**5** 107:14 109:3
**50** 3:14
**500** 3:6
**5126** 91:4
**556-8861** 3:8
**56** 6:3

**7**

**7/16/2026** 117:5
**70** 6:6
**75** 67:4
**78** 5:5 67:14

**8**

**8** 111:4
**80** 67:5
**8299444** 1:24 117:5 119:2
**8389** 93:16
**88** 6:9,11,13

**9**

**9** 5:4
**90067-2506** 3:7

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[94111 - amount]**

| | | | |
|---|---|---|---|
| **94111** 3:15 | **accesses** 89:11 | **addressed** | **alive** 56:23 |
| **94111-3821** 4:8 | **accessible** | 14:25 74:6 | **allegations** |
| **97** 22:17 | 34:10 | **addresses** | 16:13 37:12,23 |
| **99** 5:4 | **accessing** 90:1 | 85:16 | 74:3 |

| **a** |
|---|

**a.m.** 1:15 2:15 7:3,6 42:16,19
**aaas** 31:4
**ability** 35:20 86:11 108:18 108:23 116:11
**able** 56:9 57:4 88:14 93:20 94:17 96:10 100:4 103:5,12 104:13 106:11
**above** 117:6
**absent** 37:18
**absolutely** 33:3
**access** 37:17 39:5 40:9,11 40:12,12 46:2 46:6,10 86:12 87:2,5 94:24 97:6,6,8 98:2 101:11,12,16 101:17 104:9 104:14,21 109:22 110:1 111:17
**accessed** 90:20 92:5 93:9

90:12 105:17 105:23
**account** 25:11 111:2,5
**accurately** 98:1 98:9
**acquisition** 25:3 60:3,5,16 61:23,24
**act** 85:13,16
**action** 7:25 47:16 49:24 50:1 74:1 116:21
**activity** 98:2,23
**actually** 13:1 13:21 25:1
**add** 107:10 108:6
**addition** 16:20
**additional** 99:9
**address** 89:16 89:20,23 90:2 90:4,13,16,19 91:16,22,25 93:9,12,20 94:10,13 95:4 104:23 105:7,8 105:18

**adjacencies** 30:25
**adjourned** 114:13
**adjusted** 66:15
**adjusting** 66:17
**adjustments** 66:20,21,23,25
**administer** 8:20
**admitted** 103:13
**advance** 13:5,6
**advised** 100:20
**affiliations** 8:5
**afternoon** 9:12
**ageing** 31:5
**ago** 32:18,24 33:9 100:6
**agree** 7:13 18:10 80:9
**agreement** 44:10,11 47:19 49:1 110:3
**ah** 27:12
**ahead** 35:17 46:22 105:4
**aided** 116:12
**al** 117:4 119:1

**alleged** 16:14 37:12,16 38:2
**allianz** 23:25 24:3,4,5,16
**allow** 10:2 39:3 39:5 47:3 94:17
**allowable** 36:25
**allowed** 116:18
**allowing** 38:5
**allows** 36:11
**alterations** 98:18
**alternatively** 55:7
**ambiguous** 39:7 40:14,16 47:20 106:2
**ambivalent** 46:9
**ambulance** 42:8 79:15,18
**ambulances** 42:7
**amended** 37:13
**americas** 24:17
**amount** 27:17 27:18 110:7,12

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[analysis - b]

**analysis** 23:4,6 23:7,8 104:23
**analyst** 22:11
**analytical** 23:2
**angeles** 3:7 115:2 116:2
**answer** 5:8 15:4,10,19 16:8 17:1,15 19:25 20:24 35:2,18,19 38:17 39:8 47:3,7 48:18 50:12,15 62:2 62:3,5 63:12 65:8,17 68:7 69:18,19 70:3 71:6,21 73:14 73:21 74:23 81:21,22,23 82:14 83:8,18 83:19 85:1,2 86:2,7 95:1,22 97:18,19 98:13 98:14,25 102:2 102:24 104:17 106:5 110:10 112:19
**answered** 35:1 113:7
**answering** 19:3
**anybody** 9:19 13:15,22,24 14:2,7 44:15

75:25 77:22 113:1
**anyways** 74:16
**apparently** 112:25
**appearance** 8:3
**appearances** 3:1 4:1 8:5
**appearing** 3:1 117:18 118:7
**appears** 11:6 89:19
**appended** 116:19
**appreciate** 28:18
**april** 51:5
**argument** 15:23
**arrived** 63:19
**arts** 21:19
**aside** 16:7
**asked** 16:12 20:2 35:1 47:23 52:12 53:6 59:24 60:2,6,8,17 61:22 78:6 84:13 86:19 100:13 105:6 112:7,12 113:5
**asking** 19:12 27:11 31:21 37:3 46:13,24

49:18,22 50:2 63:22 74:24 85:24 103:11 107:7 108:19 108:20
**aspect** 28:5 34:23
**assert** 15:16
**assessing** 28:23
**assessment** 27:24,25 28:2 28:12 43:1
**assessments** 42:25
**assets** 26:1 27:13
**associated** 36:4 65:6 95:4
**associates** 1:7 2:7 3:11 7:18 8:13 17:7 78:6 117:4 119:1
**assume** 17:18 20:24 21:25 30:9 32:25 33:5,16 40:20 40:21 55:16,17 59:24 105:21 107:15
**assuming** 20:4
**assumption** 22:1
**attorney** 8:6

**audio** 7:12 10:17
**audit** 84:12 86:15,18,19,20 86:24 87:5,23 88:1 89:3,8,10 90:10 93:1 95:11,14,15,19 96:17,24 97:2 97:13,14 99:11 99:24 100:14 100:22,23 102:1,4 106:17 106:18 107:8 109:2,12 111:9 112:2,4,20 113:1,6
**authorized** 16:11
**auto** 108:23 109:7
**automatically** 41:12,13
**autonomy** 30:19
**aware** 44:16,18 54:9 74:15 76:12,15 98:17

**b**

**b** 6:1 101:20 108:12 112:16 118:1

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[bachelor's - california]

bachelor's 21:25
back 15:5,18 23:12,21 41:19 42:20 46:20 57:2,7 64:23 67:3,19 75:2 75:15 77:15 80:24 82:18 83:14 86:23 87:20 91:14 99:18 100:17 103:7 104:10 105:14,18 109:16
background 21:16,17 27:7 75:18
backwards 46:14
bad 29:17 43:4 48:13 49:3
bailey 4:6 8:14 8:16 12:6,7,8 13:11
bar 73:6
barred 15:8 16:10,20 47:10 72:13 73:19
base 36:13
based 15:9 17:17 28:1 38:5,17 97:25 98:8 107:19

110:3,14 111:5
basis 14:21 17:2 27:14 68:16 73:6 74:12
bates 71:23 88:2,5,6,7 92:25 95:8
bear 87:8
beard 21:22
becker 3:4
beginning 8:6 10:16
behalf 2:14 8:7 8:9,12 80:12
belief 33:10
believe 14:24 16:9 20:8,10 47:25 48:2 52:19 53:8 60:6,17 73:23 74:12 79:19 80:4 88:14 90:24 96:19
believes 48:10
best 19:5,16 20:9,14,17,22 84:15 86:24 97:25 104:7 116:10
better 10:22 34:14 62:8 88:20

beyond 14:22 62:25 74:2
bicycle 82:5
big 23:13 30:22 42:12 105:22 106:3
bigger 73:23,24 92:19
bilateral 80:10
bill 14:15,16,17 18:5
birkholz 23:5
bit 20:21 21:15 26:8 33:6,15 37:9 75:18
blocking 16:14 37:17,24 50:18 51:1 74:4
blow 88:20
bmaher 4:11
board 29:18 32:13,23 33:7
boldage 51:24 53:15,18,22 54:10,25 67:18 67:20 68:10,20 69:4
bored 25:18
boss 50:22
bottom 71:24 91:3,19
break 10:25 21:4,5 39:13 39:15 42:14

87:22
breaks 21:11
brett 13:20
briefing 73:16 74:9
briefly 111:23
bruno 59:20,21
bunch 24:16 25:25 105:5
business 22:11 23:7 28:6 30:24 31:2,4 32:10,22 33:1 47:18 51:17,17 51:18 55:22 64:9 68:4 97:15 98:23 102:3,15,17 111:16 113:24
button 96:7

c

c 3:13 108:12
c.s.r. 1:23 2:17 116:3,24
ca 117:9,12,21
cabined 47:4
cadence 33:5,6
calculated 54:9 54:14
calculating 54:22
california 1:2 2:2 3:7,14,15

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[california - clients]**

4:8 7:20 8:23 115:1,10 116:1 116:4,25
**call** 13:9 54:18 77:15
**called** 25:6 27:16
**calling** 62:1
**calls** 18:8 19:21 47:21 60:9
**camera** 7:9
**canceling** 13:3
**cap** 110:7
**capacity** 17:6
**caps** 110:12
**capture** 38:23
**captured** 58:15 71:1 104:13
**captures** 36:14 36:15
**care** 1:4 2:4 7:17 8:8 16:22 24:12,13,15,16 26:1,5 27:16 31:18 32:1 33:15,16,19,20 36:17,19 37:4 37:14,15,18 38:3,11,13,23 39:3,6 40:7,10 40:13,22 41:2 41:8,11,13,15 41:16,18,19,21 42:10,23 43:1

43:3,9,16 46:2 46:7 55:17,25 65:6 67:10 76:8,14 79:1,7 79:13,22 80:8 80:11,16,24 81:2,10,24 82:6,8,18 83:2 83:13,14 86:20 86:21 87:2,6 89:11 90:12,20 91:11,13 92:6 93:9 97:3,5,9 98:10 101:9,15 104:2,3,15 105:17,23,24 106:11 107:20 108:13 117:4 119:1
**care's** 107:21
**cared** 30:17
**carehub** 43:19 43:21
**cargill** 27:18
**carries** 88:6
**carry** 56:24
**case** 1:5 2:5 7:20 14:3,13 14:20 18:7,12 19:8 38:2,3 63:23 74:4,18 84:4
**cases** 41:20 42:4 110:14

**catch** 27:6
**cause** 15:12 20:24 35:6 44:13 53:10 67:1 72:6 81:17 103:10
**ccp** 117:9,12
**cell** 10:1,5,7
**center** 4:7
**centered** 50:25 55:25
**centering** 84:18
**century** 3:6
**certain** 40:5 47:24 52:1 80:6 101:6 109:11
**certainly** 74:14
**certified** 8:23
**certify** 116:4,20
**cetera** 66:10
**change** 38:17 43:16 50:11,12 119:4,7,10,13 119:16,19
**changed** 43:7 75:18
**changes** 116:17
**charles** 3:5 8:7 36:22 48:1 49:16 57:14 87:8 99:8
**charter** 23:17 23:21

**chief** 100:20
**choices** 107:13
**choose** 33:23
**circle** 72:7
**citigroup** 22:25 23:1,14,16
**civil** 117:19,21
**claim** 74:3
**claims** 38:1 50:19
**clarification** 48:18 49:16 50:11 55:23 112:17
**clarify** 20:23
**clarifying** 31:22 78:7
**cleaner** 48:22
**cleanup** 76:23
**clear** 50:22 90:15
**clicked** 91:3
**client** 36:20 38:22 39:2,11 39:25 41:4,7 52:8 91:10 111:1
**clients** 41:5,12 52:1,11,13,20 52:21,23,24 53:6,6,25 54:5 54:21,24 55:5 55:13 69:16 74:2 79:9

Page 5

**[close - contractually]**

close  10:25
70:22 71:2,16
75:6 114:5
clunky  20:22
cny  90:21
107:1
code  117:9,12
117:19,21
coded  38:11
cognizant
24:21,22 25:2
coll  53:2
collabrios  4:3
8:10 11:15,18
14:19 15:1,7
16:18 17:8
29:10 30:3
33:11 42:24
46:14 47:10
49:21 53:3,7
53:16 54:4
62:19 68:5
73:25 74:1
76:5 104:12
collabrios's
64:16,20 74:2
colloquial
106:9
column  89:14
89:16 90:3
91:15 101:19
101:20,24
108:6 110:23
111:7,12,20

columns  101:2
102:20 108:12
108:15,21
combination
23:7
come  15:13
29:12,17,21
32:13 56:13
57:2 94:12
103:7 111:8
coming  53:10
commencing
2:15
communicate
10:2,8,10
communicati...
23:18 33:7
62:1,12 67:18
community
52:4 53:15,18
53:22 54:10,25
69:10,13 92:5
communityp...
91:19
companies  24:1
26:23 27:13
40:1,3 42:4,8,9
79:21 80:4
company  22:12
22:13 23:11,25
25:6,19 27:16
30:23 33:1
40:17,20 43:8
66:8,9 81:13

compare
103:17
comparison
32:10
competencies
26:5 34:20
competitor
32:7 33:10,12
33:14
complaint
16:14 37:13,14
complete  34:13
34:16,23 78:15
116:13
completed
117:7,17 118:6
completion
116:15 118:10
comprises  36:8
computer
116:12
computers  59:1
con  44:6
concern  73:24
73:25
concerning
14:25 74:14
concert  25:19
concludes
114:7
conduct  47:10
conducted  7:8
confirmed
111:4

confusion
33:23
connected  41:9
connection
7:10 17:11
24:24
consistent  67:8
102:13
construct  51:14
54:2
consultants
66:10
consulting
24:11 25:19
26:21,21 27:4
27:9 29:6
contact  29:21
117:9,20
contest  21:7
context  108:7
continue  7:12
37:2
continued  4:1
contract  44:7
68:25 69:4,13
69:20,23 110:9
contracts  26:6
69:24 110:11
110:14,18
contractual
44:3
contractually
65:3

Page 6

[contributing - damages]

contributing 34:20

control 103:14

controls 109:24

conversation 51:12 55:4,13 76:24 111:23 111:24 112:10

conversations 14:9 19:11 20:6 50:5 51:9 63:14

convey 45:23 46:1

convince 15:14 31:15 73:9 74:21

convinced 29:17

copy 113:19,21

core 26:5

corporate 16:19

corporation 24:8,9

correct 9:14 11:8 14:11,18 22:1 29:11 30:2,5,11 47:5 47:6 48:1 49:8 59:13 64:9,17 64:18 67:21 68:21 78:16,24 79:4,16 80:19

80:24 81:4,13 82:17,23 91:23 92:1,6 96:22 97:9 100:14 101:10 104:10 104:15 105:12 106:13,15 108:6 109:3 111:9,10,16,22 115:7 116:13

corrections 117:14,15 118:3,4

correctly 78:11 78:22 86:16 87:4

cost 51:16 55:14 65:19

counsel 3:1 4:1 7:16 8:4,21 10:15 11:7 17:7 20:6 39:12 59:1 70:14 73:15 75:9 92:13 112:24 113:2 113:18 117:18 117:22 118:7

counterclaims 74:18

county 115:2 116:2

couple 21:12 28:14 35:9

39:16 42:22 49:9 66:4 79:20,23 100:7 112:13

course 55:3 97:15 98:22 102:3,14,17 111:15

court 1:1 2:1 7:19,22 8:19 10:3 12:18 14:24 16:11 17:9 37:20 71:17,17 72:12 73:18 74:6,10 74:10

court's 16:10 17:1 46:12 47:11 63:13 68:6 70:19 71:3 72:10,21 73:19,23

courting 31:14 31:19

create 17:14 36:12 59:16

created 25:25 26:1 59:22 98:22 111:20

creating 26:14

credentialed 39:10,24

creegan 83:23 84:1,7 86:15

87:1 96:20 100:1 102:9,11 102:23 111:21 111:24 113:1,8

criteria 107:20 107:21

cup 32:19

cures 85:13,16

current 52:23 68:4 84:23

currently 9:16 30:3

custom 108:18 108:20

customer 25:10 67:21,22 91:12 91:13

customers 16:22

customization 108:25

customize 108:23

cutoff 70:24

cutting 59:6

cv 1:6 2:6 7:20

cweir 3:9

cyber 27:25

cycle 26:7

**d**

d 5:1

damages 74:19

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[data - discovery]**

**data** 25:6,14 26:18 36:3,7 36:11 65:20 79:7,22 80:8 80:10,13,17,21 80:23 81:3,10 81:12,24 82:9 82:17,18 83:2 83:11,12,14 84:13,17 85:6 85:9 86:12,12 97:9 98:9 101:8,10,15 112:4,5
**dataset** 78:20
**date** 12:23 13:6 14:14 117:16 118:5 119:24
**dates** 105:12
**david** 3:13 8:12 11:12,16,18,22 14:6 19:11 38:18 78:5 94:4 96:4 99:5 113:11
**david's** 72:23
**day** 13:3 18:15 21:9 48:5 115:8 116:22
**days** 104:22 113:24
**deal** 17:15 30:17

**dealing** 47:9
**debate** 17:20
**declare** 115:5
**defendant** 3:11 8:13
**defendants** 1:9 2:9
**defending** 8:10 38:6
**defense** 14:19
**define** 40:11
**definition** 85:16
**degree** 21:24 21:25 22:5,8
**delayed** 12:24
**delineating** 55:21
**delivery** 113:23
**depends** 7:9 100:8
**depo** 12:19 81:19 94:5
**deponent** 116:17
**deposed** 20:5
**deposition** 1:12 2:13 7:7,16 8:11 11:13,16 11:22 12:1,17 12:23 13:3,6 13:19,25 14:10 14:22 20:4 37:1,11 38:6

63:13 70:19 71:19 72:14 77:18 113:19 114:8,12 116:6 116:9,15 117:19,23,25 118:8,10
**derive** 97:3
**describe** 27:4 27:11 84:9,16 89:7,8 94:7,9
**described** 35:9 41:25 83:11 95:18
**describing** 59:5 89:4
**description** 6:2 33:18 59:8
**desert** 6:6 16:21 52:6 53:15,17,21 54:11,25 69:17 70:18,21,22 71:2,15 73:11 73:12 74:19
**designed** 33:21
**despite** 71:7
**determine** 93:20
**determined** 117:18,23 118:7
**develop** 48:8 60:22 61:14

**developed** 49:18,24,25
**device** 10:1 42:3
**difference** 34:3
**different** 16:4 17:3 23:10,11 34:17,20 35:9 39:5 62:16 65:23 66:4,10 83:3 85:12 101:2,3 102:21 110:1,15
**differently** 17:3 37:10 81:7 82:24 98:7
**diligence** 66:15
**direct** 22:14 66:5,6,7 67:17 82:19 87:2
**directed** 74:1
**direction** 116:12
**directly** 38:1 44:13
**dis** 72:3
**disagree** 17:18
**disagreement** 72:4
**disclosed** 16:16 71:12
**discovery** 70:23,24 71:3 71:8,12,16

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[discuss - engineering]**

discuss 32:11 54:3 68:24 86:18 92:17
discussed 18:12 33:1 77:2,2,5,7 86:15 95:15 113:1
discussing 52:14 53:20,24 69:11
discussion 44:5 48:11 51:3,24 52:16 53:4 68:23 87:11,12 99:25 100:1
discussions 16:15 17:5,10 18:4,5,6 19:18 30:10,13,14 31:11,17,25 32:2,5,10 44:8 44:16 45:12 47:25 48:24 49:3,20 50:4 50:13,16,17 51:21,23 52:9 52:10 55:24 64:6,8,11,14,19 68:10 69:3,20 83:22 84:7,10 84:16 86:14 112:6,21
displaying 34:15

disputes 77:14
distinction 34:7 50:2
district 1:1,2 2:1,2 7:19,19
dive 28:21
diving 16:8
dlee 3:17
doctor 39:24
doctor's 36:19
doctors 39:22
document 16:21 56:5 70:6 71:24 73:8,20 74:9 102:8 103:14 111:6
documents 9:21 72:20 73:7 74:6 88:9
doing 23:4 26:21 29:5 32:8 58:5 83:3 90:12 104:4
domain 89:24 94:10,11,14,16 94:23
double 62:4
dozen 18:17
drawing 34:8
drill 35:11
drives 39:2
dropped 10:18 33:6

dropping 10:18
drove 66:21
duly 9:4 116:6
duplicate 71:10 71:14 72:9 73:18

**e**

e 3:5 5:1 6:1 25:22,22 117:9 117:12 118:1 119:3,3,3
ea 27:17
earlier 61:22 68:19
east 3:6
eastern 22:4
ebglaw.com 3:9
ebitda 66:16,18
ecosystem 81:4
education 21:18
educational 21:17
efficacy 28:24
efficient 16:24
efficiently 15:12
efforts 16:15 37:17
ehi 79:13
ehr 26:22 27:10 33:21,22,23,25 34:22 35:9,20

78:8,12
ehrs 26:6
either 10:18 17:18 20:5 68:25 90:7
electronic 34:1 34:5,6
element 44:7
email 6:6 71:22 72:9 99:6
emails 70:18,21 71:10,15,16 72:12 73:12
embarcadero 4:7
emery 76:2,4 76:12
employee 32:25 33:5 111:4
employees 17:9 66:7 96:25
emr 26:10,15 26:22 27:4,10 27:16,17,20 33:25 34:15
ended 13:2 59:6
ends 62:22
endurance 21:7
engaged 37:23 74:4 84:4
engineer 28:9
engineering 28:5,10

Page 9

[english - experity]

| | | | |
|---|---|---|---|
| **english** 22:6 | **essentially** 80:10 93:4 | **excel** 6:9,11,13 88:5 92:25 | 64:23 70:7,15 71:1 74:5,14 |
| **entail** 23:3 28:13 | **estimate** 18:19 19:14 | **exchange** 6:6 34:11,12,24 | 88:4,6,7,10,10 88:11,14,25 |
| **enter** 47:19 49:4 | **estimates** 19:13 | 35:10 58:15 78:13,14,19,19 | 91:2 92:16,17 92:24 93:5 |
| **entering** 44:9 | **et** 66:10 117:4 119:1 | 81:12 82:10,19 83:3 84:21,24 | 95:8 100:4,5 100:12 101:14 |
| **entire** 33:10 | **europe** 24:17 | 85:5 86:12 | 102:1,5,7,11,15 |
| **entirely** 71:1 | **evaluating** 28:7 111:17 | **exchanges** 79:7 80:10,11 81:11 | 102:25 103:8 104:1 106:19 |
| **entities** 41:23 54:15 79:14 81:3 | **evan** 104:14 | 81:24 82:9 83:11,12 | 107:2,14 108:13 109:2 |
| **entitled** 10:9 19:5,13 38:12 63:17,18 110:2 | **event** 95:3 116:21 | **exchanging** 80:17 81:2,10 83:2 | 109:16 110:22 110:22 111:12 111:19 |
| **entity** 51:25 79:9 85:6,8 90:11 | **events** 87:6 101:16 | **excited** 43:14 | **exhibits** 71:2 96:19 103:13 104:18 107:14 109:10 |
| **envision** 55:4 | **everybody** 17:22 21:14 38:11 58:18,18 | **excluded** 70:18 | |
| **episodic** 65:12 | **exact** 14:14 19:12 72:9 73:20 | **excuse** 10:15 85:14 | **existing** 102:7 |
| **epstein** 3:4 | | **executed** 115:8 | **exists** 90:3 |
| **equal** 73:23,24 | **exactly** 53:18 55:12 | **executives** 25:11 | **expect** 15:13,13 17:21 68:25 |
| **equity** 27:13 29:13,24 | **examination** 5:2 9:9 77:12 78:1 99:20 112:13 | **exela** 25:20,21 26:3,9,18,25 29:4 | **expectation** 69:12 |
| **equity's** 66:17 | | **exhaust** 48:9 | **expected** 12:22 111:2 |
| **errata** 117:14 117:16 118:3,5 | **examined** 9:5 116:5 | **exhausted** 49:22 50:13 | **expense** 65:15 |
| **errors** 98:18 | **example** 13:2 101:19 108:4 | **exhibit** 6:3,6,9 6:11,13 56:3,6 57:5,10,22 58:1,18 59:2,6 62:18 63:2 | **expenses** 66:3 |
| **especially** 111:7 | **examples** 79:23 | | **experience** 31:8 84:22 |
| **esq** 3:5,13 4:5,6 117:1 | **exceeds** 68:16 69:25 | | **experity** 27:16 |
| **essence** 84:12 89:24 | | | |

Veritext Legal Solutions
866-299-5127　　calendar-ca@veritext.com　　www.veritext.com

**[expert - functionality]**

| | | | |
|---|---|---|---|
| **expert** 54:7 63:14 84:3 | **fees** 14:16,17 | **firm** 7:23 | **forgot** 35:5 |
| **experts** 16:16 | **felton** 104:10 104:14 | **first** 9:4 24:15 31:7 37:13 43:8 83:25 90:25 100:5 103:20 106:19 111:1 | **form** 43:3 46:5 46:8 47:14,17 49:2 |
| **explained** 78:14 | **felton's** 104:21 105:11,19 | | **forma** 6:3 57:13 59:9 66:23 |
| **exposed** 26:10 | **field** 107:10 | | |
| **expressly** 70:18 71:22 | **fields** 101:17 101:25,25 102:20,21 106:21 109:11 109:12 | **fiscal** 60:24,25 | **forming** 29:14 48:6 |
| **extent** 13:12 46:12 61:25 80:23 82:8,17 83:1 | | **five** 19:2,10,16 38:11 | **forth** 57:7 |
| | | **flag** 39:14 | **forward** 13:4 38:5 |
| **f** | **fight** 15:14 | **flagged** 74:10 | **foundation** 83:16 84:25 85:17,23,25 86:6 |
| **faced** 73:18 | **figure** 55:2 63:23 72:4,5 92:8 95:24 105:7,15 108:9 | **floor** 3:14 | |
| **fact** 71:7 | | **flowed** 55:3 | **four** 24:20,20 |
| **facts** 19:6 | | **flowing** 55:11 | |
| **fair** 9:25 17:12 17:19 21:1,2 27:17,18 31:22 33:2 39:19 62:13 79:19 82:3,8 83:1,10 98:21 | **figured** 54:16 | **focus** 48:24 90:11 | **frame** 31:19 48:3 60:7,16 109:8 |
| | **figures** 54:15 61:16 62:19 66:20 | **focused** 55:8 | **francisco** 3:15 4:8 |
| | | **focusing** 47:15 47:16 | |
| | **filed** 7:18 | **folks** 10:2 11:7 104:9,14 | **frcp** 118:1 |
| **fairly** 36:23 | **final** 113:23 | **follow** 99:11,24 113:13 | **freeze** 103:9 |
| **fall** 74:5 | **financial** 59:17 59:17 | | **frequently** 33:2 |
| **familiar** 76:6 89:1 | | **follows** 9:5 117:8 | **front** 73:16 |
| **family** 24:3 | **financially** 7:25 15:8 16:19 | **footnote** 74:8 | **frozen** 56:15,19 100:16 |
| **far** 77:16,18 | **finder** 93:16 94:7 | **foray** 24:15,15 | |
| **farther** 10:19 | **fine** 15:17 17:25 57:24 | **foregoing** 115:7 116:6 | **fun** 58:7 |
| **favor** 99:5 | | | **function** 34:18 57:5 |
| **federal** 85:11 118:1,8,9 | **finish** 59:7 | **forever** 58:13 58:16 | **functional** 34:7 |
| | **fireman's** 22:14,15,20 23:22 | **forget** 104:17 | **functionality** 36:10 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[fund - handling]**

| | | | |
|---|---|---|---|
| **fund** 22:14,15 22:20 23:22 | **generating** 102:4,4 107:13 108:21 109:12 113:5 | 109:14 113:14 114:3,3 | **graduated** 22:2 |
| **further** 77:19 82:23 99:20 112:17 116:20 | | **goes** 18:1 38:23 | **gray** 21:22 |
| **future** 30:17 | **getting** 15:22 34:18 45:17 68:3 | **going** 7:6 10:6 12:19 14:21 15:9,14,16,24 20:3,24 21:8 21:11,12 22:17 47:3,10 54:17 56:3,4,22 63:11,24 65:5 67:16 68:6,15 70:9 71:6,20 72:7 73:9,10 73:13,20 74:21 75:4 77:15 81:18 83:13 88:4 97:12 100:11 104:10 | **great** 30:17 58:5 62:14 92:14 |
| **g** | | | **greatest** 26:12 |
| **game** 17:19 | **give** 18:19 19:14 21:16 28:17 33:18 54:24 55:1 76:10 94:11 112:17 | | **green** 3:4 |
| **games** 32:19 | | | **gross** 65:25 67:3,4 |
| **general** 31:21 31:23 32:2 40:17 54:2 86:5 | | | **group** 97:13 |
| | | | **grow** 30:23 |
| **generality** 32:12 | **given** 84:22 102:9 105:12 107:21 | | **guess** 15:11 36:15 43:17 47:21 51:19 58:15 60:12 65:16 77:17,17 80:17 90:20 101:13 104:8 105:1 108:3 |
| **generally** 28:15 42:6 44:2 51:16 55:18 67:11 78:9 84:6 86:3,10 89:12 93:6 94:9 100:24 | **giving** 20:9,14 20:17 111:20 | | |
| | **gmac** 22:21 | | |
| | **go** 7:13 13:4 15:18 20:3 28:14 35:17 38:5 41:1 46:20,22 51:7 70:8,11 72:5,7 74:13,19,23 75:2,5,9 87:10 87:13 88:21 89:13 91:14 92:10,11,21,23 96:12 99:12 100:4,16,25 104:22 105:4 105:17 106:17 | **good** 7:5 8:12 8:22 9:12 10:17 29:17 31:15 39:18 43:4,22 47:18 48:13 49:3 55:23 56:22 58:23 59:3 61:13 | **guy** 88:16 |
| **generate** 102:9 106:18,20 107:8 108:14 109:7 113:6 | | | **guys** 15:21 33:1 103:7 |
| | | | **h** |
| **generated** 98:19 102:11 102:14,16,22 107:19 109:1 | | | **h** 6:1 119:3 |
| | | | **half** 25:2 |
| | | **goods** 51:16 55:15 | **hand** 8:25 116:22 |
| | | **gosh** 67:13 | **handle** 45:24 |
| **generates** 107:23 | | **government** 30:16,24 31:2 31:5 | **handled** 117:8 |
| | | | **handling** 32:14 44:2,14 45:22 49:10,11 50:21 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[happen - information]

happen  36:9
happened  48:5
  48:10 69:8,13
happy  15:24
hate  39:12
header  89:16
headings
  101:24
health  4:3 8:10
  24:12,13,15,16
  26:1,5,7 34:1,5
  34:10,13,16
  35:19 36:2,8
  36:12 42:10
  53:3,7 68:5
  76:5 78:15
  84:21,23 85:5
healthy  30:23
hear  10:22
  86:16 103:7,9
heard  7:11
  85:13
help  48:19
helpful  45:18
  57:14 92:22
hereto  116:19
hie  84:20 85:16
hies  84:18
high  6:6 16:21
  52:6 53:15,17
  53:21 54:10,25
  69:17 70:18,21
  70:22 71:2,15
  73:11,12 74:19

76:13 84:9,11
  89:6
highest  21:18
highlighted
  89:19 93:21
  95:4
hipaa  105:14
history  23:20
hit  96:7
hm  54:19 64:25
  64:25 77:7
  85:3,3 108:1,1
  112:3
hold  35:15
home  9:17
  75:22
honest  58:2
honestly  58:9
hopeful  95:7
hopefully  57:9
  88:13,15 100:3
host  65:20
hosting  65:13
  65:15,18,18
hour  21:4
  39:13 75:5
  111:25
hours  21:12
  28:14 38:11
hub  82:6
huge  23:11
hundred
  109:25

hung  34:18
hunted  29:22

**i**

i.e.  37:16
idea  48:13,13
  49:3,4
identical  72:12
identified
  79:20
identify  88:2
  109:8
ids  109:8
illinois  22:4
imagine  23:11
impact  57:18
important
  30:18
impre  58:8
impressive  58:9
  88:22
improvement
  10:24
inappropriate
  74:13
inclined  38:16
  64:1
include  61:19
  101:8,14
  103:23
included  66:11
  66:13 72:20
  101:7 117:14
  118:3

includes  16:12
  101:17 106:20
including  8:4
  70:23 79:9
  80:2
income  6:3
  57:13 59:9
  60:2,16 61:17
incorrect  72:8
incredibly  21:8
  56:15
independent
  25:8 49:24
  54:13
indicate  78:18
indicated  79:13
industries  23:5
industry  67:9
info  21:15
  76:10
inform  72:11
information
  16:14 36:18
  37:17,23 38:23
  39:4,5 40:12
  44:10 50:18
  51:1 55:3,11
  64:3 74:4 80:8
  84:21,24 85:5
  95:18 97:2,12
  97:13 102:12
  102:13,15,16
  107:22 109:10

Page 13

**[informed - kevin]**

| | | | |
|---|---|---|---|
| **informed**  17:9 32:12 | **intention**  44:9 | 94:23,23 95:5 | **j** |
| **input**  36:11,19 | **interact**  15:8 | 105:16,16,23 | **jett**  100:20 |
| **inputs**  101:6 | **interacting** 76:17 | 105:24 106:10 | 101:21 108:25 |
| **ins**  105:24 | **interaction** 76:21 | 106:11,12 | 112:25 |
| 106:10,12,12 | **interactions** | 111:4 117:4 | **job**  1:24 22:10 |
| 106:14 | 15:1 17:5 47:4 | 119:1 | 26:13 29:9 |
| **instance**  80:9 | 74:2 101:9 | **intus's**  37:23 | 30:10 31:12 |
| 81:11 82:16,25 | **interacts**  81:24 | 50:18 94:12 | 42:24 49:21 |
| 111:19 | **interested**  7:25 | **intus019811-...** | **jogs**  76:11 |
| **instances**  19:17 | 116:20 | 6:8 | **join**  19:23 |
| 80:7 90:11,19 | **interject**  47:22 | **investors**  29:13 | 46:16 47:12 |
| 92:5 93:8 | **international** | 31:14 | 63:11 70:2 |
| **instruct**  15:10 | 21:19 | **involve**  26:14 | 106:4 |
| 16:8 35:3 | **internet**  7:9 | **involved**  13:10 | **joking**  58:15 |
| 38:16 47:7 | **introduce**  8:19 | 28:4,4 44:15 | **jst**  1:6 2:6 7:20 |
| 62:2,5 63:11 | 56:3 | **ip**  89:16,20,23 | **judge**  15:19 |
| 68:6 70:3 71:6 | **introducing** | 90:2,4,7,13,16 | 72:5 75:2 |
| 71:21 73:20 | 11:5 | 90:19 91:16,22 | **judge's**  9:23 |
| **instructed**  5:8 | **intus**  1:4 2:4 | 91:25 93:9,12 | **july**  1:14 2:15 |
| 74:22 109:14 | 7:17 8:8 31:18 | 93:16,20 94:7 | 7:2,7 116:22 |
| **instructing** | 32:1,6 33:9 | 94:10,13 95:4 | 117:3 |
| 16:25 19:24 | 37:17 43:25 | 104:23 105:6,8 | **k** |
| **instruction** | 44:11,16,20,21 | 105:14,18 | |
| 15:3 109:4,6 | 45:4,8,13 46:2 | **ipad**  57:6 | **keep**  11:1 19:3 |
| **instructions** | 46:6 47:9,16 | **ish**  22:17 | **kept**  111:15 |
| 17:15 46:19,21 | 48:1,10,25 | **issue**  62:12 | **kevin**  1:13 2:13 |
| **insurance** | 49:4,5,13 | 73:18 74:8,9 | 5:3 7:16 8:10 |
| 22:12,13,21 | 50:14 73:17 | 109:25 110:8 | 8:17 9:3 35:2 |
| **intend**  16:7 | 74:7 87:3,6 | 110:13,20 | 35:18 39:8 |
| **intended**  73:6 | 90:5,6,16,19 | **issued**  74:11,11 | 48:18 53:3 |
| 93:8 95:17 | 91:16 92:1,5 | **issues**  32:22 | 83:19 86:2,7 |
| **intending**  37:2 | 93:8,13,22 | 76:18 109:18 | 98:14 99:1 |
| 38:10 | | **it'll**  15:20,20 | 106:5 114:8,12 |
| | | | 115:5,14 117:5 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[kevin - lawsuit]**

119:2,24
**kids** 32:20,20
**kind** 20:3 29:25
  30:19 32:14
  35:8 37:21
  38:24 44:2
  76:23 80:10,12
  81:4 94:8
**kinds** 66:9 67:1
**knew** 49:10
**know** 10:1,7,11
  11:9 14:23
  15:16,17,19,22
  17:17 19:6,8
  20:3 21:5,6
  27:23 28:23
  29:25,25 30:17
  30:22 31:13,14
  32:8,10 33:12
  33:16 34:17
  36:16,23 38:2
  38:10,12 39:12
  40:4,19 44:1
  46:22 47:17
  49:1,12,21
  50:1,16 51:7
  52:13 54:14
  55:5,8 56:14
  57:16 59:23
  60:22 61:14,23
  62:21,23 63:7
  65:2,14,21
  66:2,11,12,16
  66:19,20,24

69:23 72:23
76:2,16,19,20
76:22 77:7,15
79:8 80:14,17
81:3,21 84:1
88:19 90:22
96:9 100:23
101:21,22
103:12,23,25
104:8,17 105:7
105:8 106:23
106:23 107:9
108:4,17,22,24
109:9 111:1,11
111:11,13
113:20
**knowledge**
  16:13 37:12,15
  37:22 44:21
  45:2,10 47:7
  48:11 49:19,23
  50:13 54:14
  81:25 97:5
  104:8
**knows** 37:7
  38:13 48:9
  50:3,6,7,8
**kotiya** 4:5 8:9,9
  15:5 16:1,3,5
  17:24 18:8
  19:21,24 35:4
  35:18 38:4,15
  39:8,12,18
  44:17,19,23

45:7,10 46:11
46:21,25 47:6
48:15,17,20
56:19 57:18
58:22 60:9
61:25 62:7,10
62:14 63:5,10
63:21 64:1
68:1,3,12,14
70:2,14,17
71:9 72:2,8,19
72:25 73:2,4
73:15 77:24
81:22 83:19
85:1,3,21 86:2
86:7,9 96:1,3
97:19 98:14,25
99:8 104:24
106:4 113:13
117:1

**l**

**l** 25:22 110:23
  111:7,12,20
**lab** 40:1,2 41:7
  80:9 81:11
  82:6,9,10,17
  83:13,13
**labcorp** 40:5,6
  40:9,16,19,22
  40:24 41:9,9
  41:13,17,24
  79:9

**labcorp's** 40:20
**labs** 40:22,25
  79:14,17 80:2
  80:14,22 112:8
**lacks** 83:15
  84:25 85:17,23
  86:6
**lady** 12:4
**lake** 2:16 7:1
  9:14
**large** 26:7
  40:20
**late** 22:17 73:7
  73:8
**lathrop** 1:13
  2:14 5:3 7:16
  8:17 9:3,12
  10:16 16:15
  17:6,10 50:12
  53:3 55:5 59:5
  75:17 78:4
  87:22 88:24
  95:10 96:17
  99:3,23 114:8
  114:12 115:5
  115:14 117:5
  119:2,24
**lathrop's** 16:12
  48:4
**laura** 76:2,4,12
**laws** 115:6
**lawsuit** 19:18
  32:11,13 50:20
  50:24,25

Veritext Legal Solutions
866-299-5127       calendar-ca@veritext.com       www.veritext.com

**[lawyers - long]**

| | | | |
|---|---|---|---|
| **lawyers** 10:8 78:5 | 77:25 78:3,5 81:6,8,20 82:2 | **limited** 37:11 45:7 109:23 | 92:3 93:1,7,16 95:11,14 97:6 |
| **lead** 12:22 24:7 | 82:13,22 83:7 | **limiting** 44:19 | 100:22,23 |
| **leaders** 29:15 | 83:17,21 85:7 | 61:24 | 101:1,7,8,11,11 |
| **leadership** 23:22 | 85:20 86:4,13 87:8,13,21 | **limits** 110:19 | 101:14,20,20 102:1,12 104:4 |
| **leading** 81:17 | 88:12,19,23 | **line** 5:9 36:24 64:23 65:10,13 | 104:21 105:11 |
| 82:12 83:6,16 | 92:11,14,15 | 66:1,12,13,15 | 105:19,24 |
| 94:4,19 95:20 | 94:6,20 95:21 | 67:3 72:22,22 | 106:10,12,12 |
| 97:16 98:4,24 | 95:24 96:2,5,8 | 79:10 83:3 | 106:14,18,20 |
| **learn** 94:12 | 96:15,16 97:17 | 111:1,4 117:15 | 106:25 107:3,6 |
| 95:3 | 97:21 98:5,12 | 118:4 119:4,7 | 107:8,18,19,22 |
| **learned** 49:23 | 98:16 99:3,7 | 119:10,13,16 | 107:24 108:2 |
| **leave** 24:4,24 | 100:6 105:6,25 | 119:19 | 108:11,14,23 |
| **leaving** 77:18 | 106:2 112:12 | **lines** 55:22 66:4 | 109:1,2,7 |
| **led** 23:2 24:17 | 113:12 | **list** 55:6 109:21 | **logging** 86:25 |
| 28:10 | **left** 24:5,22 | **litigation** 11:19 | 104:4 106:11 |
| **lee** 3:13 5:5 | 25:16 29:4 | 11:24 49:18 | **logs** 84:12 |
| 8:12,12 11:12 | 46:18 102:22 | **little** 20:21,22 | 86:15,18,19,20 |
| 11:16,18,22 | **legal** 7:22,23 | 21:13,13,15 | 86:24 87:5,23 |
| 14:6,9,12,21 | 14:16,17 117:7 | 27:7 33:15 | 88:1,2 89:3,11 |
| 17:4,23,25 | **lenient** 36:23 | 35:11 37:9 | 95:15,19 96:18 |
| 18:5,7,10,13 | **level** 21:18 | 58:14 75:18 | 96:24 97:2,8 |
| 19:11,23 35:1 | 36:13 49:19 | 76:10 88:17 | 97:13,14,22 |
| 35:13,15 36:22 | 84:9,11 89:6 | 92:19 98:7 | 98:2,8,18,21 |
| 37:6,16,20 | **license** 8:23 | **llc** 4:3 | 99:6,11,24 |
| 39:7 40:14 | 110:3 | **llp** 3:12 4:4 | 100:14 101:5 |
| 46:16 47:12,20 | **licenses** 110:15 | **located** 105:8 | 102:4,14,16,22 |
| 49:16 50:9 | **life** 53:18 | **location** 93:16 | 106:17 109:13 |
| 57:14 58:2,19 | **limine** 74:16 | 94:7,11 | 112:2,4,20 |
| 62:25 63:4,9 | **limit** 60:4 110:2 | **locked** 117:12 | 113:2,6 |
| 63:24 68:15 | **limitations** | 118:1 | **long** 12:12 21:9 |
| 69:25 70:25 | 14:25 37:21 | **log** 86:23 89:9 | 22:15,22 23:14 |
| 73:22 77:11,21 | | 89:10 91:7,19 | 23:24 24:19 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[long - medications]**

| | | | |
|---|---|---|---|
| 25:14 26:25 47:3 111:24 | 76:18 | 54:4,4 76:8 80:5 81:17 | mcguirewoo... 4:10,11 117:2 |
| **longer** 23:20 67:21 | **losses** 64:9,12 64:16,21 | 92:19 100:11 117:14 118:3 | **mean** 16:7 28:13 32:6 |
| **look** 10:7 38:9 57:4 70:9,11 71:25 75:6 105:19 106:25 107:12 | **lost** 54:9,14,22 55:6 | **makes** 36:7 | 33:14,24 34:12 34:25 35:2 |
| | **lot** 15:13 18:15 21:11,22 23:4 26:21,21 27:12 27:14,15,19 29:5,23,24 30:25 31:4,5 32:8 33:13 37:14 43:11,13 51:13 65:23 76:24 110:15 | **making** 58:7 67:14 | 37:8,8 38:9 39:2,24 40:19 |
| | | **management** 25:7 26:8 | 47:22 49:20 50:24 52:22,25 |
| **looked** 43:10 57:6 93:5,12 95:19 96:18 | | **managing** 23:22 26:6,6 26:15 | 55:1,20 61:5 63:3 65:22 66:19 67:24 71:25 72:6 74:17 77:13 78:15 85:8 86:10 89:7 90:6 105:4 112:15 |
| **looking** 15:5 29:14 30:9 36:24 46:15 54:21 56:18 91:2,22 92:24 102:10,20 107:9 110:23 111:6 | | **manner** 37:4 | |
| | | **margin** 51:16 | |
| | | **margins** 67:10 | |
| | **lots** 23:11 34:19 | **marked** 56:6,9 70:7 71:1 88:4 88:10,25 96:18 | |
| | **louis** 2:16 7:1 9:14 | **market** 30:15 30:16,16 32:7 32:9 33:13,21 | **means** 36:3 62:6 65:11 |
| | **low** 76:13 | | **meant** 35:12 78:19,25 |
| **looks** 56:14,22 56:23 60:24 75:18 106:19 | **m** | **marketing** 23:18 | |
| | **made** 30:25 45:4 66:20 107:13 116:17 | **markup** 45:15 | **mechanical** 14:15 32:14 50:20 |
| **loretta** 108:5 | | **markups** 45:3 45:8 | |
| **loretto** 90:21 106:19 107:1 108:5 110:6 | **maher** 4:6 8:16 8:16 12:6 | **master** 21:18 | **mechanics** 50:23 |
| | **mainframe** 23:13 | **master's** 21:24 22:7 | **media** 7:15 |
| **lorettopacecny** 91:7 | **maintained** 97:14 | **matter** 7:17 84:7 | **medical** 34:6,9 42:3 |
| **los** 3:7 115:2 116:2 | **make** 16:24 35:21 47:24 48:9 50:7,8 | **mcguirewoods** 4:4 11:7,9 12:2 13:20 | **medications** 20:11,15 |
| **loss** 51:13,21 54:1,4 56:2 61:16 62:24 | | | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[medium - new]**

| | | | |
|---|---|---|---|
| **medium** 76:13 | **mind** 43:13 | **morning** 7:5 | **nda** 37:18 |
| **meeting** 12:3 | **mine** 91:10 | 8:12,22 | 43:24 44:5,15 |
| 12:12 32:13 | **minimum** | **motion** 74:16 | 45:11,12 47:16 |
| **member** 32:23 | 71:20 | **mouth** 29:25 | 47:25 48:11 |
| **members** 80:13 | **minute** 13:9 | **move** 17:21 | 49:4,5,13,19 |
| 80:18 | **minutes** 12:13 | 35:20,23,25 | 50:13,16 |
| **memorializes** | **mischaracteri...** | 36:4 75:19 | **necessary** |
| 92:4 | 35:16 | 78:20 79:13 | 105:10 117:14 |
| **memory** 76:11 | **misremember...** | 103:15 | 118:3 |
| **mention** 79:17 | 75:17 | **movement** | **need** 15:18 21:5 |
| **mentioned** 9:13 | **missed** 107:4 | 84:14,17 112:4 | 21:11 28:25 |
| 18:4 27:3,8 | **missouri** 2:16 | 112:5 | 39:14 46:19 |
| 34:22 49:9 | 7:1 9:14 | **moves** 36:2 | 57:22 72:5 |
| 61:22 72:16 | **mixture** 24:10 | **moving** 35:24 | 75:1 77:22 |
| 79:15,17 82:1 | **modernized** | 56:17 | 104:22 105:17 |
| 86:14 93:11 | 28:25 | **msp** 28:1 | 105:18 113:21 |
| **messages** 10:12 | **modifies** 82:17 | **multiple** 12:20 | **needle** 17:21 |
| **messy** 98:6 | **modify** 80:23 | 55:18,20 | **negotiating** |
| **met** 12:2 29:13 | **module** 35:25 | 107:25 | 47:15 |
| 84:2 | 35:25 36:3,3,4 | | **negotiation** |
| **methodology** | 36:5 78:20,21 | **n** | 45:16 |
| 93:19 | 78:25,25 79:1 | | **negotiations** |
| **michael** 30:11 | 79:1,1 101:20 | **n** 5:1 | 43:25 44:5 |
| 31:11,18 32:1 | **modules** 76:7 | **name** 7:21 12:5 | 49:13 |
| 32:3,17 46:1 | 76:14 | 13:21 78:4 | **nelson** 1:23 |
| 50:18 59:20 | **moment** 33:9 | 111:5 | 2:17 7:23 8:22 |
| 112:22 | 100:6 | **named** 116:5 | 116:3,24 |
| **microphone** | **monday** 12:15 | 116:10 | **network** 90:8 |
| 10:19 11:1 | 13:10 | **names** 101:3 | 94:24 |
| **mike** 44:1 45:1 | **month** 32:24 | 102:21 | **never** 44:12 |
| 45:22 49:10,10 | 61:12 | **narrow** 31:23 | **nevertheless** |
| 49:11 50:5 | **monthly** 32:24 | **narrower** | 74:10 |
| 76:20 | **months** 61:6,8 | 60:14 | **new** 43:14 |
| | 61:11 | **natural** 30:25 | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[nine - operations]

| | | | |
|---|---|---|---|
| **nine** 24:2 | **numbers** 54:10 | **occurred** 48:1 | 66:11 67:16 |
| **nineties** 22:18 | **o** | 49:20 101:18 | 68:14 71:5,25 |
| **noise** 27:7 | **oath** 8:20 | **office** 90:8 | 72:25 73:3 |
| **non** 65:9 79:9 | **object** 14:21 | 117:11 | 74:17 75:4,21 |
| **nondisclosure** | 68:16 | **officer** 59:18 | 76:2 77:9 |
| 44:9 48:25 | **objected** 94:3 | 100:20 | 78:18 79:6 |
| **nonrecurring** | **objecting** 16:25 | **oh** 12:10,15 | 80:1 82:16 |
| 65:9,11 | **objection** 17:2 | 20:13 35:14 | 84:6,22 85:4 |
| **normal** 31:14 | 17:17,18 18:8 | 44:19 46:21 | 86:18,22 87:15 |
| **normally** 66:6 | 19:21 35:1,13 | 56:12,14 57:8 | 88:22 89:6,13 |
| **northern** 1:2 | 35:15 39:7 | 67:13 68:3,13 | 89:19 90:2,10 |
| 2:2 7:19 | 40:14 44:17 | 77:11 84:5 | 91:9,14,18 |
| **nossaman** 3:12 | 45:7 46:11 | 85:4,18 87:2 | 92:11,14,24 |
| 13:15,24 14:2 | 47:2,20 60:9 | 88:21 90:25 | 93:4,7,10,11,15 |
| **nossaman.com** | 61:25 62:25 | 92:11,21 93:10 | 93:19 97:22 |
| 3:17 | 63:9,11,25 | 94:3 95:25 | 100:7,11,18 |
| **notating** | 64:2 68:1,3,12 | 96:2 100:10,16 | 101:13 102:19 |
| 117:15 118:4 | 69:25 70:2 | 100:16 | 103:10,17 |
| **notation** 91:6 | 73:11 81:5,14 | **okay** 10:20 | 104:20 105:15 |
| **note** 7:7 17:4 | 81:16,17 82:11 | 11:25 12:8 | 107:3,12 108:3 |
| 70:25 73:22 | 83:5,6,15 | 15:11 17:12,14 | 108:24 109:6,9 |
| **notes** 75:6 | 84:25 85:17,22 | 18:22,24,25 | 109:16,17,17 |
| **noticing** 8:6 | 86:1,6 93:24 | 19:17 20:2 | 110:17 112:20 |
| **nuance** 33:25 | 94:1,2,19 | 21:10 22:24 | 113:9 114:3 |
| **nuanced** 34:3 | 95:20 97:16 | 29:2 35:5 37:6 | **old** 88:16 |
| **num** 32:6 | 98:4,24 104:24 | 38:4,8,19 | **once** 39:4 97:8 |
| **number** 7:20 | 105:25 106:4 | 41:16 42:15 | **ones** 42:12 52:2 |
| 8:24 18:22 | **objections** 8:2 | 44:22 46:25 | 70:21 86:25 |
| 19:12 32:6 | 16:6 82:20 | 47:14 48:15,17 | **open** 77:18 |
| 33:9 88:6 | 98:11 | 50:9,23 51:2 | **operate** 72:24 |
| 101:1,2 109:23 | **obviously** | 53:4 56:2,4,10 | **operational** |
| 110:19 117:15 | 10:10 13:12 | 56:20 57:8 | 16:18 27:25 |
| 118:4 | 49:20 | 58:17,21 59:3 | **operations** |
| | | 60:24 65:9 | 23:23 24:3 |

Page 19

**[operations - particular]**

| | | | |
|---|---|---|---|
| 25:10 68:4 | org 109:24 | p.m. 75:11,14 | 97:5,9 98:10 |
| **operator** 106:10 | **organization** 80:13,19 85:10 | 87:16,19 99:14 99:17 114:8,10 | 101:9,15 104:2 104:3,15 |
| **opex** 66:12,13 | 85:11 92:4 | **pace** 6:7 16:22 | 105:17,23 |
| **opinion** 31:13 | 109:19 | 30:15 31:8 | 106:11,20 |
| **opinions** 43:21 | **organization's** | 32:7 33:15,16 | 107:1,20,21 |
| 46:5,8,13 47:9 | 98:23 | 33:19,20,21,21 | 108:5,5,13 |
| 47:14,17 48:12 | **organized** 93:4 | 34:17 36:17,19 | 109:19,24,24 |
| 49:2 | **original** 117:10 | 37:4,14,15,18 | 110:7,12,20 |
| **opportunity** | 117:20,22 | 38:3,11,13,23 | **pace's** 92:6 |
| 31:16 43:11,13 | **originating** | 39:3 40:7,10 | **pacific** 7:6 |
| **opposed** 103:14 | 94:24 | 40:13,21,22 | **page** 5:2,9 6:2,5 |
| **option** 57:21 | **outcome** 8:1 | 41:2,8,11,13,15 | 117:15 118:4 |
| 96:6 | **outcomes** 27:19 | 41:16,18,19,21 | 119:4,7,10,13 |
| **order** 9:23 | **output** 10:22 | 42:23 43:1,3,9 | 119:16,19 |
| 12:18 14:23 | 101:25 | 43:16 46:2,7 | **pages** 1:25 |
| 15:5,6,23 | **outside** 10:3 | 51:24 52:4,6 | 117:14,17,17 |
| 16:10 17:1 | 16:10 46:11 | 55:15,16,17,19 | 118:3,6,6 |
| 37:9 38:6 41:7 | 49:17 68:5 | 55:20,21,25 | **paper** 41:10 |
| 41:10 46:12 | **outstanding** | 65:6 67:10,18 | **papers** 9:21 |
| 47:11 63:1,13 | 77:14 | 67:20 68:10,20 | **parent** 23:25 |
| 68:6,17 70:1 | **overlapping** | 69:4,10,13 | **park** 3:6 |
| 70:19 71:4,23 | 72:17 | 73:11,12 76:8 | **part** 11:19,22 |
| 72:10,21 73:3 | **oversharing** | 76:14 79:1,7 | 11:22 27:3,9 |
| 73:6,6,19 74:6 | 96:4 | 79:13,22 80:8 | 51:23 63:12,14 |
| 74:11 92:16 | **own** 25:19 | 80:11,12,16,19 | 66:8 68:23 |
| **order's** 41:12 | **owned** 27:13 | 80:24 81:2,10 | 71:14,22 |
| **ordered** 40:25 | 51:1 | 81:24 82:6,8 | **parti** 13:11 |
| 71:17 | **owner** 106:10 | 82:18 83:2,13 | **participants** |
| **orders** 41:1 | | 83:14 86:20,21 | 7:10 13:13 |
| 113:17 | **p** | 87:2,6 89:11 | **particular** |
| **ordinary** 97:15 | **p&l** 26:1 51:14 | 90:12,20,21 | 28:22 37:3 |
| 98:22 102:3,14 | **p.c.** 3:4 | 91:11,13 92:4 | 74:9 92:3,4 |
| 102:17 111:15 | | 92:6 93:9 97:3 | 93:15 94:13 |

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

## [particular - prior]

107:24 111:7 111:19

**parties** 7:13

**parts** 28:21

**party** 7:24 65:20 73:25

**past** 29:24 48:5 106:17

**patient** 34:13 34:16 36:4,17 39:6 40:4 41:10 78:16

**patients** 39:22 40:21

**pay** 65:19

**payer** 24:10 26:2,6 83:1,2

**payers** 42:3 80:3,22

**paying** 14:19 68:2

**payroll** 66:1,3 66:5,6,9

**pdf** 117:12 118:1

**penalties** 115:6

**penalty** 117:16 118:5

**people** 13:10 18:15 29:24 38:14

**percent** 67:5,14

**percentages** 67:4

**percipient** 16:13 37:12,22 47:6

**performing** 80:12

**period** 47:15 61:12 67:5 71:8 116:18 117:18 118:7

**perjury** 115:6 117:17 118:6

**person** 76:16 76:21 90:12

**personally** 11:21 53:1 67:17 71:11

**perspective** 32:9 44:25

**peter** 51:3

**pharmacies** 42:3 80:3,22

**pharmacy** 25:7 25:8 81:12

**phone** 10:1,5,7

**phrase** 112:12

**physical** 90:8

**physically** 95:1

**physician** 36:16

**pick** 103:13

**picture** 82:5

**pieces** 28:21

**pinned** 57:25

**place** 7:13 35:20,21,23,24 39:15 43:25 116:10

**placed** 110:19

**places** 30:22

**plaintiff** 1:5 2:5 2:14 3:3 7:17

**planning** 39:13

**platform** 26:22 36:1

**please** 7:7 8:3 8:19 9:1,7 11:2 19:14 20:23 40:11 72:10

**pleasure** 92:21

**plug** 75:20

**pm** 27:17

**point** 38:4,7,16 45:6 71:9 82:10,10,19,19 83:12,12 104:12 112:13 112:13,16,16 112:16,16

**points** 106:9 110:1

**political** 22:6

**portal** 34:10

**portion** 93:15

**position** 32:9 74:22

**position's** 74:25 75:1

**possible** 52:5,7

**potential** 62:11

**practice** 27:4

**pre** 60:16 61:23 61:24

**premise** 108:10

**prep** 13:5

**prepare** 12:1 12:16,23

**prepared** 87:5 87:24 93:2 95:11 96:20,24 97:22 112:21

**preparing** 112:20

**prescribewell...** 27:18

**present** 4:13 8:4 48:5

**presently** 47:9

**president** 25:13 25:20,23 30:4 46:13

**pretty** 15:24 43:14

**prevent** 20:8,12 20:17

**preview** 21:13

**previous** 12:21

**previously** 93:12 95:18

**prior** 13:6 26:9 49:21 60:3,4 93:5 116:5

Page 21

**[private - questions]**

| | | | |
|---|---|---|---|
| **private** 27:13 29:13,24 66:17 | **produced** 70:23 71:2,7 71:14,15 73:7 73:8,13 86:25 | 76:12 116:18 117:19 118:8 | 81:6,6 94:10 108:13 113:16 |
| **privilege** 16:7 18:9 19:22 60:10 62:11 | **product** 26:15 28:11 30:20 43:4,4,4,9,22 55:17 99:6 109:11 | **provider** 24:7 24:10 26:2,8 34:19 | **q** |
| **privileged** 62:1 | | **providers** 80:18 | **qi** 62:23 67:24 69:23 73:15 |
| **privy** 67:1 71:11 | **production** 72:17 | **providing** 39:6 80:13 113:8 | **quality** 7:8,9 |
| **pro** 6:3 57:13 59:9 66:23 | **products** 43:14 55:19,20,25 67:10 | **public** 94:10,13 94:16 | **quest** 112:8 |
| **probably** 13:7 13:7 15:24 21:12,12,23 22:16,23 23:15 24:1 32:18,23 32:24 58:11 | **profit** 51:13,20 54:1,3 55:15 61:16 65:25 67:3,4,9 76:18 | **pull** 60:15 61:7 61:9,23 70:9 88:14 100:4 103:5 | **question** 15:4 17:16 20:23 26:12 27:6 31:22 35:5 40:2 46:13 47:8,8,23 48:4 48:20 49:1 54:23 55:23 57:21 60:14 61:13 62:9,11 63:6 65:16 76:23 78:7 81:21 94:22 98:6 101:13 105:1 106:1,6 108:3,8 |
| **procedurally** 77:23 | **profits** 54:10 54:15,22 62:24 63:8 64:4,8,12 64:16,21 | **pulling** 103:6 | |
| **procedure** 117:19,21 | | **pump** 10:21 | |
| **proceed** 9:7 11:2 15:21,25 17:13 38:18 70:14 | **program** 110:20 | **purcha** 24:21 | |
| | **programs** 31:6 55:19,21 110:13 | **purchase** 24:25 113:19,21 | |
| | | **purchased** 24:21 | |
| **proceeding** 8:2 | **project** 27:14 28:1 | **purports** 98:2 | **question's** 62:1 |
| **proceedings** 116:14 | **properly** 71:18 | **purposes** 11:12 11:16 39:6 54:22 56:23 90:10 91:18 104:3 108:20 109:12 111:20 113:8 | **questioned** 72:14 |
| **process** 16:24 41:3 74:24 101:6 | **proposals** 45:4 | | **questioning** 36:24 38:5 73:19 79:10 |
| | **provide** 102:11 | | |
| **processes** 23:8 | **provided** 59:12 59:14 63:16,17 | **pursuant** 16:10 17:1 | **questions** 5:8 14:25 15:6,16 15:20 16:9,17 16:21 20:21 |
| **produce** 86:19 108:12 | | **put** 41:18 53:11 62:11 71:16 | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

## [questions - reidy]

36:25 37:4
39:16 42:22
44:20 45:9
47:3 63:22
68:7 69:10
71:6,21 73:11
73:14 74:1,13
74:14,24 77:19
77:21 79:7
84:13 99:4,9
99:11,24 105:6
112:7
**quick** 33:18
**quickly** 87:14
**quite** 26:8 33:6

**r**

**r** 119:3,3
**r&s** 118:1,9
**raise** 8:25 74:7
**raised** 73:17
**ran** 25:10
  100:18
**range** 88:3
**ranking** 76:7
  76:13,14
**rather** 17:20
  78:24
**read** 12:18,18
  37:8,9 38:6
  40:22 54:8,12
  110:9
**reading** 54:13
  117:24 118:9

**ready** 39:15
**real** 50:21
  87:14
**really** 10:17
  14:15 27:14,23
  28:1,19,23
  30:15 32:14
  36:20 44:13
  51:22 101:12
**reason** 21:6
  38:7 61:19
  90:2 106:16
  119:6,9,12,15
  119:18,21
**reasons** 105:14
**rebuilding** 28:5
**recall** 12:25
  13:8 14:14
  18:14,18 22:16
  30:14 32:4
  46:4 51:2
  53:20,23,24
  54:19,23 55:12
  55:14 59:25
  61:21 64:13,22
  68:13 69:2,3,7
  69:9,11,15,18
  69:19,22 77:3
  78:11,14 79:24
  83:22,25 84:6
  84:15 112:3
  113:3
**receipt** 16:21
  80:21 82:23

**receive** 79:22
**received** 70:22
**recess** 42:18
  75:13 87:18
  99:16
**recognize** 57:9
**recollection**
  13:4 19:5,16
  44:12 52:12,19
  86:25
**record** 7:6,14
  8:6 9:13 10:8,9
  10:10,12 15:2
  15:17 17:5,7
  17:14 34:1,5,6
  34:9,11,13,16
  34:23 35:20
  36:2,8,12,23
  39:11 42:17,20
  48:22 58:11,12
  58:13 73:22
  75:1,1,6,9,12
  75:15 78:4,15
  87:10,12,14,17
  87:20 88:2
  98:3 99:13,15
  99:18 113:15
  113:17,25
  114:1,4,9
**recorded** 7:12
  7:15
**recording** 7:8
  7:12

**records** 36:17
  39:23 40:6
**recurring**
  64:24 65:4
**reference** 91:9
**referenced**
  51:25 117:6
**referred** 34:4
  56:5 70:6 88:9
**referring** 31:3
  36:5 55:17,18
  108:8
**refers** 65:14
  66:2,16
**reflect** 90:18
  93:8 95:17
  98:1,9
**reflected** 87:5
  97:14 109:10
**refusing** 37:17
**regard** 62:2
  95:19
**regarding**
  76:14 99:11,24
  101:8,15,16
**regardless**
  71:23 73:12
**registered** 90:7
  94:11,23
**regular** 98:23
  113:23
**reidy** 100:21
  101:21 102:8
  107:13 108:25

Page 23

**[reidy - roles]**

112:25
**reiterating** 95:13
**relate** 45:11 64:11,15 65:1
**related** 7:24 32:22 33:7 44:15 45:15,16 46:14 47:4 55:25 66:1,3,5 66:6,9 71:22
**relates** 63:2 66:24
**relations** 21:20
**relationship** 15:7 16:17 29:16 40:24 53:21
**relative** 23:8 30:19 54:5 90:9 101:10
**released** 117:22
**relevant** 38:1
**rely** 63:18
**relying** 103:14
**remember** 12:4 13:20 31:10 51:12,15,20 52:2,8,9 53:9 53:12,18 55:10 78:9 79:10 93:13 101:11 108:7 112:2,5 112:9

**remote** 1:12 2:13 114:11 116:8
**remotely** 3:1 8:4
**reorient** 38:24
**repeat** 63:5 94:1
**rephrase** 62:10 106:8
**report** 53:11 54:7 90:11,18 107:18,18,19 107:22,23,24 108:2,11,14,23
**reported** 1:22
**reporter** 7:23 8:14,19,22,23 9:7 10:3,15,21 10:24 56:21,21 57:20 58:12 94:1 96:11,12 113:18,23 114:1,5 116:18
**reporting** 96:25
**reports** 109:1,2 109:7 111:9
**representation** 17:11 72:23
**represented** 11:12,15,18,21
**representing** 7:21 8:10,16

71:11 73:17 78:6
**request** 6:7 60:1,22
**requested** 116:16,17 118:1,9,10
**required** 117:20
**resides** 98:9
**resolved** 77:14
**respect** 67:9 96:17
**response** 12:8 57:23 78:12
**responsible** 26:14
**restate** 105:2,4
**restroom** 39:14
**results** 41:18
**retire** 25:18
**return** 117:17 118:6
**revenue** 26:7 55:6 62:23 64:24 65:1,3,5 65:6,10,11,12
**revenues** 16:22 53:24
**review** 15:18 27:25 28:1 32:24 43:16 45:3,19 97:23 97:25 98:8

116:15 117:8 117:10,13 118:2
**reviewed** 61:12
**right** 8:25 16:6 17:12 18:2 25:4 26:24 30:4 33:8 38:19,21 39:1 42:13 51:6 52:19 53:1,3 56:8,8,10 57:8 58:10 63:19,22 65:25 70:4,5 70:13 76:23 77:19,25 80:5 88:13,15,24 89:13 91:6 92:16 99:23 100:3,7 103:10 103:17 105:20 105:24 108:16 110:6,22 111:23 113:9 113:14
**road** 37:3
**robbie** 104:9,14 104:21 105:11 105:19
**role** 23:18,22 25:9,20,23 84:23
**roles** 24:2,3 26:9

Veritext Legal Solutions
866-299-5127       calendar-ca@veritext.com       www.veritext.com

[room - separate]

**room** 9:19 75:25
**rough** 113:22
**roughly** 48:2
**round** 72:7,7
**rows** 100:7
**rtz** 1:7 2:7 3:11 7:18 8:13 15:1 15:7 16:18 17:7,9,11 37:23 43:25 44:6,20,21 45:8,13 46:15 47:4,15,19 48:1,10,25 49:4,14 50:14 51:1 62:23 63:7 64:3 65:7 71:13 74:4 78:6 80:11 81:2,9 84:4 117:4 119:1
**rtz's** 14:19 16:14,16 37:16 61:15,16 64:4 80:16
**rtz0008378** 6:10 88:5
**rtz0008389** 6:12 88:7
**rtz0008390** 6:14 88:8 95:9
**rtz8389** 92:25

**rules** 118:8
**run** 100:14,23 101:7 108:11
**running** 101:5

**s**

**s** 6:1 89:14 90:3 91:15 119:3
**saint** 2:16 7:1 9:14
**san** 3:15 4:8
**saw** 67:12
**saying** 16:23 36:14 46:24 55:4
**says** 15:6 66:5 89:16 91:6,19 93:16 101:19 101:20 103:20
**scaleability** 28:19 43:14
**scenario** 30:1 34:19
**schedule** 12:20 117:10
**scheduled** 12:19,21
**schwechheimer** 51:3,10 52:10 52:16 53:5 59:12 60:12,13 60:15,20 63:15 63:17 64:7,8 64:20 68:20

69:11 76:7,13 76:17,25 77:2 77:6
**science** 22:6
**scope** 14:22 15:23 16:11 17:20 36:25 37:11 44:20 46:12 63:1,12 68:5,16 69:25 70:19 74:3
**screen** 7:11 57:15 58:1 87:25 90:23 96:14
**scroll** 103:11
**sealed** 117:20
**second** 26:25 64:23
**secret** 105:22 106:3
**security** 27:24 27:25 28:25 105:13
**see** 12:10 17:25 21:22 39:11,23 40:6 45:15 56:4,9,13,18 57:4 58:4,17 58:18 61:1,4 67:6,7 76:11 82:3 88:15,18 89:17 90:22,24 91:1,3,7,20

92:18 93:17 95:7 96:9 98:6 100:10 101:4 102:25 103:1 104:13 105:11 105:19 111:1 112:25
**seeing** 102:1,5 107:17 108:12 109:1,2
**seeking** 74:18
**seem** 37:1 50:6
**seemed** 43:10
**seems** 10:17
**seen** 7:10 20:20 43:19 54:7
**sees** 36:16
**selected** 90:3 101:24
**selecting** 101:6 109:11
**send** 10:12 41:20 80:23,24 82:18 109:21 109:21
**sending** 83:14
**sends** 82:9
**sense** 31:1 35:21 50:8
**sent** 41:8,12,13 80:8
**separate** 11:7 83:4

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

[servers - stand]

| | | | |
|---|---|---|---|
| **servers** 79:21 | **shows** 89:9,10 | **somebody** | 15:6 16:9,20 |
| **service** 79:15 | **side** 24:7 26:2,8 | 60:19 94:23 | 18:18 51:8 |
| 79:21 80:12,18 | 28:7 82:7 | 100:13 | 52:2 54:19 |
| 80:18 | **sign** 117:16 | **sooner** 21:5 | 69:15 71:17 |
| **services** 27:9 | 118:5 | **sorry** 26:19 | 72:12 103:25 |
| 42:10 79:21 | **signature** | 27:8 35:2 | 108:17 110:4 |
| **sessions** 13:5 | 116:24 117:22 | 44:19 47:22 | **specifics** 53:19 |
| **set** 38:22 85:25 | 117:24,24 | 56:12 68:13 | **specified** 37:21 |
| 107:21 | 118:9 | 81:15 89:13 | **speculation** |
| **sets** 24:1 70:20 | **similar** 41:24 | 90:25 92:20 | 47:21 |
| 72:16,17 | 84:12 95:14 | 93:25 94:3 | **spent** 23:17 |
| **settled** 58:11 | 102:5 107:9 | 95:24 96:2 | 112:1 |
| **sevil** 4:14 7:21 | 112:7 | 106:8 | **spoke** 32:16 |
| **shah** 4:5 117:1 | **simple** 65:16,17 | **sort** 20:11 | 83:4 |
| **shailika** 4:5 8:9 | **simply** 80:11 | 44:10 65:19 | **spoken** 13:18 |
| 12:4 13:11 | 80:24 82:9,18 | 84:19 | **spokes** 82:7 |
| 117:1 | 83:14 94:2 | **sound** 51:6 | **spotlighted** |
| **shaped** 29:16 | **sir** 8:25 19:5 | **sounds** 24:14 | 57:25 |
| **share** 57:15 | **sit** 19:9 77:4 | 33:5 43:6 59:3 | **spreadsheet** |
| 58:1,3 87:25 | 98:17 | 71:10 73:9 | 6:9,11,13 88:5 |
| 96:6 100:4 | **situation** 81:1,9 | **source** 11:1 | 92:25 100:8 |
| **shared** 111:2 | **situations** | **space** 24:12,13 | **spreadsheets** |
| **shares** 85:6,9 | 19:13 | 25:8 27:10 | 100:6 |
| **sharing** 44:10 | **skotiya** 4:10 | 31:8 | **ss** 115:2 116:2 |
| 67:16 92:9 | 117:2 | **specialty** 26:22 | **stack** 28:20,24 |
| 95:25,25 96:10 | **slightly** 10:24 | **specif** 19:3 | **stacks** 23:12 |
| **shortened** | **small** 88:17 | **specific** 18:21 | **staff** 100:14,18 |
| 28:18 | **smiling** 12:8 | 27:20 40:2 | **stamp** 71:23 |
| **shorthand** 8:23 | **solution** 25:7 | 45:17 50:21 | 88:6 |
| **show** 88:1 | 28:22,22 | 51:20 55:12 | **stamped** 88:5,7 |
| **showed** 100:6 | **solutions** 7:22 | 63:10 86:22 | 92:25 95:8 |
| **showing** 57:21 | 7:24 24:11,11 | 93:9 106:14 | **stand** 63:24 |
| 67:4 88:24 | 24:17 117:7 | **specifically** | 64:1 73:10 |
| 104:9 | | 13:8 14:24 | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[standpoint - team]**

**standpoint** 28:8 47:18

**start** 31:22,23 43:7 77:23 91:1

**started** 25:19 30:6 32:2 43:8

**state** 8:3,5 15:2 17:3 31:5 85:10 115:1 116:1,4,25 117:9,12

**stated** 78:12

**statement** 6:4 57:13 59:10 60:16 61:17

**statements** 60:3

**states** 1:1 2:1 7:18 115:6

**stating** 16:6

**stay** 10:25

**stayed** 24:1 25:1

**stenographic...** 116:9

**step** 67:19

**stick** 50:15

**stipulation** 117:21

**stop** 29:7 67:16 92:8 95:25,25 96:6,10

**stopped** 57:1 96:13

**stopping** 39:15

**stored** 36:17 40:12 65:20 97:9,15 101:15

**strategies** 45:23

**street** 3:14

**stuff** 27:20

**subject** 71:3,18 72:10,20 74:16 77:13 84:6

**subsidiary** 17:8

**substantive** 73:20

**suggest** 16:6

**suite** 3:6 4:7

**summary** 6:3

**support** 25:11

**suppose** 37:9 50:1

**supposed** 13:4

**sure** 33:14 40:4 48:9 50:7 53:17 58:2 73:17 81:18 87:9 94:4 100:11 113:18

**surescripts** 27:15

**susan** 1:23 2:17 7:23 8:22 96:12 113:16

116:3,24

**suspect** 15:22 74:21

**swear** 9:1

**switch** 57:7

**sworn** 9:4 116:6

**system** 27:17 34:2,15,24 36:8,11,14 37:4,25 38:24 39:3,4 40:7,10 40:13,22 41:2 41:14,15,16,18 41:19 46:3,7 76:8 79:2 80:8 80:16 81:2,10 82:6,8 83:2 89:11 90:9,20 92:6 97:3,5,8 97:10 98:10 104:2,3,13 105:23 108:14

**systems** 23:8,9 23:10,13 25:7 25:15 26:7,10 26:18 27:4 28:6

**t**

**t** 6:1 119:3,3

**tab** 57:1 90:25 91:3,4,18 100:9 103:2,20

103:21,24 104:18 106:19 107:6 109:16 110:23

**tabs** 100:10 107:17,25

**take** 7:13 21:4 22:17 30:18,21 39:13 41:10 42:13 67:18

**taken** 2:14 7:16 12:20 42:18 75:13 87:18 99:16 116:9

**talk** 14:10 18:14 19:20 33:15 40:17 51:19,24 52:1 76:6

**talked** 13:24 14:2,12 32:18 32:21 42:25 44:13 51:13 68:20 76:24 77:8 84:11,12

**talking** 29:15 32:19 49:17 55:14 82:25 87:23 107:5 112:1

**tangent** 59:7

**tasked** 76:17

**team** 23:2

Page 27

**[teams - took]**

| | | | |
|---|---|---|---|
| **teams** 28:10,10 28:11 | **testified** 9:5 68:19 96:19 108:4 | 41:23 42:6,10 47:1 51:5 55:6 | 45:6,8 46:15 47:15,21 48:3 |
| **tech** 23:12 28:2 28:10,12,20,24 30:20 42:25 43:1 | **testify** 109:4 116:7 | 55:23 56:10 57:21 59:6 63:10,16,18 | 50:22 52:13,15 53:4 60:6,16 65:7,11 67:5 |
| **technical** 23:8 | **testimony** 20:9 20:14,17 35:16 78:14 | 68:19 69:7 71:20 72:6 73:1,5 74:25 | 71:8 75:8,11 75:14 84:2 87:16,19 89:10 |
| **technically** 67:22 77:17 | **tests** 40:5 | 77:1,4,24 79:14 85:21 | 97:6 98:18 99:14,17 |
| **technologies** 25:20 | **thank** 8:18 9:7 96:15,15 | 89:7,7 107:15 113:7,9,10,14 | 104:12 106:9 109:7 112:1 |
| **technologist** 58:6 | **thanks** 92:14 | **thinking** 12:9 | 113:22,24 114:8 116:10 |
| **technology** 23:23 24:3,11 25:10 27:24 28:22 29:15 100:20 | **thesises** 29:14 | **third** 65:19 95:10 | 117:10,18,25 118:7 |
| | **thing** 19:4 21:3 56:18 69:17 | **thought** 30:24 54:4 73:7 79:22 108:3 | **times** 12:20,21 18:12,14,23 49:9 112:13 |
| **tell** 19:9 44:4 52:18 54:17 104:20,20 106:11 | **things** 20:20 25:11 29:1 32:14 33:13 65:23 66:10 67:2 77:16 81:25 84:18 85:12 105:9 112:8 | **three** 22:16,23 53:6,9,10,14,25 54:5,15,24 55:8,9,13 69:24 88:2 99:6 100:5 108:15 | **title** 25:12 30:3 30:6 |
| **telling** 51:15 | | | **today** 8:11 12:1 12:24 17:21 19:9 20:9,18 77:4,17,18 98:17,19 113:24 |
| **ten** 18:20 113:24 | **think** 9:13 12:13 13:2 14:8 15:12,18 16:17 17:13,19 18:8 19:2 20:16 21:9,23 23:15 26:5 29:2 30:2,3 34:23 37:20,20 37:25 38:4,7 38:12,15,18,22 | **thursday** 1:14 2:15 7:2 | |
| **term** 33:22 78:7 79:8 | | **tigar** 72:5 75:2 | |
| **terminated** 68:25 69:1,5 69:14,21,24 | | **till** 12:24 27:1 | **today's** 113:19 114:7 |
| | | **time** 7:6 8:3 13:2 14:12 17:21 22:11 29:14 32:16,21 33:11 42:16,19 | **together** 32:20 |
| **termination** 68:11 69:20 | | | **told** 49:12 50:3 53:5,15 |
| **terms** 36:23 60:6 77:7 | | | **took** 25:23 29:9 32:20,20 42:24 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[took - username]**

43:25 56:25,25
**top** 20:3 61:3
  101:1
**totally** 67:13
**touched** 64:20
  77:5 89:7
**toward** 47:4
**trace** 94:17,21
**traced** 90:4,6
  90:16 91:16,25
  93:12,21
**track** 105:14,18
**tracker** 89:25
**tracking** 104:4
  105:9
**tracy** 83:23
  84:1
**trade** 28:9
**trailing** 61:6,8
  61:11
**transaction**
  25:6,14 26:18
**transactional**
  16:19
**transcribed**
  116:11
**transcript**
  116:13,16
  117:6,8,10,13
  117:13,22
  118:2,2
**transcription**
  116:12

**transportation**
  42:9 80:3
  81:13
**treating** 39:22
**trial** 81:19 94:5
**tricky** 94:22
**trizetto** 24:7,9
  24:14,19,20
**true** 80:7 115:7
  116:13
**truly** 19:8
**truth** 116:7,7,8
**try** 21:4 48:21
  70:11
**trying** 15:11
  31:14 48:8,9
  48:13 55:2
  63:23 85:25
  90:22 95:24
  105:15 108:9
**ttm24** 60:25
  61:5
**turnaround**
  113:22,24
**twenty** 18:20
**two** 16:15
  23:15 25:2
  43:17 52:20
  53:5 58:25
  70:20 72:15,16
  72:17
**type** 23:6,9
  27:21 29:25
  83:10 86:22

95:17
**types** 79:20
  80:2

**u**

**ultimately**
  12:23 65:20
**under** 72:24
  104:9 109:14
  115:5 116:12
**understand**
  10:13 20:23
  35:12 39:9
  46:18,23 48:20
  49:13 84:3,23
  87:4 100:12
  105:1,3 106:5
  112:14
**understanding**
  40:23 43:24
  47:24 59:11
  61:10 65:10
  67:9,20 70:17
  72:11 74:7
  79:12 80:6
  84:20 85:15,19
  85:24 86:5
  89:20 90:15
  91:15 98:1
  113:4
**understood**
  20:25 47:2
  78:11,13,25

**undoubtedly**
  74:15
**unif** 108:5
**unified** 90:21
  91:7,19 101:19
  106:19,25
**unit** 7:15
**united** 1:1 2:1
  7:18 115:6
**units** 31:5
**university**
  21:19 22:3,4
**updated** 101:20
**urgent** 27:16
**use** 10:7 16:20
  38:14 78:7
**used** 33:22
  35:10 90:8
  104:22 105:11
  105:20 112:12
**useless** 15:24
**user** 87:2 89:10
  89:25 97:6
  98:2 101:9,11
  103:2,20,24
  104:18,21
  106:14,17
  109:8,16
  110:23 111:17
**username**
  104:5,10
  106:21 107:7
  107:10 108:6

Page 29

**[usernames - weir]**

**usernames** 109:18,22 110:1,7,12
**users** 39:5 110:12,15,19
**using** 105:24
**usually** 96:9

**v**

**v** 117:4 119:1
**vague** 39:7 40:14,15 47:20 81:5,16 82:11 83:5,5,15 95:20 98:4 104:24 105:25 106:2
**variations** 110:16,17
**varied** 27:23
**variety** 23:12
**various** 24:2 76:7 81:3 101:16
**vary** 110:4,14
**vendors** 66:10 79:8,21 80:2 80:14,22
**veritext** 7:21,23 56:18 57:1 70:9,11 117:7 117:9,11,20
**version** 28:18 95:10

**versus** 7:17 34:6 109:11
**viability** 28:24
**video** 7:12,15 10:3 57:17,20
**videographer** 4:14 7:5,22 8:15,18 42:16 42:19 56:23 57:19,24 58:23 58:25 75:8,11 75:14 87:16,19 92:12 96:9,13 99:14,17 113:16 114:2,7
**videographer's** 57:23
**videotaped** 1:12 2:13 114:11 116:8
**view** 33:12 34:1 34:1,10,11,12 78:12,13,15,20
**views** 43:3,7,9 48:5,6,8 49:2,7
**violations** 111:18
**virtual** 114:11 116:8
**virtually** 7:8
**vision** 30:16
**visit** 36:19
**voice** 10:18 11:1

**volume** 10:17
**vs** 1:6 2:6
**vulnerabilities** 29:1
**vulnerability** 28:20

**w**

**waiting** 56:12
**waived** 117:24 117:24
**waiving** 117:21
**walter** 104:14
**want** 20:7,7 28:16,16 30:21 39:14 46:2 47:24 48:24 50:7,22 70:8 80:5 87:10,11 101:7 107:22 109:22 113:16
**wanted** 25:18 30:18,22,23 35:11 46:6,6 92:17 101:13 108:11 109:25
**way** 28:3 30:23 34:14 36:7 44:2 49:7 55:2 55:10,10 60:18 62:17 66:17 67:13 82:4 88:19 93:5 108:24

**ways** 16:4 35:9
**we've** 20:20 75:4 76:24 77:5,8 95:13 95:15,19
**webster** 21:19 22:3
**week** 32:18
**weir** 3:5 5:4 8:7 8:7 9:11 11:4 15:3,11 16:2,4 17:12 18:2,3 18:11 20:1 27:7 35:7,22 37:5,7,19,25 38:9,19,20 39:16,19,20 40:18 42:13,21 44:22,24 45:9 45:11,14 46:17 46:23 47:1,13 48:7,16,19,21 48:23 49:25 50:10 56:3,7 57:3,16 58:4,6 58:7,10,14,21 58:23 59:3,4 60:11 62:6,8 62:13,15 63:2 63:5,7,16,22 64:3,5 65:24 68:8,18 70:4 70:11,16,20 71:5,25 72:3

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[weir - yup]**

72:15,22 73:1 73:3,5 74:17 75:10,16 77:9 77:13 78:6 79:6,17 81:5 81:14,16 82:11 82:20 83:5,15 84:25 85:17,23 86:6 87:10,15 88:17 92:10 93:24 94:3,19 95:20 96:4,7 97:16 98:4,11 98:24 99:5,10 99:22 104:25 106:7 113:9,14 113:21,25 114:3,6

**went** 9:12 11:5 23:17,21 24:7 25:6 32:19 67:12 78:18 79:6 99:12 105:5

**wheel** 82:5,7

**whoops** 93:25

**wide** 23:12

**winners** 105:2

**wishes** 113:18

**withdraw** 17:16 85:25

**witness** 2:14 4:3 5:2 7:11 8:20 10:20,23

11:3 15:4,10 16:8,25 19:24 35:5,14,19 37:3 38:17 39:10 40:15 42:15 44:18 46:24 56:20,25 57:22 58:5,8 58:20,24 59:1 62:4 63:12 68:2,7,13 70:3 70:8,13 71:11 71:21 73:21 81:15,23 82:21 83:20 85:2,4 86:3,8,10 88:21 93:25 97:20 98:15 99:2 106:1 116:5,22 117:13,16 118:2,5

**witness's** 35:16 37:22

**word** 29:25 94:2

**words** 33:20 35:10 80:16 81:1 83:4,12 86:11 91:11 93:7

**work** 10:25 15:21 17:22 22:15,20,22

23:20 26:10 27:4,10,12,15 27:17,18,21,21 41:6 109:20,23

**worked** 29:19 29:23,23 33:11 100:3

**workflow** 41:4 41:5,9,24,24

**working** 22:9 29:6 60:19

**works** 20:4 38:1,13 51:17 55:15 57:9 76:5 94:8 107:23

**world** 32:19

**wrong** 30:2 67:13 103:1 108:10

**wrote** 111:12

| x |
|---|

**x** 5:1 6:1 25:22 116:16

**xx** 118:1

| y |
|---|

**yeah** 10:23 14:17 16:1,3 17:23 19:1,7 22:2,19 23:15 25:22 26:24 27:12 28:9,19 29:3 30:15,22

37:19,25 38:9 39:2,16 40:15 40:19 44:23 45:9,17 48:7 50:3 52:3,7 53:2,17 54:1,1 54:16 55:22 57:6,18 58:5 58:22 59:9 60:21,22 61:2 61:14 62:10,13 65:22 66:17,25 68:15 69:15,22 72:2 73:3,4,15 84:2,11 85:3 86:9 87:13 88:16,17,21 95:1 96:5,5,8 99:10 101:4 103:12,16,19 105:4,13,13 106:2 107:4,6 108:22 110:4 110:25 111:3 112:3,19 113:7 114:6

**year** 23:17 27:1 60:25,25 64:12

**years** 22:16,23 23:15 24:2,20 25:2 43:17

**yup** 70:16 89:15

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[z - zoom]**

| z |
|---|
| **z**   45:1,22 49:10 |
| **zawadski**   30:11 |
| 31:11,18 32:1 |
| 32:17 46:1 |
| 49:11 50:18 |
| 76:20 112:22 |
| **zoom**   2:16 57:5 |
| 58:9 |

Page 32

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Evan Walters

# Highlighted Transcript

# Deposition Transcript

Case Number: 4:24-CV-01132-JST
Date: March 16, 2026

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# Evan Walters



**CERTIFIED COPY**

Reported by:
Cindy C. Jenkins

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


CASE NO:  4:24-CV-01132-JST


INTUS CARE, INC.,

     Plaintiff,

Vs.

RTZ ASSOCIATES, INC.; and DOES 1

Through 10,

     Defendants.


REMOTE DEPOSITION OF:

EVAN WALTERS

March 16, 2026

9:33 A.M.


REPORTED BY:

     CINDY C. JENKINS, CCR

A P P E A R A N C E S


APPEARING ON BEHALF OF THE PLAINTIFF:

MANATT, PHELPS & PHILLIPS, LLP

Mr. Charles E. Weir

2049 Century Park East

Suite 1700,

Los Angeles, California 90067

310-312-4000

cweir@manatt.com


APPEARING ON BEHALF OF THE DEFENDANT:

NOSSAMAN LLP

Mr. David C. Lee

50 California Street

34th Floor

San Francisco, California 94111

415-398-3600

dlee@nossaman.com


ALSO PRESENT:

Ms. Celeste Simpkins

                        I N D E X

WITNESS                                        PAGE

EVAN WALTERS

Examination by Mr. Lee                          5



                  INDEX OF EXHIBITS

NUMBER            DESCRIPTION                   PAGE

Exhibit 15    Intus 002205-002211              190

Exhibit 67    Intus 005118-005122              244

Exhibit 87    Objections and Responses          76

Exhibit 88    Intus 001797-001800              148

Exhibit 89    Intus 001763-001765              163

Exhibit 90    Intus 001793-001796              172

Exhibit 91    Intus 001801-001804              177

Exhibit 92    Intus 003028-003030              207

Exhibit 93    Intus 003474-003483              218

Exhibit 94    Intus 003580-003589              234

Exhibit 95    Intus 003604-003614              237

Exhibit 96    Intus 003908                     239

PROCEEDINGS

MARCH 16, 2026                              9:33 A.M.

COURT REPORTER:  My name is Cindy Jenkins here on behalf of Steno.  I'm going to put on the federal stipulation really quickly and then swear in Mr. Walters.

The parties and their counsel further agree that while I'm a licensed notary and court reporter, the witness may be in a state where I'm not licensed.

The parties stipulate that the deposition may be taken before me.  If any party does have an objection to this manner of reporting or anything stated above, please state so now.

Hearing none, we can proceed. Mr. Walters, can I get you to raise your right hand, please?

EVAN WALTERS being first duly sworn, was examined and testified as follows:

COURT REPORTER:  All set, Counsel, when you're ready.

MR. LEE:  Great.  Thank you very much.

EXAMINATION BY MR. LEE:

Q.     Mr. Walters, I may have introduced myself off the record, but for the record, my name is David Lee.  I represent RTZ in these proceedings.  Thank you very much for making time today to be with us.

Can you please state and spell your name for the record?

A.     Evan Walters, E-v-a-n, W-a-l-t-e-r-s.

Q.     And Mr. Walters, have you ever been deposed before?

A.     No.

Q.     Well, welcome to the party, I suppose.  If you haven't been deposed, what I want to do is just kind of run through some rules of the road with you.  It will make our conversation a little bit easier, but more importantly, it will make it much easier for the court reporter.

So you understand that you've just taken an oath and that oath carries the same force and effect as if you were testifying at trial.  Do you understand that?

A.     I do.

Q.    Okay.  And so it's important for you to be as accurate and truthful today as possible.  Will you do that?

A.    Yes.

Q.    Okay.  At the end of this proceeding, you're going to receive a transcript.  You'll have an opportunity to review that transcript.  That transcript is essentially just taking down all of the words today that are being spoken back and forth.  You'll have an opportunity, as I mentioned, to review that.  If you decide that you do need to make changes to your transcript, you're free to do so.  The only caveat is that I can comment upon those changes at trial potentially to your adverse testimony.

Does that make sense?

A.    It does.

Q.    Okay.  So for that reason, as I mentioned, it's important to be as truthful and accurate today as possible.

One of the kind of weird conversational glitches with a deposition is that, because everything needs to be taken down, we do need to avoid the head nods, kind

of nonverbal cue responses.  So in order to make the court reporter's job easier, you know, if you could just verbalize all of your responses.  Does that make sense?

A.    Understood.

Q.    Okay.  If you don't understand a question, just simply let me know.  You know, I don't ask perfect questions.  And so if, for whatever reason, you're just not certain about a question, just ask me to rephrase, and I'll do the best I can, okay?

A.    Sounds good.

Q.    One of the things -- and you're doing a good job so far -- is for us not to talk over one another.  So if you can allow me to finish my questions before you start your answer, I'll afford you the same courtesy. Does that make sense?

A.    Yes.

Q.    Okay.  From time to time, in response to a question that I asked, your counsel, Mr. Weir, may interpose an objection. Understand that those objections are just kind of post-it notes that will be, you know, addressed somewhere down the line later in the

proceeding.  And notwithstanding the fact that an objection has occurred, I'm still entitled to a response.  Do you understand that?

A.    Yes, that makes sense.

Q.    Okay.  The only exception to that is if your counsel specifically instructs you not to answer.  He and I may, you know, have some dialogue about that.  But in all other instances, I'm entitled to a response, okay?

A.    Okay.

Q.    You're obviously in -- or we're taking this deposition remotely.  Can you tell me where you're at currently?

A.    I'm in Cambridge, Massachusetts.

Q.    Okay.  And are you in a home office or in some other type of office?

A.    Home office.

Q.    Okay.  Is there anybody else in the room with you?

A.    No one's in the room.

Q.    Okay.  Do you have any sort of chat features open, you know, whether it's a telephone text, whether it's a Teams chat, any other sort of kind of communication device that's open on your computer at this point?

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

A.   I have chat programs open, but we are not discussing this deposition.  I can close them now.

Q.   Yeah.  I think that, for purposes of the record, I'd ask that you close those down.  You're free to obviously use those, you know, during a break as needed.  But for purposes of this deposition, I'd ask that you actually close those.

A.   Everything has been closed.

Q.   Okay.  Do you have any notes in front of you, whether on a screen or physical?

A.   No.

Q.   Okay.  The final question I want to ask in terms of kind of guidelines, you know, are you unable to provide your best testimony today for any reason, in other words, you know, have you taken any medications or substances that may impact your ability to testify today?

A.   No.

Q.   Great.  Can you tell me what you did to prepare for today's deposition?

A.   I met with our attorneys to understand the context of the deposition and

what to expect.

MR. WEIR:  Evan, he's not entitled to the substance of our communication.  So you can tell him that we met and kind of how long, but he doesn't get to know what we talked about.

Q.    (By Mr. Lee) Yeah.  And I agree with that.  So you said that you met -- or you mentioned that you had met with counsel.  Can you tell me which counsel you met with?

A.    Charles Weir.

Q.    Okay.  Anybody else?

A.    And Andrew --

Q.    Beshai?

A.    Beshai.

Q.    Okay.

MR. WEIR:  I won't tell Andrew.

Q.    (By Mr. Lee) Was there anybody else in the deposition preparation sessions with you and your counsel?

A.    No.

Q.    Okay.  Outside of discussions that you -- actually, I should ask, when did you meet with counsel?

A.    Last week.  And --

Q.    Okay.

A.    Yeah.

Q.    I'm sorry.  Last week and?

A.    We had met last year as well, when it looked like depositions were going to happen at the end of the summer.

Q.    Fair enough.  Do you recall roughly how long you met between those two sessions?

A.    A couple hours.

Q.    Okay.  Aside from conversations that you had with counsel, did you meet with anybody else or have discussions with anybody else outside of the presence of counsel about these depositions about this deposition?

A.    No, other than -- other than remarking to my colleagues that I couldn't make certain meetings because I was scheduled for a deposition.

Q.    Okay.  In preparation for this deposition, did you review any documents?

A.    No.

Q.    Have you reviewed any prior deposition transcripts from this case?

A.    No.

Q.     And do I understand it correctly that you had no conversations with anybody at Intus about this deposition beyond just mere logistics?

A.     That's right.

Q.     In preparation for this deposition, were you asked to look for documents?

A.     No.

Q.     Okay.  And I assume, based upon your responses, that you didn't do so?

A.     That's right.

Q.     Okay.  Mr. Walters, am I correct that you're the VP of data and infrastructure at Intus?

A.     Not any longer.

Q.     Okay.  What is your current title?

A.     Staff software engineer.

Q.     And when did you step into that role?

A.     That was about seven months ago.

Q.     So middle of 2025?

A.     That's right.

Q.     Okay.  And before being a staff software engineer, what was your title?

A.     VP of data and infrastructure.

Q.     And how long did you hold that role?

A.     Almost three years.

Q.     So roughly mid-2022 to 2025?

A.     Yeah.

Q.     And did you hold a role at Intus prior to starting your VP role?

A.     Yes.

Q.     And what was your title prior to being the VP of data and infrastructure?

A.     Senior software engineer.

Q.     And how long did you occupy that role?

A.     It must have been -- so I joined in May.  It was January, February when I was promoted to VP.  So that was eight months, nine months.  I'm giving approximate time ranges here.  I can get the exact dates if necessary.

Q.     So it would have been somewhere in 2021?

A.     Yeah, at the beginning, right. Right.  From the beginning -- from May 2021 when I joined the company until I was

promoted close to the beginning of 2022.

Q.   Okay.  And based upon your testimony, it sounds like your career with Intus started in that May of 2021?

A.   That's right.

Q.   Okay.  Did you have employment prior to coming to Intus?

A.   So I was leaving a graduate program, but I had previously worked as a software engineer.

Q.   Okay.  And in your prior stints as a software engineer, were you involved in kind of medical record types of information, or were you within the medical industry?

A.   In one of my roles, yes.

Q.   What role was that?

A.   It was at the -- I was working on the Undiagnosed Diseases Network at Harvard Medical School.

Q.   Undiagnosed Disease?

A.   Diseases Network.

Q.   And what is that real quickly?

A.   It's a coalition of organizations, researchers, doctors that are working on identifying the root cause of

undiagnosed diseases.  The software that I helped to build was used for coordinating their effort.

Q.    Understood.

Can you quickly give me a synopsis of your educational background starting with college, you know, where you went, years, and degrees?

A.    I went to Boston University for my initial undergrad.  I studied philosophy, graduated in 2008.  You're looking for just education; right?

Q.    Yeah.  Yeah.

A.    And so after some time in the workforce, I went back to study mathematics at UMass Boston.  I graduated there in 2018.

Q.    And what was your degree?

A.    Mathematics.

Q.    Sorry.  Was that an undergraduate degree, like a --

A.    Oh, yeah.  Sorry.  Yes, a bachelors.  I went to do a second bachelors.

Q.    Got it.  Okay.

Anything beyond your UMass degree?

A.    So in 2019, I enrolled in a

masters program in computer science at UMass
Amherst.  I withdrew from that program prior
to joining Intus, but I am currently
re-enrolled since.  I'm currently enrolled.

Q.    And I'm sorry.  Can you give me
the degree -- or not the degree, but the
course of study again?

A.    It's a masters in computer
science.

Q.    Got it.

I'm going to go back to the
positions that you held in Intus, starting
with your senior software title.  Can you tell
me generally what your duties and
responsibilities were in that role?

A.    When I joined the company, my
main directive was to architect and implement
their ETL data pipeline.  Are you looking for
all of my responsibilities throughout or
just --

Q.    Just at a high level.  And so you
came in to help architect the ETL pipeline.
What else did you do above and beyond that,
again, as a senior software engineer?

A.    The standard responsibilities of

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

a software engineer and, you know, an early employee at a start-up. So a software engineer working on kind of anything and everything that needed to be done in order for us to build the company. So working on application infrastructure, pipeline infrastructure, data infrastructure, any of our exploratory efforts, and then also helping to grow the team. So interviewing, you know, et cetera.

Q. You mentioned your responsibilities in the context of a start-up. What employee number were you?

A. Maybe seven. It kind of just depends. There was a lot of -- yeah, it's about that.

Q. Okay. So you were there pretty early.

A. Yes.

Q. Okay. And at that time, am I correct that Intus really only had a single product offering?

A. That's right.

Q. Okay. And that would be the data

analytics platform; right?

A.    Right.

Q.    Okay.  I believe that that has been referred to, at least by Alex Rothberg, as a Population Health product?

A.    That's right.

Q.    Okay.  So that's a term that you're familiar with?

A.    I am.

Q.    Okay.  So if I use the term "data analytics system" or "Population Health system," will you understand that I'm just using those interchangeably?

A.    Yes.  I understand what you're referring to, yeah.  Although, it might be helpful to just refer to it as the PopHealth Analytics tool.

Q.    PopHealth?

A.    We've expanded our product offering.

Q.    I will do my best.

All right.  Okay.  So if I'm kind of unpacking your response about your duties and responsibilities, do I understand correctly that one of the primary roles that

you occupied early on as a senior software engineer for Intus was to help develop the PopHealth system?

A.     My primary responsibility was for developing the data pipelines that supported it.

Q.     Okay.  And describe for me what you mean by the "data pipelines."

A.     So these are the automation and all the integrations that we use to access our customers' data.

Q.     And so that would include, for instance, like robot web agents?

A.     Can you describe what you mean by that?

Q.     Sure.  A bot?

A.     Can you be more specific?  I'm not...

Q.     This is your industry; right?  Have you ever heard of the term "bot"?

A.     Yeah.  I mean, it's not a -- Yeah.  I mean, yes, I think I generally understand what you're saying.

Q.     Okay.  And is one of the automations that you're talking about an

automated script?

A.    Yeah.  It's -- we have a system that drives the web browser to extract information.

Q.    Okay.  And that system you're referring to would be an automated script; correct?

A.    Yeah.

Q.    Okay.  And you understand that an automated script is a bot?

A.    Yeah.  There's this kind of -- I guess, I was looking for more specifics because it's kind of an overloaded term.

Q.    Okay.

A.    But now that we're on the same page as far as it just being a script that drives the web browser, yes.

Q.    Okay.  What other sorts of automations were you charged with building?

A.    Well, the rest of the -- you know, the processing of the data itself is automated, the scheduled steps in the data processing pipeline.

Q.    You're referring to transformation layers?

A.    Yeah.  Right.  So the rest of the pipeline itself.  That's right.

Q.    Okay.  So you're talking when data is inbound to Intus, it needs to undergo or transform in a manner that actually becomes suitable for the data -- or the Intus ecosystem, for lack of a better word?

A.    That's right.

Q.    Okay.  And so you were charged with kind of developing that?

A.    That's right.

Q.    Okay.  Were you charged with developing any sort of FHIR connections or APIs?

A.    Yeah.  We -- we had a FHIR integration for a period of time.

Q.    Is that an integration that you created?

A.    Yes.

Q.    Okay.  And you said "for a time." What do you mean by that?

A.    The customer that we were integrating with churned.  They were no longer our customer.  So we --

Q.    Which customer was that?

A.     Man.  So we were working with Canvas -- no.  I am -- I am blanking on the name of the customer right now.

Q.     Was it SeniorCare?

A.     CN, no.

Q.     Okay.  Doesn't matter.

Anyways, so aside from this unknown customer, were you -- sorry.  Let me ask this differently.

In connection with the FHIR integration that you had for this unnamed customer, once that customer, I think you used the term "churned," was that FHIR integration effort stopped?

A.     Yeah.  We didn't need it anymore.

Q.     What other sorts of automations other than an automated script were you developing?

MR. WEIR:  I'll object to that. Do you understand the question?  Would you like to take another shot at that one?  That one was -- automations in general was kind of a --

Q.     (By Mr. Lee) Well, do you

understand my question?

A.     Well, I think I understand your question.  It does seem fairly vague in that I've been with the company for a long time.  So we've been working on a lot of different stuff.

Q.     Understood.  Understood.  And again, I'm trying to narrow down what you were doing as a senior software engineer in the timeframe of May 2021 through mid-2022, okay, Or at least sometime in 2022 when you advanced.

And so my understanding is that you were brought in to help build out the automation infrastructure.  One of the ways that you were doing that was to create an automated script; correct?

A.     That's right, yeah.

Q.     You also, for a brief period of time, helped to build out a FHIR integration; correct?

A.     That's right.

Q.     Okay.  My question is:  Whether or not in that first stint as a senior software engineer, whether you had developed any other

types of automation integrations?

A.    Other -- I mean, other integrations?  It's still a little bit vague. I mean, I guess the reason that it's vague is that you can consider all the work of a software engineer, the work of building automations.  You can build a program that you can parameterize and run it.  And you can have it run in an automated fashion.  So meaning, if I were to build an API that was backing a website, would you consider that an automation?  It seems like it.  So the nature of my work was the work of a software engineer.

Q.    Okay.  At the time that you joined Intus, did you have an understanding of the term "electronic health record"?

A.    Yeah, I did.

Q.    Okay.  And what do you understand -- I'll shorthand it -- an EHR to be?

A.    Well, frequently it's used interchangeably with EMR or really interchangeably with the system that houses the medical records or the health records.

But I guess the electronic health record itself, you know, is something -- it's a piece of information related to a person's care or their health.

Q.    So unpacking your explanation, an EHR is essentially a software system that houses medical data that is input by the clinicians?

A.    Right.  Yeah.

Q.    Okay.  Did you have an understanding at the time that you entered or began at Intus of what type of EHRs there were within the PACE space?

A.    Not before I joined, no.

Q.    Okay.  At the time that you did join, were you informed about that?

A.    Yeah.  As it was the main thing I was working on then, yes.  Yes, I was.

Q.    Okay.  What were you told about the EHRs that were within the PACE space?

A.    I guess I was explained -- you know, people told me about the -- kind of explained the nature of PACE and, you know, the purpose behind the various features in these EHRs.

Q.    Okay.  Let me get a little more specific.  Were you told about the type of extraction process that you would need to build in order to accommodate the EHRs that were within the PACE space?

A.    Yes.  Yeah, that was a part of my job.

Q.    Okay.  And what were you told about that?

A.    So our source of the data, for the most part, were reports that these EHR systems generated.  So our automated system would drive the browser and download the reports.

Q.    Okay.  Alex Rothberg testified in deposition that he had understood, and apparently misunderstood, that EHRs all had FHIR integrations, only to come to learn that that, in fact, was not the case.  Do you remember having discussions with anybody at Intus about that reality?

A.    Not --

MR. WEIR:  Hold on a second, Evan.  Object to the predicate.  I'm not sure it exactly describes his testimony.  But if you

understand the question, Evan, go ahead and answer it.

THE WITNESS:  Yeah.  I mean, you know, I've been with the company for a long time, so I don't remember specific conversations.  And I can't, of course, speak to Alex's testimony.

Q.    (By Mr. Lee) And you wouldn't have any reason to disagree with that characterization, would you?

A.    I wouldn't have any reason to disagree or agree?  Can you repeat the question?

Q.    Yeah.  As I described it, would you have any reason to disagree with that characterization by Alex?

MR. LEE:  Objection, vague.

THE WITNESS:  Yeah.  Yeah.  I mean, I can't speak to any conversations I had with him.

Q.    (By Mr. Lee) Fair.

So, in summer of 2020, or at some point in 2022, you, I assume, are promoted to VP of data and integrations -- I'm sorry, data and infrastructure?

A.      Yes.

Q.      Okay.  Did your duties and responsibilities change?

A.      Not significantly.

Q.      Okay.  Anything material, you know, in terms of job expansion?

A.      No.  Not -- the company was far too small.

Q.      Okay.  Did you have reports?  I guess I should have asked this question before.  When you were a senior software engineer, did you have reports?

A.      Yeah.  Yes.  Interns -- well, let's see.  When did Max join?  I don't have a timeline straight in my head right now, whether or not.  So we did hire someone at the beginning of 2022.  I think that must have come after the new title.

Q.      Okay.  In any event, Max was a report to you?

A.      Yes.

Q.      Okay.  And what is Max's last name?

A.      Gunther.

Q.      Okay.  And what was his title?

A.      Software engineer.

Q.      Okay.  Who did you report up to while you were a VP of data and infrastructure?

A.      Alex Rothberg.

Q.      Okay.  And did you report to Alex as well when you were a senior software engineer?

A.      Yes.

Q.      Okay.  Did you have a report other than Alex at that time?

A.      Did I report to anyone else other than Alex?

Q.      Yes.

A.      No.

Q.      Okay.  So, I think, just to put a bow on this, that, you indicated that your job responsibilities as a VP didn't really markedly change from those as a senior software engineer?

A.      No, they didn't.

Q.      Okay.  Were you involved as a VP of data and infrastructure in the development of CareHub?

A.      No.

Q.    Okay.  Different department?

A.    Yeah, different department.  Of course, the teams changed over time.  And, you know, my response to whether or not my responsibilities changed was whether or not they changed initially.  As the company grew, of course, my responsibilities changed.

And the data team, which I am on and, for a period of time led, was involved in the data infrastructure that delivers reports alongside CareHub.  But the application itself, the web application that we're calling CareHub, I was not part of building.

Q.    Got it.  You mentioned just a moment ago that you led a data team.  When did you start leading that data team?

A.    So, I mean, I guess the moment that we hired Max.

Q.    Okay.

A.    And -- yeah.

Q.    Sorry.  Sorry.  Go ahead.

A.    Because then, you know, up to that point, it had been a team of one.

Q.    Okay.  So now we're up to a team

of two.  In your time as the VP, did that team grow beyond two?

A.   Yes.

Q.   Okay.  Who else was part of that team?

A.   You want me to list all of the people?

Q.   Yes.

A.   Christopher Roy, Amr Abouelleil.

Q.   What's the first name?

A.   Amr, A-m-r.

Q.   Okay.  Let's see.

A.   Wenxing Li was a report for a time.  Joshua Kumar Saja, Alex Zheng.  I'm forgetting people.  Who else?  We've had various interns.  Yeah.  There was a kind of a -- there was a transition period here where there were people who weren't reporting to me.  So, yeah, I mean, I'm not going to list -- it doesn't it make sense to list everyone on the data team.  That seems like it's not a --

MR. WEIR:  If you know and you remember, give him the list.  If that's as good as you can do, then --

THE WITNESS:  I mean, I can list -- so we've got Summer Box, Theodore Dyer.  People who joined since I --

Q.    You've gone on an --

A.    James Greer.

MR. WEIR:  So yeah -- and there's always this kind of tension between like just randomly guessing and, you know, kind of doing your best.

THE WITNESS:  Oh, I'm not randomly guessing.

MR. WEIR:  No.  No.  No.  You're doing a good job of just, you know, remembering stuff.  But there's always a limit to that.  So if you don't -- give what you remember, and if you don't remember anymore, then you're totally okay.  And I assume you agree with that.

THE WITNESS:  Yeah.  Really the uncertainty here -- I could list the rest of the members of the team.  The uncertainty was the transition period.  Essentially, I went on paternity leave, and that's the point where I transitioned from the leader of the data team to, you know, a technical team lead, a staff

software engineer.  And so there was a period of time where these people were reporting to me technically, but I was not working.  So, anyway, if you need it, we can go through it.

Q.    (By Mr. Lee) Understood.

Yeah, you've given me enough of a sense.  Can you do this for me.  You're a staff of two when Max is brought onboard.  Obviously, the team grows based upon the list of folks that you've just identified.

What was driving the growth of the data team?

A.    The growth of the company.

Q.    Okay.  And when you say "the growth of the company," are you referring to the number of new accounts for PACE facilities that were contracting for the PopHealth system?

A.    That's right.

Q.    Okay.  And are -- the data team members that you've just identified, were they generally all doing, you know, the same type of support work?

A.    You broke up there for a second. Can you repeat the end of the question?

Q.    Sure.  Were the data team members that you identified, at a very high level, all doing generally the same type of work?

A.    Yeah.  Yeah.  Yes, they were.

Q.    And am I correct in characterizing that work as essentially support work for integration build-outs?

A.    Yeah.  A good portion of the work was for integrations.  But there's -- you know, there's -- I would say -- I would, again, characterize their work as the work of software engineers.

Q.    Am I correct that all of these data team members that you've just identified and the others that you have in your head but haven't yet identified were all working on the PopHealth side of the company?

A.    Yes.  So the team supported other efforts as well.  But I think I -- I think I understand your distinction to be that we were not -- we were not working on CareHub, it sounds like.  Is that what you're trying to ask?

Q.    Yeah.  I mean -- and look, I don't mean to presuppose here.

My understanding is that Intus, throughout its, you know, kind of evolution really, at this point, has three product lines.  It has the PopHealth, it has the IRIS, and it has CareHub; is that right?

A.    Yes.

Q.    Okay.

A.    It.

Q.    And so -- I'm sorry.  Go ahead.

A.    Consulting services as well.

Q.    Okay.  Fair enough.

I'm assuming none of these data team members are working on consulting?

A.    Well, so, we do support that.

Q.    Okay.

A.    Yeah.  We're not working directly on it, but, yeah, we --

Q.    Okay.  Can you, at a high level, if you know, tell me what IRIS is?

A.    Yeah.  It's a revenue integrity product.  Our customers only get reimbursed by Medicare for the care that they document. So if they don't document care that they are delivering, they won't get reimbursed for it. And the revenue integrity product that we're

selling now helps them capture as much revenue as possible.

Q.   And that's in the form of a dashboard; correct?

A.   Yeah, along with medical coding support.  And there's a consulting service aspect to it as well.

Q.   Okay.  When did IRIS mobilize as a product, for Intus?

A.   It must have been -- it's '26. So 2024 -- I can't give you an exact date.

Q.   And you don't have to.

Was the IRIS development concurrent with the development of CareHub?

A.   Yes.  Yeah.  It was -- it preceded it.

Q.   My understanding is that CareHub development commenced in or around early? 2024.  And so was development of IRIS, you're saying, occurring in 2023?

A.   Yeah.  This -- I'm trying to think when -- so we had a person who was leading it initially.  And when they were -- I mean, this is a non -- this is not a software engineer, not a technical person, a

subject matter expert in PACE, Matt Zimmerman.  He's no longer at IntusCare.  But he was hired initially to start this effort.  And I don't remember when he was hired.

Q.    Okay.  Were you involved in the IRIS product at all?

A.    Yes.

Q.    Okay.  Was that similarly, you know, aimed at creating automations in connection with IRIS?

A.    Yes.  There were -- there were -- yes, there were automations that helped support that, yes.

Q.    And, again just kind of catching and receiving data?

A.    Yes.  Yep.  And -- yeah, that's right.

Q.    Is the data that is used to populate IRIS originating from an EHR?

A.    Not all of it, no.

Q.    But some of it?

A.    Some of it, yes.

Q.    I want to get back to your Intus timeline?  So in summer 2025, you become a staff software engineer.  I think you

described that that change coincided with paternity leave; is that correct?

A.    Right.

Q.    Okay.  In your role as a staff software engineer, did your duties and responsibilities change?

A.    Yes, they did.

Q.    Okay.  And in what way did they change from when you were a VP?

A.    So, managerial responsibilities were fewer, although I still have direct reports.  I, you know, was expected to spend less time developing the team, you know, less time working with, you know, other counterparts in different parts of the organization.  So focusing more on technical work.

Q.    I'm sorry.  Focusing more on technical work?

A.    Yeah.

Q.    Okay.  And by technical work, you're talking about like architecture?

A.    Yeah, just everything that goes into being a software engineer.

Q.    Okay.  As a staff software

engineer, who do you report to directly?

A.    Chris Petrino.

Q.    And what is Mr. Petrino -- he?

A.    Yes.  Yeah.

Q.    And what is Mr. Petrino's title?

A.    VP of Data, I think.

Q.    Did he occupy --

A.    I don't think it's director, but I think it's VP of Data, yeah.

Q.    Did he occupy your former role?

A.    Yes.

Q.    Okay.  Was he a report to you prior to your paternity leave?

A.    No.  No.

Q.    Is he still with the company?

A.    Yeah.  Yeah, he is.

Q.    Aside from having some reduced managerial responsibilities, is your role as a staff software engineer any different?  In other words, are there any other material changes in the duties and responsibilities?

A.    Yeah.  I mean, things -- things -- yes.  Yeah, things have changed for sure.  The structure of the data team has changed itself.  So, yes -- yeah.

Q.    Okay.  Am I correct that the data team, which you once led, you're now a member of?

A.    Right.

Q.    Okay.  We're obviously here because of a lawsuit, a lawsuit that was initiated by Intus.  Do you have any understanding of what Intus's claims against RTZ are?

A.    Yes, I do.

MR. WEIR:  So, Evan -- and I have given you this admission earlier.  Just make sure that you're not disclosing communications that you've had with me or with Andrew or any other counsel, for that matter, regarding the lawsuit.

Q.    (By Mr. Lee) As you sit here today, what do you understand Intus's claims against RTZ to be?

MR. WEIR:  If you have kind of a general overview, fine.  But if you can only disclose it by -- if your testimony is only just going to repeat what I've told you or Andrew's told you, then I'll instruct you not to answer.

THE WITNESS:  Okay.  Yeah.  Then I can't answer that.

Q.    (By Mr. Lee) So you've never had a conversation with any other employee at Intus outside of the presence of counsel about the complaint that Intus has filed against RTZ?

A.    No.

MR. WEIR:  Well, that wouldn't necessarily -- so yes or no.  It's a yes or no question.  So I didn't catch the answer.  I was just going to make sure we're not going to go beyond a yes or no answer.

THE WITNESS:  Okay.  Yeah, not that I recall.

Q.    (By Mr. Lee) As you sit here today, do you have any impressions about what Intus has alleged against RTZ?

A.    It seems like --

MR. WEIR:  Same admonitions.

Q.    (By Mr. Lee) I'm sorry.  What was your answer?

A.    Oh, that seems kind of like the same question.

Q.    Okay.  Well, let me ask you differently, Mr. Walters.  Have you read the

complaint?

A.    No.

Q.    As you sit here today, from your own personal observations, has RTZ engaged in wrongdoing?

A.    I don't know that --

MR. WEIR:  Objection, calls for a legal conclusion.  Calls for a legal conclusion and also same admonition regarding privileged communications.

COURT REPORTER:  Mr. Walters, if you can, give it a beat, just so we can get the objection, because I'm not hearing some of your answer.  If you'll let Mr. Weir go ahead and object and then answer.  Thank you so much.

THE WITNESS:  Yep.

MR. WEIR:  Sorry, Evan, I've been slow on the objections.  So you've got to --

THE WITNESS:  And I have been -- yeah.

MR. LEE:  Cindy, would you mind reading back my last question, please?

(Record read.)

Q.    (By Mr. Lee) I'm looking for your

impressions.  Based upon your work -- your day-to-day work, have you developed any impressions that RTZ has engaged in wrongful conduct?

MR. WEIR:  Same objections.  It's also vague.

Q.    (By Mr. Lee) You can answer.

A.    I -- you know, I knew -- I understood what was happening.

Q.    What does that mean?

A.    Meaning I understood that RTZ was preventing us from accessing data that our customers had authorized us to access.  I don't know anything -- I don't really know the details -- anything surrounding that. But that's what I knew.

Q.    What do you mean by "RTZ was preventing your ability to access data"?

A.    I mean, they were -- they were actively trying to prevent us from accessing that data.

Q.    Give me specifics.  How were they actively acting to prevent Intus from getting data?

A.    So not provisioning accounts,

for example.

Q.   What else?

A.   I think that's the extent of it.

Q.   What do you mean by "not provisioning accounts"?

A.   So our customers would authorize access by creating a special account that we could use to pull their data.

Q.   And if I'm understanding your testimony correctly, RTZ's unwillingness to allow Intus to have user accounts to PACECare was what you meant by not provisioning accounts?

MR. WEIR:  Objection, misstates testimony, calls for a legal conclusion, and it's vague.

Q.   (By Mr. Lee) You can answer.

A.   So you're -- sorry.  You asked -- can you repeat the question?

MR. LEE:  Sure.  Cindy, would you mind reading back the question, please?

(Record read.)

THE WITNESS:  Yes.

Q.   (By Mr. Lee) Anything else other than not provisioning accounts?

A.      Not that I recall.

Q.      You stated that up through summer 2025 you reported directly to Alex Rothberg; correct?

A.      Through summer 2025?  No, no, no, no.  That I -- I'm trying to think when -- is that 2023?  At some point, I reported to Bharath Kakarla instead.  So that -- that must have been at the -- is it end of 2023?

Q.      Okay.  So as a senior software engineer, you reported directly to Alex; correct?

A.      Right.

Q.      When you were a VP of data, at some point in time, you reported to Alex?

A.      That's right.

Q.      Okay.  Are you saying that, at a different point in time while you were a VP, you also reported to Bharath, or you stopped reporting directly to Alex and started exclusively reporting to Bharath?

A.      The latter.

Q.      Okay.  And I'm sorry.  Bharath's last name is what?

A.     Kakarla.

Q.     And what is his title?

A.     He's Senior VP of Engineering.

Q.     Is he dedicated to all things Intus in terms of products, or just PopHealth or IRIS or CareHub?

A.     He leads the entire engineering organization.

Q.     Okay.  And am I correct that you stopped reporting to Bharath once you migrated to the staff software engineer position?

A.     Sorry.  Can you -- you said I started -- yeah, sorry, can you repeat that?

Q.     Sure.  And are you just having a hard time hearing me?  Am I not coming through loudly enough, or is it my connection isn't good?

A.     No.  Sorry.  You were -- the timeline inspired a momentary reverie. Let's -- yeah.  Back to it.  Sorry about that.

Q.     So my -- I think my question was -- no, I can't remember what my question was.

MR. LEE:  Cindy, can you read my

question, please?  I don't remember it.

(Record read.)

THE WITNESS:  Well, there's some nuance there, just with how the titles transitioned, when we actually hired Chris.

Q.    (By Mr. Lee) Understood.  Okay.

A.    Yeah.  So really -- I started reporting to Chris even when my title was still VP of data and infrastructure.  It took a period -- there was a period of time before we were able to switch the title.

Q.    Understood.  Alex testified in deposition that -- and I'll use his words, that you had the most direct knowledge about the development of the automated scripts to access PACECare; is that accurate?

A.    Yes.  Yeah.  Aside from the, you know, other engineers that were working on it.

Q.    Sure.  But those were engineers that were working on it under your leadership; correct?

A.    That's right.

Q.    And so ultimately, you were the one that was accountable for developing those

EVAN WALTERS                                              JOB NO. 2462669
MARCH 16, 2026

automated scripts with team effort?

A.    Yeah.  Yes.

Q.    At a high level -- and you may have addressed some of this, so my apologies if it's a little overlapping.  At a high level, can you generally describe what your involvement was in creating an automated script that would be used to extract data from PACECare?

A.    So at the time, you know, I led the team, but I also, you know, had hands-on keyboard fairly frequently.  And the process for developing one of these automations is to direct the -- the -- our web driver to click in certain places in the browser, the same -- the same actions a human would take in order to use the website and extract the report.

So you codify those same actions that a human would take and put them into your script.

Q.    And the script then automates that process?

A.    Right.

Q.    And it allows that process to run at whatever interval the client or Intus

dictate; correct?

A.    That's right.

Q.    And so were you involved for purposes of development of this automated script in accessing PACECare in order to discern what those human steps would be?

A.    Yes, we needed to access PACECare to do that.

Q.    When is the first time that you recall accessing PACECare?

A.    It must have been 2022.  Yeah, I don't have a specific date for you.  That sounds about --

Q.    Why do you say 2022 as opposed to 2021 after you started in May?

A.    I don't -- so I don't remember developing integration in 2021.  I might be misremembering.

Q.    Okay.  Let me see if I can add a little context here.  Robbie Felton has declared that Intus had access to PACECare from June 2021 through September of 2022.

A.    Okay.

Q.    Are you aware of whether or not Intus had access to PACECare for reasons other

than developing an automated script?

A.    No.  No, definitely not.

Q.    Why do you say "definitely not"?

A.    Our access was for the sole purpose of accessing our customers' data.

Q.    Well, sure.  But --

A.    Really, what else would we do?

Q.    Well, okay.  Let me untwine that -- or unwind that a little bit.

You mentioned that access to PACECare was needed in order to develop the automated script; correct?

A.    Right.

Q.    Okay.  Are you telling me that Intus had no other reason to enter PACECare but for the development of the automated script?

A.    Right, which is to access our customers' data.

Q.    Well, the access to the customers' data is facilitated through the deployment of the automate script; right?

A.    Right.  You don't need the automated script in order to access the data.

Q.    Correct.  In other words, PACECare has a reporting functionality; right?

A.    (Witness nods head.)

Q.    Is that a "yes"?

A.    That's a yes.

Q.    Okay.  And what Intus's team -- development team for the automated script did was pull down the operations menu, click into reporting, and understand the steps to generate very specific reports that would extract very specific data that would be used to power the PopHealth analytics dashboard; correct?

A.    That's right.  That's what the scripts did.

Q.    Right.  And going back to your prior description, the human steps of processing those same reports would yield exactly the same type of data that Intus would then use to power its PopHealth data analytics dashboard; correct?

A.    That's right.  It mimics exactly what a human would do in order to pull those same reports.

Q.    Right.  And so, if I understood

EVAN WALTERS                                                    JOB NO. 2462669
MARCH 16, 2026

your prior testimony correctly, the data necessary to power the PopHealth dashboard or analytics dashboard could come from a means that didn't require Intus's access to PACECare; correct?

A.      No, because part of the application itself -- sort of the value-add of the application itself, is the frequency with which the data can be pulled.

Q.      Fair enough.  Let me ask my question a little bit differently.

If a PACECare organization opted to undergo the human steps of generating a report that contained the data necessary to power Intus's PopHealth dashboard, it could do so manually; correct?

A.      Again, the value-add is the automation itself.

Q.      I understand that that's a value-add.  My question is that that process could be used to provide Intus with the data that it needed; correct?

A.      If the company wanted to spend those resources, yes.

Q.      Okay.  And so the only difference

between those two different processes is one is automated and one is not; correct?

A.    That's right.

Q.    And so when you talk about the value-add, that's a value-add to the customer; correct?

A.    Right.

Q.    Going back to what you had talked about a little bit ago, what reason would Intus have to access PACECare, as I understand it correctly, based on your testimony, the only reason why Intus would have an interest in accessing PACECare would be to generate the automated script; correct?

MR. WEIR:  Objection, misstates his testimony.

THE WITNESS:  The only reason to access PACECare was to access the data that our customers had authorized us to access.

Q.    (By Mr. Lee) And the way that you would kind of get to that data would be to go into the reporting functionality; correct?

A.    Right.

Q.    And then from there, you would outline the steps necessary to identify which

data should be extracted for specific purposes
that Intus would then analyze; correct?

A.    Right.

Q.    And so is it fair to say that the
reporting functionality was the only area of
PACECare that Intus needed in order to achieve
that?

A.    We -- so we accessed data
through other features as well.

Q.    What other features?

A.    There was a -- I mean, they were
all reporting features.  But, you know,
you're referring to, you know, the main
reporting tab.  But there were other
reporting features, and maybe -- the
distinction may not be important because I
can't remember what -- what the other -- you
know what the other reporting feature was
called.

Q.    Well, perhaps we'll get to that.

A.    Yeah.

MR. WEIR:  David, I don't know if
this is a good time for a break.  I need a
coffee refresh.  And we've been going about an
hour.  If it's not, you know, I --

MR. LEE:  Yeah, I need maybe five more.

MR. WEIR:  Yeah.

Q.    (By Mr. Lee) Do you have an understanding as to whether or not Intus was working on the development of an automated script prior to your commencement with the company?

A.    Yes.  Yeah.

Q.    Okay.  And who would have been involved in that, to the best of your recollection?

A.    So it would have been Alex.

Q.    When you were hired by Intus, did you just simply pick up his ball and run with it, or did you, you know, start from scratch and try and develop an entirely independent process?

A.    Well, so, a portion of the integrations -- this -- you know, the method of codifying what a human will do in order to extract the -- you know, drive the browser to pull these reports, a portion of that process had already been completed.  But the larger system hadn't been built yet.

Q.    So you took what had been started and just rounded it out and completed it?

A.    Yeah.  There's --

Q.    Okay.  Do you today have any job oversight over automated scripts running on PACECare systems?

A.    No.

Q.    Who does?

A.    We no longer access PACECare systems.  And I'm -- before I put my foot in my mouth here.

Q.    I'm sorry.  Are you looking at something?

A.    Well, okay.  I won't go look.

MR. WEIR:  No, don't look stuff up.

THE WITNESS:  Yeah, okay.

MR. WEIR:  There should be nothing on your screen at all.

THE WITNESS:  Okay.  Okay.

MR. WEIR:  Just listen to those questions and answer them.  And if you don't know it without looking it up, you just tell him you don't know.

THE WITNESS:  Okay.  I don't know.

Q.      (By Mr. Lee) What were you looking at to answer that question?

A.      I was going to look at the specification of the pipeline.

Q.      And what is the specification of a pipeline?

A.      This is just the configuration that defines what it does.

Q.      When you say "the configuration that defines what it does," you're talking about the configuration of the automated script?

A.      Yeah.  I'm sorry.  I was second-guessing myself.  We are no longer accessing PACECare.

Q.      And when did, to the best of your knowledge, that access cease?

A.      I would -- I can't give you a date.

Q.      Okay.  Can you give me a year?

A.      That would have been 2025.

Q.      And what was the reason for which Intus stopped accessing PACECare?

A.      Let's see.  I'm trying to think which -- the last organization we had access

to was -- yeah, I don't remember the specifics.  But the way that we access it was no longer available to us.

Q.    What way are you describing or referencing?

A.    Using customer credentials.

Q.    And when you say "using customer credentials," are you referring to using the credentials of a PACE organization's employees' credentials?  Or are you talking about a PACE organization issuing PACECare credentials to Intus?

A.    Using a customer's -- a customer's employee's credentials.  Since RTZ was no longer allowing us to access via an account provision specifically for us, we got access to the data that our customers were authorizing us to access using one of their credentials.

Q.    Have you heard of the term within Intus, "reintegration"?

A.    Yes.

Q.    What does reintegration mean to you?

A.    In the case where we, you know,

there are a couple scenarios.  Either an organization is with a different -- they're using a different EHR, and they transition to a new one, that might require a reintegration.  Or we swap the source of data from one EHR to another.  Or it might be that the customer churned or no longer was our customer.  And then at some point, they bought our product again.  So we had to reintegrate them.

Q.    And when you say "reintegrate," you're talking about the establishment of the automated data pipeline from the EHR to the PopHealth system; correct?

A.    That's right.

Q.    So just to make this crystal clear, so, as you sit here today, is it your testimony that Intus has stopped all access to PACECare --

A.    Yes.

Q.    -- since 2025?

A.    Yes.

Q.    And your understanding is because -- or your understanding is that that occurred because RTZ no longer authorized

account credentials for access to PACECare?

A.     I don't know the specifics.  But the reason we no longer had access to the credentials was because our customer didn't give them to us.

Q.     But you still had access to data; right?

A.     Without access to the credentials, no.

Q.     Well, let me ask it differently.

A PACE organization could still undertake the human steps of extracting the data and transmitting that to Intus in order to power its PopHealth program; right?

A.     That's right.

MR. LEE:  Okay.  We're in a good place to take a break.  Five minutes?

MR. WEIR:  Why don't you give me ten if that's okay?  Let's go off the record.

MR. LEE:  Yeah.

(A short break was taken.)

Q.     (By Mr. Lee) Mr. Walters, prior to the break, we were talking about kind of the automated scripts.  And if I recall your testimony correctly, you weren't sure whether

or not the automated script was first deployed in 2021 or 2022.  I think you said that the timeframes might be a little bit blurry.  If you wanted to find out when Intus's automated script was first used, how would you find that out?

A.    I mean, I'd look at the -- the -- our version control system to see when we first put the pipeline configuration in place.

Q.    And what is a version control system?

A.    It's a tool that software engineers use to track changes to their code base over time.

Q.    Does it also track the use of those code base systems?

A.    No.  The use would have -- you know, a more direct artifact of the use of the code would have been -- would be logs, but we don't have logs for that far back.

Q.    All right.  So -- and I'll come back to that in a moment.  So if you wanted to find out when the automated script was completed and first deployed, you would go to

the version control system?

A.    Yeah.   The reason I say that now is because I know that access logs are no longer available.

Q.    Okay.   What do you mean that "access logs are no longer available"?

A.    So it's standard practice in software engineering to generate an artifact of the execution of some process that can be used by engineers to debug issues, to understand what their system is doing.   But it's also standard practice to only retain those logs for a sensible period of time.   It doesn't make sense to keep access logs from ten years ago because they won't help us debug the system now.   So really it's only relevant to keep access logs for, you know, months instead of years.

Q.    Okay.   I want to make sure I'm understanding.

What does an access log, log?

A.    It could log a variety of things.   You know, it could be -- you know, it could log just the errors, for example, if there's something that's gone wrong with the

system.  Or it could log some informational items, something -- you know, which system you're accessing, what -- you know, what the program is doing at each moment.

Q.    All right.  Why don't we migrate away from the would-haves and could-haves and get very specific about the logs that Intus had.

So the access logs that Intus created, were you involved in the development of those logs?

A.    Are you talking about the access logs that were shared with you?

Q.    Well, why don't you tell me what types of access logs Intus has, and then we can figure out whether they were shared with us.

A.    I think it'd be easier just to talk about the access logs that were shared with you.

I was involved in producing those.  And for the reasons that I've described, we don't have primary access logs any longer.  Meaning the access logs that would have been generated by the automated

system that is extracting data, we no longer have access to those.  But we were able to produce something that approximates access by looking at our storage system.  So we were able to look at which files were downloaded when, and from that, produce a record of when our system could have accessed PACECare.

Q.    All right.  I want to make sure that I'm understanding.

Intus no longer has what you term as the access logs; correct?

A.    Right.

Q.    Okay.  Are you saying that Intus has no access logs, or are you saying that the access logs that Intus has only a restricted amount of access based on time?

A.    Yeah.  Right.  It doesn't -- because we don't retain logs indefinitely, we no longer have logs that cover the period of time where we were accessing PACECare.

Q.    How -- what is the look-back period to Intus's access logs?

A.    I don't know specifically.

Q.    Are we talking -- you said that industry standard, I believe your word was, is

to purge those logs after months?

A.    I was giving -- I was trying to explain the reason for not retaining indefinitely.  Yeah, I don't have the details on how -- what the look-back window is.

Q.    Who would?

A.    I mean, I could figure it out, but I -- obviously, I'm not going to look it up right now.

Q.    Well -- and we'll get to this in time.  But you've already referenced the logs that were produced in this action that apparently you had direct involvement in generating; correct?

A.    Sorry.  Can you repeat that?

Q.    Yeah.  You -- a couple of moments ago, you said it would be easier if we just talk about the logs that were produced in this action.  Do you remember that?

A.    Yeah.  I just wanted to make sure that -- for us to get directly to the point.  But if you want to --

Q.    So I'm trying to get directly to the point.  You were involved in the development of that log that was produced in

this action; correct?

        A.      That's right.

        Q.      Okay.  And that was a log that you developed by mining the storage files in order to get an understanding as to when files may have been downloaded?

        A.      That's right.

        Q.      Okay.  I presume that, in the development of that log, you had an occasion to review the system logs that you say have been purged?

        A.      No.  No.  You're saying -- you're asking wouldn't I have needed to review the access logs to determine that I needed this alternative method?

        Q.      Well, I guess, yes.  I'll ask you your question.

        A.      The answer is, no, I didn't need to do that.

        Q.      Well, why wouldn't you just go to the access logs first as opposed to not even looking at the access logs and instead embarking on this -- what I understood was the alternate method of looking at the storage

files?

A.    And the reason for that is that the system that orchestrates access had been completely torn down and rebuilt.  So I knew for a fact that they didn't exist.

Q.    And when was that system torn down and rebuilt?

A.    That was the end of -- yeah, it must have been the beginning of 2025, end of 2024.  I don't know specifically.

Q.    Okay.  Are you aware of whether or not you were ever instructed not to have access logs purged?

A.    No.

Q.    Have you ever heard of a litigation hold?

A.    No.

Q.    A litigation hold is a directive to retain information about matters related to a pending or threatened litigation.

Have you ever been told about a litigation hold?

A.    No.

Q.    Are you the one who was responsible for the purging of the access

logs?

A.    Well, this was not a purging. This was --

Q.    Right.  Let me ask my question differently.  Were you responsible for the tear down?

MR. WEIR:  I was going to object to the question as vague.

Q.    (By Mr. Lee) I'll ask my question differently.

Were you responsible for the teardown and rebuild of the access logs that you just described a moment ago?

MR. WEIR:  Objection.  Misstates his testimony.

THE WITNESS:  I was a part of it.

Q.    (By Mr. Lee) Okay.  Who else was a part of it?

A.    We have some members of the platform team; Alex Hubitski and Stijn Asnong.

Q.    Was Intus's leadership aware of this teardown and rebuild of the access logs?

MR. WEIR:  Objection.  You keep misstating his testimony.  It's not a teardown

and rebuild of access logs.

Q.    (By Mr. Lee) I'm sorry.  I'll get clarity on that point.

Mr. Walters, a few moments ago, you just described the process of what I thought you said, tearing down and rebuilding the access logs, that it wasn't a purge, but it was a tearing down and rebuilding.  Did I hear you correctly?

A.    It is not a purge.  To clarify, it's something we did in the natural and expected course of the development of our company.  We -- you know, we hired new platform engineers whose responsibility was to improve our platform, extend it.  And, as a part of that, we transferred the system that was previously running the pipeline to this new platform.  And in doing so, you know, we lost access to the logs that were, you know, on the previous system.

And the reason that we didn't retain them was because we had no use for them.  We -- we were -- you know, their only use is for debugging.  So there was no -- it didn't make sense -- there was a period of

time where the legacy system, the old system, ran alongside the new system so we were sure that they were functioning correctly.  So we had coverage in the legacy logs so that if something went wrong, we were able to debug it.  But then we cut over to the new system, at which point, the legacy logs were no longer useful.  And so that system was removed because we don't want to pay for those resources anymore.  And that was it.

Q.    I want to get back to the simpler question I asked, which is, that process you just described, you had referred to as the tearing down and rebuilding of the access logs; correct?

MR. WEIR:  Objection, misstates his testimony.

Q.    (By Mr. Lee) You can answer.

A.    Yeah, I may have referred to it that -- but I just explained what that process was.

Q.    I understand that, and thank you.

You said that you had or Intus had no further use for that information.  My question is:  If those original logs from the

legacy system still existed, it's true, is it not, that you would be able to provide a log identifying all of the specific Intus logins to PACECare; correct?

A.    If the login system -- so, first, let me say, the login system was not built for us to construct a, you know, perfect historical record of all the external systems that we've accessed.

Q.    Mr. Walters, I just want you to answer the question that's been asked of you. Just answer it with a yes or no, and then you're free to explain, okay?

A.    Yeah.  The reason that I needed to give an explanation is that --

MR. WEIR:  So Evan, just ask him for clarification of his question if you don't understand it.  That's the best way to do it.

THE WITNESS:  Okay.  Yeah.  The question was, if the system still existed, we would have access to these access logs.

Q.    (By Mr. Lee) Yes.  And that --

A.    So I would have to qualify your question.  It would have to be something -- if the system existed, and it was behaving as

expected, we would have access to the access logs or behaving -- where behaving as expected means, it's building a historical record of our access to all external systems. And that's the qualification that I was trying to give, is that, likely that's not true. That for it to behave in a way that you need in order to provide this historical record, well, it would have to be doing something that it's not doing.

Q. Okay. I don't mean to quibble with words here. I'm not understanding your response.

My understanding is that, you didn't have access -- my understanding of your testimony is that you didn't have access to the access logs because the data didn't go back that far because of the tearing down and rebuilding process that you described. As a result, you had to go an alternate route, which was to review storage files in order to try and reconstruct information from files that had been downloaded; am I correct so far?

A. Yes, that's right.

Q. All right. So if you had the

legacy access logs and they were, to your words, acting properly, the login information by Intus into PACECare could have been gleaned from those access logs; correct?

A.    So if we had access logs, we could have -- we could have gotten the information that you wanted from them, but we didn't have access logs.

Q.    Right.  You didn't have access logs because that depository of information was essentially eliminated when you moved to the new system?

A.    Right.  It was no longer -- we only use it for debugging.  And so when we -- when we, you know, moved to our new platform, it didn't make sense to retain it.

Q.    And that move occurred in 2025?

MR. WEIR:  Objection, misstates the testimony.

THE WITNESS:  I don't remember specifically when.  I can give an approximate time, but...

Q.    (By Mr. Lee) Please give me the approximate time.

A.    It must have been before I went

on -- yes, end of 2024, beginning of 2025.

Q.    Do you know whether Intus tracks which PACE customers use PACECare versus other EHRs?  I know that you were going to look at that specifications document.  I don't know if that's tied to this.  But what would you look at in order to discern which PACE customers of Intus used PACECare versus another EHR?

A.    That information would be coming from, I guess, initially our business development team, and then customer success, you know, account managers, that kind of thing, people who are managing the relationships with the customers.  They're the ones, you know, who tell us from the outset which system we're going to be accessing.  And then eventually, you know, that configuration is put into our system. So that's one way for me to get access to it.

Q.    Okay. And I guess, just to ask a simple question, what would you access in order to determine which PACE customers use PACECare versus a different EHR?

A.    I mean, we have a number of locations where that's documented.  Maybe the

easiest would be -- you know, I think, the customer success team has an airflow table. That might be the simplest way to see who's using what.

Q.    Does the data team maintain records on that?

A.    Yes.  We have the configuration of our pipeline, which would contain that information as well.

Q.    At this point in time, mindful of your testimony that Intus no longer access PACECare, what other EHRs does Intus access for purposes of its PopHealth program?

A.    TruChart and PACELogic.

Q.    Any others?

A.    Well, we have our direct integration with Elation.  And that's it.

Q.    Is the direct integration with Elation related to the CareHub product?

A.    Yes.

Q.    So on the PopHealth side, are there any other EHRs that Intus accessed beyond TruChart and PACELogic?

A.    Not currently, no.

Q.    All right.  I'm going to introduce

an exhibit.

MR. LEE:  Oh, you know what, why don't we take a break for a moment.

MR. WEIR:  Sure.

(A short break was taken.)

(Whereupon, Defendant's Exhibit 87 was marked for identification.)

Q.      (By Mr. Lee) I've marked as Exhibit 87, a document titled IntusCare's Objections and Responses to Defendant RTZ Associates, Inc.'s Interrogatories, Set One. Do you see that?

A.      I see it.

Q.      All right.  And if you turn to page 11 of the document, it says verification, and that's your signature, correct, electronic signature?

A.      Yes.

Q.      Okay.  And this is a verification that you filled out on December 16, 2024; correct?

A.      Yes.

Q.      Okay.

MR. WEIR:  It looks like the 17th,

but I'm not sure that makes a difference.

Q.    (By Mr. Lee) Okay.  Well, the date of the verification is the 16th.  Anyways, doesn't matter.  Oh, I see what you're saying.  Sorry.  I was looking at the document.  Okay.  At the time that you executed this verification, I'm presuming that you actually had reviewed the responses?

A.    Yes, as well.

Q.    Okay.  And by signing this under penalty of perjury, you were verifying that the responses were true and correct; right?

A.    Yes.

Q.    Okay.  What I'd like to do is have you page back to No. 5, and I'll have it up on the screen here if you need it.  Page 5 has interrogatory No. 1, and it states, "Identify all login credentials Intus used to access PACECare between January 1st, 2022, and the present."  Do you see that?

A.    Okay.

Q.    And in response, Intus states that, "The following account credentials were used to access PACECare at the following Pace facilities."  Do you see that?

EVAN WALTERS                                          JOB NO. 2462669
MARCH 16, 2026

A.    I do.

Q.    Okay.  And it identifies six different facilities, Neighborhood Healthcare? Beacon of Life PACE, Senior Care PACE, Community Pace, St. Paul's PACE, and New Horizons.  Do you see that?

A.    Yes.

Q.    Okay.  Were you the person that was responsible for gathering this data?

A.    I don't recall specifically.

Q.    Were you involved in answering this particular interrogatory?

A.    I don't -- I really don't recall specifically.

Q.    Well, why don't you tell me what your involvement was generally in response to this particular interrogatory?

A.    I know that for this type of information, I would be a go-to person.  I could get -- I could get access to this, but I don't remember -- I don't remember that request specifically.

Q.    Okay.  And we talked before about your process of going through the storage files in order to see which files have been

downloaded and when?

A.    Right.

Q.    Is that the process that you would have undertaken for purposes of coming up with this information?

A.    For the -- for the credentials, no.

Q.    Okay.

A.    No.

Q.    Where -- where would you go in order to find the credential information or the username information?

A.    We have -- you know, we use -- the configurations are stored in a number of different locations, secure locations, like LastPass, for example, within our -- within our secure system that we use for the pipeline for storing credentials.  I think in this case, I would have used the latter, what was directly used for configuring the pipeline.

Q.    And what source of information would you be looking at in order to get that data or that information?

MR. WEIR:  Objection, vague.

THE WITNESS:  What I was describing was the source of information.  So I'm not -- it's unclear to me what the distinction is there.

Q.     (By Mr. Lee) Oh, fair enough.  Let me see if I understand this.

So you were saying that you would go and you would look at the actual configurations for purposes of identifying the user accounts for a particular PACE organization?

A.     Right.

Q.     Okay.  Is that -- where are those -- are these configuration logs?

A.     No, no.  That type of information you wouldn't put into a log.  You'd want it in a secure location.

Q.     Okay.  And it's -- and you're saying that this is a secured location within the Intus pipeline, I think you described it as; is that correct?

A.     Yeah, the pipeline system.  The system that's running it.

Q.     Fair -- fair enough.

And so do you have to manually

look for usernames, or are you looking at information which groups all of the usernames Intus has used for a particular PACECare system?

A.    It would all be in one location.

Q.    Are you able to generate a report that gives you that information, or do you have to manually scan the information?

A.    You would have to manually scan it.  You would use --

Q.    You would use it --

A.    For accessing -- for accessing that secure information.  You'd use that method for each of the organizations that you needed to get credentials for.

Q.    And so can you describe kind of that manual process?

A.    Yeah.  So the pipeline system that I'm describing is -- so -- made of -- we'll just talk about two components.  First, we have the system that orchestrates the pipeline.  So this is called Airflow.  And that's deployed on a container orchestration framework called Kubernetes.  Kubernetes has a way that you can store information that you

want to keep private.  And I would use a command line tool to access Kubernetes in order to pull this private information.

Q.    Were you provided instructions on which PACE organizations to get the usernames for, or did you go in and independently determine that these six organizations were the only six out there?

A.    So I don't -- again, I don't -- I don't recall this request.  I was describing how I would, if I were to receive the request again now.

Q.    Do you have a -- an estimate of the number of PACECare systems used by PACE organizations Intus accessed between 2022 and December 16th, 2024?

A.    Well, this -- this list looks about right.  I'm -- it could be -- the answer is no, I don't have a good estimate other than this list looks right.  But, yeah, I'm not sure.

Q.    How many organizations, PACE organizations contracted with Intus to provide the PopHealth service in PACECare?

A.    I'm not sure.

Q.     Was it over six?

A.     I'm not sure.

Q.     When you described at the beginning of this deposition what you perceived as RTZ's kind of wrongful conduct and not provisioning accounts, are these six entities listed in response to this interrogatory No. 1 the only organizations to whom RTZ didn't provision accounts?

MR. WEIR:  Objection, lacks Foundation.

THE WITNESS:  I'm not sure.

Q.     (By Mr. Lee) Who would know that answer?

A.     Well, we could get the definitive answer from kind of the aggregate documentation that the organization has.

Q.     What constitutes aggregate documentation?

A.     I mean, e-mails, you know, our -- our wiki system, Confluence, Jira tickets.  Since we have so many customers, it would be difficult for one person to just kind of rattle off, you know, which organizations had which properties.  I think

it would be --

Q.     If somebody at Intus wanted that information collected, would they come to you?

A.     You know, I guess if they -- if they really wanted to just know -- they wanted to get a list of customers, they would go to, you know, the people handling our billing.  They would want to see who -- who's paying their bills.  And then you would know who -- who the customers were.

Q.     Okay.  My -- my -- my question -- I guess, let me ask a little bit differently.

If somebody at Intus requested information about which PACE organizations contracted for PopHealth and used PACECare, would you -- you said we could get that by looking at the aggregated documents within the company.  Would people come to you to get that?

A.     Yeah.  I would be -- I would be one of the people they could come to, yes.

Q.     Are you aware of whether anybody at Intus has actually requested that?

A.     I -- no, I don't -- I don't recall.

Q.    Have you been specifically requested for that?

A.    No, I don't recall.

Q.    As you sit here today, do you have an understanding as to the number of PACE organizations for whom RTZ refused to provide provisioning credentials?

A.    No.  Sorry.  No.

Q.    All right.  Why don't we look at -- again, we're on page, I think, sorry, page 6.  The top -- or the first account is Neighborhood Healthcare.  Do you see that?

A.    Yes.

Q.    Okay.  It has URL: neighborhoodhealthcare.pacecare.com.  I'm assuming that is the URL that is used by the PACE organization to access its cloud account for PACECare?

A.    That's -- that's -- yes, that's what the URLs look like.

Q.    Okay.  Why would Intus retain the URL information?

A.    I mean, the way that credentials are transmitted was in, you know, a form that, you know, we have a record of, like an

e-mail.

Q.    Okay.  But -- okay.  Let me -- let me approach this differently.

For each one of these six organizations that have been listed in this response, there's a URL along with a username.  Do you see that?

A.    Yes.

Q.    Okay.  Is the URL and the username in the configuration data that you had identified or referenced before storing both the URL and the username information?

A.    That's -- that's where we would put the information, yes, along with the -- the information that needs to be kept private, yeah.

Q.    So in your searches, did you ever run a search for pacecare.com?

A.    No.

Q.    If we go down to username 5541, can you -- do you know who user 5541 is?

A.    No.  No, I don't.

Q.    I presume that's an Intus user; correct?

A.    I don't recall.

Q.    Well, the response -- or the question, if you'll recall, is, "Identify all login credentials Intus used to access PACECare between January 1st, 2022 and the present."  So if we look at the Neighborhood Healthcare username 5541, I'm presuming based upon the question and the response that that is an Intus user.  Would that be accurate?

A.    Yes.  Although we've talked -- we've talked about having used customer accounts in the past.  So I don't remember specifically whether or not this was an account provisioned for IntusCare.

Q.    In any event, it's an account that Intus would have used?

A.    Right.

Q.    Do you have an understanding as to whether or not user 5541 is one user versus multiple users?

A.    No, I don't.

Q.    So it's possible that 5541 was an account credential used by multiple people?

MR. WEIR:  Objection, calls for speculation.

THE WITNESS:  Yeah, I'm uncertain.

As far as it appears here, it is a -- you know, this is -- this account is for the sole purpose of extracting information for Neighborhood Health.  I don't have any other information there.

Q.    (By Mr. Lee) Do you know whether or not Intus had the ability to determine who user 5541 was?

A.    Can you explain what you mean by "determine who the user is"?

Q.    Yes.  If Intus used this particular username to access Neighborhood's PACECare system, did it retain any information about who as 5541 was accessing those records?

A.    So you're asking did IntusCare keep track of who was using this account?

Q.    Yes.

A.    No.  No.

Q.    So from an organizational standpoint, you would agree with me then that Intus didn't have insight into who was using the 5541 account?

A.    We -- we knew who was authorized to make use of this account.

Q.    Okay.  Then I'll get back to my

EVAN WALTERS
MARCH 16, 2026

initial question.  How would you make a determination as to who was authorized to use this account?

A.    So our customers authorize us to make use of their data, and that authorization covered access -- automated access via the pipeline, as well as individual access for the purpose of supporting consulting services.

Q.    Thank you.  I appreciate that.  My question is a little bit different.

You would agree with me that Intus doesn't know, as you sit here today, what Intus employee used 5541 user credentials; correct?

MR. WEIR:  Objection, misstates his testimony.  And he's not here as a 30(b)(6) witness.  He's here to testify in his personal capacity about what he knows.

Q.    (By Mr. Lee) You can answer.

A.    So I'm not -- so, again, I said we don't have a log of who was using it when, but we did have a method for restricting access to just those users that had been authorized to make use of the information

that they would get access to by using these credentials.

Q.      And where is the authorization list maintained at Intus?

A.      At the time, it was using LastPass.

Q.      Is that information which is available today?

A.      I'm not certain.

Q.      Why are you not certain?

MR. WEIR:  Objection, vague.

Q.      (By Mr. Lee) Well, is it because you don't know, or it's because you just haven't looked?

A.      It's because I don't know.

Q.      Was LastPass implicated at all by the tearing down and rebuilding of the access logs?

MR. WEIR:  Objection, misstates his testimony.

THE WITNESS:  No, LastPass is a separate entity.

Q.      (By Mr. Lee) All right.  If we go down to the next entry in response to interrogatory No. 1, it's Beacon of Life PACE.

Do you see that?

A.    Yes.

Q.    Okay.  And it has, again, the URL with the pacecare.com domain.  And under that it says, username: Ewalters.  Do you see that?

A.    Yes.

Q.    I presume that's referring to you?

A.    Yes.

Q.    Okay.  And so a user account was set up for you; correct?

A.    That's right.

Q.    Okay.  Do you recall whether you personally used that user account?

A.    Yes, I did.

Q.    Okay.  Did others also use that user account besides you?

A.    Yes, those who are authorized to use it.

Q.    And who was authorized to use it?

A.    I couldn't give the list of people who are authorized.

Q.    And why is that?

A.    I don't remember it.

Q.    Is it memorialized anywhere?

A.    No.

Q.    I think I know the answer to this, but I'll ask just to tie a bow on it.  Why would you be accessing Beacon Care's PACECare account?

A.    So our customer, Beacon of Life, authorized us to access it in order to pull their data.

Q.    And when you say "pull their data," you're talking about deploying the automated script that would create the automated data pipeline?

A.    That's right.

Q.    If we go down to the third one, Senior Care Partners PACE, the username is rfelton.  Do you have an understanding as to whether that refers to Robbie Felton?

A.    Yes, that refers to Robbie Felton.

Q.    Okay.  Why would Robbie Felton, to the best of your knowledge, be issued user accounts?

A.    So it was -- it was common practice for all of our customers, really, to provision access to someone, whoever the -- maybe first contact or, you know, whoever it

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

made sense for them to provision an account for.  And then that account became our access point.  And then access -- you know, access to that -- those credentials was authorized based on who needed access and who was authorized to have access.

Q.    And when you say "authorized," you mean authorized internally within Intus?

A.    Authorized by our customers.

Q.    So I want to make sure I'm understanding.  So the customers would issue a user account, in this instance, in the name of R. Felton, and then say others, in addition to R. Felton or Robbie Felton, are authorized to access our account?

A.    That's right.  Their understanding was that this account would be used by our automated pipeline, as well as anyone who needed it in order to set up this integration, or anyone else who needed access to the data, like, someone who's working for consulting services.

Q.    And the use of, in this particular instance, the R. Felton account would give the user access to the interface; correct?

A.      Yes.

MR. WEIR:  Objection, vague. What interface are you talking about?

Q.      (By Mr. Lee) The PACECare interface.  You understood that?

A.      Yes.  What I understood by "interface" was just access to the website.

Q.      Right.  And by website, I think we both mean and understand that to mean PACECare; correct?

A.      Right.  The PACECare website, yes.

Q.      And so do you have an understanding as to whether or not -- and I'll go back actually to your username for Beacon of Life PACE.  You said that you use that user account -- you would use that to access PACECare.  Would you have the same access rights as any other Beacon employee?

MR. WEIR:  Objection, lacks foundation.  Calls for speculation.

THE WITNESS:  Yeah.  I -- we -- we were given the access that we needed in order to pull the data that our customers wanted us to pull.

Q.    (By Mr. Lee) Be that as it may, in addition to the -- the access to the data that you needed, is it fair to say that you, as a user of that particular account, could navigate the entirety of PACECare?

MR. WEIR:  Objection, lacks foundation.  Calls for speculation.

THE WITNESS:  Yeah.  I'm not -- I'm not certain.  We were able to access the website.  And I know that we were able to access the features that we needed in order to get access to our customers' data.

Q.    (By Mr. Lee) Do you know whether or not you were able to access other areas beyond those that were needed just for customer data?

MR. WEIR:  Same objections.

THE WITNESS:  Yes, we were able to access other areas, but I don't know the extent --

Q.    (By Mr. Lee) Okay.

A.    -- of that access.

Q.    It's the same for each of these different PACE facilities.  So I'll just use the one that we were just looking at, the

Beacon of Life PACE.  Subsection C under the username ewalters, says, "Dates the login credential was used to access PACECare.  Please see column B of the spreadsheet labeled Appendix A served concurrently with these responses for the dates that the login credential was used to access PACECare."  I'll pull that log up in a moment -- or that Appendix A up in a moment.  But I wanted to ask this question.  That Appendix A, do I understand your prior testimony to be that you were the one that actually prepared that?

A.    If you -- if you --

MR. WEIR:  Do you want to show it to him?

THE WITNESS:  If you'll show it to me, I may be able to confirm it?

Q.    (By Mr. Lee) Sure.  I'm going to do something which I hope doesn't screw us all up here.  Bear with me.  I'm having trouble finding this.  Oh, here we go.  Okay.  Do you see that?

A.    No.

Q.    Where are we -- oh, here we go. Hold on.  Now?

A.      Yes, I see it.

Q.      Okay.

MR. WEIR:  How do I get there?
I'm sorry.

MR. LEE:  I'm just going to share
screen.

MR. WEIR:  Oh, so how are we going
to mark this?

MR. LEE:  So I asked them about
that, and the idea was that maybe what they
would do is just do a single-page copy of like
the first rows, and then we could just
reference it that way as opposed to trying to
print out 12,000.

MR. WEIR:  I was going to say, it
just creates a whole bunch of -- yeah.  All
right.  Do you want all this to be 87?
Is that where we're headed?

MR. LEE:  Uh, no.  I hadn't really
thought that far ahead.  But --

MR. WEIR:  I was just going to
say, if you're representing this was -- this
is what -- the spreadsheet was attached to
what you've marked as Exhibit 87, we can just
agree that it will all be together as it was

produced by us.

MR. LEE:  Yeah, fair enough.

Q.    And, in fact, Mr. Walters, if you look at the top of the Excel spreadsheet, you'll see a file name 2024-12-16, Appendix A to Intus Responses to Interrogatories Set One. Do you see that?

A.    I do.

Q.    Okay.  And I can represent to you that this is the Excel spreadsheet that was produced in combination with the interrogatory responses that we were just looking at as part of 87.

A.    Yes, that makes sense.

Q.    Okay.  And so what I've done, again, just for simplicity's sake, is scroll down to cell 3445.  Do you see that?

A.    Uh-huh.

Q.    Which is the first Neighborhood. And, if I am correct -- sorry.  I have a lot of paper in front of me right now.  I think that is the -- oh, I'm sorry.  That is the one that had the username of 5541.  Okay.  Did I lose you?

A.    No, I understand what you're

saying.

Q.    Okay.  So my question -- and again, I don't mean to belabor the point. Each of these -- well, sorry.  Let me back up.

Let's see if we can get an understanding of how it is that you developed Appendix A.

A.    Okay.

Q.    So why don't you tell me how you developed Appendix A?

A.    So the pipeline, the way that it's set up, kept a -- kept the data that was downloaded when it ran on disc.  So we have -- we use -- our cloud service provider is Azure, and they have a resource that allows us to stand-up storage.  And every time the pipeline runs for every organization, every instance that it runs, we would download that -- we would download the data and store it in a dated directory.

And so we were asked for -- well, actually, I'm not sure the request. But the -- I was asked to produce a log using that information so we can walk through all of the organizations and data directories and

see which data was downloaded.

Q. And those were the storage files that you made reference to before?

A. That's right.

Q. Okay. And so this is work that you did personally?

A. No, I directed this work.

Q. Okay. And you directed it to others within the data team?

A. Yes.

Q. And then they reported back up to you?

A. That's right.

Q. Did you do anything to verify their efforts?

A. I reviewed their code.

Q. What does that mean?

A. Meaning the -- the -- the code that they wrote to scrape this information from the storage system was put up for review.

Q. Okay. Who determined what data was going to be scraped?

A. I did. And through -- so the request flowed to me from Bharath. And

initially, he was asking for the type of access log that we were discussing before. I explained that we didn't have that. And -- but offered this as an alternative. And so we discussed what he might need there. You know, do you want -- for example, do you want each of the individual accesses, you know, or just a single line for each date that it was accessed. And once we had settled on what we needed, this piece of work was passed on to one of the engineers that reported to me.

Q. Okay. Let me see if I can walk through and get an understanding as to the organization of this particular appendix.

Column A, I presume, is the PACE organization associated with the username identified in response to interrogatory No. 1; is that correct?

A. That's right.

Q. Okay. Column B is the date on which an access occurred?

A. That's right.

Q. If I understand your testimony from a couple of moments ago, Bharath suggested that you could identify all of the

different specific activities within a discrete date, but you decided just to have one access per date.  Did I understand that correctly?

MR. WEIR:  Objection, misstates the testimony.

THE WITNESS:  Yeah.  It's the reverse actually.  So we produced -- you know, we produced as detailed a log as possible.

Q.    (By Mr. Lee) Okay.  And so, on a given day, for instance, if we're looking at cell 3445 to the right of Neighborhood, that date, January 4, 2022, is the same date from cell 3445 down to 3452.  Do you see that?

A.    Yes, I see that.

Q.    And so that is all of the activity that occurred when accessing Neighborhood's PACECare system on that particular day?

A.    That's right.

Q.    Okay.  And so, if we go to column C, there are certain references, for instance, Dis-enroll, ICD codes, PPT, institution, roster.  Can you tell me what column C is?

A.    Those are shorthand or code names for the type of data that was being

pulled.

Q.    Okay.  And so when you say "the type of data that was being pulled," you're talking about a specific data set that would have been retrieved by the automated script?

A.    That's right.

Q.    Column D contains some words, prod, p-r-o-d; staging.  Does prod mean production?

A.    That's right.

Q.    Okay.  And so can you tell me what column D is?

A.    D indicates the part of the system that was making the access.  So production is our production system.  So the data that's pulled in that part of the system goes to our production Population Health tool.  Staging is pre-production.  This is where we make sure the changes we're making are functioning before we promote those changes to production.

Q.    Okay.  I want to make sure that I'm understanding.

So staging is essentially the portion of the process that kind of validates

the integrity of the data before it moves into a production set?

A.    Not quite.  It's kind of like the -- this is the dress rehearsal before production, which is the main show.

Q.    So -- fair enough.  I appreciate a good analogy.  So is the staging area a standalone kind of database within Intus' system?

A.    Yes, it's a part of Intus' system, and it is identical to production in every way other than -- other than the end result.  The end result is not delivered to customers.  It's only delivered internally.

Q.    Okay.  And why is that?

A.    The -- this is a -- this is a portion of the system that's used to make sure that, when we make changes, that everything works as expected before we promote those changes to production, before we go live with those changes.

Q.    In other words, by going live, presenting them on the dashboard?

A.    Right.

Q.    Okay.  You've mentioned a couple

of times staging is the part of the process in which you may make changes or changes are made. Again, is -- is that the process of building transformation layers in order to kind of smooth out the data before it goes to production?

A.    It includes the transformation. But, again, staging is identical to production. So it includes all of the processes, all the transformations, the databases, the machines running APIs, all the way up to the dashboard itself. Even the dashboard is a part of it -- is replicated in staging.

Q.    Got it. If we go down to cell 3463, do you see that?

A.    Yep. Yes.

Q.    Under -- sorry. And I can click it here. Under column B, there's a series of number signs. Do you have an understanding of what that means?

A.    If you just take column B and make it wider, that should show the date.

Q.    Oh, Okay. Let's see.

A.    Yep.

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

Q.    There you go.  Okay.

A.    Just -- yep, a placeholder.

Q.    Understood.  Okay.  Thank you.

A.    Yep, no problem.

Q.    So is it fair to say -- again, I'm sorry, I like to wrap things up.  Is it fair to say then that the content of the data in Appendix A was sourced from the storage files that you described earlier?

A.    It was, yes.

Q.    Okay.  Was any other data outside of those storage files used to compile this particular Appendix A?

A.    No.  We -- other than we had a list of organizations that we were looking for, meaning we had -- we had a comprehensive list of all of our PACECare customers.

Q.    And you were looking for source information within the storage file for all of those?

A.    For all of our PACECare customers, we pulled that information.

Q.    Okay.  With the net result being only six PACE organizations had user accounts for Intus?

A.    I -- I am not sure.  I know that -- I know that we used a comprehensive list.

Q.    Yeah.  And I get that.  But you were involved in the preparation of the responses to the interrogatories and in the preparation of this Appendix A, and the net output from those efforts appears to be that there were six PACE organizations for whom Intus accessed PACECare with usernames; correct?

A.    I -- if you have counted them, I won't deny that.

Q.    Well, I mean, we could just go back to the interrogatory response, which identified six, which we've already looked at.  And you're not aware of any others; right?

A.    No.

Q.    Because if there were others, presumably they would be included within the response; right?

A.    Right.

Q.    And in turn, they would be identified on Appendix A?

A.    That seems to follow.

Q.    I don't remember if you've already answered this.  I'll ask it again.

Again, we're looking at the Neighborhood portion.  As you'll recall, that was the user 5541.  Is it correct to assume, based on your testimony, that all instances -- all instances of access by Intus is reflected on Appendix A for Neighborhood would have been accessed using the 5541 user account?

A.    Yes.  I don't recall having access to another account for Neighborhood.

Q.    So, in other words, all of these different entries or accesses for Neighbor (sic) would have been with the username identified in response to the interrogatory; correct?

A.    Right.

Q.    Are you aware of whether the storage file contains other information beyond the four classes of data that you put onto Appendix A?  In other words, what other types of information exists in those storage files?

A.    Just -- just the data that's extracted.

Q.    Oh, so there's no other data

besides these four columns of data in the storage files?

A.    That's right.

Q.    Okay.

MR. WEIR:  Well, I guess I'll object as vague.  I think you guys are talking past each other, but maybe I'm wrong.

Q.    (By Mr. Lee) The column C, which identifies the types of data that is extracted on a particular day and time, I guess, are you aware of whether Intus tracks which areas within PACECare users access?

A.    So you're asking for -- can you repeat the question?

Q.    Sure.  Does Intus track which areas within PACECare its users could access?

A.    No, it's not tracked.

Q.    No.  So, in other words, Intus, as an organization, to the best of your knowledge, doesn't monitor or track where its employees go within a PACECare interface?

A.    That's -- that's right. Access -- you know, access was authorized for a certain set of employees so that we could get access to the customer's data and deliver

the products that we were selling; consulting services or the Population Health analytics tool. And our employees used it to that end.

Q. Okay. Again, sorry, I just want to wrap this up. So you just said that your customers provide access for Intus employees to access PACECare. If I understood your testimony correctly, but please clarify if this is incorrect, my understanding is that the PACE organizations would authorize just globally Intus to access PACECare, and then Intus internally would determine which of its employees would do so; correct?

A. I'm not -- I can't -- I'm not certain about the "globally" portion of your question because I can't speak to the extent of how much our access was limited. I know that we -- you know, we controlled who had access based on what our customers had authorized us to do. Part of that authorization was that the company would need multiple people, including automated processes, to access PACECare.

Q. Understood.

A. That's all I could say.

Q.      Yeah.  In other words, who accessed PACECare from Intus was determined internally at Intus; correct?

MR. WEIR:  Objection, misstates his testimony and lacks foundation.

THE WITNESS:  Yeah.  It's -- I think that's kind of reducing how the decision was made that when we, you know, are working with the customer, they understand that a part of their authorization, while it won't specify particular people or processes that will access it, that we'll provide, you know, the necessary people access.  They understand that when they authorize.

Q.      (By Mr. Lee) Understood.  Understood.  Thank you.

All right.  I'm going to stop sharing this.  And I'm going to go back to 87, which was the interrogatory responses.  Do you --

A.      I've opened it up.

Q.      All right.  I want to go to page 7, which is the page that has the response to interrogatory No. 2.  Do you see that?

A.    Yes.

Q.    Okay.  So Interrogatory No. 2 states, "Identify all persons employed directly or indirectly by you who are involved in the development of the automated scripts you have produced in this action."  And then it just identifies the Intus bates numbers for those automated scripts.  We don't need to look at those.  But the response identifies you, Christopher Roy, Max Gunther, Amr, and Alexander Zheng, who I think were the folks that you had included amongst the list of data team folks; is that right?

A.    Yes.

Q.    Okay.  To the best of your knowledge, does that identify all of the folks who are involved in the development of the script?

A.    It's -- I can't recall.  It's got a good -- it's a solid chunk of them.

Q.    Understood.  Do you know who Mace Wolf is?

A.    Yes.

Q.    What was Mace Wolf's position at Intus?

A.     Yeah.  Sorry.  I left Mace Wolf -- I reported to him for a period of time.

Q.     Okay.

A.     He was a general manager, but he led the engineering department for a period of time.

Q.     Meaning he occupied the role that Bharath --

A.     Yeah, he preceded Bharath.  Yes.

Q.     Bharath.  I'm sorry.

Yeah, okay.  And you said that you reported to him for some period of time.  What period of time was that?

A.     When did we switch gears there? 2024 was -- it must of have been '23.  Yeah, 2023.  When did he go?  I don't have the specifics.

Q.     That's all right.

Would it have been -- it would have been in the period in which you were the VP?

A.     Yes.

Q.     Okay.  Do you recall whether or not you reported to him while you were a senior software engineer?

A.    I didn't, no.

Q.    Okay.  So for purposes of deduction, we can, I guess, land on the fact that when you reported to Mr. Wolf, it would have been while you were VP of data and infrastructure?

A.    That's right, yes.

Q.    Okay.  Was he involved in spearheading at all, to the best of your knowledge, the development of the automated script?

A.    No.  No.

Q.    What were his duties and responsibilities, to the best of your knowledge?

A.    He was leading the engineering department, but he was a subject matter expert in the market that we work in. I guess I don't have a good answer to that.

Q.    Okay.  That's all right.

You mentioned that he was a subject matter expert.  Did you find Mace good at his job?

MR. WEIR:  Objection, vague.

THE WITNESS:  You know, I don't

know that I can even speculate on that. Ideally, yeah.

Q.    Well, I'm not asking you to speculate.  This is a man that you worked with at Intus, you reported to him, you were colleagues.  What were your impressions of him?

A.    I liked Mace.

Q.    Was he good at his job?

A.    You know, given the right soil, I think that would have worked just fine.

Q.    What does that mean?

A.    I just think it was not the right place for him.

Q.    And why do you say that?

A.    Rubs people the wrong way.

Q.    Meaning he has a difficult personality or something else?

A.    Yeah.

Q.    I mean, you don't have to be shy about this.  You're under penalty of perjury. You can answer.

A.    Yeah, right.  I think he butted heads with some people.  I -- I -- he -- you know, I appreciated him as an engineering

manager in that he allowed me -- you know, he wasn't a micro manager.  He allowed me latitude.  But, yeah, he wasn't with us for very long.

Q.    Aside from, you know, any sort of personality, you know, obstacles that there may have been, did, from your observation, Mace have or live up to the subject matter expert name?  In other words, was this an area, you know, engineering of these types of products, something that he seemed capable of?

MR. WEIR:  Objection, vague.

THE WITNESS:  Yeah, I thought that he -- you know, he was very knowledgeable.  I mean, you know, he built companies in the past.  You know, he was smart.  I -- you know, he knew more than I knew about the space. So maybe I'm not a great -- you know...

Q.    (By Mr. Lee) No, I get it.  I think Charles probably knows more about this space than I do, but I can still form an opinion about him.

A.    Sure.  Yeah.  Yeah, I don't know -- so I thought he was -- I thought he was fine.

Q.      Understood.  No, thank you.

Do you know if Mr. Wolf had direct input to issues related to accessing PACECare?

MR. WEIR:  Objection, vague.

THE WITNESS:  Yeah, I don't know.

Q.      (By Mr. Lee) Let me ask you a little bit differently because it was a clunky question.

You said that Mr. Wolf wasn't at Intus very long.  Do you know whether or not his arrival at Intus was before or after your team had deployed the automated script?

A.      That was after.

Q.      Okay.  Do you know whether or not Mr. Wolf was at all involved in the evolution of kind of integration infrastructure for PACECare?

MR. WEIR:  Objection, vague.

THE WITNESS:  No, not at all.

MR. LEE:  Okay.  We've been going for a little bit.  Why don't we go off the record.

MR. WEIR:  Yeah, let's go off the record.

(The luncheon recess was taken.)

Q.    (By Mr. Lee) Mr. Walters, we just got back from a lunch break.  Hopefully you got something to eat there.

You understand that you're still under oath?

A.    Yes.

Q.    Okay.  Before the break, we were starting to kind of talk about the automated script -- not starting, but had discussed the automated script and kind of its development and whatnot.

And I guess my question is:  Do you have an understanding as to whether or not Intus actually developed multiple automated scripts for PACECare, or is it just a single automated script that pretty much remains the same through time?

A.    There were -- there were multiple, one for each of the types of data that we needed to extract.

Q.    Understood.

And so each script is specific to a specific report, if you will, or a specific data extract, if you will?

A.    That's right.

Q.    Okay.  Once the automated scripts for the particular data was created, would it undergo changes?

A.    Occasionally, yes.

Q.    Okay.  And what would prompt its change?

A.    A user might request access to some additional part of the report that needed to be pulled.  So you might need to change a parameter that's set in the reporting tool or whatever tool we were using to extract the data in PACECare.  Or if PACECare's interface has changed, so we would need to update it in order to, you know, where a user might have clicked in the upper right-hand corner.  Now they needed to click in the lower left-hand corner.  We would have to change our script to reflect that.

Q.    Okay.  In the last instance that you're talking about, which is a change in the user interface, how would Intus become aware of those types of interface changes?

A.    The issue would be surfaced through our pipeline orchestration system.  So the pipeline that we would monitor every

day would fail because it would no longer be -- you know, the end results, the report would no longer be in the place we expected.

Q.    And if that happened in a particular instance, what would Intus do?

A.    We would log into PACECare manually to understand the nature of the change, and then update our script.

Q.    Okay.  Do you recall that happening from time to time?

A.    Yes, occasionally.

Q.    Do you have -- it's an unfair question, but I'll ask it.  Do you have an estimate of the number of times that may have happened, you know, over the years?

A.    I -- no, I don't.

Q.    Okay.  Do you know if it was over 10, under 100?

A.    Under 100.

Q.    Okay.  And typically, would you personally be involved in logging into PACECare in order to try and ascertain what the interface change was, or is that something that you would have delegated to a team member?

A.      It was mostly delegated, but occasionally I did it myself.

Q.      Okay.  Do you know if the access log that you had referenced before would have retained those instances in which an automated script was modified to reflect an interface change?

A.      The access logs wouldn't, no.

Q.      Where would those types of changes be reflected in Intus's kind of log world?

A.      That would be in version control.  So you'd see, you know, that our extraction scripts are -- in version control and you'd see when, you'd see a new commit with the associated changes in the log there.

Q.      Would the version control logs identify what change was being made?

A.      Yeah, usually.  The engineer that worked on it would create a commit message, it's called, that is associated with the changes they're making, and that will describe what they're changing and why.

Q.      And would the version control log identify when the change was made?

A.      Yes.

Q.      You indicated that a script might change to the extent the parameters of information that a PACE customer wanted may have changed; is that correct?

A.      That's right.

Q.      Okay.  In other words, are you saying that if a PACE client decided, oh, you know what, as part of the PopHealth dashboard, I'd love to see this kind of information, is that the type of situation that you're referring to?

A.      Right.  If they needed some additional information about a particular -- related to a particular data type, and they wanted to see that in their PopHealth tool, we might have to change our scripts so that it also pulled that information.

Q.      So if a customer came to Intus with that type of request, what would Intus do?

A.      Well, we'd first need to understand whether or not the data for that -- you know, their request exists.  Most frequently, the customer would know that it exists.  And so they would, you know, point

us in the direction of it.  And then once we've found it, we'd update our scripts.

Q.    Would Intus, you know, either you or one of your team members access PACECare in order to understand the extraction method for that particular piece of data?

A.    Yes, that was necessary and the expected use.  Rather, that was the expectation of our customer.

Q.    Do you know whether Intus has developed automated scripts for other EHRs?

A.    We have, yes.

Q.    Which other EHRs?

A.    PACELogic and TruChart.

Q.    Any others beyond those two?

A.    No, no others.  We have -- we're talking about Web driving; right?

Q.    Yes.

A.    No, no others.

Q.    Does Intus have other extraction methods that it uses with other EHRs besides Web driving?

A.    Well, we talked about FHIR integrations, which we had -- you know, we had attempted to integrate with a client

before using that FTP.  So just either customers have FTPs, or we have an FTP where customers can drop data.  And there's some -- that's the extent of it.  There are other -- there are, of course, other healthcare interoperability methods, but that's what we've used.

Q.    The FTP methodology that you're referring to, when did that capability come online for Intus?

A.    2022.  That sounds about right.

Q.    Okay.  And do I understand it correctly that a customer could drop a file into FTP that would be ingested by Intus's system to populate its data analytics dashboard?

A.    That's right.

Q.    Okay.  And generally speaking, would the file types that could be dropped into an FTP include a CSV file?

A.    Yes.

Q.    A TXT file?

A.    Yeah, all variety of data formats.

Q.    So, in other words, other types of

flat files?

A.    Yes.

Q.    And what would be required of a client who opted to use this FTP delivery system?  What would they need to do?

A.    We provide them a specification for the structure of the files they're dropping in our FTP, so, you know, which columns they should have and then the type of data they should be putting in each of those columns.  And we would also have to provide them with credentials and, you know, instructions about where they should be dropping the data.

Q.    In other words, essentially a step-by-step guide on how to upload the data that they're getting into your FTP site?

A.    Yes.

Q.    Could the FTP site work for PACE organizations that utilize PACECare?

A.    Yes.

Q.    Going back to the automated scripts which we are talking about, mindful that, in certain circumstances, a script could change for the various reasons we've already

kind of gone through, how would Intus, kind of, for lack of a better word, beta test the functionality of those particular scripts, the modified scripts?

A.      So an engineer that has been authorized to use this organization's PACECare credentials would work on their, you know, development machine to test out their changes.  That's that -- they would watch the script drive the browser in real-time.

Q.      Specifically for purposes of testing and validating?

A.      Right, yeah.  You know, if -- if the way in which a person would click in to get into the report has changed, they would have to, you know, work on that locally in order to make the change.

Q.      What do you mean "work on that locally"?

A.      On their personal computer.  Of course, their IntusCare computer.

Q.      In other words, the data team member who is monitoring whether or not the modified script is working in real-time would be using their Intus-issued laptop to monitor

that?

A.     They would be -- so this is a script.  So just as the production system is a set of machines that are orchestrated to the end of extracting the data, so can their local machine perform that same -- that same task.  But when you run it locally, you have some more insight into what's going on.  You can -- you can make modifications so that you can observe what's going on.

Q.     And so really what you could do is you could tweak a script as you're kind of seeing what's happening?

A.     Right.

Q.     And I presume that that type of testing and validation process would continue until it was confirmed that the automated script as modified was doing its job?

A.     Right.

Q.     We've already talked about the necessity of accessing PACECare in order to generate and develop the automated script.  And I know that that's something that you were involved in.  Do you recall whether or not, as part of that process, you would have taken

screenshots or videos or other depictions of the PACECare interface?

A.   No, there would be no reason. So during development, when you set certain parameters for our pipeline application, you can -- you'll have a browser running locally, and you can see your scripts, this web driver clicking around in the interface.  So there's no -- there's no reason to take screenshots or video.

Q.   In other words, there was no reason because you already had access to the interface?

A.   Right.  Yeah, you have live access.  There's no reason to -- --

Q.   You --

A.   00 take a screenshot.

Q.   I'm sorry.  There's no reason to?

A.   Take a screenshot.

Q.   Are you aware of -- outside of, you know, the context of an automated script, you know, development, Intus ever taking screenshots or videos or other depictions of PACECare's interface?

A.   No.

Q.    Are you aware of whether or not Intus took screenshots, videos, or other depictions of the PACELogic interface?

A.    Yes.  Yes, there are cases that I'm aware of.

Q.    Okay.  And do you know who authorized those cases from Intus?

A.    The cases that I can remember were -- so these are recent instances where a report has failed, for example, and we need to communicate with someone on their end or someone at Collabrios in order to figure out what's going on.

So, you know, in an e-mail, we might send a picture of a an error message that we're seeing in the PACELogic interface.

Q.    Why would you need to take a screenshot if you have real-time access from a local laptop?

A.    In this case, the reason we take a screenshot is in order to communicate with someone who isn't witnessing the error.  So they're -- we have live access, and we see the error, and we understand that this is what's preventing us from downloading the

data, and we need to communicate that, you know, what's going on with someone else.  So that is more easily done if you take a screenshot.

Q.    Do you know whether Intus has taken screenshots, videos, or other depictions of EHRs other than PACELogic?

A.    You know, I can't think of any -- I can't think of any other instances. I can -- I remember this case for PACELogic, but I can't think of any -- any -- any similar situation for PACECare or TruChart.

Q.    Okay.  You mentioned that Intus had developed automated scripts for TruChart and PACELogic.  Was the development of those automated scripts generally the same process as you use to develop the PACECare automated scripts?

A.    Yes, exactly the same.

Q.    I'm going to go back to Exhibit 87, which is the interrogatory responses again, if you wouldn't mind pulling that up.

A.    Okay.  Opening it.

Q.    And Mr. Walters, I'll just direct

you to page 8.  And page 8 contains interrogatory No. 3.  Do you have that?

A.    Yes, I have it in front of me.

Q.    Okay.  I think this has probably been covered.  But it states, "For each person you identified in response to the preceding interrogatory," which was you and the other team members, "having developed the automated script, describe their specific involvement in the development of the automated scripts you have produced."  And the response is, "The individuals listed are engineers employed by Intus who contributed to the development of the automated scripts."

We've talked, you know, at some length about just kind of the development of those scripts.  Is there anything in kind of the development process we haven't discussed that would be responsive to this particular request?

A.    No.  Nothing I can think of, no.

Q.    So, in other words, you've generally described at a high level what the process of developing an automated script is, you know, earlier in the deposition?

A.     Yes.

Q.     Okay.  Thank you.  I figured, but I just wanted to make sure.

With respect to the automated script, and specifically the Population Health platform, do you have an understanding as to whether or not that platform is HIPAA compliant?

A.     The Population Health analytics tool?

Q.     Yes.

A.     Yes.

Q.     Okay.  And how do you have that understanding?

A.     Well, I've taken -- you know, I've done HIPAA trainings.  So, you know, I understand what it means.  And based on that training, I -- you know, I can see that we are doing the necessary things to make it compliant.

Q.     Okay.

MR. WEIR:  If you're -- if some of your answer would require you to disclose compliance advice you got from your lawyers,

then obviously, withhold that.  I don't know that it does, but just the admonition, be careful with that.

THE WITNESS:  Yeah.  Understood.  Yeah, my -- the extent of my knowledge is coming from the trainings that we've done.

Q.    (By Mr. Lee) And when you say trainings we've done, do you mean trainings at Intus?

A.    Yeah, that's right.

Q.    Okay.  And are those trainings provided to, you know, certain classes of employee, or is it to the general rank and file?

A.    Everyone.  Everyone takes them, as I understand it.

Q.    Okay.  And how often are those trainings offered?

A.    We -- it's quarterly.  But they are not -- yeah.  And this is -- so it is quarterly.  We have trainings quarterly.

Q.    Quarterly training on HIPAA compliance or quarterly training on a bevy of different topics?

A.    A variety of different things.

Q.    And HIPAA compliance is one of the training courses that are offered?

A.    It is, yeah.

Q.    Okay.  Does Intus, to your knowledge, have a compliance officer?

A.    Not to my knowledge.  But -- yeah, I -- we are working on our -- you know, SOC 2, so I think maybe someone is designated, but I don't know.

Q.    Who is designated, to the extent of your knowledge?

A.    It -- you know, it would have been Alex Rothberg, but it's not -- it's not an official title.  We do have people focusing on security now.

Q.    And when you say "focusing on security now," when, to your knowledge, did Intus start focusing on security?

A.    I mean, we've been focused on, you know, guaranteeing the privacy of our customers' data from day one.

Q.    Then what did you mean by "we're focusing on security now"?

A.    No, no.  We've hired someone who's dedicated to that.

Q.     And who is that?

A.     Nick Weir.

Q.     W -- I'm sorry, yeah, W-e-i-r?

A.     Yes.

Q.     Charles' son?

MR. WEIR:  No relation.

Q.     (By Mr. Lee) Who put on -- or generally organizes the quarterly trainings?

A.     I'm not sure.

Q.     Okay.  Do you have an understanding as to whether or not Intus executes business associate agreements with its clients?

A.     Oh, yes.

Q.     As part of your duties and responsibilities, do you know the contents of those BAAs?

A.     No.  No, I don't.

Q.     Okay.  Who within Intus monitors whether or not Intus's conduct is consistent with and compliant with BAAs?

A.     So it's -- you know, it's an organizational level effort.  And compliance itself is not a -- you know, it's a series of actions, not a state.  At least this is --

and we're getting into territory where my full understanding of what HIPAA compliance is will show that it's -- you know, that I don't know all the nuances.  But the -- you know, an example that might describe what I'm saying is that part of HIPAA compliance would be that when data is leaked, for example, you need to, you need to -- you need to inform the people whose data was leaked.  And you need to -- and you need to -- you know, so you need to make it known, basically.

And that's not sort of -- that's an action, not -- you know, so, yeah, to answer your question, I don't have a -- I don't know who is sort of the person who is designated as responsible.

Q.    Okay.  As part of your duties and responsibilities when you were a senior software engineer or VP of data at the time that the automated scripts were being developed and information is being uploaded into Intus's PopHealth system, were you, at an individual level, reviewing whether or not your processes with these integrations were complying with BAA terms and conditions?

MR. WEIR: Objection, calls for a legal conclusion. I think it also lacks foundation given his current -- his prior answers, but...

Q. (By Mr. Lee) You can answer.

A. So, you know, I wouldn't -- you know, I'm not reviewing contracts when I'm building a system. In a lot of ways, you can -- the principles are pretty basic. You know what I mean? It's a -- I mean, building a secure system is complicated, but, you know, you -- your aim is to keep it as -- you know, absolutely tight as possible. You exercise -- you know, you -- you use the Principle of Least Privilege. You only -- you only give people access to things that they need access to. That's --

Q. Yeah. Which -- which I get. Do you know the term "Information System Activity Review"?

A. No.

Q. Okay. Do you know the system -- or the term "Unique User Identification"?

A. Yeah. UUID?

Q. Yeah.

A.     Yes.

Q.     So how does Intus, if you know, kind of comply with the administrative and technical safeguard requirements for UII?

A.     I -- you know, the -- I think I need more details on the question --

Q.     What --

A.     -- since I --

Q.     Sorry.  Go ahead.

A.     -- Since I don't know, you know, I know what a UUID is.  They're used in all sorts of contexts, but I don't -- assuming we're still talking about HIPAA compliance and some portion of that, I don't know -- I don't know specifically what you're -- what you're talking about.

Q.     Sure.  If you were to identify somebody within Intus that you believe would have that -- that knowledge, who would it be?

A.     I'm not sure.  As I said, I don't know who the security officer is.  It would be -- I mean, well, it is Nick Weir now.  But we're talking about --

Q.     And when --

A.     -- prior, I guess.

Q.     And when was -- my apologies.  I didn't mean to step on your answer.

When was Nick Weir hired?

A.     Fairly recently.  I'm not sure of his start date.

Q.     2026?

A.     I think so, yeah.

Q.     Okay.  Can you tell me -- let's see if we can get into something that you may have more familiarity with.

Does Intus track who is logged into its PopHealth system?

A.     Yes.

Q.     Okay.  And is that information which is just retained and logged in an audit log?

A.     It's a table in the database that is tracking user sessions.

Q.     Okay.  And so that would, for instance, log every time a PACE organization wanted to access the dashboard?

A.     Yes.

Q.     Okay.  Are there other types of access that a PACE customer might have beyond simply accessing a dashboard?

A.      They're given access in -- you know, in the form of reports that analysts put together.

Q.      Are these reports that are presented on the dashboard itself?

A.      No.  They're shared within a separate channel --

Q.      Okay.

A.      -- and that sort of thing.

Q.      And this separate channel, is that a channel that is still requiring a PACE customer to log into Intus's system?

A.      No.

Q.      Is any login required to get these analysts reports, or are these just reports that can be e-mailed to a PACE customer?

A.      This is the sort of thing that would be given to them during presentation, like a consultant -- you know, a consultant would be, you know, presenting summary stats or something like that using data that's been pulled from our system.

Q.      All right.  So -- so let me -- let me try my question one more time then.

Aside from just accessing the

PopHealth dashboard, would an Intus PACE customer have any need to log into Intus's system?

A.    No.

Q.    Does Intus track which of its employees logs into the PopHealth platform?

A.    Yes.  They are issued accounts that are essentially identical to the accounts that we issue to customers.

Q.    And does the log that you just described, you know, for customer logins, contain the same Intus employee login information?

A.    Yes.

Q.    So one login for both?  I'm sorry, one log for both?

A.    Right.

Q.    Got it.  Are you aware of whether third parties outside of, you know, PACE clients have access to Intus's PopHealth platform?

A.    No, I'm not aware.  And I should say that I would be aware.

Q.    You would be aware of that fact, and, as you sit here today, you're aware that

there isn't third-party access?

A.      That's right.

Q.      Does the log that you are referring to, does that track every time a user enters the system?

A.      Yes.  By that, I mean, it tracks every time it establishes a -- a user session.  So if you -- if they were to close their browser and then open it up again and then go to IntusCare, they'd still be able to access it for a certain period of time.

Q.      Oh before -- before the --

A.      The session expired.

Q.      -- session -- all right.  Got it.

Okay.  Does Intus track the type of information that is viewed in the Intus system by a user?

A.      No.

Q.      Does it have the capability of doing so?

A.      Yes.  And we have in the past, but we no longer do it.

Q.      And why is that, if you know?

A.      Because the PopHealth Analytics tool is no longer under development.  And so

it's not -- it's not a cost we want to pay.

Q.   When you say it's no longer under development, what do you mean?

A.   Or maybe I should say, it's no longer where we want to spend our resources, and having that sort of system in place costs money.

Q.   Do I mean -- or do I understand your testimony to be that Intus, as a business, has started migrating away from the PopHealth product and devoting more energy towards a different product?

A.   Yeah, that's true.

Q.   And how do you know that to be true?

A.   Based on, I guess, the projects that I'm assigned to and, you know, the plans that we've made as a company.

Q.   And are the plans that you've made as a company to move more towards the CareHub, offering as opposed to the Population Health offering?

A.   Well, it's -- it's more than that.  But that's one of the things we were focusing on, yeah.

Q.    And so is it fair to say that, as far as you're aware, Intus is kind of de-emphasizing the Population Health offering at this point in time?

MR. WEIR:  Objection, vague.

THE WITNESS:  Yeah, we're still selling it, but, we -- yeah, really what I meant by the -- you know, not developing it, I was just giving an explanation as to why we don't track user events anymore, that it costs money to do it, you know, and we're trying to invest our money elsewhere.

Q.    (By Mr. Lee) Understood.

Do you know how Intus would detect if an unauthorized access of information or an unauthorized editing of information occurred in the PopHealth system?

A.    We -- yes.  Yes, we would.

Q.    Okay.  And what -- what would trigger an alert?

A.    I mean -- so we -- let's -- well, let's -- let's -- what -- what is a -- what does an unauthorized access look like?

Q.    You tell me.  If you have user credentials that are issued, and it's

determined that somebody has accessed a system that doesn't appear to have authorized credentials, what would Intus do?

A.   Well, if -- if they have credentials, then they -- they do have -- they are authorized to access it.

Q.   Okay.  So, for instance, if a PACE client employee decided to provide their credentials to, you know, Joe Public, and that person actually entered Intus's access -- or Intus's platform, would you view that -- would you view that as an authorized access?

MR. WEIR:  Objection.  Objection, incomplete hypothetical.

THE WITNESS:  Yeah, this is -- this is Joe --

MR. WEIR:  Let me make sure I get all the objections in there.  It's an incomplete hypothetical, calls for speculation, and lacks foundation.

Q.    (By Mr. Lee) You can answer.

A.   So if you say that -- you know, I understand the parallel you're trying to draw.  You know, we -- if -- if a customer had a third-party vendor that, you know,

needed access to our data, or effectively their data via our platform, we would 100 percent make sure that they got access to it.

So the scenario we're talking about where, you know, a customer is accessing it through, you know, their own credentials or something like that -- credentials that, you know, just based on the definition of the system, are authorized to access that data, you know, it doesn't quite, it doesn't -- it doesn't quite make sense.

Q.    (By Mr. Lee) Okay.  Well, let me see if I can put it into a form that makes more sense.

If a PACE customer employee, without authorization from it's -- their employer were to provide credentials -- their IntusCare credentials to a third party, and that person entered, would you view that as an unauthorized entry?

MR. WEIR:  Objection, lacks foundation, incomplete hypothetical, calls for speculation.

THE WITNESS:  Yeah.  I -- this

is -- you know, it's -- it's -- I guess my
follow-up would be, did they -- did this --
this -- this employee, they authorized access;
is that right?

Q.      (By Mr. Lee) They just simply gave
their credentials to a third party.

A.      Did they --

MR. WEIR:  Same objections;
incomplete hypothetical, calls for
speculation, lacks foundation.  I mean, David,
he's not -- he's not an expert.  I mean,
asking him --

MR. LEE:  Charles, you stated your
objections.  I got them.

Q.      So Mr. Walters, you can -- you can
answer.

A.      Let's -- let's get back to the
question.  What is it?

Q.      If a PACE organization's employee
provided their Intus credentials to a third
party without the knowledge of their employer
and that third party entered the credentials
to access Intus's system, would you view that
as an unauthorized access?

MR. WEIR:  Same objections.

EVAN WALTERS                                             JOB NO. 2462669
MARCH 16, 2026

THE WITNESS:  So without the -- without the knowledge of their -- their employer.  Yeah -- I -- I -- I guess that's -- that's, you know, an unexpected -- you know, they're -- they're -- they're -- they're breaking the rules on their end, meaning they're not -- they're not worried -- they're -- they're doing something that their employer expects them, you know, to not do.

But if I can follow up, since I understand that you're trying to draw a parallel here between the way in which we use --

MR. WEIR:  If he has a follow-up question, he can ask you.

THE WITNESS:  Yeah.  Yeah.

(Whereupon, Defendant's Exhibit 88 was marked for identification.)

Q.    (By Mr. Lee) All right.  Mr. Walters, I'm going to mark as the next exhibit in order 88.  Let me know when you see that.

A.    I have it open.

Q.    Okay, great.  Thank you.  I think

you can drive, right, the document?  You

can -- you can navigate?

        A.      Yes, I can.  I can scroll.  And

I'm at the top.

        Q.      Just for the record, Exhibit 88 --

sorry -- Exhibit 88 is an e-mail thread,

between Evan Walters and Yehuda Czermak, and

others at Beacon of Life dated on and around

August 16th, 2022.  The first question, sir,

is:  This is an e-mail thread that -- that you

were involved with?

        A.      Yes.

        Q.      Okay.  What I'd like you to do is

turn to page 1799.  If you look at the bottom

right corner of -- of the document, you'll see

some page numbers down there.

        A.      Oh, yeah.

        Q.      Okay.  It will say, Intus 001799.

Do you see that?

        A.      I see it.

        Q.      Okay.  Going forward, I'll just

kind of refer to those as Bates numbers.

They're just a numbering convention that has

been used in the case, okay?

        A.      Okay.

MR. WEIR:  Evan, did you want to take a look -- did you have an opportunity to look at the document?

THE WITNESS:  Quickly, yeah.  I mean, it might be good to review it.

Q.    (By Mr. Lee) Yeah.  Yeah.  Take your time.  I'll tell you that my questions are going to start at the beginning of the thread on page 1799.

A.    Okay.  That's where the thread begins?

Q.    Correct.

A.    Okay.  Yeah, I'm good to start.

Q.    Great.  So I'm looking at the e-mail that's on page 1799, which is from Lauri Wertz to Yehuda Czermak at Beacon of Life.  And it looks like you're cc'd on that; correct?

A.    I see that.

Q.    Okay.  Lauri Wertz obviously was a colleague of yours; correct?

A.    Yes.

Q.    Okay.  And was she a member of the data team, or was she outside of the data team?

A.    She was a customer success.  Or she was on -- she was on Laura's team.

Q.    Did you intersect with her in your duties and responsibilities?

A.    Yeah, as far as, you know, customer onboarding went, implementations.

Q.    So I -- this might be a little crude.  But the way that I kind of envisioned is Lauri Wertz was on the customer success side of things, and you were a little bit more on the technical side of things.  Is that -- is that fair?

A.    That's right.

Q.    Okay.  And so she would help coordinate an implementation, and then bring you in for purposes of helping to -- to actually do the technical aspect of the implementation; is that right?

A.    Right.

Q.    Okay.  Lauri writes to Ms. Czermak and says, "I would like to introduce Evan and Yehuda for purposes of the beginning of the data integration between Beacon of Life and IntusCare."  I'm assuming that her use of the term "data integration" is consistent with

what we've been talking about today, which is the deployment of the automated script to automatically extract data?

MR. WEIR:  Objection, lacks foundation.  Calls for speculation.

THE WITNESS:  Can you repeat that?

Q.    (By Mr. Lee) Yeah.  Do you have an understanding -- I mean, she's introducing you to -- to Beacon for purposes of this data integration.  You know, I just want to make sure that we're on the same page.  The data integration that's being discussed here would be Intus going into PACECare and essentially implementing the automated script that we've talked about to automatically extract the data; correct?

A.    Yes.

Q.    I just wanted to lay that, you know, framework because data integration is used elsewhere in the document, and I just wanted to make sure I understood it.  So I appreciate that.  Thank you.

If you turn to the page before this, page 1798.

A.    Okay.

Q.    You respond to Ms. Wertz's e-mail and write, "Hi, Yehuda, looking" -- you know, "Looking forward to working together.  In order to proceed with your integration, we'll need credentials for your EHR."  Can you create an account in RTZ for us?"  And so, again, this is you asking the PACE customer to provide a user account for Intus to access PACECare; correct?

A.    That's right.

Q.    Okay.  And you were asking for those credentials in order to achieve what we've already talked about, which is deploying the automated script; right?

A.    Correct.

Q.    Okay.  She, in turn, responds to you in the e-mail above and says, "Sure.  I've created an account.  Your username is Ewalters, and your password is Intuscare123."  Do you see that?

A.    Yes, I see that.

Q.    Okay.  And do you know whether the Ewalters username is something that Intus provided to her, or was that something that Beacon of Life made up on their own?

A.    I'm -- I'm not sure.  No, I'm not aware.

Q.    Okay.

A.    It's -- I could say that it's -- it's not unusual for a customer to just, based -- you know, depending on the person they're talking to, just create an account for that person.

Q.    Makes sense.  Makes sense.

Would you, on occasion, alter your username?  For instance, if one was issued to you as Ewalters, is that something that you would alter as a -- as a practice, or would you generally just leave it the way it is?

A.    I would just leave it the way it is.

Q.    Are you aware of whether other information was required of you for purposes of a PACE client creating a user account for you?  In other words, what would you need to provide to the PACE client in order to create an account for you?

A.    Nothing in this case.

Q.    So in other words, you could ask, you know, Hey, Yehuda, can you create an

account for me?  She just, as an administrator, creates a user account, has a username Ewalters, issues you a password, and you're good to go?

A.    Right.  I mean, I guess that there's sort of an implicit set of information, meaning there's a -- she knows about their -- the contracts that have been signed with IntusCare, that we're communicating with an IntusCare account.

Q.    Yeah.  Yeah.

A.    Otherwise we don't provide anything.

Q.    Got it.  Thank you.

If we go up to the top e-mail on the same page, this is from Yehuda back to you.  And she follows up and says, "Your PCO account is live, but you won't have access to anything yet.  Can you provide me a list of items you will need access to?  Once you're all set up, if you need some training on the site, please let me know, and we can set up a call."  Do you see that?

A.    Yes.

Q.    Okay.  Do you know whether or not

you took her up on her offer to have training

on the site?

A.      We -- we didn't, no.

Q.      And why wouldn't you need

training?

A.      I mean, we already knew which --

you know, which buttons to click, which

parameters to set in order to -- to download

the data that -- that our customers asked us

to access.

Q.      In other words, you and your --

your data team had enough familiarity with

PACECare to be able to navigate the user

interface to get to -- to extract files you

needed?

A.      Right.  Yeah, we didn't -- we

didn't need to be trained in order to -- to

maintain what we had already built.

Q.      Got it.  Meaning the automated

scripts?

A.      That's right.

Q.      Okay.  I do -- I do have a

question because your -- your statement

prompts a thought.

If Intus already had the automated

scripts developed, why would you need -- for purposes of integration, need to access a different PACE -- client's PACECare system? Does that make sense?

A.    Well, we -- we need access to the -- you know, the new customer's PACECare system in order to access -- access that customer's data.

Q.    So in other words, each PACECare's URL is kind of the gateway for deploying the automated script?

A.    Yeah.  Each of the -- you know, they're -- well, I don't know how RTZ system's implemented.  But are you asking why do we need new credentials?

Q.    Yeah.  So -- so for instance -- and I'm -- this is completely, you know, made up.  But let's say on day 20.

MR. WEIR:  Always a good way to start a question.

Q.    (By Mr. Lee) On day 20, you've completed your integration with Senior Care Partners and have deployed the automated script.  On day 25, Neighborhood comes to you and says, I'm interested in integrating, even

though you already have a successfully deployed automated script for Senior Care, you still need access to Neighborhood's PCO system in order to, I guess, again, deploy the automated script for that particular PACE program; correct?

A.    Right.  Yeah.  We -- we can't use just a single account.  That's not -- at least the way it looks, it's not a, you know, multi-tenant system.  So these are separate instances of -- of the software that PACECare has built.  It's running on separate servers. The data for one customer doesn't sit next to the data of another customer.  So you have to have separate user accounts, but that's -- it may just appear that way.

Q.    Got it.  Got it.  Thank you.

I can't remember, did I ask you to turn to page 1797?

A.    Not yet.

Q.    Okay.  Why don't you go ahead and do that?  And that should be the first page of the exhibit.  Do you see that?

A.    Yes.

Q.    Okay.  I want to look at your

response at the bottom of the page to Yehuda. And again, this is responding to her request that you list the items that you'll need access to, okay.

A.     Okay.

Q.     You write, "Hi, Yehuda, we need access to the reporting functionality of RTZ so all menu items that can be accessed by clicking operations, then reporting from the home page."  I think we've talked about this before, but that's the particular area within PACECare that Intus needed to access for purposes of deploying the automated script; correct?

A.     Right.  That's right.

Q.     And if I understood correctly, generally, I believe you testified before that the reporting functions area of PACECare was predominantly the only area that you needed -- or Intus needed, for purposes of identifying which data to extract; correct?

A.     That's right.

Q.     Okay.  Yehuda, in the e-mail above, responds, "Done," meaning that presumably she has granted the access to that

area.

You then follow up in the next e-mail up stating, "Hi, Yehuda, could you open up access to plan management as well?"  Do you see that?

A.    Yes.

Q.    What is plan management?

A.    I don't remember what we were using this for.  But this is an example of what I was describing earlier, that some of the other reporting functionality was not under the reporting tool.

Q.    And so, to the best of your recollection, the plan management was an ancillary area within PACECare that may have had data not existing within the function -- the reporting function?

A.    Right.

Q.    Okay.  Do you recall whether as a pattern -- you know, kind of a pattern and practice in these integrations that you would request plan management of other PACE facilities as well?

A.    You know, I don't -- I don't recall specifically.  But if -- if we needed

to access data through plan management, then yes, we probably did.

Q.   All right.  And then if we look at the top e-mail from you to Yehuda, you write, "We're able to access the necessary reporting tools in RTZ, but they're not working as expected for our account.  Instead of the usual CSV, the tool is producing an HTML file."  Do you have an understanding as to why that was happening?

A.   No.  No.  It's -- I do remember this, but I don't know why.

Q.   And it sounds to me as if Intus's preferred kind of file type is the CSV file?

A.   Yeah.  Well, I wouldn't say we have a preferred file type.  In this case, the data that we were pulling was not -- it wasn't -- it was really just a web page.  It wasn't -- what we were -- what we -- what the reporting tool was returning was not the data that it should have been returning.

Q.   You mean in this particular instance?

A.   In this particular case, yeah.

Q.   Got it.  But, I mean, as a general

matter, Intus could digest the CSV files for its data analytics platform?

A.    Yes.

Q.    Okay.  I don't mean to get too semantical here.  When you wrote, "Hi, Yehuda, we're able to access necessary reporting tools in RTZ," by "we're," you meant more than just you; correct?

A.    Yeah, I think this would be -- yes.

Q.    As you sit here today, do you have any recollection of whether you've actually logged into PACECare under a user account for somebody else?  So in other words, if a user account was created for Alex or a user account was created for Robbie or M. Yates, or whoever it may be, do you recall instances in which, you know, you may have logged into PACECare using those usernames?

A.    Not specific instances, but -- you know, this was the -- this was the expected way in which we were going to use these credentials, the expectation of our customers.  And we definitely did that because I contributed to developing parts of

the integration.

Q.    Got it.  I may have asked this, my apologies.  I just don't recall.

As you sit here today, do you have a recollection of how many different user accounts to PACECare you were issued specifically?

A.    I don't know.

Q.    Is it over five?

A.    I mean, if we -- so we've discussed -- yeah, it would be the number of PACECare organizations that were our customers at a minimum.

Q.    At a high point, do you know how many PACE customers Intus was contracted with that used PACECare?

A.    No, I don't have a number for that.

Q.    Okay.  Do you know if it's over ten?

A.    I'm not sure.

(Whereupon, Defendant's Exhibit 89 was marked for identification.)

Q.    (By Mr. Lee) All right.

Mr. Walters, I'm going to introduce the next exhibit in order, No. 89.

MR. WEIR:  We've been going over a little over an hour, David.  Is it a good time for like taking a quick five?

MR. LEE:  Can I just finish this document?  This won't take very long.

MR. WEIR:  Okay.  Works for me.

MR. LEE:  Famous last words, I know.

MR. WEIR:  No problem.

Q.    (By Mr. Lee) Mr. Walters, if you wouldn't mind reviewing this, it's pretty much a single page.  There's a little leak over onto the second page, but...

A.    Got it.  Yep, I've got it open.

MR. WEIR:  This is 89, you said, David?

MR. LEE:  89, yeah.

MR. WEIR:  All right.  Do I have to refresh to get it to pop up?

MR. LEE:  Oh, hold on.

MR. WEIR:  There it is.  I'm good.

MR. LEE:  You got it?

MR. WEIR:  Yep.

MR. LEE:  Okay.

Q.     All right.  Mr. Walters, have you gotten a chance to review it?

A.     Yeah, I'm reviewing this now. Okay.  Yeah.

Q.     All right.  For the record, Exhibit 89 is an e-mail exchange between Intus and Neighborhood Healthcare.  And it includes participants such as Marina Lomeli with Neighborhood, as well as Lauri Wertz and Evan Walters, among others from Intus.

Mr. Walters, this is an e-mail thread you've seen before?

A.     Yes.

Q.     Okay.  And in fact, you're cc'd on these communications; correct?

A.     Yes, I am.

Q.     All right.  Looking at the bottom e-mail, Ms. Wertz writes to Ms. Lomeli and states that, "Intus needs an account created with a username and password."  Do you see that?  Sorry, second paragraph in.

A.     Yes, I see that.

Q.     Okay.  And again, not to belabor the point, but this is the same type of need

that we've already discussed?

A.     Yeah, it's the typical implementation exchange.

Q.     Lauri then, in the next paragraph, says, "If this can be established by an internal staff member, that would be great, but let me know if I need to approach this differently."  Do you see that?

A.     Yes.

Q.     Okay.  Do you have an understanding as to how Intus would have approached this differently?

A.     So, you know, I remember cases where RTZ themselves needed to create -- needed to provision these accounts, that, you know, an admin at our customer couldn't create the accounts.  They didn't have that privilege.

Q.     Understood.  And in those instances, would Intus interface directly with RTZ, or would Intus drive that just through the customer?

A.     Through the customer, as I understood it.  I never -- I never communicated with RTZ directly.

Q.     Got it.  Do you recall an instance in which an administrator for a PACE organization client didn't have the ability to create a user account for that organization?

A.     Not specifically, no.

Q.     All right.  Ms. Wertz goes on to write, "Laura had mentioned a Dylan Clements and a Michael Zawadski, I'm assuming from RTZ that may be involved.  I'm copying in Evan Walters, our technology lead who manages the pipeline of data coming from RTZ into IntusCare."  Do you see that?

A.     Yes.

Q.     Is her kind of characterization of your role, the person who manages the pipeline of data accurate from your perspective?

A.     Yes.

Q.     Okay.  I think the answer is no, because I think you just said it.  I'm assuming you never actually reached out to anybody at RTZ?

A.     That's right, yeah.

Q.     As you sit here today, do you recall ever having communicated with anybody at RTZ?

A.    Yeah, I had very early on.

Q.    Okay.  And what do you recall about those communications?

A.    That was a meeting that me and Alex Rothberg were in with the CEO of RTZ.

Q.    And do you have a year that this meeting may have occurred?

A.    That was in 2021.

Q.    In 2021?

A.    Right.

Q.    Okay.  So somewhere between May and December of 2021?

A.    Yeah, I think it was in the summer.

Q.    Okay.  And what was the general purpose of that meeting?

A.    We were discussing methods for Integrating with RTZ.

Q.    Do you remember where this meeting occurred?

A.    It was a remote meeting.

Q.    And you mentioned that the CEO of RTZ was there.  Do you recall that person as Michael Zawadzki?

A.    That name sounds familiar.  I

don't remember his name specifically, but that sounds familiar.

Q.      Okay.  Do you recall whether there was anybody else from RTZ's side on this remote meeting?

A.      No, not that I recall.

Q.      This might be slightly different than the question I asked a couple of moments ago.  But what was the objective of this particular meeting, if you recall?

A.      To work with RTZ to find a way for us to integrate with them.

Q.      What was Intus's ask in this meeting?

A.      Well, we had prospective customers that were using PACECare.  You know, and we wanted them to be able to use IntusCare.  In order to do that, we needed to get access to the data that was in PACECare.

Q.      And did that lead to an ask of RTZ?

A.      There were options that were discussed.  I don't think that -- yeah, I don't know if there were real action items that came out of this.

Q.      Fair enough.  And remind me -- I'm sorry, Mr. Walters.  Who else was there from the Intus side?

A.      Just me and Alex Rothberg.

Q.      Got it.  Okay.

And do you recall anything that the RTZ side provided in that meeting?

A.      As far as -- can you clarify?

Q.      Yeah.  Yeah.  What were their discussion points to the best that you can recall?  How did they respond to Intus's ask, if you will?

A.      You know, it's been a while.  We really discussed options, like using FTP, for example.  But yeah, that's about all I can remember.

Q.      Is there anything else that you can remember about that meeting?

A.      No.

Q.      Do you recall how long that meeting lasted?

A.      Not in particular, no.

Q.      And again, because I'm a bow guy, is there anything else about this meeting that you can recall as you sit here today beyond

what you've told me?

A. I mean, other than, you know, we didn't get to -- it was a fine meeting. I think, you know, everyone under -- we -- both sides understood one another. But we didn't -- there weren't any clear action items. You know, there were no -- you know, it's not clear what was going to happen next.

Q. Got it. Okay. Let's see.

Going back to Exhibit 89, Ms. Lomeli with Neighborhood writes, "All, I just spoke with Lauri, and we discussed what was needed. Lauri Wertz, thank you for clarifying the needs. I will be creating an account for Evan and will e-mail him the credentials along with the URL shortly."

Do you recall actually obtaining the account credentials from Neighborhood?

A. Not -- not specifically.

Q. Do you have any reason to doubt that you, in fact, received them in response to this particular e-mail?

A. No. I think we -- you know, no.

MR. LEE: Charles, I know you wanted a break, so it's a good time.

MR. WEIR:  A good time.  Yeah, let's take five.

MR. LEE:  Sounds great.

MR. WEIR:  Thanks.

MR. LEE:  Okay.

(A short break was taken.)

(Whereupon, Defendant's Exhibit 90 was marked for identification.)

Q.    (By Mr. Lee) Mr. Walters, I'm going to introduce the next exhibit in order, Exhibit 90.

For the record, Exhibit 90 is an e-mail thread between Intus and CommunityPACE, participants being Malorie Marquardt, M-a-r-q-u-a-r-d-t, and Evan Walters and Lauri Wertz, among others.

And this e-mail thread is occurring on and around August 16, 2022.

A.    Okay.  I am in the document.

Q.    Great.  Essentially a two-pager. And I'm going to start my questions on page 1794.  Just tell me when you're ready.

A.    Okay.  One second.  Okay.  All set.

Q.   All right.  If we turn to page 1794 at the bottom, again, kind of a familiar playbook here.  Lauri Wertz writes to Malorie Marquardt at CommunityPACE about the IntusCare migration to RTZ, and states, "I'm sending this e-mail as an introduction to connect you with Evan Walters from our data team at IntusCare," then goes on to describe you like she has before as the person that manages the pipeline of data between PACECare and IntusCare and asks for access to RTZ for you. Do you see that?

A.   Yes.

Q.   All right.  And Ms. Marquardt, in the e-mail above, indicates that she's happy to help with the request for access, and, again, asks you to kind of define what it is that you're looking for or what kind of access you need.  And if we turn to the preceding page, page 1793, your response is at the bottom.  Do you see that?

A.   Yes.

Q.   All right.  And you write, "Hi, Malorie, please provide us with a single account as well as the domain of your RTZ

EHR."  Your request for the single account, I think you've already testified, is in service of, you know, Intus essentially having an account that its data team would use in order to access PACECare; correct?

A.    Right.

Q.    Okay.  And then you go on to articulate the reporting functionality access that you need, which is pretty consistent with what we've already looked at; right?

A.    Yes.

Q.    So, in other words, through these last couple of e-mails, is this the general process by which Intus begins its integration activities on behalf of a PACE client?

A.    Yes.

Q.    Okay.  Ms. -- I'm sorry.  Going back to page 1793, you do a follow-up a couple of weeks later stating, "I understand the go-live for RTZ is today.  Could you please send us credentials for your new EHR so there's as little downtime as possible?"  And Ms. Marquardt responds apologizing for the delayed response, and then says, "Our go-live has been pushed back to mid-September, no

confirmed date yet, as we wait for our final data extraction to be completed.  I've requested an Intus login and am awaiting word back from RTZ with that login information."

Do you recall kind of this communication flow with Community?

A.    Yeah, vaguely.

Q.    And do you recall, above and beyond just simply this e-mail thread, having discussions with Community about her notice or news to you that she had requested a login account from RTZ specifically?

A.    I mean, I don't remember this exchange in particular, but I generally remember this pushback of the go-lives.

Q.    Okay.  I got it.

Do you remember or recall why it is that Community was reaching out to Intus for a login or a user credential?

A.    Why -- are you saying why they're -- they're reaching out to RTZ; right?

MR. WEIR:  Yeah, you may have misspoke, David.

Q.    (By Mr. Lee) I'm sorry.  My

apologies.  Let me ask the question again for a clean record.

Do you have any recollection as to why it was Community was reaching out to RTZ for a PACECare login for Intus?

A.    So, I don't know all the details, but, as I was describing before, from my interactions with customers, what I understood was that, in certain cases, they didn't have administrative privileges in PACECare, and they would have to ask RTZ to provision accounts.

Q.    Okay.  As you sit here today, do you know one way or the other whether that was true in Community's circumstance?

A.    I don't.

Q.    So, as you sit here today, you don't have a clear recollection of why it was Community was approaching RTZ about a login account for you?

A.    Yeah, not -- not -- not totally clear.

Q.    Do you know ultimately whether or not you were able to get access to Community PACE's PACECare system?

A.      We did, yes.  Yeah, Community was online for a period of time.

Q.      And when you say "online," do you mean Community was utilizing the automated script you had developed?

A.      Right, we were pulling data from RTZ -- from PACECare for Community.

(Whereupon, Defendant's Exhibit 91 was marked for identification.)

Q.      (By Mr. Lee) Yeah.

All right, Mr. Walters, I'm marking what has been numbered as Exhibit 91. For the record, Exhibit 91 -- sorry, Exhibit 91 is an e-mail thread, again, with CommunityPACE involving the same individuals as Exhibit 90.  And this is an e-mail thread occurring on and around August 18, 2022.

Mr. Walters, this exhibit appears to be just another continuation of the last exhibit that we looked at.  And if you look at the e-mail at the top, you see that you are a recipient to it?

A.      Yes, I see that.

Q.      Okay.  And Ms. Marquardt writes,

"Good morning, Evan.  RTZ's rep sent this over yesterday requesting to have it completed and sent back.  She said as soon as she receives, they'll start working on building an Intus account for you.  I'll send login information as soon as I receive it."  And then if you go up to the attachment line above the e-mail body, you'll see that --

A.     I see that.

Q.     -- You'll see that there's an attachment for an NDA to access PACECare, 8/16/22.  Do you see that?

A.     I see it.

Q.     Okay.  When you received this e-mail, what did you do with that NDA?

A.     I don't recall.

Q.     Okay.  Do you recall reviewing the NDA?

A.     No.

Q.     Do you recall having any discussions within Intus about that NDA?

A.     Not in particular.

Q.     Okay.  What about generally?

A.     Generally, yes.  You know, what I understood was that RTZ was blocking our

authorized access to PACECare.  And this was,
you know, a method that they were trying to
use to do that.  But, you know, I don't know
the specifics of the NDA, its relevance, what
it means.  But that's what I knew generally
about it.

Q.    Okay.  I want to see if I
understand your answer.  When you were saying
this is an instance of RTZ blocking access,
are you referring to RTZ's request that Intus
execute an NDA to get access?

A.    Yes.  Right.  That's what I'm
saying is that our customers had authorized
us to use their data for -- you know, so that
they could make use of the PopHealth tool.
And this was something that RTZ was trying to
do to prevent us from doing that.

Q.    You mean requesting that Intus
execute an NDA to access PACECare?

A.    Right, whatever this is.  Again,
I don't -- I only understood it generally.

Q.    Okay.  Are you aware of instances
in which Intus has required third parties to
enter into an NDA?

A.    No, I'm not aware.

Q.    Are you aware of instances in which Intus has required its consent to allow somebody to access Intus's systems?

A.    Not that I'm aware of.

Q.    So those things may have happened, you just don't know if they did?

A.    That's right.  I'm not aware.

Q.    Now, the last couple of exhibits that we looked at relating to Beacons and NeighborhoodPACE in which accounts were created for you, do you know whether or not you continued to access those accounts despite having received the NDA from RTZ in August of 2022?

A.    So our integrations continued operating as expected.  We have been authorized to access the data by our customers.  You know, I don't know anything beyond that.

Again, what I understood this to be was an attempt by RTZ to block our legitimate access to the data.

Q.    Well, I want to be clear about this.  What Intus was blocked from was access to PACECare; correct?

A.    We were blocked from accessing our customers' data.

Q.    Well, you've already described that the customer could download a CSV file and transmit that CSV file to Intus for upload into the PopHealth dashboard; correct?

A.    That's true.  But, again, it's a barrier that makes the value of the Population Health analytics tool inaccessible.  Manually downloading the data is too difficult.  And then the real value of the product, in addition to the analytics functionality, is that the data can be made available at a daily frequency.  The automation is part of the value.

Q.    That's a value to the client, as you testified?

A.    Yeah, exactly.

Q.    It's not a value to Intus, because data is data.  Whether you get it via an e-mailed upload, or you get it via FTP, or you get it via automated script, the data is the same; right?

MR. WEIR:  Objection.  It's argumentative.  It misstates the evidence.

Q.    (By Mr. Lee) Okay.  You can answer.

A.    The data is not static.  We need to get the data every day for it to be valuable.

Q.    Valuable to whom?

A.    To the customer.

Q.    But you would agree that some customers would only have their dashboards refreshed once a week; right?

A.    There are some customers who only have their dashboard refreshed once per week, yes.

Q.    And so it's really up to the customer to decide what frequency they want their Intus dashboard to refresh; correct?

A.    So we understand the value of our products, and the value is largely in it being real-time, as real-time as possible.

Q.    Mr. Walters, I want you to listen to my question, okay, and answer that question.

MR. LEE:  Cindy, could you please read it back?

(Record read.)

THE WITNESS:  That is -- that's true, yes.

Q.    (By Mr. Lee) As part of your interactions with PACE customers, was this real-time value-add that you've described part of the sales pitch to entice PACE customers to your product?

MR. WEIR:  Objection, lacks Foundation.

THE WITNESS:  Yeah, I don't -- you know, I was never part of sales calls for the most part.  But, you know, I do understand that, you know, it's -- their data is more usable -- rather, the product is more useful if the data is live.

Q.    (By Mr. Lee) And if they chose, they could generally produce manual expanded exports every day if they wanted; correct?

MR. WEIR:  Objection, lacks foundation.  Incomplete hypothetical.

Q.    (By Mr. Lee) You can answer.

A.    It's -- it's not -- it's not an easy thing to do.  And the automation is a -- you know, a significant value-add.

Q.    How do you come to the conclusion

that it's not an easy thing to do to create an expanded export?

A.      I mean, it's -- it's time-consuming to -- to click through the -- the PACECare tool and select all the necessary parameters and wait for the reports to download.  It's not -- it's -- it's time-consuming and also error-prone.

Q.      Well, let me ask this:  How do you know it's time-consuming?

A.      Well, I know how long our automated system takes to run, and that does it about as fast as it possibly can be done.

Q.      Okay.  Well -- and we'll get to this.  You actually created data maps, did you not?

A.      We did.

Q.      And those data maps are essentially data extraction guidelines that provide step-by-step instructions for a PACE organization to generate the expanded export; right?

A.      That's right.

Q.      And do you have an understanding one way or the other as to whether or not a

report that is created for a specific, let's say, disenrollment dataset, once created, can simply be saved?

MR. WEIR:  Objection, vague, incomplete, hypothetical.

THE WITNESS:  It's -- it's a little bit -- yeah, I'm not totally clear on what you mean.  I mean --

Q.   (By Mr. Lee) Sure.  Let me -- let me see if I can clear it up for you.

So do you have an understanding that the PACECare product has the ability to create custom reports?

A.   Yes.

Q.   And the step-by-step instructions that Intus could provide or would provide to a PACE customer could be saved as a custom report; right?

A.   I -- you know, that's not clear to me.  Our -- our pipeline did not do that.

Q.   I'm not asking about your pipeline.  I'm saying that the PACECare product itself had the capability of saving as a custom report the very step-by-step instructions that you provided in a data map

to your PACE customers; right?

A.   Right.  I was --

MR. WEIR:  Objection, lacks foundation.  Calls for speculation.

THE WITNESS:  I was -- I was referring to the pipeline to characterize the extent of my knowledge, that I was vaguely aware of some sort of, you know, ability to save parameters for a report, but we never used it.

Q.   (By Mr. Lee) What do you mean you never used it?  You never used what?

A.   I guess what you're talking about is -- is the ability to save the parameters for the report.

Q.   Well, you wouldn't use it, because you had an automated script; right?

A.   Exactly.

Q.   Right.  But a PACE client could save it as a custom report; right?

A.   I'm not sure.  That's -- that's -- this is a -- I'm not -- I'm sort of aware of something like that, but I -- I'm not sure.

Q.   So as you sit here today, you

don't have any understanding one way or the other of whether PACECare could save the commands in your automated script as a custom report; correct?

A.     That's right.

Q.     Okay.  And you don't know one way or the other once saved as a custom report, the PACE client could simply hit generate report and create the CSV file for that very data; correct?

A.     I was not aware.

Q.     Okay.  Are you aware of whether anybody else at Intus had awareness about that feature?

A.     No, I'm not.

Q.     Upon your receipt of the NDA from Community on a foregoing basis, did you alert other perspective PACE customers to the fact that RTZ would require an NDA for purposes of setting up the integration?

A.     I didn't have contact with customers in that capacity.  Whenever -- you know, whenever it was handed off to me, it was usually just handling the technical aspects, changing credentials, kind of

working through issues that we might be seeing.

Q.    Right.  And so we've looked at the last three exhibits, sir, that have Lauri Wertz handing the introduction off to you, you requesting access to certain types of reporting functionalities within the operation click-down menu, and then requesting a user account.  My question is:  In those interactions that you would have with downstream customers, having now received this NDA, were you making the same requests of those customers?

A.    It sounds to me like the original question was, did I ever communicate to customers at the beginning of these exchanges about the NDA?

Q.    Correct.

A.    I don't -- I don't recall doing that.

Q.    Do you recall whether or not you carry on as, you know, your -- your regular integration practice, after having received the NDA of asking PACE clients for a user account for you?

A.    I -- I think that we had --
yeah, we -- we had -- there were additional
PACE integrations that we did for our
customers after this, which would have
necessitated getting credentials.  So, yes,
probably, but I don't remember specifically.

Q.    So, in other words, if I'm
understanding you correctly, the receipt of
the NDA in August of 2022 from CommunityPACE
didn't modify or alter the manner in which you
would implement the integration; correct.

A.    Right.  This -- you know, this
was what we understood to be just a way that
RTZ was trying to block our legitimate
access.  And so our customers wanted us to
have access to their data.  And so we carried
on accessing it.

Q.    Notwithstanding the fact that you
knew about RTZ's request for an NDA; right?

A.    That's -- I don't know the
specifics about an NDA.  I know that it was a
request, and that it was an attempt to block
our legitimate access.

Q.    Bear with me.  All right.  This is
going to be a little -- no, you know, I'll

just do it this way.

MR. LEE:  Charles, this might be a little odd.  I'm going to introduce what has previously been marked as Exhibit 15.

MR. WEIR:  Yeah.  Yeah.

MR. LEE:  But it wouldn't allow me to mark it --

MR. WEIR:  Oh, it's 15.

MR. LEE:  -- not mark it.  So I just marked it again as 15.

MR. WEIR:  Oh, okay, perfect.  No, that's perfect.

MR. LEE:  So sorry for that.

MR. WEIR:  Not odd all.  That's -- I thought you were going to tell me they wouldn't let you mark it as 15.

MR. LEE:  Yeah.  So it looks like it might have -- I don't know.

MR. WEIR:  Perfect.

(Whereupon, Defendant's Exhibit 15 was marked for identification.)

Q.    (By Mr. Lee) Mr. Walters, I'm showing what has been previously marked as Exhibit 15.  I know that you're not on this

e-mail.  So I just, you know, will concede that up front.  So what I want to do is actually ask you about an e-mail written from Laura -- Laura Ferrara, which is on page 2208 at the bottom.

A.    Okay.  Are we just concerned with the -- this particular e-mail?  Should I just read this?

Q.    Yeah.  We'll start there.  I don't -- I don't think I have --

MR. WEIR:  Evan, if you want to scan it to get the context, certainly take your time to do that.

Q.    (By Mr. Lee) Yeah, I think -- I mean, just for -- for context, I think my questions are largely going to be confined to Laura Ferrara's e-mail starting on 2208.

A.    Okay.

Q.    But you're free to look at as much of this as you want.

A.    Okay.  Ready to proceed.

Q.    Great.  If we look at page 2208 and Ms. Ferrara's e-mail at the bottom of the page dated September 26th, 2022, you'll see that she's writing to Mary Austin at

BoldAgePACE.  Do you see that?

A.     Yes.

Q.     And she said -- she says, "Thank you, Mary.  I appreciate the conversation with you this morning.  I'm confident that we will be able to continue setting BoldAge up for success in using IntusCare despite the current RTZ access issues."  Do you see that?

A.     Yes.

Q.     Okay.  Now, this is dated September 26th, 2022, which is roughly a month-ish from that last e-mail, which we just looked at in which you were provided a copy of the NDA.  Do you see that?  Or do you --

A.     I see the date, yes.

Q.     Okay.  Do you recall having discussions internally with anybody at Intus about the effect of RTZ's request on Intus's ability to automatically extract data from PACECare?

A.     Not in particular.

Q.     Okay.  Do you recall hearing that on September 14th, 2022, Intus received a cease and desist letter from RTZ demanding that it cease access to PACECare without

consent?

A.      So I'm -- I'm generally -- I don't know the timeline.  I am generally aware of this further attempt of RTZ to block our legitimate access to our customers' data.

Q.      Okay.  You -- you keep saying "legitimate access."  What makes access, in your view, to PACECare legitimate?

A.      I don't know when it was -- there's a piece of legislation that sort of guarantees or mandates that health information systems provide reasonable methods of accessing data.  And I guess that's -- that's where I'm basing my description of this access as -- as legitimate, meaning our customers authorized it, and they needed us to have this access so that they could make good use of their data and that -- and, yeah, that's why -- that's why it was legitimate.

Q.      Okay.  You're referring to the 21st Century Cures Act?

A.      That's right.

Q.      Have you ever read that?

A.      No.  No, I have not.

Q.      And so you don't have personal knowledge of what it does and doesn't require; correct?

A.      Yeah.  I shouldn't -- I shouldn't get into the -- the details there, but I was just giving -- giving you the reason why I'm calling it legitimate access, aside from the fact that our customers authorized it, which is, of course, a requirement of it.  But that's -- that in and of itself is enough to make it legitimate.

Q.      The fact that your clients authorized access to PACECare?

A.      To their data.

Q.      Well, again, you had access to their data by virtue of the expanded reports; correct?

A.      So access to their data in a usable form requires it to be accessed frequently, and accessing it frequently is sort of an onerous manual task.  And so reasonable access -- reasonable legitimate access here is access that's made through an automated system.

Q.      So, in your mind, the only form of

legitimate access is where a customer of yours wants automated extraction, and, in your view, once that request is made, that's a right to legitimate access?

MR. WEIR:  Objection, vague.  Do you understand the question, Evan?

THE WITNESS:  Yeah, I think it might need some clarification there.  There are two parts, I think.

Q.    (By Mr. Lee) Yeah.  That's -- that's okay.  I think I understand what you're saying.  Okay.  I want to go back to Exhibit 15.  Do you recall having any discussions with Laura Ferrara or anybody at Intus after Intus received RTZ's cease and desist letter on how Intus was going to approach data extraction?

A.    Not -- not in particular.

Q.    Okay.  How about generally?

A.    Not with Laura.  You know, any conversations would have been had with Alex Rothberg, other -- yeah, Alex Rothberg.  But I don't remember the conversation specifically.

Q.    Okay.  Can you recall anything

generally about the conversation?

A.    I mean, we -- we -- no, I don't. I really don't.

Q.    Okay.  I mean, my -- my understanding is that your entire role is occupied with ensuring that there are data integrations to allow for the transfer of data to power the PopHealth platform; right?

A.    That's right, yeah --

Q.    And now --

A.    -- that was my --

Q.    And now, as I understand your testimony in September of 2022, Intus had -- I'm sorry -- RTZ has engaged in what you've characterized as further attempts to block access to data, which, at the time, I guess my question is:  Did you view that as existential to Intus?

A.    Yeah, I don't -- I don't -- I don't remember having that thought.  I -- but I -- I -- you know, I am -- I was not, you know, part of the team that was leading the business.  You know, I was a technical leader.  So I -- you know, I can't -- I can't really comment on what the -- what the

significance of this was.

Q.     Well, if the significance was the pausing of the automated scripts that Intus was using to extract data, were you involved in any discussions about the workaround to that circumstance?

A.     Well, the -- you should be -- these are -- these were, I guess, attempts, meaning we still had access.  So the -- you know, the workarounds, I'm not totally sure what you're referring to.

Q.     Okay.  Let's -- I get that.

So let's -- let's look at Laura's e-mail.  She writes to Ms. Austin and says -- and I guess Yehuda and says, "My team member, Wenxing Li, copied on this e-mail, will reach out to you to walk through the reports that are needed from RTZ and where to find them within RTZ."  Do you see that?

A.     Yes.

Q.     Okay.  And I believe that you said Wenxing Li was a member of the data team?

A.     Yeah, I think at this point, he was reporting to Laura.  But there was -- he's reported to -- he reported to me for a

period of time.  At this point he's reporting to Laura.

Q.    Okay.  So he's not on the data team, but he's working with integrations; is that right?

A.    He's -- Laura led consulting services -- or still does, and Wenxing was a part of that.

Q.    Okay.  She goes on to state, "I have attached the data map showing the reports we access and retrieve from RTZ when we are able to connect."  Do you see that?

A.    Yes.

Q.    "Once Wenxing has helped you to identify the needed reports, we will just need to know what day each week you would like for your data to be refreshed and updated."  Do you see that?

A.    Yes.

Q.    Okay.  The data maps that she is referring to are the data maps that, I believe you testified earlier, were generated by the data team; correct?

A.    Yes, that's right.

Q.    Okay.  And those data maps are,

for lack of a better word, the data extraction guidelines telling PACE customers how to generate the various types of reports that otherwise would have been generated by the automated script?

A.   That's right.

Q.   So, in other words, as -- I liked the way that you put it before, it was the human-step process as opposed to the automated script process?

A.   Right.

Q.   Okay.  Now, these data maps presumably had been validated by Intus for purposes of being able to accurately generate the needed reports; right?

A.   That's right.

Q.   I mean, because you wouldn't send a data map to a customer that, you know, didn't work; right?

A.   Right.

Q.   Okay.  And if for whatever reason, a data map didn't pull back complete or accurate information, I believe that you said previously Intus would know that?

A.   Yes, that's right.

Q.    So Ms. Ferrara goes on to write, "As a process, when you send the reports, our data team will upload the information into IntusCare so you can see the data displayed. It will be updated and refreshed each time you send the reports.  Wenxing will provide you the e-mail address for you to send the report each week."  Do you see that?

A.    Yes.

Q.    Okay.  So this is a process which, you know, has -- has been termed or coined as the Ferrara process, because she's the one that's kind of describing it in this particular e-mail.

A.    Okay.

Q.    And my understanding is that the PACE clients using this process would take the data maps, create the reports using those data maps, generate a CSV file, e-mail that CSV file to Wenxing Li, who would then upload it into Intus's PopHealth platform; correct?

A.    Yes.

Q.    And as she noted, the data reports would identify the needed reports; correct? I'm sorry, the data maps would identify the

needed reports?

A.    Right.

Q.    Do you have an understanding as to why it is Laura Ferrara is writing this particular e-mail?

A.    So at this point, we no longer had access to PACECare.

Q.    And why does that fact implicate Laura inserting herself into an integration discussion with a client?

A.    Oh, I don't -- I was speaking to the -- the nature of the exchange, not -- not why Laura is involved.

Q.    Okay.  Yeah.  My question is more directed to, you know, why Laura is involved. My -- my understanding, and you can correct me if I'm wrong, is Laura is the chief strategy officer for Intus; correct?

A.    Right.

Q.    Okay.  And does she work on the technical side of the company?

A.    No, she's a, you know, subject matter expert in PACE.  So she works as a consultant and is a part of the leadership team.

Q.     Okay.  When you say "as a consultant," is she employed by Intus?

A.     Yes.

Q.     Okay.  So do you have an understanding as to why it is then Laura, under the circumstances here, is describing this Ferrara process to the client as opposed to, for instance, you or somebody else on your data team?

A.     No, I'm not sure.

Q.     The process that Ms. Ferrara describes, from, you know, your perspective is a process that was used by clients; correct?

A.     Yes, it was.

Q.     And once a client uses this particular process, this Ferrara process, Intus was able, through its PopHealth dashboard, to provide the analytics that a client was paying for; correct?

MR. WEIR:  Objection.  Lacks foundation, calls for speculation.

THE WITNESS:  To some extent.  So the -- the manual process is error-prone.  So the -- the automated process has a characteristic -- the feature that, if

something goes wrong during the extraction process, we know about it.  The manual process does not.  This manual human script -- of course, humans are adaptable.  But in this case, to a fault, where they may end up downloading an incorrect script or, rather, an incorrect report.

As we've talked about before, it's also very difficult for them to continually download this -- this data.  And that means it's more difficult to gain access to the -- the value of -- of IntusCare, the PopHealth tool.

Q.     (By Mr. Lee) But again, you -- you don't have personal knowledge of the amount of time that it takes them to do this; right?

A.     Well, I do from the amount of time that the pipeline takes to run.

Q.     Well, let's be specific, sir.  You don't have knowledge about the amount of time it takes for a PACE client to generate an expanded export; correct?

A.     I can, you know, make an informed estimate about how long it would take based on my experience.

Q.    Well, is that informed estimate taking into account that a PACE client would have to do a step-by-step report generation following your data map each and every time, or does it take into account the fact that that step can be resorted to a custom report that just requires a single click of a button?

A.    I mean, I'm not aware of any -- I mean, like I said, I'm vaguely aware of this ability to save parameters.  But I can't -- I can't comment on that.

Q.    Because you don't know one way or the other; right?

A.    That's true.

Q.    And your estimates based upon your experience don't account for that contingency; correct?

MR. WEIR:  Objection, lacks foundation.

THE WITNESS:  They don't. Although the -- a significant portion of time is taken up by waiting for the report to download, which the person would incur in either scenario.

Q.    (By Mr. Lee) Whether it's

automatic or whether it's manual?

A.    No, whether -- whether or not they had to enter all the parameters manually or they had some sort of saved report.  In either case, you still have to wait for the report to download, which is time-consuming in itself.

Q.    How time-consuming?

A.    I can't give you figures on that.

Q.    Well, how do you know it's time-consuming then?

A.    By just -- from -- from my, you know, recollections of how long the pipeline would take to run.  Or how long it would take during development for a report to download.

Q.    Okay.  And how long would it take in development for a report to download?

A.    A significant amount of time with respect to the amount of time that it would take to enter the parameters.

Q.    Well, sir, I don't mean to keep on rehashing this, but you're skirting what I'm looking for, which is, some definition of time.  Are we talking seconds?  Are we talking

minutes?  Are we talking hours?  Are we

talking days?

     A.    Minutes.

     Q.    What's the significant amount of

time --

     A.    Depends -- yeah, minutes, tens

of -- yeah.

     Q.    I'm sorry, tens of what?

     A.    Minutes.

     Q.    Okay.  So it could be ten minutes, or it could be multiples of ten minutes?

     A.    Right.

     Q.    Ms. Ferrara goes on to state, "As a process, when you send the reports, our data team will upload the information into IntusCare so you can see the data displayed. It will be updated and refreshed each time you send the reports."  And in the next paragraph, she writes, "We will continue on the onboarding and training schedule that has already been established.  It is our hope that we have access to RTZ again by the time you are fully onboarded.  If not, we will continue to follow the process I have outlined here." Do you see that?

A.      Yes, I see that.

Q.      Okay.  And so do you understand that to mean that the process that she has outlined could be used in lieu of access to PACECare?

A.      Yes.

MR. LEE:  Cindy, I think we're up to 92; is that right?

COURT REPORTER:  Correct, the next one is 92.

MR. LEE:  Perfect.  Thank you.

(Whereupon, Defendant's Exhibit 92 was marked for identification.)

Q.     (By Mr. Lee) All right.

Mr. Walters, I have marked what -- or I've presented what has been marked as Exhibit 92.  For the record, Exhibit 92 is an e-mail thread between Lauri Wertz and Sarah Berry of CommunityPACE, and includes Evan Walters as a cc.  This e-mail thread occurs on and around June 12th, 2023.

Mr. Walters, it looks like it's just a single page.  If you wouldn't mind taking a moment to look at page 3028.

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

A.    Okay.  Looking at it now.

Q.    Thank you.

MR. WEIR:  While he's looking, David, how are we doing on time?  We're sneaking up to 7:00 o'clock where Evan is.

MR. LEE:  Yeah, I'm -- I'm going to guess somewhere between a half an hour and 40 minutes, 45.  But we're moving along pretty quick.  So it may be -- it may be sooner than that, but I'll do my best.

MR. WEIR:  Thank you.

THE WITNESS:  Okay.

Q.    (By Mr. Lee) You're all good to go?

A.    Ready -- ready to go.

Q.    All right.  You can see at the top that you were cc'd on this thread?

A.    Yes.

Q.    Okay.  And so this is something that you would have reviewed while at work?

A.    Yeah.  I mean, I might not have read the whole chain.

Q.    Is it your typical practice not to read the entirety of e-mails you receive?

A.    I mean, most of -- I'm mostly,

you know, an internal-facing employee.  So our communications -- the most important communications are happening on Slack. E-mail, you know, is -- is -- I don't spend as much time on e-mail.  It's referenced when necessary, but I'm not going scrutinize a thread, especially one where I wasn't initially included.

Q.    Okay.  I want to ask a couple of questions about what you just said.  Do I understand correctly that Intus uses Slack as kind of a chat tool?

A.    Yes.

Q.    And is that a tool that is connected company-wide?

A.    Yes.

Q.    And do you have an understanding as to whether or not the Slack chats between members of Intus are available today?

A.    What do you mean?

Q.    If you wanted to go back and look at a Slack chat that you had in, for instance, September of 2022 --

A.    Oh, well, it -- sorry.

Q.    Let me finish my question.

A.     Yep.

Q.     -- would you be able to pull those from files?

A.     So, well, the first point, we weren't on Slack in 2022.  And second, I -- I'm not sure.  Probably.  I don't know what the retention policy of Slack is.

Q.     When did you -- when did you -- when did Intus go to Slack?

A.     I -- you know, I'm not -- I don't know specifically.

Q.     Can you give me a year?

A.     I think it must have been in 2023.  But we were using Teams as our primary internal chat tool.

Q.     So were you using Teams at the time that you arrived at Intus?

A.     Yes.  Yes.

Q.     Okay.  And so if I'm understanding you correctly, you used -- or Intus used Teams from at least the time that you arrived in May of 2021 up until sometime generally in 2023 when it moved to Slack?

A.     That's right.

Q.     Okay.  And do you have an

understanding as to whether or not you personally conducted chats using the Teams function -- or using the Teams tool?

A.     Yes, I used Teams regularly.

Q.     Okay.  And was that for all intent and purpose, kind of the -- the primary communication tool used internally at Intus?

A.     Yes.

Q.     And in 2023-ish when Slack was onboarded, would you say the same thing, that Slack is the primary communication tool used internally at Intus?

A.     Yes.

Q.     If you wanted to go back and look at a chat that you had with an employee at Intus on Slack, can you do that?

A.     Yeah, you can.

Q.     In other words, that's an available record that exists on your desktop or, you know, your user account?

A.     Yes.  I don't know how far back it goes.

Q.     And is the Slack account one in which you can have one-to-one messaging with a colleague as well as a party line?

A.      Yes.

MR. WEIR:  What did you say, a party line?

THE WITNESS:  Party line, yeah.

Q.      (By Mr. Lee) Party line.

A.      Yeah, it dates you a little bit.

Q.      It dates me a lot.

A.      Yeah.  Yeah, you can have group chats and direct messages.

Q.      And those group chats or one-to-one are all chat threads that remain available to you to go back and look at, setting aside whatever time restriction there may be?

A.      That's right, yes.

Q.      Within the context of this case, have you ever been asked to review your Slack or Teams communications for responsive materials?

A.      For this -- for this -- this case, is that what you said?

Q.      Yeah, for this lawsuit?

A.      No, I haven't.

Q.      All right.  Do you have Exhibit 92 up?

A.    Yes, I do.

Q.    Okay.  And have you gotten a chance to read it?

A.    I have.

Q.    Okay.

A.    Yeah.  And again, I -- you know, I certainly read threads.  I was just explaining that, since I wasn't initially on this thread, you know, I might avoid the context.

Q.    Fair -- fair enough.

Going to the bottom of the page, the e-mail from Lauri Wertz to Sarah Berry at CommunityPACE.  She writes, "Hi, Sarah, Hope you are doing well.  We are making good progress on reintegrating with your EMR finally."  Do you see that?

A.    Yes.

Q.    And then says, "I reached out to Melanie to ask her to share the URL that your team uses to access RTZ, but didn't realize she's out on PTO.  Can you provide the web address in her absence?"  And Ms. Berry responds in the e-mail above that and says, "Excited to hear that.  I've attached the

hyperlink.  Please let me know if you need anything else."  And below that, there's a hyperlink for PACECare online.  Do you see that?

A.    I see it.

Q.    Okay.  Do you have an understanding of what Lauri Wertz meant by "reintegrating with your EMR"?

A.    Yes.

Q.    And what does that mean?

A.    Community was originally one of our PACELogic customers.  And they migrated to PACE -- to RTZ.  So we needed to switch integrations.

Q.    Okay.  Well, I mean, we looked at an exhibit -- a prior exhibit, and I can pull it up if you need to, in which Community, as of 2022, was already on PACECare.  And you'll recall that they were the ones who the go-live had been pushed back to September 2022?

A.    Okay.  Yeah.  So -- so I --

Q.    So from 2022 to June 2023, which is the date of this particular thread, I think we can agree that Community was on PACECare; right?

A.     Yeah.  I misspoke.  This is --
while what I said was true, this -- this is a
second reintegration.

Q.     Okay.  And so what do you mean by
"a second reintegration"?

A.     Meaning, in this case, they --
they went offline for a period of time.

Q.     And when you say "they went
offline," you mean CommunityPACE, the
automated script, it was -- or being -- sorry.
Let me start over.  By going offline, what you
mean is that the automated script that
communityPACE was using for the automated
extraction had been paused and was now being
reintegrated?

A.     Right.  For a period of time, we
no longer had access to RTZ.  We --

Q.     Okay.  And that was in the wake, I
think, of the cease and desist letter back in
September of 2022, in which RTZ said, Intus,
you need to stop access to PACECare absent an
NDA; correct?

A.     Yeah.  I don't -- I don't have
the specifics on the timeline, but --

Q.     Fair enough.  Let me -- let me see

if I can break it up a little bit differently.

From 2021 through September 14th, 2022, which is when the cease and desist letter went out, my understanding of the integration process is that Intus would request user accounts directly from the PACE facility, who would then provide that to Intus; correct?

A.      Yes.

Q.      After September 14th, 2022, the cease and desist letter date, up until sometime in 2023, Intus was instructing its clients to use the Ferrara process; right?

MR. WEIR:  Objection, lacks foundation, calls for speculation.

THE WITNESS:  Yeah, the -- this -- the specifics on the timeline are -- you know, that -- I'm sure that I could, looking through e-mails, reconstruct it, and what you're describing makes sense.  And --

Q.      (By Mr. Lee) I'm building off of what I understand your testimony to be, which is, that RTZ had stopped access to PACECare for Intus, which is what necessitated what you have described as the more cumbersome human

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

script process, which I call the Ferrara process.  And at least as of June of 2023, it appears that Intus now has an alternate way to reintegrate with PACECare; correct?

A.    I don't know if this is an alternate -- this isn't an alternate way. This is the ways in which we've, you know, allowed our customers, you know, to -- or rather, the ways in which our customers have allowed us to access the data have remained the same.

Q.    Well -- well, sort of; right?  So my understanding is -- and we'll look at some of these documents here pretty quickly -- that Intus, instead of asking for account credentials from the PACE organization, would have the PACE organization key their account credentials into PACECare -- I'm sorry -- would have the PACE customers key in their login account credentials for PACECare into Intus's system; correct?

A.    So at some point, that feature was implemented, yes, meaning this is a new method that our customers could use to communicate their credentials to us.

Q.     Right.  And so do you have an understanding as to whether or not Ms. Wertz's, use of the term "reintegrating" is a reference to the process that you and I just discussed?

A.     So the reintegrations are a more general term that we had discussed previously where really it's just -- it's just an integration, but it's an integration where -- with a customer who has previously been a customer.

(Whereupon, Defendant's Exhibit 93 was marked for identification.)

Q.     (By Mr. Lee) Okay.

Let's see if we can do this a little bit differently.

All right.  Mr. Walters, I am showing you what has been marked as Exhibit 93.  Hopefully you can see that.

A.     I can.

Q.     I would apologize for the way that this is formatted, but it's your guys' doc, not mine.  But hopefully you can either blow it up or do whatever you need to do to see it?

A.    Yep, I'm zoomed in.  I can see it.

Q.    Perfect.  I am going to start my questions on page 3480.  I should say for the record, Exhibit 93 is an e-mail exchange between Intus and LifeCircles involving multiple Intus employees, including Sneha Banerjee and Evan Walters, among others and Heidi Gras and others at LifeCircles.  And this thread is dated on and around December 4th, 2023.

So, sir, if you wouldn't mind turning to page 3480.  And you can just let me know when we've gotten there.

A.    Okay.  Yeah, ready to proceed.

Q.    So on page 38 -- I'm sorry -- 3480, there's an e-mail from Sneha Banerjee to Nicole Smith of LifeCircles.  As I understand it, and based on her e-mail footer here, Ms. Banerjee was the head of business development; is that correct?

A.    That's right.

Q.    Was she somebody that was within your reporting, I'm sorry, your reporting chain?

A.    No.

Q.    Okay.  Did you work with her?

A.    Yes.

Q.    Do you have an understanding of generally at a very high level what her duties and responsibilities were?

A.    I mean, I -- not completely.  I mean, I know that she was doing business development and account management-type stuff.

Q.    Okay.  Do you know if she would -- was she generally involved in implementations?

A.    As -- she was across a bunch of different things.

Q.    Okay.  Was she more on the customer success side, technical side, or did she kind of straddle?

A.    She -- she covered a bunch of different stuff.  But, yeah, she was, I believe, client-facing, and I can't speak to all of her responsibilities.  She was definitely a part of -- if we were, you know, there are major implementations going on, she'd be part of it.

Q.    Okay.  All right.

So looking at page 3480 she asks -- or it says, rather, to Ms. Smith, "Hi, Nicole.  Hope all is well.  How is the RTZ transition going?  I wanted to connect with you on a few items ahead of that so we are all set for the IntusCare transition for LifeCircles as well.  What is the expected go-live date?"  And then below that, she says, "Can you help orient us to where you'll be documenting?"  And under that says, "Falls-data entry, and which RTZ report this will flow into?  Living situations-data entry, and which RTZ report this will flow into."  Do you have an understanding as to why it was Ms. Banerjee was asking those questions about which RTZ report falls and living situation would flow into?

A.    Yeah.  The -- we had issues with the falls data.  So the report that RTZ returned wasn't as well structured as some of the reports we pulled from PACELogic and TruChart.  And so we just needed to better understand how the data entry was being done so that we could capture this data.  An example of that type of data was the things

like the time of a fall.  PACELogic has a --
you know, there's a well-structured field
that we can use to extract that.  In RTZ, it
was -- it was just a freeform text field
where the -- whoever's doing the data entry
would just, in an unstructured way, add that
information.

Q.    So, in other words, it wasn't
specific field data that could be extracted,
it was kind of contained in a more general
field?

A.    Right.

Q.    Okay.  And what Intus was just
looking for was more clarity on perhaps how to
isolate that particular data?

A.    Yeah, that's right.  And the --
and the relating to -- to which report this
will flow into, in certain cases, data was
missing.  And so this -- you know, it's
related to our, you know, limitations on our
understanding of the RTZ of PACE there.  And
so we are kind of -- we were looking for an
understanding from our customer of where the
data they enter lands in reports so that we
can, you know -- they've given us access so

we can pull that -- you know, pull the right

data --

    Q.    Got it.

    A.    -- and we'll flow it into --

    Q.    Ms. Banerjee goes on to write, "Once you are live, you can go ahead and give us login access to kick off the integration to IntusCare."  Do you see that?

    A.    Yes.

    Q.    Okay.  And so, this is, again, an instance in which Intus is requesting login access for the integration; correct?

    A.    Right.

    Q.    Okay.  If you can turn to the preceding page -- page 3479.

    A.    Okay.  I'm there.

    Q.    Ms. Smith writes back to Ms. Banerjee and says in the bottom paragraph, if you will, "For access do you just need one global account to use, or do you need access for specific individual accounts?"  Do you see that?

    A.    Yes.

    Q.    Okay.  And then if you go to page 3477, you'll see Ms. Banerjee's response.

A.    All right.  I'm looking at it.

Q.    Okay.  And she responds, "We actually have a credential issuance section built into our platform."  Do you see that?

A.    Uh-huh, yes.

Q.    Okay.  Was the credential issuance section something that had been developed in response to RTZ's NDA request?

A.    So, you know, I'm working on denting my -- I didn't spend any time developing on the PopHealth app.

Q.    Okay.  Whether you did or not, do you have an understanding as to whether or not this particular feature, this credential issuance section was added to the PopHealth app in response to RTZ's request and requirement of an NDA?

A.    Yeah, I think it's -- it's -- it's -- this is a value-add for all of our customers.  As you've shown through some of the other e-mails, they will -- you know, there's some -- they're a little bit loose in how they are sharing credentials.  And so this is -- this is a secure way for them to share credentials.

Q.      Okay.  She's -- he goes on to write, "When you log into IntusCare, go to settings, and you will see an EHR connection info section.  You simply input your EMR login credentials there, and it will securely allow our data team to access the relevant reports for integration."  Do you see that?

A.      Yes.

Q.      Okay.  And so I read that as kind of a resumption of the automated script process that results from this set of directions; correct?

A.      Yes.

Q.      In other words, the PACE organization enters its PACECare login credentials into Intus's system to reactivate the automated data pipeline; right?

A.      That's right.  Or this -- this -- these credentials will be used by the automated process.

Q.      Got it.  And then, as she states -- Ms. Banerjee states, "Through that process, the Intus data" -- "data team can then access the relevant reports;" correct?

A.      Yes.

EVAN WALTERS                                                    JOB NO. 2462669
MARCH 16, 2026

Q.      Okay.  And is this access the same as what you had described before in the prior kind of automated script process in which the Intus data team member can go in, to the extent that there's some, you know, glitch or some modification that's needed, they can access the interface and see what's going on?

A.      Yes.

MR. WEIR:  If you understand the question, go ahead and answer it.

THE WITNESS:  What I understood the question to mean was that, we -- using the credentials that were communicating to us, using this credential issuance section, that we could still access PACECare kind of in development mode where we would use those credentials on our local machine to fix bugs, for example.

Q.      (By Mr. Lee) Right.

And -- and so my question is:  Did Intus still have that capability using this form of logging credentials?

A.      Yes.

Q.      Okay.  I'm not sure if I understood your prior testimony.  So I'll just

ask the question directly.  Were you involved in the development of this ER -- this EHR connection info section?

A.     No.

Q.     Okay.  Who was?

A.     So it would have been Alex Rothberg and, I guess, more directly, Blair Lazuca and his team.

Q.     Blair Mazuka (sic)?

A.     Lazuca.  L as in Larry.

Q.     Thank you.  And what role did Blair play or have in the company?

A.     He was an engineer manager.  He managed the application development team.

Q.     Oh, okay.  So he was -- he reported directly to Rothberg?

A.     Exactly.  Yeah.

Q.     All right.  If you go back to page 3478.

A.     Okay.

Q.     This appears to be a screenshot that Ms. Banerjee inserted in her e-mail response, which showcases the EHR connection info section.  Do you see that?

A.     Yes.

Q.    Okay.  Is this something you've seen before?

A.    Yes, I have.

Q.    In other words, you have familiarity with this feature within the Intus system; correct?

A.    I am familiar with it.

Q.    Okay.  I want to look at certain aspects of this using -- or if we look under the EHR connection info, there's a section there for username.  Do you see that?

A.    Yes.

Q.    And then there's a field there for password.  Do you see that?

A.    Yes.

Q.    Do I understand correctly that those are the areas in which the PACE client would key in their PACE -- their PACECare credentials?

A.    Yes.

Q.    Okay.  All right.

And then to the right of the EHR connection info section, it has account info. Do you see that?

A.    Yes.

Q.      And under that heading, there's a field for access and a field for status.  Do you see that?

A.      Yes.

Q.      Is the access field a field in which the manner or type of access could be defined?

A.      This -- no.  This -- this is just a readout of what's in the database. They can't set their access level.

Q.      Okay.  So in this particular instance on this particular page under access, where it says admin, do you have an understanding that that would be administrator access?

A.      Yes.

Q.      And so, if in this particular instance, administrator access is provided with these particular login credentials, Intus's data team would have the same access rights as an administrator; correct?

MR. WEIR:  Objection, lacks foundation.  Vague.

THE WITNESS:  Yeah, I -- I'm not -- so maybe I can clarify something.

These -- those are unrelated things.  The account info and --

Q.    (By Mr. Lee) I'm sorry.  How are they unrelated?

A.    The -- the -- what I mean is that the -- the access level has no bearing on the use of the credentials that are being entered there.

Q.    What is the purpose for presenting under account info the type of access?

A.    That sort of thing, just like the application version is useful for customer success to communicate with -- communicate with engineering and customers about what's going on with their application because they might have a -- they might have a question about should I -- you know, shouldn't I have access to this thing?  And then customer success would direct them to their personal settings page and say, what -- you know, what does your account info say?  And that helps them explain the behavior of their app.

Q.    Got it.  Okay.  So that's just data that allows Intus to troubleshoot a

request by a PACE customer?

A.    Right.

Q.    Okay.

MR. WEIR:  How are we doing, David?  We've been going about an hour and 20.

MR. LEE:  Yeah.  Let me just finish up this doc.

MR. WEIR:  Yeah, no problem.

MR. LEE:  I mean, I'm not done, but we're close.

Q.    All right, sir.  If you could turn to page 3745 -- 3475.

A.    Okay.

Q.    This is the e-mail thread continuing where Ms. Banerjee left off, you know, showing the EMR -- or the EHR info connection portion.

Ms. Banerjee is informed that Nicole no longer works with LifeCircles and states that Nicole's absence or departure has been added to the IntusCare account and says, "You should be able to add your EMR credentials into the settings PACE now."  Do you see that?

A.    Yes.

Q.    Okay.  And then Ms. Banerjee ends up following up and states, "Let me know if you have any issues adding your EMR credentials in the settings screen of IntusCare.  We'd love to complete your RTZ integration ahead of the holidays."  And then if you turn to the page before, page 3474, you'll see at the bottom e-mail from Heidi Gras to Ms. Banerjee, she states --

A.    I see it.

Q.    -- she states, "Just wanting to confirm how to use this.  We should set up an IntusCare user in PCO.  Then put that username and password into EHR connection info.  If that is true, any preference for the username."  Do you see that?

A.    Yes.

Q.    Okay.  And then Ms. Banerjee writes back, "Hi, Heidi, Yep.  You got that right.  Feel free to let me know over e-mail that access has been provisioned.  Provision access for Evan Walters cc'd here at an audit level of access."  Do you see that?

A.    Yes.

Q.    Okay.  So my understanding is

that Intus was requesting of LifeCircles, two things; one, a provision account in your name; and second, a provision account at a certain level of access.  Do you see that?

A.    Yes.

Q.    And so am I correct that Intus could make the determination of what level of access to PACECare it needed?

A.    Can you clarify that?

Q.    Yeah.  Ms. Banerjee is saying, Hey, we need an account for Evan Walters in Evan Walters' name, and we want it at an audit level of access.  And so my question is: Intus was able to make the request for what level of access it deemed appropriate for PACECare; correct?

A.    Yeah.  I don't know -- I don't know -- you know, I don't know the specifics around what -- what she means by audit level. You know, this is not -- this is not a -- this is, as far as I know, not a technical term for PACECare or even any of the other EHRs we had integrations with.  I can't -- I -- I know that her aim here is for us to get access to the reporting features that

we -- that we need so that we can -- so we can pull the -- pull this data and use it for -- for PopHealth.  That's -- and that's essentially all I can say.

Q.     Okay.  But the process that Ms. Banerjee is describing is accurate; correct?

A.     Yes, we're requesting that they communicate credentials to us.  They've authorized us to use those credentials to access their data.  This -- this is -- this is the standard process now making use of the -- the new credential issuance feature.

(Whereupon, Defendant's Exhibit 94 was marked for identification.)

Q.     All right.  All right.

Mr. Walters, I'm going to show you what has been marked as Exhibit 94.  And just so that you're aware, this is a continuation from the last e-mail thread.

A.     Okay.

Q.     And if you look at the first page up at the e-mail line, the to-from, you'll see that you're cc'd on this; correct?

A.      I see that.

Q.      Okay.  And if you go down to the e-mail at the bottom of page one of this exhibit, you'll see that that's the last Banerjee e-mail that we just discussed in the last exhibit.  Do you see that?

A.      I see it.

Q.      Okay.  And so this appears to be a follow-up from Heidi Gras to you and Ms. Banerjee.  And she states, "Sorry for the delay on this.  In reviewing our contract with RTZ, it seems we aren't able to produce" -- I'm sorry -- "to provide Intus with direct access to our system.  They indicated that through lawyer discussions between RTZ and Intus, that it was agreed that Intus could be provided standard files from the expanded export to populate our data.  I'm happy to arrange that export for you guys.  Do you have a template or process set up for this already?"  Do you see that?

A.      Yes, I see that.

Q.      Okay.  And so did you understand that LifeCircles was reporting back to Intus that, okay, we can't give you direct access in

the manner that you requested, but we -- what we can do is provide you the manually-generated expanded exports to help populate our system?

A.      Yes.  What I understand is that they're saying that RTZ is blocking access to PACECare.  And they -- I don't know who at this point had communicated this alternate method.  But they are referencing the -- the manual method that we discussed previously.

Q.      The Ferrara process?

A.      The Ferrara process, yes.

MR. WEIR:  Just out of -- where did that phrase come from?  Is that one that you -- I haven't been at all the depos.  Is that a David Lee original?

MR. LEE:  It is.

MR. WEIR:  Okay.

MR. LEE:  It just makes it simple because it's her process, at least as she described it.  And so it's just easy to benchmark.

Q.      All right.  All right, Mr. Walters, I'm going to show you what has been marked as Exhibit 95.  And again, this is

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

a continuation of the same e-mail thread. Ms. Banerjee responds back to Heidi Gras's last e-mail, which we just looked at in Exhibit 94.  Do you see that?

A.      On the first page?

(Whereupon, Defendant's Exhibit 95 was marked for identification.)

Q.      (By Mr. Lee) Yeah.

A.      I see it.

Q.      Okay.

So you understand that this is just a continuation of the conversation from Exhibit 94; correct?

A.      Yes, I can see where it picks up.

Q.      And again, this is an e-mail that you were cc'd on; right?

A.      I see that.

Q.      Okay.  Ms. Banerjee writes, "Hi, Heidi.  Hope you are well.  Hope your January is off to a great start.  Our team had an opportunity to connect with Luke and Sara to discuss further this morning on our RTZ integration pathway with LifeCircles.  We

would love to work with you to arrange the daily export -- I'm sorry, the daily file export as an interim solution until we can resume the automated integration. I've included our RTZ data map that showcases the standard reports that our system downloads to populate IntusCare." Do you see that?

A. I see that.

Q. Okay. And so do I understand correctly that Ms. Banerjee was providing the data map that Intus's data team had created for PACECare to facilitate the daily exports needed to power the PopHealth dashboard?

A. Yes, that's what she's referencing.

Q. So, in other words, Ms. Banerjee is giving LifeCircles the instructions on how to implement the Ferrara process?

MR. WEIR: Well, I'm going to object to this "Ferrara process" term, since it's not a real term, and I don't know what you're talking about. I should have objected to that earlier. But if you understand what he's talking about, Evan, go ahead.

THE WITNESS: Yeah. I mean, I've

been referring to it as the manual process.
But I understand.  Can you repeat the
question?

MR. LEE:  Yeah.  Cindy, would you
mind repeating the question?

(Record read.)

THE WITNESS:  Yes, that's what
she's doing.

MR. WEIR:  Yeah.  Same objection,
given that there is no Ferrara process.

MR. LEE:  Why don't we take a ten-
minute break here?  I just want to run through
my notes.  Mr. Walters, we're right near the
end here.  So we can go off the record.

(A short break was taken.)

(Whereupon, Defendant's
Exhibit 96 was marked for
identification.)

Q.    (By Mr. Lee) All right.

Mr. Walters, I'm going to
introduce the next exhibit in order, No. 96.
All right.  Hopefully you can see that.

A.    Yep, all set.

Q.    All right.  It's a single-page
e-mail.  For the record, Exhibit 96 is an

e-mail sent from Evan Walters to katiesmith@mybrio.org, Subject Line, IntusCare SFTP integration instructions, dated June 11, 2024.

Mr. Walters, this is an e-mail that you wrote; correct?

A.    Yes.

Q.    And Katie Smith is a representative of Brio?

A.    Yes, I can see that works at Brio.

Q.    Okay.  You write, "Hi, Katie, In order for us to automate the process of pulling the data that you're loading to our FTP into our database, we need this data to adhere to a particular form."  And you go on to say, "I've attached a PDF with extraction instructions for each of the reports that we require."  And then you provide a list of the expected file and directory structure.  Do you see that?

A.    Yes.

Q.    I want to make sure that I'm understanding.  Is the process that you're describing here in the first sentence

automated, you know, the process of pulling

the data into the FTP site, is that the same

process that we've been talking about as the

automated script, or is this a different

process?

A.    So this is a different process,

still part of the pipeline.  But this process

is pulling -- it's pulling data from our FTP,

data that they have uploaded to a location

we've designated.

Q.    Okay.  I want to make sure I'm

understanding.  Are you talking about a data

lake?

A.    I wouldn't characterize this as

a data lake.

Q.    Okay.  So I know Charles hates

this phrase.  But we've talked about the

Ferrara process, which is the manual process.

We've talked about the original automated

script process.  We've talked about the post

cease and desist letter automated script

process, you know, in the recent exhibits that

we've looked at with Ms. Banerjee.  Am I

understanding that this FTP process is

different than those three?

A.      It's related, but it's different, yeah.

Q.      Okay.  So describe to me how it's different.  I know that you started that description, but I just want to make sure I'm understanding it.

A.      Yeah.  So I'll start with the manual process, what you referred to as the Ferrara process, which is a set of instructions that the customer uses for downloading the reports that we need for the Population Health analytics tool.  And the output of that process could come in a couple different forms.  One could be a zip file, for example, with all the reports they've downloaded.  And then that is e-mailed to Wenxing, who might upload that data to the FTP.  Or the customer is given access to the FTP, and they load the data themselves.

So the process that's described here is a part of the pipeline.  All it does is download the latest files from the FTP, files that either the customer has uploaded or Wenxing has uploaded, and those files were manually extracted from PACECare.

The original automated process that we were talking about, the scripts, those are for automatically driving the web browser and downloading the reports.

Q.   And when you say "downloading the reports," are you talking about downloading the reports into the FTP?

A.   No.  No.  In that case, the reports are downloaded into Azure Storage.

Q.   Into what storage?

A.   Azure, which is the Microsoft cloud provider.

Q.   Got it.

Okay.  So this FTP process, albeit perhaps related to the manual process, is a different process by which Intus can get the data it needs to power the PopHealth dashboard?

A.   That's right.

Q.   Do you know when this FTP process became available?

A.   I don't recall.

Q.   Was it there when you arrived at Intus in 2021?

A.   No.

Q.      Was it there while you were a senior software engineer?

A.      No.  No, it wasn't.

Q.      Was it there while you were a VP of data and infrastructure?

A.      Yes.

Q.      So it was sometime between summer of 2022 and 2025?

A.      Yes.

Q.      Do you know how many PACE customers utilized this process?

A.      No, I don't have a number.

Q.      But she, as I mentioned, goes on to state, "I've attached a PDF with extraction instructions for each of the reports that we require."  We've talked a little bit about extraction instructions.  Are those instructions that you created?

A.      Yes, I did create those.

(Whereupon, Defendant's Exhibit 67 was marked for identification.)

Q.      (By Mr. Lee) Okay.  And I'm going to go ahead and stop presenting.

Oh, sorry, wrong one.  Sorry.  I'm

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

going to show you what has already been marked Exhibit 67.  Hopefully you can see that.

A.    Yes, I can see it.

Q.    All right.  For the record, I guess we already have this marked.  So Exhibit 67 is an e-mail dated on and around February 15, 2024.  And you are a recipient of this e-mail from Ms. Banerjee.  Do you see that?

A.    Yes, I see that.

Q.    Okay.  Ms. Banerjee writes, "As discussed, attaching the data export guide here to pass along to your IT team as our stopgap solution until we can get integration reconnected."  All right.  Did you see that?

A.    I see that.

Q.    All right.  And then if you turn to page 5120.

A.    I'm there.

Q.    Yeah.  This appears to be the data export guide.  Do you see that?

A.    Yes.

Q.    Is this the same as the data extraction guide referenced in that prior e-mail?

EVAN WALTERS                                          JOB NO. 2462669
MARCH 16, 2026

A.      This -- yes.  There were a couple, you know, versions of it all doing the same thing.  But, yeah, this would be it.

Q.      Okay.

A.      This would be --

Q.      And so that we're clear, this is a set of guidelines, extraction guidelines that you had generated; correct?

A.      Yes.

Q.      Okay.  Right.  And you generated them by accessing PACECare and figuring out the steps for each one of these different reports; correct?

A.      Essentially, yes.  This report was generated by -- I wrote a tool that analyzed the automated scripts and generated human readable data.

Q.      So in other words, you accessed PACECare to generate the automated script, and then you used the tool to analyze the automated script to create the data extraction guide?

A.      That's right.

Q.      Okay.  Did your data extraction guide achieve the data goals it was intended

to?

A. Yes. Customers were able to extract their data.

Q. And then once extracted, they would transmit that to Intus for uploading to the dashboard?

A. Right.

MR. LEE: Mr. Walters, I have no more questions.

MR. WEIR: I'll save all my questions for later. All right. I think -- let's go off the record.

(The deposition concluded at 4:58 p.m.)

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of Alabama, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.    DATED:        3/16/2026

*Cindy C. Jenkins*

_____

Cynthia C. Jenkins, 470

DEPOSITION ERRATA SHEET


DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that

I have read the entire transcript of

my Deposition taken in the captioned matter

or the same has been read to me, and

the same is true and accurate, save and

except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION

ERRATA SHEET hereof, with the understanding

that I offer these changes as if still under

oath.

Signed on the _____ day of _____,

20___.


_____

           Evan Walters

EVAN WALTERS                                              JOB NO. 2462669
MARCH 16, 2026

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

          Evan Walters

```
              DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____


Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

    SIGNATURE:_____DATE:_____

              Evan Walters
```

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

## Exhibits

**Exhibit 15** 3:9 190:4, 21,25 195:13

**Exhibit 67** 3:10 244:21 245:2,6

**Exhibit 87** 3:11 76:7, 10 97:24 130:21

**Exhibit 88** 3:12 148:18 149:5,6

**Exhibit 89** 3:13 163:23 165:7 171:10

**Exhibit 90** 3:14 172:8,12,13 177:17

**Exhibit 91** 3:15 177:9,13,14,15

**Exhibit 92** 3:16 207:13,18 212:24

**Exhibit 93** 3:17 218:13,20 219:5

**Exhibit 94** 3:18 234:15,19 237:4,14

**Exhibit 95** 3:19 236:25 237:7

**Exhibit 96** 3:20 239:17,25

## 0

**00** 128:17

**001799** 149:18

## 1

**1** 77:17 83:8 90:25 101:17

**10** 120:18

**100** 120:18,19 146:3

**11** 76:16 240:3

**12,000** 97:14

**12th** 207:22

**14th** 192:23 216:2,10

**15** 190:4,8,10,16,21,25 195:13 245:7

**16** 4:2 76:21 172:19

**16th** 77:3 82:16 149:9

**1793** 173:20 174:18

**1794** 172:23 173:2

**1797** 158:19

**1798** 152:24

**1799** 149:14 150:9,15

**17th** 76:25

**18** 177:18

**1st** 77:19 87:4

## 2

**2** 111:24 112:2 134:8

**20** 157:18,21 231:5

**2008** 15:11

**2018** 15:16

**2019** 15:25

**2020** 27:22

**2021** 13:22,24 14:4 23:10 49:15,17,22 61:2 168:8,9,12 210:22 216:2 243:24

**2022** 14:1 23:11 27:23 28:17 49:11,14,22 61:2 77:19 82:15 87:4 102:13 124:11 149:9 172:19 177:18 180:14 189:9 191:24 192:11,23 196:13 209:23 210:5 214:18,20,22 215:20 216:3,10 244:8

**2023** 36:20 45:7,10 113:16 207:22 210:14, 22 214:22 216:12 217:2 219:11

**2023-ish** 211:9

**2024** 36:11,19 67:10 74:1 76:21 82:16 113:15 240:4 245:7

**2024-12-16** 98:5

**2025** 12:22 13:5 37:24 45:3,5 57:21 59:21 67:9 73:17 74:1 244:8

**2026** 4:2 139:6

**21st** 193:22

**2208** 191:4,17,22

**23** 113:15

**25** 157:24

**26** 36:10

**26th** 191:24 192:11

## 3

**3** 131:2

**30(b)(6)** 89:18

**3028** 207:25

**3445** 98:17 102:12,14

**3452** 102:14

**3463** 105:16

**3474** 232:7

**3475** 231:12

**3477** 223:25

**3478** 227:19

**3479** 223:15

**3480** 219:4,13,17 221:1

**3745** 231:12

**38** 219:16

## 4

**4** 102:13

**40** 208:8

**45** 208:8

**4:58** 247:13

**4th** 219:11

## 5

**5** 77:15,16

**5120** 245:18

**5541** 86:20,21 87:6,18, 21 88:8,14,22 89:14 98:23 108:5,9

## 6

**6** 85:11

**67** 244:21 245:2,6

## 7

**7** 111:23

**7:00** 208:5

## 8

**8** 131:1

**8/16/22** 178:12

**87** 76:7,10 97:17,24 98:13 111:18 130:21

**88** 148:18,22 149:5,6

**89** 163:23 164:2,17,19 165:7 171:10

## 9

**90** 172:8,12,13 177:17

**91** 177:9,13,14,15

**92** 207:8,10,13,18 212:24

**93** 218:13,20 219:5

**94** 234:15,19 237:4,14

**95** 236:25 237:7

**96** 239:17,21,25

**9:33** 4:2

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

## A

**A-M-R** 31:11

**A.M.** 4:2

**ability** 9:20 43:18 88:7 167:3 185:12 186:8,14 192:19 204:10

**Abouelleil** 31:9

**absence** 213:23 231:20

**absent** 215:21

**absolutely** 137:13

**access** 19:10 43:13, 18 44:7 47:16 49:7,21, 25 50:4,10,18,20,24 52:4 53:10,18,19 56:9 57:17,25 58:2,15,17,18 59:18 60:1,3,6,8 62:3,6, 14,17,21 63:9,12,15,19, 23,24 64:2,3,11,14,15, 16,22 66:15,22,23 67:3, 13,25 68:12,23 69:1,7, 19 70:14 71:21 72:1,4, 15,16,17 73:1,4,5,8,9 74:19,21 75:11,12 77:18,24 78:20 82:2 85:17 87:3 88:12 89:6, 7,8,24 90:1,17 92:6,24 93:2,3,5,6,15,20,25 94:7,17,18,23 95:2,9, 11,12,14,19,22 96:3,7 101:2,21 102:3 103:14 108:7,11 109:12,16,23, 25 110:6,7,11,17,19,23 111:12,13 119:7 121:3, 8 123:4 128:12,15 129:18,23 137:16,17 139:21,24 140:1 141:20 142:1,11 144:15,23 145:6,10,12 146:1,3,11 147:3,23,24 153:8 155:18,20 156:10 157:2,5,7 158:3 159:4, 7,12,25 160:4 161:1,5 162:6 169:19 173:11, 16,18 174:5,8 176:24 178:11 179:1,9,11,19 180:3,12,17,22,24 188:6 189:15,16,23 192:8,25 193:5,7,15,17 194:7,13,15,18,22,23

195:1,4 196:16 197:9 198:11 201:7 203:11 206:22 207:4 213:21 215:17,21 216:23 217:10 222:25 223:7, 12,19,20 225:6,24 226:1,7,15 229:2,5,6, 10,12,15,18,20 230:6, 10,18 232:21,22,23 233:4,8,13,15,25 234:11 235:14,25 236:6 242:18

**accessed** 54:8 64:7 71:9 75:22 82:15 101:9 107:10 108:9 111:2 145:1 159:8 194:19 246:18

**accesses** 101:7 108:13

**accessing** 43:12,20 49:5,10 50:5 53:13 57:15,23 63:3 64:20 74:17 81:12 88:14 92:3 102:17 117:3 127:21 139:25 140:25 146:7 181:1 189:17 193:13 194:20 246:11

**accommodate** 26:4

**account** 44:7 58:16 60:1 74:12 77:23 85:11, 17 87:13,14,22 88:2,16, 22,24 89:3 91:9,13,16 92:4 93:1,2,12,15,17,24 94:17 95:4 108:9,11 153:6,8,18 154:7,19,22 155:1,2,10,18 158:8 161:7 162:13,15 165:20 167:4 171:15,18 173:25 174:1,4 175:12 176:20 178:5 188:9,25 204:2,5, 16 211:20,23 217:15, 17,20 220:9 223:20 228:23 230:2,10,21 231:21 233:2,3,11

**accountable** 47:25

**accounts** 33:16 43:25 44:5,11,13,25 80:10 83:6,9 87:11 92:21 106:24 141:7,9 158:15 163:6 166:15,17 176:12 180:10,12 216:6

223:21

**accurate** 6:2,21 47:16 87:8 167:16 199:23 234:6

**accurately** 199:14

**achieve** 54:6 153:12 246:25

**Act** 193:22

**acting** 43:23 73:2

**action** 65:12,19 66:1 112:6 136:13 169:24 171:6

**actions** 48:16,18 135:25

**actively** 43:20,23

**activities** 102:1 174:15

**activity** 102:16 137:19

**actual** 80:8

**adaptable** 203:4

**add** 49:19 222:6 231:22

**added** 224:15 231:21

**adding** 232:3

**addition** 93:13 95:2 181:12

**additional** 119:8 122:13 189:2

**address** 200:7 213:23

**addressed** 7:25 48:4

**adhere** 240:16

**admin** 166:16 229:13

**administrative** 138:3 176:10

**administrator** 155:2 167:2 229:14,18, 21

**admission** 40:12

**admonition** 42:9 133:2

**admonitions** 41:19

**advanced** 23:12

**adverse** 6:16

**advice** 132:25

**afford** 7:17

**agents** 19:13

**aggregate** 83:16,18

**aggregated** 84:17

**agree** 4:8 10:7 27:12 32:18 88:20 89:12 97:25 182:8 214:24

**agreed** 235:16

**agreements** 135:12

**ahead** 27:1 30:22 35:9 42:14 97:20 138:9 158:21 221:5 223:6 226:10 232:6 238:24 244:24

**aim** 137:12 233:24

**aimed** 37:9

**airflow** 75:2 81:22

**albeit** 243:14

**alert** 144:20 187:17

**Alex** 18:4 26:15 27:16 29:5,6,11,13 31:14 45:3,12,16,21 47:12 55:13 68:20 134:13 162:15 168:5 170:4 195:21,22 227:6

**Alex's** 27:7

**Alexander** 112:11

**alleged** 41:17

**allowed** 116:1,2 217:8,10

**allowing** 58:15

**alongside** 30:11 70:2

**alter** 154:10,13 189:10

**alternate** 66:25 72:20 217:3,6 236:8

**alternative** 66:16 101:4

**Amherst** 16:2

**amount** 64:16 203:15,17,20 205:19,20 206:4

**Amr** 31:9,11 112:10

**analogy** 104:7

**analysts** 140:2,15

**analytics** 18:1,11,17 51:12,20 52:3 110:2 124:15 132:10 142:24 162:2 181:9,12 202:18 242:12

**analyze** 54:2 246:20

**analyzed** 246:16

**ancillary** 160:15

**Andrew** 10:13,17 40:14

**Andrew's** 40:24

**answering** 78:11

**answers** 137:4

**anymore** 22:16 32:16 70:10 144:10

**API** 24:10

**APIS** 21:14 105:11

**apologies** 48:4 139:1 163:3 176:1

**apologize** 218:22

**apologizing** 174:23

**app** 224:11,16 230:23

**apparently** 26:17 65:13

**appears** 88:1 107:8 177:19 217:3 227:21 235:8 245:20

**appendix** 96:5,9,10 98:5 99:7,10 101:14 106:8,13 107:7,24 108:8,21

**application** 17:6 30:12 52:7,8 128:5 227:14 230:12,15

**appreciated** 115:25

**approach** 86:3 166:7 195:17

**approached** 166:12

**approaching** 176:19

**approximate** 13:18 73:21,24

**approximates** 64:3

**architect** 16:17,22

**architecture** 38:22

**area** 54:5 104:7 116:10 159:11,18,19 160:1,15

**areas** 95:14,19 109:11,16 228:17

**argumentative** 181:25

**arrange** 235:19 238:1

**arrival** 117:11

**arrived** 210:17,21 243:23

**articulate** 174:8

**artifact** 61:19 62:8

**ascertain** 120:22

**asks** 173:11,17 221:2

**Asnong** 68:21

**aspect** 36:7 151:17

**aspects** 187:25 228:9

**assigned** 143:17

**associate** 135:12

**Associates** 76:12

**assume** 12:10 27:23 32:17 108:5

**assuming** 35:12 85:16 138:12 151:24 167:8,20

**attached** 97:23 198:10 213:25 240:17 244:14

**attaching** 245:12

**attachment** 178:7, 11

**attempt** 180:21 189:22 193:4

**attempted** 123:25

**attempts** 196:15 197:8

**attorneys** 9:24

**audit** 139:15 232:22 233:12,19

**August** 149:9 172:19 177:18 180:13 189:9

**Austin** 191:25 197:14

**authorization** 89:6 90:3 110:21 111:10 146:17

**authorize** 44:6 89:4 110:10 111:14

**authorized** 43:13 53:19 59:25 88:23 89:2, 25 91:17,19,21 92:6 93:4,6,7,8,9,14 109:23 110:20 126:6 129:7 145:2,6,12 146:10 147:3 179:1,13 180:17 193:16 194:9,13 234:10

**authorizing** 58:18

**automate** 50:22 240:13

**automated** 20:1,6, 10,22 22:18 23:17 24:9 26:12 47:15 48:1,7 49:4 50:1,12,16,24 51:7 53:2,14 55:6 56:5 57:11 59:13 60:24 61:1,4,24 63:25 89:6 92:10,11 93:18 103:5 110:22 112:5,8 114:10 117:12 118:8,10,14,16 119:1 121:5 123:11 125:22 127:17,22 128:21 130:14,16,17 131:8,10, 14,24 132:5 136:20 152:2,14 153:14 156:19,25 157:11,23 158:2,5 159:13 177:4 181:22 184:12 186:17 187:3 194:24 195:2 197:3 199:5,9 202:24

215:10,12,13 225:10, 17,20 226:3 238:4 241:1,4,19,21 243:1 246:16,19,21

**automates** 48:21

**automatic** 205:1

**automatically** 152:3,15 192:19 243:3

**automation** 19:9 23:15 24:1,12 52:18 181:15 183:23

**automations** 19:25 20:19 22:17,23 24:7 37:9,12 48:13

**avoid** 6:25 213:9

**awaiting** 175:3

**aware** 49:24 67:11 68:22 84:22 107:17 108:18 109:11 119:21 128:20 129:1,5 141:18, 22,23,24,25 144:2 154:2,17 179:22,25 180:1,4,7 186:8,23 187:11,12 193:4 204:8, 9 234:20

**awareness** 187:13

**Azure** 99:15 243:9,11

---

**B**

**BAA** 136:25

**BAAS** 135:17,21

**bachelors** 15:22

**back** 6:10 15:15 16:11 37:23 42:23 44:21 46:20 51:16 53:8 61:21, 23 70:11 72:18 77:15 88:25 94:15 99:4 100:11 107:15 111:18 118:2 125:22 130:20 147:17 155:16 171:10 174:18,25 175:4 178:3 182:24 195:12 199:22 209:21 211:14,21 212:12 214:20 215:19 223:17 227:18 232:19 235:24 237:2

**background** 15:6

**backing** 24:11

**ball** 55:15

**Banerjee** 219:8,17, 20 221:15 223:5,18 225:22 227:22 231:15, 18 232:1,9,18 233:10 234:6 235:5,10 237:2, 20 238:10,16 241:23 245:8,11

**Banerjee's** 223:25

**barrier** 181:8

**base** 61:15,17

**based** 12:10 14:2 33:9 43:1 53:11 64:16 87:6 93:5 108:6 110:19 132:18 143:16 146:9 154:6 203:25 204:15 219:19

**basic** 137:9

**basically** 136:11

**basing** 193:14

**basis** 187:17

**bates** 112:7 149:22

**Beacon** 78:4 90:25 92:3,5 94:15,19 96:1 149:8 150:16 151:23 152:9 153:25

**Beacons** 180:9

**Bear** 96:20 189:24

**bearing** 230:6

**beat** 42:12

**began** 25:12

**beginning** 13:23,24 14:1 28:17 67:9 74:1 83:4 150:8 151:22 188:16

**begins** 150:11 174:14

**behalf** 4:4 174:15

**behave** 72:7

**behaving** 71:25 72:2

**behavior** 230:22

**belabor** 99:3 165:24

**benchmark** 236:22

**Berry** 207:20 213:13, 23

**Beshai** 10:14,15

**beta** 126:2

**bevy** 133:23

**Bharath** 45:8,20,22 46:10 100:25 101:24 113:8,9,10

**Bharath's** 45:24

**billing** 84:8

**bills** 84:9

**bit** 5:18 24:3 50:9 52:11 53:9 61:3 84:12 89:11 117:7,21 151:10 185:7 212:6 216:1 218:17 224:22 244:16

**Blair** 227:7,9,12

**blanking** 22:2

**block** 180:21 189:14, 22 193:4 196:15

**blocked** 180:24 181:1

**blocking** 178:25 179:9 236:6

**blow** 218:24

**blurry** 61:3

**body** 178:8

**Boldage** 192:6

**Boldagepace** 192:1

**Boston** 15:9,16

**bot** 19:16,20 20:10

**bottom** 149:14 159:1 165:18 173:2,21 191:5, 23 213:12 223:18 232:8 235:3

**bought** 59:9

**bow** 29:17 92:2 170:23

**Box** 32:2

**break** 9:7 54:23 60:17,21,23 76:3,5 118:2,7 171:25 172:6 216:1 239:12,15

**breaking** 148:6

**bring** 151:15

**Brio** 240:9,11

**broke** 33:24

**brought** 23:14 33:8

**browser** 20:3,17 26:13 48:15 55:22 126:10 128:6 142:9 243:3

**bugs** 226:17

**build** 15:2 17:5 23:14, 20 24:7,10 26:4

**build-outs** 34:7

**building** 20:19 24:6 30:14 72:3 105:4 137:8, 10 178:4 216:21

**built** 55:25 71:7 116:15 156:18 158:12 224:4

**bunch** 97:16 220:13, 18

**business** 74:10 135:12 143:10 196:23 219:20 220:8

**butted** 115:23

**button** 204:7

**buttons** 156:7

---

### C

**call** 155:23 217:1

**called** 54:19 81:22,24 121:20

**calling** 30:13 194:7

**calls** 42:7,8 44:15 87:23 94:21 95:7 137:1 145:19 146:23 147:9 152:5 183:11 186:4 202:21 216:15

**Cambridge** 8:14

**Canvas** 22:2

**capability** 124:9 142:19 185:23 226:21

**capable** 116:11

**capacity** 89:19 187:22

**capture** 36:1 221:24

**care** 25:3 35:22,23 78:4 92:14 157:22 158:2

**Care's** 92:3

**career** 14:3

**careful** 133:3

**Carehub** 29:24 30:11,13 34:22 35:5 36:14,17 46:6 75:19 143:20

**carried** 189:16

**carries** 5:22

**carry** 188:22

**case** 11:24 26:19 58:25 79:19 129:20 130:10 149:24 154:23 161:16,24 203:5 205:5 212:16,21 215:6 243:8

**cases** 129:4,7,8 166:13 176:9 222:18

**catch** 41:10

**catching** 37:14

**caveat** 6:14

**cc'd** 150:17 165:15 208:17 232:22 234:25 237:18

**cease** 57:17 192:24, 25 195:15 215:19 216:3,11 241:21

**cell** 98:17 102:12,14 105:15

**Century** 193:22

**CEO** 168:5,22

**cetera** 17:10

**chain** 208:22 219:25

**chance** 165:3 213:3

**change** 28:3 29:19 38:1,6,9 119:6,10,18,20 120:8,23 121:7,17,24 122:2,16 125:25 126:17

**changed** 30:3,5,6,7 39:23,25 119:13 122:4 126:15

**changing** 121:22 187:25

**channel** 140:7,10,11

**characteristic** 202:25

**characterization** 27:10,16 167:14

**characterize** 34:11 186:6 241:14

**characterized** 196:15

**characterizing** 34:5

**charged** 20:19 21:9, 12

**Charles** 10:11 116:20 147:13 171:24 190:2 241:16

**Charles'** 135:5

**chat** 8:22,23 9:1 209:12,22 210:15 211:15 212:11

**chats** 209:18 211:2 212:9,10

**chief** 201:17

**chose** 183:16

**Chris** 39:2 47:5,8

**Christopher** 31:9 112:10

**chunk** 112:20

**churned** 21:23 22:13 59:7

**Cindy** 4:3 42:22 44:20 46:25 182:23 207:7 239:4

**circumstance** 176:15 197:6

**circumstances** 125:24 202:6

**claims** 40:8,18

**clarification** 71:17 195:8

**clarify** 69:10 110:8 170:8 229:25 233:9

**clarifying** 171:14

**clarity** 69:3 222:14

**classes** 108:20 133:12

**clean** 176:2

**clear** 59:17 171:6,8 176:18,22 180:23 185:7,10,19 246:6

**Clements** 167:7

**click** 48:14 51:8 105:18 119:16 126:14 156:7 184:4 204:7

**click-down** 188:8

**clicked** 119:15

**clicking** 128:8 159:9

**client** 48:25 122:7 123:25 125:4 145:8 154:19,21 167:3 174:15 181:16 186:19 187:8 201:10 202:7,15,19 203:21 204:2 228:17

**client's** 157:3

**client-facing** 220:20

**clients** 135:13 141:20 188:24 194:12 200:17 202:13 216:13

**clinicians** 25:8

**close** 9:3,5,9 14:1 142:8 231:10

**closed** 9:10

**cloud** 85:17 99:14 243:12

**clunky** 117:7

**CN** 22:5

**coalition** 14:23

**code** 61:14,17,20 100:16,18 102:24

**codes** 102:22

**codify** 48:18

**codifying** 55:21

**coding** 36:5

**coffee** 54:24

**coincided** 38:1

**coined** 200:11

**Collabrios** 129:12

**colleague** 150:21 211:25

**colleagues** 11:17 115:6

**collected** 84:3

**college** 15:7

**column** 96:4 101:15, 20 102:20,23 103:7,12 105:19,22 109:8

**columns** 109:1 125:9,11

**combination** 98:11

**command** 82:2

**commands** 187:3

**commenced** 36:18

**commencement** 55:7

**comment** 6:15 196:25 204:11

**commit** 121:14,19

**common** 92:22

**communicate** 129:11,21 130:1 188:15 217:25 230:13,14 234:9

**communicated** 166:25 167:24 236:8

**communicating** 155:10 226:13

**communication**

8:24 10:3 175:6 211:7, 11

**communications** 40:13 42:10 165:16 168:3 209:2,3 212:18

**Community** 78:5 175:6,10,18 176:4,19, 24 177:1,4,7 187:17 214:11,17,24

**Community's** 176:15

**communitypace** 172:14 173:4 177:16 189:9 207:20 213:14 215:9,13

**companies** 116:15

**company** 13:25 16:16 17:5 23:4 27:4 28:7 30:6 33:13,15 34:17 39:15 52:23 55:8 69:13 84:18 110:21 143:18,20 201:21 227:12

**company-wide** 209:15

**compile** 106:12

**complaint** 41:6 42:1

**complete** 199:22 232:5

**completed** 55:24 56:2 61:25 157:22 175:2 178:2

**completely** 67:4 157:17 220:7

**compliance** 132:25 133:23 134:1,5 135:23 136:2,6 138:13

**compliant** 132:9,21 135:21

**complicated** 137:11

**comply** 138:3

**complying** 136:25

**components** 81:20

**comprehensive** 106:16 107:2

**computer** 8:25 16:1, 8 126:20,21

**concede** 191:1

**concerned** 191:6

**concluded** 247:13

**conclusion** 42:8,9 44:15 137:2 183:25

**concurrent** 36:14

**concurrently** 96:5

**conditions** 136:25

**conduct** 43:4 83:5 135:20

**conducted** 211:2

**confident** 192:5

**configuration** 57:7, 9,11 61:9 74:18 75:7 80:14 86:10

**configurations** 79:14 80:9

**configuring** 79:20

**confined** 191:16

**confirm** 96:17 232:12

**confirmed** 127:17 175:1

**Confluence** 83:21

**connect** 173:6 198:12 221:4 237:23

**connected** 209:15

**connection** 22:10 37:10 46:16 225:3 227:3,23 228:10,23 231:17 232:14

**connections** 21:13

**consent** 180:2 193:1

**consistent** 135:20 151:25 174:9

**constitutes** 83:18

**construct** 71:7

**consultant** 140:19 201:24 202:2

**consulting** 35:10,13 36:6 89:9 93:22 110:1

198:6

**contact** 92:25 187:21

**contained** 52:14 222:10

**container** 81:23

**content** 106:7

**contents** 135:16

**context** 9:25 17:13 49:20 128:21 191:12,15 212:16 213:10

**contexts** 138:12

**contingency** 204:16

**continually** 203:9

**continuation** 177:20 234:20 237:1,13

**continue** 127:16 192:6 206:19,23

**continued** 180:12, 15

**continuing** 231:15

**contract** 235:11

**contracted** 82:23 84:15 163:15

**contracting** 33:17

**contracts** 137:7 155:8

**contributed** 131:13 162:25

**control** 61:8,11 62:1 121:12,13,16,23

**controlled** 110:18

**convention** 149:23

**conversation** 5:18 41:4 192:4 195:23 196:1 237:13

**conversational** 6:23

**conversations** 11:11 12:2 27:6,19 195:21

**coordinate** 151:15

**coordinating** 15:2

**copied** 197:16

**copy** 97:11 192:13

**copying** 167:9

**corner** 119:16,17 149:15

**correct** 12:13 17:22 20:7 23:17,21 34:5,13 36:4 38:2 40:1 45:4,13 46:9 47:22 49:1 50:12 51:1,13,21 52:5,16,22 53:2,6,14,22 54:2 59:14 64:11 65:14 66:1 70:15 71:4 72:23 73:4 76:17, 22 77:12 80:21 86:24 89:15 91:10 93:25 94:10 98:20 101:18 107:11 108:5,16 110:13 111:3 122:4 150:12,18, 21 152:16 153:9,15 158:6 159:14,21 162:8 165:16 174:5 180:25 181:6 182:16 183:18 187:4,10 188:18 189:11 194:3,17 198:23 200:21,24 201:16,18 202:13,19 203:22 204:17 207:9 215:22 216:8 217:4,21 219:21 223:12 225:12,24 228:6 229:21 233:6,16 234:7, 25 237:14 240:6 246:8, 13

**correctly** 12:1 18:25 44:10 52:1 53:11 60:25 69:9 70:3 102:4 110:8 124:13 159:16 189:8 209:11 210:20 228:16 238:10

**cost** 143:1

**costs** 143:6 144:10

**could-haves** 63:6

**counsel** 4:7,22 7:22 8:6 10:9,10,20,24 11:12,14 40:15 41:5

**counted** 107:12

**counterparts** 38:15

**couple** 11:10 59:1 65:16 101:24 104:25

169:8 174:13,18 180:8 209:9 242:13 246:2

**courses** 134:2

**court** 4:3,9,22 5:20 7:2 42:11 207:9

**courtesy** 7:17

**cover** 64:19

**coverage** 70:4

**covered** 89:6 131:5 220:18

**create** 23:16 92:10 121:19 153:6 154:7,21, 25 166:14,17 167:4 184:1 185:13 187:9 200:18 244:19 246:21

**created** 21:18 63:10 119:2 153:18 162:15,16 165:20 180:11 184:15 185:1,2 238:11 244:18

**creates** 97:16 155:2

**creating** 37:9 44:7 48:7 154:19 171:14

**credential** 79:11 87:22 96:3,7 175:19 224:3,6,14 226:14 234:13

**credentials** 58:6,8, 9,10,12,14,19 60:1,4,9 77:18,23 79:6,18 81:15 85:7,23 87:3 89:14 90:2 93:4 125:12 126:7 144:25 145:3,5,9 146:8, 9,18,19 147:6,20,22 153:5,12 157:15 162:23 171:16,18 174:21 187:25 189:5 217:16, 18,20,25 224:23,25 225:5,16,19 226:13,17, 22 228:19 229:19 230:7 231:23 232:4 234:9,10

**crude** 151:8

**crystal** 59:16

**CSV** 124:20 161:8,14 162:1 181:4,5 187:9 200:19

**cue** 7:1

**cumbersome** 216:25

**Cures** 193:22

**current** 12:17 137:3 192:7

**custom** 185:13,17,24 186:20 187:3,7 204:6

**customer** 21:22,24, 25 22:3,8,12 53:5 58:6, 7 59:7,8 60:4 74:11 75:2 87:10 92:5 95:16 111:9 122:3,18,24 123:9 124:13 139:24 140:12,16 141:2,11 145:24 146:6,16 151:1, 6,9 153:7 154:5 158:13, 14 166:16,22,23 181:4 182:7,15 185:17 195:1 199:18 218:10,11 220:16 222:23 230:13, 19 231:1 242:10,18,23

**customer's** 58:13, 14 109:25 157:6,8

**customers** 35:21 43:13 44:6 53:19 58:17 74:3,7,14,22 83:22 84:6,10 89:4 92:23 93:9,11 94:24 104:14 106:17,22 110:6,19 124:2,3 141:9 156:9 162:24 163:12,15 169:16 176:8 179:13 180:18 182:9,11 183:4, 6 186:1 187:18,22 188:11,13,16 189:4,15 193:16 194:8 199:2 214:12 217:8,9,19,24 224:20 230:14 244:11 247:2

**customers'** 19:11 50:5,19,20 95:12 134:21 181:2 193:5

**cut** 70:6

**Czermak** 149:7 150:16 151:20

---

**D**

---

**daily** 181:14 238:2,12

**dashboard** 36:4 51:12,21 52:2,3,15 104:23 105:12,13 122:8 124:16 139:21,25 140:5 141:1 181:6 182:12,16 202:18 238:13 243:18 247:6

**dashboards** 182:9

**data** 12:14 13:1,11 16:18 17:7,25 18:10 19:5,8,11 20:21,22 21:3,6 25:7 26:10 27:24 29:3,23 30:8,10,16,17 31:21 32:24 33:12,20 34:1,14 35:12 37:15,18 39:6,9,24 40:1 43:12, 18,21,24 44:8 45:15 47:9 48:8 50:5,19,21,24 51:11,19,20 52:1,9,14, 21 53:18,21 54:1,8 58:17 59:5,13 60:6,13 64:1 72:17 75:5 78:9 79:24 86:10 89:5 92:7, 9,11 93:21 94:24 95:2, 12,16 99:12,20,25 100:1,9,22 102:25 103:3,4,16 104:1 105:5 106:7,11 108:20,23,25 109:1,9,25 112:12 114:5 118:19,24 119:2, 12 122:14,22 123:6 124:3,15,23 125:10,14, 16 126:22 127:5 130:1 134:21 136:7,9,19 140:21 146:1,2,11 150:24 151:23,25 152:3,9,11,16,19 156:9, 12 157:8 158:13,14 159:21 160:16 161:1, 17,20 162:2 167:11,16 169:19 173:7,10 174:4 175:2 177:6 179:14 180:17,22 181:2,10,13, 20,22 182:3,4 183:13, 15 184:15,18,19 185:25 187:10 189:16 192:19 193:5,13,18 194:14,16, 18 195:17 196:6,7,16 197:4,22 198:3,10,17, 20,21,23,25 199:1,12, 18,22 200:3,4,18,23,25 202:9 203:10 204:4 206:14,16 217:10 221:19,23,24,25 222:5, 9,15,18,24 223:2 225:6,

17,23 226:4 229:20 230:25 234:2,11 235:18 238:5,11 240:14,15 241:2,8,9,12,15 242:17, 19 243:17 244:5 245:12,20,23 246:17, 21,24,25 247:3

**database** 104:8 139:17 229:9 240:15

**databases** 105:11

**dataset** 185:2

**date** 36:11 49:12 57:19 77:2 101:8,20 102:2,3,13 105:23 139:5 175:1 192:15 214:23 216:11 221:8

**dated** 99:20 149:8 191:24 192:10 219:10 240:3 245:6

**dates** 13:19 96:2,6 212:6,7

**David** 5:4 54:22 147:10 164:4,18 175:24 208:4 231:5 236:16

**day** 102:11,18 109:10 120:1 134:21 157:18, 21,24 182:4 183:18 198:16

**day-to-day** 43:2

**days** 206:2

**de-emphasizing** 144:3

**debug** 62:10,16 70:5

**debugging** 69:24 73:14

**December** 76:21 82:16 168:12 219:10

**decide** 6:12 182:15

**decided** 102:2 122:7 145:8

**decision** 111:7

**declared** 49:21

**dedicated** 46:4 134:25

**deduction** 114:3

**deemed** 233:15

**Defendant** 76:11

**Defendant's** 76:6 148:17 163:22 172:7 177:8 190:20 207:12 218:12 234:14 237:6 239:16 244:20

**define** 173:17

**defined** 229:7

**defines** 57:8,10

**definition** 146:10 205:24

**definitive** 83:16

**degree** 15:17,20,24 16:6

**degrees** 15:8

**delay** 235:11

**delayed** 174:24

**delegated** 120:24 121:1

**deliver** 109:25

**delivered** 104:13,14

**delivering** 35:24

**delivers** 30:10

**delivery** 125:4

**demanding** 192:24

**denting** 224:10

**deny** 107:13

**department** 30:1,2 113:5 114:17

**departure** 231:20

**depending** 154:6

**depends** 17:16 206:6

**depictions** 128:1,23 129:3 130:6

**deploy** 158:4

**deployed** 61:1,25 81:23 117:12 157:23 158:2

**deploying** 92:9

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

153:13 157:10 159:13

**deployment** 50:21 152:2

**depos** 236:15

**deposed** 5:12,15

**deposition** 4:12 6:23 8:12 9:2,8,23,25 10:19 11:15,19,21,24 12:3,7 26:16 47:13 83:4 131:25 247:13

**depositions** 11:5, 15

**depository** 73:10

**describe** 19:7,14 48:6 81:16 121:22 131:9 136:5 173:8 242:3

**describes** 26:25 202:12

**describing** 58:4 80:2 81:19 82:11 160:10 176:7 200:13 202:6 216:20 234:6 240:25

**description** 51:17 193:15 242:5

**designated** 134:9, 10 136:16 241:10

**desist** 192:24 195:16 215:19 216:3,11 241:21

**desktop** 211:19

**detailed** 102:9

**details** 43:15 65:4 138:6 176:7 194:5

**detect** 144:14

**determination** 89:2 233:7

**determine** 66:15 74:22 82:7 88:7,10 110:12

**determined** 100:22 111:2 145:1

**develop** 19:2 50:11 55:17 127:22 130:17

**developed** 23:25 43:2 66:5 99:6,10 118:14 123:11 130:14 131:8 136:21 157:1 177:5 224:7

**developing** 19:5 21:10,13 22:19 38:13 47:25 48:13 49:17 50:1 131:24 144:8 162:25 224:11

**development** 29:23 36:13,14,18,19 47:15 49:4 50:16 51:7 55:6 63:10 65:25 66:10 69:12 74:11 112:5,17 114:10 118:10 126:8 128:4,22 130:15 131:10,13,16,18 142:25 143:3 205:16,18 219:20 220:9 226:16 227:2,14

**device** 8:24

**devoting** 143:11

**dialogue** 8:8

**dictate** 49:1

**difference** 52:25 77:1

**differently** 22:9 41:25 52:11 60:10 68:5, 10 84:12 86:3 117:7 166:8,12 216:1 218:17

**difficult** 83:23 115:17 181:11 203:9,11

**digest** 162:1

**direct** 38:11 47:14 48:14 61:19 65:13 75:16,18 117:2 130:25 212:9 230:19 235:13,25

**directed** 100:7,8 201:15

**direction** 123:1

**directions** 225:12

**directive** 16:17 67:18

**directly** 35:17 39:1 45:3,12,21 65:21,23 79:20 112:4 166:20,25 216:6 227:1,7,16

**director** 39:8

**directories** 99:25

**directory** 99:20 240:20

**Dis-enroll** 102:22

**disagree** 27:9,12,15

**disc** 99:13

**discern** 49:6 74:7

**disclose** 40:22 132:24

**disclosing** 40:13

**discrete** 102:2

**discuss** 237:24

**discussed** 101:5 118:9 131:18 152:12 163:11 166:1 169:23 170:14 171:12 218:5,7 235:5 236:10 245:12

**discussing** 9:2 101:2 168:17

**discussion** 170:10 201:10

**discussions** 10:22 11:13 26:20 175:10 178:21 192:17 195:14 197:5 235:15

**Disease** 14:20

**diseases** 14:18,21 15:1

**disenrollment** 185:2

**displayed** 200:4 206:16

**distinction** 34:20 54:16 80:4

**doc** 218:23 231:7

**doctors** 14:24

**document** 35:22,23 74:5 76:10,16 77:5 149:1,15 150:3 152:20 164:7 172:20

**documentation** 83:17,19

**documented** 74:25

**documenting** 221:10

**documents** 11:21 12:8 84:17 217:14

**domain** 91:4 173:25

**doubt** 171:20

**download** 26:13 99:19 156:8 181:4 184:7 203:10 204:23 205:6,16,18 242:22

**downloaded** 64:5 66:7 72:23 79:1 99:13 100:1 242:16 243:9

**downloading** 129:25 181:10 203:6 242:11 243:4,5,6

**downloads** 238:6

**downstream** 188:11

**downtime** 174:22

**draw** 145:24 148:11

**dress** 104:4

**drive** 26:13 55:22 126:10 149:1 166:21

**driver** 48:14 128:7

**drives** 20:3,17

**driving** 33:11 123:17, 22 243:3

**drop** 124:3,13

**dropped** 124:19

**dropping** 125:8,14

**duly** 4:20

**duties** 16:14 18:23 28:2 38:5 39:21 114:13 135:15 136:17 151:4 220:5

**Dyer** 32:3

**Dylan** 167:7

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

## E

**e-mail**  86:1 129:14 149:6,10 150:15 153:1, 17 155:15 159:23 160:3 161:4 165:7,12,19 171:15,22 172:14,18 173:6,15 175:9 177:15, 17,22 178:7,15 191:1,3, 7,17,23 192:12 197:14, 16 200:7,14,19 201:5 207:19,21 209:4,5 213:13,24 219:5,17,19 227:22 231:14 232:8,20 234:21,24 235:3,5 237:1,3,17 239:25 240:1,5 245:6,8,25

**e-mailed**  140:16 181:21 242:16

**e-mails**  83:20 174:13 208:24 216:19 224:21

**E-V-A-N**  5:9

**earlier**  40:12 106:9 131:25 160:10 198:22 238:23

**early**  17:1,19 19:1 36:18 168:1

**easier**  5:18,19 7:2 63:18 65:17

**easiest**  75:1

**easily**  130:3

**easy**  183:23 184:1 236:21

**eat**  118:3

**ecosystem**  21:7

**editing**  144:16

**education**  15:12

**educational**  15:6

**effect**  5:23 192:18

**effectively**  146:1

**effort**  15:3 22:14 37:3 48:1 135:23

**efforts**  17:8 34:19 100:15 107:8

**EHR**  24:20 25:6 26:11 37:19 59:3,6,13 74:8,23 153:5 174:1,21 225:3 227:2,23 228:10,22 231:16 232:14

**EHRS**  25:12,20,25 26:4,17 74:4 75:12,22 123:11,13,21 130:7 233:23

**Elation**  75:17,19

**electronic**  24:17 25:1 76:17

**eliminated**  73:11

**embarking**  66:24

**employed**  112:3 131:12 202:2

**employee**  17:2,13 41:4 89:14 94:19 133:13 141:12 145:8 146:16 147:3,19 209:1 211:15

**employee's**  58:14

**employees**  109:21, 24 110:3,6,13 141:6 219:7

**employees'**  58:10

**employer**  146:18 147:21 148:3,9

**employment**  14:6

**EMR**  24:23 213:16 214:8 225:4 231:16,22 232:3

**end**  6:5 11:6 33:25 45:10 67:8,9 74:1 104:12,13 110:3 120:2 127:5 129:11 148:6 203:5 239:14

**ends**  232:1

**energy**  143:11

**engaged**  42:4 43:3 196:14

**engineer**  12:18,25 13:12 14:10,12 16:24 17:1,3 19:2 23:9,25 24:6,14 28:12 29:1,8,20 33:1 36:25 37:25 38:5, 24 39:1,19 45:12 46:11

113:25 121:18 126:5 136:19 227:13 244:2

**engineering**  46:3,7 62:8 113:5 114:16 115:25 116:10 230:14

**engineers**  34:12 47:18,20 61:14 62:10 69:14 101:11 131:12

**enrolled**  15:25 16:4

**ensuring**  196:6

**enter**  50:15 179:24 205:3,21 222:24

**entered**  25:11 145:10 146:20 147:22 230:8

**enters**  142:5 225:15

**entice**  183:6

**entire**  46:7 196:5

**entirety**  95:5 208:24

**entities**  83:7

**entitled**  8:2,9 10:2

**entity**  90:22

**entries**  108:13

**entry**  90:24 146:21 221:11,12,23 222:5

**envisioned**  151:8

**ER**  227:2

**error**  129:15,22,24

**error-prone**  184:8 202:23

**errors**  62:24

**essentially**  6:9 25:6 32:22 34:6 73:11 103:24 125:15 141:8 152:13 172:21 174:3 184:19 234:4 246:14

**established**  166:5 206:21

**establishes**  142:7

**establishment**  59:12

**estimate**  82:13,19 120:14 203:24 204:1

**estimates**  204:15

**ETL**  16:18,22

**Evan**  4:19 5:9 10:2 26:23 27:1 40:11 42:18 71:16 149:7 150:1 151:21 165:10 167:9 171:15 172:16 173:7 178:1 191:11 195:6 207:20 208:5 219:8 232:22 233:11,12 238:24 240:1

**event**  28:19 87:14

**events**  144:10

**eventually**  74:17

**evidence**  181:25

**evolution**  35:2 117:15

**ewalters**  91:5 96:2 153:19,23 154:12 155:3

**exact**  13:19 36:11

**EXAMINATION**  5:1

**examined**  4:20

**Excel**  98:4,10

**exception**  8:5

**exchange**  165:7 166:3 175:14 201:12 219:5

**exchanges**  188:17

**Excited**  213:25

**exclusively**  45:22

**execute**  179:11,19

**executed**  77:6

**executes**  135:12

**execution**  62:9

**exercise**  137:14

**exhibit**  76:1,7,10 97:24 130:21 148:18,22 149:5,6 158:23 163:23 164:2 165:7 171:10 172:8,11,12,13 177:9, 13,14,15,17,19,21 190:4,21,25 195:13 207:13,18 212:24 214:16 218:13,20 219:5

234:15,19 235:4,6 236:25 237:4,7,14 239:17,21,25 244:21 245:2,6

**exhibits** 180:8 188:4 241:22

**exist** 67:5

**existed** 71:1,20,25

**existential** 196:17

**existing** 160:16

**exists** 108:22 122:23, 25 211:19

**expanded** 18:19 183:17 184:2,21 194:16 203:22 235:17 236:3

**expansion** 28:6

**expect** 10:1

**expectation** 123:9 162:23

**expected** 38:12 69:12 72:1,3 104:19 120:3 123:8 161:7 162:22 180:16 221:7 240:20

**expects** 148:9

**experience** 203:25 204:16

**expert** 37:1 114:18,22 116:9 147:11 201:23

**expired** 142:13

**explain** 65:3 71:13 88:9 230:22

**explained** 25:21,23 70:20 101:3

**explaining** 213:8

**explanation** 25:5 71:15 144:9

**exploratory** 17:8

**export** 184:2,21 203:22 235:18,19 238:2,3 245:12,21

**exports** 183:18 236:3 238:12

**extend** 69:15

**extent** 44:3 95:20 110:16 122:2 124:4 133:5 134:10 186:7 202:22 226:5

**external** 71:8 72:4

**extract** 20:3 48:8,17 51:11 55:22 118:20,24 119:12 152:3,15 156:14 159:21 192:19 197:4 222:3 247:3

**extracted** 54:1 108:24 109:9 222:9 242:25 247:4

**extracting** 60:12 64:1 88:3 127:5

**extraction** 26:3 121:13 123:5,20 175:2 184:19 195:2,17 199:1 203:1 215:14 240:17 244:14,17 245:24 246:7,21,24

---

**F**

---

**facilitate** 238:12

**facilitated** 50:21

**facilities** 33:16 77:25 78:3 95:24 160:23

**facility** 216:7

**fact** 8:1 26:19 67:5 98:3 114:3 141:24 165:15 171:21 187:18 189:18 194:8,12 201:8 204:5

**fail** 120:1

**failed** 129:10

**fair** 11:7 27:21 35:11 52:10 54:4 80:5,24 95:3 98:2 104:6 106:5,6 144:1 151:12 170:1 213:11 215:25

**fairly** 23:3 48:12 139:4

**fall** 222:1

**falls** 221:16,19

**Falls-data** 221:11

**familiar** 18:8 168:25 169:2 173:2 228:7

**familiarity** 139:10 156:12 228:5

**Famous** 164:9

**fashion** 24:9

**fast** 184:13

**fault** 203:5

**feature** 54:18 187:14 202:25 217:22 224:14 228:5 234:13

**features** 8:22 25:24 54:9,10,12,15 95:11 233:25

**February** 13:16 245:7

**federal** 4:5

**Feel** 232:20

**Felton** 49:20 92:16, 18,19 93:13,14,24

**Ferrara** 191:4 195:14 200:1,12 201:4 202:7, 11,16 206:13 216:13 217:1 236:11,12 238:18,20 239:10 241:18 242:9

**Ferrara's** 191:17,23

**fewer** 38:11

**FHIR** 21:13,15 22:10, 13 23:20 26:18 123:23

**field** 222:2,4,9,11 228:13 229:2,5

**figure** 63:16 65:7 129:12

**figured** 132:3

**figures** 205:9

**figuring** 246:11

**file** 98:5 106:19 108:19 124:13,19,20,22 133:14 161:9,14,16 181:4,5 187:9 200:19,20 238:2 240:20 242:14

**filed** 41:6

**files** 64:5 66:5,6 67:1 72:21,22 78:25 100:2 106:8,12 108:22 109:2 125:1,7 156:14 162:1 210:3 235:17 242:22, 23,24

**filled** 76:21

**final** 9:14 175:1

**finally** 213:17

**find** 61:4,5,24 79:11 114:22 169:11 197:18

**finding** 96:21

**fine** 40:21 115:11 116:25 171:3

**finish** 7:16 164:6 209:25 231:7

**fix** 226:17

**flat** 125:1

**flow** 175:6 221:12,13, 17 222:18 223:4

**flowed** 100:25

**focused** 134:19

**focusing** 38:16,18 134:15,16,18,23 143:25

**folks** 33:10 112:11,13, 16

**follow** 107:25 148:10 160:2 206:24

**follow-up** 147:2 148:14 174:18 235:9

**foot** 56:10

**footer** 219:19

**force** 5:23

**foregoing** 187:17

**forgetting** 31:15

**form** 36:3 85:24 116:21 140:2 146:14 194:19,25 226:22 240:16

**formats** 124:24

**formatted** 218:23

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

**forms** 242:14

**forward** 149:21 153:3

**found** 123:2

**foundation** 83:11 94:21 95:7 111:5 137:3 145:20 146:23 147:10 152:5 183:9,20 186:4 202:21 204:19 216:15 229:23

**framework** 81:24 152:19

**free** 6:14 9:6 71:13 191:19 232:20

**freeform** 222:4

**frequency** 52:8 181:14 182:15

**frequently** 24:22 48:12 122:24 194:20

**front** 9:12 98:21 131:3 191:2

**FTP** 124:1,2,8,14,20 125:4,8,17,19 170:14 181:21 240:15 241:2,8, 24 242:18,19,22 243:7, 14,20

**FTPS** 124:2

**full** 136:2

**fully** 206:23

**function** 160:16,17 211:3

**functionalities** 188:7

**functionality** 51:2 53:22 54:5 126:3 159:7 160:11 174:8 181:13

**functioning** 70:3 103:20

**functions** 159:18

**G**

**gain** 203:11

**gateway** 157:10

**gathering** 78:9

**gave** 147:5

**gears** 113:14

**general** 22:23 40:21 113:4 133:13 161:25 168:15 174:13 218:7 222:10

**generally** 16:14 19:22 33:22 34:3 48:6 78:16 124:18 130:16 131:23 135:8 154:14 159:17 175:14 178:23, 24 179:5,21 183:17 193:2,3 195:19 196:1 210:22 220:5,12

**generate** 51:10 53:13 62:8 81:6 127:22 184:21 187:8 199:3,14 200:19 203:21 246:19

**generated** 26:12 63:25 198:22 199:4 246:8,10,15,16

**generating** 52:13 65:14

**generation** 204:3

**give** 15:5 16:5 31:24 32:15 36:11 42:12 43:22 57:18,20 60:5,18 71:15 72:6 73:21,23 91:20 93:24 137:16 205:9 210:12 223:6 235:25

**giving** 13:18 65:2 144:9 194:6 238:17

**gleaned** 73:3

**glitch** 226:5

**glitches** 6:23

**global** 223:20

**globally** 110:11,15

**go-live** 174:20,24 214:19 221:8

**go-lives** 175:15

**go-to** 78:19

**goals** 246:25

**good** 7:12,14 31:25 32:13 34:8 46:17 54:23

60:16 82:19 104:7 112:20 114:19,22 115:9 150:5,13 155:4 157:19 164:4,23 171:25 172:1 178:1 193:18 208:13 213:15

**graduate** 14:8

**graduated** 15:11,16

**granted** 159:25

**Gras** 219:9 232:9 235:9

**Gras's** 237:2

**great** 4:24 9:22 116:18 148:25 150:14 166:6 172:3,21 191:22 237:22

**Greer** 32:5

**grew** 30:6

**group** 212:8,10

**groups** 81:2

**grow** 17:9 31:2

**grows** 33:9

**growth** 33:11,13,15

**guaranteeing** 134:20

**guarantees** 193:11

**guess** 20:12 24:4 25:1,21 28:10 30:18 66:17 74:10,20 84:4,12 109:5,10 114:3,19 118:12 138:25 143:16 147:1 148:3 155:5 158:4 186:13 193:13 196:16 197:8,15 208:7 227:7 245:5

**guessing** 32:8,11

**guide** 125:16 245:12, 21,24 246:22,25

**guidelines** 9:15 184:19 199:2 246:7

**Gunther** 28:24 112:10

**guy** 170:23

**guys** 109:6 235:19

**guys'** 218:23

**H**

**half** 208:7

**hand** 4:18

**handed** 187:23

**handing** 188:5

**handling** 84:7 187:24

**hands-on** 48:11

**happen** 11:6 171:8

**happened** 120:4,15 180:5

**happening** 43:9 120:10 127:13 161:10 209:3

**happy** 173:15 235:18

**hard** 46:15

**Harvard** 14:19

**hates** 241:16

**head** 6:25 28:15 34:15 51:3 219:20

**headed** 97:18

**heading** 229:1

**heads** 115:24

**health** 18:5,11 24:17, 25 25:1,4 88:4 103:17 110:2 132:6,10 143:21 144:3 181:9 193:11 242:12

**healthcare** 78:3 85:12 87:6 124:5 165:8

**hear** 69:9 213:25

**heard** 19:20 58:20 67:15

**hearing** 4:16 42:13 46:15 192:22

**Heidi** 219:9 232:8,19 235:9 237:2,21

**held** 16:12

**helped** 15:2 23:20 37:13 198:14

**helpful** 18:16

**helping** 17:9 151:16

**helps** 36:1 230:22

**Hey** 154:25 233:11

**high** 16:21 34:2 35:18 48:3,5 131:23 163:14 220:5

**HIPAA** 132:8,17 133:22 134:1 136:2,6 138:13

**hire** 28:16

**hired** 30:19 37:3,4 47:5 55:14 69:13 134:24 139:3

**historical** 71:8 72:3, 8

**hit** 187:8

**hold** 13:2,7 26:23 67:16,18,22 96:25 164:22

**holidays** 232:6

**home** 8:15,17 159:10

**hope** 96:19 206:21 213:14 221:3 237:21

**Horizons** 78:6

**hour** 54:25 164:4 208:7 231:5

**hours** 11:10 206:1

**houses** 24:24 25:7

**HTML** 161:8

**Hubitski** 68:20

**human** 48:16,19 49:6 51:17,23 52:13 55:21 60:12 203:3 216:25 246:17

**human-step** 199:9

**humans** 203:4

**hyperlink** 214:1,3

**hypothetical** 145:14,19 146:23 147:9 183:20 185:5

**I**

**ICD** 102:22

**idea** 97:10

**Ideally** 115:2

**identical** 104:11 105:8 141:8

**identification** 76:8 137:23 148:19 163:24 172:9 177:10 190:22 207:14 218:14 234:16 237:8 239:18 244:22

**identified** 33:10,21 34:2,14,16 86:11 101:17 107:16,24 108:15 131:6

**identifies** 78:2 109:9 112:7,9

**identify** 53:25 77:17 87:2 101:25 112:3,16 121:17,24 138:17 198:15 200:24,25

**identifying** 14:25 71:3 80:9 159:20

**impact** 9:19

**implement** 16:17 189:11 238:18

**implementation** 151:15,18 166:3

**implementations** 151:6 220:12,23

**implemented** 157:14 217:23

**implementing** 152:14

**implicate** 201:8

**implicated** 90:16

**implicit** 155:6

**important** 6:1,20 54:16 209:2

**importantly** 5:19

**impressions** 41:16 43:1,3 115:6

**improve** 69:15

**inaccessible** 181:10

**inbound** 21:4

**Inc.'s** 76:12

**include** 19:12 124:20

**included** 107:20 112:12 209:8 238:5

**includes** 105:7,9 165:8 207:20

**including** 110:22 219:7

**incomplete** 145:14, 19 146:23 147:9 183:20 185:5

**incorrect** 110:9 203:6,7

**incur** 204:23

**indefinitely** 64:18 65:4

**independent** 55:17

**independently** 82:6

**indirectly** 112:4

**individual** 89:8 101:7 136:23 223:21

**individuals** 131:12 177:16

**industry** 14:14 19:19 64:25

**info** 225:4 227:3,24 228:10,23 230:2,10,21 231:16 232:14

**inform** 136:8

**information** 14:13 20:4 25:3 67:19 70:24 72:22 73:2,7,10 74:9 75:9 78:19 79:5,11,12, 22,24 80:2,16 81:2,7,8, 13,25 82:3 84:3,14 85:22 86:12,14,15 88:3, 5,13 89:25 90:7 99:24 100:19 106:19,22 108:19,22 122:3,9,13, 17 136:21 137:19 139:14 141:13 142:16

144:15,16 154:18 155:7 175:4 178:5 193:12 199:23 200:3 206:15 222:7

**informational** 63:1

**informed** 25:16 203:24 204:1 231:18

**infrastructure** 12:14 13:1,11 17:6,7 23:15 27:25 29:4,23 30:10 47:9 114:6 117:16 244:5

**ingested** 124:14

**initial** 15:10 89:1

**initially** 30:6 36:23 37:3 74:10 101:1 209:8 213:8

**initiated** 40:7

**input** 25:7 117:3 225:4

**inserted** 227:22

**inserting** 201:9

**insight** 88:21 127:8

**inspired** 46:19

**instance** 19:13 93:12,24 99:18 102:11, 21 119:19 120:5 139:20 145:7 154:11 157:16 161:23 167:1 179:9 202:8 209:22 223:11 229:12,18

**instances** 8:9 108:6, 7 121:5 129:9 130:9 158:11 162:17,20 166:20 179:22 180:1

**institution** 102:22

**instruct** 40:24

**instructed** 67:12

**instructing** 216:12

**instructions** 82:4 125:13 184:20 185:15, 25 238:17 240:3,18 242:10 244:15,17,18

**instructs** 8:6

**integrate** 123:25 169:12

**integrating** 21:23 157:25 168:18

**integration** 21:16, 17 22:11,13 23:20 34:7 49:17 75:17,18 93:20 117:16 151:23,25 152:10,12,19 153:4 157:2,22 163:1 174:14 187:20 188:23 189:11 201:9 216:5 218:9 223:7,12 225:7 232:6 237:25 238:4 240:3 245:14

**integrations** 19:10 24:1,3 26:18 27:24 34:9 55:20 123:24 136:24 160:21 180:15 189:3 196:7 198:4 214:14 233:23

**integrity** 35:20,25 104:1

**intended** 246:25

**intent** 211:5

**interactions** 176:8 183:4 188:10

**interchangeably** 18:13 24:23,24

**interest** 53:12

**interested** 157:25

**interface** 93:25 94:3, 5,7 109:21 119:13,21, 22 120:23 121:6 128:2, 8,13,24 129:3,16 156:14 166:20 226:7

**interim** 238:3

**internal** 166:6 210:15

**internal-facing** 209:1

**internally** 93:8 104:14 110:12 111:3 192:17 211:7,12

**interns** 28:13 31:16

**interoperability** 124:6

**interpose** 7:22

**interrogatories** 76:12 98:6 107:6

**interrogatory** 77:17 78:12,17 83:8 90:25 98:11 101:17 107:15 108:15 111:19, 24 112:2 130:21 131:2, 7

**intersect** 151:3

**interval** 48:25

**interviewing** 17:9

**introduce** 75:25 151:21 164:2 172:11 190:3 239:21

**introduced** 5:2

**introducing** 152:8

**introduction** 173:6 188:5

**Intus** 12:3,15 13:7 14:4,7 16:3,12 17:22 19:2 21:4,6 24:16 25:12 26:21 35:1 36:9 37:23 40:7 41:4,6,17 43:23 44:11 46:5 48:25 49:21, 25 50:15 51:19 52:21 53:10,12 54:2,6 55:5,14 57:23 58:12,21 59:18 60:13 63:7,9,15 64:10, 13,15 70:23 71:3 73:3 74:2,8 75:11,12,22 77:18,22 80:20 81:3 82:15,23 84:2,13,23 85:21 86:23 87:3,8,15 88:7,11,21 89:12,14 90:4 93:8 98:6 106:25 107:10 108:7 109:11, 15,18 110:6,11,12 111:2,3 112:7,25 115:5 117:10,11 118:14 119:21 120:5 122:18,19 123:3,10,20 124:10 126:1 128:22 129:2,7 130:5,13 131:13 133:9 134:4,18 135:11,19 138:2,18 139:11 141:1, 5,12 142:15,16 143:9 144:2,14 145:3 147:20 149:18 152:13 153:8,23 156:25 159:12,20 162:1 163:15 165:7,11,20

166:11,20,21 170:3 172:14 174:3,14 175:3, 18 176:5 178:4,21 179:10,18,23 180:2,24 181:5,19 182:16 185:16 187:13 192:17,23 195:15,16 196:13,18 197:3 199:13,24 201:18 202:2,17 209:11,19 210:9,17,20 211:7,12, 16 215:20 216:5,8,12, 24 217:3,15 219:6,7 222:13 223:11 225:23 226:4,21 228:5 230:25 233:1,6,14 235:13,16, 24 243:16,24 247:5

**Intus'** 104:8,10

**Intus's** 40:8,18 51:6 52:4,15 61:4 64:22 68:22 121:10 124:14 135:20 136:22 140:12 141:2,20 145:10,11 147:23 161:13 169:13 170:11 180:3 192:18 200:21 217:21 225:16 229:20 238:11

**Intus-issued** 126:25

**Intuscare** 37:2 87:13 88:15 126:21 142:10 146:19 151:24 155:9,10 167:12 169:18 173:4,8, 11 192:7 200:4 203:12 206:16 221:6 223:8 225:2 231:21 232:5,13 238:7 240:2

**Intuscare's** 76:10

**Intuscare123** 153:19

**invest** 144:12

**involved** 14:12 29:22 30:9 37:5 49:3 55:11 63:10,21 65:24 78:11 107:5 112:4,17 114:8 117:15 120:21 127:24 149:11 167:9 197:4 201:13,15 220:12 227:1

**involvement** 48:7 65:13 78:16 131:9

**involving** 177:16 219:6

**IRIS** 35:4,19 36:8,13, 19 37:6,10,19 46:6

**isolate** 222:15

**issuance** 224:3,6,15 226:14 234:13

**issue** 93:11 119:23 141:9

**issued** 92:20 141:7 144:25 154:11 163:6

**issues** 62:10 117:3 155:3 188:1 192:8 221:18 232:3

**issuing** 58:11

**items** 63:2 155:20 159:3,8 169:24 171:7 221:5

---

### J

**James** 32:5

**January** 13:16 77:19 87:4 102:13 237:21

**Jenkins** 4:4

**Jira** 83:21

**job** 7:2,14 26:7 28:6 29:17 32:13 56:4 114:23 115:9 127:18

**Joe** 145:9,16

**join** 25:16 28:14

**joined** 13:15,25 16:16 24:15 25:14 32:3

**joining** 16:3

**Joshua** 31:14

**June** 49:22 207:22 214:22 217:2 240:3

---

### K

**Kakarla** 45:8 46:1

**Katie** 240:8,12

**katiesmith@ mybrio.org** 240:2

**key** 217:17,19 228:18

**keyboard** 48:12

**kick** 223:7

**kind** 5:16 6:22,25 7:23 8:24 9:15 10:4 14:12 17:3,15 18:22 20:11,13 21:10 22:23 25:22 31:16 32:7,8 35:2 37:14 40:20 41:22 53:21 60:23 74:12 81:16 83:5, 16,24 103:25 104:3,8 105:5 111:7 117:16 118:8,10 121:10 122:9 126:1 127:12 131:16,17 138:3 144:2 149:22 151:8 157:10 160:20 161:14 167:14 173:2, 17,18 175:5 187:25 200:13 209:12 211:6 220:17 222:10,22 225:9 226:3,15

**knew** 43:8,16 67:4 88:23 116:17 156:6 179:5 189:19

**knowledge** 47:14 57:17 92:20 109:20 112:16 114:10,15 133:5 134:5,6,11,17 138:19 147:21 148:2 186:7 194:2 203:15,20

**knowledgeable** 116:14

**Kubernetes** 81:24 82:2

**Kumar** 31:14

---

**L**

---

**labeled** 96:4

**lack** 21:7 126:2 199:1

**lacks** 83:10 94:20 95:6 111:5 137:2 145:20 146:22 147:10 152:4 183:8,19 186:3 202:20 204:18 216:14 229:22

**lake** 241:13,15

**land** 114:3

**lands** 222:24

**laptop** 126:25 129:19

**largely** 182:18 191:16

**larger** 55:24

**Larry** 227:10

**lasted** 170:21

**Lastpass** 79:16 90:6,16,21

**latest** 242:22

**latitude** 116:3

**Laura** 167:7 191:4,17 195:14,20 197:24 198:2,6 201:4,9,13,15, 17 202:5

**Laura's** 151:2 197:13

**Lauri** 150:16,20 151:9,20 165:10 166:4 171:12,13 172:16 173:3 188:4 207:19 213:13 214:7

**lawsuit** 40:6,16 212:22

**lawyer** 235:15

**lawyers** 132:25

**lay** 152:18

**layers** 20:25 105:4

**Lazuca** 227:8,10

**lead** 32:25 167:10 169:20

**leader** 32:24 196:24

**leadership** 47:21 68:22 201:24

**leading** 30:17 36:23 114:16 196:22

**leads** 46:7

**leak** 164:14

**leaked** 136:7,9

**learn** 26:18

**leave** 32:23 38:2 39:13 154:14,15

**leaving** 14:8

**led** 30:9,16 40:2 48:10 113:5 198:6

**Lee** 4:24 5:1,4 10:7,18 22:25 27:8,17,21 33:5 40:17 41:3,15,20 42:22, 25 43:7 44:17,20,24 46:25 47:6 53:20 55:1,4 57:1 60:16,20,22 68:9, 17 69:2 70:18 71:22 73:23 76:2,9 77:2 80:5 83:13 88:6 89:20 90:12, 23 94:4 95:1,13,21 96:18 97:5,9,19 98:2 102:10 109:8 111:15 116:19 117:6,20 118:1 133:7 135:7 137:5 144:13 145:21 146:13 147:5,13 148:20 150:6 152:7 157:21 163:25 164:6,9,12,19,22,24 165:1 171:24 172:3,5, 10 175:25 177:11 182:1,23 183:3,16,21 185:9 186:11 190:2,6,9, 13,17,23 191:14 195:10 203:14 204:25 207:7, 11,15 208:6,13 212:5 216:21 218:15 226:19 230:3 231:6,9 236:16, 17,19 237:9 239:4,11, 19 244:23 247:8

**left** 113:1 231:15

**left-hand** 119:17

**legacy** 70:1,4,7 71:1 73:1

**legal** 42:8 44:15 137:2

**legislation** 193:10

**legitimate** 180:22 189:14,23 193:5,7,8,16, 20 194:7,11,22 195:1,4

**length** 131:16

**letter** 192:24 195:16 215:19 216:4,11 241:21

**level** 16:21 34:2 35:18 48:3,6 131:23 135:23 136:23 220:5 229:10 230:6 232:23 233:4,7, 13,15,19

**Li** 31:13 197:16,22 200:20

**licensed** 4:8,10

**lieu** 207:4

**Life** 78:4 90:25 92:5 94:16 96:1 149:8 150:17 151:23 153:25

**Lifecircles** 219:6,9, 18 221:7 231:19 233:1 235:24 237:25 238:17

**limit** 32:14

**limitations** 222:20

**limited** 110:17

**lines** 35:4

**list** 31:6,20,24 32:2,20 33:9 82:17,20 84:6 90:4 91:20 106:15,17 107:3 112:12 155:19 159:3 240:19

**listed** 83:7 86:5 131:12

**listen** 56:21 182:20

**litigation** 67:16,18, 20,22

**live** 104:21,22 116:8 128:14 129:23 155:18 183:15 223:6

**living** 221:12,16

**load** 242:19

**loading** 240:14

**local** 127:6 129:19 226:17

**locally** 126:16,19 127:7 128:6

**location** 80:17,19 81:5 241:9

**locations** 74:25 79:15

**log** 62:21,22,24 63:1 65:25 66:4,10 71:2 80:16 89:22 96:8 99:23 101:2 102:9 120:6 121:4,10,15,23 139:16, 20 140:12 141:2,10,16 142:3 225:2

**logged** 139:11,15 162:13,18

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

**logging** 120:21 226:22

**login** 71:5,6 73:2 77:18 87:3 96:2,6 140:14 141:12,15 175:3,4,11,19 176:5,19 178:5 217:20 223:7,11 225:4,15 229:19

**logins** 71:3 141:11

**logistics** 12:4

**logs** 61:20,21 62:3,6, 13,14,17 63:7,9,11,13, 15,19,23,24 64:11,14, 15,18,19,22 65:1,11,18 66:11,15,22,23 67:13 68:1,12,23 69:1,7,19 70:4,7,15,25 71:21 72:2,17 73:1,4,5,8,10 80:14 90:18 121:8,16 141:6

**Lomeli** 165:9,19 171:11

**long** 10:4 11:8 13:2,13 23:4 27:4 116:4 117:10 164:7 170:20 184:11 203:24 205:14,15,17

**longer** 12:16 21:24 37:2 56:9 57:14 58:3,15 59:7,25 60:3 62:4,6 63:24 64:1,10,19 70:8 73:13 75:11 120:1,3 142:22,25 143:2,5 201:6 215:17 231:19

**look-back** 64:21 65:5

**looked** 11:5 90:14 107:16 174:10 177:21 180:9 188:3 192:13 214:15 237:3 241:23

**loose** 224:22

**lose** 98:24

**lost** 69:19

**lot** 17:16 23:5 98:20 137:8 212:7

**loudly** 46:16

**love** 122:9 232:5 238:1

**lower** 119:17

**Luke** 237:23

**lunch** 118:2

**luncheon** 117:25

---

**M**

**M-A-R-Q-U-A-R-D-T** 172:16

**Mace** 112:21,24 113:1 114:22 115:8 116:8

**machine** 126:8 127:6 226:17

**machines** 105:11 127:4

**made** 81:19 93:1 100:3 105:3 111:8 121:17,24 143:18,19 153:25 157:17 181:13 194:23 195:3

**main** 16:17 25:17 54:13 104:5

**maintain** 75:5 156:18

**maintained** 90:4

**major** 220:23

**make** 5:17,19 6:13,17 7:2,4,18 11:18 31:20 40:12 41:11 59:16 62:14,19 64:8 65:20 69:25 73:16 88:24 89:1, 5,25 93:10 103:19,22 104:17,18 105:2,23 126:17 127:9 132:4,20 136:11 145:17 146:3,12 152:10,21 157:4 179:15 193:18 194:11 203:23 233:7,14 240:23 241:11 242:5

**makes** 8:4 77:1 98:14 146:14 154:9 181:8 193:7 216:20 236:19

**making** 5:5 103:14, 19 121:21 188:12 213:15 234:12

**Malorie** 172:15 173:3,24

**man** 22:1 115:4

**managed** 227:14

**management** 160:4,7,14,22 161:1

**management-type** 220:9

**manager** 113:4 116:1,2 227:13

**managerial** 38:10 39:18

**managers** 74:12

**manages** 167:10,15 173:9

**managing** 74:13

**mandates** 193:11

**manner** 4:13 21:5 189:10 229:6 236:1

**manual** 81:17 183:17 194:21 202:23 203:2,3 205:1 236:10 239:1 241:18 242:8 243:15

**manually** 52:16 80:25 81:8,9 120:7 181:10 205:3 242:25

**manually-generated** 236:3

**map** 185:25 198:10 199:18,22 204:4 238:5, 11

**maps** 184:15,18 198:20,21,25 199:12 200:18,19,25

**MARCH** 4:2

**Marina** 165:9

**mark** 97:8 148:21 190:7,9,16

**marked** 76:7,9 97:24 148:18 163:23 172:8 177:9 190:4,10,21,24 207:13,16,17 218:13,19 234:15,19 236:25 237:7 239:17 244:21 245:1,5

**markedly** 29:19

**market** 114:18

**marking** 177:13

**Marquardt** 172:15 173:4,14 174:23 177:25

**Mary** 191:25 192:4

**Massachusetts** 8:14

**masters** 16:1,8

**material** 28:5 39:20

**materials** 212:19

**mathematics** 15:15,18

**Matt** 37:1

**matter** 22:6 37:1 40:15 77:4 114:17,22 116:8 162:1 201:23

**matters** 67:19

**Max** 28:14,19 30:19 33:8 112:10

**Max's** 28:22

**Mazuka** 227:9

**meaning** 24:10 43:11 63:24 100:18 106:16 113:7 115:17 148:6 155:7 156:19 159:24 193:16 197:9 215:6 217:23

**means** 52:3 72:3 105:21 132:18 179:5 203:10 233:19

**meant** 44:12 144:8 162:7 214:7

**medical** 14:13,14,19 24:25 25:7 36:5

**Medicare** 35:22

**medications** 9:19

**meet** 10:24 11:12

**meeting** 168:4,7,16, 19,21 169:5,10,14 170:7,18,21,24 171:3

**meetings** 11:18

**Melanie** 213:20

**member** 40:2 120:25 126:23 150:23 166:6

197:15,22 226:4

**members** 32:21 33:21 34:1,14 35:13 68:19 123:4 131:8 209:19

**memorialized** 91:24

**mentioned** 6:11,20 10:9 17:12 30:15 50:10 104:25 114:21 130:13 167:7 168:22 244:13

**menu** 51:8 159:8 188:8

**mere** 12:3

**message** 121:20 129:15

**messages** 212:9

**messaging** 211:24

**met** 9:24 10:4,8,9,10 11:4,8

**method** 55:20 66:16, 25 81:14 89:23 123:5 179:2 217:24 236:9,10

**methodology** 124:8

**methods** 123:21 124:6 168:17 193:13

**Michael** 167:8 168:24

**micro** 116:2

**Microsoft** 243:11

**mid-2022** 13:5 23:10

**mid-september** 174:25

**middle** 12:22

**migrate** 63:5

**migrated** 46:10 214:12

**migrating** 143:10

**migration** 173:5

**mimics** 51:22

**mind** 42:22 44:21 130:22 164:13 194:25 207:24 219:12 239:5

**mindful** 75:10 125:23

**mine** 218:24

**minimum** 163:13

**mining** 66:5

**minute** 239:12

**minutes** 60:17 206:1, 3,6,9,10,11 208:8

**misremembering** 49:18

**missing** 222:19

**misspoke** 175:24 215:1

**misstates** 44:14 53:15 68:14 70:16 73:18 89:16 90:19 102:5 111:4 181:25

**misstating** 68:25

**misunderstood** 26:17

**mobilize** 36:8

**mode** 226:16

**modification** 226:6

**modifications** 127:9

**modified** 121:6 126:4,24 127:18

**modify** 189:10

**moment** 30:16,18 61:23 63:4 68:13 76:3 96:8,9 207:25

**momentary** 46:19

**moments** 65:16 69:4 101:24 169:8

**money** 143:7 144:11, 12

**monitor** 109:20 119:25 126:25

**monitoring** 126:23

**monitors** 135:19

**month-ish** 192:12

**months** 12:21 13:17, 18 62:18 65:1

**morning** 178:1 192:5 237:24

**mouth** 56:11

**move** 73:17 143:20

**moved** 73:11,15 210:23

**moves** 104:1

**moving** 208:8

**multi-tenant** 158:10

**multiple** 87:19,22 110:22 118:14,19 219:7

**multiples** 206:11

---

**N**

---

**names** 102:25

**narrow** 23:8

**natural** 69:11

**nature** 24:12 25:23 120:7 201:12

**navigate** 95:5 149:2 156:13

**NDA** 178:11,15,18,21 179:4,11,19,24 180:13 187:16,19 188:12,17,24 189:9,19,21 192:14 215:22 224:8,17

**necessarily** 41:9

**necessitated** 189:5 216:24

**necessity** 127:21

**needed** 9:7 17:4 49:7 50:11 52:22 54:6 66:14, 16 71:14 81:15 93:5,19, 20 94:23 95:3,11,15 101:10 118:20 119:9,16 122:12 146:1 156:15 159:12,19,20 160:25 166:14,15 169:18 171:13 193:17 197:18 198:15 199:15 200:24 201:1 214:13 221:22 226:6 233:8 238:13

**Neighbor** 108:13

**Neighborhood** 78:3 85:12 87:5 88:4 98:19 102:12 108:4,8, 11 157:24 165:8,10 171:11,18

**Neighborhood's** 88:12 102:17 158:3

**neighborhoodhealthcare.pacecare.com.** 85:15

**Neighborhoodpace** 180:10

**net** 106:23 107:7

**Network** 14:18,21

**news** 175:11

**Nick** 135:2 138:22 139:3

**Nicole** 219:18 221:3 231:19

**Nicole's** 231:20

**nods** 6:25 51:3

**nonverbal** 7:1

**notary** 4:8

**noted** 200:23

**notes** 7:24 9:11 239:13

**notice** 175:10

**notwithstanding** 8:1 189:18

**nuance** 47:4

**nuances** 136:4

**number** 17:13 33:16 74:24 79:14 82:14 85:5 105:20 120:14 163:11, 17 244:12

**numbered** 177:13

**numbering** 149:23

**numbers** 112:7 149:16,22

## O

**oath** 5:22 118:5

**object** 22:20 26:24 42:15 68:7 109:6 238:20

**objected** 238:22

**objection** 4:13 7:22 8:2 27:17 42:7,13 44:14 53:15 68:14,24 70:16 73:18 79:25 83:10 87:23 89:16 90:11,19 94:2,20 95:6 102:5 111:4 114:24 116:12 117:4,18 137:1 144:5 145:13 146:22 152:4 181:24 183:8,19 185:4 186:3 195:5 202:20 204:18 216:14 229:22 239:9

**objections** 7:23 42:19 43:5 76:11 95:17 145:18 147:8,14,25

**objective** 169:9

**observation** 116:7

**observations** 42:4

**observe** 127:10

**obstacles** 116:6

**obtaining** 171:17

**occasion** 66:10 154:10

**occasionally** 119:4 120:11 121:2

**occupied** 19:1 113:7 196:6

**occupy** 13:13 39:7, 10

**occurred** 8:2 59:25 73:17 101:21 102:17 144:16 168:7,20

**occurring** 36:20 172:19 177:18

**occurs** 207:21

**odd** 190:3,14

**offer** 156:1

**offered** 101:4 133:18 134:2

**offering** 17:23 18:20 143:21,22 144:3

**office** 8:16,17

**officer** 134:5 138:21 201:18

**official** 134:14

**offline** 215:7,9,11

**onboard** 33:8

**onboarded** 206:23 211:10

**onboarding** 151:6 206:20

**one's** 8:20

**one-to-one** 211:24 212:11

**onerous** 194:21

**online** 124:10 177:2,3 214:3

**open** 8:22,25 9:1 142:9 148:24 160:3 164:16

**opened** 111:21

**Opening** 130:24

**operating** 180:16

**operation** 188:7

**operations** 51:8 159:9

**opinion** 116:22

**opportunity** 6:7,11 150:2 237:23

**opposed** 49:14 66:22 97:13 143:21 199:9 202:7

**opted** 52:12 125:4

**options** 169:22 170:14

**orchestrated** 127:4

**orchestrates** 67:3 81:21

**orchestration** 81:23 119:24

**order** 7:1 17:4 26:4 48:16 49:5 50:11,24 51:23 54:6 55:21 60:13 66:5 72:8,21 74:7,22 78:25 79:11,23 82:3 92:6 93:19 94:23 95:11 105:4 119:14 120:22 123:5 126:17 127:21 129:12,21 148:22 153:4,12 154:21 156:8, 17 157:7 158:4 164:2 169:18 172:11 174:4 239:21 240:13

**organization** 38:16 46:8 52:12 57:25 58:11 59:2 60:11 80:11 83:17 85:17 99:18 101:14,16 109:19 139:20 167:3,4 184:21 217:16,17 225:15

**organization's** 58:9 126:6 147:19

**organizational** 88:19 135:23

**organizations** 14:24 81:14 82:5,7,15, 22,23 83:8,25 84:14 85:6 86:5 99:25 106:15, 24 107:9 110:10 125:20 163:12

**organizes** 135:8

**orient** 221:9

**original** 70:25 188:15 236:16 241:19 243:1

**originally** 214:11

**originating** 37:19

**outline** 53:25

**outlined** 206:24 207:4

**output** 107:8 242:13

**outset** 74:16

**overlapping** 48:5

**overloaded** 20:13

**oversight** 56:5

**overview** 40:21

## P

**p-r-o-d** 103:8

**p.m.** 247:13

**Pace** 25:13,20,23 26:5 33:16 37:1 58:9,11 60:11 74:3,7,22 77:24 78:4,5 80:10 82:5,14,22 84:14 85:5,17 90:25 92:14 94:16 95:24 96:1 101:15 106:24 107:9 110:10 122:3,7 125:19 139:20,24 140:11,16 141:1,19 145:7 146:16 147:19 153:7 154:19,21 157:3 158:5 160:22 163:15 167:2 174:15 183:4,6 184:20 185:17 186:1,19 187:8,18 188:24 189:3 199:2 200:17 201:23 203:21 204:2 214:13 216:6 217:16,17,19 222:21 225:14 228:17,18 231:1,23 244:10

**PACE's** 176:25

**PACECARE** 44:11 47:16 48:9 49:5,8,10, 21,25 50:11,15 51:1 52:5,12 53:10,13,18 54:6 56:6,9 57:15,23 58:11 59:19 60:1 64:7, 20 71:4 73:3 74:3,8,23 75:12 77:19,24 81:3 82:14,24 84:15 85:18 87:4 88:13 92:3 94:4, 10,11,18 95:5 96:3,7 102:18 106:17,21 107:10 109:12,16,21 110:7,11,23 111:2 117:3,17 118:15 119:12 120:6,22 123:4 125:20 126:7 127:21 128:2 130:12,17 152:13 153:9 156:13 157:3,6 158:11 159:12,18 160:15 162:13,18 163:6,12,16 169:16,19 173:10 174:5 176:5,11,25 177:7 178:11 179:1,19 180:25 184:5 185:12,22 187:2

192:20,25 193:8 194:13 201:7 207:5 214:3,18, 24 215:21 216:23 217:4,18,20 225:15 226:15 228:18 233:8, 16,22 236:7 238:12 242:25 246:11,19

**PACECare's** 119:13 128:24 157:9

**pacecare.com** 86:18 91:4

**PACELOGIC** 75:14, 23 123:14 129:3,16 130:7,10,15 214:12 221:21 222:1

**paper** 98:21

**paragraph** 165:22 166:4 206:18 223:18

**parallel** 145:23 148:12

**parameter** 119:10

**parameterize** 24:8

**parameters** 122:2 128:5 156:8 184:6 186:9,15 204:10 205:3, 21

**part** 26:6,11 30:13 31:4 52:6 68:16,18 69:16 98:12 103:13,16 104:10 105:1,13 110:20 111:9 119:8 122:8 127:25 135:15 136:6,17 181:15 183:3,5,11,12 196:22 198:8 201:24 220:22,24 241:7 242:21

**participants** 165:9 172:15

**parties** 4:7,11 141:19 179:23

**Partners** 92:14 157:23

**parts** 38:15 162:25 195:9

**party** 4:13 5:14 146:19 147:6,21,22 211:25 212:3,4,5

**pass** 245:13

**passed** 101:10

**password** 153:19 155:3 165:21 228:14 232:14

**past** 87:11 109:7 116:16 142:21

**paternity** 32:23 38:2 39:13

**pathway** 237:25

**pattern** 160:20

**Paul's** 78:5

**paused** 215:14

**pausing** 197:3

**pay** 70:9 143:1

**paying** 84:9 202:19

**PCO** 155:17 158:3 232:13

**PDF** 240:17 244:14

**penalty** 77:11 115:21

**pending** 67:20

**people** 25:22 31:7,15, 18 32:3 33:2 74:13 84:7,18,21 87:22 91:21 110:22 111:11,13 115:16,24 134:14 136:9 137:16

**perceived** 83:5

**percent** 146:3

**perfect** 7:8 71:8 190:11,12,19 207:11 219:3

**perform** 127:6

**period** 21:16 23:19 30:9 31:17 32:22 33:1 47:10 62:13 64:19,22 69:25 113:2,5,12,13,20 142:11 177:2 198:1 215:7,16

**perjury** 77:11 115:21

**person** 36:22,25 78:8,19 83:23 126:14 131:5 136:15 145:10 146:20 154:6,8 167:15 168:23 173:9 204:23

**person's** 25:3

**personal** 42:4 89:19 126:20 194:1 203:15 230:20

**personality** 115:18 116:6

**personally** 91:13 100:6 120:21 211:2

**persons** 112:3

**perspective** 167:16 187:18 202:12

**Petrino** 39:2,3

**Petrino's** 39:5

**philosophy** 15:10

**phrase** 236:14 241:17

**physical** 9:12

**pick** 55:15

**picks** 237:15

**picture** 129:15

**piece** 25:2 101:10 123:6 193:10

**pipeline** 16:18,22 17:6 20:23 21:2 57:4,6 59:13 61:9 69:17 75:8 79:18,21 80:20,22 81:18,22 89:7 92:11 93:18 99:11,17 119:24, 25 128:5 167:11,15 173:10 185:20,22 186:6 203:18 205:14 225:17 241:7 242:21

**pipelines** 19:5,8

**pitch** 183:6

**place** 60:17 61:10 115:14 120:3 143:6

**placeholder** 106:2

**places** 48:15

**plan** 160:4,7,14,22 161:1

**plans** 143:17,19

**platform** 18:1 68:20 69:14,15,18 73:15 132:7,8 141:6,21

145:11 146:2 162:2 196:8 200:21 224:4

**play** 227:12

**playbook** 173:3

**point** 8:25 27:23 30:24 32:23 35:3 45:7, 16,19 59:8 65:22,24 69:3 70:7 75:10 93:3 99:3 122:25 144:4 163:14 165:25 197:23 198:1 201:6 210:4 217:22 236:8

**points** 170:10

**policy** 210:7

**pop** 164:21

**Pophealth** 18:16,18 19:3 33:17 34:17 35:4 46:5 51:12,20 52:2,15 59:14 60:14 75:13,21 82:24 84:15 122:8,15 136:22 139:12 141:1,6, 20 142:24 143:11 144:17 179:15 181:6 196:8 200:21 202:17 203:12 224:11,15 234:3 238:13 243:17

**populate** 37:19 124:15 235:18 236:4 238:7

**Population** 18:5,11 103:17 110:2 132:6,10 143:21 144:3 181:9 242:12

**portion** 34:8 55:19,23 103:25 104:17 108:4 110:15 138:14 204:21 231:17

**position** 46:11 112:24

**positions** 16:12

**possibly** 184:13

**post** 241:20

**post-it** 7:24

**potentially** 6:16

**power** 51:12,20 52:2, 15 60:14 196:8 238:13 243:17

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

**PPT** 102:22

**practice** 62:7,12 92:23 154:13 160:21 188:23 208:23

**pre-production** 103:18

**preceded** 36:16 113:9

**preceding** 131:6 173:19 223:15

**predicate** 26:24

**predominantly** 159:19

**preference** 232:15

**preferred** 161:14,16

**preparation** 10:19 11:20 12:6 107:5,7

**prepare** 9:23

**prepared** 96:12

**presence** 11:14 41:5

**present** 77:20 87:5

**presentation** 140:18

**presented** 140:5 207:17

**presenting** 104:23 140:20 230:9 244:24

**presume** 66:9 86:23 91:7 101:15 127:15

**presuming** 77:7 87:6

**presuppose** 34:25

**pretty** 17:18 118:16 137:9 164:13 174:9 208:8 217:14

**prevent** 43:20,23 179:17

**preventing** 43:12,18 129:25

**previous** 69:20

**previously** 14:9 69:17 190:4,24 199:24 218:7,10 236:10

**primary** 18:25 19:4 63:23 210:14 211:6,11

**Principle** 137:15

**principles** 137:9

**print** 97:14

**prior** 11:23 13:8,10 14:7,11 16:2 39:13 51:17 52:1 55:7 60:22 96:11 137:3 138:25 214:16 226:2,25 245:24

**privacy** 134:20

**private** 82:1,3 86:16

**privilege** 137:15 166:18

**privileged** 42:10

**privileges** 176:10

**problem** 106:4 164:11 231:8

**proceed** 4:16 153:4 191:21 219:15

**proceeding** 6:6 8:1

**proceedings** 4:1 5:5

**process** 26:3 48:12, 22,24 52:20 55:18,23 62:9 69:5 70:12,21 72:19 78:24 79:3 81:17 103:25 105:1,3 127:16, 25 130:16 131:18,24 174:14 199:9,10 200:2, 10,12,17 202:7,11,13, 16,23,24 203:2 206:14, 24 207:3 216:5,13 217:1,2 218:4 225:11, 20,23 226:3 234:5,12 235:20 236:11,12,20 238:18,20 239:1,10 240:13,24 241:1,3,5,6, 7,18,20,22,24 242:8,9, 13,20 243:1,14,15,16, 20 244:11

**processes** 53:1 105:10 110:23 111:11 136:24

**processing** 20:21, 23 51:18

**prod** 103:8

**produce** 64:3,6 99:23 183:17 235:12

**produced** 65:12,18, 25 98:1,11 102:8,9 112:6 131:11

**producing** 63:21 161:8

**product** 17:23 18:5, 19 35:3,21,25 36:9 37:6 59:9 75:19 143:11,12 181:12 183:7,14 185:12,23

**production** 103:9, 15,17,21 104:2,5,11,20 105:6,9 127:3

**products** 46:5 110:1 116:11 182:18

**program** 14:9 16:1,2 24:7 60:14 63:4 75:13 158:6

**programs** 9:1

**progress** 213:16

**projects** 143:16

**promote** 103:20 104:20

**promoted** 13:17 14:1 27:23

**prompt** 119:5

**prompts** 156:24

**properly** 73:2

**properties** 83:25

**prospective** 169:15

**provide** 9:16 52:21 71:2 72:8 82:23 85:6 110:6 111:12 125:6,11 145:8 146:18 153:8 154:21 155:12,19 173:24 184:20 185:16 193:12 200:6 202:18 213:22 216:7 235:13 236:2 240:19

**provided** 82:4 133:12 147:20 153:24 170:7 185:25 192:13 229:18 235:17

**provider** 99:14 243:12

**providing** 238:10

**provision** 58:16 83:9 92:24 93:1 166:15 176:12 232:21 233:2,3

**provisioned** 87:13 232:21

**provisioning** 43:25 44:5,12,25 83:6 85:7

**PTO** 213:22

**Public** 145:9

**pull** 44:8 51:8,23 55:23 82:3 92:6,8 94:24,25 96:8 199:22 210:2 214:16 223:1 234:2

**pulled** 52:9 103:1,3, 16 106:22 119:9 122:17 140:22 221:21

**pulling** 130:22 161:17 177:6 240:14 241:1,8

**purge** 65:1 69:7,10

**purged** 66:12 67:13

**purging** 67:25 68:2

**purpose** 25:24 50:5 88:3 89:8 168:16 211:6 230:9

**purposes** 9:4,8 49:4 54:1 75:13 79:4 80:9 114:2 126:11 151:16,22 152:9 154:18 157:2 159:13,20 187:19 199:14

**pushback** 175:15

**pushed** 174:25 214:20

**put** 4:5 29:16 48:19 56:10 61:9 74:18 80:16 86:14 100:20 108:20 135:7 140:3 146:14 199:8 232:13

**putting** 125:10

## Q

**qualification** 72:5

**qualify** 71:23

**quarterly** 133:19,21, 22,23 135:8

**question** 7:7,10,21 9:14 22:21 23:1,3,23 27:1,13 28:10 33:25 41:10,23 42:23 44:19, 21 46:22,23 47:1 52:11, 20 57:2 66:18 68:4,8,9 70:12,25 71:11,17,20, 24 74:21 84:11 87:2,7 89:1,11 96:10 99:2 109:14 110:16 117:8 118:12 120:13 136:14 138:6 140:24 147:18 148:15 149:9 156:23 157:20 169:8 176:1 182:21,22 188:9,15 195:6 196:17 201:14 209:25 226:10,12,20 227:1 230:17 233:13 239:3,5

**questions** 7:8,16 56:22 150:7 172:22 191:16 209:10 219:4 221:15 247:9,11

**quibble** 72:11

**quick** 164:5 208:9

**quickly** 4:5 14:22 15:5 150:4 217:14

## R

**raise** 4:17

**ran** 70:2 99:13

**randomly** 32:8,10

**ranges** 13:19

**rank** 133:13

**rattle** 83:24

**re-enrolled** 16:4

**reach** 197:16

**reached** 167:20 213:19

**reaching** 175:18,21 176:4

**reactivate** 225:16

**read** 41:25 42:24 44:22 46:25 47:2 182:24,25 191:8 193:24 208:22,24 213:3,7 225:9 239:6

**readable** 246:17

**reading** 42:23 44:21

**readout** 229:9

**ready** 4:23 172:23 191:21 208:15 219:15

**real** 14:22 169:24 181:11 238:21

**real-time** 126:10,24 129:18 182:19 183:5

**reality** 26:21

**realize** 213:21

**reason** 6:19 7:9 9:17 24:4 27:9,11,15 50:15 53:9,12,17 57:22 60:3 62:2 65:3 67:2 69:21 71:14 128:3,9,12,15,18 129:20 171:20 194:7 199:21

**reasonable** 193:12 194:22

**reasons** 49:25 63:22 125:25

**rebuild** 68:12,23 69:1

**rebuilding** 69:6,8 70:14 72:19 90:17

**rebuilt** 67:4,7

**recall** 11:7 41:14 45:1 49:10 60:24 78:10,13 82:10 84:25 85:3 86:25 87:2 91:12 108:4,10 112:19 113:23 120:9 127:24 160:19,25 162:17 163:3 167:1,24 168:2,23 169:3,6,10 170:6,11,20,25 171:17 175:5,8,17 178:16,17, 20 188:19,21 192:16,22

195:13,25 214:19 243:22

**receipt** 187:16 189:8

**receive** 6:6 82:11 178:6 208:24

**received** 171:21 178:14 180:13 188:11, 23 192:23 195:15

**receives** 178:3

**receiving** 37:15

**recent** 129:9 241:22

**recently** 139:4

**recess** 117:25

**recipient** 177:23 245:7

**recollection** 55:12 160:14 162:12 163:5 176:3,18

**recollections** 205:14

**reconnected** 245:15

**reconstruct** 72:22 216:19

**record** 5:3,8 9:5 14:13 24:17 25:1 42:24 44:22 47:2 60:19 64:6 71:8 72:4,9 85:25 117:22,24 149:5 165:6 172:13 176:2 177:14 182:25 207:18 211:19 219:5 239:6,14,25 245:4 247:12

**records** 24:25 75:6 88:14

**reduced** 39:17

**reducing** 111:7

**refer** 18:16 149:22

**reference** 97:13 100:3 218:4

**referenced** 65:11 86:11 121:4 209:5 245:24

**references** 102:21

**referencing** 58:5 236:9 238:15

**referred** 18:4 70:13, 19 242:8

**referring** 18:15 20:6, 24 33:15 54:13 58:8 91:7 122:11 124:9 142:4 179:10 186:6 193:21 197:11 198:21 239:1

**refers** 92:16,17

**reflect** 119:18 121:6

**reflected** 108:7 121:10

**refresh** 54:24 164:21 182:16

**refreshed** 182:10,12 198:17 200:5 206:17

**refused** 85:6

**regular** 188:22

**regularly** 211:4

**rehashing** 205:23

**rehearsal** 104:4

**reimbursed** 35:21, 24

**reintegrate** 59:10, 11 217:4

**reintegrated** 215:15

**reintegrating** 213:16 214:8 218:3

**reintegration** 58:21,23 59:5 215:3,5

**reintegrations** 218:6

**related** 25:3 67:19 75:19 117:3 122:14 222:20 242:1 243:15

**relating** 180:9 222:17

**relation** 135:6

**relationships** 74:14

**relevance** 179:4

**relevant** 62:17 225:6, 24

**remain** 212:11

**remained** 217:10

**remains** 118:16

**remarking** 11:17

**remember** 26:20 27:5 31:24 32:16 37:4 46:23 47:1 49:16 54:17 58:1 65:19 73:20 78:21 87:11 91:23 108:1 129:8 130:10 158:18 160:8 161:11 166:13 168:19 169:1 170:16,18 175:13,15,17 189:6 195:23 196:20

**remembering** 32:14

**remind** 170:1

**remote** 168:21 169:5

**remotely** 8:12

**removed** 70:9

**rep** 178:1

**repeat** 27:12 33:25 40:23 44:19 46:13 65:15 109:14 152:6 239:2

**repeating** 239:5

**rephrase** 7:10

**replicated** 105:13

**report** 28:20 29:2,6, 10,12 31:13 39:1,12 48:17 52:14 81:6 118:23 119:8 120:2 126:15 129:10 185:1, 18,24 186:9,15,20 187:4,7,9 200:7 203:7 204:3,6,22 205:4,6,16, 18 221:11,13,16,19 222:17 246:14

**reported** 45:3,8,12, 16,20 100:11 101:11 113:2,12,24 114:4 115:5 197:25 227:16

**reporter** 4:3,9,22 5:20 42:11 207:9

**reporter's** 7:2

**reporting** 4:14 31:18 33:2 45:21,22 46:10 47:8 51:2,9 53:22 54:5, 12,14,15,18 119:11 159:7,9,18 160:11,12, 17 161:5,20 162:6 174:8 188:7 197:24 198:1 219:24 233:25 235:24

**reports** 26:11,14 28:9,12 30:11 38:12 51:10,18,24 55:23 140:2,4,15 184:6 185:13 194:16 197:17 198:10,15 199:3,15 200:2,6,18,23,24 201:1 206:14,18 221:21 222:24 225:6,24 238:6 240:18 242:11,15 243:4,6,7,9 244:15 246:13

**represent** 5:4 98:9

**representative** 240:9

**representing** 97:22

**request** 78:22 82:10, 12 99:22 100:25 119:7 122:19,23 131:20 159:2 160:22 173:16 174:1 179:10 189:19,22 192:18 195:3 216:6 224:8,16 231:1 233:14

**requested** 84:13,23 85:2 175:3,11 236:1

**requesting** 178:2 179:18 188:6,8 223:11 233:1 234:8

**requests** 188:12

**require** 52:4 59:4 132:24 187:19 194:2 240:19 244:16

**required** 125:3 140:14 154:18 179:23 180:2

**requirement** 194:10 224:17

**requirements** 138:4

**requires** 194:19 204:7

**requiring** 140:11

**researchers** 14:24

**resorted** 204:6

**resource** 99:15

**resources** 52:24 70:10 143:5

**respect** 132:5 205:20

**respond** 153:1 170:11

**responding** 159:2

**responds** 153:16 159:24 174:23 213:24 224:2 237:2

**response** 7:21 8:3,9 18:23 30:4 72:13 77:22 78:16 83:7 86:6 87:1,7 90:24 101:17 107:15,21 108:15 111:24 112:9 131:6,11 159:1 171:21 173:20 174:24 223:25 224:8,16 227:23

**responses** 7:1,4 12:11 76:11 77:8,12 96:6 98:6,12 107:6 111:19 130:22

**responsibilities** 16:15,19,25 17:12 18:24 28:3 29:18 30:5,7 38:6,10 39:18,21 114:14 135:16 136:18 151:4 220:6,21

**responsibility** 19:4 69:14

**responsible** 67:25 68:5,11 78:9 136:16

**responsive** 131:19 212:18

**rest** 20:20 21:1 32:20

**restricted** 64:15

**restricting** 89:23

**restriction** 212:13

**result** 72:20 104:13 106:23

**results** 120:2 225:11

**resume** 238:4

**resumption** 225:10

**retain** 62:12 64:18 67:19 69:22 73:16 85:21 88:13

**retained** 121:5 139:15

**retaining** 65:3

**retention** 210:7

**retrieve** 198:11

**retrieved** 103:5

**returned** 221:20

**returning** 161:20,21

**revenue** 35:20,25 36:1

**reverie** 46:19

**reverse** 102:8

**review** 6:8,12 11:21 66:11,15 72:21 100:21 137:20 150:5 165:3 212:17

**reviewed** 11:23 77:8 100:16 208:20

**reviewing** 136:23 137:7 164:13 165:4 178:17 235:11

**rfelton** 92:15

**right-hand** 119:16

**rights** 94:19 229:21

**road** 5:17

**Robbie** 49:20 92:16, 17,19 93:14 162:16

**robot** 19:13

**role** 12:20 13:3,7,8,14 14:16 16:15 38:4 39:10, 18 113:7 167:15 196:5 227:11

**roles** 14:15 18:25

**room** 8:19,20

**root** 14:25

roster 102:23

Rothberg 18:4 26:15 29:5 45:3 134:13 168:5 170:4 195:22 227:7,16

roughly 11:8 13:5 192:11

rounded 56:2

route 72:20

rows 97:12

Roy 31:9 112:10

RTZ 5:4 40:9,19 41:6, 17 42:4 43:3,11,17 58:14 59:25 76:11 83:9 85:6 153:6 157:13 159:7 161:6 162:7 166:14,21,25 167:8,11, 21,25 168:5,18,23 169:11,21 170:7 173:5, 11,25 174:20 175:4,12, 21 176:4,11,19 177:7 178:25 179:9,16 180:13,21 187:19 189:14 192:8,24 193:4 196:14 197:18,19 198:11 206:22 213:21 214:13 215:17,20 216:23 221:3,11,13,16, 19 222:3,21 232:5 235:12,15 236:6 237:24 238:5

RTZ's 44:10 83:5 169:4 178:1 179:10 189:19 192:18 195:15 224:8,16

Rubs 115:16

rules 5:17 148:6

run 5:16 24:8,9 48:24 55:15 86:18 127:7 184:12 203:18 205:15 239:12

running 56:5 69:17 80:23 105:11 128:6 158:12

runs 99:17,18

---

**S**

---

safeguard 138:4

Saja 31:14

sake 98:16

sales 183:6,11

Sara 237:23

Sarah 207:19 213:13, 14

save 186:9,14,20 187:2 204:10 247:10

saved 185:3,17 187:7 205:4

saving 185:23

scan 81:8,9 191:12

scenario 146:5 204:24

scenarios 59:1

schedule 206:20

scheduled 11:18 20:22

School 14:19

science 16:1,9

scrape 100:19

scraped 100:23

scratch 55:16

screen 9:12 56:19 77:16 97:6 232:4

screenshot 128:17, 19 129:18,21 130:4 227:21

screenshots 128:1, 9,23 129:2 130:6

screw 96:19

script 20:1,6,10,16 22:18 23:17 48:8,20,21 49:5 50:1,12,17,22,24 51:7 53:14 55:7 57:12 61:1,5,24 92:10 103:5 112:18 114:11 117:12 118:9,10,16,22 119:18 120:8 121:6 122:1 125:24 126:10,24 127:3,12,18,22 128:21 131:9,24 132:6 152:2, 14 153:14 157:11,24 158:2,5 159:13 177:5

181:22 186:17 187:3 199:5,10 203:3,6 215:10,12 217:1 225:10 226:3 241:4,20,21 246:19,21

scripts 47:15 48:1 51:15 56:5 60:24 112:5, 8 118:15 119:1 121:13 122:16 123:2,11 125:23 126:3,4 128:7 130:14, 16,18 131:10,14,17 136:20 156:20 157:1 197:3 243:2 246:16

scroll 98:16 149:3

scrutinize 209:6

search 86:18

searches 86:17

second-guessing 57:14

seconds 205:25

section 224:3,7,15 225:4 226:14 227:3,24 228:10,23

secure 79:15,17 80:17 81:13 137:11 224:24

secured 80:19

securely 225:5

security 134:15,17, 18,23 138:21

select 184:5

selling 36:1 110:1 144:7

semantical 162:5

send 129:15 174:21 178:5 199:17 200:2,6,7 206:14,18

sending 173:5

senior 13:12 16:13,24 19:1 23:9,24 28:11 29:7,19 45:11 46:3 78:4 92:14 113:25 136:18 157:22 158:2 244:2

Seniorcare 22:4

sense 6:17 7:4,18 8:4 31:20 33:7 62:14 69:25

73:16 93:1 98:14 146:12,15 154:9 157:4 216:20

sentence 240:25

separate 90:22 140:7,10 158:10,12,15

September 49:22 191:24 192:11,23 196:13 209:23 214:20 215:20 216:2,10

series 105:19 135:24

served 96:5

servers 158:12

service 36:6 82:24 99:14 174:2

services 35:10 89:9 93:22 110:2 198:7

session 142:8,13,14

sessions 10:19 11:9 139:18

set 4:22 76:12 91:10 93:19 98:6 99:12 103:4 104:2 109:24 119:10 127:4 128:4 155:6,21, 22 156:8 172:25 221:6 225:11 229:10 232:12 235:20 239:23 242:9 246:7

setting 187:20 192:6 212:13

settings 225:3 230:20 231:23 232:4

settled 101:9

SFTP 240:3

share 97:5 213:20 224:25

shared 63:13,16,19 140:6

sharing 111:18 224:23

she'd 220:24

short 60:21 76:5 172:6 239:15

shorthand 24:20 102:24

EVAN WALTERS
MARCH 16, 2026

JOB NO. 2462669

**shortly** 171:16

**shot** 22:22

**show** 96:14,16 104:5 105:23 136:3 234:18 236:24 245:1

**showcases** 227:23 238:5

**showing** 190:24 198:10 218:19 231:16

**shown** 224:20

**shy** 115:20

**sic** 108:14 227:9

**side** 34:17 75:21 151:10,11 169:4 170:3, 7 201:21 220:16

**sides** 171:5

**signature** 76:17,18

**signed** 155:9

**significance** 197:1, 2

**significant** 183:24 204:21 205:19 206:4

**significantly** 28:4

**signing** 77:10

**signs** 105:20

**similar** 130:12

**similarly** 37:8

**simple** 74:21 236:19

**simpler** 70:11

**simplest** 75:3

**simplicity's** 98:16

**simply** 7:7 55:15 139:25 147:5 175:9 185:3 187:8 225:4

**single** 17:22 101:8 118:15 158:8 164:14 173:24 174:1 204:7 207:24

**single-page** 97:11 239:24

**sir** 149:9 188:4 203:19 205:22 219:12 231:11

**sit** 40:17 41:15 42:3 59:17 85:4 89:13 141:25 158:13 162:11 163:4 167:23 170:25 176:13,17 186:25

**site** 125:17,19 155:22 156:2 241:2

**situation** 122:10 130:12 221:16

**situations-data** 221:12

**skirting** 205:23

**Slack** 209:3,11,18,22 210:5,7,9,23 211:9,11, 16,23 212:17

**slightly** 169:7

**slow** 42:19

**small** 28:8

**smart** 116:16

**Smith** 219:18 221:2 223:17 240:8

**smooth** 105:5

**sneaking** 208:5

**Sneha** 219:7,17

**SOC** 134:8

**software** 12:18,25 13:12 14:10,12 15:1 16:13,24 17:1,2 19:1 23:9,24 24:6,13 25:6 28:11 29:1,7,20 33:1 34:12 36:25 37:25 38:5, 24,25 39:19 45:11 46:11 61:13 62:8 113:25 136:19 158:11 244:2

**soil** 115:10

**sole** 50:4 88:2

**solid** 112:20

**solution** 238:3 245:14

**son** 135:5

**sooner** 208:9

**sort** 8:21,24 21:13 52:7 116:5 136:12,15

140:9,17 143:6 155:6 186:8,22 193:10 194:21 205:4 217:12 230:11

**sorts** 20:18 22:17 138:12

**sounds** 7:12 14:3 34:22 49:13 124:11 161:13 168:25 169:2 172:3 188:14

**source** 26:10 59:5 79:22 80:2 106:18

**sourced** 106:8

**space** 25:13,20 26:5 116:17,21

**speak** 27:6,19 110:16 220:20

**speaking** 124:18 201:11

**spearheading** 114:9

**special** 44:7

**specific** 19:17 26:2 27:5 49:12 51:10,11 54:1 63:7 71:3 102:1 103:4 118:22,23 131:9 162:20 185:1 203:19 222:9 223:21

**specifically** 8:6 58:16 64:23 67:10 73:21 78:10,14,22 85:1 87:12 126:11 132:6 138:15 160:25 163:7 167:5 169:1 171:19 175:12 189:6 195:24 210:11

**specification** 57:4, 5 125:6

**specifications** 74:5

**specifics** 20:12 43:22 58:2 60:2 113:17 179:4 189:21 215:24 216:17 233:18

**speculate** 115:1,4

**speculation** 87:24 94:21 95:7 145:20 146:24 147:10 152:5 186:4 202:21 216:15

**spell** 5:7

**spend** 38:12 52:23 143:5 209:4 224:10

**spoke** 171:12

**spoken** 6:10

**spreadsheet** 96:4 97:23 98:4,10

**St** 78:5

**staff** 12:18,24 32:25 33:8 37:25 38:4,25 39:19 46:11 166:6

**staging** 103:8,18,24 104:7 105:1,8,14

**stand-up** 99:16

**standalone** 104:8

**standard** 16:25 62:7, 12 64:25 234:12 235:17 238:6

**standpoint** 88:20

**start** 7:16 30:17 37:3 55:16 134:18 139:5 150:8,13 157:20 172:22 178:4 191:9 215:11 219:3 237:22 242:7

**start-up** 17:2,13

**started** 14:4 45:21 46:13 47:7 49:15 56:1 143:10 242:4

**starting** 13:8 15:6 16:12 118:8,9 191:17

**state** 4:10,15 5:7 135:25 198:9 206:13 244:14

**stated** 4:14 45:2 147:13

**statement** 156:23

**states** 77:17,22 112:3 131:5 165:20 173:5 225:22 231:20 232:2,9, 11 235:10

**static** 182:3

**stating** 160:3 174:19

**stats** 140:20

**status** 229:2

**Steno** 4:4

**step** 12:19 139:2 204:6

**step-by-step** 125:16 184:20 185:15, 24 204:3

**steps** 20:22 49:6 51:9, 17 52:13 53:25 60:12 246:12

**Stijn** 68:20

**stint** 23:24

**stints** 14:11

**stipulate** 4:11

**stipulation** 4:5

**stop** 111:17 215:21 244:24

**stopgap** 245:14

**stopped** 22:14 45:20 46:10 57:23 59:18 216:23

**storage** 64:4 66:5,25 72:21 78:24 99:16 100:2,20 106:8,12,19 108:19,22 109:2 243:9, 10

**store** 81:25 99:20

**stored** 79:14

**storing** 79:18 86:11

**straddle** 220:17

**straight** 28:15

**strategy** 201:17

**structure** 39:24 125:7 240:20

**structured** 221:20

**studied** 15:10

**study** 15:15 16:7

**stuff** 23:6 32:14 56:15 220:10,19

**subject** 37:1 114:17, 22 116:8 201:22 240:2

**Subsection** 96:1

**substance** 10:3

**substances** 9:19

**success** 74:11 75:2 151:1,9 192:7 220:16 230:13,19

**successfully** 158:1

**suggested** 101:25

**suitable** 21:6

**summary** 140:20

**summer** 11:6 27:22 32:2 37:24 45:2,5 168:14 244:7

**support** 33:23 34:6 35:14 36:6 37:13

**supported** 19:6 34:18

**supporting** 89:9

**suppose** 5:15

**surfaced** 119:23

**surrounding** 43:15

**swap** 59:5

**swear** 4:6

**switch** 47:11 113:14 214:13

**sworn** 4:20

**synopsis** 15:5

**system** 18:11,12 19:3 20:2,5 24:24 25:6 26:12 33:18 55:25 59:14 61:8, 12 62:1,11,16 63:1,2 64:1,4,7 66:11 67:3,6 69:16,20 70:1,2,6,8 71:1,5,6,20,25 73:12 74:16,18 79:17 80:22, 23 81:4,18,21 83:21 88:13 100:20 102:18 103:14,15,16 104:9,11, 17 119:24 124:15 125:5 127:3 136:22 137:8,11, 19,22 139:12 140:12,22 141:3 142:5,17 143:6 144:17 145:1 146:10 147:23 157:3,7 158:3, 10 176:25 184:12 194:24 217:21 225:16 228:6 235:14 236:4

238:6

**system's** 157:14

**systems** 26:12 56:6, 10 61:17 71:9 72:4 82:14 180:3 193:12

---

## T

---

**tab** 54:14

**table** 75:2 139:17

**takes** 133:15 184:12 203:16,18,21

**taking** 6:9 8:12 128:22 164:5 204:2 207:25

**talk** 7:15 53:4 63:19 65:18 81:20 118:8

**talked** 10:5 53:8 78:23 87:9,10 123:23 127:20 131:15 152:15 153:13 159:10 203:8 241:17,19,20 244:16

**talking** 19:25 21:3 38:22 57:10 58:10 59:12 60:23 63:12 64:24 92:9 94:3 103:4 109:6 119:20 123:17 125:23 138:13,16,23 146:5 152:1 154:7 186:13 205:25 206:1,2 238:22,24 241:3,12 243:2,6

**task** 127:7 194:21

**team** 17:9 30:8,16,17, 24,25 31:1,5,21 32:21, 24,25 33:9,12,20 34:1, 14,18 35:13 38:13 39:24 40:2 48:1,11 51:6,7 68:20 74:11 75:2,5 100:9 112:13 117:12 120:24 123:4 126:22 131:8 150:24,25 151:2 156:12 173:7 174:4 196:22 197:15,22 198:4,23 200:3 201:25 202:9 206:15 213:21 225:6,23 226:4 227:8, 14 229:20 237:22 238:11 245:13

**teams** 8:23 30:3 210:14,16,20 211:2,3,4 212:18

**tear** 68:6

**teardown** 68:12,23, 25

**tearing** 69:6,8 70:14 72:18 90:17

**technical** 32:25 36:25 38:16,19,21 138:4 151:11,17 187:24 196:23 201:21 220:16 233:21

**technically** 33:3

**technology** 167:10

**telephone** 8:23

**telling** 50:14 199:2

**template** 235:20

**ten** 60:19 62:15 163:20 206:10,11

**ten-** 239:11

**tens** 206:6,8

**tension** 32:7

**term** 18:7,10 19:20 20:13 22:13 24:17 58:20 64:10 137:19,23 151:25 218:3,7 233:22 238:20,21

**termed** 200:11

**terms** 9:15 28:6 46:5 136:25

**territory** 136:1

**test** 126:2,8

**testified** 4:21 26:15 47:12 159:17 174:2 181:17 198:22

**testify** 9:20 89:18

**testifying** 5:23

**testimony** 6:16 9:17 14:3 26:25 27:7 40:22 44:10,15 52:1 53:11,16 59:18 60:25 68:15,25 70:17 72:16 73:19 75:11 89:17 90:20

96:11 101:23 102:6 108:6 110:8 111:5 143:9 196:13 216:22 226:25

**testing** 126:12 127:16

**text** 8:23 222:4

**Theodore** 32:2

**thing** 25:17 74:13 140:9,17 183:23 184:1 211:10 230:11,18 246:3

**things** 7:13 39:22,23 46:4 62:23 106:6 132:20 133:25 137:16 143:24 151:10,11 180:5 220:14 221:25 230:1 233:2

**third-party** 142:1 145:25

**thought** 69:6 97:20 116:13,24 156:24 190:15 196:20

**thread** 149:6,10 150:9,10 165:13 172:14,18 175:9 177:15,17 207:19,21 208:17 209:7 213:9 214:23 219:10 231:14 234:21 237:1

**threads** 212:11 213:7

**threatened** 67:20

**tickets** 83:22

**tie** 92:2

**tied** 74:6

**tight** 137:13

**time** 5:6 7:20 13:18 15:14 17:21 21:16,20 23:4,20 24:15 25:11,15 27:5 29:11 30:3,9 31:1, 14 33:2 38:13,14 45:16, 19 46:15 47:10 48:10 49:9 54:23 61:15 62:13 64:16,20 65:11 70:1 73:22,24 75:10 77:6 90:5 99:17 109:10 113:2,6,12,13 118:17 120:10 136:19 139:20 140:24 142:4,7,11

144:4 150:7 164:4 171:25 172:1 177:2 191:13 196:16 198:1 200:5 203:16,18,20 204:4,21 205:19,20,25 206:5,17,22 208:4 209:5 210:17,21 212:13 215:7,16 222:1 224:10

**time-consuming** 184:4,8,10 205:6,8,12

**timeframe** 23:10

**timeframes** 61:3

**timeline** 28:15 37:24 46:19 193:3 215:24 216:17

**times** 105:1 120:14

**title** 12:17,25 13:10 16:13 28:18,25 39:5 46:2 47:8,11 134:14

**titled** 76:10

**titles** 47:4

**to-from** 234:24

**today** 5:6 6:2,10,21 9:17,20 40:18 41:16 42:3 56:4 59:17 85:4 89:13 90:8 141:25 152:1 162:11 163:4 167:23 170:25 174:20 176:13,17 186:25 209:19

**today's** 9:23

**told** 25:19,22 26:2,8 40:23,24 67:21 171:1

**tool** 18:17 61:13 82:2 103:18 110:3 119:11 122:15 132:11 142:25 160:12 161:8,20 179:15 181:9 184:5 203:13 209:12,14 210:15 211:3,7,11 242:12 246:15,20

**tools** 161:6 162:6

**top** 85:11 98:4 149:4 155:15 161:4 177:22 208:16

**topics** 133:24

**torn** 67:4,6

**totally** 32:17 176:21 185:7 197:10

**track** 61:14,16 88:16 109:15,20 139:11 141:5 142:4,15 144:10

**tracked** 109:17

**tracking** 139:18

**tracks** 74:2 109:11 142:6

**trained** 156:17

**training** 132:19 133:22,23 134:2 155:21 156:1,5 206:20

**trainings** 132:17 133:6,8,11,18,21 135:8

**transcript** 6:7,8,13

**transcripts** 11:24

**transfer** 196:7

**transferred** 69:16

**transform** 21:5

**transformation** 20:24 105:4,7

**transformations** 105:10

**transition** 31:17 32:22 59:3 221:4,6

**transitioned** 32:24 47:5

**transmit** 181:5 247:5

**transmitted** 85:24

**transmitting** 60:13

**trial** 5:24 6:15

**trigger** 144:20

**trouble** 96:20

**troubleshoot** 230:25

**Truchart** 75:14,23 123:14 130:12,14 221:22

**true** 71:1 72:7 77:12 143:13,15 176:15 181:7

183:2 204:14 215:2 232:15

**truthful** 6:2,20

**turn** 76:15 107:23 149:14 152:23 153:16 158:19 173:1,19 223:14 231:11 232:7 245:17

**turning** 219:13

**tweak** 127:12

**two-pager** 172:21

**TXT** 124:22

**type** 8:16 25:12 26:2 33:22 34:3 51:19 78:18 80:15 101:1 102:25 103:3 122:10,14,19 125:9 127:15 142:15 161:14,16 165:25 221:25 229:6 230:10

**types** 14:13 24:1 63:15 108:21 109:9 116:10 118:19 119:22 121:9 124:19,25 139:23 188:6 199:3

**typical** 166:2 208:23

**typically** 120:20

───────────

**U**

───────────

**Uh-huh** 98:18 224:5

**UII** 138:4

**ultimately** 47:24 176:23

**UMASS** 15:16,24 16:1

**unable** 9:16

**unauthorized** 144:15,16,23 146:21 147:24

**uncertain** 87:25

**uncertainty** 32:20, 21

**unclear** 80:3

**undergo** 21:4 52:13 119:3

**undergrad** 15:10

**undergraduate** 15:19

**understand** 5:21,24 7:6,23 8:3 9:25 12:1 18:12,14,24 19:23 20:9 22:21 23:1,2 24:20 27:1 34:20 40:18 51:9 52:19 53:10 62:11 70:22 71:18 80:6 94:9 96:11 98:25 101:23 102:3 111:9,13 118:4 120:7 122:22 123:5 124:12 129:24 132:18 133:16 143:8 145:23 148:11 174:19 179:8 182:17 183:12 195:6,11 196:12 207:2 209:11 216:22 219:18 221:23 226:9 228:16 235:23 236:5 237:12 238:9,23 239:2

**understanding** 23:13 24:16 25:11 35:1 36:17 40:8 44:9 55:5 59:23,24 62:20 64:9 66:6 72:12,14,15 85:5 87:17 92:15 93:11,17 94:14 99:6 101:13 103:23 105:20 110:9 118:13 132:7,15 135:11 136:2 152:8 161:9 166:11 184:24 185:11 187:1 189:8 196:5 200:16 201:3,16 202:5 209:17 210:19 211:1 214:7 216:4 217:13 218:2 220:4 221:14 222:21,23 224:13 229:14 232:25 240:24 241:12,24 242:6

**understood** 7:5 15:4 23:7 26:16 33:5 43:9,11 47:6,12 51:25 66:24 94:5,6 106:3 110:7,24 111:15,16 112:21 117:1 118:21 133:4 144:13 152:21 159:16 166:19,24 171:5 176:9 178:25 179:21 180:20 189:13 226:11, 25

**undertake** 60:12

**undertaken** 79:4

**undiagnosed** 14:18,20 15:1

**unexpected** 148:4

**unfair** 120:12

**Unique** 137:23

**University** 15:9

**unknown** 22:8

**unnamed** 22:11

**unpacking** 18:23 25:5

**unrelated** 230:1,4

**unstructured** 222:6

**untwine** 50:8

**unusual** 154:5

**unwillingness** 44:10

**unwind** 50:9

**update** 119:14 120:8 123:2

**updated** 198:17 200:5 206:17

**upload** 125:16 181:5, 21 200:3,20 206:15 242:17

**uploaded** 136:21 241:9 242:23,24

**uploading** 247:5

**upper** 119:15

**URL** 85:14,16,22 86:6, 9,12 91:3 157:10 171:16 213:20

**URLS** 85:20

**usable** 183:14 194:19

**user** 44:11 80:10 86:21,23 87:8,18 88:8, 10 89:14 91:9,13,16 92:20 93:12,25 94:16 95:4 106:24 108:5,9 119:7,15,21 137:23 139:18 142:5,7,17 144:10,24 153:8 154:19 155:2 156:13 158:15

162:13,14,15 163:5 167:4 175:19 188:8,24 211:20 216:6 232:13

**username** 79:12 86:6,9,12,20 87:6 88:12 91:5 92:14 94:15 96:2 98:23 101:16 108:14 153:18,23 154:11 155:3 165:21 228:11 232:13, 16

**usernames** 81:1,2 82:5 107:10 162:19

**users** 87:19 89:24 109:12,16

**usual** 161:8

**utilize** 125:20

**utilized** 244:11

**utilizing** 177:4

**UUID** 137:24 138:11

---

**V**

**vague** 23:3 24:3,4 27:17 43:6 44:16 68:8 79:25 90:11 94:2 109:6 114:24 116:12 117:4,18 144:5 185:4 195:5 229:23

**vaguely** 175:7 186:7 204:9

**validated** 199:13

**validates** 103:25

**validating** 126:12

**validation** 127:16

**valuable** 182:5,6

**value-add** 52:7,17, 20 53:5 183:5,24 224:19

**variety** 62:22 124:23 133:25

**vendor** 145:25

**verbalize** 7:3

**verification** 76:16, 20 77:3,7

**verify** 100:14

**verifying** 77:11

**version** 61:8,11 62:1 121:11,13,16,23 230:12

**versions** 246:2

**versus** 74:3,8,23 87:18

**video** 128:10

**videos** 128:1,23 129:2 130:6

**view** 145:11,12 146:20 147:23 193:8 195:2 196:17

**viewed** 142:16

**virtue** 194:16

**VP** 12:14 13:1,8,11,17 27:24 29:3,18,22 31:1 38:9 39:6,9 45:15,19 46:3 47:9 113:21 114:5 136:19 244:4

---

**W**

**W-A-L-T-E-R-S** 5:10

**W-E-I-R** 135:3

**wait** 175:1 184:6 205:5

**waiting** 204:22

**wake** 215:18

**walk** 99:24 101:12 197:17

**Walters** 4:6,17,19 5:2,9,11 12:13 41:25 42:11 60:22 69:4 71:10 98:3 118:1 130:25 147:15 148:21 149:7 164:1,12 165:2,11,12 167:10 170:2 172:10,16 173:7 177:12,19 182:20 190:23 207:16,21,23 218:18 219:8 232:22 233:11 234:18 236:24 239:13,20 240:1,5 247:8

**Walters'** 233:12

**wanted** 52:23 61:4,23 65:20 73:7 84:2,5,6 94:24 96:9 122:3,15 132:4 139:21 152:18,21 169:17 171:25 183:18 189:15 209:21 211:14 221:4

**wanting** 232:11

**watch** 126:9

**ways** 23:15 137:8 217:7,9

**web** 19:13 20:3,17 30:12 48:14 123:17,22 128:7 161:18 213:22 243:3

**website** 24:11 48:17 94:7,8,11 95:10

**week** 10:25 11:3 182:10,13 198:16 200:8

**weeks** 174:19

**Weir** 7:22 10:2,11,17 22:20 26:23 31:23 32:6, 12 40:11,20 41:8,19 42:7,14,18 43:5 44:14 53:15 54:22 55:3 56:15, 18,21 60:18 68:7,14,24 70:16 71:16 73:18 76:4, 25 79:25 83:10 87:23 89:16 90:11,19 94:2,20 95:6,17 96:14 97:3,7, 15,21 102:5 109:5 111:4 114:24 116:12 117:4,18,23 132:23 135:2,6 137:1 138:22 139:3 144:5 145:13,17 146:22 147:8,25 148:14 150:1 152:4 157:19 164:3,8,11,17,20,23,25 172:1,4 175:23 181:24 183:8,19 185:4 186:3 190:5,8,11,14,19 191:11 195:5 202:20 204:18 208:3,11 212:2 216:14 226:9 229:22 231:4,8 236:13,18 238:19 239:9 247:10

**weird** 6:22

**well-structured** 222:2

**Wenxing** 31:13 197:16,22 198:7,14 200:6,20 242:17,24

**Wertz** 150:16,20 151:9 165:10,19 167:6 171:13 172:17 173:3 188:5 207:19 213:13 214:7

**Wertz's** 153:1 218:3

**whatnot** 118:11

**whoever's** 222:5

**wider** 105:23

**wiki** 83:21

**window** 65:5

**withdrew** 16:2

**withhold** 133:1

**witnessing** 129:22

**Wolf** 112:22 113:1 114:4 117:2,9,15

**Wolf's** 112:24

**word** 21:7 64:25 126:2 175:3 199:1

**words** 6:9 9:18 39:20 47:13 51:1 72:12 73:2 103:7 104:22 108:12,21 109:18 111:1 116:9 122:6 124:25 125:15 126:22 128:11 131:22 154:20,24 156:11 157:9 162:14 164:9 174:12 189:7 199:7 211:18 222:8 225:14 228:4 238:16 246:18

**work** 24:5,6,13 33:23 34:3,6,9,11 38:17,19,21 43:1,2 100:5,7 101:10 114:18 125:19 126:7, 16,18 169:11 199:19 201:20 208:20 220:2 238:1

**workaround** 197:5

**workarounds** 197:10

**worked** 14:9 115:4, 11 121:19

**workforce** 15:15

**working** 14:17,25 17:3,5 22:1 23:5 25:18 33:3 34:16,21 35:13,16 38:14 47:18,21 55:6 93:21 111:8 126:24 134:7 153:3 161:6 178:4 188:1 198:4 224:9

**works** 104:19 164:8 201:23 231:19 240:10

**world** 121:10

**worried** 148:7

**would-haves** 63:6

**wrap** 106:6 110:5

**write** 153:2 159:6 161:4 167:7 173:23 200:1 223:5 225:2 240:12

**writes** 151:20 165:19 171:11 173:3 177:25 197:14 206:19 213:14 223:17 232:19 237:20 245:11

**writing** 191:25 201:4

**written** 191:3

**wrong** 62:25 70:5 109:7 115:16 201:17 203:1 244:25

**wrongdoing** 42:5

**wrongful** 43:3 83:5

**wrote** 100:19 162:5 240:6 246:15

---

**Y**

**Yates** 162:16

**year** 11:4 57:20 168:6 210:12

**years** 13:4 15:7 62:15, 18 120:15

**Yehuda** 149:7 150:16 151:22 153:2 154:25 155:16 159:1,6,23 160:3 161:4 162:5 197:15

**yesterday** 178:2

**yield** 51:18

---

**Z**

**Zawadski** 167:8

**Zawadzki** 168:24

**Zheng** 31:14 112:11

**Zimmerman** 37:2

**zip** 242:14

**zoomed** 219:1

# Lauri Wertz

# Highlighted Transcript

# Deposition Transcript

Case Number: 4:24-CV-01132-JST
Date: August 19, 2025

In the matter of:

# INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.

# LAURI WERTZ

Reported by:
Cheryl Ortega



CERTIFIED COPY

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,                      )
                                       )
              PLAINTIFF,               )
                                       )
     VS.                               )   NO.
                                       )   4:24-CV-01132-JST
RTZ ASSOCIATES, INC.; AND DOES         )
1 THROUGH 10,                          )
                                       )
              DEFENDANTS.              )
_____)

REMOTE ZOOM DEPOSITION OF

LAURI WERTZ

AUGUST 19, 2025

REPORTED BY:   CHERYL S. ORTEGA, CSR NO. 13709
                         STENO

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTUS CARE, INC.,                       )
                                        )
              PLAINTIFF,                )
                                        )
      VS.                               )    NO.
                                        )    4:24-CV-01132-JST
RTZ ASSOCIATES, INC.; AND DOES    )
1 THROUGH 10,                          )
                                        )
              DEFENDANTS.              )
_____)

REMOTE ZOOM DEPOSITION OF LAURI WERTZ, TAKEN BEFORE

CHERYL S. ORTEGA, CSR NO. 13709, A CERTIFIED COURT

REPORTER FOR THE STATE OF CALIFORNIA, COMMENCING AT 9:00

A.M., TUESDAY, AUGUST 19, 2025.

STENO

APPEARANCES OF COUNSEL:


           For the Plaintiff and counter-defendant:

                MANATT, PHELPS & PHILLIPS, LLP
                2049 COUNTY PARK EAST
                SUITE 1700
                LOS ANGELES, CALIFORNIA   90067
                310.312.4000
                ABESHAI@MANATT.COM
                BY:  ANDREW BESHAI, ESQ.

           For the Defendant and counter-claimant:

                NOSSAMAN, LLP
                50 CALIFORNIA STREET
                34TH FLOOR
                SAN FRANCISCO, CALIFORNIA   94111
                415.398.3600
                DLEE@NOSSAMAN.COM
                BY:  DAVID C. LEE, ESQ.
                     KASIA PENN, ESQ.

                            STENO

INDEX


                                                                PAGE

EXAMINATION BY MR. LEE                                             6

EXAMINATION BY MR. BESHAI                                        134

EXAMINATION BY MR. LEE                                           136



                         EXHIBITS

                                                              PAGE

11      E-MAIL THREAD DATED THURSDAY                   37
        SEPTEMBER 22, 2022, BATES STAMP
        NUMBERS INTUS 4172 THROUGH 4174

12      E-MAIL THREAD DATED JULY 19, 2022,            49
        BATES STAMP NUMBERS INTUS 001668
        THROUGH 1669

13      E-MAIL THREAD DATED JULY 26, 2022,            56
        BATES STAMP NUMBERS INTUS 001738

14      E-MAIL THREAD DATED JULY 26, 2022,            64
        BATES STAMP RANGE INTUS 001731
        THROUGH 1737

15      E-MAIL THREAD DATED OCTOBER 6, 2022,          72
        BATES STAMP RANGES 002205
        THROUGH 2211

16      E-MAIL THREAD DATED NOVEMBER 10,              87
        2022, BATES STAMP NUMBERS INTUS
        002384 THROUGH 2385

17      E-MAIL SENT FROM LAURI WERTZ TO SARAH         89
        BERRY ON SEPTEMBER 29, 2022, BATES
        NUMBER INTUS 002194

18      E-MAIL THREAD DATED DECEMBER 6, 2022,         91
        BATES STAMP 2406


                         STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

| 19 | E-MAIL SENT BY LAURI WERTZ, JANUARY 11, 2023, BATES STAMP INTUS 002502 THROUGH 2504 | 94 |
| 20 | E-MAIL FROM LAURI WERTZ SENT TO JANET HUANG, ASTRID FORBITO AND JOANNE WON, JUNE 23, 2023 | 99 |
| 21 | E-MAIL FROM SARAH BERRY TO LAURI WERTZ, JUNE 12, 2023, CORRECT | 111 |
| 22 | E-MAIL FROM SNEHA BANERJEE TO VARIOUS PEOPLE AT SAINT PAUL SENIORS ORG, DATED JUNE 30, 2023, BATES STAMP NUMBERS INTUS 003117 THROUGH 3120 | 114 |
| 23 | E-MAIL FROM MALORIE MARQUARDT TO EVAN WALTERS AND LAURI WERTZ, AUGUST 18, 2022, BATES STAMP NUMBERS INTUS 001801 THROUGH 1804 | 119 |
| 24 | E-MAIL FROM LAURI WERTZ TO MALORIE MARQUARDT, DATED SEPTEMBER 16, 2022, BATES STAMP NUMBER INTUS 002049 THROUGH 2052 | 121 |
| 25 | E-MAIL THREAD BETWEEN LAURA EMERY AND LAURI WERTZ, SEPTEMBER 6, 2022, BATES STAMP NUMBERS INTUS 002002 THROUGH 2009 | 126 |
| 26 | E-MAIL EXCHANGE BETWEEN BOBBI RUNYON, LAURI WERTZ AND EVAN JACKSON, SEPTEMBER 21, 2022, BATES STAMP INTUS 002137 THROUGH 2138 | 129 |
| 27 | E-MAIL BETWEEN LAURI WERTH AND ALEX LEUTH DATED SEPTEMBER 28, 2022, BATES STAMP NUMBER INTUS 002189 | 131 |

QUESTIONS INSTRUCTED NOT TO ANSWER          PAGE   LINE


INFORMATION REQUESTED                       PAGE   LINE


STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

TUESDAY, AUGUST 19, 2025

9:00 A.M.

-oOo-

THE REPORTER:  Hello, everyone.  My name is Cheryl Ortega.  I am a certified Licensed Shorthand Reporter with the State of California, License number 13709.

(RULE 29 STIPULATION READ BY REPORTER.)

LAURI WERTZ,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LEE:

Q.   Good morning, Ms. Wertz.  My name is David Lee I introduced myself off the record before the record.  I am one of the attorneys that is representing the RTZ --

A.   Good morning.

Q.   -- associates.

And so thank you very much for taking your morning to be with us.  I know that this isn't probably the thing that you are hoping to do today but we certainly appreciate you making the time for it.  Just as a preliminary matter would you mind stating and spelling

STENO

your name for the record, please?

A.   Sure.

Lauri Wertz.  L-a-u-r-i, W-e-r-t-z.

Q.   And Ms. Wertz, you are here today pursuant to a deposition subpoena that was issued to you, correct?

A.   Yes.

Q.   Are you represented by counsel today?

A.   No.

Q.   Okay.  Have you spoken with Counsel at all about this deposition?

A.   Yes.

Q.   Okay.  And can you identify who it was that you spoke with?  I don't need to know the content but I would like to know who you spoke with, please?

A.   I spoke with Andrew on this call and I spoke with one of his coworkers, I cannot recall the name.

Q.   Okay.  Would that have been Charlie Weir?

A.   Yes, Charles Weir.

Q.   When did you speak with them?

A.   Approximately 1 to 2 weeks after I received the subpoena.

Q.   Okay.  We'll get -- well, let me ask you this: In response to my question as to whether or not you were represented by Counsel I'm assuming, then, that Mr. Beshai nor Mr. Weir are your lawyers, correct?

STENO

A.   Correct.

Q.   And they weren't your lawyers at the time you had the conversations that you just described?

A.   Correct.

Q.   Okay.  Can you generally tell me the topics that you discussed with Mr. Beshai and Mr. Weir?

MR. BESHAI:  Objection.  I'm going to object here, David.  We don't represent Ms. Wertz in this current proceeding but we are taking the position that as a former employee she's covered by the privilege that extends to Intus so I'll object to this question as privileged or to this question as calling for privileged information.

MR. LEE:  Okay.  Despite the fact that she just confirmed that you are not her counsel?

MR. BESHAI:  Yes.  We are not representing her in this particular proceeding but the content of the information, without getting into too much detail, that you can imagine we discussed with her in the meeting she testified to was all about the time that she served as an employee of Intus and our position is the privilege extends to those communications.

MR. LEE:  Okay.

BY MR. LEE:

Q.   Ms. Wertz, you mentioned that you talked with

STENO

Counsel a couple weeks after you were served with the subpoena.  How many times in total did you talk with them?

A.   Once.

Q.   Okay.  And can you tell -- estimate how long you talked with them?

A.   20 to 30 minutes.

Q.   Okay.

A.   20 minutes.

Q.   Thank you.

Were you provided any documents to look at?

A.   Yes.

Q.   Okay.  How many documents, roughly?

A.   Two.

Q.   Okay.  And as you sit here today, can you recall what it was that you reviewed?

A.   I can't recall specifically but it was an e-mail that I had sent during my time at Intus Care.

Q.   And can you generally describe to the best of your recollection the content of that e-mail, just the subject matter, you know, what it was about generally?

A.   It was generally about the connection of data between an RTZ customer and Intus Care.

Q.   Okay.  Do you remember who the customer was?

A.   I don't recall.

STENO

Q.   Okay.  Do you recall if it was Beacon?

A.   I don't -- I don't recall.

Q.   That's all right.

Okay.  Aside from that document, do you recall any other documents that you reviewed?

A.   No.

Q.   Okay.  Were all of the documents that you reviewed generally e-mails?

A.   Yes.

Q.   Okay.  Sorry.  Okay.  Okay.  And my apologies, I was distracted there for a moment.

Roughly, how many documents did you review?  Did you say a couple?

A.   Two at the most.  I specifically remember one, looking at one --

(Speaking simultaneously.)

Q.   Okay.

A.   -- as an example.  Two at most.

Q.   Aside from the documents that counsel provided to you did you undertake any effort to review materials on your own?

A.   No.

Q.   Okay.  Aside from speaking with Counsel have you talked with anybody else about this deposition?

A.   I -- when I was subpoenaed my original
STENO

communication was reaching out to Evan Jackson at Intus Care to say, I received the subpoena, can you -- I don't know anything about what it might be about, and he connected me with their attorneys to share more information.

Q.   Okay.  Evan Jackson, he's the chief operating officer for Intus Care?

A.   I'm not certain what his current title is but he works at Intus Care, yes.

Q.   Okay.  And aside from Mr. Jackson did you contact anyone else?

A.   I didn't.  Robby Felton was initially on the call with the two attorneys that I discussed with but I didn't reach out to any.

Q.   Okay.  If I'm understanding you correctly, is it fair to say that the only four individuals that you talked to -- or talked to about this deposition are Mr. Jackson Mr. Felton and the two Counsel?

A.   Evan Jackson, Robby Felton and the two Counsel, correct.

Q.   Okay.  Ms. Wertz, have you ever been deposed before?

A.   No.

Q.   Okay.  What I would like to do is kind of give you some rules of the road.  You are doing a great job so

STENO

far but I would like to kind of explain some of the handling instructions, so to speak.

A.   Yes.

Q.   Just to make everybody's job a little bit easier and also make the proceeding a little bit faster.

At the front end of this deposition you took an oath.  That oath carries the same force and effect as if you were testifying at trial.

Do you understand that?

A.   Yes.

Q.   Okay.  And so it's important therefore to be truthful and accurate.

Does that make sense?

A.   Yes.

Q.   Okay.  At the end of this deposition you are going to have an opportunity to review the transcript. So the transcript is being prepared by the court reporter, she's taking down everything that I'm saying and you are saying and anybody else who has anything to say.

So at the end of this deposition you'll have an opportunity to review that transcript to see whether or not any changes to your testimony are needed.

Does that make sense?

A.   Yes.

STENO

Q.   Okay.  And we'll caution you that to the extent that you do make changes to any of your testimony, any attorney involved in this proceeding has an opportunity to comment on those changes potentially in order to establish inconsistency or perhaps bias.

Does that make sense?

A.   Yes.

Q.   Okay.  For this reason it's important to be, you know, as accurate as possible.  And as part of that, if, for whatever reason I ask a question and you are confused by the question or you don't understand it, don't feel you have to answer that question, just simply let me know that the question wasn't clear and I'll do my best to try and ask a different question.

Does that make sense?

A.   Yes.

Q.   Okay.  Similarly just, again, for creating a clean record, you know, if we talk over one another, that tends to make it difficult for the court reporter.  So if you wouldn't mind waiting until I finish my question before starting your answer, I'll certainly do my best to allow you, you know, the time to finish your answer before asking my next question.

Does that make sense?

A.   Yes.

                        STENO

Q.   All right.   We are on video and so obviously because this is a deposition which is being transcribed and, you know, will essentially be put in writing, gestures such as nods of the head, shrugs of the shoulder, that type of thing don't really translate well on a transcript.   So if you can provide verbal responses, that would be appreciated.

Does that make sense?

A.   Yes.

Q.   Okay.   From time to time if you hear me say something along the lines of, Was that a yes or was that a no, I'm not intending to be rude, I'm trying to get a verbal response.

Okay?

A.   Yes.

Q.   I'm mindful of the fact that you are not represented today by Counsel for purposes of this deposition but I do want to note that from time to time Mr. Beshai may find a question that I've asked objectionable and he may interpose an objection.

If that happens, then that doesn't impact your responsibility to provide a response to the question. That objection will just be dealt with, you know, somewhere down the line.

Does that make sense?
                    STENO

A.   Yes.

Q.   Okay.  So in other words, if an objection is interposed, you are, you know, still able to and asked to answer the question.

Okay?

A.   Yes.

Q.   Okay.  As I mentioned before, obviously, this is a remote proceeding, you and I are not in the same room and a couple of special rules for these types of remote depositions.  The first is, is there anyone else in the room with you currently?

Are you there?

A.   Yes.  Yes, I'm back.

Q.   No worries.

So what was the last word you heard me say?

A.   Some special conditions for these remote depositions are...

Q.   Got it.

All right.  Is there anyone else in the room with you today?

A.   No.

Q.   Okay.  Can you tell me, where are you sitting currently?

A.   I'm in my home office in Valparaiso, Indiana.

Q.   Okay.  Do you have access to any devices that

STENO

have communication features turned on presently?

A.    No, no.

Q.    Okay.  And I often times will kind of explain that by saying, you know, do you have a phone that has a chat feature or instant messaging or text that's open sitting next to you?

A.    No, not near me.

Q.    Okay.  And same thing, I presume that you are looking at a computer monitor.  Do you have any chat features that are open on your computer?

A.    I don't, no.

Q.    Okay.  I would ask that while we are on the record to the extent that there are communications that come through, that you not look at them or respond to them.

Does that make sense?

A.    Yes.

Q.    Okay.  I also ask that to the extent anybody else does enter the room where you are if you can just let us know?

A.    Yes.

Q.    We appreciate that.  Okay.

Let's see.  Do you have any documents or other notes, you know, whether electronic or physical next to you or readily accessible that you intend to use to aid

STENO

your testimony today?

A.    No.

Q.    Okay.  And, finally, is there any reason why today you are unable to provide your best testimony?  In other words, have you taken any substances or medications or anything that could affect your memory or your cognitive ability?

A.    No.

Q.    Okay.  Thank you.

We talked a little bit about what you've done for the deposition.  I think as I understand it, you looked at a couple of documents you talked to four different individuals.  Beyond that, did you do anything else to prepare yourself for deposition today?

A.    No.

Q.    Okay.  Thank you.

Ms. Wertz, where are you currently employed?

A.    Wellbe Health.

Q.    And you stated that you are in Indiana?

A.    Yes.

Q.    And what is your current position at Wellbe Health?

A.    Quality operations director.

Q.    And how long have you been with Wellbe Health?

A.    Since October of 2023.

STENO

Q.   And in your position as quality operations director, can you just give me a really high level kind of general understanding of what your job duties and responsibilities are?

A.   Sure.

Performance improvement for a PACE program.

Q.   So is Wellbe Health a PACE program?

A.   Yes.

Q.   Okay.  And what do you mean by "performance improvement"?  Are you on the technology side or on the operations side?

A.   Operations side.

Q.   Okay.  Congratulations.

A.   Thank you.

Q.   In your capacity as the quality operations director, do you interface with the technology side at all?

A.   Yes.

Q.   Okay.  In what way?

A.   We use dashboards designed by our technology team to seek data outcomes to use in assessing performance at Wellbe.

Q.   Got it.

And can you tell me, does Wellbe have what is referred to as an EMR, you know, electronic medical

STENO

records system or electronic health records system?

A.   Yes.

Q.   Okay.  And do you know whose system it uses?

A.   It's called Athena, A-t-h-e-n-a.

Q.   Okay.  And does Wellbe Health utilize the services of Intus Care in any way?

A.   No.

Q.   Are you aware of whether Wellbe Health ever has used the services of Intus Care?

A.   Not to my knowledge.

Q.   Okay.  Do you know whether Wellbe Health has ever utilized a product offering from RTZ?

A.   Not to my knowledge.

Q.   Okay.  And by the way, I should have explained this on the front end.  You have an understanding that when I say, "RTZ," I'm referring to RTZ Associates?

A.   Yes.

Q.   Okay.  And if I refer to Intus I'm referring to Intus Care?

A.   Yes, thank you.

Q.   Thank you.

All right.  Prior to Wellbe Health, where were you employed?

A.   I was employed at Intus Care.

Q.   Okay.  And can you tell me when you started

STENO

and -- well, I guess you ended in October of 2023 at Intus Care or September?

A.   I ended in September of 2023 and I started in March of 2022.

Q.   And when you arrived at Intus what was your job title?

A.   My job title was PACE implementation specialist.

Q.   And at a very high level can you kind of explain to me what your duties and responsibilities were as a PACE implementation specialist?

A.   Sure.

I worked with the PACE programs that contracted with Intus Care to onboard them and teach them how to use the software.

Q.   Okay.  And when you say, "the software," are you referring to an Intus software?

A.   The data analytics software, yes.

Q.   Got it.

We'll get into it in a moment but I'll jump to this question.  I've seen on some of the e-mails -- again, that we'll look at in short order here -- that you had a title data implementation manager.

Is that a different role from the PACE implementation specialist?

STENO

A.    No, no.

Q.    Okay.  I'll ask the question a little bit differently.  Did your job title ever change while you were at Intus?

A.    Yes.  My job titled changed -- I can't recall the date -- to customer success lead.

Q.    And do you recall generally when you became a customer success lead?

A.    I believe it was in 2023.  I don't believe it was before that.  I can't recall specifically.

Q.    Okay.  And before we get into what you did as a customer success lead, did you undergo any other title changes while you were at Intus?

A.    No.

Q.    Okay.  So it's fair to say that you just held two positions?

A.    Yes.

Q.    Okay.  Can you tell me how your job duties and responsibilities changed, if they changed, once you became a customer service lead?

A.    Sure.  Customer success lead.

Q.    Customer success lead, I'm sorry.

A.    The responsibilities were quite similar.  However, it focused additionally on continuation of supporting our current customers instead of just

onboarding new customers.

Q.    Understood.

And before, with respect to Wellbe Health, I asked if you were on the operations side versus the technology side.  At Intus were you mostly, if not exclusively, on the technology side?

A.    I understand your question so I'm not going to ask you to rephrase it but I hesitate.  I don't believe I was on the technology side as in I was designing technology.  My role was essentially an in-between between Intus care's technology team and the customers.

I was teaching and I was laying information so I wasn't designing software.  I wasn't designing platforms in that respect.

Q.    I understand and I appreciate that clarification.

So if I'm understanding your testimony correctly, what you were really hired to do was to help onboard new clients while you were the PACE implementation specialist, get them onboarded and integrated to the Intus Care data analytics tool.

And then when you migrated to the customer success lead, you maintained that same type of responsibility but also worked with existing customers and current customers, correct?

STENO

A.   Correct.

Q.   Okay.  Since your departure from Intus have you remained in contact with any Intus employees?

A.   I have had -- yes, I have had a few contacts with a few employees.

Q.   Okay.  And can you identify who those employees are?

A.   Laura Ferrara, Evan Jackson and Robby Felton for the purposes that we spoke about earlier.

Q.   Right.

A.   That's all I recall.

Q.   Okay.  And is it fair to say if I'm understanding correctly that your interactions with Mr. Jackson and Mr. Felton were just limited to what you had described before?

A.   Yes, yes.

Q.   Okay.  What about Ms. Ferrara?  She is the chief, I think, population health officer; is that right?

A.   Yes.

Q.   Okay.  And were you staying in contact with Ms. Ferrara for social reasons or for professional reasons?

A.   Social.

Q.   Okay.  When is the last time you talked with Ms. Ferrara?

STENO

A.   Greater than six months ago.

Q.   Okay.  And in the discussions that you have had with Ms. Ferrara in the time since you've left Intus, were any of those discussions about this particular lawsuit?

A.   No.

Q.   Okay.  Do you recall having any discussions after you left Intus with Ms. Ferrara about RTZ?

A.   No.

Q.   Okay.  And just for clarity, no, you didn't have any conversations or, no, you don't recollect it?

A.   No, I don't recollect speaking of RTZ.

Q.   Okay.  While at Intus, did you manage a team at all?  Did you have any reports?

A.   I had -- I had one report at a time.  So I had a total of two reports but they were at separate times.

Q.   Okay.  And who are those individuals?

A.   One is Alysia Ogburn, and the other is Maria Green.

Q.   And can you generally describe, you know, what their roles were in the company?

A.   Maria Green's role was customer success -- I can't remember the final word -- specialist, service, success, something.  And Alysia was PACE implementation specialist, I believe.

STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

Q.   And can you -- do you have a recollection or understanding of what Alicia's job was?

A.   Her job was similar to mine as PACE implementation manager.  We onboarded new customers.

Q.   Got it.

Okay.  Did you report up to anybody?

A.   I did.

Q.   And who was that?  Who did you report to?

A.   When I started I reported up to Laura Ferrara.  When I -- when my job title changed to customer success, I reported to Sneha Banerjee.

Q.   All right.  And for the record, Sneha, is that spelled S-n-e-h-a?

A.   Yes.

Q.   And last name Banerjee?

A.   Banerjee.

Q.   What was Mr. Banergy's position with the company if you recall?

A.   Exact title, I can't recall.

Q.   Okay.  Can you generally describe what his duties and responsibilities were?

A.   Sneha is a female and her --

(Speaking simultaneously.)

Q.   I'm sorry.

A.   I believe it was business development of some

STENO

nature.  I can't recall the exact title.

Q.   Okay.  And when you say, "business development," are you referring to developing leads for Intus for whom they could provide the data analytic service?

A.   Yes.

Q.   Now you described a little bit of your duties and responsibilities about kind of facilitating the onboarding of clients for Intus.  What I would like to do is get a little deeper understanding kind of what your day to day was.

My understanding -- and again we'll look at documents.  I don't mean to be presumptuous, but my understanding is you were handling and managing kind of the integrations between a PACE facility and Intus, correct?

A.   Correct.

I was -- I was taking information and communications from the technology team at Intus and coordinating it with the PACE programs.

Q.   Okay.

A.   For the integration.

Q.   Okay.  And when we talk about the term, "integration," can you tell me what you mean by that term?

A.   Sure.

Integration is the EHR, EMR data from the PACE program being visible and connecting with the Intus Care platform.

Q.   Okay.  I think I understand what you are saying.  My question is this:  Can you describe again perhaps at a high level what you understood that Intus Care platform to provide?

In other words, what was the service that was being provided by Intus that required this nature of integration?

A.   Sure.

The Intus Care platform was a tool to visualize groupings of data and trends that were all separate or disparate data in the EHR.  So pulling together metric trends for PACE organizations.

Q.   Okay.  And so if I'm understanding correctly, Intus would take various data that was stored within an EHR, reorganize it for purposes of visually presenting it and using that type of kind of dashboard presentation as really kind of the sales pitch for its value?

A.   Correct.

Q.   Okay.  And your job was to kind of facilitate -- if I'm understanding correctly, kind of facilitate the interface in between Intus's technology

STENO

team and the PACE facility's technology team so that the pipeline of data could go from the EHR system that the PACE facility was using to Intus Care?

A.   Correct.

And then teaching the programs, how to use the Intus Care platform once the data integration was complete.

Q.   Okay.  As part of your training at Intus, did you become proficient in the use of the Intus Care platform?

A.   Yes.

Q.   Okay.  Just so that I'm clear, was there a name for this particular service?

A.    At the time I was there, I believe we just referred to it as the data analytic -- Intus Care or the data analytics platform.

Q.   Got it.

Aside from the data analytics platform that you just described, are you aware whether Intus had any other types of services that they were offering to customers?

A.    At the time I was there, near to the time I left they were working on another -- another service. But it hadn't -- I don't believe it had been rolled out yet.

Q.    Okay.  And do you have an understanding of what

STENO

that other service was?

A.   To my recollection, it was risk adjustment.

Q.   As part of your duties and responsibilities, did you ever really get introduced to the risk adjustment service offering or is it that something that was kind of out of your lane?

A.   I believe I may have seen a demo once but it was pretty much out of my lane.

Q.   Okay.  At a very high level, do you have an understanding of what the risk adjustment technology was or what the service or product was?

A.   I couldn't speak to it, no.

Q.   Okay.  All right.  By the way, I did forget to mention to you on the front end, this isn't an endurance contest.  So if at any point you need a break, just simply let me know, drink of water, whatever, just simply let me know.

A.   Thank you.

Q.   And we'll be happy to accommodate that.

All right.  I want to ask a couple more questions about the data analytics platform that you described and I know that you say you were trained on it. Do you have an understanding as to how a PACE facility would access the data analytics platform?

In other words, how was that information

STENO

viewable?

A.   Yes.  I believe it -- there were individual logins for each user to the Intus Care data analytics platform once the integration was complete.

Q.   Okay.  And so do you know whether or not the data which populated the data analytics platform was stored by Intus locally or was it a cloud based program, if you know?

A.   I'm not certain.

Q.   Okay.  Let me ask it this way, when you discussed just now the use of credentials for users, am I understanding correctly that once the information was complete and the data analytics tool was available to a PACE facility, certain representatives from that PACE facility would be issued login credentials to access the Intus Care data analytics platform?

A.   Yes.

Q.   Okay.  Do you have an understanding as to whether those access points were limited to certain individuals or could any employee of the PACE facility access the data analytics platform?

A.   I believe it was up to the PACE program to determine their list of preferred users.

Q.   Understood.

Okay.  Can you tell me, as part of your duties

STENO

and responsibilities when you were initially the PACE implementation specialist, what would signal the end of your kind of role in the integration?

Does that make sense?

A.    It does.

The end of my role in integration would be when the customers' EHR data was successfully flowing into the Intus Care platform and it could now be viewed by the customer.

Q.    Okay.  And once that pipeline was up and running, at that point, your job was complete for all intent and purposes?

A.    No.  My job for the integration was complete but I would continue to -- I would continue to support the team, the PACE teams in learning how to use the software or if they had questions or best practices, but my role in the flow of data was complete.

Q.    Understood.

Okay.  And so it migrated from an integration focus, you know, kind of skill set to a, you know, continuing education and kind of customer assistance role?

A.    Correct.

Q.    Okay.  I appreciate that.  Thank you.

Obviously, you were served with a subpoena in

STENO

this action which signals that there's a lawsuit.  Prior to receiving the subpoena in this case, were you made aware or did you have awareness that Intus had actually filed a lawsuit against RTZ?

A.   Yes.

Q.   Okay.  And how did you first become aware of that lawsuit?

A.   I believe I saw a posting on Linked-In.  I believe that's how I first saw a discussion on it.

Q.   Okay.  And was this while you were still at Intus or was this after you had left Intus?

A.   No, this was after I had left.

Q.   Okay.  And when you saw this posting, did you have any reaction?

A.   I was surprised that it was happening but, I mean, no, nothing other than that.

Q.   Okay.  And I'm sorry to ask, you know, what seems like kind of silly questions but why were you surprised?

A.   I guess surprised that what had started when I was still at Intus Care hasn't been already settled.  I was surprised that it moved to a litigation situation.

Q.   Understood.

As you sit here today, do you have any understanding of what this lawsuit is actually about?

STENO

A.   My understanding is it is in relation to information -- information blocking between RTZ and Intus Care.

Q.   Okay.  And how did you -- what is the basis of your understanding?

A.   The basis --

(Speaking simultaneously.)

Q.   Go ahead.

A.   I'm sorry.

The basis of my understanding truly is what I read on Linked-In and a bit of history because the disconnect had started before I left Intus Care.

Q.   Understood.

Other than the conversations that you described with Robby Felton and Evan Jackson and the two Counsel in connection with your subpoena, have you talked with anyone else at Intus about the lawsuit?

A.   No.

Q.   Okay.  Have you talked to anybody outside of Intus about the lawsuit?

A.   My family as well know I'm giving a deposition today for this reason but, no, other than that, no.

Q.   Okay.  As you sit here today, based upon your experience at Intus, do you have any negative feelings towards RTZ?

STENO

A.   No.

Q.   Prior to working at Intus, had you ever heard of RTZ?

A.   No.

Q.   Okay.  And again, this is kind of one of those silly questions so I can see that on the front end.

When did you first become aware of RTZ while you were at Intus?

A.   When I started at Intus Care there was, I believe, one customer that used RTZ so it was at that point that I became aware.  So soon after March of 2022.

Q.   Okay.  And do you have an understanding of what RTZ does as a company?

A.   My understanding -- when I say, "RTZ," my understanding, I'm referring to the -- their EHR.

Q.   Got it.

And that's called PACE Care?

A.   Yes.

Q.   Okay.  I've also seen reference to it as PCO which as I understand is PACE Care Online.  And so if I refer to it as PACE Care or PCO will you understand that to be their PACE Care system?

A.   Yes.

Q.   So if I'm understanding you correctly, you learned about RTZ because one of the Intus customers was

STENO

using PACE Care as its EHR?

        A.    Yes.

        Q.    Okay.  Over time did you work on integrations for more than one customer that were utilizing PACE Care?

        A.    Yes.

        Q.    Okay.  Did -- that's all right.  Okay.

              Now, I -- we threw around a couple of terms here, one, you know, EMR, electronic medical records, EHR, electronic health records.  Do you have an understanding, at least in your mind, of the difference between an EMR and an EHR?

        A.    Yes.

        Q.    Okay.  What is the difference to you?

        A.    From my understanding, an EMR contains medical information, an EHR contains -- can contain more health information, demographic information and also PACE related specific information specific to the PACE regulation.  They tend to be used interchangeably I find.

        Q.    Okay.  And you've kind of predicted where I'm going with this because, again, in some of the e-mail correspondence that we'll look at, I've seen PACE Care referred to as an EHR, I've seen it referred to as an EMR.

              Did you have an understanding that, you know, intentionally or otherwise that Intus kind of used EMR

STENO

and EHR interchangeably when discussing PACE Care?

        A.    Can you repeat that, please?

        Q.    Sure.

              It was a long question.  My apologies.

              From your experience at Intus, did you understand PACE Care to be identified as both an EHR and an EMR interchangeably?

        A.    Yes.

        Q.    Okay.  Do you, for purposes of e-mail communications, assign, you know, any difference or value to whether PACE Care is identified as an EHR or EMR in writing?

        A.    No.  For the purposes of Intus Care integration, no.

        Q.    Okay.  And as you sit here today, from a technical standpoint do you have an understanding of whether PACE Care is one or the other?

        A.    No.

        Q.    All right.  I'm going to warn you I'm new to this platform so if there's a technology glitch here it's on me.  So I'm not trying to delay things so I'll do the best that I can.

              I'm going to go ahead and mark the first exhibit.  And to confuse you more, Ms. Wertz, I'm going to mark this as Exhibit 11.  The reason being that we

STENO

have already had a deposition in the case and so I'm just going to start on today's exhibit numbers where the last ones left off.

A.   Okay.

Q.   Does that make sense?

A.   Yes.

Q.   Okay.  So what I would like to do is see if I can present it.  All right.  Ms. Wertz, are you able to see that?

A.   Yes.

(Exhibit 11 marked.)

BY MR. LEE:

Q.   Okay.  And is it big enough for you?  Would you like me to make it bigger?

A.   No, thank you.  I can see.

Q.   Okay.  For the record, we have marked as Exhibit 11 an e-mail thread dated Thursday September 22, 2022, and it appears the Bates stamp numbers Intus 4172 through 4174.

Ms. Wertz, it's kind of a multi-page exhibit but what I want to do is focus at least on the top.  This is an e-mail thread that you have seen before, correct?

A.   It is -- I can confirm that is my e-mail from Intus Care, yes.

Q.   Okay.  And looking at this, is it fair to say

STENO

that you would have authored or received the e-mails on this exhibit as an employee of Intus?

A.   Yes.

Q.   Okay.  It looks like the top e-mail is an e-mail that you forwarded to Ms. Ferrara, correct?

A.   Yes.

Q.   Okay.  And so what I want to do is I want to look at the e-mail that you forwarded to her.  And the first thing I want to do is ask if we look at -- I don't know, can you see my -- let me see if I can do this. Wrong one.

Right here, this appears to be an e-mail exchange between Evan Jackson and Bobbi Runyon at Beacon Care; is that correct?

A.   Yes.

Q.   And Beacon Care, was that one of the PACE facilities that Intus had as a client?

A.   Yes.

Q.   Okay.  And is this one of the accounts that you were involved in the integration for?

A.   Yes.

Q.   Okay.  I want to look at the second page and specifically look at the e-mail from Ms. Runyon to Melanie.

Do you see that?

STENO

A.    I do.

Q.    Okay.  She states, Melanie -- right here -- I would like to understand what the hesitation or hold up is with the integration between RTZ and Intus Care for Beacon of Life.

Do you see that?

A.    I do.

Q.    Okay.  And then above that we see that Ms. Martinez, Melanie Martinez responds, Intus Care has so far refused to sign the NDA we provided.  And in order to allow any outside vendor access to our proprietary system and information, we do require that an NDA be signed.

Do you see that?

A.    I do.

Q.    Okay.  Do you view that as an unreasonable position?

A.    No.

Q.    In your work with Intus, had you dealt with, you know, companies that engaged or had NDA agreements with Intus?

A.    I don't know that I would have been aware if there were an NDA or not an NDA.

Q.    Fair enough.

All right.  Ms. Runyon then -- we look at this

top e-mail on the first page -- forwards the e-mail thread to you as well as Mr. Jackson.  And says, What is in the NDA that is hesitant for Intus Care to sign?

          Do you see that?

     A.   I do.

     Q.   Okay.  Do you recall whether you had any discussions with Evan Jackson or anybody else at Intus about that particular question?

     A.   I don't recall specific discussions on it.

     Q.   Which is perfectly fair.  I understand that we are talking, you know, a couple of years ago.  So with that, why don't we look at the top e-mail from Mr. Jackson.

          Do you see that?

     A.   Yes.

     Q.   And he writes and says to Ms. Runyon, you know, I'll provide some context.  Intus first received the proposed NDA from RTZ in early September.  We then returned an access agreement for RTZ's consideration.  The access agreement also included confidentiality and IP provisions.  RTZ neither agreed nor provided any counter proposal or red lines to it.

          Do you see that?

     A.   I do.

     Q.   Were you at all involved in any of the
                         STENO

discussions with RTZ and Intus about an NDA?

A.   No, not that I recall.

Q.   Okay.  That would have been, you know, just handled by folks outside of your duties and responsibilities; is that right?

A.   Yes.

Q.   Okay.  He goes on -- Mr. Jackson -- to state that right here, As of September 14th, RTZ directed Intus not to access PACE Care.

Do you see that?

A.   Yes.

Q.   Okay.  Were you aware of that RTZ directive prior to this e-mail?

A.   I don't recall the exact -- I was aware of the directive but I don't recall the exact date that I was made aware of that directive.

Q.   Fair enough.

Can you recall how it was that you became aware of that directive?

A.   Specifically, no.

Q.   Okay.  Do you have an understanding or a recollection as to why RTZ had made that directive?

A.   My understanding was that RTZ felt that Intus Care -- that it was a privacy concern and Intus Care should not have access to confidential health records

STENO

housed in PACE Care, RTZ.

Q.   In the absence of an NDA?

A.   In the absence of an NDA.

Q.   Mr. Jackson goes on to explain, Only your patients' electronic health records are required to provide our services.

Do you understand what he meant by that sentence?

A.   I couldn't tell you.  I couldn't say what he meant.  I'm not certain.

Q.   Okay.  Let me ask it this way, based on your experience at Intus, was that a correct statement?

A.   Access to the EHR is what allowed PACE programs to have access to Intus Care services.

Q.   So in other words, Intus simply needed the EHR data to provide its services; is that correct?

A.   To provide the data analytics services, correct.

Q.   Do you have an understanding as to why Mr. Jackson felt it important to relay this information to Ms. Runyon?

A.   I couldn't say specifically what he was feeling but he was looking at the e-mail chain, he was responding to her question of what is in the NDA that is making Intus Care hesitant to sign.

STENO

Q.   Okay.  But let me ask it this way, in your role, would RTZ's directive impact how you did your job?

A.   Can you tell me what you mean by "RTZ's directive"?

Q.   Yes.

A.   The NDA?

Q.   Yes, the direction identified here in Mr. Jackson's e-mail.  RTZ directed Intus not to access PACE Care.  So how was RTZ's direction to Intus not to access PACE Care impactful for your job responsibilities?

A.   So my job responsibilities were to facilitate the communication on the integrations.  So my job responsibilities were to send this communication back and forth.  But once the integration happened, then I could teach the programs how to use it.

So if the integration hadn't happened, I couldn't continue on with the education piece of my job and teaching the programs how to use it.

Q.   Fair enough.

Let me see if I can ask a question a little bit differently.  Did RTZ's directive to Intus not to access PACE Care impact the integration process?

A.   Yes.

Q.   In what way?

A.   Intus Care did not have the health record

STENO

information from, in this case, Beacon to pull into the Intus Care data analytics platform to provide the service that Beacon was looking for.

Q.    So in other words, so long as Intus obtained the EHR data, it could provide it services?

A.    Yes.

Q.    And the manner in which it obtained that data from an integration standpoint didn't matter; is that correct?

MR. BESHAI:  Objection.  Misstates testimony.

THE WITNESS:  I -- can you restate that, please?

BY MR. LEE:

Q.    Sure.

The manner in which Intus received the EHR data didn't impact the integration, correct?

MR. BESHAI:  Objection.  Vague as to "manner" and vague as to "impact."

THE WITNESS:  In my role, I was not involved enough in the technology in the mapping of the data to comment, that that wasn't a part of my role --

BY MR. LEE:

Q.    Okay.

A.    -- on how they received it.

Q.    Fair enough.

STENO

If we look at the top e-mail, as we had discussed before, you forwarded this e-mail thread to Laura Ferrara.  Do you recall why?

A.   No, I don't.

Q.   Okay.  Okay.  I know that you just stated that you weren't involved enough on the technology side to understand kind of the ins and outs of the integration from a technical standpoint.

What I want to ask is if we assume the directive from RTZ never occurred, can you describe the integration process that you were facilitating between Intus and a PACE facility?

MR. BESHAI:  Objection.  Incomplete hypothetical.

BY MR. LEE:

Q.   You can answer.

A.   Can you -- can you repeat it, please?

Q.   Sure.

As we can see from Exhibit 11, RTZ directed Intus not to access PACE Care.  If RTZ hadn't issued that directive such that Intus had access, can you kind of describe the integration process as you understood it?

A.   Yes.

To my recollection, the PACE program would give -- would give a secure login to Intus, would assign

STENO

a secure login to Intus Care so that the Intus Care technology team could pull or access the EHR data into the Intus Care platform.

Q. Okay. So I want to unpack that a little bit.

So if Intus had access to PACE Care, your understanding was that the PACE facility using PACE Care would issue login credentials to certain Intus employees who would then use that login to access the records within PACE Care?

A. From my understanding, it was not a login for one specific person. It was a login used by the tool to map and to flow the data from EHR into Intus Care but it was assigned by the PACE program.

Q. Okay. And when you say the tool?

A. The data analytics platform.

Q. Understood.

And so an account is created in the name of an Intus employee but the tool uses that login credential in order to facilitate the data pipeline?

A. I can't recall if the login name was assigned to a specific name of an Intus employee or what specifically or if it was assigned to Intus Care as the company. But that was how it was assigned.

Q. Okay. So was my description correct? If we omit the term "Intus employee," a login credential was

STENO

issued to someone or something at Intus which the data analytics platform then used in order to access the data on PACE Care?

A.    To my understanding, yes, that is correct.

Q.    Okay.  And were you, in your duties and responsibilities, charged with securing those login credentials for either the individual or the company Intus?

A.    I was at times.  At other times the technology team themselves connected with the technology team at the PACE program to do so.

Q.    Understood.

And do you have an understanding as to kind of the process by which the data was extracted once access to PACE Care was provided?

A.    Not confidently that I can speak to it.

Q.    Okay.  Do you have a high level understanding without getting into the weeds or the details?

A.    Yes.

Q.    What is your high level understanding?

A.    My high level understanding is that on a daily basis a formula was written so that the login could be used for an automatic login into the EHR to extract the data into the data analytics platform on a daily basis.

Q.    And do you know whether Intus technology

STENO

employees could control through that login access what types of information would actually be extracted?

MR. BESHAI:  Objection.  Vague as to "control."

BY MR. LEE:

Q.   You know, select or designate what type of data was going to be extracted from the system through this login access?

A.   From my understanding, the login contained only access to certain pieces or types of information.  For example, the types that we -- that we would pull into the Intus Care platform.

Q.   Understood.  Okay.

A.   Not things unrelated.

Q.   By the way, how are you doing?  Do you want to take a break?  Are you still feeling okay?  Do you want to keep on going?

A.   I'm okay for a bit.  Thank you.

Q.   Why don't we go for a few more minutes then we'll take a quick break?

A.   Sure.

Q.   I'm going to mark as the next exhibit in order, Exhibit Number 12, and hopefully you see that in a moment here.  All right.  Ms. Wertz, are you able to see this exhibit?

A.   Yes.

STENO

(Exhibit 12 marked.)

BY MR. LEE:

Q.   Okay.  And is it Zoomed in enough for you to be able to easily read it?

A.   Yes.  Thank you.

MR. BESHAI:  Could I have the Bates stamp of that?  I can't see it --

MR. LEE:  Yeah, I was going to mark it and identify it.

MR. BESHAI:  Sure, sure.

MR. LEE:  Yeah.

BY MR. LEE:

Q.   So for the record Exhibit 12 is an e-mail thread dated July 19, 2022, and it bears the Bates stamp numbers Intus 001668 through 1669.

Turning your attention Ms. Wertz to the first page, this is an e-mail that you received on or about July 19, 2022; is that correct?

A.   Yes, it appears so.

Q.   Okay.  And this is an e-mail thread that you would have either authored or received, you know, e-mails from in your capacity as an Intus employee; is that correct?

A.   Correct.

Q.   Okay.  We talked about Evan Walters a little

STENO

bit in the last -- with respect to the last exhibit, but I wanted to ask, do you recall what position Mr. Walters held and if I asked this and you told me I forgot and my apologies.

A.   I don't recall his exact title.

Q.   Okay.  Do you have an understanding generally of what his duties and responsibilities were?

A.   I do know that he lead the teams that completed the data integration and maintained the data integration.

Q.   And so am I understanding correctly that the technology teams or the integration teams that you described reported up to Mr. Walters?

A.   Yes, I believe so.

Q.   Okay.  Do you have an understanding as to whether Mr. Walters is still with Intus?

A.   I'm not certain.

Q.   Okay.  Turning back to Exhibit 12, I would like to look at the e-mail at the bottom of Page 1 and so this one.  And in it -- well, this appears to be an e-mail that you wrote to various individuals, including -- I'm not sure I'm going to pronounce this correctly -- Yehuda Czermak.

Do you see that?

A.   I do.

Q.   As well as Evan Walters and then a Gregory

STENO

LAURI WERTZ                                                    JOB NO. 1900014
AUGUST 19, 2025

Pulley.  It looks like Yehuda is from Acute Care, do you see that, in this e-mail screen?

A.    I see that.

Q.    Okay.  Do you know whether Acute Care was affiliated with Beacon Care?

A.    Yes, I recall that they were affiliated.

Q.    Okay.  The subject line for this particular e-mail thread is, Beacon of Life data integration.

Is this one of the projects that you were managing the integration for?

A.    Yes.

Q.    Okay.  Your e-mail to Yehuda states, Good morning, I would like to introduce Evan and Yehuda for purposes of beginning the data integration between Beacon of Life and Intus Care.

Do you see that?

A.    I do.

Q.    Okay.  And this is for the integration, the data integration which you've already described, correct?

A.    Yes.

Q.    Okay.  In other words, just integrating the EHR data to Intus Care data analytics platform?

A.    Correct.

Q.    Okay.  You go on to write that Beacon uses RTZ at their existing PACE program as well as the program

STENO

that opened on July 1st, 2022.

And when you say, Beacon of light uses RTZ, you are referring to uses PACE Care, correct?

A.    Correct.

Q.    Okay.  In response to this e-mail, Mr. Walters pipes in and says, I'm looking forward to working together.  In order to proceed with your integration will need credentials for your EHR.  Can you create an account in RTZ for us?

Do you see that?

A.    I do.

Q.    Okay.  And so that's essentially what you were just describing about the need for Intus to have an account in PACE Care in order to facilitate the integration, correct?

A.    Correct.

Q.    Okay.  And in this particular e-mail thread, Yehuda responds back and says, Sure.  I've created an account.  Your user name is E Walters and your password is Intus Care 123.

Do you see that?

A.    Yes.

Q.    Okay.  Does that refresh your recollection that PACE facilities would issue account credentials to specific individuals at Intus?

STENO

LAURI WERTZ                                                          JOB NO. 1900014
AUGUST 19, 2025

A.    The PACE program selected that user name on their own.  It wasn't requested by Intus Care.

Q.    Got it.

And so in -- you anticipated the question that I had which was at any point in time, to your knowledge, did Intus actually provide instructions to PACE facilities on whom to issue credentials to?

A.    Not that I recall.

Q.    Okay.  Do you have an understanding as to why Intus didn't just go directly to RTZ to obtain a PACE Care account?

A.    No, I don't -- I don't know.

Q.    Do you recall ever having discussions with anybody at Intus about that?

A.    No, I don't recall.

Q.    To the best of your recollection, I -- did Intus always seek account credentials from the PACE facilities instead of going to RTZ?

A.    To what I recall, yes.

Q.    And so is it fair to say that, again, from your experience, the normal course of business for Intus was to seek PACE Care account credentials through PACE facilities?

A.    Yes, that was the normal course of business.

Q.    You touched on it a little bit earlier and I

STENO

just wanted to make certain that I'm understanding.  You said that certain types of information or data was accessible to Intus when they got the PACE Care credentials.

Can you be a little more specific to the extent that you have a recollection as to what types of information Intus would get access to?

A.   I can tell you the things that were valuable to be displayed in the Intus Care platform which were medications, incidents, like a fall or a medication error, hospitalization, emergency room visits, diagnosis codes or problem list.

Q.   I'm sorry.  Problem what?

A.   I apologize.  Problem list or a list of diagnoses.

Q.   Got it.

A.   And I believe some demographic information such as name, date of birth.

Q.   All right.  Aside from the general, kind of, categories that you just delineated, do you recall any other types of access that Intus gained to PACE Care by virtue of these login credentials?

A.   Not that I recall.

Q.   Okay.  Are you aware of whether or not Intus provided to PACE facilities any sorts of written
STENO

materials that delineated what type of access Intus needed in PACE Care?

A.   Can you tell me more about type of access?

Q.   Sure.

And I'll see if I can simplify the question.

Did Intus provide instruction sheets to its PACE facilities about what features within PACE Care Intus needed access to?

A.   Yes.

Q.   In other words, was there anything in just written, kind of, form?

A.   Yes, I believe so.

Q.   Okay.  And can you kind of describe what these instructions were, did they have a name?  Well, why don't we start with that.  Did it have name that you can recall?

A.   I believe we called them data maps.

Q.   Okay.  Other than data maps, do you recall any other source of instructions that were provided to PACE facilities by Intus that itemized or describe what types of information needed to be accessed?

A.   I don't recall.

Q.   Okay.  Okay.  Let me go ahead and mark the next exhibit.  All right.  Ms. Wertz, I have marked as the next exhibit in order, Exhibit 13.

STENO

A.   Okay.

(Exhibit 13 marked.)

BY MR. LEE:

Q.   For the record, Exhibit 13 is an e-mail thread dated July 26, 2022, and it bears the Bates stamp numbers Intus 001738.

Do you see this document?

A.   Yes.

Q.   Okay.  And it's -- can you read it okay?

A.   Yes.

Q.   Great.  Thank you.

This is an e-mail that you wrote on July 26, 2022, correct?

A.   Yes, that's my e-mail.

Q.   Okay.  And you wrote this as part of your duties and responsibilities as an employee of Intus?

A.   Yes.

Q.   Okay.  And if we look at the subject line this appears to be an e-mail about data integration; is that correct?

A.   Yes.

Q.   Okay.  And if we look at the recipient's e-mail addresses, there is a designation Nhcare.org.

Do you see that?

A.   Yes.

STENO

Q.    Okay.  Does that stand for Neighborhood Healthcare?

A.    To my recollection, yes.

Q.    Okay.  And was Neighborhood Healthcare another data integration project that you were helping to manage?

A.    Yes.

Q.    Okay.  You write, looking at the first paragraph here, Per Laura Ferrara's request I'm stepping in to assist in coordinating the data integration between Neighborhood Healthcare and Intus Care.

Do you see that?

A.    Yes.

Q.    Okay.  Can you describe at a high level what Laura Ferrara's role in data integration was if you recall?

A.    I don't believe that -- I don't recall.  I don't believe that Laura had a regular role in the data integration.

Q.    Okay.  You had mentioned previously that at least initially you reported up to Laura Ferrara; is that correct?

A.    That's correct.

Q.    Okay.  And can you kind of at a high level describe what types of things you were reporting to her?

A.    I would report all of -- I mean, she was my

STENO

direct supervisor.  So I would have reported all of my duties -- reported to her when she was my direct supervisor.

Q.   Okay.  Would you report to her the status of integration projects that you were managing?

A.   Yes.

Q.   Okay.  And would you provide her updates on whether or not problems or, you know, successes were occurring with respect to those integration projects?

A.   Yes.

Q.   Okay.  Does data integration for Neighborhood Healthcare, is this the same type of integration we already discussed earlier?

A.   Yes.

Q.   Okay.  The next paragraph you write to Neighborhood Healthcare, We will need access to the reporting functionality of RTZ so all menu items that can be accessed by clicking operations then reporting from your home page.

Do you see that?

A.   I do.

Q.   Okay.  You described before, you know, some of the access needs of Intus.  Does this help refresh your recollection about, you know, the types of access that Intus needed in PACE Care above and beyond what you

STENO

already described to me?

    A.   Yes.

    Q.   Okay.  What else -- you know, what other types of access did Intus require from PACE Care or for PACE Care?

    A.   Intus Care utilized the reporting function in the EHR's to run the reports that were needed to populate the Intus Care platform.

    Q.   Okay.  I want to ask a couple of follow-up questions.  When you say it needed access to the reporting functionality in order to run the reports, was Intus through the login access dictating what types of reports to run?

    MR. BESHAI:  Objection.  Vague as to "dictate."

    THE WITNESS:  Can you repeat that, please?

BY MR. LEE:

    Q.   Sure.

    Let me -- let me see if I can ask it a little bit differently, Ms. Wertz.

    Looking back at the same sentence that we just have been focused on, why would Intus need access to, quote, all menu items that can be accessed by clicking operations?

    MR. BESHAI:  Objection.  Lacks foundation.

///

STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

BY MR. LEE:

Q.   You can answer.

A.   Intus Care needed access to the reporting function.  Per the instructions here, Intus Care needed access to the reporting functions under operations so that it could -- it could pull in the data that was included in that report to be visualized in the Intus Care platform.

Q.   So in other words, access to this reporting functionality within PACE Care would allow Intus to select which reports containing which data it wanted to populate the data analytics platform?

A.   From my understanding, yes, of the data it had access to, correct.

Q.   Mindful that we are a couple years down the line here, do you have any recollection as to what operations were managed through the operations tab?

A.   No, I don't recall.

Q.   Do you have an understanding when you write the words, All menu items that can be accessed by clicking operations, whether all of those menu items were types of reports or were they other things?

A.   My recollection is that it would have been types of reports because it says, Clicking operations then reporting.

STENO

Q.   Do you have an understanding as to whether Intus could access the reporting functionality without accessing PACE Care?

A.   Can you rephrase that?

Q.   Sure.

Can we agree that Intus could not access the reporting functionality within PACE Care without actually having access to PACE Care?

A.   Yes.

Q.   So you would agree with me?

A.   I would -- yeah, I would agree that if Intus Care didn't have access to PACE Care they couldn't access the reporting function within PACE Care.

Q.   Are you aware of how many Intus customers using PACE Care provided Intus with EMR credentials and accounts just at a broad level?

A.   During my time there, less than five, I believe, to my recollection.

Q.   Do you know whether or not the numbers started increasing the closer you got to leaving Intus or was it more front loaded?

A.   They were increasing -- during my time at Intus Care and as I was leaving, they were more -- they were higher than when I started.

Q.   Are you aware of an EMR called PACE Logic?

STENO

A.    Yes.

Q.    Did you manage integrations between Intus and PACE facilities that utilize PACE Logic?

A.    Yes.

Q.    Were there other EMR's utilized by Intus clients that you are aware of beyond PACE Care and PACE Logic?

A.    I recall another one.  I believe it was -- I'm not going to remember the name.  There was another one that was -- that they integrated with, yes.

Q.    Do you remember the company that developed that third EMR?

A.    I believe it was developed by Tabula Rasa.

Q.    Was it perhaps True Chart?

A.    Yes, yes.

Q.    Are you aware of whether Intus asked PACE facilities using PACE Logic or True Chart access to those EMR's as part of the integration process?

A.    Yes.

Q.    Do you have an understanding as to whether or not Intus had executed NDA's with Tabula Rasa for access to PACE Care or True Chart?

A.    I'm not certain.  I wouldn't have known that.

Q.    I'm just going to finish up this exhibit and then we can take a quick break.  Does that work for you?

STENO

A. Okay.

Q. Okay. I want to go back and look at your e-mail here. You write, If this can be established by an internal staff member that would be great but let me know if I need to approach differently. Laura had mentioned a Dylan Clements and Michael Zawadski I'm assuming from RTZ that may need to be involved.

Do you see that?

A. I do.

Q. Do you recall the discussion you had with Laura about Dylan Clements and Michael Zawadski?

A. I don't.

Q. Okay. Do you know as you sit here today, whether or not you ever got them involved in connection with this Neighborhood Healthcare integration?

A. I don't recall.

Q. As you sit here today, do you have any recollection of any discussions that you've ever had with Michael Zawadski?

A. I don't recall.

Q. Okay. Let me ask it a little bit differently.

As you sit here today, did you ever have any conversations with Mr. Zawadski?

A. I may have but I don't recall.

Q. And then same question with respect to Dylan
STENO

Clements?

A.   Same answer.  I may have but I don't recall today.

Q.   Great.

All right.  My thought is why don't we go ahead and take a, you know, a five-minute break, let you kind of stretch your legs.

So we can go off the record.

(Break taken.)

MR. LEE:  Back on the record.

BY MR. LEE:

Q.   All right.  Ms. Wertz, we are back from the break.  During the break did you talk with anybody about the deposition?

A.   No.

Q.   All right.  I'm going to mark the next exhibit in order which is Exhibit 14.  Ms. Wertz, can you read that okay?

A.   Yes.

(Exhibit 14 marked.)

BY MR. LEE:

Q.   Okay.  For the record -- actually, before I get to the Exhibit, one thing I should have asked is, Ms. Wertz, I'm going to be showing you a number of exhibits today.  If any of the exhibits that I show you

STENO

are the same as those which were shown to you during your call with your prior call with Counsel, could you just kindly let me know?

A.   Sure.

Q.   And I guess I'll ask, are any of the documents or exhibits that we already looked at, any of the exhibits that you looked at with Counsel?

A.   No, I don't believe so.

Q.   Okay.   Great.   Thank you.

For the record, Exhibit 14 is an e-mail thread with the last or the latest e-mail being dated July 26, 2022, and it bears the Bates stamp range Intus 001731 through 1737.

Ms. Wertz, I want to just kind of direct your attention to the first page here.   Is this an e-mail thread that you were on in and around July 26, 2022?

A.   Yes, it appears to be.

Q.   Okay.   And, again, you were involved in this e-mail thread in your capacity as an employee of Intus, correct?

A.   Correct.

Q.   Okay.   Before the break we were talking about the integration between Intus and Neighborhood PACE and this appears to be a communication that's related to that.   If I'm understanding it correctly.

STENO

And so what I would like to do is just direct your attention to the second page in which -- sorry -- at the top of the e-mail from Jeffrey Glenn of Neighborhood Healthcare to Laura Ferrara and other individuals.

Do you see that?

A.   Yes.

Q.   Okay.  And Mr. Glenn writes, Laura, has your team been able to gain access to our RTZ application for the data integration project?

Laura that same day responds, Hi, Jeff, we have not been able to grant access yet.  I have copied my team member Lauri Wertz who managed your data integration with our data team.

Do you see that?

A.   Yes.

Q.   Okay.  At the top of this e-mail Marina Lomeli from Neighborhood Healthcare, who appears to be the director of IT, if we look down here, writes to you, Laura Ferrara and Mr. Glenn as well as Sandra Mireles and says, All, I'm not sure if my last e-mail on July 21st was missed but Neighborhood Health IT does not manage nor authorize access to the RTZ data or database.  This clearance or permission would need to be granted by RTZ themselves.

Do you see that?

STENO

LAURI WERTZ                                          JOB NO. 1900014
AUGUST 19, 2025

A.    Yes.

Q.    Okay.  Do you recall having a reaction to that?

A.    No, I don't recall.

Q.    Okay.  Are you aware of anyone at Intus that had a reaction to that that you learned about?

A.    Not that I recall --

(Speaking simultaneously.)

MR. BESHAI:  Objection.

Sorry, Ms. Wertz.

Objection.  Vague as to "reaction."

BY MR. LEE:

Q.    Are you aware of anyone at Intus expressing disagreement with Ms. Lomeli's position?

A.    Not that I recall in this instance.

Q.    At the time, did you have any agreement that access to PACE Care was appropriately granted by RTZ as opposed to a PACE program?

MR. BESHAI:  Objection.  Lacks foundation.

THE WITNESS:  Can you rephrase that, please?

BY MR. LEE:

Q.    Sure.

Did you have any view one way or the other of whether or not RTZ was the entity that appropriately should provide access to PACE Care versus a PACE facility?

STENO

MR. BESHAI:  Objection.  Vague as to "appropriately" and lacks foundation.

THE WITNESS:  I don't recall a reaction.  I don't recall my reaction to this e-mail on July 26th.

BY MR. LEE:

Q.   Understood.

My question is, you know, based on the experience that you gained over the years, was -- was RTZ the appropriate party as the owner and licensor of PACE Care the party who should be granting access to PACE Care by Intus?

MR. BESHAI:  Objection.  Vague as to "should be" and "appropriate."

THE WITNESS:  From my experience and from my time at Intus Care between March of 2022 and July 26th of 2022, it was most common for the PACE programs to be the ones to grant access to their EHR's.

BY MR. LEE:

Q.   And if I understood your prior testimony correctly, would that have been a result of the fact that Intus was asking those PACE facilities as opposed to the EMR developers?

A.   Yes.

Q.   In your experience, was Ms. Lomeli's stated position in this e-mail unique?

STENO

A.   I believe so, yes, at the time.

Q.   Do you recall whether after receiving this e-mail from Ms. Lomeli, Intus, in fact, sought permission from RTZ to gain access to PACE Care?

A.   I don't specifically recall.

Q.   Based on your experience, is that something you would have done?  "That something" being requesting from RTZ access or is that something, in your view, somebody else at Intus would have done?

A.   That is something I would not have done without the direction and approval of someone else at Intus Care.

Q.   And whose direction and approval would you have sought before contacting RTZ for that purpose?

A.   Likely at this time I believe I reported to Laura Ferrara, so I would say Laura or one of the other C Suite individuals.

Q.   Do you recall whether Intus kind of modified its data integration process at all in response to Ms. Lomeli's e-mail?

A.   I don't recall the response to the e-mail on the 26th.

Q.   Any response?

A.   I don't -- I don't recall what the specific response was.

Q.   Okay.  My question is a little bit different,

STENO

which is to the best of your knowledge, do you recall whether Intus modified its data integration process approach for Neighborhood Healthcare as a reaction or in response to this e-mail?

MR. BESHAI:  Objection.  Vague as to "process" and "approach."

THE WITNESS:  I don't -- yeah, I don't recall the specific response.

BY MR. LEE:

Q.   Okay.

A.   To this one.

Q.   Now, we have previously looked at the e-mail from Evan Jackson.  I believe it was in Exhibit 11 in which he explained to Ms. Runyon for context that RTZ on September 14, 2022, had directed Intus to stop accessing PACE Care.

Do you remember that?

A.   Yes.

Q.   Okay.  As you sit here today, was the data integration process that we talked about, you know, up until now altered as a response to RTZ's directive to Intus not to access PACE Care?

A.   Can you repeat that?  I'm sorry.

Q.   Yeah, yeah.  So let me see if I can build in a little bit of foundation here.

STENO

You have described the integration process over the last couple of exhibits that we have looked at which is the PACE facility would issue credentials to Intus or an employee at Intus in order to access PACE Care and the reporting functionality and that would set up the pipeline through which EHR would flow from the PACE facilities' PACE Care system to Intus's data analytics platform.

Correct?

A.   Correct.

Q.   Okay.  And so that's -- I'll call that the integration process that, you know, we have talked about, you know, until now.

Does that make sense?

A.   Yes.

Q.   Okay?

A.   Correct, yes.

Q.   Was that integration process which we just described changed as a result of Intus -- I'm sorry -- as a result of RTZ's directive to Intus to no longer access PACE Care without an NDA?

A.   Understood.

At some point, I cannot specifically recall a date, there was an alternate process offered to PACE organizations to send the reports securely to Intus Care

STENO

and Intus Care could use those to populate the data analytics platform.

Q.   Got it.

What I would like to do is introduce Exhibit 15.  Ms. Wertz, are you able to see Exhibit 15?

A.   Yes.

(Exhibit 15 marked.)

BY MR. LEE:

Q.   Okay.  For the record, Exhibit 15 is an e-mail thread dated on and around October 6, 2022, and it carries the Bates stamp ranges 002205 through 2211.

I'm mindful, Ms. Wertz, that this is a multi-page exhibit so what I'll do is my best to kind of direct you to certain areas within the exhibit that I want to focus on.  If you want to review the entire exhibit, certainly feel free but I think the questions I'm going to be asking are pretty specific to sections of the e-mail so we'll just work through it and see how it goes.

Initially, as I'm sure you've gotten used to it at this point this is not an e-mail or an e-mail thread that you were involved with on or about October 6, 2022; is that correct?

A.   It appears to be.  I see my name, I don't see the specific address but I see my name.

STENO

Q.   Okay.  And this is an e-mail thread that you would that have been involved with as part of your duties and responsibilities as an employee of Intus, correct?

A.   Correct.

Q.   All right.  What I would like to do is go to the fourth page which is Page 2208.  Do you see that at the bottom?  And this is an e-mail from Ms. Ferrara to several individuals with bold.

Do you see that?

A.   Yes.

Q.   Okay.  Now the subject line for this particular e-mail thread is, RTZ Intus collaboration.

Do you see that?

A.   Yes.

Q.   Okay.  What I would like to do is make sure that I'm understanding where I am here.  Hold on one second.  This Laura Ferrara e-mail, this is one that you are cc'd on, correct?

A.   Yes.

Q.   Okay.  And so it's fair to say that you would have reviewed this at the time?

A.   I don't recall specifically reading this e-mail but I likely would have read it.

Q.   Sure.

And do you understand that BoldAge is the same

STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

organization is Beacon of Life?

A.   They are affiliated, yes.

Q.   Okay.  I've just seen so many different names, you know, uses for BoldAge, Beacon and Acute Care.  So I just wanted to make sure.  So Ms. Ferrara's e-mail to BoldAge states up here in the first line, I am confident that we will be able to continue setting BoldAge up for success in using Intus Care despite the current RTZ access issues.

Do you see that?

A.   I do.

Q.   Okay.  And you understand the, you know, RTZ access issues to be the directive from RTZ for Intus not to access PACE Care without an NDA?

A.   I can't speak to what Laura specifically meant but I would assume that that is what she was addressing.

Q.   Okay.  She goes on to write, Yehuda, my team member Wenxing Li will reach out to you to walk through the reports that are needed from RTZ and where to find them within RTZ.

Did you see that?  Did you see where I was just reading?

A.   Yes.

Q.   Okay.  I'm sorry.

Do you have an understanding that these

STENO

references to RTZ is actually just a shorthand reference to PACE Care?

A. Yes.

Q. Okay. She goes on to state, I have attached the data map showing the reports we accessed and retrieved from RTZ when we were able to connect. Once Wenxing has helped you identify the needed reports, we will just need to know what day each week you would like for your data to be refreshed and updated. As a process when you send the reports, our data team will upload the information into Intus Care so you can see the data displayed. It will be updated and refreshed each time you send the reports. Wenxing will provide you the e-mail address for you to send the reports each week.

Is the process that Ms. Ferrara described the one that you were just alluding to as kind of the alternate approach?

A. Yes.

Q. Okay. And, again, your understanding was that this is an approach that was developed in response to RTZ's directive to Intus not to access PACE Care without an NDA, correct?

A. That is my understanding.

Q. Okay. And so is the process -- I'm not sure what that is. The process that Ms. Ferrara described was

STENO

in all I suppose manner just kind of the work around that Intus developed in order to get the data needed from its PACE facilities to populate the data analytics platform?

A.    Yes.

Q.    And this was a workaround that will allow Intus to provide its data analytics services to its PACE facilities despite not having access to PACE Care, correct?

A.    Correct.

Q.    I want to go through this process a little bit.

Ms. Ferrara mentions this individual Wenxing Li, I think I'm pronouncing that correctly.  Do you recall what role he occupied at Intus?

A.    If I recall his title was business analyst.

Q.    And do you have a general understanding of what his kind of duties and responsibilities were?

A.    Very generally speaking he assisted with data related things.

Q.    So is he on the technical side of the integration process?

A.    He was on the tech side of the integration process.

Q.    Okay.  Do you have an understanding as to whether or not Mr. Li was dedicated to integrations that involved RTZ's PACE Care?

STENO

A.   I don't -- I don't have that knowledge.

Q.   Okay.  Are you aware of whether or not Intus had multiple individuals in the same role as Mr. Li who specialized in certain EMR's or EHR's for purposes of data integration?

A.   No.

MR. BESHAI:  Objection --

(Speaking simultaneously.)

THE WITNESS:   --

MR. BESHAI:  Sorry, Ms. Wertz.

Misstates the document.

Mr. Li, I believe, worked for the client, not Intus.

MR. LEE:  Okay.  I think that's wrong but you can go ahead.

MR. BESHAI:  Sorry.  Sorry.  You are right, you are right.  Strike that objection.  Apologies.

BY MR. LEE:

Q.   Go ahead, Ms. Wertz.  If you need, we can read the question back.

A.   I'm not aware of how the integrations were divided up to the technical team and assigned out.

Q.   Got it.

Was Mr. Li still with Intus at the time you left?

STENO

A.   He was, yes.

Q.   Okay.  That's a shot in the dark here but do you know if she's still there?

A.   I'm not sure.

Q.   Fair enough.

All right.  In any event, as at least described by Ms. Ferrara, Mr. Li would train the PACE facility clients here at BoldAge which specific reports to send to Intus that contained the data that it needed in order to populate its dashboards, right?

A.   Yes.

Q.   Were you involved in any of those training sessions personally?

A.   I don't recall sitting in on any of them.

Q.   Do you know whether or not Intus had any sort of literature or instructions that accompanied whatever instructions Mr. Li was providing to them?

A.   I believe there were written copies of the data maps as Laura referenced here, I've attached the data maps showing the reports we access.  That's what would have been provided to the client.

Q.   Okay.  And have you seen these data maps?

A.   Yes.

Q.   Okay.  And at a high level are you able to kind of describe what they are?

STENO

A.   Yes.

The data maps show what displays in Intus, in the Intus Care platform, and the pathway to extract that data from the report in the EHR.

Q.   So in other words, the data that's housed in the EHR, here PACE Care, is in one location and the data map identifies where the location of that data is in PACE Care so that it can be presented in the data analytics tool?

A.   How to run the report that would show the data in Intus Care.

Q.   Okay.  Do you have an understanding as to when Intus first started using data maps for PACE Care?

A.   No.  I believe it was before -- before I began with Intus Care in March of 2022.

Q.   Do you have an understanding as to whether these maps were created by Intus?

MR. BESHAI:  Objection.  Lacks foundation.

THE WITNESS:  I can't speak to where they were created before --

(Speaking simultaneously.)

BY MR. LEE:

Q.   Okay.

A.   -- my time at Intus.

Q.   Do you know who at Intus may have been involved

STENO

in the creation of data maps?

A.   Not concretely.

Q.   What about non-concretely?  Do you have any general sense?

A.   I would guess the data analytics team that were employed there prior to whenever they were created -- not prior to when they were created -- the data analytics team that were present when they were created prior to March of 2022.

Q.   Do you have any recollection of an instance in which a data map was created in connection with one of the integrations that you manage?

A.   Can you repeat that, please?

Q.   Sure.

Do you have any recollection of being involved in a data integration project in which a data map was needed, I'm sorry, a data map needed to be created specifically for that integration?

A.   To my recollection all of the data maps were created before I started working at Intus Care.  They may have been updated or edited with changes to the EMR, EHR while I was a part of the account but they were all created, to my recollection, prior to me joining.

Q.   And you anticipated kind of my next question which is are you aware of an instance in which a data map

STENO

was revised or modified in order to help achieve a data integration project that you were working on?

A.    I can't speak to a specific instance but I would imagine that it happened.  It had to have happened.

Q.    And why do you say that?

A.    Because the EMR's go through updates where things change, mapping may change, so then that would affect how reports are run.

Q.    Are you aware of whether or not in this particular exhibit that we are looking at, a data map that is provided to BoldAge is the same data map that could be provided to any PACE facility customer that was using PACE Care?

In other words, is there one data map for PACE Care or are there different iterations at a PACE facility?

MR. BESHAI:  Objection.

THE WITNESS:  To my --

(Speaking simultaneously.)

MR. BESHAI:  --

THE WITNESS:  To my understanding, an RTZ data map was an RTZ data map.  They were not different per customer.

BY MR. LEE:

Q.    And do you have an understanding as to whether

STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

or not there were data maps for PACE Logic and True Chart as well?

A.    Yes, there were.

Q.    Do you have an understanding as to whether or not they were data maps for any other EMR or EHR?

A.    To my recollection, those were the three EHR's that Intus Care worked with during my time so I believe those were the only three.

Q.    And just so that we are clear, there were different data maps for each of those three different EMR's, correct?

A.    Correct.

Q.    I think I know the answer to the question but I'm going to ask it anyways.  Why would Intus send the data map to its customer?

A.    Intus would send the data map to the customer during a regular integration for a couple a reasons. Number one, during the integration so that the different tech teams could know what data was going where.

But then it would also send it to the front line staff, the caregivers that worked with the participants that were also using the Intus Care software so they could understand that when they entered this piece of data into the EMR in this location this is where they could see it aggregated with other data in Intus

STENO

Care.

Q.   And the idea was that having this level of detail about where this data was located would allow the (audio cut out) to run the required reports that Intus, you know, wanted for purposes of being able to populate its data analytics tool?

A.   Can you repeat that?  I apologize you broke up right in the middle.

Q.   My apologies.

So my understanding is that the data maps would be furnished to the PACE facilities in order to direct them to the data that would need to be included in a report that was then manually provided to Intus to populate the data analytics file?

A.   Manually provided or just in a standard integration so that I, as a clinician, would know if I entered this fall for this participant in this location in the EMR I could then see it in Intus Care here.  So it would be valuable in all manual integrations and non-manual integrations.

Q.   Understood.

But my point perhaps is a little bit lost which is the data maps are provided to the facilities so that the facilities can generate the types of reports that Intus needed in order to populate the data analytics

platform?

A.    Correct.

Q.    And I want to focus on language from Ms. Ferrara's e-mail here, simply here, in which she says, I've attached the data maps showing the reports we access and retrieve from RTZ when we are able to connect.

Do you see that?

A.    I do.

Q.    And so if I understand correctly, she was providing a data map that would identify the same reports that Intus had direct access to when it could access PACE Care, correct?

MR. BESHAI:  Objection.  Lacks foundation.

THE WITNESS:  Yes.

BY MR. LEE:

Q.    So without Intus's access to PACE Care, a process that Ms. Ferrara has described, would -- meaning, the data maps and Mr. Li's training, would instruct the customer here at BoldAge on the same reports to generate and send to Intus for upload into Intus Care?

A.    Yes.

Q.    And through this process as I understand it, the PACE facility would then just simply generate the report and e-mail them to somebody at Intus for upload, correct?

STENO

MR. BESHAI:  Objection.  Vague as to "simply."

THE WITNESS:  I don't recall how the data --
how the report exchange happened.

BY MR. LEE:

Q.   No problem.  We'll clear that up through some
of these e-mails.

A.   Okay.

Q.   All right.  In any event, is it accurate to say
that whether Intus had direct access to PACE Care or
whether or not it was using the process described in this
particular exhibit, the same data is being uploaded into
the Intus Care data analytics tool whether Intus had
direct access to PACE Care or not?

A.   Yes.

Q.   As you sit here today, and I'm mindful of what
you testified to before, Ms. Wertz, do you have an
understanding as to whether or not RTZ had any
involvement in any of the development of the data maps?

MR. BESHAI:  Objection.  Lacks foundation.

THE WITNESS:  In the development, no, I'm
not -- I don't have any knowledge.

BY MR. LEE:

Q.   Okay.  Do you know whether anybody at Intus
ever informed RTZ about the existence of the data maps
that Intus was providing to the PACE facilities?

STENO

A.    No, I don't know.

Q.    Okay.  Do you know whether Intus ever actually obtained permission from RTZ to either develop or transmit these data maps to PACE facilities?

A.    I don't know.

Q.    All right.  I want to focus on the next paragraph here, Ms. Wertz, where Ms. Ferrara writes, It is our hope that we have access to RTZ again by the time you are fully onboarded.  If not, we will continue to follow the process I've outlined here.

Do you see that?

A.    I do.

Q.    Okay.  Did you mean -- understand to mean that if Intus never regained access to PACE Care, Intus still had access to the same data through the process that she described in this exhibit?

A.    That would be my understanding.

Q.    Ms. Wertz, is this one of the exhibits that was shown to you by Counsel?

A.    I don't believe so.

Q.    Okay.  All right.  I'm going to mark the next exhibit in order, Ms. Wertz.  All right.  Are you able to read that?

A.    Yes.

Q.    Okay.  For the record, Exhibit 16 is an e-mail

STENO

thread dated on and around November 10, 2022, and it bears the Bates stamp numbers Intus 002384 through 2385. Ms. Wertz, at the top of this e-mail we see that you are a recipient, correct?

A.    Yes.

(Exhibit 16 marked.)

BY MR. LEE:

Q.    Okay.  And so this is an e-mail that you would have received on or around November 10th of 2022?

A.    Correct.

Q.    And you would have received it as an employee of Intus?

A.    Correct.

Q.    Okay.  If we look at the first e-mail it appears to be from Ms. Ferrara to Community PACE, Sarah Berry at community PACE.

Do you see that?

A.    Yes.

Q.    Okay.  And Community PACE was another data integration project that you were helping to manage?

A.    Yes.

Q.    Okay.  And Community PACE also used PACE Care, correct?

A.    Yes.

Q.    Okay.  Ms. Ferrara writes to Ms. Berry -- let

STENO

me find it here -- As we have discussed during the NPA conference in Seattle, Washington we have a solution to receive an upload Community PACE at home's data until we have our agreement resolved with RTZ.  We had made more progress with RTZ recently and I believe we are close to permanent solution.  Until that time, Lauri would like to work with you to obtain manual data reports to provide your access -- I'm sorry -- to provide you access to your data.  Please see her related message below.

          Do you see that?

     A.   I do.

     Q.   Okay.  And this is in connection with the process that Ms. Ferrara had outlined in the prior exhibit we looked at, right?

     A.   Yes.

     Q.   Okay.  In other words, this is the altered process that you are now following for purposes of facilitating the integrations, correct?

     A.   Yes.  To my understanding of her e-mail, correct.

     Q.   Okay.  All right.  Your e-mail below to Ms. Berry states, If you are agreeable, our data analyst will be happy to review with you a process document that provides step by step instructions on pulling the needed reports.

                         STENO

Do you see that?

A.   I do.

Q.   Okay.  The data analyst, was that Mr. Li?

A.   I believe so, yes.

Q.   Okay.  I want to focus on the language that you used, A process document that provides step by step instructions, is that the data map that you had previously described or is this a different document?

A.   No, that's the same document.

Q.   Okay.  So process document just equals data map?

A.   Yes.

Q.   Okay.  All right.  Ms. Wertz, I am marking the next exhibit in order, number 17.  All right.  Exhibit 17 is an e-mail from Ms. Wertz to Sarah Berry dated September 29, 2022.  And it bears the Bates stamp number Intus 002194.

Ms. Wertz, this is an e-mail you sent to Ms. Berry on September 29, 2022?

A.   Yes.

(Exhibit 17 marked.)

BY MR. LEE:

Q.   Okay.  And you sent this in your capacity as an employee of Intus?

A.   Correct.

                              STENO

Q.    All right.  And Ms. Berry, as a reminder, is a representative from Community PACE, correct?

A.    Correct.

Q.    Okay.  I want to focus on language here in the first paragraph.  You said, I hope you are doing well and that your migration too RTZ was smooth.  And follow-up to Laura Ferrara's e-mail, if your team is able to send us the RTZ reports that are used to populate the Intus dashboards on a weekly basis, we can easily upload those manually on our end to keep your dashboards somewhat current.

Do you see that?

A.    Yes.

Q.    Okay.  Again, without meaning to belabor the point, you are meaning reference to the process from Ms. Ferrara's prior e-mail, correct?

A.    Correct.

Q.    Do you mind if I just call it the Ferrara Process?

A.    Yes.

Q.    And if I call it the Ferrara Process, you'll understand what I mean?

A.    Yes.

Q.    Okay.  Is it accurate to say that if Community PACE sent Intus the RTZ reports, those reports contain

STENO

the data needed to populate the Intus dashboards?

A.   Yes.

Q.   Okay.  And according to your e-mail, those reports would be easy to upload into Intus, correct?

A.   Correct.

Q.   Okay.  In other words, it wasn't a complicated process, right?

A.   I speak with a nontechnical skill set but, correct, from my perspective.

Q.   All right.  All right.  Ms. Wertz, I'm going to mark the next exhibit in order which is Exhibit 18.  For the record, Exhibit 18 is an e-mail thread dated December 6th -- December 6, 2022 and it bears the Bates stamp range 2406.

Can you see that okay?

A.   Yes.

(Exhibit 18 marked.)

BY MR. LEE:

Q.   Okay.  This is an e-mail that you sent to Astrid Forbito, Debra Fisher and others on December 6, 2022?

A.   Yes.

Q.   And you did so in your capacity as an employee of Intus, correct?

A.   Yes.

STENO

Q.   All right.  My understanding looking at least at some of the e-mail addresses in the to line that you were writing to individuals at Neighborhood Healthcare, correct?

A.   Correct.

Q.   All right.  And I know that we already looked at some of the e-mails between Intus and Neighborhood but as a reminder, Neighborhood was one of the integrations that you were managing?

A.   Yes.

Q.   All right.  I want to focus on your e-mail and some of the bullet points.  You say, Thank you all for your time today.  I'm sending some notes with follow-ups for us so that we can stay on track.  Please let me know if I miss anything.

I want to look at this first bullet point where you write, As part of the workaround RTZ Astrid to determine which day of the week the team would like to have the data/slash dashboards refreshed.

Do you see that?

A.   Yes.

Q.   Okay.  And when you say, As part of the workaround for RTZ, is that a reference to RTZ's directive that Intus cease access, direct access, to PACE Care absent an NDA?

STENO

A.    Yes and that's in response to -- it means also the process that Laura outlined.

Q.    Got it?

A.    Yes.

Q.    The Ferrara Process?

A.    The Ferrara.

Q.    Thank you.

All right.  The next bullet point states that Alysia, who I think is the same individual that you had talked about before, and Lauri to send EHR data maps/data dictionaries for the team to understand the location in RTZ for the different metrics that pull into Intus Care.

What are data dictionaries?

A.    It was synonymous with data maps.

Q.    Okay.

THE REPORTER:  This is the reporter.  When you are reading I would appreciate it if you would slow down a bit.

MR. LEE:  My apologies.  I will.

THE REPORTER:  No worries.  Everybody does it.

BY MR. LEE:

Q.    So Ms. Wertz, although you use different terms, EHR data maps and data dictionaries, your recollection is that they were one in the same?

A.    Yes.

STENO

Q.   Okay.  Are you aware of whether or not in addition to data maps Intus provided any other type of documents to PACE facilities in order to help them identify which data to provide to Intus?

A.   I don't recall anything other than the reporting data maps, data dictionaries.

Q.   Got it.

Ms. Wertz, I'm marking the next exhibit in order, Exhibit 19.  I'll pull that up for you.

All right.  Ms. Wertz, are you able to see Exhibit 19?

A.   Yes.

(Exhibit 19 marked.)

BY MR. LEE:

Q.   All right.  Exhibit 19 is an e-mail that you sent dated January 11, 2023, and it bears a Bates stamp ranges Intus 002502 through 2504.  I know the questions get a little rote, Ms. Wertz, but this is an e-mail that you've seen before?

A.   That appears to be my e-mail, yes.

Q.   Okay.  And it's an e-mail that you sent in your capacity as an employee of Intus?

A.   Correct.

Q.   All right.  And given that this is an e-mail addressed to Astrid Forbito, I assume that this is

STENO

another e-mail to Neighborhood Healthcare?

A.   Yes.

Q.   Okay.  Your e-mail in the first paragraph makes reference to -- well, I'll just read it.  It said, Hi, Astrid, we use a customer port in RTZ/PCO to pull in the ICD-10 codes that are assigned to each participant in order to build their risk acuity score.

Do you see that?

A.   Yes.

Q.   Okay.  What did you mean by, We use a customer port in RTZ/PACE Care Online?

A.   From my understanding, in the reporting features in any EMR there's standard reports, for example, a report of falls or a report of hospitalizations which Intus Care used for that purpose.

But then there was also the ability to build a custom report that wasn't like a preselected template to pull in other data metrics that the user had access to and aggregate that into a report.

Q.   Understood.

Is this type of custom report that you just described a report that would be accessible through the reporting functionality as we had, you know, kind of described earlier?

A.   Yes.

STENO

Q.   Okay.  And so it's a custom report that is built and then included as one of the reports that is available through that reporting functionality?

A.   Correct.

Q.   Okay.  Do you have an understanding as to who would build the custom report?

A.   Anyone that had access to the EMR could build a custom report of data that they had access to.

Q.   The custom report that is referenced by you in this Exhibit 19, is that a custom report that you recall Intus creating?

A.   From -- I can't say that I ever seen it but from what I see here that is what Intus Care used to pull in the ICD-10 codes which are diagnoses and the onset dates of those -- onset and closed dates of those diagnoses.

Q.   So do you know one way or the other of whether or not this is a report that was created by Intus or created by a PACE facility or somebody else?

A.   Customer ports can be created by the user at -- whenever they login.  So this report -- this data could have been pulled by Intus Care.

Q.   And when you say, "pulled by Intus Care," does that suggest that Intus would have been the developer of this particular custom report?

STENO

A.   They could have been, yes, if they had access to all of the data elements in the report.

Q.   Okay.  All right.  Ms. Wertz, we spent sometime kind of going through and talking about the Ferrara Process as we called it.  Are you aware of whether Intus developed an alternate process beyond the Ferrara Process to gain access to the data that it needed to upload to Intus Care after the whole NDA issue?

A.   Not that I recall.

Q.   Okay.  Do you have an understanding or recollection that Intus developed an automated process to gain access to data in order to upload it into Intus Care?

     MR. BESHAI:  Objection.  Lacks foundation.

BY MR. LEE:

Q.   You can answer.

A.   Can you restate?

Q.   Sure.

     Have you ever heard of the term "automated script"?

A.   Yes.

Q.   Okay.  What do you understand an automated script to be?

A.   I understand an automated script to be, it could be a formula or a request, data request, that

happens automatically through data programming.

Q.   Okay.  And do you have an understanding as to whether or not Intus utilized an automated script for integrating PACE facility data and Intus Care data analytics platform?

A.   Understood.  Yes.

Q.   Okay.  Do you know when that process of using an automated script first began?

A.   I don't.  I do know it was before I joined Intus Care.

Q.   Okay.  And when you say it was used before you joined Intus Care, is that because it was one of the processes that you used in your data integration projects?

A.   Yes, it was the standard integration.

Q.   Okay.  Is that the standard integration process that you described prior to RTZ's directive to Intus to stop accessing PACE Care without an NDA?

A.   Yes, that was the standard process.

Q.   Okay.  And so the standard process was disrupted by RTZ's directive which gave rise to the Ferrara Process, am I right so far?

A.   You are correct.

Q.   Okay.  And then in your understanding, did Intus go back to using the automated script process as an

STENO

alternative to the Ferrara Process?

A.    With RTZ?

Q.    Yes.

A.    I don't recall that they went back prior to me leaving.

Q.    Okay.

A.    Intus Care.

Q.    Why don't we look at some documents to see if it helps.  All right.  Ms. Wertz, I have marked as Exhibit 20 an e-mail thread dated on and around June 23, 2023, and it bears the Bates stamp numbers Intus 003089 through 3095.

Looking at the first page, this is an e-mail that you sent to Janet Huang, Astrid Forbito and Joanne Won?

A.    Yes, correct.

(Exhibit 20 marked.)

BY MR. LEE:

Q.    And you sent this on or around June 23, 2023?

A.    Correct.

Q.    And you would have done so in your capacity as an employee of Intus?

A.    Yes.

Q.    Okay.  Just so that the record is clear, the recipients of your e-mail were employees and

STENO

representatives of Neighborhood Healthcare, correct?

A.   Correct.

Q.   Okay.  Now, the subject line for this particular e-mail thread is, RTZ process solution.

Do you see that?

A.   I see that.

Q.   All right.  What I would like to do is actually jump down a couple of pages and for the record, this is page Intus 003092.  I want to focus on the an e-mail from Evan Jackson to the Neighborhood care folks.  It's in the middle of the page.

Do you see that?

A.   I do.

Q.   All right.  He says -- and, again, I don't know if this was helpful and if it's not, Ms. Wertz, just tell me to stop doing it but it's kind of fun.

He says, It was great to connect with you today.  We are excited to resume the automation of your data pipeline.

Do you see that?

A.   Yes.

Q.   Okay.  Do you have an understanding as to what he meant by, Resume the automation of your data pipeline?

A.   Yes.

Q.   Okay.  What is your understanding?

STENO

A.   My understanding of what he's referring to is ending the process, the manual process, the Ferrara Process, ending the manual process of, in this case, Neighborhood health sending manual reports to Intus Care.

Q.   Okay.  And so I -- when you say kind of ending the Ferrara Process, in other words, Intus was moving away from the Ferrara process back to this automated process?

A.   They moved back to the automated process by asking the PACE programs to essentially run the pipeline or pull the data with their own logins giving them the access to do so.

Q.   Okay.  And we'll unpack that a little bit in a moment.  The -- okay.  Sorry.  I'm looking at my notes.

So the process that you just described, which is that the PACE facilities essentially facilitate the, I guess, the data flow.  My understanding is that the automation system was the same, it's just the login used to initiate that process went from an Intus login to a PACE facility login; is that correct?

A.   That's correct.

Q.   Okay.  Mr. Jackson goes on to write in his e-mail, I've attached a brief data integration addendum for your review and signature.

Do you see that?

A.   Yes.

Q.   Okay.  Were you at all involved in securing data integration addendums from clients?

A.   Since I was the -- kind of the go-between, between Intus Care and the customers I likely passed the addendum from leadership at Intus Care to the clients for review and signature.

Q.   Okay.

A.   And back to Intus Care.

Q.   Okay.  Did you have any involvement in the development of the data integration addendum?

A.   I don't recall any.

Q.   Okay.  Do you recall when it was that the data integration addendum was first used by Intus?

A.   No, I don't recall.

Q.   Okay.  Would -- do you have an understanding as to whether or not data integration addendums were issued by Intus to PACE facilities prior to your arrival?

A.   I'm not certain, I can't speak to that.

Q.   Okay.  In the integrations that you had managed prior to September 14, 2022, when the RTZ directive occurred, had you, if you recall, passed to clients any data integration addendums?

A.   I don't recall doing any.  I don't recall passing any.

STENO

Q.   Okay.  But you do recall passing data integration addendums once Intus migrated from the Ferrara Process to the resumed automation process?

A.   It would have been within my scope of my job, so, yes, I likely did.

Q.   Okay.  Do you recall having any discussions with anybody at Intus about the need for a data integration addendum?

A.   I don't recall.

Q.   Do you recall having any discussions with a PACE facility client about why it was Intus was having them or asking them to execute a data integration addendum?

A.   I don't recall an specific incidence but I would have been equipped with an understanding of the process so that I could have answered questions if needed but I don't recall a specific incidence where I was involved.

Q.   Okay.  Do you recall any instances in which an Intus customer expressed resistance to signing an addendum?

A.   I don't recall any.

Q.   Okay.  In your capacity at Intus did you ever ask a PACE facility for a copy of their PACE Care agreement?

STENO

A.   I don't recall doing so.

Q.   Okay.  In your time at Intus, do you recall ever seeing a PACE Care agreement?

A.   No, I don't recall seeing one.

Q.   Do you recall having any discussions with anybody at Intus about the content of a PACE Care agreement?

A.   I don't recall.

Q.   Mr. Jackson's e-mail goes on to write, Once this is completed, please let us know your designated Intus Care representative and Alex will update this representative's instance to give them the ability to start the automated pipeline.

Do you see that?

A.   I do.

Q.   Okay.  The reference to Alex, to the best of your knowledge is that to Alex Rothberg?

A.   To my knowledge, that would have been Alex Rothberg.

Q.   Okay.  And he's a cofounder and technology leader for Intus; is that correct?

A.   Yes.

Q.   At a high level can you describe what you understand his job responsibilities to be?

A.   He is the top leader of the tech development

product development team.

Q.   Did you ever interface with Mr. Rothberg?

A.   Yes.

Q.   You know, in your job duties?

A.   Yes.

Q.   Okay.  Why would you be interfacing with Mr. Rothberg?  Just generally.

A.   To share feedback from customers on the data analytics platform, would be the main reason.

Q.   In other words, you were relaying customer comments about the use of the platform?

A.   Correct.

Q.   Okay.  Things they like, things that they didn't like, that sort of thing?

A.   Yes.

Q.   As you sit here today, do you have any recollections about customer complaints of the data analytics platform?

A.   Yes.

Q.   Do you recall who complained about the platform?

A.   Are you asking specific people or programs?

Q.   Yeah.  Specific programs.  Why don't we start there.

A.   Most of the feedback and complaints would have

STENO

been around things that programs wished they could see in the platform, like ideas for improvement since it was a startup and it was very new.

Q.   And so these were comments about enhancements that these PACE facilities wanted to see in the product?

A.   Correct.

Q.   Okay.  I want to go up to the third page and here this is an e-mail from Ms. Forbito to Evan Jackson and this is on Page 3091.  In which she states, Good morning.  Attached is the partially executed agreement and then she requested a fully executed copy.

And then in the e-mail above from you to Ms. Forbito you write, The next step is to connect us with the user for Neighborhood that will be responsible for entering his/her credentials into the Intus Care software to control the data flow.

Do you see that?

A.   Yes.

Q.   Okay.  Again, this is the same process that we talked about before except that here the Neighborhood designated employee is going to enter their credentials into Intus software, correct?

A.   Correct.

Q.   Okay.  And the credentials that they are entering into the Intus Care software are the PACE Care

STENO

login credentials that they use to access PACE Care, correct?

A.    Correct.

Q.    And so the resumed automated process required PACE Care login credentials to be entered into the Intus data analytics platform in order to achieve the pipeline, correct?

A.    Correct.

Q.    I'm going to go to the first page of the e-mail and here you are writing to again the individuals of Neighborhood Health and you write, I have received specific instructions from our data team on how the pipeline process will work.  Essentially by you entering your EMR credentials into Intus Care that will allow us to manage the pipeline automatically again.  The only thing we will need from you is to let us know if/when you change your EMR login credentials.

Do you see that?

A.    Yes.

Q.    Okay.  By "EMR credentials," again, you are making reference to the PACE Care credentials, right?

A.    Correct.

Q.    And when you state, that will allow us to manage the pipeline automatically again, the "us" is a reference to Intus, correct?

STENO

A.    Correct.

Q.    What did you mean that Intus would be allowed, quote, to manage the pipeline automatically again?  What does that mean?

A.    I believe that meant the ending of the manual reporting process sent to Intus Care, and with these logins the data flow would be -- would no longer be manual.

Q.    Not only would not only be manual but wouldn't require the assistance of the PACE Care facility employees, correct?

A.    It would require them to login to run the pipeline themselves.

Q.    But that's a login that would only need to happen once, correct?

A.    That, I don't recall.

Q.    I asked the question because the last sentence in that e-mail or that paragraph states, The only thing we will need from you is to let us know if/when you change your EMR login credentials.

So if I'm understanding correctly, the login credentials that were put into the data analytics tool would continue to be used until they were changed; is that correct?

A.    I believe that is correct.

STENO

Q.   Okay.  And so as long as those credentials weren't changed the automatic pipeline would continue to transmit data from PACE Care to the Intus data analytics platform, correct?

A.   Correct.

Q.   Now, the language "manage the pipeline automatically," do you have an understanding as to how it was that Intus managed the pipeline?

A.   A specific knowledge, no.

Q.   Would this process allow Intus the ability to select which reports would be generated through PACE Care and automatically uploaded to the data analytics platform?

A.   To my knowledge, I believe so, yes.

Q.   And so if I'm understanding your testimony, Intus had the ability to self-select which reports would be generated at which frequencies; is that correct?

A.   I believe so, correct.

Q.   And so this resumed automated process allowed Intus to access the data directly from the PACE Care system through the use of the PACE facility's login credentials; is that correct?

A.   That's correct.

MR. BESHAI:  David, do you mind if we take just a quick break before the next exhibit you show?

STENO

MR. LEE:  Perfect timing, Andrew, so yes.

Why don't we go ahead and take a break.  Let's say another ten minutes.

THE REPORTER:  Can I ask if we are going all day and if we are going to take a lunch today?

MR. LEE:  Yeah, why don't we go off the record.

(Break taken.)

MR. LEE:  Back on the record.

BY MR. LEE:

Q.   All right.  Ms. Wertz, we are back on the record.  During the break did you talk with anybody about the depo?

A.   No.

Q.   Okay.  All right.  We are going to try and be as efficient as possible.  I'm just trying to run through some stuff.  My apologies if I'm moving a little bit fast but I'm mindful of your time and want to try to get you out of here as quickly as I can.  All right.

Ms. Wertz, I'm going to go ahead and present the next exhibit in order and have it marked Exhibit Number 21.  Exhibit 21 for the record is an e-mail exchange dated January 12, 2023, and it bears the Bates stamp numbers Intus 003026 through 3027.

Ms. Wertz, if we look at the top e-mail it appears to be an e-mail from Sarah Berry of Community

STENO

PACE to you on June 6 (sic) 2023, correct?

A.   Correct.

(Exhibit 21 marked.)

BY MR. LEE:

Q.   And you received this e-mail as an employee of Intus correct?

A.   Correct.

Q.   All right.  Before the break we were talking about this kind of resumed automated system.  If we look at the subject matter, I'm sorry, the subject line for this particular e-mail it states, Automating Intus Care.

Do you see that?

A.   Yes.

Q.   All right.  If we look at the first page I want to scroll down to the second e-mail which you write to Ms. Berry, and you write, Hi, Sarah, hope you are doing well.  We are making good progress on reintegrating with your EMR finally.

Do you see that?

A.   Yes.

Q.   And, again, I think we know but the EMR that you are referring to is PACE Care?

A.   Yes.

Q.   And by reintegrating, what did you mean?

A.   I meant making their data visible in the Intus

STENO

Care platform.

Q.   Through the resumed automated system?

A.   Through the revised automated system, yes.

Q.   Got it.

You next write here, I reached out to Melanie who I assume is Melanie Gustman also at Community PACE if we look at the e-mail below.  It says, I reached out to Melanie to ask her to share the URL that your team uses to access RTZ but didn't realize she's on PTO this week. Could you provide this web address in her absence?

Is the URL that you are referring to the URL used to access Community's, you know, PACE Care system?

A.   I believe so, yes.  I believe that's what I was referring to.

Q.   Why would Intus need that or why would you need that as part of the integration process?

A.   I'm sure that is something that the data analytics team requested me to ask for as in my role as the, you know, go-between.  I can't recall or speak to the specific use.

Q.   Okay.  Do you recall asking customers for their URL's prior to the Ferrara Process?

A.   I don't recall.

Q.   Do you have an understanding as to how Intus would use this URL?

STENO

A.   Not a specific understanding, no.

Q.   I'll see if I can ask it a little bit differently.

Do you have an understanding whether use of the URL was for purposes of facilitating the automated process?

A.   Based on my e-mail that says, Automating Intus Care, I would say, yes.

Q.   You just don't have an understanding as to the technical aspect of it, correct?

A.   Correct.

Q.   Okay.  Do you know who at Intus at the time you were working there would?

A.   I wouldn't -- I would confidently be able to say Alex Rothberg or Evan Walters in their roles.  Aside from that, I couldn't speak specifically.

Q.   Okay.  I'm going to mark the next exhibit in order.  All right.  Ms. Wertz, I have up on the screen Exhibit 22.  For the record, Exhibit 22 is an e-mail from Sneha Banerjee to various folks at Saint Paul Seniors org dated January -- I'm sorry -- dated June 30, 2023, and it bears the Bates stamp numbers Intus 003117 through 3120.

Ms. Wertz, if we look at the first e-mail on Page 1 you are listed as a recipient, correct?

A.   Yes.

STENO

(Exhibit 22 marked.)

BY MR. LEE:

Q.   And so this is an e-mail that you received on or around June 30, 2023?

A.   Yes.

Q.   And you received it in your capacity as an Intus employee, correct?

A.   Correct.

Q.   Okay.  The subject line for this particular e-mail is, Saint Paul's PACE EHR integration.

Do you see that?

A.   Yes.

Q.   Now you had identified -- am I pronouncing it correct -- Sneha Banerjee?

A.   Correct.

Q.   Okay.  And you indicated that you reported to her?

A.   Yes.  At this time I reported to her.

Q.   Okay.  And, again, my apologies if you have answered this question and I've just forgotten.

Can you tell me how Ms. Banerjee was involved in the integration process?

A.   I believe her title was business development lead, something in business development but she was involved when she joined in all new integrations, all new

STENO

customers coming on board.  And I reported to her.

Q.    Okay.  Did Ms. Banerjee, did she work kind of on the business development side only or was she involved in the technology as well, if you know?

A.    She was not -- she was not on the tech side.

Q.    Okay.  At the bottom of her e-mail she signed off Sneha and Lauri.  Was that typical of her to sign off using your name as well?

A.    No, and I didn't author this e-mail.

Q.    Yeah, you anticipated this question which was were you involved in actually drafting this and the answer to that, I am assuming, is no?

A.    It is no.

Q.    Okay.  If we look at the e-mail towards the top first paragraph she writes, I appreciate you reaching out to RTZ to request a schema for the replica database as we continue integration work.

Do you see that?

A.    I do.

Q.    Okay.  Do you have an understanding of what a schema is?

A.    I understand the definition of schema to be like a layout but I don't necessarily know what specifically she was referring to in her request here.

Q.    Okay.  And when you say a layout, are you

STENO

talking for lack of a better word just kind of a structure blueprint that kind of defines how data is organized?

A.   By definition I would say a schema a structural blueprint, yes.

Q.   Okay.  Do you have an understanding as to why it was Saint Paul's was being asked for a schema?

A.   No.

Q.   Do you know --

(Speaking simultaneously.)

A.   I don't recall why --

Q.   My apologies, I didn't mean to cut you off.  Go ahead.

A.   I don't recall why that would have been requested.

Q.   Okay.  And I'll ask the question a little bit differently.

Do you have any recollection of discussions within Intus as to why Intus was requesting a schema from Saint Paul?

A.   I don't recall.

Q.   If we go on -- well, actually, before we go on, are you aware of any instance in which Intus had received any schema's or any EMR's that it worked with?

A.   No.  No, I don't recall seeing them but I
                    STENO

don't -- I don't know if they would have received them in a different capacity or department.

Q.   Okay.  Do you know whether or not Intus itself has schema for its data analytics platform?

A.   I don't know.

Q.   All right.  Ms. Banerjee goes on to write, If they are able to provide the schema in a timely manner, we are all set with that pathway.  If not, we can move forward with the direct pull pathway using the EMR login credentials.

Do you see that?

A.   Yes.

Q.   Okay.  Do you have an understanding of what that means?

A.   I -- based on my understanding and my recollection I would say this means the PACE program using their credentials to run the data pipeline.

Q.   If the schema wasn't obtained?

A.   Yes.

Q.   Okay.  So in other words, your understanding is Ms. Banerjee is saying to Saint Paul, Great, if we can get the schema, we'll use that.  If we can't, then we are just going to use our revised automated process?

MR. BESHAI:  Objection.  Lacks foundation.  Calls for speculation.

STENO

BY MR. LEE:

Q. You can answer.

A. That's how I would -- that's how I would interpret what Sneha wrote.

Q. And so at least based on your interpretation the direct pull pathway using EMR login credentials is a reference to the revised automated process?

A. That would be my interpretation of what Sneha wrote.

Q. Ms. Wertz, I'm going to introduce the next exhibit in order. Before I do, and I'm sorry to nag you about this, are any of the documents that we have looked at thus far documents that you've reviewed with Counsel?

A. I don't believe so.

Q. Okay. All right. Ms. Wertz, I had put up on the screen Exhibit 23 and for the record -- let me blow this up for you.

A. Thank you.

Q. Is that big enough?

A. Yes, thank you.

Q. Okay. Exhibit 23, for the record, is an e-mail thread from Malorie Marquardt, last name, M-a-r-q-u-a-r-d-t to Evan Walters and Lauri Wertz dated August 18, 2022, and it bears the Bates stamp numbers Intus 001801 through 1804.

STENO

Ms. Wertz this is an e-mail that you received on or about August 18, 2022?

A.   Yes.

(Exhibit 23 marked.)

BY MR. LEE:

Q.   And you received it in your capacity as an employee of Intus, correct?

A.   Correct.

Q.   All right.  If we look at the subject line it states, Community PACE Intus Care migration to RTZ.

Do you see that?

A.   Yes.

Q.   Okay.  It writes, Good morning, Evan.  Our RTZ representative sent this over yesterday requesting to have it completed and sent back.  She said as soon as she receives, they will start working on building an Intus account for you.  I'll send login information as soon as I receive it.

Do you see that?

A.   Yes.

Q.   And then if we go up to the attachments it appears that Ms. Marquardt attached a file titled NDA to access PACE Care August 16, 2022, Intus for Community PACE.

Do you see that?
STENO

A.   I do.

Q.   Okay.  Now we talked a bit about NDA's or at least discussions between Intus and RTZ and I'm mindful that you didn't have a recollection of being directly involved in those discussions.  My question centers really on do you recall receiving this NDA?

A.   I don't recall receiving the NDA.

Q.   Okay.  You don't have any doubt that you received a copy of the NDA when you received this e-mail, though, correct?

A.   I don't see the attachment there but -- so I can't speak to it.  She references that it's attached but I don't see it.

Q.   Okay.  Would seeing it help refresh your recollection?

A.   Yes.

Q.   Okay.  We'll go ahead and get that for you.  In the meantime, do you recall having discussions with anyone internally at Intus about the fact that Community PACE has forwarded an NDA from RTZ?

A.   I don't recall specifically if I received it. I don't recall specifically what I did with it.

Q.   Do you recall any instance during your time with Intus in which you were on the receiving end of an NDA?  I should say, other than this instance?

STENO

A.   Specifically, no.

Q.   I may have asked this question, my apologies if I did.  Do you have any recollection of seeing or hearing about NDA's that have been executed between Intus and Tabula Rasa?

A.   No, I don't recall.

Q.   Are you aware of any instance in which a PACE facility working with Intus used an EMR from Epic?

A.   No, I don't believe that I worked with any organizations that integrated with Intus Care and used Epic.

Q.   Okay.  Are you aware of whether any Intus client, to your knowledge, whether you worked on the integrations or not, utilize Epic for an EMR or an EHR?

A.   To my knowledge, no.

Q.   Okay.  All right.  Ms. Wertz I'm going to mark the next exhibit in order number 24.  For the record Exhibit 24 is an e-mail from Ms. Wertz to Malorie Marquardt, dated September 16, 2022, and it bears the Bates stamp number Intus 002049 through 2052.

Ms. Wertz, this is an e-mail that you sent on or around September 16th, 2022?

A.   Yes, it appears so.

(Exhibit 24 marked.)

///

STENO

BY MR. LEE:

Q.   And you did so in your capacity as an employee of Intus?

A.   Yes.

Q.   Okay.  You state in your e-mail in the first paragraph, Our leadership at Intus is working directly with RTZ leadership on some edits to the NDA for Community PACE and our other RTZ customers.

Do you see that?

A.   I do.

Q.   Okay.  Do you have a recollection of how it was that you came to learn that?

A.   I don't have a specific recollection of who gave me that update.  It likely would have been Evan Walters or my supervisor Sneha.

Q.   Okay.

A.   Well, no, I take that back.  At the time it would have been Laura Ferrara so Evan Jackson or Laura Ferrara at that time.

Q.   Okay.  At the time that you were at Intus did -- did you ever have kind of team meetings to address kind of the status of the integration projects?

A.   Yes.

Q.   Okay.  And were those team meetings on kind of a structured interval, you know, every Wednesday or every

STENO

Thursday at such and such time?  I mean, were these structured meetings or were they just kind of random meetings?

A.    I believe they were fairly structured.

Q.    And who generally in your recollection would attend these meetings?

A.    I recall Evan Walters, Alex Rothberg, myself, and I believe Alysia Ogburn or Maria Green depending on who was at the organization at that time.

Q.    Would Laura Ferrara ever sit in on those?

A.    She may have.  I don't -- she may have.

Q.    Okay.  But the primary folks were Evan Walters?

A.    Yes.

Q.    Alex Rothberg, you and perhaps Alysia or Maria?

A.    Correct.

Q.    And, generally, what was the purpose of these meetings?

A.    The purpose was to just update each other on the status of new integrations, new customers, letting the tech team know what was in, what was upcoming for things to expect, new integrations to expect coming in the future, information exchange on the status of new customers and current integrations.

Q.    My understanding, and correct me if I'm wrong, is that many of the employees at Intus are remotely

STENO

located; is that correct?

A.   That's correct.

Q.   And so I presume, then, that these meetings were largely remote, kind of videoconferencing?

A.   That's correct.

Q.   Okay.  Do you have an understanding as to whether or do you recall taking notes from these meetings?

A.   Yes.  I believe there was an action document that we kept updated.

Q.   And do you remember what that action document was called?

A.   No, I do not -- I don't recall.

Q.   Okay.  Do you know who updated it?

A.   I believe -- I believe I did a good portion of the time but we all had access to self-serve, the tech team did, to put updates in as well.

Q.   Okay.  And I'm sorry, just so I'm understanding, what is self-serve?

A.   Sorry.  We could all -- it was a shared document so we could all go into the document and put our own updates in, status of updates.

Q.   And this was kind of an evergreen document, meaning, that over time people would just have their additions and it was just kind of a growing document?

STENO

A.    Yes.

Q.    Okay.  Was this the an action document that you utilized from the time you first got to Intus to the time you left Intus?

A.    No.  I believe that -- if I recall, I believe that it was -- it did change, formatting did change over time and the structure of the document kind of changed over time.

Q.    Okay.  If I wanted to see a copy of this document, what would I call it?  In other words, how -- is there a name that, you know, folks within Intus would recognize as being that document?

A.    I don't recall what it was saved as.

Q.    Did the team meetings that you were having with the individuals that you identified have kind of a team name?

A.    Not that I recall.

Q.    The action document that you mentioned, I know that you said that it was -- I think you called it a self-serve document, meaning, that multiple folks had access to it.  Was it a document that at any point in time you actually kind of were the, quote/unquote, author of?

A.    Yeah, it's possible I could have made the template of the document.

STENO

Q.   Do you recall whether or not the updates that you received about kind of the NDA progress as between Intus and RTZ were subjects that may have been discussed at these team meetings?

A.   Yes, they could have been.

Q.   To your knowledge, were there any other documents that were kept in connection with these team meetings?  In other words, were there agendas, were there status reports that emanated from the meetings?  Were there action item updates that went to your supervisors, anything that was generated really out of these meetings?

A.   No.  From my understanding, the updates were just exchanged verbally on the meeting and then anything that was captured in the action document.

Q.   Understood.  Thank you.

All right.  I'm going to mark the next exhibit in order, number 25.  For the record, Exhibit 25 is an e-mail thread between Laura Emery and Lauri Wertz dated September 6, 2022, and it bears the Bates stamp numbers Intus 002002 through 2009.

All right.  Ms. Wertz, if we look at the first e-mail on Page 1, is this an e-mail that you received from Lauri Emery of RTZ on September 6, 2022?

A.   Yes, I believe so.

(Exhibit 25 marked.)
                              STENO

BY MR. LEE:

Q.   Okay.   And you would have received it in your capacity as an employee of Intus?

A.   Yes.

Q.   Okay.   You -- I want to focus on the e-mail below, the first e-mail and you write, Hello, all, I was asked to check back with your team as it seems that our login account has either been disabled or the password had been reset.   If anyone has any information, would you please let me know.

And Ms. Emery responds to you and writes, Intus Care was provided an NDA in mid August and we are still awaiting its return.   Prior to any access to the application, staff should sign and be familiar with the terms.   If you need me to provide another copy, please let me know.

Do you see that?

A.   I do.

Q.   Okay.   If we look below it appears that you were writing to RTZ in connection with Beacon PACE; is that correct?

A.   Yes, I see that.

Q.   Okay.   Do you recall how it was you came to learn that the login account was either disabled or the password had been reset?   Do you just recall any

STENO

discussions about those points?

A.   I don't -- I don't recall specifically but what likely would have happened because of the work flow is that Evan Walters would have let me know that there was a problem in the pipeline and I would channel that communication to the PACE program.

Q.   Okay.  Do you recall -- and it's a little bit of an unfair question, but do you recall approximately how many times you may have communicated directly with RTZ during your tenure with Intus?

A.   No, I don't -- I don't recall.

Q.   Was it something that happened often, was it rare, was it something in between?

A.   It was -- it was rare -- I would say it was in between.  It was rare before -- it was rare prior to the manual and the manual reporting process so it was probably an average of in-between.

Q.   Okay.  When you say, the manual reporting process, you mean the Ferrara Process?

A.   Yes.

Q.   Okay.  So it was rare before the Ferrara Process but then it picked up after the Ferrara Process?

A.   I believe so.

Q.   Okay.  Do you recall who at Intus was -- for lack of a better word -- your primary contact?  In other

STENO

words, did you have a go-to person at RTZ that you communicated with?

A.   No.

Q.   All right.  Ms. Wertz, I'm going to mark the next exhibit in order.  All right.  I have on the screen what has been marked as Exhibit 26.  And for the record, this is an e-mail exchange between Bobbi Runyon of Beacon of Life and Lauri Wertz and Evan Jackson dated September 21, 2022, and it bears the Bates stamp range of Intus 002137 through 2138.

Ms. Wertz, this is an e-mail that you received on or around September 21, 2022, correct?

A.   Yes I believe so.

(Exhibit 26 marked.)

BY MR. LEE:

Q.   Okay.  And you received it in your capacity as an Intus employee?

A.   Yes.

Q.   Okay.  I want to look at the e-mail, lower e-mail on the first page from Ms. Runyon to Melanie Martinez at RTZ and specifically I want to look at the first sentence here.  Ms. Runyon writes, Melanie, I would like to understand what the hesitation or hold up is with the integration between RTZ and Intus Care for Beacon of Life.

STENO

Do you see that?

A.   Yes.

Q.   Okay.  Ms. Martinez responds above and says, Thanks for the e-mail.  Intus Care has so far refused to sign the NDA we provided and in order to allow any outside vendor access to our proprietary system and information we do require that an NDA be signed.

Do you see that?

A.   Yes.

Q.   Do you recall having any discussions with Beacon about the NDA process?

A.   I don't recall.

Q.   Okay.  Ms. Runyon at the top of this page writes, What is in the NDA that is hesitant for Intus Care to sign?

And that's an e-mail she directed to you and Mr. Jackson.  Do you recall any discussions internally at Intus about that question?

A.   I don't recall any.  That would have been lead by Evan, though.

Q.   Okay.  Is this the type of update that may have been discussed during the team meeting that you described before?

A.   Likely, no.

Q.   Okay.  And why do you say that?

STENO

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

A.    Because this is a question specifically about the contents of an NDA.  And the integration status meeting of sort that we talked about earlier was more, how are the various integrations going, are there any barriers, when do you think they will be ready to go, who is coming up in the pipeline.

It wasn't necessarily the venue for specifics of an NDA.

Q.    Okay.  All right.  All right.  Ms. Wertz, I'll mark the next exhibit in order which is Exhibit 27.  For the record, Exhibit 27 is an e-mail between you and Alex Leuth dated September 28, 2022, and it bears the Bates stamp number Intus 002189.

Ms. Wertz, this is an e-mail that you received -- I'm sorry -- that you sent to Alex Leuth?

A.    Yes.

(Exhibit 27 marked.)

BY MR. LEE:

Q.    And you sent that on or about September 28, 2022, correct?

A.    Correct.

Q.    And you did so as an employee of Intus?

A.    Yes.

Q.    All right.  My understanding is that Alex Leuth was associated with Senior Care PACE; is that correct?

STENO

A.   That's correct.

Q.   Okay.  The subject line for this particular e-mail is, Intus Care RTZ report.  Ms. Wertz, the only reason why I actually have introduced this exhibit was kind of a follow-up to something we talked about before.

For purposes of the Ferrara Process, I had an earlier question of whether or not the PACE facilities could, you know, generate their reports and then just e-mail them to Intus.  And I think your response was that you can't recall the mechanism through which, you know, clients would send the reports to Intus.

If we look down at the e-mail that you sent to Alex Leuth, you write, The reports could be sent securely to our data analysts Wenxing Li copied on this e-mail.  His address is -- and then it provides his e-mail address.

Does this refresh your recollection as to whether or not PACE facilities could just e-mail the reports directly to Intus for purposes of getting them uploaded into the analytics platform?

A.   Yes.  After seeing this, I feel confident that the e-mail was the process, was the mechanism.

Q.   Okay.  Great.

MR. BESHAI:  What's the Bates on this one?  Apologies, I missed that.

STENO

MR. LEE:  I'm sorry.  The Bates range?

MR. BESHAI:  Yeah, Exhibit 27 that you just showed.

MR. LEE:  Yeah, it's Intus 002189.

MR. BESHAI:  Okay.  Is it just a single page?

MR. LEE:  Yeah.

MR. BESHAI:  Thank you.

BY MR. LEE:

Q.  Ms. Wertz, what I would like to do at this point is take a five-minute break.  I think I'm near the end and I was able to get through stuff a little faster than I expected so I would like to take a five-minute break, just kind of, you know, run through my notes and see if there's any kind of clean up that I want to do.

But why don't we go ahead and do that right now and go off the record.

A.  Sure.

(Break taken.)

MR. LEE:  Back on the record.

BY MR. LEE:

Q.  Ms. Wertz, did you during the break talk with anybody about the depo?

A.  No.

Q.  Okay.  At this point, thank you very much.  I have nothing further.  I may have some follow-up requests

STENO

after Mr. Beshai's questions but thank you very much.

A.    Thank you.


EXAMINATION

BY MR. BESHAI:

Q.    Good afternoon, Ms. Wertz, just a few questions on what we've all dubbed the Ferrara process, the Ferrara method?

A.    Sure.

Q.    It's like a science experiment.

So as I understand it the Ferrara method or process was Intus's workaround after the cease and desist from RTZ, correct?

A.    Correct.

Q.    And this required PACE entities to have their employees manually pull the data reports that Intus needed to populate its analytics program, correct?

A.    Correct.

Q.    Are you -- and I believe you testified that you weren't super familiar with the technical aspects of this process but on a high level understood it?

A.    Yes.

Q.    Okay.  And you testified that it would be the same data as if Intus was directly accessing the PACE Care Online program, correct?

STENO

A.   Yes, I believe so.

Q.   Do you know how often the PACE entities employees during a week had to do these manual pulls?

A.   I believe it was however often they sought to have their data updated in -- to view their data in Intus Care.  So if they were good with once a week, it was once a week.

Q.   And are you aware how long it would take to transmit from the PACE entities to Intus to then upload it to the data analytics software?

A.   No, I'm not, but I would -- I believe it was like within 24 business hours -- sorry -- 24 hours that the Intus Care would have it updated but I'm not sure of the exact hours it takes to accomplish it.

Q.   So you don't know compared -- if I were to ask to you compare, for instance, how efficient the direct access was versus the Ferrara method, could you, sitting here today, tell me how long one took versus the other?

A.   Not confidently.

I think it should be fairly equal aside from the time frame considering sending an e-mail or opening that e-mail, opening the reports, but I think it should be fairly similar.

Q.   Well, was there someone as Intus whose full-time job was to send an e-mail, monitor it and wait

STENO

for PACE entities reports to come in manually or was that decided upon -- like was a schedule decided upon with each PACE entity in advance?

A.    For just the manual process?

Q.    For the Ferrara Process.

A.    For the Ferrara Process, I believe -- I believe my e-mails indicated that all programs directed their e-mail reports to Wenxing Li to do the updates.

Q.    Right, but was it on -- you know, you were the liaison between them.  Was it on a prearranged schedule or was it they would just send when they had data they wanted uploaded?

A.    If I recall, it was a prearranged schedule.

Q.    Okay.  I don't have anything else.


                        EXAMINATION

BY MR. LEE:

Q.    I don't think I have anything else either but this:  Ms. Wertz, we went through and we marked the 16 or 17 exhibits.  Are any of the exhibits that we looked at those which you looked at with Counsel?

A.    I don't believe so.

Q.    Okay.  Do you have copies of the exhibits that you looked at with Counsel?

A.    No, I don't.
                        STENO

Q.    Were those only shown to you during the videoconference?

A.    Yes.

Q.    Okay.  And did you review those as part of your preparation for this deposition?

A.    With Counsel, yes they pulled up and said for example this might be how the deposition goes.

MR. LEE:  Mr. Beshai, I would request copies of whatever the e-mails were that Ms. Wertz reviewed during her preparation session and I want to know on the record whether you are willing to provide those.

MR. BESHAI:  I have to confer with the team but I'll let you know in the next couple days.

MR. LEE:  Fair enough.

Ms. Wertz, thank you very much.  I appreciate the time.  I know that's -- it's been a long day but hopefully not too painful.

THE WITNESS:  No, no.  Thank you.

MR. LEE:  Great.  Thank you.

Ms. Ortega, do you need anything from the witness or us at this point?  We can go off the record.

THE REPORTER:  Mr. Beshai, would you like a copy?

MR. BESHAI:  Yes, please.

(Deposition concluded at 1:17 p.m.)
                              STENO

Declaration Under Penalty of Perjury

     I, LAURI WERTZ, the witness herein, declare under penalty of perjury that I have read the foregoing in its entirety; and that the testimony contained therein, as corrected by me, is a true and accurate transcription of my testimony elicited at said time and place.

Executed this_____day of _____20__

At _____, _____
              City                    State

_____
   LAURI WERTZ

STENO

I, CHERYL ORTEGA, Certified Shorthand Reporter for the State of California, do hereby certify:

That the proceeding was taken by me in machine shorthand and later transcribed into typewriting, under my direction, and that the foregoing contains a true record of the testimony of the witness.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

Dated:  This 27th of August, 2025 at San Bernardino, California.

_____
Cheryl Ortega
CSR NO. 13709

139

STENO

ERRATA SHEET
CHANGES IN TESTIMONY
INTUS CARE, INC. v RTZ ASSOCIATES, INC., et al.
LAURI WERTZ
August 19, 2025

Page   Line    From                    To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____

          LAURI WERTZ

## Exhibits

**Exhibit 11**  4:10 36:25 37:11,17 45:19 70:13

**Exhibit 12**  4:12 48:22 49:1,13 50:17

**Exhibit 13**  4:14 55:25 56:2,4

**Exhibit 14**  4:15 64:17,20 65:10

**Exhibit 15**  4:17 72:5, 7,9

**Exhibit 16**  4:19 86:25 87:6

**Exhibit 17**  4:21 89:14,21

**Exhibit 18**  4:23 91:11,12,17

**Exhibit 19**  5:1 94:9, 11,13,15 96:10

**Exhibit 20**  5:3 99:10, 17

**Exhibit 21**  5:5 110:20,21 111:3

**Exhibit 22**  5:6 113:19 114:1

**Exhibit 23**  5:9 118:16,21 119:4

**Exhibit 24**  5:11 121:18,24

**Exhibit 25**  5:14 126:17,25

**Exhibit 26**  5:16 129:6,14

**Exhibit 27**  5:19 131:10,11,17 133:2

---

## -

**-OOO-**  6:3

---

## 0

**001668**  49:15

**001731**  65:12

**001738**  56:6

**001801**  118:25

**002002**  126:20

**002049**  121:20

**002137**  129:10

**002189**  131:13 133:4

**002194**  89:17

**002205**  72:11

**002384**  87:2

**002502**  94:17

**003026**  110:23

**003089**  99:11

**003092**  100:9

**003117**  113:22

---

## 1

**1**  7:20 50:18 113:24 126:22

**10**  87:1

**10th**  87:9

**11**  36:25 37:11,17 45:19 70:13 94:16

**12**  48:22 49:1,13 50:17 110:22

**123**  52:20

**13**  55:25 56:2,4

**13709**  6:8

**14**  64:17,20 65:10 70:15 102:21

**14th**  41:8

**15**  72:5,7,9

**16**  86:25 87:6 119:23 121:19 136:19

**1669**  49:15

**16th**  121:22

**17**  89:14,21 136:20

**1737**  65:13

**18**  91:11,12,17 118:24 119:2

**1804**  118:25

**19**  6:1 49:14,18 94:9, 11,13,15 96:10

**1:17**  137:25

**1st**  52:1

---

## 2

**2**  7:20

**20**  9:7,9 99:10,17

**2009**  126:20

**2022**  20:4 34:11 37:18 49:14,18 52:1 56:5,13 65:12,16 68:15,16 70:15 72:10,22 79:15 80:9 87:1,9 89:16,19 91:13,21 102:21 118:24 119:2,23 121:19,22 126:19,23 129:9,12 131:12,20

**2023**  17:25 20:1,3 21:9 94:16 99:11,19 110:22 111:1 113:21 114:4

**2025**  6:1

**2052**  121:20

**21**  110:21 111:3 129:9, 12

**2138**  129:10

**21st**  66:20

**22**  37:17 113:19 114:1

**2208**  73:6

**2211**  72:11

**23**  99:10,19 118:16,21 119:4

**2385**  87:2

**24**  121:17,18,24 135:12

**2406**  91:14

**25**  126:17,25

**2504**  94:17

**26**  56:5,12 65:11,16 129:6,14

**26th**  68:4,15 69:21

**27**  131:10,11,17 133:2

**28**  131:12,19

**29**  6:9 89:16,19

---

## 3

**30**  9:7 113:21 114:4

**3027**  110:23

**3091**  106:9

**3095**  99:12

**3120**  113:22

---

## 4

**4172**  37:18

**4174**  37:19

---

## 6

**6**  72:10,22 91:13,20 111:1 126:19,23

**6th**  91:13

---

## 9

**9:00**  6:2

---

## A

**A-T-H-E-N-A**  19:4

**A.M.**  6:2

**ability**  17:7 95:16 104:12 109:10,16

**absence**  42:2,3 112:10

**absent** 92:25

**access** 15:25 29:24 30:15,19,21 39:11 40:19,20 41:9,25 42:13, 14 43:8,10,21 45:20,21 46:2,5,8 47:2,14 48:1,7, 9 54:7,21 55:1,3,8 58:16,23,24 59:4,10,12, 21 60:3,5,9,14 61:2,6,8, 12 62:17,21 66:8,11,22 67:16,24 68:10,17 69:4, 8 70:22 71:4,20 74:9, 13,14 75:21 76:7 78:20 84:6,11,16 85:9,13 86:8,14,15 88:8 92:24 95:18 96:7,8 97:1,7,12 101:12 107:1 109:20 112:9,12 119:23 124:16 125:21 127:13 130:6 135:17

**accessed** 55:21 58:18 59:22 60:20 75:5

**accessible** 16:25 54:3 95:22

**accessing** 61:3 70:15 98:18 134:24

**accommodate** 29:19

**accompanied** 78:16

**accomplish** 135:14

**account** 46:17 52:8, 14,19,24 53:11,17,22 80:22 119:17 127:8,24

**accounts** 38:19 61:16

**accurate** 12:12 13:9 85:8 90:24

**achieve** 81:1 107:6

**action** 32:1 124:9,11 125:2,18 126:10,14

**acuity** 95:7

**Acute** 51:1,4 74:4

**addendum** 101:23 102:6,11,14 103:8,13, 21

**addendums** 102:3, 17,23 103:2

**addition** 94:2

**additionally** 21:24

**additions** 124:25

**address** 72:25 75:14 112:10 122:21 132:15, 16

**addressed** 94:25

**addresses** 56:23 92:2

**addressing** 74:16

**adjustment** 29:2,4, 10

**advance** 136:3

**affect** 17:6 81:8

**affiliated** 51:5,6 74:2

**afternoon** 134:6

**agendas** 126:8

**aggregate** 95:19

**aggregated** 82:25

**agree** 61:6,10,11

**agreeable** 88:22

**agreed** 40:21

**agreement** 40:19,20 67:15 88:4 103:25 104:3,7 106:10

**agreements** 39:20

**ahead** 33:8 36:23 55:23 64:5 77:15,19 110:2,19 116:13 120:17 133:15

**aid** 16:25

**Alex** 104:11,16,17,18 113:15 123:7,14 131:11,15,24 132:13

**Alicia's** 25:2

**allowed** 42:13 108:2 109:19

**alluding** 75:16

**altered** 70:21 88:16

**alternate** 71:24 75:17 97:6

**alternative** 99:1

**Alysia** 24:18,24 93:9 123:8,14

**analyst** 76:14 88:22 89:3

**analysts** 132:14

**analytic** 26:4 28:15

**analytics** 20:18 22:21 28:16,18 29:21, 24 30:3,6,13,16,21 42:17 44:2 46:15 47:2, 24 51:22 60:12 71:7 72:2 76:3,6 79:8 80:5,7 83:6,14,25 85:12 98:5 105:9,18 107:6 108:22 109:3,12 112:18 117:4 132:20 134:17 135:10

**Andrew** 7:15 110:1

**anticipated** 53:4 80:24 115:10

**apologies** 10:10 36:4 50:4 77:17 83:9 93:19 110:16 114:19 116:12 121:2 132:25

**apologize** 54:14 83:7

**appears** 37:18 38:12 49:19 50:19 56:19 65:17,24 66:17 72:24 87:15 94:20 110:25 119:22 121:23 127:19

**application** 66:8 127:14

**appreciated** 14:7

**approach** 63:5 70:3, 6 75:17,20

**appropriately** 67:16,23 68:2

**approval** 69:11,12

**approximately** 7:20 128:8

**areas** 72:14

**arrival** 102:18

**arrived** 20:5

**aspect** 113:10

**aspects** 134:20

**assessing** 18:21

**assign** 36:10 45:25

**assigned** 46:13,20, 22,23 77:22 95:6

**assist** 57:9

**assistance** 31:21 108:10

**assisted** 76:17

**associates** 6:20 19:16

**assume** 45:9 74:16 94:25 112:6

**assuming** 7:24 63:6 115:12

**Astrid** 91:20 92:17 94:25 95:5 99:14

**Athena** 19:4

**attached** 75:4 78:19 84:5 101:23 106:10 119:22 120:12

**attachment** 120:11

**attachments** 119:21

**attend** 123:6

**attention** 49:16 65:15 66:2

**attorney** 13:3

**attorneys** 6:18 11:4, 13

**audio** 83:4

**August** 6:1 118:24 119:2,23 127:12

**author** 115:9 125:22

**authored** 38:1 49:21

**authorize** 66:22

**automated** 97:11, 19,22,24 98:3,8,25 101:7,9 104:13 107:4 109:19 111:9 112:2,3 113:5 117:23 118:7

**automatic** 47:23 109:2

**automatically** 98:1 107:15,24 108:3 109:7, 12

**Automating** 111:11 113:7

**automation** 100:18, 23 101:18 103:3

**average** 128:17

**awaiting** 127:13

**aware** 19:8 28:19 32:3,6 34:7,11 39:22 41:12,14,16,18 54:24 61:14,25 62:6,16 67:4, 12 77:2,21 80:25 81:9 94:1 97:5 116:23 121:7, 12 135:8

**awareness** 32:3

### B

**back** 15:13 43:13 50:17 52:18 59:20 63:2 64:10,12 77:20 98:25 99:4 101:7,9 102:9 110:8,10 119:15 122:17 127:7 133:19

**Banergy's** 25:17

**Banerjee** 25:11,15, 16 113:20 114:14,21 115:2 117:6,21

**barriers** 131:5

**based** 30:7 33:23 42:11 68:7 69:6 113:7 117:15 118:5

**basis** 33:4,6,10 47:22, 24 90:9

**Bates** 37:18 49:6,14 56:5 65:12 72:11 87:2 89:16 91:13 94:16 99:11 110:22 113:22 118:24 121:20 126:19 129:9 131:12 132:24 133:1

**Beacon** 10:1 38:13, 16 39:5 44:1,3 51:5,8, 14,24 52:2 74:1,4 127:20 129:7,24 130:11

**bears** 49:14 56:5 65:12 87:2 89:16 91:13 94:16 99:11 110:22 113:22 118:24 121:19 126:19 129:9 131:12

**began** 79:14 98:8

**beginning** 51:14

**belabor** 90:14

**Berry** 87:16,25 88:22 89:15,19 90:1 110:25 111:16

**Beshai** 7:25 8:6,7,16 14:19 44:10,17 45:13 48:3 49:6,10 59:14,24 67:8,18 68:1,12 70:5 77:7,10,16 79:18 81:17, 20 84:13 85:1,19 97:14 109:24 117:24 132:24 133:2,5,7 134:5 137:8, 12,22,24

**Beshai's** 134:1

**bias** 13:5

**big** 37:13 118:19

**bigger** 37:14

**birth** 54:18

**bit** 12:4,5 17:10 21:2 26:7 33:11 43:20 46:4 48:17 50:1 53:25 59:19 63:21 69:25 70:25 76:10 83:22 93:18 101:13 110:16 113:2 116:16 120:2 128:7

**blocking** 33:2

**blow** 118:16

**blueprint** 116:2,5

**board** 115:1

**Bobbi** 38:13 129:7

**bold** 73:8

**Boldage** 73:25 74:4, 6,7 78:8 81:11 84:19

**bottom** 50:18 73:7 115:6

**break** 29:15 48:15,19 62:25 64:6,9,13 65:22 109:25 110:2,7,11 111:8 133:10,13,18,21

**broad** 61:16

**broke** 83:7

**build** 70:24 95:7,16 96:6,7

**building** 119:16

**built** 96:2

**bullet** 92:12,16 93:8

**business** 25:25 26:2 53:21,24 76:14 114:23, 24 115:3 135:12

### C

**California** 6:7

**call** 7:15 11:13 65:2 71:11 90:18,21 125:10

**called** 19:4 34:17 55:17 61:25 97:5 124:12 125:19

**calling** 8:12

**Calls** 117:25

**capacity** 18:15 49:22 65:19 89:23 91:23 94:22 99:21 103:23 114:6 117:2 119:6 122:2 127:3 129:16

**captured** 126:14

**care** 9:18,23 11:2,7,9 19:6,9,19,24 20:2,14 22:21 27:3,8,13 28:3,6, 9,15 30:3,16 31:8 32:21 33:3,12 34:9,17,20,21, 22 35:1,4,21 36:1,6,11, 13,17 37:24 38:14,16 39:4,9 40:3 41:9,24 42:1,14,25 43:9,10,22, 25 44:2 45:20 46:1,3,5, 6,9,12,22 47:3,15 48:11 51:1,4,5,15,22 52:3,14, 20 53:2,11,22 54:3,9,21 55:2,7 57:10 58:25 59:4,5,6,8 60:3,4,8,10 61:3,7,8,12,13,15,23 62:6,22 67:16,24 68:10, 15 69:4,11 70:16,22 71:4,7,21,25 72:1 74:4, 8,14 75:2,11,21 76:7,25 79:3,6,8,11,13,15 80:20

81:13,15 82:7,22 83:1, 18 84:12,16,20 85:9,12, 13 86:14 87:22 92:25 93:12 95:11,15 96:13, 22,23 97:8,13 98:4,10, 12,18 99:7 100:10 101:4 102:5,6,9 103:24 104:3,6,11 106:15,25 107:1,5,14,21 108:6,10 109:3,11,20 111:11,22 112:1,12 113:8 119:10, 23 121:10 127:12 129:24 130:4,15 131:25 132:3 134:25 135:6,13

**care's** 22:11

**caregivers** 82:21

**carries** 12:7 72:11

**case** 32:2 37:1 44:1 101:3

**categories** 54:20

**caution** 13:1

**cc'd** 73:18

**cease** 92:24 134:12

**centers** 120:5

**certified** 6:6

**chain** 42:23

**change** 21:3 81:7 107:17 108:20 125:6

**changed** 21:5,19 25:10 71:19 108:23 109:2 125:7

**channel** 128:5

**charged** 47:6

**Charles** 7:18

**Charlie** 7:17

**Chart** 62:14,17,22 82:1

**chat** 16:5,9

**check** 127:7

**Cheryl** 6:6

**chief** 11:6 23:18

**clarification** 22:16

**clarity** 24:10

**clean** 13:18 133:14

**clear** 13:13 28:12 82:9 85:5 99:24

**clearance** 66:23

**Clements** 63:6,11 64:1

**clicking** 58:18 59:22 60:20,24

**client** 38:17 77:12 78:21 103:11 121:13

**clients** 22:19 26:9 62:6 78:8 102:3,6,22 132:11

**clinician** 83:16

**close** 88:5

**closed** 96:15

**closer** 61:20

**cloud** 30:7

**codes** 54:12 95:6 96:14

**cofounder** 104:20

**cognitive** 17:7

**collaboration** 73:12

**comment** 13:4 44:21

**comments** 105:11 106:4

**common** 68:16

**communicated** 128:9 129:2

**communication** 11:1 16:1 43:12,13 65:24 128:6

**communications** 8:22 16:13 26:19 36:10

**community** 87:15, 16,19,22 88:3 90:2,24 110:25 112:6 119:10,23 120:19 122:8

**Community's** 112:12

**companies** 39:20

**company** 24:21 25:18 34:13 46:23 47:7 62:11

**compare** 135:16

**compared** 135:15

**complained** 105:20

**complaints** 105:17, 25

**complete** 28:7 30:4, 13 31:11,13,17

**completed** 50:8 104:10 119:15

**complicated** 91:6

**computer** 16:9,10

**concern** 41:24

**concluded** 137:25

**concretely** 80:2

**conditions** 15:16

**confer** 137:12

**conference** 88:2

**confident** 74:6 132:21

**confidential** 41:25

**confidentiality** 40:20

**confidently** 47:16 113:14 135:19

**confirm** 37:23

**confirmed** 8:15

**confuse** 36:24

**confused** 13:11

**Congratulations** 18:13

**connect** 75:6 84:6 100:17 106:13

**connected** 11:4 47:10

**connecting** 27:3

**connection** 9:22 33:16 63:14 80:11 88:12 126:7 127:20

**consideration** 40:19

**contact** 11:11 23:3, 20 128:25

**contacting** 69:13

**contacts** 23:4

**contained** 48:8 78:9

**content** 7:13 8:17 9:20 104:6

**contents** 131:2

**contest** 29:15

**context** 40:17 70:14

**continuation** 21:24

**continue** 31:14 43:17 74:7 86:9 108:23 109:2 115:17

**continuing** 31:21

**contracted** 20:13

**control** 48:1,3 106:16

**conversations** 8:3 24:11 33:14 63:23

**coordinating** 26:20 57:9

**copied** 66:11 132:14

**copies** 78:18 136:23 137:8

**copy** 103:24 106:11 120:9 125:9 127:15 137:23

**correct** 7:5,25 8:1,4 11:20 22:25 23:1 26:16, 17 27:22 28:4 31:23 37:22 38:5,14 42:12,16, 18 44:9,16 46:24 47:4 49:18,23,24 51:19,23 52:3,4,15,16 56:13,20 57:21,22 60:14 65:20, 21 71:9,10,17 72:23 73:3,4,18 75:22 76:8,9 82:11,12 84:2,12,25 87:4,10,13,23 88:18,20 89:25 90:2,3,16,17 91:4,5,9,24 92:4,5 94:23 96:4 98:23 99:16, 20 100:1,2 101:20,21 104:21 105:12 106:6,

22,23 107:2,3,7,8,22,25 108:1,11,15,24,25 109:4,5,17,18,22,23 111:1,2,6,7 113:10,11, 24 114:7,8,14,15 119:7, 8 120:10 123:15,24 124:1,2,5 127:21 129:12 131:20,21,25 132:1 134:13,14,17,18, 25

**correctly** 11:15 22:18 23:13 27:17,24 30:12 34:24 50:10,21 65:25 68:20 76:12 84:9 108:21

**correspondence** 35:21

**counsel** 7:7,9,24 8:15 9:1 10:19,23 11:18,19 14:17 33:15 65:2,7 86:19 118:13 136:21,24 137:6

**counter** 40:21

**couple** 9:1 10:13 15:9 17:12 29:20 35:7 40:11 59:9 60:15 71:2 82:17 100:8 137:13

**court** 12:17 13:19

**covered** 8:10

**coworkers** 7:16

**create** 52:8

**created** 46:17 52:18 79:17,20 80:6,7,8,11, 17,20,23 96:18,19,20

**creating** 13:17 96:11

**creation** 80:1

**credential** 46:18,25

**credentials** 30:11, 15 46:7 47:7 52:8,24 53:7,17,22 54:4,22 61:15 71:3 106:15,21, 24 107:1,5,14,17,20,21 108:20,22 109:1,22 117:10,17 118:6

**current** 8:9 11:8 17:21 21:25 22:25 74:8 90:11 123:23

**custom** 95:17,21 96:1,6,8,9,10,25

**customer** 9:23,24 21:6,8,12,20,21,22 22:22 24:22 25:10 31:9, 21 34:10 35:4 81:12,23 82:15,16 84:19 95:5,10 96:20 103:20 105:10,17

**customers** 21:25 22:1,11,24,25 25:4 28:20 34:25 61:14 102:5 105:8 112:21 115:1 122:8 123:19,23

**customers'** 31:7

**cut** 83:4 116:12

**Czermak** 50:22

**D**

**daily** 47:21,24

**dark** 78:2

**dashboard** 27:20

**dashboards** 18:20 78:10 90:9,10 91:1 92:19

**data** 9:22 18:21 20:18, 23 22:21 26:4 27:2,14, 15,18 28:2,6,15,16,18 29:21,24 30:3,6,13,16, 21 31:7,17 42:16,17 44:2,5,7,15,20 46:2,12, 15,19 47:1,2,14,24 48:5 50:9 51:8,14,19,22 54:2 55:17,18 56:19 57:5,9, 14,17 58:11 60:6,11,12, 13 66:9,12,13,22 69:18 70:2,19 71:7 72:1 75:5, 9,10,11 76:2,3,6,17 77:5 78:9,18,19,22 79:2,4,5,6,7,8,10,13 80:1,5,7,11,16,17,19,25 81:1,10,11,14,21,22 82:1,5,10,15,16,19,24, 25 83:3,6,10,12,14,23, 25 84:5,10,18 85:2,11, 12,18,24 86:4,15 87:19 88:3,7,9,22 89:3,7,10 91:1 93:10,13,14,23 94:2,4,6 95:18 96:8,21 97:2,7,12,25 98:1,4,13

100:19,23 101:11,17,23 102:3,11,13,17,23 103:1,7,12 105:8,17 106:16 107:6,12 108:7, 22 109:3,12,20 111:25 112:17 116:2 117:4,17 132:14 134:16,24 135:5,10 136:11

**data/slash** 92:19

**database** 66:22 115:16

**date** 21:6 41:15 54:18 71:24

**dated** 37:17 49:14 56:5 65:11 72:10 87:1 89:15 91:12 94:16 99:10 110:22 113:21 118:23 121:19 126:18 129:8 131:12

**dates** 96:15

**David** 6:16 8:8 109:24

**day** 26:11 66:10 75:8 92:18 110:5 137:16

**days** 137:13

**dealt** 14:23 39:19

**Debra** 91:20

**December** 91:13,20

**decided** 136:2

**dedicated** 76:24

**deeper** 26:10

**defines** 116:2

**definition** 115:22 116:4

**delay** 36:21

**delineated** 54:20 55:1

**demo** 29:7

**demographic** 35:16 54:17

**department** 117:2

**departure** 23:2

**depending** 123:8

**depo** 110:12 133:22

**deposed** 11:21

**deposition** 7:5,10 10:24 11:17 12:6,15,21 14:2,18 17:11,14 33:21 37:1 64:14 137:5,7,25

**depositions** 15:10, 17

**describe** 9:19 24:20 25:20 27:6 45:10,22 55:13,20 57:13,24 78:25 104:23

**describing** 52:13

**description** 46:24

**designate** 48:5

**designated** 104:10 106:21

**designation** 56:23

**designed** 18:20

**designing** 22:9,13

**desist** 134:12

**detail** 8:18 83:3

**details** 47:18

**determine** 30:23 92:18

**develop** 86:3

**developed** 62:11,13 75:20 76:2 97:6,11

**developer** 96:24

**developers** 68:22

**developing** 26:3

**development** 25:25 26:3 85:18,20 102:11 104:25 105:1 114:23,24 115:3

**devices** 15:25

**diagnoses** 54:15 96:14,16

**diagnosis** 54:11

**dictate** 59:14

**dictating** 59:12

**dictionaries** 93:11, 13,23 94:6

**difference** 35:10,13 36:10

**differently** 21:3 43:21 59:19 63:5,21 113:3 116:17

**difficult** 13:19

**direct** 58:1,2 65:14 66:1 72:14 83:11 84:11 85:9,13 92:24 117:9 118:6 135:16

**directed** 41:8 43:8 45:19 70:15 130:16 136:7

**direction** 43:7,9 69:11,12

**directive** 41:12,15, 16,19,22 43:2,4,21 45:10,21 70:21 71:20 74:13 75:21 92:24 98:17,21 102:21

**directly** 53:10 109:20 120:4 122:6 128:9 132:19 134:24

**director** 17:23 18:2, 16 66:18

**disabled** 127:8,24

**disagreement** 67:13

**disconnect** 33:12

**discussed** 8:6,19 11:13 30:11 45:2 58:13 88:1 126:3 130:22

**discussing** 36:1

**discussion** 32:9 63:10

**discussions** 24:2, 4,7 40:7,9 41:1 53:13 63:18 103:6,10 104:5 116:18 120:3,5,18 128:1 130:10,17

**disparate** 27:15

**displayed** 54:9 75:12

**displays** 79:2

**disrupted** 98:21

**distracted** 10:11

**divided** 77:22

**document** 10:4 56:7 77:11 88:23 89:6,8,9,10 124:9,11,21,23,25 125:2,7,10,12,18,20,21, 25 126:14

**documents** 9:11,13 10:5,7,12,19 16:23 17:12 26:13 65:5 94:3 99:8 118:12,13 126:7

**doubt** 120:8

**drafting** 115:11

**drink** 29:16

**dubbed** 134:7

**duly** 6:12

**duties** 18:3 20:10 21:18 25:21 26:7 29:3 30:25 41:4 47:5 50:7 56:16 58:2 73:2 76:16 105:4

**Dylan** 63:6,11,25

---

**E**

**e-mail** 9:18,20 35:20 36:9 37:17,22,23 38:4, 5,8,12,23 40:1,12 41:13 42:23 43:8 45:1,2 49:13,17,20 50:18,19 51:2,8,12 52:5,17 56:4, 12,14,19,22 63:3 65:10, 11,15,19 66:3,16,20 68:4,25 69:3,19,20 70:4,12 72:9,18,21 73:1,7,12,17,22 74:5 75:14 84:4,24 86:25 87:3,8,14 88:19,21 89:15,18 90:7,16 91:3, 12,19 92:2,11 94:15,18, 20,21,24 95:1,3 99:10, 13,25 100:4,9 101:23 104:9 106:8,12 107:9 108:18 110:21,24,25 111:5,11,15 112:7 113:7,19,23 114:3,10 115:6,9,14 118:21 119:1 120:9 121:18,21 122:5 126:18,22 127:5, 6 129:7,11,19,20 130:4,

16 131:11,14 132:3,9, 12,14,15,18,22 135:21, 22,25 136:8

**e-mails** 10:8 20:21 38:1 49:21 85:6 92:7 136:7 137:9

**earlier** 23:9 53:25 58:13 95:24 131:3 132:7

**early** 40:18

**easier** 12:5

**easily** 49:4 90:9

**easy** 91:4

**edited** 80:21

**edits** 122:7

**education** 31:21 43:17

**effect** 12:7

**efficient** 110:15 135:16

**effort** 10:20

**EHR** 27:2,15,19 28:2 31:7 34:15 35:1,9,11, 15,22 36:1,6,11 42:13, 15 44:5,15 46:2,12 47:23 51:21 52:8 71:6 79:4,6 80:21 82:5 93:10,23 114:10 121:14

**EHR's** 59:7 68:17 77:4 82:6

**electronic** 16:24 18:25 19:1 35:8,9 42:5

**elements** 97:2

**emanated** 126:9

**emergency** 54:11

**Emery** 126:18,23 127:11

**employed** 17:17 19:23,24 80:6

**employee** 8:10,21 30:20 38:2 46:18,21,25 49:22 56:16 65:19 71:4 73:3 87:11 89:24 91:23 94:22 99:22 106:21 111:5 114:7 119:7

122:2 127:3 129:17 131:22

**employees** 23:3,5,6 46:7 48:1 99:25 108:11 123:25 134:16 135:3

**EMR** 18:25 27:2 35:8, 11,14,23,25 36:7,11 61:15,25 62:12 68:22 80:21 82:5,24 83:18 95:13 96:7 107:14,17, 20 108:20 111:18,21 117:9 118:6 121:8,14

**EMR's** 62:5,18 77:4 81:6 82:11 116:24

**end** 12:6,15,21 19:15 29:14 31:2,6 34:6 90:10 120:24 133:11

**ended** 20:1,3

**ending** 101:2,3,5 108:5

**endurance** 29:14

**engaged** 39:20

**enhancements** 106:4

**enter** 16:19 106:21

**entered** 82:23 83:17 107:5

**entering** 106:15,25 107:13

**entire** 72:15

**entities** 134:15 135:2,9 136:1

**entity** 67:23 136:3

**Epic** 121:8,11,14

**equal** 135:20

**equals** 89:10

**equipped** 103:15

**error** 54:11

**essentially** 14:3 22:10 52:12 101:10,16 107:13

**establish** 13:5

**established** 63:3

**estimate** 9:5

**Evan** 11:1,6,19 23:8 33:15 38:13 40:7 49:25 50:25 51:13 70:13 100:10 106:8 113:15 118:23 119:13 122:14, 18 123:7,12 128:4 129:8 130:20

**event** 78:6 85:8

**evergreen** 124:23

**everybody's** 12:4

**exact** 25:19 26:1 41:14,15 50:5 135:14

**EXAMINATION** 6:14 134:4 136:16

**exchange** 38:13 85:3 110:22 123:22 129:7

**exchanged** 126:13

**excited** 100:18

**exclusively** 22:6

**execute** 103:12

**executed** 62:21 106:10,11 121:4

**exhibit** 36:24,25 37:2, 11,17,20 38:2 45:19 48:21,22,24 49:1,13 50:1,17 55:24,25 56:2,4 62:24 64:16,17,20,23 65:10 70:13 72:5,7,9, 13,14,16 81:10 85:11 86:16,22,25 87:6 88:14 89:14,21 91:11,12,17 94:8,9,11,13,15 96:10 99:10,17 109:25 110:20,21 111:3 113:17,19 114:1 118:11,16,21 119:4 121:17,18,24 126:16, 17,25 129:5,6,14 131:10,11,17 132:4 133:2

**exhibits** 64:25 65:6,7 71:2 86:18 136:20,23

**existence** 85:24

**existing** 22:24 51:25

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

**expect** 123:21

**expected** 133:12

**experience** 33:24 36:5 42:12 53:21 68:8, 14,24 69:6

**experiment** 134:10

**explain** 12:1 16:3 20:10 42:4

**explained** 19:14 70:14

**expressed** 103:20

**expressing** 67:12

**extends** 8:11,22

**extent** 13:1 16:13,18 54:5

**extract** 47:23 79:3

**extracted** 47:14 48:2,6

**F**

**facilitate** 27:24,25 43:11 46:19 52:14 101:16

**facilitating** 26:8 45:11 88:18 113:5

**facilities** 38:17 52:24 53:7,18,23 54:25 55:7, 20 62:3,17 68:21 76:3,7 83:11,23,24 85:25 86:4 94:3 101:16 102:18 106:5 132:7,18

**facilities'** 71:7

**facility** 26:15 28:3 29:23 30:14,15,20 45:12 46:6 67:25 71:3 78:7 81:12,16 84:23 96:19 98:4 101:20 103:11,24 108:10 121:8

**facility's** 28:1 109:21

**fact** 8:14 14:16 68:20 69:3 120:19

**fair** 11:16 21:15 23:12 37:25 39:24 40:10 41:17 43:19 44:25

53:20 73:20 78:5 137:14

**fairly** 123:4 135:20,23

**fall** 54:10 83:17

**falls** 95:14

**familiar** 127:14 134:20

**family** 33:21

**fast** 110:16

**faster** 12:5 133:11

**feature** 16:5

**features** 16:1,10 55:7 95:13

**feedback** 105:8,25

**feel** 13:12 72:16 132:21

**feeling** 42:22 48:15

**feelings** 33:24

**felt** 41:23 42:20

**Felton** 11:12,18,19 23:8,14 33:15

**female** 25:22

**Ferrara** 23:8,17,21,25 24:3,8 25:9 38:5 45:3 57:20 66:4,19 69:15 73:7,17 75:15,25 76:11 78:7 84:17 86:7 87:15, 25 88:13 90:18,21 93:5, 6 97:4,6 98:22 99:1 101:2,6,7 103:3 112:22 122:18,19 123:10 128:19,21,22 132:6 134:7,11 135:17 136:5, 6

**Ferrara's** 57:8,14 74:5 84:4 90:7,16

**file** 83:14 119:22

**filed** 32:4

**final** 24:23

**finally** 17:3 111:18

**find** 14:19 35:18 74:19 88:1

**finish** 13:20,22 62:24

**Fisher** 91:20

**five-minute** 64:6 133:10,12

**flow** 31:17 46:12 71:6 101:17 106:16 108:7 128:3

**flowing** 31:7

**focus** 31:20 37:21 72:15 84:3 86:6 89:5 90:4 92:11 100:9 127:5

**focused** 21:24 59:21

**folks** 41:4 100:10 113:20 123:12 125:11, 20

**follow** 86:10

**follow-up** 59:9 90:6 132:5 133:25

**follow-ups** 92:13

**Forbito** 91:20 94:25 99:14 106:8,13

**force** 12:7

**forget** 29:13

**forgot** 50:3

**forgotten** 114:20

**form** 55:11

**formatting** 125:6

**formula** 47:22 97:25

**forward** 52:6 117:9

**forwarded** 38:5,8 45:2 120:20

**forwards** 40:1

**foundation** 59:24 67:18 68:2 70:25 79:18 84:13 85:19 97:14 117:24

**fourth** 73:6

**frame** 135:21

**free** 72:16

**frequencies** 109:17

**front** 12:6 19:15 29:14 34:6 61:21 82:20

**full-time** 135:25

**fully** 86:9 106:11

**fun** 100:16

**function** 59:6 60:4 61:13

**functionality** 58:17 59:11 60:10 61:2,7 71:5 95:23 96:3

**functions** 60:5

**furnished** 83:11

**future** 123:22

**G**

**gain** 66:8 69:4 97:7,12

**gained** 54:21 68:8

**gave** 98:21 122:14

**general** 18:3 54:19 76:15 80:4

**generally** 8:5 9:19, 21,22 10:8 21:7 24:20 25:20 50:6 76:17 105:7 123:5,16

**generate** 83:24 84:19,23 132:8

**generated** 109:11, 17 126:11

**gestures** 14:4

**give** 11:24 18:2 45:25 104:12

**giving** 33:21 101:11

**Glenn** 66:3,7,19

**glitch** 36:20

**go-between** 102:4 112:19

**go-to** 129:1

**good** 6:16,19 51:12 106:9 111:17 119:13 124:15 134:6 135:6

**grant** 66:11 68:17

**granted** 66:23 67:16

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

granting 68:10

great 11:25 56:11 63:4 64:4 65:9 100:17 117:21 132:23 137:19

Greater 24:1

Green 24:19 123:8

Green's 24:22

Gregory 50:25

groupings 27:14

growing 124:25

guess 20:1 32:20 65:5 80:5 101:17

Gustman 112:6

**H**

handled 41:4

handling 12:2 26:14

happen 108:15

happened 43:14,16 81:4 85:3 128:3,12

happening 32:15

happy 29:19 88:23

head 14:4

health 17:18,22,24 18:7 19:1,5,8,11,22 22:3 23:18 35:9,15 41:25 42:5 43:25 66:21 101:4 107:11

Healthcare 57:2,4, 10 58:12,16 63:15 66:4, 17 70:3 92:3 95:1 100:1

hear 14:10

heard 15:15 34:2 97:19

hearing 121:3

held 21:15 50:3

helped 75:7

helpful 100:15

helping 57:5 87:20

helps 99:9

hesitant 40:3 42:25 130:14

hesitate 22:8

hesitation 39:3 129:23

high 18:2 20:9 27:7 29:9 47:17,20,21 57:13, 23 78:24 104:23 134:21

higher 61:24

hired 22:18

his/her 106:15

history 33:11

hold 39:3 73:16 129:23

home 15:24 58:19

home's 88:3

hope 86:8 90:5 111:16

hoping 6:23

hospitalization 54:11

hospitalizations 95:15

hours 135:12,14

housed 42:1 79:5

Huang 99:14

hypothetical 45:14

**I**

ICD-10 95:6 96:14

idea 83:2

ideas 106:2

identified 36:6,11 43:7 114:13 125:15

identifies 79:7

identify 7:12 23:6 49:9 75:7 84:10 94:4

if/when 107:16 108:19

imagine 8:19 81:4

impact 14:21 43:2,22 44:16,18

impactful 43:10

implementation 20:7,11,23,25 22:20 24:24 25:4 31:2

important 12:11 13:8 42:20

improvement 18:6, 10 106:2

in-between 22:10 128:17

incidence 103:14,17

incidents 54:10

included 40:20 60:7 83:12 96:2

including 50:20

Incomplete 45:13

inconsistency 13:5

increasing 61:20,22

Indiana 15:24 17:19

individual 30:2 47:7 76:11 93:9

individuals 11:16 17:13 24:17 30:20 50:20 52:25 66:4 69:16 73:8 77:3 92:3 107:10 125:15

information 8:13,18 11:5 22:12 26:18 29:25 30:12 33:2 35:15,16,17 39:12 42:20 44:1 48:2,9 54:2,7,17 55:21 75:11 119:17 123:22 127:9 130:7

informed 85:24

initially 11:12 31:1 57:20 72:20

initiate 101:19

ins 45:7

instance 67:14 80:10,25 81:3 104:12 116:23 120:23,25 121:7 135:16

instances 103:19

instant 16:5

instruct 84:18

instruction 55:6

instructions 12:2 53:6 55:14,19 60:4 78:16,17 88:24 89:7 107:12

integrated 22:21 62:10 121:10

integrating 51:21 98:4

integration 26:22, 24 27:2,11 28:6 30:4 31:3,6,13,19 36:14 38:20 39:4 43:14,16,22 44:8,16 45:7,11,22 50:9,11 51:8,10,14,18, 19 52:7,15 56:19 57:5, 9,14,18 58:5,9,11,12 62:18 63:15 65:23 66:9, 12 69:18 70:2,20 71:1, 12,18 76:20,21 77:5 80:16,18 81:2 82:17,18 83:16 87:20 98:13,15, 16 101:23 102:3,11,14, 17,23 103:2,8,12 112:16 114:10,22 115:17 122:22 129:24 131:2

integrations 26:15 35:3 43:12 62:2 76:24 77:21 80:12 83:19,20 88:18 92:8 102:20 114:25 121:14 123:19, 21,23 131:4

intend 16:25

intending 14:12

intent 31:12

intentionally 35:25

interactions 23:13

interchangeably 35:18 36:1,7

interface 18:16 27:25 105:2

interfacing 105:6

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

**internal** 63:4

**internally** 120:19 130:17

**interpose** 14:20

**interposed** 15:3

**interpret** 118:4

**interpretation** 118:5,8

**interval** 122:25

**introduce** 51:13 72:4 118:10

**introduced** 6:17 29:4 132:4

**Intus** 8:11,21 9:18,23 11:1,7,9 19:6,9,18,19, 24 20:2,5,14,17 21:4,13 22:5,11,21 23:2,3 24:3, 8,13 26:4,9,15,19 27:3, 7,10,13,18 28:3,6,8,9, 15,19 30:3,7,16 31:8 32:3,11,21 33:2,12,17, 20,24 34:2,8,9,25 35:25 36:5,13 37:18,24 38:2, 17 39:4,9,19,21 40:3,7, 17 41:1,8,23,24 42:12, 14,15,25 43:8,9,21,25 44:2,4,15 45:12,20,21, 25 46:1,3,5,7,12,18,21, 22,25 47:1,8,25 48:11 49:15,22 50:15 51:15, 22 52:13,20,25 53:2,6, 10,14,17,21 54:3,7,9, 21,24 55:1,6,8,20 56:6, 16 57:10 58:23,25 59:4, 6,8,12,21 60:3,4,7,10 61:2,6,11,14,15,20,22 62:2,5,16,21 65:12,19, 23 67:4,12 68:11,15,21 69:3,9,11,17 70:2,15,22 71:3,4,19,20,25 72:1 73:3,12 74:8,13 75:11, 21 76:2,5,13 77:2,13,24 78:9,15 79:2,3,11,13, 15,17,24,25 80:20 82:7, 14,16,22,25 83:4,13,18, 25 84:11,20,24 85:9,12, 23,25 86:2,14 87:2,12 89:17,24 90:8,25 91:1, 4,24 92:7,24 93:12 94:2,4,17,22 95:15 96:11,13,18,22,23,24

97:5,8,11,12 98:3,4,10, 12,17,25 99:7,11,22 100:9 101:4,6,19 102:5, 6,9,14,18 103:2,7,11, 20,23 104:2,6,11,21 106:15,22,25 107:5,14, 25 108:2,6 109:3,8,10, 16,20 110:23 111:6,11, 25 112:15,24 113:7,12, 22 114:7 116:19,23 117:3 118:25 119:7,10, 16,23 120:3,19,24 121:4,8,10,12,20 122:3, 6,20 123:25 125:3,4,11 126:3,20 127:3,11 128:10,24 129:10,17,24 130:4,14,18 131:13,22 132:3,9,11,19 133:4 134:16,24 135:5,9,13, 24

**Intus's** 27:25 71:7 84:16 134:12

**involved** 13:3 38:20 40:25 44:19 45:6 63:7, 14 65:18 72:22 73:2 76:25 78:12 79:25 80:15 102:2 103:18 114:21,25 115:3,11 120:5

**involvement** 85:18 102:10

**IP** 40:20

**issue** 46:7 52:24 53:7 71:3 97:8

**issued** 7:5 30:15 45:20 47:1 102:17

**issues** 74:9,13

**item** 126:10

**itemized** 55:20

**items** 58:17 59:22 60:20,21

**iterations** 81:15

**J**

**Jackson** 11:1,6,10, 18,19 23:8,14 33:15 38:13 40:2,7,13 41:7 42:4,20 70:13 100:10

101:22 106:8 122:18 129:8 130:17

**Jackson's** 43:8 104:9

**Janet** 99:14

**January** 94:16 110:22 113:21

**Jeff** 66:10

**Jeffrey** 66:3

**Joanne** 99:14

**job** 11:25 12:4 18:3 20:5,7 21:3,5,18 25:2,3, 10 27:23 31:11,13 43:2, 10,11,12,17 103:4 104:24 105:4 135:25

**joined** 98:9,12 114:25

**joining** 80:23

**July** 49:14,18 52:1 56:5,12 65:11,16 66:20 68:4,15

**jump** 20:20 100:8

**June** 99:10,19 111:1 113:21 114:4

**K**

**kind** 11:24 12:1 16:3 18:2 20:9 26:8,10,14 27:20,21,23,24 29:5 31:3,20,21 32:18 34:5 35:19,25 37:20 45:7,21 47:13 54:19 55:11,13 57:23 64:6 65:14 69:17 72:13 75:16 76:1,16 78:24 80:24 95:23 97:4 100:16 101:5 102:4 111:9 115:2 116:1,2 122:21,22,24 123:2 124:4,23,25 125:7,15, 22 126:2 132:5 133:13, 14

**kindly** 65:3

**knowledge** 19:10, 13 53:5 70:1 77:1 85:21 104:17,18 109:9,14 121:13,15 126:6

**L**

**L-A-U-R-I** 7:3

**lack** 116:1 128:25

**lacks** 59:24 67:18 68:2 79:18 84:13 85:19 97:14 117:24

**lane** 29:6,8

**language** 84:3 89:5 90:4 109:6

**largely** 124:4

**latest** 65:11

**Laura** 23:8 25:9 45:3 57:8,14,17,20 63:5,10 66:4,7,10,19 69:15 73:17 74:15 78:19 90:7 93:2 122:18 123:10 126:18

**Lauri** 6:11 7:3 66:12 88:6 93:10 115:7 118:23 126:18,23 129:8

**lawsuit** 24:5 32:1,4,7, 25 33:17,20

**lawyers** 7:25 8:2

**laying** 22:12

**layout** 115:23,25

**lead** 21:6,8,12,20,21, 22 22:23 50:8 114:24 130:19

**leader** 104:21,25

**leadership** 102:6 122:6,7

**leads** 26:3

**learn** 122:12 127:24

**learned** 34:25 67:5

**learning** 31:15

**leaving** 61:20,23 99:5

**Lee** 6:15,16 8:14,23,24 37:12 44:13,22 45:15 48:4 49:2,8,11,12 56:3 59:16 60:1 64:10,11,21 67:11,20 68:5,18 70:9 72:8 77:14,18 79:22

STENO.COM
(888) 707-8366

81:24 84:15 85:4,22 87:7 89:22 91:18 93:19, 21 94:14 97:15 99:18 110:1,6,8,9 111:4 114:2 118:1 119:5 122:1 127:1 129:15 131:18 133:1,4,6,8,19,20 136:17 137:8,14,19

**left** 24:3,8 28:22 32:11, 12 33:12 37:3 77:25 125:4

**legs** 64:7

**letting** 123:19

**Leuth** 131:12,15,24 132:13

**level** 18:2 20:9 27:7 29:9 47:17,20,21 57:13, 23 61:16 78:24 83:2 104:23 134:21

**Li** 74:18 76:12,24 77:3, 12,24 78:7,17 89:3 132:14 136:8

**Li's** 84:18

**liaison** 136:10

**License** 6:7

**Licensed** 6:6

**licensor** 68:9

**Life** 39:5 51:8,15 74:1 129:8,25

**light** 52:2

**limited** 23:14 30:19

**lines** 14:11 40:22

**Linked-in** 32:8 33:11

**list** 30:23 54:12,14

**listed** 113:24

**literature** 78:16

**litigation** 32:22

**loaded** 61:21

**locally** 30:7

**located** 83:3 124:1

**location** 79:6,7 82:24 83:17 93:11

**Logic** 61:25 62:3,7,17 82:1

**login** 30:15 45:25 46:1,7,8,10,11,18,20,25 47:6,22,23 48:1,7,8 54:22 59:12 96:21 101:18,19,20 107:1,5, 17 108:12,14,20,21 109:21 117:9 118:6 119:17 127:8,24

**logins** 30:3 101:11 108:7

**Lomeli** 66:16 69:3

**Lomeli's** 67:13 68:24 69:19

**long** 9:5 17:24 36:4 44:4 109:1 135:8,18 137:16

**longer** 71:20 108:7

**looked** 17:12 65:6,7 70:12 71:2 88:14 92:6 118:12 136:20,21,24

**lost** 83:22

**lower** 129:19

**lunch** 110:5

---

### M

**M-A-R-Q-U-A-R-D-T** 118:23

**made** 32:2 41:16,22 88:4 125:24

**main** 105:9

**maintained** 22:23 50:9

**make** 12:4,5,13,24 13:2,6,15,19,24 14:8,25 16:16 31:4 37:5,14 54:1 71:14 73:15 74:5

**makes** 95:3

**making** 6:24 42:24 107:21 111:17,25

**Malorie** 118:22 121:18

**manage** 24:13 57:5 62:2 66:21 80:12 87:20 107:15,24 108:3 109:6

**managed** 60:17 66:12 102:20 109:8

**manager** 20:23 25:4

**managing** 26:14 51:10 58:5 92:9

**manner** 44:7,15,17 76:1 117:7

**manual** 83:19 88:7 101:2,3,4 108:5,8,9 128:16,18 135:3 136:4

**manually** 83:13,15 90:10 134:16 136:1

**map** 46:12 75:5 79:7 80:11,16,17,25 81:10, 11,14,22 82:15,16 84:10 89:7,11

**mapping** 44:20 81:7

**maps** 55:17,18 78:19, 20,22 79:2,13,17 80:1, 19 82:1,5,10 83:10,23 84:5,18 85:18,24 86:4 93:14,23 94:2,6

**maps/data** 93:10

**March** 20:4 34:11 68:15 79:15 80:9

**Maria** 24:18,22 123:8, 14

**Marina** 66:16

**mark** 36:23,25 48:21 49:8 55:23 64:16 86:21 91:11 113:17 121:16 126:16 129:4 131:10

**marked** 37:11,16 49:1 55:24 56:2 64:20 72:7 87:6 89:21 91:17 94:13 99:9,17 110:20 111:3 114:1 119:4 121:24 126:25 129:6,14 131:17 136:19

**marking** 89:13 94:8

**Marquardt** 118:22 119:22 121:19

**Martinez** 39:9 129:21 130:3

**materials** 10:20 55:1

**matter** 6:25 9:21 44:8 111:10

**meaning** 84:17 90:14,15 124:24 125:20

**means** 93:1 117:14, 16

**meant** 42:7,10 74:15 100:23 108:5 111:25

**meantime** 120:18

**mechanism** 132:10, 22

**medical** 18:25 35:8, 14

**medication** 54:10

**medications** 17:5 54:10

**meeting** 8:19 126:13 130:22 131:3

**meetings** 122:21,24 123:2,3,6,17 124:3,8 125:14 126:4,8,9,11

**Melanie** 38:24 39:2,9 112:5,6,8 129:20,22

**member** 63:4 66:12 74:18

**memory** 17:6

**mention** 29:14

**mentioned** 8:25 15:7 57:19 63:5 125:18

**mentions** 76:11

**menu** 58:17 59:22 60:20,21

**message** 88:9

**messaging** 16:5

**method** 134:8,11 135:17

**metric** 27:15

**metrics** 93:12 95:18

**Michael** 63:6,11,19

**mid** 127:12

**middle** 83:8 100:11

**migrated** 22:22 31:19 103:2

**migration** 90:6 119:10

**mind** 6:25 13:20 35:10 90:18 109:24

**mindful** 14:16 60:15 72:12 85:15 110:17 120:3

**mine** 25:3

**minutes** 9:7,9 48:18 110:3

**Mireles** 66:19

**missed** 66:21 132:25

**Misstates** 44:10 77:11

**modified** 69:17 70:2 81:1

**moment** 10:11 20:20 48:22 101:14

**monitor** 16:9 135:25

**months** 24:1

**morning** 6:16,19,22 51:13 106:10 119:13

**move** 117:8

**moved** 32:22 101:9

**moving** 101:6 110:16

**multi-page** 37:20 72:13

**multiple** 77:3 125:20

---

**N**

---

**nag** 118:11

**names** 74:3

**nature** 26:1 27:10

**NDA** 39:10,12,20,23 40:3,18 41:1 42:2,3,24 43:6 71:21 74:14 75:22 92:25 97:8 98:18 119:22 120:6,7,9,20,25 122:7 126:2 127:12 130:5,7,11,14 131:2,8

**NDA's** 62:21 120:2 121:4

**necessarily** 115:23 131:7

**needed** 12:23 42:15 55:2,8,21 58:25 59:7,10 60:3,4 74:19 75:7 76:2 78:9 80:17 83:25 88:24 91:1 97:7 103:16 134:17

**negative** 33:24

**Neighborhood** 57:1,4,10 58:11,16 63:15 65:23 66:3,17,21 70:3 92:3,7,8 95:1 100:1,10 101:4 106:14, 20 107:11

**Nhcare.org.** 56:23

**nods** 14:4

**non-concretely** 80:3

**non-manual** 83:20

**nontechnical** 91:8

**normal** 53:21,24

**note** 14:18

**notes** 16:24 92:13 101:14 124:7 133:13

**November** 87:1,9

**NPA** 88:1

**number** 6:7 48:22 64:24 82:18 89:14,16 110:21 121:17,20 126:17 131:13

**numbers** 37:2,18 49:15 56:5 61:19 87:2 99:11 110:23 113:22 118:24 126:19

---

**O**

---

**oath** 12:7

**object** 8:7,11

**objection** 8:7 14:20, 23 15:2 44:10,17 45:13 48:3 59:14,24 67:8,10,

18 68:1,12 70:5 77:7,17 79:18 81:17 84:13 85:1, 19 97:14 117:24

**objectionable** 14:20

**obtain** 53:10 88:7

**obtained** 44:4,7 86:3 117:18

**occupied** 76:13

**occurred** 45:10 102:22

**occurring** 58:9

**October** 17:25 20:1 72:10,22

**offered** 71:24

**offering** 19:12 28:20 29:5

**office** 15:24

**officer** 11:7 23:18

**Ogburn** 24:18 123:8

**omit** 46:25

**onboard** 20:14 22:19

**onboarded** 22:20 25:4 86:9

**onboarding** 22:1 26:9

**Online** 34:20 95:11 134:25

**onset** 96:14,15

**open** 16:5,10

**opened** 52:1

**opening** 135:21,22

**operating** 11:6

**operations** 17:23 18:1,11,12,15 22:4 58:18 59:23 60:5,17,21, 24

**opportunity** 12:16, 22 13:3

**opposed** 67:17 68:21

**order** 13:4 20:22

39:10 46:19 47:2 48:21 52:7,14 55:25 59:11 64:17 71:4 76:2 78:9 81:1 83:11,25 86:22 89:14 91:11 94:3,9 95:7 97:12 107:6 110:20 113:18 118:11 121:17 126:17 129:5 130:5 131:10

**org** 113:20

**organization** 74:1 123:9

**organizations** 27:16 71:25 121:10

**organized** 116:3

**original** 10:25

**Ortega** 6:6 137:20

**outcomes** 18:21

**outlined** 86:10 88:13 93:2

**outs** 45:7

**owner** 68:9

---

**P**

---

**p.m.** 137:25

**PACE** 18:6,7 20:7,11, 13,24 22:19 24:24 25:3 26:15,20 27:2,16 28:1,3 29:23 30:14,20,22 31:1, 15 34:17,20,21,22 35:1, 4,16,17,21 36:1,6,11,17 38:16 41:9 42:1,13 43:9,10,22 45:12,20,24 46:5,6,9,13 47:3,11,15 51:25 52:3,14,24 53:1, 6,10,17,22 54:3,21,25 55:2,7,19 58:25 59:4 60:10 61:3,7,8,12,13, 15,25 62:3,6,16,17,22 65:23 67:16,17,24 68:9, 10,16,21 69:4 70:16,22 71:3,4,6,7,21,24 74:14 75:2,21 76:3,6,7,25 78:7 79:6,7,13 81:12, 13,14,15 82:1 83:11 84:11,16,23 85:9,13,25 86:4,14 87:15,16,19,22 88:3 90:2,25 92:24 94:3

96:19 98:4,18 101:10, 16,20 102:18 103:11,24 104:3,6 106:5,25 107:1, 5,21 108:10 109:3,11, 20,21 111:1,22 112:6, 12 114:10 117:16 119:10,23,24 120:20 121:7 122:8 127:20 128:6 131:25 132:7,18 134:15,24 135:2,9 136:1,3

**pages** 100:8

**painful** 137:17

**paragraph** 57:8 58:15 86:7 90:5 95:3 108:18 115:15 122:6

**part** 13:9 28:8 29:3 30:25 44:21 56:15 62:18 73:2 80:22 92:17, 22 112:16 137:4

**partially** 106:10

**participant** 83:17 95:6

**participants** 82:22

**party** 68:9,10

**passed** 102:5,22

**passing** 102:25 103:1

**password** 52:19 127:8,25

**pathway** 79:3 117:8, 9 118:6

**patients'** 42:5

**Paul** 113:20 116:20 117:21

**Paul's** 114:10 116:7

**PCO** 34:19,21

**people** 105:22 124:24

**Perfect** 110:1

**perfectly** 40:10

**performance** 18:6, 9,22

**permanent** 88:6

**permission** 66:23

69:3 86:3

**person** 46:11 129:1

**personally** 78:13

**perspective** 91:9

**phone** 16:4

**physical** 16:24

**picked** 128:22

**piece** 43:17 82:24

**pieces** 48:9

**pipeline** 28:2 31:10 46:19 71:6 100:19,23 101:10 104:13 107:6, 13,15,24 108:3,13 109:2,6,8 117:17 128:5 131:6

**pipes** 52:6

**pitch** 27:21

**platform** 27:4,8,13 28:6,10,16,18 29:21,24 30:4,6,16,21 31:8 36:20 44:2 46:3,15 47:2,24 48:11 51:22 54:9 59:8 60:8,12 71:8 72:2 76:3 79:3 84:1 98:5 105:9, 11,18,21 106:2 107:6 109:4,13 112:1 117:4 132:20

**platforms** 22:14

**point** 29:15 31:11 34:11 53:5 71:23 72:21 83:22 90:15 92:16 93:8 125:21 133:10,24 137:21

**points** 30:19 92:12 128:1

**populate** 59:7 60:12 72:1 76:3 78:10 83:5, 14,25 90:8 91:1 134:17

**populated** 30:6

**population** 23:18

**port** 95:5,11

**portion** 124:15

**ports** 96:20

**position** 8:9,21 17:21

18:1 25:17 39:17 50:2 67:13 68:25

**positions** 21:16

**posting** 32:8,13

**potentially** 13:4

**practices** 31:16

**prearranged** 136:10,13

**predicted** 35:19

**preferred** 30:23

**preliminary** 6:25

**preparation** 137:5, 10

**prepare** 17:14

**prepared** 12:17

**preselected** 95:17

**present** 37:8 80:8 110:19

**presentation** 27:20

**presented** 79:8

**presenting** 27:19

**presently** 16:1

**presume** 16:8 124:3

**presumptuous** 26:13

**pretty** 29:8 72:17

**previously** 57:19 70:12 89:8

**primary** 123:12 128:25

**prior** 19:22 32:1 34:2 41:13 65:2 68:19 80:6, 7,8,23 88:13 90:16 98:17 99:4 102:18,21 112:22 127:13 128:15

**privacy** 41:24

**privilege** 8:10,21

**privileged** 8:12

**problem** 54:12,13,14 85:5 128:5

**problems** 58:8

**proceed** 52:7

**proceeding** 8:9,17 12:5 13:3 15:8

**process** 43:22 45:11, 22 47:14 62:18 69:18 70:2,5,20 71:1,12,18,24 75:9,15,24,25 76:10,20, 22 84:17,22 85:10 86:10,15 88:13,17,23 89:6,10 90:15,19,21 91:7 93:2,5 97:5,6,11 98:7,16,19,20,22,25 99:1 100:4 101:2,3,6,7, 8,9,15,19 103:3,16 106:19 107:4,13 108:6 109:10,19 112:16,22 113:6 114:22 117:23 118:7 128:16,19,22 130:11 132:6,22 134:7, 12,21 136:4,5,6

**processes** 98:13

**product** 19:12 29:11 105:1 106:5

**professional** 23:21

**proficient** 28:9

**program** 18:6,7 27:3 30:7,22 45:24 46:13 47:11 51:25 53:1 67:17 117:16 128:6 134:17,25

**programming** 98:1

**programs** 20:13 26:20 28:5 42:13 43:15, 18 68:16 101:10 105:22,23 106:1 136:7

**progress** 88:5 111:17 126:2

**project** 57:5 66:9 80:16 81:2 87:20

**projects** 51:9 58:5,9 98:14 122:22

**pronounce** 50:21

**pronouncing** 76:12 114:13

**proposal** 40:22

**proposed** 40:18

LAURI WERTZ
AUGUST 19, 2025

JOB NO. 1900014

**proprietary** 39:11 130:6

**provide** 14:6,22 17:4 26:4 27:8 40:17 42:6, 16,17 44:2,5 53:6 55:6 58:7 67:24 75:13 76:6 88:7,8 94:4 112:10 117:7 127:15 137:11

**provided** 9:11 10:19 27:10 39:10 40:21 47:15 54:25 55:19 61:15 78:21 81:11,12 83:13,15,23 94:2 127:12 130:5

**providing** 78:17 84:10 85:25

**provisions** 40:21

**PTO** 112:9

**pull** 44:1 46:2 48:10 60:6 93:12 94:9 95:5,18 96:13 101:11 117:9 118:6 134:16

**pulled** 96:22,23 137:6

**Pulley** 51:1

**pulling** 27:15 88:24

**pulls** 135:3

**purpose** 69:13 95:15 123:16,18

**purposes** 14:17 23:9 27:19 31:12 36:9,13 51:14 77:4 83:5 88:17 113:5 132:6,19

**pursuant** 7:4

**put** 14:3 108:22 118:15 124:17,21

**Q**

**quality** 17:23 18:1,15

**question** 7:23 8:11, 12 13:10,11,12,13,14, 20,23 14:19,22 15:4 20:21 21:2 22:7 27:6 36:4 40:8 42:24 43:20 53:4 55:5 63:25 68:7 69:25 77:20 80:24 82:13 108:17 114:20

115:10 116:16 120:5 121:2 128:8 130:18 131:1 132:7

**questions** 29:21 31:16 32:18 34:6 59:10 72:16 94:17 103:16 134:1,6

**quick** 48:19 62:25 109:25

**quickly** 110:18

**quote** 59:22 108:3

**quote/unquote** 125:22

**R**

**random** 123:2

**range** 65:12 91:14 129:9 133:1

**ranges** 72:11 94:17

**rare** 128:13,14,15,21

**Rasa** 62:13,21 121:5

**reach** 11:14 74:18

**reached** 112:5,7

**reaching** 11:1 115:15

**reaction** 32:14 67:2, 5,10 68:3,4 70:3

**read** 6:9 33:11 49:4 56:9 64:17 73:23 77:19 86:23 95:4

**readily** 16:25

**reading** 73:22 74:22 93:17

**ready** 131:5

**realize** 112:9

**reason** 13:8,10 17:3 33:22 36:25 105:9 132:4

**reasons** 23:21,22 82:17

**recall** 7:16 9:16,17,25 10:1,2,4 21:5,7,10 23:11 24:7 25:18,19

26:1 40:6,9 41:2,14,15, 18 45:3 46:20 50:2,5 51:6 53:8,13,15,19 54:20,23 55:16,18,22 57:15,16 60:18 62:8 63:10,16,20,24 64:2 67:2,3,6,14 68:3,4 69:2, 5,17,20,23 70:1,7 71:23 73:22 76:13,14 78:14 85:2 94:5 96:10 97:9 99:4 102:12,13,15,22, 24 103:1,6,9,10,14,17, 19,22 104:1,2,4,5,8 105:20 108:16 112:19, 21,23 116:11,14,21,25 120:6,7,18,21,22,23 121:6 123:7 124:7,13 125:5,13,17 126:1 127:23,25 128:2,7,8,11, 24 130:10,12,17,19 132:10 136:13

**receive** 88:3 119:18

**received** 7:20 11:2 38:1 40:17 44:15,24 49:17,21 87:9,11 107:11 111:5 114:3,6 116:23 117:1 119:1,6 120:9,21 126:2,22 127:2 129:11,16 131:15

**receives** 119:16

**receiving** 32:2 69:2 120:6,7,24

**recently** 88:5

**recipient** 87:4 113:24

**recipient's** 56:22

**recipients** 99:25

**recognize** 125:12

**recollect** 24:11,12

**recollection** 9:20 25:1 29:2 41:22 45:24 52:23 53:16 54:6 57:3 58:24 60:16,23 61:18 63:18 80:10,15,19,23 82:6 93:23 97:11 116:18 117:16 120:4,15 121:3 122:11,13 123:5 132:17

**recollections** 105:17

**record** 6:17 7:1 13:18 16:13 25:12 37:16 43:25 49:13 56:4 64:8, 10,22 65:10 72:9 86:25 91:12 99:24 100:8 110:6,8,11,21 113:19 118:16,21 121:17 126:17 129:6 131:11 133:16,19 137:10,21

**records** 19:1 35:8,9 41:25 42:5 46:8

**red** 40:22

**refer** 19:18 34:21

**reference** 34:19 75:1 90:15 92:23 95:4 104:16 107:21,25 118:7

**referenced** 78:19 96:9

**references** 75:1 120:12

**referred** 18:25 28:15 35:22

**referring** 19:16,18 20:17 26:3 34:15 52:3 101:1 111:22 112:11,14 115:24

**refresh** 52:23 58:23 120:14 132:17

**refreshed** 75:9,12 92:19

**refused** 39:10 130:4

**regained** 86:14

**regular** 57:17 82:17

**regulation** 35:18

**reintegrating** 111:17,24

**related** 35:17 65:24 76:18 88:9

**relation** 33:1

**relay** 42:20

**relaying** 105:10

**remained** 23:3

**remember** 9:24 10:14 24:23 62:9,11 70:17 124:11

**reminder** 90:1 92:8

**remote** 15:8,10,16 124:4

**remotely** 123:25

**reorganize** 27:19

**repeat** 36:2 45:17 59:15 70:23 80:13 83:7

**rephrase** 22:8 61:4 67:19

**replica** 115:16

**report** 24:15 25:6,8 57:25 58:4 60:7 79:4,10 83:13 84:24 85:3 95:14, 17,19,21,22 96:1,6,8,9, 10,18,21,25 97:2 132:3

**reported** 25:9,11 50:12 57:20 58:1,2 69:14 114:16,18 115:1

**reporter** 6:5,7,9 12:18 13:19 93:16,20 110:4 137:22

**reporting** 57:24 58:17,18 59:6,11 60:3, 5,9,25 61:2,7,13 71:5 94:6 95:12,23 96:3 108:6 128:16,18

**reports** 24:14,16 59:7,11,13 60:11,22,24 71:25 74:19 75:5,7,10, 13,14 78:8,20 81:8 83:4,24 84:5,10,19 88:7,25 90:8,25 91:4 95:13 96:2 101:4 109:11,16 126:9 132:8, 11,13,19 134:16 135:22 136:1,8

**represent** 8:8

**representative** 90:2 104:11 119:14

**representative's** 104:12

**representatives** 30:14 100:1

**represented** 7:7,24 14:17

**representing** 6:18 8:16

**request** 57:8 97:25 115:16,24 137:8

**requested** 53:2 106:11 112:18 116:15

**requesting** 69:7 116:19 119:14

**requests** 133:25

**require** 39:12 59:4 108:10,12 130:7

**required** 27:10 42:5 83:4 107:4 134:15

**reset** 127:9,25

**resistance** 103:20

**resolved** 88:4

**respect** 22:3,14 50:1 58:9 63:25

**respond** 16:14

**responding** 42:23

**responds** 39:9 52:18 66:10 127:11 130:3

**response** 7:23 14:13,22 52:5 69:18,20, 22,24 70:4,8,21 75:20 93:1 132:9

**responses** 14:6

**responsibilities** 18:4 20:10 21:19,23 25:21 26:8 29:3 31:1 41:5 43:10,11,13 47:6 50:7 56:16 73:3 76:16 104:24

**responsibility** 14:22 22:24

**responsible** 106:14

**restate** 44:11 97:17

**result** 68:20 71:19,20

**resume** 100:18,23

**resumed** 103:3 107:4 109:19 111:9 112:2

**retrieve** 84:6

**retrieved** 75:6

**return** 127:13

**returned** 40:19

**review** 10:12,20 12:16,22 72:15 88:23 101:24 102:7 137:4

**reviewed** 9:16 10:5,8 73:21 118:13 137:9

**revised** 81:1 112:3 117:23 118:7

**rise** 98:21

**risk** 29:2,4,10 95:7

**road** 11:25

**Robby** 11:12,19 23:8 33:15

**role** 20:24 22:10 24:22 31:3,6,17,22 43:2 44:19,21 57:14,17 76:13 77:3 112:18

**roles** 24:21 113:15

**rolled** 28:23

**room** 15:9,11,19 16:19 54:11

**rote** 94:18

**Rothberg** 104:17,19 105:2,7 113:15 123:7, 14

**roughly** 9:13 10:12

**RTZ** 6:18 9:23 19:12, 16 24:8,12 32:4 33:2,25 34:3,7,10,13,14,25 39:4 40:18,21 41:1,8,12,22, 23 42:1 43:8 45:10,19, 20 51:24 52:2,9 53:10, 18 58:17 63:6 66:8,22, 23 67:16,23 68:8 69:4, 8,13 70:14 73:12 74:8, 12,13,19,20 75:1,6 81:21,22 84:6 85:17,24 86:3,8 88:4,5 90:6,8,25 92:17,23 93:12 99:2 100:4 102:21 112:9 115:16 119:10,13 120:3,20 122:7,8 126:3, 23 127:20 128:10 129:1,21,24 132:3 134:13

**RTZ's** 40:19 43:2,3,9, 21 70:21 71:20 75:21 76:25 92:23 98:17,21

**RTZ/PACE** 95:11

**RTZ/PCO** 95:5

**rude** 14:12

**RULE** 6:9

**rules** 11:25 15:9

**run** 59:7,11,13 79:10 81:8 83:4 101:10 108:12 110:15 117:17 133:13

**running** 31:11

**Runyon** 38:13,23 39:25 40:16 42:21 70:14 129:7,20,22 130:13

---

**S**

**S-N-E-H-A** 25:13

**Saint** 113:20 114:10 116:7,20 117:21

**sales** 27:21

**Sandra** 66:19

**Sarah** 87:15 89:15 110:25 111:16

**saved** 125:13

**schedule** 136:2,10, 13

**schema** 115:16,21, 22 116:4,7,19 117:4,7, 18,22

**schema's** 116:24

**science** 134:10

**scope** 103:4

**score** 95:7

**screen** 51:2 113:18 118:16 129:5

**script** 97:20,23,24 98:3,8,25

**scroll** 111:15

**Seattle** 88:2

**sections** 72:17

**secure**  45:25 46:1

**securely**  71:25 132:13

**securing**  47:6 102:2

**seek**  18:21 53:17,22

**select**  48:5 60:11 109:11

**selected**  53:1

**self-select**  109:16

**self-serve**  124:16,19 125:20

**send**  43:13 71:25 75:10,13,14 78:8 82:14, 16,20 84:20 90:7 93:10 119:17 132:11 135:25 136:11

**sending**  92:13 101:4 135:21

**Senior**  131:25

**Seniors**  113:20

**sense**  12:13,24 13:6, 15,24 14:8,25 16:16 31:4 37:5 71:14 80:4

**sentence**  42:8 59:20 108:17 129:22

**separate**  24:16 27:14

**September**  20:2,3 37:17 40:18 41:8 70:15 89:16,19 102:21 121:19,22 126:19,23 129:9,12 131:12,19

**served**  8:20 9:1 31:25

**service**  21:20 24:23 26:5 27:9 28:13,22 29:1,5,11 44:2

**services**  19:6,9 28:20 42:6,14,16,17 44:5 76:6

**session**  137:10

**sessions**  78:13

**set**  31:20 71:5 91:8 117:8

**setting**  74:7

**settled**  32:21

**share**  11:4 105:8 112:8

**shared**  124:20

**sheets**  55:6

**short**  20:22

**shorthand**  6:6 75:1

**shot**  78:2

**shoulder**  14:5

**show**  64:25 79:2,10 109:25

**showed**  133:3

**showing**  64:24 75:5 78:20 84:5

**shown**  65:1 86:19 137:1

**shrugs**  14:4

**sic**  111:1

**side**  18:10,11,12,16 22:4,5,6,9 45:6 76:19, 21 115:3,5

**sign**  39:10 40:3 42:25 115:7 127:14 130:5,15

**signal**  31:2

**signals**  32:1

**signature**  101:24 102:7

**signed**  39:13 115:6 130:7

**signing**  103:20

**silly**  32:18 34:6

**similar**  21:23 25:3 135:23

**Similarly**  13:17

**simplify**  55:5

**simply**  13:12 29:16 42:15 84:4,23 85:1

**simultaneously** 10:16 25:23 33:7 67:7 77:8 79:21 81:19 116:10

**single**  133:5

**sit**  9:15 32:24 33:23 36:15 63:13,17,22 70:19 85:15 105:16 123:10

**sitting**  15:22 16:6 78:14 135:17

**situation**  32:22

**skill**  31:20 91:8

**slow**  93:17

**smooth**  90:6

**Sneha**  25:11,12,22 113:20 114:14 115:7 118:4,8 122:15

**social**  23:21,23

**software**  20:15,16, 17,18 22:13 31:16 82:22 106:16,22,25 135:10

**solution**  88:2,6 100:4

**sort**  78:15 105:14 131:3

**sorts**  54:25

**sought**  69:3,13 135:4

**source**  55:19

**speak**  7:19 12:2 29:12 47:16 74:15 79:19 81:3 91:8 102:19 112:19 113:16 120:12

**speaking**  10:16,23 24:12 25:23 33:7 67:7 76:17 77:8 79:21 81:19 116:10

**special**  15:9,16

**specialist**  20:8,11, 25 22:20 24:23,25 31:2

**specialized**  77:4

**specific**  35:17 40:9 46:11,21 52:25 54:5 69:23 70:8 72:17,25 78:8 81:3 103:14,17 105:22,23 107:12 109:9 112:20 113:1 122:13

**specifically**  9:17 10:14 21:10 38:23

41:20 42:22 46:22 69:5 71:23 73:22 74:15 80:18 113:16 115:24 120:21,22 121:1 128:2 129:21 131:1

**specifics**  131:7

**speculation**  117:25

**spelled**  25:13

**spelling**  6:25

**spent**  97:3

**spoke**  7:13,14,15 23:9

**spoken**  7:9

**staff**  63:4 82:21 127:14

**stamp**  37:18 49:6,14 56:5 65:12 72:11 87:2 89:16 91:14 94:16 99:11 110:23 113:22 118:24 121:20 126:19 129:9 131:13

**stand**  57:1

**standard**  83:15 95:13 98:15,16,19,20

**standpoint**  36:16 44:8 45:8

**start**  37:2 55:15 104:13 105:23 119:16

**started**  19:25 20:3 25:9 32:20 33:12 34:9 61:19,24 79:13 80:20

**starting**  13:21

**startup**  106:3

**state**  6:7 41:7 75:4 107:23 122:5

**stated**  17:19 45:5 68:24

**statement**  42:12

**states**  39:2 51:12 74:6 88:22 93:8 106:9 108:18 111:11 119:10

**stating**  6:25

**status**  58:4 122:22 123:19,22 124:22 126:9

131:2

**stay** 92:14

**staying** 23:20

**STENO** 6:25 7:25 8:25 9:25 10:25 11:25 12:25 13:25 14:25 15:25 16:25 17:25 18:25 19:25 20:25 21:25 22:25 23:25 24:25 25:25 26:25 27:25 28:25 29:25 30:25 31:25 32:25 33:25 34:25 35:25 36:25 37:25 38:25 39:25 40:25 41:25 42:25 43:25 44:25 45:25 46:25 47:25 48:25 49:25 50:25 51:25 52:25 53:25 54:25 55:25 56:25 57:25 58:25 59:25 60:25 61:25 62:25 63:25 64:25 65:25 66:25 67:25 68:25 69:25 70:25 71:25 72:25 73:25 74:25 75:25 76:25 77:25 78:25 79:25 80:25 81:25 82:25 83:25 84:25 85:25 86:25 87:25 88:25 89:25 90:25 91:25 92:25 93:25 94:25 95:25 96:25 97:25 98:25 99:25 100:25 101:25 102:25 103:25 104:25 105:25 106:25 107:25 108:25 109:25 110:25 111:25 112:25 113:25 114:25 115:25 116:25 117:25 118:25 119:25 120:25 121:25 122:25 123:25 124:25 125:25 126:25 127:25 128:25 129:25 130:25 131:25 132:25 133:25 134:25 135:25 136:25 137:25

**step** 88:24 89:6 106:13

**stepping** 57:8

**STIPULATION** 6:9

**stop** 70:15 98:18

100:16

**stored** 27:18 30:7

**stretch** 64:7

**Strike** 77:17

**structural** 116:4

**structure** 116:2 125:7

**structured** 122:25 123:2,4

**stuff** 110:16 133:11

**subject** 9:21 51:7 56:18 73:11 100:3 111:10 114:9 119:9 132:2

**subjects** 126:3

**subpoena** 7:5,21 9:2 11:2 31:25 32:2 33:16

**subpoenaed** 10:25

**substances** 17:5

**success** 21:6,8,12, 21,22 22:23 24:22,24 25:10 74:8

**successes** 58:8

**successfully** 31:7

**suggest** 96:24

**Suite** 69:16

**super** 134:20

**supervisor** 58:1,3 122:15

**supervisors** 126:10

**support** 31:14

**supporting** 21:25

**suppose** 76:1

**surprised** 32:15,19, 20,22

**sworn** 6:12

**synonymous** 93:14

**system** 19:1,3 28:2 34:22 39:12 48:6 71:7 101:18 109:21 111:9 112:2,3,12 130:6

## T

**tab** 60:17

**Tabula** 62:13,21 121:5

**takes** 135:14

**taking** 6:21 8:9 12:18 26:18 124:7

**talk** 9:2 13:18 26:23 64:13 110:11 133:21

**talked** 8:25 9:6 10:24 11:17 17:10,12 23:24 33:16,19 49:25 70:20 71:12 93:10 106:20 120:2 131:3 132:5

**talking** 40:11 65:22 97:4 111:8 116:1

**teach** 20:14 43:15

**teaching** 22:12 28:5 43:18

**team** 18:21 22:11 24:13 26:19 28:1 31:15 46:2 47:10 66:8,11,13 74:17 75:10 77:22 80:5, 8 90:7 92:18 93:11 105:1 107:12 112:8,18 122:21,24 123:20 124:17 125:14,15 126:4,7 127:7 130:22 137:12

**teams** 31:15 50:8,11 82:19

**tech** 76:21 82:19 104:25 115:5 123:20 124:16

**technical** 36:16 45:8 76:19 77:22 113:10 134:20

**technology** 18:10, 16,20 22:5,6,9,10,11 26:19 27:25 28:1 29:10 36:20 44:20 45:6 46:2 47:9,10,25 50:11 104:20 115:4

**template** 95:17 125:25

**ten** 110:3

**tend** 35:18

**tenure** 128:10

**term** 26:23,25 46:25 97:19

**terms** 35:7 93:22 127:15

**testified** 6:12 8:20 85:16 134:19,23

**testifying** 12:8

**testimony** 12:23 13:2 17:1,4 22:17 44:10 68:19 109:15

**text** 16:5

**thing** 6:23 14:5 16:8 38:9 64:23 105:14 107:16 108:18

**things** 36:21 48:13 54:8 57:24 60:22 76:18 81:7 105:13 106:1 123:21

**thought** 64:5

**thread** 37:17,22 40:2 45:2 49:14,20 51:8 52:17 56:4 65:10,16,19 72:10,21 73:1,12 87:1 91:12 99:10 100:4 118:22 126:18

**threw** 35:7

**Thursday** 37:17 123:1

**time** 6:24 8:2,20 9:18 13:22 14:10,18 23:24 24:3,15 28:14,21 35:3 53:5 61:17,22 67:15 68:15 69:1,14 73:21 75:12 77:24 79:24 82:7 86:8 88:6 92:13 104:2 110:17 113:12 114:18 120:23 122:17,19,20 123:1,9 124:16,24 125:3,7,8,22 135:21 137:16

**timely** 117:7

**times** 9:2 16:3 24:16 47:9 128:9

timing  110:1

title  11:8 20:6,7,23
21:3,12 25:10,19 26:1
50:5 76:14 114:23

titled  21:5 119:22

today  6:23 7:4,7 9:15
14:17 15:20 17:1,4,14
32:24 33:22,23 36:15
63:13,17,22 64:3,25
70:19 85:15 92:13
100:18 105:16 110:5
135:18

today's  37:2

told  50:3

tool  22:21 27:13 30:13
46:11,14,18 79:9 83:6
85:12 108:22

top  37:21 38:4 40:1,12
45:1 66:3,16 87:3
104:25 110:24 115:14
130:13

topics  8:5

total  9:2 24:16

touched  53:25

track  92:14

train  78:7

trained  29:22

training  28:8 78:12
84:18

transcribed  14:2

transcript  12:16,17,
22 14:6

translate  14:5

transmit  86:4 109:3
135:9

trends  27:14,16

trial  12:8

True  62:14,17,22 82:1

truthful  12:12

TUESDAY  6:1

turned  16:1

Turning  49:16 50:17

type  14:5 22:23 27:20
48:5 55:1,3 58:12 94:2
95:21 130:21

types  15:9 28:20 48:2,
9,10 54:2,6,21 55:20
57:24 58:24 59:3,12
60:21,24 83:24

typical  115:7

---

## U

unable  17:4

undergo  21:12

understand  12:9
13:11 17:11 22:7,15
27:5 34:20,21 36:6 39:3
40:10 42:7 45:7 73:25
74:12 82:23 84:9,22
86:13 90:22 93:11
97:22,24 104:24 115:22
129:23 134:11

understanding
11:15 18:3 19:15 22:17
23:13 25:2 26:10,12,14
27:17,24 28:25 29:10,
23 30:12,18 32:25 33:1,
5,10 34:12,14,15,24
35:10,14,24 36:16
41:21,23 42:19 46:6,10
47:4,13,17,20,21 48:8
50:6,10,14 53:9 54:1
60:13,19 61:1 62:20
65:25 73:16 74:25
75:19,23 76:15,23
79:12,16 81:21,25 82:4
83:10 85:17 86:17
88:19 92:1 95:12 96:5
97:10 98:2,24 100:22,
25 101:1,17 102:16
103:15 108:21 109:7,15
112:24 113:1,4,9
115:20 116:6 117:13,
15,20 123:24 124:6,19
126:12 131:24

understood  22:2
27:7 30:24 31:18 32:23
33:13 45:22 46:16
47:12 48:12 68:6,19
71:22 83:21 95:20 98:6
126:15 134:21

undertake  10:20

unfair  128:8

unique  68:25

unpack  46:4 101:13

unreasonable
39:16

unrelated  48:13

upcoming  123:20

update  104:11
122:14 123:18 130:21

updated  75:9,12
80:21 124:10,14 135:5,
13

updates  58:7 81:6
124:17,22 126:1,10,12
136:8

upload  75:10 84:20,
24 88:3 90:9 91:4 97:7,
12 135:9

uploaded  85:11
109:12 132:20 136:12

URL  112:8,11,25
113:5

URL's  112:22

user  30:3 52:19 53:1
95:18 96:20 106:14

users  30:11,23

utilize  19:5 62:3
121:14

utilized  19:12 59:6
62:5 98:3 125:3

utilizing  35:4

---

## V

vague  44:17,18 48:3
59:14 67:10 68:1,12
70:5 85:1

Valparaiso  15:24

valuable  54:8 83:19

vendor  39:11 130:6

venue  131:7

verbal  14:6,13

verbally  126:13

versus  22:4 67:24
135:17,18

video  14:1

videoconference
137:2

videoconferencin
g  124:4

view  39:16 67:22 69:8
135:5

viewable  30:1

viewed  31:8

virtue  54:22

visible  27:3 111:25

visits  54:11

visualize  27:13

visualized  60:7

visually  27:19

---

## W

W-E-R-T-Z  7:3

wait  135:25

waiting  13:20

walk  74:18

Walters  49:25 50:2,
12,15,25 52:5,19
113:15 118:23 122:15
123:7,12 128:4

wanted  50:2 54:1
60:11 74:5 83:5 106:5
125:9 136:12

warn  36:19

Washington  88:2

water  29:16

web  112:10

Wednesday  122:25

weeds  47:18

week  75:8,14 92:18
112:9 135:3,6,7

**weekly**  90:9

**weeks**  7:20 9:1

**Weir**  7:17,18,25 8:6

**Wellbe**  17:18,21,24 18:7,22,24 19:5,8,11,22 22:3

**Wenxing**  74:18 75:7, 13 76:11 132:14 136:8

**Wertz**  6:11,16 7:3,4 8:8,25 11:21 17:17 36:24 37:8,20 48:23 49:16 55:24 59:19 64:12,17,24 65:14 66:12 67:9 72:5,12 77:10,19 85:16 86:7,18, 22 87:3 89:13,15,18 91:10 93:22 94:8,10,18 97:3 99:9 100:15 110:10,19,24 113:18,23 118:10,15,23 119:1 121:16,18,21 126:18,21 129:4,8,11 131:9,14 132:3 133:9,21 134:6 136:19 137:9,15

**wished**  106:1

**Won**  99:15

**word**  15:15 24:23 116:1 128:25

**words**  15:2 17:5 27:9 29:25 42:15 44:4 51:21 55:10 60:9,20 79:5 81:14 88:16 91:6 101:6 105:10 117:20 125:10 126:8 129:1

**work**  35:3 39:19 62:25 72:18 76:1 88:7 107:13 115:2,17 128:3

**workaround**  76:5 92:17,23 134:12

**worked**  20:13 22:24 77:12 82:7,21 116:24 121:9,13

**working**  28:22 34:2 52:6 80:20 81:2 113:13 119:16 121:8 122:6

**works**  11:9

**worries**  15:14 93:20

**write**  51:24 57:7 58:15 60:19 63:3 74:17 92:17 101:22 104:9 106:13 107:11 111:15,16 112:5 117:6 127:6 132:13

**writes**  40:16 66:7,18 86:7 87:25 115:15 119:13 127:11 129:22 130:14

**writing**  14:3 36:12 92:3 107:10 127:20

**written**  47:22 54:25 55:11 78:18

**wrong**  38:11 77:14 123:24

**wrote**  50:20 56:12,15 118:4,9

---

## Y

**years**  40:11 60:15 68:8

**Yehuda**  50:21 51:1, 12,13 52:18 74:17

**yesterday**  119:14

---

## Z

**Zawadski**  63:6,11, 19,23

**Zoomed**  49:3